## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3
 4
 5   SOLU-MED, INC.,           )
                               )
 6            Plaintiffs,      )
                               )
 7      vs.                    ) Case No. 0:10-CV-60487
                               )
 8   YOUNGBLOOD SKIN CARE      )
     PRODUCTS LLC,             )
 9                             )
              Defendants.      )
10   _____)
11
12
13
14      VIDEOTAPED DEPOSITION OF JASON TOTH, M.D.
15                  ENCINO, CALIFORNIA
16             MONDAY, DECEMBER 9, 2019
17
18
19
20
21
22
23
24   Reported by: Wendy J. Wright
                   CSR No. 11607
25
```

## Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3
 4
 5   SOLU-MED, INC.,           )
                               )
 6            Plaintiffs,      )
                               )
 7      vs.                    ) Case No. 0:10-CV-60487
                               )
 8   YOUNGBLOOD SKIN CARE      )
     PRODUCTS LLC,             )
 9                             )
              Defendants.      )
10   _____)
11
12
13
14      Videotaped Deposition of JASON TOTH, M.D.,
15      taken on behalf of the Plaintiff, at
16      15760 Ventura Boulevard, 7th Floor, Encino,
17      California, commencing at 10:06 a.m., Monday,
18      December 9, 2019, before Wendy J. Wright,
19      CSR No. 11607.
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES OF COUNSEL:
 2
 3   For the Plaintiff:
 4        GOODMAN & SAPERSTEIN
          BY:  STANLEY R. GOODMAN, ATTORNEY AT LAW
 5          666 Old Country Road
            Suite 200
 6          Garden City, New York  11530
            (516) 227-2100
 7          gsesq600@aol.com
 8               -- AND --
 9        BLACK LAW, P.A.
          BY:  KELSEY K. BLACK, ATTORNEY AT LAW
10            (Via telephone)
          1401 East Broward Boulevard
11          Suite 204
            Fort Lauderdale, Florida  33301
12          (954) 320-6220
            kelsey@kkbpa.com
13
14
15   For the Defendants:
16        COLE, SCOTT & KISSANE, P.A.
          BY:  JONATHAN VINE, ATTORNEY AT LAW
17          222 Lakeview Avenue
            Suite 120
18          West Palm Beach, Florida  33401
            (561) 383-9200
19          jonathan.vine@csklegal.com
20
21   Also Present:
22        TODD BULLOCK, VIDEOGRAPHER
23
24
25
```

## Page 4

```
 1                  I N D E X
 2
 3   DEPONENT:            EXAMINATION BY:      PAGE:
 4   JASON TOTH, M.D.     MR. GOODMAN              7
 5
 6
 7   EXHIBITS FOR IDENTIFICATION:
 8   Plaintiff's
 9      1 - Notice of Deposition, 3 pages.       8
10      2 - Answers to Interrogatories,
            5 pages.                            39
11
        3 - Complaint, 42 pages.                58
12
        4 - Answer and Affirmative Defenses,
13          8 pages.                            58
14      5 - Letter from Youngblood, 1 page.     65
15      6 - Amazon article, 8 pages.            66
16    * 7 - Plastic bag containing product.     83
17    * 8 - Plastic bag containing product.     87
18    * 9 - Plastic bag containing product.     89
19     10 - Email string, 9 pages.              95
20
21
22   QUESTIONS INSTRUCTED NOT TO ANSWER:
23      (None)
24
25      * Exhibits retained by counsel.
```



Page 5

1          I N D E X (Continued)

2

3   CONFIDENTIAL PORTION:

4      PAGES 80 - 82

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1              ENCINO, CALIFORNIA

2       MONDAY, DECEMBER 9, 2019, 10:06 A.M.

3

4       THE VIDEOGRAPHER:  This is tape number one to

5   the videotaped deposition of Dr. Jason Toth, in the

6   matter of Solu-Med, Inc., versus Youngblood Skin

7   Care Products, LLC, et al., being heard before

8   United States District Court, Southern District of

9   Florida, case number 0:19-CV-60487.

10          Today's deposition is being held at

11   15760 Ventura Boulevard in Encino, california.

12   Today's date is December 9, 2019.  The time on the

13   record is 10:06 a.m.

14          My name is Todd Bullcok.  I'm the

15   videographer.  The court reporter is Wendy Wright.

16          Counsel, will you please introduce

17   yourselves and affiliations, and the witness will be

18   sworn in.

19       MR. GOODMAN:  Stanley R. Goodman, counsel for

20   the plaintiff, Solu-Med, Inc.

21       MR. VINE:  Jonathan Vine with the law firm of

22   Cole, Scott & Kissane.  I represent the

23   defendants.

24       MR. GOODMAN:  And Kelsey is on the phone.

25       MS. BLACK:  Yes.  Kelsey Black for the

Page 7

1   plaintiff, and I'm attending this deposition by

2   phone.

3

4          JASON TOTH, M.D.,

5          having been first duly sworn, was

6          examined and testified as follows:

7

8              EXAMINATION

9   BY MR. GOODMAN:

10      Q    Dr. Toth -- is that the right

11   pronunciation of your name?

12      A    Correct.

13      Q    All right.  I'm here on behalf of the

14   plaintiff, Solu-Med, with the purpose of asking you

15   certain questions relevant to this lawsuit.

16          I will be asking you a series of

17   questions based upon allegations made in the

18   complaint by my client as against Youngblood Skin

19   Care Products, LLC.

20          I would appreciate it -- I'm sure your

21   counsel has instructed you as to the conduct of a

22   deposition.  The court reporter cannot take down

23   shrugs, nods of the head or anything like that, so

24   just try to give straightforward answers.

25          If there's anything you don't understand

Page 8

1   about my questions, please let me know and I'll be

2   glad to rephrase it for you.

3          You understand that?

4      A    Yes.

5      Q    All right.  And you are appearing here

6   today on behalf of a company by the name of

7   Youngblood Skin Care Products, LLC.

8          I'm going to show you what will be marked

9   as Exhibit No. 1, which is the notice of your

10   deposition.

11          And I'd ask you to please look at that.

12          (Plaintiff's Exhibit No. 1 was

13          marked for identification and is attached

14          hereto.)

15      Q    BY MR. GOODMAN:  And have you read the

16   third page, which is Schedule A?

17      A    Yes, I have.

18      Q    Have you seen this document before?

19      A    Yes, I have.

20      Q    And is there any reason why you could not

21   testify today to all of the topics listed on

22   Schedule A?

23      MR. VINE:  Objection.

24          You can answer.

25      THE DEPONENT:  No.



JASON TOTH, M.D.                                                December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                                          9–12

Page 9

1    Q   BY MR. GOODMAN:  Excuse me?
2    A   There's no reason why I should not be
3  able to --
4    Q   All right.
5    A   -- address all of these.
6    Q   All right.  I presume you're not taking
7  any medication at this time that would decrease your
8  ability to answer these questions?
9    A   Correct.
10    Q   All right.  Dr. Toth, what is your
11  relationship to the defendant?
12    A   Pauline Youngblood -- formerly
13  Pauline Youngblood is my wife.  Now is Pauline Toth.
14  We are married approximately five years ago.
15        Pauline founded the company approximately
16  23 years ago, and I joined the company approximately
17  two years ago on a part-time basis as, primarily, a
18  CFO/vice president role.
19    Q   And would you just explain, please, what
20  your responsibilities are as the CFO since you
21  joined the company two years ago.
22    MR. VINE:  Objection.
23    Q   BY MR. GOODMAN:  Go ahead.
24    A   At the time that I joined the company, we
25  were experiencing some significant year-over-year

Page 10

1  revenue losses.  One of my roles at that time was to
2  identify areas and strategies that might help in the
3  turnaround of the company.
4        One of those areas was reviewing our
5  e-tail presence, or lack of presence, and digital
6  strategy, and then otherwise reviewing the monthly
7  income statements and assist the accountant in
8  preparation of taxes.
9    Q   What is your educational background?
10    A   Undergraduate degree from University of
11  California San Diego in biology, master's degree at
12  George Washington University in environmental
13  health, medical degree from George Washington
14  University, and residency training in emergency
15  medicine at L.A. County.
16    Q   Until the time you joined the plaintiffs,
17  Youngblood Skin Care Products, what was your work
18  background?
19    A   I continue to own and operate an urgent
20  care practice and practice full-time as an urgent
21  care physician.  Prior to that, I was an emergency
22  medicine physician for approximately 20 years.
23    Q   During that period of time, had you had
24  any experience in the cosmetic field?
25    A   No.

Page 11

1    Q   Now, in addition to what you told me
2  before about your duties as the CFO, did you have
3  any other responsibilities with respect to the
4  company?
5    MR. VINE:  Objection.
6    Q   BY MR. GOODMAN:  Go ahead.
7    A   Well, assist in identifying strategies
8  and areas of focus that would present an opportunity
9  for future growth.
10    Q   Anything else?
11    A   I'm involved with authorizing and
12  overseeing the hiring and recruitment of new talent.
13    Q   Did there come a time within the past two
14  years -- let's go back to November of 2018 -- that
15  you became familiar with an e-commerce seller by the
16  name of Solu-Med, Inc.?
17    A   Yes.  I only became aware of them as a
18  result of Solu-Med initiating the lawsuit.
19    Q   Well, prior to the initiation of the
20  lawsuit, which I will represent to you was commenced
21  sometime in, I believe, February of 2019, were you
22  at all familiar with the company Solu-Med?
23    A   Only to the extent that I know that they
24  had filed a complaint and requested a retraction to
25  our brand partner Amazzia.

Page 12

1    Q   Would you please explain your last
2  answer.  I didn't get it.
3    MR. VINE:  Objection.
4    MR. GOODMAN:  I didn't understand --
5    MR. VINE:  What don't you understand about it?
6    MR. GOODMAN:  I just didn't understand the
7  question.
8    MR. VINE:  Just repeat your answer.  We can
9  have her read it back, if you want.
10    MR. GOODMAN:  Yeah.
11    THE DEPONENT:  Could you do that, please.
12        (The following record was read by
13    the reporter:
14        "A   Only to the extent that I
15    know that they had filed a complaint and
16    requested a retraction to our brand
17    partner Amazzia.")
18    Q   BY MR. GOODMAN:  Would you tell me,
19  please, what is Amazzia?
20    A   Amazzia is a company specializing in both
21  the brand protection, marketing and e-tail selling
22  of brands on Amazon marketplace.
23    Q   If you look at topic three of the notice
24  of deposition, it says you are familiar -- or, I
25  presume you're familiar with communications between



JASON TOTH, M.D.                                    December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                              13—16

Page 13

1  Youngblood Skin Care Products and Amazzia regarding
2  Solu-Med's offering of Youngblood products on Amazon
3  in November of 2018 and thereafter.
4         What did you learn about Solu-Med's
5  offering of Youngblood products on Amazon in
6  November of 2018?
7     MR. VINE:  Objection.
8         You can answer.
9     THE DEPONENT:  We learned that they had -- our
10  partner Amazzia had reported them to Amazon as
11  selling counterfeit and inauthentic product.
12  Solu-Med, in return, communicated a complaint to
13  Youngblood requesting a retraction.
14     Q    BY MR. GOODMAN:  Did Amazzia advise
15  Youngblood in November of 2018 that Solu-Med's
16  products, meaning Youngblood's products, on Amazon
17  were, in fact, counterfeit?
18     A    Yes.  Their position was that -- because
19  only Amazzia and ourselves were the only authorized
20  sellers on Amazon, that anyone else selling the
21  product on Amazon was by definition inauthentic, and
22  because they were inauthentic, they didn't possess
23  the warranty or the guarantee that the product was
24  handled and shipped and stored in the conditions we
25  would expect our distributors.

Page 14

1     Q    You used the term, just in your earlier
2  response, that Amazzia advised you that the goods
3  that Solu-Med was offering was counterfeit.
4         Do you know what "counterfeit" means?
5     MR. VINE:  Objection.
6     Q    BY MR. GOODMAN:  Go ahead.
7     MR. VINE:  You mean how Amazon defines it?
8     MR. GOODMAN:  No.  I said how he understands it
9  to be.
10     MR. VINE:  Okay.
11     THE DEPONENT:  Yes.  I understand it to -- and
12  this is quite clearly laid out in many of Amazon's
13  communications on their anti-counterfeit policy
14  seller's platform, product quality and integrity
15  guidelines, that authentic means new, and new means
16  original packaging with original invoices with
17  guarantees as to the quality and performance of the
18  product.  Anything other than that is considered
19  inauthentic, and because it's inauthentic, it's
20  counterfeit.
21     Q    BY MR. GOODMAN:  Can you tell me what of
22  Amazon's policies you are aware of that defines
23  counterfeit products?
24     A    I believe Amazon has a specific -- I
25  believe they call it anti-counterfeit policy.

