KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
1–4

**Page 1**

```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2
               CASE NO.: 0:19-cv-60487-MGC
3
   SOLU-MED, INC.,
4
               Plaintiff,
5
   vs.
6
   YOUNGBLOOD SKIN CARE
7  PRODUCTS, LLC.,
8               Defendant.
9  --------------------------/
10
11             Fort Lauderdale, Florida
                  January 9, 2020
12              8:11 a.m. - 11:26 a.m.
13
14             - - - - - - - -
15             VIDEOTAPED DEPOSITION
16                    OF
17                KELLON GOODSON
18             - - - - - - - - - -
19
20
21
22  JOB NO: J4842062
    Reported By:
23  Evan A. Ferguson, RPR
    Notary Public, State of Florida
24  Esquire Deposition Solutions
    Fort Lauderdale Office
25  Phone 954.331.4400
```

**Page 2**

```
1  APPEARANCES:
2  FOR THE PLAINTIFF:
3
        BLACK LAW, P.A.
4       BY:  KELSEY K. BLACK, ESQUIRE,
        1401 East Broward Boulevard
5       Victoria Park Centre, Suite 204
        Fort Lauderdale, Florida 33301
6       Tel:  954.320.6220
        Fax:  954.320.6024
7       Email: kelsey@kkbpa.com
        Appearing on behalf of the Plaintiff.
8
9
10 FOR THE DEFENDANT:
11      COLE, SCOTT & KISSANE, P.A.,
        BY:  JONATHAN VINE, ESQUIRE,
12      Esperante Building
        222 Lakeview Avenue, Suite 120
13      West Palm Beach, Florida 33401
        Tel:  561.383.9203
14      Fax:  561.683.8977
        Email: jonathan.vine@csklegal.com
15      Appearing on behalf of the Defendant.
16
17 ALSO PRESENT:
18      DONALD C. SAVOY, VIDEOGRAPHER
        Esquire Deposition Solutions
19      Fort Lauderdale Office
        Phone 954.331.4400
20
21
22
23
24
25
```

**Page 3**

```
1                    I-N-D-E-X
2  WITNESS:                                  PAGE:
3  KELLON GOODSON
4  DIRECT EXAMINATION BY MR. VINE:              5
5  CROSS EXAMINATION BY MS. BLACK:            147
6  REDIRECT EXAMINATION BY MR. VINE:          157
7              E-X-H-I-B-I-T-S
8  DEFENDANT'S                      FOR IDENTIFICATION
9  NO.  1  Life & Health Source Storefront Page   45
10 NO.  2  Condition Guidelines from Amazon        57
11 NO.  3  Cosmetics & Skin/Hair Care Policy       62
               from Amazon.
12
   NO.  4  Product Authenticity and Quality        62
13           Guidelines from Amazon.
14 NO.  5  Amazon Anti-Counterfeiting Policy       69
15 NO.  6  Amazon Selling Policies and Seller      82
               Code of Conduct.
16
   NO.  7  Other Complaints Composite from Amazon  89
17
   NO.  8  Bates No: CONFIDENTIAL AMZN_00003      103
18
   NO.  9  Bates No: PL00046                      104
19
   NO. 10  Bates No: PL00047                      104
20
   NO. 11  Bates No: PL00048                      110
21
   NO. 12  Bates No: PL00049                      115
22
   NO. 13  Bates Nos: PL000051 - PL000053         123
23
   NO. 14  Bates No: PL000344                     158
24
25 (***All Exhibits to be Marked Confidential.***)
```

**Page 4**

```
1      Videotaped deposition of KELLON GOODSON, a
2  witness of lawful age, taken by the Defendant, for the
3  purpose of discovery and for use as evidence in the
4  above-entitled cause, wherein SOLU-MED, INC. is the
5  Plaintiff, and YOUNGBLOOD SKIN CARE PRODUCTS, LLC. is
6  the Defendant, pending in the United States District
7  Court, Southern District of Florida, pursuant to notice
8  heretofore filed, before EVAN FERGUSON, a Notary Public
9  in and for the State of Florida at Large, at Cole, Scott
10 & Kissane, P.A., 110 Southeast 6th Street, Suite 2700,
11 Fort Lauderdale, Broward County, Florida, on the 9th day
12 of January 2020, commencing at 8:11 a.m.
13      THE VIDEOGRAPHER:  We are now on the video
14 record today is Thursday the 9th day of January of
15 2020.  The time is 8:11 a.m.
16      We are here at 110 Southeast 6th Street, Suite
17 2700, in Fort Lauderdale, Florida, for the purpose
18 of taking the videotaped deposition of Kellon
19 Goodson.  The case is Solu-Med, Inc. versus
20 Youngblood Skin Care Products, LLC.
21      The court reporter is Evan Ferguson and the
22 videographer is Don Savoy, both from Esquire
23 Deposition Solutions.
24      Will counsel please announce their appearances
25 for the record?
```



KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
5–8

Page 5

1       MS. BLACK:  Kelsey Black on behalf of the
2  Plaintiff Solu-Med, Inc.
3       MR. VINE:  Jonathan Vine with the law firm of
4  Cole, Scott & Kissane on behalf of the Defendant
5  Youngblood.
6       - - - - - - -
7  Thereupon:
8            KELLON GOODSON,
9     A witness named in the notice heretofore
10  filed, being a witness of lawful age, and being first
11  duly sworn in the above cause, testified under oath as
12  follows:
13            DIRECT EXAMINATION
14  BY MR. VINE:
15     Q   Can you please state your name for the record?
16     A   Kellon Goodson.
17     Q   Mr. Goodson, can you please give me your
18  current address?
19     A   4657 Lakeside Terrace, Davie, Florida.  33314.
20     Q   Are you currently employed?
21     A   Yes.
22     Q   Where are you employed?
23     A   Dart Container Corporation.
24     Q   What is Dart Container Corporation?
25     A   It's a company that sells packaging for food

Page 6

1  service and restaurants, things like that.
2     Q   What do you do for them?
3     A   I am director of sales eCommerce.
4     Q   Prior to coming here today did you have any
5  conversations with anyone from Solu-Med, Q Med or AGRO
6  regarding your deposition?
7     A   From AGRO, Solu-Med, Q Med, no.
8     Q   Okay.  Anybody representing them?
9     A   I spoke to Ms. Black last night.
10     Q   When did you -- so last night you spoke to
11  her?
12     A   Yes.
13     Q   For how long?
14     A   Probably 20, 25 minutes.
15     Q   And what did you guys talk about?
16     A   Just what to expect today and just to answer
17  truthfully and concisely.
18     Q   Did she tell you about the facts of the case?
19     A   Just the background of kind of what's going
20  on.
21     Q   What did she tell you about the case?
22     A   Just that there's a lawsuit still pending and
23  I needed to testify.
24     Q   Did she give you any specific facts of the
25  case?

Page 7

1     A   No.
2     Q   Did she tell you about any of the deposition
3  testimony?
4     A   No.
5     Q   Did she tell you about the type of questions
6  you would be asked?
7     A   She did say that she expected to ask
8  questions, be answering questions about my time as
9  director of eCommerce.
10     Q   Anything else?
11     A   That was it.
12     Q   Any questions you asked Ms. Black?
13     A   Just how long it was going to take and what
14  the kind of the layout was going to be and how we were
15  going to do it.
16     Q   Okay.  And so no substantive discussions about
17  the facts of this case?
18     A   No.
19     Q   Have you ever had a substantive discussion
20  with anybody, whether it be Ms. Black or anybody from
21  Solu-Med, Q Med or AGRO about the case?
22     A   As far as the my time working there and things
23  like that?
24     Q   Yes.
25     A   Previously when I worked with Solu-Med we did

Page 8

1  talk about the case.
2     Q   When was that?
3     A   I stopped working there November 1st.
4     Q   And we'll get back to that.
5     A   Okay.
6     Q   Okay.  Can you give me a brief description of
7  your educational background?
8     A   I have a Bachelor's in Political Science and a
9  Master's -- a Master's of Science in Business
10  Administration from the University of Florida.
11     Q   And when did you graduate?
12     A   2005.
13     Q   And you got a BA and a Master's from the
14  University of Florida?
15     A   Yes.
16     Q   And after graduating from the University of
17  Florida, did you become employed?
18     A   Yes.
19     Q   Where?
20     A   Pulte Corporation.
21     Q   Pulte?
22     A   Yes, it's a home builder.
23     Q   P-U-L-T-E?
24     A   Yes.
25     Q   Pulte.  And what did you do for them?



KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

1   A   I was in purchasing and sourcing.
2   Q   Materials?
3   A   Materials and subcontracting.
4   Q   And how long did you work for them?
5   A   A year and a half.
6   Q   And that was until about 2007?
7   A   2006.
8   Q   2006, okay.
9       And then where did you go?
10   A   I worked for another home builder called
11  Centex Homes.
12   Q   Okay.  And what did you do for them?
13   A   The same, I did sourcing and purchasing.
14   Q   The same type of role?
15   A   Exactly the same type of role.
16   Q   And how long did you work for them?
17   A   One year.
18   Q   So about mid 2007?
19   A   Yes, towards the end of 2007.
20   Q   And then where did you go?
21   A   I worked for a company called Atlas Traffic
22  Management Systems, and it also was a construction
23  company, but it dealt with infrastructure construction,
24  road construction, light systems, things like that so I
25  was also there for a year.

1   Q   And what did do for them?
2   A   Purchasing and sourcing.
3   Q   So you were there until about the end of 2008?
4   A   Yes.
5   Q   And why did you leave there?
6   A   The financial crisis happened, the company
7  started having some trouble so I looked for other
8  employment.
9   Q   Why did you leave Centex?
10   A   The same thing, just the housing bust, things
11  weren't going well there so I decided to leave.
12   Q   And why did you leave Pulte?
13   A   There was actually a reduction in force and
14  they had a group of layoffs and I was part of like a
15  group of layoffs.
16   Q   So after Atlas did you become employed?
17   A   Yes, so I was employed by Q Med Corporation.
18   Q   In 2009 I guess?
19   A   In the very end of 2008, December of 2008.
20   Q   And what did you do for them?
21   A   I was an analyst.
22   Q   In doing what, analyst in what?
23   A   In looking at sales, vendor purchasing costs,
24  things like that.
25   Q   What type of materials were you purchasing at

1  Q Med?
2   A   Well, it's medical, medical supplies,
3  disposables, things likes that.
4   Q   And Q Med doesn't manufacture anything, isn't
5  that correct?
6   A   Q Med itself, no, it did not.
7   Q   It buys products from resellers?
8   A   Yes, from distributors or also from other
9  distributors, right.
10   Q   It doesn't buy from retail or manufacturers
11  directly?
12   A   What do you mean by retail?
13   Q   Well, let's start with one question at a time.
14   A   Okay.
15   Q   Did it buy in your time directly from
16  manufacturers as opposed to distributors?
17   A   Q Med, no, it bought it from distribution.
18   Q   Okay.  And it was strictly in the medical
19  supply area?
20   A   Yes, medical and disposable supplies.
21   Q   And how long were you an analyst there?
22   A   From 2008 until about 2015 or '16, somewhere
23  in there.
24   Q   And what happened about 2015?
25   A   The eCommerce operation started, and I took

1  the -- my roles and responsibilities changed, and I
2  started up the eCommerce part of it.
3   Q   You helped start the eCommerce department?
4   A   That's right.
5   Q   Okay.  And what was the eCommerce department
6  at Q Med?
7   A   So Solu-Med became the eCommerce operation for
8  the organization.
9   Q   But it originally was part of Q Med, correct?
10   A   No, it wasn't really ever just part of Q Med,
11  it was basically Solu-Med was the eCommerce operation.
12  Q Med really didn't have the eCommerce presence at all.
13   Q   But Solu-Med was within a department within
14  Q Med at the time?
15   A   It was within AGRO, so they were sister
16  companies I guess.
17   Q   When did it become a sister company?
18   A   I am not aware of that, I'm not sure.
19   Q   Okay.  And did you help begin the Solu-Med
20  eCommerce department?
21   A   Yes.
22   Q   And why don't you walk me through what
23  infrastructure you set up at Solu-Med to begin the
24  eCommerce department.
25   A   So we set up accounts for selling, so selling



KELLON GOODSON                                          January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      13–16

Page 13

1  to marketplaces; we set up the systems to help to sell
2  the product and so the software, things like that.
3        And then we used the Q Med had existing
4  infrastructure for its ERP system and distribution
5  systems so we had some shared services that already
6  existed that we used that we just kind of tapped into
7  existing Q Med, just Q Med personnel or functions.
8     Q   What shared services that you said, I think
9  you said you called it Q tip?
10     A   No, it would be like distribution,
11  distribution functions or the ERP, which is the
12  Enterprise Resource Software that runs the information
13  for products or purchasing, things like that.
14     Q   And that software was owned by Q Med?
15     A   Yes.
16     Q   And Solu-Med used it?
17     A   Yes.
18     Q   Did Solu-Med pay for that use?
19     A   I'm not aware of that.
20     Q   Okay.  What platforms did you have; you had
21  Amazon, correct?
22     A   Yes.
23     Q   And you had a storefront on Amazon, correct?
24     A   That's correct.
25     Q   And you also had ability to sell to Amazon

Page 14

1  directly if you wanted to?
2     A   You mean as a first party to sell?
3     Q   Instead of selling to consumers you could have
4  sold directly to Amazon any product?
5     A   Solu-Med did not have a direct relationship
6  with them.
7     Q   You could have, though?
8     A   We could have, yes.
9     Q   But Solu-Med chose not to do that?
10     A   You have to get a vendor account to sell
11  directly to them so you have to be invited.
12     Q   Did Solu-Med try to do that?
13     A   Not that I am aware of, no.
14     Q   So there was Amazon?
15     A   Uhm-hum.
16     Q   What other marketplace?
17     A   eBay.
18     Q   eBay.
19     A   Later on Wal-Mart.
20     Q   And did it have a storefront on Wal-Mart or
21  was it just selling products that it purchased and
22  resold on Wal-Mart's website?
23     A   So the Wal-Mart has a marketplace just like
24  Amazon does so it's a storefront for your products on
25  Wal-Mart's platform.

Page 15

1     Q   And, again, Solu-Med doesn't manufacture any
2  products so it's not your products, correct?
3     A   Correct, we were reselling products.
4     Q   In fact Solu-Med is just a reseller of other
5  people's manufactured products, correct?
6     A   That's correct.
7     Q   And eBay, did it have a similar marketplace?
8     A   Yes.
9     Q   So Amazon, eBay, Wal-Mart, anybody else?
10     A   We had a Shopify account, which was our own
11  proprietary website.
12     Q   Okay.  And in the years 2017 until the time
13  you left, the bulk of the products being sold were
14  through the Amazon account?
15     A   That's correct.
16     Q   At your current job do you deal with the
17  Amazon marketplace?
18     A   No.
19     Q   When you started and opened up this Amazon
20  account through Solu-Med, did you take any courses that
21  were offered by Amazon?
22     A   Can you explain that a little bit further?
23     Q   Do you know what a course is?
24     A   Yes.
25     Q   Okay.  Are you aware that Amazon offered

Page 16

1  educational courses regarding its marketplace?
2     A   There is some information on their, as far as
3  their selling university and things like that, there's
4  some of those demos and videos that I have watched, yes.
5     Q   You have watched the videos, but did you
6  attend any of the courses?
7     A   No.
8     Q   Do you know which video you watched?
9     A   Maybe related to the packaging and materials
10  and the shipments, things that are related to
11  distribution.
12     Q   Any other video that you have watched that you
13  can recall as you sit here?
14     A   Not that I can recall.
15     Q   And did you receive any training to sell on
16  the Amazon marketplace?
17     A   No.
18     Q   And this obviously was all new to you because
19  previously you were doing what you would call were
20  sourcing and purchasing?
21     A   Q Med was analytics.
22     Q   Okay.  So analytics and sourcing and
23  purchasing --
24     A   Uhm-hum.
25     Q   -- Is different than setting up an eCommerce



KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
17—20

Page 17

1  department?
2     A   Yes.
3     Q   Were you the individual in charge of running
4  all of Solu-Med?
5     A   I had the responsibilities for the eCommerce
6  part of Solu-Med, that was my responsibility.
7     Q   My question was were you the person at the
8  head of all of Solu-Med?
9     A   No, that would be Manny, he was the owner so
10  he was running it.
11     Q   I think you have -- have you ever been deposed
12  before by the way?
13     A   No.
14     Q   Okay.  I forgot to give you what the typical
15  ground rules are.
16        I'll be asking you a series of questions.  If
17  you don't understand any of my questions feel free to
18  let me know.
19        From time to time you may hear Ms. Black make
20  objections, you are still required to answer unless she
21  directs you not to, and then Ms. Black and I can have a
22  debate a different day.
23        The court reporter is going to be taking down
24  our questions and answers and I'm going to try to go as
25  fast as I can, despite what the court reporter wants,

Page 18

1  because I know you have to get out of here.
2     A   Uhm-hum.
3     Q   But it's important for you to let me complete
4  my question for the court reporter.
5     A   Okay.
6     Q   Even if you anticipate the answer because the
7  court reporter can't take the two of us speaking at the
8  same time.
9        It's also important that all your responses be
10  articulate and loud --
11     A   Okay.
12     Q   -- And verbal because otherwise the court
13  reporter can't take that down, okay?
14     A   Understood.
15     Q   And if you need a break at any time let me
16  know.
17     A   Okay.
18     Q   So we were talking about you were in charge of
19  the eCommerce department.
20        You weren't in charge of the accounting of it,
21  correct?
22     A   Correct.
23     Q   You were in charge of the mechanics and
24  operations as it relates to the various platforms and
25  selling the, reselling products on those platforms,

Page 19

1  correct?
2     A   Correct.
3     Q   Any other job functions and job duties that
4  you would have had?
5     A   I did provide information to the accounting
6  team as far as sales, sales summaries, things like that
7  that they needed to complete some of their work, and
8  then I did do some of the purchasing and sourcing.
9     Q   Great point.  Was the bulk of the products
10  that Solu-Med purchased from Q Med?
11     A   Yes.
12     Q   Who else did Solu-Med purchase products from
13  that you can recall?
14     A   Solu-Med's purchasing was from Q Med.
15     Q   All of it?
16     A   Yes.
17     Q   So Q Med would purchase the products from
18  various distributors, correct?
19     A   Correct.
20     Q   Okay.  And then Q Med would sell it at cost to
21  Solu-Med, correct?
22        MS. BLACK:  Form.
23        THE WITNESS:  There's -- I'm not sure as far
24     as the accounting part of it I will be honest.
25

Page 20

1  BY MR. VINE:
2     Q   So do you know if it was sold at cost or a
3  markup between Q Med, do you know, because you said you
4  were not sure, I just want to make the record is clear,
5  because she made an objection I'm going to ask the
6  question in a little clearer way.
7        Do you have specific knowledge as to whether
8  Q Med sold the products to Solu-Med at cost or something
9  else?
10     A   I don't have specific knowledge, no.
11     Q   When you say you were involved in the
12  purchasing and sourcing for products at Solu-Med, was it
13  that you would direct Q Med to purchase certain
14  products?
15     A   There were products that were specific for
16  Solu-Med that I was directing them to purchase basically
17  for the eCommerce sales.
18     Q   So I just want to make sure I understand.
19     A   Uhm-hum.
20     Q   Q Med would go out and purchase products based
21  upon your direction at Solu-Med, correct?
22     A   Yes, there were products that were purchased
23  at my direction for Solu-Med.
24     Q   Okay.  But Q Med purchased them, correct?
25     A   Correct.



