## Page 1

```
                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                       Case No. 0:19-CV-60487


  ARGO HOLDINGS, INC. AND SOLU-MED, INC.,

                        Plaintiff,

             vs.

  YOUNGBLOOD SKIN CARE PRODUCTS, LLC,

                        Defendant.
  _____/

                   VIDEOTAPED DEPOSITION
                           OF
                    MANUEL E. AGUERO
          SOLU-MED, INC. CORPORATE REPRESENTATIVE
                   NONCONFIDENTIAL PORTIONS

             TAKEN ON BEHALF OF THE DEFENDANT

                Wednesday, November 20, 2019
                  10:02 a.m. - 2:03 p.m.


                  110 Southeast 6th Street
                         Suite 2700
                  Fort Lauderdale, Florida 33301
                       Job #J4467092



           Reported by:  Dona J. Wong, CSR, RPR
```

## Page 2

```
                    APPEARANCES OF COUNSEL

      On behalf of the Plaintiffs:

          BLACK LAW, P.A.
          1401 East Broward Boulevard
          Suite 204
          Fort Lauderdale, Florida 33301
          Telephone:  (954) 320-6220
          Fax:  (954) 320-6005
          E-mail:  kelsey@kkbpa.com
          By:  KELSEY K. BLACK, ATTORNEY AT LAW

      And

          GOODMAN & SAPERSTEIN
          666 Old Country Road
          Suite 200
          Garden City, New York  11530
          Telephone:  (516) 227-2100
          Fax:  (516) 227-2108
          E-mail:  Gsesq600@aol.com
          By:  STANLEY R. GOODMAN, ATTORNEY AT LAW

      On behalf of the Defendant:

          COLE, SCOTT & KISSANE, P.A.
          222 Lakeview Avenue
          Suite 120
          West Palm Beach, Florida  33401
          Telephone:  (561) 383-9201
          Fax:  (561) 683-8977
          E-mail:  ryan.ransom@cslegal.com
          By:  RYAN M. RANSOM, ATTORNEY AT LAW

   Also Present:

          George B. Ellis, Videographer

                      - - -
```

## Page 3

```
  REPORTER'S KEY TO PUNCTUATION
  -- at the end of the question, answer or colloquy
  indicates interruption by another speaker

  . . . indicates while reading, words left out

  . . . . and the end of a line indicates a trailing off

  "Uh-huh" indicates affirmative

  "Huh-uh" or "huh-huh" indicates negative

                      - - -
                    I N D E X
                      - - -

  WITNESS:         DIRECT    CROSS   REDIRECT   RECROSS

  MANUEL E. AGUERO

  BY MR. RANSON        7

                      - - -
                  E X H I B I T S
                      - - -

  NUMBER                DESCRIPTION            PAGE

  DEFENDANT'S EX. 1   TWO-PAGE SOLU-MED WEB SITE   13

  DEFENDANT'S EX. 2   ONE PAGE PRINTOUT FROM       34
                      YOUNGBLOOD'S WEBSITE
                      REGARDING DIVERSION

  DEFENDANT'S EX. 3   TWO-PAGE COMPOSITE OF        41
                      REVIEWS
```

## Page 4

```
                      - - -
                  E X H I B I T S
                      - - -

  NUMBER                DESCRIPTION            PAGE

  DEFENDANT'S EX. 4   ONE-PAGE LIFE & HEALTH       53
                      SOURCE REVIEW

  DEFENDANT'S EX. 5   FOUR-PAGE CODE OF CONDUCT    73
                      DOCUMENT

  DEFENDANT'S EX. 6   FOURTEEN-PAGE AMAZON         75
                      CONDITION GUIDELINES

  DEFENDANT'S EX. 7   CONFIDENTIAL AMAZON          79
                      PRODUCT AUTHENTICITY AND
                      QUALITY DOCUMENT, BATES
                      LABEL CONFIDENTIAL
                      AMZN_0038-0042

  DEFENDANT'S EX. 8   AMAZON ANTI-COUNTERFEITING   84
                      POLICY, BATES LABEL
                      CONFIDENTIAL AMZN_00046-47

  DEFENDANT'S EX. 9   FOUR-PAGE BEST PRACTICES     89
                      IN PRODUCT AUTHENTICITY
                      AND QUALITY

  DEFENDANT'S EX. 10  ONE-PAGE DOCUMENT WITH       91
                      TITLE OF CURRENT SELLING
                      STATUS OF ABABPETWJQTSG:
                      NORMAL

  DEFENDANT'S EX. 11  COMPLAINT                    96

  DEFENDANT'S EX. 12  LIST OF ITEMS BEING          98
                      COUNTERFEIT

  DEFENDANT'S EX. 13  COMPLAINTS BATES LABELED    103
                      PL00187-PL00229 WITH A
                      LIST ENTITLED OTHER
                      COMPLAINTS
```



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
5—8

**Page 5**

```
1            -  -  -
2              E X H I B I T S
3            -  -  -
4
     NUMBER            DESCRIPTION              PAGE
5
6  DEFENDANT'S EX. 14   PLAINTIFFS' RESPONSES TO   121
                        DEFENDANT'S FIRST SET OF
7                       INTERROGATORIES
8  DEFENDANT'S EX. 15   PLAINTIFF'S RESPONSES TO    124
                        DEFENDANT'S SECOND SET OF
9                       INTERROGATORIES
10 DEFENDANT'S EX. 16   ONE-PAGE DROP SHIPPING      150
                        POLICY
11
                     -  -  -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

1    VIDEOTAPED DEPOSITION OF MANUEL E. AGUERO,
2         Wednesday, November 20, 2019
3              - - -
4    Videotaped deposition taken before Dona J. Wong,
5  Certified Shorthand Reporter, Registered Professional
6  Reporter, and Notary Public in and for the State of
7  Florida at Large, in the above cause.
8              - - -
9         THE VIDEOGRAPHER:  We are now on the video
10  record.  Today is Wednesday, the 20th day of
11  November 2019.  The time is 10:02.
12       This is the videotaped deposition of Manuel
13  E. Aguero as corporate rep -- representative of
14  Solu-Med in the matter of Argo Holdings,
15  Incorporated and Solu-Med, Incorporated versus
16  Youngblood Skin Care Products, LLC.
17       The court reporter is Dona Wong, the
18  videographer is George B. Ellis.
19       Will counsel please announce their
20  appearances for the record.
21       MR. RANSON:  Ryan Ranson on behalf of
22  Youngblood Skin Care Products.
23       MR. GOODMAN:  Stanley R. Goodman, Goodman &
24  Saperstein on behalf of Solu-Med.
25       MS. BLACK:  And Kelsey Black, Black Law, P.A.

**Page 7**

1  on behalf of Solu-Med.
2       THE COURT REPORTER:  Sir, would you raise your
3  right hand to be sworn, please.
4       THE WITNESS:  I do.
5       THE COURT REPORTER:  Thank you.
6       (Oath administered.)
7  Thereupon,
8            (MANUEL E. AGUERO)
9  having been first duly sworn or affirmed, was examined
10  and testified as follows:
11            DIRECT EXAMINATION
12  BY MR. RANSON:
13     Q.  How are you doing today, sir?
14     A.  Good.
15     Q.  I know we went over this yesterday.  You've
16  had your deposition taken.
17       Do you understand the ground rules of kind of
18  how this works?
19     A.  Yes.
20     Q.  Okay.  I would like to reiterate -- reiterate
21  that if you do need to take a break at any time, please
22  let me know, but please answer the pending question or
23  the line of questioning.  Is that okay?  Is that fair?
24     A.  Yes.
25     Q.  Okay, great.

**Page 8**

1       For the record, could you please state your
2  complete name.
3     A.  Manuel E. Aguero.
4     Q.  And could you please spell that.
5     A.  M-a-n-u-e-l, middle initial E., last name
6  A-g-u-e-r-o.
7     Q.  And your home address, please.
8     A.  1801 Southeast Eighth Street, Fort Lauderdale,
9  Florida 33316.
10     Q.  And your phone number?
11     A.  (954) 254-1107.
12     Q.  And what is your age and date of birth?
13     A.  Age, 58; date of birth, June 30th, 1961.
14     Q.  Okay.  And you understand that you're
15  appearing today, pursuant to the notice that was served
16  upon your counsel, to answer questions regarding
17  Solu-Med.  Correct?
18     A.  Yes.
19     Q.  And you've reviewed those documents and you're
20  prepared to answer those questions?
21     A.  Yes.
22     Q.  Okay.  And we spoke yesterday, but did you
23  review any other documents after we spoke yesterday?
24     A.  No.
25     Q.  Have you spoken to anyone about the deposition



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
9–12

Page 9

1   today other than your attorneys?
2      A.  No.
3      Q.  Okay.  And you're -- you're familiar with
4   Youngblood products that Solu-Med sells?
5      A.  Yes.
6      Q.  And what's your position at Solu-Med?
7      A.  I'm the cofounder and director of the company.
8      Q.  How many other cofounders are there?
9      A.  One other cofounder.
10     Q.  And who is that?
11     A.  Carlos Rodriguez.
12     Q.  Do you guys have 50/50 or how does that work?
13     A.  We actually own 45 percent each, and we have
14   five executives that own about ten percent.
15     Q.  Are they located in Florida as well?
16     A.  Yes.
17     Q.  Okay.  Do you have any other occupation other
18   than owning these companies?
19     A.  No.
20     Q.  Okay.  And how long have you worked for
21   Solu-Med?
22     A.  Solu-Med started operations in -- 2014.
23     Q.  And you've worked for Solu-Med since 2014?
24     A.  Yes.
25     Q.  Okay.  And you've always been the founder

Page 10

1   and -- and I guess you've ran that company?
2      A.  Correct.
3      Q.  Okay.  And where did you work before or did
4   you work?
5      A.  Well, we -- yesterday we took the deposition
6   on Q-Med and Q-Med was founded in 1990 and I've been
7   working for Q-Med as a cofounder for 29 years.
8      Q.  Okay.  Where did you work before Q-Med?
9      A.  Johnson & Johnson Medical, Inc.
10     Q.  And how long were you at Johnson & Johnson?
11     A.  Six years.
12     Q.  And what did you do for them?
13     A.  I was a medical sales rep.
14     Q.  So you're very familiar with acquiring and
15   selling products from your experience at Johnson &
16   Johnson?
17     A.  Well, no.  I'd say Johnson & Johnson, I was a
18   medical sales rep.  When I founded Q-Med is when we got
19   into the business of -- of trading medical supplies.
20     Q.  But did your experience at Johnson & Johnson
21   lead you to founding Q-Med?
22     MR. GOODMAN:  I'll object to the form.
23     THE WITNESS:  I would say no.
24   BY MR. RANSON:
25     Q.  Okay.  And where did you attend school?

Page 11

1      A.  University of Florida.
2      Q.  Go Gators.
3          Did you get a master's degree?
4      A.  Bachelor's in business administration, major
5   in finance, graduated in 1983 with honors.
6      Q.  Okay.  You only worked at Johnson & Johnson?
7      A.  Prior to that, I worked at Dean Witter
8   Reynolds for one year.
9      Q.  Okay.  All right.  And what position did you
10   hold with Dean Witter Reynolds?
11     A.  I was a licensed stockbroker.
12     Q.  Okay.  And that was in Florida?
13     A.  Yes.
14     Q.  Okay.  Do you have any professional licenses?
15     A.  No.
16     Q.  I'm going to be referring to Youngblood Skin
17   Care Products as Youngblood today.  Is that okay with
18   you?
19     A.  Yes.
20     Q.  Okay.  I'll -- I'll be referring to Solu-Med,
21   Inc. as Solu-Med.  Is that okay?
22     A.  Yes.
23     Q.  Okay.  And I'll be discussing some Amazon
24   policies with you today.  I'm just going to refer to
25   those as the selling policies or the seller code of

Page 12

1   conduct.  Is that okay?
2      A.  Yes.
3      Q.  Okay.  All right.
4          And you said Solu-Med was founded in Florida.
5   Correct?
6      A.  I believe it's Delaware.
7      Q.  Delaware.  Where is it -- where is it
8   headquartered right now?
9      A.  At 2281 Griffin Road, Fort Lauderdale,
10   Florida.
11     Q.  Okay.  So it was headquartered in Delaware and
12   now it's in Florida?
13     A.  It was established in Delaware.  It's a
14   Delaware Corp.  It's always been housed in Florida.
15     Q.  Okay.  Do -- do you know if you have a
16   registered agent listed on Sunbiz?
17     A.  I'm -- I'm not certain.
18     Q.  I mean, is there any reason why you wouldn't,
19   being a corporation in Florida, why you wouldn't
20   register on Sunbiz?
21     A.  I think we initially initiated the corporation
22   in Delaware, and it's been registered there since the
23   beginning.
24     Q.  So I went on your Web site for Solu-Med --
25   I'll just enter this as Composite Exhibit 1.  She can



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
13–16

Page 13

1  mark it and she'll hand it to you.
2       MR. GOODMAN:  Thank you.
3       (Defendant's Exhibit Number 1 was marked for
4  identification.)
5  BY MR. RANSON:
6     Q.  This is your Web site.  Correct?
7     A.  Yes.
8     Q.  Okay.  I'm a little bit confused because on
9  the first page it says Company Overview.
10      Do you see that?
11    A.  I can barely read it because it's so light.
12      MR. GOODMAN:  Do you have a darker copy by any
13  chance?
14      MR. RANSON:  We can print it off if you need
15  it.
16      MR. GOODMAN:  Yeah.
17      MR. RANSON:  Okay.
18      MR. GOODMAN:  Because I'm finding it difficult
19  to read it as well.
20  BY MR. RANSON:
21    Q.  Okay.  I'll -- I'll just represent to you and
22  you can correct me if I'm wrong, but it says,
23      "We ship directly from our warehouse to
24  your home.  We're committed to providing only
25  new and authentic high quality named brands with

Page 14

1  fast and reliable shipping."
2  Is that true?  Can you see that?
3     A.  Actually, I can't read it because it's so
4  light.
5       MR. GOODMAN:   Well, we'll accept your reading
6  of it --
7       THE WITNESS:  Yes.
8       MR. GOODMAN:  -- so just follow Mr. Ranson.
9  BY MR. RANSON:
10    Q.  Are you -- are you aware of what's on your Web
11  site?  Maybe I should ask you that.
12    A.  Yes.
13    Q.  Okay.  And you've seen this before?
14    A.  Yes.
15    Q.  Okay.  My -- my real question is:  Why does
16  your Company Overview, on the first page, differ so much
17  from when I click on it?  So this is a link when I click
18  on Company Overview, the second page.  The first one
19  says --
20      MR. GOODMAN:  I do not have the second page
21  here.
22      MR. RANSON:  You should.
23      MS. BLACK:  Oh, this is the second page.
24      MR. GOODMAN:  Okay.  Sorry.
25

Page 15

1  BY MR. RANSON:
2     Q.  All right.  I'll start up.  I'll read the
3  first page in -- in the entirety of what it says in Our
4  Company Overview.  It says,
5       "We are a leading distributor for beauty
6  and cosmetics with 25 years of experience and
7  top seller rates on marketplaces like Amazon,
8  Walmart and eBay.  It's clear that our customers
9  are always our number one priority.  Shipping
10  directly from our warehouse to your home, we're
11  committed to providing only new and authentic,
12  high quality name brands with fast and reliable
13  shipping."
14  Does that sound right?
15    A.  Yes.
16    Q.  Can you -- can you see what I'm reading or no?
17    A.  I can't but I -- I'm hearing what you're
18  saying.
19    Q.  Okay.  All right.
20      Well, first of all, before we move on to the
21  second page, does Solu-Med have a warehouse?
22    A.  Yes.
23    Q.  It does?
24    A.  Correct.
25    Q.  Okay.  I thought you told me yesterday that

Page 16

1  Q-Med had a warehouse.
2     A.  Q-Med and Solu-Med are housed in the same
3  facility, at 2281 Griffin Road.
4     Q.  So they share warehouse space?
5     A.  Correct.
6     Q.  Okay.  And how is that -- how do you keep
7  track of that?  Does -- does one company get 50 percent
8  and the other company get 50 percent, or how is it split
9  up?
10    A.  No, no, no.  If you come to our warehouse,
11  it's a hundred eighty thousand square foot facility, and
12  a section of it is specific Solu-Med inventory and the
13  other section is Q-Med inventory.
14    Q.  Is that labeled in your warehouse?
15    A.  Yes.
16    Q.  So if I walk in your warehouse, I could see
17  this Solu-Med section and this is Q-Med section?
18    A.  I don't know that you would know but we would
19  know.
20    Q.  How would you know?
21    A.  Because it's basically cordoned off and it's a
22  section within the warehouse.
23    Q.  But I mean, you couldn't -- if I -- if someone
24  came and visited your warehouse, it would not be clear
25  to them which section is Q-Med or which section is



Page 17

1  Solu-Med?
2    A.  Not necessarily.
3    Q.  Okay.  Okay.
4      And it also says you provide authentic, high
5  quality name brands.  What does that mean?
6    A.  Exactly what it says.
7    Q.  What does that mean to you?  What is an
8  authentic, high quality name brand?
9    A.  It means we go through great lengths to make
10  sure that we're only selling authentic, first quality
11  goods.  We don't sell seconds.  We don't sell damages.
12  We don't sell any counterfeit products.  We only sell
13  name brand quality goods.
14    Q.  What about authentic as defined by Amazon, do
15  you sell authentic Amazon goods?
16    A.  Authentic Amazon goods?
17      MR. GOODMAN:  I'll object to the form.  As
18  defined by Amazon, do you have a Amazon definition?
19      MR. RANSON:  Possibly.
20      MR. GOODMAN:  Well, how can you --
21      MR. RANSON:  Okay.  Well, I'm just asking
22  about his knowledge, but we'll -- we'll get there.
