\UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:19-cv-60487

SOLU-MED, INC.,

       Plaintiff,

vs.

YOUNGBLOOD SKIN CARE
PRODUCTS LLC,

       Defendant.
_____/

**PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE
TESTIMONY OF DEFENSE EXPERT MICHAEL PAZAK AND
DEFENSE EXPERT RICHARD GRAY
WITH INCORPORATED MEMORANDUM OF LAW**

    Plaintiff Solu-Med, Inc., moves for entry of an order excluding the testimony of defense experts Michael Pazak and Richard Gray based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"), and says:

**MOTION**

    1.    This case involves the months-long shutdown of Plaintiff's longstanding, successful online Amazon store. The shutdown occurred shortly after Defendant Youngblood Skin Care Products LLC ("Youngblood") sent several complaints to Amazon which falsely accused Plaintiff of selling counterfeit Youngblood-branded products. Plaintiff is seeking damages for its business losses by reason of Youngblood's false complaints which was the proximate cause of Amazon's shutdown of Plaintiff's online store.

**A.  CAUSATION EXPERT – MICHAEL PAZAK**

    2.    To refute causation, Youngblood intends to call at trial Michael Pazak – a purported Amazon-policies expert who had worked for Amazon for only four years, ending in 2012, eight years ago. Pazak though while at Amazon was not actively involved in policy compliance or in a real-life situation such as the incident in this case.

1

3. In his deposition Pazak admitted that Amazon has no set formula for determining what action it will take when it receives a complaint that a seller is offering counterfeit goods for sale ("counterfeit complaints"). (See deposition transcript of Michael Pazak, at pg. 73-76, 85-86, attached as Exhibit "1"). But that did not stop him from giving an opinion about why Amazon shut down Solu-Med's store. Further, Pazak has never testified or been qualified as an expert in any litigated case. (*Id.* at 63) Pazak has not authored any article that has been published that would provide substantial assistance to the jury in this case to understand the reasoning of Amazon in shutting down Plaintiff's store. (*Id.*)

4. At his deposition, Pazak testified that he "believes," "thinks," and "assumes" that Amazon's decision to shut down Plaintiff's store was based solely on the history of prior brand owner's unsubstantiated complaints against Solu-Med and Solu-Med's alleged pattern of unresponsiveness to those prior complaints. (Exh. 1 at p. 19-20, 38, 42-43, 73-76, 85-86.) The complaints relied upon were from 2018 through January, 2019, five (5) of which were after the store was reactivated. Further, Pazak offered no testimony regarding any brand owner complaints against Solu-Med from 2015 through November, 2018. Solu-Med had been selling Youngblood products for two (2) years prior to November, 2018 without complaint. In Pazak's view, that "history of complaints was the *determining factor* in Amazon's decision to suspend Solu-Med." (*Id.* at 20 (*emphasis added*); *see also id.* at 85 ("when Amazon looked at the facts, looked at the history, the lack of response, then they took that action")). In essence, he intends to tell the jury that the shutdown was simply Plaintiff's own fault.

5. When Plaintiff's counsel pressed him about the basis for his opinion regarding Amazon's decision and pointedly asked whether it was really just an "assumption" on his part, Pazak replied "Yes." (Exh. 1. at 86.)

6. If that is not bad enough, Pazak was proffering an opinion on a topic where he has had *no* personal experience or involvement, namely Amazon's decision-making process regarding counterfeit complaints. To be sure, Pazak worked at Amazon, but that was a long time ago (2008 to 2012) and at that time he served as Amazon's director of enterprise business in charge of various tasks including e-commerce operations with third parties, product ads, expansion of the Amazon prime program, growth of the "reseller" business, and so forth. (*Id.* at 32-35) No doubt, those were important responsibilities. But

conspicuously missing from this job description was any responsibility over -- or even any involvement with -- incoming counterfeit complaints and deciding what action to take. And as for the eight years since he left Amazon -- during which he has run his own consulting company -- Pazak has offered nothing to show that he has acquired any current specific knowledge about Amazon's internal decision-making process as to counterfeit complaints. Pazak even admitted that he only has a "*general* understanding of how Amazon responds to seller performance complaints." (*Id.* at 70; *emphasis added*.)

