**Page 1**

```
 1                 UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF FLORIDA
 3
 4
 5   SOLU-MED, INC.,            )
                               )
 6            Plaintiffs,      )
                               )
 7       vs.                   ) Case No. 0:10-CV-60487
                               )
 8   YOUNGBLOOD SKIN CARE       )
     PRODUCTS LLC,             )
 9                             )
                Defendants.    )
10   _____)
11
12
13
14       VIDEOTAPED DEPOSITION OF JASON TOTH, M.D.
15                    ENCINO, CALIFORNIA
16               MONDAY, DECEMBER 9, 2019
17
18
19
20
21
22
23
24   Reported by: Wendy J. Wright
                   CSR No. 11607
25
```

**Page 2**

```
 1                 UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF FLORIDA
 3
 4
 5   SOLU-MED, INC.,            )
                               )
 6            Plaintiffs,      )
                               )
 7       vs.                   ) Case No. 0:10-CV-60487
                               )
 8   YOUNGBLOOD SKIN CARE       )
     PRODUCTS LLC,             )
 9                             )
                Defendants.    )
10   _____)
11
12
13
14       Videotaped Deposition of JASON TOTH, M.D.,
15       taken on behalf of the Plaintiff, at
16       15760 Ventura Boulevard, 7th Floor, Encino,
17       California, commencing at 10:06 a.m., Monday,
18       December 9, 2019, before Wendy J. Wright,
19       CSR No. 11607.
20
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES OF COUNSEL:
 2
 3   For the Plaintiff:
 4        GOODMAN & SAPERSTEIN
             BY:  STANLEY R. GOODMAN, ATTORNEY AT LAW
 5           666 Old Country Road
             Suite 200
 6           Garden City, New York  11530
             (516) 227-2100
 7        gsesq600@aol.com
 8             -- AND --
 9        BLACK LAW, P.A.
             BY:  KELSEY K. BLACK, ATTORNEY AT LAW
10               (Via telephone)
          1401 East Broward Boulevard
11        Suite 204
          Fort Lauderdale, Florida  33301
12        (954) 320-6220
          kelsey@kkbpa.com
13
14
15   For the Defendants:
16        COLE, SCOTT & KISSANE, P.A.
             BY:  JONATHAN VINE, ATTORNEY AT LAW
17           222 Lakeview Avenue
             Suite 120
18           West Palm Beach, Florida  33401
             (561) 383-9200
19        jonathan.vine@csklegal.com
20
21   Also Present:
22        TODD BULLOCK, VIDEOGRAPHER
23
24
25
```

**Page 4**

```
 1                    I N D E X
 2
 3   DEPONENT:           EXAMINATION BY:      PAGE:
 4   JASON TOTH, M.D.     MR. GOODMAN            7
 5
 6
 7   EXHIBITS FOR IDENTIFICATION:
 8   Plaintiff's
 9       1 - Notice of Deposition, 3 pages.        8
10       2 - Answers to Interrogatories,
                5 pages.                          39
11
         3 - Complaint, 42 pages.                 58
12
         4 - Answer and Affirmative Defenses,
13              8 pages.                          58
14       5 - Letter from Youngblood, 1 page.      65
15       6 - Amazon article, 8 pages.             66
16     * 7 - Plastic bag containing product.      83
17     * 8 - Plastic bag containing product.      87
18     * 9 - Plastic bag containing product.      89
19      10 - Email string, 9 pages.               95
20
21
22   QUESTIONS INSTRUCTED NOT TO ANSWER:
23       (None)
24
25       * Exhibits retained by counsel.
```



**EXHIBIT 1**

JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
5—8

Page 5

1           I N D E X (Continued)

2

3   CONFIDENTIAL PORTION:

4     PAGES 80 - 82

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1               ENCINO, CALIFORNIA

2           MONDAY, DECEMBER 9, 2019, 10:06 A.M.

3

4       THE VIDEOGRAPHER:  This is tape number one to

5   the videotaped deposition of Dr. Jason Toth, in the

6   matter of Solu-Med, Inc., versus Youngblood Skin

7   Care Products, LLC, et al., being heard before

8   United States District Court, Southern District of

9   Florida, case number 0:19-CV-60487.

10          Today's deposition is being held at

11  15760 Ventura Boulevard in Encino, california.

12  Today's date is December 9, 2019.  The time on the

13  record is 10:06 a.m.

14          My name is Todd Bullock.  I'm the

15  videographer.  The court reporter is Wendy Wright.

16          Counsel, will you please introduce

17  yourselves and affiliations, and the witness will be

18  sworn in.

19      MR. GOODMAN:  Stanley R. Goodman, counsel for

20  the plaintiff, Solu-Med, Inc.

21      MR. VINE:  Jonathan Vine with the law firm of

22  Cole, Scott & Kissane.  I represent the

23  defendants.

24      MR. GOODMAN:  And Kelsey is on the phone.

25      MS. BLACK:  Yes.  Kelsey Black for the

Page 7

1   plaintiff, and I'm attending this deposition by

2   phone.

3

4           JASON TOTH, M.D.,

5       having been first duly sworn, was

6       examined and testified as follows:

7

8           EXAMINATION

9   BY MR. GOODMAN:

10      Q    Dr. Toth -- is that the right

11  pronunciation of your name?

12      A    Correct.

13      Q    All right.  I'm here on behalf of the

14  plaintiff, Solu-Med, with the purpose of asking you

15  certain questions relevant to this lawsuit.

16          I will be asking you a series of

17  questions based upon allegations made in the

18  complaint by my client as against Youngblood Skin

19  Care Products, LLC.

20          I would appreciate it -- I'm sure your

21  counsel has instructed you as to the conduct of a

22  deposition.  The court reporter cannot take down

23  shrugs, nods of the head or anything like that, so

24  just try to give straightforward answers.

25          If there's anything you don't understand

Page 8

1   about my questions, please let me know and I'll be

2   glad to rephrase it for you.

3           You understand that?

4       A    Yes.

5       Q    All right.  And you are appearing here

6   today on behalf of a company by the name of

7   Youngblood Skin Care Products, LLC.

8           I'm going to show you what will be marked

9   as Exhibit No. 1, which is the notice of your

10  deposition.

11          And I'd ask you to please look at that.

12          (Plaintiff's Exhibit No. 1 was

13      marked for identification and is attached

14      hereto.)

15      Q    BY MR. GOODMAN:  And have you read the

16  third page, which is Schedule A?

17      A    Yes, I have.

18      Q    Have you seen this document before?

19      A    Yes, I have.

20      Q    And is there any reason why you could not

21  testify today to all of the topics listed on

22  Schedule A?

23      MR. VINE:  Objection.

24          You can answer.

25      THE DEPONENT:  No.



Page 9

1    Q    BY MR. GOODMAN:  Excuse me?
2    A    There's no reason why I should not be
3  able to --
4    Q    All right.
5    A    -- address all of these.
6    Q    All right.  I presume you're not taking
7  any medication at this time that would decrease your
8  ability to answer these questions?
9    A    Correct.
10    Q    All right.  Dr. Toth, what is your
11  relationship to the defendant?
12    A    Pauline Youngblood -- formerly
13  Pauline Youngblood is my wife.  Now is Pauline Toth.
14  We are married approximately five years ago.
15         Pauline founded the company approximately
16  23 years ago, and I joined the company approximately
17  two years ago on a part-time basis as, primarily, a
18  CFO/vice president role.
19    Q    And would you just explain, please, what
20  your responsibilities are as the CFO since you
21  joined the company two years ago.
22    MR. VINE:  Objection.
23    Q    BY MR. GOODMAN:  Go ahead.
24    A    At the time that I joined the company, we
25  were experiencing some significant year-over-year

Page 10

1  revenue losses.  One of my roles at that time was to
2  identify areas and strategies that might help in the
3  turnaround of the company.
4         One of those areas was reviewing our
5  e-tail presence, or lack of presence, and digital
6  strategy, and then otherwise reviewing the monthly
7  income statements and assist the accountant in
8  preparation of taxes.
9    Q    What is your educational background?
10    A    Undergraduate degree from University of
11  California San Diego in biology, master's degree at
12  George Washington University in environmental
13  health, medical degree from George Washington
14  University, and residency training in emergency
15  medicine at L.A. County.
16    Q    Until the time you joined the plaintiffs,
17  Youngblood Skin Care Products, what was your work
18  background?
19    A    I continue to own and operate an urgent
20  care practice and practice full-time as an urgent
21  care physician.  Prior to that, I was an emergency
22  medicine physician for approximately 20 years.
23    Q    During that period of time, had you had
24  any experience in the cosmetic field?
25    A    No.

Page 11

1    Q    Now, in addition to what you told me
2  before about your duties as the CFO, did you have
3  any other responsibilities with respect to the
4  company?
5    MR. VINE:  Objection.
6    Q    BY MR. GOODMAN:  Go ahead.
7    A    Well, assist in identifying strategies
8  and areas of focus that would present an opportunity
9  for future growth.
10    Q    Anything else?
11    A    I'm involved with authorizing and
12  overseeing the hiring and recruitment of new talent.
13    Q    Did there come a time within the past two
14  years -- let's go back to November of 2018 -- that
15  you became familiar with an e-commerce seller by the
16  name of Solu-Med, Inc.?
17    A    Yes.  I only became aware of them as a
18  result of Solu-Med initiating the lawsuit.
19    Q    Well, prior to the initiation of the
20  lawsuit, which I will represent to you was commenced
21  sometime in, I believe, February of 2019, were you
22  at all familiar with the company Solu-Med?
23    A    Only to the extent that I know that they
24  had filed a complaint and requested a retraction to
25  our brand partner Amazzia.

Page 12

1    Q    Would you please explain your last
2  answer.  I didn't get it.
3    MR. VINE:  Objection.
4    MR. GOODMAN:  I didn't understand --
5    MR. VINE:  What don't you understand about it?
6    MR. GOODMAN:  I just didn't understand the
7  question.
8    MR. VINE:  Just repeat your answer.  We can
9  have her read it back, if you want.
10    MR. GOODMAN:  Yeah.
11    THE DEPONENT:  Could you do that, please.
12         (The following record was read by
13    the reporter:
14         "A    Only to the extent that I
15    know that they had filed a complaint and
16    requested a retraction to our brand
17    partner Amazzia.")
18    Q    BY MR. GOODMAN:  Would you tell me,
19  please, what is Amazzia?
20    A    Amazzia is a company specializing in both
21  the brand protection, marketing and e-tail selling
22  of brands on Amazon marketplace.
23    Q    If you look at topic three of the notice
24  of deposition, it says you are familiar -- or, I
25  presume you're familiar with communications between



Page 13

1   Youngblood Skin Care Products and Amazzia regarding
2   Solu-Med's offering of Youngblood products on Amazon
3   in November of 2018 and thereafter.
4       What did you learn about Solu-Med's
5   offering of Youngblood products on Amazon in
6   November of 2018?
7    MR. VINE:  Objection.
8       You can answer.
9    THE DEPONENT:  We learned that they had -- our
10  partner Amazzia had reported them to Amazon as
11  selling counterfeit and inauthentic product.
12  Solu-Med, in return, communicated a complaint to
13  Youngblood requesting a retraction.
14   Q    BY MR. GOODMAN:  Did Amazzia advise
15  Youngblood in November of 2018 that Solu-Med's
16  products, meaning Youngblood's products, on Amazon
17  were, in fact, counterfeit?
18   A    Yes.  Their position was that -- because
19  only Amazzia and ourselves were the only authorized
20  sellers on Amazon, that anyone else selling the
21  product on Amazon was by definition inauthentic, and
22  because they were inauthentic, they didn't possess
23  the warranty or the guarantee that the product was
24  handled and shipped and stored in the conditions we
25  would expect our distributors.

Page 14

1    Q    You used the term, just in your earlier
2   response, that Amazzia advised you that the goods
3   that Solu-Med was offering was counterfeit.
4       Do you know what "counterfeit" means?
5    MR. VINE:  Objection.
6    Q    BY MR. GOODMAN:  Go ahead.
7    MR. VINE:  You mean how Amazon defines it?
8    MR. GOODMAN:  No.  I said how he understands it
9   to be.
10   MR. VINE:  Okay.
11   THE DEPONENT:  Yes.  I understand it to -- and
12  this is quite clearly laid out in many of Amazon's
13  communications on their anti-counterfeit policy
14  seller's platform, product quality and integrity
15  guidelines, that authentic means new, and new means
16  original packaging with original invoices with
17  guarantees as to the quality and performance of the
18  product.  Anything other than that is considered
19  inauthentic, and because it's inauthentic, it's
20  counterfeit.
21   Q    BY MR. GOODMAN:  Can you tell me what of
22  Amazon's policies you are aware of that defines
23  counterfeit products?
24   A    I believe Amazon has a specific -- I
25  believe they call it anti-counterfeit policy.

Page 15

1    Q    And do you know what that policy is?
2    A    I believe I just stated it.
3    Q    Have you ever looked into the policy
4   itself?
5    MR. VINE:  Have you ever read it?
6    THE DEPONENT:  I've -- yes I've read their
7   policies online
8    Q    BY MR. GOODMAN:  Can you tell me what
9   policy that is that you're referring to?
10   A    I believe it's their anti-counterfeit
11  policy, the definition of what product is that's
12  considered new and authentic.
13   Q    Now, in November of 2018 --
14   MR. VINE:  Just for the record, November 2018?
15  We're not saying it's November 18th.
16   MR. GOODMAN:  No.
17   MR. VINE:  Okay.  I just want to make sure the
18  record is clear, because it sounds like you're
19  saying November 18th.
20   MR. GOODMAN:  Let me go back.
21   Q    When, to your knowledge, did
22  Youngblood -- I'll just refer to Youngblood.  I'm
23  not gonna go through the whole thing of Skin Care
24  Products.
25       Okay.

Page 16

1    A    (Nods head.)
2    Q    When did Youngblood become aware
3   initially that its products were being offered on
4   Amazon by Solu-Med?
5    A    It wasn't until sometime after the formal
6   complaint was filed.
7    Q    Would you agree with me that the
8   complaints filed with Amazon were filed on
9   November 11th and November 13th of 2018?
10   MR. VINE:  Objection.  Document speaks for
11  itself.
12   MR. GOODMAN:  There's no document before him.
13   MR. VINE:  Well --
14   Q    BY MR. GOODMAN:  Go ahead.
15   A    Can you show me a document to that?
16   Q    No.  Just answer the question --
17   MR. VINE:  He asked you for something.  Don't
18  direct my client to do something that he doesn't
19  have to do.  That's inappropriate.  Back off.
20   MR. GOODMAN:  Let's continue.
21   Q    Were you aware in November of 2018 that
22  the company Youngblood had filed complaints with
23  Amazon alleging that Solu-Med's offering of
24  Youngblood products on Amazon were, in fact,
25  counterfeit?



JASON TOTH, M.D.                                          December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                         17—20

Page 17

1    A    Yes.

2    Q    All right.  And what was the basis for

3  that notification to Amazon?

4    MR. VINE:  Objection.  Asked and answered.

5       You can answer it again.

6    Q    BY MR. GOODMAN:  Go ahead.

7    A    The basis for that notification to Amazon

8  was that they were not an authorized seller by

9  Youngblood on the Amazon marketplace, and,

10  therefore, we could not guarantee that the product

11  they were selling was either authentic or current or

12  stored and shipped and handled in the manner in

13  which we expect all of our distributors and

14  wholesale accounts to handle the product.

15    Q    Were there any other resellers on Amazon

16  in November of 2018 that were offering Youngblood

17  products?

18    MR. VINE:  Objection.

19    THE DEPONENT:  Yes, I suspect there were

20  dozens.

21    Q    BY MR. GOODMAN:  You suspect.

22       Do you know that there was more than our

23  client, Solu-Med?

24    A    Yes, I do.

25    Q    You know the names of those?

Page 18

1    A    No, I do not.

2    Q    Did you -- did Youngblood notify the

3  other resellers that they likewise were not

4  authorized and, therefore, were selling counterfeit

5  products?

6    A    Youngblood had first, before we

7  on-boarded Amazzia, per their recommendation,

8  communicated at least two weeks prior to on-boarding

9  Amazzia that we informed all of our wholesale,

10  retail and distributor accounts that no one was

11  authorized to sell on Amazon.  After that, all

12  communications were by Amazzia.

13    Q    Can you give me an approximate date when

14  those notices were sent?

15    A    September 1st.  I believe we on-boarded

16  Amazzia somewhere around mid-September 17, 2018.

17    MR. VINE:  And you had to finish your statement

18  about what Amazzia did with the Amazon people who

19  were selling the product.

20    MR. GOODMAN:  Thank you.

21    THE DEPONENT:  So, yes, Amazzia referred many

22  resellers to Amazon and filed complaints on our

23  behalf.

24    Q    BY MR. GOODMAN:  Do you know whether

25  specifically Amazzia, in September or October of

Page 19

1  2018, notified Solu-Med that it was offering

2  counterfeit products?

3    MR. VINE:  Objection.

4    Q    BY MR. GOODMAN:  Go ahead.

5    MR. VINE:  I don't even -- can you repeat that

6  question?

7       (The following question was read by

8       the reporter:

9       "Q    Do you know whether

10       specifically Amazzia, in September or

11       October of 2018, notified Solu-Med that it

12       was offering counterfeit products?")

13    Q    BY MR. GOODMAN:  Offering -- Solu-Med was

14  offering counterfeit products?

15    MR. VINE:  They weren't a distributor.

16    MR. GOODMAN:  We know that --

17    MR. VINE:  Fine.  Objection.  Lack of

18  predicate.

19    MR. GOODMAN:  Understandably, your attorney is

20  even entitled to make all the objections he deems to

21  be appropriate.  It doesn't restrict you from

22  answering the question, providing you understand it.

23    MR. VINE:  I haven't directed him not to

24  answer.

25    MR. GOODMAN:  I know.

Page 20

1    MR. VINE:  It's a lack of predicate and lack

2  of --

3    THE DEPONENT:  I understand the question.

4       I don't think Amazzia would have filed a

5  notice.  I think they simply filed a complaint

6  directly with Amazon.

7    Q    BY MR. GOODMAN:  Well, you previously

8  said that Amazzia notified sellers on Amazon that

9  they were not authorized.

10    MR. VINE:  No --

11    MR. GOODMAN:  I'm just --

12    MR. VINE:  Objection.

13       You didn't say that, by the way.

14    THE DEPONENT:  What I meant to say was that we

15  informed all of our customers -- wholesale, retail

16  and distributors -- that no one was allowed to sell

17  on Amazon.

18    MR. VINE:  You said that.

19    THE DEPONENT:  After that, Amazzia was engaged

20  as our brand protection partner on Amazon, and any

21  communications by Amazzia were up to them.

22    Q    BY MR. GOODMAN:  So as I understand it,

23  then -- as I understand it, then, Youngblood did

24  notify all of its authorized distributors that it

25  was not to sell Youngblood products on Amazon?



JASON TOTH, M.D.                                    December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                    21—24

---

Page 21

1   A   Correct.

2   Q   Okay.  Now, let's go back to Amazzia.

3       When did Youngblood first become

4   acquainted with the company known as Amazzia, Inc.?

5   MR. VINE:  Objection.  Asked and answered.

6       You can answer it.

7   MR. GOODMAN:  Let him, please.

8   MR. VINE:  I know.

9   THE DEPONENT:  I think they had first emailed

10  my former GM perhaps late 2017/early 2018.  At the

11  time, we were using another brand protection company

12  called Marketplace Valet.

13  Q   BY MR. GOODMAN:  Who was your last GM?

14  A   Geovanna Waters.

15  Q   And what was her responsibilities with

16  Youngblood?

17  A   She was responsible for overseeing all

18  day-to-day operations in all departments.

19  Q   And she was the one who contacted

20  Amazzia?

21  MR. VINE:  Objection.

22  Q   BY MR. GOODMAN:  Did she contact Amazzia?

23  A   She approached me as to whether we wanted

24  to look into them, and I said yes.  And I believe

25  she placed the initial communication.

---

Page 22

1   Q   And what did she tell you the reason for

2   contacting Amazzia was?

3   A   Well, we were looking to further protect

4   our brand from the diversion discounting and the

5   diminished reputation of the brand by these

6   resellers, and at that time, I was investigating

7   several brand protection companies.

8   Q   You refer to discounting of your

9   products.

10      What do you mean?

11  A   I mean all distributors and wholesale

12  partners understand that we need to protect the

13  manufacturered -- our minimum asking price, MAP.

14  So, technically, anything that's advertised and

15  marketed below MAP without our authorization is an

16  unauthorized discounted product.

17  Q   Was there any other concerns of

18  Youngblood with respect to authorized distributors

19  offering Youngblood products?

20  MR. VINE:  Objection.  Asked and answered.

21  Q   BY MR. GOODMAN:  Go ahead.

22  A   You're asking me, was there a concern

23  that we had our own office --

24  Q   When you say discounting was one of them.

25  MR. VINE:  He actually said -- just so the

---

Page 23

1   record's clear, he said discount, he also said

2   dilution of the name and reputation, which goes into

3   the issue of selling inauthentic products.

4   THE DEPONENT:  Yes, we have other concerns.  A

5   lot of these resellers are selling discontinued

6   product or expired product or product that's been

7   possibly repurchased or remanufactured from other

8   who knows how many third parties.

9   Q   BY MR. GOODMAN:  Is that your

10  distributors who were doing those things?

11  MR. VINE:  Objection.

12  Q   BY MR. GOODMAN:  Go ahead.

13  A   In some cases, I suspect yes.

14  Q   Now, with respect to -- you used the

15  term "brand protection."

16      What were you seeking to do about brand

17  protection?

18  A   All of these brand protection companies

19  have their own proprietary strategies and methods,

20  but first and foremost is eliminating or identifying

21  those resellers that are suspected of discounting or

22  selling discontinued or expired product.

23  Q   Did you meet with representatives of

24  Amazzia in September of 2018?

25  A   Yes.

---

Page 24

1   Q   All right.  Who did you meet with?

2   A   I believe there were four individuals in

3   the room from Amazzia at that time about the initial

4   on-boarding.  William, one of the -- William Samuel,

5   one of the owners of the company, Jamie Daniel and

6   Yoji.

7   Q   Does Jamie have a last name?

8   A   Yes, she does.

9   Q   What is that?

10  A   I'm blanking out at the moment.

11  MR. VINE:  Siegel.

12  THE DEPONENT:  Siegel.

13  MR. GOODMAN:  Siegel?

14  Q   And Daniel?

15  A   I forget his last name, as well.

16  MR. VINE:  We have it.  It's been in the

17  production.

18  Q   BY MR. GOODMAN:  Is the name LaBlanc?

19  A   Excuse me?

20  Q   Is the name LaBlanc?

21  A   Yes, that sounds correct.

22  Q   Who else did you meet with?

23  MR. VINE:  He also mentioned Yoji.

24  MR. GOODMAN:  Hmm?

25  MR. VINE:  He also mentioned Yoji.

---



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
25–28

Page 25

1    MR. GOODMAN:  Yoji?
2    Q    And who on behalf of Youngblood joined
3  that meeting?
4    A    Geovanna Waters, who's no longer with us.
5  Medical leave.
6    Q    What was her response -- was she the CFO?
7    A    She was the GM, operations director.
8    Q    And when did she leave the company?
9    A    Several months ago.
10    Q    And under what terms did she leave?
11    MR. VINE:  Just --
12    THE DEPONENT:  Medical leave.
13    Q    BY MR. GOODMAN:  Did she resign?
14    A    Yes.
15    Q    Was there any particular reason she
16  tendered her resignation?
17    MR. VINE:  Other than -- don't say her health
18  condition, but just you can just say --
19    THE DEPONENT:  She was underperforming.
20    Q    BY MR. GOODMAN:  And when did she leave
21  the company?
22    A    I think, approximately two months ago.
23    Q    Was her leaving the company because of
24  underperformance in any way related to this lawsuit?
25    A    No.

Page 26

1    Q    Was there also an individual employed by
2  Youngblood by the name of Covenian?
3    A    Scott Giovanni.
4    Q    Scott?
5    A    Giovanni.
6    Q    And what was Scott's position?
7    A    Scott was formerly VP of digital strategy
8  and e-tail commerce.
9    Q    Did he join in the meeting with Amazzia?
10    A    No, he did not.
11    Q    And I have another name, and I'll show
12  you some documents -- emails.  Covenian.
13    A    Roxana Covenian.
14    Q    That's it.
15    What was her responsibility?
16    A    She's no longer with the company, but her
17  responsibility was primarily brand regulation;
18  composition -- she was a chemist -- being compliant
19  with various standards in the manufacture,
20  production and marketing of the products.
21    Q    To your knowledge, did she have anything
22  to do with the complaints that were filed with
23  Amazon regarding Solu-Med's alleged offering of
24  counterfeit products?
25    A    No.

Page 27

1    Q    And when did she leave the company?
2    A    Approximately seven months ago.
3    Q    Was her leaving the company related in
4  any way to the lawsuit?
5    A    No.  Roxana had no-to-minimal involvement
6  with the lawsuit.  She went on to take a
7  higher-level position with another company.
8    Q    And after the meeting -- excuse me.  I
9  withdraw that.
10    Did the meeting with Amazzia take place
11  at its corporate offices?
12    A    Yes.
13    Q    And after that meeting, did Youngblood
14  enter into a contract with Amazzia?
15    A    Yes.
16    Q    And do you remember or do you have any
17  recall of the day that it entered into that
18  agreement?  I will show you a document later on.
19    A    I'm thinking that it's on or about
20  September 17th.
21    Q    I think you're right.  It was around that
22  time.
23    And do you recall, sitting here today,
24  what the terms of the agreement were, particularly
25  with regard to the performance by Amazzia on behalf

Page 28

1  of Youngblood?
2    MR. VINE:  Objection.
3    Q    BY MR. GOODMAN:  Go ahead.
4    A    No.  But you could -- if I could see
5  Exhibit B of that distributor agreement, it could
6  refresh my memory --
7    Q    I will in a moment.
8    But just sitting here, do you have any
9  recollection of the terms of the agreement and what
10  Amazzia was to do on behalf of Youngblood, just
11  generally?
12    A    Generally, yes.  I think Amazzia proposed
13  that they would have, I think, 70 to 90 percent of
14  the marketplace cleaned up of resellers within
15  60 days.  I think they had a forecast sales growth
16  of $600,000.
17    I believe their discount was, initially
18  they wanted 40 percent off of wholesale, and I think
19  we were in -- we were gonna revisit that in
20  90 days.
21    Q    Could you further explain the financial
22  arrangements made with Amazzia.  What was the fee or
23  the scale by which they were supposed to be paid?
24    A    Well, they purchased the product at an
25  agreed-upon distributor discount.  And the product



JASON TOTH, M.D.                                             December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                                      29–32

Page 29

1  was delivered straight to them, and then they in
2  turn resold it through their two resale channels.
3      Q    So Amazzia was retained or engaged as a
4  distributor of Youngblood products?
5      A    Correct.
6      Q    And were they engaged to offer for sale
7  the full line of Youngblood products?
8      A    Yes, they were.
9      Q    And what was to be their consumer
10 population?  Who were they selling to?
11     A    You mean --
12     MR. VINE:  Online or in the stores?
13     THE DEPONENT:  Oh, strictly limited only to the
14 Amazon marketplace.
15     Q    BY MR. GOODMAN:  And that became
16 effective in September of 2018?
17     A    Yes, I believe so.
18     Q    So am I to understand that Amazzia was
19 engaged as a distributor of Youngblood products and
20 they purchased Youngblood products for resale?
21     MR. VINE:  Objection.
22     Q    BY MR. GOODMAN:  Go ahead.
23         That's my understanding.  Is it yours?
24     MR. VINE:  No.  He also talked about brand
25 protection --

Page 30

1      MR. GOODMAN:  Well, I'll get to the distributor
2  end of it.
3      THE DEPONENT:  Right.  They were our authorized
4  seller on Amazon.
5      Q    BY MR. GOODMAN:  And when did they
6  actually place Youngblood products on Amazon's
7  platform?
8      MR. VINE:  Objection.
9      Q    BY MR. GOODMAN:  Go ahead.
10     A    I think there was at least 30 to 45 days
11 of paperwork and on-boarding and purchasing the
12 product and the getting the product to their
13 resellers.  I would say late October/early November.
14     Q    Who were their resellers?
15     A    Well, they had two stores, La Chique
16 Boutique and Nature Glow.
17     Q    Was Youngblood and Amazzia aware at that
18 time, in September of 2018, that Solu-Med was
19 offering Youngblood products on Amazon's platform?
20     MR. VINE:  You can't speak for Amazzia, but you
21 can speak for Youngblood.  You weren't --
22     THE DEPONENT:  Yeah, I was not aware.
23     Q    BY MR. GOODMAN:  Now, did at some time
24 between the retention of Amazzia by Youngblood in
25 September of 2018, did it advise Youngblood that

Page 31

1  Solu-Med was offering Youngblood products on
2  Amazon's platform?
3      A    No, they never mentioned Solu-Med by
4  name.  There were dozens of unauthorized sellers
5  selling Youngblood product.  I did not and we did
6  not keep track of them, and we specifically engaged
7  Amazzia to track those unauthorized resellers.
8         And many times, as they were eliminated,
9  they would show up possibly under another dba.  We
10 call it whack-a-mole.  As soon as you'd eliminate a
11 dozen, another dozen would show up.
12     Q    I just want to go back for a moment.  If
13 I missed it, please forgive me.
14         Was Youngblood in any way informed, in
15 September of 2018, that Solu-Med was a reseller of
16 its products on the Amazon platform?
17     MR. VINE:  Objection.  He answered that.
18         But you can say it.
19     MR. GOODMAN:  But --
20     THE DEPONENT:  No.
21     Q    BY MR. GOODMAN:  No.
22         And when, for the first time, did
23 Youngblood became -- become aware of the fact that
24 its products were being offered by Solu-Med on
25 Amazon?

Page 32

1      MR. VINE:  Objection.  Asked and answered.
2      Q    BY MR. GOODMAN:  Go ahead.
3      A    I think I indicated only after we became
4  aware of a formal complaint by your firm on behalf
5  of Solu-Med.
6      Q    Mm-hmm.
7      MR. VINE:  Just so it's clear, because he
8  testified to this, there were a number of,
9  apparently, stores that were reselling inauthentic
10 products, and they didn't necessarily go by the
11 specific name of the store or owner or the dba of
12 the store.
13         So he may have not heard the name
14 Solu-Med, but, as he testified, he was advised about
15 people selling inauthentic products.  Not just not
16 authorized.  Inauthentic.
17     Q    BY MR. GOODMAN:  Do you know what the
18 difference is between counterfeit and inauthentic?
19     MR. VINE:  Objection.
20     Q    BY MR. GOODMAN:  Go ahead.
21     MR. VINE:  Based upon Amazon's?
22     MR. GOODMAN:  No.  Based upon Youngblood's
23 knowledge.
24     MR. VINE:  Okay.
25     MR. GOODMAN:  It was Youngblood who filed the



JASON TOTH, M.D.                                    December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                              33–36

Page 33

1  complaint.

2  MR. VINE: Right. And Youngblood goes by what
3  Amazon does.

4  THE DEPONENT: Right. I think I've
5  communicated that it was our understanding that
6  Amazon's policy is that unless the product is
7  purchased and new, sold by an authorized dealer in
8  its original packaging with its original warranty
9  and its original guarantees, stored and shipped and
10 handled by our standards, then it's considered
11 inauthentic. And if it's inauthentic, it's
12 counterfeit.

13 Q    BY MR. GOODMAN: And that was your
14 understanding based upon Amazon's policy?

15 A    That was our understanding based on
16 Amazon's policy, and that was reiterated by Amazzia.

17 Q    And who at Amazzia provided you with that
18 information?

19 A    I think Jamie and Daniel.

20 Q    Mm-hmm. I believe you testified that the
21 first time you became aware of the complaints made
22 to Amazon by Youngblood was upon the filing of this
23 lawsuit?

24 MR. VINE: Objection.

25 THE DEPONENT: Well, filing of -- to clarify

Page 34

1  that, the initial legal communication that came to
2  us prior to actual filing of the lawsuit.

3  Q    BY MR. GOODMAN: I'll represent to you
4  that this case was filed sometime in February of
5  2019.

6         Is it your testimony that between
7  September of 2018 and February 2019, you had no
8  knowledge of the complaints that were filed with
9  Amazon?

10 MR. VINE: Objection.

11 Q    BY MR. GOODMAN: You can answer.

12 A    No. We became aware of complaints
13 somewhere around December.

14 Q    And how did you become aware of them?

15 A    I believe a complaint was filed with our
16 labor attorney, who -- and he in turn shared that
17 complaint with us. I believe that was my
18 recollection that's the very earliest --

19 MR. VINE: He'll show you. If you need a
20 document to refresh your recollection, he'll show
21 you.

22 Q    BY MR. GOODMAN: Who was your labor
23 attorney?

24 A    Barry Kellman.

25 Q    And where is he located?

Page 35

1  A    He's here in the Valley.

2  Q    And he's still your labor attorney? I
3  mean Youngblood's.

4  A    Yes.

5  Q    And is it your testimony that Mr. Kellman
6  is the one who advised you, meaning Youngblood, in
7  December that complaints were made to Amazon as to
8  the sale of its products by Young- -- by Solu-Med on
9  Amazon?

10 MR. VINE: Objection. Mischaracterizes his
11 testimony.

12 MR. GOODMAN: Well, then let him answer it as
13 best as he understands it.

14 Q    Is it Mr. Kellman who told you in
15 December of 2018 that Solu-Med was offering
16 Youngblood products that were counterfeit on Amazon?

17 A    Yes, I believe so.

18 Q    Up until that time, meaning from
19 September of 2018 till Mr. Kellman's communication,
20 then Youngblood had no idea of any complaint being
21 filed?

22 MR. VINE: Complaint by what?

23 MR. GOODMAN: Complaint by Youngblood that
24 Solu-Med was offering counterfeit products.

25 THE DEPONENT: No, I have no recollection of

Page 36

1  any communication prior to that.

2  Q    BY MR. GOODMAN: All right.

3  A    Can we break for just a minute to get a
4  water?

5  Q    Sure. I'm sorry. You can break at any
6  time.

7         (Discussion held off the record.)

8  THE VIDEOGRAPHER: This is the end of tape
9  number one. We're off the record at 10:46 a.m.

10        (Recess was taken.)

11 THE VIDEOGRAPHER: This is the beginning of
12 tape number two. We are back on the record at
13 10:53 a.m.

14 Q    BY MR. GOODMAN: Doctor, I have been
15 somewhat remiss. I have been referring to the store
16 on Amazon as being Solu-Med, which is the company,
17 rather than the store name, which was Life and
18 Health Source.

19        Is that familiar to you?

20 A    Yes.

21 Q    Now, if you can just recall the questions
22 I've asked you, each time I've referred to Solu-Med,
23 would you agree that it was Life and Health Source
24 that we're talking about?

25 A    Yes. I would agree that we were made



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
37–40

Page 37

1  aware of Life and Health Source filing a complaint
2  sometime after Black Friday.
3      Q    After Black Friday.  You're talking
4  about --
5      A    Late November.
6      Q    -- late November?
7          And what did you learn on or about Black
8  Friday?
9      A    Well, we learned that Amazzia had
10  requests -- had reported a number of stores as
11  filing inauthentic and not new product, and Life
12  Source, I believe, had requested a retraction -- and
13  I'm not sure exactly when they actually requested
14  the retraction, but it was on or about sometime, I
15  think, late November/early December.
16     Q    Well, do you know what gave rise to Life
17  and Health Source requesting a retraction of a
18  statement made to Amazon that it was offering
19  counterfeit Youngblood products?
20     A    Well, ultimately we became aware that
21  Life Source was alleging that Amazon had shut down
22  their storefront.
23     Q    And did Amazzia prepare a notice, to your
24  knowledge, to Life and Health Source -- no; strike
25  that -- to Amazon that Life and Health Source was

Page 38

1  offering Youngblood products which were counterfeit
2  on its platform?
3      A    Yes.
4      Q    All right.  And did you in any way,
5  meaning you on behalf of Youngblood, participate in
6  the -- in preparing the notice to Amazon?
7      A    No.
8      Q    Then to your knowledge, who did
9  participate in writing the notice to Amazon?
10     A    Lisa Garrett at the time was director of
11  sales.  I believe Amazzia communicated to us, via
12  Alisa Geovanna, the elements that needed to be
13  contained in a communication to Amazon if we want to
14  request a retraction --
15         MR. VINE:  No.  He's talking about the original
16  notice of complaint.  The original complaint -- that
17  was Amazzia.
18         THE DEPONENT:  So it isn't clear to me, so if
19  you can --
20         MR. VINE:  We have to stop using the word
21  "complaint."
22         THE DEPONENT:  That would be useful.
23     Q    BY MR. GOODMAN:  Well, let's talk about
24  Amazzia.  Let's get it straight.
25         Who prepared the notice to Amazon?

Page 39

1      MR. VINE:  About?
2      MR. GOODMAN:  The counterfeit products --
3      MR. VINE:  Okay.
4      MR. GOODMAN:  -- being offered by Life and
5  Health Source.
6      THE DEPONENT:  So are you talking about who's
7  responsible for filing the initial complaint?
8      Q    BY MR. GOODMAN:  I think we're getting
9  there.
10     A    That is Amazzia.  They were engaged
11  purposefully for that purpose.
12         MR. VINE:  Now we're clear.  Because your
13  question -- you're leaving out a lot of facts, and I
14  think there were a couple notices --
15         MR. GOODMAN:  Well, I'm sure he's aware of a
16  lot of things.  We're just trying to get to it.
17         Let me see if we can make this a little
18  easier.  I've marked as Exhibit 2 Defendant
19  Youngblood Skin Care Products answers to the first
20  set of interrogatories.
21         (Plaintiff's Exhibit No. 2 was
22         marked for identification and is attached
23         hereto.)
24     Q    BY MR. GOODMAN:  I would like you to just
25  review these five pages and make certain that you're

Page 40

1  familiar with it.  Take your time.
2      A    Okay.
3      Q    Doctor, now that you have reviewed
4  Exhibit No. 2, do you recall seeing this document at
5  any time prior to today?
6      A    Yes.
7      Q    And on page five of Exhibit 2, is that
8  your signature?
9      A    Yes, it is.
10     Q    And you certified, you verified, at that
11  time that the statements contained, or the
12  responses, are true, to the best of your knowledge?
13     A    Yes.
14     Q    All right.  Now, prior to signing this,
15  can you tell me who assisted in the preparation of
16  these responses?  I'm not interested in your
17  attorney.
18         MR. VINE:  You could -- you could say, "My
19  attorneys" and the names of people.  Names are not
20  privileged --
21     Q    BY MR. GOODMAN:  That's right.
22         MR. VINE:  -- so you could say our firm and
23  anybody --
24     Q    BY MR. GOODMAN:  Yes.
25     A    As indicated in question one,



Page 41

1  Geovanna Waters and Rachel Kier, and myself
2      Q    Now, what information did Ms. Waters --
3  is it a woman, Geovanna?
4      A    Yes.  Yes.
5      Q    What information did she provide?
6      A    I think just offering her consensus that
7  this was our position.
8      MR. VINE:  Wait, wait, wait.  I just want to
9  make sure it's on record.
10        If conversations occurred where I was
11  present or Ryan was present, then we won't answer
12  those, so -- because I know a lot of information was
13  with phone calls.  But go on.
14      THE DEPONENT:  Okay.
15      Q    BY MR. GOODMAN:  Go ahead.
16        Other than what Mr. Vine has put on the
17  record, what information did she provide that was
18  based upon records of Youngblood?
19      A    I don't think she provided any
20  independent information that together we didn't
21  either already know or I knew.
22      Q    All right.  Who was Rachel Kier, K-i-e-r?
23      A    She's our current e-commerce account
24  representative.  She's been with us less than six
25  months.

Page 42

1      Q    To what extent did she contribute to the
2  responses of this document?
3      A    Well, only to the extent that she
4  reviewed and managed the relationship with Amazzia
5  at that point.  So she was familiar with Amazzia's
6  management agreement with us.
7      Q    All right.  Next page, page two,
8  interrogatory number two:  Please describe your
9  relationship with Amazzia and list and describe any
10  contractual relationship.
11        "You" doesn't mean you personally.  It
12  means the company.  All right?
13        Would you agree, the answer, which -- the
14  answer is, "Youngblood first signed and engaged
15  Amazzia on September 17, 2018 --" is that correct?
16      A    Correct.
17      Q    "-- to provide marketplace enforcement
18  from counterfeiters --" I'll stop at that point.
19        Was there a problem that Youngblood was
20  faced with, with respect to counterfeiters at that
21  time?
22      MR. VINE:  Objection.
23      Q    BY MR. GOODMAN:  Go ahead.
24      A    Well, before we engaged Amazzia, we could
25  tell by reviewing Amazon ourselves that there were

Page 43

1  dozens of resellers on Amazon selling product that
2  was very out of date.  Some images we didn't even
3  recognize.
4        And so, again, I can't speak specifically
5  to Solu-Med or their --
6      Q    Well, Life and Health --
7      A    Life and Health Source, but as a general
8  rule and consideration, yes, we had very legitimate
9  concerns that the brand reputation was being
10  degraded and diminished on a daily basis from
11  consumers who were purchasing products that were
12  potentially expired or fake.
13      Q    All right.  At that time, in September of
14  2018, did Youngblood have any specific information
15  that Life and Health Source was selling counterfeit
16  Youngblood products on Amazon?
17      MR. VINE:  Objection.  Asked and answered.
18      Q    BY MR. GOODMAN:  Go ahead.
19      A    Only to the extent that we knew that they
20  were -- all resellers were not authorized and,
21  therefore, the products were not guaranteed as new,
22  as we understood them to be.
23      Q    And that's your understanding, that if
24  they were not authorized, they were not new and they
25  were inauthentic?

Page 44

1      A    Correct.
2      MR. VINE:  Objection.
3      Q    BY MR. GOODMAN:  Is that your answer?
4      MR. VINE:  Objection.
5      Q    BY MR. GOODMAN:  Go ahead.
6      A    Yes, I believe I've stated that
7  previously.
8      Q    And that is based upon Youngblood's
9  understanding of Amazon's online policy?
10      A    Correct.
11      Q    And prior to September 17, 2018, had
12  Youngblood sought enforcement as against the
13  unauthorized resellers of its products?
14      MR. VINE:  Objection.
15      Q    BY MR. GOODMAN:  Go ahead.
16      A    Yes.  We had partnered with another brand
17  protection company for approximately six to nine
18  months.
19      Q    What was the name of that company?
20      MR. VINE:  Objection.
21      A    Marketplace Valet.
22      Q    BY MR. GOODMAN:  What?
23      A    Marketplace Valet, V-a-l-e-t.
24      Q    Where are they located?
25      A    San Bernardino.



Page 45

1    Q    And was Amazzia engaged in place of
2    Marketplace?
3    A    Yes.
4    Q    Now, after Amazzia entered into the
5    contract in September of 2018 with Youngblood, did
6    there come a time between September 17th and
7    November 11th that Amazzia advised Youngblood that
8    Life and Health Source was offering counterfeit
9    Youngblood products on Amazon's platform?
10   A    No, I have no independent recollection of
11   Amazzia informing us of that particular store.
12   Amazzia was, in fact, reporting dozens of resellers
13   selling inauthentic product.
14   Q    At any time between September 17, 2018,
15   and November 11th of 2018, did Youngblood purchase
16   on Amazon any of its products offered by Life and
17   Health Source?
18   A    No, I have no -- it was not our policy to
19   do so at the time.
20   Q    Mm-hmm.
21       At any time between September 17, 2018,
22   and November 11, 2018, did Youngblood compare any of
23   Life and Health Source's Youngblood products with
24   its own retained samples of those products?
25   A    No, I have no recollection of doing that.

Page 46

1    Q    And after Amazzia notified Youngblood
2    that Life and Health Source was offering counterfeit
3    Youngblood products, did Amazzia notify Amazon of
4    that fact?
5       MR. VINE:  Objection.
6    Q    BY MR. GOODMAN:  Go ahead.  To your
7    knowledge.
8       MR. VINE:  I think he testified that Amazzia --
9    he was not aware about selling it, or Life and
10   Health individually.
11      But you can answer the second --
12      MR. GOODMAN:  I think he can answer that.
13      MR. VINE:  Okay.  Go ahead.
14      THE DEPONENT:  So Amazzia didn't ask or inform
15   us specifically of all of the stores that they were
16   going to report to Amazon prior to reporting them.
17   That was -- they were engaged specifically to do
18   brand protection for us and to take that initiative
19   for us.
20   Q    BY MR. GOODMAN:  Okay.  Let's go to
21   interrogatory number three:  "Please list the person
22   or persons responsible for the information contained
23   within the two complaints you made --" and I'll
24   suggest to you, responsibly, that that means
25   Youngblood "-- made to Amazon on November 11 --" and

Page 47

1    it says 2013, which is a typographical error "--
2    that the alleged plaintiffs' store Life and Health
3    Source was selling counterfeit products" --
4    "counterfeit Youngblood products."
5       Answer: "Jamie Siegel and Daniel
6    LaBlanc, Amazon's account managers assigned to
7    Youngblood."
8       MR. VINE:  Objection.  Amazzia's.  It says
9    Amazzia, not Amazon.
10      MR. GOODMAN:  Okay.  You like that
11   pronunciation, I'll give it to you.
12      MR. VINE:  No.  You said Amazon.
13      MR. GOODMAN:  Did I say Amazon?
14      MR. VINE:  Yeah.
15      MR. GOODMAN:  Oh.  I meant Amazzia.  It's hard
16   with --
17      MR. VINE:  Okay.
18      MR. GOODMAN:  Forgive me.
19      MR. VINE:  No, that's fine.
20      THE DEPONENT:  That's intentional.
21   Q    BY MR. GOODMAN:  Huh?
22   A    Amazzia is a confluence of Amazon and
23   amazing.
24   Q    It gets to be a little confusing.
25      Do you know whether Amazzia has any

Page 48

1    relationship with Amazon?
2    A    Well, I don't know if they have any
3    relationships I'm unaware of, but it's my
4    understanding that they do not.
5    Q    All right.
6       Would you agree with the answer that
7    there was two complaints made to Amazon on
8    November 11th -- and the typographical error is that
9    it says 2013.  It should have been 13 -- it was
10   November 11th and November 13th.
11      Do you agree with the answer that
12   complaints were made at that time?
13      MR. VINE:  Objection.
14   Q    BY MR. GOODMAN:  Go ahead.  Read it.
15      MR. VINE:  There's nothing -- it's not about
16   reading.
17      Do you agree that were on those dates, or
18   they exist on those dates, yes or no --
19   Q    BY MR. GOODMAN:  I'll eliminate the
20   typographical error.  Just go with November 11th.
21   A    Yes, I think the record speaks for
22   itself.  If that's the dates the complaints were
23   filed, then that's the dates that they were filed.
24   Q    So let's try to straighten this out.
25      Who made the complaint?

JASON TOTH, M.D.                                      December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                              49–52

Page 49

1    A    Which complaint?
2    Q    November 11th.
3    A    Well, I don't know specifically who in
4  Amazzia actually pulled the trigger and filed the
5  complaint. I can't speak for them. They have a big
6  team.
7         Jamie and Daniel were our account
8  representatives, so either they themselves did it,
9  or they have an entire department that's devoted to
10 filing complaints with Amazon.
11   Q    Was Youngblood made aware that a
12 complaint, as I have described it, was being placed
13 with Amazon on November 11th concerning Life and
14 Health Source selling counterfeit Youngblood
15 products?
16   A    No, not to my knowledge.
17   Q    So, then, Youngblood had no knowledge of
18 this at that time?
19   A    Yes, that's my position.
20   Q    And when did you come upon this
21 information that's contained in the answer to
22 interrogatory number three?
23   A    Well, I think somewhere on or about very
24 last week of November -- I believe there was a
25 communication through the brand protection email

Page 50

1  that we first became aware.
2    Q    I'd like you to, please, go to page
3  three, interrogatory number five: "Please name the
4  author of the November 29, 2019, email from the --"
5  and that's a email address; I believe that's
6  Youngblood's email address "-- that informed
7  plaintiffs' counsel, Stanley R. Goodman, that
8  Youngblood agreed to file a retraction with
9  Amazon."
10        The answer was, "Alisa Garrett,
11 Youngblood Mineral Cosmetics previous Director of
12 Sales."
13        I think you testified that she's no
14 longer with the company?
15   A    Correct.
16   Q    Do you know her present whereabouts?
17   A    She went with a startup. The answer to
18 that I don't know, but that startup folded and she
19 reached out, I think, a couple months ago just
20 saying that she was available. So to answer your
21 question, no, I don't know where she's at.
22   Q    Are there any records at Youngblood that
23 may indicate where she's presently located or the
24 home address?
25   A    We certainly would have her home address

Page 51

1  in our employee file.
2    MR. GOODMAN: Jonathan, I would ask you if you
3  could please provide that.
4    MR. VINE: Sure. When you say "that," you mean
5  her address?
6    MR. GOODMAN: Specifically, yeah.
7    MR. VINE: He mentioned file.
8    MR. GOODMAN: Yeah, well --
9    MR. VINE: I'm not providing the file, but I'll
10 provide --
11   MR. GOODMAN: I think it's quite evident what
12 I'm looking for.
13   Q    Now, did you see the email sent by
14 Alisa Garrett informing myself on behalf of my
15 client that Youngblood agreed to file a retraction
16 with Amazon?
17   A    Yes. I believe it's included in the
18 Schedule A.
19   MR. VINE: Objection.
20   Q    BY MR. GOODMAN: So there's no question
21 that Youngblood did agree to file a retraction?
22   MR. VINE: Objection. Objection.
23   Q    BY MR. GOODMAN: Go ahead.
24   A    Well, we agreed to file a response with
25 Amazon that we had resolved our differences and that

Page 52

1  by filing that, that was in no way an admission by
2  us that the products weren't somehow authentic. And
3  part of the condition of that retraction was that
4  Solu-Med would no longer sell Youngblood products.
5    Q    But that was not contained in the
6  November 29, 2019, email, was it?
7    A    Well, show me the email, please, and I'll
8  refresh my memory.
9    Q    I will. I will.
10   MR. VINE: Or show your letter first, what it
11 stated, and then show him the email.
12   MR. GOODMAN: Well, we'll get to that in a
13 moment. I can get to it by referring to the
14 complaint, which has it as an exhibit.
15   MR. VINE: Okay. Great.
16   Q    BY MR. GOODMAN: Do you understand what
17 the word "retraction" means?
18   A    Yes. Common sense. It means that we
19 will -- we will file a -- some communication with
20 Amazon that we've resolved the differences between
21 us and that Solu-Med has agreed to no longer sell --
22 that's how I understood it.
23   Q    That's how you understood it?
24   A    Right.
25   Q    And was it Alisa Garrett who prepared

JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
53–56

Page 53

1 that email that we're talking about?
2    A    Yes, I believe so.
3    Q    Was it sent with your approval?
4    A    Yes.
5    Q    Why did -- no.
6        What was the basis for Youngblood
7 agreeing to file the retraction within two weeks
8 after the notice that Amazon was sent alleging that
9 Youngblood -- not Youngblood -- Life and Health
10 Source was offering counterfeit products?  What
11 caused Youngblood to file that retraction?
12    A    Well, Youngblood's position is that we
13 are -- have no intention of harming any competitors,
14 and nor are we looking to get engaged in litigation.
15        We simply want to protect the equity and
16 investment in our brand, and we want to protect the
17 consumer from purchasing product that is potentially
18 expired or inauthentic or not new.
19        So the basis for that retraction is that
20 if we can have an understanding that someone will
21 stop selling our product that's unauthorized, then
22 we're happy to file a retraction on their behalf.
23    Q    The original notice dated November 11th
24 from Youngblood to Amazon stated, in substance, that
25 the products offered by Life and Health Source were

Page 54

1 counterfeit and did not contain any of the
2 information you just referred to, did it not?
3    MR. VINE:  Objection.
4    Q    BY MR. GOODMAN:  Go ahead.
5    A    Are you asking me, was there
6 clarification in that email communication as to what
7 constituted counterfeit?
8    Q    Yeah.
9    A    No.  My understanding is that they would
10 have the same information that we had access to
11 concerning Amazon's published policies on
12 intellectual property protection.
13    Q    Was Youngblood aware of Amazon's policy
14 with respect to products being offered on its
15 platform that were alleged to be counterfeit?
16    A    Yes.
17    Q    And that was that?
18    A    What was what exactly?
19    Q    Amazon's policy with regard to
20 counterfeit complaints.
21    MR. VINE:  Objection.  Asked and answered.
22        We've gone over it --
23    THE DEPONENT:  I think we've asked that
24 repeatedly, approximately six or eight times
25 since --

Page 55

1    Q    BY MR. GOODMAN:  Well, please.
2    MR. VINE:  I mean, this is the last time he's
3 going to --
4    MR. GOODMAN:  Well --
5    MR. VINE:  The documents will speak for itself.
6        But you could say, were you generally
7 aware about their policies?
8    THE DEPONENT:  Well, my general understanding
9 was that only authorized sellers selling new product
10 has the authority to represent, that we have the
11 warranties and full guarantee of the company, and
12 that anyone not authorized is not selling new
13 product and it's inauthentic and counterfeit.
14    Q    BY MR. GOODMAN:  I ask you to go to
15 page four, interrogatory eight:  "Please describe
16 what steps you took to ensure the accuracy of the
17 November 11th and November 13th complaints you
18 made --" meaning Youngblood "-- to Amazon about the
19 alleged counterfeit products you claim plaintiffs'
20 store sold."
21        Answer:  "Amazzia's team was responsible
22 for initiating and verifying the accuracy of the
23 complaint submitted to Amazon's brand registry
24 support."
25        Did Amazzia communicate you --

Page 56

1 communicate to Youngblood what it did, if anything,
2 to verify the validity of the complaints filed on
3 November 11th and November 13th?
4    MR. VINE:  Did they ever, he's saying.
5    Q    BY MR. GOODMAN:  Yeah.
6    MR. VINE:  Did you -- did they ever?
7    Q    BY MR. GOODMAN:  Tell you what they did
8 to verify the accuracy of the complaint.  That's
9 the --
10    A    Well, it's self-explanatory.  It's
11 redundant.
12        If they filed a complaint under the
13 trademark drop-down box and alleging counterfeit
14 because the product is not new, it's not being sold
15 by an authorized seller, then the product's
16 inauthentic and counterfeit.  I think that's the
17 general understanding between us, and we operated as
18 a team and that's --
19    Q    You mean understanding between Amazzia
20 and Youngblood?
21    A    Correct.
22    MR. VINE:  Based upon --
23    THE DEPONENT:  Based upon Amazon's published
24 policies concerning counterfeit intellectual
25 property --



JASON TOTH, M.D.                                    December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                         57–60

Page 57

1    Q    BY MR. GOODMAN:  So the answer is
2  correct, Amazzia's team was responsible for
3  initiating and verifying the accuracy of the
4  complaints?
5    A    Correct.
6    Q    Last question on that:  Did Amazzia
7  notify Youngblood prior to submitting the complaints
8  that it was doing so and it had verified that the
9  products offered by Life and Health Source were
10  counterfeit?
11    MR. VINE:  Objection.  Asked and answered.
12    Q    BY MR. GOODMAN:  Go ahead.
13    MR. VINE:  Before they did it.
14    Q    BY MR. GOODMAN:  That's it.  Before they
15  did it.
16    MR. VINE:  Right.
17        Answer.  You've already answered that.
18    THE DEPONENT:  Well, they knew, by
19  definition --
20    MR. GOODMAN:  Not --
21    MR. VINE:  Did they inform you guys?  The
22  answer was no --
23    THE DEPONENT:  No.  I'm sorry.  They did not
24  inform us.
25    Q    BY MR. GOODMAN:  Okay.

Page 58

1        Give me a moment, Jonathan.
2    MR. VINE:  No problem.  Take your time.
3    Q    BY MR. GOODMAN:  One last question on
4  that document, Dr. Toth, if you could just go back
5  to it for me, please.
6        On page five of the document, you
7  executed this response, this verification, on
8  July 12, 2019; that's accurate?
9    A    Yes.
10    MR. GOODMAN:  Okay.  I'll mark two documents at
11  this point.  Document 3 will be the complaint, and
12  document 4 will be the answer.
13      (Plaintiff's Exhibit Nos. 3 and 4
14      were marked for identification and are
15      attached hereto.)
16    Q    BY MR. GOODMAN:  I realize it's a lot of
17  pages, Dr. Toth.
18        The document, Exhibit No. 3, is the
19  complaint that was filed in this action.
20        Have you seen this document before?
21    MR. VINE:  The complaint, this one.
22    THE DEPONENT:  Yes, I've seen this.
23    Q    BY MR. GOODMAN:  And I'd like you to look
24  at page 11.  Please take note of the date that this
25  was filed with the court, which is also on the face

Page 59

1  page, of February 23, 2019.
2        And document No. 4 is the answer, which
3  was filed with the court -- it's on the top of the
4  first page -- of October 3, 2019.
5        All right?
6    A    (Nods head.)
7    Q    Now, I'd just like to take you to the
8  complaint, page four.  16-A.
9        Do you have that there, Doctor?
10    A    Yes, I do.
11    Q    Okay.  16-A states --
12    MR. VINE:  Go ahead.
13    Q    BY MR. GOODMAN:  I don't want to read it
14  all into the record --
15    MR. VINE:  16-A -- that's -- yeah, it's a whole
16  statement.
17    MR. GOODMAN:  Has he got the complaint and the
18  answer?  Just juxtapose the two.
19    MR. VINE:  Right.
20    Q    BY MR. GOODMAN:  All right.  Essentially,
21  subdivision A says, "Defendant --" that refers to
22  Youngblood "-- filed two complaints with Amazon
23  alleging that several Youngblood-branded products
24  being offered for sale in plaintiffs' online store
25  were counterfeit" and it describes the products.

Page 60

1        Now, I'd just like you to look at the
2  answer alongside of it and prepared by your
3  attorneys, number 16:  "Denies the allegations in
4  paragraph 16 and subparts A through I."
5        Is that consistent with your
6  understanding, Doctor?
7    MR. VINE:  And if you don't know, say, "I don't
8  know."
9    THE DEPONENT:  I don't know.
10    Q    BY MR. GOODMAN:  It says that --
11    MR. VINE:  No.  It actually -- the lawyers
12  prepared this on behalf of the client --
13    Q    BY MR. GOODMAN:  But did you read the
14  answer?
15    MR. VINE:  Well, what you did with your lawyer
16  would be privileged, so --
17    MR. GOODMAN:  I understand.
18    Q    But did you read the answer before it was
19  filed with the court?
20    A    No, I have no recollection of reading it.
21    Q    As you sit here today, do you deny that
22  Youngblood filed some complaints with Amazon?
23    MR. VINE:  Objection.  He's already testified
24  that Amazzia filed the complaints.
25    MR. GOODMAN:  I just wanted to re-emphasize.



Page 61

1    Q    It says here, "Defendant filed two
2  complaints with Amazon."
3        Is it your testimony -- we'll put an end
4  to this right now -- that it was Amazzia, not
5  Youngblood, that filed the complaints?
6    A    Yes.
7    Q    Thank you.
8        I'd like you to turn to page five of
9  the complaint, Subdivision C, November 26:
10 "Plaintiffs --" meaning Solu-Med Life and Health
11 Source "-- sent a written demand to Defendant --"
12 that's Youngblood "-- to contact Amazon and to
13 retract its false statement that Plaintiffs were
14 selling counterfeit merchandise in their online
15 store."
16       And if you go to the answer, 16 -- do you
17 have that there, Doctor?
18   A    Yes.
19   Q    "Denies the allegations in Parts A
20 through I, which include C."
21   MR. VINE:  Okay.
22   Q    BY MR. GOODMAN:  Does Youngblood, as you
23 sit here today, deny that the plaintiff sent
24 a demand to Youngblood to retract the false
25 statements?

Page 62

1    MR. VINE:  That question you can answer as a
2  yes or no.  Do you deny that they asked for a
3  retraction?
4    THE DEPONENT:  Again --
5    MR. GOODMAN:  We may be having some
6  difficulty.
7    MR. VINE:  So without getting into
8  attorney/client privileged communication, there's
9  reasons that we advise to deny this specific
10 paragraph.
11       The fact that a demand was sent, I could
12 stipulate to you, yes, a -- was a demand sent.  But
13 we don't agree that Amazon's de-listing of the
14 online store was triggered by what you've said.  So
15 that is why the paragraph was denied.
16   MR. GOODMAN:  By there's no denial that the
17 plaintiff sent a written demand to contact Amazon to
18 retract?  No --
19   MR. VINE:  I'll stipulate to that.
20   MR. GOODMAN:  Okay.
21   THE DEPONENT:  No.
22   MR. GOODMAN:  All right.
23   MR. VINE:  But when you put everything else in
24 there, you have to deny it.
25   MR. GOODMAN:  I know.

Page 63

1    Q    On the same page, 5-D -- page five,
2  Subparagraph D, November 29, 2018:  "Defendant
3  notified Plaintiffs --" that's Youngblood "-- that
4  it has agreed to file a retraction.  See Defendant's
5  agreement to file retraction, a copy of which is
6  attached as Exhibit 2."
7        So if you'll just kindly flip the pages
8  till you get to Exhibit 2, do you see that, Doctor?
9    A    Yes, I do.
10   Q    It indicates by, apparently, an email
11 sent from Youngblood says, "On November 29, 2018, at
12 3:59 p.m., brand protection --" and that's an email
13 address at Youngblood, presumably; is that correct?
14   A    Yes.
15   Q    "Hello.  We have agreed to file a
16 retraction with Amazon.  Please provide me with the
17 following information."
18       And I believe that was Ms. Covenian; is
19 that correct?
20   A    Yes.
21   Q    So there is no dispute, then, that
22 Youngblood had agreed to file a retraction with
23 Amazon?
24   MR. VINE:  Objection.
25       Not within your definition of retraction,

Page 64

1  but within ours.
2    MR. GOODMAN:  We're not looking at definitions.
3    MR. VINE:  Okay.
4    MR. GOODMAN:  They agreed to file a retraction.
5    Q    Now look at your answer, again,
6  paragraph 16:  "Defendant denies the allegations in
7  paragraph 16 in Subparts A through I."
8        So can we agree that that denial is not
9  correct or that Youngblood agreed to file a
10 retraction?
11   MR. VINE:  Objection.
12   Q    BY MR. GOODMAN:  Well, would you like to
13 change your answer?  The email from your brand
14 protection says you have agreed to file a
15 retraction, and your answer denies it.
16   MR. VINE:  Objection.
17   Q    BY MR. GOODMAN:  Go ahead.
18   A    Yeah.  No, I think we could change it
19 within the context of our -- of my understanding and
20 our understanding of what that retraction
21 constitutes.
22   Q    I think that we can agree that there was
23 an agreement to file the retraction.  That's all I'm
24 asking you.
25   MR. VINE:  Objection.



Page 65

1       You can answer it the way you see fit.
2       THE DEPONENT: Yes.
3       Q    BY MR. GOODMAN: All right.
4       I'd like you to go to page six of the
5  complaint, Subdivision F, December 6, 2018:
6  "Plaintiffs advised Youngblood --" it says
7  "Defendant" "-- that its notification to Amazon was
8  ineloquent because it did not actually retract its
9  false accusation against Plaintiffs."
10      MR. VINE: Go on.
11      Q    BY MR. GOODMAN: "Plaintiffs therefore
12  again demanded that Plaintiffs (sic) submit a
13  promised retraction. . . Exhibit 5."
14      Look at Exhibit 5.
15      (Plaintiff's Exhibit No. 5 was
16  marked for identification and is attached
17  hereto.)
18      MR. VINE: If you want us to stipulate that you
19  sent a letter, we'll stipulate that you sent a
20  letter. We don't agree with, though, the remainder
21  of the paragraph where it talks about it was a false
22  accusation.
23      MR. GOODMAN: I have no problem with that. But
24  do you now agree that that is an accurate statement?
25      MR. VINE: No. It's an accurate statement that

Page 66

1  you sent the letter.
2       MR. GOODMAN: We sent the letter.
3       MR. VINE: You could say yes.
4       THE DEPONENT: Yes, I agree that you sent the
5  letter.
6       Q    BY MR. GOODMAN: So the denial contained
7  in your answer --
8       A    Is in reference to false accusation.
9       Q    Solely with reference to that?
10      MR. VINE: Because we don't believe --
11      THE DEPONENT: Right.
12      MR. GOODMAN: Could we take a break for five
13  minutes?
14      MR. VINE: Sure.
15      THE VIDEOGRAPHER: We're off the record at
16  11:39 a.m.
17      (Recess was taken whereupon
18  Plaintiff's Exhibit No. 6 was marked for
19  identification and is attached hereto.)
20      THE VIDEOGRAPHER: This is the beginning of
21  tape number three. We are back on the record at
22  11:55 a.m.
23      Q    BY MR. GOODMAN: Dr. Toth, you have
24  before you what has been marked Exhibit 5. You'll
25  note at the bottom of the exhibit is "Confidential

Page 67

1  AMZN," four zeros and a three.
2       I'll represent to you that these were
3  documents pursuant to a subpoena served upon Amazon,
4  I believe, by your attorneys.
5       Have you seen this document before?
6       A    Yes.
7       Q    All right. And the title is, "Name and
8  Contact Info of Entity That Submitted Take-Down
9  Notice." First line has a complaint I.D. number
10  submitted by RO. Presumably, that means rights
11  owner contact.
12      Is that brandprotection@ybskin
13  Youngblood?
14      A    Yes.
15      Q    It is.
16      And it reads on, "Hello. We have
17  researched Youngblood's listings and found the
18  following ASINs are in violation of our trademark."
19      Can you tell me what research was done of
20  the listings?
21      MR. VINE: Objection. Asked and answered.
22      Q    BY MR. GOODMAN: Go ahead.
23      MR. VINE: And lack of foundation.
24      Q    BY MR. GOODMAN: Go ahead.
25      MR. VINE: Go ahead and tell him -- the same

Page 68

1  answers --
2       THE DEPONENT: Well, Amazzia was engaged for
3  purposes of constantly reviewing the website on a
4  daily basis. We have 280 different SKUs. There's a
5  couple hundred products times dozens of different
6  resellers, so it was their responsibility to scan
7  their website; identify resellers that would be
8  targeted for complaints.
9       Q    BY MR. GOODMAN: And it states that these
10  ASINs -- those are Amazon's identification numbers;
11  is that correct?
12      A    Yes.
13      Q    "Counterfeit products are being sold on
14  the following listings."
15      MR. VINE: You understand those two bullet
16  points are drop-downs, like when you go online?
17      MR. GOODMAN: Mm-hmm.
18      Q    And it says further, "Please, immediate
19  action and remove these sellers currently
20  listing counterfeit products."
21      Would you agree that there was nothing
22  contained in this notice that refers to unauthorized
23  distribution, inauthentic products, guarantees and
24  warranties?
25      MR. VINE: Objection.



JASON TOTH, M.D.                                                December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                                69–72

Page 69

1     Q    BY MR. GOODMAN:  Go ahead.
2     A    Well, it says right here, "The indicated
3  sellers are not selling authentic products."
4     Q    And what is the basis for this statement
5  that the indicated sellers are not selling authentic
6  products?
7     A    I think --
8     MR. VINE:  Objection.  Asked and answered.
9         You can try again.
10    THE DEPONENT:  Let me make it perfectly
11  clear.
12    Q    BY MR. GOODMAN:  Please do.
13    A    I think the basis is this:  Resellers are
14  advertising their product as new.  The new product
15  is supposed to come in its original packaging, with
16  the original guarantees and warranties, and it's
17  supposed to be understood by the consumer that it's
18  shipped and handled and transported by the
19  guidelines that we've identified and communicated to
20  our wholesalers and distributors.
21        Further, anyone not able to establish
22  that the product is new within that context that has
23  either the invoice for purchase of the product or
24  documentation that we've extended our warranties and
25  guarantees to them is by definition unauthorized,

Page 70

1  inauthentic, and therefore counterfeit.
2     Q    Let me ask you again, by whose
3  definition?
4     A    Amazon as -- explains their policy in
5  several documents, somewhat redundantly.  But they
6  have policies that speak to the product authenticity
7  and quality, general conditions of use and sale,
8  on-boarding of new sellers to the seller platform,
9  as well as similar language in their
10  anti-counterfeit policy.
11    Q    Since 2018, has Youngblood in any way
12  amended its website to include statements such as
13  you have described about resellers selling products
14  that lack authenticity because of the fact that they
15  are not authorized?
16    MR. VINE:  Objection.
17        I don't understand the question, but to
18  the extent --
19    Q    BY MR. GOODMAN:  Have you updated
20  your --
21    A    First of all, the website underwent an
22  entire transformation and migration from a
23  complicated platform called Magento to a new
24  platform called Shopify.
25        This was initiated independently of any

Page 71

1  of this lawsuit involving Solu-Med.  We did that for
2  business reasons and to improve the sales on our own
3  website.
4        To answer your question, yes it's my
5  understanding that we did add language to further
6  reinforce and strengthen our policies, but I think I
7  indicated at the beginning of this deposition that I
8  came on board and specifically wanted to address our
9  entire digital strategy and e-commerce strategy.
10  And part of that strategy was looking at all
11  channels, not only our own website, not only Amazon,
12  but looking at the policies and procedures across
13  all of our distributors' websites, as well.
14        So we were concurrently in a state of
15  mind of constantly revisiting and revising and
16  having ongoing communication with all of our
17  customers as we became more sophisticated and
18  learned more about the strategies of the grey
19  market.
20    Q    Is diversion a concern of Youngblood?
21    A    Absolutely.
22    Q    And why is it a concern?
23    A    Well, it's more than a disruptive channel
24  of sales.  It's actually destructive.  It's
25  totally -- any time you offer a product that's

Page 72

1  heavily discounted off of the manufacturer's asking
2  price and selling product that's expired or tampered
3  with or comes without guarantees, the consumers are
4  used to purchasing this in a high-end retail store
5  in Milan or Western Europe someplace, and they come
6  over here and see it offered on Amazon or Wal-Mart,
7  it completely diminishes the equity of the brand and
8  all of the work that we've done, marketing dollars
9  that we've spent engaging influencers.
10        My wife founded this company 23 years
11  ago.  You go to our website or any of our social
12  media or public information, you'll see that a half
13  a dozen movie stars have endorsed it, and they
14  endorse it because they believe that it's a
15  high-performing, clean, nontoxic, animal-free
16  testing, high-quality product.
17        So every time this product is sold
18  somewhere by somebody without guarantees in which we
19  sell the product direct to our consumer, then it
20  diminishes the equity and reputation of the brand.
21  And that has significantly -- significantly impacted
22  our bottom line.
23    Q    Can you tell me the reasons why
24  Youngblood believe -- no.  Let's withdraw the
25  question.



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
73–76

Page 73

1      Can you tell me why diversion exists, or
2  had existed, with regard to your products?
3      MR. VINE:  Objection.
4      Q    BY MR. GOODMAN:  Go ahead.
5      MR. VINE:  You can answer, if you know.
6      MR. GOODMAN:  I'm sure he does.
7      THE DEPONENT:  Downstream customers not
8  fulfilling their obligations, either to their
9  contract or to us, offering the product, I suspect,
10  to buyers on the grey market.
11      Q    BY MR. GOODMAN:  And what has Youngblood
12  done with respect to those sellers?
13      A    Well, within the past year, I've probably
14  eliminated three or four to the tune of $3 million
15  with the lost sales.
16      Q    And how do you accomplish that?
17      A    Either we've identified -- either
18  we've -- they come to our attention through this
19  process of engaging Amazzia and their brand defense
20  where we're able to identify the customer who sold
21  the product to the reseller, and then we're able to
22  track back the reseller to the distributor and the
23  distributor to our contract.  And at that point,
24  then if we're able to do that, then we can cancel
25  that relationship.

Page 74

1      Q    To your knowledge and understanding, is
2  diverse legal?
3      MR. VINE:  Objection.
4      THE DEPONENT:  It all depends under what
5  circumstances they're selling the product.
6      Q    BY MR. GOODMAN:  Well, what circumstances
7  have you become aware of?
8      MR. VINE:  Objection.
9      THE DEPONENT:  Well, if you're gonna offer the
10  product as new --
11      MR. VINE:  Right.
12      THE DEPONENT:  -- as an authorized seller, then
13  the presumption, from the consumer point of view, is
14  that it comes with guarantees and warranties that
15  are associated with the new products.
16      So to the extent that -- certainly, you
17  can resell a product to someone else if it's another
18  authorized customer of ours, then presumably they
19  have the -- that right to resell the product would
20  be intact.
21      MR. VINE:  Wait.  Are you done?
22      THE DEPONENT:  Yes.
23      MR. GOODMAN:  Thank you.
24      Q    In 200-- -- November 2018, was it
25  Youngblood's agenda to eliminate diversion?

Page 75

1      MR. VINE:  Objection.
2      Q    BY MR. GOODMAN:  Go ahead.
3      A    No.  Our objective was to identify
4  resellers who are offering the product as new on the
5  website when, in fact, it's not new and guaranteed,
6  and we simply wanted to eliminate that market --
7  that grey market from selling to our consumers.
8      Q    Was it Youngblood's intent, in November
9  of 2017, to get rid of Life and Health Source as a
10  reseller of Youngblood products on Amazon's
11  platform?
12      A    Absolutely not.  We are a small business.
13  We worked very hard to get exactly where we're at
14  right now.  We respect the right of every small
15  business to be in operation.  We were only
16  attempting to protect the equity of the brand and
17  the investment that we made in that brand.
18      Q    So together with Amazzia, the way to
19  protect the brand, then, was to provide a notice to
20  Amazon that Life and Health Source was offering
21  Youngblood products that were counterfeit?
22      MR. VINE:  Objection.
23      You can answer.
24      THE DEPONENT:  Yes, that's one strategy.
25      Q    BY MR. GOODMAN:  Mm-hmm.

Page 76

1      Was there any other strategy?
2      A    Well, we monitor other websites, as we do
3  Amazon, for batch codes; expiration dates;
4  out-of-date images; copyright that's incorrect;
5  products that look blatantly fake.  So it's a
6  multi-front challenge.
7      Q    Doctor, have you ever seen any of the
8  Youngblood products that were offered by Life and
9  Health Source on Amazon's platform?
10      MR. VINE:  Objection.
11      THE DEPONENT:  Yes.
12      Q    BY MR. GOODMAN:  When did you see them?
13      A    Well, I can't stipulate that they saw
14  them on Life and Health Source store.  I see them
15  all the time by other grey-market resellers.  So let
16  me correct that by saying --
17      Q    Go ahead.
18      A    -- I go on the website at least weekly to
19  look how often we're capturing the buy box, how much
20  we're being discounted, how many resellers there
21  are, and what the reviews are that may be impacting
22  the customer reviews.
23      So in the generic sense, yes, I do
24  monitor the website for resellers and discounters.
25  Specifically, no, I don't recall seeing that



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
77–80

Page 77

1  particular store ever.
2    Q    Is Youngblood still being serviced or
3  having a business relationship with Amazzia?
4    A    No.
5    Q    Did that terminate at a certain point in
6  time?
7    A    Well, we didn't renew it for another
8  year, so. . .
9    Q    Well, initial term commenced in September
10  of 2017.
11    A    Mm-hmm.
12    Q    That's when the --
13  MR. VINE:  '18.
14  MR. GOODMAN:  Hmm?
15  MR. VINE:  '18.
16  MR. GOODMAN:  '18.  I'm sorry.
17    Q    2018.
18    And did it continue until 2019?
19    A    Yes, it did.
20    Q    And was there a reason why you didn't
21  continue with their services?
22    A    Well, it just was a business decision.
23  They weren't meeting anywhere near their sales
24  goals, and --
25    Q    As a distributor?

Page 78

1    A    As a distributor.
2    Q    Okay.
3    A    And despite their best efforts to clean
4  up the marketplace, we still have a lot
5  of discounting resellers.
6    Q    Aside from not meeting their budget or
7  something for distribution of their products, how
8  about brand protection?
9  MR. VINE:  Objection.  He just --
10    Go ahead.
11    Q    BY MR. GOODMAN:  What did they do, if
12  anything, during the one year, other than --
13    A    Well, they did a pretty good job.  I
14  mean, we -- I'd have to go back and have to identify
15  how many resellers were there in September of 2018
16  and how many were there one year later, but I would
17  submit that they eliminated at least 50 percent of
18  them, to their efforts.
19    Q    And in what manner did they accomplish
20  this?
21    A    Well, primarily, by filing complaints
22  with Amazon for trademark and counterfeit and
23  copyright infringement.
24    Q    To your knowledge, did Amazzia file
25  complaints on behalf of Youngblood about other

Page 79

1  resellers that Life and Health Source -- making a
2  claim that they were counterfeit products?
3    A    Absolutely.  I made that perfectly clear.
4  Dozens of resellers.
5  MR. VINE:  He said that earlier.
6    Q    BY MR. GOODMAN:  Do you have any
7  documents to support what you're telling us?
8    A    Well, Amazzia can -- they certainly have
9  ongoing monthly and quarterly sales reports.  I
10  don't have any.
11    Q    Well, did Amazzia report to Youngblood
12  over this period of one year the information
13  concerning other resellers that were allegedly
14  selling counterfeit Youngblood products?
15  MR. VINE:  Objection.
16  THE DEPONENT:  What Amazzia did was they would
17  file summary reports of how many resellers they
18  reported.  Whether all of those reports were for
19  counterfeit I can't say specifically.
20    Q    BY MR. GOODMAN:  Well, what was contained
21  in those reports, do you remember?
22  MR. VINE:  Okay.  So I'm going to designate
23  this portion would be as confidential.
24    I'm going to allow him to testify.  I
25  don't believe, unless it's absolutely critical, not

Page 80

1  to -- to direct a witness.  But this is definitely
2  proprietary information that I believe --
3  MR. GOODMAN:  Mark it confidential.  Go
4  ahead.
5  MR. VINE:  We'll mark it.
6    (The testimony that follows is
7  bound separately in a transcript
8  designated confidential.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
82–85

Page 82

1          ***
2     Q    BY MR. GOODMAN:  You referred before to
3  the products being not sold as new by Life and
4  Health Source.
5          What does that mean?
6     A    To me, I think it's exactly like it
7  sounds.  New is new.  New comes, the original
8  packaging, the original guarantees and original
9  warranties concerning how the product was acquired,
10  preferably with an invoice documenting that it was
11  acquired from a legitimate customer of ours.
12     MR. GOODMAN:  I don't know how to do it best to
13  identify these.
14     MR. VINE:  What is that?
15     MR. GOODMAN:  They're samples of the product.
16          So if you want to, just for
17  identification purposes, put a sticker on each one
18  of these envelopes.
19     MR. VINE:  That's fine.  I mean, I certainly --
20  I don't remember these being produced, but that's
21  okay.
22     MR. GOODMAN:  I'm producing them now --
23     MR. VINE:  No, but under -- let me put
24  something on the record.  I'm gonna let him testify
25  to it.

Page 83

1          But under Rule 26, you have an obligation
2  to produce, and a supplemental obligation that's
3  ongoing, to produce any documents or any things that
4  you intend to use during the course of the case.
5  You have not done this.
6          I'm still going to let you question, but
7  it's obviously a violation of rules.
8     MR. GOODMAN:  Thank you for making that.
9     MR. VINE:  Fine.
10     MR. GOODMAN:  All right.  Let's mark this here.
11  "This is entitled, Life and Health Source Sample
12  From Inventory."  All right.  Let's mark this as
13  Exhibit --
14     THE REPORTER:  7.
15     MR. GOODMAN:  -- 7.
16          (Plaintiff's Exhibit No. 7 was
17     marked for identification and is retained
18     by counsel.)
19     MR. GOODMAN:  We're finished with those
20  exhibits.
21     MR. VINE:  That's fine.
22          You want him to open it up?
23     MR. GOODMAN:  I'll tell him.
24     MR. VINE:  Okay.
25     Q    BY MR. GOODMAN:  Doctor, would you please

Page 84

1  open up that envelope.
2     MR. VINE:  How did you describe this envelope,
3  by the way?
4     MR. GOODMAN:  These are samples obtained from
5  our client, Life and Health Source, from their
6  inventory of products -- Youngblood products that
7  were in their inventory in 200- --
8     MR. VINE:  Did you intend to have this in
9  there, as well?
10     MR. GOODMAN:  Let me see what that is.  Sorry.
11     Yes.
12     MR. VINE:  Okay.
13     MR. GOODMAN:  This was the container for
14  those --
15     MR. VINE:  And these came -- just so it's
16  clear, these products came in your briefcase?
17     MR. GOODMAN:  Yeah.
18     MR. VINE:  And you transported them from where?
19     MR. GOODMAN:  My office.
20     MR. VINE:  And how were they sent to your
21  office?
22     MR. GOODMAN:  They were sent to me from our
23  client.
24     MR. VINE:  By overnight mail?  In a certain --
25  what condition?

Page 85

1     MR. GOODMAN:  I picked them up, actually, when
2  I was in Florida during our last visit when you took
3  the depositions.
4     MR. VINE:  Okay.
5     MR. GOODMAN:  Okay?
6     MR. VINE:  You get my point, but, anyway, go
7  on.
8     Q    BY MR. GOODMAN:  Look at these two
9  products.
10     MR. VINE:  Please.
11     Q    BY MR. GOODMAN:  Please.
12     Thank you.
13          Can you identify those as being
14  Youngblood products?
15     A    Yes, they appear as Youngblood products.
16  But I could go down and stop at a vendor and show me
17  a Rolex watch that looks -- for all intents and
18  purposes, looks like the one in Beverly Hills.  It's
19  not so much how they appear.  It's how they're
20  sourced and purchased.
21     Q    All right.  Taking a look at those two
22  products -- if you would, open up the container.
23          Would you identify which product that is.
24     A    Yes.  This is our pressed mineral
25  foundation, honey.  It appears to be our pressed



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
86—89

Page 86

1  mineral foundation, honey.

2      Q   Right.

3          Is there anything about the packaging

4  that's different from any of your products?

5      MR. VINE:  Objection.

6      THE DEPONENT:  No, I don't see anything.

7      Q   BY MR. GOODMAN:  Mm-hmm.

8          And look at the labeling on the reverse

9  side.

10         Jonathan, I'll make copies of these

11  things so I can give them to you.

12     MR. VINE:  Obviously --

13     MR. GOODMAN:  Huh?

14     MR. VINE:  I mean, you have a whole host of

15  evidentiary problems that will never get this in

16  front a jury, but --

17     MR. GOODMAN:  We'll take care of it.  We'll

18  take care of it.

19     MR. VINE:  Okay.

20     Q   BY MR. GOODMAN:  Here's another envelope

21  that's been placed --

22     MR. VINE:  We call them envelopes.  For the

23  record, they're plastic bags that contain purported

24  Youngblood products that lack both source, shipment

25  and warranty.

Page 87

1      Q   BY MR. GOODMAN:  When you reviewed these

2  products, is there anything in the labeling of those

3  products that refer to a warranty or a guarantee?

4  If you want to open them up again, go ahead.

5      A   No.  But, again, I say for the record, I

6  can't tell the difference between a real Louis

7  Vuitton bag and a fake one.

8      Q   Do you have any question as to whether

9  these are authentic products?  Or should we say,

10  genuine products?

11     MR. VINE:  No, no, no.

12     THE DEPONENT:  You said authentic.

13     Q   BY MR. GOODMAN:  Is there anything

14  different about those products, physically, that

15  differ from Youngblood products?

16     MR. VINE:  Objection.

17     THE DEPONENT:  No.  Other than how they were

18  acquired, no.  They appear to be our product.

19     MR. GOODMAN:  And this would be Exhibit 8.

20         (Plaintiff's Exhibit No. 8 was

21         marked for identification and is retained

22         by counsel.)

23     MR. VINE:  Same objection.

24     Q   BY MR. GOODMAN:  Can you just identify

25  which product that is, Doctor.

Page 88

1      A   This is a pressed mineral blush, sugar

2  plum.

3      MR. VINE:  Is it sealed up?

4      THE DEPONENT:  One of them looks tampered with.

5  It's not a complete seal.

6          Have you opened this already?

7      Q   BY MR. GOODMAN:  No.

8      A   Is this how it came to you?

9      Q   This is how it came to me.

10     A   So this --

11     Q   Other than the broken seal on it, take a

12  look at the package itself.

13     MR. VINE:  Well, he can only open one of them.

14  But go on.

15     THE DEPONENT:  Okay.

16     Q   BY MR. GOODMAN:  Is there anything about

17  that package that leads you to believe that it is

18  not a Youngblood product?

19     MR. VINE:  Objection.

20     Q   BY MR. GOODMAN:  Go ahead.

21     A   Other than what I've already previously

22  stated.  I can't speak to how it was acquired and

23  what marketplace it was marketed on.

24     Q   But if you will assume it came from --

25  no.  Withdraw the question.

Page 89

1          This would be 9.

2          (Plaintiff's Exhibit No. 9 was

3          marked for identification and is retained

4          by counsel.)

5      MR. VINE:  Your client has already admitted --

6  no.

7      MR. GOODMAN:  Let me just carry on --

8      MR. VINE:  It's fine.  We're good.

9      MR. GOODMAN:  May be boring, but let's get

10  through it.

11     THE DEPONENT:  See, this also is a little bit

12  suspicious here, when I see -- when we purchase a

13  lot of product from the global Internet, we see a

14  lot of labels that are over our bar code.

15         This is what's done by a lot of

16  distributors to hide the fact that -- where they

17  originally acquired it so that we can't track it

18  back.  This is a big problem.

19     Q   BY MR. GOODMAN:  Doctor, is Amazon an

20  authorized reseller of your products today?

21     A   No.

22     Q   Amazon doesn't sell your products?

23     A   Yes, they do.

24     Q   And under what -- how do they sell your

25  products?  Are they an unauthorized reseller?



JASON TOTH, M.D.                                    December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                                    90—93

Page 90

1    A    Yes, they are.
2    Q    Well, this -- I represent to you this is
3    purchased on Amazon on November 20th of 2019.
4    A    And we've made Amazon aware that they are
5    selling a lot of outdated, expired and discontinued
6    product. This very well could have been tampered
7    with.
8    Q    Could you put that back in the envelope.
9    MR. VINE: Plastic bag.
10   MR. GOODMAN: Hmm?
11   MR. VINE: Plastic bag. It's not an envelope.
12       I just don't want -- when we refer to the
13   transcript and then we're looking for an envelope
14   with product -- I think a better way to describe it
15   is plastic bag.
16   Q    BY MR. GOODMAN: Are there any authorized
17   resellers of Youngblood products on Amazon at the
18   present time?
19   A    No.
20   Q    Are there any authorized resellers of the
21   product on any e-commerce platforms today?
22   A    Yes. Some distributors, which are
23   predominantly spa salon, globally, and retail,
24   Western Europe and Australia -- some distributors
25   maintain their own websites and we've authorized

Page 91

1    them to sell the product on their websites at MAP.
2    Q    Did you ever hear of a retailer by the
3    name of Clover X?
4    A    Yes. I believe that was a big reseller
5    on Amazon.
6    Q    Authorized?
7    A    No.
8    Q    Unauthorized?
9    A    Correct.
10   Q    So is it your testimony that they, too,
11   are selling counterfeit products?
12   MR. VINE: Objection. We don't see if it's
13   being advertised as new, and it's a whole host of
14   other --
15   Q    BY MR. GOODMAN: Well, looking at these
16   products that you've seen already -- Exhibits 7, 8
17   and 9 -- is there anything on these products that
18   you could visualize that --
19   A    I did. I mentioned a couple things. One
20   package seal was broken. Another package had the
21   bar code covered. So --
22   Q    Other than that --
23   A    Well, those are the two big things.
24       So what is your question with respect to
25   Clover X? I can't speak to where they're selling

Page 92

1    right now or what they're selling, but the short
2    answer is they're not authorized, either.
3    Q    They're not authorized.
4        Doctor, who is -- can you identify Amazon
5    Com Services, Inc.?
6    A    No.
7    Q    So is it your testimony that Amazon is
8    not an authorized reseller of Youngblood products as
9    of this date?
10   A    Correct.
11   Q    And the only authorized resellers of
12   Youngblood products as of this date are which?
13   A    Ourselves.
14   MR. VINE: Online? On Amazon, you mean?
15   THE DEPONENT: Yes --
16   Q    BY MR. GOODMAN: You sell it --
17   Youngblood sells it on Amazon?
18   A    Correct.
19   Q    So that's coming directly from your
20   company and fulfilled by your company?
21   A    Correct.
22       You need to be clear --
23   Q    I'm trying --
24   MR. VINE: Well, no.
25       Finish your statement.

Page 93

1    Q    BY MR. GOODMAN: I'm trying hard to find
2    the distinction.
3    A    Amazon has a storefront, and they sell
4    and compete with us. We may, from time to time,
5    have done some fulfilled by Amazon, but that's not
6    the same as Amazon selling it themselves.
7    Q    Mm-hmm.
8        And in what manner did they compete with
9    you?
10   A    Just like Solu-Med. They discount and
11   diminish the integrity of the brand.
12   Q    Is there any way you can get them to
13   cease selling your products?
14   A    We're trying. We've reported them not
15   too long ago, we've sent them a list of product
16   that's been either expired or discontinued, and
17   we're waiting for them to respond.
18   Q    Well, is it Youngblood's position that
19   Amazon is selling those products, and those products
20   are likewise counterfeit?
21   A    Yes.
22   Q    And have you taken any action as against
23   Amazon?
24   A    I just mentioned. We've engaged a new --
25   we've reported them through our new brand protection

JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
94—97

Page 94

1 company called pointer brand protection, which we've
2 engaged to address this same issue on global
3 websites, and we have communicated with Amazon which
4 products that we know to be expired or discontinued.
5     Q    So Amazon, on one hand, is acting as an
6 authorized distributor, selling Youngblood products,
7 and on the other platform, they're an unauthorized
8 reseller?
9     A    Well, they're never an authorized seller
10 for us.
11    Q    So, then, you are actually -- meaning
12 Youngblood is actually the seller on Amazon?
13    A    Correct.
14    Q    That's the distinction I was having some
15 problems with.
16        Jonathan, give me a few moments.  I'll
17 see how much longer I have.
18    MR. VINE:  All right.
19    THE VIDEOGRAPHER:  Off the record, Counsel?
20    MR. GOODMAN:  Yeah.
21    THE VIDEOGRAPHER:  We're off the record at
22 12:33 p.m.  This is the end of tape number three.
23        (Recess was taken.)
24    THE VIDEOGRAPHER:  This is the beginning of
25 tape number four.  We're back on the record at

Page 95

1 12:46 p.m.
2        (Plaintiff's Exhibit No. 10 was
3    marked for identification and is attached
4    hereto.)
5    Q    BY MR. GOODMAN:  Doctor, you have before
6 you what's been marked as Exhibit 10, and it's a
7 series of emails.
8        At the bottom you will note it's
9 YBSC 00045 through -53.  And these were documents
10 that were produced by Youngblood.
11        Understood?
12    A    Yes.
13    Q    All right.  Now, I don't want to go
14 through this, each and every one of these, because
15 you've already testified to a lot of the
16 information.  I just want you to refer to one
17 particular one, and that's on page 51.
18        And this is an email stream from Brand
19 Protection, Thursday, December 20, 2018, to
20 Jason Toth, cc Geovanna Waters, who's no longer with
21 your company -- is that correct?
22    A    Correct.
23    Q    -- re: Solu-Med, back slash, Youngblood
24 Amazon complaint.
25        It says, "Hi.  We did file a retraction.

Page 96

1    They are coming back stating our retraction isn't
2 good enough.  This is what our retraction says.
3 This comes from Amazzia.  There was another
4 retraction but it says the same thing."
5        Was the retraction that's referred to
6 here drafted by Amazzia?
7    A    Amazzia identified the elements that
8 needed to be included in a retraction.  In that
9 sense, yes, it was drafted.
10    Q    And who actually constructed the
11 retraction that was sent?  Was it at Youngblood?
12    A    Yes.  I believe this probably would have
13 been Alisa.
14    MR. VINE:  I don't want you to guess.  If you
15 don't recall --
16    THE DEPONENT:  I don't recall.
17    Q    BY MR. GOODMAN:  But you didn't do it
18 personally?
19    A    Correct.
20    Q    All right.  And it says, "Hello
21 Amazon.com.  Please withdraw complaint
22 I.D. 5518323151 as we have resolved our complaint
23 with the seller Life and Health Source.  This is
24 regarding the --" particular assignment number.
25 Then it says, "Thank you, Youngblood."

Page 97

1        Beneath that, "I reattached the complaint
2 and why they sent this letter.  We filed a
3 retraction but they want us to say we were wrong and
4 they'd (sic) -- and that they were (sic) not selling
5 counterfeit products.  We didn't admit to that.  We
6 just said we resolved the complaint --"
7        Now, whose wording is that?
8    A    The more I think about this, the more I
9 think that both may have been constructed by
10 Amazzia's team, because there's no one on Youngblood
11 that would ever sign Youngblood as two words.
12    Q    Right.
13        So you believe this was constructed and
14 written by Amazzia?
15    A    Yes.
16    MR. VINE:  Explain to him that they had access
17 to the brand protection.
18    THE DEPONENT:  Exactly.  Together we had access
19 to the brand protection email.  It was originally
20 set up at their request.
21    Q    BY MR. GOODMAN:  And this statement,
22 "They want us to say we were wrong and they are not
23 selling counterfeit products.  We did (sic)
24 admit --
25    MR. VINE:  "We didn't."



JASON TOTH, M.D.
SOLU-MED vs YOUNGBLOOD SKIN CARE

December 09, 2019
98—101

---

Page 98

1    MR. GOODMAN: "We didn't.  That's what I
2    said.
3    MR. VINE:  I heard "did," but okay.
4    MR. GOODMAN:  You didn't hear me --
5    MR. VINE:  Maybe I'm wrong.  Everybody tells me
6    that.
7    Q    BY MR. GOODMAN:  "We didn't admit to
8    that."
9        Why didn't you admit to that?
10   A    We didn't admit to it because that's not
11   our basis for resolving the matter.  We had no
12   admission that the product was not, in fact,
13   counterfeit.
14       I think I've established repeatedly, or
15   attempted to establish, what my understanding was,
16   is the same understanding as Amazon as to the
17   definition of a counterfeit product.
18   MR. GOODMAN:  I have no further questions.
19   MR. VINE:  He will read.  I don't know if you
20   know what that is.
21   THE REPORTER:  Yes, I do.
22   MR. VINE:  Yeah, he will read.
23   MR. GOODMAN:  Pardon?
24   MR. VINE:  He's gonna read.
25   MR. GOODMAN:  He's gonna read?

---

Page 99

1    MR. VINE:  Yeah.  She knows.
2    MR. GOODMAN:  Okay.
3    MR. VINE:  And I assume, if he's ordering,
4    we'll take a copy.
5    THE REPORTER:  Okay.
6    MR. GOODMAN:  Are you ordering?
7    MR. GOODMAN:  Yeah.
8    MR. VINE:  We'll take a copy.
9    MR. GOODMAN:  Yeah.
10       He's gonna read; he's not gonna waive?
11   MR. VINE:  Right.
12   THE VIDEOGRAPHER:  This concludes tape four in
13   today's videotaped deposition.  We're going off the
14   record, December 9, 2019, at 12:51 p.m.
15       (The deposition was concluded at
16       12:52 p.m.)
17       -oOo-
18
19
20
21
22
23
24
25

---

Page 100

1            DEPONENT'S DECLARATION
2
3        I, JASON TOTH, M.D., hereby declare:
4        I have read the foregoing deposition
5    transcript, I identify it as my own, and I have made
6    any corrections, additions or deletions that I was
7    desirous of making in order to render the within
8    transcript true and correct.
9        I declare under penalty of perjury, under
10   the laws of the State of California, that the
11   foregoing is true and correct.
12
13   _____,_____
         (date)                    (city and state)
14
15
16   _____
17                    (Signature)
18
19
20
21
22
23
24
25

---

Page 101

1    STATE OF CALIFORNIA   )
                           )  ss.
2    COUNTY OF LOS ANGELES )
3        I, Wendy J. Wright, Certified Shorthand
4    Reporter, Certificate No. 11607 in the State of
5    California, duly empowered to administer oaths, do
6    hereby certify:
7        I am the deposition officer that
8    stenographically recorded the testimony in the
9    foregoing deposition;
10       Prior to being examined, the deponent was
11   by me first duly sworn;
12       The foregoing transcript is a true record
13   of the testimony given;
14   (  )  I was relieved of my duty pursuant to
             Rule 30(e) and (f) of the Federal Rules
15           of Civil Procedure.
16   (X)   Pursuant to Rule 30(e) of the Federal
             Rules of Civil Procedure, it was
17           requested that the deponent shall have
             30 days to review the transcript;
18           therefore, any changes made by the
             deponent or whether or not the deponent
19           signed the transcript cannot at this time
             be set forth.
20
21   (  )  Pursuant to Rule(e) of the Federal Rules
             of Civil Procedure, no request being made
             for review, the transcript was sealed and
22           sent to the noticing attorney.
23   Dated December 23, 2019, Los Angeles, California.
24
25   _____

---

ESQUIRE
DEPOSITION SOLUTIONS

JASON TOTH, M.D.                                    December 09, 2019
SOLU-MED vs YOUNGBLOOD SKIN CARE                              102—105

---

Page 102

1    STATE OF CALIFORNIA   )
                           )  ss.
2    COUNTY OF LOS ANGELES )

3

4            I, Wendy J. Wright, a Certified Shorthand
5    Reporter, Certificate No. 11607, in the State of
6    California, duly empowered to administer oaths, do
7    hereby certify:
8            As requested pursuant to the Rule 30(e)
9    of the Federal Rules of Civil Procedure, written
10   notice having been sent to the deponent, the
11   deponent:
12       ( )   In person made the changes set forth in
               the foregoing transcript; and
13
         ( )   Signed the transcript identifying the
14             deposition as his or her own;
15       ( )   Expressly refused to approve the
               transcript by not signing it;
16
         ( )   By signed letter attached hereto, made
17             the changes set forth therein;
18       ( )   Failed to contact the deposition officer
               within the allotted time period.
19

20

21   Dated_____, Los Angeles, California.

22

23

24       _____

25

---

Page 103

1    Reference No.: 4744327

2

3    Case:  SOLU-MED vs YOUNGBLOOD SKIN CARE

4
         DECLARATION UNDER PENALTY OF PERJURY

5
         I declare under penalty of perjury that
6    I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
7    same has been read to me, and the same is
     true and accurate, save and except for
8    changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
9    hereof, with the understanding that I offer
     these changes as if still under oath.

10

11       _____

12       Jason Toth, M.D.

13

14       NOTARIZATION OF CHANGES
15           (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)              Notary Public,

24

25   in and for the State of _____

---

Page 104

1    Reference No.: 4744327

     Case:  SOLU-MED vs YOUNGBLOOD SKIN CARE

2

3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24

     SIGNATURE:_____DATE:_____
25   Jason Toth, M.D.

---

Page 105

1    Reference No.: 4744327

     Case:  SOLU-MED vs YOUNGBLOOD SKIN CARE

2

3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24

     SIGNATURE:_____DATE:_____
25   Jason Toth, M.D.

---





**YOUNGBLOOD®**
MINERAL COSMETICS

*Retail / Web Clients Only*
*Customer Division: 10 or 10W*

**All of our products are 100% guaranteed**

If you are not completely satisfied with your product(s), please return your merchandise within 30 days of the purchase date for an exchange or refund.

To return or exchange your merchandise, please note on the front of your packing slip the reason(s) you are returning the item(s) and whether you want an exchange or a refund.

- If you are requesting a refund, we will credit your original payment method, less shipping and handling charges.
- If you are requesting an exchange, we will forward your new selection(s) and debit your credit card on file for the difference in cost of the product(s), if any, plus shipping & handling.

Enclose your packing slip with the item(s), and ship pre-paid* and insured to:

Youngblood Mineral Cosmetics
Attn: Returns Dept.
4583 Ish Drive
Simi Valley, CA 93063

You can expect your refund or exchange within two to four weeks from the time you mailed your return back to Youngblood. For returned purchases with a credit card, please allow one to two statements for your credit to appear.

If you have any questions, please call us at 800.216.6133, or email us at info@ybskin.com. We appreciate your business!

* We do not accept COD packages.


Thank you,

**Youngblood Mineral Cosmetics**
4583 Ish Drive, Simi Valley, CA 93063
800-216-6133 • Fax: 805-577-0114
www.ybskin.com

**EXHIBIT 2**

td/092413
YBSC 0054

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3
 4   SOLU-MED, INC.,            )
                                )
 5             Plaintiff,   )Case No.
                                )0:10-cv-60487
 6        vs.                   )
                                )
 7   YOUNGBLOOD SKIN CARE PRODUCTS )
     LLC,                        )
 8                              )
                Defendants.   )
 9   _____)
10
11           * * * CONFIDENTIAL * * *
12
13       VIDEOTAPED 30(b)(6) DEPOSITION OF
14      THIRD-PARTY, AMAZZIA, BY AND THROUGH
15         PERSON MOST KNOWLEDGEABLE
16              WILLIAM FIKHMAN
17
18            DECEMBER 10, 2019
19               10:18 A.M.
20
21          16501 Ventura Boulevard
22            Encino, California
23
24
25          Susan Pobor, CSR No. 5132
```

**Page 2**

```
 1          APPEARANCES OF COUNSEL
 2
 3   ON BEHALF OF PLAINTIFF, SOLU-MED, INC.:
 4       GOODMAN & SAPERSTEIN
         BY:  STANLEY R. GOODMAN, ESQ.
 5       666 OLD COUNTRY ROAD
         SUITE 200
 6       GARDEN CITY, NEW YORK  11530
         (516) 227-2100
 7       GSESQ@AOL.COM
 8          -- AND --
 9       BLACK LAW, P.A.
         BY:  KELSEY K. BLACK, EQ.
10           (Via telephone)
         1401 East Broward Boulevard
11       Suite 204
         Fort Lauderdale, Florida  33301
12       (954) 320-6220
         Kelsey@kkbpa.com
13
14   ON BEHALF OF DEFENDANT, YOUNGBLOOD SKIN CARE
     PRODUCTS LLC:
15
         COLE, SCOTT & KISSANE, P.A.
16       BY:  JONATHAN VINE, ESQ.
         222 Lakeview Avenue
17       Suite 120
         West Palm Beach, Florida  33401
18       (561) 383-9200
         Jonathan.Vine@csklegal.com
19
20   ON BEHALF OF THIRD-PARTY, Amazzia:
21       BURKHALTER KESSLER CLEMENT & GEORGE LLP
         BY:  ANDREW M. CUMMINGS, ESQ.
22       2020 Main Street
         Suite 600
23       Irvine, California  92614
         (949) 975-7500
24       Acummings@bkcglaw.com
25
```

**Page 3**

```
 1          APPEARANCES (CONTINUED):
 2
 3   VIDEOGRAPHER:  DANIEL ROCCO
 4
     ALSO PRESENT:  JASON TOTH
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2
 3   WITNESS        EXAMINATION        PAGE
 4   WILLIAM FIKHMAN   BY MR. VINE        7
 5                     BY MR. GOODMAN   108
 6                     BY MR. VINE      164
 7
 8
 9          E X H I B I T S
10   EXHIBITS      DESCRIPTION        PAGE
11   Exhibit 1   Notice of Deposition,      10
                 attaching a document
12               entitled "Scheduled 'A'
                 Areas of Inquiry
13
     Exhibit 2   Document entitled,         26
14               "Youngblood Skin Care
                 Products, LLC
15               Distributor Agreement
16   Exhibit 3   Amazon Management Agreement   29
                 between Youngblood and
17               Amazzia
18   Exhibit 4   Condition Guidelines from   42
                 Amazon
19
     Exhibit 5   Document entitled,         45
20               "Cosmetics & Skin/Hair
                 Care"
21
     Exhibit 6   Document entitled, Amazon   50
22               Product Authenticity and
                 Quality
23
     Exhibit 7   Document entitled, "Amazon   68
24               Anti-Counterfeiting Policy"
25
```



**EXHIBIT 3**

PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019

5—8

Page 5

1          E X H I B I T S  (CONTINUED)
2  Exhibit 8   Document entitled, "Selling      82
3          Policies and Seller Code of
           Conduct
4  Exhibit 9   Complaint submitted to          86
           Amazon on behalf of
5          Youngblood
6  Exhibit 10  E-mail correspondence, top      94
           e-mail from Brand
7           Protection to Daniel Le
            Blanc, dated 7/15/19,
8            Subject: Fw: Solu-Med,
             Inc./Youngblood - Amazon
9             Complaint ID #5518323151
10 Exhibit 11  Correspondence relating to       98
            a retraction request
11
   Exhibit 12  E-mail correspondence, top      102
12           e-mail from Brand
             Protection to Daniel Le
13           Blanc, dated 7/15/19,
             Subject: Fw: Complaint ID:
14            5519411921
15
            INFORMATION REQUESTED
16
                 (NONE)
17
18
19        QUESTIONS INSTRUCTED NOT TO ANSWER
20         PAGE    LINE
21          162     13
22
23
24
25

Page 6

1          DEPOSITION ON WILLIAM FIKHMAN
2             DECEMBER 10, 2019
3             ---o0o---
4          THE VIDEOGRAPHER:  Here begins Volume I,
5  Media one, deposition of William Fikhman, in the
6  matter of Solu-Med, Inc. versus Youngblood Skin
7  Care Products LLC.  Case number is 0:10-cv-60487.
8          Today's date is Tuesday, December 10, 2019.
9  The time on the video monitor is 10:18 a.m.
10         The video operator today is Daniel Rocco,
11 contracted by Esquire Deposition Solutions.
12         This video deposition is taking place at
13 16501 Ventura Boulevard, Suite 400, Encino,
14 California.
15         Counsel, please identify yourselves and
16 state whom you represent.
17         MR. GOODMAN:  Stanley R. Goodman for the
18 plaintiff, Solu-Med.
19         MS. BLACK:  Kelsey Black with Stanley
20 Goodman for the plaintiff, Solu-Med.
21         MR. VINE:  Jonathan Vine with the law firm
22 of Cole, Scott & Kissane on behalf of Youngblood.
23         MR. CUMMINGS:  Andrew Cummings from
24 Burkhalter Kessler Clement & George here for
25 third-party deponent, Amazzia.

Page 7

1          THE VIDEOGRAPHER:  The court reporter today
2  is Susan Pobor of Esquire.
3          Will the reporter please swear in the
4  witness.
5             * * *
6          WILLIAM FIKHMAN,
7          having been first duly sworn, was
8          examined and testified as
9          follows:
10
11            EXAMINATION
12 BY MR. VINE:
13    Q.  Okay.
14        Can you please state your name for the
15 record?
16    A.  William Fikhman.
17    Q.  Did you say "Fikhman"?
18    A.  Fikhman.
19    Q.  Thank you.
20        Mr. Fikhman, have you ever sat for a
21 deposition before?
22    A.  No.
23    Q.  Okay.
24        Today, I'll be asking you a series of
25 questions.

Page 8

1          If you don't understand any of my
2  questions, feel free to let me know, but I'm going
3  to assume that you understood them unless you tell
4  me to rephrase the question.
5          Is that good?
6    A.  Yes.
7    Q.  It's also important for you to keep your
8  questions as verbal responses, as the
9  court reporter can't take down nods or gestures.
10        Okay?
11    A.  Okay.
12    Q.  It's also important for you to let me
13 complete my question, even if you anticipate the
14 answer, as the court reporter can't take the two of
15 us speaking at the same time.
16        Does that sound good?
17    A.  Yes.
18    Q.  And then, lastly -- well, not lastly -- but
19 you're going to be hearing, from time to time,
20 object -- potentially, objections from counsel,
21 whether it be your counsel or Mr. Goodman.  You're
22 still required to respond to the question unless
23 they direct you not to answer.
24        Okay?
25    A.  Uh-huh, yes.



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019

9–12

Page 9

1    Q.   Okay.
2        And, lastly, any time you need a break,
3    feel free to let your counsel know, and we can take
4    a break.
5        Okay?
6    A.   Okay.
7    Q.   Okay.  Great.
8        Can you give me your current address?
9    A.   Business or --
10   Q.   Business is fine.
11   A.   7040 Darby Avenue, Reseda, California,
12   91335.
13   Q.   Where -- Where are you employed?
14   A.   Auction Brothers, Inc. doing business as
15   Amazzia.
16   Q.   Okay.
17       And are you one of the owners of the
18   company?
19   A.   I am.
20   Q.   Okay.
21       How many owners are there at the company?
22   A.   Three.
23   Q.   And who are the owners?
24   A.   Mike Fikhman, George Fikhman and
25   William Fikhman.

Page 10

1        (Whereupon Exhibit 1 was marked
2            for identification)
3    BY MR. VINE:
4    Q.   Okay.  We've marked as Exhibit 1 -- it's a
5    Notice of Deposition with an Exhibit A with areas
6    that we seek to depose you on.
7        Can you take a look at it and tell me if
8    you've seen this before?
9    A.   Yes.
10   Q.   Okay.  If you could stay on the third page.
11       The third page is an exhibit that lists
12   areas of a potential inquiry.
13       Correct?
14   A.   Yes.
15   Q.   Okay.
16       Do you -- Are you the designee from Amazzia
17   to answer questions regarding those listed on -- in
18   Exhibit 1?
19   A.   Yes.
20   Q.   Okay.
21       Can you just give me a brief description of
22   your educational background?
23   A.   I have a bachelors in accounting and
24   business honors --
25   Q.   Okay.

Page 11

1    A.   -- from Cal State Northridge.  Cal State
2    Northridge.
3    Q.   Okay.
4        And how long have you been working at
5    Amazzia?
6    A.   The corporation is 15 years old.  So the
7    entire 15 years.
8    Q.   Okay.
9    A.   It has not always been Amazzia.
10   Q.   Okay.
11       So why -- why don't we start --
12       How -- When was -- When did Amazzia become
13   first incorporated or began?
14   A.   Amazzia became a dba of Auction Brothers
15   maybe two years ago.
16   Q.   Okay.
17       Prior to that, it was some -- it was
18   Auction Brothers?
19   A.   It was just Auction Brothers.
20   Q.   What -- What was the nature of the business
21   for Auction Brothers?
22   A.   It was Amazon reselling.
23   Q.   Amazon.
24       And -- And why --
25       About two years ago, you said, 2017?

Page 12

1        Is that correct?
2    A.   (No audible response).
3    Q.   You have to respond verbally.
4    A.   Yes.
5    Q.   Okay.
6        About two years ago?
7    A.   Yes.
8    Q.   Okay.
9        And why did it change its name to "Amazzia"
10   or use a dba?
11   A.   We created -- We pivoted the business
12   model towards more of the Amazon brand protection
13   and management model.
14       Prior to that, it was just purely
15   reselling products on Amazon without any exclusive
16   relationships with brands.
17   Q.   Okay.
18       When did you begin --
19       Strike that.
20       Would you agree with me that you handled
21   brand protection prior to converting into the name
22   of "Amazzia"?
23   A.   Yes.
24   Q.   Okay.
25       When did Auction Brothers or the



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
13–16

Page 13

1  predecessor of Amazzia begin doing brand
2  protection?
3    A.  Early 2016.
4    Q.  Okay.
5      So since January -- about January of 2016?
6    A.  Yes.
7    Q.  Okay.
8      And what is brand protection?
9    A.  Brand protection is helping a brand that
10  loses control on Amazon to regain control of who's
11  selling its products on Amazon, to clear up the
12  marketplace of bad actors that sell used product,
13  counterfeit product, returns, and just other messes
14  that ultimately create an uneven playing field for
15  everybody that is authorized to sell in the market.
16      So brand protection helps a brand identify
17  and clean up all of these bad sellers and bad
18  actors in the Amazon market.
19      As Amazon has grown to 300 million
20  products, it's lost control of the market.  It's
21  not able to police all the products that exist in
22  the database.
23      And so there are many third-party
24  companies like Amazzia that have been created to
25  help brands patrol, police, and clean up their

Page 14

1  presence on Amazon.
2    Q.  So the type of brand protection that
3  Amazzia does is prevents used products that aren't
4  authorized to be sold.
5      Correct?
6    A.  Correct.
7    Q.  Inauthentic products?
8    A.  Correct.
9    Q.  Counterfeit products?
10   A.  Correct.
11   Q.  And any other type of products that are
12  diluting the -- the name of your clients?
13   A.  Yes.
14   Q.  Okay.
15      Anything else regarding brand protection
16  that Amazzia does that --
17   A.  Sure.
18      Brand protection also extends to
19  optimizing pages, to make sure they're consistent
20  across the catalog, to make sure the brand is
21  represented consistently through the catalog,
22  through the Amazon catalog, to make sure every
23  product has consistency in the imagery and the
24  pictures and the descriptions and just a general
25  organized presence on Amazon, versus a unorganized

Page 15

1  market that gets created when all the unauthorized
2  sellers come into the market and change the pages.
3      Amazon works like a Wiki page.  So every
4  person that's selling the product can contribute to
5  that page, and sometimes, these sellers contribute
6  inaccurate things, make false claims, like this
7  product cures cancer on dietary supplements which
8  can't be made, and various other things that
9  potentially put the -- the brand in liability for
10  being misrepresented on Amazon.
11      So we look to reverse that, and clean that
12  up.
13   Q.  Okay.
14      And how did your company get into the brand
15  protection business?
16      What triggered your company to start doing
17  this?
18      Was it something about what you were
19  selling, or something else?
20   A.  Originally, I was introduced through
21  another group I'm involved with, with a lady that
22  owned a brand.  She does not, anymore, own this
23  brand.
24      But it was a beauty product, and she was
25  trying to get her product into mass retail and

Page 16

1  couldn't because her Amazon market was wildly out
2  of control.
3      There were people she couldn't identify
4  that were selling her product, some of which was
5  not really her product.  It was flat-out
6  counterfeits, and it was ultimately driving her
7  price down on Amazon.
8      And I thought we could help her.
9      And so we -- we took on kind of a project
10  just to help her, and that was the start of
11  Amazzia, informally.
12   Q.  Okay.
13      And how did you develop the name "Amazzia"?
14      What is that a deriv -- derived from?
15   A.  We -- We actually hired a naming expert,
16  contractor that came up of a variety of names.
17  That was one he recommended.
18      And it's a play on "amazing," and our
19  belief is that, you know, a brand can be amazing on
20  Amazon.  So it's a play on that.
21   Q.  Okay.
22      Does Amazzia contract with companies to
23  list and sell products on Amazon?
24   A.  I don't understand the question.
25   Q.  Sure.  Not a problem.



Page 17

1    Do -- Does Amazzia become a distributor
2 with companies such as Youngblood --
3    A.  Yes.
4    Q.  -- to sell products online?
5    A.  Yes.
6    Q.  Okay.
7    So what percentage of the business is that,
8 do you think, for Amazzia?
9    Because that's reselling.
10    A.  Where it becomes a --
11    Q.  Yes.
12    A.  -- distributor of the product?
13    Q.  Sure.
14    A.  97 percent, maybe.
15    Q.  Okay.
16    And 3 percent is about brand protec --
17    A.  3 percent, we operate --
18    COURT REPORTER:  I'm sorry.
19    What you need to do is wait until the very
20 last word of his question, please, and then give
21 your answer.  And --
22    Q.  So let me just start over.
23    Would you say about 3 percent is brand
24 protection?
25    A.  Our entire business includes brand

Page 18

1 protection.
2    Q.  Okay.
3    A.  97 percent is distributed business, like
4 our relationship with Youngblood.
5    Q.  Okay.
6    A.  The smaller part is sometimes we offer a
7 service, only, where we don't distribute the
8 products, but some companies will hire us to do the
9 brand protection service for a monthly retainer.
10    Q.  Okay.  So now I understand.
11    So, typically, the services that you
12 provide are both brand protection and distribution,
13 and that's about 97 percent, and about 3 percent is
14 brand protection, only?
15    A.  Correct.
16    Q.  Okay.
17    And where is Amazzia located?
18    A.  Reseda, California.
19    Q.  Okay.
20    And has it always been there?
21    A.  Amazzia has always been there.
22    We were in Tarzana prior to that for many
23 years.
24    Q.  And do you sell services for brand
25 protection and distribution on other platforms

Page 19

1 other than Amazon?
2    A.  We do offer a Walmart service.
3    Q.  And what's that?
4    A.  Same thing.  We help a brand clean up the
5 Walmart channel.
6    That's the only other brand protection
7 area we serve today.
8    We have one client in that --
9    Q.  Okay.
10    A.  -- aspect.
11    Q.  Okay.
12    Does Amazzia protect brands or provide
13 protection services of brands that sell on Amazon
14 from competitors who sell counterfeit products?
15    A.  Can you repeat that?
16    Q.  Sure.
17    One of the services that you provide is
18 providing protection from inauthentic or
19 counterfeit products.
20    Correct?
21    A.  Yes.
22    Q.  Okay.
23    And how -- What is the process in which
24 Amazzia goes by to look for inauthentic,
25 counterfeit or used products that are not

Page 20

1 authorized?
2    A.  Okay.  So when we partner with a brand,
3 whether we are distributing that product or purely
4 providing the -- the brand protection service, part
5 of our agreement will stipulate what is their what
6 we call enforcement rule.
7    So every brand defines the enforcement
8 rule differently.  In this case --
9    I think it's on that form there.
10    Q.  I'll -- I'll show it to you in a second.
11    A.  Okay.
12    So --
13    Q.  I'm just talking generally, and then we're
14 going to do specifics.
15    A.  Okay.  So, in general, we would identify
16 that Amazzia will be removing all resellers except
17 authorized resellers.
18    And then we start to look at, okay, who is
19 in the market that is not authorized.
20    On a beauty product, specifically one in
21 cosmetics like Youngblood, Amazon actually doesn't
22 allow you to list the product unless it is new.
23    So used products that go on the body are
24 not allowed, by policy, to be listed on Amazon.
25    So all sellers list this type of a product



Page 21

1  as new.
2       And then anybody that's not authorized,
3  the company, in this case Youngblood, does not
4  extend its warranty, and certain quality controls
5  that it has to a reseller that it doesn't know --
6       Because in -- in a product that goes on
7  the body that has a certain shelf life, when a
8  company doesn't know how the product is stored, how
9  it's shipped, you know, how it's handled, they
10  really can't stand behind the efficient -- the
11  effectiveness of that product when it actually is
12  used by the consumer.
13       It could have been made 20 years ago
14  and -- and still be used on someone's face, which
15  might not be efficient.  It might actually be
16  harmful in some cases to the consumer.
17       So we look for product -- sellers who are
18  not authorized, and if they are listing the product
19  as new, they're technically breaking Amazon's rule.
20       Amazon has something called the
21  Condition Guidelines.  And for condition guidelines
22  of new, it will actually say the original warranty,
23  if one applies, is included with the sale of the
24  product.
25       And we make the position that an

Page 22

1  unauthorized seller is not including the warranty.
2  They're technically breaking Amazon's policy for
3  condition guidelines of new.
4       This is a material difference in the --
5  the sale of the product, and actually creating
6  consumer confusion.
7       Because the consumer will end up buying
8  the product, and if they have questions or any kind
9  of post-sale customer service needs, will come back
10  to a brand, Youngblood in this case, and ask, you
11  know, user questions or instructions or that kind
12  of stuff, and that user's product will not have had
13  the warranty.
14       So because of all those reasons, there's a
15  material difference and consumer confusion that's
16  created, and it's technically counterfeit and --
17  Q.  And inauthentic?
18  A.  It's inauthentic.
19  Q.  And -- And we'll get to the guidelines.
20       Because actually, if you recall correctly,
21  the guidelines specifically talk about
22  inauthenticity for material differences, doesn't
23  it?
24  A.  The Amazon guidelines?
25  Q.  Yes.

Page 23

1  A.  The guidelines I'm referring to are the
2  condition guidelines that talk about for a product
3  listed as new, the original warranty has to be
4  included.
5       So I don't know which guidelines you're
6  referring to.
7  Q.  I'll -- I'll show you the guidelines.
8  A.  Okay.
9  Q.  I mean, that's -- that's not a big deal.
10  We'll go -- We'll go one-by-one.
11       Let's talk about -- Let's just go right to
12  the point of Youngblood.
13       When did you first meet with somebody from
14  Youngblood?
15  A.  Youngblood was called on by a gentleman,
16  Yoji Cole, that worked on my sales team in maybe
17  mid-2018.
18       And I first met Youngblood I believe at
19  their office in maybe late summer, fall of 2019
20  [sic], maybe a month or two before we actually
21  executed our agreement.
22  Q.  '18, not '19?
23  A.  '18, correct.
24  Q.  I thought you said '19, but --
25       And did -- Who attended that first meeting

Page 24

1  that you were at in September of 2018?
2  A.  Me, Yoji Cole, Jason, and I believe --
3  Q.  When you say "Jason", Jason who?
4  A.  Jason Toth.
5  Q.  Okay.
6  A.  Am I saying that correctly?
7  Q.  Yes.
8  A.  Toth?
9       And I believe they had a -- a lady that
10  was --
11       Oh, a General Manager, Geovanna Waters, I
12  think was her last name.
13       And there was maybe one more lady, I'm --
14  I'm not sure, from the sales team.
15  Q.  Okay.
16  A.  Alisa --
17  Q.  Alisa Garrett?
18  A.  Maybe, but I'm not certain.
19  Q.  Okay.
20  A.  She's no longer there, I think, though.
21       So if -- That would be her if that's the
22  same person.
23  Q.  Okay.
24       And at this meeting, do you recall the
25  substance of that?



Page 25

1    A.  The meeting was a sales meeting, pitching
2   Youngblood on our capabilities of helping them
3   enforce the Amazon market and becoming their
4   distributor on Amazon.
5    Q.  And you would agree with me that Youngblood
6   expressed concern they had of counterfeit,
7   inauthentic products, and unauthorized products
8   being sold on Amazon at that time?
9    A.  Absolutely.  That was the basis of why
10  they were even interested in having a discussion
11  with us, is because there -- there were
12  counterfeits and inauthentic products trading in
13  the marketplace, and they could not identify how it
14  was coming into the marketplace.
15   Q.  Right.
16       I mean, Youngblood is a small company.
17       Correct?
18   A.  I don't know what a small company is.
19   Q.  Okay.  Fair enough.
20       But they looked to Amazzia to partner with
21  it and hire Amazzia to protect its brand.
22       Correct?
23   A.  Correct.
24       That was the basis of our distribution
25  agreement, was to protect the brand.

Page 26

1    Q.  Okay.
2       MR. VINE:  I'm going to mark Exhibit 2.
3       (Whereupon Exhibit 2 was marked
4        for identification)
5       THE WITNESS:  Are we done with this one?
6   BY MR. VINE:
7    Q.  For now.  We can -- You can leave them
8   here.
9    A.  Okay.
10   Q.  We're going to definitely come back to
11  those.
12       Marked as Exhibit 2 is the distribution
13  agreement with Youngblood.
14       If you turn to the signature page, tell me
15  if you recognize those signatures.
16   A.  This signature is my signature.
17       But the Agreement, the version I saw
18  earlier had -- had said "Amazzia" up here.  I don't
19  know if that was actually part of our Agreement or
20  added later --
21   Q.  Okay.
22   A.  -- in the process.
23       I'm not sure that the contents of this
24  Agreement are our Agreement, but I'm certain that
25  is my signature.

Page 27

1    Q.  That's -- To be fair, somebody from our
2   office --
3    A.  That's the version.
4    Q.  It's the same version?
5    A.  Yes.
6    Q.  Okay.  Somebody wrote that, meaning my
7   office.  I think that was sent over.
8       But, in any event, who is William Samuel?
9    A.  William -- "Samuel" is my middle name.  I
10  used to operate in business under the name
11  "William Samuel".  It's not my legal name.  So, it
12  is me.
13       And then last year, I went back to
14  "William Fikhman".
15   Q.  Okay.
16       And this distribution agreement, this was
17  an Agreement that was drafted by whom?
18   A.  This distribution agreement was drafted by
19  Youngblood.
20   Q.  And this distribution agreement agreed that
21  you would have -- be able to sell Youngblood
22  products on Amazon.
23       Correct?
24       MR. CUMMINGS:  If you want to take time to
25  read the Agreement, you can?

Page 28

1       THE WITNESS:  The whole thing?
2       MR. CUMMINGS:  I mean, whatever you need to
3   do.
4   BY MR. VINE:
5    Q.  I mean, if you don't know, then say
6   "I don't know" and I could point you to a specific
7   section.
8    A.  Yeah, please.
9       Can you please point me to a section that
10  talks about Amazon?
11   Q.  Well, before -- before we get to that, I
12  want to first take you to the Section D --
13  Subsection D --
14       MR. GOODMAN:  What page are you talking
15  about?
16       MR. VINE:  Sorry.  Subsection 9, which is
17  on Page 9, Relationship of Parties.
18   Q.  Tell me when you're done reading that.
19   A.  Section 9?
20   Q.  Yes.
21   A.  Okay.
22       Okay.  I have read it.
23   Q.  Okay.
24       And based upon the language within it,
25  within this provision, you agreed that Amazzia was



Page 29

1  an independent contractor and not an agent of
2  Youngblood.
3       Correct?
4       MR. CUMMINGS:  Objection to the extent it
5  calls for --
6       MR. GOODMAN:  Objection.
7  Mischaracterization.
8       MR. CUMMINGS:  Objection to the extent it
9  calls for a legal conclusion.
10      MR. VINE:  You can answer.
11      THE WITNESS:  Can you repeat your question?
12  BY MR. VINE:
13      Q.  Did Amazzia agree that it was an
14  independent contractor of my client?
15  "Yes" or "no"?
16      MR. CUMMINGS:  Same objections.
17      THE WITNESS:  Yes.
18      MR. VINE:  I'm going to mark this as
19  Exhibit 3.  It is the Amazon Management Agreement
20  between Youngblood and Amazzia.
21      (Whereupon Exhibit 3 was marked
22          for identification)
23  BY MR. VINE:
24      Q.  Can you tell me what this document is?
25      A.  This is our standard Agreement that we

Page 30

1  draft up when entering a distributor relationship
2  with a brand like Youngblood.
3       Q.  Okay.
4       And what does this provide for?
5       A.  Sorry.
6       What does it provide?
7       Q.  What are -- What are you -- What are you
8  providing by the terms of this contract?
9       A.  Oh, I see.
10      The -- The main services we cover are
11  three areas of service:  One, around brand
12  protection; two, around marketing and optimization;
13  and, three, around physical distribution of
14  product.
15      Q.  Okay.
16      And how does this differ from the
17  distribution agreement?
18      A.  This is the -- For all intents and
19  purposes, this is the distribution agreement.
20      Q.  That you guys signed -- That you guys put
21  forward.
22      Correct?
23      A.  This is the only Agreement we put forward
24  when we partner with a brand.  This is our version.
25      Q.  What about Exhibit 2?

Page 31

1       A.  Sometimes a brand will come back and say:
2  Hey, we have our own version of our
3  Distributor Agreement.  Will you sign it?
4       And, usually, we will sign it, provided
5  it's all standard, normal business language, which
6  in this case it was.  I don't think we had any
7  changes in this Agreement, and we did sign this,
8  Youngblood's version.
9       Q.  Okay.
10      So you -- Both contracts were in effect?
11      A.  Correct.
12      Q.  Okay.
13      And can you point us to the provisions in
14  this Amazon -- Exhibit 3, Amazon Management
15  Agreement, where it talks about brand protection
16  services?
17      A.  It's Bullet Point 3, under "Services",
18  where it says:  "Report unauthorized sellers, until
19  Amazon removes them:  50% of resellers removed in
20  the first 60 days...", et cetera.
21      Q.  Okay.
22      A.  Bullet Point 4, from the bottom, Guidance
23  on set-up of Brand Registry 2.0", is also part of
24  that, because you need Brand Registry to do the
25  brand protection.

Page 32

1       And Bullet Point 1:  "ASIN pages monitored
2  and protected, 24/7/365."
3       Q.  What is ASIN?
4       A.  "ASIN" stands for Amazon stock indexing
5  unit.  It's basically a serial number of a product
6  page on Amazon.
7       Q.  And every product that's sold on Amazon has
8  one of those?
9       A.  Yes.
10      Q.  Okay.
11      In order to sell product, you need to have
12  that number?
13      A.  You don't need to have it.
14      Amazon assigns you that number.  When you
15  upload an item to their catalog, they would assign
16  as ASIN number.
17      Q.  So then you would need it.
18      Right?
19      A.  It's not a matter of need.
20      There's -- There's -- Yes, I guess there's
21  no other options.  There's no page that does not
22  have ASIN --
23      Q.  And I just don't understand the
24  argument about why you're arguing about it.
25      But you agree that you can't sell a product



Page 33

1 unless Amazon gives you an ASIN number?
2    A.  Yes.  It's sort of -- Yeah, it's just part
3 of the upload process.
4    Q.  Okay.  Great.
5        So let's talk about the timeline on Page 2
6 of 3.
7    A.  Page 2 of 3, sure.
8    Q.  Actually, before we get to that, it says,
9 "What We Need to Get Started" on Page 2.
10        Do you see that?
11   A.  Yes.
12   Q.  It says:  "Dedicated email address under
13 your domain to be provided to Amazzia."
14        Is that correct?
15   A.  Yes.
16   Q.  And in this case, did you set one up -- did
17 Amazzia set one up for Youngblood?
18   A.  It's the opposite.
19        Youngblood set up an address for us.
20   Q.  Okay.
21        So Youngblood -- In this case, did
22 Youngblood set up an address for Amazzia to use?
23   A.  Yes.
24   Q.  Okay.  What was that address?
25   A.  I don't know it -- the exact address

Page 34

1 because it changes sometimes, but it would be
2 something like brandprotection@youngblood.com.
3    Q.  Okay.
4        What about -- Do you recall or would it
5 refresh your recollection if I told you it was
6 brandprotection@ybskin.com?
7    A.  Yes, I would not disagree.
8    Q.  And what's the purpose of this e-mail
9 domain?
10   A.  We -- We assign this e-mail domain the
11 registered access in the Brand Registry.  So
12 Brand Registry is like the master -- the brand owns
13 the Brand Registry.
14        That's the brand telling Amazon:  We are
15 the owner of this trademark.
16        And then this address is assigned as a
17 guest user of that.  So we're able to go into
18 the -- Youngblood's Brand Registry portal, and
19 communicate with Amazon through that portal.
20   Q.  On -- On Youngblood's behalf?
21   A.  Correct.
22   Q.  Okay.
23        So if you needed to report something to
24 Amazon, you would -- you would report it through
25 the Amazon portal, but using the brand protection

Page 35

1 Ybskin website?
2    A.  Correct.
3    Q.  Sorry.
4        E-mail address.
5    A.  And then we would sometimes also use the
6 e-mail address for like if we needed to issue a
7 retraction, which in this case there was a
8 retraction issue in the Solu-Med matter.
9        It would be e-mailed directly to an Amazon
10 e-mail address from Ybskin's e-mail address.
11   Q.  There's some debate in this case about the
12 word "retraction", so we might as well address it
13 now.
14   A.  Sure.
15   Q.  "Retraction" and -- does not mean that
16 anybody was admitting to doing something wrong.
17        Correct.
18        MR. GOODMAN:  Objection.
19 BY MR. VINE:
20   Q.  You can answer.
21   A.  Correct.
22        A retraction is simply telling Amazon we
23 have resolved our matter with this reseller.  We --
24 We basically are --
25        That's it.  We have resolved our matter

Page 36

1 with this reseller.
2        But many times, a retraction is used as a
3 business, you know, cost benefit analysis.
4        When a reseller, you know, claims they
5 will bring suit or liability, sometimes a
6 retraction is used to -- as a business matter to
7 just reduce that liability but it's not to admit
8 fault.
9    Q.  Okay.
10        In this case, Youngblood never admitted
11 that it reported Solu-Med improperly.
12        Correct?
13   A.  Correct.
14   Q.  In fact, the products that were being sold
15 by Solu-Med were being sold as new.
16        Correct?
17   A.  They were.
18   Q.  And we know that based upon Amazon's
19 guidelines, the products could not be sold as new
20 because they were not selling it with a guarantee.
21        Correct?
22   A.  Correct.
23        Their product -- Their product sales did
24 not come with a warranty, which on the Amazon
25 Condition Guideline rules would not allow it to be

PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
37–40

Page 37

1 listed as new.
2 So when it was listed as new, it was
3 fraudulent and it was essentially selling in --
4 inauthentic, counterfeit product that did not match
5 the detail page, which also, by the way, another
6 Amazon policy that specifies all products must
7 match the detail page exactly, and their offer on
8 that detail page did not match the detail page.
9 Q. When you say "the detail page" --
10 A. That is the same as the ASIN page.
11 it's -- It's the product page --
12 When you're looking at a product on Amazon
13 for sale, that page is called the detail page, also
14 called the ASIN page, and also --
15 Q. The A --
16 A. -- called the product page.
17 Q. So the ASIN page slash product page is
18 something that is inputted in by Youngblood.
19 Correct?
20 A. Not always. It could be inputted by
21 Amazon directly, it could be inputted by a brand,
22 or it could be inputted by a third-party reseller
23 creating their own page in Amazon's catalog.
24 Q. Okay.
25 But in this case, the Youngblood ASIN page,

Page 38

1 who inputted that information.
2 A. We -- We don't have that information,
3 actually.
4 All we know is that it exists. We don't
5 know who built it.
6 Q. Okay.
7 A. Amazon is the only one that knows who
8 uploaded the page.
9 Q. So one of the things listed on what we need
10 to get started is ASINs to be protected, including
11 product tiles -- titles.
12 And you put "Entire Brand".
13 Correct?
14 A. Yes.
15 Q. And what does that mean?
16 A. That just specifies --
17 Sometimes in an Agreement, we are cherry
18 picking specific products that will be represented
19 in the distribution agreement, and some -- usually,
20 it's a entire brand distribution agreement.
21 So what that means is that we will be
22 monitoring, protecting and distributing the entire
23 brand. Anything cosmetic that is mentioning the
24 word "Youngblood" on Amazon will fall into our
25 scope.

Page 39

1 Q. Okay.
2 A. Or did fall into our scope.
3 Q. If you look at the date of this Agreement,
4 it was in September of 2018.
5 Do you see that?
6 A. Yes.
7 Q. Okay.
8 And can you tell me the date that you
9 signed the distribution agreement, which is
10 Exhibit 1?
11 A. September 15th --
12 No, no. I'm sorry. I correct.
13 You know, there's no date on my signature,
14 but Exhibit B says the start date of the Agreement
15 will be September 15, 2018.
16 Q. Okay.
17 And this contract lasted for a year.
18 Correct?
19 A. Correct.
20 Q. And it was not renewed.
21 Correct?
22 A. Correct.
23 Q. Okay.
24 At some point --
25 How long did it take for the process for

Page 40

1 Amazzia to start monitoring and reporting products
2 to Amazon that were being sold either
3 inauthentically or counterfeit-wise to Amazon on
4 behalf of Youngblood?
5 A. I don't know the exact date the first
6 date -- report was made.
7 But I do know in Solu-Med's case, we made
8 reports against them on November 11th and 13th.
9 So it took between September 15th and
10 November 11th, but there may have been other
11 reports earlier to -- on other sellers.
12 Q. And that's where I'm going.
13 My point is, you weren't just cherry
14 picking Solu-Med. You reported on --
15 A. Absolutely.
16 Q. -- the number of --
17 A. Absolutely.
18 Q. You got to let me finish my question.
19 Okay.
20 My point is, and I'll say it: You,
21 Amazzia, on behalf of Solu-Med, were not only
22 reporting on Solu-Med.
23 Correct?
24 It's Correct?
25 A. On behalf of Youngblood, we were reporting



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
41—44

Page 41

1  against hundreds of unauthorized sellers,
2  potentially, maybe even thousands of unauthorized
3  sellers, I don't know the exact number, and
4  Solu-Med was one of them.
5      Q.  Okay.
6      So any claim by Solu-Med is that they were
7  being targeted specifically as a competitor would
8  be inaccurate.
9      Correct?
10     MR. GOODMAN:  Objection.
11 BY MR. VINE:
12     Q.  You can answer.
13     A.  Completely inaccurate.
14     Everyone except the authorized sellers was
15 targeted.
16     Q.  And that's because they were selling
17 products that were, one, not authorized, two, they
18 were selling them as new, and three, were
19 inauthentic and counterfeit?
20     A.  Correct.
21     Anybody unauthorized is not including the
22 warranty or quality controls, and because of that,
23 it becomes an inauthentic product.
24     Q.  Okay.
25     A.  Yes.

Page 42

1      Q.  Let's go through some of --
2      You need some more water?
3      A.  That would be great if there is.
4      MR. VINE:  Why don't we --
5      MR. CUMMINGS:  Five minutes?
6      MR. VINE:  -- take a five-minute break so
7  he can get water.
8      THE VIDEOGRAPHER:  Going off the record.
9  The time is 10:52 a.m.
10     (Whereupon a recess was taken)
11     THE VIDEOGRAPHER:  Back on the record.
12 The time is 10:57 a.m.
13     MR. VINE:  I'm going to mark as Exhibit 4
14 the Condition Guidelines from Amazon.
15     (Whereupon Exhibit 4 was marked
16     for identification)
17 BY MR. VINE:
18     Q.  Would you take a look at this?
19     A.  Sure.
20     Very familiar.  Speaking my language now.
21     Q.  Okay.  Well, we're going to be going
22 through a lot of guidelines.
23     A.  Okay.
24     Q.  Have you had an opportunity to look at
25 Exhibit 4?

Page 43

1      A.  Yes.
2      Q.  What is Exhibit 4?
3      A.  Exhibit 4 is Amazon's Condition Guidelines
4  from their selling policies and seller Code of
5  Conduct.
6      Q.  And when you do provide brand protection
7  services, you use the Condition Guidelines.
8      Correct?
9      MR. GOODMAN:  Objection.
10     THE WITNESS:  When we --
11 BY MR. VINE:
12     Q.  When you provide brand protection services,
13 do you use the Condition Guidelines?
14     A.  Yes.
15     Q.  Okay.
16     And how they define "new" is how you
17 understand new.
18     Correct?
19     A.  Yes.
20     Q.  What -- How they define "inauthentic" or
21 "authentic", that's how you would define it?
22     A.  Yes.
23     Q.  How they define "counterfeit" or
24 "not counterfeit", that's how you would define it?
25     A.  Yes.

Page 44

1      Q.  Okay.
2      In the Condition Guidelines, do they refer
3  to a definition for "new"?
4      A.  Yes.
5      Q.  Okay.
6      How do they refer to it?
7      A.  It says: "Just like it sounds.  A
8  brand-new item.  Original manufacturer's warranty,
9  if any, still applies, with warranty details
10 included in the listing comments.  Original
11 packaging is present for most New items but certain
12 items like shoes may be re-boxed."
13     Q.  Okay.  So "new", according to the Amazon
14 Condition Guidelines, must include the original
15 manufacture warranty?
16     A.  Yes.
17     Q.  Okay.
18     And that's how you understood it in 2018.
19     Correct?
20     A.  Yes.
21     Q.  And that's how you --
22     When I say "you", I mean Amazzia.
23     -- understood it when it reported Solu-Med
24 for selling products that were not authentic?
25     MR. GOODMAN:  Objection.



Page 45

1     THE WITNESS:  Yes.  Correct.
2  BY MR. VINE:
3     Q.   Did you understand the Condition Guidelines
4  definition of "new" when you reported Solu-Med to
5  Amazon --
6     A.   Yes.
7     Q.   -- in 2018?
8     A.   Yes.
9     Q.   Okay.
10        On both the 11th and the 13th?
11     A.   Yes.
12     Q.   We're going to come back to this, but you
13  can put Exhibit 4 to the side for a second?
14        MR. VINE:  Marked as Exhibit 5 is
15  additional documents from Amazon that are entitled
16  "Cosmetics & Skin/Hair Care".
17        (Whereupon Exhibit 5 was marked
18        for identification)
19  BY MR. VINE:
20     Q.   Have you ever seen this document before?
21     A.   Yes.
22     Q.   Okay.
23        And can you tell me what this -- what this
24  document is?
25     A.   These are Amazon's specific rules for

Page 46

1  cosmetics and skin care products as part of
2  restricted products policies.
3     Q.   And one of --
4        Does Amazon have a prohibition of selling
5  used products?
6     A.   Specifically --
7        In general, no.
8        But in the cosmetics, anything that
9  touches, goes in or on the body, does have a
10  prohibition of being sold used.
11     Q.   Okay.
12     A.   So it applies to cosmetics, supplements,
13  eye drops.
14     Q.   Would that apply to the products --
15     A.   Absolute --
16     Q.   -- being manu --
17        Would that apply to the products being sold
18  by Youngblood?
19     A.   Absolutely.  Youngblood's products are
20  makeup and cosmetics.
21     Q.   So, for example, in order to sell
22  Youngblood products as new online, it would have to
23  be an authorized seller.
24        Correct?
25        MR. GOODMAN:  Objection.

Page 47

1  BY MR. VINE:
2     Q.   You can answer.
3     A.   To sell -- Yes, to -- Yes.
4     Q.   Okay.
5        Were you about to say something else?
6     A.   I -- I was going to say, obviously,
7  it's -- they're able to list and do it, but they
8  are breaking the law when they're do -- the Amazon
9  rules and subsequently the law when they do that.
10     Q.   Okay.  So we're -- we're talking semantics.
11        Let me say it a different way.
12     A.   Yeah.
13     Q.   Would Solu-Med be violating Amazon's skin
14  care policies and other guidelines if it listed and
15  sold Youngblood products as new?
16     A.   Correct.  Yes, they would be.
17     Q.   Okay.
18        Would those products be counterfeit?
19     A.   Yes.
20     Q.   And why?
21     A.   So per the Condition Guidelines, which is
22  Exhibit 4 that we looked at, for condition new, a
23  new -- in order to list something in condition new,
24  which is differentiated from renewed, refurbished,
25  used, used acceptable, in order to be listed as

Page 48

1  condition new, the original warranty has to apply.
2     Q.   Can you lift up the document and show --
3  put that into the camera --
4     A.   This is Exhibit 4.
5     Q.   -- so the ladies and gentlemen of the jury
6  can see that?
7        And you're pointing to "new"?
8     A.   Yes, under the Condition Guidelines for
9  Section "New", it says original manufacture's
10  warranty still applies, but because Youngblood does
11  not extend its warranty to unauthorized sellers,
12  those sellers are selling an item without a
13  warranty and that warranty is a material part of
14  the sale, which creates consumer confusion because
15  consumers think they will be buying a product that
16  is backed by Youngblood, which it will not be
17  backed by Youngblood.
18        And that creates the consumer confusion,
19  which ultimately, you know, deems the product
20  inauthentic and counterfeit in -- when reported to
21  Amazon.
22     Q.   Okay.
23        So I also -- In addition to the
24  compliance -- the compliance checklist provided by
25  Amazon about new and unused, they also have rules



Page 49

1 regarding displaying of identify -- identifying
2 codes placed on the packaging.
3        Correct?
4     A.  Yes, Bullet Point 3 says:  Cosmetics must
5 clearly display identifying codes placed on the
6 packaging by the manufacturer.
7     Q.  So if somebody put some --
8        Strike that.
9        Are you aware that Youngblood has products
10 that has a serial number, a label on the side of
11 it?
12     A.  I'm not aware of it.
13     Q.  Okay.
14     A.  But I don't deny it, either.
15     Q.  Okay.
16        If an unauthorized reseller of the product
17 or seller of the product, unauthorized, put a white
18 label over their -- the serial number of
19 Youngblood, that would also be violating the rules.
20        Correct?
21        MR. GOODMAN:  Objection.
22     A.  "Clearly display identifying codes --"
23        Correct.
24     Q.  Okay.
25        So if Solu-Med was covering up the labels

Page 50

1 of Youngblood, serial labels, they would be
2 violating the policies of Amazon?
3     A.  Correct.
4     Q.  Okay.
5        MR. VINE:  We'll mark as Exhibit 6 an
6 Amazon Product Authenticity and Quality document.
7        (Whereupon Exhibit 6 was marked
8        for identification)
9 BY MR. VINE:
10     Q.  Have you seen this document before?
11     A.  I'm sure I've seen it in passing, but I'm
12 not as familiar as the other exhibits we've
13 reviewed.
14     Q.  You were referring to items that are,
15 quote, material diff -- materially different.
16        Do you recall that earlier?
17     A.  Yes.
18     Q.  Okay.
19        If you look at the second bullet point on
20 types of violations, do you see that, where it
21 says, "Materially different product condition
22 violation"?
23     A.  Yes.
24     Q.  Okay.
25        And why don't you read to yourself that

Page 51

1 bullet point, and then tell me when you're done.
2     A.  I'm done.
3     Q.  Okay.
4        And it -- What does it say about Amazon
5 policy prohibiting items from being listed as
6 materially different?
7     A.  It says you're not allowed to list things
8 that are materially different.
9     Q.  And would a product being listed as a new
10 condition without a warranty be something that is
11 materially different?
12     A.  Yes.
13        In fact, they give an example in the
14 sub-bullet here of that exact instance.
15     Q.  Okay.
16        And then in the second bullet point, do
17 they also give a description of a violation that
18 you talked about earlier?
19     A.  Yes.
20        It says:  Listing your product for sale on
21 any related product ... page when your product does
22 not exactly match the description on that page.
23     Q.  Okay.
24        And Solu-Med couldn't have exactly matched
25 that description.

Page 52

1        Right?
2     A.  Correct, because their product was not
3 new.
4     Q.  Okay.
5        So that would be violating Amazon's
6 policies.
7        Correct?
8     A.  Correct.
9        MR. GOODMAN:  Objection.
10 BY MR. VINE:
11     Q.  Would that be violating Amazon's policies?
12     A.  It would.
13     Q.  And why?
14     A.  Well, again, because the item doesn't have
15 a warranty, which is another policy of Amazon's.
16        It says to be new, it must include the
17 warranty.  If it doesn't have a warranty, it cannot
18 be new.
19        So it needed to be listed as used --
20     Q.  And the --
21     A.  -- but which is then also not allowed.
22     Q.  Right.
23        And all --
24        COURT REPORTER:  I'm sorry --
25        THE WITNESS:  Which is then also not



Page 53

1  allowed by another policy, because you can't sell
2  cosmetic products as used.
3  BY MR. VINE:
4      Q.  So all --
5          And that's a great segue.
6          All these policies that Amazon has, they
7  all kind of work hand-in-hand together.
8          Correct?
9  A.  Yes.
10     Q.  And when you provide your brand protection
11  services, do you rely on these guidelines when you
12  provide advice to your clients?
13     A.  Absolutely.
14         Everything we do is based on these
15  guidelines that Amazon sets forward.
16     Q.  And you take your job very seriously.
17         Correct?
18     A.  Yes.
19     Q.  And you provide the protection to your
20  clients in a diligent way.
21         Correct?
22         MR. GOODMAN:  Objection.
23         THE WITNESS:  Correct.
24  BY MR. VINE:
25     Q.  Okay.

Page 54

1          I mean, you don't just report people for
2  the fun of reporting people to --
3      A.  Absolutely not.
4          All of our reporting processes are
5  actually very methodical and organized and
6  strategic.
7      Q.  Okay.
8          So can you talk about how they're
9  methodical and strategic for -- for the ladies and
10  gentlemen of the jury?
11     A.  Sure.
12         So -- We -- We have a directive from the
13  brand of, in this case, removing any sellers that
14  are not authorized.
15         We have a team that works daily, 24/7/365.
16         Half of our team is here in L.A., and half
17  of out team is overseas in the Philippines.  So we
18  literally have 24 coverage -- 24/7 monitoring and
19  coverage of the listings.
20         And so we are looking at pages at all
21  times of the day and taking snapshots and seeing if
22  somebody is selling and breaking these rules.  Then
23  we're moving forward to proving that to Amazon, and
24  removing them from the marketplace.
25         And if they --

Page 55

1          That's it.
2      Q.  Okay.
3          So if you look back at Exhibit 6, which is
4  the Amazon guidelines regarding product
5  authenticity and quality --
6          Why don't you read out loud for the ladies
7  and gentlemen of the jury the first sentence,
8  what's important for Amazon.
9      A.  "Customers trust that they can always buy
10  with confidence on Amazon.  As a seller it's
11  important to understand Amazon's guidelines on
12  product quality and authenticity".
13     Q.  Okay.
14         So it's important based --
15         Would you agree with me that it was
16  important for sellers such as Solu-Med to comply
17  with the Amazon product authenticity and quality
18  guidelines?
19     A.  Yes.
20     Q.  Okay.
21         And, in fact, Amazon requires that.
22         Correct?
23     A.  Yes.
24     Q.  Does this guideline indicate whether Amazon
25  enforces sellers who violate their policies?

Page 56

1      A.  It does say --
2          In the "Enforcement" section at the
3  bottom, it does say that if you violate these
4  policies, Amazon may:  Cancel your listings; limit,
5  suspend, or block your ability to sell [sic]
6  products; or suspend or block your entire [sic]
7  ability to sell on Amazon, which is what happened
8  in Solu-Med's case here.
9      Q.  Okay.
10         So if a company such as Solu-Med violated
11  Amazon's policies, Amazon reserved the right to do
12  any of those three things?
13     A.  Correct.
14     Q.  Okay.
15         And, in fact, it also indicates on the next
16  page, two other additional items.
17         Is that correct?
18     A.  Yes.
19         It can remove or dispose of your FBA
20  inventory, or withhold your payments.
21     Q.  What's FBA inventory?
22     A.  "FBA" stands for fulfilled by Amazon, and
23  it means that a seller such as Solu-Med would ship
24  their inventory into Amazon's fulfillment centers,
25  and Amazon holds the inventory in their custody and



Page 57

1  ships it to the consumer.
2      Q.   Okay.
3          Under "Types of Violations" section on the
4  first page, what does it say about violations
5  relating to product authenticity?
6      A.   Which bullet point is that?
7      Q.   Under "Types of violations", about
8  "Amazon enforces sellers who violate..."
9          Do you see that?
10     A.   "Violations related to product
11  authenticity are categorized as intellectual
12  property violations".
13     Q.   And then --
14         So what does that mean to you?
15     A.   It means that if a product is not
16  authentic or inauthentic, that is an intellectual
17  property violation.
18     Q.   Like counterfeit.
19         Correct?
20     A.   Correct.
21     Q.   And then on the next page, if you take a
22  look at it, it has "Best Practices in Product
23  Authenticity and Quality".
24     A.   Correct.
25     Q.   Do you see that?

Page 58

1      A.   Yes.
2      Q.   And that's helping Amazon --
3          Do you understand Amazon to putting these
4  out, to help the sellers comply with Amazon's
5  guidelines?
6      A.   Yes.
7      Q.   And it's important for a seller, before
8  they start listing and selling products on this, to
9  be familiar with these guidelines.
10         Correct?
11     A.   Absolutely.
12     Q.   In fact, what does it say under the
13  paragraph under the head, "Best Practices in
14  Product Authenticity and Quality"?
15     A.   It says:  All Amazon sellers are
16  responsible for complying with the law along with
17  Amazon's policies.  Customers trust that they can
18  buy with confidence on Amazon and receive authentic
19  products that arrive in the condition as
20  advertised.  In order to ensure that both sellers
21  and customers have the best experience, here are
22  some tips..."
23     Q.   Okay.
24         So would Solu-Med be required to be
25  complying with Amazon policies --

Page 59

1          MR. GOODMAN:  Objection.
2  BY MR. VINE:
3      Q.   -- based upon this document?
4          Were they required to comply with Amazon's
5  policies?
6      A.   All sellers, including Solu-Med, are
7  required to comply with Amazon policy.
8      Q.   I appreciate that.
9          I'm only asking about Solu-Med, so let me
10  just ask again.
11         Was Solu-Med required to comply with
12  Amazon's policies if it's --
13     A.   Yes.
14         MR. CUMMINGS:  Let him finish the question.
15  BY MR. VINE:
16     Q.   Was Solu-Med required to comply with
17  Amazon's policies if it's selling products on the
18  Amazon platform?
19     A.   Yes.
20         MR. GOODMAN:  Objection.
21         MR. VINE:  What's the form of the objection
22  for that?
23         MR. GOODMAN:  No foundation.
24         MR. VINE:  Okay.
25     Q.   What was the basis of your opinion on that,

Page 60

1  that they're requir -- that Solu-Med is required to
2  comply with Amazon policies?
3      A.   (No audible response).
4      Q.   This policy is one of them where it says
5  it.
6          Right?
7      A.   Yes.  I mean, every experienced seller on
8  Amazon knows that if you don't comply with the
9  policy, sooner or later, you will simply be
10  suspended from the platform.
11     Q.   And do you often see that sellers are
12  suspended from the platform?
13     A.   Yes, absolutely.
14         I mean, I have many friends in the Amazon
15  business that have had businesses suspended off
16  Amazon.
17         We have personally had Amazon accounts in
18  our history suspended on Amazon.
19         It's a known thing in -- in the Amazon
20  selling industry, that suspension is a very feared
21  thing because it's pretty hard to get back.
22         Amazon is very strict with their rules,
23  with following their rules.
24     Q.   So one of the source --
25         One of the items under Best Practices



Page 61

1  For [sic Authenticity and Quality is
2  "Sourcing Products".
3      Do you see that?
4  A.  Yes.
5      Q.  And one of them talks about, "Verify the
6  authenticity of the products you source."
7      Meaning, are you confident in the
8  authenticity and quality of your goods.
9      Do you see that ques --
10  A.  Yes.
11  Q.  Okay.  What does that -- What does that
12  mean to you?
13  A.  Excuse me.
14      To me, that means this is --
15      To me, that means this is Amazon advising
16  a seller that you've got to be -- you've got to be
17  sure who you're buying the product from.
18      You -- You need to be sure who you're
19  buying the product from and that it's truly a new
20  product and in great condition and satisfies the
21  high quality bar that Amazon sets for its
22  marketplace.
23  Q.  Okay.
24      And storing --
25      Are you okay?

Page 62

1      You want to take a break?
2      MR. CUMMINGS:  You want to take a break?
3      THE WITNESS:  No, I think we're good.
4  BY MR. VINE:
5  Q.  Okay.
6      One of the next bullet points regarding
7  sourcing the products talks about storing
8  documentation.
9      Do you see that?
10  A.  Yes.
11  Q.  Okay.
12      Why is storing documentation important?
13  A.  Because when Amazon --
14      There may come a time, and often this
15  happens, where a seller is questioned for the
16  authenticity of what they're selling.
17      And Amazon has a -- their own product
18  safety teams whose mission is to make sure the
19  products sold on Amazon are safe and reputable and
20  trustworthy.
21      And so they will time-to-time -- they will
22  ask you for these records.
23      So they'll basically pause your sales and
24  ask you to prove the authenticity of what you're
25  selling to ensure that there's trust in the

Page 63

1  marketplace.
2  Q.  Okay.
3      And storing --
4      And we can talk about it on the next page.
5      -- also refers to how the product is
6  stored, as well.  Meaning --
7  A.  Where are you seeing that?
8  Q.  Okay.  Well, let's go to the next page,
9  "Storing and Shipping".
10  A.  Yes.
11  Q.  Okay.
12      It's important for products to be stored
13  and shipped in certain condi -- certain ways to
14  preserve the integrity of the product.
15      Correct?
16  A.  Absolutely.
17  Q.  Okay.
18      And does Amazon talk about that?
19  A.  Absolutely.  In this section, they -- they
20  talk about that.
21  Q.  Why don't you tell the ladies and gentlemen
22  of the jury what they say.
23  A.  It says:  "Store your products according
24  to their unique features.  Thoughtfully storing
25  your products will help you preserve the integrity

Page 64

1  of your products and their packaging.  Some
2  goods will need to be preserved in a particular --"
3      COURT REPORTER:  I'm sorry.
4      Can you slow down just a little bit?
5      THE WITNESS:  You want me to start over?
6      COURT REPORTER:  "Some goods --"
7      THE WITNESS:  "Some goods will need to be
8  preserved in a particular manner to maintain their
9  freshness.  Remember to check the expiration date
10  of your products.  If you use the Fulfilled by
11  Amazon services, we will deem your expired products
12  unsellable.
13      Pack products carefully and include all
14  parts of the product.  Buyers expect to receive
15  products in their original packaging..."
16  Q.  So do you recall earlier on when we were
17  talking about one of the concerns of Youngblood was
18  how other people were representing or reselling
19  their product because of the way the products were
20  stored?
21      Do you remember talking about that earlier?
22  A.  Yes.
23  Q.  Okay.
24      An unauthorized seller cannot provide the
25  guarantee that it was stored in -- in a unique way



PMK WILLIAM FIKHMAN  30(b)(6), Confidential                    December 10, 2019
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE                        65—68

Page 65

1  to protect the integrity of the product of
2  Youngblood --
3       MR. GOODMAN:  Objection.
4  BY MR. VINE:
5    Q.  -- correct?
6    A.  Can you say that again?
7    Q.  Sure.  That's not a problem.
8        Do you have an understanding of why
9  Youngblood wanted to protect the integrity of the
10 products when it was being sold on Amazon?
11   A.  Yes.
12   Q.  Okay.
13       What was your understanding?
14   A.  It's -- It's, again, a cosmetics product.
15 Mostly, it goes on the face.
16       There's quite a lot of liability for
17 somebody selling, you know, an old product or -- or
18 a counterfeit product that could contain substances
19 that are obviously harmful to a person, especially
20 their face.  Could be dangerous, could be deadly.
21       And so Youngblood wanted to ensure that
22 only good quality products that it could stand
23 behind were being sold to a consumer.
24   Q.  Okay.
25       And Young -- Did Youngblood do that with

Page 66

1  providing certain authorization to particular
2  sellers on Amazon?
3        Correct?
4    A.  Correct.
5    Q.  And Amazzia was one of them.
6        Correct?
7    A.  Amazzia is not the direct reseller on
8  Amazon.  We are the distributor.
9        We then partner with several sellers who
10 become the authorized sellers.
11   Q.  Okay.
12       And that comes with the appropriate
13 warrantees, that it's stored in the appropriate --
14   A.  Correct.
15       MR. CUMMINGS:  Let him finish the question.
16       THE WITNESS:  All right.
17 BY MR. VINE:
18   Q.  Those sellers would have the appropriate
19 warranties, that the products were stored in the
20 proper way?
21   A.  Correct, those sellers are trained and
22 more experienced in handling product in a certain
23 way.
24   Q.  All right.  Okay.
25       Do you understand that Youngblood had brand

Page 67

1  equity and wanted -- and had a luxury prestige?
2    A.  Yes.
3    Q.  Okay.
4        And that was important to Youngblood?
5    A.  Yes.
6    Q.  Why?
7        Why was the luxury and brand prestige
8  important from what they told you or you recall?
9    A.  I don't remember a specific conversation
10 where I can answer that.
11   Q.  Okay.
12   A.  But I would have -- My -- My experience
13 would say it's not much different than any other
14 premium makeup brands out there that, you know, has
15 a certain quality product at a certain price point
16 and wants to ensure that customers get good quality
17 product at the end of the day.
18   Q.  Do you remember them discussing with you
19 that they're clean and a green product?
20   A.  That, I do remember, yes.
21   Q.  Okay.
22       That they don't test on animals?
23   A.  That, I do remember.
24   Q.  Okay.
25       And that their product obviously would have

Page 68

1  a certain shelf life.
2        Correct?
3    A.  Correct.
4    Q.  Okay.
5        And if these were --
6        And that a number of stars have endorsed
7  their product?
8    A.  That, I'm aware of.
9    Q.  And it was important for Youngblood to
10 protect the integrity and brand equity it had built
11 up over the years?
12       MR. GOODMAN:  Objection.
13 BY MR. VINE:
14   Q.  Would you agree?
15   A.  I would agree that those are important
16 things for a brand, for Youngblood.
17   Q.  Let me ask it differently.
18       MR. VINE:  I'll mark as Exhibit 7 as
19 Amazon's Anti-Counterfeiting Policy.
20       (Whereupon Exhibit 7 was marked
21       for identification)
22 BY MR. VINE:
23   Q.  Exhibit 7, I have marked as Amazon's
24 Anti-Counterfeiting Policy.
25       Please take a minute to take a look at it,



Page 69

1  and then tell me when you're done.
2     A.  I'm done.
3     Q.  Are you familiar with this document?
4     A.  Yes.
5     Q.  Okay.
6        Is this a document that Amazzia relies on
7  when it reports companies like Solu-Med to Amazon?
8     A.  Yes.
9     Q.  Is this a document you relied on in 2018?
10    A.  Yes.
11    Q.  Can you walk me through the first three
12  bullet points under Amazon's Anti-Counterfeiting
13  Policy?
14    A.  The first three bullet points say:
15       The sale of counterfeit products is
16  strictly prohibited --
17    Q.  So let's stop there.
18       "The sale of counterfeit products is
19  strictly prohibited", does that include inauthentic
20  products?
21    A.  Yes.
22    Q.  Okay.
23       Let's go to the next one.
24    A.  "You may not sell any products that are
25  not legal for sale, such as products that have been

Page 70

1  illegally replicated, reproduced, or manufactured".
2     Q.  Okay.
3        And what kind of examples would that be?
4     A.  In this matter or --
5     Q.  Just in general?
6     A.  In general, that might be like bootleg CDs
7  or counterfeit T-shirts or counterfeit shoes.
8     Q.  Okay.  And that -- that happens a lot in
9  the luxury market?
10    A.  Sure.
11    Q.  Okay.
12       I mean, people have the fake handbags.
13  Right?
14    A.  Yes, definitely.  That's a great example.
15    Q.  Or the fake shoes?
16    A.  Yes.
17    Q.  Okay.
18       And then there's a third bullet point.
19  Correct?
20    A.  (Witness nods).
21    Q.  And can you tell -- Can you read that and
22  tell us what that is?
23    A.  "You must provide records about the
24  authenticity if Amazon requests that
25  documentation."

Page 71

1     Q.  Okay.
2        Would the authenticity of the products
3  concern whether the products were being sold as new
4  in this case?
5     A.  Yes, again, because in order to be new, it
6  has to have the warranty and certain quality
7  controls that the brand gives.
8        So when someone is not authorized, they're
9  selling a materially different unit, which the
10  consumer relies on that warranty but never actually
11  gets it, and because of it -- of that, it is
12  counterfeit.
13    Q.  Okay.
14       And if you look under the
15  Anti-Counterfeiting Policy of Amazon, they also
16  give -- provide a "More Information" section.
17       Do you see that?
18    A.  Yes.
19    Q.  And the first bullet point lists:  "Sell
20  Only Authentic and Legal Products".
21    A.  Correct.
22    Q.  Okay.
23       And one of the bullet points says:
24  "Products that infringe on another property's [sic]
25  intellectual property rights"?

Page 72

1     A.  Correct.  I see that.
2     Q.  Okay.
3        We'll stop there for a second.
4        Can you take out the guideline that
5  said -- talked about Amazon product authenticity
6  and quality?
7     A.  Yes.
8     Q.  If you look under "Types of Violations", it
9  says violations related to product consistency --
10  authenticity are characterized --
11       As what?
12    A.  Intellectual property violations.
13    Q.  Okay.
14       So that interplays with the Amazon
15  guidelines for anti-counterfeiting policy?
16    A.  Correct.
17    Q.  And it's that bullet point where it -- it
18  lists -- talks about it where it says:  Products
19  that infringe on another property's [sic]
20  intellectual property rights.
21       Correct?
22    A.  Yes.
23    Q.  So if a product is not authentic, it's
24  infringing upon another party's intellectual
25  property right?



Page 73

1    A.  Correct.
2         MR. GOODMAN:  Objection.
3    Q.  So what happens if a product is not
4  authentic?
5    A.  What do you mean?
6    Q.  Is a product infringing on another
7  property's [sic] intellectual property rights if
8  it's not authentic?
9    A.  Yes.
10   Q.  Then under the anti-counter -- under
11  Amazon's Anti-Counterfeiting Policy, it has a
12  bullet point talking about consequences of selling
13  inauthentic products.
14        What are the consequences of selling
15  inauthentic products as defined by Amazon?
16   A.  "If you sell inauthentic products, we may
17  immediately suspend or terminate your Amazon
18  selling account... destroy any inauthentic
19  products...  and/or withhold payments to you".
20   Q.  Okay.
21        Did that happen to Solu-Med?
22   A.  Yes.
23   Q.  And do you know why it happened to
24  Solu-Med?
25   A.  I don't exactly know.

Page 74

1         Only Amazon knows why they suspended
2  Solu-Med.
3    Q.  Okay.
4         You -- Amazzia reported that Solu-Med was
5  selling inauthentic and counterfeit products.
6         Right?
7    A.  Yes.  That, we did.
8    Q.  Okay.
9    A.  Can I add to that?
10        It usually -- For -- For --
11        The suspension of an account is usually
12  related to its history.
13        Like let's say you have a brand-new
14  account that has one intellectual property
15  violation.  They would be instantly suspended.
16        But an account like Solu-Med, that was
17  probably running for many years with lots of
18  transactions, it would have taken multiple
19  complaints at the same time from different brands,
20  potentially, to -- to be shut down.
21   Q.  So in Amazzia's experience, when does
22  Amazon shut down a storefront?
23   A.  When they -- Again, it depends on history.
24        So if you have a newer storefront, one or
25  two violations could be enough.

Page 75

1         But if you have an aged storefront over
2  lots of transactions, hundreds or thousands of
3  transactions with some history, there could be a
4  multitude of policy violations that an investigator
5  looks at to shut down.
6    Q.  Okay.
7         So, so far, we've seen a number of
8  different guidelines that are promulgated by
9  Amazon.
10        Correct?
11   A.  Yes.
12   Q.  Okay.
13        And, again, Amazzia relies on these
14  guidelines and rules and regulations that are
15  issued by Amazon when it reported violations of
16  Solu-Med in November of 2018 to Amazon?
17   A.  Yes.
18        MR. GOODMAN:  Objection.
19  BY MR. VINE:
20   Q.  Okay.
21        Let me say it this way.
22        Did --
23        Because this is a form objection, so I've
24  got to redo it.
25        Did Amazzia rely on all of the exhibit

Page 76

1  Amazon guidelines that I've shown you when it
2  reported Solu-Med to Amazon in November of 2018?
3    A.  Yes.
4    Q.  Okay.
5         Now, I want to talk about -- expand upon
6  Amazzia's reporting strategy and methods for -- for
7  identifying sellers that are not authorized or
8  diluting some of these product.
9         Can you talk about that a little bit more?
10   A.  What -- What, specifically, about it?
11   Q.  What is the steps and processes -- process
12  that Amazzia goes by to identify an unauthorized
13  seller, and in this case Solu-Med, to determine
14  whether a product is counterfeit or inauthentic?
15        MR. CUMMINGS:  I'd just like to interject
16  that I'd like to mark this section as confidential.
17        MR. VINE:  Not a problem.
18        MR. CUMMINGS:  Okay.
19        THE WITNESS:  So in the beginning of our
20  engagement, based on a brand's rule, they'll tell
21  us who the authorized sellers are, and then
22  everybody else besides those authorized sellers
23  becomes unauthorized and is therefore selling
24  inauthentic product, because we know they're not
25  selling new items.  So it's, therefore, inauthentic



Page 77

1  with -- based on all these policies we've reviewed.
2      We take an audit of --
3      So when we start, we would survey the
4  brand, make a list of all the ASINs in the Amazon
5  catalog, and then sublists of all the sellers on
6  each of those ASINS.
7      And we basically build like a master
8  spreadsheet, and our team starts to look daily at
9  if the seller is on that page, they get reported.
10      The next day, we look again.  If they're
11  not on that page, well, then --
12      Actually, you can't report a seller that's
13  not actively selling on a page.
14      So if they're not on a page, they don't get
15  reported.  If the next day they come back, they get
16  reported.
17      And so we -- we do that methodically across
18  all sellers who are unauthorized on a daily basis.
19  BY MR. VINE:
20      Q.  And you don't report everybody that is
21  unauthorized counterfeit.
22      I mean, there's different options to report
23  a seller by.
24      Right?
25      A.  Yes.

Page 78

1      Q.  So let's talk about that for a second.
2      What is the process in which a company like
3  Amazzia does to report a seller to Amazon?
4      A.  There are several main types of
5  intellectual property violations.  It could be
6  copyright, could be trademark, could be patent
7  infringement.
8      And depending on the circumstances, we
9  report --
10      They're basically radio buttons in
11  Amazon's form that you choose.
12      When you click one button, it opens you up
13  to certain other options.  When you click the other
14  button, it gives you different options.
15      So depending on the circumstances, we pick
16  a button and report to Amazon what the matter is,
17  with a little explanation, as well.
18      Q.  Okay.
19      Before we get to the complaint in this
20  case, do you recall the process in which Amazzia
21  performed as it relates to the Youngblood products
22  on Solu-Med's websites or storefronts?
23      A.  The process?
24      Q.  How did you -- How did Amazzia go about
25  identifying that these products were being sold by

Page 79

1  Solu-Med?
2      A.  We use a combination of real people that
3  visually look at the page and observe whether a
4  seller is active on the page or not.
5      And then we also sometimes supplement with
6  software.  Although, that's new.  I don't know if
7  we did that, necessarily, in Youngblood's matter.
8      Q.  Okay.
9      In this -- In this case, did Amazzia
10  identify that Solu-Med was selling Youngblood's
11  products?
12      A.  Yes, of course.  We would -- We would have
13  no other way to report them if we didn't --
14      Q.  Okay.
15      A.  -- if they weren't.
16      Q.  So, but in this case, they did identify
17  them?
18      A.  Yes.
19      Q.  Okay.
20      And did Amazzia, when it identified --
21      Strike that.
22      What did Amazzia do when it identified
23  Solu-Med selling Youngblood products?
24      A.  We made a report to Amazon, that they were
25  selling counterfeit product.

Page 80

1      Q.  Why did you refer to it as counterfeit?
2      A.  When you select Amazon's form, there's
3  three issues you can report on:  Copyright
4  infringement, which relates to images or the use of
5  a -- of specific words; there's Patent, which is --
6      Well, I don't know if you want an
7  explanation --
8      Q.  Mechanical engineering.
9      A.  Yeah.
10      Q.  I understand that.
11      A.  Yeah, some type of that, you know, which
12  there's -- there's --
13      There's copyright, patent, and trademark
14  infringement.
15      When you click "trademark infringement",
16  it leads you to another page which is, you know,
17  This seller is infringing on my trademark, or, This
18  seller is selling counterfeit products.
19      And so we picked "counterfeit products"
20  because we believe it's --
21      It is created as -- It becomes a
22  counterfeit product when a seller is selling a
23  product without a warranty, because that warranty
24  is a material part of the sale, and given the
25  Amazon policies around quality controls and



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019

81–84

Page 81

1  authenticity and Condition Guidelines for new.
2      All of that together means the product is
3  counterfeit.  There's no other option if it -- if
4  it doesn't include the warranty.
5      Q.  Did Amazzia rely on the guidelines of
6  Amazon that we've used -- we've seen today when it
7  reported on November 11th and November 13th that
8  the products were counterfeit?
9      A.  Yes.
10      Q.  Was one of the reasons because
11  inauthenticity is characterized as an intellectual
12  property violation?
13      A.  Yes.
14      Q.  Okay.
15      And that's --
16      Those intellectual property violations were
17  patent, copyright or trademark?
18      Correct?
19      A.  Right.
20      Q.  Okay.
21      And you chose that intellectual property
22  violation as trademark.
23      Correct?
24      A.  Yes.
25      Q.  Okay.

Page 82

1      And that's based upon the guidelines
2  that we've -- the exhibits that we've seen, I
3  think, are 5 -- 4, 5, 6 and 7.
4      A.  Yes.
5      Q.  Okay.
6      Let's go to the Sellers Policies and
7  Sellers Code of Conduct [sic].
8      This will be Exhibit 8.
9      And then we're going to go to the actual
10  complaint that was filed with Amazon.
11      (Whereupon Exhibit 8 was marked
12      for identification)
13  BY MR. VINE:
14      Q.  Can you take a look at it, please?
15      A.  Yes.
16      Q.  Are you familiar with this document?
17      A.  Yes.
18      Q.  Okay.
19      Solu-Med is a seller.
20      Correct?
21      A.  Yes.
22      Q.  Okay.
23      So this policy -- The policies and
24  Seller Code of Conduct would apply to Solu-Med?
25      Correct?

Page 83

1      MR. GOODMAN:  Objection.
2  BY MR. VINE:
3      Q.  Would it apply to Solu-Med?
4      A.  We should clarify, because we had a
5  different Seller of Record name as Life --
6      Q.  Okay, great.
7      So the Life Store --
8      A.  I don't know the relationship between --
9      Q.  (Inaudible) Life Store?
10      COURT REPORTER:  I'm sorry.
11      What was your question?
12      MR. VINE:  Can I -- Can I finish?
13      Just give me one second.
14      I'll redo it.  I'll redo it.
15      Okay.  I'm sorry.  I'm sorry.
16      Q.  We've been saying "Solu-Med" this entire
17  time.
18      Correct?
19      A.  Correct.
20      Q.  Okay.
21      And if you --
22      I'll pull out the complaint.
23      The name of the store is called
24  Life and Health Source?
25      A.  That sounds --  Yes.

Page 84

1      Q.  Okay.
2      A.  Life and Health Source is a seller.
3      Q.  Right.
4      Solu-Med owns Life and Health Source.
5      A.  Okay.
6      Q.  Okay.
7      So that -- the plaintiff in this case, if
8  you look at the caption from the Exhibit 1, is
9  Solu-Med.
10      Do you see that?
11      A.  Yes.
12      Q.  Okay.
13      They brought suit on behalf of
14  Life and Health Source.
15      A.  I have a --
16      Can I ask a question?
17      Q.  Sure.
18      A.  Because the --
19      The suit is from Argo or Agro?
20      Q.  It's just Solu-Med now.  Agro is out.
21      A.  Okay.  That's what my --
22      I wasn't sure why two corporations were
23  bringing a suit on one seller.
24      But I -- I understand now.
25      Q.  Okay.



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
85–88

Page 85

1    You're all set?
2    A.  Yes.  I just didn't want confusion around
3  is Solu-Med a seller.
4       We had it as Life and Health Source, and
5  that's --
6    Q.  Is Life and Health Source a seller?
7    A.  Yes.
8    Q.  And, obviously, the owner of Life and
9  Health Source, that would go -- the Seller Policy
10  and Code of Conduct would apply.
11      Correct?
12   A.  Yes.
13   Q.  Okay.
14      So the seller would be required to comply
15  with the Code of Conduct issued by Amazon?
16   A.  Absolutely.
17   Q.  And one of the items that Amazon has in the
18  first bullet point talks about providing accurate
19  information to its customers?
20   A.  Yes.
21   Q.  Would selling a product as new without a
22  warranty and a guarantee be inaccurate
23  information --
24   A.  No.
25   Q.  -- to its customers?

Page 86

1    A.  That would be a -- That would be
2  inaccurate.
3    Q.  Okay.
4       (Whereupon Exhibit 9 was marked
5        for identification)
6  BY MR. VINE:
7    Q.  Marked as Exhibit 9 is a complaint that was
8  submitted to Amazon on behalf of Youngblood.
9       After you've had an opportunity to review
10  this, let me know when you're done.
11   A.  I'm done.
12   Q.  Okay.
13      This is a complaint --
14      What is this?
15      Sorry.
16   A.  This looks like verbiage that may have
17  been used when we submit a complaint to Amazon.
18   Q.  All right.
19      I understand when you submit it, it's on a
20  website platform?
21   A.  Correct.
22   Q.  Okay.
23      And you input information within specific
24  categories?
25   A.  Correct.  We would insert this message

Page 87

1  into the box --
2    Q.  Okay.
3    A.  -- on a -- on the platform.
4    Q.  So it says:  "We have researched
5  Youngblood's listings and found the following ASINs
6  are in violation of our trademark..."
7       Do you see that?
8    A.  Yes.
9    Q.  Okay.
10      And that's Youngblood's trademark?
11   A.  I don't know for sure, but I'm assuming.
12   Q.  Okay.
13      This is an item that was drafted by
14  Amazzia.
15      Correct?
16   A.  I don't know for sure.
17      I'm -- I'm not deny -- disputing that, but
18  I -- I would need a -- if we want to know if that
19  trademarks --
20   Q.  I'm not asking that.
21   A.  Okay.
22   Q.  I changed --
23      Youngblood hired Amazzia for brand
24  protection.
25      Correct?

Page 88

1    A.  Yes.
2    Q.  Amazzia is the one who filed the complaint
3  about Solu-Med or Life and Health Source to Amazon.
4       Correct?
5    A.  Yes.
6    Q.  Okay.
7       And so if this is the complaint that Amazon
8  relied on, this would be the document that was
9  drafted by Amazzia.
10      Correct?
11   A.  Yes.
12   Q.  Okay.
13      And if you look, it talks about
14  authenticity.
15      Do you see that?
16   A.  Yes.
17   Q.  And the request was to remove the sellers
18  from selling just this product.
19      Correct?
20   A.  Correct.
21   Q.  Okay.
22      You weren't asking that the seller's store
23  be shut down.
24      Correct?
25   A.  Correct.



Page 89

1     We've never asked that on any seller.
2     Q.   And you indicated here that -- that:  The
3  indicated sellers are not selling the authentic
4  products as shown in the ASIN(s) referenced."
5     Do you see that?
6     A.  Yes.
7     Q.  Okay.
8     What did you mean by that?
9     A.  So this usually goes in the box where
10  above it, there would be like a list you pick
11  the -- the ASIN from.
12     And so you report a seller or a group of
13  sellers on an ASIN.
14     So you pick the ASIN, and then Amazon
15  displays you a list of sellers you want to report.
16  And you pick by radio buttons one or several or all
17  of the sellers you want -- you think are violating
18  that rule or that you want to report as counterfeit
19  at that moment.
20     Q.  Okay.  But I'm -- I'm talking about,
21  specifically, the -- in this case.
22     The indicated sellers, which is the
23  Life and Health Source slash Solu-Med, you stated
24  were not selling the authentic product.
25     Do you see that?

Page 90

1     A.  Yes.
2     Q.  Okay.
3     What did Amazzia mean by that?
4     A.  We -- We meant -- We meant they're selling
5  inauthentic product, and that they're ultimately
6  selling counterfeit product to us.  Those two are
7  the same.
8     Q.  What do you mean?
9     Why did you say that the products were not
10  authentic?
11     A.  Because they lacked --
12     Because the seller was not authorized,
13  they were not on the authorized list of sellers.
14  They were there for unauthorized.
15     And because of that, we knew they were
16  making sales of product to consumers that did not
17  include the warranty or have the same quality
18  controls that Youngblood would have wanted on that
19  consumer sale to happen.
20     And because of that, we knew it was
21  counterfeit.
22     Q.  And inauthentic?
23     A.  And inauthentic.
24     Q.  You -- You also put in here that the
25  sellers were required to match the detail pages

Page 91

1  exactly.
2     A.  Yes.
3     Q.  Okay.
4     And was Solu-Med slash Life and Health
5  Source matching the detail pages identically?
6     A.  No.
7     I mean, they were claiming the product was
8  new when it was not new.
9     Q.  And why is that important?
10     A.  Well, first of all, to comply with Amazon
11  selling the policies, all the policies mentioned
12  you got to sell things to comply with the policy.
13     But, second of all, when something is not
14  new, it's lacking a warranty and lacking a material
15  part of the sale.
16     Q.  And that's one of the --
17     And that -- And if you look back at --
18     Let's go through a couple different.
19     There was a guideline that's called
20  Condition Guidelines, which defines as new, is
21  which -- which exhibit number?
22     A.  Condition Guidelines?
23     Exhibit 4.
24     Q.  And that defines what is new?
25     A.  Correct.

Page 92

1     Q.  And new must have a manufacturers warranty
2  included.
3     Correct?
4     A.  Correct.
5     Q.  And then if you look at where it says
6  Amazon's Product Authenticity and Quality
7  Guideline, I believe that's Exhibit 6.
8     A.  Right.
9     Q.  Do you see that?
10     A.  Yes.
11     Q.  And there's a section referred to as
12  materially different product condition violation?
13     A.  Yes.
14     Q.  And that's the types of violation under
15  authenticity and quality?
16     A.  Yes.
17     Q.  And that's what you were referring to when
18  you stated that Solu-Med's products were not --
19  were being advertised as materially different?
20     A.  Correct.
21     Q.  And it was a violation of Amazon's product
22  authenticity and quality guideline?
23     A.  Correct.
24     Q.  Okay.  You can put that aside.
25     Do you recall approximately how many



Page 93

1  different unauthorized or resellers were selling
2  inauthentic Youngblood products?
3      A.  There must have been hundreds, if not
4  thousands, across all the products and pages.
5      Q.  Okay.
6          And you -- you reported all of them?
7      A.  Yes.
8      Q.  Okay.
9          In Amazzia's experience, does Amazon
10  provide explicit responses confirming whether they
11  have received a request for retraction?
12      A.  Oh, we're on retraction now.
13          Amazon does not always provide very clear
14  responses, in general.
15      Q.  Okay.
16          And we're going to talk about this.
17          But we talked about Solu-Med or Life and
18  Health Source was -- eventually, their storefront
19  was suspended.
20          Correct?
21      A.  Correct.
22      Q.  Does Amazon ever guarantee when or how soon
23  they would reinstate a reseller?
24      A.  No, there's no guarantees around that.
25      Q.  Okay.  Let's talk about --

Page 94

1          MR. VINE:  We're on Exhibit 9?
2          THE WITNESS:  Exhibit 9?
3          MR. VINE:  Exhibit 10.  Sorry.
4          (Whereupon Exhibit 10 was marked
5          for identification)
6  BY MR. VINE:
7      Q.  Exhibit 10 is a chain of e-mails.  And I
8  want to go, first, to the very last page.
9          Do you see that the original e-mail starts
10  from Goodman & Saperstein on Monday, November 26?
11      A.  Yes.
12      Q.  Okay.
13          And are you -- Have you seen this e-mail
14  before?
15      A.  Yes.
16      Q.  Okay.
17          And that was a complaint -- a written
18  complaint, not an actual legal Complaint -- but a
19  written complaint by Solu-Med's counsel regarding
20  the complaint that was filed against Solu-Med.
21          Correct?
22      A.  Yes.
23      Q.  Okay.
24          And then if you look on November 29th, it's
25  from Brand Protection.

Page 95

1          There was an agreement to file a retraction
2  with Amazon.
3          Do you see that?
4      A.  Yes.
5      Q.  Okay.
6          That -- Are you aware if that agreement was
7  an admission that -- that Youngblood or Amazzia did
8  something wrong?
9      A.  No.
10          MR. GOODMAN:  Objection.
11          MR. VINE:  What -- What's the objection?
12          MR. GOODMAN:  He's not qualified to render
13  an opinion.
14          MR. VINE:  Okay.
15      Q.  So the question was:  Are you aware?
16          So I'll -- So I'll ask it a different way.
17          Did Amazzia or Youngblood, by agreeing to
18  file a retraction with Amazon, agree that they did
19  something wrong?
20          MR. GOODMAN:  Objection.
21  BY MR. VINE:
22      Q.  You can answer.
23      A.  No, we --
24      Q.  Well --
25      A.  We did not agree we did something wrong.

Page 96

1      Q.  Why was there a retraction agreed to?
2      A.  When -- In -- In this matter, you know,
3  we --
4          Youngblood received a legal threat on
5  November 26, 2018.  It was just a -- a legal
6  request to issue the retraction, or else, you know,
7  we'll commence with a lawsuit.
8          And we go through this process often, and
9  we may have even gone through this process with --
10  with Youngblood on others.
11          But, eventually, we --
12          Every brand makes a decision, takes a
13  cost/benefit analysis, and decides, you know:  Hey,
14  how serious is this threat?  Do we want to make
15  this retraction for business purpose to kind of --
16  because it's easier than continuing the deal with
17  this legal matter.
18          And sometimes, like in this case, it was
19  decided to do the retraction because it would
20  reduce the amount of correspondence and management
21  Amazzia and Youngblood would have to be giving this
22  matter.
23          So we go through this process of -- we
24  went through this process of filing this
25  retraction.



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
97—100

Page 97

1    Q.   And we're going to get to the retraction in
2  a second.
3        But are you aware if Solu-Med continued to
4  sell Youngblood products after that?
5    A.   After --
6    Q.   (Inaudible).
7    A.   After this moment --
8    Q.   They didn't.
9        Isn't that correct?
10       COURT REPORTER:  I'm sorry --
11  BY MR. VINE:
12   Q.   They did not.
13       Isn't that correct?
14   A.   They -- I'm not 100 percent certain if
15  they did or did not sell after this date,
16  November 29th.
17       I'm not certain, but --
18   Q.   Wasn't one of the issues that Solu-Med
19  agreed that they would no longer sell?
20   A.   Yes.
21       Every time we process a retraction,
22  including this time, part of the deal is the other
23  seller agrees not to sell the product anymore.
24   Q.   And in this case, they -- with that one,
25  that was part of the agreement?

Page 98

1    A.   Yes.
2        Every time we issue a retraction, it's for
3  that purpose.
4    Q.   Okay.
5        And so in this case, Solu-Med agreed not to
6  sell the product -- Youngblood product?
7    A.   Correct.
8        (Whereupon Exhibit 11 was marked
9        for identification)
10  BY MR. VINE:
11   Q.   Exhibit 11 is a copy.  It's not the
12  greatest, but it's what I have.
13       Have you seen this document before?
14   A.   Yes.
15   Q.   Okay.
16       And what is this document?
17   A.   This is our correspondence.  And it looks
18  like our internal screenshots of Asana, where we
19  keep track of retraction requests and how we
20  process them --
21   Q.   Okay.
22   A.   -- internally.
23   Q.   And -- And your -- And Amazzia processed
24  this retraction request?
25   A.   Yes.

Page 99

1    Q.   Okay.
2        And it talks about the Amazon store name on
3  it.
4        Is that correct?
5    A.   Yes.
6    Q.   And what does that mean?
7    A.   Amazon store name is the reseller's name
8  on Amazon.
9        "Life and Health Source", that's how a
10  consumer would see it on Amazon.
11   Q.   And then you list the attorney, the client.
12       Correct?
13   A.   We list the attorney, the client's e-mail.
14       The client being our client.
15   Q.   And that would --
16   A.   In this case, Youngblood's --
17   Q.   Right.
18   A.   -- people.
19       This is all the information we need.
20       So that when we process the retraction, we
21  actually cc everybody so that the requester of the
22  retraction, in this case Solu-Med, their attorney,
23  Mr. Goodman, everybody sees that it has been done
24  and can follow up with Amazon from their end.
25   Q.   And you list the specific associated ASIN

Page 100

1  numbers.
2        Is that correct?
3    A.   Yes.
4    Q.   And that was on the products that they were
5  selling -- the counterfeit products that they were
6  selling?
7    A.   Yes.
8    Q.   Now, Amazzia did not actually go and buy
9  those products.
10       Correct?
11   A.   Correct.
12   Q.   And when I say "those products", the Sol --
13  the Youngblood products from Solu-Med.
14       Correct?
15   A.   Correct.
16   Q.   And, in this case, Amazzia did not need to
17  do that, because they knew by looking at the screen
18  or the products being sold on their storefront.
19       Correct?
20   A.   Correct, because they were --
21       MR. GOODMAN:  Objection.
22  BY MR. VINE:
23   Q.   Why --
24       Let me ask it.
25       Why, in --



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
101–104

Page 101

1    He made an objection, so I've got to redo
2  the question.
3    Why, in this case, did you not buy the
4  product?
5    A.  Because any seller who is unauthorized, in
6  this case Life and Health Source was unauthorized,
7  they could not be selling a product with the
8  warranty and quality controls that Youngblood would
9  have released this item into commerce with.
10    And so those two things make it materially
11  different, which means you can't list it in new
12  condition.
13    So if it were listed as new, we
14  automatically deem it to be counterfeit because
15  it's lacking the warranty and the quality controls
16  that would be a material part of the sale.
17    Q.  And this -- Was this all based upon
18  Amazon's guidelines?
19    A.  Correct.  All of that is on Amazon
20  guidelines.
21    Q.  I'm almost done.
22    A.  How much longer?
23    I will need a break eventually, but --
24    Q.  I'm almost done, but he'll probably have an
25  hour.

Page 102

1    MR. GOODMAN:  Could be.
2    MR. VINE:  Okay.  So maybe we'll go to
3  lunch --
4    Let me finish mine, and then we'll take a
5  lunch break in between.
6    MR. GOODMAN:  You want to take a break now?
7    THE WITNESS:  How long -- How much more do
8  you need to finish you questions?
9  BY MR. VINE:
10    Q.  10, 15 minutes.
11    A.  Let's do it.
12    Q.  Okay.
13    And then I may have some --
14    (Whereupon Exhibit 12 was marked
15     for identification)
16  BY MR. VINE:
17    Q.  Marked as Exhibit 12 is an e-mail regarding
18  the retraction.
19  BY MR. VINE:
20    Q.  This is an e-mail --
21    I'm not talking about the top part.
22    The bottom part, do you see that --
23    A.  Yes.
24    Q.  -- where it talks about -- it's an e-mail
25  dated December 4th, 2018?

Page 103

1    A.  Yes.
2    Q.  Okay.
3    And this is an e-mail that was drafted by
4  Amazzia.
5    Correct?
6    A.  Yes.
7    Q.  Okay.
8    And it says:  Do you agree with me that --
9    Strike that.
10    Amazzia does not admit that Youngblood or
11  Amazzia, in this retraction, did something wrong.
12    Correct?
13    A.  Correct.
14    Q.  Okay.
15    What does it say?
16    A.  It says:  Please withdraw Complaint
17  ID: 55 --" dot, dot, dot "-- we have resolved our
18  complaint with the seller Life and Health Source".
19    Q.  And when you said, "we have resolved our
20  complaint", what did you mean?
21    A.  We have reached an amicable agreement in
22  that the seller will no longer sell the product and
23  we will clear their name with Amazon and, everybody
24  can go their separate way --
25    Q.  Right.

Page 104

1    A.  -- peacefully.
2    Q.  So Amazzia is achieving its goal of sell --
3  of preventing inauthentic and counterfeit products
4  from being sold on storefronts that weren't
5  permitted.
6    Correct?
7    A.  Correct.
8    MR. GOODMAN:  Objection as to form.
9  BY MR. VINE:
10    Q.  Did Amazzia achieve its goals,
11  preventing --
12    A.  Yes.
13    Q.  You've got to let me finish.
14    MR. CUMMINGS:  Let him finish.
15  BY MR. VINE:
16    Q.  Did Amazzia achieve its goals of preventing
17  Life and Health Source slash Solu-Med from selling
18  counterfeit and authentic -- inauthentic products?
19    A.  Yes, we did.
20    Q.  Did Amazon ever come back to you in this
21  case and say that you reported something
22  improperly, meaning that Amazzia did something
23  wrong in this case?
24    A.  Not to my knowledge.
25    Q.  You would know that.  I mean, you're the



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019

105—108

Page 105

1  owner of the company.
2      If Amazon thought that Amazzia did
3  something wrong as it relates to this complaint,
4  you would know.
5      Correct?
6  A.  I would know.
7      It's also been a year ago, so --
8  Q.  Okay.
9      Can you take out the Amazon
10  Anti-Counterfeiting Policy?
11  A.  Okay.
12  Q.  If you look at the last bullet point, can
13  you read to me what that says?
14  A.  "We stand behind the products --"
15  Q.  What's the bullet point called?
16  A.  "Reporting Inauthentic Products".
17  Q.  Is this a bullet point that Amazzia filed?
18  A.  Yes.
19  Q.  Okay.
20      What does this bullet point say?
21  A.  "We stand behind the products sold on our
22  site... and we encourage rights owners who have
23  product authenticity concerns to notify us.  We
24  will promptly investigate and take all appropriate
25  action to protect customers, sellers, and rights

Page 106

1  holders.  You may view counterfeit complaints on
2  the Account Health page in Seller Central".
3  Q.  Did Amazon ever respond to this retraction
4  that we've marked, I believe, as exhibit --
5  A.  12?
6  Q.  -- 12 as inadequate?
7      The answer is no.
8      Right?
9      MR. GOODMAN:  Objection.
10  BY MR. VINE:
11  Q.  Okay.
12      Did Amazon ever respond to Amazzia or
13  Youngblood saying that this retraction was not
14  adequate?
15  A.  Not to my knowledge.
16  Q.  If Amazon did, would Amazzia provide more
17  information?
18  A.  We would reprocess the retraction, yes.
19  Q.  Who is Jamie Siegel?
20  A.  Jamie Siegel was an account manager who
21  used to work for us.  She was Youngblood's account
22  manager at Amazzia.
23  Q.  Okay.
24      And she no longer works for you?
25  A.  Correct.

Page 107

1  Q.  Do you recall Mr. Goodman communicating
2  with Youngblood and Amazzia that -- to ask for --
3      Strike that.
4      MR. VINE:  Okay.  I don't think I have
5  anything further, subject obviously --
6          (Multiple voices)
7      MR. VINE:  Obviously, I re --
8      I don't have any further questions
9  unless --
10      There will be, obviously more likely than
11  not, redirect after Mr. Goodman goes.
12      MR. GOODMAN:  And let's take a break for
13  about 10, 15 minutes.
14      MR. VINE:  Well, do you want to take a
15  lunch break?
16      MR. GOODMAN:  Yes, let's do that now.
17      MR. VINE:  For 10 or 15 minutes?
18      MR. GOODMAN:  No.
19      MR. VINE:  That's what I didn't understand.
20      MR. GOODMAN:  Let's take a break -- Let's
21  have the lunch break for about 45 minutes.
22      Say, we come back here at --
23      What time is it?
24      MR. VINE:  It's 12:00.
25      Let's just say 1 o'clock.

Page 108

1      MR. GOODMAN:  1 o'clock.
2      MR. VINE:  Off the record.
3      THE VIDEOGRAPHER:  Going off the record.
4      The time is 12:03 p.m.
5  (Whereupon a lunch recess was taken
6  from 12:03 p.m. to 1:03 p.m.)
7      THE VIDEOGRAPHER:  Back on the record.
8      The time is 1:03 p.m.
9
10          EXAMINATION
11  BY MR. GOODMAN:
12  Q.  All right.
13      Mr. Fikhman, my name is Stanley Goodman.
14  The firm is Goodman & Saperstein.  We are
15  co-counsel for the plaintiff in this case.
16      I've listened to your testimony, I've
17  listened to Mr. Vine's questions, and I have
18  several questions I'd like to ask you.
19      If at any time you don't understand my
20  question, just tell me, and I'd be glad to rephrase
21  it.
22      Of course, during the pendency of the
23  question, you must continue to answer, and you
24  can't converse with your counsel.
25      All right?



PMK WILLIAM FIKHMAN 30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
109–112

Page 109

1        Amazzia, according to your testimony, came
2    into existence some 15 years ago.
3        Is that it?
4    A.    The corporation that owns Amazzia came
5    into existence 15 years ago.
6    Q.    And what was the name of that corporation?
7    A.    Auction Brothers, Inc.
8    Q.    And they were located here in California?
9    A.    Yes.
10    Q.    And although the question has been asked,
11   I'll ask it again.
12        When did Amazzia's name come into the
13   framework of your company?
14    A.    About two years ago.
15    Q.    And what was the purpose of that?
16    A.    We just rebranded to add more clarity to
17   our --
18        Our business model evolved, and became
19   more clear.
20    Q.    Prior to that time, going back beyond two
21   years ago, did your company -- was your company a
22   reseller of any products on Amazon?
23    A.    Yes.
24    Q.    And what products were you reselling?
25    A.    A variety of general goods.

Page 110

1    Q.    Cosmetics?
2    A.    Sure.
3    Q.    What other types of products?
4    A.    Supplements, cosmetics, home goods.
5    Q.    Are you talking about dietary supplements?
6    A.    Yes.
7    Q.    And what else?
8    A.    Home goods.
9    Q.    All right.
10    A.    Bedding, whatever --
11    Q.    It was a myriad of products?
12    A.    A myriad of -- A wide variety of products.
13    Q.    Yeah.
14        And at that time, when you were a reseller,
15   were these from companies that had registered
16   trademarks?
17    A.    I'd imagine so, yes.
18    Q.    Can you name a few of the companies?
19        MR. VINE:  Objection.
20   BY MR. GOODMAN:
21    Q.    Go ahead.
22        I just want to tell you, Mr. Vine will make
23   certain objections, as I did.
24        All right?
25        But you can continue with your answer.

Page 111

1    A.    I'm trying to remember.  It's been more
2    than four years that we've sold the --
3    Q.    Well, name three.
4    A.    Viviscal, Herstyler, Orogold.
5    Q.    And what was the name or what -- what is
6    the name of the storefronts?
7    A.    I don't understand the question.
8    Q.    Well, these products were resold on Amazon.
9        Did you have a storefront name?
10    A.    Did Amazzia have a storefront name?
11    Q.    Yes.
12    A.    Amazzia didn't sell the products on
13   Amazon.
14    Q.    What did it do?
15    A.    Amazzia sold the products to other
16   retailers that sold the product on Amazon.
17    Q.    And where did Amazzia obtain these
18   products?
19        MR. CUMMINGS:  Objection.  Vague.
20        MR. GOODMAN:  What?
21        MR. CUMMINGS:  Objection.  Vague.
22        MR. VINE:  Form.
23   BY MR. GOODMAN:
24    Q.    Well, where did they obtain the products?
25        Did they buy it from the manufacturers?

Page 112

1    A.    15 years ago, or in the recent time?
2        Because the business model changed over
3    the years.
4    Q.    All right.
5        So take me back 15 years, and then just
6    morph it into the current --
7        MR. VINE:  Objection.  Outside the scope of
8    this 30(b)(6).
9    BY MR. GOODMAN:
10    Q.    Go ahead.
11        MR. CUMMINGS:  Same objection.
12        THE WITNESS:  Originally, we started in a
13   whole different business, selling products on e-Bay
14   15 years ago.
15   BY MR. GOODMAN:
16    Q.    Uh-huh.
17    A.    That transitioned to an Amazon business
18   10 years ago --
19    Q.    All right.
20    A.    -- and then that transitioned to an -- the
21   Amazzia business four years ago.
22   BY MR. GOODMAN:
23    Q.    Well, Amazon business, where were the
24   products obtained from?
25        Did you buy those products directly from



Page 113

1 manufacturers, or from secondary sources?
2      MR. VINE: Objection. Outside the scope.
3      MR. CUMMINGS: Same objection.
4      THE WITNESS: Both. They could have been
5 direct from brands, but also through secondary
6 sources.
7      MR. VINE: Also, it's confidential.
8      Well, all of this is confidential.
9 BY MR. GOODMAN:
10    Q. And then the products were sold to others
11 that resold the products on Amazon?
12    A. Correct.
13      MR. VINE: Objection --
14      You've got to let me finish.
15      Objection. Lack of foundation.
16      He doesn't know what other people did
17 with the -- with the products.
18      MR. CUMMINGS: Join.
19 BY MR. GOODMAN:
20    Q. Do you know where the --
21      Let's go back.
22      Amazzia bought the products from secondary
23 sources.
24      Is that correct?
25      MR. VINE: Objection. Leading, form.

Page 114

1      Mischaracterizes testimony where he
2 indicated he -- he bought also directly from --
3 BY MR. GOODMAN:
4    Q. Did Amazzia purchase the --
5      COURT REPORTER: I'm sorry.
6      Where he what?
7      MR. VINE: -- bought the products directly
8 from the manufacturer.
9      MR. CUMMINGS: Join.
10 BY MR. GOODMAN:
11    Q. Did Amazzia purchase the products that
12 it -- it ultimately sold to resellers from
13 manufacturers?
14    A. Yes.
15    Q. All right.
16      Did it buy from secondary sources, as well?
17    A. Amazzia does not buy from -- has never
18 bought from secondary sources.
19    Q. All right.
20      Now, there came a time when Amazzia
21 established a business relationship with the
22 defendant in this case, Youngblood.
23      Is that correct?
24    A. Can you rephrase that question?
25    Q. In September of 2018, Amazzia entered into

Page 115

1 a contract with Youngblood.
2      Is that correct?
3    A. Yes.
4    Q. And there were two contracts.
5      One was as you've testified previously, was
6 a distributor agreement?
7    A. Yes.
8    Q. Is that correct?
9      And there was --
10      Exhibit 2, do you have Exhibit 2 there?
11    A. Yes.
12    Q. And as a result of this Agreement, the
13 terms of this Agreement, did Amazzia buy Youngblood
14 products from Youngblood?
15    A. Yes.
16    Q. And did it purchase a full line of
17 Youngblood's products or a limited line?
18    A. Full line.
19    Q. And after buying the products from
20 Youngblood, did Amazzia resell those products?
21    A. Yes.
22    Q. Who did they resell the products to?
23    A. To authorized resellers on Amazon.
24    Q. All right.
25      And who were the authorized resellers?

Page 116

1    A. They were La Chic Boutique and
2 Nature Glow.
3    Q. Are they in any way owned by Amazon -- by
4 Amazzia?
5    A. No.
6    Q. Do you know who owns those companies?
7    A. Yes.
8    Q. Could you tell me that, please?
9    A. Mike Fikhman, George Fikhman, and
10 William Fikhman.
11    Q. So you are an owner of those companies?
12    A. Correct.
13    Q. And do you exercise control over those
14 companies?
15      MR. CUMMINGS: Objection. Vague.
16      THE WITNESS: I don't understand --
17 BY MR. GOODMAN:
18    Q. What is your role with respect to those
19 companies?
20    A. My individual role?
21    Q. Yes.
22    A. My personal role?
23    Q. Not personal.
24      As a corporate representative, an as owner,
25 what are your responsibilities?



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
117–120

Page 117

1    A.  I'm just not clear.
2        Am I speaking now as a corporate
3    officer --
4    Q.  Yes, as a corporate --
5    A.  -- of Amazzia, or of those corporations?
6    Q.  As a corporate officer of Amazzia.
7    A.  There's no responsibility as corporate
8    officer of Amazzia inside of those companies.
9    Q.  What is the business of those companies?
10   A.  Reselling products on Amazon.
11   Q.  All right.
12       Do those -- Do those companies sell any
13   other products other than Youngblood?
14   A.  Yes.
15   Q.  What products do they sell?
16   A.  A myriad of categories.
17   Q.  And are those products that it sells on
18   Amazon sourced from the manufacturers?
19   A.  Yes.
20   Q.  Are there any of the products that are
21   offered on Amazon by these companies bought from
22   secondary sources?
23   A.  No.
24   Q.  Now, with respect to the Agreement, the
25   distributor agreement with Youngblood, we refer you

Page 118

1    to --
2        MR. VINE:  What exhibit number is it?
3        MR. GOODMAN:  I think that was --
4        MR. VINE:  I'm asking the witness.
5        THE WITNESS:  Two.
6        MR. VINE:  Okay.  Just so we have it for
7    the record.  It's easier.
8    BY MR. GOODMAN:
9    Q.  Page 9, Paragraph 9, Relationship of
10   Parties:  "Distributor acknowledges that
11   Distributor's services are herein -- being provided
12   as an independent contractor."
13       What does that mean?
14       MR. CUMMINGS:  Objection to the extent it
15   calls for a legal conclusion.
16       MR. VINE:  Join.
17   BY MR. GOODMAN:
18   Q.  What's your understanding of that?
19   A.  I think it tries to clearly, you know,
20   note the independence, that we're not an employee
21   of Youngblood, we're not --
22       I think I tries -- that's what that means.
23   Q.  I ask you to refer to Exhibit 3, which is
24   Amazon's Management Agreement with --
25   A.  Amazzia.

Page 119

1    Q.  Amazzia's.  I'm sorry.  I get the two of
2    them mixed up.
3        -- with Youngblood.
4        Now, you previously testified, if I heard
5    correctly, that the Distributor Agreement was
6    constructed and drafted by Youngblood.
7    A.  Yes.
8    Q.  And Exhibit 3, the Amazon Management
9    Agreement, was drafted by Amazzia?
10   A.  Yes.
11   Q.  All right.
12       Is there any language in the Amazon
13   Management Agreement similar to or identical with
14   the language as to an independent contractor in
15   this Agreement?
16       MR. VINE:  Objection.
17       MR. CUMMINGS:  Objection.  Calls for a
18   legal conclusion.
19       THE WITNESS:  I'm not lawyer.  I don't
20   know.
21       MR. GOODMAN:  No, I just asked him whether
22   there's any knowl -- any language in that, written
23   word, that doesn't require a legal opinion.
24       MR. VINE:  Objection.
25       MR. CUMMINGS:  Objection.  The document

Page 120

1    speaks for itself.
2        You want him to just compare the documents?
3    BY MR. GOODMAN:
4    Q.  Yes, please do.
5    A.  I mean, that would take me -- I don't
6    know.
7        I'd have to pair every single line of this
8    20-page --
9    Q.  It's only three pages.  Take a look at it.
10       MR. VINE:  The distribution agreement is
11   not three pages.
12       THE WITNESS:  Yeah, the distribution
13   agreement is like 14, 15 pages.
14   BY MR. GOODMAN:
15   Q.  I just referred you to Page 9.
16   A.  Sure.
17       Some of the terms are in common.  Some of
18   the terms here are in common, I believe, in both
19   agreements.
20       The 12-month term is probably in common.
21       "Amazzia's margins will come from the
22   distribution of the brand."  I think we'll find
23   similar language that, you know, we make a markup
24   on the distribution of the products.
25   Q.  Is there any language in there with respect



Page 121

1  to Amazzia acting as an independent contractor?
2      MR. CUMMINGS: Objection.
3      MR. VINE:  Objection.  The document speaks
4  for itself.
5      MR. CUMMINGS:  Join.
6  BY MR. GOODMAN:
7    Q.   That means you can't find anything in
8  there.
9      MR. VINE:  Objection.
10     Move to strike Counsel's comments.  Both
11  inappropriate.
12  BY MR. GOODMAN:
13    Q.   Let me ask you this, Mr. Fikhman.
14     Prior to coming here today, what did you do
15  in preparation for your deposition?
16    A.   This morning, I meditated.
17    Q.   What?
18    A.   I meditated this morning.
19     And yesterday, me and my lawyer here,
20  Andrew, had a prep call.
21     MR. CUMMINGS:  And don't get into what we
22  discussed, but --
23  BY MR. GOODMAN:
24    Q.   No.
25     Have you had any discussions with Mr. Vine?

Page 122

1    A.   Mr. Vine?
2      MR. VINE:  Me.
3    No.
4      THE WITNESS:  Not discussions.  Maybe just
5  requests a long time ago for documents or
6  information, I think.  Not discussions.
7  BY MR. GOODMAN:
8    Q.   Have you discussed your deposition with
9  Mr. Vine prior to coming here today?
10    A.   No.
11    Q.   Have you discussed it with him prior to
12  commencing your deposition this morning?
13    A.   No.
14    Q.   Following the execution of the Exhibit 3,
15  which is the Amazon Management Agreement with
16  Youngblood, what were the first steps you took on
17  behalf of Youngblood?
18    A.   Is your question after the signing of this
19  agreement --
20    Q.   Yes, sir.
21    A.   -- on September 7th --
22    Q.   Correct.
23    A.   -- what steps we took?
24    Q.   Yes.
25    A.   Through what period of time?

Page 123

1     We probably took thousands of steps.
2    Q.   Through November -- Through November of
3  2018.
4      MR. VINE:  Just for the record, he's not
5  saying November 18th.  He's saying November 2018.
6      MR. GOODMAN:  2018.
7      THE WITNESS:  Yeah, so we're talking in the
8  two-month period.
9     The steps would have been like introduction
10  to Youngblood's account manager, which would have
11  been Jamie Siegel on our end.  So, that
12  introduction.
13     There would have been an on-boarding call
14  where the client and we get on a call to kind of
15  reconfirm all the details, be clear -- make sure
16  that what the client expects is what we expect to
17  deliver in the coming months.
18     And then we would have set up the
19  Brand Registry 2.0, which would have also included
20  nominating the e-mail addresses provided by
21  Youngblood in that Brand Registry.
22     And then we would have started, you know,
23  what we call like a snapshot of the market, looking
24  at -- building a document of who is selling what.
25     And then we would have started the actual

Page 124

1  enforcement of making complaints to Amazon.
2  BY MR. GOODMAN:
3    Q.   Did Youngblood advise you at that time that
4  Life and Health Source was offering its products on
5  Amazon's platform?
6    A.   No.
7    Q.   And how did you determine or did you
8  determine at some point that Life and Health Source
9  was offering Youngblood products?
10    A.   We take -- As I testified earlier, we take
11  a snapshot of the whole market, of every product,
12  and build a master doc of every product and every
13  seller selling that.
14     And Life and Health Source would have been
15  one of dozens, hundreds, potentially even thousands
16  of sellers on that list.
17    Q.   There was thousands of resellers of
18  Youngblood products?
19    A.   We count --
20      MR. VINE:  Objection.
21     You can answer.
22      THE WITNESS:  We count -- We count one
23  reseller per product.
24     So if a brand has 50 products and
25  potentially 50 sellers on each, it multiplies.



PMK WILLIAM FIKHMAN  30(b)(6), Confidential                     December 10, 2019
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE                              125–128

Page 125

1     That's how we count.
2  BY MR. GOODMAN:
3     Q.  How many seller, itself?
4        Other than one seller having 50 or 100
5  products --
6     A.  How many --
7     Q.  -- how many sellers did you identify?
8     A.  I would estimate at least a few dozen.
9     Q.  Can you name any of them?
10    A.  No.
11    Q.  Do you have any records at your offices
12  that would --
13    A.  Yes.
14    Q.  -- disclose that information?
15    A.  Yes.
16    Q.  And how were they maintained?
17    A.  In a spreadsheet.
18    Q.  Now, with respect to those other resellers,
19  were they selling the products on Amazon?
20    A.  Yes.
21    Q.  And were they selling a full line of the
22  products -- of Youngblood's products, or just
23  separate items?
24    A.  We don't know.  We don't audit for that,
25  whether it's full line or even one product.

Page 126

1     Q.  Having determined that there was a number
2  of resellers of the products, what did you do then?
3     A.  Having determined --
4        We identify all the resellers.  We build a
5  plan of how we're going to enforce the resellers.
6        We do -- prioritize, you know, which ones
7  we go after.  We build a strategic plan, and then
8  we start executing that plan.
9     Q.  Well, when did you make the determination
10  as to what resellers you would go after?
11    A.  It was for sure between November -- the
12  date of this Agreement and the date of the first
13  complaints filed, which I saw somewhere else on
14  another document, October 31st.  So somewhere in
15  September of 2018.
16    Q.  And did you make --
17       Did you, on behalf of Amazzia, make a
18  determination at that time that the sellers you
19  have identified were selling counterfeit Youngblood
20  products?
21    A.  Can you repeat that again?
22    Q.  Let the reporter repeat it.  I can't.
23  (Whereupon the record was read as follows:)
24       "QUESTION:  Did you, on behalf of
25       Amazzia, make a determination at

Page 127

1        that time that the sellers you
2        have identified were selling
3        counterfeit Youngblood products?"
4        THE WITNESS:  Are you asking me,
5  personally, or the company -- as a representative
6  of the company?
7     Q.  You're here as a representative of the
8  company.
9     A.  Okay.  Yeah --
10    Q.  I wouldn't be asking you, personally.
11    A.  Sure.
12       Yes, we --
13    Q.  Just remember, whenever I'm asking you, is
14  in your capacity as a witness on behalf of the
15  corporation.
16    A.  Okay.
17       MR. VINE:  Meaning, Amazzia determined it.
18       THE WITNESS:  Amazzia, sure.
19       Yes, we -- we -- we scope out everyone
20  that's selling the product, and anyone outside of
21  the authorized sellers is considered unauthorized,
22  and therefore, selling counterfeit because they
23  lack the warranty and the quality controls that
24  would go with the product.
25       And that creates the material difference,

Page 128

1  which ultimately, through Amazon policy, it's
2  deemed counterfeit.
3  BY MR. GOODMAN:
4     Q.  How do you define "counterfeit"?
5        Meaning on behalf of the company.  I'm not
6  talking about you, personally.
7     A.  I define counter --
8        MR. VINE:  Objection.
9        In -- In him reporting the complaints to
10  Amazon?
11       MR. GOODMAN:  Yeah.
12       MR. CUMMINGS:  Not just counterfeit --
13       (Multiple voices)
14       MR. VINE:  So the question is, just so it's
15  clear for the record, Mr. Goodman is asking how
16  does Amazzia define "counterfeit" when it
17  reports --
18       MR. GOODMAN:  That's right.
19       MR. VINE:  -- to Amazon.
20       THE WITNESS:  Okay.
21       A counterfeit item by us is defined as
22  having a material difference, and one that creates
23  customer confusion.
24  BY MR. GOODMAN:
25    Q.  And what are the material differences?



Page 129

1    A.  The material differences would be the lack
2   of warranty and the lack of quality controls that
3   go with a product, such as a cosmetic product in
4   this case that go on the body, the consumer's body
5   that present risks to -- to a consumer when not
6   stored properly, when not, you know, sold within
7   their shelf life, things like that.
8       Q.  Did Amazzia make those determinations prior
9   to the time it sent a notice to Amazon regarding
10  Life and Health Source offering of their products?
11      A.  We would not have made a complaint to
12  Amazon of counterfeit unless we made that
13  determination first.
14          So I would say, yes, we made a
15  determination that these people are counterfeit and
16  then reported them.
17      Q.  Is that a legal definition or a definition
18  that you made of counterfeit?
19          MR. VINE:  Objection.
20          He stated previously that he determined
21  what was counterfeit based upon Amazon's guidelines
22  and reporting it to Amazon.
23          MR. CUMMINGS:  Join.
24  BY MR. GOODMAN:
25      Q.  So the determination of counterfeit is your

Page 130

1   interpretation of Amazon's guidelines?
2           MR. VINE:  Objection.
3   BY MR. GOODMAN:
4       Q.  You may answer.
5       A.  I --
6       Q.  We have a number of documents --
7       A.  Yeah.
8       Q.  -- that are all from Amazon's --
9       A.  Yes.
10      Q.  -- guidelines.
11      A.  My understanding of the -- the definition
12  of "counterfeit" is, if it creates customer
13  confusion and if it's materially different than
14  what are consumers to expect, then it is
15  counterfeit.
16          So just like, you know, in my Rolex watch,
17  there's a mechanism that runs it.
18          If you were to replace the mechanism with
19  a different mechanism, the consumer would say
20  that's not a Rolex watch anymore.
21          And Rolex wouldn't warranty the watch,
22  because that's not the watch they released into the
23  stream of commerce.
24      Q.  Would you just testify, then, if that watch
25  had a different movement in it, it would be

Page 131

1   considered a fake?
2       A.  Yes.
3           And Rolex would agree with that and the
4   consumer would agree that if the interior parts,
5   which are material to a watch would be replaced,
6   then yes, that would be considered a fake, a
7   counterfeit, inauthentic.
8       Q.  Do you -- Did Amazzia make any
9   determination in September of 2018 that the
10  Youngblood products it was offering on Amazon were
11  fake?
12      A.  Yes, because they lack warranty.
13          And the warranty on a consumer product and
14  the post-sale customer service that a consumer
15  expects from a product when using it after they
16  purchase it, are a material part of the sale.
17      Q.  You talk about "consumer confusion".
18          What do you mean?
19      A.  Consumer confusion, that they -- they buy
20  a product from the Amazon market, they expect to be
21  able to get certain support and service from
22  Youngblood that they might not get.
23      Q.  What support and services would they expect
24  from Youngblood?
25      A.  I mean, Youngblood could probably tell us

Page 132

1   more, but my -- my estimation would be like how to
2   use a product, what products to use with other
3   combinations of products, when to not use a
4   product, how to know if the product is not usable
5   anymore.
6           It's makeup that gets applied to the body,
7   so there's some instruction that you have to know
8   to properly apply it, what brush to, for example,
9   use this makeup with, or whether to use a brush at
10  all.
11          And then if they use it and they have a
12  reaction to it, like their skin flairs up or a burn
13  or something like that, you know, they would go
14  back to Youngblood and seek some sort of support
15  for that.
16      Q.  Did Youngblood advise you at the time they
17  retained Amazzia that they had complaints of injury
18  as a result of using their products?
19          MR. VINE:  Objection.
20          THE WITNESS:  I -- I can't remember
21  specifically.
22          But they absolutely had a ton of customer
23  confusion, because people were buying what they
24  thought was good product but getting damaged
25  product, old product, old packaging product which



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
133—136

Page 133

1  may have not been compliant with the current FDA
2  labeling restrictions.
3  BY MR. GOODMAN:
4      Q.  Are you stating what you believe --
5      A.  I remember --
6      Q.  -- the consumers --
7          COURT REPORTER:  I'm sorry --
8          THE WITNESS:  No, no.  I'm stating what --
9  BY MR. GOODMAN:
10     Q.  -- expect --
11         MR. VINE:  Hang on.  Time out.
12         He wasn't done.
13         THE WITNESS:  Yeah, I wasn't done.
14         MR. CUMMINGS:  Yeah, let him finish his
15  answer.
16         MR. TOTH:  You've got to let him finish his
17  question.
18         MR. VINE:  No, no.  Not you.
19         Let the witness finish his response.
20         THE WITNESS:  Yeah.
21  BY MR. GOODMAN:
22     Q.  Go ahead.
23     A.  I -- I am remembering what came up in our
24  conversations by telephone and in the meeting when
25  we actually met at Youngblood's offices, the issues

Page 134

1  they were saying their brand was experiencing as a
2  result of unauthorized sellers selling the product
3  in the Amazon market.
4      Q.  Was there any statements made that referred
5  those complaints or would you have described to
6  Life and Health Source?
7      A.  Can you rephrase that?
8      Q.  Yes.
9          I mean, was any of the remarks concerning
10  the complaints with regard to the use of the
11  products referable to Life and Health Source?
12         MR. VINE:  Objection.  He already testified
13  that the -- that Youngblood never reported --
14         MR. GOODMAN:  Go ahead.
15         You're not directing him not to answer.
16         THE WITNESS:  At that moment, there was no
17  discussion about a specific seller.
18         Youngblood may not have known where
19  these -- who the seller of record was at the
20  moment.
21         When you make a sale on Amazon, you don't
22  exactly --
23         Like when Amazon sells your product, for
24  example, it's not very clear who is making that
25  sale on Amazon.

Page 135

1          Someone supplying Amazon or sometimes
2  someone is operating a storefront under a pseudonym
3  that's not identified by Youngblood, and they're
4  basically hiding and, you know, not selling
5  honestly.
6  BY MR. GOODMAN:
7      Q.  In whatever research you conducted, did you
8  determine for how long Life and Health Source had
9  been offering Youngblood products at Amazon?
10     A.  We would have no way to know how long
11  Life Tech -- Life and Health Source --
12     Q.  ... and Health Source.
13     A.  -- had offered the products.
14         All we know is that they were -- All we
15  could observe is they were in the market at that
16  moment when we went to do our reporting of them.
17     Q.  Did Youngblood, at the time they retained
18  Amazzia, provide Amazzia with a selection of their
19  products for your investigation?
20     A.  No, because our agreement was for the
21  entire brand.
22     Q.  Uh-huh.
23     A.  So --
24     Q.  So you never physically viewed any of their
25  products?

Page 136

1          MR. VINE:  Objection.
2          THE WITNESS:  Oh.  Objection --
3          Not objection, but I --
4          We did view, because we purchased them.
5  BY MR. GOODMAN:
6      Q.  So you're a tag team.
7      A.  We purchased -- We -- We were distributing
8  the products.
9          So before we actually started the
10  enforcement, we had received the product into our
11  warehouse and physically observed the things.
12     Q.  And these were the products your stores
13  were offering?
14     A.  Amazzia didn't have any stores.
15     Q.  Well, your re -- the purp -- the entities
16  that you sold to.
17     A.  Yes, our retailers who resold to --
18         Yes, these were products that were going
19  to be retailed sold by the entities we sold to.
20     Q.  And then I would ask you:  Did you at that
21  time, as well, buy any of the products on Amazon's
22  platform that were offered by Life and Health
23  Source?
24     A.  No.
25     Q.  So you've never seen the product that --



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
137–140

Page 137

1    that was being offered?
2        A.   Correct.
3        Q.   Were you provided with the warranty which
4    you have testified to?
5            MR. VINE:  By whom?
6            MR. GOODMAN:  By Youngblood.
7            MR. VINE:  When they bought it from
8    Youngblood?
9            MR. GOODMAN:  Yeah.
10           THE WITNESS:  Were we provide the
11   warranty --
12   BY MR. GOODMAN:
13       Q.   Well, did you observe the warranty at any
14   time after you purchased the products from
15   Youngblood?
16       A.   I think we probably discussed the
17   warranty, and before even crafting the deal and
18   probably after signing it, made sure that the
19   warranty was crafted --
20       Q.   Well --
21       A.   -- in a certain way, but I can't exactly
22   recall.
23       Q.   Well, how did you make sure the warranty
24   was crafted in a certain way?
25       A.   We -- We certainly reviewed it together.

Page 138

1            Like Amazzia and Youngblood would have
2    reviewed Youngblood's warranty.
3        Q.   Did you review it, or you believe you did?
4        A.   I believe we did, but I don't specifically
5    remember the meeting where we did.
6        Q.   Do you know the wording?
7        A.   No.  Today, I don't, no.
8        Q.   Well, did you have an understanding of the
9    wording of the warranty?
10       A.   At the moment, yes.  I mean, now it's been
11   a year.  I don't have it now, but --
12       Q.   What is your present understanding?
13       A.   It would probably be like a satisfaction
14   guarantee for a certain number of days, maybe
15   60 days, 90 days, a year, something like that, or a
16   lifetime.
17       Q.   Did that -- Was that printed on the
18   product, itself?
19       A.   I'm not sure.
20       Q.   Do you have any memory of ever seeing that
21   warranty?
22       A.   I remember seeing the warranty on their
23   website or maybe in an e-mail to me like in writing
24   on some form.
25       Q.   But can you testify that the warranty was

Page 139

1    actually on Youngblood's products?
2            MR. CUMMINGS:  Objection.  Asked and
3    answered.
4            MR. VINE:  He's already testified on
5    this --
6    BY MR. GOODMAN:
7        Q.   Go ahead.
8            MR. VINE:  -- that he remembers there being
9    a warranty.  There was no discussion on the
10   physical box.
11           THE WITNESS:  I -- I can't remember if it
12   was physically on the box or not.
13   BY MR. GOODMAN:
14       Q.   Now, at or about the same time Amazzia was
15   retained by agreement with Youngblood, was Amazon,
16   to your knowledge or to the knowledge of Amazzia,
17   was Amazon offering Youngblood products for sale on
18   its platform?
19       A.   Yes.
20       Q.   And was Amazon an authorized seller?
21           MR. CUMMINGS:  Objection.  Vague.
22           You mean Amazon, the company, itself,
23   selling it?
24           THE WITNESS:  Amazon, the retailer, or
25   Amazon, the marketplace?

Page 140

1    BY MR. GOODMAN:
2        Q.   Amazon, the retailer.
3        A.   Yes.
4        Q.   So they were an authorized reseller --
5        A.   They were not an authorized retailer.
6    They were an unauthorized retailer at the moment.
7        Q.   So if they were not an authorized
8    reseller -- reseller, they were unauthorized?
9        A.   Yes.
10       Q.   And did Amazzia notify Amazon that it was
11   unauthorized?
12       A.   Yes.
13       Q.   And what --
14       A.   Sorry.
15       Q.   And what they were selling, offering for
16   sale, were counterfeits?
17       A.   Yes.
18       Q.   And where is --
19           Is there a document that would demonstrate
20   that?
21       A.   Our internal document would show that
22   Amazon is one of the unauthorized resellers amongst
23   those.
24       Q.   And do you recall when you notified,
25   meaning Amazzia notified, Amazon that it was



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
141–144

Page 141

1   unauthorized and that it was selling counterfeit
2   product?
3       A.   It would have been sometime in this
4   enforcement period.
5           I don't know when, but between
6   September 7th and November, somewhere around there,
7   October.
8       Q.   I -- I'm not referring to Life and Health
9   Source products, but I'm referring solely to Amazon
10  offering Youngblood products on its platform.
11      A.   Correct.
12          That was a -- a clear point that we had
13  discussed in that Amazon.com was the retailer of
14  record on Amazon.com, and Youngblood didn't know
15  who was supplying them the products and couldn't
16  extend their warranty and quality controls to those
17  products, either.
18      Q.   So then am I to understand that Amazon was
19  violating its own policy?
20      A.   Yes.
21          And we have many instances of removing
22  Amazon off of its own platform for that exact
23  reason.
24      Q.   And have you removed Amazon?
25      A.   Yes, in our history, we absolutely removed

Page 142

1   Amazon.
2       Q.   How have you done that?
3       A.   By the same exact complaints we made
4   against Life and Health Source, through the same
5   web form with the same language.
6       Q.   And are there documents to evidence the
7   fact that you had taken action as against Amazon?
8       A.   Can you clarify that again?
9       Q.   Well, what enforcement acts, if any, did
10  Amazzia take with respect to Amazon being an
11  unauthorized reseller of Youngblood products?
12          MR. VINE:  Objection.  Asked and answered.
13          But you can answer again.
14          THE WITNESS:  It would be no different than
15  the actions we take against any other reseller --
16  took against any other reseller, including
17  Life and Health Source.
18  BY MR. GOODMAN:
19      Q.   So am I to understand that a
20  communication --
21          Let me just get it --
22          MR. GOODMAN:  Exhibit 9, Jonathan?
23          MR. VINE:  Okay.
24          He has it.
25          ///

Page 143

1   BY MR. GOODMAN:
2       Q.   It's a one-page document.
3       A.   I don't have 9.
4           MR. VINE:  He should find 9.  We don't want
5   to lose that.
6           MR. GOODMAN:  What?
7           MR. VINE:  We don't want to lose 9.
8           THE WITNESS:  Okay.  9.
9   BY MR. GOODMAN:
10      Q.   Yeah.
11      A.   I'm with you.
12      Q.   This here warranty identified as the notice
13  that Amazzia prepared on behalf of Youngblood and
14  sent to Amazon.
15          Is that correct?
16      A.   Yes.
17      Q.   All right.
18          Was a similar notice sent to Amazon
19  advising Amazon that it was violating Youngblood's
20  trademarks?
21      A.   Yes.
22      Q.   And where is that document?
23          MR. VINE:  Objection.  You've never
24  requested that document.
25          MR. GOODMAN:  I'm just asking.

Page 144

1       Q.   Does that document exist?
2       A.   No, there -- I don't believe a document
3   exists, because it's filled out on a form on a
4   website that then goes to Amazon.
5           It's not like it's then logged in a case
6   that we could access back.
7           It's kind of like submit it on a web page,
8   and then goes in.
9       Q.   Well, you were able to --
10      A.   This looks like a copy.
11          MR. VINE:  No.
12          Look at the bottom the Bates stamp numbers.
13  They were produced at Amazon --  It was produced by
14  Amazon.
15          MR. CUMMINGS:  Yeah, this was produced by
16  Amazon, not by Amazzia.
17          THE WITNESS:  Yeah, we would have no record
18  of the actual words.
19  BY MR. GOODMAN:
20      Q.   You don't keep copies of anything you send?
21      A.   Correct.
22      Q.   So if we made a request for a document that
23  you sent to Amazon, you would be unable to re --
24      A.   Correct.
25      Q.   What was Amazon's response?



Page 145

1      MR. CUMMINGS: Objection. Vague.
2      THE WITNESS: When?
3   BY MR. GOODMAN:
4      Q.   After they received this notice that you're
5   referring to.
6         You said you notified Amazon that they were
7   offering counterfeit Youngblood products.
8      MR. CUMMINGS: Objection. Lacks
9   foundation.
10        THE WITNESS: Amazon comes back with one of
11  three possible answers.
12        One is:  We received your notice.  Thank
13  you.  Were looking at it.
14        One is:  We disagree with your notice.
15        And one could be:  No notice at all.
16        Amazon is incredibly inconsistent in how it
17  communicates back to people.
18  BY MR. GOODMAN:
19     Q.   So are you saying that Amazon did not
20  respond?
21     MR. CUMMINGS:  Objection --
22     THE WITNESS:  I'm not saying that.
23     MR. VINE:  Objection.
24        He previously testified that Amazon took
25  themselves off or suspended their own ability to

Page 146

1   sell certain products.
2      MR. GOODMAN:  He didn't testify they took
3   it off.
4      THE WITNESS:  We -- We have removed Amazon.
5      I don't remember if in Youngblood's
6   instance, we removed Amazon, but I can tell you
7   that there definitely have been many other
8   instances in our business where we have removed
9   Amazon in the same manner, in the same form, from
10  selling a product because it lacked warranty and
11  quality controls.
12  BY MR. GOODMAN:
13     Q.   So during the period of time that Amazon
14  was offering Youngblood products on its platform,
15  those products were counterfeit?
16     A.   Can you repeat that?
17     Q.   During the period of time that Amazon was
18  offering Youngblood products on Amazon.com --
19     MR. VINE:  The retail?
20     MR. GOODMAN:  The retail.  Pardon me.
21  BY MR. GOODMAN:
22     Q.   -- those products were counterfeit?
23     A.   Yes.
24     Q.   Now, when Amazzia, in September of 2018,
25  became a distributor for Youngblood products and at

Page 147

1   the same time Life and Health Source was offering
2   Youngblood products on Amazon, was Life and Health
3   Source in competition with Amazzia?
4      A.   No.
5      Q.   It was selling the same products you were
6   offering.
7         Is that correct?
8      A.   Amazzia is a distributor of products.
9         Life and Health Source is a retailer of
10  products.
11     Q.   All right.
12        Then the purchases of the Youngblood
13  products, where did they offer the products?
14     MR. CUMMINGS:  Objection.  Vague.
15  BY MR. GOODMAN:
16     Q.   Do you understand what they did with the
17  products?
18     A.   Who is "they"?
19     Q.   The persons or the entities you sold the
20  products to.
21     A.   Sure.
22        The retailers we sold to would sell them
23  on Amazon as an authorized retailer.
24     Q.   As an authorized retailer.
25        And at the same time Youngblood's products

Page 148

1   were being offered by Life and Health Source, would
2   they be in competition with those authorized
3   resellers?
4      MR. VINE:  Objection.
5      THE WITNESS:  They would be in false
6   competition.
7   BY MR. GOODMAN:
8      Q.   False?
9      A.   They would be in unfair competition,
10  because they're claiming to sell a new product but
11  they're not selling a new product.
12        They're actually selling a product lacking
13  warranty, that's materially different, and is not
14  the same thing the authorized seller is selling.
15        It would be like one watch dealer selling
16  a watch with the mechanism, and the other watch
17  dealer selling a watch claiming it's perfect,
18  missing the entire mechanism inside --
19     Q.   Was it a --
20     A.   -- for -- for the same price.
21     Q.   Okay.
22        Was it Amazzia's determination that the
23  products being offered by Life and Health Source,
24  the Youngblood products were not new?
25     A.   Yes, we did observe them to be not new



Page 149

1  because they were lacking the warranty and the
2  quality controls that Youngblood attaches to those
3  products and releases into commerce.
4       So they were not new.
5    Q.  But, visually, you could not determine
6  whether they were new or used?
7    A.  We didn't have to, because just by knowing
8  that it was lacking warranty and the quality
9  controls that go with that product, we -- we didn't
10 need to visually inspect them because they were
11 already not new.
12   Q.  Well, how did Amazzia determine they were
13 lacking the warranty?
14      MR. VINE:  Objection.  Argumentative.
15      But you can answer.
16      THE WITNESS:  Because we know who the
17 authorized sellers are, only those sellers are
18 offering the warranty.
19      So the unauthorized sellers cannot be
20 offering a product with warranty.
21 BY MR. GOODMAN:
22   Q.  So was it Amazzia's intent to get rid of
23 all unauthorized sellers of Youngblood products?
24      MR. VINE:  Objection.  Mischaracter --
25      Objection.

Page 150

1       THE WITNESS:  Yes.
2  BY MR. GOODMAN:
3    Q.  And were you successful?
4       MR. VINE:  Objection.
5       THE WITNESS:  I don't know how you would
6  define "success".
7  BY MR. GOODMAN:
8    Q.  Well, either you got rid of them or you
9  weren't able to do so.
10      MR. CUMMINGS:  Objection.
11      MR. VINE:  How do you define --
12      THE WITNESS:  We certainly made a lot of
13 progress in the market.
14      We didn't get rid of everyone.  But, yes, I
15 would say we definitely removed a good majority of
16 the sellers selling both products and regained
17 control for Youngblood.
18 BY MR. GOODMAN:
19   Q.  The Agreement, the distributor agreement
20 that Amazzia entered into with Youngblood, did it
21 expire after one year?
22      MR. VINE:  Objection.
23      THE WITNESS:  Expire after --
24 BY MR. GOODMAN:
25   Q.  Well, the initial term was one year.

Page 151

1       You have the --
2    A.  Yes.
3       And we received a notice, and it was not
4  renewed after that one-year period.
5    Q.  Did they advise you of what the reason was
6  for not extending the contract?
7    A.  No.
8    Q.  Do you know what the reason was?
9    A.  No.
10   Q.  And what happened to the existing stock of
11 Youngblood products that were purchased from
12 Youngblood as a distributor?
13   A.  I believe the -- the retailers at that
14 point had the stock and just continued to sell
15 through them.
16      And whatever odd ends were left were
17 returned back to Amazzia, the distributor, and then
18 possibly liquidated.
19   Q.  In what manner was it liquidated?
20   A.  We work with a --
21      If there were any.  That, I'm just -- I'm
22 not sure of the facts.
23      MR. VINE:  We don't want you to guess.
24      THE WITNESS:  Okay.
25      MR. CUMMINGS:  Yeah, don't speculate.

Page 152

1       THE WITNESS:  I don't want to guess, then.
2       So my belief would be that the majority was
3  resold through Amazon and sold out.
4       I don't know for a fact whether they were
5  liquidated or not after, or returned.
6  BY MR. GOODMAN:
7    Q.  At the present time, are you aware -- are
8  you aware or is Amazzia aware of any other
9  unauthorized resellers of Youngblood products on
10 Amazon?
11   A.  We stopped monitoring after our Agreement
12 didn't renew.
13      So we're not aware at this moment of any
14 unauthorized sellers.
15   Q.  And you have not been requested by
16 Youngblood to make that determination?
17   A.  Correct.
18   Q.  You referred earlier to one of the other
19 factors other than the lack of warranty, the
20 newness of the product, to quality control.
21      Would you please explain -- explain that
22 for me?
23   A.  Do you mean explaining --
24      Like what --
25   Q.  Well, you said the lack of quality control.



PMK WILLIAM FIKHMAN  30(b)(6), Confidential          December 10, 2019
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE                    153–156

Page 153

1    A.  Sure.
2        Quality control, to us, and to brands we
3  represent like Youngblood, means knowing who is
4  selling your product, how they're shipping it, how
5  they're storing it, what their return and customer
6  service policies are, and if those are supportive
7  of the brand, in this case Youngblood's policies.
8    Q.  Do you know what Youngblood's policies were
9  with respect to quality control?
10       MR. VINE:  At the present, or then?
11       MR. GOODMAN:  Then.
12       MR. VINE:  Okay, then.  A year ago.
13       THE WITNESS:  I'm trying to remember.
14       MR. VINE:  No, no.
15       The question is not that you remember now,
16 but at that time, did you know?
17       THE WITNESS:  Did I know?
18       Yes, of course, yes.
19 BY MR. GOODMAN:
20   Q.  And to your present knowledge, what were
21 they?
22   A.  I don't want to guess.  It's been a year.
23 So I don't want to guess.
24   Q.  You don't know anything about it?
25       You don't recall anything?

Page 154

1    A.  I just don't want to guess.
2    Q.  I know.
3        But you have no memory of any of the
4  quality control procedures?
5    A.  If I had to be aware of one, it would be
6  like shelf life, because some of the products do
7  have a certain shelf life.
8        They -- They go bad and can become harmful
9  or not effective after a period of time, and so
10 there is periods of shelf life on products.
11   Q.  Did you know at that time in September of
12 2018, whether any of the Youngblood products had an
13 expiry date?
14   A.  Yes.
15   Q.  Was it on the product?
16       MR. CUMMINGS:  Objection.  Vague.
17 BY MR. GOODMAN:
18   Q.  Do you know whether there was an expiry
19 date on any of the Youngblood products?
20       MR. VINE:  You mean on the packaging?
21       MR. GOODMAN:  Yeah.
22       MR. VINE:  Okay.
23       Do you recall?
24       THE WITNESS:  I'm trying to picture it.
25       But a brand that has shelf lives would have

Page 155

1  those expiration dates on the packaging.
2  BY MR. GOODMAN:
3    Q.  What do you -- What did you know about
4  shelf life at that time?
5    A.  Youngblood shelf life?
6        I don't remember the exact period.
7        But different products have different
8  amounts of shelf life.  Some can last six months, a
9  year.  Some can last three years.
10   Q.  Well, do you have any recollection at
11 all --
12   A.  No.
13   Q.  -- of what the shelf life was of any of the
14 Youngblood products?
15       MR. VINE:  There are hundreds of prod --
16       I mean --
17       THE WITNESS:  At this time?
18       MR. CUMMINGS:  Objection.  Vague.
19 BY MR. GOODMAN:
20   Q.  Any of the products.
21       You bought the full range of products, and
22 resold them.
23       What did you know about the shelf life?
24   A.  At the time, we knew what the shelf lives
25 were because we were managing the shelf life.

Page 156

1        We -- We were managing the --
2    Q.  Well, do you have any memory today as you
3  sit here?
4        MR. VINE:  Objection.  This is entirely
5  outside the scope.
6  BY MR. GOODMAN:
7    Q.  Continue.
8    A.  I don't have memory today of shelf lives
9  of a brand a year ago.
10   Q.  As far as quality control, do you have any
11 knowledge of the manner in which your customers of
12 Youngblood products handle the product?
13       MR. CUMMINGS:  Objection.  Vague.
14       THE WITNESS:  Our customers --
15 BY MR. GOODMAN:
16   Q.  What was their, quote, quality control
17 procedures?
18   A.  Our customers, the retailers?
19   Q.  Yes.
20   A.  Okay.  Yeah, I -- I am aware of their --
21   Q.  Okay.
22       Please --
23   A.  -- quality control procedures.
24   Q.  -- tell me.
25   A.  All of the quality control procedures?



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
157–160

Page 157

1    Q.   All that you can remember.
2         MR. VINE:  For La Chique Boutique and --
3         That -- Those two companies?
4    BY MR. GOODMAN:
5    Q.   Whoever they sold to.
6         Do you know what the quality control
7    procedures --
8    A.   Yes.
9    Q.   -- were?
10   A.   Their quality control procedure would be
11   to, one, verify expiration dates, and that
12   everything shipping to Amazon was longer than six
13   months of shelf life.
14        The Amazon policy requires that products
15   going into the fulfillment center have a shelf life
16   of at least six months.
17        So one of the procedures is to verify that
18   the product is being shipped in has a shelf life of
19   longer than six months.  Otherwise, it gets
20   rejected by Amazon.
21        The other thing is every product goes
22   through three sets of eyes before it actually
23   leaves the door to ensure that it's the right --
24        A product like Youngblood has lots of
25   color variations.

Page 158

1         You know, a light brown and a brown and a
2    dark brown all look -- could be the same.  And so
3    it's very easy if you sticker, for example, a dark
4    brown with a light brown, it becomes a whole -- you
5    are misleading consumers.
6         So it's very important that we get the --
7    the correct labeling of each individual skew so
8    that it gets into the fulfillment center and to a
9    consumer the right way.
10        So every product goes through three sets
11   of eyes at the retailers business --
12   Q.   Well, did you know --
13   A.   -- to ensure that.
14        MR. CUMMINGS:  Objection --
15        MR. VINE:  He's not done.
16        THE WITNESS:  To ensure that.
17        So it's --
18        MR. CUMMINGS:  You asked him for all
19   quality control.
20        THE WITNESS:  There's probably many, many
21   more, but I don't have them off the top of my head.
22   BY MR. GOODMAN:
23   Q.   Well, did you keep track of this --
24        Did Amazzia keep track of this with their
25   retailers, as to how they were handling the

Page 159

1    product?
2         MR. CUMMINGS:  Objection.  Vague.
3         MR. VINE:  Form.
4    BY MR. GOODMAN:
5    Q.   Go ahead.
6    A.   Yes, Amazzia does emphasize some control
7    over the quality control with the retailers we sell
8    product to, to make sure that their standards match
9    our standards and the promise we make to the brand,
10   ultimately.
11   Q.   Well, does Amazzia maintain records of
12   those controls?
13   A.   The records, no.  But we --
14        No, there's no purpose to maintain records
15   of a control.
16   Q.   Is there any written protocol that you have
17   at Amazzia for those quality control procedures?
18   A.   Yes, we ab -- we absolutely have
19   written --
20   Q.   Are they --
21   A.   -- controls.
22   Q.   -- exist --
23        Are they still in existence?
24   A.   They evolve all the time.
25        So I don't think we have last year's

Page 160

1    version, but we have our present operating
2    procedures, sure.
3    Q.   With respect to quality control?
4    A.   With re -- Yes.
5    Q.   I just have a few more questions.
6         Is it Amazzia's belief that any reseller
7    that doesn't have permission to be a reseller for
8    the manufacturer violates Amazon's policy if
9    selling its product -- if selling its product as
10   new?
11        MR. VINE:  Objection.
12        Are you talking about skin care products or
13   like makeup?
14        MR. GOODMAN:  Yes, I'm talking about
15   Youngblood products.
16        MR. VINE:  Okay.
17        THE WITNESS:  Yes.  Yes.
18   BY MR. GOODMAN:
19   Q.   That they're violating Amazon's policies?
20   A.   Yes.
21   Q.   Does -- Has Amazzia reported these
22   unauthorized sellers as counterfeit to Amazon?
23        MR. VINE:  Objection.  Asked and answered.
24        MR. CUMMINGS:  And vague.
25        / / /



PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
161–164

Page 161

BY MR. GOODMAN:
 2   Q.  Go ahead.
 3   A.  Yes, I think that's why we're here.
 4   Q.  I've asked you whether you know the legal
 5  definition of "counterfeit".
 6      I believe you've answered that.
 7   A.  I think so.
 8   Q.  Yeah.
 9      Did Amazzia communicate with an attorney
10  prior to making the determinations of whether the
11  products they were reselling were counterfeit?
12   A.  Yes.
13      MR. CUMMINGS:  Let me object.
14      Objection --
15  BY MR. GOODMAN:
16   Q.  I'm not asking what they do with counsel,
17  but did they retain counsel?
18   A.  Yes.
19   Q.  And you've received opinions from counsel?
20   A.  Yes.
21   Q.  Are you familiar --
22      Do you have a legal background?
23   A.  Me?
24   Q.  Yes.
25   A.  No.

Page 162

 1   Q.  Have you ever determined what the legal
 2  definition is of "counterfeit"?
 3      MR. VINE:  Objection.  Asked and answered.
 4      THE WITNESS:  I have -- Yes,  we -- Yes.
 5  BY MR. GOODMAN:
 6   Q.  And from what source did you determine
 7  that?
 8      MR. VINE:  Objection.
 9      In what -- In what venue?
10      MR. CUMMINGS:  And --
11      MR. VINE:  In the state of Florida or in
12  the state of California or on the Amazon platform?
13      MR. GOODMAN:  With respect -- With respect
14  to the Youngblood cosmetics that were offered by
15  Life and Health Source.
16      MR. VINE:  As it relates to Amazon?
17      MR. CUMMINGS:  And I'll object to --
18      If this invokes any attorney-client
19  discussions, don't answer.
20      MR. GOODMAN:  No, I dont want the
21  attorney/client.
22      I want to know what he knows.
23      MR. CUMMINGS:  If it's based on a
24  conversation you had with an attorney --
25      THE WITNESS:  It was based on conversations

Page 163

 1  with an attorney we had --
 2      MR. CUMMINGS:  Then don't answer.
 3      THE WITNESS:  -- used for this purpose.
 4  BY MR. GOODMAN:
 5   Q.  Does Amazzia still at this point sell
 6  products of -- cosmetic products of any brand owner
 7  to customers who resell them on Amazon?
 8      MR. VINE:  Objection.  Lacks foundation.
 9      He already testified Amazzia doesn't sell
10  products.
11      But you can answer.
12      MR. GOODMAN:  Well, he sells products to --
13      THE WITNESS:  Amazzia continues to
14  distribute products to retailers that sell on
15  Amazon, yes.
16  BY MR. GOODMAN:
17   Q.  Right.
18      And were all those products being sold,
19  then, to authorized retailers?
20      MR. CUMMINGS:  Objection.  Vague.
21      THE WITNESS:  Yes.
22  BY MR. GOODMAN:
23   Q.  And they're authorized by the rights owner?
24   A.  Yes.
25      MR. GOODMAN:  No further questions.

Page 164

 1      MR. VINE:  I just have a --
 2
 3      FURTHER EXAMINATION
 4  BY MR. VINE:
 5   Q.  If you could take out Exhibit 2.
 6      This is the distribution agreement.
 7   A.  Sure.
 8   Q.  That Agreement was signed and executed by
 9  Amazzia.
10      Correct?
11   A.  Yes.
12   Q.  And it accepted the terms contained within
13  that document.
14      Correct?
15   A.  Yes.
16   Q.  Including the term of independent
17  contractor.
18      Right?
19   A.  Yes.
20      MR. VINE:  Nothing further.
21      MR. CUMMINGS:  All right.  Nothing for me.
22      MR. VINE:  Okay.  You have the opportunity
23  and right to read or waive.  I assume your counsel
24  is going to ask you to read it.
25      What that means is, after the



Page 165

1   court reporter -- because we will be ordering it --
2   after the court reporter types it up, you'll review
3   it to make sure that she took down everything that
4   you said was appropriate.
5        Of course, if there's any changes, we all
6   reserve the right, both sides, to come back and
7   question you, unless it's a typographical change,
8   which typically people don't do.
9        THE WITNESS:  Okay.
10       MR. VINE:  You agree?
11       MR. CUMMINGS:  Yup.  Agreed.
12       MR. VINE:  Okay.  And we will order --
13       You don't have to put this part on, but
14  I'll tell you how I want it.
15       THE VIDEOGRAPHER:  This concludes
16  Media One in the deposition of William Fikhman.
17       Going off the record.
18       The time is 2:01 p.m.
19       COURT REPORTER:  And you wanted a copy of
20  the transcript?
21       MR. GOODMAN:  Yes.
22       (Whereupon the deposition was
23       concluded at 2:01 p.m.)
24
25

Page 166

1                   PENALTY OF PERJURY
2
3
4
5        I hereby declare I am the deponent in the
6   within matter; that I have read the foregoing
7   proceeding and know the contents thereof and I
8   declare that the same is true of my knowledge
9   except as to the matters which are therein stated
10  upon my information or belief, and as to those
11  matters I believe it to be true.
12       I declare under penalty of perjury that the
13  foregoing is true and correct.
14       Executed on the _____ day of
15  _____, 20____, at _____,
16  California.
17
18
19
20
21            _____
                         WILLIAM FIKHMAN
22
23
24
25

Page 167

1
2
3   Our Assignment No. J4663289
4   Case Caption: SOLU-MED, INC. vs. YOUNGBLOOD SKIN
    CARE PRODUCTS LLC
5
6
       DECLARATION UNDER PENALTY OF PERJURY
7
8
9        I declare under penalty of perjury that I have
10  read the entire transcript of my deposition taken
11  in the above-captioned matter or the same has been
12  read to me and the same is true and accurate, save
13  and except for changes and/or corrections, if any,
14  as indicated by me on the Deposition Errata Sheet,
15  hereof, with the understanding that I offer these
16  changes as if still under oath.  Signed on the
17  _____ day of _____, 20____.
18
19
20
21
22            _____
                         WILLIAM FIKHMAN
23
24
25

DEPOSITION ERRATA SHEET

Page 168

1              DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to: _____
3   _____
4   Reason for change: _____
5   Page No._____Line No._____Change to: _____
6   _____
7   Reason for change: _____
8   Page No._____Line No._____Change to: _____
9   _____
10  Reason for change: _____
11  Page No._____Line No._____Change to: _____
12  _____
13  Reason for change: _____
14  Page No._____Line No._____Change to: _____
15  _____
16  Reason for change: _____
17  Page No._____Line No._____Change to: _____
18  _____
19  Reason for change: _____
20  Page No._____Line No._____Change to: _____
21  _____
22  Reason for change: _____
23
24  SIGNATURE:_____DATE:_____
25       [WILLIAM FIKHMAN] [JOB NO. J4663289]



Page 169

```
1                    DEPOSITION ERRATA SHEET

2

3     Page No.____Line No.____Change to: _____

4     _____

5     Reason for change: _____

6     Page No.____Line No.____Change to: _____

7     _____

8     Reason for change: _____

9     Page No.____Line No.____Change to: _____

10    _____

11    Reason for change: _____

12    Page No.____Line No.____Change to: _____

13    _____

14    Reason for change: _____

15    Page No.____Line No.____Change to: _____

16    _____

17    Reason for change: _____

18    Page No.____Line No.____Change to: _____

19    _____

20    Reason for change: _____

21    Page No.____Line No.____Change to: _____

22    _____

23    Reason for change: _____

24    SIGNATURE:_____DATE:_____

25         [WILLIAM FIKHMAN] [JOB NO. J4663289]
```

Page 170

```
1     STATE OF CALIFORNIA   )
                            )  ss.
2     COUNTY OF LOS ANGELES )

3         I, SUSAN POBOR, Certified Shorthand Reporter

4     No. 5132 for the State of California, do hereby

5     certify:

6         That prior to being examined, the witness named

7     in the foregoing deposition, was duly sworn to

8     testify the truth, the whole truth, and nothing but

9     the truth;

10        That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced by me to typewritten form and

13    that the same is a true, correct, and complete

14    transcript of said proceedings.

15        Before completion of the deposition, review of

16    the transcript [ ] was [ ] was not requested.  If

17    requested, any changes made by the deponent (and

18    provided to the reporter) during the period allowed

19    are appended hereto.

20        I further certify that I am not interested in

21    the outcome of the action.

22        Witness my hand this 15th day of December,

23    2019.

24

25        Susan Pobor, CSR No. 5132
```



## Page 1

```
                    IN THE UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
                         Case No. 0:19-CV-60487

          ARGO HOLDINGS, INC. AND SOLU-MED, INC.,

                            Plaintiff,

                    vs.

          YOUNGBLOOD SKIN CARE PRODUCTS, LLC,

                            Defendant.
          _____/

                       VIDEOTAPED DEPOSITION
                               OF
                         MANUEL E. AGUERO
              SOLU-MED, INC. CORPORATE REPRESENTATIVE
                      NONCONFIDENTIAL PORTIONS

                  TAKEN ON BEHALF OF THE DEFENDANT

                    Wednesday, November 20, 2019
                      10:02 a.m. - 2:03 p.m.


                       110 Southeast 6th Street
                              Suite 2700
                        Fort Lauderdale, Florida 33301
                           Job #J4467092




                Reported by:  Dona J. Wong, CSR, RPR
```

## Page 2

```
                     APPEARANCES OF COUNSEL

          On behalf of the Plaintiffs:

              BLACK LAW, P.A.
              1401 East Broward Boulevard
              Suite 204
              Fort Lauderdale, Florida 33301
              Telephone:  (954) 320-6220
              Fax:  (954) 320-6005
              E-mail:  kelsey@kkbpa.com
              By:  KELSEY K. BLACK, ATTORNEY AT LAW

          And

              GOODMAN & SAPERSTEIN
              666 Old Country Road
              Suite 200
              Garden City, New York  11530
              Telephone:  (516) 227-2100
              Fax:  (516) 227-2108
              E-mail:  Gsesq600@aol.com
              By:  STANLEY R. GOODMAN, ATTORNEY AT LAW

          On behalf of the Defendant:

              COLE, SCOTT & KISSANE, P.A.
              222 Lakeview Avenue
              Suite 120
              West Palm Beach, Florida  33401
              Telephone:  (561) 383-9201
              Fax:  (561) 683-8977
              E-mail:  ryan.ransom@cslegal.com
              By:  RYAN M. RANSOM, ATTORNEY AT LAW

          Also Present:

              George B. Ellis, Videographer

                           -  -  -
```

## Page 3

```
REPORTER'S KEY TO PUNCTUATION

-- at the end of the question, answer or colloquy
indicates interruption by another speaker

. . . indicates while reading, words left out

. . . . and the end of a line indicates a trailing off

"Uh-huh" indicates affirmative

"Huh-uh" or "huh-huh" indicates negative

                    -  -  -
                  I N D E X
                    -  -  -

WITNESS:        DIRECT   CROSS   REDIRECT   RECROSS

MANUEL E. AGUERO

BY MR. RANSON        7

                    -  -  -
                E X H I B I T S
                    -  -  -
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| DEFENDANT'S EX. 1 | TWO-PAGE SOLU-MED WEB SITE | 13 |
| DEFENDANT'S EX. 2 | ONE PAGE PRINTOUT FROM YOUNGBLOOD'S WEBSITE REGARDING DIVERSION | 34 |
| DEFENDANT'S EX. 3 | TWO-PAGE COMPOSITE OF REVIEWS | 41 |

## Page 4

```
                    -  -  -
                E X H I B I T S
                    -  -  -
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| DEFENDANT'S EX. 4 | ONE-PAGE LIFE & HEALTH SOURCE REVIEW | 53 |
| DEFENDANT'S EX. 5 | FOUR-PAGE CODE OF CONDUCT DOCUMENT | 73 |
| DEFENDANT'S EX. 6 | FOURTEEN-PAGE AMAZON CONDITION GUIDELINES | 75 |
| DEFENDANT'S EX. 7 | CONFIDENTIAL AMAZON PRODUCT AUTHENTICITY AND QUALITY DOCUMENT, BATES LABEL CONFIDENTIAL AMZN_0038-0042 | 79 |
| DEFENDANT'S EX. 8 | AMAZON ANTI-COUNTERFEITING POLICY, BATES LABEL CONFIDENTIAL AMZN_00046-47 | 84 |
| DEFENDANT'S EX. 9 | FOUR-PAGE BEST PRACTICES IN PRODUCT AUTHENTICITY AND QUALITY | 89 |
| DEFENDANT'S EX. 10 | ONE-PAGE DOCUMENT WITH TITLE OF CURRENT SELLING STATUS OF ABABPETWJQTSG: NORMAL | 91 |
| DEFENDANT'S EX. 11 | COMPLAINT | 96 |
| DEFENDANT'S EX. 12 | LIST OF ITEMS BEING COUNTERFEIT | 98 |
| DEFENDANT'S EX. 13 | COMPLAINTS BATES LABELED PL00187-PL00229 WITH A LIST ENTITLED OTHER COMPLAINTS | 103 |



**EXHIBIT 4**

MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
5—8

Page 5

```
1              - - -
2          E X H I B I T S
3              - - -
4
      NUMBER           DESCRIPTION              PAGE
5
6  DEFENDANT'S EX. 14   PLAINTIFFS' RESPONSES TO   121
                        DEFENDANT'S FIRST SET OF
7                       INTERROGATORIES
8  DEFENDANT'S EX. 15   PLAINTIFF'S RESPONSES TO   124
                        DEFENDANT'S SECOND SET OF
9                       INTERROGATORIES
10 DEFENDANT'S EX. 16   ONE-PAGE DROP SHIPPING     150
                        POLICY
11
                        - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1      VIDEOTAPED DEPOSITION OF MANUEL E. AGUERO,
2          Wednesday, November 20, 2019
3              - - -
4      Videotaped deposition taken before Dona J. Wong,
5  Certified Shorthand Reporter, Registered Professional
6  Reporter, and Notary Public in and for the State of
7  Florida at Large, in the above cause.
8              - - -
9      THE VIDEOGRAPHER:  We are now on the video
10 record.  Today is Wednesday, the 20th day of
11 November 2019.  The time is 10:02.
12     This is the videotaped deposition of Manuel
13 E. Aguero as corporate rep -- representative of
14 Solu-Med in the matter of Argo Holdings,
15 Incorporated and Solu-Med, Incorporated versus
16 Youngblood Skin Care Products, LLC.
17     The court reporter is Dona Wong, the
18 videographer is George B. Ellis.
19     Will counsel please announce their
20 appearances for the record.
21     MR. RANSON:  Ryan Ranson on behalf of
22 Youngblood Skin Care Products.
23     MR. GOODMAN:  Stanley R. Goodman, Goodman &
24 Saperstein on behalf of Solu-Med.
25     MS. BLACK:  And Kelsey Black, Black Law, P.A.
```

Page 7

```
1  on behalf of Solu-Med.
2      THE COURT REPORTER:  Sir, would you raise your
3  right hand to be sworn, please.
4      THE WITNESS:  I do.
5      THE COURT REPORTER:  Thank you.
6      (Oath administered.)
7  Thereupon,
8          (MANUEL E. AGUERO)
9  having been first duly sworn or affirmed, was examined
10 and testified as follows:
11         DIRECT EXAMINATION
12 BY MR. RANSON:
13     Q.  How are you doing today, sir?
14     A.  Good.
15     Q.  I know we went over this yesterday.  You've
16 had your deposition taken.
17     Do you understand the ground rules of kind of
18 how this works?
19     A.  Yes.
20     Q.  Okay.  I would like to reiterate -- reiterate
21 that if you do need to take a break at any time, please
22 let me know, but please answer the pending question or
23 the line of questioning.  Is that okay?  Is that fair?
24     A.  Yes.
25     Q.  Okay, great.
```

Page 8

```
1      For the record, could you please state your
2  complete name.
3      A.  Manuel E. Aguero.
4      Q.  And could you please spell that.
5      A.  M-a-n-u-e-l, middle initial E., last name
6  A-g-u-e-r-o.
7      Q.  And your home address, please.
8      A.  1801 Southeast Eighth Street, Fort Lauderdale,
9  Florida 33316.
10     Q.  And your phone number?
11     A.  (954) 254-1107.
12     Q.  And what is your age and date of birth?
13     A.  Age, 58; date of birth, June 30th, 1961.
14     Q.  Okay.  And you understand that you're
15 appearing today, pursuant to the notice that was served
16 upon your counsel, to answer questions regarding
17 Solu-Med.  Correct?
18     A.  Yes.
19     Q.  And you've reviewed those documents and you're
20 prepared to answer those questions?
21     A.  Yes.
22     Q.  Okay.  And we spoke yesterday, but did you
23 review any other documents after we spoke yesterday?
24     A.  No.
25     Q.  Have you spoken to anyone about the deposition
```



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
9–12

Page 9

1  today other than your attorneys?
2    A.  No.
3    Q.  Okay.  And you're -- you're familiar with
4  Youngblood products that Solu-Med sells?
5    A.  Yes.
6    Q.  And what's your position at Solu-Med?
7    A.  I'm the cofounder and director of the company.
8    Q.  How many other cofounders are there?
9    A.  One other cofounder.
10   Q.  And who is that?
11   A.  Carlos Rodriguez.
12   Q.  Do you guys have 50/50 or how does that work?
13   A.  We actually own 45 percent each, and we have
14  five executives that own about ten percent.
15   Q.  Are they located in Florida as well?
16   A.  Yes.
17   Q.  Okay.  Do you have any other occupation other
18  than owning these companies?
19   A.  No.
20   Q.  Okay.  And how long have you worked for
21  Solu-Med?
22   A.  Solu-Med started operations in -- in 2014.
23   Q.  And you've worked for Solu-Med since 2014?
24   A.  Yes.
25   Q.  Okay.  And you've always been the founder

Page 10

1  and -- and I guess you've ran that company?
2    A.  Correct.
3    Q.  Okay.  And where did you work before or did
4  you work?
5    A.  Well, we -- yesterday we took the deposition
6  on Q-Med and Q-Med was founded in 1990 and I've been
7  working for Q-Med as a cofounder for 29 years.
8    Q.  Okay.  Where did you work before Q-Med?
9    A.  Johnson & Johnson Medical, Inc.
10   Q.  And how long were you at Johnson & Johnson?
11   A.  Six years.
12   Q.  And what did you do for them?
13   A.  I was a medical sales rep.
14   Q.  So you're very familiar with acquiring and
15  selling products from your experience at Johnson &
16  Johnson?
17   A.  Well, no.  I'd say Johnson & Johnson, I was a
18  medical sales rep.  When I founded Q-Med is when we got
19  into the business of -- of trading medical supplies.
20   Q.  But did your experience at Johnson & Johnson
21  lead you to founding Q-Med?
22     MR. GOODMAN:  I'll object to the form.
23     THE WITNESS:  I would say no.
24  BY MR. RANSON:
25   Q.  Okay.  And where did you attend school?

Page 11

1    A.  University of Florida.
2    Q.  Go Gators.
3      Did you get a master's degree?
4    A.  Bachelor's in business administration, major
5  in finance, graduated in 1983 with honors.
6    Q.  Okay.  You only worked at Johnson & Johnson?
7    A.  Prior to that, I worked at Dean Witter
8  Reynolds for one year.
9    Q.  Okay.  All right.  And what position did you
10  hold with Dean Witter Reynolds?
11   A.  I was a licensed stockbroker.
12   Q.  Okay.  And that was in Florida?
13   A.  Yes.
14   Q.  Okay.  Do you have any professional licenses?
15   A.  No.
16   Q.  I'm going to be referring to Youngblood Skin
17  Care Products as Youngblood today.  Is that okay with
18  you?
19   A.  Yes.
20   Q.  Okay.  I'll -- I'll be referring to Solu-Med,
21  Inc. as Solu-Med.  Is that okay?
22   A.  Yes.
23   Q.  Okay.  And I'll be discussing some Amazon
24  policies with you today.  I'm just going to refer to
25  those as the selling policies or the seller code of

Page 12

1  conduct.  Is that okay?
2    A.  Yes.
3    Q.  Okay.  All right.
4      And you said Solu-Med was founded in Florida.
5  Correct?
6    A.  I believe it's Delaware.
7    Q.  Delaware.  Where is it -- where is it
8  headquartered right now?
9    A.  At 2281 Griffin Road, Fort Lauderdale,
10  Florida.
11   Q.  Okay.  So it was headquartered in Delaware and
12  now it's in Florida?
13   A.  It was established in Delaware.  It's a
14  Delaware Corp.  It's always been housed in Florida.
15   Q.  Okay.  Do -- do you know if you have a
16  registered agent listed on Sunbiz?
17   A.  I'm -- I'm not certain.
18   Q.  I mean, is there any reason why you wouldn't,
19  being a corporation in Florida, why you wouldn't
20  register on Sunbiz?
21   A.  I think we initially initiated the corporation
22  in Delaware, and it's been registered there since the
23  beginning.
24   Q.  So I went on your Web site for Solu-Med --
25  I'll just enter this as Composite Exhibit 1.  She can



Page 13

1  mark it and she'll hand it to you.

2      MR. GOODMAN:  Thank you.

3      (Defendant's Exhibit Number 1 was marked for

4  identification.)

5  BY MR. RANSON:

6    Q.  This is your Web site.  Correct?

7    A.  Yes.

8    Q.  Okay.  I'm a little bit confused because on

9  the first page it says Company Overview.

10      Do you see that?

11    A.  I can barely read it because it's so light.

12      MR. GOODMAN:  Do you have a darker copy by any

13  chance?

14      MR. RANSON:  We can print it off if you need

15  it.

16      MR. GOODMAN:  Yeah.

17      MR. RANSON:  Okay.

18      MR. GOODMAN:  Because I'm finding it difficult

19  to read it as well.

20  BY MR. RANSON:

21    Q.  Okay.  I'll -- I'll just represent to you and

22  you can correct me if I'm wrong, but it says,

23      "We ship directly from our warehouse to

24      your home.  We're committed to providing only

25      new and authentic high quality named brands with

Page 14

1  fast and reliable shipping."

2  Is that true?  Can you see that?

3    A.  Actually, I can't read it because it's so

4  light.

5      MR. GOODMAN:  Well, we'll accept your reading

6  of it --

7      THE WITNESS:  Yes.

8      MR. GOODMAN:  -- so just follow Mr. Ranson.

9  BY MR. RANSON:

10    Q.  Are you -- are you aware of what's on your Web

11  site?  Maybe I should ask you that.

12    A.  Yes.

13    Q.  Okay.  And you've seen this before?

14    A.  Yes.

15    Q.  Okay.  My -- my real question is:  Why does

16  your Company Overview, on the first page, differ so much

17  from when I click on it?  So this is a link when I click

18  on Company Overview, the second page.  The first one

19  says --

20      MR. GOODMAN:  I do not have the second page

21  here.

22      MR. RANSON:  You should.

23      MS. BLACK:  Oh, this is the second page.

24      MR. GOODMAN:  Okay.  Sorry.

25

Page 15

1  BY MR. RANSON:

2    Q.  All right.  I'll start up.  I'll read the

3  first page in -- in the entirety of what it says in Our

4  Company Overview.  It says,

5      "We are a leading distributor for beauty

6      and cosmetics with 25 years of experience and

7      top seller rates on marketplaces like Amazon,

8      Walmart and eBay.  It's clear that our customers

9      are always our number one priority.  Shipping

10     directly from our warehouse to your home, we're

11     committed to providing only new and authentic,

12     high quality name brands with fast and reliable

13     shipping."

14  Does that sound right?

15    A.  Yes.

16    Q.  Can you -- can you see what I'm reading or no?

17    A.  I can't but I -- I'm hearing what you're

18  saying.

19    Q.  Okay.  All right.

20      Well, first of all, before we move on to the

21  second page, does Solu-Med have a warehouse?

22    A.  Yes.

23    Q.  It does?

24    A.  Correct.

25    Q.  Okay.  I thought you told me yesterday that

Page 16

1  Q-Med had a warehouse.

2    A.  Q-Med and Solu-Med are housed in the same

3  facility, at 2281 Griffin Road.

4    Q.  So they share warehouse space?

5    A.  Correct.

6    Q.  Okay.  And how is that -- how do you keep

7  track of that?  Does -- does one company get 50 percent

8  and the other company get 50 percent, or how is it split

9  up?

10    A.  No, no, no.  If you come to our warehouse,

11  it's a hundred eighty thousand square foot facility, and

12  a section is specific Solu-Med inventory and the

13  other section is Q-Med inventory.

14    Q.  Is that labeled in your warehouse?

15    A.  Yes.

16    Q.  So if I walk in your warehouse, I could see

17  this is Solu-Med section and this is Q-Med section?

18    A.  I don't know that you would know but we would

19  know.

20    Q.  How would you know?

21    A.  Because it's basically cordoned off and it's a

22  section within the warehouse.

23    Q.  But I mean, you couldn't -- if I -- if someone

24  came and visited your warehouse, it would not be clear

25  to them which section is Q-Med or which section is



Page 17

1  Solu-Med?

2   A. Not necessarily.

3   Q. Okay. Okay.

4      And it also says you provide authentic, high

5  quality name brands. What does that mean?

6   A. Exactly what it says.

7   Q. What does that mean to you? What is an

8  authentic, high quality name brand?

9   A. It means we go through great lengths to make

10  sure that we're only selling authentic, first quality

11  goods. We don't sell seconds. We don't sell damages.

12  We don't sell any counterfeit products. We only sell

13  name brand quality goods.

14   Q. What about authentic as defined by Amazon, do

15  you sell authentic Amazon goods?

16   A. Authentic Amazon goods?

17      MR. GOODMAN: I'll object to the form. As

18  defined by Amazon, do you have a Amazon definition?

19      MR. RANSON: Possibly.

20      MR. GOODMAN: Well, how can you --

21      MR. RANSON: Okay. Well, I'm just asking

22  about his knowledge, but we'll -- we'll get there.

23  Okay.

24  BY MR. RANSON:

25   Q. So when I -- when I click on Company Overview,

Page 18

1  it now takes me to a different definition of your

2  company, which says,

3      "Solu-Med is a highly experienced and

4   leading distributor of medical and surgical

5   supplies and equipment to the Southern Cone

6   region of South America. We work with public

7   and private hospitals, nursing homes, clinics,

8   distributors and various government and military

9   agencies to service our brand -- broad portfolio

10   of primarily branded manufacturers."

11      So my question is: Do you sell -- are you a

12  leading distributor of medical and surgical supplies or

13  are you a top-rated seller on Amazon, Walmart and eBay?

14   A. Okay. So in 2009, Solu-Med was formulated.

15   Q. Uh-huh.

16   A. After -- we -- during 2009, we basically sold

17  products in Southern Cone of South America. In 2014, we

18  shifted the focus of the company to selling online

19  products.

20   Q. So when was this added onto the Web site, the

21  new Company Overview? So I think what you're telling

22  me, and you can correct me if I'm wrong, so you're

23  saying that the -- this Company Overview, when I click

24  it, right, which takes me to your Company Overview is

25  old? This is the new.

Page 19

1   A. Yes.

2   Q. Correct? Okay.

3      So when was this added on the home page of the

4  Web site, Company Overview?

5   A. Probably 2014.

6   Q. Probably 2014?

7   A. I couldn't tell you exactly what year.

8   Q. It didn't happen in the last year?

9   A. No.

10   Q. Okay. And you're sure about that?

11   A. I didn't make the change so I don't know

12  exactly what year, which is what I stated, but I'm

13  saying it was done sometime 2014 or '15. It was

14  definitely not in the last year.

15   Q. Okay. All right. Thank you.

16      And what kind of corporation is Solu-Med?

17   A. Solu-Med is a QSUB of Argo Holdings. Q-Med

18  and Solu-Med are QSUBs of Argo Holdings.

19   Q. But you don't sell stock at Solu-Med. Right?

20   A. No. Stock, when you say stock --

21   Q. Do you sell stock privately? Do you sell

22  stock publicly?

23   A. No.

24   Q. Do you sell stock of your corporation?

25   A. No.

Page 20

1   Q. Okay. And where is the company located in

2  Florida?

3   A. The company Solu-Med?

4   Q. Uh-huh.

5   A. It's located at 2281 Griffin Road.

6   Q. Okay. You probably already said that.

7      And do the employees that work at Solu-Med, do

8  they work strictly for Solu-Med or are they

9  interchangeable with Q-Med and your other companies?

10   A. They work primarily for Solu-Med.

11   Q. What does that mean?

12   A. They work primarily for Solu-Med. I mean,

13  they spend most of their days working for Solu-Med.

14   Q. Do they spend other days working for Q-Med?

15   A. No.

16   Q. Well, you said "primarily." I'm just trying

17  to understand what you meant by "primarily."

18   A. The reason I'm answering it that way is

19  because we have warehouse workers and so from time to

20  time, based on load and demand, there could be warehouse

21  workers that are working for both Q-Med and Solu-Med on

22  a given day, so I don't want to misrepresent that, but

23  primarily their functions are they're Solu-Med

24  employees.

25   Q. So anybody besides the warehouse workers that



Page 21

1  works for Solu-Med, do they also work for Q-Med?
2  A.  No.
3  Q.  Okay.  And when these warehouse workers are
4  working for Solu-Med or Q-Med, are they aware of who
5  they're working for that day?
6  A.  Absolutely.
7  Q.  So they know like Monday I'm working for
8  Solu-Med, Tuesday I might be working for Q-Med?
9  A.  Correct.
10  Q.  And they're paid separate paychecks for each
11  corporation?
12  A.  I'm going to say no, that they're only paid
13  from their working company.
14  Q.  So there's two corporations.  An employee that
15  works in your storage warehouse could work for either
16  corporation but they would still receive their salary or
17  their pay from the corporation they were hired for.
18  Correct?
19  A.  That's correct.
20  Q.  Okay.  And does Solu-Med have offices in other
21  states?
22  A.  No.
23  Q.  Okay.  So it's just the one office in Fort
24  Lauderdale.  Correct?
25  A.  Correct.

Page 22

1  Q.  Okay.  And what's the name of the store that
2  Solu-Med operates -- operates on Amazon?
3  A.  Life & Health Source.
4  Q.  Okay.  I'm going to refer to that as the
5  Amazon store today.  Is that okay?
6  A.  Yes.
7  Q.  Okay.  And that's the store that sold the
8  Youngblood products that are in question in this
9  lawsuit.  Correct?
10  A.  That's correct.
11  Q.  Okay.  I just want to go through some
12  information that you provided us.
13  Who is Cheri Siedle?
14  A.  Cheri Siedle was a Q-Med executive who helped
15  us transition to our new facility and was earmarked to
16  come over and be the chief operating officer of
17  Solu-Med.  Unfortunately, due to greatly diminished
18  sales and impact to the bottom line, we offered her a
19  severance package in June of this year.
20  Q.  So she was -- she was fired in June.  Right?
21  MR. GOODMAN:  Objection, form.
22  THE WITNESS:  She was -- we agreed on a
23  mutual -- there wasn't a role for her to take over
24  in Solu-Med, so we agreed on a mutual basis that we
25  give her a generous severance package and she moved

Page 23

1  on.
2  BY MR. RANSON:
3  Q.  And what role did she play in acquiring the
4  Youngblood products?
5  A.  None.
6  Q.  Well, in your disclosure, sir, it says that
7  Miss Siedle would have knowledge about the length of the
8  store being disabled due to Youngblood's actions and the
9  acquisition of Youngblood products.  So --
10  A.  She -- she was aware of the actions taken by
11  Youngblood, so she was very much aware that the store
12  was disabled for two months.
13  Q.  But she had no role in the acquisition of
14  Youngblood products?
15  A.  Kellon Goodson ran the store for -- for me, so
16  Kellon Goodson did all the acquisitions and all the
17  sales.  He was the operator of the Amazon store.
18  Q.  Let me stop you there.  I may ask you about
19  Mr. Goodson in a second, but did Miss Siedle, did she
20  have any role in the acquisition of the Youngblood
21  products?
22  A.  When you say "acquisition," I'm assuming that
23  you mean the purchasing of the products.
24  Q.  You -- you provided this to me so I'm -- I'm
25  asking you:  What role does Cheri Siedle have in the

Page 24

1  acquisition of the Youngblood products?  The
2  acquisition.
3  A.  She -- she played no role in the purchasing of
4  the product.
5  Q.  So it's fair to say that Cheri Siedle played
6  no role in the acquisition of Youngblood products?
7  A.  Cheri's role was, during the time that we were
8  disabled, in assisting Kellon Goodson in trying to find
9  ways that we could reopen the store based on
10  Youngblood's actions.  So her primary role was helping
11  us reestablish the store.
12  But when you say "was she involved with the
13  acquisition of the product," she neither played a role
14  in the purchasing nor the sale of the product.  Is that
15  clear?
16  Q.  Yes, sir.  Thank you.
17  And we just talked about Mr. Goodson.  And
18  what does he do?  Does he create this Web site for you?
19  A.  He creates the Web site.  He manages the
20  Amazon store.  He procures the products that he believes
21  we can sell successfully on the store.  He does the
22  purchasing and the selling.  He manages the entire
23  operation of the Amazon store.  That's his job.
24  Q.  And he reports directly to you?
25  A.  He does -- he reported directly to me,



Page 25

1  correct.
2      Q.  Okay.  So I reviewed your listings on Amazon.
3  I noticed you have about 470 different brands.
4      Does that sound about right?
5      A.  I think we have about 470 different S.K.U.s.
6  I don't think it's 470 brands.
7      MR. GOODMAN:  Excuse me, Mr. Ranson, are you
8  referring to the listings as of this day?
9      MR. RANSON:  Yes, sir.
10     MR. GOODMAN:  Okay.
11  BY MR. RANSON:
12     Q.  As of today.
13     A.  I just want to clarify --
14     Q.  What's an S.K.U.?  I'm not aware.  You might
15  have to tell me.
16     A.  Okay.  So when you say 470 items are listed on
17  our store, that's a -- a unique selling item with a
18  unique selling A.S.I.N. number in the Amazon system.
19  When you say 470 brands, I'm going to correct you and
20  say that it's probably less than 470 brands because we
21  might sell a dozen different S.K.U.s of a particular
22  brand.
23     Q.  When you say "S.K.U.," are you meaning
24  different products?
25     A.  Yes, a unique selling item.  So we might

Page 26

1  sell -- for example, one time we might have sold eight
2  or ten Youngblood products.  I would refer to that as
3  eight different S.K.U.s or stock keeping units but it's
4  only one brand.
5      Q.  So you're telling me -- this is
6  approximately -- that you might, approximately, only
7  have 470 items for sale on Amazon?
8      A.  You're talking specifically of our store?
9      Q.  Uh-huh.
10     A.  And that's what's listed on the Amazon store,
11  yes.
12     Q.  Okay.  How many brands do you think you have
13  for sale on Amazon?
14     A.  I wouldn't want to just guess.  I could count
15  them but it's -- it's not 470.
16     Q.  Are you familiar with the brands that you sell
17  on Amazon?
18     A.  Absolutely.
19     Q.  You could name all of them?
20     A.  No, I couldn't name them all, but it's
21  constantly changing.
22     Q.  Sure.  And why is it always changing?
23     A.  Sourcing opportunities.
24     MS. BLACK:  What topic are we on?
25     MR. RANSON:  We're on the structure of

Page 27

1  Solu-Med, Solu-Med's business.
2      MS. BLACK:  Okay.
3      THE WITNESS:  It's constantly in flux.
4  There's constantly items being added and items
5  being deleted.
6  BY MR. RANSON:
7      Q.  Okay.  Are you familiar with Amazon seller
8  policies?
9      A.  Generally, yes.
10     Q.  Okay.  Do you feel like you have a duty to
11  keep up with those policies?
12     A.  Absolutely.
13     Q.  Okay.  And who in your -- who in Solu-Med is
14  in -- would also, you know, be aware of those policies?
15     A.  Kellon.
16     Q.  Kellon.  That's it?
17     A.  That would be the primary -- it would have
18  been Kellon and Cheri but Cheri has been gone since --
19     Q.  Is Kellon the only person that lists these
20  products for sale on Amazon?
21     A.  That's correct.
22     Q.  Okay.  No one else is in charge of listing any
23  other products on Amazon?
24     A.  He handles its complete responsibility for the
25  store.

Page 28

1      Q.  Okay.  And do you and Kellon both try to stay
2  up to date with the seller's policies and changes that
3  are made?
4      A.  I would say yes.
5      Q.  And -- and what do you do to -- what -- what
6  policy do you have in place at Solu-Med that would prove
7  that you guys stay up to date with those policies?
8      A.  We have S.O.P.s within our distribution team
9  that basically monitors any changes Amazon would
10  communicate, any changes to us directly in their selling
11  policy.  So if they communicate something that there's
12  an issue, they would communicate it to us directly.
13     Q.  All right.  And what's S.O.P.  I'm sorry?
14     A.  Standard operating procedures.
15     Q.  Okay.  Have you ever had to change the way you
16  do business on Amazon since you've had Solu-Med, from
17  changes in their policies?
18     A.  The only change that's taken place is from
19  time to time manufacturers have gone to Amazon and
20  requested to become brand registered, and brand
21  registered means that they strike a deal with Amazon to
22  basically eliminate any third-party sellers from Amazon
23  sites, and so in that case Amazon will notify us and
24  basically send us a notification that says, Such and
25  Such brand, XYZ Brand -- let's use Youngblood as an



Page 29

1 example -- has become brand registered and you have 60
2 days to liquidate your inventory and whatever is
3 remaining will have to be shipped back to you.
4    Q.  Okay.  So since 2009, that's the only change
5 you're aware of in Amazon's policies?
6    A.  I wouldn't say it's the only change.
7 That's --
8    Q.  Strike that.
9       Since 2014, that's the only change that you're
10 aware of in Amazon's policies that has changed the way
11 you conduct business?
12    A.  I'm going to say that it's the only one that
13 I'm aware of.
14    Q.  Sure.  Okay, that's fair.
15       And, to the best of your knowledge, you've
16 never violated any of Amazon's policies.  Correct?
17    A.  Absolutely not.
18    Q.  Okay.  And I know we discussed this yesterday,
19 but can you please tell -- tell me how Solu-Med received
20 its Youngblood products.
21    A.  How we receive the Youngblood product.  Okay.
22 Let's -- you want me to walk through an example of the
23 purchasing of the Youngblood product?
24    Q.  Sure.
25    A.  So we -- you know, we'll tell a -- suppliers

Page 30

1 that we have that we're open to buy certain lines or
2 that we're interested, open to buy certain lines.  They
3 will tell us what lines they have available.  And so we
4 will look at the -- at the lines that we're interested
5 in buying, that we're open to buy, the lines that
6 they're offering it and then we'll drill down on those
7 lines and ask them to send us pricing and availability
8 of what codes and prices they have on those lines.
9    Q.  And when you say "we," are you referring to
10 Solu-Med or Q-Med?
11    A.  I'm referring to -- I'm referring to both
12 because Kellon is a Solu-Med employee but we would
13 purchase the product through Q-Med.
14    Q.  So Youngblood acquires their products from
15 Q-Med.  Correct?
16    A.  Youngblood acquires their products --
17    Q.  I'm sorry -- strike that.
18       Solu-Med acquires their products from Q-Med?
19    A.  That's correct.
20    Q.  Okay.  Do they -- does Solu-Med pay -- strike
21 that.
22       Does Q-Med sell their products to Solu-Med at
23 a profit?
24    A.  At cost.
25    Q.  At cost.  And how do you -- how do you track

Page 31

1 these purchases?
2       MR. GOODMAN:  Are you referring to Youngblood?
3       MR. RANSON:  Young -- Youngblood, sure.
4 BY MR. RANSON:
5    Q.  How would you track a Youngblood purchase from
6 the moment that you purchase the product?  How would you
7 track the item?
8    A.  When you say track --
9    Q.  Do you -- do you have any tracking systems in
10 place to track your items?
11    A.  Sure.  Let's walk through an example of
12 sourcing.
13    Q.  Okay.
14    A.  So let's say that we receive an offer for
15 Youngblood products.  The way that that would play out
16 is the folks at Solu-Med would purchase merchandise
17 directly from the manufacturer in an effort to basically
18 assure that we're selling the exact same brand of
19 product, so they would purchase a sample of four or five
20 items, basically get samples from the supplier to make
21 sure that they match up exactly, that we're not
22 receiving something that's different, that's somehow
23 different product.  Once they're satisfied and it's gone
24 through our Q.A. process and it's been approved, then we
25 would place a purchase order from Q-Med to the supplier.

Page 32

1       In this case, the product that you're
2 referring to came from Imperial Trading.  We would place
3 an order with Imperial Trading.  They would ship it from
4 their New Jersey warehouse freight prepaid to our
5 facility in Q-Med.  Q-Med would check it in off of a
6 packing slip, place it into inventory.  Once it's in
7 inventory, then Solu-Med would be free to place it on
8 the store.
9    Q.  So when Q-Med acquires the Youngblood product,
10 for example, is there a bar code?  Is there some sort of
11 scanning device that tracks that product from the moment
12 it's in your possession in Q-Med until -- then it is
13 sold in Amazon?
14    A.  I want to make sure I understand the question.
15 Could you repeat it one more time?
16    Q.  Sure.  My question really is:  How do you
17 track the goods that you acquire from the moment that
18 you purchase them until the moment that they're sold, or
19 do you track them at all?
20    A.  We absolutely track them.
21    Q.  Okay.
22    A.  We have a warehouse -- warehouse management
23 system in our facility.
24    Q.  And how does that system track it?
25    A.  It's checked in, it's given a bin location and



MANUEL E. AGUERO  Non-Confidential                          November 20, 2019
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                              33–36

Page 33

1  it's updated monthly in -- and we keep an inventory of
2  every month how much product we've sold, how much we
3  still have in stock.
4      Q.  So you know where all your products are at all
5  times, what bin they're in, when they're shipped to one
6  facility to the next, when they're shipped to Amazon?
7      A.  That's correct.
8      Q.  Okay.  And what steps do you take to verify
9  the condition and authenticity of the products prior to
10 listing them for sale?
11     A.  I think we just covered that.  We basically
12 purchase samples to make sure that they're exact matches
13 and that there's no deviation from the product that
14 we're sourcing.
15     Q.  So if the samples are good, then you'll place
16 the order?
17     A.  That's correct.
18     Q.  Okay.  And did you check to see if these
19 products had a manufacturer's warranty?
20     A.  All products have a manufacturer's warranty.
21     Q.  So the Youngblood products that you purchased
22 had a manufacturer's warranty?
23     A.  I'm assuming that they do.
24     Q.  Why are you assuming that they do?
25     A.  Most of the products that we source have --

Page 34

1  the manufacturer's will have some warranty on it.
2      Q.  Okay.  Let me just show you.
3         Mark this as 2.
4      MR. GOODMAN:  Two?
5      MR. RANSON:  Yes, sir.
6         (Defendant's Exhibit Number 2 was marked for
7  identification.)
8  BY MR. RANSON:
9      Q.  I took this from Youngblood's Web site.
10     MS. BLACK:  I'm sorry.  Would you raise that
11 up.
12     MR. RANSON:  Sure.  Yeah.
13 BY MR. RANSON:
14     Q.  I took this from Youngblood's Web site.  It
15 says,
16         "What is Youngblood doing to stop
17     diversion.  In order to ensure Youngblood
18     consumers only receive the highest quality
19     Youngblood products with a backed warranty and
20     to protect Youngblood's authorized salons, spas
21     and retailers, Youngblood continues in its
22     commitment to aggressively combat diversion."
23         Okay.  So I want to ask you:  Do you have a
24 Solu-Med spa?
25     A.  No.

Page 35

1      MS. BLACK:  I'm going to object to this
2  question.  When was this updated on the Web site;
3  do you have any idea?
4      MR. RANSON:  No.
5      MS. BLACK:  So you don't know if it was before
6  or after they purchased the product.  Right?
7      MR. RANSON:  Youngblood products have always
8  had a warranty.
9      MS. BLACK:  But how -- did they have this
10 statement on the Web site that you're reading to
11 him?  It has no relevance in the case unless it was
12 on Youngblood's Web site in October of 2018.
13     MR. RANSON:  Are you directing him not to
14 answer the question?
15     MS. BLACK:  I'm asking you if you know when
16 this was posted on the Web site.
17     MR. RANSON:  I can get that information to
18 you.
19     MS. BLACK:  He can go ahead and answer, but go
20 ahead.
21     MR. RANSON:  Okay.  Yeah.  We can -- we can
22 sort that out.
23 BY MR. RANSON:
24     Q.  So I was asking you:  Do you have -- does
25 Solu-Med have a spa?

Page 36

1      A.  Does Solu-Med have a spa?
2      Q.  Correct.  Do you -- do you have any spas under
3  Solu-Med?
4      A.  No.
5      Q.  Okay.  Do you have any salons?
6      A.  No.
7      Q.  Okay.  Are you an authorized seller from
8  Youngblood to sell their products?
9      A.  No.
10     Q.  Okay.  So I'm going to ask you again:  Does
11 your products come with a Youngblood warranty?
12     A.  No.
13     Q.  Okay.  Thank you.
14         And how did you become aware of Youngblood
15 products?
16     A.  They were offered to us by one of our
17 suppliers.
18     Q.  I know I asked you this yesterday but we have
19 to keep the record clean.  I'm sorry.
20         So would it be fair to say that the Youngblood
21 products were offered to you for a price you felt like
22 you could make some money on your e-commerce platforms?
23     A.  Correct.
24     Q.  Okay.  Do you guys look at customer trends on
25 Amazon to select your products?



Page 37

1     A.  I'm not sure what you mean by "customer
2  trends."
3     Q.  Sure.  Well, Amazon has customer trends; you
4  can see the products that are trending, the products
5  that are selling.  I didn't know if Solu-Med had a
6  policy to look at those products and then pick the ones
7  that were doing well and try to acquire those.
8     A.  I -- I believe that Kellon would evaluate
9  products based on their merit and based on making sure
10  that they met our quality standards and making sure that
11  they were -- would have the adequate volume and would
12  make purchasing decisions based on all those factors.
13     Q.  So Kellon would probably be a better person to
14  ask that question?
15     A.  Could be, yeah.
16     Q.  Okay.  Were you aware of Youngblood products
17  because of the high quality of those products?
18     A.  No.
19     Q.  Okay.  Did you order samples of the Youngblood
20  products?
21     A.  Yes.
22     Q.  And you can verify that?
23     A.  Can I verify.  In what way would you want --
24     Q.  Can you prove to me that you received
25  Youngblood samples from your --

Page 38

1        MR. GOODMAN:  Object to the form of the
2     question.
3        You can answer.
4        THE WITNESS:  I -- we purchased Youngblood
5     samples -- we purchase samples of all products that
6     we -- before we purchase --
7  BY MR. RANSON:
8     Q.  So you purchased the samples.  They didn't
9  send them to you for free.  Correct?
10     A.  Correct.
11     Q.  So you would have a receipt?
12     A.  Potentially.
13        MR. GOODMAN:  Objection.  Ask him whether he
14     has a receipt.
15  BY MR. RANSON:
16     Q.  Do you have a receipt for the Youngblood
17  products that you purchased the samples?
18     A.  I doubt that we have a receipt dating back to
19  2017.
20     Q.  Okay.  Now I want to ask you how you store
21  these products.  Kind of went over a few of these
22  questions so. . . .
23        What -- what employee monitors the Solu-Med
24  facility, the storage facility?
25     A.  We have multiple employees in the warehouse

Page 39

1  that work under Solu-Med.  When you say monitor the
2  warehouse, I'm not quite sure I understand your
3  question.
4     Q.  Sure.  Is there someone that's in charge of
5  the -- of Solu-Med's warehouse?
6     A.  No.  We have the -- the warehouse of Solu-Med
7  is all managed by Greg May, who oversees both Q-Med and
8  Solu-Med.
9     Q.  I'm sorry, who is that?
10     A.  Our warehouse manager.
11     Q.  What's his name?
12     A.  Greg May.
13     Q.  May or Bay?  I'm sorry.
14     A.  May.
15     Q.  May?
16     A.  Greg May, M-a-y.
17     Q.  Okay.  And he works for Q-Med but oversees
18  Solu-Med's warehouse as well?
19     A.  Correct.
20     Q.  So you have two separate corporations but you
21  have Q-Med's warehouse supervisor that monitors
22  Solu-Med's warehouse as well?
23     A.  The purpose of that is to maintain the same
24  integrity and quality that we do with our medical
25  supplies.

Page 40

1     Q.  I see.  Okay.
2     A.  We have one quality system and one -- you
3  know, one set of S.O.P.s for the entire warehouse.
4     Q.  Okay.  Do you have a manual or a handbook that
5  provides the protocol for monitoring the storage
6  facility?
7     A.  Absolutely.
8     Q.  Okay.  I think we requested that in -- I don't
9  think we received it, so do you mind sending me that?
10     A.  Not at all.
11        MS. BLACK:  We produced --
12        MR. RANSON:  Did you?
13        MS. BLACK:  -- those documents.
14        MR. RANSON:  Okay.  I'll check again but --
15        THE WITNESS:  Let me make sure I understand
16     what you want, so you want the --
17        MR. GOODMAN:  Well, I believe we've already --
18        MR. RANSON:  If you've produced them, that's
19     fine because I know that, you know --
20        MR. GOODMAN:  Yeah, I believe we did.
21        MR. RANSON:  Okay.  All right.
22  BY MR. RANSON:
23     Q.  Do you use Amazon's fulfillment centers?
24     A.  Yes.
25     Q.  Okay.  And -- and so you keep some products in



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
41—44

Page 41

1    the fulfillment centers and some products at Q-Med's
2    storage facility.  Correct?
3        A.  That's correct.
4        Q.  Do you have any idea what percentages of those
5    are?
6        A.  It varies constantly.
7        Q.  Okay.  I want to show you something.
8            You can make this a composite exhibit.
9            (Defendant's Exhibit Number 3 was marked for
10   identification.)
11           MR. GOODMAN:  Thank you.  Which one is page
12   one?
13           MR. RANSON:  We'll make page one the one with
14   the stars.  How about that?  This one.
15           MR. GOODMAN:  This one?
16           MR. RANSON:  Yeah.  They're two separate pages
17   but page one would be the with the stars.
18           MR. GOODMAN:  (Simultaneous cross talking)
19           MR. RANSON:  Yes, page one with the stars.
20           MR. GOODMAN:  So this will be Exhibit 3?
21           MR. RANSON:  Yes, Composite Exhibit 3.  Okay.
22   Did you do that?
23           THE COURT REPORTER:  No, because you were
24   talking.
25           MR. RANSON:  That's right.  Sorry.

Page 42

1            THE COURT REPORTER:  You were moving pretty
2    fast so --
3            MR. RANSON:  Yeah.  You've got to slow me
4    down.  Sorry.
5            THE COURT REPORTER:  Yeah.
6            MR. RANSON:  Okay.
7            MR. GOODMAN:  Can you read it?  It's kind of
8    faint.
9    BY MR. RANSON:
10       Q.  I'm really more concerned with a different
11   question rather than what the actual reviews say.  So in
12   one, we have -- we have negative reviews on the first
13   page with the stars, you see, and they're not stricken
14   through.  Correct?  They're not striked out.  Whereas if
15   you look at the second page, it will say -- and these
16   are -- I'll represent to you, these are your Life &
17   Health Source reviews from your Web site on Amazon,
18   seller's Web site on Amazon.
19           The second page, you will see it says,
20           "Very rough material.  Not really cotton as
21           described.  Can't wear."
22   and then it's stricken out.  Do you see that?
23       A.  Can you point out what you're reading?
24           MR. GOODMAN:  Is this page two?
25

Page 43

1    BY MR. RANSON:
2        Q.  Yes, this one.  I'm sorry.  Page two.
3        A.  Okay.  Yes.
4        Q.  Do you see where it's stricken out?
5        A.  Yes.
6        Q.  Okay.  It's my understanding that it's
7    stricken out because this was fulfilled by Amazon's
8    fulfillment center and when they screw up, they will
9    strike out your review.  Is that correct?
10       A.  Yes.
11       Q.  Okay.  And on the other page, these are
12   reviews that were from your warehouse.  They were
13   fulfilled by Q-Med's warehouse.
14       A.  I don't know that you can say with certainty
15   that these would have been exclusively from our
16   warehouse.
17       Q.  Can you give me any reason why they wouldn't
18   be?
19       A.  We'd have to look at each one individually and
20   understand what was the product that was shipped, what
21   was the customer complaint, and then I can determine by
22   researching it and the shipment number whether it came
23   from Amazon's fulfillment center or if it came from our
24   warehouse.
25       Q.  Well, if you look at the second page, it says,

Page 44

1        "Message From Amazon.  This item was
2        fulfilled by Amazon and we take responsibility
3        for this fulfillment experience."
4            So when Amazon fulfills the item -- I'm sorry,
5    when Amazon fulfills the shipment, the customer is
6    unhappy, they'll take responsibility.
7            When you ship the item, obviously Amazon is
8    not going to take responsibility because it's not from
9    their fulfillment center.  Correct?
10       A.  If you're saying that all of these negative
11   customer reviews were exclusively shipped from our
12   facility, I wouldn't be able to confirm that.  That -- I
13   think I understand what you're saying, which is if
14   Amazon strikes it, that they're owning that
15   responsibility.  The ones here that have negative
16   reviews, what you're trying to imply is that all of
17   these came from our facility and what I'm trying to tell
18   you is that some of them could have and some of them
19   might have come from Amazon.  It does not mean
20   exclusively that they came from our facility.
21       Q.  So you're telling me that the negative reviews
22   on page one may have came from Amazon's fulfillment
23   center?
24       A.  What I'm saying is without looking at each
25   individual claim and where it shipped from, I wouldn't



Page 45

1   know whether it shipped from Amazon or whether it
2   shipped from our warehouse.  I don't have that
3   information.
4       Q.   Who -- who handles the reviews on your Web
5   site, on your -- I'm sorry, on your Amazon e-commerce
6   platform?
7       A.   I'm not sure I follow who handles
8   (Simultaneous cross talking) --
9       Q.   Let me ask you -- let me ask that question
10  again.
11      Do you have somebody that's in charge of
12  monitoring your reviews?
13      A.   Absolutely.
14      Q.   And who is that person?
15      A.   Kellon would monitor reviews and respond
16  accordingly.
17      Q.   So Kellon probably would be a better person to
18  ask this question?
19      A.   He monitors the reviews more closely than I
20  do.
21      Q.   And how often do you monitor the reviews?
22      A.   I go on -- we talk about it on a monthly
23  basis.  We have a board meeting every month.  We talk
24  about all business issues related to Solu-Med.
25      Q.   Okay.  Now, when you send a lot today --

Page 46

1   because you do use Amazon's fulfillment center.
2   Correct?
3       A.   We do.
4       Q.   Okay.  Now, when you send a shipment to the
5   Amazon fulfillment center, do you send that in a large
6   lot?  Do you send little tiny lots?  Do you -- how do
7   you do it?
8       A.   It would be -- Amazon will direct us.  They
9   will give us the labels that we have to place on the
10  product so they will -- all the product that goes to
11  Amazon fulfillment center has to be pre-labeled, and
12  Amazon would send us those labels so we can print them
13  and then we will label the product and then it will be
14  sent to the various distribution centers per Amazon's
15  direction.
16      So let's say we have 100 pieces of a certain
17  item.  They're going to tell us, Send 20 here, send 40
18  there.  And, typically, our Amazon shipments are pallets
19  of product, not just individual items or small boxes.
20      Q.   So, if I understand you correct -- correctly,
21  you send pallets which is -- I'm not in the Amazon
22  sales --
23      A.   No, I understand.
24      Q.   -- industry, but when you send a pallet,
25  that's a large, you know, shipment of items that all

Page 47

1   comes in bulk to the fulfillment center.  Correct?
2       A.   It might contain, you know, 20 different
3   S.K.U.s or 20 different items on that pallet that's
4   being shipped, and we prepare the items that we want to
5   ship to F.P.A. which is fulfillment by Amazon, and then
6   they direct us how they want it broken down.  So they
7   might want a certain amount to go to Jacksonville, a
8   certain amount to go to Kentucky.  And they have, as you
9   well know, you know, hundreds of locations.
10      Q.   Does -- does Amazon tell you how many pallets
11  or shipments you're allowed to make at once -- strike
12  that.
13      Does Amazon tell you how many products you're
14  allowed to send to their fulfillment center at the time?
15      A.   They usually limit based on the seasonality of
16  the year, you know, how much -- you can't just ship to
17  them without their approval.
18      Q.   So they have to approve the shipment
19  beforehand but there's not necessarily a maximum number
20  of items you can send at once?
21      A.   I'm -- I'm not aware of that level of detail.
22  I don't believe that there's a --
23      Q.   Okay.  Who's in charge of sending the
24  shipments to Amazon?
25      A.   Generally, Kellon would be the one that would

Page 48

1   prepare because the Amazon's seller central store will
2   indicate where you're running low on inventory, where
3   you're running low on -- on product, where you're on
4   back order, you're out of stock, and so, generally, you
5   monitor the -- the metrics that they provide you, which
6   is like a tool to basically decide where you need to
7   fulfill product.
8       Q.   I see.  Okay.
9       Now, we -- we talked about expiration dates a
10  little bit yesterday, but what's your expiration policy
11  when purchasing products?
12      A.   Our purchasing product -- purchase order that
13  governs our agreements is 18 months, is what -- what we
14  request, the minimum of 18-month dating on the product.
15      Q.   So you will not purchase any product with an
16  expiration date that's less than 18 months?
17      A.   There are examples where some manufacturers
18  will sometimes produce product with less -- with a year
19  dating.  So if we're aware of that, there could be
20  exceptions to that.  But, generally speaking, I'm going
21  to say 98 percent, 99 percent of our purchases are going
22  to be with 18-month dating or better.
23      Q.   Okay.  So you're saying if a company -- if
24  they make a product, you know, today that expires in 12
25  months from today, then that would be acceptable to,



Page 49

1  obviously, purchase and --
2      A.  We would still have a minimum dating required.
3  It might be six months.  It might be nine months.  We
4  would take that as a one-off unique example.  There's
5  very few items that fall under that category.
6      Q.  So how do you evaluate what your expiration
7  date is going to be by each -- each purchase?
8      A.  Again, we -- if -- if the manufacturer does
9  not have an expiration date or if the manufacturer has,
10  typically, a five-year expiration date, we're going to
11  govern it and say it has to have a minimum of 18 months.
12      Q.  Okay.  Are you --
13      A.  Eighteen months is the standard.
14      Q.  Okay.  Do you know what a first-in, first-out
15  policy is?
16      A.  For inventory terms?
17      Q.  Yes.
18      A.  Yes.
19      Q.  And what is that?
20      A.  Basically, we rotate the inventory to make
21  sure that the oldest inventory goes out first.
22      Q.  Okay.  Are you aware that Amazon does not have
23  a first-in first-out policy?
24      A.  I -- I don't know that.
25      Q.  Do you think that's something you should know?

Page 50

1      MR. GOODMAN:  Objection to form.
2  BY MR. RANSON:
3      Q.  I'll represent to you that Amazon does not
4  have a first-in first-out policy.
5      So, for example, if you ship a product today
6  and you ship the same product six months from now and
7  someone makes a purchase seven months from now, it does
8  not necessarily mean that Amazon is going to fulfill
9  that order with the first shipment you sent.  They can
10  send products from the second shipment.  Are you aware
11  of that?
12      A.  Yes.
13      Q.  Okay.
14      MR. GOODMAN:  Mr. Ranson, are we finished with
15  this exhibit?
16      MR. RANSON:  Yes, sir.  Yes.
17      MR. GOODMAN:  All right.  I just wanted to
18  note for the record that there is no indication on
19  Exhibit 3 that any of these complaints or reviews
20  are with regard to Youngblood products.
21      MR. RANSON:  I -- I wasn't asking about
22  Youngblood products, sir.  I was asking about in
23  general about their fulfillment -- whether they
24  were at the fulfillment center or whether, you
25  know --

Page 51

1      MR. GOODMAN:  Okay.
2      MR. RANSON:  -- they were fulfilled by Q-Med.
3  That was more into the storage of the products.
4      THE WITNESS:  Are you -- one of the things
5  that should be mentioned is 98 percent positive
6  ratings.
7  BY MR. RANSON:
8      Q.  That's very impressive.
9      A.  Very rare.
10      Q.  That's a good job.
11      A.  Yeah.
12      Q.  Okay.  And I forgot to ask you this:  Solu-Med
13  doesn't have an online store directly so I couldn't
14  purchase these products from Solu-Med or -- directly.  I
15  would have to go through one of the e-commerce
16  platforms.  Correct?
17      A.  No, we do have our own proprietary Web site.
18      Q.  And -- and you're selling Solu-Med branded
19  items or are you selling items based on the other
20  platforms?
21      A.  Items that are sold on other platforms.
22      Q.  Okay.  So I could purchase these items from
23  you directly?
24      A.  Potentially.
25      Q.  Okay.

Page 52

1      A.  It's a more limited Web site.
2      Q.  What about Q-Med, can I purchase items from
3  them directly?
4      A.  No.
5      Q.  Okay.  Is there someone in your storage
6  facility that verifies that each shipment is accurate
7  and what it's supposed to be?  Would that be Kellon?
8      A.  No, that would be the warehouse team.
9      Q.  Okay.  Is that a large team?  How many people
10  work on the warehouse team?
11      A.  Probably -- we probably have a total of at
12  least 60 warehouse employees.
13      Q.  Sixty?
14      A.  Sixty.
15      Q.  And who do they report to?
16      A.  Greg May.
17      Q.  Greg May, okay.
18      And who processes the returns from the
19  customers on Amazon?
20      A.  We would process them through Solu-Med.
21      Q.  Okay.
22      A.  We don't get that many returns, but we get
23  periodic returns.  Typically, we will inspect the
24  product and, basically, it usually gets discarded.
25      Q.  So if I return an item to you, does that go to



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
53–56

Page 53

1  the Q-Med facility?
2      A.  It goes to the 2281 Griffin Road facility.
3      Q.  Okay.  And what's your return policy on Amazon
4  for cosmetics?  So, for example, I purchase Youngblood
5  lipstick from you and I don't like the lipstick, I want
6  to send it back two days later.  What -- what would you
7  do?
8      A.  We have a 100 percent customer satisfaction
9  policy, we take back any product at any time.
10     Q.  No matter what?
11     A.  No matter what.
12     Q.  On all your cosmetics?
13     A.  On all the products that we sell, not just the
14  cosmetics.
15     Q.  Okay.  So this is a little bit bigger.
16  Hopefully, you can read it, but this is from Life &
17  Health Source, Exhibit 4.  Sorry.
18         (Defendant's Exhibit Number 4 was marked for
19  identification.)
20         MR. GOODMAN:  Just give me a second, please.
21         MR. RANSON:  Sure.
22  BY MR. RANSON:
23     Q.  Okay.  Now, you had a chance to review this
24  document?
25     A.  I'm reading it.

Page 54

1      Q.  Okay.  Take your time.  I'm really just
2  focused on the -- it looks like it's darkened, but the
3  third paragraph up from the middle.
4      A.  Uh-huh.
5      Q.  Do you see that?
6      A.  Yes.
7      Q.  Can you read that for me?
8      A.  "Due to Federal regulations we are
9      unable to accept returns or exchanges on
10     personal hygiene items, hair care, cosmetic,
11     fragrances, skin care or toys."
12     Q.  Okay.  Now, a moment ago you said that you
13  offer a hundred percent satisfaction guarantee, and here
14  it says you're unable to accept returns or exchanges on
15  cosmetics.  So which one is it?
16     A.  We still accept returns on cosmetics.  What
17  happens with Amazon customers, sometimes people will
18  open products, use them, say they're unhappy with them
19  and return them and in order to --
20     Q.  In that circumstance, you would not accept it.
21  Correct?
22     A.  In the end, Amazon governs the return policy
23  for their customers and so the answer is yes, we accept
24  all returns.
25     Q.  Then why does it say under Life & Health

Page 55

1  Source,
2      "We are unable to accept returns or
3      exchanges on cosmetics"?
4      A.  This is to basically dis -- you know,
5  discourage people from using products and just returning
6  them.
7      Q.  So I'm a customer of Life & Health Source.  I
8  purchase Youngblood lipstick and I read this and -- and
9  I think I can still return the product to you?  Should
10  I -- should I think that I can still return this product
11  to you?
12     A.  I don't know what you would conclude.
13     Q.  How would a customer know that they can return
14  the product to you?
15     A.  Because the -- the Amazon policy is they
16  accept pretty much all returns.
17     Q.  So you're saying Amazon will process the
18  return for you?
19     A.  That's correct.
20     Q.  And how many days would that be?  How many
21  days would I have to -- before I had to -- for the
22  item --
23     A.  It's immediate.
24     Q.  -- would not be able to be returned?  I'm
25  sorry.

Page 56

1      A.  It's, essentially, immediate.  They debit our
2  account and -- and return the product.
3      Q.  Now, I purchase lipstick from you.  Okay?
4         How many days do I have to return the product?
5      A.  I don't think it gives you a specific number
6  of days or a limit.
7      Q.  How would a customer know that they can return
8  cosmetics to your store?
9      A.  Because if -- if you purchase on Amazon,
10  people have purchased things and returned them six
11  months later.
12     Q.  But you would agree, sir, that this says,
13     "We are unable to accept returns or
14     exchanges on cosmetics," among others?
15  Would you agree that that says that?
16     A.  I agree that it says that, yes.
17     Q.  Okay.  But you don't agree with that?
18     A.  I -- let's -- let's make sure I understand.
19     Q.  Sure.
20     A.  What is it that you're asking me I don't agree
21  to?
22     Q.  Well, I'm reading --
23     A.  I just told you that this --
24     Q.  -- I'm reading from your store that you do not
25  accept returns or exchanges on cosmetics, among other



Page 57

1  things.  Okay?  You're telling me that Amazon will --
2  will refund my money immediately.  I'm -- I'm -- I'm --
3  I'm confused as well.
4      A.  There's no confusion.  If you return product
5  on Amazon, they will refund your money in full and they
6  will debit our account.
7      Q.  What if I open the product, use the lipstick,
8  I don't like the color, then I can send it back?
9      A.  Yes.
10     Q.  Okay.  What if I don't like it three months
11 later?
12     A.  This is the problem that you have with Amazon,
13 is they take back all returns.
14     Q.  All returns without any limits on time?
15     A.  I'm sure there is some limit on time.
16     Q.  You're -- you're just not really aware of the
17 return policy for cosmetics?
18     A.  I don't agree with that statement.  I'm
19 generally aware that, yes, you can return product on
20 Amazon.  And on average you're going to get two to
21 three percent returns of folks that are going to use the
22 product and then return it several months later.  That's
23 just a reality of doing business on Amazon.  It's the
24 cost of doing business.
25          In order to discourage that, we try to make

Page 58

1  sure that we don't get people just willy-nilly buying
2  product and then returning it.
3      Q.  What do you mean by "willy-nilly buying
4  product"?
5      A.  People using product and then returning it
6  several months later when they've consumed the product.
7  People will --
8          We've had situations where folks have bought a
9  box of bandages, used half the bandages, then three
10 months later returned the bandages.
11     Q.  And what do you do to combat that?
12     A.  Really, there's no combating it other than
13 trying to discourage people from doing that.
14     Q.  So you're saying that this note here,
15         "Due to Federal regulations, we're unable
16     to accept returns or exchanges on cosmetics,"
17 among other things, is a deterrent?
18     A.  Correct.
19     Q.  Okay.  All right.  Because you're not an
20 authorized retailer of Youngblood products, you would
21 agree I could not contact Youngblood, give them the
22 S.K.U. number, the -- is it S.K.U. number -- do items
23 have S.K.U. numbers on them or A.S.I.N.?  How -- how do
24 you identify each item?
25     A.  There's both.

Page 59

1      Q.  Both?
2      A.  A.S.I.N. is an Amazon number and then the
3  manufacturer has their own manufacturer code number.
4      Q.  The manufacturer code number, what do you call
5  that in your line of work?  Just the manufacturer code?
6      A.  Code number, S.K.U.
7      Q.  Okay.
8          MR. GOODMAN:  Mr. Ranson --
9          MR. RANSON:  Yeah.
10         MR. GOODMAN:  -- it would be most helpful if
11     you had any of the Youngblood products here.
12         MR. RANSON:  The what?
13         MR. GOODMAN:  The Youngblood products here.  I
14     mean, the samples to show him.
15         MR. RANSON:  Okay, thank you.
16 BY MR. RANSON:
17     Q.  So I'm asking you:  If I purchase a Youngblood
18 product from you, I'm unhappy with the product, you
19 would agree I couldn't return that to Youngblood in
20 California because you're not an authorized reseller of
21 Youngblood products.  Correct?
22         MR. GOODMAN:  Object to the form.
23         THE WITNESS:  I -- I don't know what
24     Youngblood's policy would be on that.
25

Page 60

1  BY MR. RANSON:
2      Q.  We just looked at it.  It's right here.
3          The products will be backed with a warranty.
4  I'll represent to you that Youngblood has a hundred
5  percent guarantee on all their products for the life of
6  the product.  So I could use the lipstick down to the
7  last drop, two years later say, I don't really want this
8  anymore and they would give me a brand new lipstick.
9  Correct?
10     A.  I don't know that.
11     Q.  Okay.  I'm representing that you to.
12     A.  Okay.
13     Q.  So if I -- if I purchase the Youngblood
14 products from you -- because you're not an authorized
15 dealer, are you?
16     A.  No.
17     Q.  Okay.  So if I purchase the product from you,
18 I would not be able to go to Youngblood and then say,
19 Hey, I don't like this lipstick, will you replace this
20 lipstick.  Correct?
21     A.  Why not?
22     Q.  Because they're not going to give a war --
23 they're not going to back their product by a warranty in
24 a -- from someone that sold their product that was not
25 an authorized reseller.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
61–64

Page 61

1     MR. GOODMAN:  You are assuming facts --
2     THE WITNESS:  You just said that they -- you
3  just said that they --
4     MR. RANSON:  It is in Exhibit --
5     THE WITNESS:  -- you just said that they would
6  provide a hundred percent warranty on all products.
7 BY MR. RANSON:
8     Q.  Right, for the authorized resellers or salons
9  or spas.  So -- okay.
10       Is it your understanding, then, that I would
11  be able to get my product replaced by Youngblood that I
12  purchased from you?
13     A.  I don't know what it would be.
14     Q.  Okay.
15     A.  You have to do it to test it out.
16     Q.  Okay.  Do all the individuals responsible for
17  acquiring -- listing your Youngblood products, so they
18  review the selling policies and the seller code of
19  conduct posted on the Amazon seller central system prior
20  to acquiring the products?
21     A.  I would say yes.
22     Q.  Okay.
23     A.  When you say all -- all the folks, it would be
24  primarily one person.
25     Q.  And who would that be?

Page 62

1     A.  Kellon.
2     Q.  Because Kellon is the only person that
3  acquires the products.  Correct?
4     A.  Correct.
5     Q.  Okay.  And do you have any handbooks or
6  manuals that -- that I could look at that would show
7  that Kellon must be -- must review the selling policies
8  and seller code of conduct before he acquires products?
9     A.  Are we talking the warehouse S.O.P.s and --
10  and --
11     Q.  I'm talking when an individual acquires
12  Youngblood products from your company.  Correct?  You
13  told me that you would imagine they were -- they review
14  the selling policies and seller code of conduct before
15  they acquired the items.  Correct?
16     A.  Yes.
17     Q.  Okay.  Do you have any documentation that
18  would show Kellon must review the selling policies and
19  seller code of conduct before acquiring Youngblood
20  products?
21     A.  I'm going to say no.
22     Q.  Or any cosmetics.  The answer is no?
23     A.  No.
24     Q.  Okay.  Can you tell me anything that the
25  selling policies and seller code of conduct says?

Page 63

1     A.  Our primary focus is to make sure that we
2  comply with Amazon's vigorous non-counterfeiting policy,
3  so we go through great lengths to ensure that we're only
4  selling first quality, authentic goods.  That's our
5  primary goal.
6     Q.  Okay.  All right.  What's -- what's Amazon's
7  authenticity requirement then?
8     A.  Authenticity requirement, making sure it's not
9  counterfeit product.  You have to go to -- due diligence
10  to make sure you're not selling counterfeit product.
11     Q.  Do you know what a counterfeit product means
12  to Amazon?  Strike that.
13       Do you know what a counterfeit product is as
14  it relates to Amazon?
15     A.  I -- well, you're asking a question that what
16  do I -- do I understand what Amazon's definition of
17  counterfeit is?
18     Q.  Uh-huh.  Yes.  Do you?
19     A.  I -- I believe that the counterfeit product is
20  items that are not authentic product.
21     Q.  What's an authentic product?
22     A.  It's originally made by the manufacturer.
23     Q.  So that's what an authentic product is?
24     A.  Correct.
25     Q.  Okay.  Do you have any documentation that the

Page 64

1  selling policies and seller code of conduct, those
2  policies, were followed in the acquisition of selling
3  the Youngblood products?
4       Initially, I asked you if you -- if you had
5  any documentation when they acquired the Youngblood
6  products.  Now, I'm talking about when they sell the
7  Youngblood products, do you have any documentation that
8  would show that Kellon -- that's the only person that
9  sells the products.  Right?
10       Do you have any documentation that Kellon
11  followed the selling policies and seller code of conduct
12  when he -- when he sold the Youngblood products on
13  Amazon?
14     A.  I would say he would have followed the
15  policies that Amazon presents on -- on their Web site.
16     Q.  Why would you say that?
17     A.  Because that -- that's our policy, you must
18  comply with the Amazon's policies for sale.
19     Q.  Okay.  So you said that's your policy.
20       Do you have that written somewhere?  Do you
21  have a written policy?
22     A.  No.
23     Q.  No.  Okay.  So it's just like a -- known
24  policy that you guys have amongst each other, it's just
25  not written down?



Page 65

1    A.  Correct.

2    Q.  Okay.  Do you know if the selling policies and

3  seller code of conduct was followed in the customer

4  support of Youngblood's products?

5    A.  Customer support.  Could you rephrase the

6  question?

7    Q.  Sure.  Were the selling policies and the

8  seller code of conduct that you agreed to when you sold

9  your products on Amazon, were they followed in the

10  customer support of Youngblood's products?

11    A.  I'm not aware of any customer returns or -- or

12  any dissatisfaction with any of the Youngblood products

13  that we sold.

14    Q.  Do you have any policy concerning customer

15  returns for products on Amazon?  When I say "policy," I

16  mean, written.  Do you have any written policy that

17  would tell me how you handle a return on Amazon?

18    A.  We -- we follow the Amazon protocol for

19  returns.

20    Q.  I'm asking if Solu-Med has a written policy

21  for how to follow the selling policies and seller code

22  of conduct on Amazon when there's a customer return.

23    A.  I don't believe there is a written policy.

24    Q.  Okay.  What written policies do you have?

25    A.  We have quite a few.

Page 66

1    Q.  Okay.  What written policies do you have in

2  regard to Amazon?

3    A.  Can you be more specific?

4    Q.  Sure.  What written policies do you have in

5  the acquiring, listing, sale, and customer support of

6  your products on Amazon?

7    A.  Okay.  So we have our purchase order; terms

8  and conditions on our purchase order would govern the

9  terms and conditions of the purchase.

10    Q.  Let me stop you there.

11      What internal policies do you have in the

12  acquiring, listing, selling and customer support of your

13  products that you sell on Amazon?

14    A.  I -- I'd have to go and retrieve those.  I

15  don't have those.

16    Q.  But there is some that exist?

17    A.  I believe we have -- yes, we have --

18    Q.  How sure are you as you sit here today?

19    A.  I'm sure we have policies and procedures.

20    Q.  A hundred percent?

21    A.  Yes.

22    Q.  Okay.  Do you mind producing those to me?

23    A.  Not a problem.

24    Q.  Okay, thank you.  All right.

25      Did any of your employees complete the Amazon

Page 67

1  Seller University Training, and that training is called

2  Best Practices in Product Authenticity and Quality?  And

3  since Kellon is the only person that lists products on

4  Amazon, let me rephrase that.

5      Does Kellon complete the Amazon Seller

6  University Training, Best Practices in Product

7  Authenticity and Quality?

8    A.  You're asking me did Kellon complete that

9  course?

10    Q.  Uh-huh.

11    A.  I personally don't know if he --

12    Q.  Have you completed it?

13    A.  No.

14    Q.  Has anyone in your company, to your knowledge,

15  completed that?

16    A.  I wouldn't know if Kellon completed it or not.

17    Q.  Is today the first time you're aware that

18  there's a Seller University Training?

19    A.  I haven't heard of it referred to that.  I'm

20  sure that we basically have reviewed the policies

21  required to sell on Amazon.

22    Q.  No, sir, I'm not talking about the policies.

23      So Amazon offers a Seller University where

24  they will train your employees on the Best Practices in

25  Product Authenticity and Quality.  I'm asking if today

Page 68

1  is the first time you've heard of that.

2    A.  The first time I've heard it specifically in

3  that term.

4    Q.  Is today.  Correct?

5    A.  Yeah.

6    Q.  Okay.  Do you think it's a good idea to have

7  Kellon or other people that sell products on Amazon to

8  complete that training?

9      MR. GOODMAN:  Objection as to form.

10  BY MR. RANSON:

11    Q.  Would you like me to repeat the question?

12    A.  Sure.

13    Q.  Okay.  Do you have any intentions of -- for

14  your employees to complete the Amazon Seller University

15  Training, Best Practices in Product Authenticity and

16  Quality?

17    A.  I'm -- I'm going to look into it and decide,

18  you know, if it makes sense.

19    Q.  Do you think it's a good practice to have your

20  employees aware and trained on the authenticity and

21  quality policies that are on Amazon where you sell

22  products?

23    A.  I -- I believe that Kellon probably has

24  complied with that.  He would know about it.

25    Q.  Okay.  All right.  We'll ask Kellon.



Page 69

1     Okay.  Do you know if the Best Practices in
2  Product Authenticity and Quality guidelines were
3  followed in the listing, acquisition, sales, and
4  customer support on Amazon?
5     A.  I don't know.
6     Q.  Okay.  And Kellon would know that?
7     A.  I don't know if Kellon would know that.
8     Q.  Well, he's the person that sells on Amazon.
9  Correct?
10    A.  Yes.
11    Q.  Okay.  So what information did you give Amazon
12  when you listed the Youngblood products for sale?
13    A.  What information?
14    Q.  Sure.  Let me give you an example.  I'm sure
15  you had to give them a price.  Is that correct?
16    A.  I'm sure there's a process to upload items
17  onto the Amazon site.  I'm not specifically aware of all
18  the details as far as what the process is.
19    Q.  So, as you sit here today, you're not really
20  aware of how you list a product for sale on Amazon?
21    A.  I wouldn't be able to list a product for sale
22  on Amazon myself.
23    Q.  Okay, fair enough.
24       Would Kellon be in charge of that?
25    A.  Correct.

Page 70

1     Q.  Okay.  Do you know if Kellon listed the
2  product without a warranty?
3     A.  I -- I don't know.
4     Q.  Okay.  When you sell cosmetics like Youngblood
5  on Amazon, do you list them in new condition or used
6  condition?
7     A.  New condition.
8     Q.  New condition.  Okay.
9       But you wouldn't list your products on Amazon
10  with a manufacturer's warranty.  Correct?
11    MR. GOODMAN:  Objection as to form.
12  BY MR. RANSON:
13    Q.  Do -- are your -- were your Youngblood
14  products listed for sale on Amazon listed with a
15  manufacturer's warranty?
16    A.  I couldn't say.
17    Q.  Are you -- are you familiar with Amazon's
18  seller's code of conduct?
19    A.  In general, yes.
20    Q.  Well, what do you know in general about it?
21    A.  I've read it before.
22    Q.  Can -- can you tell me one thing that it says?
23    MS. BLACK:  Can I -- he can answer.  I'm
24  sorry, but can you -- I think it will help for
25  purposes of today's deposition if you just let us

Page 71

1  know what topic you're under when you're asking
2  questions.
3     MR. RANSON:  Sure.  I'm -- this is -- this all
4  relates to the entire complaint in this entire
5  lawsuit.
6     MS. BLACK:  Okay.  I mean, that's broad.  I
7  could formulate an objection based on that.  I'm
8  not saying you can't ask that question, but it
9  would be nice to stick to the topics.
10    MR. RANSON:  This has to do with Solu-Med's
11  relationship with Amazon, selling and listing
12  Youngblood's products on Amazon --
13    THE COURT REPORTER:  You're going to have to
14  slow down.
15    MR. RANSON:  Okay, I'm sorry.
16    THE WITNESS:  Speed.
17    MS. BLACK:  That's not a topic.
18    MR. RANSON:  It relates to the lawsuit --
19    MS. BLACK:  Okay.
20    MR. RANSON:  -- to the Complaint that you
21  filed.
22       Okay.  It relates to the authenticity of
23  the products.
24    MS. BLACK:  Also.  Right.
25    MR. RANSON:  Which is the subject of the

Page 72

1  lawsuit.  Okay.
2     MR. GOODMAN:  Mr. Ranson, do you have a copy
3  of the actual listing of the Youngblood products of
4  Life & Health Source that he can refer to?  You've
5  been asking him a lot of questions concerning the
6  content of the listing and more --
7     MR. RANSON:  Sure.  I mean, when you --
8  whenever you -- on direct -- you're happy to
9  provide him any exhibits you want and show him
10  anything that you want.
11    MR. GOODMAN:  Well, you're referring to the
12  warranty, presumably, the --
13    MR. RANSON:  Yeah, I'm asking him about his
14  knowledge of these things.
15    MR. GOODMAN:  Oh.
16    MR. RANSON:  Okay.
17    MR. GOODMAN:  But if we had the products, it
18  would be helpful.
19    MR. RANSON:  Sure.  Well, to my knowledge, the
20  products are no longer for sale on Life & Health
21  Source.  Is that correct?
22    MR. GOODMAN:  No.  I mean, do you have here in
23  your office samples of the Youngblood products that
24  were the subject of the notice?
25    MR. RANSON:  No, I don't have any Youngblood



Page 73

1   products here today.  We could probably order you
2   some.  Okay.
3       What did we say we're on, 5?
4       MR. GOODMAN:  Five.
5       MR. RANSON:  Okay.  Yeah, this is 5.
6   BY MR. RANSON:
7    Q.  So I went ahead and printed out the selling
8   policies --
9       THE COURT REPORTER:  Wait, wait, I'm sorry.
10      (Defendant's Exhibit Number 5 was marked for
11  identification.)
12      MR. RANSON:  Sorry.  Go ahead.
13  BY MR. RANSON:
14   Q.  So I went ahead and printed out the selling
15  policies and seller code of conduct that you agreed to
16  when you became a seller on Amazon, and you said you --
17  you're generally aware of this.  Correct?
18   A.  I'm sure at some point I reviewed this.  I
19  couldn't regurgitate it.  If that's what you're
20  asking --
21   Q.  Sure, I understand.  No, I mean, you just told
22  me a minute ago that you've read through it, though.
23  Correct?
24   A.  Correct.
25   Q.  Okay.  I'm really just focused on the first

Page 74

1   page, and you can look at the whole document if you
2   want, but I'm really just focused on the first page
3   where it says Accurate Information.  Do you see that?
4   You see at the bottom where it says Accurate
5   Information?
6    A.  "You must provide accurate information
7       to Amazon and our customers and update
8       information if it changes."
9    Q.  Then what?  Can you just read that for me,
10  please, the Accurate Information.
11      MR. GOODMAN:  It continues on the next page.
12      MR. RANSON:  Yeah.
13      THE WITNESS:  "You must provide accurate
14      information to Amazon and our customers and
15      update the information if it changes.  For
16      example, this means that you must --"
17  BY MR. RANSON:
18   Q.  I believe it says, "Have a business or use a
19  business name."
20   A.  "-- use a business name that accurately
21      identifies your business and lists your products
22      in the correct category."
23   Q.  Okay.  So you would agree you have to list
24  your products in the correct category and you have to
25  provide accurate information to Amazon.  Correct?

Page 75

1    A.  That's what it says.
2    Q.  Okay.  Thank you.
3       And do you believe that Solu-Med does that?
4    A.  Yes.
5       MR. RANSON:  Okay.  Mark this as Exhibit 6.
6       (Defendant's Exhibit Number 6 was marked for
7   identification.)
8   BY MR. RANSON:
9    Q.  So, sir, this is the Condition Guidelines.  Do
10  you see that?
11   A.  Yes.
12   Q.  Do you understand what the Condition
13  Guidelines means?  We discussed it earlier.  New, used,
14  so forth, the condition of the product.
15   A.  Okay.
16   Q.  And you sell your cosmetics, specifically the
17  Youngblood products, as new.  Correct?
18   A.  That's correct.
19   Q.  Okay.  Can you read where it says New, please?
20   A.  "New, just like it sounds.  A brand new
21      item.  Original manufacturer's warranty, if any,
22      still applies, with warranty details included in
23      the listing comments.  Original packaging is
24      present for most new items but certain items,
25      like shoes, may be reboxed."

Page 76

1    Q.  Okay.  And you would agree, as we've been over
2   many times, that your Youngblood products for sale on
3   Amazon did not contain the original manufacturer's
4   warranty?
5       MS. BLACK:  Objection, form.
6       THE WITNESS:  I -- I don't have an actual
7       listing from 2017, so I -- I don't have the answer
8       to that question.
9   BY MR. RANSON:
10   Q.  Okay.  Are you an authorized reseller of
11  Youngblood products?
12   A.  No.
13   Q.  Okay.  So I'll represent to you that you do
14  not get a manufacturer's warranty from Youngblood.
15      Have you purchased a -- a warranty from
16  someone else for the Youngblood products?
17      MS. BLACK:  Objection, form.
18      THE WITNESS:  No.
19  BY MR. RANSON:
20   Q.  Okay.  So why do you list your products as new
21  when they do not contain the original manufacturer's
22  warranty?
23      MS. BLACK:  Objection, form.
24      THE WITNESS:  The product is authentic
25      product.  It's new product.  It's unused product.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
77–80

Page 77

1 BY MR. RANSON:
2    Q.  And you believe it's new as defined by Amazon?
3    A.  I believe it's new items.  It's -- it's not
4 used product.
5    Q.  I'm asking you:  Do you believe your
6 Youngblood products you list for sale on Amazon meet the
7 new Condition Guideline as provided by Amazon?
8    A.  When was this guideline implemented?  Is this
9 a recent change in the guidelines or is this the
10 guidelines that were in place --
11    Q.  Well, you would know that, sir, because you
12 monitor -- as you told me earlier, you monitor the
13 changes in the Amazon policies.  Correct?
14    A.  As in general our organization monitors any
15 changes within Amazon, but I'm asking you --
16    Q.  I will represent to you that this document
17 existed at the time you listed the Youngblood products,
18 okay, so if that's what you're asking me, even though
19 I'm asking the questions.
20        So I'm going to ask you again.  Do you believe
21 the products you listed for sale on Amazon, the
22 Youngblood products, meet the new Condition Guideline as
23 provided by the Condition Guidelines on Amazon?
24    A.  Clearly, the issue that you're bringing forth
25 is the warranty issue.

Page 78

1    Q.  So yes or no, sir?
2    A.  From my perspective, yes.  From your
3 perspective, no.
4    Q.  Why from your perspective yes?
5    A.  Because you're singling out the issue
6 regarding this warranty as being -- that we're not
7 complying with the warranty issue.  I -- I cannot tell
8 you -- I'd have to see our original listing from 2017 to
9 see how it was listed to be able to answer the question.
10    Q.  All right.  Let me ask you this:  How many --
11 how many products do you think you have for sale on
12 Amazon right now?  Roughly.
13    A.  You thing -- I think you said 470 earlier this
14 morning.
15    Q.  Okay, let's say 470.  Do you think any of the
16 470 products you have for -- for sale on Amazon right
17 now, do you think one of them says -- comes with an
18 original manufacturer's warranty on the listing?
19    A.  I don't know.  I'd have to check and see.
20    Q.  You can't tell me if one of them does?
21    MS. BLACK:  Objection to form.
22    MR. RANSON:  What's wrong with the question?
23    MS. BLACK:  Because you're arguing with the
24 witness, and in addition, have you shown the
25 witness what the manufacturer's warranty is in this

Page 79

1 case?
2    MR. RANSON:  No.
3 BY MR. RANSON:
4    Q.  I'm asking if the product came with the
5 manufacturer's warranty in the listing.
6    A.  I've already answered.  I said no.
7    Q.  Okay, thank you.  That was it.
8    MR. RANSON:  What are we on, 6 or 7?
9    MR. GOODMAN:  Seven.
10    MR. RANSON:  Seven.  Okay.
11    (The testimony on pages 79 through 87, line 7 was
12 marked confidential, excerpted and bound separately.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
81–84

Page 81

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 82

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 84

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
85–88

Page 85

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1
2
3
4
5
6
7
8     THE VIDEOGRAPHER:  We are back on the record.
9    The time is 11:37.
10   BY MR. RANSON:
11     Q.  Okay, sir.  I wanted to follow up on something
12   you mentioned earlier, which was the 60 warehouse
13   employees that work in the Q-Med/Solu-Med warehouse
14   facility.  Okay?
15     How many of those employees work for Solu-Med
16   and how many work for Q-Med?
17     A.  Okay.  At one -- at its peak, prior to being
18   delisted, Solu-Med had probably ten folks working in the
19   warehouse, primarily working for Solu-Med, and we're
20   down to about three now and Q-Med would have the
21   balance.
22     Q.  Okay.  And are those employees paid hourly, or
23   are they paid a salary?  How are they paid?
24     A.  All warehouse employees are paid an hourly
25   wage and have bonuses based on accuracy and K.P.I.

Page 86

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 88

1   metrics, key performance metrics, so they're capable of
2   earning a bonus based on shipping accuracy and other,
3   you know, key performance indicators that we measure.
4     Q.  And do those employees also receive overtime?
5     A.  Yes.
6     Q.  Okay.  I'm going to switch gears a little bit.
7   We were on the topic of authenticity before we took a
8   break.
9     We can go off the record for one second.
10    THE VIDEOGRAPHER:  We're off the record.
11    (Thereupon, a recess was taken.)
12    THE VIDEOGRAPHER:  Back on the record.
13   BY MR. RANSON:
14     Q.  Okay.  Before we took the -- last break,
15   we were discussing authenticity and quality.  We were
16   discussing some Condition Guidelines by Amazon.  And now
17   I want to show you what I think I mentioned to you
18   earlier, which is the Best Practices in Product
19   Authenticity and Quality, and this is also what -- if
20   someone would have completed the Seller University
21   Training what they would have been made aware of.
22    MR. GOODMAN:  Is this 9 or --
23    MR. RANSON:  I can't keep track.
24    MS. BLACK:  It is 9.
25    MR. RANSON:  Yeah, it's 9.  I won't say



Page 89

1    anything else.
2        (Defendant's Exhibit Number 9 was marked for
3    identification.)
4    BY MR. RANSON:
5        Q.  Okay.  So this manual, this Best Practices in
6    Product Authenticity and Quality basically lays out how
7    you can comply with all of Amazon's guidelines and not
8    be in violation of counterfeit, of intellectual property
9    violations, and authenticity violations.
10        If you look at the second page, do you see the
11    second bullet point?  Do you see that, sir?
12        A.  Yes.
13        Q.  Okay.  And you would agree with me that that
14    says that you must verify the authenticity of the
15    products you source.  Correct?
16        A.  Yes.
17        Q.  Okay.  And if you look at the third page, when
18    it says Listing the Products, do you see the third
19    bullet point now?
20        A.  Yes.
21        Q.  Can you read that for me?
22        A.  "Clearly state whether your products
23        are new or used, and list your products under
24        the most appropriate Amazon category.  Provide a
25        detail and accurate information about the

Page 90

1    product you are selling."
2        Q.  Okay.  And you would agree that new or -- and
3    also the word "used" is in bold.  Correct?
4        A.  Yes.
5        Q.  Okay.  All right.
6        So other than the alleged complaint by
7    Youngblood against your store, has your store ever been
8    reported or shut down on Amazon?
9        A.  I think you're asking two questions, reported
10    or shut down.  The answer to shut down --
11        Q.  Let me -- you're right -- let me -- let me --
12    strike that question, please.  Okay.
13        Has your store ever been shut down on Amazon
14    other than the Youngblood instance in this lawsuit?
15    Strike that.  That was a terrible question.
16        Other than the time your store was shut down
17    due to the alleged Youngblood complaint, has your store
18    ever been shut down on Amazon?
19        A.  No.
20        Q.  Never?
21        A.  Never.
22        Q.  Okay.
23        MR. RANSON:  Is this 10?
24        (Defendant's Exhibit Number 10 was marked for
25    identification.)

Page 91

1    BY MR. RANSON:
2        Q.  Okay.  This document was produced to me by
3    Amazon and it says, Current Selling Status of
4    ABABPETWJQTSG.
5        Is that -- is that something to do with your
6    store?  I'm confused what that means.
7        A.  I -- I couldn't say.
8        Q.  Is that maybe an abbreviation for your store?
9    You -- you might have been able to tell me.
10        Anyway, this was in response to the time
11    periods that your store was suspended or prohibited.
12    Okay?
13        Now, I understand on 11/13 the store was
14    suspended due to the alleged complaint from Youngblood.
15    Would you agree with me there?  On 11/13/2017.
16        A.  Yes.
17        Q.  Okay.  So on 7/1/2018, it says your store was
18    suspended and then you were reinstated a day later.
19        Do you -- do you remember that?
20        A.  I do not.
21        Q.  Okay.  Do you want to change your answer a
22    minute ago when I asked you if your store has ever been
23    suspended or shut down on Amazon other than on
24    11/13/2018?
25        A.  I'd want to make sure that you're representing

Page 92

1    that this is our store.
2        Q.  Well, I don't want -- I'm representing to you
3    that Amazon gave me this in response and also provided
4    to your attorney when Amazon produced these documents
5    that shows this -- this is for your store.
6        A.  So you're representing that this is --
7        Q.  Absolutely, representing that this is your
8    store.
9        A.  Okay.
10        Q.  So you're not aware of a 7/1 suspension for
11    Performance-LSR?
12        A.  I am not.
13        Q.  Okay.  Do you know what Performance-LSR means?
14        A.  I do not.
15        Q.  Okay.  It means late shipment rate.  So I
16    assume, and you can tell -- correct me if I'm wrong,
17    that your store was shut down for having a late shipment
18    rate.  Were you not aware of that?
19        A.  I was not.
20        Q.  Okay.  And then on 12/20/2018 your store was
21    blocked for infringement and you were reinstated
22    1/14/2019.  I would assume that's in regard to this --
23    to the Youngblood complaint.  Would you agree?
24        A.  We were -- I agree that on 11/13 we were shut
25    down for the Youngblood complaint and that we were



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019

93–96

Page 93

1  reinstated on or about January 14th.
2      Q.  Yeah.  That's why I'm confused, because why
3  does it say on 12/20/2018 your store was blocked?
4          MS. BLACK:  Objection.  This is my problem,
5  you're asking him to interpret an Amazon document,
6  so whatever he says --
7          MR. RANSON:  Well, he runs the -- he -- I
8  don't want to get into an argument with you, but he
9  runs the store so I'm just -- I mean, if he's not
10  aware of when his store was shut down or suspended
11  or blocked, that's fine.
12          MS. BLACK:  But he can't testify to the
13  accuracy of this document or it's only attesting
14  this isn't -- as, you know --
15          MR. RANSON:  We can take that up with Amazon
16  or you can tell me that these dates aren't -- this
17  isn't true, that this didn't happen.
18          MS. BLACK:  I'm just saying he has no way of
19  knowing that.  So he can testify as to what he
20  thinks --
21          MR. RANSON:  To his knowledge.  Sure.
22          MS. BLACK:  -- but it's not -- it's hearsay
23  and it's not going to --
24          MR. RANSON:  Okay, thank you.
25          MR. GOODMAN:  I believe he did testify that

Page 94

1      11/13 through 12/20 is the same cause which is
2  infringement and then the restoration was
3  January 14th so it refers to the complaint.
4          MR. RANSON:  Thank you.  Okay.
5  BY MR. RANSON:
6      Q.  And then you see on 2/14/2019?
7      A.  Yes.
8      Q.  It says, Block MFN.  Are you aware of this?
9      A.  No.
10      Q.  Okay.  So I'll ask you again:  Are you aware
11  of any other time, other than the report by Youngblood,
12  where your store was shut down?
13      A.  I was not aware of any other shutdowns of the
14  store.
15      Q.  Okay.  Okay.  Also, I meant to ask you this
16  earlier:  When you said process the returns from the
17  Q-Med storage facility, are you a hundred percent sure
18  that the Solu-Med employees processed those returns or
19  could there be a chance that a Q-Med employee processed
20  that return?
21      A.  In our warehouse we have a segmented area for
22  Solu-Med.  All returns come to that area to be processed
23  and returned.
24      Q.  Sure.  I understand they come to that area,
25  but would a Q-Med employee possibly on that day be the

Page 95

1  one that processed that return?
2      A.  Very unlikely.
3      Q.  But it is possible?
4      A.  Anything is possible.
5      Q.  Well, I mean, if it's -- is it -- you told me
6  earlier that some of the Q-Med employees work for
7  Solu-Med some days of the week, some days they're
8  working for Q-Med.  Is that correct?
9      A.  What I said was that during peak shipping
10  seasons or peak shipping times, sometimes folks will
11  come over to support the Solu-Med team to make sure that
12  we get shipments out on time.
13      Q.  Okay.  So on a peak --
14      A.  That would be outbound shipments, not returns
15  or inbound shipments.
16      Q.  So you're a hundred percent sure that all the
17  returns are handled by Solu-Med only?
18      A.  As reasonably -- a hundred -- yes.
19      Q.  Okay.  I want to go through the Complaint with
20  you a little bit, which I have here.  I think.  Oh,
21  right here.  I would like to represent that this
22  Complaint is the original Complaint.
23          Is there anything different in this
24  Complaint -- I'm asking you guys.  Is there anything
25  different in the Complaint other than the title Argo

Page 96

1  Holdings?
2          MR. GOODMAN:  No.
3          MR. RANSON:  Okay.  All right.  Is this fine
4      if I use this as an exhibit, or do you want me to
5      print out one that says Solu-Med?
6          MR. GOODMAN:  No.
7          MR. RANSON:  Okay.
8          MR. GOODMAN:  Other than the change in the
9      caption and the --
10          MR. RANSON:  Right.
11          MR. GOODMAN:  -- the removal of Argo, it's the
12      same.
13          MR. RANSON:  Everything else is the same?
14          MR. GOODMAN:  Yeah.
15          MR. RANSON:  Okay, all right.
16      (Defendant's Exhibit Number 11 was marked for
17      identification.)
18  BY MR. RANSON:
19      Q.  So let's run through what happened.  Okay?
20  Okay.
21          So you acquired Youngblood products.  You
22  listed them for sale.  On or about November 13th, you
23  received a notification from Amazon that your store was
24  in violation of a counterfeit policy.  Is that correct?
25      A.  What I recall is that our store -- our store



Page 97

1  was shut down, assuming that we received some sort of
2  notification from Amazon.
3      Q.  But you're not aware when that notification --
4  you don't remember ever receiving that correspondence
5  or --
6      A.  Kellon notified me that the store had been
7  shut down due to a counterfeit allegation.
8      Q.  Okay.  Well, it says in the Complaint
9  November 11th and the 13th.  Right?  That's on page
10  four.  Do you see where it says that?
11     A.  Yes.
12     Q.  Okay.  Did -- were you notified that -- that
13  Youngblood reported you for any products other than
14  Youngblood products as being counterfeit?
15         MR. GOODMAN:  Would you rephrase that
16  question?
17         MR. RANSON:  Sure.
18  BY MR. RANSON:
19     Q.  Are you aware -- let me ask it this way:
20  What -- what brand of products were reported as being
21  counterfeit?
22     A.  I believe it was Youngblood products.
23     Q.  Okay.  Any other brands?
24     A.  Not that I'm aware of.
25         MR. RANSON:  Okay.  Just to verify, I just

Page 98

1  want to enter this as Composite Exhibit 14 -- 15 --
2  12.
3         (Defendant's Exhibit Number 12 was marked for
4  identification.)
5  BY MR. RANSON:
6      Q.  So on this page, this is a list of all the
7  items that were reported as being counterfeit to Amazon.
8  And I've actually -- I drafted this, which is a nice
9  chart.  It basically goes through each item as it is
10  shown on this fairly confusing rights infringement
11  e-mail to you or notification.  Okay?
12         MR. GOODMAN:  I believe that refers to
13  everything that was on the platform.
14         MS. BLACK:  Can we go off the record one
15  second?
16         MR. RANSON:  Sure.
17         MS. BLACK:  This document --
18         THE VIDEOGRAPHER:  Just a moment.  Off the
19  record.
20         (Discussion held off the record.)
21         THE VIDEOGRAPHER:  We are back on the record.
22         MS. BLACK:  Counsel just showed us Exhibit
23  marked as 15.  It's the --
24         THE WITNESS:  Twelve.
25         MR. RANSON:  Twelve.

Page 99

1      MS. BLACK:  Twelve?  Oh.  Exhibit marked as
2  12.  It's our contention that this exhibit was not
3  produced to us before in discovery and we're just
4  having an objection to any documents that we
5  haven't had the opportunity to see before today's
6  corporate rep deposition.
7      MR. RANSON:  Okay.  And I'll represent that
8  this was produced to plaintiff's counsel, and we'll
9  take that issue up at a later time.
10     MR. GOODMAN:  And the report date is
11  11/12/2018.  And we have produced for you a letter
12  from -- an e-mail communication of November 11
13  providing the delisting of the products, which you
14  have.  I think it's an exhibit on the Complaint.
15     MR. RANSON:  Okay.  Thank you.  All right.
16     MR. GOODMAN:  And this is the listing of all
17  the Youngblood products, the different S.K.U.s.
18     MR. RANSON:  This is what Amazon removed
19  from --
20     MR. GOODMAN:  Yeah, I know.  They removed
21  initially all the S.K.U.s.  You're correct.
22     MR. RANSON:  Sure.  Yes.  I just want to be
23  clear.
24     MR. GOODMAN:  From Youngblood.
25     MR. RANSON:  Yes, sir.  All right.  Thank you.

Page 100

1  BY MR. RANSON:
2      Q.  So I just want to be clear, and my question to
3  you is:  That no other products were removed other than
4  the Youngblood products on 11/12/2018 -- strike that.
5         No other products were reported as counterfeit
6  other than the Youngblood products?
7      A.  Okay.  So no other products other than
8  Youngblood were referred to as counterfeit?
9      Q.  Uh-huh.  Correct.  Is that correct?
10     A.  You -- you're the one telling me that.
11     Q.  I'm asking you.
12     A.  I don't know.
13     Q.  You don't know, so you don't know if
14  Youngblood maybe reported your L'Oreal products as
15  counterfeit or --
16     A.  I -- I have no knowledge of the Youngblood
17  complaint.  I don't have a copy of their complaint to
18  Amazon.
19     Q.  Your counsel didn't provide you with a copy of
20  the complaint?
21     A.  I haven't seen the Youngblood specific
22  complaint.
23     Q.  Oh.  Well, your counsel has it so I think
24  maybe he can show that to you.  Okay.
25         Well, would you agree with me that it says the



Page 101

1   only products that were removed, based on the
2   information that this brand protection e-mail address
3   provided, were the Youngblood products, which is on this
4   nice list here?
5       MR. GOODMAN:  Can we go off the record for a
6   minute?
7       MR. RANSON:  Sure.
8       THE VIDEOGRAPHER:  One moment, please.  Off
9   the record.
10      (Discussion held off the record.)
11      THE VIDEOGRAPHER:  We are back on the record.
12  BY MR. RANSON:
13  Q.  So, sir, are you aware of any other products
14  that were complained of by Youngblood besides Youngblood
15  products when your store was shut down?
16  A.  No.
17  Q.  Okay.  Thank you.  All right.
18      So on 11/13, you received notification from
19  Amazon that your store was shut down.
20      Are you aware of that?
21  A.  Yes.
22  Q.  Okay.  And you said your store has never been
23  shut down before.  Correct?
24  A.  I was not aware of any other shutdowns --
25  Q.  Okay.

Page 102

1   A.  -- for counterfeit claims.
2   Q.  What about complaints?
3   A.  Complaints, yes.
4   Q.  Okay.  So how many complaints do you think you
5   had before your store was shut down?
6   A.  You're asking me to speculate.
7   Q.  Do you know?
8   A.  I -- I don't know.
9   Q.  Okay.  I'll just give it in relation to this.
10  A.  Are you talking about customer complaints or
11  are you talking about brand complaints?
12  Q.  I'm talking about complaints, trademark
13  infringement complaints, counterfeit complaints,
14  authenticity complaints.
15  A.  Okay.
16      MR. RANSON:  All right.  So we don't have
17  three copies of this, but I'm just going to show --
18  I can get them printed, but these are what you guys
19  produced to us, which is the -- and I just made
20  this little list of the dates, which I think you
21  provided to me in the -- yeah.  So I can do it that
22  way, if that's easier.
23      MS. BLACK:  Do you need these?  Is that what
24  you're saying?
25      MR. RANSON:  I was just going to ask him

Page 103

1   about -- I'm sure he would like to review --
2       MS. BLACK:  No, he --
3       MR. GOODMAN:  No.
4       MS. BLACK:  -- needs to give them to the
5   witness because he doesn't have extra copies.
6       MR. RANSON:  Yeah, sorry.
7       MS. BLACK:  They were Bates stamped --
8       MR. RANSON:  Yes.
9       THE COURT REPORTER:  I'm sorry, could you
10  speak up a little bit when you're talking.  I'm
11  having a hard time hearing.
12      MS. BLACK:  Of course.
13      THE COURT REPORTER:  Thank you.
14      MR. GOODMAN:  Here, this is yours.
15      MR. RANSON:  Yes, sir.  Thank you.  Sorry I
16  didn't bring more copies.
17  BY MR. RANSON:
18  Q.  Okay, sir.  I'm going to -- I'm going to give
19  you what is Plaintiffs marked Bates stamp PL00187
20  through PL00229.  And I've done you a favor and made a
21  nice little chart here of each of these complaints.
22      (Defendant's Exhibit Number 13 was marked for
23  identification.)
24  BY MR. RANSON:
25  Q.  Take -- take a second to review those.

Page 104

1       You're aware of those complaints during that
2   time?
3   A.  Yes.
4   Q.  Okay.  Okay.
5       So you would agree that there was a complaint
6   on, let's see, 1/27/2018?  Let me read that one second.
7       Okay, sir, I'll -- I'll just do this.  It's a
8   lot easier.  I'll represent to you that from the
9   documents you produced, that are Bates stamp PL00187
10  through PL00229, that you had seven complaints on Amazon
11  before this Youngblood complaint.
12      MR. GOODMAN:  That's prior to November 11th of
13  2018?
14      MR. RANSON:  Yes, sir.
15      MR. GOODMAN:  Yep.
16      THE WITNESS:  Well, some of these dates are
17  2019.
18  BY MR. RANSON:
19  Q.  That's why I only said seven.
20  A.  Okay.
21      MR. GOODMAN:  He's only referring to seven of
22  them.
23      THE WITNESS:  Okay.
24  BY MR. RANSON:
25  Q.  So, as you told me -- and I'm not trying



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
105–108

Page 105

1  to argue with you about when -- when your store was shut
2  down or not shut down, but there were seven complaints
3  that was filed against you on Amazon where your store
4  was not shut down or suspended.  Correct?
5      A.  Yes.
6      Q.  Okay.  And then for this specific instance
7  your store was shut down.  Correct?
8      A.  Yes.
9      Q.  Do you know why?
10     A.  I believe because it was made as a counterfeit
11  claim.
12     Q.  And -- and why would that matter?
13         MR. GOODMAN:  Objection as to form.  You're
14      asking him what Amazon's thinking process was in
15      taking it down.
16         THE WITNESS:  Go ahead, restate your question.
17  BY MR. RANSON:
18     Q.  You said you thought your store was taken down
19  because of the counterfeit claim.  Right?  Correct?  But
20  you had other -- as you can see in front of you, some of
21  the seven complaints before this time that your store
22  was shut down included counterfeit complaints where your
23  store was not shut down.  Correct?
24     A.  Correct.
25     Q.  Okay.  So why do you think this time your

Page 106

1  store was shut down?
2      A.  I don't know.
3      Q.  Okay.  All right.
4          I just want to go through some of the exhibits
5  in the Complaint.  It's kind of a timeline.
6          MS. BLACK:  You're talking about the lawsuit?
7          MR. RANSON:  Yeah, the Complaint that was
8      filed.
9          THE WITNESS:  Yeah.
10  BY MR. RANSON:
11     Q.  Okay.  So on 11/13 -- and this is in the --
12  this is actually Plaintiff's -- I'm not entering this as
13  an exhibit.  I'm just reading this to you.  This is a
14  Plaintiff's Bates stamp PL0048 and it says on 11/13,
15          "Reactivate your account.  Next step,
16      please provide us -- I'm sorry, fulfill any open
17      orders to ensure customers receive their items
18      to -- to avoid future impact to your account.
19      The actions you have taken resolved the issues.
20      We have removed all listings for the Youngblood
21      product line.  Deleted are sales offerings to
22      ensure that we don't infringe --"
23  I'm sorry, strike everything that I just said.
24     A.  Yeah.
25     Q.  This is your Plan of Action on 11/13 that you

Page 107

1  provided to -- to Amazon.  Okay?  And this is what you
2  said you're -- you were going to do.  You are going to
3  take down all Youngblood products from your store.
4  Correct?
5      A.  Yes.
6      Q.  Okay.  You have deleted all your sales
7  offerings to ensure that they don't infringe on anyone's
8  intellectual property or Youngblood cosmetics.  Correct?
9          I'll show you.  If you want, I can make a --
10  we can go off the record -- I can make a quick copy.
11  This is your Plan of Action.
12          Can you just read the Plan of Action?  That
13  might be easier -- one, two, and three.
14     A.  "Your submission, the root cause of
15      the issues:  We have offerings of the brand
16      Youngblood cosmetics with listings which the
17      intellectual property holder felt infringed on
18      their intellectual property rights.  The actions
19      you have taken to resolve the issue:  We have
20      removed all listings for -- for Youngblood
21      product line and deleted our sales offerings to
22      ensure that we don't infringe on any
23      intellectual property of Youngblood cosmetics.
24      Three, the steps you have taken to prevent these
25      issues going forward:  We will review our

Page 108

1  product offerings to ensure compliance with
2  Amazon terms and conditions."
3      Q.  Thank you.  So you would agree that you took
4  down the Youngblood products so you would be in
5  compliance with Amazon's terms of service related to
6  intellectual property.  Correct?  And removed any
7  offerings that weren't in compliance.  Correct?
8      A.  Yes.
9      Q.  Okay.  And just -- just a quick question.
10  When you were reinstated, which was in January --
11  January 14th, correct, of 2019 -- did you sell
12  Youngblood products anymore?
13     A.  We never sold Youngblood products after 11/13.
14     Q.  Why not?
15     A.  Because, first off, Youngblood had already
16  filed to become brand registered --
17     Q.  Uh-huh.
18     A.  -- and had Youngblood contacted us, we would
19  have said, We have only about $10,000 worth of inventory
20  left and we're not going to continue to sell the
21  Youngblood products because they were -- had struck a
22  deal with Amazon.
23     Q.  Do you know when Youngblood became brand
24  registered?
25     A.  I don't know the exact date, no.



Page 109

1    Q.  Okay.  So you submitted your Plan of Action
2    which was on 11/13, but then your attorney sends an
3    e-mail on November 26th -- and this is Bates stamp
4    PL00045 -- to my client stating,
5        "Amazon, consistent with their policies,
6        has delisted all of Solu-Med's products."
7        Do you know -- do you have any idea what that
8    means, "consistent with their policies," which policies
9    that's in reference to?
10   A.  I don't.
11   Q.  Me neither.
12       Then there's a demand,
13       "Demand is made that Youngblood immediately
14       communicate in writing to Amazon and copy us,
15       advising that the statement made as to the lack
16       of authenticity of the product is a complete
17       fabrication."
18   And this was on November 26th.
19       Are you aware of this -- this letter?
20   A.  Yes.
21   Q.  I believe you're copied.
22   A.  Yes.
23   Q.  Okay.  So that's November 26th.
24       So three days later we have an e-mail from
25   brandprotection@ybskin.com, and this is PL00044.  It

Page 110

1    says,
2        "Hello, we've agreed to file a retraction
3        with Amazon.  Please provide me with the
4        following information so we can submit it to
5        Amazon."
6        Then it asks for the Amazon store name, the
7    Amazon store e-mail, the merchant I.D. and the complaint
8    I.D.  Are you aware of that e-mail?
9    A.  Yes.
10   Q.  Okay.  Then on November 30th, which is the
11   very next day, Mr. Goodman said,
12       "Please send retraction upon receipt of
13       this e-mail and copy me at Goodman and
14       Sapersein -- Saperstein.
15       MR. GOODMAN:  Saperstein.
16       MR. RANSON:  Saperstein, sorry.
17   BY MR. RANSON:
18   Q.  Okay.  So that was the next day.  Right?  Are
19   you aware of that e-mail?
20   A.  Yes.
21   Q.  Okay.  Then that was on a Thursday.  On
22   Tuesday, which was three business days later -- you
23   agree with me there?  Do you agree with me that Tuesday
24   is three business days later from Thursday?
25   A.  Yes.

Page 111

1    Q.  Okay.  Young -- the e-mail
2    brandprotection@ybskin.com says,
3        "Hello, Amazon.  Please withdraw complaint
4        I.D. number," the I.D. number, "We resolved our
5        complaint with the seller Life & Health Source,"
6    gives the merchant I.D. which is, for the record,
7    ABABETWJQTSG, which I believe matches that Excel
8    spreadsheet that I gave you and says,
9        "Thank you to Youngblood."
10   So this is on December the 4th.  Are you aware of that?
11   A.  Yes.
12   Q.  Okay.  On the same day, on December 4th, their
13   e-mail sent to Mr. Saperstein --
14       MR. GOODMAN:  Saperstein.
15   BY MR. RANSON:
16   Q.  It says,
17       "A retraction has been filed with Amazon.
18       Please review the attached."
19   Are you aware of that e-mail?
20   A.  Yes.
21   Q.  Okay.  That was on December the 4th.  On
22   December the 6th, two days later, after the retraction,
23   Mr. Saperstein --
24       MR. GOODMAN:  This is a withdrawal.  You're
25   misstating.

Page 112

1        MR. RANSON:  What's that?
2        MR. GOODMAN:  It says we -- please withdraw
3    the complaint.  You said there was a retraction.  I
4    think you misspoke.
5        MR. RANSON:  Okay.  Well, just to be clear,
6    the document on December 4th, that was a -- that
7    was withdrawing the complaint on Amazon.  It said,
8        "Please withdraw complaint I.D. number
9        5518323151 as we have resolved our complaint
10       with the seller, Life & Health Source, merchant
11       I.D. ABABPETWJQTSG."
12       MR. GOODMAN:  Okay.
13       MR. RANSON:  Okay?  All right.
14       MR. GOODMAN:  Now we're right.
15   BY MR. RANSON:
16   Q.  All right.  So they sent that to Amazon.  You
17   said you were aware of that e-mail.  Correct?
18   A.  Yes.
19   Q.  All right.  Then they forwarded a copy to
20   Mr. Saperstein.  You're aware of that e-mail --
21   A.  Yes.
22   Q.  -- on the following -- on the same day.  Two
23   days later, so it must have been Thursday,
24   Mr. Saperstein sends another e-mail to
25   brandprotection@ybskin.com.  In that e-mail it says,



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
113–116

Page 113

1      "The communication of December 4th by
2   Youngblood to Amazon does not constitute a
3   retraction, nor was there any resolution of the
4   baseless statements Youngblood made to Amazon."
5      Do you know why that does not constitute a
6   retraction?
7      A.  Because, basically, it did not retract the
8   statement of product being counterfeit.
9      Q.  So when you were asking for a retraction, you
10  wanted them to say their products are not counterfeit?
11     A.  Correct.
12     Q.  Okay.  Then it says,
13     "Although Amazon has received your
14     December 4th e-mails, it has not yet restored
15     our client's status as a online retailer.  We
16     have no information that would indicate when our
17     client's status will be restored."
18  So the retrac -- what I'm calling the retraction, the --
19     MR. GOODMAN:  Withdrawal.
20  BY MR. RANSON:
21     Q.  -- withdrawal of the complaint that was sent
22  to Amazon on December the 4th, okay, your -- you two
23  days later are now unsatisfied that your store has not
24  been reinstated.  Correct?
25     A.  Correct.

Page 114

1      Q.  How long do you think it takes to get
2   reinstated on Amazon?
3      MR. GOODMAN:  Objection as to form.
4      MR. RANSON:  Sure.
5      THE WITNESS:  I -- I don't know.
6   BY MR. RANSON:
7      Q.  Okay.  Do you think it takes two days?
8      MR. GOODMAN:  Objection.
9      THE WITNESS:  I -- I wouldn't know what it
10     takes.
11  BY MR. RANSON:
12     Q.  Okay.  You would agree, though, that from --
13  that during December it's probably Amazon's busiest time
14  of the year because it's Christmas?
15     MS. BLACK:  Objection.
16     THE WITNESS:  Yes.
17  BY MR. RANSON:
18     Q.  You would agree that the holidays occur in
19  December?
20     A.  Yes.
21     Q.  All right.
22     MR. GOODMAN:  That, we could agree upon.
23  BY MR. RANSON:
24     Q.  Okay.
25     A.  I think what we don't agree on is that a

Page 115

1   retraction of the complaint is -- is -- is not the same
2   as a retraction of a counterfeit claim.
3      Q.  Sure.  So did Amazon ever send you any
4   correspondence whatsoever that says the retraction that
5   was filed by Youngblood was insufficient?
6      A.  Their lack of putting us back on as a
7   storefront I think was their response.  It was
8   unsatisfactory.
9      Q.  Okay.  Let me -- let me be more specific.
10     Did Amazon ever send you any documentation
11  that said the retraction filed by Youngblood was
12  insufficient?
13     A.  I'm not aware.
14     Q.  Did -- did Amazon ever send you any
15  correspondence or documentation that said that the
16  retraction was inadequate?
17     MR. GOODMAN:  That the withdrawal --
18     MR. RANSON:  What?
19     MR. GOODMAN:  You said retraction.  I thought
20  we were talking about the withdrawal of the
21  complaint was not satisfactory.
22     MR. RANSON:  We call it a retraction.
23     MR. GOODMAN:  You're calling --
24     MR. RANSON:  I'm calling it a retraction.
25     MR. GOODMAN:  Okay.

Page 116

1      MR. RANSON:  All right?
2      THE WITNESS:  Okay.  Restate the question.
3   BY MR. RANSON:
4      Q.  Sure.  Yeah, it's pretty simple.
5      Did Amazon ever notify you that the retraction
6   or the withdrawal by Youngblood was insufficient?
7      A.  Yes.
8      Q.  And what -- do you have a documentation?  Do
9   you have an e-mail?  What do you have that shows that?
10     A.  What we have is that our store was not -- our
11  store was not restored.
12     Q.  Okay.  When was your store restored?
13     A.  I believe we said it was on or about
14  January 14th.
15     Q.  Okay.  So that's, roughly, 40 days after the
16  withdrawal or the retraction was sent, correct, which
17  was on December 4th?
18     A.  Roughly, yes.
19     Q.  Okay.  So because your store was not
20  reinstated from December 4th until January 14th, because
21  it took 40 days, you're telling me you assumed that the
22  retraction was inadequate.  Is that correct?
23     A.  I didn't assume.
24     Q.  Okay.  Then what?
25     A.  I'm stating that it was inadequate.



MANUEL E. AGUERO  Non-Confidential                                    November 20, 2019
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                                        117–120

Page 117

1    Q.  But you don't have any -- you don't have any
2  documentation from Amazon that it was inadequate?
3    A.  I'd have to check.  I don't know if we do or
4  don't.
5    Q.  As you sit here today, to your knowledge, do
6  you have any documentation that the withdrawal or
7  retraction that was sent to Amazon by Youngblood was
8  inadequate?
9    A.  What I recall is Kellon sent multiple action
10  plans to get the store reinstated.  None of them were
11  sufficient.  What Amazon -- what he stated to me was
12  that Amazon wanted a full and comprehensive retraction
13  of the counterfeit claim.
14    Q.  Do you have an e-mail where Amazon says that
15  they did not receive a full retraction of the complaint
16  after December 4th?
17    A.  No.
18    Q.  Would Kellon have that e-mail?
19    A.  I don't know.
20    Q.  Okay.  Did you get any letters, documentation
21  whatsoever that ever said that the retraction was
22  inadequate?
23    A.  I'm not aware of that.
24    Q.  Okay, thank you.
25      I want to refer you to paragraph 17 of the

Page 118

1  Complaint.  Okay.  It says,
2      "Not only did plaintiffs lose income from
3      the shutdown of the store during the
4      historically busiest time of the year costing
5      them hundreds of thousands of dollars, but
6      plaintiffs also lost the goodwill and analytical
7      data stored by Amazon and, essentially, had to
8      rebuild from start."
9  That's what that says.  Correct?
10    A.  Yes.
11    Q.  Okay.  I have two questions.  One, which I
12  just asked you a second ago.
13      Now, would you agree that this time period was
14  historically the busiest time of the year?  We're
15  talking about a time period from 11/13 to January 14th.
16  Correct?
17    A.  Yes.
18    Q.  And as pled in your Complaint, do you agree
19  that that time period is historically the busiest time
20  of the year?
21    A.  For who?
22    Q.  For -- for stores, for sellers, Amazon, for
23  you as a seller.
24    A.  It's busy for us, yes.  That's the only person
25  I can attest --

Page 119

1    Q.  Well, it doesn't say busy for you, sir.  It
2  says, "historically, the busiest time of the year."
3    A.  What that refers to is that -- come on, you
4  know as well as I do that being shut down during Black
5  Friday and Cyber Monday was harmful to our business.
6  That's what I can attest to.
7    Q.  And Christmas?
8    A.  Yeah.
9    Q.  Correct.  So I'm asking you a really simple
10  question.
11      Do you agree that this time period for
12  sellers, for e-commerce sellers in the marketplace, was
13  the busiest time of the year?
14    A.  Yes.
15    Q.  Okay.  Did you ever think that the 40 days it
16  took to get reinstated back online had anything to do
17  with the historically busiest time of the year?
18    A.  No.
19      MR. GOODMAN:  Objection as to form.
20  BY MR. RANSON:
21    Q.  Okay.  And it says it costed you hundreds of
22  thousands of dollars.
23      When you say "hundreds of thousands of
24  dollars," are you talking about hundreds of thousands of
25  dollars in profit, in revenue?  What are you referring

Page 120

1  to there?
2    A.  Referring to sales.
3    Q.  Sales.  Okay.  So not profit then.  Just sales
4  in general?
5    A.  Not sales in general.  Are -- are -- you --
6  you can see through our sales that our average sales
7  were for the first ten months of the year and then as
8  you -- as you stated during busy time of the year, we
9  were probably anticipating a significant bump in sales
10  during this time of year.
11    Q.  Sir, I'm just asking what you pled in this
12  Complaint, sir.
13    A.  Uh-huh.
14    Q.  Okay.  So when it says,
15      "Shutdown of the store during the
16      historically busiest time of the year costing
17      them hundreds of thousands of dollars --"
18  and when I say "them," I'm referring to you Solu-Med.
19  Okay.
20    A.  Yes.
21    Q.  I'm asking you:  Are you saying costing you
22  hundreds of thousands of dollars in revenue or profit or
23  do you not know?
24    A.  Of course I know.
25    Q.  Okay.



Page 121

1    A. It cost us hundreds of thousands of dollars in
2  sales and probably well over a hundred thousand dollars
3  in profit.
4    Q. Okay. I appreciate that.
5      All right. Do you care if we take a 15-,
6  20-minute break? And we'll finish this up.
7      MR. GOODMAN: Okay, sure.
8      MR. RANSON: Unless you guys want to do lunch
9  or something?
10     MS. BLACK: Well, what do you -- how long do
11  you think --
12     MR. RANSON: Can we go off the record, please?
13     MIDDLE ATTORNEY: We are going off the record.
14  The time is 12:21.
15     (Thereupon, the deposition adjourned for the
16  luncheon recess at 12:21 p.m.)
17  AFTERNOON SESSION - 1:15 P.M.
18     THE VIDEOGRAPHER: We are back on the record.
19  The time is 1:16.
20  BY MR. RANSON:
21    Q. I just want to go over your Answers to
22  Interrogatories real quick. I'll give you --
23     (Defendant's Exhibit Number 14 was marked for
24  identification.)
25     MR. GOODMAN: Thank you. You're marking this?

Page 122

1      MR. RANSON: Please.
2      MR. GOODMAN: What number?
3      THE COURT REPORTER: Fourteen.
4  BY MR. RANSON:
5    Q. And we discussed this a little bit earlier,
6  sir, but I would just like you to turn to page four.
7      You say that, in your response to the
8  question,
9      "If you contend that Youngblood by any of
10     its officers, agents, managers or supervisors
11     made any statement that might constitute an
12     omission or might be construed to be against the
13     interest of Youngblood, identify the specific
14     person that made the statement, any witnesses to
15     the statement, the date of the statement and the
16     substance of the statement."
17     And in your response in the second paragraph
18  you say,
19     "Similarly, Youngblood informed plaintiffs
20     that it agreed to file a retraction with Amazon
21     but never filed one."
22  That's reference in paragraph 16 dealing with the
23  Complaint. Is that correct?
24    A. Yes.
25    Q. And is it your position here today still

Page 123

1  that -- that Youngblood never filed a retraction to
2  Amazon?
3    A. That's correct.
4    Q. Okay. And I'll ask you one more time: Do you
5  have any documentation from Amazon stating that the
6  retraction sent by Youngblood was insufficient?
7    A. It wasn't considered a retraction.
8    Q. Okay. Do you have any correspondence from
9  Amazon that said the withdrawal sent by Youngblood was
10  not a retraction?
11    A. Merely the fact that we weren't reinstated for
12  two months.
13    Q. Well, that would be 40 days after the
14  withdrawal. Correct?
15    A. Correct.
16    Q. Okay. But you don't have anything from Amazon
17  that says their withdrawal filed by Youngblood was not
18  in effect a retraction?
19    A. Again, the lack of responsiveness from Amazon
20  and the lack of restoring our store -- as you see,
21  they -- they restored, you know, our store before very
22  quickly, in one day -- so the fact that they didn't
23  restore it, we took it as insufficient retraction.
24    Q. Okay. You said they restored our store
25  quickly, in one day. Right?

Page 124

1    A. Yes.
2    Q. That's what you just said?
3    A. Uh-huh.
4    Q. And what was that in response to?
5    A. You showed me a document earlier today that
6  showed that our store was closed for one day for what
7  they consider an LSR --
8    Q. Uh-huh.
9    A. -- which I'm not familiar with, but we're
10  going to --
11     MR. GOODMAN: That was Exhibit 10.
12     MR. RANSON: Uh-huh.
13  BY MR. RANSON:
14    Q. So let me ask you this: Have -- has your
15  store ever been shut down previously for counterfeit
16  allegations?
17    A. No.
18    Q. Okay. So the -- the reference you just made
19  to "my store was shut down for one day" had nothing to
20  do with the counterfeit complaint. Correct?
21    A. Correct.
22    Q. Okay. Thank you. This is 15.
23     (Defendant's Exhibit Number 15 was marked for
24  identification.)
25



Page 125

1  BY MR. RANSON:
2      Q.  And you're looking at the second set of
3  interrogatories.  Is that correct?
4      A.  This is Exhibit 15?
5          MR. GOODMAN:  Yes.
6          MR. RANSON:  Yes.
7          THE WITNESS:  Yes.
8  BY MR. RANSON:
9      Q.  Does it say Second Set of Interrogatories at
10  the top of the page?
11     A.  Yes, it does.
12     Q.  Okay, great.  And it says that Solu-Med's
13  financials are completed by Joaquin Lorie.  Is that
14  correct?
15     A.  That is correct.
16     Q.  Okay.  And explain to me how that works.  How
17  does -- how does Joaquin Lorie complete your financials
18  each year?
19         MR. GOODMAN:  I'll object to the form.
20  BY MR. RANSON:
21     Q.  Okay.
22     A.  Joaquin Lorie is the C.F.O. of both Solu-Med
23  as well as Q-Med and he files, in conjunction with our
24  C.P.A.s, our taxes, and he's a -- chief financial
25  officer for both companies, as they both are QSUBS of

Page 126

1  Argo Holdings.  He's been employed with us for 13 years.
2  He's a C.P.A.
3      Q.  Okay.  And he has done all of your financials
4  since 2014, since Solu-Med was founded?
5      A.  That's correct.
6      Q.  Okay.  So does he provide the information from
7  Solu-Med to the accounting firm that files the
8  consolidated tax returns?
9      A.  He does.
10     Q.  Okay.  And if you look at question number
11  three, it says,
12         "Please explain with detailed specificity
13     how Solu-Med incurred approximately 60,000 in
14     freight and warehouse charges with Amazon as,
15     stated in your response to interrogatory number
16     eight."
17     You say,
18         "The 60,000 loss relating to freight and
19     warehouse is encompassed in the $1.1 million
20     loss discussed in the previous response and
21     should not be separate line item of loss.
22     Please accept this response as supplementing
23     interrogatory response to number eight,
24     defendant's set of interrogatories."
25         So let me ask you that question again.

Page 127

1      Do you know how Solu-Med incurred $60,000 in
2  freight and warehouse charges?
3      A.  What I -- what we said in that statement was
4  that all the losses related to the freight and warehouse
5  impact of lost revenue and lost profits was incorporated
6  in the financial statements that we've provided, so it
7  was not to be in addition to.
8      Q.  Sure.  Now, I understand that, but did you
9  incur $60,000 in freight and warehouse charges?
10     A.  Approximately.
11     Q.  Okay.  Can you tell me why?
12     A.  I think we talked about when we were shut down
13  for a period of two months, basically Amazon's charge --
14  creates charges for you for storing of product, product
15  that's not moving, shipping merchandise for you and,
16  basically, all the -- this was an estimate that Kellon
17  had put together for me of the financial impact of the
18  store being closed down for two months only, as it
19  pertained to freight and Amazon-related charges.
20     Q.  Okay.  I need you to explain this to me
21  because I'm -- I'm not in your line work so I don't
22  understand.
23         So what was the $60,000 charge for?  Did you
24  have to receive products back from Amazon?
25     A.  It was debits to our account.  Amazon froze

Page 128

1  our account on November 13th and was not reinstated
2  until January of 2019 and these were debits to our
3  account.
4      Q.  Debits to your online seller's account on
5  Amazon?
6      A.  Debits to the seller, yes.
7      Q.  So you had $60,000 in debits --
8      A.  Approximately.
9      Q.  Approximately, $60,000 in debits to your
10  Amazon account while your store was shut down, in
11  freight and warehouse charges?
12     A.  Correct.
13     Q.  Okay.  And I don't have them with me and if
14  you don't know, that's fine, but the Amazon documents
15  you produced to me say you got an F.B.A. inventory
16  credit of $25,000, approximately, in December.
17         Do you know what that was for?
18     A.  F.B.A. inventory credit.
19     Q.  Uh-huh.  Well, now we know F.B.A. means
20  fulfillment by Amazon.  Correct?
21     A.  You have to show me the document you're
22  referring to because I don't know which --
23     Q.  Okay.  You're not aware?
24     A.  I don't know what you're looking -- what
25  you're referring to.  See, you're asking about a



MANUEL E. AGUERO  Non-Confidential                         November 20, 2019
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                          129–132

Page 129

1  specific document that I haven't seen.
2      Q.  Okay, I'll get it for you.  All right.
3          I don't think I want to enter this as an
4  exhibit but I'll just give it to you so you can look at
5  it.  A copy for everybody.
6          So these are some of the financial statements
7  that you produced to us.  You are aware that you
8  produced these.  Correct?
9      A.  Yes.
10     Q.  Okay.  And we were able to get the general
11 ledger for 2018 and some of 2017.
12         Did you not keep a general ledger in 2017, for
13 the entire year?
14     A.  Let me see what you're looking at here.
15     Q.  Well, it's not in here, sir, because you
16 didn't produce it.  What I'm saying, this is a general
17 ledger for 2018.
18     A.  Okay.
19     Q.  Right here on the front.
20     A.  Yep.
21     Q.  I'll separate it for you, I believe.
22         So you have your tax returns in the back --
23 I'm sorry, you have your K.P.I. metrics in the back and
24 then this is your general ledger for 2018.  You have two
25 documents.  Do you see that?

Page 130

1      A.  Okay.  Yeah.
2      Q.  Okay.  So you produced me -- to me a general
3  ledger for 2018?
4      A.  Yes.
5      Q.  But your counsel indicated that you do not
6  have one for 2017.  I'm asking you --
7      A.  That is correct.
8      Q.  Okay.  And your company has been around since
9  2014.  Correct?
10     A.  Correct.
11     Q.  Okay.  So why did you not keep a general
12 ledger until the end of 2017?
13     A.  In 2014 through 2017, Solu-Med operated as
14 strictly a department within Q-Med.  It was not
15 maintained as a separate entity.
16         In 2018, we had separated out.  We wanted to
17 actually see the specific performance of the company
18 because it was growing very rapidly and we decided as of
19 1/1 -- January 2018, to start producing complete sets of
20 financials starting January of 2018.
21     Q.  So was Solu-Med incorporated in 2014?
22     A.  No.
23     Q.  When was Solu-Med incorporated?
24     A.  I believe Solu-Med was incorporated in 2009.
25     Q.  Okay.  So Solu-Med was incorporated in 2009

Page 131

1  and they were a corporation within Q-Med so both -- they
2  were a department inside of Q-Med.  Is that -- is that
3  correct, since 2009 --
4      A.  It wasn't --
5      Q.  -- up until --
6      A.  We didn't produce -- all the financial
7  transactions within Solu-Med up through 2017 were
8  incorporated within Q-Med.  And then in 2018, because we
9  had the K.P.I. metrics that we were producing at a high
10 level, but it wasn't a detailed financial income
11 statement or balance sheet, so I told our C.F.O. that I
12 wanted to, as of 1/1/2018, break it out so I could
13 really monitor the growth and the progress of the
14 organization separately, so we broke it out in 2018.
15     Q.  So until it was broke out, as you say, in
16 2018, then everything was kind of commingled together?
17     A.  Prior to 2018.
18     Q.  Okay.  And you told me yesterday that Solu-Med
19 was, roughly, five percent of Q-Med's business.  Is that
20 still correct today?
21     A.  Correct.
22     Q.  Okay.  So Solu-Med is, approximately,
23 five percent of Q-Med's business up until they broke
24 off, and now Solu-Med is Solu-Med which is a hundred
25 percent, all -- everything, financials are all under

Page 132

1  Solu-Med?  Correct?
2      A.  That's correct.
3      Q.  Okay.  So when you found out your store was
4  shut down, what actions did you take to mitigate your
5  damages?
6      A.  Well, the first thing we did was we filed an
7  action plan with Amazon and -- to -- to get the store
8  reopened, and as the days went by we started to,
9  basically, cut back on expenses.
10     Q.  And how did you cut back on expenses?
11     A.  We -- as employees -- you know, our workload
12 went from -- you can imagine we were doing as of
13 October, roughly, some $300,000 in sales and so in
14 November and December, the sales that you see here
15 listed in November and December would either be -- would
16 be other platforms other than Amazon, and the sales
17 decreased dramatically and the profits quickly turned to
18 losses.  So as folks were basically, you know, let go
19 as -- until the store was, you know, returned to
20 normalcy.
21     Q.  Okay.  Well, let's discuss that.  So the first
22 thing you did to mitigate your damages was you had to
23 let some employees go.  Correct?
24     A.  Yes.
25     Q.  Okay.  Did you reduce your costs and expenses?



Page 133

1     A.  Yes.
2     Q.  Did you reduce the amount of money you spent
3   on advertising?
4     A.  Actually, we increased the amount of
5   advertising on other sales platforms in an effort to try
6   to grow our sales.
7        At the time of the shutdown on -- on Amazon,
8   Amazon was, approximately, 80 percent of our revenue.
9   Ten percent of our revenue was in the Walmart Jet
10  platform and, approximately, ten percent on eBay.  So
11  with 80 percent of our revenue shut down, we started
12  doing more advertising on other platforms in an effort
13  to try to increase sales.
14    Q.  Okay.  And what happened to the merchandise --
15  because your entire store was shut down, not just the
16  Youngblood products, correct, for those two months?
17    A.  Correct.
18    Q.  So what did you do with all the merchandise?
19  Was it all in a Amazon fulfillment center?  Was it in
20  the Q-Med warehouse?  What happened to it?
21    A.  Well, it's a mixture.  Some of it was in our
22  facility at Griffin Point, which is our -- our
23  warehouse, and some of our merchandise was at Amazon
24  fulfillment centers all over the country.  And not
25  knowing the extent -- you know, we first had the store

Page 134

1   shut down, we thought it might be a one- or
2   two-day event.
3        Once we realized it was a two-week event, we
4   started to take action and, ultimately, it turned out to
5   be more than a two-month event.
6     Q.  Okay.  So I'm -- I'm sorry.  So what happened
7   to all the merchandise during those two months?  That's
8   what I'm asking you.  Did it sit in the warehouse?  Did
9   you sell it on another platform?  Did you throw it away?
10    A.  You're asking about the merchandise that was
11  sitting at Amazon?
12    Q.  Yes, because I imagine you had -- well, yeah,
13  tell me what happened.  I don't know.
14    A.  Okay.  So the merchandise that's sitting at
15  Amazon, after a certain period of time of it not moving,
16  Amazon begins the process of shipping it back to you at
17  your expense.  And so, remember, it's -- it's a very
18  lengthy supply chain.  You have merchandise that's in
19  transit going from our facility to Amazon that's on the
20  road.  Then you have merchandise that has arrived at an
21  Amazon warehouse that has not been checked in by Amazon.
22  And then you have merchandise that Amazon has it in your
23  inventory and is available for sale in the store.
24       So on the day of the shutdown, all that
25  merchandise that was in transit, both over the road and

Page 135

1   in their facilities, all of that merchandise got refused
2   and sent back at our expense.
3        And we also, in addition to eating the freight
4   expense, also eat any subsequent damages or anything
5   that happens to that product getting shipped back.  And
6   the merchandise that was in the Amazon centers as
7   fulfillment by Amazon over a period of time, if your
8   product isn't moving, Amazon starts to hit you with
9   slow-turning charges and fees and then, subsequently, if
10  the product doesn't ship or sell, they, basically, ship
11  it back to you at their discretion, at their expense --
12    Q.  So --
13    A.  -- at -- at our expense.  Sorry.
14    Q.  I understand.
15    A.  Our expense.
16    Q.  So were you able to sell any of those other
17  products on any other platforms?  Did you try to take
18  some of the products you received back and sell them on
19  Walmart or eBay or anywhere else?
20    A.  Sure.  We tried to advertise on Walmart.  We
21  tried to advertise on eBay.  We spent quite a bit on
22  advertising on -- with Google.  And we did shuffle
23  product from other -- you know, that we received back
24  that was in good sellable condition to other platforms.
25    Q.  Okay.  And I'm not asking you about

Page 136

1   advertising.
2        When you received the products back -- you
3   said Amazon ships the products back to you.  Correct?
4     A.  Yes.
5     Q.  Okay.  Did you wait to be reinstated on Amazon
6   and put those products back on Amazon or did you try to
7   sell them during that two-month period on other
8   platforms or both?
9     A.  I would both.
10    Q.  Okay.
11       THE VIDEOGRAPHER:  Excuse me.  We need to go
12  off the record.
13       (Discussion held off the record.)
14       THE VIDEOGRAPHER:  Okay.  We are back on the
15  record.
16  BY MR. RANSON:
17    Q.  Okay.  So we were discussing mitigating
18  damages, what you did with the products, what you did
19  with Solu-Med store while the store was shut down.
20       You said that you had to lay some people off
21  during the shutdown.  That's correct?
22    A.  Yes, we reduced head count.
23    Q.  Okay.  Did payroll reflect that?
24    A.  Not immediately because in some cases we gave
25  people severance pays.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
137–140

Page 137

1    Q.  I see.  Okay.  All right.
2        I'm going to ask you some questions about the
3    documents I gave you.  It starts on PL000308.
4        Do you see that?
5    A.  Yes.
6    Q.  Yeah, so I'm going -- I'm actually going to
7    turn to 000328.
8        MR. GOODMAN:  328?
9        MR. RANSON:  Yes, sir.
10       MS. BLACK:  One thing we didn't do, any
11   documents that are marked confidential, we would
12   like to maintain that designation.
13       MR. RANSON:  I -- I didn't enter in this
14   exhibit.
15       MS. BLACK:  It's not an exhibit.  Okay?
16   Relevant to financial actual numbers and
17   discussions on the record about confidential
18   documents, we're probably going to designate that
19   portion --
20       MR. RANSON:  That's fine.
21       MS. BLACK:  -- of the testimony --
22       MR. RANSON:  Yeah.
23       MS. BLACK:  -- as confidential.
24       MR. RANSON:  That's what I was going to say,
25   agreed.  All right.  Yeah.  So the rest of this

Page 138

1    testimony probably will be confidential until I
2    tell you otherwise.
3        MR. GOODMAN:  Some will be changed.
4        MS. BLACK:  Thanks, Ryan.
5        MR. RANSON:  Yep.
6    (The testimony on pages 138 through 150, line 4 was
7    marked confidential, excerpted, and bound separately.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 141

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 143

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 142

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 145

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 146

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 147

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 149

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 150

1
2
3
4
5     Q.   Okay.  Are you aware of Amazon's drop shipping
6  policy?
7     A.   Drop shipping policy?
8     Q.   Yes.  Have you ever seen that before or heard
9  of that before?
10     A.   I'm not familiar with what it is.
11     Q.   Okay, I'll show you.
12         (Defendant's Exhibit Number 16 was marked for
13  identification.)
14  BY MR. RANSON:
15     Q.   So Amazon's Drop Shipping Policy, if you'll
16  look to the fourth one down, can you read that for me?
17     A.   "Be responsible for accepting and
18     processing customer returns of your products."
19     Q.   Right.  And if you read at the very top,
20  it's -- it's basically the Drop Shipping Policy in
21  reference to third parties.
22         You would agree, though, that Solu-Med is
23  responsible for accepting and processing customer
24  returns.  Correct?
25     A.   Yes.

Page 151

1     Q.   Okay.  Do you see examples of drop shipping
2  that is not permitted?  Do you see that?
3     A.   Where are you pointing to?
4     Q.   It says,
5         "Examples of drop shipping that is not
6     permitted."
7  Do you see that?
8     A.   "Examples of drop shipping that is
9     not permitted.  Purchasing products from another
10     online retailer and having the retailer ship
11     directly to customers."
12     Q.   Okay.  My question is:  Do you guys ever
13  purchase products from other retailers and have them
14  ship them to the customers or do you always possess your
15  products?
16     A.   We always possess our products.
17     Q.   So Q-Med, for example, wouldn't be sending
18  products from Q-Med that were purchased through
19  Solu-Med's Life & Health Source?
20     A.   No.
21     Q.   You're positive?
22     A.   State the question again.
23     Q.   Q-Med would not ship a product that was
24  purchased by Solu-Med -- strike that.
25         Q-Med would not ship a product that was

Page 152

1  purchased from Life & Health Source under Solu-Med.
2  Correct?
3     A.   Q-Med would not purchase a product that was --
4     Q.   Q-Med would not ship a product.  So I
5  purchase -- let me give you an example.
6         I purchase L'Oreal eye cream from Life &
7  Health Source under Solu-Med.  Correct?  Okay, follow
8  me?
9         Would Q-Med send that shipment or would
10  Solu-Med?  Would Q -- would there ever be an instance
11  where Q-Med would be the corporation sending that?
12     A.   No.
13     Q.   Okay.  All right.  Thank you.
14         All right.  Back to, sorry, PL000340.  And we
15  were discussing the rent expense, and you were
16  explaining that that was for a third party to,
17  basically, collect the returns and then bring them to
18  Solu-Med.  Is that correct?
19     A.   It was a courier service.  Yes.
20     Q.   A courier service.  Okay.
21         It was not rent for Solu-Med's section of
22  Q-Med's warehouse then?
23     A.   No.
24     Q.   Okay.  Does Solu-Med pay any rent to Q-Med for
25  the warehouse?



Page 153

1    A.  No.

2    Q.  So they use it, basically, free of charge?

3    A.  Correct.

4        MR. RANSON:  Okay.  Can we just take like a

5    five-minute break and I will just see if I have

6    anything else.

7        MR. GOODMAN:  Okay, sure.

8        MR. RANSON:  I don't think I do.

9        THE VIDEOGRAPHER:  Off the record.  The time

10   is 2:00 p.m.

11       (Thereupon, a recess was taken.)

12       THE VIDEOGRAPHER:  We are back on the record.

13   The time is 2:03.

14       THE WITNESS:  Oh.

15       MR. RANSON:  I have no further questions.

16       MR. GOODMAN:  One moment.  No further

17   questions.  Thank you.

18       MR. RANSON:  All right.  Thank you, guys.

19       THE VIDEOGRAPHER:  Going off the record.  The

20   time is 2:03.

21       (The following discussion was held off the

22   video record.)

23       THE COURT REPORTER:  Read or waive?

24       MR. RANSON:  We'll waive it.  It's video.

25       MS. BLACK:  We'll read but -- yeah.

Page 154

1        THE VIDEOGRAPHER:  Are you ordering?

2        MR. RANSON:  Please, yes.  Yes.  How long will

3    that take?

4        THE COURT REPORTER:  Ten business days.

5        MR. RANSON:  Can you expedite it?

6        THE COURT REPORTER:  How fast?

7        MR. RANSON:  By next Monday.

8        THE COURT REPORTER:  Monday, yeah.

9        MR. RANSON:  Actually, ten days will be fine.

10       THE COURT REPORTER:  Okay.  Okay.  All right.

11   Copy?

12       MS. BLACK:  Yeah, we'll take a copy.  I don't

13   want a hard copy.  I do want the exhibits and

14   addressed to me, not to Stanley.  And then a text

15   TXT format.

16       (Thereupon, at 2:03 p.m., the deposition was

17   concluded.)

18       (Witness excused.)

19            - - - - -

20

21

22

23

24

25

Page 155

1              C E R T I F I C A T E

2    THE STATE OF FLORIDA  )
                           )
3    COUNTY OF BROWARD.    )

4        I, Dona J. Wong, Registered Professional
     Reporter, do hereby certify that I was authorized to and
5    did stenographically report said deposition in
     stenotype, and that the foregoing deposition as
6    hereinabove shown is a true and correct computer
     transcription under my shorthand notes of said
7    deposition.

8        I further certify that I am not a relative,
     employee, attorney or counsel of any of the parties, nor
9    am I a relative or employee of any attorney or counsel
     or party connected with the action, nor am I financially
10   interested in the action.

11       The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
12   means unless under the direct control and/or direction
     of the certifying reporter.

13

     Dated this 27th day of November, 2019.

14

15       _____

16       Dona J. Wong, RPR, CSR
         My Commission #GG91873
17       Expires May 16, 2021

18

19

20

21

22

23

24

25

Page 156

1            DEPOSITION ERRATA SHEET

2

3    Our Assignment No.  J4467092

4    Case Caption:

5    ARGO HOLDINGS, INC. AND SOLU-MED, INC.,

6         vs.

7    YOUNGBLOOD SKIN CARE PRODUCTS, LLC,

8

9

10       DECLARATION UNDER PENALTY OF PERJURY

11       I declare under penalty of perjury that I

12   have read the entire transcript of my Deposition taken

13   in the captioned matter or the same has been read to me,

14   and the same is true and accurate, save and except for

15   changes and/or corrections, if any, as indicated by me

16   on the DEPOSITION ERRATA SHEET(S) hereof, with the

17   understanding  that I offer these changes as if still

18   under oath.

19       Signed on the _____ day of  _____, 20___.

20

21       _____

         MANUEL E. AGUERO

22

23

24

25



Page 157

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
              MANUEL E. AGUERO
25
```

Page 158

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
              MANUEL E. AGUERO
25
```

Page 159

```
 1                 C E R T I F I C A T E
 2    THE STATE OF FLORIDA, )
                             )
 3    COUNTY OF BROWARD.    )
 4
 5          I, the undersigned authority, certify that
 6    MANUEL E. AGUERO personally appeared before me and was
 7    duly sworn on the 20th day of November 2019.
 8          WITNESS my hand and official seal this 27th
 9    day of November 2019.
10
11          _____
            Dona J. Wong, RPR, CSR
            Notary Public - State of Florida
12          My Commission #GG91873
            Expires May 16, 2021
13
14
15
16
17
18
19
20
21
22
23
24
25
```