Page 15

1     Q    And do you know what that policy is?
2     A    I believe I just stated it.
3     Q    Have you ever looked into the policy
4  itself?
5     MR. VINE:  Have you ever read it?
6     THE DEPONENT:  I've -- yes I've read their
7  policies online
8     Q    BY MR. GOODMAN:  Can you tell me what
9  policy that is that you're referring to?
10     A    I believe it's their anti-counterfeit
11  policy, the definition of what product is that's
12  considered new and authentic.
13     Q    Now, in November of 2018 --
14     MR. VINE:  Just for the record, November 2018?
15  We're not saying it's November 18th.
16     MR. GOODMAN:  No.
17     MR. VINE:  Okay.  I just want to make sure the
18  record is clear, because it sounds like you're
19  saying November 18th.
20     MR. GOODMAN:  Let me go back.
21     Q    When, to your knowledge, did
22  Youngblood -- I'll just refer to Youngblood.  I'm
23  not gonna go through the whole thing of Skin Care
24  Products.
25         Okay.

Page 16

1     A    (Nods head.)
2     Q    When did Youngblood become aware
3  initially that its products were being offered on
4  Amazon by Solu-Med?
5     A    It wasn't until sometime after the formal
6  complaint was filed.
7     Q    Would you agree with me that the
8  complaints filed with Amazon were filed on
9  November 11th and November 13th of 2018?
10     MR. VINE:  Objection.  Document speaks for
11  itself.
12     MR. GOODMAN:  There's no document before him.
13     MR. VINE:  Well --
14     Q    BY MR. GOODMAN:  Go ahead.
15     A    Can you show me a document to that?
16     Q    No.  Just answer the question --
17     MR. VINE:  He asked you for something.  Don't
18  direct my client to do something that he doesn't
19  have to do.  That's inappropriate.  Back off.
20     MR. GOODMAN:  Let's continue.
21     Q    Were you aware in November of 2018 that
22  the company Youngblood had filed complaints with
23  Amazon alleging that Solu-Med's offering of
24  Youngblood products on Amazon were, in fact,
25  counterfeit?



JASON TOTH, M.D.                                    December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                    17–20

Page 17

1    A    Yes.
2    Q    All right.  And what was the basis for
3  that notification to Amazon?
4    MR. VINE:  Objection.  Asked and answered.
5       You can answer it again.
6    Q    BY MR. GOODMAN:  Go ahead.
7    A    The basis for that notification to Amazon
8  was that they were not an authorized seller by
9  Youngblood on the Amazon marketplace, and,
10  therefore, we could not guarantee that the product
11  they were selling was either authentic or current or
12  stored and shipped and handled in the manner in
13  which we expect all of our distributors and
14  wholesale accounts to handle the product.
15    Q    Were there any other resellers on Amazon
16  in November of 2018 that were offering Youngblood
17  products?
18    MR. VINE:  Objection.
19    THE DEPONENT:  Yes, I suspect there were
20  dozens.
21    Q    BY MR. GOODMAN:  You suspect.
22       Do you know that there was more than our
23  client, Solu-Med?
24    A    Yes, I do.
25    Q    You know the names of those?

Page 18

1    A    No, I do not.
2    Q    Did you -- did Youngblood notify the
3  other resellers that they likewise were not
4  authorized and, therefore, were selling counterfeit
5  products?
6    A    Youngblood had first, before we
7  on-boarded Amazzia, per their recommendation,
8  communicated at least two weeks prior to on-boarding
9  Amazzia that we informed all of our wholesale,
10  retail and distributor accounts that no one was
11  authorized to sell on Amazon.  After that, all
12  communications were by Amazzia.
13    Q    Can you give me an approximate date when
14  those notices were sent?
15    A    September 1st.  I believe we on-boarded
16  Amazzia somewhere around mid-September 17, 2018.
17    MR. VINE:  And you had to finish your statement
18  about what Amazzia did with the Amazon people who
19  were selling the product.
20    MR. GOODMAN:  Thank you.
21    THE DEPONENT:  So, yes, Amazzia referred many
22  resellers to Amazon and filed complaints on our
23  behalf.
24    Q    BY MR. GOODMAN:  Do you know whether
25  specifically Amazzia, in September or October of

Page 19

1  2018, notified Solu-Med that it was offering
2  counterfeit products?
3    MR. VINE:  Objection.
4    Q    BY MR. GOODMAN:  Go ahead.
5    MR. VINE:  I don't even -- can you repeat that
6  question?
7       (The following question was read by
8       the reporter:
9       "Q    Do you know whether
10    specifically Amazzia, in September or
11    October of 2018, notified Solu-Med that it
12    was offering counterfeit products?")
13    Q    BY MR. GOODMAN:  Offering -- Solu-Med was
14  offering counterfeit products?
15    MR. VINE:  They weren't a distributor.
16    MR. GOODMAN:  We know that --
17    MR. VINE:  Fine.  Objection.  Lack of
18  predicate.
19    MR. GOODMAN:  Understandably, your attorney is
20  even entitled to make all the objections he deems to
21  be appropriate.  It doesn't restrict you from
22  answering the question, providing you understand it.
23    MR. VINE:  I haven't directed him not to
24  answer.
25    MR. GOODMAN:  I know.

Page 20

1    MR. VINE:  It's a lack of predicate and lack
2  of --
3    THE DEPONENT:  I understand the question.
4       I don't think Amazzia would have filed a
5  notice.  I think they simply filed a complaint
6  directly with Amazon.
7    Q    BY MR. GOODMAN:  Well, you previously
8  said that Amazzia notified sellers on Amazon that
9  they were not authorized.
10    MR. VINE:  No --
11    MR. GOODMAN:  I'm just --
12    MR. VINE:  Objection.
13       You didn't say that, by the way.
14    THE DEPONENT:  What I meant to say was that we
15  informed all of our customers -- wholesale, retail
16  and distributors -- that no one was allowed to sell
17  on Amazon.
18    MR. VINE:  You said that.
19    THE DEPONENT:  After that, Amazzia was engaged
20  as our brand protection partner on Amazon, and any
21  communications by Amazzia were up to them.
22    Q    BY MR. GOODMAN:  So as I understand it,
23  then -- as I understand it, then, Youngblood did
24  notify all of its authorized distributors that it
25  was not to sell Youngblood products on Amazon?



JASON TOTH, M.D.                                     December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                                21—24

Page 21

1    A    Correct.

2    Q    Okay.  Now, let's go back to Amazzia.

3         When did Youngblood first become

4  acquainted with the company known as Amazzia, Inc.?

5    MR. VINE:  Objection.  Asked and answered.

6         You can answer it.

7    MR. GOODMAN:  Let him, please.

8    MR. VINE:  I know.

9    THE DEPONENT:  I think they had first emailed

10  my former GM perhaps late 2017/early 2018.  At the

11  time, we were using another brand protection company

12  called Marketplace Valet.

13    Q    BY MR. GOODMAN:  Who was your last GM?

14    A    Geovanna Waters.

15    Q    And what was her responsibilities with

16  Youngblood?

17    A    She was responsible for overseeing all

18  day-to-day operations in all departments.

19    Q    And she was the one who contacted

20  Amazzia?

21    MR. VINE:  Objection.

22    Q    BY MR. GOODMAN:  Did she contact Amazzia?

23    A    She approached me as to whether we wanted

24  to look into them, and I said yes.  And I believe

25  she placed the initial communication.

Page 22

1    Q    And what did she tell you the reason for

2  contacting Amazzia was?

3    A    Well, we were looking to further protect

4  our brand from the diversion discounting and the

5  diminished reputation of the brand by these

6  resellers, and at that time, I was investigating

7  several brand protection companies.

8    Q    You refer to discounting of your

9  products.

10         What do you mean?

11    A    I mean all distributors and wholesale

12  partners understand that we need to protect the

13  manufacturered -- our minimum asking price, MAP.

14  So, technically, anything that's advertised and

15  marketed below MAP without our authorization is an

16  unauthorized discounted product.

17    Q    Was there any other concerns of

18  Youngblood with respect to authorized distributors

19  offering Youngblood products?

20    MR. VINE:  Objection.  Asked and answered.

21    Q    BY MR. GOODMAN:  Go ahead.

22    A    You're asking me, was there a concern

23  that we had our own office --

24    Q    When you say discounting was one of them.

25    MR. VINE:  He actually said -- just so the

Page 23

1  record's clear, he said discount, he also said

2  dilution of the name and reputation, which goes into

3  the issue of selling inauthentic products.

4    THE DEPONENT:  Yes, we have other concerns.  A

5  lot of these resellers are selling discontinued

6  product or expired product or product that's been

7  possibly repurchased or remanufactured from other

8  who knows how many third parties.

9    Q    BY MR. GOODMAN:  Is that your

10  distributors who were doing those things?

11    MR. VINE:  Objection.

12    Q    BY MR. GOODMAN:  Go ahead.

13    A    In some cases, I suspect yes.

14    Q    Now, with respect to -- you used the

15  term "brand protection."

16         What were you seeking to do about brand

17  protection?

18    A    All of these brand protection companies

19  have their own proprietary strategies and methods,

20  but first and foremost is eliminating or identifying

21  those resellers that are suspected of discounting or

22  selling discontinued or expired product.

23    Q    Did you meet with representatives of

24  Amazzia in September of 2018?

25    A    Yes.

Page 24

1    Q    All right.  Who did you meet with?

2    A    I believe there were four individuals in

3  the room from Amazzia at that time about the initial

4  on-boarding.  William, one of the -- William Samuel,

5  one of the owners of the company, Jamie Daniel and

6  Yoji.

7    Q    Does Jamie have a last name?

8    A    Yes, she does.

9    Q    What is that?

10    A    I'm blanking out at the moment.

11    MR. VINE:  Siegel.

12    THE DEPONENT:  Siegel.

13    MR. GOODMAN:  Siegel?

14    Q    And Daniel?

15    A    I forget his last name, as well.

16    MR. VINE:  We have it.  It's been in the

17  production.

18    Q    BY MR. GOODMAN:  Is the name LaBlanc?

19    A    Excuse me?

20    Q    Is the name LaBlanc?

21    A    Yes, that sounds correct.

22    Q    Who else did you meet with?

23    MR. VINE:  He also mentioned Yoji.

24    MR. GOODMAN:  Hmm?

25    MR. VINE:  He also mentioned Yoji.

Page 25

1    MR. GOODMAN:  Yoji?
2    Q    And who on behalf of Youngblood joined
3  that meeting?
4    A    Geovanna Waters, who's no longer with us.
5  Medical leave.
6    Q    What was her response -- was she the CFO?
7    A    She was the GM, operations director.
8    Q    And when did she leave the company?
9    A    Several months ago.
10    Q    And under what terms did she leave?
11    MR. VINE:  Just --
12    THE DEPONENT:  Medical leave.
13    Q    BY MR. GOODMAN:  Did she resign?
14    A    Yes.
15    Q    Was there any particular reason she
16  tendered her resignation?
17    MR. VINE:  Other than -- don't say her health
18  condition, but just you can just say --
19    THE DEPONENT:  She was underperforming.
20    Q    BY MR. GOODMAN:  And when did she leave
21  the company?
22    A    I think, approximately two months ago.
23    Q    Was her leaving the company because of
24  underperformance in any way related to this lawsuit?
25    A    No.

Page 26

1    Q    Was there also an individual employed by
2  Youngblood by the name of Covenian?
3    A    Scott Giovanni.
4    Q    Scott?
5    A    Giovanni.
6    Q    And what was Scott's position?
7    A    Scott was formerly VP of digital strategy
8  and e-tail commerce.
9    Q    Did he join in the meeting with Amazzia?
10    A    No, he did not.
11    Q    And I have another name, and I'll show
12  you some documents -- emails.  Covenian.
13    A    Roxana Covenian.
14    Q    That's it.
15    What was her responsibility?
16    A    She's no longer with the company, but her
17  responsibility was primarily brand regulation;
18  composition -- she was a chemist -- being compliant
19  with various standards in the manufacture,
20  production and marketing of the products.
21    Q    To your knowledge, did she have anything
22  to do with the complaints that were filed with
23  Amazon regarding Solu-Med's alleged offering of
24  counterfeit products?
25    A    No.