KELLON GOODSON                                          January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      21–24

Page 21

1    Q   And then Q Med would transfer them over to
2  Solu-Med, correct?
3    A   Correct.
4    Q   And this was all under the same warehouse,
5  correct?
6    A   Correct.
7    Q   Do you know how much square footage Solu-Med
8  used?
9    A   I am not aware it, no.
10    Q   Do you know how much rent Solu-Med paid to
11  Q Med?
12    A   I'm not aware, no.
13    Q   Do you know how much expenses they paid for
14  utilities and those things?
15    A   I'm not sure.
16    Q   Anything as it related to operations from an
17  accounting standpoint you wouldn't be familiar with what
18  was paid or not paid, correct?
19    A   No, that was --
20    Q   I'm correct?
21    A   That's correct.
22    Q   Okay, thank you.
23       When you transferred in 2015, '16 to Solu-Med
24  as an analyst to eCommerce manager did your paychecks
25  still say Q Med if you recall?

Page 22

1    A   I don't recall.  Yes, I don't recall.
2    Q   I guess the better way to ask this question
3  did it ever change to Solu-Med?
4    A   It did, yes.
5    Q   Okay.  Do you know when?
6    A   I don't recall when exactly it was.
7    Q   Was that in 2019?
8    A   It may have been.  I'm not fully remembering
9  exactly.
10    Q   So you're familiar or you have a familiarity
11  with Amazon that it has a marketplace, correct?
12    A   Yes.
13    Q   Okay.  Like Amazon Wal-Mart has a marketplace?
14    A   Yes.
15    Q   Did you take any training for the Wal-Mart
16  marketplace?
17    A   The, again, just their videos and their kind
18  of self service model of training.
19    Q   They offer courses as well?
20    A   Yes.
21    Q   Did you take those courses?
22    A   Yes.
23    Q   So you took courses for the Wal-Mart one and
24  not the Amazon one?
25    A   Well, there were specific courses to start

Page 23

1  with Wal-Mart that they required us to view that we
2  took.
3    Q   Okay.  And you're saying Amazon didn't require
4  them?
5    A   There was no specific requirement to start an
6  account and then to watch the video or watch the
7  training.
8    Q   So Wal-Mart required you to watch certain
9  training?
10    A   Yes.
11    Q   And you took it?
12    A   Yes.
13    Q   And what were those?
14    A   How to list products, expectations on how to
15  present your products, the types of products that were
16  going to be sold through the marketplace and categories
17  that were related to the products sold.
18    Q   So just to make sure I understand, you took
19  the courses at Wal-Mart because it was required, and you
20  didn't take the courses at Amazon because it wasn't
21  required, is that correct?
22    A   Well, the Amazon courses that were -- that we
23  were doing were mostly related to like I said
24  distribution, Wal-Mart's were to bring the account
25  online so we had to do the...

Page 24

1    Q   Are you done?
2    A   Yes.
3    Q   Okay.  I just want to make sure.  You didn't
4  really answer my question so we're going to go back to
5  that.
6       Wal-Mart required you to take certain courses,
7  correct?
8    A   Yes.
9    Q   Okay.  And you took those courses?
10    A   Yes.
11    Q   Amazon offered courses, you chose to take only
12  the courses regarding packaging and distributing,
13  correct?
14       MS. BLACK:  Form.
15       THE WITNESS:  That I am aware of.  I don't
16    recall all the courses that I watched, but I do
17    know that specifically for Amazon the distribution
18    ones I watched all of those.
19  BY MR. VINE:
20    Q   Do you recall any of the other courses offered
21  by Amazon?
22    A   I don't recall at this point.
23    Q   Do you remember reading any of their
24  guidelines?
25    A   Yes.



Page 25

1    Q   Did you have a printout of the guidelines in
2  your office?
3    A   A printout, no.
4    Q   Did you save the guidelines to the computers
5  at Solu-Med?
6    A   As far as like an electronic copy on the hard
7  drive, yes, we did.
8    Q   So if we went back and did a search of your
9  computer at Solu-Med we would be able to confirm the
10  accuracy of your testimony that you had saved guidelines
11  from Amazon, correct?
12    MS. BLACK:  Form.
13    THE WITNESS:  I want to be specific, as far as
14    the guidelines for -- they have different
15    guidelines for different things.
16  BY MR. VINE:
17    Q   Okay.  So you saved certain guidelines, not
18  all guidelines?
19    A   Correct.
20    Q   Did you save the Seller Code of Conduct
21  guideline?
22    A   I don't recall.
23    Q   Did you ever read the Seller Code of Conduct
24  guideline?
25    A   Yes.

Page 26

1    Q   Did you save the guidelines regarding
2  counterfeit items?
3    A   I don't recall if I saved it.
4    Q   Did you review it?
5    A   Yes.
6    Q   Okay.  When did you review that?
7    A   Probably 2015.
8    Q   Okay.  So from 2015 to 2018 you would have
9  read it one time?
10    A   Yes, that is correct.
11    Q   Did you review any guidelines regarding
12  authenticity?
13    A   Yes.
14    Q   And was that also in 2015?
15    A   Yes.
16    Q   Would you have read all the guidelines
17  regarding from Amazon in 2015?
18    A   Yes.
19    Q   Would you have read them again thereafter?
20    A   I don't recall.
21    Q   You only recall reading them in 2015?
22    A   Correct.
23    Q   And as you sit here today can you tell me if
24  you had saved copies for your employees to review those
25  guidelines?

Page 27

1    A   I don't recall if we have them saved.
2    Q   Did you instruct your employees at Solu-Med to
3  review the Amazon guidelines before posting and selling
4  products on Amazon?
5    A   No.
6    Q   More specifically, did your -- did Solu-Med
7  and its employees review the guidelines of Amazon
8  regarding authenticity, counterfeit products and selling
9  hair and makeup before it sold Youngblood products on
10  its Amazon storefront in 2018?
11    A   Can you ask the question again?
12    Q   Yes.  In 2018 Solu-Med sold Youngblood
13  products?
14    A   Yes.
15    Q   Okay.  On its storefront, right?
16    A   Yes.
17    Q   Okay.  Prior to posting and listing those
18  products did someone from Solu-Med re-review the
19  guidelines regarding authenticity?
20    A   You're saying specifically in 2018?
21    Q   Yes.
22    A   No.
23    Q   Did they review them regarding counterfeit
24  items?
25    A   No.

Page 28

1    Q   Regarding the Seller Code of Conduct?
2    A   No.
3    Q   Regarding the sale of hair and makeup?
4    A   No.
5    Q   And we'll get to a couple of the others.
6    When you had -- strike that.  When someone put
7  an item to be sold on Solu-Med's storefront on Amazon,
8  who was the individual responsible in 2018 to post it on
9  Amazon?
10    A   That would have been Adam Weinstein.
11    Q   And when did Adam Weinstein leave Solu-Med?
12    A   2018.
13    Q   When in 2018?
14    A   December 2018.
15    Q   Why did he leave in December of 2018?
16    A   I believe he was let go.
17    Q   Do you know why he was let go?
18    A   I think it was because -- actually I'm not, I
19  don't recall exactly what the specifics were.
20    Q   Well, you were the manager so you were the
21  boss; did you terminate him?
22    MS. BLACK:  Form.
23  BY MR. VINE:
24    Q   You were the boss of Adam Weinstein, correct?
25    A   I was not the manager of Solu-Med at that



KELLON GOODSON                                           January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                         29–32

Page 29

1 point.
2    Q   Okay. When did you become the manager of
3 Solu-Med?
4    A   Well, I was managing it in 2018, Cheri Seidle
5 had responsibilities for Solu-Med as well.
6    Q   Do you know why?
7    A   I don't recall exactly.
8    Q   Do you know generally why?
9    A   I think it was because of reduction of our
10 sales because of the issues we had with our account.
11    Q   In December '18?
12    A   Yes.
13    Q   Did it have to do with poor performance?
14        MS. BLACK:  Form.
15        THE WITNESS:  I'm not aware.
16 BY MR. VINE:
17    Q   Have you spoken to Adam Weinstein since he has
18 left?
19    A   Yes.
20    Q   When was the last time you have spoken to him?
21    A   I don't recall exactly.
22    Q   What did you guys talk about?
23    A   Just how he's doing.
24    Q   Do you know where he is?
25    A   In Broward County somewhere.

Page 30

1    Q   Do you know what job, where he's working?
2    A   Oh, I don't know exactly, I just know he had a
3 job working. I know he's working, so that's about it.
4    Q   Okay. But you can't tell me where he is
5 working?
6    A   I don't know specifics, no.
7    Q   When was the last time you spoke to him?
8    A   I don't recall.
9    Q   Was it in the year 2019?
10    A   Yes.
11    Q   Cheri Seidle doesn't work at Q Med anymore,
12 correct?
13    A   That's correct.
14    Q   And when was the last time you spoke to her?
15    A   The last time I spoke to her would have been
16 in June 2019 I believe.
17    Q   Is that when she left?
18    A   Yes.
19    Q   Do you know why she left?
20    A   She was also let go.
21    Q   She worked at Q Med, correct?
22    A   Yes.
23    Q   I'm waiting for a document, this is an Exhibit
24 that I need, okay.
25        You set up the storefront on Amazon, correct?

Page 31

1    A   Yes.
2    Q   Okay. And then Adam would be the one charged
3 with the responsibility of putting the products on the
4 website?
5    A   Yes.
6    Q   Okay. Did you provide any training to Adam?
7    A   We --
8    Q   I asked if you did.
9    A   Yes.
10    Q   What was the training that you did?
11    A   Basically the way that we would list the
12 products, the setup of the products, things like that.
13    Q   Did you give him a copy of all the Amazon
14 guidelines?
15    A   A copy, no.
16    Q   Do you know if he -- do you have specific
17 knowledge if he read the Amazon guidelines?
18    A   Specific knowledge, no.
19    Q   Did you direct him to read it, the Amazon
20 guidelines?
21    A   No.
22    Q   So do you know what a, let me get the Exhibit
23 for you so I don't butcher it, an ASIN is; do you know
24 what an ASIN is?
25    A   Yes.

Page 32

1    Q   What is an ASIN?
2    A   It's the Amazon, Amazon listing number or SKU
3 that they use for their listings.
4    Q   So they can match up the product, correct?
5    A   Correct.
6    Q   And each ASIN has a product page that when you
7 list something you sell it must match up, correct?
8    A   Yes.
9    Q   And you agree with me it was Solu-Med's or
10 Life & Health Source responsibility to make sure that
11 any product they listed must be matched to the ASIN?
12    A   Specifically on the Amazon listing, yes.
13    Q   And if it didn't it would be a violation of
14 Amazon guidelines, correct?
15    A   Yes.
16    Q   Prior to acquiring Youngblood products, and I
17 think we -- in 2018 do you recall specifically reviewing
18 the selling -- strike that.
19        Prior to acquiring Youngblood products did you
20 review the selling policies and Seller Code of Conduct
21 as posted in Amazon Seller Central System in 2018?
22    A   2018?
23    Q   Yes.
24    A   I don't specifically remember.
25    Q   In 2017 did you do it?



Page 33

1    A  I don't specifically remember.
2    Q  2016?
3    A  Again, specifically I don't remember.
4    Q  You only remember 2015, correct?
5    A  Correct.
6    Q  Okay.  You're familiar that there are selling
7  policies and Seller Code of Conduct, correct?
8    A  Yes.
9    Q  Did you or people at Solu-Med review these
10  items before acquiring the Youngblood products?
11    MS. BLACK:  Form.
12    THE WITNESS:  It would have been in 2015?
13  BY MR. VINE:
14    Q  In 2018.
15    A  No, not in 2018.
16    Q  In 2017?
17    A  Not that I am aware of.
18    Q  Okay.  Prior to listing them were the
19  practices of the selling policies and Seller Code of
20  Conduct followed -- strike that.
21    Prior to listing the Youngblood products sale
22  in 2018, were these practices followed?
23    A  Can you say it again?
24    Q  Yes.  Prior to listing the Youngblood products
25  in 2018, do you have specific knowledge as to whether

Page 34

1  the selling policies and Seller Code of Conduct were
2  followed in 2018 as it relates to the Youngblood
3  products?
4    A  We would have followed the guidelines that we
5  read in 2015 I am assuming.
6    Q  So you would know, you said you assume, so you
7  don't, do you have specific knowledge that you can
8  recall?
9    A  I don't have specific knowledge.
10    Q  Okay.  I think we talked about this, but I
11  want to make sure we understand.
12    Did you complete Amazon Seller University
13  training entitled Best Practices in Product Authenticity
14  and Quality prior to acquiring Youngblood products and
15  listing them for sale on Amazon?
16    A  I don't remember.
17    Q  Did anyone at Solu-Med attend Best Practices
18  in Product Authenticity and Quality at Amazon Seller
19  University?
20    A  I am not aware.
21    Q  When you say you're not aware, you didn't do
22  that, correct?
23    A  I'm saying I don't remember which ones we
24  watched, so I don't have any specifics.
25    Q  Sir, I didn't ask that if you watched

Page 35

1  something, I asked if you attended Amazon Seller
2  University?
3    A  I want to be specific, so because these were
4  usually like webinars, things like that.
5    Are you saying there's actually a class
6  training?  I want to be specific about that.
7    Q  Well, you only recall watching a video
8  regarding distribution, correct?
9    MS. BLACK:  Form.
10  BY MR. VINE:
11    Q  No, package and distribution, that's what you
12  stated earlier?
13    A  Correct, those are the ones I specifically
14  remember.
15    Q  Okay.  And you don't recall any others,
16  correct?
17    A  Correct.
18    Q  Okay.  And I'm asking do you ever remember
19  attending a webinar or anything regarding Amazon
20  Seller's University's training?
21    A  I don't specifically remember.
22    Q  Did you ever receive a certificate from Amazon
23  acknowledging your attendance or anyone's attendance
24  from Amazon Seller University?
25    A  Not that I am aware of, no.

Page 36

1    Q  Did Adam Weinstein before he started listing
2  products on Amazon attend the Amazon Seller University?
3    A  I am not sure.
4    Q  Did you direct him as his manager to do that?
5    A  No, I did not.
6    Q  Why not?
7    A  I don't remember honestly.
8    Q  So it was your decision to purchase Youngblood
9  products, correct?
10    A  Yes.
11    Q  Do you recall who you purchased Youngblood
12  products from?
13    A  The distributor was Innopex.
14    Q  Is that the only one you purchased it from?
15    A  Yes.
16    Q  And who at Innopex was your contact?
17    A  Joel, I can't pronounce his last name,
18  Milapinski.
19    Q  And do you recall your conversations with him
20  regarding the Youngblood products?
21    A  I don't.
22    Q  Did he tell you where he got the products
23  from?
24    A  He did not.
25    Q  Did he tell you if the products came with a



Page 37

1  warranty or not?
2      A   I don't think so.
3      Q   Okay.  Did you ask him if the products come
4  with a warranty?
5      A   I don't recall.
6      Q   Are you aware if the products came with a
7  warranty?
8      A   No.
9      Q   Why did you decide to purchase the Youngblood
10 products?
11     A   When the account was growing and we were
12 looking into new product lines to start, we looked at it
13 as an opportunity to expand into makeup.
14     Q   But why Youngblood?
15     A   It was a product line that was offered to us
16 through distribution.
17     Q   But why specifically the Youngblood line if
18 you can recall?
19     A   I don't recall.
20     Q   Was it because it was a luxury item?
21     A   I think it was specifically just to try to
22 expand into makeup.
23     Q   Okay.  Did Innopex sell you other products?
24     A   Yes.
25     Q   Did you ever receive a complaint from Amazon

Page 38

1  on any of the other products that you received from
2  Innopex?
3      A   I don't recall.
4      Q   You're aware that Solu-Med in, just in the
5  year 2018, received eight prior complaints regarding the
6  products it was selling before the complaint at issue,
7  correct?
8      A   As far as Youngblood specifically?
9      Q   There was a complaint in 2018, November of
10 2018 --
11     A   Right.
12     Q   -- Regarding the sale of Youngblood products,
13 correct?
14     A   Correct.
15     Q   Prior to that Solu-Med was notified about
16 selling other products and complaints relating to those
17 other products about eight times in the year of 2018
18 before the sale -- before the complaint in November of
19 2018, correct?
20     A   Correct.
21     Q   Were any of those products, non-Youngblood
22 products, come from Innopex?
23     A   I'm not aware.
24     Q   You don't know one way or the other?
25     A   No, I don't know.

Page 39

1      Q   Did you purchase, you being Solu-Med, did
2  Solu-Med purchase other products from Innopex?
3      A   Yes.
4      Q   What other products did you sell?
5      A   Hair and beauty and skin care products mainly.
6      Q   What steps did you take to verify the
7  condition and authenticity of the Youngblood products
8  prior to listing them for sale on the Amazon storefront,
9  what were the specific steps?
10     A   So when we receive the product a employee
11 would receive the products in, break down the order and
12 look at the products and view the actual physical
13 product.
14         Then the product would be viewed on listing
15 online, so Amazon's listing on ASIN, and the product
16 would be photographed and we would compare the product
17 that we have in the photograph to what was on the Amazon
18 listing to see that the item matched, and that there was
19 a UPC match to the item that we had compared to the ASIN
20 that was listed on Amazon.
21     Q   Anything else?
22     A   No, not that I am aware of.
23     Q   Did you ask for the sourcing information from
24 Innopex?
25     A   No.

Page 40

1      Q   Did you ask where they purchased the product
2  from?
3      A   No.
4      Q   Did you ask for any publications or warranty,
5  written warranty information from the manufacturer?
6      A   No.
7      Q   Did anyone from Solu-Med reach out to
8  Youngblood to verify that you were allowed to sell their
9  product?
10     A   No.
11     Q   Did anyone from Solu-Med verify with
12 Youngblood whether the product came with a warranty?
13     A   No.
14     Q   Did anyone from Solu-Med ever look at the
15 website of Youngblood prior to the complaint in 2018?
16     A   Not that I am aware of.
17     Q   Did Solu-Med employees open the packaging to
18 look at the product?
19     A   There was product, there were products that we
20 would open to look at.
21     Q   So you broke the seal?
22     A   We would break a seal to look at one of the
23 products inside to see what it looked like.
24     Q   Did you resell the one that you broke the seal
25 on?