23  Okay.
24  BY MR. RANSON:
25    Q.  So when I -- when I click on Company Overview,

Page 18

1  it now takes me to a different definition of your
2  company, which says,
3      "Solu-Med is a highly experienced and
4    leading distributor of medical and surgical
5    supplies and equipment to the Southern Cone
6    region of South America.  We work with public
7    and private hospitals, nursing homes, clinics,
8    distributors and various government and military
9    agencies to service our brand -- broad portfolio
10    of primarily branded manufacturers."
11      So my question is:  Do you sell -- are you a
12  leading distributor of medical and surgical supplies or
13  are you a top-rated seller on Amazon, Walmart and eBay?
14    A.  Okay.  So in 2009, Solu-Med was formulated.
15    Q.  Uh-huh.
16    A.  After -- we -- during 2009, we basically sold
17  products in Southern Cone of South America.  In 2014, we
18  shifted the focus of the company to selling online
19  products.
20    Q.  So when was this added onto the Web site, the
21  new Company Overview?  So I think what you're telling
22  me, and you can correct me if I'm wrong, so you're
23  saying that the -- this Company Overview, when I click
24  it, right, which takes me to your Company Overview is
25  old?  This is the new.

Page 19

1    A.  Yes.
2    Q.  Correct?  Okay.
3      So when was this added on the home page of the
4  Web site, Company Overview?
5    A.  Probably 2014.
6    Q.  Probably 2014?
7    A.  I couldn't tell you exactly what year.
8    Q.  It didn't happen in the last year?
9    A.  No.
10    Q.  Okay.  And you're sure about that?
11    A.  I didn't make the change so I don't know
12  exactly what year, which is what I stated, but I'm
13  saying it was done sometime 2014 or '15.  It was
14  definitely not in the last year.
15    Q.  Okay.  All right.  Thank you.
16      And what kind of corporation is Solu-Med?
17    A.  Solu-Med is a QSUB of Argo Holdings.  Q-Med
18  and Solu-Med are QSUBs of Argo Holdings.
19    Q.  But you don't sell stock at Solu-Med.  Right?
20    A.  No.  Stock, when you say stock --
21    Q.  Do you sell stock privately?  Do you sell
22  stock publicly?
23    A.  No.
24    Q.  Do you sell stock of your corporation?
25    A.  No.

Page 20

1    Q.  Okay.  And where is the company located in
2  Florida?
3    A.  The company Solu-Med?
4    Q.  Uh-huh.
5    A.  It's located at 2281 Griffin Road.
6    Q.  Okay.  You probably already said that.
7      And do the employees that work at Solu-Med, do
8  they work strictly for Solu-Med or are they
9  interchangeable with Q-Med and your other companies?
10    A.  They work primarily for Solu-Med.
11    Q.  What does that mean?
12    A.  They work primarily for Solu-Med.  I mean,
13  they spend most of their days working for Solu-Med.
14    Q.  Do they spend other days working for Q-Med?
15    A.  No.
16    Q.  Well, you said "primarily."  I'm just trying
17  to understand what you meant by "primarily."
18    A.  The reason I'm answering it that way is
19  because we have warehouse workers and so from time to
20  time, based on load and demand, there could be warehouse
21  workers that are working for both Q-Med and Solu-Med on
22  a given day, so I don't want to misrepresent that, but
23  primarily their functions are they're Solu-Med
24  employees.
25    Q.  So anybody besides the warehouse workers that



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
21–24

Page 21

1  works for Solu-Med, do they also work for Q-Med?
2      A.  No.
3      Q.  Okay.  And when these warehouse workers are
4  working for Solu-Med or Q-Med, are they aware of who
5  they're working for that day?
6      A.  Absolutely.
7      Q.  So they know like Monday I'm working for
8  Solu-Med, Tuesday I might be working for Q-Med?
9      A.  Correct.
10     Q.  And they're paid separate paychecks for each
11  corporation?
12     A.  I'm going to say no, that they're only paid
13  from their working company.
14     Q.  So there's two corporations.  An employee that
15  works in your storage warehouse could work for either
16  corporation but they would still receive their salary or
17  their pay from the corporation they were hired for.
18  Correct?
19     A.  That's correct.
20     Q.  Okay.  And does Solu-Med have offices in other
21  states?
22     A.  No.
23     Q.  Okay.  So it's just the one office in Fort
24  Lauderdale.  Correct?
25     A.  Correct.

Page 22

1      Q.  Okay.  And what's the name of the store that
2  Solu-Med operates -- operates on Amazon?
3      A.  Life & Health Source.
4      Q.  Okay.  I'm going to refer to that as the
5  Amazon store today.  Is that okay?
6      A.  Yes.
7      Q.  Okay.  And that's the store that sold the
8  Youngblood products that are in question in this
9  lawsuit.  Correct?
10     A.  That's correct.
11     Q.  Okay.  I just want to go through some
12  information that you provided us.
13         Who is Cheri Siedle?
14     A.  Cheri Siedle was a Q-Med executive who helped
15  us transition to our new facility and was earmarked to
16  come over and be the chief operating officer of
17  Solu-Med.  Unfortunately, due to greatly diminished
18  sales and impact to the bottom line, we offered her a
19  severance package in June of this year.
20     Q.  So she was -- she was fired in June.  Right?
21         MR. GOODMAN:  Objection, form.
22         THE WITNESS:  She was -- we agreed on a
23  mutual -- there wasn't a role for her to take over
24  in Solu-Med, so we agreed on a mutual basis that we
25  give her a generous severance package and she moved

Page 23

1  on.
2  BY MR. RANSON:
3      Q.  And what role did she play in acquiring the
4  Youngblood products?
5      A.  None.
6      Q.  Well, in your disclosure, sir, it says that
7  Miss Siedle would have knowledge about the length of the
8  store being disabled due to Youngblood's actions and the
9  acquisition of Youngblood products.  So --
10     A.  She -- she was aware of the actions taken by
11  Youngblood, so she was very much aware that the store
12  was disabled for two months.
13     Q.  But she had no role in the acquisition of
14  Youngblood products?
15     A.  Kellon Goodson ran the store for -- for me, so
16  Kellon Goodson did all the acquisitions and all the
17  sales.  He was the operator of the Amazon store.
18     Q.  Let me stop you there.  I may ask you about
19  Mr. Goodson in a second, but did Miss Siedle, did she
20  have any role in the acquisition of the Youngblood
21  products?
22     A.  When you say "acquisition," I'm assuming that
23  you mean the purchasing of the products.
24     Q.  You -- you provided this to me so I'm -- I'm
25  asking you:  What role does Cheri Siedle have in the

Page 24

1  acquisition of the Youngblood products?  The
2  acquisition.
3      A.  She -- she played no role in the purchasing of
4  the product.
5      Q.  So it's fair to say that Cheri Siedle played
6  no role in the acquisition of Youngblood products?
7      A.  Cheri's role was, during the time that we were
8  disabled, in assisting Kellon Goodson in trying to find
9  ways that we could reopen the store based on
10  Youngblood's actions.  So her primary role was helping
11  us reestablish the store.
12         But when you say "was she involved with the
13  acquisition of the product," she neither played a role
14  in the purchasing nor the sale of the product.  Is that
15  clear?
16     Q.  Yes, sir.  Thank you.
17         And we just talked about Mr. Goodson.  And
18  what does he do?  Does he create this Web site for you?
19     A.  He creates the Web site.  He manages the
20  Amazon store.  He procures the products that he believes
21  we can sell successfully on the store.  He does the
22  purchasing and the selling.  He manages the entire
23  operation of the Amazon store.  That's his job.
24     Q.  And he reports directly to you?
25     A.  He does -- he reported directly to me,



Page 25

1  correct.
2      Q.  Okay.  So I reviewed your listings on Amazon.
3  I noticed you have about 470 different brands.
4          Does that sound about right?
5      A.  I think we have about 470 different S.K.U.s.
6  I don't think it's 470 brands.
7          MR. GOODMAN:  Excuse me, Mr. Ranson, are you
8  referring to the listings as of this day?
9          MR. RANSON:  Yes, sir.
10         MR. GOODMAN:  Okay.
11  BY MR. RANSON:
12     Q.  As of today.
13     A.  I just want to clarify --
14     Q.  What's an S.K.U.?  I'm not aware.  You might
15  have to tell me.
16     A.  Okay.  So when you say 470 items are listed on
17  our store, that's a -- a unique selling item with a
18  unique selling A.S.I.N. number in the Amazon system.
19  When you say 470 brands, I'm going to correct you and
20  say that it's probably less than 470 brands because we
21  might sell a dozen different S.K.U.s of a particular
22  brand.
23     Q.  When you say "S.K.U.," are you meaning
24  different products?
25     A.  Yes, a unique selling item.  So we might

Page 26

1  sell -- for example, one time we might have sold eight
2  or ten Youngblood products.  I would refer to that as
3  eight different S.K.U.s or stock keeping units but it's
4  only one brand.
5      Q.  So you're telling me -- this is
6  approximately -- that you might, approximately, only
7  have 470 items for sale on Amazon?
8      A.  You're talking specifically of our store?
9      Q.  Uh-huh.
10     A.  And that's what's listed on the Amazon store,
11  yes.
12     Q.  Okay.  How many brands do you think you have
13  for sale on Amazon?
14     A.  I wouldn't want to just guess.  I could count
15  them but it's -- it's not 470.
16     Q.  Are you familiar with the brands that you sell
17  on Amazon?
18     A.  Absolutely.
19     Q.  You could name all of them?
20     A.  No, I couldn't name them all, but it's
21  constantly changing.
22     Q.  Sure.  And why is it always changing?
23     A.  Sourcing opportunities.
24         MS. BLACK:  What topic are we on?
25         MR. RANSON:  We're on the structure of

Page 27

1  Solu-Med, Solu-Med's business.
2          MS. BLACK:  Okay.
3          THE WITNESS:  It's constantly in flux.
4  There's constantly items being added and items
5  being deleted.
6  BY MR. RANSON:
7      Q.  Okay.  Are you familiar with Amazon seller
8  policies?
9      A.  Generally, yes.
10     Q.  Okay.  Do you feel like you have a duty to
11  keep up with those policies?
12     A.  Absolutely.
13     Q.  Okay.  And who in your -- who in Solu-Med is
14  in -- would also, you know, be aware of those policies?
15     A.  Kellon.
16     Q.  Kellon.  That's it?
17     A.  That would be the primary -- it would have
18  been Kellon and Cheri but Cheri has been gone since --
19     Q.  Is Kellon the only person that lists these
20  products for sale on Amazon?
21     A.  That's correct.
22     Q.  Okay.  No one else is in charge of listing any
23  other products on Amazon?
24     A.  He handles its complete responsibility for the
25  store.

Page 28

1      Q.  Okay.  And do you and Kellon both try to stay
2  up to date with the seller's policies and changes that
3  are made?
4      A.  I would say yes.
5      Q.  And -- and what do you do to -- what -- what
6  policy do you have in place at Solu-Med that would prove
7  that you guys stay up to date with those policies?
8      A.  We have S.O.P.s within our distribution team
9  that basically monitors any changes Amazon would
10  communicate, any changes to us directly in their selling
11  policy.  So if they communicate something that there's
12  an issue, they would communicate it to us directly.
13     Q.  All right.  And what's S.O.P.  I'm sorry?
14     A.  Standard operating procedures.
15     Q.  Okay.  Have you ever had to change the way you
16  do business on Amazon since you've had Solu-Med, from
17  changes in their policies?
18     A.  The only change that's taken place is from
19  time to time manufacturers have gone to Amazon and
20  requested to become brand registered, and brand
21  registered means that they strike a deal with Amazon to
22  basically eliminate any third-party sellers from Amazon
23  sites, and so in that case Amazon will notify us and
24  basically send us a notification that says, Such and
25  Such brand, XYZ Brand -- let's use Youngblood as an



MANUEL E. AGUERO  Non-Confidential                    November 20, 2019
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                        29–32

Page 29

1  example -- has become brand registered and you have 60
2  days to liquidate your inventory and whatever is
3  remaining will have to be shipped back to you.
4      Q.  Okay.  So since 2009, that's the only change
5  you're aware of in Amazon's policies?
6      A.  I wouldn't say it's the only change.
7  That's --
8      Q.  Strike that.
9          Since 2014, that's the only change that you're
10  aware of in Amazon's policies that has changed the way
11  you conduct business?
12      A.  I'm going to say that it's the only one that
13  I'm aware of.
14      Q.  Sure.  Okay, that's fair.
15          And, to the best of your knowledge, you've
16  never violated any of Amazon's policies.  Correct?
17      A.  Absolutely not.
18      Q.  Okay.  And I know we discussed this yesterday,
19  but can you please tell -- tell me how Solu-Med received
20  its Youngblood products.
21      A.  How we receive the Youngblood product.  Okay.
22  Let's -- you want me to walk through an example of the
23  purchasing of the Youngblood product?
24      Q.  Sure.
25      A.  So we -- you know, we'll tell a -- suppliers

Page 30

1  that we have that we're open to buy certain lines or
2  that we're interested, open to buy certain lines.  They
3  will tell us what lines they have available.  And so we
4  will look at the -- at the lines that we're interested
5  in buying, that we're open to buy, the lines that
6  they're offering it and then we'll drill down on those
7  lines and ask them to send us pricing and availability
8  of what codes and prices they have on those lines.
9      Q.  And when you say "we," are you referring to
10  Solu-Med or Q-Med?
11      A.  I'm referring to -- I'm referring to both
12  because Kellon is a Solu-Med employee but we would
13  purchase the product through Q-Med.
14      Q.  So Youngblood acquires their products from
15  Q-Med.  Correct?
16      A.  Youngblood acquires their products --
17      Q.  I'm sorry -- strike that.
18          Solu-Med acquires their products from Q-Med?
19      A.  That's correct.
20      Q.  Okay.  Do they -- does Solu-Med pay -- strike
21  that.
22          Does Q-Med sell their products to Solu-Med at
23  a profit?
24      A.  At cost.
25      Q.  At cost.  And how do you -- how do you track

Page 31

1  these purchases?
2          MR. GOODMAN:  Are you referring to Youngblood?
3          MR. RANSON:  Young -- Youngblood, sure.
4  BY MR. RANSON:
5      Q.  How would you track a Youngblood purchase from
6  the moment that you purchase the product?  How would you
7  track the item?
8      A.  When you say track --
9      Q.  Do you -- do you have any tracking systems in
10  place to track your items?
11      A.  Sure.  Let's walk through an example of
12  sourcing.
13      Q.  Okay.
14      A.  So let's say that we receive an offer for
15  Youngblood products.  The way that that would play out
16  is the folks at Solu-Med would purchase merchandise
17  directly from the manufacturer in an effort to basically
18  assure that we're selling the exact same brand of
19  product, so they would purchase a sample of four or five
20  items, basically get samples from the supplier to make
21  sure that they match up exactly, that we're not
22  receiving something that's different, that's somehow
23  different product.  Once they're satisfied and it's gone
24  through our Q.A. process and it's been approved, then we
25  would place a purchase order from Q-Med to the supplier.

Page 32

1          In this case, the product that you're
2  referring to came from Imperial Trading.  We would place
3  an order with Imperial Trading.  They would ship it from
4  their New Jersey warehouse freight prepaid to our
5  facility in Q-Med.  Q-Med would check it in off of a
6  packing slip, place it into inventory.  Once it's in
7  inventory, then Solu-Med would be free to place it on
8  the store.
9      Q.  So when Q-Med acquires the Youngblood product,
10  for example, is there a bar code?  Is there some sort of
11  scanning device that tracks that product from the moment
12  it's in your possession in Q-Med until -- then it is
13  sold in Amazon?
14      A.  I want to make sure I understand the question.
15  Could you repeat it one more time?
16      Q.  Sure.  My question really is:  How do you
17  track the goods that you acquire from the moment that
18  you purchase them until the moment that they're sold, or
19  do you track them at all?
20      A.  We absolutely track them.
21      Q.  Okay.
22      A.  We have a warehouse -- warehouse management
23  system in our facility.
24      Q.  And how does that system track it?
25      A.  It's checked in, it's given a bin location and



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019

33–36

Page 33

1  it's updated monthly in -- and we keep an inventory of
2  every month how much product we've sold, how much we
3  still have in stock.
4      Q.  So you know where all your products are at all
5  times, what bin they're in, when they're shipped to one
6  facility to the next, when they're shipped to Amazon?
7      A.  That's correct.
8      Q.  Okay.  And what steps do you take to verify
9  the condition and authenticity of the products prior to
10  listing them for sale?
11      A.  I think we just covered that.  We basically
12  purchase samples to make sure that they're exact matches
13  and that there's no deviation from the product that
14  we're sourcing.
15      Q.  So if the samples are good, then you'll place
16  the order?
17      A.  That's correct.
18      Q.  Okay.  And did you check to see if these
19  products had a manufacturer's warranty?
20      A.  All products have a manufacturer's warranty.
21      Q.  So the Youngblood products that you purchased
22  had a manufacturer's warranty?
23      A.  I'm assuming that they do.
24      Q.  Why are you assuming that they do?
25      A.  Most of the products that we source have --

Page 34

1  the manufacturer's will have some warranty on it.
2      Q.  Okay.  Let me just show you.
3          Mark this as 2.
4      MR. GOODMAN:  Two?
5      MR. RANSON:  Yes, sir.
6      (Defendant's Exhibit Number 2 was marked for
7  identification.)
8  BY MR. RANSON:
9      Q.  I took this from Youngblood's Web site.
10      MS. BLACK:  I'm sorry.  Would you raise that
11  up.
12      MR. RANSON:  Sure.  Yeah.
13  BY MR. RANSON:
14      Q.  I took this from Youngblood's Web site.  It
15  says,
16          "What is Youngblood doing to stop
17      diversion.  In order to ensure Youngblood
18      consumers only receive the highest quality
19      Youngblood products with a backed warranty and
20      to protect Youngblood's authorized salons, spas
21      and retailers, Youngblood continues in its
22      commitment to aggressively combat diversion."