7. As such, on the specific topic of his testimony -- the supposed grounds upon which Amazon shut down Solu-Med's store -- Pazak has no specific experience to draw from. Nor has he relied on a single publication or report on this topic from anyone else to validate his conclusions. Yet Pazak now intends to inform the jury of the precise grounds for Amazon's decision, despite his own admission that it was an "assumption" or belief on his part. (Exh. 1 at 85, 86.) Indeed, Pazak couched his entire thought process about the shutdown in terms of an imagined dialogue between Amazon staff, rather than by relying upon specific past experience or corroboration of any type. His own words virtually speak for themselves:

> "It followed the same pattern as the seven previous complaints where they got no response from Solu-Med. And based on no response to eight complaints at that point, *I think* Amazon said, 'We need to wake them up,' to use kind of a casual term, 'see it they are even paying attention. They are not answering our emails. We need to make sure that we have a discussion with them.' And *I think* Amazon took the action to have an in-depth discussion and investigation with Solu-Med, and *I think* that's exactly what it triggered, is they suspended it so that they could have that discussion, and that's what transpired." (Exh. 1 at 75-76; emphasis added.)

8. Such rank speculation and conjecture by a purported expert is exactly why *Daubert* exists. As explained below, the standard for admitting expert testimony under *Daubert* is stringent and has three essential requirements: (a) that the expert have sufficient qualifications as to the *specific* subject matter of the opinion, (b) that the opinion is reliable based on genuine and proven support, and (c) that the opinion will be helpful to the jury in evaluating the facts of the case. As the party offering Pazak's testimony, Youngblood bears

the burden to establish *all three*. On this record, however, Youngblood cannot show that *any* of these requirements can be met.

9.      Although Pazak may have dated general knowledge of Amazon's business, that does not give him free rein to offer theories or make unsubstantiated guesses beyond his own expertise – which is precisely what he has done here. Indeed, his conclusions are based on nothing more than his own "say so" and guesses about Amazon's decision-making process in 2018 (six years after he left the company).

      **B.**     **DAMAGES EXPERT – RICHARD GRAY**

10.     Youngblood intends to offer at trial the testimony of Richard Gray – a Certified Public Accountant and Accredited Business Valuator who worked for Amazon for the purposes of "calculat[ing] the amount of damages relating to this particular case." (Deposition Transcript of Richard Gray, p. 28-29, a copy of which is attached as Exhibit "2").

11.     Gray offered two opinions in this case – 1) he issued a damages report that calculates "lost profits" experienced by the store as a result of the shutdown; and 2) he offered a rebuttal opinion on the valuation of Solu-med, Inc.

12.     With regards to his initial report on damages, during his deposition Gray makes clear that he made assumptions not based on his expertise relating to the Amazon store. But that has not stopped him from giving an opinion on damages.

13.     According to his deposition, despite having access to five years of sales reports from Plaintiff's Amazon store, Gray only chose to utilize four months of reports to project damages. (Ex. 2 at p. 48-52). He bases this limitation on the fact that Plaintiff decided not to sell less profitable items through its store in June 2018; therefore, Gray believes that the sales period from June 2018-October 2018 should be the only relevant time period to consider. (*Id.* at 48-49).

14.     Even assuming Gray was correct or within his purview as expert to ignore the 5-year performance history of the store to project damages in this case, Gray then testified that he ignored Solu-med's *actual* profits in this time period for purposes of projecting lost profits (which - led to a number far less favorable to Solu-med than if he would have used its actual average net profits for this carefully selected time period). (*Id.* at 52-59).

15. When pressed on whether he actually understands how the Amazon reseller business model works, Gray admitted he does not. For instance, Gray opines that it is his opinion that he expects a direct correlation on a monthly basis between revenue and shipping costs. When asked if he had any understanding of Amazon's shipping requirements and the differences between goods fulfilled by Amazon versus the store, he admitted that he "didn't go into that level analysis." (*Id.* at 62).

16. Gray also admitted that for the purposes of his damages opinion, he "assumed" that the store was back to "normal operations" as of February 2019. (*Id.* at 65-66). When asked why he made that assumption, Gray stated that it was based on the fact that the store was reinstated on January 14, 2019 and that "customers that would go into the store and purchase … had that ability after January 14, 2019."(*Id.* at 65-66). When asked if he could point to any month in 2019 where the Amazon store reached its pre-shutdown numbers, Gray testified no. (*Id.* at 65.) When asked if he made any inquiry into the store's buy-box ratings pre-shutdown versus post-shutdown, Gray testified no. (*Id.* at 66-68.)