Page 27

1    Q    And when did she leave the company?
2    A    Approximately seven months ago.
3    Q    Was her leaving the company related in
4  any way to the lawsuit?
5    A    No.  Roxana had no-to-minimal involvement
6  with the lawsuit.  She went on to take a
7  higher-level position with another company.
8    Q    And after the meeting -- excuse me.  I
9  withdraw that.
10    Did the meeting with Amazzia take place
11  at its corporate offices?
12    A    Yes.
13    Q    And after that meeting, did Youngblood
14  enter into a contract with Amazzia?
15    A    Yes.
16    Q    And do you remember or do you have any
17  recall of the day that it entered into that
18  agreement?  I will show you a document later on.
19    A    I'm thinking that it's on or about
20  September 17th.
21    Q    I think you're right.  It was around that
22  time.
23    And do you recall, sitting here today,
24  what the terms of the agreement were, particularly
25  with regard to the performance by Amazzia on behalf

Page 28

1  of Youngblood?
2    MR. VINE:  Objection.
3    Q    BY MR. GOODMAN:  Go ahead.
4    A    No.  But you could -- if I could see
5  Exhibit B of that distributor agreement, it could
6  refresh my memory --
7    Q    I will in a moment.
8    But just sitting here, do you have any
9  recollection of the terms of the agreement and what
10  Amazzia was to do on behalf of Youngblood, just
11  generally?
12    A    Generally, yes.  I think Amazzia proposed
13  that they would have, I think, 70 to 90 percent of
14  the marketplace cleaned up of resellers within
15  60 days.  I think they had a forecast sales growth
16  of $600,000.
17    I believe their discount was, initially
18  they wanted 40 percent off of wholesale, and I think
19  we were in -- we were gonna revisit that in
20  90 days.
21    Q    Could you further explain the financial
22  arrangements made with Amazzia.  What was the fee or
23  the scale by which they were supposed to be paid?
24    A    Well, they purchased the product at an
25  agreed-upon distributor discount.  And the product

JASON TOTH, M.D.                                                December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                                29–32

Page 29

1 was delivered straight to them, and then they in
2 turn resold it through their two resale channels.
3     Q    So Amazzia was retained or engaged as a
4 distributor of Youngblood products?
5     A    Correct.
6     Q    And were they engaged to offer for sale
7 the full line of Youngblood products?
8     A    Yes, they were.
9     Q    And what was to be their consumer
10 population?  Who were they selling to?
11    A    You mean --
12    MR. VINE:  Online or in the stores?
13    THE DEPONENT:  Oh, strictly limited only to the
14 Amazon marketplace.
15    Q    BY MR. GOODMAN:  And that became
16 effective in September of 2018?
17    A    Yes, I believe so.
18    Q    So am I to understand that Amazzia was
19 engaged as a distributor of Youngblood products and
20 they purchased Youngblood products for resale?
21    MR. VINE:  Objection.
22    Q    BY MR. GOODMAN:  Go ahead.
23         That's my understanding.  Is it yours?
24    MR. VINE:  No.  He also talked about brand
25 protection --

Page 30

1     MR. GOODMAN:  Well, I'll get to the distributor
2 end of it.
3     THE DEPONENT:  Right.  They were our authorized
4 seller on Amazon.
5     Q    BY MR. GOODMAN:  And when did they
6 actually place Youngblood products on Amazon's
7 platform?
8     MR. VINE:  Objection.
9     Q    BY MR. GOODMAN:  Go ahead.
10    A    I think there was at least 30 to 45 days
11 of paperwork and on-boarding and purchasing the
12 product and the getting the product to their
13 resellers.  I would say late October/early November.
14    Q    Who were their resellers?
15    A    Well, they had two stores, La Chique
16 Boutique and Nature Glow.
17    Q    Was Youngblood and Amazzia aware at that
18 time, in September of 2018, that Solu-Med was
19 offering Youngblood products on Amazon's platform?
20    MR. VINE:  You can't speak for Amazzia, but you
21 can speak for Youngblood.  You weren't --
22    THE DEPONENT:  Yeah, I was not aware.
23    Q    BY MR. GOODMAN:  Now, did at some time
24 between the retention of Amazzia by Youngblood in
25 September of 2018, did it advise Youngblood that

Page 31

1 Solu-Med was offering Youngblood products on
2 Amazon's platform?
3     A    No, they never mentioned Solu-Med by
4 name.  There were dozens of unauthorized sellers
5 selling Youngblood product.  I did not and we did
6 not keep track of them, and we specifically engaged
7 Amazzia to track those unauthorized resellers.
8         And many times, as they were eliminated,
9 they would show up possibly under another dba.  We
10 call it whack-a-mole.  As soon as you'd eliminate a
11 dozen, another dozen would show up.
12    Q    I just want to go back for a moment.  If
13 I missed it, please forgive me.
14         Was Youngblood in any way informed, in
15 September of 2018, that Solu-Med was a reseller of
16 its products on the Amazon platform?
17    MR. VINE:  Objection.  He answered that.
18         But you can say it.
19    MR. GOODMAN:  But --
20    THE DEPONENT:  No.
21    Q    BY MR. GOODMAN:  No.
22         And when, for the first time, did
23 Youngblood became -- become aware of the fact that
24 its products were being offered by Solu-Med on
25 Amazon?

Page 32

1     MR. VINE:  Objection.  Asked and answered.
2     Q    BY MR. GOODMAN:  Go ahead.
3     A    I think I indicated only after we became
4 aware of a formal complaint by your firm on behalf
5 of Solu-Med.
6     Q    Mm-hmm.
7     MR. VINE:  Just so it's clear, because he
8 testified to this, there were a number of,
9 apparently, stores that were reselling inauthentic
10 products, and they didn't necessarily go by the
11 specific name of the store or owner or the dba of
12 the store.
13        So he may have not heard the name
14 Solu-Med, but, as he testified, he was advised about
15 people selling inauthentic products.  Not just not
16 authorized.  Inauthentic.
17    Q    BY MR. GOODMAN:  Do you know what the
18 difference is between counterfeit and inauthentic?
19    MR. VINE:  Objection.
20    Q    BY MR. GOODMAN:  Go ahead.
21    MR. VINE:  Based upon Amazon's?
22    MR. GOODMAN:  No.  Based upon Youngblood's
23 knowledge.
24    MR. VINE:  Okay.
25    MR. GOODMAN:  It was Youngblood who filed the



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
33–36

Page 33

1   complaint.
2        MR. VINE:  Right.  And Youngblood goes by what
3   Amazon does.
4        THE DEPONENT:  Right.  I think I've
5   communicated that it was our understanding that
6   Amazon's policy is that unless the product is
7   purchased and new, sold by an authorized dealer in
8   its original packaging with its original warranty
9   and its original guarantees, stored and shipped and
10  handled by our standards, then it's considered
11  inauthentic.  And if it's inauthentic, it's
12  counterfeit.
13       Q    BY MR. GOODMAN:  And that was your
14  understanding based upon Amazon's policy?
15       A    That was our understanding based on
16  Amazon's policy, and that was reiterated by Amazzia.
17       Q    And who at Amazzia provided you with that
18  information?
19       A    I think Jamie and Daniel.
20       Q    Mm-hmm.  I believe you testified that the
21  first time you became aware of the complaints made
22  to Amazon by Youngblood was upon the filing of this
23  lawsuit?
24       MR. VINE:  Objection.
25       THE DEPONENT:  Well, filing of -- to clarify

Page 34

1   that, the initial legal communication that came to
2   us prior to actual filing of the lawsuit.
3        Q    BY MR. GOODMAN:  I'll represent to you
4   that this case was filed sometime in February of
5   2019.
6             Is it your testimony that between
7   September of 2018 and February 2019, you had no
8   knowledge of the complaints that were filed with
9   Amazon?
10       MR. VINE:  Objection.
11       Q    BY MR. GOODMAN:  You can answer.
12       A    No.  We became aware of complaints
13  somewhere around December.
14       Q    And how did you become aware of them?
15       A    I believe a complaint was filed with our
16  labor attorney, who -- and he in turn shared that
17  complaint with us.  I believe that was my
18  recollection that's the very earliest --
19       MR. VINE:  He'll show you.  If you need a
20  document to refresh your recollection, he'll show
21  you.
22       Q    BY MR. GOODMAN:  Who was your labor
23  attorney?
24       A    Barry Kellman.
25       Q    And where is he located?

Page 35

1   A    He's here in the Valley.
2        Q    And he's still your labor attorney?  I
3   mean Youngblood's.
4        A    Yes.
5        Q    And is it your testimony that Mr. Kellman
6   is the one who advised you, meaning Youngblood, in
7   December that complaints were made to Amazon as to
8   the sale of its products by Young- -- by Solu-Med on
9   Amazon?
10       MR. VINE:  Objection.  Mischaracterizes his
11  testimony.
12       MR. GOODMAN:  Well, then let him answer it as
13  best as he understands it.
14       Q    Is it Mr. Kellman who told you in
15  December of 2018 that Solu-Med was offering
16  Youngblood products that were counterfeit on Amazon?
17       A    Yes, I believe so.
18       Q    Up until that time, meaning from
19  September of 2018 till Mr. Kellman's communication,
20  then Youngblood had no idea of any complaint being
21  filed?
22       MR. VINE:  Complaint by what?
23       MR. GOODMAN:  Complaint by Youngblood that
24  Solu-Med was offering counterfeit products.
25       THE DEPONENT:  No, I have no recollection of

Page 36

1   any communication prior to that.
2        Q    BY MR. GOODMAN:  All right.
3        A    Can we break for just a minute to get a
4   water?
5        Q    Sure.  I'm sorry.  You can break at any
6   time.
7             (Discussion held off the record.)
8        THE VIDEOGRAPHER:  This is the end of tape
9   number one.  We're off the record at 10:46 a.m.
10            (Recess was taken.)
11       THE VIDEOGRAPHER:  This is the beginning of
12  tape number two.  We are back on the record at
13  10:53 a.m.
14       Q    BY MR. GOODMAN:  Doctor, I have been
15  somewhat remiss.  I have been referring to the store
16  on Amazon as being Solu-Med, which is the company,
17  rather than the store name, which was Life and
18  Health Source.
19            Is that familiar to you?
20       A    Yes.
21       Q    Now, if you can just recall the questions
22  I've asked you, each time I've referred to Solu-Med,
23  would you agree that it was Life and Health Source
24  that we're talking about?
25       A    Yes.  I would agree that we were made



JASON TOTH, M.D.                                         December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                                    37–40

Page 37

1  aware of Life and Health Source filing a complaint
2  sometime after Black Friday.
3     Q    After Black Friday.  You're talking
4  about --
5     A    Late November.
6     Q    -- late November?
7        And what did you learn on or about Black
8  Friday?
9     A    Well, we learned that Amazzia had
10  requests -- had reported a number of stores as
11  filing inauthentic and not new product, and Life
12  Source, I believe, had requested a retraction -- and
13  I'm not sure exactly when they actually requested
14  the retraction, but it was on or about sometime, I
15  think, late November/early December.
16     Q    Well, do you know what gave rise to Life
17  and Health Source requesting a retraction of a
18  statement made to Amazon that it was offering
19  counterfeit Youngblood products?
20     A    Well, ultimately we became aware that
21  Life Source was alleging that Amazon had shut down
22  their storefront.
23     Q    And did Amazzia prepare a notice, to your
24  knowledge, to Life and Health Source -- no; strike
25  that -- to Amazon that Life and Health Source was

Page 38

1  offering Youngblood products which were counterfeit
2  on its platform?
3     A    Yes.
4     Q    All right.  And did you in any way,
5  meaning you on behalf of Youngblood, participate in
6  the -- in preparing the notice to Amazon?
7     A    No.
8     Q    Then to your knowledge, who did
9  participate in writing the notice to Amazon?
10     A    Lisa Garrett at the time was director of
11  sales.  I believe Amazzia communicated to us, via
12  Alisa Geovanna, the elements that needed to be
13  contained in a communication to Amazon if we want to
14  request a retraction --
15     MR. VINE:  No.  He's talking about the original
16  notice of complaint.  The original complaint -- that
17  was Amazzia.
18     THE DEPONENT:  So it isn't clear to me, so if
19  you can --
20     MR. VINE:  We have to stop using the word
21  "complaint."
22     THE DEPONENT:  That would be useful.
23     Q    BY MR. GOODMAN:  Well, let's talk about
24  Amazzia.  Let's get it straight.
25        Who prepared the notice to Amazon?