Page 41

1    A   No.
2    Q   Okay.  Did Solu-Med put its own SKU label on
3  the product?
4    A   There is an Amazon ASIN label that is required
5  to put on products that are listed through Amazon's
6  Prime FBA system that Amazon requires you to put on, but
7  we do not specifically put on a Solu-Med label or
8  relabel any products.
9    Q   Okay.  Do you put that Amazon label over the
10  SKU of the Youngblood product?
11    A   Over the bar code, which is Amazon's
12  requirement.
13    Q   Where in Amazon does it say that you are
14  supposed to put it over Youngblood's bar code?
15    A   There were the videos and specifics on the
16  packaging so that Amazon's fulfillment center didn't
17  confuse on the scanning the bar code, that they are just
18  scanning their ASIN label.
19    Q   So if their guidelines say that you're not
20  supposed to cover the SKU from the manufacturer, those
21  guidelines are wrong?
22    MS. BLACK:  Form.
23    THE WITNESS:  It would have been whatever
24    Amazon said, told us to do.
25    (BY Mr. Vine)

Page 42

1  BY MR. VINE:
2    Q   So are you a hundred percent sure they told
3  you to put the Amazon label over the bar code of
4  Youngblood's SKU?
5    A   That was the specifics back at the time.  I'm
6  not aware of what it is now to be honest.
7    Q   Was that what was valid in 2018?
8    A   Again, I'm not aware of what the updates were
9  in 2018.
10    Q   Because you didn't review anything since 2015,
11  correct?
12    A   I'm not aware.
13    Q   You're not aware of reviewing anything since
14  2015?
15    A   That is correct.
16    Q   What specific information did you submit to
17  Amazon regarding Solu-Med's offering of Youngblood's
18  products for sale?
19    A   Can you say that again?
20    Q   What specific information did Solu-Med submit
21  to Amazon regarding Solu-Med's offering of Youngblood's
22  products for sale?
23    A   So the way that it works is an item is, like I
24  said, matched up in the UPC system.
25    Q   Right.

Page 43

1    A   Then the listing basically links in with the
2  existing information that's already on Amazon.
3    MS. BLACK:  Can we take a brief break?
4    MR. VINE:  Yes, okay.
5    MS. BLACK:  Is that okay?
6    MR. VINE:  Okay.  That's fine.
7    MS. BLACK:  Sorry.
8    THE VIDEOGRAPHER:  We are going off the video
9    record 8:55 a.m.
10    (Whereupon, a short recess was had.)
11    THE VIDEOGRAPHER:  We are back on the video
12    record 9:01 a.m.
13  BY MR. VINE:
14    Q   We were talking about what specific
15  information did Amazon receive from Solu-Med before it
16  listed Youngblood products, and you've indicated that
17  you would try to match up the ASIN page, that wasn't my
18  question.
19    My question is what did Solu-Med submit to
20  Amazon regarding the products that were sold, if you
21  know?
22    A   The price that we'd would sell it at, and the
23  quantity that was sought.
24    Q   Did you also advise that you were selling the
25  product as new?

Page 44

1    A   Yes.
2    Q   Did you also advise whether there would be a
3  warranty?
4    A   That was not part of the data submittal that
5  Amazon asked for.
6    Q   Are you aware that if a product is listed as
7  new it must come with the warranty?
8    A   I wasn't aware of that.
9    Q   It's true that -- strike that.
10    Did Life & Health Source at Solu-Med accept
11  returns on Youngblood products?
12    A   Yes.
13    Q   Are you aware that the Life & Health Source
14  storefront indicated that it would not accept return or
15  exchanges on personal hygiene items, hair care,
16  cosmetics, fragrance, skin care or toys?
17    A   Yes, there were some parameters that we put in
18  place for some returns.
19    Q   So makeup would fall within those categories,
20  correct?
21    A   Correct.
22    Q   Okay.  Youngblood products were makeup,
23  correct?
24    A   Correct.
25    Q   And on the Life & Health Source storefront



KELLON GOODSON                                                January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                              45—48

Page 45

1  it's stated on the Amazon website that it would not
2  accept returns for exchanges for those products,
3  correct?
4     A   Correct.
5     Q   Okay.  Yet you would still accept them?
6     A   So I want to make a specific statement to
7  that.
8        There is a requirement that when you sell
9  items on Amazon that you adhere to their return policy.
10       Youngblood's products were sold through
11 Amazon's FBA Prime program so they were all able to be
12 returned to Amazon.
13    Q   Then why did you tell the public that you
14 wouldn't accept it?
15    A   There were items that were not accepted as
16 returns because of some guidelines around usage of the
17 product, things like that, that we could not accept, so
18 we did put that statement out there to make sure that
19 there were people not using the products and trying to
20 return them and things like that that were not valid.
21    Q   But what you stated on the store -- well, why
22 don't I look at the Exhibit.
23       (Wherupon, the below referred to document
24       was marked as Defendant's Exhibit No. 1.)
25

Page 46

1  BY MR. VINE:
2     Q   We will mark as Exhibit 1 to the deposition a
3  copy of the Life & Health Source Storefront page.
4        Have you seen this document before?
5     A   Yes, I have.
6     Q   Okay.  Did you draft this document?
7     A   No.
8     Q   Who drafted it?
9     A   Adam Weinstein did.
10    Q   Okay.  So do you see the bold section where it
11 says Due to Federal regulations we are unable to accept
12 returns or exchanges on personal hygiene items, hair
13 care, cosmetics, fragrance, skin care or toys?
14    A   Yes.
15    Q   So this is a representation to the public that
16 you will not accept any returns or exchanges on
17 cosmetics, correct?
18    A   Correct.
19    Q   Who directed Adam to put that in there?
20    A   I did.
21    Q   Okay.  Who directed you to put that in there?
22    A   It was basically reading some information
23 about items that could be returned or issues receiving
24 items back through the postal service or things like
25 that.

Page 47

1     Q   Okay.  So you're making a representation to
2  the public that's not accurate, correct?
3     A   Well, we would try to be as accurate as
4  possible.  We didn't want to accept things that would be
5  potentially a HAZMAT item, things like that in returns
6  back.
7     Q   Right.  But and then Mr. Aguero testified that
8  the reason, one of the reasons why you put this on there
9  was because you wanted to discourage returns?
10       MS. BLACK:  Form.
11 BY MR. VINE:
12    Q   Isn't that correct?
13    A   Well, we wanted to try and mitigate the amount
14 of people that potentially using the products and then
15 sending it back saying it wasn't -- they weren't, they
16 didn't want to use it anymore.
17    Q   That was one of the reasons why you put that
18 there, correct?
19    A   Correct.
20    Q   Okay.  So you wanted to discourage returns,
21 correct?
22    A   Correct.
23    Q   And you told them that you wouldn't accept
24 returns, correct?
25    A   Correct.

Page 48

1     Q   Yet in reality you had to accept returns,
2  that's your statement under oath?
3        MS. BLACK:  Form.
4        THE WITNESS:  So I want to be specific, there
5  are items that were sold through the FBA program
6  that were under Amazon's terms in how they accept
7  the returns.
8        Well, this was what we were accepting through
9  our own fulfillment or our own selling directly to
10 the customer.
11       Amazon has its own return policy so.
12 BY MR. VINE:
13    Q   So that's what I understood because I thought
14 what you said earlier is you had to accept returns;
15 that's not true, correct?
16    A   Amazon FBA they would accept returns.
17    Q   What is FBA so that the ladies and gentlemen
18 of the jury know?
19    A   Fulfillment by Amazon, which is the program
20 where inventory that was, Solu-Med inventory would go to
21 an Amazon fulfillment center, and they would be
22 responsible for the fulfillment of those products that
23 they would ship it directly to the customer, and the
24 items would also be if they were returns they would
25 handle customer service, and they would handle any type



Page 49

1  of exchanges, things like that, but we were not involved
2  in that process because Amazon handles that 100 percent.
3      Q   Okay. But what we're talking about is not the
4  FBA program, correct?
5      MS. BLACK:  Form.
6      THE WITNESS:  Youngblood products were sold
7     through the FBA program, so that's where I wanted
8     to bring that into the answer.
9  BY MR. VINE:
10     Q   So what was this bold, not relating to the FBA
11  program?
12     A   Correct, these were items that would be sold
13  directly to the customer returned to the Solu-Med
14  warehouse where we would accept the returns.
15     Q   So not everything on the storefront was sold
16  through the FBA program?
17     A   Correct.
18     Q   And all Youngblood products were sold through
19  the FBA program?
20     A   Correct.
21     Q   So Amazon required the acceptance of it,
22  correct?
23     A   Correct.
24     Q   Yet do you distinguish on your storefront that
25  through the FBA program we would accept cosmetics?

Page 50

1      A   No, we do not.
2      Q   So the public doesn't know that Amazon -- that
3  Life & Health Source would accept returns --
4      MS. BLACK:  Form.
5  BY MR. VINE:
6      Q   -- Because you don't distinguish that,
7  correct?
8      Let me ask you this, did Solu-Med make the
9  public aware that the Youngblood products could be
10  accepted as a return?
11     MS. BLACK:  Form.
12     MR. VINE:  What's the form with that, does
13     Solu-Med know?  I mean did Solu-Med tell the
14     public, what is the form problem with that?
15     MS. BLACK:  No, there's no problem.
16     MR. VINE:  Okay.
17     THE WITNESS:  Sorry, can you say it again?
18  BY MR. VINE:
19     Q   Does Solu-Med inform the public that
20  Youngblood products couldn't be returned?
21     A   Specifically Youngblood, no.
22     Q   Any product, any cosmetic products that can be
23  returned, does Solu-Med inform the public?
24     A   Solu-Med, no.
25     Q   On its storefront does Life & Health Source

Page 51

1  inform the public?
2      A   No.
3      Q   You can put that aside.
4      What steps did you take, being Solu-Med, to
5  verify that the Youngblood products you were reselling
6  met Amazon's definition of new?  Met Amazon's definition
7  of new?
8      A   That would have been the process of receiving
9  them in and viewing the comparison of the item that we
10  received versus what was listed on Amazon's ASIN.
11     Q   Anything else?
12     A   No.
13     Q   Would you review the definition of new?
14     A   No.
15     Q   And you didn't investigate whether the product
16  had a manufacturer or any warranty that would apply?
17     A   No.
18     Q   And you didn't ask that question from the
19  supplier, correct?
20     A   No.
21     Q   I'm correct you didn't ask that question?
22     A   Correct.
23     Q   Right?
24     A   Correct.
25     Q   And you didn't ask that question of

Page 52

1  Youngblood, correct?
2      A   Correct.
3      Q   And did you speak to Youngblood about the
4  customer support needed for its products?
5      A   Sorry, say that again?
6      Q   Did you speak to Youngblood about the customer
7  support or customer services needed for its product?
8      A   No.
9      Q   Meaning how to apply the type of product?
10     A   No.
11     Q   What type of ingredients were included in the
12  product if not listed?
13     A   No.
14     Q   How it was manufactured?
15     A   No.
16     Q   So how would Life & Health Source be able to
17  answer the customer support service questions like that?
18     A   As far as the application of the product?
19     A   As far as the application of the product.
20     A   I'm not aware.
21     Q   Couldn't do it, right?
22     MS. BLACK:  Form.
23     THE WITNESS:  No, there would be nothing that
24     we would offer specifically on how to use the
25     product.

KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
53–56

Page 53

1  BY MR. VINE:
2     Q   Okay.  What about how the product was
3  manufactured?
4     A   Can you be more specific?
5     Q   What about that question do you not
6  understand?
7        MS. BLACK:  Form.
8        THE WITNESS:  I guess can you restate it?
9  BY MR. VINE:
10    Q   Sure.
11    A   Okay.
12    Q   Okay.  How could you answer the question on
13  how the Youngblood product was manufactured?
14    A   We wouldn't.
15    Q   Okay.  You didn't have that information,
16  correct?
17    A   We wouldn't answer those questions anyway.
18    Q   So you couldn't provide customer service or
19  support in those two areas, correct?
20    A   Correct.
21    Q   What information in your listing did you
22  include regarding the original warranty?
23    A   We matched up to existing ASINs so we provided
24  no information.
25        Whatever information existed on the listing is

Page 54

1  what we would have used.
2     Q   But you weren't selling the product with a
3  warranty, correct?
4     A   No.
5     Q   I'm correct?
6     A   Correct, correct.
7     Q   At some point you received an intellectual
8  property notification from Amazon regarding a Youngblood
9  issue, correct?
10    A   Correct.
11    Q   Did you review Amazon's intellectual property
12  policy at that time?
13    A   Yes.
14    Q   What about all the prior eight complaints?
15    A   Yes, we reviewed the intellectual property
16  specifications.
17    Q   Which ones?
18    A   Related to counterfeit products.
19    Q   So you would review it then?
20    A   Yes.
21    Q   And authenticity?
22    A   Yes.
23    Q   Are you guessing or you have specific
24  knowledge that you did?
25    A   I don't specifically know dates, but we did

Page 55

1  review it.
2     Q   In 2018?
3     A   I don't remember the specific dates.
4     Q   I know you told me you reviewed the guidelines
5  in 2015.
6     A   Correct.
7     Q   In 2018 when you received various
8  notifications regarding various complaints of the
9  products you were selling, do you have specific
10  recollection of you personally reviewing the
11  intellectual property policies at Amazon in 2018?
12    A   I don't have the specifics, no.
13    Q   Okay.  Do you have a specific recollection of
14  Adam Weinstein telling you that he reviewed them?
15    A   Not specifically, no.
16    Q   What steps did you take to verify the
17  condition of the product as new and authentic of the
18  Youngblood products when you received the notice from
19  Amazon?
20    A   It would have been the process of opening the
21  product, reviewing the product and the listing on the
22  Amazon listing.
23    Q   That's what you would have done?
24    A   Yes.
25    Q   When you got the notice?

Page 56

1     A   Yes.
2     Q   And do you have a specific recollection of
3  doing that as it relates to the Youngblood product?
4     A   I don't specifically remember.
5     Q   Okay.  So you were just guessing just now?
6        MS. BLACK:  Form.
7  BY MR. VINE:
8     Q   Do you have a specific recollection of
9  actually instructing someone when you received the
10  notice regarding the Youngblood product violation of
11  taking those steps?
12    A   I don't specifically recall.
13    Q   Do you know generally if you told somebody to
14  do that?
15    A   Generally we would do that.
16    Q   Not whether you would do that; generally do
17  you have a recollection of doing that?
18    A   Yes, there were times when we would -- sorry.
19    Q   Do you have a general recollection when the
20  Youngblood violation came in, meaning the notice of
21  violation to Solu-Med, that you instructed somebody to
22  verify the authenticity and new condition of the
23  Youngblood product?
24    A   When the Youngblood, when the Youngblood
25  complaint came in I don't specifically remember, no.



Page 57

1    Q   You understand that it's a violation from
2  Amazon when the listing is materially different than the
3  product sold, correct?
4    A   Yes.
5    Q   That's one of the items, material difference,
6  right?
7    A   Yes.
8    Q   And you know that a product that is being sold
9  that is listed as new must come with a warranty,
10 correct?
11       MS. BLACK:  Form.
12       THE WITNESS:  Are we speaking specifically or
13    generally about?
14 BY MR. VINE:
15    Q   Generally are you aware if it's listed as new
16 it should include the warranty if it were in like new
17 condition?
18    A   I wasn't aware of that, no.
19       (Whereupon, the below referred to documents
20    were marked as Defendant's Exhibit No. 2.)
21 BY MR. VINE:
22    Q   Marked as Exhibit 2 is the Condition
23 guidelines from Amazon.
24       Have you ever seen this document before?
25    A   Yes.

Page 58

1    Q   When was the last time you saw this?
2    A   2015.
3    Q   So you have specific recollection of reviewing
4  these guidelines in 2015?
5    A   Yes.
6    Q   Okay.  And can you read what the general
7  Condition guidelines state regarding new?
8    A   Just like it sounds.  A brand-new item.
9  Original manufacturer's warranty, if any, still applies,
10 with warranty details included in the listing comments.
11 Original packaging is present for most New items but
12 certain items like shoes may be re-boxed.
13    Q   Do you see here this definition of new?
14    A   Yes.
15    Q   Youngblood products were listed as new?
16    A   Yes.
17    Q   And you already testified earlier that they
18 did not come with a warranty, correct?
19    A   Correct.
20    Q   Okay.  Do you see how that a Youngblood
21 product cannot be sold as new on Amazon unless it comes
22 with the warranty?
23       MS. BLACK:  Form.
24 BY MR. VINE:
25    Q   This is all new to you, right?  No pun

Page 59

1  intended.
2        MS. BLACK:  Form.
3        THE WITNESS:  Correct.
4  BY MR. VINE:
5    Q   Okay, you can put that aside.
6        Had you known that Youngblood products came
7  with a warranty, were supposed to come with a warranty
8  if sold as new, would you have sold them as new on
9  Amazon?
10       MS. BLACK:  Form.
11       THE WITNESS:  Can you say again, I'm sorry?
12 BY MR. VINE:
13    Q   You have already testified that you were
14 unaware that the Youngblood products came with a
15 warranty, are supposed to come with a warranty, correct?
16    A   Correct.
17    Q   Okay.  And you also testified that the
18 Youngblood products were listed as new, correct?
19    A   Correct.
20    Q   Okay.  Had you known and, sorry, and you see
21 from the General condition guidelines that if you're
22 listing it new it must come with that warranty, correct?
23    A   Correct.
24    Q   And you have already testified that the
25 Youngblood products you sold did not come with a

Page 60

1  warranty, correct?
2    A   Correct.
3    Q   Had you known that it was supposed to come
4  with a warranty would you have listed the products as
5  new?
6    A   I honestly don't know what I would have done
7  at that point.
8    Q   Okay.  Or you would have chosen not to sell
9  the products, correct?
10   A   Maybe, I'm not sure.
11   Q   Do you see how it's a violation of the
12 guidelines by listing it new and not selling it with the
13 warranty?
14       MS. BLACK:  Form.
15 BY MR. VINE:
16   Q   You can answer.
17   A   Can you say it again?
18   Q   Sure.  After reviewing the guidelines and
19 listening to your testimony do you see how listing the
20 product as new when it doesn't come with a warranty is a
21 violation of the condition guidelines?
22       MS. BLACK:  Form.
23 BY MR. VINE:
24   Q   You can answer.
25   A   Yes.