23          Okay.  So I want to ask you:  Do you have a
24  Solu-Med spa?
25      A.  No.

Page 35

1      MS. BLACK:  I'm going to object to this
2  question.  When was this updated on the Web site;
3  do you have any idea?
4      MR. RANSON:  No.
5      MS. BLACK:  So you don't know if it was before
6  or after they purchased the product.  Right?
7      MR. RANSON:  Youngblood products have always
8  had a warranty.
9      MS. BLACK:  But how -- did they have this
10  statement on the Web site that you're reading to
11  him?  It has no relevance in the case unless it was
12  on Youngblood's Web site in October of 2018.
13      MR. RANSON:  Are you directing him not to
14  answer the question?
15      MS. BLACK:  I'm asking you if you know when
16  this was posted on the Web site.
17      MR. RANSON:  I can get that information to
18  you.
19      MS. BLACK:  He can go ahead and answer, but go
20  ahead.
21      MR. RANSON:  Okay.  Yeah.  We can -- we can
22  sort that out.
23  BY MR. RANSON:
24      Q.  So I was asking you:  Do you have -- does
25  Solu-Med have a spa?

Page 36

1      A.  Does Solu-Med have a spa?
2      Q.  Correct.  Do you -- do you have any spas under
3  Solu-Med?
4      A.  No.
5      Q.  Okay.  Do you have any salons?
6      A.  No.
7      Q.  Okay.  Are you an authorized seller from
8  Youngblood to sell their products?
9      A.  No.
10      Q.  Okay.  So I'm going to ask you again:  Does
11  your products come with a Youngblood warranty?
12      A.  No.
13      Q.  Okay.  Thank you.
14          And how did you become aware of Youngblood
15  products?
16      A.  They were offered to us by one of our
17  suppliers.
18      Q.  I know I asked you this yesterday but we have
19  to keep the record clean.  I'm sorry.
20          So would it be fair to say that the Youngblood
21  products were offered to you for a price you felt like
22  you could make some money on your e-commerce platforms?
23      A.  Correct.
24      Q.  Okay.  Do you guys look at customer trends on
25  Amazon to select your products?



Page 37

1    A.  I'm not sure what you mean by "customer
2  trends."
3    Q.  Sure.  Well, Amazon has customer trends; you
4  can see the products that are trending, the products
5  that are selling.  I didn't know if Solu-Med had a
6  policy to look at those products and then pick the ones
7  that were doing well and try to acquire those.
8    A.  I -- I believe that Kellon would evaluate
9  products based on their merit and based on making sure
10  that they met our quality standards and making sure that
11  they were -- would have the adequate volume and would
12  make purchasing decisions based on all those factors.
13    Q.  So Kellon would probably be a better person to
14  ask that question?
15    A.  Could be, yeah.
16    Q.  Okay.  Were you aware of Youngblood products
17  because of the high quality of those products?
18    A.  No.
19    Q.  Okay.  Did you order samples of the Youngblood
20  products?
21    A.  Yes.
22    Q.  And you can verify that?
23    A.  Can I verify.  In what way would you want --
24    Q.  Can you prove to me that you received
25  Youngblood samples from your --

Page 38

1        MR. GOODMAN:  Object to the form of the
2    question.
3        You can answer.
4        THE WITNESS:  I -- we purchased Youngblood
5    samples -- we purchase samples of all products that
6    we -- before we purchase --
7  BY MR. RANSON:
8    Q.  So you purchased the samples.  They didn't
9  send them to you for free.  Correct?
10    A.  Correct.
11    Q.  So you would have a receipt?
12    A.  Potentially.
13        MR. GOODMAN:  Objection.  Ask him whether he
14    has a receipt.
15  BY MR. RANSON:
16    Q.  Do you have a receipt for the Youngblood
17  products that you purchased the samples?
18    A.  I doubt that we have a receipt dating back to
19  2017.
20    Q.  Okay.  Now I want to ask you how you store
21  these products.  Kind of went over a few of these
22  questions so. . . .
23        What -- what employee monitors the Solu-Med
24  facility, the storage facility?
25    A.  We have multiple employees in the warehouse

Page 39

1  that work under Solu-Med.  When you say monitor the
2  warehouse, I'm not quite sure I understand your
3  question.
4    Q.  Sure.  Is there someone that's in charge of
5  the -- of Solu-Med's warehouse?
6    A.  No.  We have the -- the warehouse of Solu-Med
7  is all managed by Greg May, who oversees both Q-Med and
8  Solu-Med.
9    Q.  I'm sorry, who is that?
10    A.  Our warehouse manager.
11    Q.  What's his name?
12    A.  Greg May.
13    Q.  May or Bay?  I'm sorry.
14    A.  May.
15    Q.  May?
16    A.  Greg May, M-a-y.
17    Q.  Okay.  And he works for Q-Med but oversees
18  Solu-Med's warehouse as well?
19    A.  Correct.
20    Q.  So you have two separate corporations but you
21  have Q-Med's warehouse supervisor that monitors
22  Solu-Med's warehouse as well?
23    A.  The purpose of that is to maintain the same
24  integrity and quality that we do with our medical
25  supplies.

Page 40

1    Q.  I see.  Okay.
2    A.  We have one quality system and one -- you
3  know, one set of S.O.P.s for the entire warehouse.
4    Q.  Okay.  Do you have a manual or a handbook that
5  provides the protocol for monitoring the storage
6  facility?
7    A.  Absolutely.
8    Q.  Okay.  I think we requested that in -- I don't
9  think we received it, so do you mind sending me that?
10    A.  Not at all.
11        MS. BLACK:  We produced --
12        MR. RANSON:  Did you?
13        MS. BLACK:  -- those documents.
14        MR. RANSON:  Okay.  I'll check again but --
15        THE WITNESS:  Let me make sure I understand
16    what you want, so you want the --
17        MR. GOODMAN:  Well, I believe we've already --
18        MR. RANSON:  If you've produced them, that's
19    fine because I know that, you know --
20        MR. GOODMAN:  Yeah, I believe we did.
21        MR. RANSON:  Okay.  All right.
22  BY MR. RANSON:
23    Q.  Do you use Amazon's fulfillment centers?
24    A.  Yes.
25    Q.  Okay.  And -- and so you keep some products in



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
41—44

Page 41

1 the fulfillment centers and some products at Q-Med's
2 storage facility.  Correct?
3     A.  That's correct.
4     Q.  Do you have any idea what percentages of those
5 are?
6     A.  It varies constantly.
7     Q.  Okay.  I want to show you something.
8         You can make this a composite exhibit.
9         (Defendant's Exhibit Number 3 was marked for
10 identification.)
11        MR. GOODMAN:  Thank you.  Which one is page
12 one?
13        MR. RANSON:  We'll make page one the one with
14 the stars.  How about that?  This one.
15        MR. GOODMAN:  This one?
16        MR. RANSON:  Yeah.  They're two separate pages
17 but page one would be the with the stars.
18        MR. GOODMAN:  (Simultaneous cross talking)
19        MR. RANSON:  Yes, page one with the stars.
20        MR. GOODMAN:  So this will be Exhibit 3?
21        MR. RANSON:  Yes, Composite Exhibit 3.  Okay.
22        Did you do that?
23        THE COURT REPORTER:  No, because you were
24 talking.
25        MR. RANSON:  That's right.  Sorry.

Page 42

1         THE COURT REPORTER:  You were moving pretty
2 fast so --
3         MR. RANSON:  Yeah.  You've got to slow me
4 down.  Sorry.
5         THE COURT REPORTER:  Yeah.
6         MR. RANSON:  Okay.
7         MR. GOODMAN:  Can you read it?  It's kind of
8 faint.
9 BY MR. RANSON:
10    Q.  I'm really more concerned with a different
11 question rather than what the actual reviews say.  So in
12 one, we have -- we have negative reviews on the first
13 page with the stars, you see, and they're not stricken
14 through.  Correct?  They're not striked out.  Whereas if
15 you look at the second page, it will say -- and these
16 are -- I'll represent to you, these are your Life &
17 Health Source reviews from your Web site on Amazon,
18 seller's Web site on Amazon.
19        The second page, you will see it says,
20        "Very rough material.  Not really cotton as
21        described.  Can't wear."
22 and then it's stricken out.  Do you see that?
23    A.  Can you point out what you're reading?
24        MR. GOODMAN:  Is this page two?
25

Page 43

1 BY MR. RANSON:
2     Q.  Yes, this one.  I'm sorry.  Page two.
3     A.  Okay.  Yes.
4     Q.  Do you see where it's stricken out?
5     A.  Yes.
6     Q.  Okay.  It's my understanding that it's
7 stricken out because this was fulfilled by Amazon's
8 fulfillment center and when they screw up, they will
9 strike out your review.  Is that correct?
10    A.  Yes.
11    Q.  Okay.  And on the other page, these are
12 reviews that were from your warehouse.  They were
13 fulfilled by Q-Med's warehouse.
14    A.  I don't know that you can say with certainty
15 that these would have been exclusively from our
16 warehouse.
17    Q.  Can you give me any reason why they wouldn't
18 be?
19    A.  We'd have to look at each one individually and
20 understand what was the product that was shipped, what
21 was the customer complaint, and then I can determine by
22 researching it and the shipment number whether it came
23 from Amazon's fulfillment center or if it came from our
24 warehouse.
25    Q.  Well, if you look at the second page, it says,

Page 44

1     "Message From Amazon.  This item was
2     fulfilled by Amazon and we take responsibility
3     for this fulfillment experience."
4         So when Amazon fulfills the item -- I'm sorry,
5 when Amazon fulfills the shipment, the customer is
6 unhappy, they'll take responsibility.
7         When you ship the item, obviously Amazon is
8 not going to take responsibility because it's not from
9 their fulfillment center.  Correct?
10    A.  If you're saying that all of these negative
11 customer reviews were exclusively shipped from our
12 facility, I wouldn't be able to confirm that.  That -- I
13 think I understand what you're saying, which is if
14 Amazon strikes it, that they're owning that
15 responsibility.  The ones here that have negative
16 reviews, what you're trying to imply is that all of
17 these came from our facility and what I'm trying to tell
18 you is that some of them could have and some of them
19 might have come from Amazon.  It does not mean
20 exclusively that they came from our facility.
21    Q.  So you're telling me that the negative reviews
22 on page one may have came from Amazon's fulfillment
23 center?
24    A.  What I'm saying is without looking at each
25 individual claim and where it shipped from, I wouldn't



Page 45

1  know whether it shipped from Amazon or whether it
2  shipped from our warehouse. I don't have that
3  information.
4      Q.  Who -- who handles the reviews on your Web
5  site, on your -- I'm sorry, on your Amazon e-commerce
6  platform?
7      A.  I'm not sure I follow who handles
8  (Simultaneous cross talking) --
9      Q.  Let me ask you -- let me ask that question
10  again.
11      Do you have somebody that's in charge of
12  monitoring your reviews?
13      A.  Absolutely.
14      Q.  And who is that person?
15      A.  Kellon would monitor reviews and respond
16  accordingly.
17      Q.  So Kellon probably would be a better person to
18  ask this question?
19      A.  He monitors the reviews more closely than I
20  do.
21      Q.  And how often do you monitor the reviews?
22      A.  I go on -- we talk about it on a monthly
23  basis. We have a board meeting every month. We talk
24  about all business issues related to Solu-Med.
25      Q.  Okay.  Now, when you send a lot today --

Page 46

1  because you do use Amazon's fulfillment center.
2  Correct?
3      A.  We do.
4      Q.  Okay.  Now, when you send a shipment to the
5  Amazon fulfillment center, do you send that in a large
6  lot? Do you send little tiny lots?  Do you -- how do
7  you do it?
8      A.  It would be -- Amazon will direct us. They
9  will give us the labels that we have to place on the
10  product so they will -- all the product that goes to
11  Amazon fulfillment center has to be pre-labeled, and
12  Amazon would send us those labels so we can print them
13  and then we will label the product and then it will be
14  sent to the various distribution centers per Amazon's
15  direction.
16      So let's say we have 100 pieces of a certain
17  item. They're going to tell us, Send 20 here, send 40
18  there. And, typically, our Amazon shipments are pallets
19  of product, not just individual items or small boxes.
20      Q.  So, if I understand you correct -- correctly,
21  you send pallets which is -- I'm not in the Amazon
22  sales --
23      A.  No, I understand.
24      Q.  -- industry, but when you send a pallet,
25  that's a large, you know, shipment of items that all

Page 47

1  comes in bulk to the fulfillment center. Correct?
2      A.  It might contain, you know, 20 different
3  S.K.U.s or 20 different items on that pallet that's
4  being shipped, and we prepare the items that we want to
5  ship to F.P.A. which is fulfillment by Amazon, and then
6  they direct us how they want it broken down. So they
7  might want a certain amount to go to Jacksonville, a
8  certain amount to go to Kentucky. And they have, as you
9  well know, you know, hundreds of locations.
10      Q.  Does -- does Amazon tell you how many pallets
11  or shipments you're allowed to make at once -- strike
12  that.
13      Does Amazon tell you how many products you're
14  allowed to send to their fulfillment center at the time?
15      A.  They usually limit based on the seasonality of
16  the year, you know, how much -- you can't just ship to
17  them without their approval.
18      Q.  So they have to approve the shipment
19  beforehand but there's not necessarily a maximum number
20  of items you can send at once?
21      A.  I'm -- I'm not aware of that level of detail.
22  I don't believe that there's a --
23      Q.  Okay.  Who's in charge of sending the
24  shipments to Amazon?
25      A.  Generally, Kellon would be the one that would

Page 48

1  prepare because the Amazon's seller central store will
2  indicate where you're running low on inventory, where
3  you're running low on -- on product, where you're on
4  back order, you're out of stock, and so, generally, you
5  monitor the -- the metrics that they provide you, which
6  is like a tool to basically decide where you need to
7  fulfill product.
8      Q.  I see.  Okay.
9      Now, we -- we talked about expiration dates a
10  little bit yesterday, but what's your expiration policy
11  when purchasing products?
12      A.  Our purchasing product -- purchase order that
13  governs our agreements is 18 months, is what -- what we
14  request, the minimum of 18-month dating on the product.
15      Q.  So you will not purchase any product with an
16  expiration date that's less than 18 months?
17      A.  There are examples where some manufacturers
18  will sometimes produce product with less -- with a year
19  dating. So if we're aware of that, there could be
20  exceptions to that. But, generally speaking, I'm going
21  to say 98 percent, 99 percent of our purchases are going
22  to be with 18-month dating or better.
23      Q.  Okay.  So you're saying if a company -- if
24  they make a product, you know, today that expires in 12
25  months from today, then that would be acceptable to,



Page 49

1  obviously, purchase and --
2      A.  We would still have a minimum dating required.
3  It might be six months.  It might be nine months.  We
4  would take that as a one-off unique example.  There's
5  very few items that fall under that category.
6      Q.  So how do you evaluate what your expiration
7  date is going to be by each -- each purchase?
8      A.  Again, we -- if -- if the manufacturer does
9  not have an expiration date or if the manufacturer has,
10  typically, a five-year expiration date, we're going to
11  govern it and say it has to have a minimum of 18 months.
12      Q.  Okay.  Are you --
13      A.  Eighteen months is the standard.
14      Q.  Okay.  Do you know what a first-in, first-out
15  policy is?
16      A.  For inventory terms?
17      Q.  Yes.
18      A.  Yes.
19      Q.  And what is that?
20      A.  Basically, we rotate the inventory to make
21  sure that the oldest inventory goes out first.
22      Q.  Okay.  Are you aware that Amazon does not have
23  a first-in first-out policy?
24      A.  I -- I don't know that.
25      Q.  Do you think that's something you should know?

Page 50

1      MR. GOODMAN:  Objection to form.
2  BY MR. RANSON:
3      Q.  I'll represent to you that Amazon does not
4  have a first-in first-out policy.
5      So, for example, if you ship a product today
6  and you ship the same product six months from now and
7  someone makes a purchase seven months from now, it does
8  not necessarily mean that Amazon is going to fulfill
9  that order with the first shipment you sent.  They can
10  send products from the second shipment.  Are you aware
11  of that?
12      A.  Yes.
13      Q.  Okay.
14      MR. GOODMAN:  Mr. Ranson, are we finished with
15  this exhibit?
16      MR. RANSON:  Yes, sir.  Yes.
17      MR. GOODMAN:  All right.  I just wanted to
18  note for the record that there is no indication on
19  Exhibit 3 that any of these complaints or reviews
20  are with regard to Youngblood products.
21      MR. RANSON:  I -- I wasn't asking about
22  Youngblood products, sir.  I was asking about in
23  general about their fulfillment -- whether they
24  were at the fulfillment center or whether, you
25  know --

Page 51

1      MR. GOODMAN:  Okay.
2      MR. RANSON:  -- they were fulfilled by Q-Med.
3  That was more into the storage of the products.
4      THE WITNESS:  Are you -- one of the things
5  that should be mentioned is 98 percent positive
6  ratings.
7  BY MR. RANSON:
8      Q.  That's very impressive.
9      A.  Very rare.
10      Q.  That's a good job.
11      A.  Yeah.
12      Q.  Okay.  And I forgot to ask you this:  Solu-Med
13  doesn't have an online store directly so I couldn't
14  purchase these products from Solu-Med or -- directly.  I
15  would have to go through one of the e-commerce
16  platforms.  Correct?
17      A.  No, we do have our own proprietary Web site.
18      Q.  And -- and you're selling Solu-Med branded
19  items or are you selling items based on the other
20  platforms?
21      A.  Items that are sold on other platforms.
22      Q.  Okay.  So I could purchase these items from
23  you directly?
24      A.  Potentially.
25      Q.  Okay.

Page 52

1      A.  It's a more limited Web site.
2      Q.  What about Q-Med, can I purchase items from
3  them directly?