17. But what also reflects his lack of expertise, is that Gray "thinks" and "assumes" "based on his personal interaction in buying products off Amazon", that if the store is re-opened and an "individual is looking for a specific product, that product is going to appear and [the customer] has the ability to purchase it."(*Id* at. 69. ) Gray then wanders into the realm of incredulity when he states that even if Plaintiff's buy box (i.e, what page the store appeared in a customer's search for a specific product), was buried on the third or fourth page of Amazon, since *he* would  click through all the pages to view every offering of a product, Gray assumes every consumer would likely do the same. Therefore, concludes Gray, the store is the same as it would have been pre-shutdown. (*Id.* at 69-70). In essence, Gray intends to tell the jury that because he's a consumer on Amazon, he's qualified to testify that the store was fine after it was re-instated, with no regard to the reality of the pre-shutdown buy box ratings versus post-shutdown buy box ratings.

18. Gray also noted that he did not review any documents or information in order to determine how long it took Plaintiff's Amazon store to restock all of its inventory after the shutdown which might exceed the damages period that he provided in his report. (*Id.* at 71).

19.     Gray also unequivocally admits that the store never regains the sales history it did in 2018 pre-store shutdown, yet provides an opinion that the store was back to normal by February 2019 when it was reinstated. (*Id.* at 65)

20.     As such, on the specific topic of his testimony -- the grounds upon which Solu-Med lost profits are based as a result of the Amazon shutdown -- Gray has no specific experience to draw from.  Nor has Gray relied on a single publication or report to validate his conclusions.  Yet Gray now intends to tell the jury the precise lost profits to measure in the three-month period that the store was actually down, and he intends to do so in the face of his own admission that it is all just one big "assumption." (Ex. 1 at 65).  Gray couched his whole thought process about the shutdown in terms of his own interaction with Amazon, rather than by relying upon specific experience or corroboration of any type.

21.     In addition, when pressed on his rebuttal opinion, Gray admitted that he has little experience in valuating distribution companies and no experience in valuating Amazon stores. (*Id.* at p. 18, p. 36).  Yet, he assesses an arbitrary percentage to decrease the value of Plaintiff's company based on the fact that the Plaintiff sells on Amazon. (*Id.* at 40-41, 42-43).  Gray acknowledges that this 15% reduction was based on his "own judgment." (*Id.* at 43).

22.     Similar to Pazak, such rank speculation by a purported expert is exactly why *Daubert* exists.  The standard for admitting expert testimony requires the opinion to be reliable based on genuine proven support and helpful to the jury in evaluating facts. Youngblood bears the burden on establishing this.  While Gray may be well-versed in accounting and valuation, that does not give him free rein to offer theories or make unsubstantiated guesses beyond his experience – which is precisely what he's done here.

23.     As discussed in detail in the following memorandum, Pazak and Gray's testimony falls well below the threshold established by *Daubert* for the admission of expert testimony.  Indeed, *Daubert* is specifically designed to prevent this exact type of unreliable "hired gun" testimony from reaching the jury because, unlike a court, jurors may be easily swayed by the words of a purported expert witness.  An order excluding Defendant's experts must therefore be entered.

## **MEMORANDUM OF LAW**

### I

### *Trial Judge's Critical Role as Gatekeeper of Expert Testimony*

Under the applicable standard, the trial court is required to "act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *See Williams v. Mosaic Fertilizer, LLC*, 2016 WL 7175657, at *3 (M.D. Fla. Jun. 24, 2016); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("[t]he importance of *Daubert*'s gatekeeping requirement cannot be overstated"); *Salvani v. Corizon Health, Inc.*, 2019 WL 3410028, at *2 (S.D. Fla. Jul. 29, 2019); *see generally Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 141, 148 (1999). And the burden to establish the three specific requirements for admissibility (*i.e.*, qualifications, reliability, and helpfulness)[1] necessarily "rests on the proponent of the expert opinion," which here is Youngblood. *Frazier*, 387 F.3d at 1260. As the case law emphasizes, this gatekeeping function is critical because jurors may not be equipped to recognize the speculative/unreliable nature of an expert opinion and to give it the weight it deserves. *See, e.g., Frazier*, 387 F.3d at 1263 ("expert testimony may be assigned talismanic significance in the eyes of lay jurors" and thus "courts must take care to weigh the value of such evidence against its potential to mislead or confuse"); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999) (noting that jurors are more likely than a judge "to be awestruck by the expert's mystique").