Page 39

1     MR. VINE:  About?
2     MR. GOODMAN:  The counterfeit products --
3     MR. VINE:  Okay.
4     MR. GOODMAN:  -- being offered by Life and
5  Health Source.
6     THE DEPONENT:  So are you talking about who's
7  responsible for filing the initial complaint?
8     Q    BY MR. GOODMAN:  I think we're getting
9  there.
10     A    That is Amazzia.  They were engaged
11  purposefully for that purpose.
12     MR. VINE:  Now we're clear.  Because your
13  question -- you're leaving out a lot of facts, and I
14  think there were a couple notices --
15     MR. GOODMAN:  Well, I'm sure he's aware of a
16  lot of things.  We're just trying to get to it.
17        Let me see if we can make this a little
18  easier.  I've marked as Exhibit 2 Defendant
19  Youngblood Skin Care Products answers to the first
20  set of interrogatories.
21        (Plaintiff's Exhibit No. 2 was
22        marked for identification and is attached
23        hereto.)
24     Q    BY MR. GOODMAN:  I would like you to just
25  review these five pages and make certain that you're

Page 40

1  familiar with it.  Take your time.
2     A    Okay.
3     Q    Doctor, now that you have reviewed
4  Exhibit No. 2, do you recall seeing this document at
5  any time prior to today?
6     A    Yes.
7     Q    And on page five of Exhibit 2, is that
8  your signature?
9     A    Yes, it is.
10     Q    And you certified, you verified, at that
11  time that the statements contained, or the
12  responses, are true, to the best of your knowledge?
13     A    Yes.
14     Q    All right.  Now, prior to signing this,
15  can you tell me who assisted in the preparation of
16  these responses?  I'm not interested in your
17  attorney.
18     MR. VINE:  You could -- you could say, "My
19  attorneys" and the names of people.  Names are not
20  privileged --
21     Q    BY MR. GOODMAN:  That's right.
22     MR. VINE:  -- so you could say our firm and
23  anybody --
24     Q    BY MR. GOODMAN:  Yes.
25     A    As indicated in question one,



Page 41

1  Geovanna Waters and Rachel Kier, and myself
2      Q   Now, what information did Ms. Waters --
3  is it a woman, Geovanna?
4      A   Yes. Yes.
5      Q   What information did she provide?
6      A   I think just offering her consensus that
7  this was our position.
8      MR. VINE: Wait, wait, wait. I just want to
9  make sure it's on record.
10         If conversations occurred where I was
11  present or Ryan was present, then we won't answer
12  those, so -- because I know a lot of information was
13  with phone calls. But go on.
14      THE DEPONENT: Okay.
15      Q   BY MR. GOODMAN: Go ahead.
16         Other than what Mr. Vine has put on the
17  record, what information did she provide that was
18  based upon records of Youngblood?
19      A   I don't think she provided any
20  independent information that together we didn't
21  either already know or I knew.
22      Q   All right. Who was Rachel Kier, K-i-e-r?
23      A   She's our current e-commerce account
24  representative. She's been with us less than six
25  months.

Page 42

1      Q   To what extent did she contribute to the
2  responses of this document?
3      A   Well, only to the extent that she
4  reviewed and managed the relationship with Amazzia
5  at that point. So she was familiar with Amazzia's
6  management agreement with us.
7      Q   All right. Next page, page two,
8  interrogatory number two: Please describe your
9  relationship with Amazzia and list and describe any
10  contractual relationship.
11         "You" doesn't mean you personally. It
12  means the company. All right?
13         Would you agree, the answer, which -- the
14  answer is, "Youngblood first signed and engaged
15  Amazzia on September 17, 2018 --" is that correct?
16      A   Correct.
17      Q   "-- to provide marketplace enforcement
18  from counterfeiters --" I'll stop at that point.
19         Was there a problem that Youngblood was
20  faced with, with respect to counterfeiters at that
21  time?
22      MR. VINE: Objection.
23      Q   BY MR. GOODMAN: Go ahead.
24      A   Well, before we engaged Amazzia, we could
25  tell by reviewing Amazon ourselves that there were

Page 43

1  dozens of resellers on Amazon selling product that
2  was very out of date. Some images we didn't even
3  recognize.
4         And so, again, I can't speak specifically
5  to Solu-Med or their --
6      Q   Well, Life and Health --
7      A   Life and Health Source, but as a general
8  rule and consideration, yes, we had very legitimate
9  concerns that the brand reputation was being
10  degraded and diminished on a daily basis from
11  consumers who were purchasing products that were
12  potentially expired or fake.
13      Q   All right. At that time, in September of
14  2018, did Youngblood have any specific information
15  that Life and Health Source was selling counterfeit
16  Youngblood products on Amazon?
17      MR. VINE: Objection. Asked and answered.
18      Q   BY MR. GOODMAN: Go ahead.
19      A   Only to the extent that we knew that they
20  were -- all resellers were not authorized and,
21  therefore, the products were not guaranteed as new,
22  as we understood them to be.
23      Q   And that's your understanding, that if
24  they were not authorized, they were not new and they
25  were inauthentic?

Page 44

1      A   Correct.
2      MR. VINE: Objection.
3      Q   BY MR. GOODMAN: Is that your answer?
4      MR. VINE: Objection.
5      Q   BY MR. GOODMAN: Go ahead.
6      A   Yes, I believe I've stated that
7  previously.
8      Q   And that is based upon Youngblood's
9  understanding of Amazon's online policy?
10      A   Correct.
11      Q   And prior to September 17, 2018, had
12  Youngblood sought enforcement as against the
13  unauthorized resellers of its products?
14      MR. VINE: Objection.
15      Q   BY MR. GOODMAN: Go ahead.
16      A   Yes. We had partnered with another brand
17  protection company for approximately six to nine
18  months.
19      Q   What was the name of that company?
20      MR. VINE: Objection.
21      A   Marketplace Valet.
22      Q   BY MR. GOODMAN: What?
23      A   Marketplace Valet, V-a-l-e-t.
24      Q   Where are they located?
25      A   San Bernardino.



Page 45

1    Q    And was Amazzia engaged in place of
2  Marketplace?
3    A    Yes.
4    Q    Now, after Amazzia entered into the
5  contract in September of 2018 with Youngblood, did
6  there come a time between September 17th and
7  November 11th that Amazzia advised Youngblood that
8  Life and Health Source was offering counterfeit
9  Youngblood products on Amazon's platform?
10    A    No, I have no independent recollection of
11  Amazzia informing us of that particular store.
12  Amazzia was, in fact, reporting dozens of resellers
13  selling inauthentic product.
14    Q    At any time between September 17, 2018,
15  and November 11th of 2018, did Youngblood purchase
16  on Amazon any of its products offered by Life and
17  Health Source?
18    A    No, I have no -- it was not our policy to
19  do so at the time.
20    Q    Mm-hmm.
21        At any time between September 17, 2018,
22  and November 11, 2018, did Youngblood compare any of
23  Life and Health Source's Youngblood products with
24  its own retained samples of those products?
25    A    No, I have no recollection of doing that.

Page 46

1    Q    And after Amazzia notified Youngblood
2  that Life and Health Source was offering counterfeit
3  Youngblood products, did Amazzia notify Amazon of
4  that fact?
5    MR. VINE:  Objection.
6    Q    BY MR. GOODMAN:  Go ahead.  To your
7  knowledge.
8    MR. VINE:  I think he testified that Amazzia --
9  he was not aware about selling it, or Life and
10  Health individually.
11        But you can answer the second --
12    MR. GOODMAN:  I think he can answer that.
13    MR. VINE:  Okay.  Go ahead.
14    THE DEPONENT:  So Amazzia didn't ask or inform
15  us specifically of all of the stores that they were
16  going to report to Amazon prior to reporting them.
17  That was -- they were engaged specifically to do
18  brand protection for us and to take that initiative
19  for us.
20    Q    BY MR. GOODMAN:  Okay.  Let's go to
21  interrogatory number three:  "Please list the person
22  or persons responsible for the information contained
23  within the two complaints you made --" and I'll
24  suggest to you, responsibly, that that means
25  Youngblood "-- made to Amazon on November 11 --" and

Page 47

1  it says 2013, which is a typographical error "--
2  that the alleged plaintiffs' store Life and Health
3  Source was selling counterfeit products" --
4  "counterfeit Youngblood products."
5        Answer: "Jamie Siegel and Daniel
6  LaBlanc, Amazon's account managers assigned to
7  Youngblood."
8    MR. VINE:  Objection.  Amazzia's.  It says
9  Amazzia, not Amazon.
10    MR. GOODMAN:  Okay.  You like that
11  pronunciation, I'll give it to you.
12    MR. VINE:  No.  You said Amazon.
13    MR. GOODMAN:  Did I say Amazon?
14    MR. VINE:  Yeah.
15    MR. GOODMAN:  Oh.  I meant Amazzia.  It's hard
16  with --
17    MR. VINE:  Okay.
18    MR. GOODMAN:  Forgive me.
19    MR. VINE:  No, that's fine.
20    THE DEPONENT:  That's intentional.
21    Q    BY MR. GOODMAN:  Huh?
22    A    Amazzia is a confluence of Amazon and
23  amazing.
24    Q    It gets to be a little confusing.
25        Do you know whether Amazzia has any

Page 48

1  relationship with Amazon?
2    A    Well, I don't know if they have any
3  relationships I'm unaware of, but it's my
4  understanding that they do not.
5    Q    All right.
6        Would you agree with the answer that
7  there was two complaints made to Amazon on
8  November 11th -- and the typographical error is that
9  it says 2013.  It should have been 13 -- it was
10  November 11th and November 13th.
11        Do you agree with the answer that
12  complaints were made at that time?
13    MR. VINE:  Objection.
14    Q    BY MR. GOODMAN:  Go ahead.  Read it.
15    MR. VINE:  There's nothing -- it's not about
16  reading.
17        Do you agree that were on those dates, or
18  they exist on those dates, yes or no --
19    Q    BY MR. GOODMAN:  I'll eliminate the
20  typographical error.  Just go with November 11th.
21    A    Yes, I think the record speaks for
22  itself.  If that's the dates the complaints were
23  filed, then that's the dates that they were filed.
24    Q    So let's try to straighten this out.
25        Who made the complaint?



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
49–52

Page 49

1   A    Which complaint?
2   Q    November 11th.
3   A    Well, I don't know specifically who in
4  Amazzia actually pulled the trigger and filed the
5  complaint. I can't speak for them. They have a big
6  team.
7        Jamie and Daniel were our account
8  representatives, so either they themselves did it,
9  or they have an entire department that's devoted to
10  filing complaints with Amazon.
11   Q    Was Youngblood made aware that a
12  complaint, as I have described it, was being placed
13  with Amazon on November 11th concerning Life and
14  Health Source selling counterfeit Youngblood
15  products?
16   A    No, not to my knowledge.
17   Q    So, then, Youngblood had no knowledge of
18  this at that time?
19   A    Yes, that's my position.
20   Q    And when did you come upon this
21  information that's contained in the answer to
22  interrogatory number three?
23   A    Well, I think somewhere on or about very
24  last week of November -- I believe there was a
25  communication through the brand protection email

Page 50

1  that we first became aware.
2   Q    I'd like you to, please, go to page
3  three, interrogatory number five: "Please name the
4  author of the November 29, 2019, email from the --"
5  and that's a email address; I believe that's
6  Youngblood's email address "-- that informed
7  plaintiffs' counsel, Stanley R. Goodman, that
8  Youngblood agreed to file a retraction with
9  Amazon."
10       The answer was, "Alisa Garrett,
11  Youngblood Mineral Cosmetics previous Director of
12  Sales."
13       I think you testified that she's no
14  longer with the company?
15   A    Correct.
16   Q    Do you know her present whereabouts?
17   A    She went with a startup. The answer to
18  that I don't know, but that startup folded and she
19  reached out, I think, a couple months ago just
20  saying that she was available. So to answer your
21  question, no, I don't know where she's at.
22   Q    Are there any records at Youngblood that
23  may indicate where she's presently located or the
24  home address?
25   A    We certainly would have her home address

Page 51

1  in our employee file.
2       MR. GOODMAN: Jonathan, I would ask you if you
3  could please provide that.
4       MR. VINE: Sure. When you say "that," you mean
5  her address?
6       MR. GOODMAN: Specifically, yeah.
7       MR. VINE: He mentioned file.
8       MR. GOODMAN: Yeah, well --
9       MR. VINE: I'm not providing the file, but I'll
10  provide --
11       MR. GOODMAN: I think it's quite evident what
12  I'm looking for.
13   Q    Now, did you see the email sent by
14  Alisa Garrett informing myself on behalf of my
15  client that Youngblood agreed to file a retraction
16  with Amazon?
17   A    Yes. I believe it's included in the
18  Schedule A.
19       MR. VINE: Objection.
20   Q    BY MR. GOODMAN: So there's no question
21  that Youngblood did agree to file a retraction?
22       MR. VINE: Objection. Objection.
23   Q    BY MR. GOODMAN: Go ahead.
24   A    Well, we agreed to file a response with
25  Amazon that we had resolved our differences and that