KELLON GOODSON                                           January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                61–64

Page 61

1    Q   Okay.  Put that aside.
2        Mark as Exhibit 2 is Program Policies
3    regarding Cosmetics & Skin Care and/Hair Care from
4    Amazon.
5        Have you seen this guideline before?
6    A   Yes.
7    Q   When did you see this?
8    A   2015.  In 2015.
9    Q   So you would not have seen this at the time
10   you were selling the product, the Youngblood product in
11   2018?
12   A   Not that I am aware of.
13   Q   Okay.  Do you see that all cosmetics and skin
14   care products must be sold as new?
15       If you look under Packaging, Number 2
16   Compliance Checklist?
17   A   Yes.
18   Q   It says cosmetics must be new?
19   A   Yes.
20   Q   So if you're selling Youngblood products they
21   must be sold as new, correct?
22   A   Yes.
23   Q   And in order to sell Youngblood products as
24   new it must come with a warranty, correct?
25   A   According to the Amazon terms of services,

Page 62

1    yes.
2    Q   And Solu-Med wasn't doing that, correct?
3        MS. BLACK:  Form.
4    BY MR. VINE:
5    Q   You can answer.
6    A   Can I have a minute to review this?
7    Q   Yes, go ahead.  My question, though, was
8    Solu-Med wasn't selling the product with a warranty,
9    correct?
10   A   Correct.
11   Q   I will give you a second to look at that.
12       I have given you an opportunity, correct?
13   A   Yes.
14       (Whereupon, the below referred to documents
15       were marked as Defendant's Exhibit No. 3.)
16   BY MR. VINE:
17   Q   It should be, just for the record so it's not
18   confusing, the Cosmetics & Skin Care/Hair Care policy
19   from Amazon is Exhibit 3.
20       I just want to make sure, because I wrote 2,
21   but I assume I said 3, okay, great.
22       (Whereupon, the below referred to documents
23       were marked as Defendant's Exhibit No. 4.)
24   BY MR. VINE:
25   Q   Marked as Exhibit 4 is Amazon's Product

Page 63

1    Authenticity and Quality guidelines.
2        Are you familiar with these guidelines?
3    A   Yes.
4    Q   And these are the ones you would have seen in
5    2015?
6    A   Correct.
7    Q   Would you have seen these at the time in 2018
8    when you were selling the Youngblood product?
9    A   I am not aware.
10   Q   You're not aware doing that, correct?
11   A   I'm not aware of doing that, no.
12   Q   Okay.  Do you want to take an opportunity to
13   look at it?
14   A   Yes.
15   Q   Okay, sure, go ahead.
16   A   Okay.
17   Q   You have had an opportunity to review the
18   Product Authenticity and Quality guidelines from Amazon,
19   correct?
20   A   Yes.
21   Q   And do you see on the top left hand corner,
22   like you have seen on Exhibit 2 and 3, here on Exhibit 4
23   it all talks about Amazon Seller Central, correct?
24   A   Yes.
25   Q   Okay.  And you knew where that was located on

Page 64

1    Amazon?
2    A   Yes.
3    Q   And when you listed the Youngblood products,
4    we already talked about that you didn't review this for
5    at least three years, correct?
6    A   Yes, not that I am aware.
7    Q   And in fact you're not aware of Adam reviewing
8    it, correct?
9    A   I'm not aware of it, no.
10   Q   Do you see under materially different product
11   condition violation; do you see that?
12   A   Yes.
13   Q   Okay.  There's intellectual property violation
14   and materially different product violation, correct?  Do
15   you see these?
16   A   Yes.
17   Q   Those are the two bullet points, right?
18   A   Yes, uhm-hum.
19   Q   And if you go above it it says Types of
20   violations, correct?
21   A   Correct.
22   Q   And do you see where it says violations
23   related to product authenticity?
24   A   Correct.
25   Q   So if a product is inauthentic or there's a --



Page 65

1   strike that.
2       What did you understand Amazon was saying when
3   it said violations related to product authenticity?
4       MS. BLACK:  Form.
5   BY MR. VINE:
6   Q   Based upon this document?
7       MS. BLACK:  Form.
8       MR. VINE:  What's the form?
9       MS. BLACK:  Do you want me to say?
10  BY MR. VINE:
11  Q   What was his understanding based upon this
12  document?
13      MS. BLACK:  But you are assuming this document
14  was in place prior to the purchase of the
15  Youngblood products, which is the problem with all
16  these documents, which is going to be the --
17      MR. VINE:  He already indicated that he
18  reviewed them in 2015.
19      MS. BLACK:  He may have reviewed a policy, but
20  the identical policy?
21      MR. VINE:  That's not what he said.
22      MS. BLACK:  No, that's what you said.
23      MR. VINE:  No, I asked him if he reviewed
24  this.
25      MS. BLACK:  Okay.  We will argue about it

Page 66

1   later, that's why I asked you do you want me to
2   explain.
3   BY MR. VINE:
4   Q   Okay.  Go ahead.
5   A   I'm sorry, can you repeat the question?
6   Q   Sure.  You have now reviewed this a second
7   time, correct?  The first time in 2015, correct?
8   A   Correct.
9   Q   Okay.  Now, what is your understanding
10  relating, based upon this document about violations
11  related to product authenticity based upon this
12  document?
13      If you would like you could read that section,
14  it says violations.
15  A   Yes, I'm reading that section again.  That the
16  items cannot be materially different.
17  Q   Okay.  And that authenticity issues are
18  considered intellectual property violations, correct?
19  A   No.
20  Q   You don't see that?
21  A   Intellectual property and materially different
22  are two different violations.
23  Q   Look under where it says Types of violations.
24  A   Right.
25  Q   And then the second sentence, why don't you

Page 67

1   read that out loud for the ladies and gentlemen of the
2   jury.
3   A   The intellectual property violation?
4   Q   No, once again where it says Types of
5   violations.
6   A   Right.
7   Q   And then there is a paragraph before that
8   section that says Amazon enforces sellers who violate
9   our selling policies.
10  A   Right.
11  Q   Why don't you read that next sentence.
12  A   Violations related to product authenticity are
13  categorized as intellectual property violations.
14  Q   Okay.  Then read the next sentence.
15  A   Issue with the overall product quality,
16  including products that do not match their descriptions,
17  can be categorized as "materially different" violations.
18  Q   Okay.  So authenticity issues are
19  characterized as intellectual property violations,
20  correct?
21  A   Yes, violations related to product
22  authenticity are categorized as intellectual property
23  violations.
24  Q   Now, let's go to the issue of, and this is all
25  under authenticity guidelines, correct, if you look at

Page 68

1   the top, Amazon Product Authenticity and Quality?
2   A   Yes.
3   Q   Now, on the materially different product
4   condition violation, it states that you can't -- it
5   states that a violation would be listing your product in
6   new condition when it's not, does not meet the
7   definition of new, correct?
8   A   Correct.
9   Q   Okay, put that aside.
10      In fact we went over the definition of new
11  already, correct?
12  A   Correct.
13  Q   And it has to come with that warranty,
14  correct?
15  A   Correct.
16  Q   And Solu-Med's product was being listed as
17  new, correct?
18  A   Correct.
19  Q   And it didn't come with that warranty,
20  correct?
21  A   The manufacturer warranty, no.
22  Q   It didn't come with any warranty from
23  Youngblood, correct?
24  A   No.
25  Q   Am I correct?



Page 69

1    A    You're correct.

2    Q    Okay.

3        (Whereupon, the below referred to document

4    was marked as Defendant's Exhibit No. 5.)

5    BY MR. VINE:

6    Q    Marked as Exhibit 5 is Amazon

7    Anti-Counterfeiting Policy.

8        Have you ever seen this document before?

9    A    Yes, I have.

10   Q    In 2015?

11   A    After 2015 I saw this document.

12   Q    In 2018?

13   A    I am not aware.  I'm not sure if it was 2018.

14   Q    Okay.  But you definitely have seen it before

15   selling Youngblood products?

16   A    Yes.

17   Q    Okay.  Do you see a sentence where it starts

18   failure to abide?

19   A    Yes.

20   Q    Okay.  And the last bullet point above, it

21   says you must provide records about the authenticity of

22   your products if Amazon requests that document, correct?

23   A    Yes.

24   Q    And one of the documents that Amazon would

25   want would be the sourcing documents, correct?

Page 70

1    A    I am not sure.

2    Q    Okay.  Well, you agree that Amazon requires

3    you to keep the sourcing information from its

4    distributors?

5    A    Say that again?

6    Q    Amazon requires Solu-Med to keep its sourcing

7    information?

8    A    I am not aware of that.

9    Q    Okay.  If you turn to the next page regarding

10   best practices and product authenticity, and do you see

11   the section regarding sourcing your product?

12   A    I'm sorry, what document?

13   Q    The same document you're on, Exhibit 5.

14   A    Okay.

15   Q    The next page it says source.

16   A    Is it on a different document?

17   Q    Exhibit 4, sorry, Exhibit 4 right here, yes.

18       Do you see in Exhibit 4 where it says sourcing

19   your products?

20   A    Yes.

21   Q    Did you review these best practices prior to

22   selling Youngblood products?

23   A    Not that I am aware.

24   Q    Okay.  One of the questions was are you

25   storing documentation of all of your purchases; do you

Page 71

1    see that?

2    A    Yes.

3    Q    Okay.  And it says keep all documents and

4    records of transactions, such as POs and invoices

5    establishing that you sourced products from reliable

6    suppliers.

7        Did Solu-Med do that?

8    A    Did we keep documentation?

9    Q    That wasn't my question.

10   A    I'm sorry, can you say it?

11   Q    Did you keep sourcing documentation?

12   A    Yes.

13   Q    For all suppliers?

14   A    Correct.

15   Q    Okay.  Do you have specific knowledge or

16   recollection of doing that or are you guessing?

17       MS. BLACK:  Form.

18       THE WITNESS:  On all products, I would not be

19   aware of all products.

20   BY MR. VINE:

21   Q    Do you know if they were kept for the

22   Youngblood product?

23   A    Yes.

24   Q    They were?

25   A    Yes.

Page 72

1    Q    Or did you have to request the documentation

2    from Innopex after the suit was started?

3        MS. BLACK:  Form.

4        THE WITNESS:  As far as our invoicing our

5    purchases?

6    BY MR. VINE:

7    Q    The sourcing information.

8    A    I'm sorry, say that again?

9    Q    Okay.  So when this suit ensued did Solu-Med

10   contact Innopex to ask for the sourcing information?

11   A    I'm sorry, I --

12       MS. BLACK:  You're confusing two concepts.

13       MR. VINE:  No, I'm not.

14       MS. BLACK:  Yes, you are.  You read him the

15   policy, he answered the policy.

16       Now you asked a new question, but you're

17   trying to confuse the witness.

18       MR. VINE:  I appreciate that, Ms. Black, but

19   you're entitled to say form.  Thank you.

20       MS. BLACK:  Well, I need to keep the record

21   clear.

22       THE WITNESS:  I want to make sure we are

23   talking about the right documents.

24       The POs and invoices that we had from Innopex,

25   we kept all those documents, yes, correct.

KELLON GOODSON                                            January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                 73–76

Page 73

1  BY MR. VINE:
2   Q   So you have the POs and the invoices, correct?
3   A   Correct, yes, but I think it states that we
4  needed to have the transactions.
5   Q   Okay.  Did you get any other information from
6  them where they sourced the materials from?
7   A   No, not at the time of the purchase order.
8   Q   What did you determine or verify to determine
9  that Innopex was a reliable supplier?
10  A   That I did personally?
11  Q   Yes.
12  A   I didn't, I wasn't part of that.
13  Q   I thought you were involved in products and
14 sourcing, purchasing and sourcing?
15  A   I was purchasing, yes.
16  Q   Okay.  And you're the one who instructed Q Med
17 to purchase this product, right?
18  A   Correct.
19  Q   What did you do to determine that Innopex was
20 a reliable source?
21  A   I would not have been the one to handle the
22 checking the reliability of Innopex, that would have
23 been someone else in the organization.
24  Q   Who?
25  A   I am not aware.

Page 74

1   Q   Are you aware if anybody determined whether
2  Innopex was a reliable source or not?
3   A   Someone within Q Med would have done that.
4   Q   Do you have specific knowledge of that?
5   A   Not specific knowledge.
6   Q   Do you know of anyone who did it?
7   A   Again, I'm not aware.
8   Q   Was Innopex a supplier before Solu-Med
9  existed?
10  A   Yes.
11  Q   Okay.  So they sell also medical supplies to
12 you guys?
13  A   Yes.
14  Q   Does Q Med still do business as of the last,
15 your date of employment with Innopex?
16  A   Yes.
17  Q   They're a big supplier?
18  A   I'm not aware of how big they are.
19  Q   Okay.  What -- how were the Youngblood
20 products stored at the Q Med warehouse?
21  A   They would have been in bins, so bins related
22 to each product.
23  Q   Did you follow the manufacturer's instructions
24 on how to store the Youngblood products?
25  A   We kept cosmetics in a specific controlled

Page 75

1  area that would have been outside of normal warehouse,
2  it would have been temperature controlled, it would have
3  been separate from any other type of product.
4       MR. VINE:  Can you please read back my
5     question?
6       (Whereupon, the above referred to question
7     was read back by the Court Reporter.)
8       MS. BLACK:  Form.
9  BY MR. VINE:
10  Q   Yes or no?
11  A   Specific to Youngblood?
12  Q   Yes.
13  A   No.
14  Q   Did you ask Youngblood how they should store
15 their product, how you should store their product?
16  A   No.
17  Q   Now, you indicated that cosmetics were kept in
18 a separate area of the Q Med warehouse?
19  A   Correct.
20  Q   And Solu-Med did not have their own warehouse,
21 correct?
22  A   Correct.
23  Q   They used the Q Med or warehouse or space
24 within the Q Med warehouse?
25  A   Correct.

Page 76

1   Q   Okay.  Where in the Q Med warehouse were the
2  cosmetics kept?
3   A   In a temperature controlled area.
4   Q   What was the temperature?
5   A   I'm not exactly aware.
6   Q   Was it within the same warehouse area or was
7  it in a separate room?
8   A   There would have been a separate area in the
9  warehouse.
10  Q   So it was within the same room, but not a
11 separate room, correct?
12  A   No, it was actually a different, there were
13 walls that would separate that from the other areas of
14 the warehouse.
15  Q   Okay.  So there was a separate room, correct?
16  A   Right.
17  Q   Okay.  And what was contained within that
18 separate room?
19  A   Items that needed to be temperature
20 controlled.
21  Q   And what items were they?
22  A   Cosmetics or anything that had stickers that
23 said that they need to be temperature controlled.
24  Q   Okay.  And what was the temperature
25 controlled?



Page 77

1    A   I'm sorry, say that again?
2    Q   What was the temperature?
3    A   I'm not exactly sure.
4    Q   Who was in charge of that?
5    A   Specifically the person who was in charge of
6    that?
7    Q   What company, was it Solu-Med or Q Med?
8    A   Of the temperature, Q Med.
9    Q   Okay.  Did somebody from Solu-Med instruct the
10   Q Med employees on which products of Youngblood needed
11   to go into that separate controlled area?
12   A   Say that again?
13   Q   Do you have specific knowledge that the
14   Youngblood products were put in that area?
15   A   Yes.
16   Q   Okay.  You observed it with your own eyes?
17   A   Yes.
18   Q   Do you see where it says if you sell branded
19   products on Amazon?
20   A   Which, sorry, which document?
21   Q   We are still on Exhibit 4.
22   A   Okay.
23   Q   And it's on the second page are you confident
24   in the authenticity of the quality of their goods; do
25   you see that best practices question?  Do you see that?

Page 78

1    A   Which are you --
2    Q   Are you confident?
3    A   -- The second section?  Okay.
4    Q   Are you confident in the authenticity and
5    quality of their goods; do you see that?
6    A   Yes.
7    Q   Okay.  And it says if you sell branded
8    products on Amazon ensure that your source, that you
9    source the product from a reliable supplier, correct?
10   A   Correct.
11   Q   Okay.  Did you ensure that the Youngblood
12   products came from a reliable supplier?
13   A   I knew Innopex to be a reliable supplier.
14   Q   Okay.  But what did you do to verify that they
15   were a reliable supplier?
16   A   Me personally I did not verify that they were
17   a reliable supplier.
18   Q   You say you knew them to be a reliable
19   supplier because they gave you the products on time,
20   correct?
21   A   Correct.
22   Q   Okay.  And the products that they sent to you
23   you matched up to the invoice or the PO, correct?
24   A   Correct.
25   Q   Anything else you can determine that made them

Page 79

1    a reliable supplier?
2    A   The history they had with Q Med.
3    Q   And when you say "history with Q Med", that
4    means them providing medical supplies?
5    A   Correct.
6    Q   What made them a reliable supplier for
7    cosmetics, if you know anything?
8    A   I'm not aware.
9    Q   So as you sit here today you can't testify
10   that Solu-Med was able to verify that Innopex was a
11   reliable supplier of cosmetics?
12   A   Specifically cosmetics?
13   Q   Yes.
14   A   I'm not aware.
15   Q   Now, it says questions regarding have you
16   considered possible safety concerns with your products;
17   do you see that?
18   A   Yes.
19   Q   Okay.  It says take time to research whether
20   there are any safety testing or compliance requirements
21   for the products that you sell; do you see that?
22   A   Yes.
23   Q   Did Solu-Med do that as it relates to
24   cosmetics?
25   A   To do safety testing?

Page 80

1    Q   Yes, and compliance requirements for the
2    products you sell?
3    A   No.
4    Q   You can put that aside.
5         Now, I want to go back to Exhibit 5.  It says
6    failure to abide by this policy may result in loss of
7    selling privileges; do you see that?
8    A   Yes.
9    Q   So you understood that if any of the policies
10   that were violated that we've gone over, there would be
11   a chance that the ability to sell specific products or
12   any products could be suspended?
13   A   Yes.
14   Q   Okay.  You understood that Amazon encouraged
15   reporting inauthentic or counterfeit products?
16   A   I wasn't aware.
17   Q   Okay.  Do you see that in this policy, though?
18   A   Could you direct me to where it's at?
19   Q   Well, you indicated earlier that you had read
20   this, so in 2018 before the Youngblood products were
21   being sold, if you look on the bottom left hand corner
22   it says reporting inauthentic products; do you see that?
23   A   Uhm-hum.
24   Q   Why don't you read it to the ladies and
25   gentlemen of the jury that section.



KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
81–84

Page 81

1    A   Reporting Inauthentic Products.  We stand
2  behind the products sold on our site with our A-to-Z
3  Guarantee, and we encourage rights owners who have
4  product authenticity concerns to notify us.  We will
5  promptly investigate and take all appropriate actions to
6  protect customers, sellers, and rights holders.  You may
7  view counterfeit complaints on the Account Health page
8  in Seller Central.
9    Q   So they're telling the sellers or, sorry,
10  rights holders, that they should report to them any
11  issues or concerns regarding product authenticity,
12  correct?
13    A   Correct.
14    Q   And also there's issues regarding selling
15  counterfeit, correct?
16    A   Correct.
17    Q   And then there is a section regarding
18  consequences of selling inauthentic products; do you see
19  that?
20    A   Yes.
21    Q   What does it say happens if you sell an
22  inauthentic product?  Read that out loud.
23    A   Which section?
24    Q   Where it says consequences.
25    A   Consequences of Selling Inauthentic Products.