4      A.  No.
5      Q.  Okay.  Is there someone in your storage
6  facility that verifies that each shipment is accurate
7  and what it's supposed to be?  Would that be Kellon?
8      A.  No, that would be the warehouse team.
9      Q.  Okay.  Is that a large team?  How many people
10  work on the warehouse team?
11      A.  Probably -- we probably have a total of at
12  least 60 warehouse employees.
13      Q.  Sixty?
14      A.  Sixty.
15      Q.  And who do they report to?
16      A.  Greg May.
17      Q.  Greg May, okay.
18      And who processes the returns from the
19  customers on Amazon?
20      A.  We would process them through Solu-Med.
21      Q.  Okay.
22      A.  We don't get that many returns, but we get
23  periodic returns.  Typically, we will inspect the
24  product and, basically, it usually gets discarded.
25      Q.  So if I return an item to you, does that go to



Page 53

1  the Q-Med facility?

2      A.  It goes to the 2281 Griffin Road facility.

3      Q.  Okay.  And what's your return policy on Amazon

4  for cosmetics?  So, for example, I purchase Youngblood

5  lipstick from you and I don't like the lipstick, I want

6  to send it back two days later.  What -- what would you

7  do?

8      A.  We have a 100 percent customer satisfaction

9  policy, we take back any product at any time.

10      Q.  No matter what?

11      A.  No matter what.

12      Q.  On all your cosmetics?

13      A.  On all the products that we sell, not just the

14  cosmetics.

15      Q.  Okay.  So this is a little bit bigger.

16  Hopefully, you can read it, but this is from Life &

17  Health Source, Exhibit 4.  Sorry.

18          (Defendant's Exhibit Number 4 was marked for

19  identification.)

20          MR. GOODMAN:  Just give me a second, please.

21          MR. RANSON:  Sure.

22  BY MR. RANSON:

23      Q.  Okay.  Now, you had a chance to review this

24  document?

25      A.  I'm reading it.

Page 54

1      Q.  Okay.  Take your time.  I'm really just

2  focused on the -- it looks like it's darkened, but the

3  third paragraph up from the middle.

4      A.  Uh-huh.

5      Q.  Do you see that?

6      A.  Yes.

7      Q.  Can you read that for me?

8      A.  "Due to Federal regulations we are

9      unable to accept returns or exchanges on

10      personal hygiene items, hair care, cosmetic,

11      fragrances, skin care or toys."

12      Q.  Okay.  Now, a moment ago you said that you

13  offer a hundred percent satisfaction guarantee, and here

14  it says you're unable to accept returns or exchanges on

15  cosmetics.  So which one is it?

16      A.  We still accept returns on cosmetics.  What

17  happens with Amazon customers, sometimes people will

18  open products, use them, say they're unhappy with them

19  and return them and in order to --

20      Q.  In that circumstance, you would not accept it.

21  Correct?

22      A.  In the end, Amazon governs the return policy

23  for their customers and so the answer is yes, we accept

24  all returns.

25      Q.  Then why does it say under Life & Health

Page 55

1  Source,

2          "We are unable to accept returns or

3      exchanges on cosmetics"?

4      A.  This is to basically dis -- you know,

5  discourage people from using products and just returning

6  them.

7      Q.  So I'm a customer of Life & Health Source.  I

8  purchase Youngblood lipstick and I read this and -- and

9  I think I can still return the product to you?  Should

10  I -- should I think that I can still return this product

11  to you?

12      A.  I don't know what you would conclude.

13      Q.  How would a customer know that they can return

14  the product to you?

15      A.  Because the -- the Amazon policy is they

16  accept pretty much all returns.

17      Q.  So you're saying Amazon will process the

18  return for you?

19      A.  That's correct.

20      Q.  And how many days would that be?  How many

21  days would I have to -- before I had to -- for the

22  item --

23      A.  It's immediate.

24      Q.  -- would not be able to be returned?  I'm

25  sorry.

Page 56

1      A.  It's, essentially, immediate.  They debit our

2  account and -- and return the product.

3      Q.  Now, I purchase lipstick from you.  Okay?

4          How many days do I have to return the product?

5      A.  I don't think it gives you a specific number

6  of days or a limit.

7      Q.  How would a customer know that they can return

8  cosmetics to your store?

9      A.  Because if -- if you purchase on Amazon,

10  people have purchased things and returned them six

11  months later.

12      Q.  But you would agree, sir, that this says,

13          "We are unable to accept returns or

14      exchanges on cosmetics," among others?

15  Would you agree that that says that?

16      A.  I agree that it says that, yes.

17      Q.  Okay.  But you don't agree with that?

18      A.  I -- let's -- let's make sure I understand.

19      Q.  Sure.

20      A.  What is it that you're asking me I don't agree

21  to?

22      Q.  Well, I'm reading --

23      A.  I just told you that this --

24      Q.  -- I'm reading from your store that you do not

25  accept returns or exchanges on cosmetics, among other



Page 57

1  things.  Okay?  You're telling me that Amazon will --
2  will refund my money immediately.  I'm -- I'm -- I'm --
3  I'm confused as well.
4      A.  There's no confusion.  If you return product
5  on Amazon, they will refund your money in full and they
6  will debit our account.
7      Q.  What if I open the product, use the lipstick,
8  I don't like the color, then I can send it back?
9      A.  Yes.
10      Q.  Okay.  What if I don't like it three months
11  later?
12      A.  This is the problem that you have with Amazon,
13  is they take back all returns.
14      Q.  All returns without any limits on time?
15      A.  I'm sure there is some limit on time.
16      Q.  You're -- you're just not really aware of the
17  return policy for cosmetics?
18      A.  I don't agree with that statement.  I'm
19  generally aware that, yes, you can return product on
20  Amazon.  And on average you're going to get two to
21  three percent returns of folks that are going to use the
22  product and then return it several months later.  That's
23  just a reality of doing business on Amazon.  It's the
24  cost of doing business.
25          In order to discourage that, we try to make

Page 58

1  sure that we don't get people just willy-nilly buying
2  product and then returning it.
3      Q.  What do you mean by "willy-nilly buying
4  product"?
5      A.  People using product and then returning it
6  several months later when they've consumed the product.
7  People will --
8          We've had situations where folks have bought a
9  box of bandages, used half the bandages, then three
10  months later returned the bandages.
11      Q.  And what do you do to combat that?
12      A.  Really, there's no combating it other than
13  trying to discourage people from doing that.
14      Q.  So you're saying that this note here,
15      "Due to Federal regulations, we're unable
16  to accept returns or exchanges on cosmetics,"
17  among other things, is a deterrent?
18      A.  Correct.
19      Q.  Okay.  All right.  Because you're not an
20  authorized retailer of Youngblood products, you would
21  agree I could not contact Youngblood, give them the
22  S.K.U. number, the -- is it S.K.U. number -- do items
23  have S.K.U. numbers on them or A.S.I.N.?  How -- how do
24  you identify each item?
25      A.  There's both.

Page 59

1      Q.  Both?
2      A.  A.S.I.N. is an Amazon number and then the
3  manufacturer has their own manufacturer code number.
4      Q.  The manufacturer code number, what do you call
5  that in your line of work?  Just the manufacturer code?
6      A.  Code number, S.K.U.
7      Q.  Okay.
8          MR. GOODMAN:  Mr. Ranson --
9          MR. RANSON:  Yeah.
10          MR. GOODMAN:  -- it would be most helpful if
11  you had any of the Youngblood products here.
12          MR. RANSON:  The what?
13          MR. GOODMAN:  The Youngblood products here.  I
14  mean, the samples to show him.
15          MR. RANSON:  Okay, thank you.
16  BY MR. RANSON:
17      Q.  So I'm asking you:  If I purchase a Youngblood
18  product from you, I'm unhappy with the product, you
19  would agree I couldn't return that to Youngblood in
20  California because you're not an authorized reseller of
21  Youngblood products.  Correct?
22          MR. GOODMAN:  Object to the form.
23          THE WITNESS:  I -- I don't know what
24  Youngblood's policy would be on that.
25

Page 60

1  BY MR. RANSON:
2      Q.  We just looked at it.  It's right here.
3          The products will be backed with a warranty.
4  I'll represent to you that Youngblood has a hundred
5  percent guarantee on all their products for the life of
6  the product.  So I could use the lipstick down to the
7  last drop, two years later say, I don't really want this
8  anymore and they would give me a brand new lipstick.
9  Correct?
10      A.  I don't know that.
11      Q.  Okay.  I'm representing that you to.
12      A.  Okay.
13      Q.  So if I -- if I purchase the Youngblood
14  products from you -- because you're not an authorized
15  dealer, are you?
16      A.  No.
17      Q.  Okay.  So if I purchase the product from you,
18  I would not be able to go to Youngblood and then say,
19  Hey, I don't like this lipstick, will you replace this
20  lipstick.  Correct?
21      A.  Why not?
22      Q.  Because they're not going to give a war --
23  they're not going to back their product by a warranty in
24  a -- from someone that sold their product that was not
25  an authorized reseller.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
61—64

Page 61

1        MR. GOODMAN:  You are assuming facts --
2        THE WITNESS:  You just said that they -- you
3    just said that they --
4        MR. RANSON:  It is in Exhibit --
5        THE WITNESS:  -- you just said that they would
6    provide a hundred percent warranty on all products.
7   BY MR. RANSON:
8        Q.   Right, for the authorized resellers or salons
9    or spas.  So -- okay.
10        Is it your understanding, then, that I would
11   be able to get my product replaced by Youngblood that I
12   purchased from you?
13       A.   I don't know what it would be.
14       Q.   Okay.
15       A.   You have to do it to test it out.
16       Q.   Okay.  Do all the individuals responsible for
17   acquiring -- listing your Youngblood products, so they
18   review the selling policies and the seller code of
19   conduct posted on the Amazon seller central system prior
20   to acquiring the products?
21       A.   I would say yes.
22       Q.   Okay.
23       A.   When you say all -- all the folks, it would be
24   primarily one person.
25       Q.   And who would that be?

Page 62

1        A.   Kellon.
2        Q.   Because Kellon is the only person that
3    acquires the products.  Correct?
4        A.   Correct.
5        Q.   Okay.  And do you have any handbooks or
6    manuals that -- that I could look at that would show
7    that Kellon must be -- must review the selling policies
8    and seller code of conduct before he acquires products?
9        A.   Are we talking the warehouse S.O.P.s and --
10   and --
11       Q.   I'm talking when an individual acquires
12   Youngblood products from your company.  Correct?  You
13   told me that you would imagine they were -- they review
14   the selling policies and seller code of conduct before
15   they acquired the items.  Correct?
16       A.   Yes.
17       Q.   Okay.  Do you have any documentation that
18   would show Kellon must review the selling policies and
19   seller code of conduct before acquiring Youngblood
20   products?
21       A.   I'm going to say no.
22       Q.   Or any cosmetics.  The answer is no?
23       A.   No.
24       Q.   Okay.  Can you tell me anything that the
25   selling policies and seller code of conduct says?

Page 63

1        A.   Our primary focus is to make sure that we
2    comply with Amazon's vigorous non-counterfeiting policy,
3    so we go through great lengths to ensure that we're only
4    selling first quality, authentic goods.  That's our
5    primary goal.
6        Q.   Okay.  All right.  What's -- what's Amazon's
7    authenticity requirement then?
8        A.   Authenticity requirement, making sure it's not
9    counterfeit product.  You have to go to -- due diligence
10   to make sure you're not selling counterfeit product.
11       Q.   Do you know what a counterfeit product means
12   to Amazon?  Strike that.
13       Do you know what a counterfeit product is as
14   it relates to Amazon?
15       A.   I -- well, you're asking a question that what
16   do I -- do I understand what Amazon's definition of
17   counterfeit is?
18       Q.   Uh-huh.  Yes.  Do you?
19       A.   I -- I believe that the counterfeit product is
20   items that are not authentic product.
21       Q.   What's an authentic product?
22       A.   It's originally made by the manufacturer.
23       Q.   So that's what an authentic product is?
24       A.   Correct.
25       Q.   Okay.  Do you have any documentation that the

Page 64

1    selling policies and seller code of conduct, those
2    policies, were followed in the acquisition of selling
3    the Youngblood products?
4        Initially, I asked you if you -- if you had
5    any documentation when they acquired the Youngblood
6    products.  Now, I'm talking about when they sell the
7    Youngblood products, do you have any documentation that
8    would show that Kellon -- that's the only person that
9    sells the products.  Right?
10       Do you have any documentation that Kellon
11   followed the selling policies and seller code of conduct
12   when he -- when he sold the Youngblood products on
13   Amazon?
14       A.   I would say he would have followed the
15   policies that Amazon presents on -- on their Web site.
16       Q.   Why would you say that?
17       A.   Because that -- that's our policy, you must
18   comply with the Amazon's policies for sale.
19       Q.   Okay.  So you said that's your policy.
20       Do you have that written somewhere?  Do you
21   have a written policy?
22       A.   No.
23       Q.   No.  Okay.  So it's just like a -- known
24   policy that you guys have amongst each other, it's just
25   not written down?



Page 65

1   A. Correct.

2   Q. Okay. Do you know if the selling policies and
3 seller code of conduct was followed in the customer
4 support of Youngblood's products?

5   A. Customer support. Could you rephrase the
6 question?

7   Q. Sure. Were the selling policies and the
8 seller code of conduct that you agreed to when you sold
9 your products on Amazon, were they followed in the
10 customer support of Youngblood's products?

11   A. I'm not aware of any customer returns or -- or
12 any dissatisfaction with any of the Youngblood products
13 that we sold.

14   Q. Do you have any policy concerning customer
15 returns for products on Amazon? When I say "policy," I
16 mean, written. Do you have any written policy that
17 would tell me how you handle a return on Amazon?

18   A. We -- we follow the Amazon protocol for
19 returns.

20   Q. I'm asking if Solu-Med has a written policy
21 for how to follow the selling policies and seller code
22 of conduct on Amazon when there's a customer return.

23   A. I don't believe there is a written policy.

24   Q. Okay. What written policies do you have?

25   A. We have quite a few.

Page 66

1   Q. Okay. What written policies do you have in
2 regard to Amazon?

3   A. Can you be more specific?

4   Q. Sure. What written policies do you have in
5 the acquiring, listing, sale, and customer support of
6 your products on Amazon?

7   A. Okay. So we have our purchase order; terms
8 and conditions on our purchase order would govern the
9 terms and conditions of the purchase.

10   Q. Let me stop you there.

11   What internal policies do you have in the
12 acquiring, listing, selling and customer support of your
13 products that you sell on Amazon?

14   A. I -- I'd have to go and retrieve those. I
15 don't have those.

16   Q. But there is some that exist?

17   A. I believe we have -- yes, we have --

18   Q. How sure are you as you sit here today?

19   A. I'm sure we have policies and procedures.

20   Q. A hundred percent?

21   A. Yes.

22   Q. Okay. Do you mind producing those to me?

23   A. Not a problem.

24   Q. Okay, thank you. All right.

25   Did any of your employees complete the Amazon

Page 67

1 Seller University Training, and that training is called
2 Best Practices in Product Authenticity and Quality? And
3 since Kellon is the only person that lists products on
4 Amazon, let me rephrase that.

5   Does Kellon complete the Amazon Seller
6 University Training, Best Practices in Product
7 Authenticity and Quality?

8   A. You're asking me did Kellon complete that
9 course?

10   Q. Uh-huh.

11   A. I personally don't know if he --

12   Q. Have you completed it?

13   A. No.

14   Q. Has anyone in your company, to your knowledge,
15 completed that?

16   A. I wouldn't know if Kellon completed it or not.

17   Q. Is today the first time you're aware that
18 there's a Seller University Training?

19   A. I haven't heard of it referred to that. I'm
20 sure that we basically have reviewed the policies
21 required to sell on Amazon.

22   Q. No, sir, I'm not talking about the policies.

23   So Amazon offers a Seller University where
24 they will train your employees on the Best Practices in
25 Product Authenticity and Quality. I'm asking if today

Page 68

1 is the first time you've heard of that.

2   A. The first time I've heard it specifically in
3 that term.

4   Q. Is today. Correct?

5   A. Yeah.

6   Q. Okay. Do you think it's a good idea to have
7 Kellon or other people that sell products on Amazon to
8 complete that training?

9   MR. GOODMAN: Objection as to form.

10 BY MR. RANSON:

11   Q. Would you like me to repeat the question?

12   A. Sure.

13   Q. Okay. Do you have any intentions of -- for
14 your employees to complete the Amazon Seller University
15 Training, Best Practices in Product Authenticity and
16 Quality?

17   A. I'm -- I'm going to look into it and decide,
18 you know, if it makes sense.

19   Q. Do you think it's a good practice to have your
20 employees aware and trained on the authenticity and
21 quality policies that are on Amazon where you sell
22 products?

23   A. I -- I believe that Kellon probably has
24 complied with that. He would know about it.

25   Q. Okay. All right. We'll ask Kellon.



Page 69

1    Okay.  Do you know if the Best Practices in
2  Product Authenticity and Quality guidelines were
3  followed in the listing, acquisition, sales, and
4  customer support on Amazon?
5    A.  I don't know.
6    Q.  Okay.  And Kellon would know that?
7    A.  I don't know if Kellon would know that.
8    Q.  Well, he's the person that sells on Amazon.
9  Correct?
10    A.  Yes.
11    Q.  Okay.  So what information did you give Amazon
12  when you listed the Youngblood products for sale?
13    A.  What information?
14    Q.  Sure.  Let me give you an example.  I'm sure
15  you had to give them a price.  Is that correct?