To that end, courts are required to ensure that an "expert", whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of ***intellectual rigor*** that characterizes the practice of an expert in the relevant field." *Frazier*, 387 F. 3d at 1260 (emphasis added), *quoting*, *Kumho Tire*, 526 U.S. at 152; *United States v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) (*Daubert* requires courts to be vigilant in ensuring that experts employ "intellectual rigor" in reaching their opinions and that experts do not "bring their aura of expertise into the courtroom to merely serve as 'hired guns' for their respective parties"); *In re Traysol*, No. 08-MD-01928, 2011 WL 7109295, at *3 (S.D. Fla. Feb. 4, 2011) ("[i]mperative, however, is that the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Consistent

---

[1] These three requirements are explained in detail in Section II below.

with that mandate of "intellectual rigor," the Eleventh Circuit has been clear that the courtroom is not the place for expert guesswork. *See, e.g.*, *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194, 1203 (11th Cir. 2010).

## II

### *The Required Analytical Framework under Daubert*

To exercise the gatekeeping function described above, it is well-settled that courts must examine three prongs under the *Daubert* standard and that *all three* must be met before an expert may be allowed to testify at trial. Although the expert testimony at issue in *Daubert* was scientific in nature, the three-prong *Daubert* standard applies to *all* expert testimony being offered under Fed. R. Evid. 702.[2] *See Lugo v. Hulett Env'l Svcs., Inc.*, No. 6:10-cv-1252, 2011 WL 13298500, at *4 (M.D. Fla. May 18, 2011), *citing Kumho Tire*, 526 U.S. at 149; *see also Johnson v. Dixon*, No. 3:14-cv-579, 2015 WL 12851563, at *25 n. 30 (M.D. Fla. Nov. 20, 2015), *citing*, *Kumho Tire*, 526 U.S. at 141. The following is a brief overview of each prong and the specific inquiries applicable to each.

**A.**   *Qualifications of Expert*

To survive *Daubert*, the witness must not only possess expertise in the relevant field, but also on the **specific** subject matter upon which he/she is opining. *See, e.g.*, *Medina v. Louisville Ladder, Inc.*, 496 F. Supp. 2d 1324, 1326-27 (M.D. Fla. 2007) (mechanical engineer was not

---

[2]   Fed. R. Evid. 702 currently provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

qualified to render opinions on specific topic of warnings). To that end, an "expert may testify only about matters within the scope of his or her expertise and must be qualified to testify competently regarding the matters he intends to address." *Cordoves v. Miami-Dade County*, 104 F. Supp. 3d 1350, 1358 (S.D. Fla. 2015). "[E]xpert testimony regarding matters outside of the witness's expertise is inadmissible, even if the expert is qualified to testify about other matters." *Id.*

**B.**     *Reliability of Opinion*

A common thread running through *Daubert* cases is that an expert's opinion must be reliable, and the court cannot "simply tak[e] the expert's word for it." *See, e.g., Frazier*, 387 F.3d at 1265; *Sorrels v. NCL (Bahamas) Ltd.*, 796 F. 3d 1275, 1286 (11th Cir. 2015) ("court's gatekeeping function requires more than simply taking the expert's word for it"); *see Williams*, *supra*, at *3 ("good grounds and appropriate validation must support [expert testimony]"). Indeed, as courts uniformly recognize:

> *Daubert* compels district courts to reject expert opinion based solely on an expert's mere say so, however well qualified he or she may be.

*Johnson, supra*, at *25; *accord O'Malley v. Royal Caribbean Cruises, Ltd.*, No. 17-21225-CIV, 2018 WL 2970728, at *6 (S.D. Fla. June 13, 2018) ("[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it"); *Lugo, supra*, at *5 (where expert's opinion is based on nothing "other than his say so," the opinion "does not survive the Rule 702 and *Daubert* analysis.")

To that end, expert opinions must be fully supported by "appropriate validation." *See Williams*, *supra*, at *3; *Traysol*, *supra*, at *3. What this means is the court must evaluate and scrutinize every step of the expert's rationale that underlies his/her conclusions, including: (a) whether the expert's underlying methodology/reasoning has been tested or is capable of being tested; (b) whether it has been subjected to peer review/publication; (c) whether it has a potential error rate; and (d) whether it has been generally accepted in the relevant community. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014), *citing Daubert*, 509 U.S. at 593-94. And where the expert relies on his own experience to support his opinion, "[t]he proponent of such an opinion must explain how that experience

led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the acts of the case." *Lugo, supra*, at *4.