Page 52

1  by filing that, that was in no way an admission by
2  us that the products weren't somehow authentic. And
3  part of the condition of that retraction was that
4  Solu-Med would no longer sell Youngblood products.
5   Q    But that was not contained in the
6  November 29, 2019, email, was it?
7   A    Well, show me the email, please, and I'll
8  refresh my memory.
9   Q    I will. I will.
10       MR. VINE: Or show your letter first, what it
11  stated, and then show him the email.
12       MR. GOODMAN: Well, we'll get to that in a
13  moment. I can get to it by referring to the
14  complaint, which has it as an exhibit.
15       MR. VINE: Okay. Great.
16   Q    BY MR. GOODMAN: Do you understand what
17  the word "retraction" means?
18   A    Yes. Common sense. It means that we
19  will -- we will file a -- some communication with
20  Amazon that we've resolved the differences between
21  us and that Solu-Med has agreed to no longer sell --
22  that's how I understood it.
23   Q    That's how you understood it?
24   A    Right.
25   Q    And was it Alisa Garrett who prepared



JASON TOTH, M.D.                                          December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                                    53–56

Page 53

1  that email that we're talking about?
2     A    Yes, I believe so.
3     Q    Was it sent with your approval?
4     A    Yes.
5     Q    Why did -- no.
6          What was the basis for Youngblood
7  agreeing to file the retraction within two weeks
8  after the notice that Amazon was sent alleging that
9  Youngblood -- not Youngblood -- Life and Health
10 Source was offering counterfeit products?  What
11 caused Youngblood to file that retraction?
12    A    Well, Youngblood's position is that we
13 are -- have no intention of harming any competitors,
14 and nor are we looking to get engaged in litigation.
15         We simply want to protect the equity and
16 investment in our brand, and we want to protect the
17 consumer from purchasing product that is potentially
18 expired or inauthentic or not new.
19         So the basis for that retraction is that
20 if we can have an understanding that someone will
21 stop selling our product that's unauthorized, then
22 we're happy to file a retraction on their behalf.
23    Q    The original notice dated November 11th
24 from Youngblood to Amazon stated, in substance, that
25 the products offered by Life and Health Source were

Page 54

1  counterfeit and did not contain any of the
2  information you just referred to, did it not?
3     MR. VINE:  Objection.
4     Q    BY MR. GOODMAN:  Go ahead.
5     A    Are you asking me, was there
6  clarification in that email communication as to what
7  constituted counterfeit?
8     Q    Yeah.
9     A    No.  My understanding is that they would
10 have the same information that we had access to
11 concerning Amazon's published policies on
12 intellectual property protection.
13    Q    Was Youngblood aware of Amazon's policy
14 with respect to products being offered on its
15 platform that were alleged to be counterfeit?
16    A    Yes.
17    Q    And that was that?
18    A    What was what exactly?
19    Q    Amazon's policy with regard to
20 counterfeit complaints.
21    MR. VINE:  Objection.  Asked and answered.
22    We've gone over it --
23    THE DEPONENT:  I think we've asked that
24 repeatedly, approximately six or eight times
25 since --

Page 55

1     Q    BY MR. GOODMAN:  Well, please.
2     MR. VINE:  I mean, this is the last time he's
3  going to --
4     MR. GOODMAN:  Well --
5     MR. VINE:  The documents will speak for itself.
6          But you could say, were you generally
7  aware about their policies?
8     THE DEPONENT:  Well, my general understanding
9  was that only authorized sellers selling new product
10 has the authority to represent, that we have the
11 warranties and full guarantee of the company, and
12 that anyone not authorized is not selling new
13 product and it's inauthentic and counterfeit.
14    Q    BY MR. GOODMAN:  I ask you to go to
15 page four, interrogatory eight:  "Please describe
16 what steps you took to ensure the accuracy of the
17 November 11th and November 13th complaints you
18 made --" meaning Youngblood "-- to Amazon about the
19 alleged counterfeit products you claim plaintiffs'
20 store sold."
21         Answer:  "Amazzia's team was responsible
22 for initiating and verifying the accuracy of the
23 complaint submitted to Amazon's brand registry
24 support."
25         Did Amazzia communicate you --

Page 56

1  communicate to Youngblood what it did, if anything,
2  to verify the validity of the complaints filed on
3  November 11th and November 13th?
4     MR. VINE:  Did they ever, he's saying.
5     Q    BY MR. GOODMAN:  Yeah.
6     MR. VINE:  Did you -- did they ever?
7     Q    BY MR. GOODMAN:  Tell you what they did
8  to verify the accuracy of the complaint.  That's
9  the --
10    A    Well, it's self-explanatory.  It's
11 redundant.
12         If they filed a complaint under the
13 trademark drop-down box and alleging counterfeit
14 because the product is not new, it's not being sold
15 by an authorized seller, then the product's
16 inauthentic and counterfeit.  I think that's the
17 general understanding between us, and we operated as
18 a team and that's --
19    Q    You mean understanding between Amazzia
20 and Youngblood?
21    A    Correct.
22    MR. VINE:  Based upon --
23    THE DEPONENT:  Based upon Amazon's published
24 policies concerning counterfeit intellectual
25 property --



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
57—60

Page 57

1    Q    BY MR. GOODMAN:  So the answer is
2  correct, Amazzia's team was responsible for
3  initiating and verifying the accuracy of the
4  complaints?
5    A    Correct.
6    Q    Last question on that:  Did Amazzia
7  notify Youngblood prior to submitting the complaints
8  that it was doing so and it had verified that the
9  products offered by Life and Health Source were
10  counterfeit?
11     MR. VINE:  Objection.  Asked and answered.
12     Q    BY MR. GOODMAN:  Go ahead.
13     MR. VINE:  Before they did it.
14     Q    BY MR. GOODMAN:  That's it.  Before they
15  did it.
16     MR. VINE:  Right.
17        Answer.  You've already answered that.
18     THE DEPONENT:  Well, they knew, by
19  definition --
20     MR. GOODMAN:  Not --
21     MR. VINE:  Did they inform you guys?  The
22  answer was no --
23     THE DEPONENT:  No.  I'm sorry.  They did not
24  inform us.
25     Q    BY MR. GOODMAN:  Okay.

Page 58

1        Give me a moment, Jonathan.
2     MR. VINE:  No problem.  Take your time.
3     Q    BY MR. GOODMAN:  One last question on
4  that document, Dr. Toth, if you could just go back
5  to it for me, please.
6        On page five of the document, you
7  executed this response, this verification, on
8  July 12, 2019; that's accurate?
9     A    Yes.
10     MR. GOODMAN:  Okay.  I'll mark two documents at
11  this point.  Document 3 will be the complaint, and
12  document 4 will be the answer.
13        (Plaintiff's Exhibit Nos. 3 and 4
14        were marked for identification and are
15        attached hereto.)
16     Q    BY MR. GOODMAN:  I realize it's a lot of
17  pages, Dr. Toth.
18        The document, Exhibit No. 3, is the
19  complaint that was filed in this action.
20        Have you seen this document before?
21     MR. VINE:  The complaint, this one.
22     THE DEPONENT:  Yes, I've seen this.
23     Q    BY MR. GOODMAN:  And I'd like you to look
24  at page 11.  Please take note of the date that this
25  was filed with the court, which is also on the face

Page 59

1  page, of February 23, 2019.
2        And document No. 4 is the answer, which
3  was filed with the court -- it's on the top of the
4  first page -- of October 3, 2019.
5        All right?
6     A    (Nods head.)
7     Q    Now, I'd just like to take you to the
8  complaint, page four.  16-A.
9        Do you have that there, Doctor?
10     A    Yes, I do.
11     Q    Okay.  16-A states --
12     MR. VINE:  Go ahead.
13     Q    BY MR. GOODMAN:  I don't want to read it
14  all into the record --
15     MR. VINE:  16-A -- that's -- yeah, it's a whole
16  statement.
17     MR. GOODMAN:  Has he got the complaint and the
18  answer?  Just juxtapose the two.
19     MR. VINE:  Right.
20     Q    BY MR. GOODMAN:  All right.  Essentially,
21  subdivision A says, "Defendant --" that refers to
22  Youngblood "-- filed two complaints with Amazon
23  alleging that several Youngblood-branded products
24  being offered for sale in plaintiffs' online store
25  were counterfeit" and it describes the products.

Page 60

1        Now, I'd just like you to look at the
2  answer alongside of it and prepared by your
3  attorneys, number 16:  "Denies the allegations in
4  paragraph 16 and subparts A through I."
5        Is that consistent with your
6  understanding, Doctor?
7     MR. VINE:  And if you don't know, say, "I don't
8  know."
9     THE DEPONENT:  I don't know.
10     Q    BY MR. GOODMAN:  It says that --
11     MR. VINE:  No.  It actually -- the lawyers
12  prepared this on behalf of the client --
13     Q    BY MR. GOODMAN:  But did you read the
14  answer?
15     MR. VINE:  Well, what you did with your lawyer
16  would be privileged, so --
17     MR. GOODMAN:  I understand.
18     Q    But did you read the answer before it was
19  filed with the court?
20     A    No, I have no recollection of reading it.
21     Q    As you sit here today, do you deny that
22  Youngblood filed some complaints with Amazon?
23     MR. VINE:  Objection.  He's already testified
24  that Amazzia filed the complaints.
25     MR. GOODMAN:  I just wanted to re-emphasize.

JASON TOTH, M.D.                                        December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                          61–64

Page 61

1    Q    It says here, "Defendant filed two
2    complaints with Amazon."
3         Is it your testimony -- we'll put an end
4    to this right now -- that it was Amazzia, not
5    Youngblood, that filed the complaints?
6    A    Yes.
7    Q    Thank you.
8         I'd like you to turn to page five of
9    the complaint, Subdivision C, November 26:
10   "Plaintiffs --" meaning Solu-Med Life and Health
11   Source "-- sent a written demand to Defendant --"
12   that's Youngblood "-- to contact Amazon and to
13   retract its false statement that Plaintiffs were
14   selling counterfeit merchandise in their online
15   store."
16        And if you go to the answer, 16 -- do you
17   have that there, Doctor?
18   A    Yes.
19   Q    "Denies the allegations in Parts A
20   through I, which include C."
21   MR. VINE:  Okay.
22   Q    BY MR. GOODMAN:  Does Youngblood, as you
23   sit here today, deny that the plaintiff sent
24   a demand to Youngblood to retract the false
25   statements?

Page 62

1    MR. VINE:  That question you can answer as a
2    yes or no.  Do you deny that they asked for a
3    retraction?
4    THE DEPONENT:  Again --
5    MR. GOODMAN:  We may be having some
6    difficulty.
7    MR. VINE:  So without getting into
8    attorney/client privileged communication, there's
9    reasons that we advise to deny this specific
10   paragraph.
11        The fact that a demand was sent, I could
12   stipulate to you, yes, a -- was a demand sent.  But
13   we don't agree that Amazon's de-listing of the
14   online store was triggered by what you've said.  So
15   that is why the paragraph was denied.
16   MR. GOODMAN:  By there's no denial that the
17   plaintiff sent a written demand to contact Amazon to
18   retract?  No --
19   MR. VINE:  I'll stipulate to that.
20   MR. GOODMAN:  Okay.
21   THE DEPONENT:  No.
22   MR. GOODMAN:  All right.
23   MR. VINE:  But when you put everything else in
24   there, you have to deny it.
25   MR. GOODMAN:  I know.

Page 63

1    Q    On the same page, 5-D -- page five,
2    Subparagraph D, November 29, 2018:  "Defendant
3    notified Plaintiffs --" that's Youngblood "-- that
4    it has agreed to file a retraction.  See Defendant's
5    agreement to file retraction, a copy of which is
6    attached as Exhibit 2."
7         So if you'll just kindly flip the pages
8    till you get to Exhibit 2, do you see that, Doctor?
9    A    Yes, I do.
10   Q    It indicates by, apparently, an email
11   sent from Youngblood says, "On November 29, 2018, at
12   3:59 p.m., brand protection --" and that's an email
13   address at Youngblood, presumably; is that correct?
14   A    Yes.
15   Q    "Hello.  We have agreed to file a
16   retraction with Amazon.  Please provide me with the
17   following information."
18        And I believe that was Ms. Covenian; is
19   that correct?
20   A    Yes.
21   Q    So there is no dispute, then, that
22   Youngblood had agreed to file a retraction with
23   Amazon?
24   MR. VINE:  Objection.
25        Not within your definition of retraction,

Page 64

1    but within ours.
2    MR. GOODMAN:  We're not looking at definitions.
3    MR. VINE:  Okay.
4    MR. GOODMAN:  They agreed to file a retraction.
5    Q    Now look at your answer, again,
6    paragraph 16:  "Defendant denies the allegations in
7    paragraph 16 in Subparts A through I."
8         So can we agree that that denial is not
9    correct or that Youngblood agreed to file a
10   retraction?
11   MR. VINE:  Objection.
12   Q    BY MR. GOODMAN:  Well, would you like to
13   change your answer?  The email from your brand
14   protection says you have agreed to file a
15   retraction, and your answer denies it.
16   MR. VINE:  Objection.
17   Q    BY MR. GOODMAN:  Go ahead.
18   A    Yeah.  No, I think we could change it
19   within the context of our -- of my understanding and
20   our understanding of what that retraction
21   constitutes.
22   Q    I think that we can agree that there was
23   an agreement to file the retraction.  That's all I'm
24   asking you.
25   MR. VINE:  Objection.