Page 82

1  If you sell inauthentic products, we may immediately
2  suspend or terminate your Amazon selling account (and
3  any related accounts), destroy any inauthentic products
4  then in our fulfillment centers at your expense, and/or
5  withhold payments to you.
6    Q   Okay.  So you were aware prior to selling
7  Youngblood products that a consequence of violating
8  Amazon's guidelines would be the suspension of the
9  Amazon selling account?
10    A   Yes, correct.
11    Q   Was Manny Aguero aware of that?
12    A   I'm not aware.
13    Q   Did you tell him that?
14    A   I don't recall.
15    Q   Okay.  Put that aside.
16    (Whereupon, the below referred to document
17    was marked as Defendant's Exhibit No. 6.)
18  BY MR. VINE:
19    Q   We are on Number 6, okay.
20    When was the first time you reviewed this?
21    A   2015.
22    Q   And did you review this in 2018 before selling
23  Youngblood products?
24    A   I am not aware of that.
25    Q   Okay.  And you understood that the Selling

Page 83

1  Policy and Seller's Code of Conduct, one of the
2  requirements was providing accurate information?
3    A   Yes.
4    Q   Okay.  And it says you must provide accurate
5  information to Amazon and "our customers", right?
6    A   Correct.
7    Q   For example this means that you must use a
8  business name that accurately identifies your business
9  and lists your products in the correct category,
10  correct?
11    A   Correct.
12    Q   Okay.  So was Solu-Med accurately providing
13  information when it stated that it was not accepting
14  returns of cosmetics when it actually was accepting, as
15  reflected in Exhibit 1?
16    MS. BLACK:  Form.
17  BY MR. VINE:
18    Q   You can answer.
19    A   Can you ask it again or restate it?
20    Q   Sure.
21    Q   Or restate it?
22    Q   Sure.  We have Exhibit 1 here, correct?
23    A   Uhm-hum, yes.
24    Q   And Exhibit 1 reflects that Life & Health
25  Source/Solu-Med is telling the public that it will not

Page 84

1  accept returns of cosmetics, right?
2    A   Correct.
3    Q   Okay.  That's what you're representing to the
4  public, correct?
5    A   Correct.
6    Q   But that's not accurate, right?
7    MS. BLACK:  Form.
8    THE WITNESS:  Again, I want to stress that
9  there's the products that we're selling FBA had
10  their own terms, had their own return policies, so
11  this was specific to items that we were selling
12  merchant fulfilled from Solu-Med to the customers.
13  BY MR. VINE:
14    Q   Did you say that?
15    MS. BLACK:  Form.
16    THE WITNESS:  Did we say that in this policy?
17  BY MR. VINE:
18    Q   On Exhibit 1 on the storefront of Life &
19  Health Source did you say that any items through the FBA
20  account we would accept returns or Amazon would accept
21  returns, but if we sell it to you directly we won't?
22    A   On this, no.
23    Q   Okay.  On anywhere on the Life & Health Source
24  storefront?
25    A   This is our own storefront.



Page 85

1    Q   Okay.  So it wasn't said on the storefront?
2    A   Correct.  It would have been stated on
3  Amazon's website.
4    Q   Right, I'm talking about what Life & Health
5  Source represented to the public, correct?
6    A   Correct.
7    Q   And you don't tell the public that if they
8  purchase a product through you, but it's fulfilled by
9  Amazon they could still return it, correct?  You don't
10  tell the public that?
11    A   Through Life & Health Source?
12    Q   Right.
13    A   Correct.
14    Q   In fact you tell the public they can't return
15  it, correct?
16    A   Cosmetics, correct.
17    Q   Even though they could if it's fulfilled by
18  Amazon, correct?
19    A   Correct.
20    Q   And in fact all of Youngblood products are
21  fulfilled by Amazon as you testified earlier, right?
22    A   Correct.
23    Q   Okay.  So do you say anywhere on your
24  storefront that Youngblood products could be accepted if
25  they're returned?

Page 86

1    A   Not here, no.
2    Q   Anywhere?
3    A   No.
4    Q   Isn't that a representation -- sorry.
5        Isn't that providing inaccurate information to
6  the public?
7        MS. BLACK:  Form.
8  BY MR. VINE:
9    Q   Isn't Life & Health Source or Solu-Med
10  providing inaccurate information to the public or
11  confusing?
12    A   No, I think we were trying to differentiate
13  between our account and the FBA account.
14    Q   Do you think you accomplished that?
15    A   I'm not aware of how the customers perceived
16  that.
17    Q   Well, looking at it now can you tell me if you
18  would be able to tell the difference whether it's
19  through an FBA account or you selling it directly?
20    A   I mean I am not sure.
21    Q   Okay.  So you don't know, even somebody who
22  ran the eCommerce department, you don't know if you
23  could tell the difference, correct?
24        MS. BLACK:  Form.
25

Page 87

1  BY MR. VINE:
2    Q   By reading that document?
3        MS. BLACK:  Form.
4  BY MR. VINE:
5    Q   You can't tell the difference, can you?
6        The ladies and gentlemen of the jury will see
7  it as well.
8    A   I mean there's no, nothing that differentiates
9  between our FBA account and our merchant fulfilled
10  account so I guess there could be confusion there.
11    Q   Okay.  Thank you, you can put that aside.
12        Oh, you also list the product as new, correct?
13    A   Yes.
14    Q   And it doesn't meet the definition of new,
15  meaning --
16        MS. BLACK:  Form.
17  BY MR. VINE:
18    Q   You list -- is it true that Solu-Med lists the
19  Youngblood product as new?
20    A   Yes.
21    Q   Is it true that the Youngblood product that is
22  listed as new doesn't meet the definition that we went
23  over in Amazon's guidelines?
24        MS. BLACK:  Form.
25

Page 88

1  BY MR. VINE:
2    Q   You can answer.
3    A   Because of the issue with?
4    Q   With the warranty.
5    A   Correct.
6    Q   So that would be providing also inaccurate
7  information to the public when you list it as new, isn't
8  that correct?
9        MS. BLACK:  Form.
10        THE WITNESS:  No, I don't believe so.
11        We listed whatever was on Amazon's ASIN so we
12  moved in basically whatever information was there.
13  BY MR. VINE:
14    Q   So you think you complied with the ASIN by
15  listing it as new even though it didn't come with a
16  warranty or you don't know?
17    A   I'm not sure.
18    Q   Okay.
19        MS. BLACK:  Can we take a quick break?
20        MR. VINE:  Sure.
21        THE VIDEOGRAPHER:  We are going off the video
22  record 9:52 a.m.
23        (Whereupon, a short recess was had.)
24        THE VIDEOGRAPHER:  We are back on the video
25  record 10:02 a.m.

Page 89

1  BY MR. VINE:
2      Q   Okay.  Earlier in the deposition we discussed
3  about other complaints that Solu-Med had; you're aware
4  of those complaints, correct?
5      A   Yes.
6          (Whereupon, the below referred to documents
7          were marked as Defendant's Exhibit No. 7.)
8  BY MR. VINE:
9      Q   We will mark as Exhibit 7 is a composite set
10 of Exhibits, also marked at another deposition, of other
11 complaints from Amazon regarding products being sold on
12 Amazon by Solu-Med.
13         Have you seen this before?
14     A   No.
15     Q   Can you turn to the next page?
16     A   Yes.
17     Q   Have you seen these types of documents before?
18     A   Yes.
19     Q   Okay.  And if you turn to for example, if you
20 look below there's on the first page it says 1/27/2018
21 there's a complaint on that day, correct?
22     A   Yes.
23     Q   And then on 1/28, correct?
24     A   Yes.
25     Q   And then on 3/05, correct?

Page 90

1      A   Yes.
2      Q   4/04?
3      A   Yes.
4      Q   5/12?
5      A   Yes.
6      Q   Roughly throughout the year you have received
7  on average once a month --
8      A   Yes.
9      Q   -- A complaint?
10     A   Correct.
11     Q   And that also continued on to 2019, correct?
12     A   Correct.
13     Q   And these were complaints regarding everything
14 from trademark to counterfeit to intellectual property
15 violations?
16     A   Yes, correct.
17     Q   Authenticity issues as well?
18     A   Correct.
19     Q   Now, if we look at the 4/04/2018 one, which is
20 PL 199.  And PL 199 is the bottom Bates Number, if you
21 will look at that.
22     A   The last page you said?
23     Q   No, it's PL 199, if you look at the left hand
24 corner, do you see that?  It goes in order.
25     A   I've got PL 198 and then it goes to PL 222.

Page 91

1      Q   Because I have it, and this is a copy of what
2  I have.
3          PL 199, do you have it?
4      A   Yes.
5      Q   Okay.  In April of 2018 did you receive this
6  notice?
7      A   Yes.
8      Q   Okay.  And what does this notice say?
9      A   We are contacting you because we received a
10 report from a rights center that you were listing
11 counterfeit items, example of these items are listed
12 below.
13     Q   And then they listed a number of different
14 ASIN numbers, correct?
15     A   Correct.
16     Q   And then it says we may let you list this
17 again if we receive a retraction from the owner?
18     A   Correct.
19     Q   And then it says the conflict information for
20 that owner, correct?
21     A   Correct.
22     Q   Did you contact that owner?
23     A   I am not aware.
24     Q   What did you do in response to this?
25     A   Specific to this one I don't remember.

Page 92

1      Q   Other than the Youngblood one what did you do
2  in response to any of these various notices that you
3  received before listing the Youngblood product?
4      A   Generally I would take the listing information
5  usually as is seen here with the email or the response
6  from Amazon, and I would typically send it to Manny
7  Aguero to review it.
8      Q   And then what would happen?
9      A   I would ask him generally what his take would
10 be, what his direction would be.
11     Q   And what was the typical response that Manny
12 would receive, would provide?
13     A   It would vary depending on he would ask me
14 questions about inventory, what the specific item was,
15 the type of item it was and then he would give me some
16 direction on what the next steps would be.
17     Q   What do you recall the directions he did give
18 you?
19     A   Sometimes he would say --
20         MS. BLACK:  Form.  You can answer.
21         THE WITNESS:  Sometimes he would say to remove
22     the listing; sometimes he would say to leave it,
23     depending on what his take on the situation was.
24 BY MR. VINE:
25     Q   Well, how could you leave it if it was



Page 93

1  suspended that, or that that deactivated that listing?
2      A   It would be like this specific item there
3  would be no, there would be no listing.
4          The listing would be -- our listing would be
5  removed so there would be no -- there would be no active
6  listing for us at that point.
7      Q   So then he would say just leave it alone?
8      A   It would just come down automatically so there
9  was actually no action for us to take at that point.
10     Q   Okay.  You could appeal it and seek to have it
11  relisted, correct?
12     A   Correct, yes.
13     Q   And you chose on a number of them not to do
14  that, correct?
15     A   Typically we did not respond.
16     Q   Okay.  Other than the Youngblood one, prior to
17  Youngblood did you ever respond to Amazon regarding any
18  of these notices?
19     A   I am not aware.
20     Q   And the reason why you responded to the Amazon
21  one is because they actually shut down the entire
22  storefront, correct?
23     A   Correct.
24     Q   Previously they just deactivated all, they
25  suspended all the listings that were complained about,

Page 94

1  correct?
2      A   Correct.
3      Q   Okay.  And then Amazon, for whatever reason
4  you don't know, specifically decided after I guess at
5  least eight violations chose to suspended the entire
6  account, correct?
7      A   The specific suspension was related to the
8  Youngblood products, yes, that's when it happened.
9      Q   It happened after Youngblood made that
10  complaint, correct?
11     A   There were three complaints in a row.
12     Q   There were two, correct?  There were three or
13  two?
14     A   I'm sorry, there were three ASINs that were
15  related to that.
16     Q   Right.
17     A   Correct.
18     Q   Well, this one had five ASINs, correct?
19     A   Correct.  These are variations on the same
20  product.
21     Q   But there were five separate ASINs, correct?
22     A   Correct, yes.
23     Q   And we can go through, it's a pretty large
24  pack, maybe you can show the ladies and gentlemen of the
25  jury of all the complaints that, other than the

Page 95

1  Youngblood ones, if you would hold it up like this, that
2  Solu-Med received from January of 2018 to June of 2019,
3  not including the Youngblood complaints, correct?
4      A   Correct.
5      Q   Okay.  And so other than in Youngblood you
6  don't recall taking any action?
7      A   In 2018, no, we did not take any action.
8      Q   And in 2019?
9      A   We took action.
10     Q   What was the action?
11     A   Our lawyer --
12     Q   Who?
13     A   Stan Goodman.
14     Q   Okay.
15     A   Would just --
16         MS. BLACK:  I'm going to object to any
17  attorney-client advice.
18         MR. VINE:  I didn't.
19         MS. BLACK:  I'm just saying I don't know if he
20  advised you to do something.
21         MR. VINE:  You've got to let me ask the
22  question.  I said what actions did you take, and he
23  said --
24         MS. BLACK:  Okay.
25

Page 96

1  (BY Mr. Vine)
2  BY MR. VINE:
3      Q   What action did you take in 2019?
4      A   In 2019 we sent it to Stan Goodman and he
5  would take the next steps.
6      Q   Okay.  And was that after Amazon had shut down
7  Solu-Med?
8      A   After the suspension?
9      Q   Yes.
10     A   Yes, 2019, yes.
11     Q   So it was only after there was a suspension
12  did you all of a sudden did Solu-Med start to decide to
13  respond, correct?
14     A   Correct.
15     Q   Okay.
16     A   Also during 2019 there was a change in the
17  system that Amazon was utilizing for the way that we
18  would receive information, so instead of a notification
19  via message, there was actually a dashboard that had all
20  of the complaints or any information that would come
21  through that was in the Seller Central Dashboard.
22     Q   Okay.  But that wasn't the reason why you went
23  to Stan Goodman, correct?
24     A   Correct.
25     Q   What was the reason you went to Stan Goodman



KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
97–100

Page 97

1 in 2019 after the Youngblood complaint regarding these
2 other complaints?
3     A    Manny Aguero directed me to.
4     Q    What did Manny tell you?
5     A    That we needed someone who knew specifics
6 about how to deal with these types of things.
7     Q    Okay.  And so he said going forward we're
8 going to change the strategy and actually start
9 responding to the complaint?
10       MS. BLACK:  Form.
11       THE WITNESS:  That I would not do anything,
12    but that Stan would make decisions.
13 BY MR. VINE:
14    Q    We do know that prior to the Youngblood
15 complaint there were eight prior complaints, correct?
16    A    Correct.
17    Q    And what you've told me is Solu-Med didn't
18 respond to those complaints, correct?
19    A    Yes, not that I am aware of.
20    Q    Okay.  So it was only after there was a
21 suspension did, of the entire storefront --
22    A    Correct.
23    Q    -- Did counsel get hired, correct, to address
24 these complaints?
25    A    They were brought in to address complaints,

Page 98

1 correct.
2     Q    Right.  It was only after there was a
3 suspension of the entire account, correct?
4     A    Correct.
5     Q    Okay.  For all the prior suspensions of
6 specific listings no counsel was hired to address the
7 complaints, correct?
8     A    Correct.
9     Q    And did you ever speak with Stan Goodman
10 regarding the Youngblood complaints?
11    A    Yes.
12    Q    When did you speak with him?
13    A    In 2018, the end of 2018 and then into 2019.
14    Q    What did you and Stan Goodman -- what did you
15 and Stan Goodman discuss regarding the Youngblood
16 products?
17       MS. BLACK:  I'm going to object and instruct
18    you not to answer that question.
19 BY MR. VINE:
20    Q    And if you notice I gave a hand gesture to
21 Kelsey because I didn't want you to answer the question
22 because I knew she would be asserting, I'm not trying to
23 pull a fast one, as Kelsey knows, but I have to ask
24 these questions so there can be an objection.
25       We're going to have obviously a separate

Page 99

1 discussion on whether there is, whether this is the
2 appropriate place for an attorney-client privilege or
3 not, and that's something that we don't need to do
4 through you.
5       But I just need to ask the question so there
6    would be an objection and you can't answer that
7    question.
8       Mr. Goodman was providing advice to you during
9    that conversation?
10    A    For specifically Youngblood I gave him
11 information on for example these notifications, the
12 warnings, and anything that was related to the account
13 that I would have had access to, and then he basically
14 took that information.
15    Q    Now, did Solu-Med have written internal
16 guidelines regarding its products -- sorry, regarding
17 the selling of its products on Amazon?
18    A    Sorry, say that again?
19    Q    Did Solu-Med have any internal written
20 guidelines regarding the operations of Solu-Med, yes or
21 no?
22    A    No.
23    Q    Were there internal procedures written in any
24 way regarding Solu-Med's operation?
25    A    No.

Page 100

1     Q    Were there any internal operational written
2 procedures?
3     A    Written, no.
4     Q    Were there general ones?
5     A    Well, as an example we wouldn't resell
6 products that were damaged or things that were, you
7 know.
8     Q    That's a verbal policy?
9     A    Correct.
10    Q    So if somebody's reviewing something, that
11 would be a written policy, correct?
12    A    Correct.
13    Q    Okay.  But you're not aware of any written
14 internal operating procedures, correct?
15    A    Correct.
16    Q    Did you ever tell Stan Goodman that there were
17 written internal operating procedures?
18       MS. BLACK:  Form.
19       THE WITNESS:  I'm not aware of --
20       MS. BLACK:  Don't answer it, attorney-client
21    privilege.
22       MR. VINE:  Okay.  I'm not going to debate you,
23    but you can direct it, but I don't agree, but
24    that's fine, it's not a big deal.
25



KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
101-104

Page 101

1  BY MR. VINE:
2      Q    Have you ever told anybody there was written
3  internal operating procedures?
4      A    Written, no.
5      Q    Do you have, did Solu-Med have internal
6  operating procedures in 2018?
7      A    Written procedures?
8      Q    No, that wasn't what I asked.
9      A    Sorry.  Yes, say it again?
10     Q    What I asked was was there any internal
11 operating procedures?
12     A    Yes.
13     Q    We already know there weren't any written,
14 right?
15     A    Correct.
16     Q    So now you're saying there were verbal
17 internal operating procedures, correct?
18     A    Correct.
19     Q    Were there internal operating procedures for
20 listing items with Amazon?
21     A    Not that I am aware.
22     Q    Now, I want to -- when you got these
23 complaints that are listed in Exhibit 7 we have already
24 discussed that you never responded to them, correct?
25     A    Again, not that I am aware of.

Page 102

1      Q    Right.  And so because you never responded to
2  them you don't know how the complaints were written
3  other than what was in these policy notifications,
4  correct?
5      A    Correct.
6      Q    So for example if we went to the 199 again it
7  lists a specific ASIN number and it asks to -- tell me
8  when you're ready.
9      A    Sorry.
10     Q    Take your time.
11          So this one talks about again a counterfeit
12 item, and instead of responding you have chosen not to.
13          Would you have reviewed this document?
14     A    Yes.
15     Q    Okay.  And then it says to learn more about
16 this policy search for intellectual property violations
17 in Seller Cental Health; did you specifically do that
18 after each notice?
19     A    I don't recall.
20     Q    You don't recall doing that?
21     A    I don't recall.
22     Q    You don't recall doing it either way or you
23 don't recall doing that?
24     A    I don't recall doing that.
25     Q    Okay.  Do you recall doing it for any of these

Page 103

1  violations?
2      A    Specifically, no, but...
3      Q    Prior to the Youngblood complaint?
4      A    Correct.
5      Q    Put this aside, we are going to come back to
6  it in a minute.
7          (Whereupon, the below referred to document
8           was marked as Defendant's Exhibit No. 8.)
9  BY MR. VINE:
10     Q    Exhibit 8, I want to show you a copy of one of
11 the complaints from Youngblood, which is Exhibit 8.
12          Have you ever seen this document before?
13     A    No.
14     Q    Okay.  So you never even saw the complaint
15 that was written by Youngblood, correct?
16     A    No, I never saw it, correct.
17     Q    If you look at the bottom or sorry, the second
18 to last paragraph the specific complaint says.
19          "The indicated sellers are not selling
20 authentic products as shown in the ASIN(s) referenced."
21          Do you see that?
22     A    I do.
23     Q    When the complaint, when you were notified of
24 the complaint by Amazon for this ASIN number did you go
25 to the ASIN page, you personally?