16    A.  I'm sure there's a process to upload items
17  onto the Amazon site.  I'm not specifically aware of all
18  the details as far as what the process is.
19    Q.  So, as you sit here today, you're not really
20  aware of how you list a product for sale on Amazon?
21    A.  I wouldn't be able to list a product for sale
22  on Amazon myself.
23    Q.  Okay, fair enough.
24    Would Kellon be in charge of that?
25    A.  Correct.

Page 70

1    Q.  Okay.  Do you know if Kellon listed the
2  product without a warranty?
3    A.  I -- I don't know.
4    Q.  Okay.  When you sell cosmetics like Youngblood
5  on Amazon, do you list them in new condition or used
6  condition?
7    A.  New condition.
8    Q.  New condition.  Okay.
9    But you wouldn't list your products on Amazon
10  with a manufacturer's warranty.  Correct?
11    MR. GOODMAN:  Objection as to form.
12  BY MR. RANSON:
13    Q.  Do -- are your -- were your Youngblood
14  products listed for sale on Amazon listed with a
15  manufacturer's warranty?
16    A.  I couldn't say.
17    Q.  Are you -- are you familiar with Amazon's
18  seller's code of conduct?
19    A.  In general, yes.
20    Q.  Well, what do you know in general about it?
21    A.  I've read it before.
22    Q.  Can -- can you tell me one thing that it says?
23    MS. BLACK:  Can I -- he can answer.  I'm
24  sorry, but can you -- I think it will help for
25  purposes of today's deposition if you just let us

Page 71

1  know what topic you're under when you're asking
2  questions.
3    MR. RANSON:  Sure.  I'm -- this is -- this all
4  relates to the entire complaint in this entire
5  lawsuit.
6    MS. BLACK:  Okay.  I mean, that's broad.  I
7  could formulate an objection based on that.  I'm
8  not saying you can't ask that question, but it
9  would be nice to stick to the topics.
10    MR. RANSON:  This has to do with Solu-Med's
11  relationship with Amazon, selling and listing
12  Youngblood's products on Amazon --
13    THE COURT REPORTER:  You're going to have to
14  slow down.
15    MR. RANSON:  Okay, I'm sorry.
16    THE WITNESS:  Speed.
17    MS. BLACK:  That's not a topic.
18    MR. RANSON:  It relates to the lawsuit --
19    MS. BLACK:  Okay.
20    MR. RANSON:  -- to the Complaint that you
21  filed.
22    Okay.  It relates to the authenticity of
23  the products.
24    MS. BLACK:  Also.  Right.
25    MR. RANSON:  Which is the subject of the

Page 72

1  lawsuit.  Okay.
2    MR. GOODMAN:  Mr. Ranson, do you have a copy
3  of the actual listing of the Youngblood products of
4  Life & Health Source that he can refer to?  You've
5  been asking him a lot of questions concerning the
6  content of the listing and more --
7    MR. RANSON:  Sure.  I mean, when you --
8  whenever you -- on direct -- you're happy to
9  provide him any exhibits you want and show him
10  anything that you want.
11    MR. GOODMAN:  Well, you're referring to the
12  warranty, presumably, the --
13    MR. RANSON:  Yeah, I'm asking him about his
14  knowledge of these things.
15    MR. GOODMAN:  Oh.
16    MR. RANSON:  Okay.
17    MR. GOODMAN:  But if we had the products, it
18  would be helpful.
19    MR. RANSON:  Sure.  Well, to my knowledge, the
20  products are no longer for sale on Life & Health
21  Source.  Is that correct?
22    MR. GOODMAN:  No.  I mean, do you have here in
23  your office samples of the Youngblood products that
24  were the subject of the notice?
25    MR. RANSON:  No, I don't have any Youngblood



Page 73

1 products here today. We could probably order you
2 some. Okay.
3 What did we say we're on, 5?
4 MR. GOODMAN: Five.
5 MR. RANSON: Okay. Yeah, this is 5.
6 BY MR. RANSON:
7 Q. So I went ahead and printed out the selling
8 policies --
9 THE COURT REPORTER: Wait, wait, I'm sorry.
10 (Defendant's Exhibit Number 5 was marked for
11 identification.)
12 MR. RANSON: Sorry. Go ahead.
13 BY MR. RANSON:
14 Q. So I went ahead and printed out the selling
15 policies and seller code of conduct that you agreed to
16 when you became a seller on Amazon, and you said you --
17 you're generally aware of this. Correct?
18 A. I'm sure at some point I reviewed this. I
19 couldn't regurgitate it. If that's what you're
20 asking --
21 Q. Sure, I understand. No, I mean, you just told
22 me a minute ago that you've read through it, though.
23 Correct?
24 A. Correct.
25 Q. Okay. I'm really just focused on the first

Page 74

1 page, and you can look at the whole document if you
2 want, but I'm really just focused on the first page
3 where it says Accurate Information. Do you see that?
4 You see at the bottom where it says Accurate
5 Information?
6 A. "You must provide accurate information
7 to Amazon and our customers and update
8 information if it changes."
9 Q. Then what? Can you just read that for me,
10 please, the Accurate Information.
11 MR. GOODMAN: It continues on the next page.
12 MR. RANSON: Yeah.
13 THE WITNESS: "You must provide accurate
14 information to Amazon and our customers and
15 update the information if it changes. For
16 example, this means that you must --"
17 BY MR. RANSON:
18 Q. I believe it says, "Have a business or use a
19 business name."
20 A. "-- use a business name that accurately
21 identifies your business and lists your products
22 in the correct category."
23 Q. Okay. So you would agree you have to list
24 your products in the correct category and you have to
25 provide accurate information to Amazon. Correct?

Page 75

1 A. That's what it says.
2 Q. Okay. Thank you.
3 And do you believe that Solu-Med does that?
4 A. Yes.
5 MR. RANSON: Okay. Mark this as Exhibit 6.
6 (Defendant's Exhibit Number 6 was marked for
7 identification.)
8 BY MR. RANSON:
9 Q. So, sir, this is the Condition Guidelines. Do
10 you see that?
11 A. Yes.
12 Q. Do you understand what the Condition
13 Guidelines means? We discussed it earlier. New, used,
14 so forth, the condition of the product.
15 A. Okay.
16 Q. And you sell your cosmetics, specifically the
17 Youngblood products, as new. Correct?
18 A. That's correct.
19 Q. Okay. Can you read where it says New, please?
20 A. "New, just like it sounds. A brand new
21 item. Original manufacturer's warranty, if any,
22 still applies, with warranty details included in
23 the listing comments. Original packaging is
24 present for most new items but certain items,
25 like shoes, may be reboxed."

Page 76

1 Q. Okay. And you would agree, as we've been over
2 many times, that your Youngblood products for sale on
3 Amazon did not contain the original manufacturer's
4 warranty?
5 MS. BLACK: Objection, form.
6 THE WITNESS: I -- I don't have an actual
7 listing from 2017, so I -- I don't have the answer
8 to that question.
9 BY MR. RANSON:
10 Q. Okay. Are you an authorized reseller of
11 Youngblood products?
12 A. No.
13 Q. Okay. So I'll represent to you that you do
14 not get a manufacturer's warranty from Youngblood.
15 Have you purchased a -- a warranty from
16 someone else for the Youngblood products?
17 MS. BLACK: Objection, form.
18 THE WITNESS: No.
19 BY MR. RANSON:
20 Q. Okay. So why do you list your products as new
21 when they do not contain the original manufacturer's
22 warranty?
23 MS. BLACK: Objection, form.
24 THE WITNESS: The product is authentic
25 product. It's new product. It's unused product.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
77—80

Page 77

1  BY MR. RANSON:
2    Q.  And you believe it's new as defined by Amazon?
3    A.  I believe it's new items.  It's -- it's not
4  used product.
5    Q.  I'm asking you:  Do you believe your
6  Youngblood products you list for sale on Amazon meet the
7  new Condition Guideline as provided by Amazon?
8    A.  When was this guideline implemented?  Is this
9  a recent change in the guidelines or is this the
10  guidelines that were in place --
11    Q.  Well, you would know that, sir, because you
12  monitor -- as you told me earlier, you monitor the
13  changes in the Amazon policies.  Correct?
14    A.  As in general our organization monitors any
15  changes within Amazon, but I'm asking you --
16    Q.  I will represent to you that this document
17  existed at the time you listed the Youngblood products,
18  okay, so if that's what you're asking me, even though
19  I'm asking the questions.
20      So I'm going to ask you again.  Do you believe
21  the products you listed for sale on Amazon meet the
22  Youngblood products, meet the new Condition Guideline as
23  provided by the Condition Guidelines on Amazon?
24    A.  Clearly, the issue that you're bringing forth
25  is the warranty issue.

Page 78

1    Q.  So yes or no, sir?
2    A.  From my perspective, yes.  From your
3  perspective, no.
4    Q.  Why from your perspective yes?
5    A.  Because you're singling out the issue
6  regarding this warranty as being -- that we're not
7  complying with the warranty issue.  I -- I cannot tell
8  you -- I'd have to see our original listing from 2017 to
9  see how it was listed to be able to answer the question.
10    Q.  All right.  Let me ask you this:  How many --
11  how many products do you think you have for sale on
12  Amazon right now?  Roughly.
13    A.  You thing -- I think you said 470 earlier this
14  morning.
15    Q.  Okay, let's say 470.  Do you think any of the
16  470 products you have for -- for sale on Amazon right
17  now, do you think one of them says -- comes with an
18  original manufacturer's warranty on the listing?
19    A.  I don't know.  I'd have to check and see.
20    Q.  You can't tell me if one of them does?
21    MS. BLACK:  Objection to form.
22    MR. RANSON:  What's wrong with the question?
23    MS. BLACK:  Because you're arguing with the
24  witness, and in addition, have you shown the
25  witness what the manufacturer's warranty is in this

Page 79

1  case?
2    MR. RANSON:  No.
3  BY MR. RANSON:
4    Q.  I'm asking if the product came with the
5  manufacturer's warranty in the listing.
6    A.  I've already answered.  I said no.
7    Q.  Okay, thank you.  That was it.
8    MR. RANSON:  What are we on, 6 or 7?
9    MR. GOODMAN:  Seven.
10    MR. RANSON:  Seven.  Okay.
11    (The testimony on pages 79 through 87, line 7 was
12  marked confidential, excerpted and bound separately.)

Page 80



Page 81

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 82

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 84

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
85–88

Page 85

Page 87

8    THE VIDEOGRAPHER:  We are back on the record.
9    The time is 11:37.
10  BY MR. RANSON:
11    Q.  Okay, sir.  I wanted to follow up on something
12  you mentioned earlier, which was the 60 warehouse
13  employees that work in the Q-Med/Solu-Med warehouse
14  facility.  Okay?
15    How many of those employees work for Solu-Med
16  and how many work for Q-Med?
17    A.  Okay.  At one -- at its peak, prior to being
18  delisted, Solu-Med had probably ten folks working in the
19  warehouse, primarily working for Solu-Med, and we're
20  down to about three now and Q-Med would have the
21  balance.
22    Q.  Okay.  And are those employees paid hourly, or
23  are they paid a salary?  How are they paid?
24    A.  All warehouse employees are paid an hourly
25  wage and have bonuses based on accuracy and K.P.I.

Page 86

Page 88

1  metrics, key performance metrics, so they're capable of
2  earning a bonus based on shipping accuracy and other,
3  you know, key performance indicators that we measure.
4    Q.  And do those employees also receive overtime?
5    A.  Yes.
6    Q.  Okay.  I'm going to switch gears a little bit.
7  We were on the topic of authenticity before we took a
8  break.
9    We can go off the record for one second.
10    THE VIDEOGRAPHER:  We're off the record.
11    (Thereupon, a recess was taken.)
12    THE VIDEOGRAPHER:  Back on the record.
13  BY MR. RANSON:
14    Q.  Okay.  Before we took the -- last break,
15  we were discussing authenticity and quality.  We were
16  discussing some Condition Guidelines by Amazon.  And now
17  I want to show you what I think I mentioned to you
18  earlier, which is the Best Practices in Product
19  Authenticity and Quality, and this is also what -- if
20  someone would have completed the Seller University
21  Training what they would have been made aware of.
22    MR. GOODMAN:  Is this 9 or --
23    MR. RANSON:  I can't keep track.
24    MS. BLACK:  It is 9.
25    MR. RANSON:  Yeah, it's 9.  I won't say



Page 89

1    anything else.
2        (Defendant's Exhibit Number 9 was marked for
3    identification.)
4    BY MR. RANSON:
5        Q.   Okay.  So this manual, this Best Practices in
6    Product Authenticity and Quality basically lays out how
7    you can comply with all of Amazon's guidelines and not
8    be in violation of counterfeit, of intellectual property
9    violations, and authenticity violations.
10        If you look at the second page, do you see the
11   second bullet point?  Do you see that, sir?
12       A.   Yes.
13       Q.   Okay.  And you would agree with me that that
14   says that you must verify the authenticity of the
15   products you source.  Correct?
16       A.   Yes.
17       Q.   Okay.  And if you look at the third page, when
18   it says Listing the Products, do you see the third
19   bullet point now?
20       A.   Yes.
21       Q.   Can you read that for me?
22       A.   "Clearly state whether your products
23       are new or used, and list your products under
24       the most appropriate Amazon category.  Provide a
25       detail and accurate information about the

Page 90

1    product you are selling."
2        Q.   Okay.  And you would agree that new or -- and
3    also the word "used" is in bold.  Correct?
4        A.   Yes.
5        Q.   Okay.  All right.
6        So other than the alleged complaint by
7    Youngblood against your store, has your store ever been
8    reported or shut down on Amazon?
9        A.   I think you're asking two questions, reported
10   or shut down.  The answer to shut down --
11       Q.   Let me -- you're right -- let me -- let me --
12   strike that question, please.  Okay.
13       Has your store ever been shut down on Amazon
14   other than the Youngblood instance in this lawsuit?
15   Strike that.  That was a terrible question.
16       Other than the time your store was shut down
17   due to the alleged Youngblood complaint, has your store
18   ever been shut down on Amazon?
19       A.   No.
20       Q.   Never?
21       A.   Never.
22       Q.   Okay.
23           MR. RANSON:  Is this 10?
24           (Defendant's Exhibit Number 10 was marked for
25   identification.)

Page 91

1    BY MR. RANSON:
2        Q.   Okay.  This document was produced to me by
3    Amazon and it says, Current Selling Status of
4    ABABPETWJQTSG.
5        Is that -- is that something to do with your
6    store?  I'm confused what that means.
7        A.   I -- I couldn't say.
8        Q.   Is that maybe an abbreviation for your store?
9    You -- you might have been able to tell me.
10       Anyway, this was in response to the time
11   periods that your store was suspended or prohibited.
12   Okay?
13       Now, I understand on 11/13 the store was
14   suspended due to the alleged complaint from Youngblood.
15   Would you agree with me there?  On 11/13/2017.
16       A.   Yes.
17       Q.   Okay.  So on 7/1/2018, it says your store was
18   suspended and then you were reinstated a day later.
19       Do you -- do you remember that?
20       A.   I do not.
21       Q.   Okay.  Do you want to change your answer a
22   minute ago when I asked you if your store has ever been
23   suspended or shut down on Amazon other than on
24   11/13/2018?
25       A.   I'd want to make sure that you're representing

Page 92

1    that this is our store.
2        Q.   Well, I don't want -- I'm representing to you
3    that Amazon gave me this in response and also provided
4    to your attorney when Amazon produced these documents
5    that shows this -- this is for your store.
6        A.   So you're representing that this is --
7        Q.   Absolutely, representing that this is your
8    store.
9        A.   Okay.
10       Q.   So you're not aware of a 7/1 suspension for
11   Performance-LSR?
12       A.   I am not.
13       Q.   Okay.  Do you know what Performance-LSR means?
14       A.   I do not.
15       Q.   Okay.  It means late shipment rate.  So I
16   assume, and you can tell -- correct me if I'm wrong,
17   that your store was shut down for having a late shipment
18   rate.  Were you not aware of that?
19       A.   I was not.
20       Q.   Okay.  And then on 12/20/2018 your store was
21   blocked for infringement and you were reinstated
22   1/14/2019.  I would assume that's in regard to this --
23   to the Youngblood complaint.  Would you agree?
24       A.   We were -- I agree that on 11/13 we were shut
25   down for the Youngblood complaint and that we were



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019

93—96

Page 93

1    reinstated on or about January 14th.

2        Q.   Yeah.  That's why I'm confused, because why

3    does it say on 12/20/2018 your store was blocked?

4        MS. BLACK:  Objection.  This is my problem,

5    you're asking him to interpret an Amazon document,

6    so whatever he says --

7        MR. RANSON:  Well, he runs the -- he -- I

8    don't want to get into an argument with you, but he

9    runs the store so I'm just -- I mean, if he's not

10   aware of when his store was shut down or suspended

11   or blocked, that's fine.

12       MS. BLACK:  But he can't testify to the

13   accuracy of this document or it's only attesting

14   this isn't -- as, you know --

15       MR. RANSON:  We can take that up with Amazon

16   or you can tell me that these dates aren't -- this

17   isn't true, that this didn't happen.

18       MS. BLACK:  I'm just saying he has no way of

19   knowing that.  So he can testify as to what he

20   thinks --

21       MR. RANSON:  To his knowledge.  Sure.

22       MS. BLACK:  -- but it's not -- it's hearsay

23   and it's not going to --

24       MR. RANSON:  Okay, thank you.

25       MR. GOODMAN:  I believe he did testify that

Page 94

1    11/13 through 12/20 is the same cause which is

2    infringement and then the restoration was

3    January 14th so it refers to the complaint.

4        MR. RANSON:  Thank you.  Okay.

5    BY MR. RANSON:

6        Q.   And then you see on 2/14/2019?

7        A.   Yes.

8        Q.   It says, Block MFN.  Are you aware of this?

9        A.   No.

10       Q.   Okay.  So I'll ask you again:  Are you aware

11   of any other time, other than the report by Youngblood,

12   where your store was shut down?