In conducting this rigorous inquiry, the Court must ultimately ensure that the testimony is not merely speculation offered by one who might be an expert on other topics. *Chapman*, 766 F.3d at 1306; *Allison*, 184 F.3d at 1316-17. As the courts have recognized, evaluating reliability under these guiding principles is absolutely essential to ensure that litigants do not "dump[] a barrage of questionable" testimony on a jury which is "less equipped than the judge to make reliability and relevance determinations and more likely than the judge to be awestruck by the expert's mystique." *Allison*, 184 F.3d at 1310.

**C.** *Helpfulness to Jury*

As for the final prong, the trial judge must find that the expert testimony is helpful to the jury by providing a substantiated framework through which the jury is better able to understand the implications of the fact evidence being presented to them. As such, the opinion must "fit" the facts of the case. *See, e.g.*, *Allison,* 184 F.3d at 1312, *citing*, *Daubert,* 509 U.S. at 591. To that end, expert testimony is deemed unhelpful to a jury if it is irrelevant to the actual facts of the case or if it "offers nothing more than what lawyers for the parties can argue in closing arguments." *See, e.g.*, *Tompkins-Holmes v. Gualtieri*, No. 8:17-cv-52, 2018 WL 1556423, at *5 (M.D. Fla. Mar. 30, 2018), *citing*, *Frazier*, 387 F.3d at 1262–63; *Salvani*, *supra*, at *5. Moreover, expert testimony automatically fails the "helpfulness" prong where the expert essentially tells the jury what result to reach by opining about who is responsible for causing the alleged injury. Such testimony impermissibly invades the province of the jury. As the court explained in *Ryken v. Celebrity Cruises, Inc.*, No. 18-CIV-25152, 2019 WL 5485177 (S.D. Fla. Sept. 10, 2019):

> [M]erely telling the jury what result to reach is unhelpful and inappropriate.
>
> Here, [the expert's] report is replete with legal conclusions instructing the jury that … Defendant's actions and inactions were the sole cause of Plaintiff's injuries. … [U]nder *Daubert* an expert may not testify as to his opinion regarding ultimate legal conclusions. In sum, the opinions offered by [the expert] would be telling the jury how he thinks they should rule and, therefore, invade the province of the jury. Thus, Plaintiff failed to satisfy the helpfulness prong under *Daubert.*

10

*Id.* at \*6 (citations omitted); *see also O'Malley, supra,* at \*4 (S.D. Fla. June 13, 2018) ("[t]he Eleventh Circuit has made clear that legal conclusions or statements instructing what conclusion the jury should reach are impermissible and do not pass muster under *Daubert*"), citing, *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) ("courts must remain vigilant against the admission of legal conclusions").

### III

### *Defendants' Experts Opinions Fail the Daubert Analysis*

**A. Michael Pazak's Opinions Fail Every Requirement of Daubert**

Applying that analytical framework to the expert opinions Defendant is offering here, it is clear that Pazak's opinions fail the *Daubert* standard at every step. While Pazak may have been a former Amazon employee, this pedigree standing alone does not *ipso facto* establish the reliability of the opinion he has offered. Indeed, courts routinely exclude opinions from seemingly qualified professionals where reliability of the specific opinion being offered is suspect under a *Daubert* analysis.[3]

As noted, it is evident from Pazak's own testimony that he has no specific experience to support his opinion as to the cause of the shutdown, nor has Pazak relied on any corroborating publication by anyone else. In his own words, Pazak simply *thinks*, *believes*, and *assumes* that he knows what was in the minds of Amazon staff when they shut down the Solu-Med store. That is pure guesswork -- rather than the required "intellectual rigor" -- and such imprecision in an expert opinion "easily could serve to confuse the jury" in violation of

---

[3] *See, e.g.*, *Allison*, 184 F.3d at 1316-17 ("Dr. Gershwin is a prolific scientific author and has published numerous articles in peer reviewed journals. … While we do not question the scientific expertise of Dr. Gershwin, we find the district court correctly excluded his testimony…"); *see also Bushore v. Dow Corning-Wright Corp.*, 1999 WL 1116920, at \*1 (M.D. Fla. Nov. 15, 1999) ("Dr. Vasey has impressive credentials in the field of rheumatology as a treating physician and academician. … However, Dr. Vasey's opinion does not meet the *Daubert* test for opinion testimony"); *see also Frazier*, 387 F.3d at 1261, 1263-64 ("overwhelming [expert] qualifications … are by no means a guarantor of reliability"; "we have little doubt that he would be competent to testify generally as an expert forensic investigator," but "he failed to establish that his opinions were methodologically reliance or sound").