Page 65

1    You can answer it the way you see fit.
2    THE DEPONENT:  Yes.
3    Q    BY MR. GOODMAN:  All right.
4       I'd like you to go to page six of the
5  complaint, Subdivision F, December 4, 2018:
6  "Plaintiffs advised Youngblood --" it says
7  "Defendant" "-- that its notification to Amazon was
8  ineloquent because it did not actually retract its
9  false accusation against Plaintiffs."
10   MR. VINE:  Go on.
11   Q    BY MR. GOODMAN:  "Plaintiffs therefore
12  again demanded that Plaintiffs (sic) submit a
13  promised retraction. . . Exhibit 5."
14       Look at Exhibit 5.
15       (Plaintiff's Exhibit No. 5 was
16       marked for identification and is attached
17       hereto.)
18   MR. VINE:  If you want us to stipulate that you
19  sent a letter, we'll stipulate that you sent a
20  letter.  We don't agree with, though, the remainder
21  of the paragraph where it talks about it was a false
22  accusation.
23       MR. GOODMAN:  I have no problem with that.  But
24  do you now agree that that is an accurate statement?
25       MR. VINE:  No.  It's an accurate statement that

Page 66

1  you sent the letter.
2    MR. GOODMAN:  We sent the letter.
3    MR. VINE:  You could say yes.
4    THE DEPONENT:  Yes, I agree that you sent the
5  letter.
6    Q    BY MR. GOODMAN:  So the denial contained
7  in your answer --
8    A    Is in reference to false accusation.
9    Q    Solely with reference to that?
10   MR. VINE:  Because we don't believe --
11   THE DEPONENT:  Right.
12   MR. GOODMAN:  Could we take a break for five
13  minutes?
14   MR. VINE:  Sure.
15   THE VIDEOGRAPHER:  We're off the record at
16  11:39 a.m.
17       (Recess was taken whereupon
18       Plaintiff's Exhibit No. 6 was marked for
19       identification and is attached hereto.)
20   THE VIDEOGRAPHER:  This is the beginning of
21  tape number three.  We are back on the record at
22  11:55 a.m.
23   Q    BY MR. GOODMAN:  Dr. Toth, you have
24  before you what has been marked Exhibit 5.  You'll
25  note at the bottom of the exhibit is "Confidential

Page 67

1  AMZN," four zeros and a three.
2    I'll represent to you that these were
3  documents pursuant to a subpoena served upon Amazon,
4  I believe, by your attorneys.
5    Have you seen this document before?
6    A    Yes.
7    Q    All right.  And the title is, "Name and
8  Contact Info of Entity That Submitted Take-Down
9  Notice."  First line has a complaint I.D. number
10  submitted by RO.  Presumably, that means rights
11  owner contact.
12       Is that brandprotection@ybskin
13  Youngblood?
14   A    Yes.
15   Q    It is.
16       And it reads on, "Hello.  We have
17  researched Youngblood's listings and found the
18  following ASINs are in violation of our trademark."
19       Can you tell me what research was done of
20  the listings?
21   MR. VINE:  Objection.  Asked and answered.
22   Q    BY MR. GOODMAN:  Go ahead.
23   MR. VINE:  And lack of foundation.
24   Q    BY MR. GOODMAN:  Go ahead.
25   MR. VINE:  Go ahead and tell him -- the same

Page 68

1  answers --
2    THE DEPONENT:  Well, Amazzia was engaged for
3  purposes of constantly reviewing the website on a
4  daily basis.  We have 280 different SKUs.  There's a
5  couple hundred products times dozens of different
6  resellers, so it was their responsibility to scan
7  their website; identify resellers that would be
8  targeted for complaints.
9    Q    BY MR. GOODMAN:  And it states that these
10  ASINs -- those are Amazon's identification numbers;
11  is that correct?
12   A    Yes.
13   Q    "Counterfeit products are being sold on
14  the following listings."
15   MR. VINE:  You understand those two bullet
16  points are drop-downs, like when you go online?
17   MR. GOODMAN:  Mm-hmm.
18   Q    And it says further, "Please, immediate
19  action and remove these sellers currently
20  listing counterfeit products."
21       Would you agree that there was nothing
22  contained in this notice that refers to unauthorized
23  distribution, inauthentic products, guarantees and
24  warranties?
25   MR. VINE:  Objection.



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
69–72

Page 69

1    Q    BY MR. GOODMAN:  Go ahead.
2    A    Well, it says right here, "The indicated
3  sellers are not selling authentic products."
4    Q    And what is the basis for this statement
5  that the indicated sellers are not selling authentic
6  products?
7    A    I think --
8    MR. VINE:  Objection.  Asked and answered.
9        You can try again.
10    THE DEPONENT:  Let me make it perfectly
11  clear.
12    Q    BY MR. GOODMAN:  Please do.
13    A    I think the basis is this:  Resellers are
14  advertising their product as new.  The new product
15  is supposed to come in its original packaging, with
16  the original guarantees and warranties, and it's
17  supposed to be understood by the consumer that it's
18  shipped and handled and transported by the
19  guidelines that we've identified and communicated to
20  our wholesalers and distributors.
21        Further, anyone not able to establish
22  that the product is new within that context that has
23  either the invoice for purchase of the product or
24  documentation that we've extended our warranties and
25  guarantees to them is by definition unauthorized,

Page 70

1  inauthentic, and therefore counterfeit.
2    Q    Let me ask you again, by whose
3  definition?
4    A    Amazon as -- explains their policy in
5  several documents, somewhat redundantly.  But they
6  have policies that speak to the product authenticity
7  and quality, general conditions of use and sale,
8  on-boarding of new sellers to the seller platform,
9  as well as similar language in their
10  anti-counterfeit policy.
11    Q    Since 2018, has Youngblood in any way
12  amended its website to include statements such as
13  you have described about resellers selling products
14  that lack authenticity because of the fact that they
15  are not authorized?
16    MR. VINE:  Objection.
17        I don't understand the question, but to
18  the extent --
19    Q    BY MR. GOODMAN:  Have you updated
20  your --
21    A    First of all, the website underwent an
22  entire transformation and migration from a
23  complicated platform called Magento to a new
24  platform called Shopify.
25        This was initiated independently of any

Page 71

1  of this lawsuit involving Solu-Med.  We did that for
2  business reasons and to improve the sales on our own
3  website.
4        To answer your question, yes it's my
5  understanding that we did add language to further
6  reinforce and strengthen our policies, but I think I
7  indicated at the beginning of this deposition that I
8  came on board and specifically wanted to address our
9  entire digital strategy and e-commerce strategy.
10  And part of that strategy was looking at all
11  channels, not only our own website, not only Amazon,
12  but looking at the policies and procedures across
13  all of our distributors' websites, as well.
14        So we were concurrently in a state of
15  mind of constantly revisiting and revising and
16  having ongoing communication with all of our
17  customers as we became more sophisticated and
18  learned more about the strategies of the grey
19  market.
20    Q    Is diversion a concern of Youngblood?
21    A    Absolutely.
22    Q    And why is it a concern?
23    A    Well, it's more than a disruptive channel
24  of sales.  It's actually destructive.  It's
25  totally -- any time you offer a product that's

Page 72

1  heavily discounted off of the manufacturer's asking
2  price and selling product that's expired or tampered
3  with or comes without guarantees, the consumers are
4  used to purchasing this in a high-end retail store
5  in Milan or Western Europe someplace, and they come
6  over here and see it offered on Amazon or Wal-Mart,
7  it completely diminishes the equity of the brand and
8  all of the work that we've done, marketing dollars
9  that we've spent engaging influencers.
10        My wife founded this company 23 years
11  ago.  You go to our website or any of our social
12  media or public information, you'll see that a half
13  a dozen movie stars have endorsed it, and they
14  endorse it because they believe that it's a
15  high-performing, clean, nontoxic, animal-free
16  testing, high-quality product.
17        So every time this product is sold
18  somewhere by somebody without guarantees in which we
19  sell the product direct to our consumer, then it
20  diminishes the equity and reputation of the brand.
21  And that has significantly -- significantly impacted
22  our bottom line.
23    Q    Can you tell me the reasons why
24  Youngblood believe -- no.  Let's withdraw the
25  question.



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
73–76

Page 73

1        Can you tell me why diversion exists, or
2   had existed, with regard to your products?
3        MR. VINE:  Objection.
4        Q    BY MR. GOODMAN:  Go ahead.
5        MR. VINE:  You can answer, if you know.
6        MR. GOODMAN:  I'm sure he does.
7        THE DEPONENT:  Downstream customers not
8   fulfilling their obligations, either to their
9   contract or to us, offering the product, I suspect,
10   to buyers on the grey market.
11       Q    BY MR. GOODMAN:  And what has Youngblood
12   done with respect to those sellers?
13       A    Well, within the past year, I've probably
14   eliminated three or four to the tune of $3 million
15   with the lost sales.
16       Q    And how do you accomplish that?
17       A    Either we've identified -- either
18   we've -- they come to our attention through this
19   process of engaging Amazzia and their brand defense
20   where we're able to identify the customer who sold
21   the product to the reseller, and then we're able to
22   track back the reseller to the distributor and the
23   distributor to our contract.  And at that point,
24   then if we're able to do that, then we can cancel
25   that relationship.

Page 74

1        Q    To your knowledge and understanding, is
2   diverse legal?
3        MR. VINE:  Objection.
4        THE DEPONENT:  It all depends under what
5   circumstances they're selling the product.
6        Q    BY MR. GOODMAN:  Well, what circumstances
7   have you become aware of?
8        MR. VINE:  Objection.
9        THE DEPONENT:  Well, if you're gonna offer the
10   product as new --
11       MR. VINE:  Right.
12       THE DEPONENT:  -- as an authorized seller, then
13   the presumption, from the consumer point of view, is
14   that it comes with guarantees and warranties that
15   are associated with the new products.
16        So to the extent that -- certainly, you
17   can resell a product to someone else if it's another
18   authorized customer of ours, then presumably they
19   have the -- that right to resell the product would
20   be intact.
21       MR. VINE:  Wait.  Are you done?
22       THE DEPONENT:  Yes.
23       MR. GOODMAN:  Thank you.
24       Q    In 200- -- November 2018, was it
25   Youngblood's agenda to eliminate diversion?

Page 75

1        MR. VINE:  Objection.
2        Q    BY MR. GOODMAN:  Go ahead.
3        A    No.  Our objective was to identify
4   resellers who are offering the product as new on the
5   website when, in fact, it's not new and guaranteed,
6   and we simply wanted to eliminate that market --
7   that grey market from selling to our consumers.
8        Q    Was it Youngblood's intent, in November
9   of 2017, to get rid of Life and Health Source as a
10   reseller of Youngblood products on Amazon's
11   platform?
12       A    Absolutely not.  We are a small business.
13   We worked very hard to get exactly where we're at
14   right now.  We respect the right of every small
15   business to be in operation.  We were only
16   attempting to protect the equity of the brand and
17   the investment that we made in that brand.
18       Q    So together with Amazzia, the way to
19   protect the brand, then, was to provide a notice to
20   Amazon that Life and Health Source was offering
21   Youngblood products that were counterfeit?
22       MR. VINE:  Objection.
23        You can answer.
24       THE DEPONENT:  Yes, that's one strategy.
25       Q    BY MR. GOODMAN:  Mm-hmm.