Page 104

1      A    Is this the ASIN -- I'm sorry, the ASIN is not
2  on here, but is this the ASIN that was --
3      Q    I'll show you.
4      A    Okay.
5          (Whereupon, the below referred to documents
6           were marked as Defendant's Exhibit Nos. 9 & 10.)
7  BY MR. VINE:
8      Q    I'm going to show you the two, there were two
9  complaints, and I'm going to mark them as Exhibit 8
10 and 9 -- sorry, Exhibit 9 and 10.
11          So Exhibit 8 matches the notification of
12 Exhibit 9.
13     A    Okay.
14     Q    And then Exhibit 10 is regarding a second
15 complaint, a notification that I will give to you.
16          Just one second, this one is 8.  So I will
17 just for the record Exhibit 8 -- sorry, I've got to
18 start over.
19          Exhibit 9 is PL00046, that's this one.
20     A    This one?
21     Q    Yes.  And Exhibit 10 is PL00047.
22          Now, let's just look at Exhibits 8 and 9 for
23 now.
24     A    Okay.
25     Q    Exhibit 8 is the complaint from Youngblood

Page 105

1  which is marked as CONFIDENTIAL AMZN 0003; then there is

2  PL00046, which is Exhibit 9, put those side-by-side.

3      A   Okay.

4      Q   If look at the Complaint ID number, the

5  Complaint ID numbers match, correct?

6      A   Yes, correct.

7      Q   So they would obviously relate to each other,

8  correct?

9      A   Correct.

10     Q   Okay.  Now, when you got this complaint, this

11  complaint being Exhibit 9, because that's the document

12  you would receive, right?

13     A   Correct.

14     Q   Okay.  Did you go to the ASIN page for this

15  specific ASIN number, did you specifically do that?

16     A   Yes.

17     Q   Okay.  You printed it up?

18     A   I am not sure if I would have I printed it.

19     Q   Did you save the page somewhere?

20     A   This?

21     Q   No, the ASIN page.

22     A   Oh, it's -- yes.

23     Q   You saved it?

24     A   It would be in a I guess like a --

25         MS. BLACK:  Sorry for the interruption.

Page 106

1          THE WITNESS:  I'm sorry, ask the question

2      again?

3  BY MR. VINE:

4      Q   I had asked you when you got Exhibit 9 the

5  notice of violation, the Policy Warning violation from

6  Amazon did you specifically go look at the ASIN page on

7  Amazon?

8      A   Yes.

9      Q   Okay.  Did you then save that ASIN page at all

10  in your computer?

11     A   Oh, the actual web page?

12     Q   Yes.

13     A   No.

14     Q   Did you print it up?

15     A   No.

16     Q   How did you explain to Manny Aguero that it

17  matched or it did not match, if you did at all?

18     A   I'm not aware if I sent that specific item to

19  Manny at that point.

20     Q   Okay.  At that point you weren't aware, made

21  aware that there was a suspension, correct?

22     A   Correct.

23     Q   It was only that this item was being delisted,

24  correct?

25     A   Correct.

Page 107

1      Q   Okay.  And you chose not to respond to this

2  one, correct?

3      A   Correct.

4      Q   Okay.  Then a couple days later another notice

5  of violation came in on other Youngblood products,

6  correct?

7      A   Correct.

8      Q   Okay.  And that's Exhibit 10, correct?

9      A   Correct.

10     Q   Okay.  Before we get to Exhibit 10, if you

11  look at the ASIN number, you looked on Exhibit 9, and

12  you looked at the ASIN page?

13     A   Yes.

14     Q   And did you contact, you personally at that

15  time, contact a brandprotection@ybskin to ask what the

16  problem was?

17     A   At that point, no.

18     Q   Okay.  In fact you chose to stand down to do

19  nothing, like you were previously doing nothing,

20  correct?

21     A   Correct.

22     Q   Okay.  And then a couple days later another

23  notice from Amazon comes in, correct?

24     A   Correct.

25     Q   It says we attempted to reach you by phone

Page 108

1  today to discuss recent issues related to intellectual

2  property infringement.

3          Do you recall getting a telephone call?

4      A   There was a voice call, a voice mail on our

5  account, on our, yes, on our customer service line, yes.

6      Q   And did you call them back?

7      A   I did call them back.

8      Q   And did you speak to somebody?

9      A   Yes, I did.

10     Q   And who did you speak to?

11     A   I don't remember.

12     Q   Okay.  Did you take notes from that

13  conversation?

14     A   I don't recall.

15     Q   Do you recall that conversation?

16     A   Not specifically, no.

17     Q   Do you recall anything about that

18  conversation?

19     A   Just that our account had been suspended and

20  that the next steps would be a plan of action needed to

21  be compiled, put together and that would need to be sent

22  to Amazon for the possible, the possibility of getting

23  our account reopened.

24     Q   Okay.  Now, it says that Amazon previously

25  listed -- previously sent you concerns regarding these



KELLON GOODSON                                           January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      109–112

Page 109

1   other ASINs; do you see that?
2      A   Yes.
3      Q   Okay.  And you received those, correct?
4      A   I'm not aware of specific ASINs, but they had
5   sent us other violations.
6      Q   And you chose to ignore those warnings,
7   correct?
8      A   Right, we did not respond, correct.
9      Q   Okay.  And then after not responding that is
10  when they suspended the account, correct?
11     A   Correct.
12     Q   Okay.  And it says it's been temporarily
13  deactivated, right?
14     A   Correct.
15     Q   So then you were told to do a plan of action,
16  is that what they were told?
17     A   Correct.
18     Q   Did you ask them about the complaint that was
19  made?
20        I need to know what you remember asking, not
21  what you guess.
22     A   I don't specifically remember, no.
23     Q   Okay.  Do you remember asking about getting a
24  copy of the complaint?
25     A   Say that again, sorry?

Page 110

1      Q   Do you remember asking to get a copy of the
2   complaint?
3      A   I don't recall.
4      Q   Do you remember asking about any of the facts
5   of the complaint?
6      A   I don't recall.
7      Q   Do you remember discussing with them any facts
8   about the complaint?
9      A   I don't recall.
10     Q   Okay.  So you then receive Exhibit 10,
11  correct?
12     A   Correct.
13     Q   Okay.  And that was on November 13th, correct?
14     A   Correct.
15        (Whereupon, the below referred to document
16        was marked as Defendant's Exhibit No. 11.)
17  BY MR. VINE:
18     Q   Okay.  Let's mark as Exhibit 11.  Here is a
19  copy of Exhibit 11, which is "First Plan of Action
20  11/13/2018 Reactivate your account".  PL00048, and I
21  will give you a copy.
22        Did you draft that document?
23     A   Yes.
24     Q   Was it you or Adam Weinstein?
25     A   I did.

Page 111

1      Q   Okay.  Let's go over it.  Your submission on
2   November 13th, 2018 at 12:10 p.m.
3         The question I guess is the root cause of
4   issue, that's just something that's there, and you have
5   to fill in information next to it?
6      A   Correct.
7      Q   So you wrote we have offerings for the brand
8   Youngblood Cosmetics with listings which the
9   intellectual property holder felt infringed on their
10  intellectual property rights?
11     A   Correct.
12     Q   Okay.  You wrote that, correct?
13     A   Correct.
14     Q   Was that a true and accurate statement when
15  you wrote it?
16     A   Correct.
17     Q   Is that a true and accurate statement now?
18     A   True.
19     Q   The second item or question was the actions
20  you have taken to resolve this issue.
21        We have removed all listings for the
22  Youngblood product line, and deleted our sales offerings
23  to ensure that we don't infringe on any intellectual
24  property of Youngblood Cosmetics.
25        Do you see that?

Page 112

1      A   Yes.
2      Q   Was that a true and accurate statement at the
3   time you wrote it?
4      A   Yes.
5      Q   Is it a true and accurate statement today?
6      A   Yes, we removed all the listings, absolutely.
7      Q   Of Youngblood products?
8      A   Yes.
9      Q   Why?
10     A   We wanted to get the account reopened and we
11  were going to, I was willing to take Youngblood
12  completely out of the account at that point.
13     Q   Who made that decision, you or Manny Aguero?
14     A   I advised Manny of what was happening, and he
15  agreed to remove Youngblood.
16     Q   Okay.  Did you tell Manny that you had not
17  previously responded to the prior warnings?
18     A   Yes.
19     Q   And that was at his direction, correct?
20     A   Yes.
21     Q   Then the third question is the steps you have
22  taken to prevent the issue going forward.
23        And then you wrote:  Going forward, we will
24  review our product offerings, to ensure compliance with
25  Amazon's terms of service related to intellectual



Page 113

1  property, and removing any offerings that aren't in
2  compliance.
3      A   Yes.
4      Q   Was that a true and accurate statement of what
5  you would do at that time?
6      A   Yes.
7      Q   Is it a true and accurate statement today?
8      A   As far as?
9      Q   Did you review all the product offerings that
10  you had on Amazon at that time?
11      A   Yes.
12      Q   You reviewed every single one?
13      A   Yes.
14      Q   How many items did you have selling on
15  Solu-Med.
16      A   I don't --
17      Q   Thousands?
18      A   Yes, probably a thousand.
19      Q   And who was the one who removed every single
20  offering and matched it to the ASIN numbers and the ASIN
21  page?
22      A   As far as every item I'm not aware of who
23  would be person to do every single item.
24      Q   Well, you said we will review our product
25  offerings; did you review all the product offerings?

Page 114

1      A   We did look at all the UPCs to make sure they
2  matched up to all the UPCs on the Amazon system.
3      Q   Okay.  Did you ensure that they were in
4  compliance with the intellectual property guidelines?
5      A   As I knew it, yes.
6      Q   Based upon what you reviewed today?
7      A   Manufacturer warranty?
8      Q   Yes.
9      A   No, I did not review the manufacturer
10  warranties.
11      Q   And did you review only what you knew at the
12  time, correct?
13      A   Correct.
14      Q   Not what you have learned today through these
15  guidelines?
16      A   Correct.
17      Q   You can put that aside.
18          After you submitted that Exhibit 11 was your
19  account reactivated on November 13th?
20      A   No.
21      Q   Okay.  Did you place a follow-up call that day
22  on November 13th?
23      A   To Amazon?
24      Q   Yes.
25      A   Yes.

Page 115

1      Q   And what did they say?
2      A   That we needed to redo the Plan of Action.
3      Q   Why did they say you needed to redo the Plan
4  of Action?
5      A   I don't remember specifics, but there was
6  greater -- it didn't meet what they needed basically to
7  reopen the account.
8      Q   Okay.  So they told you they were not
9  satisfied with your response, correct?
10      A   Correct.
11          (Whereupon, the below referred to document
12      was marked as Defendant's Exhibit No. 12.)
13  BY MR. VINE:
14      Q   Exhibit 12, I just want to make sure we are
15  all on the same page.
16          One second.  So the Plan of Action of
17  11/14/2018, PL000049.
18          On November 14th you issued I guess an amended
19  version, correct?
20      A   Correct.
21      Q   And that's based upon Amazon telling you that
22  the prior one that you submitted was not acceptable,
23  correct?
24      A   Correct.
25      Q   Okay.  And what did you change, each item,

Page 116

1  right?
2      A   Yes.
3      Q   So let's go through it.  The root cause of the
4  issue, what did you write now?
5      A   We were listing Youngblood Cosmetics product
6  that we sourced from a distributor, and the brand may
7  not have been aware that we were selling the product on
8  Amazon that was purchased through that distributor.
9      Q   In fact the brand was not aware, isn't that
10  true?
11      A   Correct.
12      Q   Okay.  You never contacted the brand and told
13  them that you were selling their product, correct?
14      A   Prior to this, no.
15      Q   And you never asked for their permission to
16  sell their product, correct?
17      A   Correct.
18      Q   Did you ask Innopex if they ever got the
19  authority to sell their product?
20      A   No.
21      Q   And when I say "their product", I mean
22  Youngblood's product.
23      A   Correct.
24      Q   The second item was the actions you have taken
25  to resolve the issue; you changed this section as well,



Page 117

1  correct?
2      A   Correct.
3      Q   Okay.  Why don't you read what you wrote.
4      A   We have removed all listings for the
5  Youngblood product line and deleted our sales offerings
6  to ensure that we don't infringe on any intellectual
7  property of Youngblood Cosmetics.  We have attached the
8  invoices from our distributor for these products for
9  your review.  We are in the process of reaching out to
10  the brand to establish what steps we should take next in
11  order to come into compliance with their selling
12  guidelines and ask them to retract the complaint.
13      Q   Okay.  On November 14th had you contacted my
14  client?
15      A   I did call and email the brand compliance
16  email that they provided and asked them to contact us so
17  we could understand what we should do.
18      Q   On November 14th?
19      A   Yes.
20      Q   Do you have a copy of that email?
21      A   I don't have any copy of the emails.
22      MR. VINE:  Kelsey, I don't remember seeing an
23      email from you guys on November 14th.  The first
24      one I recall seeing is November 26th.
25      MS. BLACK:  From Solu-Med to Youngblood?

Page 118

1      MR. VINE:  Yes.
2      MS. BLACK:  I can't answer off the top of my
3      head whether or not it's in the production or not.
4      MR. VINE:  The first item I saw was a letter
5      from Stan Goodman on November 26th.
6      MS. BLACK:  I said we have produced everything
7      that we were given.
8      MR. VINE:  I'm not suggesting you're hiding
9      anything, I'm just telling you.
10      THE WITNESS:  And to be honest the phone call
11      would have been, I do specifically remember the
12      phone call.
13      MR. VINE:  Well, we'll talk about that in a
14      second, but he said there was an email on
15      November 14th, so if you have that, I would like --
16      MS. BLACK:  I will certainly make an inquiry.
17      MR. VINE:  Yes, thank you.
18  BY MR. VINE:
19      Q   Okay.  You also mentioned that there was a
20  phone call?
21      A   Yes.
22      Q   Who did you speak with?
23      A   I don't recall, but I was trying to reach
24  anyone honestly who was in brand compliance because that
25  is who the email directed us to talk to.

Page 119

1      Q   But you spoke to somebody?
2      A   Somebody, yes.
3      Q   Female or male?
4      A   I don't remember.  I think it was -- I don't
5  recall.
6      Q   You don't recall?
7      A   No.
8      Q   Okay.  And do you recall the conversation?
9      A   I just asked them to please call me back and
10  that I needed to speak with --
11      Q   You left a message?
12      A   Yes, I spoke to a person that said I need to
13  talk to someone in brand compliance, and the person who
14  answered the phone was not that person.
15      Q   And did somebody return your call?
16      A   No.
17      Q   How many times did you call?
18      A   Oh, gosh, I won't remember, it was a lot.
19      I don't recall the exact amount but I kept
20  calling over the next few days just to try and reach
21  someone, yes.
22      Q   Okay.  And you don't recall who you spoke to,
23  correct?
24      A   Correct.
25      Q   And every time you called back do you recall

Page 120

1  if you got the same person?
2      A   It was not the same person, it would be
3  different people, and I would ask for the, just someone
4  in the brand compliance please contact me.
5      Q   Okay.  Did you ever speak to anybody from
6  Youngblood substantively?
7      A   No, no.
8      Q   And it says we are in the process of reaching
9  out.
10      So other than reaching out and leaving a
11  message and you emailed how many times?
12      A   I don't recall.
13      Q   More than once?
14      A   Quite a bit, yes.  I believe it was more than
15  once.
16      Q   Okay.
17      A   The phone call was the main, I just wanted to
18  try and speak with somebody.
19      Q   I understand you placed a couple of phone
20  calls to them, what I'm asking is if you recall ever
21  emailing, you said you did email?
22      A   I did.
23      MS. BLACK:  I am looking for emails, but also
24      we have requested all emails from Youngblood as
25      well and don't have emails, so I don't know that we



Page 121

1  got them.
2      THE WITNESS:  It would have been through the
3  one that we provided.
4      MS. BLACK:  The brand provided to the
5  info@lifeandhealthsource.
6      MR. VINE:  No, it's
7  brandprotection@ybskin.com.
8      THE WITNESS:  Well, we would have emailed
9  that.
10     MS. BLACK:  That's the email address that you
11 think you addressed?
12     THE WITNESS:  That I would have sent it to
13 because that's the only one I had.
14     MR. VINE:  Right.  And we don't have from your
15 production that I remember but I will --
16     MS. BLACK:  And I don't think I have one from
17 your production either, but we will do some
18 follow-up.
19     MR. VINE:  I don't know if that was
20 specifically requested, but that's fine.
21     MS. BLACK:  It was specifically requested.
22     MR. VINE:  You and I don't need to debate that
23 right now.
24     MS. BLACK:  Yes.
25

Page 122

1  BY MR. VINE:
2      Q    Number 3:  The steps that you have taken to
3  prevent these issues going forward:
4      "Going forward, we will review our product
5  offerings and sourcing, to ensure compliance with
6  Amazon's terms of service related to intellectual
7  property and remove any offerings that aren't in
8  compliance."
9      Correct?
10     A    Correct.
11     Q    Did you remove any other offerings by any
12 company after this point?
13     A    I don't recall.
14     Q    You understand that in 2019 you received a
15 number of complaints as well, correct?
16     A    Correct.
17     Q    Not from Youngblood but from other companies,
18 correct?
19     A    Correct.
20     Q    Did you remove any of those listings?
21     A    Yes.
22     Q    Because they weren't in compliance?
23     MS. BLACK:  Form.
24     THE WITNESS:  It would have been at the
25 direction of Manny.

Page 123

1      (Whereupon, the below referred to document
2      was marked as Defendant's Exhibit No. 13.)
3  BY MR. VINE:
4      Q    All right.  We are on Exhibit 13, which is
5  PL000051 through 53.
6      13, here is a copy for you, give one to
7  Kelsey.
8      Did you draft this document?
9      A    I worked with Cheri Seidle to address this
10 document.
11     Q    So who was the main author?
12     A    I typed it and she reviewed it and added
13 content that she thought was important.
14     Q    Okay.  What content did she add?
15     A    I don't recall exactly what she added, if she
16 directed me if there was things that needed to be
17 included as we sent the next letter.
18     Q    You don't recall what she added, correct?
19     A    I don't.
20     Q    It says the root cause:  We received a
21 counterfeit complaint from Youngblood on November 13th.
22     Do you see that?
23     A    Yes.
24     Q    That's not entirely accurate, isn't that
25 correct?