13       A.   I was not aware of any other shutdowns of the

14   store.

15       Q.   Okay.  Okay.  Also, I meant to ask you this

16   earlier:  When you said process the returns from the

17   Q-Med storage facility, are you a hundred percent sure

18   that the Solu-Med employees processed those returns or

19   could there be a chance that a Q-Med employee processed

20   that return?

21       A.   In our warehouse we have a segmented area for

22   Solu-Med.  All returns come to that area to be processed

23   and returned.

24       Q.   Sure.  I understand they come to that area,

25   but would a Q-Med employee possibly on that day be the

Page 95

1    one that processed that return?

2        A.   Very unlikely.

3        Q.   But it is possible?

4        A.   Anything is possible.

5        Q.   Well, I mean, if it's -- is it -- you told me

6    earlier that some of the Q-Med employees work for

7    Solu-Med some days of the week, some days they're

8    working for Q-Med.  Is that correct?

9        A.   What I said was that during peak shipping

10   seasons or peak shipping times, sometimes folks will

11   come over to support the Solu-Med team to make sure that

12   we get shipments out on time.

13       Q.   Okay.  So on a peak --

14       A.   That would be outbound shipments, not returns

15   or inbound shipments.

16       Q.   So you're a hundred percent sure that all the

17   returns are handled by Solu-Med only?

18       A.   As reasonably -- a hundred -- yes.

19       Q.   Okay.  I want to go through the Complaint with

20   you a little bit, which I have here.  I think.  Oh,

21   right here.  I would like to represent that this

22   Complaint is the original Complaint.

23           Is there anything different in this

24   Complaint -- I'm asking you guys.  Is there anything

25   different in the Complaint other than the title Argo

Page 96

1    Holdings?

2        MR. GOODMAN:  No.

3        MR. RANSON:  Okay.  All right.  Is this fine

4    if I use this as an exhibit, or do you want me to

5    print out one that says Solu-Med?

6        MR. GOODMAN:  No.

7        MR. RANSON:  Okay.

8        MR. GOODMAN:  Other than the change in the

9    caption and the --

10       MR. RANSON:  Right.

11       MR. GOODMAN:  -- the removal of Argo, it's the

12   same.

13       MR. RANSON:  Everything else is the same?

14       MR. GOODMAN:  Yeah.

15       MR. RANSON:  Okay, all right.

16       (Defendant's Exhibit Number 11 was marked for

17   identification.)

18   BY MR. RANSON:

19       Q.   So let's run through what happened.  Okay?

20   Okay.

21           So you acquired Youngblood products.  You

22   listed them for sale.  On or about November 13th, you

23   received a notification from Amazon that your store was

24   in violation of a counterfeit policy.  Is that correct?

25       A.   What I recall is that our store -- our store



Page 97

1  was shut down, assuming that we received some sort of
2  notification from Amazon.
3      Q.  But you're not aware when that notification --
4  you don't remember ever receiving that correspondence
5  or --
6      A.  Kellon notified me that the store had been
7  shut down due to a counterfeit allegation.
8      Q.  Okay.  Well, it says in the Complaint
9  November 11th and the 13th.  Right?  That's on page
10  four.  Do you see where it says that?
11     A.  Yes.
12     Q.  Okay.  Did -- were you notified that -- that
13  Youngblood reported you for any products other than
14  Youngblood products as being counterfeit?
15         MR. GOODMAN:  Would you rephrase that
16  question?
17         MR. RANSON:  Sure.
18  BY MR. RANSON:
19     Q.  Are you aware -- let me ask it this way:
20  What -- what brand of products were reported as being
21  counterfeit?
22     A.  I believe it was Youngblood products.
23     Q.  Okay.  Any other brands?
24     A.  Not that I'm aware of.
25         MR. RANSON:  Okay.  Just to verify, I just

Page 98

1  want to enter this as Composite Exhibit 14 -- 15 --
2  12.
3         (Defendant's Exhibit Number 12 was marked for
4  identification.)
5  BY MR. RANSON:
6      Q.  So on this page, this is a list of all the
7  items that were reported as being counterfeit to Amazon.
8  And I've actually -- I drafted this, which is a nice
9  chart.  It basically goes through each item as it is
10  shown on this fairly confusing rights infringement
11  e-mail to you or notification.  Okay?
12         MR. GOODMAN:  I believe that refers to
13  everything that was on the platform.
14         MS. BLACK:  Can we go off the record one
15  second?
16         MR. RANSON:  Sure.
17         MS. BLACK:  This document --
18         THE VIDEOGRAPHER:  Just a moment.  Off the
19  record.
20         (Discussion held off the record.)
21         THE VIDEOGRAPHER:  We are back on the record.
22         MS. BLACK:  Counsel just showed us Exhibit
23  marked as 15.  It's the --
24         THE WITNESS:  Twelve.
25         MR. RANSON:  Twelve.

Page 99

1         MS. BLACK:  Twelve?  Oh.  Exhibit marked as
2  12.  It's our contention that this exhibit was not
3  produced to us before in discovery and we're just
4  having an objection to any documents that we
5  haven't had the opportunity to see before today's
6  corporate rep deposition.
7         MR. RANSON:  Okay.  And I'll represent that
8  this was produced to plaintiff's counsel, and we'll
9  take that issue up at a later time.
10         MR. GOODMAN:  And the report date is
11  11/12/2018.  And we have produced for you a letter
12  from -- an e-mail communication of November 11
13  providing the delisting of the products, which you
14  have.  I think it's an exhibit on the Complaint.
15         MR. RANSON:  Okay.  Thank you.  All right.
16         MR. GOODMAN:  And this is the listing of all
17  the Youngblood products, the different S.K.U.s.
18         MR. RANSON:  This is what Amazon removed
19  from --
20         MR. GOODMAN:  Yeah, I know.  They removed
21  initially all the S.K.U.s.  You're correct.
22         MR. RANSON:  Sure.  Yes.  I just want to be
23  clear.
24         MR. GOODMAN:  From Youngblood.
25         MR. RANSON:  Yes, sir.  All right.  Thank you.

Page 100

1  BY MR. RANSON:
2      Q.  So I just want to be clear, and my question to
3  you is:  That no other products were removed other than
4  the Youngblood products on 11/12/2018 -- strike that.
5         No other products were reported as counterfeit
6  other than the Youngblood products?
7      A.  Okay.  So no other products other than
8  Youngblood were referred to as counterfeit?
9      Q.  Uh-huh.  Correct.  Is that correct?
10     A.  You -- you're the one telling me that.
11     Q.  I'm asking you.
12     A.  I don't know.
13     Q.  You don't know, so you don't know if
14  Youngblood maybe reported your L'Oreal products as
15  counterfeit or --
16     A.  I -- I have no knowledge of the Youngblood
17  complaint.  I don't have a copy of their complaint to
18  Amazon.
19     Q.  Your counsel didn't provide you with a copy of
20  the complaint?
21     A.  I haven't seen the Youngblood specific
22  complaint.
23     Q.  Oh.  Well, your counsel has it so I think
24  maybe he can show that to you.  Okay.
25         Well, would you agree with me that it says the



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
101–104

Page 101

1 only products that were removed, based on the
2 information that this brand protection e-mail address
3 provided, were the Youngblood products, which is on this
4 nice list here?
5      MR. GOODMAN:  Can we go off the record for a
6 minute?
7      MR. RANSON:  Sure.
8      THE VIDEOGRAPHER:  One moment, please.  Off
9 the record.
10     (Discussion held off the record.)
11     THE VIDEOGRAPHER:  We are back on the record.
12 BY MR. RANSON:
13   Q.  So, sir, are you aware of any other products
14 that were complained of by Youngblood besides Youngblood
15 products when your store was shut down?
16   A.  No.
17   Q.  Okay.  Thank you.  All right.
18     So on 11/13, you received notification from
19 Amazon that your store was shut down.
20     Are you aware of that?
21   A.  Yes.
22   Q.  Okay.  And you said your store has never been
23 shut down before.  Correct?
24   A.  I was not aware of any other shutdowns --
25   Q.  Okay.

Page 102

1   A.  -- for counterfeit claims.
2   Q.  What about complaints?
3   A.  Complaints, yes.
4   Q.  Okay.  So how many complaints do you think you
5 had before your store was shut down?
6   A.  You're asking me to speculate.
7   Q.  Do you know?
8   A.  I -- I don't know.
9   Q.  Okay.  I'll just give it in relation to this.
10   A.  Are you talking about customer complaints or
11 are you talking about brand complaints?
12   Q.  I'm talking about complaints, trademark
13 infringement complaints, counterfeit complaints,
14 authenticity complaints.
15   A.  Okay.
16     MR. RANSON:  All right.  So we don't have
17 three copies of this, but I'm just going to show --
18 I can get them printed, but these are what you guys
19 produced to us, which is the -- and I just made
20 this little list of the dates, which I think you
21 provided to me in the -- yeah.  So I can do it that
22 way, if that's easier.
23     MS. BLACK:  Do you need these?  Is that what
24 you're saying?
25     MR. RANSON:  I was just going to ask him

Page 103

1 about -- I'm sure he would like to review --
2     MS. BLACK:  No, he --
3     MR. GOODMAN:  No.
4     MS. BLACK:  -- needs to give them to the
5 witness because he doesn't have extra copies.
6     MR. RANSON:  Yeah, sorry.
7     MS. BLACK:  They were Bates stamped --
8     MR. RANSON:  Yes.
9     THE COURT REPORTER:  I'm sorry, could you
10 speak up a little bit when you're talking.  I'm
11 having a hard time hearing.
12     MS. BLACK:  Of course.
13     THE COURT REPORTER:  Thank you.
14     MR. GOODMAN:  Here, this is yours.
15     MR. RANSON:  Yes, sir.  Thank you.  Sorry I
16 didn't bring more copies.
17 BY MR. RANSON:
18   Q.  Okay, sir.  I'm going to -- I'm going to give
19 you what is Plaintiffs marked Bates stamp PL00187
20 through PL00229.  And I've done you a favor and made a
21 nice little chart here of each of these complaints.
22     (Defendant's Exhibit Number 13 was marked for
23 identification.)
24 BY MR. RANSON:
25   Q.  Take -- take a second to review those.

Page 104

1     You're aware of those complaints during that
2 time?
3   A.  Yes.
4   Q.  Okay.  Okay.
5     So you would agree that there was a complaint
6 on, let's see, 1/27/2018?  Let me read that one second.
7     Okay, sir, I'll -- I'll just do this.  It's a
8 lot easier.  I'll represent to you that from the
9 documents you produced, that are Bates stamp PL00187
10 through PL00229, that you had seven complaints on Amazon
11 before this Youngblood complaint.
12     MR. GOODMAN:  That's prior to November 11th of
13 2018?
14     MR. RANSON:  Yes, sir.
15     MR. GOODMAN:  Yep.
16     THE WITNESS:  Well, some of these dates are
17 2019.
18 BY MR. RANSON:
19   Q.  That's why I only said seven.
20   A.  Okay.
21     MR. GOODMAN:  He's only referring to seven of
22 them.
23     THE WITNESS:  Okay.
24 BY MR. RANSON:
25   Q.  So, as you told me -- and I'm not trying



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE
November 20, 2019
105–108

Page 105

1  to argue with you about when -- when your store was shut
2  down or not shut down, but there were seven complaints
3  that was filed against you on Amazon where your store
4  was not shut down or suspended.  Correct?
5     A.  Yes.
6     Q.  Okay.  And then for this specific instance
7  your store was shut down.  Correct?
8     A.  Yes.
9     Q.  Do you know why?
10    A.  I believe because it was made as a counterfeit
11  claim.
12    Q.  And -- and why would that matter?
13       MR. GOODMAN:  Objection as to form.  You're
14    asking him what Amazon's thinking process was in
15    taking it down.
16       THE WITNESS:  Go ahead, restate your question.
17  BY MR. RANSON:
18    Q.  You said you thought your store was taken down
19  because of the counterfeit claim.  Right?  Correct?  But
20  you had other -- as you can see in front of you, some of
21  the seven complaints before this time that your store
22  was shut down included counterfeit complaints where your
23  store was not shut down.  Correct?
24    A.  Correct.
25    Q.  Okay.  So why do you think this time your

Page 106

1  store was shut down?
2     A.  I don't know.
3     Q.  Okay.  All right.
4        I just want to go through some of the exhibits
5  in the Complaint.  It's kind of a timeline.
6       MS. BLACK:  You're talking about the lawsuit?
7       MR. RANSON:  Yeah, the Complaint that was
8    filed.
9       THE WITNESS:  Yeah.
10  BY MR. RANSON:
11    Q.  Okay.  So on 11/13 -- and this is in the --
12  this is actually Plaintiff's -- I'm not entering this as
13  an exhibit.  I'm just reading this to you.  This is a
14  Plaintiff's Bates stamp PL0048 and it says on 11/13,
15       "Reactivate your account.  Next step,
16    please provide us -- I'm sorry, fulfill any open
17    orders to ensure customers receive their items
18    to -- to avoid future impact to your account.
19    The actions you have taken have resolved the issues.
20    We have removed all listings for the Youngblood
21    product line.  Deleted are sales offerings to
22    ensure that we don't infringe --"
23  I'm sorry, strike everything that I just said.
24    A.  Yeah.
25    Q.  This is your Plan of Action on 11/13 that you

Page 107

1  provided to -- to Amazon.  Okay?  And this is what you
2  said you're -- you were going to do.  You are going to
3  take down all Youngblood products from your store.
4  Correct?
5     A.  Yes.
6     Q.  Okay.  You have deleted all your sales
7  offerings to ensure that they don't infringe on anyone's
8  intellectual property or Youngblood cosmetics.  Correct?
9        I'll show you.  If you want, I can make a --
10  we can go off the record -- I can make a quick copy.
11  This is your Plan of Action.
12       Can you just read the Plan of Action?  That
13  might be easier -- one, two, and three.
14    A.  "Your submission, the root cause of
15    the issues:  We have offerings of the brand
16    Youngblood cosmetics with listings which the
17    intellectual property holder felt infringed on
18    their intellectual property rights.  The actions
19    you have taken to resolve the issue:  We have
20    removed all listings for -- for Youngblood
21    product line and deleted our sales offerings to
22    ensure that we don't infringe on any
23    intellectual property of Youngblood cosmetics.
24    Three, the steps you have taken to prevent these
25    issues going forward:  We will review our

Page 108

1     product offerings to ensure compliance with
2     Amazon terms and conditions."
3     Q.  Thank you.  So you would agree that you took
4  down the Youngblood products so you would be in
5  compliance with Amazon's terms of service related to
6  intellectual property.  Correct?  And removed any
7  offerings that weren't in compliance.  Correct?
8     A.  Yes.
9     Q.  Okay.  And just -- just a quick question.
10  When you were reinstated, which was in January --
11  January 14th, correct, of 2019 -- did you sell
12  Youngblood products anymore?
13    A.  We never sold Youngblood products after 11/13.
14    Q.  Why not?
15    A.  Because, first off, Youngblood had already
16  filed to become brand registered --
17    Q.  Uh-huh.
18    A.  -- and had Youngblood contacted us, we would
19  have said, We have only about $10,000 worth of inventory
20  left and we're not going to continue to sell the
21  Youngblood products because they were -- had struck a
22  deal with Amazon.
23    Q.  Do you know when Youngblood became brand
24  registered?
25    A.  I don't know the exact date, no.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
109–112

Page 109

1    Q.  Okay.  So you submitted your Plan of Action
2   which was on 11/13, but then your attorney sends an
3   e-mail on November 26th -- and this is Bates stamp
4   PL00045 -- to my client stating,
5        "Amazon, consistent with their policies,
6       has delisted all of Solu-Med's products."
7        Do you know -- do you have any idea what that
8   means, "consistent with their policies," which policies
9   that's in reference to?
10   A.  I don't.
11   Q.  Me neither.
12       Then there's a demand,
13       "Demand is made that Youngblood immediately
14      communicate in writing to Amazon and copy us,
15      advising that the statement made as to the lack
16      of authenticity of the product is a complete
17      fabrication."
18   And this was on November 26th.
19       Are you aware of this -- this letter?
20   A.  Yes.
21   Q.  I believe you're copied.
22   A.  Yes.
23   Q.  Okay.  So that's November 26th.
24       So three days later we have an e-mail from
25   brandprotection@ybskin.com, and this is PL00044.  It

Page 110

1   says,
2        "Hello, we've agreed to file a retraction
3       with Amazon.  Please provide me with the
4       following information so we can submit it to
5       Amazon."
6        Then it asks for the Amazon store name, the
7   Amazon store e-mail, the merchant I.D. and the complaint
8   I.D.  Are you aware of that e-mail?
9   A.  Yes.
10   Q.  Okay.  Then on November 30th, which is the
11  very next day, Mr. Goodman said,
12       "Please send retraction upon receipt of
13      this e-mail and copy me at Goodman and
14      Sapersein -- Saperstein.
15       MR. GOODMAN:  Saperstein.
16       MR. RANSON:  Saperstein, sorry.
17  BY MR. RANSON:
18   Q.  Okay.  So that was the next day.  Right?  Are
19  you aware of that e-mail?
20   A.  Yes.
21   Q.  Okay.  Then that was on a Thursday.  On
22  Tuesday, which was three business days later -- you
23  agree with me there?  Do you agree with me that Tuesday
24  is three business days later from Thursday?