11

*Daubert*. *See, e.g., Frazier*, 387 F. 3d at 1266. Indeed, as *Daubert* reflects, the expert's role is to *clarify* matters -- not to confuse them.

No matter how vigorously Youngblood tries to prop up Pazak's expert's opinion, the fact remains that Pazak simply cannot opine with reasonable certainty why Amazon shut down Solu-Med's store. After all, he conceded that Amazon handles such matters on a case-by-case basis, and Pazak is no mind-reader. He simply does not know the actual reasons for the shutdown and Pazak must not be permitted to tell the jury otherwise. Moreover, the upshot of Pazak's testimony is that Plaintiff is solely to blame for the damages it suffered from the shutdown. That impermissibly tells the jury how to decide the case and thus fails the third prong of *Daubert*. *See Ryken, supra*, at *6; *O'Malley, supra*, at *4. Admission of such testimony is not sustainable under the letter or spirit of *Daubert.*

To the extent Pazak has further opined that Solu-Med violated Amazon's policies by selling products without a manufacturer's warranty as an additional ground, that fares no better under *Daubert* for that was not in Youngblood's complaint. There is simply no evidence in the record showing that such an alleged violation played any role whatsoever in Amazon's decision to shut down the store -- or more importantly, that such a violation is the same as selling "counterfeit" goods. Accordingly, such testimony does not fit the facts of the case, thereby failing the *Daubert* test. Moreover, given the inflammatory nature of such accusations, there is clearly a danger of juror confusion and unfair prejudice to Solu-Med, warranting exclusion under Fed. R. Evid. 403 as well. *See, e.g., Malverty v. Equifax Info. Svcs.*, LLC, No. 8:17-cv-1617, 2019 WL 5549146, at *3 (M.D. Fla. Oct. 28, 2019) (excluding expert's testimony about prior cases under Rule 403 because it "is likely to confuse the jury"); Fed. R. Evid. 403 (authorizing court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). Alleged prior misconduct which played no role in the event under consideration should not be admitted.

### B. *Richard Gray's Opinion Must Be Stricken Under Daubert*

Applying that analytical framework to the expert opinions being offered here, it is quite clear that Gray's opinions fail the *Daubert* standard at every step with regard to his lost profit opinion and rebuttal valuation opinion. While Gray may well be experienced in

accounting and valuation, that lone does not ipso facto establish the reliability of every opinion offered by that person. Courts routinely exclude opinions from professionals with impeccable credentials where reliability of the specific opinion being offered is suspect under a *Daubert* analysis.[4]

1. Lost Profits

As noted, it is evident from Gray's own testimony that he arbitrarily assumed the store was "back to normal" after it was re-opened and therefore, his lost profits analysis ended there. He performed no analysis on store sales *post* the store re-opening, he made no inquiry into the store's buy-box ranking, and no inquiry into how long it took to re-stock the store's inventory with Amazon. That is pure guesswork on its face -- rather than the required "intellectual rigor" -- and such imprecision in an expert opinion "easily could serve to confuse the jury" in violation of *Daubert*. *See, e.g., Frazier*, 387 F. 3d at 1266. Indeed, as noted above, the expert's role is to *clarify* matters -- not to confuse them. Gray admits that he ended his lost profits analysis after the store re-opened based on the assumption "it was operating normally." He conducted no independent investigation as to the financial reality of the store at that time. His testimony faltered greatly when he began explaining that he would maybe go to the second, third, fourth page of an Amazon search for a product to look at a store. Not only is that contrary to common human experience, but it is also not helpful for the jury or an appropriate area of testimony for an expert. For Gray certainly has no expertise on consumer search tendencies on Amazon, which is what he began providing "expert opinion" on to justify his "store is re-instated and therefore, I assumed normal operation" opinion. The effect of his "lost profit" testimony is that the jury should determine that once the store was re-opened, Plaintiff was back to "normal." This is the equivalent of a doctor telling the jury that the day after his surgery re-attaching a limb, the plaintiff's use of the limb was the same as pre-accident. Clearly, Gray is attempting to paint a false picture of Plaintiff's financial condition post-shutdown because he has failed to consider the financial reality due to Gray's obvious lack of expertise and thus he fails the third prong of *Daubert*. *See Ryken, supra*, at \*6; *O'Malley, supra*, at \*4. Admission of such testimony is not sustainable under the letter or spirit of *Daubert* – not even close.