Page 76

1        Was there any other strategy?
2        A    Well, we monitor other websites, as we do
3   Amazon, for batch codes; expiration dates;
4   out-of-date images; copyright that's incorrect;
5   products that look blatantly fake.  So it's a
6   multi-front challenge.
7        Q    Doctor, have you ever seen any of the
8   Youngblood products that were offered by Life and
9   Health Source on Amazon's platform?
10       MR. VINE:  Objection.
11       THE DEPONENT:  Yes.
12       Q    BY MR. GOODMAN:  When did you see them?
13       A    Well, I can't stipulate that they saw
14   them on Life and Health Source store.  I see them
15   all the time by other grey-market resellers.  So let
16   me correct that by saying --
17       Q    Go ahead.
18       A    -- I go on the website at least weekly to
19   look how often we're capturing the buy box, how much
20   we're being discounted, how many resellers there
21   are, and what the reviews are that may be impacting
22   the customer reviews.
23        So in the generic sense, yes, I do
24   monitor the website for resellers and discounters.
25   Specifically, no, I don't recall seeing that



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
77—80

Page 77

1  particular store ever.
2      Q     Is Youngblood still being serviced or
3  having a business relationship with Amazzia?
4      A     No.
5      Q     Did that terminate at a certain point in
6  time?
7      A     Well, we didn't renew it for another
8  year, so. . .
9      Q     Well, initial term commenced in September
10 of 2017.
11     A     Mm-hmm.
12     Q     That's when the --
13     MR. VINE:  '18.
14     MR. GOODMAN:  Hmm?
15     MR. VINE:  '18.
16     MR. GOODMAN:  '18.  I'm sorry.
17     Q     2018.
18          And did it continue until 2019?
19     A     Yes, it did.
20     Q     And was there a reason why you didn't
21 continue with their services?
22     A     Well, it just was a business decision.
23 They weren't meeting anywhere near their sales
24 goals, and --
25     Q     As a distributor?

Page 78

1      A     As a distributor.
2      Q     Okay.
3      A     And despite their best efforts to clean
4  up the marketplace, we still have a lot
5  of discounting resellers.
6      Q     Aside from not meeting their budget or
7  something for distribution of their products, how
8  about brand protection?
9      MR. VINE:  Objection.  He just --
10          Go ahead.
11     Q     BY MR. GOODMAN:  What did they do, if
12 anything, during the one year, other than --
13     A     Well, they did a pretty good job.  I
14 mean, we -- I'd have to go back and have to identify
15 how many resellers were there in September of 2018
16 and how many were there one year later, but I would
17 submit that they eliminated at least 50 percent of
18 them, to their efforts.
19     Q     And in what manner did they accomplish
20 this?
21     A     Well, primarily, by filing complaints
22 with Amazon for trademark and counterfeit and
23 copyright infringement.
24     Q     To your knowledge, did Amazzia file
25 complaints on behalf of Youngblood about other

Page 79

1  resellers that Life and Health Source -- making a
2  claim that they were counterfeit products?
3      A     Absolutely.  I made that perfectly clear.
4  Dozens of resellers.
5      MR. VINE:  He said that earlier.
6      Q     BY MR. GOODMAN:  Do you have any
7  documents to support what you're telling us?
8      A     Well, Amazzia can -- they certainly have
9  ongoing monthly and quarterly sales reports.  I
10 don't have any.
11     Q     Well, did Amazzia report to Youngblood
12 over this period of one year the information
13 concerning other resellers that were allegedly
14 selling counterfeit Youngblood products?
15     MR. VINE:  Objection.
16     THE DEPONENT:  What Amazzia did was they would
17 file summary reports of how many resellers they
18 reported.  Whether all of those reports were for
19 counterfeit I can't say specifically.
20     Q     BY MR. GOODMAN:  Well, what was contained
21 in those reports, do you remember?
22     MR. VINE:  Okay.  So I'm going to designate
23 this portion would be as confidential.
24          I'm going to allow him to testify.  I
25 don't believe, unless it's absolutely critical, not

Page 80

1  to -- to direct a witness.  But this is definitely
2  proprietary information that I believe --
3      MR. GOODMAN:  Mark it confidential.  Go
4  ahead.
5      MR. VINE:  We'll mark it.
6          (The testimony that follows is
7          bound separately in a transcript
8          designated confidential.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 82

1             ***
2       Q    BY MR. GOODMAN:  You referred before to
3   the products being not sold as new by Life and
4   Health Source.
5             What does that mean?
6       A    To me, I think it's exactly like it
7   sounds.  New is new.  New comes, the original
8   packaging, the original guarantees and original
9   warranties concerning how the product was acquired,
10  preferably with an invoice documenting that it was
11  acquired from a legitimate customer of ours.
12      MR. GOODMAN:  I don't know how to do it best to
13  identify these.
14      MR. VINE:  What is that?
15      MR. GOODMAN:  They're samples of the product.
16            So if you want to, just for
17  identification purposes, put a sticker on each one
18  of these envelopes.
19      MR. VINE:  That's fine.  I mean, I certainly --
20  I don't remember these being produced, but that's
21  okay.
22      MR. GOODMAN:  I'm producing them now --
23      MR. VINE:  No, but under -- let me put
24  something on the record.  I'm gonna let him testify
25  to it.

Page 83

1             But under Rule 26, you have an obligation
2   to produce, and a supplemental obligation that's
3   ongoing, to produce any documents or any things that
4   you intend to use during the course of the case.
5   You have not done this.
6       I'm still going to let you question, but
7   it's obviously a violation of rules.
8       MR. GOODMAN:  Thank you for making that.
9       MR. VINE:  Fine.
10      MR. GOODMAN:  All right.  Let's mark this here.
11  "This is entitled, Life and Health Source Sample
12  From Inventory."  All right.  Let's mark this as
13  Exhibit --
14      THE REPORTER:  7.
15      MR. GOODMAN:  -- 7.
16      (Plaintiff's Exhibit No. 7 was
17      marked for identification and is retained
18      by counsel.)
19      MR. GOODMAN:  We're finished with those
20  exhibits.
21      MR. VINE:  That's fine.
22            You want him to open it up?
23      MR. GOODMAN:  I'll tell him.
24      MR. VINE:  Okay.
25      Q    BY MR. GOODMAN:  Doctor, would you please

Page 84

1   open up that envelope.
2       MR. VINE:  How did you describe this envelope,
3   by the way?
4       MR. GOODMAN:  These are samples obtained from
5   our client, Life and Health Source, from their
6   inventory of products -- Youngblood products that
7   were in their inventory in 200- --
8       MR. VINE:  Did you intend to have this in
9   there, as well?
10      MR. GOODMAN:  Let me see what that is.  Sorry.
11      Yes.
12      MR. VINE:  Okay.
13      MR. GOODMAN:  This was the container for
14  those --
15      MR. VINE:  And these came -- just so it's
16  clear, these products came in your briefcase?
17      MR. GOODMAN:  Yeah.
18      MR. VINE:  And you transported them from where?
19      MR. GOODMAN:  My office.
20      MR. VINE:  And how were they sent to your
21  office?
22      MR. GOODMAN:  They were sent to me from our
23  client.
24      MR. VINE:  By overnight mail?  In a certain --
25  what condition?

Page 85

1       MR. GOODMAN:  I picked them up, actually, when
2   I was in Florida during our last visit when you took
3   the depositions.
4       MR. VINE:  Okay.
5       MR. GOODMAN:  Okay?
6       MR. VINE:  You get my point, but, anyway, go
7   on.
8       Q    BY MR. GOODMAN:  Look at these two
9   products.
10      MR. VINE:  Please.
11      Q    BY MR. GOODMAN:  Please.
12      Thank you.
13      Can you identify those as being
14  Youngblood products?
15      A    Yes, they appear as Youngblood products.
16  But I could go down and stop at a vendor and show me
17  a Rolex watch that looks -- for all intents and
18  purposes, looks like the one in Beverly Hills.  It's
19  not so much how they appear.  It's how they're
20  sourced and purchased.
21      Q    All right.  Taking a look at those two
22  products -- if you would, open up the container.
23      Would you identify which product that is.
24      A    Yes.  This is our pressed mineral
25  foundation, honey.  It appears to be our pressed

Page 86

1  mineral foundation, honey.
2      Q    Right.
3          Is there anything about the packaging
4  that's different from any of your products?
5      MR. VINE:  Objection.
6      THE DEPONENT:  No, I don't see anything.
7      Q    BY MR. GOODMAN:  Mm-hmm.
8          And look at the labeling on the reverse
9  side.
10         Jonathan, I'll make copies of these
11 things so I can give them to you.
12     MR. VINE:  Obviously --
13     MR. GOODMAN:  Huh?
14     MR. VINE:  I mean, you have a whole host of
15 evidentiary problems that will never get this in
16 front a jury, but --
17     MR. GOODMAN:  We'll take care of it.  We'll
18 take care of it.
19     MR. VINE:  Okay.
20     Q    BY MR. GOODMAN:  Here's another envelope
21 that's been placed --
22     MR. VINE:  We call them envelopes.  For the
23 record, they're plastic bags that contain purported
24 Youngblood products that lack both source, shipment
25 and warranty.

Page 87

1      Q    BY MR. GOODMAN:  When you reviewed these
2  products, is there anything in the labeling of those
3  products that refer to a warranty or a guarantee?
4  If you want to open them up again, go ahead.
5      A    No.  But, again, I say for the record, I
6  can't tell the difference between a real Louis
7  Vuitton bag and a fake one.
8      Q    Do you have any question as to whether
9  these are authentic products?  Or should we say,
10 genuine products?
11     MR. VINE:  No, no, no.
12     THE DEPONENT:  You said authentic.
13     Q    BY MR. GOODMAN:  Is there anything
14 different about those products, physically, that
15 differ from Youngblood products?
16     MR. VINE:  Objection.
17     THE DEPONENT:  No.  Other than how they were
18 acquired, no.  They appear to be our product.
19     MR. GOODMAN:  And this would be Exhibit 8.
20         (Plaintiff's Exhibit No. 8 was
21         marked for identification and is retained
22         by counsel.)
23     MR. VINE:  Same objection.
24     Q    BY MR. GOODMAN:  Can you just identify
25 which product that is, Doctor.

Page 88

1      A    This is a pressed mineral blush, sugar
2  plum.
3      MR. VINE:  Is it sealed up?
4      THE DEPONENT:  One of them looks tampered with.
5  It's not a complete seal.
6          Have you opened this already?
7      Q    BY MR. GOODMAN:  No.
8      A    Is this how it came to you?
9      Q    This is how it came to me.
10     A    So this --
11     Q    Other than the broken seal on it, take a
12 look at the package itself.
13     MR. VINE:  Well, he can only open one of them.
14 But go on.
15     THE DEPONENT:  Okay.
16     Q    BY MR. GOODMAN:  Is there anything about
17 that package that leads you to believe that it is
18 not a Youngblood product?
19     MR. VINE:  Objection.
20     Q    BY MR. GOODMAN:  Go ahead.
21     A    Other than what I've already previously
22 stated.  I can't speak to how it was acquired and
23 what marketplace it was marketed on.
24     Q    But if you will assume it came from --
25 no.  Withdraw the question.

Page 89

1          This would be 9.
2          (Plaintiff's Exhibit No. 9 was
3          marked for identification and is retained
4          by counsel.)
5      MR. VINE:  Your client has already admitted --
6  no.
7      MR. GOODMAN:  Let me just carry on --
8      MR. VINE:  It's fine.  We're good.
9      MR. GOODMAN:  May be boring, but let's get
10 through it.
11     THE DEPONENT:  See, this also is a little bit
12 suspicious here, when I see -- when we purchase a
13 lot of product from the global Internet, we see a
14 lot of labels that are over our bar code.
15         This is what's done by a lot of
16 distributors to hide the fact that -- where they
17 originally acquired it so that we can't track it
18 back.  This is a big problem.
19     Q    BY MR. GOODMAN:  Doctor, is Amazon an
20 authorized reseller of your products today?
21     A    No.
22     Q    Amazon doesn't sell your products?
23     A    Yes, they do.
24     Q    And under what -- how do they sell your
25 products?  Are they an unauthorized reseller?