Page 124

1      Wasn't there a counterfeit complaint a couple
2  days before November 13th?
3      A    I was specifically speaking about the Plan of
4  Action for the account suspension, though, yes.
5      Q    So but you indicated here that you didn't
6  mention that there was a prior complaint?
7      A    No.
8      Q    And there were prior complaints on Youngblood,
9  correct?
10     A    Correct.
11     Q    Okay.  And if you -- it says we have been
12 selling on Amazon for five years, and Youngblood for two
13 years, without complaint.
14     That's not entirely accurate, correct?
15     A    This was speaking specific about customer
16 complaints, yes.
17     Q    It says we have been selling Amazon for five
18 years, and Youngblood for two years, without customer
19 complaints, correct?
20     A    I believe, yes.
21     Q    You weren't referring to complaints from
22 Youngblood, correct?
23     A    No.
24     Q    It says:  "The items that we sourced are
25 authentic, genuine products and we follow the Amazon



Page 125

1  Catalog Listing protocol for create all of our
2  listings."
3        You wrote that?
4      A  Probably a typo.
5      Q  No, but you wrote that sentence?
6      A  Yes.
7      Q  Okay.  You said your sources are authentic,
8  and the way you determined they would be authentic is
9  what?
10     A  Again, following the, what we discussed
11  before, where we buy a product, we would have the item
12  reviewed, the reviewed version listing on Amazon, and
13  the reviewed version of the property.
14     Q  Nothing else, correct?
15     A  Correct.
16     Q  You didn't contact the manufacturer, right?
17     A  No.
18     Q  You didn't contact Innopex to determine the
19  source and where they got it from?
20     A  Correct.
21     Q  Okay.  You didn't determine whether there was
22  a warranty or not, correct?
23     A  Correct.
24     Q  All you did was look at the product from an on
25  site and match it up to the ASIN, correct?

Page 126

1      A  Correct, a UPC verification.
2      Q  Anybody could type up a UPC and put it on a
3  label, correct?
4      MS. BLACK:  Form.
5      THE WITNESS:  I am aware of that, yes.
6  BY MR. VINE:
7      Q  So that wouldn't be a good way to verify
8  authenticity alone, correct?
9      A  That would be a way to verify the item on
10  systems so we are not duplicating as far as relating to
11  the Amazon catalog listing.
12     Q  But that's not a way to determine
13  authenticity, correct?
14     A  Correct.
15     Q  It says we have taken the following steps.  It
16  says after receiving the first complaint on 11/13, but
17  we know now there was complaints earlier, correct?
18     A  Correct.
19     Q  Okay.
20     A  Yet I want to stress this was specific to the
21  action that happened on the 13th, everything in this
22  Plan of Action.
23     Q  But it says first complaint, and that's not --
24  it's not the first complaint about Youngblood on 11/13?
25     A  Correct.

Page 127

1      Q  Okay.
2      A  Well, it was the first complaint on 11/15, but
3  it wasn't the first Youngblood complaint.
4      Q  Okay.  Not only did we remove the three
5  mentioned Youngblood items but we also proactively
6  removed the remaining 40 Youngblood listings from our
7  offerings on Amazon; that's correct?
8      A  Correct.
9      Q  You say we launched an immediate investigation
10  of our supply chain to confirm the chain of custody.
11       You wrote that or was this Cheri?
12     A  This was Cheri's quote.
13     Q  Okay.  Do you know what investigation Cheri
14  did regarding the supply chain?
15     A  I'm not sure.
16     Q  Did you do an investigation regarding the
17  supply chain?
18     A  I don't recall what steps I took.
19     Q  I think we asked earlier if you contacted
20  Innopex and you said you didn't after you received this,
21  is that accurate?
22     A  Correct.
23     Q  So that would be the investigation of the
24  contacting the source of the product, correct?
25     A  Correct, I didn't respond, I didn't, yes,

Page 128

1  correct.
2      Q  And you're not responsible for this statement
3  because you didn't write that, correct?
4      A  Correct.
5      Q  And you don't know if Cheri did something or
6  not, correct?
7      A  Correct.
8      Q  Okay.  So you can't tell us if that statement
9  was accurate or not, correct?
10     A  I am not aware.
11     Q  You can't tell us?
12     A  Correct.
13     Q  Okay.  Then it's cut off a little bit but it
14  says we evaluate all items in our something our
15  products, correct?
16     A  I guess.
17     Q  Yes, it's cut off, it's just a copy.
18       Okay.  Then the next bullet point says:  We
19  reviewed our internal operational procedures for listing
20  items with Amazon.
21       Do you see that?
22     A  I do.
23     Q  Was that your statement or was that Cheri's
24  statement?
25     A  Cheri.



Page 129

1    Q   Okay.  Because you have already testified
2  under oath there were no internal operating procedures
3  for listing items with Amazon, correct?
4        MS. BLACK:  Form.
5        THE WITNESS:  As far as the terms of service?
6  BY MR. VINE:
7    Q   No, that's not what you wrote or what Cheri
8  wrote.
9        I asked you earlier if you recall correctly
10  that you testified under oath that there were no
11  internal operating procedures for listing items with
12  Amazon; do you recall that?
13        MS. BLACK:  Form.
14        THE WITNESS:  Correct.
15  BY MR. VINE:
16    Q   Is it correct that there were no internal
17  operating procedures for listing items with Amazon; is
18  that correct?
19    A   Correct.
20    Q   Okay.  So Cheri wrote that statement, correct?
21    A   Correct.
22    Q   And that is an inaccurate statement, correct?
23    A   Correct.
24    Q   Okay.  Now, the next one it says:
25        Referencing the "Product Detail Page Rules"

Page 130

1  guide and "Policies for adding detail pages" subsection.
2        Did you write that?
3    A   I don't recall.
4    Q   Okay.
5        You must not create a product detail page for
6  a product that already in -- that already, it should say
7  is in Amazon's catalog.
8        Do you see that?
9    A   I do.
10    Q   Did you write that?
11    A   I don't recall.
12    Q   It says:  We follow these guidelines for items
13  that already have an existing ASIN in the Amazon
14  catalog.
15        Do you see that?
16    A   Yes.
17    Q   Did you write that?
18    A   I don't recall.
19    Q   Okay.  The next sentence says:  For the
20  products in question, Youngblood Cosmetics, Youngblood
21  Cosmetics, we follow the exact guidelines.
22        Did you write that?
23    A   I don't recall.
24    Q   Okay.
25        During our conversation, on Friday

Page 131

1  November 16th with the Amazon Catalog team.
2        Did you have that conversation or was that
3  Cheri?
4    A   I would have had that conversation.
5    Q   Okay.  So you would have wrote this sentence?
6    A   She and I would have talked about it.  I'm not
7  sure if I wrote it or she wrote it.
8    Q   Okay.
9        We were conflicting information to the
10  document Amazon Product Detail Page Rules.
11        What does that mean?
12    A   That would have been specifically creating a
13  duplicate listing for Amazon items that are, already
14  have an existing ASIN, so the Youngblood products
15  already all had existing ASINs.
16    Q   And you guys had done your own page?
17    A   No, we specifically did not do our own pages,
18  and they said to create a secondary listing, which we
19  thought it was a violation of their own terms of
20  service.
21    Q   Is that what you wrote here?
22    A   Yes, that's what they're saying.
23    Q   Well, on here it says:  During our
24  conversation, on Friday November 16 with the Amazon
25  Catalog team, we were conflicting information to the

Page 132

1  document Amazon Product Detail Page Rules.
2        Then you said:  We were told, duplicate
3  listings are redundant, and are not within Amazon's
4  Terms of Service, which is what could have caused the
5  issuance of the counterfeit complaint.
6        Aren't you saying here that you did do one and
7  that Amazon told you you shouldn't have done one?
8    A   No, the question was if you created a
9  secondary listing, which is not what Amazon wants, they
10  want every ASIN or the UPC to be linked together.
11    Q   Right.
12    A   They don't want redundant listings.
13    Q   Right.
14    A   They're saying create a redundant listing, if
15  you were to create that secondary listing that it would
16  be a violation of terms of service, but if we were to
17  create a new listing that says you didn't have a
18  warranty or if there's something that was different
19  about it, that would be the way that you would go about
20  doing that so that it wouldn't be in violation with
21  intellectual property.
22    Q   Okay.  But that's not what was done, correct?
23    A   We did not create secondary listings.
24    Q   They believed you did, correct?
25    A   No.



Page 133

1    Q   Okay.  Then why don't you read the next

2  sentence in where it says:

3       We have repeatedly explained (during numerous

4  emails and phone calls to Amazon support) that we

5  produce our own product content, photos, and keywords

6  for our listings, but that information is not always

7  visible on the listing is the listing was created by

8  another seller or existed prior to us selling the item.

9    A   Correct.

10    Q   Okay.  How do you correlate the two?

11    A   So if an item in ASIN already exists on

12  Amazon, all that information is locked in with the

13  Amazon system.

14       So we take pictures of our items, we took the

15  content, we write content or create keywords, but if all

16  that information already existed there, then we weren't

17  allowed to override that information.

18       Basically we were linked into Amazon ASIN, and

19  if we could take all the pictures we wanted or we could

20  create keywords it wouldn't matter, everything is linked

21  in based on that UPC and that ASIN.

22    Q   So what was Amazon saying about this?

23    A   We were saying that even though we took all

24  the steps to not violate any kind of intellectual

25  property, that all that information already existed

Page 134

1  there so we wouldn't even have the opportunity not to

2  violate intellectual property because it's already

3  linked into that ASIN.

4    Q   It says (during the numerous emails); emails

5  regarding this Youngblood issue?

6    A   I believe so.

7    Q   Okay.  So you have numerous emails to Amazon?

8    A   I don't recall how many.

9    Q   You wrote numerous, right?

10    A   That would either be me or Cheri, I'm not sure

11  which.

12    Q   So there were numerous emails to Amazon

13  regarding how you were using Amazon Product Detail Page

14  Rules?

15    A   Yes.

16    Q   Okay.

17    A   Discussion about their terms of service on not

18  creating redundant listings, but linked into the

19  existing ASINs.

20    Q   Then you write:  We do try and proactively

21  petition Amazon if we do see issues with currently

22  listed items that may be incorrect or invalid.

23       Is that an accurate statement?

24    A   Yes.

25    Q   Okay.  Do you recall proactively petitioning

Page 135

1  Amazon when you saw items not valid?

2    A   If there would be an item photo issue.

3    Q   Do you recall doing it specifically?

4    A   Specific items, no.

5    Q   So you can't point to one occasion where you

6  proactively petitioned Amazon as reflected in the

7  currently listed items, correct?

8    A   Correct.

9    Q   Okay.  Who wrote that, you or Cheri?

10    A   I don't recall.

11    Q   So despite you saying you proactively

12  petitioned, you can't recall any as you sit here today,

13  correct?

14    A   Correct, specific listings, no.

15    Q   In fact you weren't proactive with Amazon, you

16  actually ignored Amazon's warnings up until the

17  violations noted on Youngblood and they suspended your

18  account, correct?

19       MS. BLACK:  Form.

20       THE WITNESS:  I think we are talking about two

21  different things here.

22  BY MR. VINE:

23    Q   Well, when you received policy warnings you

24  weren't proactive at all with them, correct?

25    A   But this was not --

Page 136

1    Q   I'm asking when you received policy warnings,

2  did you proactively address them?

3    A   No.

4    Q   So here it says you have sent two additional

5  follow up emails on 11/14 and 11/15, okay, right?

6    A   Yes.

7    Q   So you would have emailed in from your email

8  address regarding this, correct?

9    A   Yes, there should be.

10    Q   Okay.  Let's turn to the next page.

11    A   Okay.

12    Q   Actions taken to prevent the issue in the

13  future:  Number III:  It says we are instituting

14  additional quality checks to ensure that newly sourced

15  product passes quality inspection and that the packaging

16  is valid and genuine.  We have created a system

17  generated flag to allow us to pull products off a

18  receipt for inspections.

19       Is that a true statement?

20    A   I don't recall.

21    Q   Okay.  Who wrote that?

22    A   I don't recall if that was me or Cheri.

23    Q   Okay.  Is it true that you didn't have that

24  additional quality check system in place prior to this,

25  the date of this document?



KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
137—140

Page 137

1    A   Correct.
2        MS. BLACK:  Form.
3  BY MR. VINE:
4    Q   Okay.  You also say in Number II:  We will vet
5  or current and future supply chain partners to ensure
6  that they can also comply with the same Terms of Service
7  for any items we plan to sell on Amazon.
8        Do you see that?
9    A   Yes.
10   Q   Okay.  Did you go forward in vetting the
11  supply chain partners?
12   A   I don't recall.
13   Q   Did you write that or did Cheri write that?
14   A   I don't recall.
15   Q   Prior to that you were not vetting your supply
16  chain to ensure that they were complying with Amazon's
17  guidelines, correct?
18   A   Correct.
19   Q   Okay.  And then on the fourth item you said
20  that you weren't going to be selling Amazon products,
21  correct?
22   A   I'm sorry, say that again?
23   Q   Going forward you weren't going to be selling
24  any more of Youngblood products?
25   A   Correct.

Page 138

1    Q   I said Amazon, my apologies.
2        Okay.  You can put that aside.
3        Were you aware that Youngblood since 1997 had
4  100 percent guarantee on all of their products?
5    A   No.
6    Q   Were you aware that Youngblood had a guarantee
7  and a warranty that 100 percent satisfaction that if the
8  purchaser was not satisfied with their product that they
9  can return the merchandise within 30 days for an
10  exchange or refund?
11   A   No.
12   Q   Are you aware that Amazon categorizes
13  violations regarding product authenticity as a
14  intellectual property violation?
15       MS. BLACK:  Form.
16       THE WITNESS:  No.
17  BY MR. VINE:
18   Q   This was the first time that you were made
19  aware of that?
20   A   As intellectual property, yes.
21   Q   Okay.  Did Solu-Med have a website?
22   A   That we sold products on?
23   Q   Yes.
24   A   Yes.
25   Q   Okay.  And of course it wasn't products that

Page 139

1  you manufactured, it was products that you bought from a
2  distributor, correct?
3    A   Yes, correct.
4    Q   And what would you say the percentage of sales
5  were from that website, a small part?
6    A   Small.
7    Q   Very small?
8    A   Yes.
9    Q   The bulk was either Amazon or Wal-Mart?
10   A   Amazon specifically.
11   Q   Okay.  Did Solu-Med secure advanced contracts
12  with suppliers for future supplies of particular
13  products?
14   A   Not that I am aware of, no.
15   Q   What makes Solu-Med's store unique, storefront
16  unique on the Amazon storefront, if anything?
17   A   Nothing specific.
18   Q   Cost is the biggest factor, right?
19       MS. BLACK:  Form.
20  BY MR. VINE:
21   Q   When I say cost, meaning the cost --
22   Q   What?
23   Q   The cost factor of a product is the best way
24  to differentiate yourself between your competitors,
25  correct?

Page 140

1    A   Oh, actually in Amazon there's a whole host of
2  things that they review that make you, you know,
3  customer service ratings, and delivery, if you use the
4  FBA program, so there's a lot of factors they use.
5    Q   But you would agree with me that price is a
6  significant factor in attracting customers?
7    A   Price is important, yes.
8    Q   Do you agree that it's the most important for
9  a storefront like yours selling cosmetics on Amazon?
10   A   No, if you have bad customer service ratings
11  people won't buy from you, even if you have great
12  pricing trying to sell.
13   Q   So would you think that the price is a
14  significant factor?
15   A   It's important.
16   Q   I asked if it was a significant factor.
17       MS. BLACK:  Form.
18       THE WITNESS:  Again, I think if you have bad
19       customer service ratings.
20  BY MR. VINE:
21   Q   I'm going to keep on asking until you answer
22  the question, it is either yes or no.
23   A   No.
24       MS. BLACK:  Form.
25



Page 141

1  BY MR. VINE:
2      Q    So you're saying that price is not a
3  significant factor, that's what you're telling the
4  ladies and gentlemen of the jury?
5      MS. BLACK:  Form.
6  BY MR. VINE:
7      Q    You think it's important, but not significant?
8      A    Yes, it is important.
9      Q    But you don't know if it's significant or not?
10     A    Yes, I'm not sure.
11     Q    Okay.  What were the most popular products
12  sold on Solu-Med?
13     A    By popular you mean?
14     Q    I mean a brand.
15     A    Specific brands like the brand names or just
16  the categories?
17     Q    It could be a category, a brand, do you know,
18  first let's start with do you know what brand that was
19  the most popular name on Solu-Med?
20     A    At that time I'm not sure what the best
21  selling brand.
22     Q    What about now?
23     A    I have no idea.
24     Q    What about the time you left?
25     A    Probably health and beauty, yes.

Page 142

1      Q    That is the name of a brand?
2      A    No, that's the category.
3      Q    I was asking a specific brand.
4      A    I'm not sure.
5      Q    The health and beauty is what, isn't that all
6  you were selling in Life & Health Source?
7      A    There was some medical items as well.
8      Q    The majority and bulk was health and beauty,
9  correct?
10     A    Correct.
11     Q    What product or type of products of life and
12  health beauty was the most popular?
13     A    Hair care and skin care.
14     Q    Isn't that life and health and beauty?
15     A    No, I'm sorry, the like --
16     Q    Is it a brush, is it a certain type of blush
17  cosmetic?
18     A    Shampoos, conditioners, hair treatments,
19  things like that.
20     Q    That were the most popular?
21     A    Yes.
22     Q    Okay.  And Solu-Med is not selling any of
23  their own branded products, correct?
24     A    Correct.
25     Q    Did you have a constant supply of these

Page 143

1  demanded products that you are aware of?
2      A    I am not aware.
3      Q    You don't know if there was a constant demand
4  of these products, correct?
5      A    Correct.
6      Q    And you don't know it you could consistently
7  get a supply because you weren't the one actually doing
8  the purchasing, that was Q Med, correct?
9      A    We had an understanding of how much we would
10  forecast, but as far as specifics, no.
11     Q    You don't know if that supply could continue,
12  because you didn't have those future contracts that we
13  talked about earlier?
14     A    Correct.
15     Q    Are you aware of Amazon's algorithm that
16  resulted in certain stores or entities products being
17  displayed on the first page of a search of a product?
18     MS. BLACK:  Form.
19     THE WITNESS:  Yes, I am aware of the
20     algorithm.
21  BY MR. VINE:
22     Q    You don't know what that it is?
23     A    I don't have the specifics.
24     Q    Well, are you aware of how one can achieve
25  getting to be on the first page?