25   A.  Yes.

Page 111

1    Q.  Okay.  Young -- the e-mail
2   brandprotection@ybskin.com says,
3        "Hello, Amazon.  Please withdraw complaint
4       I.D. number," the I.D. number, "We resolved our
5       complaint with the seller Life & Health Source,"
6   gives the merchant I.D. which is, for the record,
7   ABABETWJQTSG, which I believe matches that Excel
8   spreadsheet that I gave you and says,
9        "Thank you to Youngblood."
10  So this is on December the 4th.  Are you aware of that?
11   A.  Yes.
12   Q.  Okay.  On the same day, on December 4th, their
13  e-mail sent to Mr. Saperstein --
14       MR. GOODMAN:  Saperstein.
15  BY MR. RANSON:
16   Q.  It says,
17       "A retraction has been filed with Amazon.
18      Please review the attached."
19  Are you aware of that e-mail?
20   A.  Yes.
21   Q.  Okay.  That was on December the 4th.  On
22  December the 6th, two days later, after the retraction,
23  Mr. Saperstein --
24       MR. GOODMAN:  This is a withdrawal.  You're
25  misstating.

Page 112

1        MR. RANSON:  What's that?
2        MR. GOODMAN:  It says we -- please withdraw
3   the complaint.  You said there was a retraction.  I
4   think you misspoke.
5        MR. RANSON:  Okay.  Well, just to be clear,
6   the document on December 4th, that was a -- that
7   was withdrawing the complaint on Amazon.  It said,
8        "Please withdraw complaint I.D. number
9       5518323151 as we have resolved our complaint
10      with the seller, Life & Health Source, merchant
11      I.D. ABABPETWJQTSG."
12       MR. GOODMAN:  Okay.
13       MR. RANSON:  Okay?  All right.
14       MR. GOODMAN:  Now we're right.
15  BY MR. RANSON:
16   Q.  All right.  So they sent that to Amazon.  You
17  said you were aware of that e-mail.  Correct?
18   A.  Yes.
19   Q.  All right.  Then they forwarded a copy to
20  Mr. Saperstein.  You're aware of that e-mail --
21   A.  Yes.
22   Q.  -- on the following -- on the same day.  Two
23  days later, so it must have been Thursday,
24  Mr. Saperstein sends another e-mail to
25  brandprotection@ybskin.com.  In that e-mail it says,



Page 113

1      "The communication of December 4th by
2   Youngblood to Amazon does not constitute a
3   retraction, nor was there any resolution of the
4   baseless statements Youngblood made to Amazon."
5      Do you know why that does not constitute a
6   retraction?
7      A.  Because, basically, it did not retract the
8   statement of product being counterfeit.
9      Q.  So when you were asking for a retraction, you
10  wanted them to say their products are not counterfeit?
11     A.  Correct.
12     Q.  Okay.  Then it says,
13      "Although Amazon has received your
14     December 4th e-mails, it has not yet restored
15     our client's status as a online retailer.  We
16     have no information that would indicate when our
17     client's status will be restored."
18  So the retrac -- what I'm calling the retraction, the --
19     MR. GOODMAN:  Withdrawal.
20  BY MR. RANSON:
21     Q.  -- withdrawal of the complaint that was sent
22  to Amazon on December the 4th, okay, your -- you two
23  days later are now unsatisfied that your store has not
24  been reinstated.  Correct?
25     A.  Correct.

Page 114

1      Q.  How long do you think it takes to get
2   reinstated on Amazon?
3      MR. GOODMAN:  Objection as to form.
4      MR. RANSON:  Sure.
5      THE WITNESS:  I -- I don't know.
6   BY MR. RANSON:
7      Q.  Okay.  Do you think it takes two days?
8      MR. GOODMAN:  Objection.
9      THE WITNESS:  I -- I wouldn't know what it
10     takes.
11  BY MR. RANSON:
12     Q.  Okay.  You would agree, though, that from --
13  that during December it's probably Amazon's busiest time
14  of the year because it's Christmas?
15     MS. BLACK:  Objection.
16     THE WITNESS:  Yes.
17  BY MR. RANSON:
18     Q.  You would agree that the holidays occur in
19  December?
20     A.  Yes.
21     Q.  All right.
22     MR. GOODMAN:  That, we could agree upon.
23  BY MR. RANSON:
24     Q.  Okay.
25     A.  I think what we don't agree on is that a

Page 115

1   retraction of the complaint is -- is -- is not the same
2   as a retraction of a counterfeit claim.
3      Q.  Sure.  So did Amazon ever send you any
4   correspondence whatsoever that says the retraction that
5   was filed by Youngblood was insufficient?
6      A.  Their lack of putting us back on as a
7   storefront I think was their response.  It was
8   unsatisfactory.
9      Q.  Okay.  Let me -- let me be more specific.
10     Did Amazon ever send you any documentation
11  that said the retraction filed by Youngblood was
12  insufficient?
13     A.  I'm not aware.
14     Q.  Did -- did Amazon ever send you any
15  correspondence or documentation that said that the
16  retraction was inadequate?
17     MR. GOODMAN:  That the withdrawal --
18     MR. RANSON:  What?
19     MR. GOODMAN:  You said retraction.  I thought
20  we were talking about the withdrawal of the
21  complaint was not satisfactory.
22     MR. RANSON:  We call it a retraction.
23     MR. GOODMAN:  You're calling --
24     MR. RANSON:  I'm calling it a retraction.
25     MR. GOODMAN:  Okay.

Page 116

1      MR. RANSON:  All right?
2      THE WITNESS:  Okay.  Restate the question.
3   BY MR. RANSON:
4      Q.  Sure.  Yeah, it's pretty simple.
5      Did Amazon ever notify you that the retraction
6   or the withdrawal by Youngblood was insufficient?
7      A.  Yes.
8      Q.  And what -- do you have a documentation?  Do
9   you have an e-mail?  What do you have that shows that?
10     A.  What we have is that our store was not -- our
11  store was not restored.
12     Q.  Okay.  When was your store restored?
13     A.  I believe we said it was on or about
14  January 14th.
15     Q.  Okay.  So that's, roughly, 40 days after the
16  withdrawal or the retraction was sent, correct, which
17  was on December 4th?
18     A.  Roughly, yes.
19     Q.  Okay.  So because your store was not
20  reinstated from December 4th until January 14th, because
21  it took 40 days, you're telling me you assumed that the
22  retraction was inadequate.  Is that correct?
23     A.  I didn't assume.
24     Q.  Okay.  Then what?
25     A.  I'm stating that it was inadequate.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
117–120

Page 117

1    Q. But you don't have any -- you don't have any
2  documentation from Amazon that it was inadequate?
3    A. I'd have to check. I don't know if we do or
4  don't.
5    Q. As you sit here today, to your knowledge, do
6  you have any documentation that the withdrawal or
7  retraction that was sent to Amazon by Youngblood was
8  inadequate?
9    A. What I recall is Kellon sent multiple action
10  plans to get the store reinstated. None of them were
11  sufficient. What Amazon -- what he stated to me was
12  that Amazon wanted a full and comprehensive retraction
13  of the counterfeit claim.
14    Q. Do you have an e-mail where Amazon says that
15  they did not receive a full retraction of the complaint
16  after December 4th?
17    A. No.
18    Q. Would Kellon have that e-mail?
19    A. I don't know.
20    Q. Okay. Did you get any letters, documentation
21  whatsoever that ever said that the retraction was
22  inadequate?
23    A. I'm not aware of that.
24    Q. Okay, thank you.
25      I want to refer you to paragraph 17 of the

Page 118

1  Complaint. Okay. It says,
2      "Not only did plaintiffs lose income from
3      the shutdown of the store during the
4      historically busiest time of the year costing
5      them hundreds of thousands of dollars, but
6      plaintiffs also lost the goodwill and analytical
7      data stored by Amazon and, essentially, had to
8      rebuild from start."
9  That's what that says. Correct?
10    A. Yes.
11    Q. Okay. I have two questions. One, which I
12  just asked you a second ago.
13      Now, would you agree that this time period was
14  historically the busiest time of the year? We're
15  talking about a time period from 11/13 to January 14th.
16  Correct?
17    A. Yes.
18    Q. And as pled in your Complaint, do you agree
19  that that time period is historically the busiest time
20  of the year?
21    A. For who?
22    Q. For -- for stores, for sellers, Amazon, for
23  you as a seller.
24    A. It's busy for us, yes. That's the only person
25  I can attest --

Page 119

1    Q. Well, it doesn't say busy for you, sir. It
2  says, "historically, the busiest time of the year."
3    A. What that refers to is that -- come on, you
4  know as well as I do that being shut down during Black
5  Friday and Cyber Monday was harmful to our business.
6  That's what I can attest to.
7    Q. And Christmas?
8    A. Yeah.
9    Q. Correct. So I'm asking you a really simple
10  question.
11      Do you agree that this time period for
12  sellers, for e-commerce sellers in the marketplace, was
13  the busiest time of the year?
14    A. Yes.
15    Q. Okay. Did you ever think that the 40 days it
16  took to get reinstated back online had anything to do
17  with the historically busiest time of the year?
18    A. No.
19      MR. GOODMAN: Objection as to form.
20  BY MR. RANSON:
21    Q. Okay. And it says it costed you hundreds of
22  thousands of dollars.
23      When you say "hundreds of thousands of
24  dollars," are you talking about hundreds of thousands of
25  dollars in profit, in revenue? What are you referring

Page 120

1  to there?
2    A. Referring to sales.
3    Q. Sales. Okay. So not profit then. Just sales
4  in general?
5    A. Not sales in general. Are -- are -- you --
6  you can see through our sales that our average sales
7  were for the first ten months of the year and then as
8  you -- as you stated during busy time of the year, we
9  were probably anticipating a significant bump in sales
10  during this time of year.
11    Q. Sir, I'm just asking what you pled in this
12  Complaint, sir.
13    A. Uh-huh.
14    Q. Okay. So when it says,
15      "Shutdown of the store during the
16      historically busiest time of the year costing
17      them hundreds of thousands of dollars --"
18  and when I say "them," I'm referring to you Solu-Med.
19  Okay.
20    A. Yes.
21    Q. I'm asking you: Are you saying costing you
22  hundreds of thousands of dollars in revenue or profit or
23  do you not know?
24    A. Of course I know.
25    Q. Okay.



Page 121

1    A.  It cost us hundreds of thousands of dollars in
2   sales and probably well over a hundred thousand dollars
3   in profit.
4    Q.  Okay.  I appreciate that.
5        All right.  Do you care if we take a 15-,
6   20-minute break?  And we'll finish this up.
7        MR. GOODMAN:  Okay, sure.
8        MR. RANSON:  Unless you guys want to do lunch
9   or something?
10       MS. BLACK:  Well, what do you -- how long do
11   you think --
12       MR. RANSON:  Can we go off the record, please?
13       MIDDLE ATTORNEY:  We are going off the record.
14   The time is 12:21.
15       (Thereupon, the deposition adjourned for the
16   luncheon recess at 12:21 p.m.)
17   AFTERNOON SESSION - 1:15 P.M.
18       THE VIDEOGRAPHER:  We are back on the record.
19   The time is 1:16.
20   BY MR. RANSON:
21    Q.  I just want to go over your Answers to
22   Interrogatories real quick.  I'll give you --
23       (Defendant's Exhibit Number 14 was marked for
24   identification.)
25       MR. GOODMAN:  Thank you.  You're marking this?

Page 122

1        MR. RANSON:  Please.
2        MR. GOODMAN:  What number?
3        THE COURT REPORTER:  Fourteen.
4   BY MR. RANSON:
5    Q.  And we discussed this a little bit earlier,
6   sir, but I would just like you to turn to page four.
7        You say that, in your response to the
8   question,
9        "If you contend that Youngblood by any of
10       its officers, agents, managers or supervisors
11       made any statement that might constitute an
12       omission or might be construed to be against the
13       interest of Youngblood, identify the specific
14       person that made the statement, any witnesses to
15       the statement, the date of the statement and the
16       substance of the statement."
17       And in your response in the second paragraph
18   you say,
19       "Similarly, Youngblood informed plaintiffs
20       that it agreed to file a retraction with Amazon
21       but never filed one."
22   That's reference in paragraph 16 dealing with the
23   Complaint.  Is that correct?
24    A.  Yes.
25    Q.  And is it your position here today still

Page 123

1   that -- that Youngblood never filed a retraction to
2   Amazon?
3    A.  That's correct.
4    Q.  Okay.  And I'll ask you one more time:  Do you
5   have any documentation from Amazon stating that the
6   retraction sent by Youngblood was insufficient?
7    A.  It wasn't considered a retraction.
8    Q.  Okay.  Do you have any correspondence from
9   Amazon that said the withdrawal sent by Youngblood was
10   not a retraction?
11    A.  Merely the fact that we weren't reinstated for
12   two months.
13    Q.  Well, that would be 40 days after the
14   withdrawal.  Correct?
15    A.  Correct.
16    Q.  Okay.  But you don't have anything from Amazon
17   that says their withdrawal filed by Youngblood was not
18   in effect a retraction?
19    A.  Again, the lack of responsiveness from Amazon
20   and the lack of restoring our store -- as you see,
21   they -- they restored, you know, our store before very
22   quickly, in one day -- so the fact that they didn't
23   restore it, we took it as insufficient retraction.
24    Q.  Okay.  You said they restored our store
25   quickly, in one day.  Right?

Page 124

1    A.  Yes.
2    Q.  That's what you just said?
3    A.  Uh-huh.
4    Q.  And what was that in response to?
5    A.  You showed me a document earlier today that
6   showed that our store was closed for one day for what
7   they consider an LSR --
8    Q.  Uh-huh.
9    A.  -- which I'm not familiar with, but we're
10   going to --
11       MR. GOODMAN:  That was Exhibit 10.
12       MR. RANSON:  Uh-huh.
13   BY MR. RANSON:
14    Q.  So let me ask you this:  Have -- has your
15   store ever been shut down previously for counterfeit
16   allegations?
17    A.  No.
18    Q.  Okay.  So the -- the reference you just made
19   to "my store was shut down for one day" had nothing to
20   do with the counterfeit complaint.  Correct?
21    A.  Correct.
22    Q.  Okay.  Thank you.  This is 15.
23       (Defendant's Exhibit Number 15 was marked for
24   identification.)
25



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
125–128

Page 125

BY MR. RANSON:

Q.  And you're looking at the second set of interrogatories.  Is that correct?

A.  This is Exhibit 15?

MR. GOODMAN:  Yes.

MR. RANSON:  Yes.

THE WITNESS:  Yes.

BY MR. RANSON:

Q.  Does it say Second Set of Interrogatories at the top of the page?

A.  Yes, it does.

Q.  Okay, great.  And it says that Solu-Med's financials are completed by Joaquin Lorie.  Is that correct?

A.  That is correct.

Q.  Okay.  And explain to me how that works.  How does -- how does Joaquin Lorie complete your financials each year?

MR. GOODMAN:  I'll object to the form.

BY MR. RANSON:

Q.  Okay.

A.  Joaquin Lorie is the C.F.O. of both Solu-Med as well as Q-Med and he files, in conjunction with our C.P.A.s, our taxes, and he's a -- the chief financial officer for both companies, as they both are QSUBS of

Page 126

Argo Holdings.  He's been employed with us for 13 years.  He's a C.P.A.

Q.  Okay.  And he has done all of your financials since 2014, since Solu-Med was founded?

A.  That's correct.

Q.  Okay.  So does he provide the information from Solu-Med to the accounting firm that files the consolidated tax returns?

A.  He does.

Q.  Okay.  And if you look at question number three, it says,

"Please explain with detailed specificity how Solu-Med incurred approximately 60,000 in freight and warehouse charges with Amazon as, stated in your response to interrogatory number eight."

You say,

"The 60,000 loss relating to freight and warehouse is encompassed in the $1.1 million loss discussed in the previous response and should not be separate line item of loss. Please accept this response as supplementing interrogatory response to number eight, defendant's set of interrogatories."

So let me ask you that question again.

Page 127

Do you know how Solu-Med incurred $60,000 in freight and warehouse charges?

A.  What I -- what we said in that statement was that all the losses related to the freight and warehouse impact of lost revenue and lost profits was incorporated in the financial statements that we've provided, so it was not to be in addition to.

Q.  Sure.  Now, I understand that, but did you incur $60,000 in freight and warehouse charges?

A.  Approximately.

Q.  Okay.  Can you tell me why?

A.  I think we talked about when we were shut down for a period of two months, basically Amazon's charge -- creates charges for you for storing of product, product that's not moving, shipping merchandise for you and, basically, all the -- this was an estimate that Kellon had put together for me of the financial impact of the store being closed down for two months only, as it pertained to freight and Amazon-related charges.

Q.  Okay.  I need you to explain this to me because I'm -- I'm not in your line work so I don't understand.

So what was the $60,000 charge for?  Did you have to receive products back from Amazon?

A.  It was debits to our account.  Amazon froze

Page 128

our account on November 13th and was not reinstated until January of 2019 and these were debits to our account.

Q.  Debits to your online seller's account on Amazon?

A.  Debits to the seller, yes.

Q.  So you had $60,000 in debits --

A.  Approximately.

Q.  Approximately, $60,000 in debits to your Amazon account while your store was shut down, in freight and warehouse charges?

A.  Correct.

Q.  Okay.  And I don't have them with me and if you don't know, that's fine, but the Amazon documents you produced to me say you got an F.B.A. inventory credit of $25,000, approximately, in December.

Do you know what that was for?

A.  F.B.A. inventory credit.

Q.  Uh-huh.  Well, now we know F.B.A. means fulfillment by Amazon.  Correct?

A.  You have to show me the document you're referring to because I don't know which --

Q.  Okay.  You're not aware?

A.  I don't know what you're looking -- what you're referring to.  See, you're asking about a



Page 129

1  specific document that I haven't seen.
2     Q.  Okay, I'll get it for you.  All right.
3        I don't think I want to enter this as an
4  exhibit but I'll just give it to you so you can look at
5  it.  A copy for everybody.