---

[4] *See FN 3, supra.*

2. Valuation – Rebuttal Report

Similarly, in his rebuttal opinion, Gray provided a valuation of Plaintiff. However, he admits that he has no experience in valuing Amazon stores and little experience valuing distribution companies. Yet, Gray believes he is qualified to provide a valuation opinion of this Amazon store/distribution company. Gray acknowledges that he "used his own judgment" when coming up with a 15% risk factor to de-value the store based on the "risk" that he assessed would apply to this type of company. This fares no better under *Daubert*.

As set out above, expert opinions must be fully supported by "appropriate validation – i.e., 'good grounds,' 'based on what is known.'" *Frazier*, 387 F.3d at 1261. Thus, Rule 702 expressly requires that "the testimony is based upon sufficient facts or data." Fed. R. Evid. 702((b). Expert testimony is admissible only "if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988).

Here, Gray's valuation opinion is based not on facts or data, but on his own conjecture and speculation. Gray admitted that he based his analysis and application of a 15% risk premium to his valuation of Plaintiff based only on his own "judgment." Gray did not provide any data or factual analysis to support that 15% risk factor, thereby impermissibly requiring the fact finder to accept that number based on his own "say so." *See, e.g., Frazier*, 387 F.3d at 1265; *Sorrels*, 796 F. 3d at 1286. A purported expert valuation that is not based on any principled methodology is pure *ipse dixit* and should be excluded. *See, e.g., Kipperman v. Onex Corp.*, 411 B.R. 805 (N.D. Ga. 2009) (excluding valuation testimony where expert testified that he used specific growth rate to calculate valuation because it was "just right" without any explainable reason for that determination).

Gray's opinion based on his "judgment" is especially unreliable here because he has little experience in valuing distribution companies and no experience in valuing Amazon stores. Where an expert relies on his own experience to support his opinion, "[t]he proponent of such an opinion must explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the acts of the case." *Lugo, supra*, at *4. Here, Gray attempts to base his opinion on his "judgment" but has no relevant experience to justify his conclusion. His opinion, therefore,

fails to satisfy the requirements for admissibility under *Daubert*. *See Kipperman*, 411 B.R. at 847-849 (finding that although expert had experience in business valuations generally, his lack of industry-specific experience rendered his analysis unreliable). Because Gray's opinion lacks a proper factual basis, it is not properly admissible at trial under the *Daubert* standard. Therefore, the Court should exclude Gray's testimony on this basis.

## IV.

### *Conclusion*

Both of Defendant's experts' opinions lack the factual basis to survive this Daubert challenge. They make inappropriate assumptions that stray outside their expertise and yet attempt to weave these assumptions into their opinion to elicit testimony favorable to their client. The Court should exclude both of their opinions on this basis.

WHEREFORE, Plaintiff respectfully requests that the Honorable Court enter an Order precluding Michael Pazak and Richard Gray from testifying at the upcoming trial and any further relief this Honorable Court deems just and proper.

### LOCAL RULE 7.1(a)(3) CONFERRAL

Counsel for Plaintiff has conferred with counsel for Defendant via telephone and email in a good faith effort to resolve the issues raised in the motion, and Defendant opposes the relief sought.

Respectfully submitted,

Attorneys for Plaintiff:

BLACK LAW P.A.
1401 E Broward Blvd. Suite 204
Fort Lauderdale FL 33301
ph-954.320.6220  fx-954.320.6005

By:       s/ Kelsey K. Black
      Kelsey K. Black
      Florida Bar No. 078925
      kelsey@kkbpa.com
and

Stanley R. Goodman, Esq. (admitted *pro hac vice*)
Goodman & Saperstein

666 Old Country Road, Suite 200
Garden City, NY  11530
Telephone:  (516) 227-2100
Facsimile:   (516) 227-2108
*gsesq600@aol.com*