Page 90

1    A    Yes, they are.
2    Q    Well, this -- I represent to you this is
3  purchased on Amazon on November 20th of 2019.
4    A    And we've made Amazon aware that they are
5  selling a lot of outdated, expired and discontinued
6  product. This very well could have been tampered
7  with.
8    Q    Could you put that back in the envelope.
9  MR. VINE: Plastic bag.
10  MR. GOODMAN: Hmm?
11  MR. VINE: Plastic bag. It's not an envelope.
12      I just don't want -- when we refer to the
13  transcript and then we're looking for an envelope
14  with product -- I think a better way to describe it
15  is plastic bag.
16    Q    BY MR. GOODMAN: Are there any authorized
17  resellers of Youngblood products on Amazon at the
18  present time?
19    A    No.
20    Q    Are there any authorized resellers of the
21  product on any e-commerce platforms today?
22    A    Yes. Some distributors, which are
23  predominantly spa salon, globally, and retail,
24  Western Europe and Australia -- some distributors
25  maintain their own websites and we've authorized

Page 91

1  them to sell the product on their websites at MAP.
2    Q    Did you ever hear of a retailer by the
3  name of Clover X?
4    A    Yes. I believe that was a big reseller
5  on Amazon.
6    Q    Authorized?
7    A    No.
8    Q    Unauthorized?
9    A    Correct.
10    Q    So is it your testimony that they, too,
11  are selling counterfeit products?
12  MR. VINE: Objection. We don't see if it's
13  being advertised as new, and it's a whole host of
14  other --
15    Q    BY MR. GOODMAN: Well, looking at these
16  products that you've seen already -- Exhibits 7, 8
17  and 9 -- is there anything on these products that
18  you could visualize that --
19    A    I did. I mentioned a couple things. One
20  package seal was broken. Another package had the
21  bar code covered. So --
22    Q    Other than that --
23    A    Well, those are the two big things.
24      So what is your question with respect to
25  Clover X? I can't speak to where they're selling

Page 92

1  right now or what they're selling, but the short
2  answer is they're not authorized, either.
3    Q    They're not authorized.
4      Doctor, who is -- can you identify Amazon
5  Com Services, Inc.?
6    A    No.
7    Q    So is it your testimony that Amazon is
8  not an authorized reseller of Youngblood products as
9  of this date?
10    A    Correct.
11    Q    And the only authorized resellers of
12  Youngblood products as of this date are which?
13    A    Ourselves.
14  MR. VINE: Online? On Amazon, you mean?
15  THE DEPONENT: Yes --
16    Q    BY MR. GOODMAN: You sell it --
17  Youngblood sells it on Amazon?
18    A    Correct.
19    Q    So that's coming directly from your
20  company and fulfilled by your company?
21    A    Correct.
22      You need to be clear --
23    Q    I'm trying --
24  MR. VINE: Well, no.
25      Finish your statement.

Page 93

1    Q    BY MR. GOODMAN: I'm trying hard to find
2  the distinction.
3    A    Amazon has a storefront, and they sell
4  and compete with us. We may, from time to time,
5  have done some fulfilled by Amazon, but that's not
6  the same as Amazon selling it themselves.
7    Q    Mm-hmm.
8      And in what manner did they compete with
9  you?
10    A    Just like Solu-Med. They discount and
11  diminish the integrity of the brand.
12    Q    Is there any way you can get them to
13  cease selling your products?
14    A    We're trying. We've reported them not
15  too long ago, we've sent them a list of product
16  that's been either expired or discontinued, and
17  we're waiting for them to respond.
18    Q    Well, is it Youngblood's position that
19  Amazon is selling those products, and those products
20  are likewise counterfeit?
21    A    Yes.
22    Q    And have you taken any action as against
23  Amazon?
24    A    I just mentioned. We've engaged a new --
25  we've reported them through our new brand protection



Page 94

1  company called pointer brand protection, which we've
2  engaged to address this same issue on global
3  websites, and we have communicated with Amazon which
4  products that we know to be expired or discontinued.
5      Q    So Amazon, on one hand, is acting as an
6  authorized distributor, selling Youngblood products,
7  and on the other platform, they're an unauthorized
8  reseller?
9      A    Well, they're never an authorized seller
10  for us.
11     Q    So, then, you are actually -- meaning
12  Youngblood is actually the seller on Amazon?
13     A    Correct.
14     Q    That's the distinction I was having some
15  problems with.
16         Jonathan, give me a few moments.  I'll
17  see how much longer I have.
18     MR. VINE:  All right.
19     THE VIDEOGRAPHER:  Off the record, Counsel?
20     MR. GOODMAN:  Yeah.
21     THE VIDEOGRAPHER:  We're off the record at
22  12:33 p.m.  This is the end of tape number three.
23         (Recess was taken.)
24     THE VIDEOGRAPHER:  This is the beginning of
25  tape number four.  We're back on the record at

Page 95

1  12:46 p.m.
2         (Plaintiff's Exhibit No. 10 was
3          marked for identification and is attached
4          hereto.)
5      Q    BY MR. GOODMAN:  Doctor, you have before
6  you what's been marked as Exhibit 10, and it's a
7  series of emails.
8         At the bottom you will note it's
9  YBSC 00045 through -53.  And these were documents
10  that were produced by Youngblood.
11        Understood?
12     A    Yes.
13     Q    All right.  Now, I don't want to go
14  through this, each and every one of these, because
15  you've already testified to a lot of the
16  information.  I just want you to refer to one
17  particular one, and that's on page 51.
18        And this is an email stream from Brand
19  Protection, Thursday, December 20, 2018, to
20  Jason Toth, cc Geovanna Waters, who's no longer with
21  your company -- is that correct?
22     A    Correct.
23     Q    -- re: Solu-Med, back slash, Youngblood
24  Amazon complaint.
25        It says, "Hi.  We did file a retraction.

Page 96

1  They are coming back stating our retraction isn't
2  good enough.  This is what our retraction says.
3  This comes from Amazzia.  There was another
4  retraction but it says the same thing."
5         Was the retraction that's referred to
6  here drafted by Amazzia?
7      A    Amazzia identified the elements that
8  needed to be included in a retraction.  In that
9  sense, yes, it was drafted.
10     Q    And who actually constructed the
11  retraction that was sent?  Was it at Youngblood?
12     A    Yes.  I believe this probably would have
13  been Alisa.
14     MR. VINE:  I don't want you to guess.  If you
15  don't recall --
16     THE DEPONENT:  I don't recall.
17     Q    BY MR. GOODMAN:  But you didn't do it
18  personally?
19     A    Correct.
20     Q    All right.  And it says, "Hello
21  Amazon.com.  Please withdraw complaint
22  I.D. 5518323151 as we have resolved our complaint
23  with the seller Life and Health Source.  This is
24  regarding the --" particular assignment number.
25  Then it says, "Thank you, Youngblood."

Page 97

1         Beneath that, "I reattached the complaint
2  and why they sent this letter.  We filed a
3  retraction but they want us to say we were wrong and
4  they'd (sic) -- and that they were (sic) not selling
5  counterfeit products.  We didn't admit to that.  We
6  just said we resolved the complaint --"
7         Now, whose wording is that?
8      A    The more I think about this, the more I
9  think that both may have been constructed by
10  Amazzia's team, because there's no one on Youngblood
11  that would ever sign Youngblood as two words.
12     Q    Right.
13        So you believe this was constructed and
14  written by Amazzia?
15     A    Yes.
16     MR. VINE:  Explain to him that they had access
17  to the brand protection.
18     THE DEPONENT:  Exactly.  Together we had access
19  to the brand protection email.  It was originally
20  set up at their request.
21     Q    BY MR. GOODMAN:  And this statement,
22  "They want us to say we were wrong and they are not
23  selling counterfeit products.  We did (sic)
24  admit --
25     MR. VINE:  "We didn't."



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
98—101

Page 98

1    MR. GOODMAN: "We didn't. That's what I
2    said.
3    MR. VINE: I heard "did," but okay.
4    MR. GOODMAN: You didn't hear me --
5    MR. VINE: Maybe I'm wrong. Everybody tells me
6    that.
7    Q    BY MR. GOODMAN: "We didn't admit to
8    that."
9         Why didn't you admit to that?
10   A    We didn't admit to it because that's not
11   our basis for resolving the matter. We had no
12   admission that the product was not, in fact,
13   counterfeit.
14        I think I've established repeatedly, or
15   attempted to establish, what my understanding was,
16   is the same understanding as Amazon as to the
17   definition of a counterfeit product.
18   MR. GOODMAN: I have no further questions.
19   MR. VINE: He will read. I don't know if you
20   know what that is.
21   THE REPORTER: Yes, I do.
22   MR. VINE: Yeah, he will read.
23   MR. GOODMAN: Pardon?
24   MR. VINE: He's gonna read.
25   MR. GOODMAN: He's gonna read?

Page 99

1    MR. VINE: Yeah. She knows.
2    MR. GOODMAN: Okay.
3    MR. VINE: And I assume, if he's ordering,
4    we'll take a copy.
5    THE REPORTER: Okay.
6    MR. GOODMAN: Are you ordering?
7    MR. GOODMAN: Yeah.
8    MR. VINE: We'll take a copy.
9    MR. GOODMAN: Yeah.
10        He's gonna read; he's not gonna waive?
11   MR. VINE: Right.
12   THE VIDEOGRAPHER: This concludes tape four in
13   today's videotaped deposition. We're going off the
14   record, December 9, 2019, at 12:51 p.m.
15        (The deposition was concluded at
16        12:52 p.m.)
17        -oOo-
18
19
20
21
22
23
24
25

Page 100

1            DEPONENT'S DECLARATION
2
3         I, JASON TOTH, M.D., hereby declare:
4         I have read the foregoing deposition
5    transcript, I identify it as my own, and I have made
6    any corrections, additions or deletions that I was
7    desirous of making in order to render the within
8    transcript true and correct.
9         I declare under penalty of perjury, under
10   the laws of the State of California, that the
11   foregoing is true and correct.
12
13   _____,_____
          (date)                    (city and state)
14
15
16        _____
17                  (Signature)
18
19
20
21
22
23
24
25

Page 101

1    STATE OF CALIFORNIA   )
                          ) ss.
2    COUNTY OF LOS ANGELES )
3         I, Wendy J. Wright, Certified Shorthand
4    Reporter, Certificate No. 11607 in the State of
5    California, duly empowered to administer oaths, do
6    hereby certify:
7         I am the deposition officer that
8    stenographically recorded the testimony in the
9    foregoing deposition;
10        Prior to being examined, the deponent was
11   by me first duly sworn;
12        The foregoing transcript is a true record
13   of the testimony given;
14   (  )   I was relieved of my duty pursuant to
              Rule 30(e) and (f) of the Federal Rules
15            of Civil Procedure.
16   (X)   Pursuant to Rule 30(e) of the Federal
              Rules of Civil Procedure, it was
17            requested that the deponent shall have
              30 days to review the transcript;
18            therefore, any changes made by the
              deponent or whether or not the deponent
19            signed the transcript cannot at this time
              be set forth.
20
21   (  )   Pursuant to Rule(e) of the Federal Rules
              of Civil Procedure, no request being made
21            for review, the transcript was sealed and
22            sent to the noticing attorney.
23   Dated December 23, 2019, Los Angeles, California.
24            Wendy J. Wright
25



Page 102

1   STATE OF CALIFORNIA  )
                          )  ss.
2   COUNTY OF LOS ANGELES )

3

4          I, Wendy J. Wright, a Certified Shorthand
5   Reporter, Certificate No. 11607, in the State of
6   California, duly empowered to administer oaths, do
7   hereby certify:
8          As requested pursuant to the Rule 30(e)
9   of the Federal Rules of Civil Procedure, written
10  notice having been sent to the deponent, the
11  deponent:
12     ( )   In person made the changes set forth in
             the foregoing transcript; and
13
       ( )   Signed the transcript identifying the
14           deposition as his or her own;
15     ( )   Expressly refused to approve the
             transcript by not signing it;
16
       ( )   By signed letter attached hereto, made
17           the changes set forth therein;
18     ( )   Failed to contact the deposition officer
             within the allotted time period.
19
20
21  Dated_____, Los Angeles, California.
22
23         *Wendy J. Wright*
24
25

Page 103

1   Reference No.: 4744327
2
3   Case:  SOLU-MED vs YOUNGBLOOD SKIN CARE
4
         DECLARATION UNDER PENALTY OF PERJURY
5
       I declare under penalty of perjury that
6   I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the
7   same has been read to me, and the same is
    true and accurate, save and except for
8   changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET
9   hereof, with the understanding that I offer
    these changes as if still under oath.
10
11  _____
12     Jason Toth, M.D.
13
14     NOTARIZATION OF CHANGES
15         (If Required)
16
17  Subscribed and sworn to on the _____ day of
18
19  _____, 20____ before me,
20
21  (Notary Sign)_____
22
23  (Print Name)              Notary Public,
24
25  in and for the State of _____

Page 104

1   Reference No.: 4744327
    Case:  SOLU-MED vs YOUNGBLOOD SKIN CARE
2
3   Page No._____Line No._____Change to:_____
4   _____
    Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
    SIGNATURE:_____DATE:_____
25  Jason Toth, M.D.

Page 105

1   Reference No.: 4744327
    Case:  SOLU-MED vs YOUNGBLOOD SKIN CARE
2
3   Page No._____Line No._____Change to:_____
4   _____
5   Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
    SIGNATURE:_____DATE:_____
25  Jason Toth, M.D.