Page 144

1      A    Again, I know it's a combination of price and
2  customer service and having a good reputation.
3      Q    So price is definitely a factor for that?
4      A    Price is a factor, yes.
5      Q    So if I asked you questions about Solu-Med's
6  financial statements you wouldn't be able to answer
7  those questions, correct?
8      A    No.
9      Q    Were you involved, though, in creating the KPI
10  Metrics for Solu-Med?
11     A    I helped to provide some information for
12  those.
13     Q    But you didn't draft the KPI Metrics?
14     A    No, the accounting team did the actual KPIs in
15  2018.
16     Q    And you couldn't have done the KPI, I'm
17  talking about in 2017, did you do the KPI Metrics?
18     A    In 2017, yes.
19     Q    You drafted it?
20     A    Yes.
21     Q    Okay.  Let me take a five minute break.
22     THE VIDEOGRAPHER:  We are going off the video
23     record 11:02 a.m.
24     (Whereupon, a short recess was had.)
25     THE VIDEOGRAPHER:  We are back on the video



Page 145

1     record 11:08 a.m.
2   BY MR. VINE:
3     Q    Were you aware that in June of 2018 there was
4   a strategic shift at Solu-Med?
5     A    Can you explain that?
6     Q    Was there a decision by management to stop
7   selling certain types of products on storefronts?
8     A    Not that I recall.
9     Q    You weren't told to stop selling any medical
10  supplies or anything to that extent in the summer of
11  2018?
12    A    I don't recall.
13    Q    Were you aware that there was sales declines
14  from June of '18, 2018 to November of 2018 before the
15  Youngblood product?
16    A    Yes.
17    Q    Do you know why there was a decline, a sales
18  decline?
19    A    There were items that we stopped selling
20  specifically that we didn't want to sell anymore.
21        There were large items that we got out of, but
22  we did look at reinvesting those in different products
23  in the hopes that we could sell those in the later part
24  of the year.
25    Q    Okay.  But there was a sales decline for the

Page 146

1   six months prior to November of 2018?
2         MS. BLACK:  Form.
3         THE WITNESS:  I don't recall specifics.
4   BY MR. VINE:
5     Q    But you were aware that there was a sales
6   decline?
7     A    Yes.
8         MR. VINE:  I am going to allow you to continue
9     until I get those Exhibits, it's just two minor
10    Exhibits, but I'm going to reserve my right to
11    question on that and the emails.
12    Go ahead.
13        MS. BLACK:  Okay, thanks.
14            CROSS EXAMINATION
15  BY MS. BLACK:
16    Q    Solu-Med accepted returns on all its products
17  listed on the Amazon store, right?
18        MR. VINE:  Objection.
19        THE WITNESS:  Yes, we would contact the -- the
20    vendor would contact -- the customer would contact
21    us and we would have a discussion about the
22    products.
23  BY MS. BLACK:
24    Q    And any products purchased through the
25  Fulfilled by Amazon program would automatically be

Page 147

1   accepted for return, correct?
2     A    Correct.
3         MR. VINE:  Objection.
4   BY MS. BLACK:
5     Q    Solu-Med sourced all its products from Q Med?
6     A    Correct.
7     Q    And Innopex was a supplier of Q Med?
8     A    Correct.
9     Q    Q Med has very stringent standards for their
10  suppliers?
11    A    Correct.
12    Q    Q Med supplies medical equipment for companies
13  like Kipson and other big brand medical suppliers,
14  right?
15        MR. VINE:  Objection.
16        THE WITNESS:  Correct.
17  BY MS. BLACK:
18    Q    And Q Med goes through audits by those
19  customers on a regular basis?
20        MR. VINE:  Objection.
21  BY MS. BLACK:
22    Q    Are you aware of that?
23    A    Yes.
24    Q    Yes, sorry, for the camera and the court
25  reporter you have to actually say yes.

Page 148

1     A    Correct.
2     Q    If a supplier of Q Med was packing on
3   counterfeit products, would Q Med continue to do
4   business with them?
5         MR. VINE:  Objection.
6         THE WITNESS:  No.
7   BY MS. BLACK:
8     Q    And you worked at Q Med before you worked at
9   Solu-Med, correct?
10    A    Correct.
11    Q    In your 10 year history of Q Med and Solu-Med
12  have you ever heard of any instance of Innopex passing
13  on counterfeit product?
14    A    Not that I was aware of, no.
15    Q    Does Q Med have extremely strict quality
16  control measures for new product from the supplier
17  passing through its warehouse?
18        MR. VINE:  Objection.
19        THE WITNESS:  Yes.
20  BY MS. BLACK:
21    Q    Have you ever compared Q Med's quality control
22  SOPs against Amazon's policies?
23    A    No.
24    Q    You don't know if Q Med has a stricter SOP
25  than Amazon in sourcing and chain of custody, right?



Page 149

1    A   I'm not sure, no, I am not aware.

2    Q   When you testified that Innopex is a reliable

3 supplier, did you make that statement based on your

4 experience with Q Med, the stringent requirements that

5 they make their suppliers go through to sell products

6 through them, and your history, your 10 year history

7 with the company?

8        MR. VINE:  Objection.

9        THE WITNESS:  Correct.

10 BY MS. BLACK:

11   Q   Are you aware that Amazon Seller University

12 YouTube channel and credentials only came about in 2019?

13   A   I wasn't aware of that.

14   Q   If that statement is true would it have been

15 possible to achieve the certificate on the YouTube

16 channel or whatever Mr. Vine was referencing prior to

17 purchasing Youngblood products?

18       MR. VINE:  Objection.

19       THE WITNESS:  No.

20       MR. VINE:  That's not true either.

21   Q   Do you have any idea with regard to the Amazon

22 policies that Mr. Vine showed you if these policies were

23 put in place, or revised in any way I should say, in

24 fact let's strike the question.

25

Page 150

1        If you look at Exhibit 2.

2    A   Okay.

3    Q   If you look at the top left hand corner of

4 Exhibit 2?

5    A   Yes.

6    Q   Do you see the date?

7    A   Yes.

8    Q   What does it say?

9    A   December 2nd, 2019.

10   Q   The policies he was asking you to review the

11 Condition Guidelines, you have no idea if they had

12 materially changed from the time you reviewed them in

13 December or in 2015, correct?

14   A   Correct.

15   Q   You don't know if they have changed from pre

16 let's say October 2018 until now, correct?

17   A   Correct.

18   Q   And if we go through for every, if you go to

19 the next one, the cosmetics and skin care Exhibit 5, or

20 Exhibit 3, sorry, I have different Exhibit numbers.

21       What's the date in the upper left hand corner

22 of that Exhibit?

23   A   December 10th, 2019.

24   Q   Correct.

25       If you had a question about a listing on the

Page 151

1 Amazon store would you refer to Amazon's referenced

2 videos, tutorials, helplines, et cetera, to ensure that

3 you are complying to the best of your ability with any

4 of Amazon's policies?

5        MR. VINE:  Objection.  I just move to strike

6    it as inaccurate, but go ahead.

7        THE WITNESS:  Can you ask the question again?

8 BY MS. BLACK:

9    Q   Yes, I was asking if you had a question about

10 something that you were listing on Life & Health Source

11 Amazon store would you review to assist yourself in

12 listing the product accurately Amazon's policies?

13       MR. VINE:  Objection.

14       THE WITNESS:  I'm not aware of what our next

15    steps would be.

16 BY MS. BLACK:

17   Q   If Amazon had different language in October or

18 at any time in 2018 that the definition under the

19 Condition Guidelines that you looked at earlier didn't

20 have to include the word new, or that the Condition

21 Guidelines for listing new products did not have to

22 include original manufacturer's warranty, would you like

23 to see a document that said that?

24       MR. VINE:  Objection.

25       THE WITNESS:  Yes.

Page 152

1 BY MS. BLACK:

2    Q   If we go to Exhibit 4.  If you go to

3 Exhibit 4, what does it say under materially different

4 product violation?

5        I think it's about halfway through the page.

6    A   Materially different product condition

7 violation.  The product you list and ship must exactly

8 match the description, pictures and all other

9 information on the product detail.  Amazon policy

10 prohibits you from listing or shipping materially

11 different products.

12   Q   And when you read that policy it says Amazon

13 Products Authenticity and Quality, right?

14   A   Yes.

15   Q   That's the name of the policy you were reading

16 from?

17   A   Yes.

18   Q   And there's two types of violations,

19 intellectual property violation and materially different

20 product conditions violation, correct?

21   A   Yes.

22   Q   And when it lists examples of problems under

23 the second category, Materially Different Product

24 Condition Violations, is one of the first examples it

25 says listing your products in new condition when it's



KELLON GOODSON
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

January 09, 2020
153–156

Page 153

1  not brand new or used?
2    A   Correct.
3    Q   Do you know one way or the another if
4  Youngblood had specific instructions on how to store its
5  products?
6    A   I wasn't aware.
7    Q   Did Youngblood ever contact you or anyone at
8  Solu-Med as far as you know for samples of Solu-Med
9  listed Youngblood products?
10   A   No.
11   Q   They didn't contact you pre making the
12  counterfeit report in 2018?
13   A   No.
14   Q   And they didn't contact you after, right?
15   A   Not that I am aware of, no.
16   Q   In terms of Exhibit 8, I will give you a
17  second to flip through it, did Youngblood ever email you
18  the information contained in this complaint?
19   A   No.
20   Q   The first notice that you had issue that
21  counterfeit -- is that Youngblood told Amazon that you
22  had counterfeit product was received in this
23  notification or was when Amazon shut down your store,
24  correct?
25       MR. VINE:  Objection, mischaracterizes his

Page 154

1  testimony, and there was an Exhibit that's already
2  reflected that he received one on November 11th.
3       MS. BLACK:  I asked a bad question.
4  BY MS. BLACK:
5    Q   In terms of communications about Youngblood
6  complaining about counterfeit product, the only
7  communications you ever received came through Amazon,
8  correct?
9    A   Correct.
10   Q   Youngblood never reached out to the Life &
11  Health Store to notify you that they took issue with any
12  of your listings?
13   A   No.
14   Q   They never requested samples of any of the
15  products you issued?
16   A   No.
17   Q   Do you know one way or another if Amazon
18  required a manufacturer warranty to be included to list
19  the products as new in October of 2018?
20       MR. VINE:  Objection.
21       THE WITNESS:  No, I am not aware.
22       MR. VINE:  One way or the other?  You don't
23  know one way or the other, right?
24       THE WITNESS:  I don't know, I'm not sure.
25

Page 155

1  BY MS. BLACK:
2    Q   Mr. Vine asked you some questions about
3  Exhibit 13, which was the November 16, 2018 Plan of
4  Action.
5    A   Okay.
6    Q   If you flip to the second page and I may have
7  misunderstood, but it says:
8       "We reviewed our internal operational
9  procedures for listing items with Amazon, in order to
10  ensure that we are following Amazon's Terms of Service
11  and Product Detail Page Rules of protocol."
12       Correct?
13   A   Yes.
14   Q   I read that correctly?
15   A   Yes, correct.
16   Q   When you were talking about operational
17  procedures for Solu-Med, you previously said none of
18  them are in writing, right?
19   A   Correct.
20   Q   But you had procedures, right, on how to --
21       MS. BLACK:  Well, let him answer.
22       MR. VINE:  Well, no, no, no, because you're
23  misleading and I'm going to object because that's
24  not what that says, and that's not what he
25  testified to, but that's fine if he wants to change

Page 156

1  his testimony under oath and I will just object.
2       MS. BLACK:  Well, you inserted the word
3  "written" earlier.
4       MR. VINE:  He actually said that there were no
5  internal operating procedures regarding listing,
6  verbal or written, that's what he testified to.
7       MS. BLACK:  I must have taken an inaccurate
8  note, but regardless.
9       MR. VINE:  He said that was an inaccurate
10  statement, and he said that Cheri is the one who
11  wrote it.
12       MS. BLACK:  Right, and that's because you
13  inserted the word written.
14       MR. VINE:  No, ask him.
15       MS. BLACK:  The record --
16       MR. VINE:  Ask him.  Ask him, let's see what
17  he says.
18  BY MS. BLACK:
19   Q   So what I'm asking is while there weren't
20  written protocols would that statement be true if you
21  guys discussed operational procedures that Solu-Med had
22  for listing products with Amazon?
23       MR. VINE:  Objection.
24       THE WITNESS:  We would discuss ways of listing
25  but we didn't have any internal, there were no set



Page 157

1    procedures.
2  BY MS. BLACK:
3    Q    And set in terms of -- all right, I will leave
4  it at that, that's fine.
5        Can you explain the fulfillment by Amazon
6  program?
7    A    Yes, so there is product that would be owned
8  by Solu-Med that we would send to Amazon's fulfillment
9  centers, Amazon would take the products in, and they
10  would be listed on Amazon's site and then Amazon would
11  handle the fulfillment, once a customer orders those
12  products they would go to the customer and Amazon would
13  be responsible for customer service, returns, and
14  anything related to the sale of the product and delivery
15  of the product.
16    Q    And I just have one more question related to
17  that, and I can turn this back over to Mr. Vine.
18        When a customer goes shopping on the Amazon
19  store is it notified somehow in the listing that an item
20  is fulfilled by Amazon?
21    A    Yes, it says Amazon Prime.
22        MS. BLACK:  Perfect.  No further questions.
23            REDIRECT EXAMINATION
24  BY MR. VINE:
25    Q    Okay, great.  I have a couple of follow-up

Page 158

1  questions.
2        You were asked a whole slew of questions about
3  the Amazon guidelines, correct?
4    A    Yes.
5    Q    And what existed in 2018, you don't know what
6  existed in 2018 because you didn't review them prior to
7  selling the Youngblood products, correct?
8    A    Correct.
9    Q    You also were asked whether Youngblood ever
10  contacted, Youngblood ever contacted Solu-Med to discuss
11  how the products were being stored; do you remember
12  that?
13    A    Yes.
14    Q    Okay.  You never contacted Youngblood before
15  you started selling the products, correct?
16    A    Correct.
17    Q    You never contacted Youngblood before selling
18  its product to ask them to review samples of the
19  products you bought, correct?
20    A    Correct.
21    Q    Now I have this KPI Metrics that I was
22  referring to earlier.
23        MS. BLACK:  Got it.
24        (Whereupon, the below referred to document
25        was marked as Defendant's Exhibit No. 14.)

Page 159

1        MR. VINE:  Exhibit 14.  I have a copy for you.
2        MS. BLACK:  Thank you.
3        MR. VINE:  You're welcome.
4  BY MR. VINE:
5    Q    Is this a document you drafted?
6    A    Yes.
7    Q    And this is the KPI Metrics that you drafted,
8  they don't reflect expenses for payroll, correct?
9    A    Correct.
10    Q    It doesn't reflect expenses for rent, correct?
11    A    Correct.
12    Q    It doesn't reflect expenses for insurance,
13  correct?
14    A    Correct.
15    Q    It doesn't reflect expenses for almost
16  anything, correct?
17    A    Correct.
18    Q    Okay.  Put that aside.
19        MS. BLACK:  Did you state that was for 2017?
20  BY MR. VINE:
21    Q    This document, I thought we testified earlier,
22  he testified earlier that the KPI Metrics reflects for
23  2017, correct?
24    A    Correct, this is 2017 KPIs.
25    Q    And you were asked a number of questions

Page 160

1  regarding Q Med's internal guidelines, correct?
2    A    Correct.
3    Q    Okay.  When you were at Solu-Med did you have
4  access to their written guidelines?
5    A    I don't recall.
6    Q    Okay.  Did you review their written guidelines
7  regarding their supply of chain of custody, correct?
8        Or, no, did you review their supply of chain
9  of custody guidelines?
10    A    Not that I am aware of, no.
11    Q    Okay.  So all of the "verification" that Q Med
12  did, you're not aware of what they actually did as
13  relates to Youngblood products, correct?
14    A    While I was at Solu-Med, no.
15    Q    And you're not aware of how they vetted
16  Innopex, correct?
17    A    Specifically Innopex, no.
18    Q    You haven't received or reviewed their file
19  for Innopex, have you?
20    A    No.
21    Q    Okay.  Are you aware if they have a vetting
22  file of Innopex?
23    A    Generally I know they vet all their suppliers.
24    Q    They have one for all their suppliers?
25    A    Yes.



Page 161

1    Q    And what's in that file?

2    A    I'm not sure, I don't know.

3    Q    Are you aware of that ERA system that you were

4  talking about?

5    A    ERP.

6    Q    ERP system, is that cost something that

7  Solu-Med pays for?

8    A    I am not aware.

9    Q    Okay.  And the last question, when you were

10  speaking with Ms. Black last night about this

11  deposition, did she go over any questions that she asked

12  you today?

13   A    No.

14   Q    Nothing further.

15        You have the opportunity to read the

16  deposition to make sure that this lovely court reporter

17  over here took down everything you said was accurate in

18  your response about your responses --

19   A    Okay.

20   Q    -- Or you could waive that right, it's up to

21  you.

22   A    I have to do it now?

23   Q    No, you don't have to read it now, you have to

24  make a determination whether you want to waive.

25        MS. BLACK:  She's going to type it up and then

Page 162

1  you will have an opportunity to come in and read it

2  and sign it within 30 days of her notifying you

3  that it's been typed up.

4        THE WITNESS:  Okay.

5        MS. BLACK:  But you have to say it on the

6  record whether you want to read or whether you

7  waive that right.

8        THE WITNESS:  Yes, I would like it read it.

9        THE VIDEOGRAPHER:  We are going off the video

10  record 11:26 a.m.

11        MR. VINE:  We would like a rush on this as

12  well.

13        MS. BLACK:  Yes, I would like a copy, only

14  electronic PDF, TXT.

15        (Thereupon, the videotaped deposition

16  was concluded.  Signature and formalities were

17  not waived.)

18            - - - - - -

19

20

21

22

23

24

25

Page 163

1              - - - - -

2              CERTIFICATE OF OATH

3  STATE OF FLORIDA

4  COUNTY OF BROWARD

5

6

7        I, the undersigned authority, certify

8  that KELLON GOODSON personally appeared

9  before me and was duly sworn.

10        WITNESS my hand and official seal this

11  12th day of January 2020.

12

13

14                    _____

15              Evan A. Ferguson

              Notary Public, State of Florida

16              My Commission Expires 12/29/21

              Commission No. GG 139467

17

18

19

20

21

22

23

24

25

Page 164

1              CERTIFICATE OF REPORTER

2

3

4  STATE OF FLORIDA:

5  COUNTY OF BROWARD:

6

7

8        I, Evan A. Ferguson, Court Reporter,

  certify that pursuant to Notice of Taking Deposition

9  in the above-styled cause, that I was authorized to

  and did stenographically report the foregoing

10  deposition as hereinabove shown, and the testimony

  of said witness was reduced to computer

11  transcription under my personal supervision.

        I further certify that the said deposition

12  was taken at the time and place specified

  hereinabove, and that I am neither of counsel nor

13  solicitor to either of the parties in said suit nor

  interested in the event of the cause.

14        I further certify that I have delivered

  the original copy of said deposition to JONATHAN

15  VINE, ESQUIRE, to be retained by him pending further

  order of the Court.

16        Witness my hand and official seal in the

  City of Fort Lauderdale, County of Broward, State of

17  Florida, this 12th day of January 2020.

18

19

20              Evan A. Ferguson, Notary

              Public at Large

21              My Commission Expires 12/29/21

              Commission No. GG 139467

22

23

24

25



**Page 165**

```
 1              DEPOSITION ERRATA SHEET
 2
     Job Assignment No: J4842062
 3
     Case Caption:  SOLU-MED, INC.
 4
     vs.
 5
     YOUNGBLOOD SKIN CARE
 6   PRODUCTS, LLC.
 7
 8      DECLARATION UNDER PENALTY OF PERJURY
 9        I declare under penalty of perjury
10   that I have read the entire transcript of
11   my Deposition taken in the captioned matter
12   or the same has been read to me, and
13   the same is true and accurate, save and
14   except for changes and/or corrections, if
15   any, as indicated by me on the DEPOSITION
16   ERRATA SHEET hereof, with the understanding
17   that I offer these changes as if still under
18   oath.
19        Signed on the _____ day of
20   _____, 20___.
21
22   _____
23   KELLON GOODSON
24
25
```

**Page 166**

```
 1              DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24            KELLON GOODSON
25
```

**Page 167**

```
 1              DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25            KELLON GOODSON
```