6        So these are some of the financial statements
7  that you produced to us.  You are aware that you
8  produced these.  Correct?
9     A.  Yes.
10    Q.  Okay.  And we were able to get the general
11 ledger for 2018 and some of 2017.
12       Did you not keep a general ledger in 2017, for
13 the entire year?
14    A.  Let me see what you're looking at here.
15    Q.  Well, it's not in here, sir, because you
16 didn't produce it.  What I'm saying, this is a general
17 ledger for 2018.
18    A.  Okay.
19    Q.  Right here on the front.
20    A.  Yep.
21    Q.  I'll separate it for you, I believe.
22       So you have your tax returns in the back --
23 I'm sorry, you have your K.P.I. metrics in the back and
24 then this is your general ledger for 2018.  You have two
25 documents.  Do you see that?

Page 130

1     A.  Okay.  Yeah.
2     Q.  Okay.  So you produced me -- to me a general
3  ledger for 2018?
4     A.  Yes.
5     Q.  But your counsel indicated that you do not
6  have one for 2017.  I'm asking you --
7     A.  That is correct.
8     Q.  Okay.  And your company has been around since
9  2014.  Correct?
10    A.  Correct.
11    Q.  Okay.  So why did you not keep a general
12 ledger until the end of 2017?
13    A.  In 2014 through 2017, Solu-Med operated as
14 strictly a department within Q-Med.  It was not
15 maintained as a separate entity.
16       In 2018, we had separated out.  We wanted to
17 actually see the specific performance of the company
18 because it was growing very rapidly and we decided as of
19 1/1 -- January 2018, to start producing complete sets of
20 financials starting January of 2018.
21    Q.  So was Solu-Med incorporated in 2014?
22    A.  No.
23    Q.  When was Solu-Med incorporated?
24    A.  I believe Solu-Med was incorporated in 2009.
25    Q.  Okay.  So Solu-Med was incorporated in 2009

Page 131

1  and they were a corporation within Q-Med so both -- they
2  were a department inside of Q-Med.  Is that -- is that
3  correct, since 2009 --
4     A.  It wasn't --
5     Q.  -- up until --
6     A.  We didn't produce -- all the financial
7  transactions within Solu-Med up through 2017 were
8  incorporated within Q-Med.  And then in 2018, because we
9  had the K.P.I. metrics that we were producing at a high
10 level, but it wasn't a detailed financial income
11 statement or balance sheet, so I told our C.F.O. that I
12 wanted to, as of 1/1/2018, break it out so I could
13 really monitor the growth and the progress of the
14 organization separately, so we broke it out in 2018.
15    Q.  So until it was broke out, as you say, in
16 2018, then everything was kind of commingled together?
17    A.  Prior to 2018.
18    Q.  Okay.  And you told me yesterday that Solu-Med
19 was, roughly, five percent of Q-Med's business.  Is that
20 still correct today?
21    A.  Correct.
22    Q.  Okay.  So Solu-Med is, approximately,
23 five percent of Q-Med's business up until they broke
24 off, and now Solu-Med is Solu-Med which is a hundred
25 percent, all -- everything, financials are all under

Page 132

1  Solu-Med?  Correct?
2     A.  That's correct.
3     Q.  Okay.  So when you found out your store was
4  shut down, what actions did you take to mitigate your
5  damages?
6     A.  Well, the first thing we did was we filed an
7  action plan with Amazon and -- to -- to get the store
8  reopened, and as the days went by we started to,
9  basically, cut back on expenses.
10    Q.  And how did you cut back on expenses?
11    A.  We -- as employees -- you know, our workload
12 went from -- you can imagine we were doing as of
13 October, roughly, some $300,000 in sales and so in
14 November and December, the sales that you see here
15 listed in November and December would either be -- would
16 be other platforms other than Amazon, and the sales
17 decreased dramatically and the profits quickly turned to
18 losses.  So as folks were basically, you know, let go
19 as -- until the store was, you know, returned to
20 normalcy.
21    Q.  Okay.  Well, let's discuss that.  So the first
22 thing you did to mitigate your damages was you had to
23 let some employees go.  Correct?
24    A.  Yes.
25    Q.  Okay.  Did you reduce your costs and expenses?



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
133–136

Page 133

1   A.  Yes.
2   Q.  Did you reduce the amount of money you spent
3   on advertising?
4   A.  Actually, we increased the amount of
5   advertising on other sales platforms in an effort to try
6   to grow our sales.
7       At the time of the shutdown on -- on Amazon,
8   Amazon was, approximately, 80 percent of our revenue.
9   Ten percent of our revenue was in the Walmart Jet
10  platform and, approximately, ten percent on eBay.  So
11  with 80 percent of our revenue shut down, we started
12  doing more advertising on other platforms in an effort
13  to try to increase sales.
14  Q.  Okay.  And what happened to the merchandise --
15  because your entire store was shut down, not just the
16  Youngblood products, correct, for those two months?
17  A.  Correct.
18  Q.  So what did you do with all the merchandise?
19  Was it all in a Amazon fulfillment center?  Was it in
20  the Q-Med warehouse?  What happened to it?
21  A.  Well, it's a mixture.  Some of it was in our
22  facility at Griffin Point, which is our -- our
23  warehouse, and some of our merchandise was at Amazon
24  fulfillment centers all over the country.  And not
25  knowing the extent -- you know, we first had the store

Page 134

1   shut down, we thought it might be a one- or
2   two-day event.
3       Once we realized it was a two-week event, we
4   started to take action and, ultimately, it turned out to
5   be more than a two-month event.
6   Q.  Okay.  So I'm -- I'm sorry.  So what happened
7   to all the merchandise during those two months?  That's
8   what I'm asking you.  Did it sit in the warehouse?  Did
9   you sell it on another platform?  Did you throw it away?
10  A.  You're asking about the merchandise that was
11  sitting at Amazon?
12  Q.  Yes, because I imagine you had -- well, yeah,
13  tell me what happened.  I don't know.
14  A.  Okay.  So the merchandise that's sitting at
15  Amazon, after a certain period of time of it not moving,
16  Amazon begins the process of shipping it back to you at
17  your expense.  And so, remember, it's -- it's a very
18  lengthy supply chain.  You have merchandise that's in
19  transit going from our facility to Amazon that's on the
20  road.  Then you have merchandise that has arrived at an
21  Amazon warehouse that has not been checked in by Amazon.
22  And then you have merchandise that Amazon has it in your
23  inventory and is available for sale in the store.
24      So on the day of the shutdown, all that
25  merchandise that was in transit, both over the road and

Page 135

1   in their facilities, all of that merchandise got refused
2   and sent back at our expense.
3       And we also, in addition to eating the freight
4   expense, also eat any subsequent damages or anything
5   that happens to that product getting shipped back.  And
6   the merchandise that was in the Amazon centers as
7   fulfillment by Amazon over a period of time, if your
8   product isn't moving, Amazon starts to hit you with
9   slow-turning charges and fees and then, subsequently, if
10  the product doesn't ship or sell, they, basically, ship
11  it back to you at their discretion, at their expense --
12  Q.  So --
13  A.  -- at -- at our expense.  Sorry.
14  Q.  I understand.
15  A.  Our expense.
16  Q.  So were you able to sell any of those other
17  products on any other platforms?  Did you try to take
18  some of the products you received back and sell them on
19  Walmart or eBay or anywhere else?
20  A.  Sure.  We tried to advertise on Walmart.  We
21  tried to advertise on eBay.  We spent quite a bit on
22  advertising on -- with Google.  And we did shuffle
23  product from other -- you know, that we received back
24  that was in good sellable condition to other platforms.
25  Q.  Okay.  And I'm not asking you about

Page 136

1   advertising.
2       When you received the products back -- you
3   said Amazon ships the products back to you.  Correct?
4   A.  Yes.
5   Q.  Okay.  Did you wait to be reinstated on Amazon
6   and put those products back on Amazon or did you try to
7   sell them during that two-month period on other
8   platforms or both?
9   A.  I would both.
10  Q.  Okay.
11      THE VIDEOGRAPHER:  Excuse me.  We need to go
12  off the record.
13      (Discussion held off the record.)
14      THE VIDEOGRAPHER:  Okay.  We are back on the
15  record.
16  BY MR. RANSON:
17  Q.  Okay.  So we were discussing mitigating
18  damages, what you did with the products, what you did
19  with Solu-Med store while the store was shut down.
20      You said that you had to lay some people off
21  during the shutdown.  That's correct?
22  A.  Yes, we reduced head count.
23  Q.  Okay.  Did payroll reflect that?
24  A.  Not immediately because in some cases we gave
25  people severance pays.



Page 137

1    Q.  I see.  Okay.  All right.

2        I'm going to ask you some questions about the

3    documents I gave you.  It starts on PL000308.

4        Do you see that?

5    A.  Yes.

6    Q.  Yeah, so I'm going -- I'm actually going to

7    turn to 000328.

8        MR. GOODMAN:  328?

9        MR. RANSON:  Yes, sir.

10       MS. BLACK:  One thing we didn't do, any

11   documents that are marked confidential, we would

12   like to maintain that designation.

13       MR. RANSON:  I -- I didn't enter in this

14   exhibit.

15       MS. BLACK:  It's not an exhibit.  Okay?

16   Relevant to financial actual numbers and

17   discussions on the record about confidential

18   documents, we're probably going to designate that

19   portion --

20       MR. RANSON:  That's fine.

21       MS. BLACK:  -- of the testimony --

22       MR. RANSON:  Yeah.

23       MS. BLACK:  -- as confidential.

24       MR. RANSON:  That's what I was going to say,

25   agreed.  All right.  Yeah.  So the rest of this

Page 138

1    testimony probably will be confidential until I

2    tell you otherwise.

3        MR. GOODMAN:  Some will be changed.

4        MS. BLACK:  Thanks, Ryan.

5        MR. RANSON:  Yep.

6        (The testimony on pages 138 through 150, line 4 was

7    marked confidential, excerpted, and bound separately.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 139

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 141

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 142

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 143

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 145

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 147

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 146

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
149–152

Page 149

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 150

1
2
3
4
5    Q.  Okay.  Are you aware of Amazon's drop shipping
6   policy?
7    A.  Drop shipping policy?
8    Q.  Yes.  Have you ever seen that before or heard
9   of that before?
10    A.  I'm not familiar with what it is.
11    Q.  Okay, I'll show you.
12       (Defendant's Exhibit Number 16 was marked for
13   identification.)
14  BY MR. RANSON:
15    Q.  So Amazon's Drop Shipping Policy, if you'll
16   look to the fourth one down, can you read that for me?
17    A.  "Be responsible for accepting and
18     processing customer returns of your products."
19    Q.  Right.  And if you read at the very top,
20   it's -- it's basically the Drop Shipping Policy in
21   reference to third parties.
22       You would agree, though, that Solu-Med is
23   responsible for accepting and processing customer
24   returns.  Correct?
25    A.  Yes.

Page 151

1    Q.  Okay.  Do you see examples of drop shipping
2   that is not permitted?  Do you see that?
3    A.  Where are you pointing to?
4    Q.  It says,
5     "Examples of drop shipping that is not
6     permitted."
7   Do you see that?
8    A.  "Examples of drop shipping that is
9     not permitted.  Purchasing products from another
10     online retailer and having the retailer ship
11     directly to customers."
12    Q.  Okay.  My question is:  Do you guys ever
13   purchase products from other retailers and have them
14   ship them to the customers or do you always possess your
15   products?
16    A.  We always possess our products.
17    Q.  So Q-Med, for example, wouldn't be sending
18   products from Q-Med that were purchased through
19   Solu-Med's Life & Health Source?
20    A.  No.
21    Q.  You're positive?
22    A.  State the question again.
23    Q.  Q-Med would not ship a product that was
24   purchased by Solu-Med -- strike that.
25       Q-Med would not ship a product that was

Page 152

1   purchased from Life & Health Source under Solu-Med.
2   Correct?
3    A.  Q-Med would not purchase a product that was --
4    Q.  Q-Med would not ship a product.  So I
5   purchase -- let me give you a example.
6       I purchase L'Oreal eye cream from Life &
7   Health Source under Solu-Med.  Correct?  Okay, follow
8   me?
9       Would Q-Med send that shipment or would
10   Solu-Med?  Would Q -- would there ever be an instance
11   where Q-Med would be the corporation sending that?
12    A.  No.
13    Q.  Okay.  All right.  Thank you.
14       All right.  Back to, sorry, PL000340.  And we
15   were discussing the rent expense, and you were
16   explaining that that was for a third party to,
17   basically, collect the returns and then bring them to
18   Solu-Med.  Is that correct?
19    A.  It was a courier service.  Yes.
20    Q.  A courier service.  Okay.
21       It was not rent for Solu-Med's section of
22   Q-Med's warehouse then?
23    A.  No.
24    Q.  Okay.  Does Solu-Med pay any rent to Q-Med for
25   the warehouse?



**Page 153**

1   A.  No.

2   Q.  So they use it, basically, free of charge?

3   A.  Correct.

4       MR. RANSON:  Okay.  Can we just take like a

5   five-minute break and I will just see if I have

6   anything else.

7       MR. GOODMAN:  Okay, sure.

8       MR. RANSON:  I don't think I do.

9       THE VIDEOGRAPHER:  Off the record.  The time

10  is 2:00 p.m.

11      (Thereupon, a recess was taken.)

12      THE VIDEOGRAPHER:  We are back on the record.

13  The time is 2:03.

14      THE WITNESS:  Oh.

15      MR. RANSON:  I have no further questions.

16      MR. GOODMAN:  One moment.  No further

17  questions.  Thank you.

18      MR. RANSON:  All right.  Thank you, guys.

19      THE VIDEOGRAPHER:  Going off the record.  The

20  time is 2:03.

21      (The following discussion was held off the

22  video record.)

23      THE COURT REPORTER:  Read or waive?

24      MR. RANSON:  We'll waive it.  It's video.

25      MS. BLACK:  We'll read but -- yeah.

**Page 154**

1       THE VIDEOGRAPHER:  Are you ordering?

2       MR. RANSON:  Please, yes.  Yes.  How long will

3   that take?

4       THE COURT REPORTER:  Ten business days.

5       MR. RANSON:  Can you expedite it?

6       THE COURT REPORTER:  How fast?

7       MR. RANSON:  By next Monday.

8       THE COURT REPORTER:  Monday, yeah.

9       MR. RANSON:  Actually, ten days will be fine.

10      THE COURT REPORTER:  Okay.  Okay.  All right.

11  Copy?

12      MS. BLACK:  Yeah, we'll take a copy.  I don't

13  want a hard copy.  I do want the exhibits and

14  addressed to me, not to Stanley.  And then a text

15  TXT format.

16      (Thereupon, at 2:03 p.m., the deposition was

17  concluded.)

18      (Witness excused.)

19        - - - - -

20

21

22

23

24

25

**Page 155**

1             C E R T I F I C A T E

2   THE STATE OF FLORIDA  )
                          )

3   COUNTY OF BROWARD.    )

4       I, Dona J. Wong, Registered Professional
    Reporter, do hereby certify that I was authorized to and

5   did stenographically report said deposition in
    stenotype, and that the foregoing deposition as

6   hereinabove shown is a true and correct computer
    transcription under my shorthand notes of said

7   deposition.

8       I further certify that I am not a relative,
    employee, attorney or counsel of any of the parties, nor

9   am I a relative or employee of any attorney or counsel
    or party connected with the action, nor am I financially

10  interested in the action.

11      The foregoing certification of this transcript
    does not apply to any reproduction of the same by any

12  means unless under the direct control and/or direction
    of the certifying reporter.

13

    Dated this 27th day of November, 2019.

14

15

16      Dona J. Wong, RPR, CSR
        My Commission #GG91873

17      Expires May 16, 2021

18

19

20

21

22

23

24

25

**Page 156**

1             DEPOSITION ERRATA SHEET

2

3   Our Assignment No.  J4467092

4   Case Caption:

5   ARGO HOLDINGS, INC. AND SOLU-MED, INC.,

6           vs.

7

    YOUNGBLOOD SKIN CARE PRODUCTS, LLC,

8

9

10      DECLARATION UNDER PENALTY OF PERJURY

11      I declare under penalty of perjury that I

12  have read the entire transcript of my Deposition taken

13  in the captioned matter or the same has been read to me,

14  and the same is true and accurate, save and except for

15  changes and/or corrections, if any, as indicated by me

16  on the DEPOSITION ERRATA SHEET(S) hereof, with the

17  understanding  that I offer these changes as if still

18  under oath.

19      Signed on the _____ day of  _____, 20___.

20

21      _____

        MANUEL E. AGUERO

22

23

24

25



MANUEL E. AGUERO  Non-Confidential

November 20, 2019

ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

157—159

**Page 157**

```
 1            DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
               MANUEL E. AGUERO
25
```

**Page 158**

```
 1            DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
               MANUEL E. AGUERO
25
```

**Page 159**

```
 1            C E R T I F I C A T E
 2   THE STATE OF FLORIDA, )
                          )
 3   COUNTY OF BROWARD.    )
 4
 5        I, the undersigned authority, certify that
 6   MANUEL E. AGUERO personally appeared before me and was
 7   duly sworn on the 20th day of November 2019.
 8        WITNESS my hand and official seal this 27th
 9   day of November 2019.
10
11        Dona J. Wong, RPR, CSR
          Notary Public - State of Florida
12        My Commission #GG91873
          Expires May 16, 2021
13
14
15
16
17
18
19
20
21
22
23
24
25
```

