# In the Matter Of:

## SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

0:19-cv-60487-MGC

---

# KELLON GOODSON

*January 09, 2020*

---

**EXHIBIT 5**



800.211.DEPO (3376)
*EsquireSolutions.com*

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2
             CASE NO.: 0:19-cv-60487-MGC
3
   SOLU-MED, INC.,
4
                 Plaintiff,
5
   vs.
6
   YOUNGBLOOD SKIN CARE
7  PRODUCTS, LLC.,
8
                 Defendant.
9  ----------------------------/
10
11               Fort Lauderdale, Florida
                   January 9, 2020
12               8:11 a.m. - 11:26 a.m.
13
14               - - - - - - - - -
15               VIDEOTAPED DEPOSITION
16                       OF
17                 KELLON GOODSON
18               - - - - - - - - -
19
20
21
22  JOB NO: J4842062
    Reported By:
23  Evan A. Ferguson, RPR
    Notary Public, State of Florida
24  Esquire Deposition Solutions
    Fort Lauderdale Office
25  Phone 954.331.4400



KELLON GOODSON                                      January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                          2

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3
          BLACK LAW, P.A.
 4        BY:  KELSEY K. BLACK, ESQUIRE,
          1401 East Broward Boulevard
 5        Victoria Park Centre, Suite 204
          Fort Lauderdale, Florida 33301
 6        Tel:  954.320.6220
          Fax:  954.320.6024
 7        Email: kelsey@kkbpa.com
          Appearing on behalf of the Plaintiff.
 8

 9

10    FOR THE DEFENDANT:

11        COLE, SCOTT & KISSANE, P.A.,
          BY:  JONATHAN VINE, ESQUIRE,
12        Esperante Building
          222 Lakeview Avenue, Suite 120
13        West Palm Beach, Florida 33401
          Tel:  561.383.9203
14        Fax:  561.683.8977
          Email: jonathan.vine@csklegal.com
15        Appearing on behalf of the Defendant.

16

17    ALSO PRESENT:

18        DONALD C. SAVOY, VIDEOGRAPHER
          Esquire Deposition Solutions
19        Fort Lauderdale Office
          Phone 954.331.4400
20

21

22

23

24

25
```



```
 1                          I-N-D-E-X

 2    WITNESS:                                        PAGE:

 3    KELLON GOODSON

 4    DIRECT EXAMINATION BY MR. VINE:                   5

 5    CROSS EXAMINATION BY MS. BLACK:                  147

 6    REDIRECT EXAMINATION BY MR. VINE:                157

 7                        E-X-H-I-B-I-T-S

 8    DEFENDANT'S                          FOR IDENTIFICATION

 9    NO.  1   Life & Health Source Storefront Page     45

10    NO.  2   Condition Guidelines from Amazon         57

11    NO.  3   Cosmetics & Skin/Hair Care Policy        62
               from Amazon.
12
      NO.  4   Product Authenticity and Quality         62
13             Guidelines from Amazon.

14    NO.  5   Amazon Anti-Counterfeiting Policy        69

15    NO.  6   Amazon Selling Policies and Seller       82
               Code of Conduct.
16
      NO.  7   Other Complaints Composite from Amazon   89
17
      NO.  8   Bates No: CONFIDENTIAL AMZN_00003       103
18
      NO.  9   Bates No:  PL00046                      104
19
      NO. 10   Bates No:  PL00047                      104
20
      NO. 11   Bates No:  PL00048                      110
21
      NO. 12   Bates No:  PL00049                      115
22
      NO. 13   Bates Nos: PL000051 - PL000053          123
23
      NO. 14   Bates No:  PL000344                     158
24

25    (***All Exhibits to be Marked Confidential.***)
```



1          Videotaped deposition of KELLON GOODSON, a

2    witness of lawful age, taken by the Defendant, for the

3    purpose of discovery and for use as evidence in the

4    above-entitled cause, wherein SOLU-MED, INC. is the

5    Plaintiff, and YOUNGBLOOD SKIN CARE PRODUCTS, LLC. is

6    the Defendant, pending in the United States District

7    Court, Southern District of Florida, pursuant to notice

8    heretofore filed, before EVAN FERGUSON, a Notary Public

9    in and for the State of Florida at Large, at Cole, Scott

10   & Kissane, P.A., 110 Southeast 6th Street, Suite 2700,

11   Fort Lauderdale, Broward County, Florida, on the 9th day

12   of January 2020, commencing at 8:11 a.m.

13          THE VIDEOGRAPHER:  We are now on the video

14      record today is Thursday the 9th day of January of

15      2020.  The time is 8:11 a.m.

16          We are here at 110 Southeast 6th Street, Suite

17      2700, in Fort Lauderdale, Florida, for the purpose

18      of taking the videotaped deposition of Kellon

19      Goodson.  The case is Solu-Med, Inc. versus

20      Youngblood Skin Care Products, LLC.

21          The court reporter is Evan Ferguson and the

22      videographer is Don Savoy, both from Esquire

23      Deposition Solutions.

24          Will counsel please announce their appearances

25      for the record?



KELLON GOODSON                                       January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                         5

```
 1            MS. BLACK:  Kelsey Black on behalf of the
 2       Plaintiff Solu-Med, Inc.
 3            MR. VINE:  Jonathan Vine with the law firm of
 4       Cole, Scott & Kissane on behalf of the Defendant
 5       Youngblood.
 6                      - - - - - - -
 7  Thereupon:
 8                      KELLON GOODSON,
 9        A witness named in the notice heretofore
10  filed, being a witness of lawful age, and being first
11  duly sworn in the above cause, testified under oath as
12  follows:
13                      DIRECT EXAMINATION
14  BY MR. VINE:
15       Q    Can you please state your name for the record?
16       A    Kellon Goodson.
17       Q    Mr. Goodson, can you please give me your
18  current address?
19       A    4657 Lakeside Terrace, Davie, Florida.  33314.
20       Q    Are you currently employed?
21       A    Yes.
22       Q    Where are you employed?
23       A    Dart Container Corporation.
24       Q    What is Dart Container Corporation?
25       A    It's a company that sells packaging for food
```



1  service and restaurants, things like that.

2      Q    What do you do for them?

3      A    I am director of sales eCommerce.

4      Q    Prior to coming here today did you have any

5  conversations with anyone from Solu-Med, Q Med or AGRO

6  regarding your deposition?

7      A    From AGRO, Solu-Med, Q Med, no.

8      Q    Okay.  Anybody representing them?

9      A    I spoke to Ms. Black last night.

10     Q    When did you -- so last night you spoke to

11 her?

12     A    Yes.

13     Q    For how long?

14     A    Probably 20, 25 minutes.

15     Q    And what did you guys talk about?

16     A    Just what to expect today and just to answer

17 truthfully and concisely.

18     Q    Did she tell you about the facts of the case?

19     A    Just the background of kind of what's going

20 on.

21     Q    What did she tell you about the case?

22     A    Just that there's a lawsuit still pending and

23 I needed to testify.

24     Q    Did she give you any specific facts of the

25 case?



 1        A    No.

 2        Q    Did she tell you about any of the deposition

 3   testimony?

 4        A    No.

 5        Q    Did she tell you about the type of questions

 6   you would be asked?

 7        A    She did say that she expected to ask

 8   questions, be answering questions about my time as

 9   director of eCommerce.

10        Q    Anything else?

11        A    That was it.

12        Q    Any questions you asked Ms. Black?

13        A    Just how long it was going to take and what

14   the kind of the layout was going to be and how we were

15   going to do it.

16        Q    Okay.  And so no substantive discussions about

17   the facts of this case?

18        A    No.

19        Q    Have you ever had a substantive discussion

20   with anybody, whether it be Ms. Black or anybody from

21   Solu-Med, Q Med or AGRO about the case?

22        A    As far as the my time working there and things

23   like that?

24        Q    Yes.

25        A    Previously when I worked with Solu-Med we did



1   talk about the case.

2          Q    When was that?

3          A    I stopped working there November 1st.

4          Q    And we'll get back to that.

5          A    Okay.

6          Q    Okay.  Can you give me a brief description of

7   your educational background?

8          A    I have a Bachelor's in Political Science and a

9   Master's -- a Master's of Science in Business

10  Administration from the University of Florida.

11         Q    And when did you graduate?

12         A    2005.

13         Q    And you got a BA and a Master's from the

14  University of Florida?

15         A    Yes.

16         Q    And after graduating from the University of

17  Florida, did you become employed?

18         A    Yes.

19         Q    Where?

20         A    Pulte Corporation.

21         Q    Pulte?

22         A    Yes, it's a home builder.

23         Q    P-U-L-T-E?

24         A    Yes.

25         Q    Pulte.  And what did you do for them?



1        A     I was in purchasing and sourcing.

2        Q     Materials?

3        A     Materials and subcontracting.

4        Q     And how long did you work for them?

5        A     A year and a half.

6        Q     And that was until about 2007?

7        A     2006.

8        Q     2006, okay.

9              And then where did you go?

10       A     I worked for another home builder called

11    Centex Homes.

12       Q     Okay.  And what did you do for them?

13       A     The same, I did sourcing and purchasing.

14       Q     The same type of role?

15       A     Exactly the same type of role.

16       Q     And how long did you work for them?

17       A     One year.

18       Q     So about mid 2007?

19       A     Yes, towards the end of 2007.

20       Q     And then where did you go?

21       A     I worked for a company called Atlas Traffic

22    Management Systems, and it also was a construction

23    company, but it dealt with infrastructure construction,

24    road construction, light systems, things like that so I

25    was also there for a year.



1    Q    And what did do for them?

2    A    Purchasing and sourcing.

3    Q    So you were there until about the end of 2008?

4    A    Yes.

5    Q    And why did you leave there?

6    A    The financial crisis happened, the company

7  started having some trouble so I looked for other

8  employment.

9    Q    Why did you leave Centex?

10   A    The same thing, just the housing bust, things

11 weren't going well there so I decided to leave.

12   Q    And why did you leave Pulte?

13   A    There was actually a reduction in force and

14 they had a group of layoffs and I was part of like a

15 group of layoffs.

16   Q    So after Atlas did you become employed?

17   A    Yes, so I was employed by Q Med Corporation.

18   Q    In 2009 I guess?

19   A    In the very end of 2008, December of 2008.

20   Q    And what did you do for them?

21   A    I was an analyst.

22   Q    In doing what, analyst in what?

23   A    In looking at sales, vendor purchasing costs,

24 things like that.

25   Q    What type of materials were you purchasing at



 1   Q Med?

 2        A    Well, it's medical, medical supplies,

 3   disposables, things likes that.

 4        Q    And Q Med doesn't manufacture anything, isn't

 5   that correct?

 6        A    Q Med itself, no, it did not.

 7        Q    It buys products from resellers?

 8        A    Yes, from distributors or also from other

 9   distributors, right.

10        Q    It doesn't buy from retail or manufacturers

11   directly?

12        A    What do you mean by retail?

13        Q    Well, let's start with one question at a time.

14        A    Okay.

15        Q    Did it buy in your time directly from

16   manufacturers as opposed to distributors?

17        A    Q Med, no, it bought it from distribution.

18        Q    Okay.  And it was strictly in the medical

19   supply area?

20        A    Yes, medical and disposable supplies.

21        Q    And how long were you an analyst there?

22        A    From 2008 until about 2015 or '16, somewhere

23   in there.

24        Q    And what happened about 2015?

25        A    The eCommerce operation started, and I took



 1  the -- my roles and responsibilities changed, and I

 2  started up the eCommerce part of it.

 3       Q    You helped start the eCommerce department?

 4       A    That's right.

 5       Q    Okay.  And what was the eCommerce department

 6  at Q Med?

 7       A    So Solu-Med became the eCommerce operation for

 8  the organization.

 9       Q    But it originally was part of Q Med, correct?

10       A    No, it wasn't really ever just part of Q Med,

11  it was basically Solu-Med was the eCommerce operation.

12  Q Med really didn't have the eCommerce presence at all.

13       Q    But Solu-Med was within a department within

14  Q Med at the time?

15       A    It was within AGRO, so they were sister

16  companies I guess.

17       Q    When did it become a sister company?

18       A    I am not aware of that, I'm not sure.

19       Q    Okay.  And did you help begin the Solu-Med

20  eCommerce department?

21       A    Yes.

22       Q    And why don't you walk me through what

23  infrastructure you set up at Solu-Med to begin the

24  eCommerce department.

25       A    So we set up accounts for selling, so selling



 1  to marketplaces; we set up the systems to help to sell

 2  the product and so the software, things like that.

 3          And then we used the Q Med had existing

 4  infrastructure for its ERP system and distribution

 5  systems so we had some shared services that already

 6  existed that we used that we just kind of tapped into

 7  existing Q Med, just Q Med personnel or functions.

 8      Q    What shared services that you said, I think

 9  you said you called it Q tip?

10      A    No, it would be like distribution,

11  distribution functions or the ERP, which is the

12  Enterprise Resource Software that runs the information

13  for products or purchasing, things like that.

14      Q    And that software was owned by Q Med?

15      A    Yes.

16      Q    And Solu-Med used it?

17      A    Yes.

18      Q    Did Solu-Med pay for that use?

19      A    I'm not aware of that.

20      Q    Okay.  What platforms did you have; you had

21  Amazon, correct?

22      A    Yes.

23      Q    And you had a storefront on Amazon, correct?

24      A    That's correct.

25      Q    And you also had ability to sell to Amazon



 1   directly if you wanted to?

 2       A     You mean as a first party to sell?

 3       Q     Instead of selling to consumers you could have

 4   sold directly to Amazon any product?

 5       A     Solu-Med did not have a direct relationship

 6   with them.

 7       Q     You could have, though?

 8       A     We could have, yes.

 9       Q     But Solu-Med chose not to do that?

10       A     You have to get a vendor account to sell

11   directly to them so you have to be invited.

12       Q     Did Solu-Med try to do that?

13       A     Not that I am aware of, no.

14       Q     So there was Amazon?

15       A     Uhm-hum.

16       Q     What other marketplace?

17       A     eBay.

18       Q     eBay.

19       A     Later on Wal-Mart.

20       Q     And did it have a storefront on Wal-Mart or

21   was it just selling products that it purchased and

22   resold on Wal-Mart's website?

23       A     So the Wal-Mart has a marketplace just like

24   Amazon does so it's a storefront for your products on

25   Wal-Mart's platform.



1        Q    And, again, Solu-Med doesn't manufacture any

2    products so it's not your products, correct?

3        A    Correct, we were reselling products.

4        Q    In fact Solu-Med is just a reseller of other

5    people's manufactured products, correct?

6        A    That's correct.

7        Q    And eBay, did it have a similar marketplace?

8        A    Yes.

9        Q    So Amazon, eBay, Wal-Mart, anybody else?

10       A    We had a Shopify account, which was our own

11   proprietary website.

12       Q    Okay.  And in the years 2017 until the time

13   you left, the bulk of the products being sold were

14   through the Amazon account?

15       A    That's correct.

16       Q    At your current job do you deal with the

17   Amazon marketplace?

18       A    No.

19       Q    When you started and opened up this Amazon

20   account through Solu-Med, did you take any courses that

21   were offered by Amazon?

22       A    Can you explain that a little bit further?

23       Q    Do you know what a course is?

24       A    Yes.

25       Q    Okay.  Are you aware that Amazon offered



1   educational courses regarding its marketplace?

2       A    There is some information on their, as far as

3   their selling university and things like that, there's

4   some of those demos and videos that I have watched, yes.

5       Q    You have watched the videos, but did you

6   attend any of the courses?

7       A    No.

8       Q    Do you know which video you watched?

9       A    Maybe related to the packaging and materials

10  and the shipments, things that are related to

11  distribution.

12      Q    Any other video that you have watched that you

13  can recall as you sit here?

14      A    Not that I can recall.

15      Q    And did you receive any training to sell on

16  the Amazon marketplace?

17      A    No.

18      Q    And this obviously was all new to you because

19  previously you were doing what you would call were

20  sourcing and purchasing?

21      A    Q Med was analytics.

22      Q    Okay.  So analytics and sourcing and

23  purchasing --

24      A    Uhm-hum.

25      Q    -- Is different than setting up an eCommerce



 1  department?

 2      A    Yes.

 3      Q    Were you the individual in charge of running

 4  all of Solu-Med?

 5      A    I had the responsibilities for the eCommerce

 6  part of Solu-Med, that was my responsibility.

 7      Q    My question was were you the person at the

 8  head of all of Solu-Med?

 9      A    No, that would be Manny, he was the owner so

10  he was running it.

11      Q    I think you have -- have you ever been deposed

12  before by the way?

13      A    No.

14      Q    Okay.  I forgot to give you what the typical

15  ground rules are.

16          I'll be asking you a series of questions.  If

17  you don't understand any of my questions feel free to

18  let me know.

19          From time to time you may hear Ms. Black make

20  objections, you are still required to answer unless she

21  directs you not to, and then Ms. Black and I can have a

22  debate a different day.

23          The court reporter is going to be taking down

24  our questions and answers and I'm going to try to go as

25  fast as I can, despite what the court reporter wants,



```
 1  because I know you have to get out of here.

 2      A    Uhm-hum.

 3      Q    But it's important for you to let me complete

 4  my question for the court reporter.

 5      A    Okay.

 6      Q    Even if you anticipate the answer because the

 7  court reporter can't take the two of us speaking at the

 8  same time.

 9           It's also important that all your responses be

10  articulate and loud --

11      A    Okay.

12      Q    -- And verbal because otherwise the court

13  reporter can't take that down, okay?

14      A    Understood.

15      Q    And if you need a break at any time let me

16  know.

17      A    Okay.

18      Q    So we were talking about you were in charge of

19  the eCommerce department.

20           You weren't in charge of the accounting of it,

21  correct?

22      A    Correct.

23      Q    You were in charge of the mechanics and

24  operations as it relates to the various platforms and

25  selling the, reselling products on those platforms,
```



1  correct?

2       A    Correct.

3       Q    Any other job functions and job duties that

4  you would have had?

5       A    I did provide information to the accounting

6  team as far as sales, sales summaries, things like that

7  that they needed to complete some of their work, and

8  then I did do some of the purchasing and sourcing.

9       Q    Great point.  Was the bulk of the products

10  that Solu-Med purchased from Q Med?

11      A    Yes.

12      Q    Who else did Solu-Med purchase products from

13  that you can recall?

14      A    Solu-Med's purchasing was from Q Med.

15      Q    All of it?

16      A    Yes.

17      Q    So Q Med would purchase the products from

18  various distributors, correct?

19      A    Correct.

20      Q    Okay.  And then Q Med would sell it at cost to

21  Solu-Med, correct?

22           MS. BLACK:  Form.

23           THE WITNESS:  There's -- I'm not sure as far

24      as the accounting part of it I will be honest.

25



KELLON GOODSON                                          January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                            20

```
 1   BY MR. VINE:
 2       Q    So do you know if it was sold at cost or a
 3   markup between Q Med, do you know, because you said you
 4   were not sure, I just want to make the record is clear,
 5   because she made an objection I'm going to ask the
 6   question in a little clearer way.
 7            Do you have specific knowledge as to whether
 8   Q Med sold the products to Solu-Med at cost or something
 9   else?
10       A    I don't have specific knowledge, no.
11       Q    When you say you were involved in the
12   purchasing and sourcing for products at Solu-Med, was it
13   that you would direct Q Med to purchase certain
14   products?
15       A    There were products that were specific for
16   Solu-Med that I was directing them to purchase basically
17   for the eCommerce sales.
18       Q    So I just want to make sure I understand.
19       A    Uhm-hum.
20       Q    Q Med would go out and purchase products based
21   upon your direction at Solu-Med, correct?
22       A    Yes, there were products that were purchased
23   at my direction for Solu-Med.
24       Q    Okay.  But Q Med purchased them, correct?
25       A    Correct.
```



1      Q    And then Q Med would transfer them over to

2  Solu-Med, correct?

3      A    Correct.

4      Q    And this was all under the same warehouse,

5  correct?

6      A    Correct.

7      Q    Do you know how much square footage Solu-Med

8  used?

9      A    I am not aware it, no.

10      Q    Do you know how much rent Solu-Med paid to

11  Q Med?

12      A    I'm not aware, no.

13      Q    Do you know how much expenses they paid for

14  utilities and those things?

15      A    I'm not sure.

16      Q    Anything as it related to operations from an

17  accounting standpoint you wouldn't be familiar with what

18  was paid or not paid, correct?

19      A    No, that was --

20      Q    I'm correct?

21      A    That's correct.

22      Q    Okay, thank you.

23           When you transferred in 2015, '16 to Solu-Med

24  as an analyst to eCommerce manager did your paychecks

25  still say Q Med if you recall?



1      A    I don't recall.  Yes, I don't recall.

2      Q    I guess the better way to ask this question

3  did it ever change to Solu-Med?

4      A    It did, yes.

5      Q    Okay.  Do you know when?

6      A    I don't recall when exactly it was.

7      Q    Was that in 2019?

8      A    It may have been.  I'm not fully remembering

9  exactly.

10      Q    So you're familiar or you have a familiarity

11  with Amazon that it has a marketplace, correct?

12      A    Yes.

13      Q    Okay.  Like Amazon Wal-Mart has a marketplace?

14      A    Yes.

15      Q    Did you take any training for the Wal-Mart

16  marketplace?

17      A    The, again, just their videos and their kind

18  of self service model of training.

19      Q    They offer courses as well?

20      A    Yes.

21      Q    Did you take those courses?

22      A    Yes.

23      Q    So you took courses for the Wal-Mart one and

24  not the Amazon one?

25      A    Well, there were specific courses to start



1  with Wal-Mart that they required us to view that we

2  took.

3      Q    Okay.  And you're saying Amazon didn't require

4  them?

5      A    There was no specific requirement to start an

6  account and then to watch the video or watch the

7  training.

8      Q    So Wal-Mart required you to watch certain

9  training?

10     A    Yes.

11     Q    And you took it?

12     A    Yes.

13     Q    And what were those?

14     A    How to list products, expectations on how to

15  present your products, the types of products that were

16  going to be sold through the marketplace and categories

17  that were related to the products sold.

18     Q    So just to make sure I understand, you took

19  the courses at Wal-Mart because it was required, and you

20  didn't take the courses at Amazon because it wasn't

21  required, is that correct?

22     A    Well, the Amazon courses that were -- that we

23  were doing were mostly related to like I said

24  distribution, Wal-Mart's were to bring the account

25  online so we had to do the...



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      24

```
 1        Q    Are you done?

 2        A    Yes.

 3        Q    Okay.  I just want to make sure.  You didn't

 4   really answer my question so we're going to go back to

 5   that.

 6             Wal-Mart required you to take certain courses,

 7   correct?

 8        A    Yes.

 9        Q    Okay.  And you took those courses?

10        A    Yes.

11        Q    Amazon offered courses, you chose to take only

12   the courses regarding packaging and distributing,

13   correct?

14             MS. BLACK:  Form.

15             THE WITNESS:  That I am aware of.  I don't

16        recall all the courses that I watched, but I do

17        know that specifically for Amazon the distribution

18        ones I watched all of those.

19   BY MR. VINE:

20        Q    Do you recall any of the other courses offered

21   by Amazon?

22        A    I don't recall at this point.

23        Q    Do you remember reading any of their

24   guidelines?

25        A    Yes.
```



 1      Q    Did you have a printout of the guidelines in
 2  your office?
 3      A    A printout, no.
 4      Q    Did you save the guidelines to the computers
 5  at Solu-Med?
 6      A    As far as like an electronic copy on the hard
 7  drive, yes, we did.
 8      Q    So if we went back and did a search of your
 9  computer at Solu-Med we would be able to confirm the
10  accuracy of your testimony that you had saved guidelines
11  from Amazon, correct?
12          MS. BLACK:  Form.
13          THE WITNESS:  I want to be specific, as far as
14      the guidelines for -- they have different
15      guidelines for different things.
16  BY MR. VINE:
17      Q    Okay.  So you saved certain guidelines, not
18  all guidelines?
19      A    Correct.
20      Q    Did you save the Seller Code of Conduct
21  guideline?
22      A    I don't recall.
23      Q    Did you ever read the Seller Code of Conduct
24  guideline?
25      A    Yes.



1      Q    Did you save the guidelines regarding

2   counterfeit items?

3      A    I don't recall if I saved it.

4      Q    Did you review it?

5      A    Yes.

6      Q    Okay.  When did you review that?

7      A    Probably 2015.

8      Q    Okay.  So from 2015 to 2018 you would have

9   read it one time?

10     A    Yes, that is correct.

11     Q    Did you review any guidelines regarding

12  authenticity?

13     A    Yes.

14     Q    And was that also in 2015?

15     A    Yes.

16     Q    Would you have read all the guidelines

17  regarding from Amazon in 2015?

18     A    Yes.

19     Q    Would you have read them again thereafter?

20     A    I don't recall.

21     Q    You only recall reading them in 2015?

22     A    Correct.

23     Q    And as you sit here today can you tell me if

24  you had saved copies for your employees to review those

25  guidelines?



1       A    I don't recall if we have them saved.

2       Q    Did you instruct your employees at Solu-Med to

3   review the Amazon guidelines before posting and selling

4   products on Amazon?

5       A    No.

6       Q    More specifically, did your -- did Solu-Med

7   and its employees review the guidelines of Amazon

8   regarding authenticity, counterfeit products and selling

9   hair and makeup before it sold Youngblood products on

10  its Amazon storefront in 2018?

11      A    Can you ask the question again?

12      Q    Yes.  In 2018 Solu-Med sold Youngblood

13  products?

14      A    Yes.

15      Q    Okay.  On its storefront, right?

16      A    Yes.

17      Q    Okay.  Prior to posting and listing those

18  products did someone from Solu-Med re-review the

19  guidelines regarding authenticity?

20      A    You're saying specifically in 2018?

21      Q    Yes.

22      A    No.

23      Q    Did they review them regarding counterfeit

24  items?

25      A    No.



1      Q     Regarding the Seller Code of Conduct?

2      A     No.

3      Q     Regarding the sale of hair and makeup?

4      A     No.

5      Q     And we'll get to a couple of the others.

6            When you had -- strike that.  When someone put

7   an item to be sold on Solu-Med's storefront on Amazon,

8   who was the individual responsible in 2018 to post it on

9   Amazon?

10     A     That would have been Adam Weinstein.

11     Q     And when did Adam Weinstein leave Solu-Med?

12     A     2018.

13     Q     When in 2018?

14     A     December 2018.

15     Q     Why did he leave in December of 2018?

16     A     I believe he was let go.

17     Q     Do you know why he was let go?

18     A     I think it was because -- actually I'm not, I

19   don't recall exactly what the specifics were.

20     Q     Well, you were the manager so you were the

21   boss; did you terminate him?

22           MS. BLACK:  Form.

23   BY MR. VINE:

24     Q     You were the boss of Adam Weinstein, correct?

25     A     I was not the manager of Solu-Med at that



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                     29

1    point.

2        Q    Okay.  When did you become the manager of

3    Solu-Med?

4        A    Well, I was managing it in 2018, Cheri Seidle

5    had responsibilities for Solu-Med as well.

6        Q    Do you know why?

7        A    I don't recall exactly.

8        Q    Do you know generally why?

9        A    I think it was because of reduction of our

10   sales because of the issues we had with our account.

11       Q    In December '18?

12       A    Yes.

13       Q    Did it have to do with poor performance?

14            MS. BLACK:  Form.

15            THE WITNESS:  I'm not aware.

16   BY MR. VINE:

17       Q    Have you spoken to Adam Weinstein since he has

18   left?

19       A    Yes.

20       Q    When was the last time you have spoken to him?

21       A    I don't recall exactly.

22       Q    What did you guys talk about?

23       A    Just how he's doing.

24       Q    Do you know where he is?

25       A    In Broward County somewhere.



1      Q    Do you know what job, where he's working?

2      A    Oh, I don't know exactly, I just know he had a

3  job working.  I know he's working, so that's about it.

4      Q    Okay.  But you can't tell me where he is

5  working?

6      A    I don't know specifics, no.

7      Q    When was the last time you spoke to him?

8      A    I don't recall.

9      Q    Was it in the year 2019?

10     A    Yes.

11     Q    Cheri Seidle doesn't work at Q Med anymore,

12 correct?

13     A    That's correct.

14     Q    And when was the last time you spoke to her?

15     A    The last time I spoke to her would have been

16 in June 2019 I believe.

17     Q    Is that when she left?

18     A    Yes.

19     Q    Do you know why she left?

20     A    She was also let go.

21     Q    She worked at Q Med, correct?

22     A    Yes.

23     Q    I'm waiting for a document, this is an Exhibit

24 that I need, okay.

25          You set up the storefront on Amazon, correct?



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      31

```
 1        A    Yes.

 2        Q    Okay.  And then Adam would be the one charged

 3   with the responsibility of putting the products on the

 4   website?

 5        A    Yes.

 6        Q    Okay.  Did you provide any training to Adam?

 7        A    We --

 8        Q    I asked if you did.

 9        A    Yes.

10        Q    What was the training that you did?

11        A    Basically the way that we would list the

12   products, the setup of the products, things like that.

13        Q    Did you give him a copy of all the Amazon

14   guidelines?

15        A    A copy, no.

16        Q    Do you know if he -- do you have specific

17   knowledge if he read the Amazon guidelines?

18        A    Specific knowledge, no.

19        Q    Did you direct him to read it, the Amazon

20   guidelines?

21        A    No.

22        Q    So do you know what a, let me get the Exhibit

23   for you so I don't butcher it, an ASIN is; do you know

24   what an ASIN is?

25        A    Yes.
```



KELLON GOODSON                                      January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                        32

1       Q    What is an ASIN?

2       A    It's the Amazon, Amazon listing number or SKU

3    that they use for their listings.

4       Q    So they can match up the product, correct?

5       A    Correct.

6       Q    And each ASIN has a product page that when you

7    list something you sell it must match up, correct?

8       A    Yes.

9       Q    And you agree with me it was Solu-Med's or

10   Life & Health Source responsibility to make sure that

11   any product they listed must be matched to the ASIN?

12      A    Specifically on the Amazon listing, yes.

13      Q    And if it didn't it would be a violation of

14   Amazon guidelines, correct?

15      A    Yes.

16      Q    Prior to acquiring Youngblood products, and I

17   think we -- in 2018 do you recall specifically reviewing

18   the selling -- strike that.

19           Prior to acquiring Youngblood products did you

20   review the selling policies and Seller Code of Conduct

21   as posted in Amazon Seller Central System in 2018?

22      A    2018?

23      Q    Yes.

24      A    I don't specifically remember.

25      Q    In 2017 did you do it?



 1      A    I don't specifically remember.

 2      Q    2016?

 3      A    Again, specifically I don't remember.

 4      Q    You only remember 2015, correct?

 5      A    Correct.

 6      Q    Okay.  You're familiar that there are selling

 7  policies and Seller Code of Conduct, correct?

 8      A    Yes.

 9      Q    Did you or people at Solu-Med review these

10  items before acquiring the Youngblood products?

11           MS. BLACK:  Form.

12           THE WITNESS:  It would have been in 2015?

13  BY MR. VINE:

14      Q    In 2018.

15      A    No, not in 2018.

16      Q    In 2017?

17      A    Not that I am aware of.

18      Q    Okay.  Prior to listing them were the

19  practices of the selling policies and Seller Code of

20  Conduct followed -- strike that.

21           Prior to listing the Youngblood products sale

22  in 2018, were these practices followed?

23      A    Can you say it again?

24      Q    Yes.  Prior to listing the Youngblood products

25  in 2018, do you have specific knowledge as to whether



1  the selling policies and Seller Code of Conduct were

2  followed in 2018 as it relates to the Youngblood

3  products?

4      A    We would have followed the guidelines that we

5  read in 2015 I am assuming.

6      Q    So you would know, you said you assume, so you

7  don't, do you have specific knowledge that you can

8  recall?

9      A    I don't have specific knowledge.

10     Q    Okay.  I think we talked about this, but I

11  want to make sure we understand.

12          Did you complete Amazon Seller University

13  training entitled Best Practices in Product Authenticity

14  and Quality prior to acquiring Youngblood products and

15  listing them for sale on Amazon?

16     A    I don't remember.

17     Q    Did anyone at Solu-Med attend Best Practices

18  in Product Authenticity and Quality at Amazon Seller

19  University?

20     A    I am not aware.

21     Q    When you say you're not aware, you didn't do

22  that, correct?

23     A    I'm saying I don't remember which ones we

24  watched, so I don't have any specifics.

25     Q    Sir, I didn't ask that if you watched



 1  something, I asked if you attended Amazon Seller

 2  University?

 3      A    I want to be specific, so because these were

 4  usually like webinars, things like that.

 5           Are you saying there's actually a class

 6  training?  I want to be specific about that.

 7      Q    Well, you only recall watching a video

 8  regarding distribution, correct?

 9           MS. BLACK:  Form.

10  BY MR. VINE:

11      Q    No, package and distribution, that's what you

12  stated earlier?

13      A    Correct, those are the ones I specifically

14  remember.

15      Q    Okay.  And you don't recall any others,

16  correct?

17      A    Correct.

18      Q    Okay.  And I'm asking do you ever remember

19  attending a webinar or anything regarding Amazon

20  Seller's University's training?

21      A    I don't specifically remember.

22      Q    Did you ever receive a certificate from Amazon

23  acknowledging your attendance or anyone's attendance

24  from Amazon Seller University?

25      A    Not that I am aware of, no.



1      Q    Did Adam Weinstein before he started listing

2   products on Amazon attend the Amazon Seller University?

3      A    I am not sure.

4      Q    Did you direct him as his manager to do that?

5      A    No, I did not.

6      Q    Why not?

7      A    I don't remember honestly.

8      Q    So it was your decision to purchase Youngblood

9   products, correct?

10     A    Yes.

11     Q    Do you recall who you purchased Youngblood

12  products from?

13     A    The distributor was Innopex.

14     Q    Is that the only one you purchased it from?

15     A    Yes.

16     Q    And who at Innopex was your contact?

17     A    Joel, I can't pronounce his last name,

18  Milapinski.

19     Q    And do you recall your conversations with him

20  regarding the Youngblood products?

21     A    I don't.

22     Q    Did he tell you where he got the products

23  from?

24     A    He did not.

25     Q    Did he tell you if the products came with a



KELLON GOODSON                                            January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                          37

1   warranty or not?

2        A    I don't think so.

3        Q    Okay.  Did you ask him if the products come

4   with a warranty?

5        A    I don't recall.

6        Q    Are you aware if the products came with a

7   warranty?

8        A    No.

9        Q    Why did you decide to purchase the Youngblood

10  products?

11       A    When the account was growing and we were

12  looking into new product lines to start, we looked at it

13  as an opportunity to expand into makeup.

14       Q    But why Youngblood?

15       A    It was a product line that was offered to us

16  through distribution.

17       Q    But why specifically the Youngblood line if

18  you can recall?

19       A    I don't recall.

20       Q    Was it because it was a luxury item?

21       A    I think it was specifically just to try to

22  expand into makeup.

23       Q    Okay.  Did Innopex sell you other products?

24       A    Yes.

25       Q    Did you ever receive a complaint from Amazon



1  on any of the other products that you received from

2  Innopex?

3      A    I don't recall.

4      Q    You're aware that Solu-Med in, just in the

5  year 2018, received eight prior complaints regarding the

6  products it was selling before the complaint at issue,

7  correct?

8      A    As far as Youngblood specifically?

9      Q    There was a complaint in 2018, November of

10  2018 --

11     A    Right.

12     Q    -- Regarding the sale of Youngblood products,

13  correct?

14     A    Correct.

15     Q    Prior to that Solu-Med was notified about

16  selling other products and complaints relating to those

17  other products about eight times in the year of 2018

18  before the sale -- before the complaint in November of

19  2018, correct?

20     A    Correct.

21     Q    Were any of those products, non-Youngblood

22  products, come from Innopex?

23     A    I'm not aware.

24     Q    You don't know one way or the other?

25     A    No, I don't know.



1     Q    Did you purchase, you being Solu-Med, did

2   Solu-Med purchase other products from Innopex?

3     A    Yes.

4     Q    What other products did you sell?

5     A    Hair and beauty and skin care products mainly.

6     Q    What steps did you take to verify the

7   condition and authenticity of the Youngblood products

8   prior to listing them for sale on the Amazon storefront,

9   what were the specific steps?

10    A    So when we receive the product a employee

11  would receive the products in, break down the order and

12  look at the products and view the actual physical

13  product.

14         Then the product would be viewed on listing

15  online, so Amazon's listing on ASIN, and the product

16  would be photographed and we would compare the product

17  that we have in the photograph to what was on the Amazon

18  listing to see that the item matched, and that there was

19  a UPC match to the item that we had compared to the ASIN

20  that was listed on Amazon.

21    Q    Anything else?

22    A    No, not that I am aware of.

23    Q    Did you ask for the sourcing information from

24  Innopex?

25    A    No.



1     Q      Did you ask where they purchased the product

2   from?

3     A      No.

4     Q      Did you ask for any publications or warranty,

5   written warranty information from the manufacturer?

6     A      No.

7     Q      Did anyone from Solu-Med reach out to

8   Youngblood to verify that you were allowed to sell their

9   product?

10    A      No.

11    Q      Did anyone from Solu-Med verify with

12  Youngblood whether the product came with a warranty?

13    A      No.

14    Q      Did anyone from Solu-Med ever look at the

15  website of Youngblood prior to the complaint in 2018?

16    A      Not that I am aware of.

17    Q      Did Solu-Med employees open the packaging to

18  look at the product?

19    A      There was product, there were products that we

20  would open to look at.

21    Q      So you broke the seal?

22    A      We would break a seal to look at one of the

23  products inside to see what it looked like.

24    Q      Did you resell the one that you broke the seal

25  on?



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                    41

```
 1       A     No.

 2       Q     Okay.  Did Solu-Med put its own SKU label on

 3  the product?

 4       A     There is an Amazon ASIN label that is required

 5  to put on products that are listed through Amazon's

 6  Prime FBA system that Amazon requires you to put on, but

 7  we do not specifically put on a Solu-Med label or

 8  relabel any products.

 9       Q     Okay.  Do you put that Amazon label over the

10  SKU of the Youngblood product?

11       A     Over the bar code, which is Amazon's

12  requirement.

13       Q     Where in Amazon does it say that you are

14  supposed to put it over Youngblood's bar code?

15       A     There were the videos and specifics on the

16  packaging so that Amazon's fulfillment center didn't

17  confuse on the scanning the bar code, that they are just

18  scanning their ASIN label.

19       Q     So if their guidelines say that you're not

20  supposed to cover the SKU from the manufacturer, those

21  guidelines are wrong?

22             MS. BLACK:  Form.

23             THE WITNESS:  It would have been whatever

24       Amazon said, told us to do.

25       (BY Mr. Vine)
```



800.211.DEPO (3376)
EsquireSolutions.com

1    BY MR. VINE:

2        Q    So are you a hundred percent sure they told

3    you to put the Amazon label over the bar code of

4    Youngblood's SKU?

5        A    That was the specifics back at the time.  I'm

6    not aware of what it is now to be honest.

7        Q    Was that what was valid in 2018?

8        A    Again, I'm not aware of what the updates were

9    in 2018.

10       Q    Because you didn't review anything since 2015,

11   correct?

12       A    I'm not aware.

13       Q    You're not aware of reviewing anything since

14   2015?

15       A    That is correct.

16       Q    What specific information did you submit to

17   Amazon regarding Solu-Med's offering of Youngblood's

18   products for sale?

19       A    Can you say that again?

20       Q    What specific information did Solu-Med submit

21   to Amazon regarding Solu-Med's offering of Youngblood's

22   products for sale?

23       A    So the way that it works is an item is, like I

24   said, matched up in the UPC system.

25       Q    Right.



1      A     Then the listing basically links in with the

2    existing information that's already on Amazon.

3            MS. BLACK:  Can we take a brief break?

4            MR. VINE:  Yes, okay.

5            MS. BLACK:  Is that okay?

6            MR. VINE:  Okay.  That's fine.

7            MS. BLACK:  Sorry.

8            THE VIDEOGRAPHER:  We are going off the video

9       record 8:55 a.m.

10           (Whereupon, a short recess was had.)

11           THE VIDEOGRAPHER:  We are back on the video

12      record 9:01 a.m.

13   BY MR. VINE:

14     Q     We were talking about what specific

15   information did Amazon receive from Solu-Med before it

16   listed Youngblood products, and you've indicated that

17   you would try to match up the ASIN page, that wasn't my

18   question.

19           My question is what did Solu-Med submit to

20   Amazon regarding the products that were sold, if you

21   know?

22     A     The price that we'd would sell it at, and the

23   quantity that was sought.

24     Q     Did you also advise that you were selling the

25   product as new?



1      A    Yes.

2      Q    Did you also advise whether there would be a

3  warranty?

4      A    That was not part of the data submittal that

5  Amazon asked for.

6      Q    Are you aware that if a product is listed as

7  new it must come with the warranty?

8      A    I wasn't aware of that.

9      Q    It's true that -- strike that.

10          Did Life & Health Source at Solu-Med accept

11  returns on Youngblood products?

12     A    Yes.

13     Q    Are you aware that the Life & Health Source

14  storefront indicated that it would not accept return or

15  exchanges on personal hygiene items, hair care,

16  cosmetics, fragrance, skin care or toys?

17     A    Yes, there were some parameters that we put in

18  place for some returns.

19     Q    So makeup would fall within those categories,

20  correct?

21     A    Correct.

22     Q    Okay.  Youngblood products were makeup,

23  correct?

24     A    Correct.

25     Q    And on the Life & Health Source storefront



1   it's stated on the Amazon website that it would not

2   accept returns for exchanges for those products,

3   correct?

4        A    Correct.

5        Q    Okay.  Yet you would still accept them?

6        A    So I want to make a specific statement to

7   that.

8             There is a requirement that when you sell

9   items on Amazon that you adhere to their return policy.

10            Youngblood's products were sold through

11  Amazon's FBA Prime program so they were all able to be

12  returned to Amazon.

13       Q    Then why did you tell the public that you

14  wouldn't accept it?

15       A    There were items that were not accepted as

16  returns because of some guidelines around usage of the

17  product, things like that, that we could not accept, so

18  we did put that statement out there to make sure that

19  there were people not using the products and trying to

20  return them and things like that that were not valid.

21       Q    But what you stated on the store -- well, why

22  don't I look at the Exhibit.

23            (Whereupon, the below referred to document

24       was marked as Defendant's Exhibit No. 1.)

25



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      46

```
 1   BY MR. VINE:
 2        Q    We will mark as Exhibit 1 to the deposition a
 3   copy of the Life & Health Source Storefront page.
 4             Have you seen this document before?
 5        A    Yes, I have.
 6        Q    Okay.  Did you draft this document?
 7        A    No.
 8        Q    Who drafted it?
 9        A    Adam Weinstein did.
10        Q    Okay.  So do you see the bold section where it
11   says Due to Federal regulations we are unable to accept
12   returns or exchanges on personal hygiene items, hair
13   care, cosmetics, fragrance, skin care or toys?
14        A    Yes.
15        Q    So this is a representation to the public that
16   you will not accept any returns or exchanges on
17   cosmetics, correct?
18        A    Correct.
19        Q    Who directed Adam to put that in there?
20        A    I did.
21        Q    Okay.  Who directed you to put that in there?
22        A    It was basically reading some information
23   about items that could be returned or issues receiving
24   items back through the postal service or things like
25   that.
```



KELLON GOODSON                                             January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                            47

1        Q    Okay.  So you're making a representation to

2   the public that's not accurate, correct?

3        A    Well, we would try to be as accurate as

4   possible.  We didn't want to accept things that would be

5   potentially a HAZMAT item, things like that in returns

6   back.

7        Q    Right.  But and then Mr. Aguero testified that

8   the reason, one of the reasons why you put this on there

9   was because you wanted to discourage returns?

10            MS. BLACK:  Form.

11   BY MR. VINE:

12        Q    Isn't that correct?

13        A    Well, we wanted to try and mitigate the amount

14   of people that potentially using the products and then

15   sending it back saying it wasn't -- they weren't, they

16   didn't want to use it anymore.

17        Q    That was one of the reasons why you put that

18   there, correct?

19        A    Correct.

20        Q    Okay.  So you wanted to discourage returns,

21   correct?

22        A    Correct.

23        Q    And you told them that you wouldn't accept

24   returns, correct?

25        A    Correct.



1       Q    Yet in reality you had to accept returns,

2    that's your statement under oath?

3            MS. BLACK:  Form.

4            THE WITNESS:  So I want to be specific, there

5        are items that were sold through the FBA program

6        that were under Amazon's terms in how they accept

7        the returns.

8            Well, this was what we were accepting through

9        our own fulfillment or our own selling directly to

10       the customer.

11           Amazon has its own return policy so.

12   BY MR. VINE:

13       Q    So that's what I understood because I thought

14   what you said earlier is you had to accept returns;

15   that's not true, correct?

16       A    Amazon FBA they would accept returns.

17       Q    What is FBA so that the ladies and gentlemen

18   of the jury know?

19       A    Fulfillment by Amazon, which is the program

20   where inventory that was, Solu-Med inventory would go to

21   an Amazon fulfillment center, and they would be

22   responsible for the fulfillment of those products that

23   they would ship it directly to the customer, and the

24   items would also be if they were returns they would

25   handle customer service, and they would handle any type



 1   of exchanges, things like that, but we were not involved

 2   in that process because Amazon handles that 100 percent.

 3        Q    Okay.  But what we're talking about is not the

 4   FBA program, correct?

 5            MS. BLACK:  Form.

 6            THE WITNESS:  Youngblood products were sold

 7        through the FBA program, so that's where I wanted

 8        to bring that into the answer.

 9   BY MR. VINE:

10        Q    So what was this bold, not relating to the FBA

11   program?

12        A    Correct, these were items that would be sold

13   directly to the customer returned to the Solu-Med

14   warehouse where we would accept the returns.

15        Q    So not everything on the storefront was sold

16   through the FBA program?

17        A    Correct.

18        Q    And all Youngblood products were sold through

19   the FBA program?

20        A    Correct.

21        Q    So Amazon required the acceptance of it,

22   correct?

23        A    Correct.

24        Q    Yet do you distinguish on your storefront that

25   through the FBA program we would accept cosmetics?



 1        A     No, we do not.

 2        Q     So the public doesn't know that Amazon -- that

 3   Life & Health Source would accept returns --

 4              MS. BLACK:  Form.

 5   BY MR. VINE:

 6        Q     -- Because you don't distinguish that,

 7   correct?

 8              Let me ask you this, did Solu-Med make the

 9   public aware that the Youngblood products could be

10   accepted as a return?

11              MS. BLACK:  Form.

12              MR. VINE:  What's the form with that, does

13        Solu-Med know?  I mean did Solu-Med tell the

14        public, what is the form problem with that?

15              MS. BLACK:  No, there's no problem.

16              MR. VINE:  Okay.

17              THE WITNESS:  Sorry, can you say it again?

18   BY MR. VINE:

19        Q     Does Solu-Med inform the public that

20   Youngblood products couldn't be returned?

21        A     Specifically Youngblood, no.

22        Q     Any product, any cosmetic products that can be

23   returned, does Solu-Med inform the public?

24        A     Solu-Med, no.

25        Q     On its storefront does Life & Health Source



1    inform the public?

2         A    No.

3         Q    You can put that aside.

4              What steps did you take, being Solu-Med, to

5    verify that the Youngblood products you were reselling

6    met Amazon's definition of new?  Met Amazon's definition

7    of new?

8         A    That would have been the process of receiving

9    them in and viewing the comparison of the item that we

10   received versus what was listed on Amazon's ASIN.

11        Q    Anything else?

12        A    No.

13        Q    Would you review the definition of new?

14        A    No.

15        Q    And you didn't investigate whether the product

16   had a manufacturer or any warranty that would apply?

17        A    No.

18        Q    And you didn't ask that question from the

19   supplier, correct?

20        A    No.

21        Q    I'm correct you didn't ask that question?

22        A    Correct.

23        Q    Right?

24        A    Correct.

25        Q    And you didn't ask that question of



1  Youngblood, correct?

2      A    Correct.

3      Q    And did you speak to Youngblood about the

4  customer support needed for its products?

5      A    Sorry, say that again?

6      Q    Did you speak to Youngblood about the customer

7  support or customer services needed for its product?

8      A    No.

9      Q    Meaning how to apply the type of product?

10     A    No.

11     Q    What type of ingredients were included in the

12 product if not listed?

13     A    No.

14     Q    How it was manufactured?

15     A    No.

16     Q    So how would Life & Health Source be able to

17 answer the customer support service questions like that?

18     A    As far as the application of the product?

19     Q    As far as the application of the product.

20     A    I'm not aware.

21     Q    Couldn't do it, right?

22         MS. BLACK:  Form.

23         THE WITNESS:  No, there would be nothing that

24     we would offer specifically on how to use the

25     product.



1  BY MR. VINE:

2      Q    Okay.  What about how the product was

3  manufactured?

4      A    Can you be more specific?

5      Q    What about that question do you not

6  understand?

7          MS. BLACK:  Form.

8          THE WITNESS:  I guess can you restate it?

9  BY MR. VINE:

10     Q    Sure.

11     A    Okay.

12     Q    Okay.  How could you answer the question on

13  how the Youngblood product was manufactured?

14     A    We wouldn't.

15     Q    Okay.  You didn't have that information,

16  correct?

17     A    We wouldn't answer those questions anyway.

18     Q    So you couldn't provide customer service or

19  support in those two areas, correct?

20     A    Correct.

21     Q    What information in your listing did you

22  include regarding the original warranty?

23     A    We matched up to existing ASINs so we provided

24  no information.

25          Whatever information existed on the listing is



1   what we would have used.

2        Q    But you weren't selling the product with a

3   warranty, correct?

4        A    No.

5        Q    I'm correct?

6        A    Correct, correct.

7        Q    At some point you received an intellectual

8   property notification from Amazon regarding a Youngblood

9   issue, correct?

10       A    Correct.

11       Q    Did you review Amazon's intellectual property

12  policy at that time?

13       A    Yes.

14       Q    What about all the prior eight complaints?

15       A    Yes, we reviewed the intellectual property

16  specifications.

17       Q    Which ones?

18       A    Related to counterfeit products.

19       Q    So you would review it then?

20       A    Yes.

21       Q    And authenticity?

22       A    Yes.

23       Q    Are you guessing or you have specific

24  knowledge that you did?

25       A    I don't specifically know dates, but we did



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      55

 1  review it.

 2        Q    In 2018?

 3        A    I don't remember the specific dates.

 4        Q    I know you told me you reviewed the guidelines

 5  in 2015.

 6        A    Correct.

 7        Q    In 2018 when you received various

 8  notifications regarding various complaints of the

 9  products you were selling, do you have specific

10  recollection of you personally reviewing the

11  intellectual property policies at Amazon in 2018?

12        A    I don't have the specifics, no.

13        Q    Okay.  Do you have a specific recollection of

14  Adam Weinstein telling you that he reviewed them?

15        A    Not specifically, no.

16        Q    What steps did you take to verify the

17  condition of the product as new and authentic of the

18  Youngblood products when you received the notice from

19  Amazon?

20        A    It would have been the process of opening the

21  product, reviewing the product and the listing on the

22  Amazon listing.

23        Q    That's what you would have done?

24        A    Yes.

25        Q    When you got the notice?



 1        A    Yes.

 2        Q    And do you have a specific recollection of

 3   doing that as it relates to the Youngblood product?

 4        A    I don't specifically remember.

 5        Q    Okay.  So you were just guessing just now?

 6             MS. BLACK:   Form.

 7   BY MR. VINE:

 8        Q    Do you have a specific recollection of

 9   actually instructing someone when you received the

10   notice regarding the Youngblood product violation of

11   taking those steps?

12        A    I don't specifically recall.

13        Q    Do you know generally if you told somebody to

14   do that?

15        A    Generally we would do that.

16        Q    Not whether you would do that; generally do

17   you have a recollection of doing that?

18        A    Yes, there were times when we would -- sorry.

19        Q    Do you have a general recollection when the

20   Youngblood violation came in, meaning the notice of

21   violation to Solu-Med, that you instructed somebody to

22   verify the authenticity and new condition of the

23   Youngblood product?

24        A    When the Youngblood, when the Youngblood

25   complaint came in I don't specifically remember, no.



1       Q    You understand that it's a violation from

2  Amazon when the listing is materially different than the

3  product sold, correct?

4       A    Yes.

5       Q    That's one of the items, material difference,

6  right?

7       A    Yes.

8       Q    And you know that a product that is being sold

9  that is listed as new must come with a warranty,

10  correct?

11            MS. BLACK:  Form.

12            THE WITNESS:  Are we speaking specifically or

13       generally about?

14  BY MR. VINE:

15       Q    Generally are you aware if it's listed as new

16  it should include the warranty if it were in like new

17  condition?

18       A    I wasn't aware of that, no.

19            (Whereupon, the below referred to documents

20       were marked as Defendant's Exhibit No. 2.)

21  BY MR. VINE:

22       Q    Marked as Exhibit 2 is the Condition

23  guidelines from Amazon.

24            Have you ever seen this document before?

25       A    Yes.



 1       Q    When was the last time you saw this?

 2       A    2015.

 3       Q    So you have specific recollection of reviewing

 4  these guidelines in 2015?

 5       A    Yes.

 6       Q    Okay.  And can you read what the general

 7  Condition guidelines state regarding new?

 8       A    Just like it sounds.  A brand-new item.

 9  Original manufacturer's warranty, if any, still applies,

10  with warranty details included in the listing comments.

11  Original packaging is present for most New items but

12  certain items like shoes may be re-boxed.

13       Q    Do you see here this definition of new?

14       A    Yes.

15       Q    Youngblood products were listed as new?

16       A    Yes.

17       Q    And you already testified earlier that they

18  did not come with a warranty, correct?

19       A    Correct.

20       Q    Okay.  Do you see how that a Youngblood

21  product cannot be sold as new on Amazon unless it comes

22  with the warranty?

23            MS. BLACK:  Form.

24  BY MR. VINE:

25       Q    This is all new to you, right?  No pun



 1   intended.

 2          MS. BLACK:  Form.

 3          THE WITNESS:  Correct.

 4   BY MR. VINE:

 5      Q    Okay, you can put that aside.

 6          Had you known that Youngblood products came

 7   with a warranty, were supposed to come with a warranty

 8   if sold as new, would you have sold them as new on

 9   Amazon?

10          MS. BLACK:  Form.

11          THE WITNESS:  Can you say again, I'm sorry?

12   BY MR. VINE:

13      Q    You have already testified that you were

14   unaware that the Youngblood products came with a

15   warranty, are supposed to come with a warranty, correct?

16      A    Correct.

17      Q    Okay.  And you also testified that the

18   Youngblood products were listed as new, correct?

19      A    Correct.

20      Q    Okay.  Had you known and, sorry, and you see

21   from the General condition guidelines that if you're

22   listing it new it must come with that warranty, correct?

23      A    Correct.

24      Q    And you have already testified that the

25   Youngblood products you sold did not come with a



1  warranty, correct?

2      A    Correct.

3      Q    Had you known that it was supposed to come

4  with a warranty would you have listed the products as

5  new?

6      A    I honestly don't know what I would have done

7  at that point.

8      Q    Okay.  Or you would have chosen not to sell

9  the products, correct?

10     A    Maybe, I'm not sure.

11     Q    Do you see how it's a violation of the

12  guidelines by listing it new and not selling it with the

13  warranty?

14          MS. BLACK:  Form.

15  BY MR. VINE:

16     Q    You can answer.

17     A    Can you say it again?

18     Q    Sure.  After reviewing the guidelines and

19  listening to your testimony do you see how listing the

20  product as new when it doesn't come with a warranty is a

21  violation of the condition guidelines?

22          MS. BLACK:  Form.

23  BY MR. VINE:

24     Q    You can answer.

25     A    Yes.



1       Q     Okay.  Put that aside.

2             Mark as Exhibit 2 is Program Policies

3    regarding Cosmetics & Skin Care and/Hair Care from

4    Amazon.

5             Have you seen this guideline before?

6       A     Yes.

7       Q     When did you see this?

8       A     2015.  In 2015.

9       Q     So you would not have seen this at the time

10   you were selling the product, the Youngblood product in

11   2018?

12      A     Not that I am aware of.

13      Q     Okay.  Do you see that all cosmetics and skin

14   care products must be sold as new?

15            If you look under Packaging, Number 2

16   Compliance Checklist?

17      A     Yes.

18      Q     It says cosmetics must be new?

19      A     Yes.

20      Q     So if you're selling Youngblood products they

21   must be sold as new, correct?

22      A     Yes.

23      Q     And in order to sell Youngblood products as

24   new it must come with a warranty, correct?

25      A     According to the Amazon terms of services,



 1   yes.

 2        Q    And Solu-Med wasn't doing that, correct?

 3             MS. BLACK:  Form.

 4   BY MR. VINE:

 5        Q    You can answer.

 6        A    Can I have a minute to review this?

 7        Q    Yes, go ahead.  My question, though, was

 8   Solu-Med wasn't selling the product with a warranty,

 9   correct?

10        A    Correct.

11        Q    I will give you a second to look at that.

12             I have given you an opportunity, correct?

13        A    Yes.

14             (Whereupon, the below referred to documents

15        were marked as Defendant's Exhibit No. 3.)

16   BY MR. VINE:

17        Q    It should be, just for the record so it's not

18   confusing, the Cosmetics & Skin Care/Hair Care policy

19   from Amazon is Exhibit 3.

20             I just want to make sure, because I wrote 2,

21   but I assume I said 3, okay, great.

22             (Whereupon, the below referred to documents

23        were marked as Defendant's Exhibit No. 4.)

24   BY MR. VINE:

25        Q    Marked as Exhibit 4 is Amazon's Product



1   Authenticity and Quality guidelines.

2           Are you familiar with these guidelines?

3       A   Yes.

4       Q   And these are the ones you would have seen in

5   2015?

6       A   Correct.

7       Q   Would you have seen these at the time in 2018

8   when you were selling the Youngblood product?

9       A   I am not aware.

10      Q   You're not aware doing that, correct?

11      A   I'm not aware of doing that, no.

12      Q   Okay.  Do you want to take an opportunity to

13  look at it?

14      A   Yes.

15      Q   Okay, sure, go ahead.

16      A   Okay.

17      Q   You have had an opportunity to review the

18  Product Authenticity and Quality guidelines from Amazon,

19  correct?

20      A   Yes.

21      Q   And do you see on the top left hand corner,

22  like you have seen on Exhibit 2 and 3, here on Exhibit 4

23  it all talks about Amazon Seller Central, correct?

24      A   Yes.

25      Q   Okay.  And you knew where that was located on



1  Amazon?

2       A    Yes.

3       Q    And when you listed the Youngblood products,

4  we already talked about that you didn't review this for

5  at least three years, correct?

6       A    Yes, not that I am aware.

7       Q    And in fact you're not aware of Adam reviewing

8  it, correct?

9       A    I'm not aware of it, no.

10       Q    Do you see under materially different product

11  condition violation; do you see that?

12       A    Yes.

13       Q    Okay.  There's intellectual property violation

14  and materially different product violation, correct?  Do

15  you see these?

16       A    Yes.

17       Q    Those are the two bullet points, right?

18       A    Yes, uhm-hum.

19       Q    And if you go above it it says Types of

20  violations, correct?

21       A    Correct.

22       Q    And do you see where it says violations

23  related to product authenticity?

24       A    Correct.

25       Q    So if a product is inauthentic or there's a --



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      65

```
 1   strike that.
 2          What did you understand Amazon was saying when
 3   it said violations related to product authenticity?
 4          MS. BLACK:  Form.
 5   BY MR. VINE:
 6      Q    Based upon this document?
 7          MS. BLACK:  Form.
 8          MR. VINE:  What's the form?
 9          MS. BLACK:  Do you want me to say?
10   BY MR. VINE:
11      Q    What was his understanding based upon this
12   document?
13          MS. BLACK:  But you are assuming this document
14      was in place prior to the purchase of the
15      Youngblood products, which is the problem with all
16      these documents, which is going to be the --
17          MR. VINE:  He already indicated that he
18      reviewed them in 2015.
19          MS. BLACK:  He may have reviewed a policy, but
20      the identical policy?
21          MR. VINE:  That's not what he said.
22          MS. BLACK:  No, that's what you said.
23          MR. VINE:  No, I asked him if he reviewed
24      this.
25          MS. BLACK:  Okay.  We will argue about it
```



KELLON GOODSON                                        January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                          66

```
 1        later, that's why I asked you do you want me to
 2        explain.
 3   BY MR. VINE:
 4        Q    Okay.  Go ahead.
 5        A    I'm sorry, can you repeat the question?
 6        Q    Sure.  You have now reviewed this a second
 7   time, correct?  The first time in 2015, correct?
 8        A    Correct.
 9        Q    Okay.  Now, what is your understanding
10   relating, based upon this document about violations
11   related to product authenticity based upon this
12   document?
13             If you would like you could read that section,
14   it says violations.
15        A    Yes, I'm reading that section again.  That the
16   items cannot be materially different.
17        Q    Okay.  And that authenticity issues are
18   considered intellectual property violations, correct?
19        A    No.
20        Q    You don't see that?
21        A    Intellectual property and materially different
22   are two different violations.
23        Q    Look under where it says Types of violations.
24        A    Right.
25        Q    And then the second sentence, why don't you
```



 1   read that out loud for the ladies and gentlemen of the
 2   jury.
 3        A    The intellectual property violation?
 4        Q    No, once again where it says Types of
 5   violations.
 6        A    Right.
 7        Q    And then there is a paragraph before that
 8   section that says Amazon enforces sellers who violate
 9   our selling policies.
10        A    Right.
11        Q    Why don't you read that next sentence.
12        A    Violations related to product authenticity are
13   categorized as intellectual property violations.
14        Q    Okay.  Then read the next sentence.
15        A    Issue with the overall product quality,
16   including products that do not match their descriptions,
17   can be categorized as "materially different" violations.
18        Q    Okay.  So authenticity issues are
19   characterized as intellectual property violations,
20   correct?
21        A    Yes, violations related to product
22   authenticity are categorized as intellectual property
23   violations.
24        Q    Now, let's go to the issue of, and this is all
25   under authenticity guidelines, correct, if you look at



 1  the top, Amazon Product Authenticity and Quality?

 2       A    Yes.

 3       Q    Now, on the materially different product

 4  condition violation, it states that you can't -- it

 5  states that a violation would be listing your product in

 6  new condition when it's not, does not meet the

 7  definition of new, correct?

 8       A    Correct.

 9       Q    Okay, put that aside.

10            In fact we went over the definition of new

11  already, correct?

12       A    Correct.

13       Q    And it has to come with that warranty,

14  correct?

15       A    Correct.

16       Q    And Solu-Med's product was being listed as

17  new, correct?

18       A    Correct.

19       Q    And it didn't come with that warranty,

20  correct?

21       A    The manufacturer warranty, no.

22       Q    It didn't come with any warranty from

23  Youngblood, correct?

24       A    No.

25       Q    Am I correct?



KELLON GOODSON                                                  January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                                    69

```
1        A     You're correct.

2        Q     Okay.

3              (Whereupon, the below referred to document

4        was marked as Defendant's Exhibit No. 5.)

5   BY MR. VINE:

6        Q     Marked as Exhibit 5 is Amazon

7   Anti-Counterfeiting Policy.

8              Have you ever seen this document before?

9        A     Yes, I have.

10       Q     In 2015?

11       A     After 2015 I saw this document.

12       Q     In 2018?

13       A     I am not aware.  I'm not sure if it was 2018.

14       Q     Okay.  But you definitely have seen it before

15  selling Youngblood products?

16       A     Yes.

17       Q     Okay.  Do you see a sentence where it starts

18  failure to abide?

19       A     Yes.

20       Q     Okay.  And the last bullet point above, it

21  says you must provide records about the authenticity of

22  your products if Amazon requests that document, correct?

23       A     Yes.

24       Q     And one of the documents that Amazon would

25  want would be the sourcing documents, correct?
```



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      70

1        A    I am not sure.

2        Q    Okay.  Well, you agree that Amazon requires

3   you to keep the sourcing information from its

4   distributors?

5        A    Say that again?

6        Q    Amazon requires Solu-Med to keep its sourcing

7   information?

8        A    I am not aware of that.

9        Q    Okay.  If you turn to the next page regarding

10  best practices and product authenticity, and do you see

11  the section regarding sourcing your product?

12       A    I'm sorry, what document?

13       Q    The same document you're on, Exhibit 5.

14       A    Okay.

15       Q    The next page it says source.

16       A    Is it on a different document?

17       Q    Exhibit 4, sorry, Exhibit 4 right here, yes.

18            Do you see in Exhibit 4 where it says sourcing

19  your products?

20       A    Yes.

21       Q    Did you review these best practices prior to

22  selling Youngblood products?

23       A    Not that I am aware.

24       Q    Okay.  One of the questions was are you

25  storing documentation of all of your purchases; do you



 1   see that?

 2       A    Yes.

 3       Q    Okay.  And it says keep all documents and

 4   records of transactions, such as POs and invoices

 5   establishing that you sourced products from reliable

 6   suppliers.

 7            Did Solu-Med do that?

 8       A    Did we keep documentation?

 9       Q    That wasn't my question.

10       A    I'm sorry, can you say it?

11       Q    Did you keep sourcing documentation?

12       A    Yes.

13       Q    For all suppliers?

14       A    Correct.

15       Q    Okay.  Do you have specific knowledge or

16   recollection of doing that or are you guessing?

17            MS. BLACK:  Form.

18            THE WITNESS:  On all products, I would not be

19       aware of all products.

20   BY MR. VINE:

21       Q    Do you know if they were kept for the

22   Youngblood product?

23       A    Yes.

24       Q    They were?

25       A    Yes.



KELLON GOODSON                                                   January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                                      72

```
 1        Q    Or did you have to request the documentation
 2   from Innopex after the suit was started?
 3             MS. BLACK:  Form.
 4             THE WITNESS:  As far as our invoicing our
 5        purchases?
 6   BY MR. VINE:
 7        Q    The sourcing information.
 8        A    I'm sorry, say that again?
 9        Q    Okay.  So when this suit ensued did Solu-Med
10   contact Innopex to ask for the sourcing information?
11        A    I'm sorry, I --
12             MS. BLACK:  You're confusing two concepts.
13             MR. VINE:  No, I'm not.
14             MS. BLACK:  Yes, you are.  You read him the
15        policy, he answered the policy.
16             Now you asked a new question, but you're
17        trying to confuse the witness.
18             MR. VINE:  I appreciate that, Ms. Black, but
19        you're entitled to say form.  Thank you.
20             MS. BLACK:  Well, I need to keep the record
21        clear.
22             THE WITNESS:  I want to make sure we are
23        talking about the right documents.
24             The POs and invoices that we had from Innopex,
25        we kept all those documents, yes, correct.
```



1    BY MR. VINE:

2         Q    So you have the POs and the invoices, correct?

3         A    Correct, yes, but I think it states that we

4    needed to have the transactions.

5         Q    Okay.  Did you get any other information from

6    them where they sourced the materials from?

7         A    No, not at the time of the purchase order.

8         Q    What did you determine or verify to determine

9    that Innopex was a reliable supplier?

10        A    That I did personally?

11        Q    Yes.

12        A    I didn't, I wasn't part of that.

13        Q    I thought you were involved in products and

14   sourcing, purchasing and sourcing?

15        A    I was purchasing, yes.

16        Q    Okay.  And you're the one who instructed Q Med

17   to purchase this product, right?

18        A    Correct.

19        Q    What did you do to determine that Innopex was

20   a reliable source?

21        A    I would not have been the one to handle the

22   checking the reliability of Innopex, that would have

23   been someone else in the organization.

24        Q    Who?

25        A    I am not aware.



1    Q    Are you aware if anybody determined whether

2  Innopex was a reliable source or not?

3    A    Someone within Q Med would have done that.

4    Q    Do you have specific knowledge of that?

5    A    Not specific knowledge.

6    Q    Do you know of anyone who did it?

7    A    Again, I'm not aware.

8    Q    Was Innopex a supplier before Solu-Med

9  existed?

10   A    Yes.

11   Q    Okay.  So they sell also medical supplies to

12  you guys?

13   A    Yes.

14   Q    Does Q Med still do business as of the last,

15  your date of employment with Innopex?

16   A    Yes.

17   Q    They're a big supplier?

18   A    I'm not aware of how big they are.

19   Q    Okay.  What -- how were the Youngblood

20  products stored at the Q Med warehouse?

21   A    They would have been in bins, so bins related

22  to each product.

23   Q    Did you follow the manufacturer's instructions

24  on how to store the Youngblood products?

25   A    We kept cosmetics in a specific controlled



1   area that would have been outside of normal warehouse,

2   it would have been temperature controlled, it would have

3   been separate from any other type of product.

4          MR. VINE:  Can you please read back my

5       question?

6          (Whereupon, the above referred to question

7       was read back by the Court Reporter.)

8          MS. BLACK:  Form.

9   BY MR. VINE:

10      Q    Yes or no?

11      A    Specific to Youngblood?

12      Q    Yes.

13      A    No.

14      Q    Did you ask Youngblood how they should store

15  their product, how you should store their product?

16      A    No.

17      Q    Now, you indicated that cosmetics were kept in

18  a separate area of the Q Med warehouse?

19      A    Correct.

20      Q    And Solu-Med did not have their own warehouse,

21  correct?

22      A    Correct.

23      Q    They used the Q Med or warehouse or space

24  within the Q Med warehouse?

25      A    Correct.



1    Q    Okay.  Where in the Q Med warehouse were the

2  cosmetics kept?

3    A    In a temperature controlled area.

4    Q    What was the temperature?

5    A    I'm not exactly aware.

6    Q    Was it within the same warehouse area or was

7  it in a separate room?

8    A    There would have been a separate area in the

9  warehouse.

10   Q    So it was within the same room, but not a

11 separate room, correct?

12   A    No, it was actually a different, there were

13 walls that would separate that from the other areas of

14 the warehouse.

15   Q    Okay.  So there was a separate room, correct?

16   A    Right.

17   Q    Okay.  And what was contained within that

18 separate room?

19   A    Items that needed to be temperature

20 controlled.

21   Q    And what items were they?

22   A    Cosmetics or anything that had stickers that

23 said that they need to be temperature controlled.

24   Q    Okay.  And what was the temperature

25 controlled?



1      A    I'm sorry, say that again?

2      Q    What was the temperature?

3      A    I'm not exactly sure.

4      Q    Who was in charge of that?

5      A    Specifically the person who was in charge of

6   that?

7      Q    What company, was it Solu-Med or Q Med?

8      A    Of the temperature, Q Med.

9      Q    Okay.  Did somebody from Solu-Med instruct the

10   Q Med employees on which products of Youngblood needed

11   to go into that separate controlled area?

12      A    Say that again?

13      Q    Do you have specific knowledge that the

14   Youngblood products were put in that area?

15      A    Yes.

16      Q    Okay.  You observed it with your own eyes?

17      A    Yes.

18      Q    Do you see where it says if you sell branded

19   products on Amazon?

20      A    Which, sorry, which document?

21      Q    We are still on Exhibit 4.

22      A    Okay.

23      Q    And it's on the second page are you confident

24   in the authenticity of the quality of their goods; do

25   you see that best practices question?  Do you see that?



1      A    Which are you --

2      Q    Are you confident?

3      A    -- The second section?  Okay.

4      Q    Are you confident in the authenticity and

5  quality of their goods; do you see that?

6      A    Yes.

7      Q    Okay.  And it says if you sell branded

8  products on Amazon ensure that your source, that you

9  source the product from a reliable supplier, correct?

10     A    Correct.

11     Q    Okay.  Did you ensure that the Youngblood

12  products came from a reliable supplier?

13     A    I knew Innopex to be a reliable supplier.

14     Q    Okay.  But what did you do to verify that they

15  were a reliable supplier?

16     A    Me personally I did not verify that they were

17  a reliable supplier.

18     Q    You say you knew them to be a reliable

19  supplier because they gave you the products on time,

20  correct?

21     A    Correct.

22     Q    Okay.  And the products that they sent to you

23  you matched up to the invoice or the PO, correct?

24     A    Correct.

25     Q    Anything else you can determine that made them



1   a reliable supplier?

2        A    The history they had with Q Med.

3        Q    And when you say "history with Q Med", that

4   means them providing medical supplies?

5        A    Correct.

6        Q    What made them a reliable supplier for

7   cosmetics, if you know anything?

8        A    I'm not aware.

9        Q    So as you sit here today you can't testify

10  that Solu-Med was able to verify that Innopex was a

11  reliable supplier of cosmetics?

12       A    Specifically cosmetics?

13       Q    Yes.

14       A    I'm not aware.

15       Q    Now, it says questions regarding have you

16  considered possible safety concerns with your products;

17  do you see that?

18       A    Yes.

19       Q    Okay.  It says take time to research whether

20  there are any safety testing or compliance requirements

21  for the products that you sell; do you see that?

22       A    Yes.

23       Q    Did Solu-Med do that as it relates to

24  cosmetics?

25       A    To do safety testing?



1      Q    Yes, and compliance requirements for the

2   products you sell?

3      A    No.

4      Q    You can put that aside.

5           Now, I want to go back to Exhibit 5.  It says

6   failure to abide by this policy may result in loss of

7   selling privileges; do you see that?

8      A    Yes.

9      Q    So you understood that if any of the policies

10   that were violated that we've gone over, there would be

11   a chance that the ability to sell specific products or

12   any products could be suspended?

13      A    Yes.

14      Q    Okay.  You understood that Amazon encouraged

15   reporting inauthentic or counterfeit products?

16      A    I wasn't aware.

17      Q    Okay.  Do you see that in this policy, though?

18      A    Could you direct me to where it's at?

19      Q    Well, you indicated earlier that you had read

20   this, so in 2018 before the Youngblood products were

21   being sold, if you look on the bottom left hand corner

22   it says reporting inauthentic products; do you see that?

23      A    Uhm-hum.

24      Q    Why don't you read it to the ladies and

25   gentlemen of the jury that section.



1        A     Reporting Inauthentic Products.  We stand

2   behind the products sold on our site with our A-to-Z

3   Guarantee, and we encourage rights owners who have

4   product authenticity concerns to notify us.  We will

5   promptly investigate and take all appropriate actions to

6   protect customers, sellers, and rights holders.  You may

7   view counterfeit complaints on the Account Health page

8   in Seller Central.

9        Q     So they're telling the sellers or, sorry,

10  rights holders, that they should report to them any

11  issues or concerns regarding product authenticity,

12  correct?

13       A     Correct.

14       Q     And also there's issues regarding selling

15  counterfeit, correct?

16       A     Correct.

17       Q     And then there is a section regarding

18  consequences of selling inauthentic products; do you see

19  that?

20       A     Yes.

21       Q     What does it say happens if you sell an

22  inauthentic product?  Read that out loud.

23       A     Which section?

24       Q     Where it says consequences.

25       A     Consequences of Selling Inauthentic Products.



1   If you sell inauthentic products, we may immediately

2   suspend or terminate your Amazon selling account (and

3   any related accounts), destroy any inauthentic products

4   then in our fulfillment centers at your expense, and/or

5   withhold payments to you.

6        Q    Okay.  So you were aware prior to selling

7   Youngblood products that a consequence of violating

8   Amazon's guidelines would be the suspension of the

9   Amazon selling account?

10       A    Yes, correct.

11       Q    Was Manny Aguero aware of that?

12       A    I'm not aware.

13       Q    Did you tell him that?

14       A    I don't recall.

15       Q    Okay.  Put that aside.

16            (Whereupon, the below referred to document

17       was marked as Defendant's Exhibit No. 6.)

18   BY MR. VINE:

19       Q    We are on Number 6, okay.

20            When was the first time you reviewed this?

21       A    2015.

22       Q    And did you review this in 2018 before selling

23   Youngblood products?

24       A    I am not aware of that.

25       Q    Okay.  And you understood that the Selling



 1   Policy and Seller's Code of Conduct, one of the

 2   requirements was providing accurate information?

 3       A    Yes.

 4       Q    Okay.  And it says you must provide accurate

 5   information to Amazon and "our customers", right?

 6       A    Correct.

 7       Q    For example this means that you must use a

 8   business name that accurately identifies your business

 9   and lists your products in the correct category,

10   correct?

11       A    Correct.

12       Q    Okay.  So was Solu-Med accurately providing

13   information when it stated that it was not accepting

14   returns of cosmetics when it actually was accepting, as

15   reflected in Exhibit 1?

16            MS. BLACK:  Form.

17   BY MR. VINE:

18       Q    You can answer.

19       A    Can you ask it again or restate it?

20       Q    Sure.

21       A    Or restate it?

22       Q    Sure.  We have Exhibit 1 here, correct?

23       A    Uhm-hum, yes.

24       Q    And Exhibit 1 reflects that Life & Health

25   Source/Solu-Med is telling the public that it will not



1   accept returns of cosmetics, right?

2        A    Correct.

3        Q    Okay.  That's what you're representing to the

4   public, correct?

5        A    Correct.

6        Q    But that's not accurate, right?

7             MS. BLACK:  Form.

8             THE WITNESS:  Again, I want to stress that

9        there's the products that we're selling FBA had

10       their own terms, had their own return policies, so

11       this was specific to items that we were selling

12       merchant fulfilled from Solu-Med to the customers.

13  BY MR. VINE:

14       Q    Did you say that?

15            MS. BLACK:  Form.

16            THE WITNESS:  Did we say that in this policy?

17  BY MR. VINE:

18       Q    On Exhibit 1 on the storefront of Life &

19  Health Source did you say that any items through the FBA

20  account we would accept returns or Amazon would accept

21  returns, but if we sell it to you directly we won't?

22       A    On this, no.

23       Q    Okay.  On anywhere on the Life & Health Source

24  storefront?

25       A    This is our own storefront.



1     Q     Okay.  So it wasn't said on the storefront?

2     A     Correct.  It would have been stated on

3  Amazon's website.

4     Q     Right, I'm talking about what Life & Health

5  Source represented to the public, correct?

6     A     Correct.

7     Q     And you don't tell the public that if they

8  purchase a product through you, but it's fulfilled by

9  Amazon they could still return it, correct?  You don't

10  tell the public that?

11     A     Through Life & Health Source?

12     Q     Right.

13     A     Correct.

14     Q     In fact you tell the public they can't return

15  it, correct?

16     A     Cosmetics, correct.

17     Q     Even though they could if it's fulfilled by

18  Amazon, correct?

19     A     Correct.

20     Q     And in fact all of Youngblood products are

21  fulfilled by Amazon as you testified earlier, right?

22     A     Correct.

23     Q     Okay.  So do you say anywhere on your

24  storefront that Youngblood products could be accepted if

25  they're returned?



1        A    Not here, no.

2        Q    Anywhere?

3        A    No.

4        Q    Isn't that a representation -- sorry.

5             Isn't that providing inaccurate information to

6    the public?

7             MS. BLACK:  Form.

8    BY MR. VINE:

9        Q    Isn't Life & Health Source or Solu-Med

10   providing inaccurate information to the public or

11   confusing?

12       A    No, I think we were trying to differentiate

13   between our account and the FBA account.

14       Q    Do you think you accomplished that?

15       A    I'm not aware of how the customers perceived

16   that.

17       Q    Well, looking at it now can you tell me if you

18   would be able to tell the difference whether it's

19   through an FBA account or you selling it directly?

20       A    I mean I am not sure.

21       Q    Okay.  So you don't know, even somebody who

22   ran the eCommerce department, you don't know if you

23   could tell the difference, correct?

24             MS. BLACK:  Form.

25



 1  BY MR. VINE:

 2      Q    By reading that document?

 3           MS. BLACK:  Form.

 4  BY MR. VINE:

 5      Q    You can't tell the difference, can you?

 6           The ladies and gentlemen of the jury will see

 7  it as well.

 8      A    I mean there's no, nothing that differentiates

 9  between our FBA account and our merchant fulfilled

10  account so I guess there could be confusion there.

11      Q    Okay.  Thank you, you can put that aside.

12           Oh, you also list the product as new, correct?

13      A    Yes.

14      Q    And it doesn't meet the definition of new,

15  meaning --

16           MS. BLACK:  Form.

17  BY MR. VINE:

18      Q    You list -- is it true that Solu-Med lists the

19  Youngblood product as new?

20      A    Yes.

21      Q    Is it true that the Youngblood product that is

22  listed as new doesn't meet the definition that we went

23  over in Amazon's guidelines?

24           MS. BLACK:  Form.

25



KELLON GOODSON                                           January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                            88

1   BY MR. VINE:

2       Q    You can answer.

3       A    Because of the issue with?

4       Q    With the warranty.

5       A    Correct.

6       Q    So that would be providing also inaccurate

7   information to the public when you list it as new, isn't

8   that correct?

9            MS. BLACK:  Form.

10           THE WITNESS:  No, I don't believe so.

11           We listed whatever was on Amazon's ASIN so we

12       moved in basically whatever information was there.

13  BY MR. VINE:

14      Q    So you think you complied with the ASIN by

15  listing it as new even though it didn't come with a

16  warranty or you don't know?

17      A    I'm not sure.

18      Q    Okay.

19           MS. BLACK:  Can we take a quick break?

20           MR. VINE:  Sure.

21           THE VIDEOGRAPHER:  We are going off the video

22       record 9:52 a.m.

23           (Whereupon, a short recess was had.)

24           THE VIDEOGRAPHER:  We are back on the video

25       record 10:02 a.m.



1  BY MR. VINE:

2      Q    Okay.  Earlier in the deposition we discussed

3  about other complaints that Solu-Med had; you're aware

4  of those complaints, correct?

5      A    Yes.

6          (Whereupon, the below referred to documents

7      were marked as Defendant's Exhibit No. 7.)

8  BY MR. VINE:

9      Q    We will mark as Exhibit 7 is a composite set

10 of Exhibits, also marked at another deposition, of other

11 complaints from Amazon regarding products being sold on

12 Amazon by Solu-Med.

13         Have you seen this before?

14     A    No.

15     Q    Can you turn to the next page?

16     A    Yes.

17     Q    Have you seen these types of documents before?

18     A    Yes.

19     Q    Okay.  And if you turn to for example, if you

20 look below there's on the first page it says 1/27/2018

21 there's a complaint on that day, correct?

22     A    Yes.

23     Q    And then on 1/28, correct?

24     A    Yes.

25     Q    And then on 3/05, correct?



KELLON GOODSON                                           January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                           90

```
 1        A     Yes.

 2        Q     4/04?

 3        A     Yes.

 4        Q     5/12?

 5        A     Yes.

 6        Q     Roughly throughout the year you have received

 7   on average once a month --

 8        A     Yes.

 9        Q     -- A complaint?

10        A     Correct.

11        Q     And that also continued on to 2019, correct?

12        A     Correct.

13        Q     And these were complaints regarding everything

14   from trademark to counterfeit to intellectual property

15   violations?

16        A     Yes, correct.

17        Q     Authenticity issues as well?

18        A     Correct.

19        Q     Now, if we look at the 4/04/2018 one, which is

20   PL 199.  And PL 199 is the bottom Bates Number, if you

21   will look at that.

22        A     The last page you said?

23        Q     No, it's PL 199, if you look at the left hand

24   corner, do you see that?  It goes in order.

25        A     I've got PL 198 and then it goes to PL 222.
```



1      Q     Because I have it, and this is a copy of what

2  I have.

3            PL 199, do you have it?

4      A     Yes.

5      Q     Okay.  In April of 2018 did you receive this

6  notice?

7      A     Yes.

8      Q     Okay.  And what does this notice say?

9      A     We are contacting you because we received a

10  report from a rights center that you were listing

11  counterfeit items, example of these items are listed

12  below.

13     Q     And then they listed a number of different

14  ASIN numbers, correct?

15     A     Correct.

16     Q     And then it says we may let you list this

17  again if we receive a retraction from the owner?

18     A     Correct.

19     Q     And then it says the conflict information for

20  that owner, correct?

21     A     Correct.

22     Q     Did you contact that owner?

23     A     I am not aware.

24     Q     What did you do in response to this?

25     A     Specific to this one I don't remember.



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                    92

1       Q     Other than the Youngblood one what did you do

2    in response to any of these various notices that you

3    received before listing the Youngblood product?

4       A     Generally I would take the listing information

5    usually as is seen here with the email or the response

6    from Amazon, and I would typically send it to Manny

7    Aguero to review it.

8       Q     And then what would happen?

9       A     I would ask him generally what his take would

10   be, what his direction would be.

11      Q     And what was the typical response that Manny

12   would receive, would provide?

13      A     It would vary depending on he would ask me

14   questions about inventory, what the specific item was,

15   the type of item it was and then he would give me some

16   direction on what the next steps would be.

17      Q     What do you recall the directions he did give

18   you?

19      A     Sometimes he would say --

20            MS. BLACK:  Form.  You can answer.

21            THE WITNESS:  Sometimes he would say to remove

22        the listing; sometimes he would say to leave it,

23        depending on what his take on the situation was.

24   BY MR. VINE:

25      Q     Well, how could you leave it if it was



1  suspended that, or that that deactivated that listing?

2     A    It would be like this specific item there

3  would be no, there would be no listing.

4          The listing would be -- our listing would be

5  removed so there would be no -- there would be no active

6  listing for us at that point.

7     Q    So then he would say just leave it alone?

8     A    It would just come down automatically so there

9  was actually no action for us to take at that point.

10    Q    Okay.  You could appeal it and seek to have it

11 relisted, correct?

12    A    Correct, yes.

13    Q    And you chose on a number of them not to do

14 that, correct?

15    A    Typically we did not respond.

16    Q    Okay.  Other than the Youngblood one, prior to

17 Youngblood did you ever respond to Amazon regarding any

18 of these notices?

19    A    I am not aware.

20    Q    And the reason why you responded to the Amazon

21 one is because they actually shut down the entire

22 storefront, correct?

23    A    Correct.

24    Q    Previously they just deactivated all, they

25 suspended all the listings that were complained about,



 1  correct?

 2      A    Correct.

 3      Q    Okay.  And then Amazon, for whatever reason

 4  you don't know, specifically decided after I guess at

 5  least eight violations chose to suspended the entire

 6  account, correct?

 7      A    The specific suspension was related to the

 8  Youngblood products, yes, that's when it happened.

 9      Q    It happened after Youngblood made that

10  complaint, correct?

11      A    There were three complaints in a row.

12      Q    There were two, correct?  There were three or

13  two?

14      A    I'm sorry, there were three ASINs that were

15  related to that.

16      Q    Right.

17      A    Correct.

18      Q    Well, this one had five ASINs, correct?

19      A    Correct.  These are variations on the same

20  product.

21      Q    But there were five separate ASINs, correct?

22      A    Correct, yes.

23      Q    And we can go through, it's a pretty large

24  pack, maybe you can show the ladies and gentlemen of the

25  jury of all the complaints that, other than the



 1  Youngblood ones, if you would hold it up like this, that

 2  Solu-Med received from January of 2018 to June of 2019,

 3  not including the Youngblood complaints, correct?

 4       A    Correct.

 5       Q    Okay.  And so other than in Youngblood you

 6  don't recall taking any action?

 7       A    In 2018, no, we did not take any action.

 8       Q    And in 2019?

 9       A    We took action.

10       Q    What was the action?

11       A    Our lawyer --

12       Q    Who?

13       A    Stan Goodman.

14       Q    Okay.

15       A    Would just --

16            MS. BLACK:  I'm going to object to any

17       attorney-client advice.

18            MR. VINE:  I didn't.

19            MS. BLACK:  I'm just saying I don't know if he

20       advised you to do something.

21            MR. VINE:  You've got to let me ask the

22       question.  I said what actions did you take, and he

23       said --

24            MS. BLACK:  Okay.

25




KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      96

```
 1        (BY Mr. Vine)

 2   BY MR. VINE:

 3        Q    What action did you take in 2019?

 4        A    In 2019 we sent it to Stan Goodman and he

 5   would take the next steps.

 6        Q    Okay.  And was that after Amazon had shut down

 7   Solu-Med?

 8        A    After the suspension?

 9        Q    Yes.

10        A    Yes, 2019, yes.

11        Q    So it was only after there was a suspension

12   did you all of a sudden did Solu-Med start to decide to

13   respond, correct?

14        A    Correct.

15        Q    Okay.

16        A    Also during 2019 there was a change in the

17   system that Amazon was utilizing for the way that we

18   would receive information, so instead of a notification

19   via message, there was actually a dashboard that had all

20   of the complaints or any information that would come

21   through that was in the Seller Central Dashboard.

22        Q    Okay.  But that wasn't the reason why you went

23   to Stan Goodman, correct?

24        A    Correct.

25        Q    What was the reason you went to Stan Goodman
```



1    in 2019 after the Youngblood complaint regarding these

2    other complaints?

3        A    Manny Aguero directed me to.

4        Q    What did Manny tell you?

5        A    That we needed someone who knew specifics

6    about how to deal with these types of things.

7        Q    Okay.  And so he said going forward we're

8    going to change the strategy and actually start

9    responding to the complaint?

10           MS. BLACK:  Form.

11           THE WITNESS:  That I would not do anything,

12       but that Stan would make decisions.

13   BY MR. VINE:

14       Q    We do know that prior to the Youngblood

15   complaint there were eight prior complaints, correct?

16       A    Correct.

17       Q    And what you've told me is Solu-Med didn't

18   respond to those complaints, correct?

19       A    Yes, not that I am aware of.

20       Q    Okay.  So it was only after there was a

21   suspension did, of the entire storefront --

22       A    Correct.

23       Q    -- Did counsel get hired, correct, to address

24   these complaints?

25       A    They were brought in to address complaints,



 1  correct.

 2       Q    Right.  It was only after there was a

 3  suspension of the entire account, correct?

 4       A    Correct.

 5       Q    Okay.  For all the prior suspensions of

 6  specific listings no counsel was hired to address the

 7  complaints, correct?

 8       A    Correct.

 9       Q    And did you ever speak with Stan Goodman

10  regarding the Youngblood complaints?

11       A    Yes.

12       Q    When did you speak with him?

13       A    In 2018, the end of 2018 and then into 2019.

14       Q    What did you and Stan Goodman -- what did you

15  and Stan Goodman discuss regarding the Youngblood

16  products?

17            MS. BLACK:  I'm going to object and instruct

18       you not to answer that question.

19  BY MR. VINE:

20       Q    And if you notice I gave a hand gesture to

21  Kelsey because I didn't want you to answer the question

22  because I knew she would be asserting, I'm not trying to

23  pull a fast one, as Kelsey knows, but I have to ask

24  these questions so there can be an objection.

25            We're going to have obviously a separate



1    discussion on whether there is, whether this is the

2    appropriate place for an attorney-client privilege or

3    not, and that's something that we don't need to do

4    through you.

5           But I just need to ask the question so there

6    would be an objection and you can't answer that

7    question.

8           Mr. Goodman was providing advice to you during

9    that conversation?

10   A    For specifically Youngblood I gave him

11   information on for example these notifications, the

12   warnings, and anything that was related to the account

13   that I would have had access to, and then he basically

14   took that information.

15   Q    Now, did Solu-Med have written internal

16   guidelines regarding its products -- sorry, regarding

17   the selling of its products on Amazon?

18   A    Sorry, say that again?

19   Q    Did Solu-Med have any internal written

20   guidelines regarding the operations of Solu-Med, yes or

21   no?

22   A    No.

23   Q    Were there internal procedures written in any

24   way regarding Solu-Med's operation?

25   A    No.



1       Q    Were there any internal operational written
2    procedures?
3       A    Written, no.
4       Q    Were there general ones?
5       A    Well, as an example we wouldn't resell
6    products that were damaged or things that were, you
7    know.
8       Q    That's a verbal policy?
9       A    Correct.
10      Q    So if somebody's reviewing something, that
11   would be a written policy, correct?
12      A    Correct.
13      Q    Okay.  But you're not aware of any written
14   internal operating procedures, correct?
15      A    Correct.
16      Q    Did you ever tell Stan Goodman that there were
17   written internal operating procedures?
18           MS. BLACK:  Form.
19           THE WITNESS:  I'm not aware of --
20           MS. BLACK:  Don't answer it, attorney-client
21      privilege.
22           MR. VINE:  Okay.  I'm not going to debate you,
23      but you can direct it, but I don't agree, but
24      that's fine, it's not a big deal.
25



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                  101

```
 1   BY MR. VINE:
 2        Q    Have you ever told anybody there was written
 3   internal operating procedures?
 4        A    Written, no.
 5        Q    Do you have, did Solu-Med have internal
 6   operating procedures in 2018?
 7        A    Written procedures?
 8        Q    No, that wasn't what I asked.
 9        A    Sorry.  Yes, say it again?
10        Q    What I asked was was there any internal
11   operating procedures?
12        A    Yes.
13        Q    We already know there weren't any written,
14   right?
15        A    Correct.
16        Q    So now you're saying there were verbal
17   internal operating procedures, correct?
18        A    Correct.
19        Q    Were there internal operating procedures for
20   listing items with Amazon?
21        A    Not that I am aware.
22        Q    Now, I want to -- when you got these
23   complaints that are listed in Exhibit 7 we have already
24   discussed that you never responded to them, correct?
25        A    Again, not that I am aware of.
```



1    Q    Right.  And so because you never responded to

2    them you don't know how the complaints were written

3    other than what was in these policy notifications,

4    correct?

5    A    Correct.

6    Q    So for example if we went to the 199 again it

7    lists a specific ASIN number and it asks to -- tell me

8    when you're ready.

9    A    Sorry.

10    Q    Take your time.

11        So this one talks about again a counterfeit

12    item, and instead of responding you have chosen not to.

13        Would you have reviewed this document?

14    A    Yes.

15    Q    Okay.  And then it says to learn more about

16    this policy search for intellectual property violations

17    in Seller Cental Health; did you specifically do that

18    after each notice?

19    A    I don't recall.

20    Q    You don't recall doing that?

21    A    I don't recall.

22    Q    You don't recall doing it either way or you

23    don't recall doing that?

24    A    I don't recall doing that.

25    Q    Okay.  Do you recall doing it for any of these



1  violations?

2       A     Specifically, no, but...

3       Q     Prior to the Youngblood complaint?

4       A     Correct.

5       Q     Put this aside, we are going to come back to

6  it in a minute.

7            (Whereupon, the below referred to document

8       was marked as Defendant's Exhibit No. 8.)

9  BY MR. VINE:

10      Q     Exhibit 8, I want to show you a copy of one of

11  the complaints from Youngblood, which is Exhibit 8.

12            Have you ever seen this document before?

13      A     No.

14      Q     Okay.  So you never even saw the complaint

15  that was written by Youngblood, correct?

16      A     No, I never saw it, correct.

17      Q     If you look at the bottom or sorry, the second

18  to last paragraph the specific complaint says.

19            "The indicated sellers are not selling

20  authentic products as shown in the ASIN(s) referenced."

21            Do you see that?

22      A     I do.

23      Q     When the complaint, when you were notified of

24  the complaint by Amazon for this ASIN number did you go

25  to the ASIN page, you personally?



 1         A     Is this the ASIN -- I'm sorry, the ASIN is not

 2    on here, but is this the ASIN that was --

 3         Q     I'll show you.

 4         A     Okay.

 5               (Whereupon, the below referred to documents

 6         were marked as Defendant's Exhibit Nos. 9 & 10.)

 7    BY MR. VINE:

 8         Q     I'm going to show you the two, there were two

 9    complaints, and I'm going to mark them as Exhibit 8

10    and 9 -- sorry, Exhibit 9 and 10.

11               So Exhibit 8 matches the notification of

12    Exhibit 9.

13         A     Okay.

14         Q     And then Exhibit 10 is regarding a second

15    complaint, a notification that I will give to you.

16               Just one second, this one is 8.  So I will

17    just for the record Exhibit 8 -- sorry, I've got to

18    start over.

19               Exhibit 9 is PL00046, that's this one.

20         A     This one?

21         Q     Yes.  And Exhibit 10 is PL00047.

22               Now, let's just look at Exhibits 8 and 9 for

23    now.

24         A     Okay.

25         Q     Exhibit 8 is the complaint from Youngblood



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                     105

```
 1   which is marked as CONFIDENTIAL AMZN 0003; then there is
 2   PL00046, which is Exhibit 9, put those side-by-side.
 3       A    Okay.
 4       Q    If look at the Complaint ID number, the
 5   Complaint ID numbers match, correct?
 6       A    Yes, correct.
 7       Q    So they would obviously relate to each other,
 8   correct?
 9       A    Correct.
10       Q    Okay.  Now, when you got this complaint, this
11   complaint being Exhibit 9, because that's the document
12   you would receive, right?
13       A    Correct.
14       Q    Okay.  Did you go to the ASIN page for this
15   specific ASIN number, did you specifically do that?
16       A    Yes.
17       Q    Okay.  You printed it up?
18       A    I am not sure if would have I printed it.
19       Q    Did you save the page somewhere?
20       A    This?
21       Q    No, the ASIN page.
22       A    Oh, it's -- yes.
23       Q    You saved it?
24       A    It would be in a I guess like a --
25            MS. BLACK:  Sorry for the interruption.
```



```
 1              THE WITNESS:  I'm sorry, ask the question
 2      again?
 3    BY MR. VINE:
 4      Q    I had asked you when you got Exhibit 9 the
 5    notice of violation, the Policy Warning violation from
 6    Amazon did you specifically go look at the ASIN page on
 7    Amazon?
 8      A    Yes.
 9      Q    Okay.  Did you then save that ASIN page at all
10    in your computer?
11      A    Oh, the actual web page?
12      Q    Yes.
13      A    No.
14      Q    Did you print it up?
15      A    No.
16      Q    How did you explain to Manny Aguero that it
17    matched or it did not match, if you did at all?
18      A    I'm not aware if I sent that specific item to
19    Manny at that point.
20      Q    Okay.  At that point you weren't aware, made
21    aware that there was a suspension, correct?
22      A    Correct.
23      Q    It was only that this item was being delisted,
24    correct?
25      A    Correct.
```



 1      Q    Okay.  And you chose not to respond to this
 2  one, correct?
 3      A    Correct.
 4      Q    Okay.  Then a couple days later another notice
 5  of violation came in on other Youngblood products,
 6  correct?
 7      A    Correct.
 8      Q    Okay.  And that's Exhibit 10, correct?
 9      A    Correct.
10      Q    Okay.  Before we get to Exhibit 10, if you
11  look at the ASIN number, you looked on Exhibit 9, and
12  you looked at the ASIN page?
13      A    Yes.
14      Q    And did you contact, you personally at that
15  time, contact a brandprotection@ybskin to ask what the
16  problem was?
17      A    At that point, no.
18      Q    Okay.  In fact you chose to stand down to do
19  nothing, like you were previously doing nothing,
20  correct?
21      A    Correct.
22      Q    Okay.  And then a couple days later another
23  notice from Amazon comes in, correct?
24      A    Correct.
25      Q    It says we attempted to reach you by phone



 1  today to discuss recent issues related to intellectual

 2  property infringement.

 3          Do you recall getting a telephone call?

 4      A   There was a voice call, a voice mail on our

 5  account, on our, yes, on our customer service line, yes.

 6      Q   And did you call them back?

 7      A   I did call them back.

 8      Q   And did you speak to somebody?

 9      A   Yes, I did.

10      Q   And who did you speak to?

11      A   I don't remember.

12      Q   Okay.  Did you take notes from that

13  conversation?

14      A   I don't recall.

15      Q   Do you recall that conversation?

16      A   Not specifically, no.

17      Q   Do you recall anything about that

18  conversation?

19      A   Just that our account had been suspended and

20  that the next steps would be a plan of action needed to

21  be compiled, put together and that would need to be sent

22  to Amazon for the possible, the possibility of getting

23  our account reopened.

24      Q   Okay.  Now, it says that Amazon previously

25  listed -- previously sent you concerns regarding these



1  other ASINs; do you see that?

2      A    Yes.

3      Q    Okay.  And you received those, correct?

4      A    I'm not aware of specific ASINs, but they had

5  sent us other violations.

6      Q    And you chose to ignore those warnings,

7  correct?

8      A    Right, we did not respond, correct.

9      Q    Okay.  And then after not responding that is

10 when they suspended the account, correct?

11     A    Correct.

12     Q    Okay.  And it says it's been temporarily

13 deactivated, right?

14     A    Correct.

15     Q    So then you were told to do a plan of action,

16 is that what they were told?

17     A    Correct.

18     Q    Did you ask them about the complaint that was

19 made?

20          I need to know what you remember asking, not

21 what you guess.

22     A    I don't specifically remember, no.

23     Q    Okay.  Do you remember asking about getting a

24 copy of the complaint?

25     A    Say that again, sorry?



 1      Q    Do you remember asking to get a copy of the
 2  complaint?
 3      A    I don't recall.
 4      Q    Do you remember asking about any of the facts
 5  of the complaint?
 6      A    I don't recall.
 7      Q    Do you remember discussing with them any facts
 8  about the complaint?
 9      A    I don't recall.
10      Q    Okay.  So you then receive Exhibit 10,
11  correct?
12      A    Correct.
13      Q    Okay.  And that was on November 13th, correct?
14      A    Correct.
15           (Whereupon, the below referred to document
16      was marked as Defendant's Exhibit No. 11.)
17  BY MR. VINE:
18      Q    Okay.  Let's mark as Exhibit 11.  Here is a
19  copy of Exhibit 11, which is "First Plan of Action
20  11/13/2018 Reactivate your account".  PL00048, and I
21  will give you a copy.
22           Did you draft that document?
23      A    Yes.
24      Q    Was it you or Adam Weinstein?
25      A    I did.



KELLON GOODSON                                          January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                          111

 1          Q    Okay.  Let's go over it.  Your submission on

 2    November 13th, 2018 at 12:10 p.m.

 3               The question I guess is the root cause of

 4    issue, that's just something that's there, and you have

 5    to fill in information next to it?

 6          A    Correct.

 7          Q    So you wrote we have offerings for the brand

 8    Youngblood Cosmetics with listings which the

 9    intellectual property holder felt infringed on their

10    intellectual property rights?

11          A    Correct.

12          Q    Okay.  You wrote that, correct?

13          A    Correct.

14          Q    Was that a true and accurate statement when

15    you wrote it?

16          A    Correct.

17          Q    Is that a true and accurate statement now?

18          A    True.

19          Q    The second item or question was the actions

20    you have taken to resolve this issue.

21               We have removed all listings for the

22    Youngblood product line, and deleted our sales offerings

23    to ensure that we don't infringe on any intellectual

24    property of Youngblood Cosmetics.

25               Do you see that?



KELLON GOODSON                                          January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                          112

```
 1        A    Yes.

 2        Q    Was that a true and accurate statement at the

 3   time you wrote it?

 4        A    Yes.

 5        Q    Is it a true and accurate statement today?

 6        A    Yes, we removed all the listings, absolutely.

 7        Q    Of Youngblood products?

 8        A    Yes.

 9        Q    Why?

10        A    We wanted to get the account reopened and we

11   were going to, I was willing to take Youngblood

12   completely out of the account at that point.

13        Q    Who made that decision, you or Manny Aguero?

14        A    I advised Manny of what was happening, and he

15   agreed to remove Youngblood.

16        Q    Okay.  Did you tell Manny that you had not

17   previously responded to the prior warnings?

18        A    Yes.

19        Q    And that was at his direction, correct?

20        A    Yes.

21        Q    Then the third question is the steps you have

22   taken to prevent the issue going forward.

23             And then you wrote:  Going forward, we will

24   review our product offerings, to ensure compliance with

25   Amazon's terms of service related to intellectual
```



 1  property, and removing any offerings that aren't in

 2  compliance.

 3       A    Yes.

 4       Q    Was that a true and accurate statement of what

 5  you would do at that time?

 6       A    Yes.

 7       Q    Is it a true and accurate statement today?

 8       A    As far as?

 9       Q    Did you review all the product offerings that

10  you had on Amazon at that time?

11       A    Yes.

12       Q    You reviewed every single one?

13       A    Yes.

14       Q    How many items did you have selling on

15  Solu-Med.

16       A    I don't --

17       Q    Thousands?

18       A    Yes, probably a thousand.

19       Q    And who was the one who removed every single

20  offering and matched it to the ASIN numbers and the ASIN

21  page?

22       A    As far as every item I'm not aware of who

23  would be person to do every single item.

24       Q    Well, you said we will review our product

25  offerings; did you review all the product offerings?



KELLON GOODSON                                January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                    114

1      A    We did look at all the UPCs to make sure they

2    matched up to all the UPCs on the Amazon system.

3      Q    Okay.  Did you ensure that they were in

4    compliance with the intellectual property guidelines?

5      A    As I knew it, yes.

6      Q    Based upon what you reviewed today?

7      A    Manufacturer warranty?

8      Q    Yes.

9      A    No, I did not review the manufacturer

10   warranties.

11     Q    And did you review only what you knew at the

12   time, correct?

13     A    Correct.

14     Q    Not what you have learned today through these

15   guidelines?

16     A    Correct.

17     Q    You can put that aside.

18          After you submitted that Exhibit 11 was your

19   account reactivated on November 13th?

20     A    No.

21     Q    Okay.  Did you place a follow-up call that day

22   on November 13th?

23     A    To Amazon?

24     Q    Yes.

25     A    Yes.



1        Q     And what did they say?

2        A     That we needed to redo the Plan of Action.

3        Q     Why did they say you needed to redo the Plan

4   of Action?

5        A     I don't remember specifics, but there was

6   greater -- it didn't meet what they needed basically to

7   reopen the account.

8        Q     Okay.  So they told you they were not

9   satisfied with your response, correct?

10       A     Correct.

11             (Whereupon, the below referred to document

12       was marked as Defendant's Exhibit No. 12.)

13   BY MR. VINE:

14       Q     Exhibit 12, I just want to make sure we are

15   all on the same page.

16             One second.  So the Plan of Action of

17   11/14/2018, PL000049.

18             On November 14th you issued I guess an amended

19   version, correct?

20       A     Correct.

21       Q     And that's based upon Amazon telling you that

22   the prior one that you submitted was not acceptable,

23   correct?

24       A     Correct.

25       Q     Okay.  And what did you change, each item,



KELLON GOODSON                                                      January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                                       116

 1  right?

 2      A    Yes.

 3      Q    So let's go through it.  The root cause of the

 4  issue, what did you write now?

 5      A    We were listing Youngblood Cosmetics product

 6  that we sourced from a distributor, and the brand may

 7  not have been aware that we were selling the product on

 8  Amazon that was purchased through that distributor.

 9      Q    In fact the brand was not aware, isn't that

10  true?

11      A    Correct.

12      Q    Okay.  You never contacted the brand and told

13  them that you were selling their product, correct?

14      A    Prior to this, no.

15      Q    And you never asked for their permission to

16  sell their product, correct?

17      A    Correct.

18      Q    Did you ask Innopex if they ever got the

19  authority to sell their product?

20      A    No.

21      Q    And when I say "their product", I mean

22  Youngblood's product.

23      A    Correct.

24      Q    The second item was the actions you have taken

25  to resolve the issue; you changed this section as well,



1  correct?

2      A    Correct.

3      Q    Okay.  Why don't you read what you wrote.

4      A    We have removed all listings for the

5  Youngblood product line and deleted our sales offerings

6  to ensure that we don't infringe on any intellectual

7  property of Youngblood Cosmetics.  We have attached the

8  invoices from our distributor for these products for

9  your review.  We are in the process of reaching out to

10 the brand to establish what steps we should take next in

11 order to come into compliance with their selling

12 guidelines and ask them to retract the complaint.

13     Q    Okay.  On November 14th had you contacted my

14 client?

15     A    I did call and email the brand compliance

16 email that they provided and asked them to contact us so

17 we could understand what we should do.

18     Q    On November 14th?

19     A    Yes.

20     Q    Do you have a copy of that email?

21     A    I don't have any copy of the emails.

22          MR. VINE:  Kelsey, I don't remember seeing an

23          email from you guys on November 14th.  The first

24          one I recall seeing is November 26th.

25          MS. BLACK:  From Solu-Med to Youngblood?



```
 1              MR. VINE:  Yes.
 2              MS. BLACK:  I can't answer off the top of my
 3         head whether or not it's in the production or not.
 4              MR. VINE:  The first item I saw was a letter
 5         from Stan Goodman on November 26th.
 6              MS. BLACK:  I said we have produced everything
 7         that we were given.
 8              MR. VINE:  I'm not suggesting you're hiding
 9         anything, I'm just telling you.
10              THE WITNESS:  And to be honest the phone call
11         would have been, I do specifically remember the
12         phone call.
13              MR. VINE:  Well, we'll talk about that in a
14         second, but he said there was an email on
15         November 14th, so if you have that, I would like --
16              MS. BLACK:  I will certainly make an inquiry.
17              MR. VINE:  Yes, thank you.
18    BY MR. VINE:
19         Q    Okay.  You also mentioned that there was a
20    phone call?
21         A    Yes.
22         Q    Who did you speak with?
23         A    I don't recall, but I was trying to reach
24    anyone honestly who was in brand compliance because that
25    is who the email directed us to talk to.
```



```
 1        Q    But you spoke to somebody?

 2        A    Somebody, yes.

 3        Q    Female or male?

 4        A    I don't remember.  I think it was -- I don't

 5   recall.

 6        Q    You don't recall?

 7        A    No.

 8        Q    Okay.  And do you recall the conversation?

 9        A    I just asked them to please call me back and

10   that I needed to speak with --

11        Q    You left a message?

12        A    Yes, I spoke to a person that said I need to

13   talk to someone in brand compliance, and the person who

14   answered the phone was not that person.

15        Q    And did somebody return your call?

16        A    No.

17        Q    How many times did you call?

18        A    Oh, gosh, I don't remember, it was a lot.

19             I don't recall the exact amount but I kept

20   calling over the next few days just to try and reach

21   someone, yes.

22        Q    Okay.  And you don't recall who you spoke to,

23   correct?

24        A    Correct.

25        Q    And every time you called back do you recall
```



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      120

1    if you got the same person?

2        A    It was not the same person, it would be

3    different people, and I would ask for the, just someone

4    in the brand compliance please contact me.

5        Q    Okay.  Did you ever speak to anybody from

6    Youngblood substantively?

7        A    No, no.

8        Q    And it says we are in the process of reaching

9    out.

10       So other than reaching out and leaving a

11   message and you emailed how many times?

12       A    I don't recall.

13       Q    More than once?

14       A    Quite a bit, yes.  I believe it was more than

15   once.

16       Q    Okay.

17       A    The phone call was the main, I just wanted to

18   try and speak with somebody.

19       Q    I understand you placed a couple of phone

20   calls to them, what I'm asking is if you recall ever

21   emailing, you said you did email?

22       A    I did.

23           MS. BLACK:  I am looking for emails, but also

24       we have requested all emails from Youngblood as

25       well and don't have emails, so I don't know that we



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                    121

1   got them.

2        THE WITNESS:  It would have been through the

3   one that we provided.

4        MS. BLACK:  The brand provided to the

5   info@lifeandhealthsource.

6        MR. VINE:  No, it's

7   brandprotection@ybskin.com.

8        THE WITNESS:  Well, we would have emailed

9   that.

10        MS. BLACK:  That's the email address that you

11   think you addressed?

12        THE WITNESS:  That I would have sent it to

13   because that's the only one I had.

14        MR. VINE:  Right.  And we don't have from your

15   production that I remember but I will --

16        MS. BLACK:  And I don't think I have one from

17   your production either, but we will do some

18   follow-up.

19        MR. VINE:  I don't know if that was

20   specifically requested, but that's fine.

21        MS. BLACK:  It was specifically requested.

22        MR. VINE:  You and I don't need to debate that

23   right now.

24        MS. BLACK:  Yes.

25



 1   BY MR. VINE:

 2        Q     Number 3:  The steps that you have taken to

 3   prevent these issues going forward:

 4             "Going forward, we will review our product

 5   offerings and sourcing, to ensure compliance with

 6   Amazon's terms of service related to intellectual

 7   property and remove any offerings that aren't in

 8   compliance."

 9             Correct?

10        A     Correct.

11        Q     Did you remove any other offerings by any

12   company after this point?

13        A     I don't recall.

14        Q     You understand that in 2019 you received a

15   number of complaints as well, correct?

16        A     Correct.

17        Q     Not from Youngblood but from other companies,

18   correct?

19        A     Correct.

20        Q     Did you remove any of those listings?

21        A     Yes.

22        Q     Because they weren't in compliance?

23             MS. BLACK:  Form.

24             THE WITNESS:  It would have been at the

25        direction of Manny.



```
 1              (Whereupon, the below referred to document

 2         was marked as Defendant's Exhibit No. 13.)

 3   BY MR. VINE:

 4         Q    All right.  We are on Exhibit 13, which is

 5   PL000051 through 53.

 6              13, here is a copy for you, give one to

 7   Kelsey.

 8              Did you draft this document?

 9         A    I worked with Cheri Seidle to address this

10   document.

11         Q    So who was the main author?

12         A    I typed it and she reviewed it and added

13   content that she thought was important.

14         Q    Okay.  What content did she add?

15         A    I don't recall exactly what she added, if she

16   directed me if there was things that needed to be

17   included as we sent the next letter.

18         Q    You don't recall what she added, correct?

19         A    I don't.

20         Q    It says the root cause:  We received a

21   counterfeit complaint from Youngblood on November 13th.

22              Do you see that?

23         A    Yes.

24         Q    That's not entirely accurate, isn't that

25   correct?
```



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      124

1              Wasn't there a counterfeit complaint a couple

2     days before November 13th?

3        A    I was specifically speaking about the Plan of

4     Action for the account suspension, though, yes.

5        Q    So but you indicated here that you didn't

6     mention that there was a prior complaint?

7        A    No.

8        Q    And there were prior complaints on Youngblood,

9     correct?

10       A    Correct.

11       Q    Okay.  And if you -- it says we have been

12    selling on Amazon for five years, and Youngblood for two

13    years, without complaint.

14             That's not entirely accurate, correct?

15       A    This was speaking specific about customer

16    complaints, yes.

17       Q    It says we have been selling Amazon for five

18    years, and Youngblood for two years, without customer

19    complaints, correct?

20       A    I believe, yes.

21       Q    You weren't referring to complaints from

22    Youngblood, correct?

23       A    No.

24       Q    It says:  "The items that we sourced are

25    authentic, genuine products and we follow the Amazon



 1   Catalog Listing protocol for create all of our

 2   listings."

 3         You wrote that?

 4     A    Probably a typo.

 5     Q    No, but you wrote that sentence?

 6     A    Yes.

 7     Q    Okay.  You said your sources are authentic,

 8   and the way you determined they would be authentic is

 9   what?

10     A    Again, following the, what we discussed

11   before, where we buy a product, we would have the item

12   reviewed, the reviewed version listing on Amazon, and

13   the reviewed version of the property.

14     Q    Nothing else, correct?

15     A    Correct.

16     Q    You didn't contact the manufacturer, right?

17     A    No.

18     Q    You didn't contact Innopex to determine the

19   source and where they got it from?

20     A    Correct.

21     Q    Okay.  You didn't determine whether there was

22   a warranty or not, correct?

23     A    Correct.

24     Q    All you did was look at the product from an on

25   site and match it up to the ASIN, correct?



 1      A    Correct, a UPC verification.

 2      Q    Anybody could type up a UPC and put it on a

 3   label, correct?

 4           MS. BLACK:  Form.

 5           THE WITNESS:  I am aware of that, yes.

 6   BY MR. VINE:

 7      Q    So that wouldn't be a good way to verify

 8   authenticity alone, correct?

 9      A    That would be a way to verify the item on

10   systems so we are not duplicating as far as relating to

11   the Amazon catalog listing.

12      Q    But that's not a way to determine

13   authenticity, correct?

14      A    Correct.

15      Q    It says we have taken the following steps.  It

16   says after receiving the first complaint on 11/13, but

17   we know now there was complaints earlier, correct?

18      A    Correct.

19      Q    Okay.

20      A    Yet I want to stress this was specific to the

21   action that happened on the 13th, everything in this

22   Plan of Action.

23      Q    But it says first complaint, and that's not --

24   it's not the first complaint about Youngblood on 11/13?

25      A    Correct.



KELLON GOODSON                                           January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                        127

```
1        Q    Okay.

2        A    Well, it was the first complaint on 11/15, but

3    it wasn't the first Youngblood complaint.

4        Q    Okay.  Not only did we remove the three

5    mentioned Youngblood items but we also proactively

6    removed the remaining 40 Youngblood listings from our

7    offerings on Amazon; that's correct?

8        A    Correct.

9        Q    You say we launched an immediate investigation

10   of our supply chain to confirm the chain of custody.

11            You wrote that or was this Cheri?

12       A    This was Cheri's quote.

13       Q    Okay.  Do you know what investigation Cheri

14   did regarding the supply chain?

15       A    I'm not sure.

16       Q    Did you do an investigation regarding the

17   supply chain?

18       A    I don't recall what steps I took.

19       Q    I think we asked earlier if you contacted

20   Innopex and you said you didn't after you received this,

21   is that accurate?

22       A    Correct.

23       Q    So that would be the investigation of the

24   contacting the source of the product, correct?

25       A    Correct, I didn't respond, I didn't, yes,
```



 1   correct.

 2        Q    And you're not responsible for this statement

 3   because you didn't write that, correct?

 4        A    Correct.

 5        Q    And you don't know if Cheri did something or

 6   not, correct?

 7        A    Correct.

 8        Q    Okay.  So you can't tell us if that statement

 9   was accurate or not, correct?

10        A    I am not aware.

11        Q    You can't tell us?

12        A    Correct.

13        Q    Okay.  Then it's cut off a little bit but it

14   says we evaluate all items in our something our

15   products, correct?

16        A    I guess.

17        Q    Yes, it's cut off, it's just a copy.

18             Okay.  Then the next bullet point says:  We

19   reviewed our internal operational procedures for listing

20   items with Amazon.

21             Do you see that?

22        A    I do.

23        Q    Was that your statement or was that Cheri's

24   statement?

25        A    Cheri.



1      Q    Okay.  Because you have already testified

2  under oath there were no internal operating procedures

3  for listing items with Amazon, correct?

4           MS. BLACK:  Form.

5           THE WITNESS:  As far as the terms of service?

6  BY MR. VINE:

7      Q    No, that's not what you wrote or what Cheri

8  wrote.

9           I asked you earlier if you recall correctly

10  that you testified under oath that there were no

11  internal operating procedures for listing items with

12  Amazon; do you recall that?

13          MS. BLACK:  Form.

14          THE WITNESS:  Correct.

15  BY MR. VINE:

16     Q    Is it correct that there were no internal

17  operating procedures for listing items with Amazon; is

18  that correct?

19     A    Correct.

20     Q    Okay.  So Cheri wrote that statement, correct?

21     A    Correct.

22     Q    And that is an inaccurate statement, correct?

23     A    Correct.

24     Q    Okay.  Now, the next one it says:

25          Referencing the "Product Detail Page Rules"



1    guide and "Policies for adding detail pages" subsection.

2              Did you write that?

3        A    I don't recall.

4        Q    Okay.

5              You must not create a product detail page for

6    a product that already in -- that already, it should say

7    is in Amazon's catalog.

8              Do you see that?

9        A    I do.

10       Q    Did you write that?

11       A    I don't recall.

12       Q    It says:  We follow these guidelines for items

13   that already have an existing ASIN in the Amazon

14   catalog.

15             Do you see that?

16       A    Yes.

17       Q    Did you write that?

18       A    I don't recall.

19       Q    Okay.  The next sentence says:  For the

20   products in question, Youngblood Cosmetics, Youngblood

21   Cosmetics, we follow the exact guidelines.

22             Did you write that?

23       A    I don't recall.

24       Q    Okay.

25             During our conversation, on Friday



 1   November 16th with the Amazon Catalog team.

 2           Did you have that conversation or was that

 3   Cheri?

 4       A    I would have had that conversation.

 5       Q    Okay.  So you would have wrote this sentence?

 6       A    She and I would have talked about it.  I'm not

 7   sure if I wrote it or she wrote it.

 8       Q    Okay.

 9           We were conflicting information to the

10   document Amazon Product Detail Page Rules.

11           What does that mean?

12       A    That would have been specifically creating a

13   duplicate listing for Amazon items that are, already

14   have an existing ASIN, so the Youngblood products

15   already all had existing ASINs.

16       Q    And you guys had done your own page?

17       A    No, we specifically did not do our own pages,

18   and they said to create a secondary listing, which we

19   thought it was a violation of their own terms of

20   service.

21       Q    Is that what you wrote here?

22       A    Yes, that's what they're saying.

23       Q    Well, on here it says:  During our

24   conversation, on Friday November 16 with the Amazon

25   Catalog team, we were conflicting information to the



 1  document Amazon Product Detail Page Rules.

 2          Then you said:  We were told, duplicate

 3  listings are redundant, and are not within Amazon's

 4  Terms of Service, which is what could have caused the

 5  issuance of the counterfeit complaint.

 6          Aren't you saying here that you did do one and

 7  that Amazon told you you shouldn't have done one?

 8      A    No, the question was if you created a

 9  secondary listing, which is not what Amazon wants, they

10  want every ASIN or the UPC to be linked together.

11      Q    Right.

12      A    They don't want redundant listings.

13      Q    Right.

14      A    They're saying create a redundant listing, if

15  you were to create that secondary listing that it would

16  be a violation of terms of service, but if we were to

17  create a new listing that says you didn't have a

18  warranty or if there's something that was different

19  about it, that would be the way that you would go about

20  doing that so that it wouldn't be in violation with

21  intellectual property.

22      Q    Okay.  But that's not what was done, correct?

23      A    We did not create secondary listings.

24      Q    They believed you did, correct?

25      A    No.



 1        Q    Okay.  Then why don't you read the next

 2   sentence in where it says:

 3             We have repeatedly explained (during numerous

 4   emails and phone calls to Amazon support) that we

 5   produce our own product content, photos, and keywords

 6   for our listings, but that information is not always

 7   visible on the listing is the listing was created by

 8   another seller or existed prior to us selling the item.

 9        A    Correct.

10        Q    Okay.  How do you correlate the two?

11        A    So if an item in ASIN already exists on

12   Amazon, all that information is locked in with the

13   Amazon system.

14             So we take pictures of our items, we took the

15   content, we write content or create keywords, but if all

16   that information already existed there, then we weren't

17   allowed to override that information.

18             Basically we were linked into Amazon ASIN, and

19   if we could take all the pictures we wanted or we could

20   create keywords it wouldn't matter, everything is linked

21   in based on that UPC and that ASIN.

22        Q    So what was Amazon saying about this?

23        A    We were saying that even though we took all

24   the steps to not violate any kind of intellectual

25   property, that all that information already existed



KELLON GOODSON                                          January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                          134

 1    there so we wouldn't even have the opportunity not to

 2    violate intellectual property because it's already

 3    linked into that ASIN.

 4         Q    It says (during the numerous emails); emails

 5    regarding this Youngblood issue?

 6         A    I believe so.

 7         Q    Okay.  So you have numerous emails to Amazon?

 8         A    I don't recall how many.

 9         Q    You wrote numerous, right?

10         A    That would either be me or Cheri, I'm not sure

11    which.

12         Q    So there were numerous emails to Amazon

13    regarding how you were using Amazon Product Detail Page

14    Rules?

15         A    Yes.

16         Q    Okay.

17         A    Discussion about their terms of service on not

18    creating redundant listings, but linked into the

19    existing ASINs.

20         Q    Then you write:  We do try and proactively

21    petition Amazon if we do see issues with currently

22    listed items that may be incorrect or invalid.

23              Is that an accurate statement?

24         A    Yes.

25         Q    Okay.  Do you recall proactively petitioning



 1  Amazon when you saw items not valid?

 2      A    If there would be an item photo issue.

 3      Q    Do you recall doing it specifically?

 4      A    Specific items, no.

 5      Q    So you can't point to one occasion where you

 6  proactively petitioned Amazon as reflected in the

 7  currently listed items, correct?

 8      A    Correct.

 9      Q    Okay.  Who wrote that, you or Cheri?

10      A    I don't recall.

11      Q    So despite you saying you proactively

12  petitioned, you can't recall any as you sit here today,

13  correct?

14      A    Correct, specific listings, no.

15      Q    In fact you weren't proactive with Amazon, you

16  actually ignored Amazon's warnings up until the

17  violations noted on Youngblood and they suspended your

18  account, correct?

19          MS. BLACK:  Form.

20          THE WITNESS:  I think we are talking about two

21      different things here.

22  BY MR. VINE:

23      Q    Well, when you received policy warnings you

24  weren't proactive at all with them, correct?

25      A    But this was not --



KELLON GOODSON                                        January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                          136

1      Q    I'm asking when you received policy warnings,

2   did you proactively address them?

3      A    No.

4      Q    So here it says you have sent two additional

5   follow up emails on 11/14 and 11/15, okay, right?

6      A    Yes.

7      Q    So you would have emailed in from your email

8   address regarding this, correct?

9      A    Yes, there should be.

10     Q    Okay.  Let's turn to the next page.

11     A    Okay.

12     Q    Actions taken to prevent the issue in the

13  future:  Number III:  It says we are instituting

14  additional quality checks to ensure that newly sourced

15  product passes quality inspection and that the packaging

16  is valid and genuine.  We have created a system

17  generated flag to allow us to pull products off a

18  receipt for inspections.

19          Is that a true statement?

20     A    I don't recall.

21     Q    Okay.  Who wrote that?

22     A    I don't recall if that was me or Cheri.

23     Q    Okay.  Is it true that you didn't have that

24  additional quality check system in place prior to this,

25  the date of this document?



1       A    Correct.

2            MS. BLACK:   Form.

3   BY MR. VINE:

4       Q    Okay.  You also say in Number II:  We will vet

5   or current and future supply chain partners to ensure

6   that they can also comply with the same Terms of Service

7   for any items we plan to sell on Amazon.

8            Do you see that?

9       A    Yes.

10      Q    Okay.  Did you go forward in vetting the

11  supply chain partners?

12      A    I don't recall.

13      Q    Did you write that or did Cheri write that?

14      A    I don't recall.

15      Q    Prior to that you were not vetting your supply

16  chain to ensure that they were complying with Amazon's

17  guidelines, correct?

18      A    Correct.

19      Q    Okay.  And then on the fourth item you said

20  that you weren't going to be selling Amazon products,

21  correct?

22      A    I'm sorry, say that again?

23      Q    Going forward you weren't going to be selling

24  any more of Youngblood products?

25      A    Correct.



1        Q    I said Amazon, my apologies.

2             Okay.  You can put that aside.

3             Were you aware that Youngblood since 1997 had

4    100 percent guarantee on all of their products?

5        A    No.

6        Q    Were you aware that Youngblood had a guarantee

7    and a warranty that 100 percent satisfaction that if the

8    purchaser was not satisfied with their product that they

9    can return the merchandise within 30 days for an

10   exchange or refund?

11       A    No.

12       Q    Are you aware that Amazon categorizes

13   violations regarding product authenticity as a

14   intellectual property violation?

15            MS. BLACK:  Form.

16            THE WITNESS:  No.

17   BY MR. VINE:

18       Q    This was the first time that you were made

19   aware of that?

20       A    As intellectual property, yes.

21       Q    Okay.  Did Solu-Med have a website?

22       A    That we sold products on?

23       Q    Yes.

24       A    Yes.

25       Q    Okay.  And of course it wasn't products that



 1   you manufactured, it was products that you bought from a

 2   distributor, correct?

 3        A    Yes, correct.

 4        Q    And what would you say the percentage of sales

 5   were from that website, a small part?

 6        A    Small.

 7        Q    Very small?

 8        A    Yes.

 9        Q    The bulk was either Amazon or Wal-Mart?

10        A    Amazon specifically.

11        Q    Okay.  Did Solu-Med secure advanced contracts

12   with suppliers for future supplies of particular

13   products?

14        A    Not that I am aware of, no.

15        Q    What makes Solu-Med's store unique, storefront

16   unique on the Amazon storefront, if anything?

17        A    Nothing specific.

18        Q    Cost is the biggest factor, right?

19             MS. BLACK:  Form.

20   BY MR. VINE:

21        Q    When I say cost, meaning the cost --

22        A    What?

23        Q    The cost factor of a product is the best way

24   to differentiate yourself between your competitors,

25   correct?



1      A    Oh, actually in Amazon there's a whole host of

2   things that they review that make you, you know,

3   customer service ratings, and delivery, if you use the

4   FBA program, so there's a lot of factors they use.

5      Q    But you would agree with me that price is a

6   significant factor in attracting customers?

7      A    Price is important, yes.

8      Q    Do you agree that it's the most important for

9   a storefront like yours selling cosmetics on Amazon?

10     A    No, if you have bad customer service ratings

11  people won't buy from you, even if you have great

12  pricing trying to sell.

13     Q    So would you think that the price is a

14  significant factor?

15     A    It's important.

16     Q    I asked if it was a significant factor.

17          MS. BLACK:  Form.

18          THE WITNESS:  Again, I think if you have bad

19      customer service ratings.

20  BY MR. VINE:

21     Q    I'm going to keep on asking until you answer

22  the question, it is either yes or no.

23     A    No.

24          MS. BLACK:  Form.

25



1   BY MR. VINE:

2       Q    So you're saying that price is not a

3   significant factor, that's what you're telling the

4   ladies and gentlemen of the jury?

5            MS. BLACK:   Form.

6   BY MR. VINE:

7       Q    You think it's important, but not significant?

8       A    Yes, it is important.

9       Q    But you don't know if it's significant or not?

10      A    Yes, I'm not sure.

11      Q    Okay.  What were the most popular products

12  sold on Solu-Med?

13      A    By popular you mean?

14      Q    I mean a brand.

15      A    Specific brands like the brand names or just

16  the categories?

17      Q    It could be a category, a brand, do you know,

18  first let's start with do you know what brand that was

19  the most popular name on Solu-Med?

20      A    At that time I'm not sure what the best

21  selling brand.

22      Q    What about now?

23      A    I have no idea.

24      Q    What about the time you left?

25      A    Probably health and beauty, yes.



1      Q      That is the name of a brand?

2      A      No, that's the category.

3      Q      I was asking a specific brand.

4      A      I'm not sure.

5      Q      The health and beauty is what, isn't that all

6   you were selling in Life & Health Source?

7      A      There was some medical items as well.

8      Q      The majority and bulk was health and beauty,

9   correct?

10     A      Correct.

11     Q      What product or type of products of life and

12  health beauty was the most popular?

13     A      Hair care and skin care.

14     Q      Isn't that life and health and beauty?

15     A      No, I'm sorry, the like --

16     Q      Is it a brush, is it a certain type of blush

17  cosmetic?

18     A      Shampoos, conditioners, hair treatments,

19  things like that.

20     Q      That were the most popular?

21     A      Yes.

22     Q      Okay.  And Solu-Med is not selling any of

23  their own branded products, correct?

24     A      Correct.

25     Q      Did you have a constant supply of these



 1  demanded products that you are aware of?

 2       A    I am not aware.

 3       Q    You don't know if there was a constant demand

 4  of these products, correct?

 5       A    Correct.

 6       Q    And you don't know it you could consistently

 7  get a supply because you weren't the one actually doing

 8  the purchasing, that was Q Med, correct?

 9       A    We had an understanding of how much we would

10  forecast, but as far as specifics, no.

11       Q    You don't know if that supply could continue,

12  because you didn't have those future contracts that we

13  talked about earlier?

14       A    Correct.

15       Q    Are you aware of Amazon's algorithm that

16  resulted in certain stores or entities products being

17  displayed on the first page of a search of a product?

18            MS. BLACK:  Form.

19            THE WITNESS:  Yes, I am aware of the

20       algorithm.

21  BY MR. VINE:

22       Q    You don't know what that it is?

23       A    I don't have the specifics.

24       Q    Well, are you aware of how one can achieve

25  getting to be on the first page?



1      A    Again, I know it's a combination of price and

2  customer service and having a good reputation.

3      Q    So price is definitely a factor for that?

4      A    Price is a factor, yes.

5      Q    So if I asked you questions about Solu-Med's

6  financial statements you wouldn't be able to answer

7  those questions, correct?

8      A    No.

9      Q    Were you involved, though, in creating the KPI

10  Metrics for Solu-Med?

11      A    I helped to provide some information for

12  those.

13      Q    But you didn't draft the KPI Metrics?

14      A    No, the accounting team did the actual KPIs in

15  2018.

16      Q    And you couldn't have done the KPI, I'm

17  talking about in 2017, did you do the KPI Metrics?

18      A    In 2017, yes.

19      Q    You drafted it?

20      A    Yes.

21      Q    Okay.  Let me take a five minute break.

22           THE VIDEOGRAPHER:  We are going off the video

23      record 11:02 a.m.

24           (Whereupon, a short recess was had.)

25           THE VIDEOGRAPHER:  We are back on the video



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS              145

```
 1        record 11:08 a.m.

 2   BY MR. VINE:

 3        Q    Were you aware that in June of 2018 there was

 4   a strategic shift at Solu-Med?

 5        A    Can you explain that?

 6        Q    Was there a decision by management to stop

 7   selling certain types of products on storefronts?

 8        A    Not that I recall.

 9        Q    You weren't told to stop selling any medical

10   supplies or anything to that extent in the summer of

11   2018?

12        A    I don't recall.

13        Q    Were you aware that there was sales declines

14   from June of '18, 2018 to November of 2018 before the

15   Youngblood product?

16        A    Yes.

17        Q    Do you know why there was a decline, a sales

18   decline?

19        A    There were items that we stopped selling

20   specifically that we didn't want to sell anymore.

21             There were large items that we got out of, but

22   we did look at reinvesting those in different products

23   in the hopes that we could sell those in the later part

24   of the year.

25        Q    Okay.  But there was a sales decline for the
```



 1   six months prior to November of 2018?

 2              MS. BLACK:  Form.

 3              THE WITNESS:  I don't recall specifics.

 4   BY MR. VINE:

 5       Q    But you were aware that there was a sales

 6   decline?

 7       A    Yes.

 8              MR. VINE:  I am going to allow you to continue

 9        until I get those Exhibits, it's just two minor

10        Exhibits, but I'm going to reserve my right to

11        question on that and the emails.

12        Go ahead.

13              MS. BLACK:  Okay, thanks.

14                      CROSS EXAMINATION

15   BY MS. BLACK:

16       Q    Solu-Med accepted returns on all its products

17   listed on the Amazon store, right?

18              MR. VINE:  Objection.

19              THE WITNESS:  Yes, we would contact the -- the

20        vendor would contact -- the customer would contact

21        us and we would have a discussion about the

22        products.

23   BY MS. BLACK:

24       Q    And any products purchased through the

25   Fulfilled by Amazon program would automatically be



 1  accepted for return, correct?

 2      A    Correct.

 3           MR. VINE:  Objection.

 4  BY MS. BLACK:

 5      Q    Solu-Med sourced all its products from Q Med?

 6      A    Correct.

 7      Q    And Innopex was a supplier of Q Med?

 8      A    Correct.

 9      Q    Q Med has very stringent standards for their

10  suppliers?

11      A    Correct.

12      Q    Q Med supplies medical equipment for companies

13  like Kipson and other big brand medical suppliers,

14  right?

15           MR. VINE:  Objection.

16           THE WITNESS:  Correct.

17  BY MS. BLACK:

18      Q    And Q Med goes through audits by those

19  customers on a regular basis?

20           MR. VINE:  Objection.

21  BY MS. BLACK:

22      Q    Are you aware of that?

23      A    Yes.

24      Q    Yes, sorry, for the camera and the court

25  reporter you have to actually say yes.



```
 1        A    Correct.

 2        Q    If a supplier of Q Med was packing on

 3   counterfeit products, would Q Med continue to do

 4   business with them?

 5             MR. VINE:  Objection.

 6             THE WITNESS:  No.

 7   BY MS. BLACK:

 8        Q    And you worked at Q Med before you worked at

 9   Solu-Med, correct?

10        A    Correct.

11        Q    In your 10 year history of Q Med and Solu-Med

12   have you ever heard of any instance of Innopex passing

13   on counterfeit product?

14        A    Not that I was aware of, no.

15        Q    Does Q Med have extremely strict quality

16   control measures for new product from the supplier

17   passing through its warehouse?

18             MR. VINE:  Objection.

19             THE WITNESS:  Yes.

20   BY MS. BLACK:

21        Q    Have you ever compared Q Med's quality control

22   SOPs against Amazon's policies?

23        A    No.

24        Q    You don't know if Q Med has a stricter SOP

25   than Amazon in sourcing and chain of custody, right?
```



1        A    I'm not sure, no, I am not aware.

2        Q    When you testified that Innopex is a reliable

3   supplier, did you make that statement based on your

4   experience with Q Med, the stringent requirements that

5   they make their suppliers go through to sell products

6   through them, and your history, your 10 year history

7   with the company?

8             MR. VINE:  Objection.

9             THE WITNESS:  Correct.

10  BY MS. BLACK:

11       Q    Are you aware that Amazon Seller University

12  YouTube channel and credentials only came about in 2019?

13       A    I wasn't aware of that.

14       Q    If that statement is true would it have been

15  possible to achieve the certificate on the YouTube

16  channel or whatever Mr. Vine was referencing prior to

17  purchasing Youngblood products?

18            MR. VINE:  Objection.

19            THE WITNESS:  No.

20            MR. VINE:  That's not true either.

21  BY MS. BLACK:

22       Q    Do you have any idea with regard to the Amazon

23  policies that Mr. Vine showed you if these policies were

24  put in place, or revised in any way I should say, in

25  fact let's strike the question.



1           If you look at Exhibit 2.

2     A     Okay.

3     Q     If you look at the top left hand corner of

4  Exhibit 2?

5     A     Yes.

6     Q     Do you see the date?

7     A     Yes.

8     Q     What does it say?

9     A     December 2nd, 2019.

10    Q     The policies he was asking you to review the

11 Condition Guidelines, you have no idea if they had

12 materially changed from the time you reviewed them in

13 December or in 2015, correct?

14    A     Correct.

15    Q     You don't know if they have changed from pre

16 let's say October 2018 until now, correct?

17    A     Correct.

18    Q     And if we go through for every, if you go to

19 the next one, the cosmetics and skin care Exhibit 5, or

20 Exhibit 3, sorry, I have different Exhibit numbers.

21          What's the date in the upper left hand corner

22 of that Exhibit?

23    A     December 10th, 2019.

24    Q     Correct.

25          If you had a question about a listing on the



1  Amazon store would you refer to Amazon's referenced

2  videos, tutorials, helplines, et cetera, to ensure that

3  you are complying to the best of your ability with any

4  of Amazon's policies?

5              MR. VINE:  Objection.  I just move to strike

6      it as inaccurate, but go ahead.

7              THE WITNESS:  Can you ask the question again?

8  BY MS. BLACK:

9      Q    Yes, I was asking if you had a question about

10  something that you were listing on Life & Health Source

11  Amazon store would you review to assist yourself in

12  listing the product accurately Amazon's policies?

13             MR. VINE:  Objection.

14             THE WITNESS:  I'm not aware of what our next

15      steps would be.

16  BY MS. BLACK:

17      Q    If Amazon had different language in October or

18  at any time in 2018 that the definition under the

19  Condition Guidelines that you looked at earlier didn't

20  have to include the word new, or that the Condition

21  Guidelines for listing new products did not have to

22  include original manufacturer's warranty, would you like

23  to see a document that said that?

24             MR. VINE:  Objection.

25             THE WITNESS:  Yes.

 1   BY MS. BLACK:

 2       Q    If we go to Exhibit 4.  If you go to

 3   Exhibit 4, what does it say under materially different

 4   product violation?

 5            I think it's about halfway through the page.

 6       A    Materially different product condition

 7   violation.  The product you list and ship must exactly

 8   match the description, pictures and all other

 9   information on the product detail.  Amazon policy

10   prohibits you from listing or shipping materially

11   different products.

12       Q    And when you read that policy it says Amazon

13   Products Authenticity and Quality, right?

14       A    Yes.

15       Q    That's the name of the policy you were reading

16   from?

17       A    Yes.

18       Q    And there's two types of violations,

19   intellectual property violation and materially different

20   product conditions violation, correct?

21       A    Yes.

22       Q    And when it lists examples of problems under

23   the second category, Materially Different Product

24   Condition Violations, is one of the first examples it

25   says listing your products in new condition when it's



1   not brand new or used?

2        A     Correct.

3        Q     Do you know one way or the another if

4   Youngblood had specific instructions on how to store its

5   products?

6        A     I wasn't aware.

7        Q     Did Youngblood ever contact you or anyone at

8   Solu-Med as far as you know for samples of Solu-Med

9   listed Youngblood products?

10       A     No.

11       Q     They didn't contact you pre making the

12  counterfeit report in 2018?

13       A     No.

14       Q     And they didn't contact you after, right?

15       A     Not that I am aware of, no.

16       Q     In terms of Exhibit 8, I will give you a

17  second to flip through it, did Youngblood ever email you

18  the information contained in this complaint?

19       A     No.

20       Q     The first notice that you had issue that

21  counterfeit -- is that Youngblood told Amazon that you

22  had counterfeit product was received in this

23  notification or was when Amazon shut down your store,

24  correct?

25             MR. VINE:  Objection, mischaracterizes his



1          testimony, and there was an Exhibit that's already

2          reflected that he received one on November 11th.

3               MS. BLACK:  I asked a bad question.

4     BY MS. BLACK:

5          Q    In terms of communications about Youngblood

6     complaining about counterfeit product, the only

7     communications you ever received came through Amazon,

8     correct?

9          A    Correct.

10         Q    Youngblood never reached out to the Life &

11    Health Store to notify you that they took issue with any

12    of your listings?

13         A    No.

14         Q    They never requested samples of any of the

15    products you issued?

16         A    No.

17         Q    Do you know one way or another if Amazon

18    required a manufacturer warranty to be included to list

19    the products as new in October of 2018?

20              MR. VINE:  Objection.

21              THE WITNESS:  No, I am not aware.

22              MR. VINE:  One way or the other?  You don't

23         know one way or the other, right?

24              THE WITNESS:  I don't know, I'm not sure.

25



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                    155

```
 1   BY MS. BLACK:
 2        Q    Mr. Vine asked you some questions about
 3   Exhibit 13, which was the November 16, 2018 Plan of
 4   Action.
 5        A    Okay.
 6        Q    If you flip to the second page and I may have
 7   misunderstood, but it says:
 8             "We reviewed our internal operational
 9   procedures for listing items with Amazon, in order to
10   ensure that we are following Amazon's Terms of Service
11   and Product Detail Page Rules of protocol."
12             Correct?
13        A    Yes.
14        Q    I read that correctly?
15        A    Yes, correct.
16        Q    When you were talking about operational
17   procedures for Solu-Med, you previously said none of
18   them are in writing, right?
19        A    Correct.
20        Q    But you had procedures, right, on how to --
21             MS. BLACK:  Well, let him answer.
22             MR. VINE:  Well, no, no, no, because you're
23        misleading and I'm going to object because that's
24        not what that says, and that's not what he
25        testified to, but that's fine if he wants to change
```



1        his testimony under oath and I will just object.

2              MS. BLACK:  Well, you inserted the word

3         "written" earlier.

4              MR. VINE:  He actually said that there were no

5         internal operating procedures regarding listing,

6         verbal or written, that's what he testified to.

7              MS. BLACK:  I must have taken an inaccurate

8         note, but regardless.

9              MR. VINE:  He said that was an inaccurate

10        statement, and he said that Cheri is the one who

11        wrote it.

12             MS. BLACK:  Right, and that's because you

13        inserted the word written.

14             MR. VINE:  No, ask him.

15             MS. BLACK:  The record --

16             MR. VINE:  Ask him.  Ask him, let's see what

17        he says.

18    BY MS. BLACK:

19        Q    So what I'm asking is while there weren't

20    written protocols would that statement be true if you

21    guys discussed operational procedures that Solu-Med had

22    for listing products with Amazon?

23             MR. VINE:  Objection.

24             THE WITNESS:  We would discuss ways of listing

25        but we didn't have any internal, there were no set



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                    157

1      procedures.

2  BY MS. BLACK:

3      Q    And set in terms of -- all right, I will leave

4  it at that, that's fine.

5           Can you explain the fulfillment by Amazon

6  program?

7      A    Yes, so there is product that would be owned

8  by Solu-Med that we would send to Amazon's fulfillment

9  centers, Amazon would take the products in, and they

10  would be listed on Amazon's site and then Amazon would

11  handle the fulfillment, once a customer orders those

12  products they would go to the customer and Amazon would

13  be responsible for customer service, returns, and

14  anything related to the sale of the product and delivery

15  of the product.

16     Q    And I just have one more question related to

17  that, and I can turn this back over to Mr. Vine.

18          When a customer goes shopping on the Amazon

19  store is it notified somehow in the listing that an item

20  is fulfilled by Amazon?

21     A    Yes, it says Amazon Prime.

22          MS. BLACK:  Perfect.  No further questions.

23                    REDIRECT EXAMINATION

24  BY MR. VINE:

25     Q    Okay, great.  I have a couple of follow-up



 1  questions.

 2         You were asked a whole slew of questions about

 3  the Amazon guidelines, correct?

 4      A    Yes.

 5      Q    And what existed in 2018, you don't know what

 6  existed in 2018 because you didn't review them prior to

 7  selling the Youngblood products, correct?

 8      A    Correct.

 9      Q    You also were asked whether Youngblood ever

10  contacted, Youngblood ever contacted Solu-Med to discuss

11  how the products were being stored; do you remember

12  that?

13      A    Yes.

14      Q    Okay.  You never contacted Youngblood before

15  you started selling the products, correct?

16      A    Correct.

17      Q    You never contacted Youngblood before selling

18  its product to ask them to review samples of the

19  products you bought, correct?

20      A    Correct.

21      Q    Now I have this KPI Metrics that I was

22  referring to earlier.

23         MS. BLACK:  Got it.

24         (Whereupon, the below referred to document

25      was marked as Defendant's Exhibit No. 14.)



```
 1              MR. VINE:  Exhibit 14.  I have a copy for you.

 2              MS. BLACK:  Thank you.

 3              MR. VINE:  You're welcome.

 4   BY MR. VINE:

 5        Q    Is this a document you drafted?

 6        A    Yes.

 7        Q    And this is the KPI Metrics that you drafted,

 8   they don't reflect expenses for payroll, correct?

 9        A    Correct.

10        Q    It doesn't reflect expenses for rent, correct?

11        A    Correct.

12        Q    It doesn't reflect expenses for insurance,

13   correct?

14        A    Correct.

15        Q    It doesn't reflect expenses for almost

16   anything, correct?

17        A    Correct.

18        Q    Okay.  Put that aside.

19              MS. BLACK:  Did you state that was for 2017?

20   BY MR. VINE:

21        Q    This document, I thought we testified earlier,

22   he testified earlier that the KPI Metrics reflects for

23   2017, correct?

24        A    Correct, this is 2017 KPIs.

25        Q    And you were asked a number of questions
```



1  regarding Q Med's internal guidelines, correct?

2      A    Correct.

3      Q    Okay.  When you were at Solu-Med did you have

4  access to their written guidelines?

5      A    I don't recall.

6      Q    Okay.  Did you review their written guidelines

7  regarding their supply of chain of custody, correct?

8           Or, no, did you review their supply of chain

9  of custody guidelines?

10     A    Not that I am aware of, no.

11     Q    Okay.  So all of the "verification" that Q Med

12  did, you're not aware of what they actually did as

13  relates to Youngblood products, correct?

14     A    While I was at Solu-Med, no.

15     Q    And you're not aware of how they vetted

16  Innopex, correct?

17     A    Specifically Innopex, no.

18     Q    You haven't received or reviewed their file

19  for Innopex, have you?

20     A    No.

21     Q    Okay.  Are you aware if they have a vetting

22  file of Innopex?

23     A    Generally I know they vet all their suppliers.

24     Q    They have one for all their suppliers?

25     A    Yes.



KELLON GOODSON                                    January 09, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      161

1        Q     And what's in that file?

2        A     I'm not sure, I don't know.

3        Q     Are you aware of that ERA system that you were

4   talking about?

5        A     ERP.

6        Q     ERP system, is that cost something that

7   Solu-Med pays for?

8        A     I am not aware.

9        Q     Okay.  And the last question, when you were

10  speaking with Ms. Black last night about this

11  deposition, did she go over any questions that she asked

12  you today?

13       A     No.

14       Q     Nothing further.

15             You have the opportunity to read the

16  deposition to make sure that this lovely court reporter

17  over here took down everything you said was accurate in

18  your response about your responses --

19       A     Okay.

20       Q     -- Or you could waive that right, it's up to

21  you.

22       A     I have to do it now?

23       Q     No, you don't have to read it now, you have to

24  make a determination whether you want to waive.

25             MS. BLACK:  She's going to type it up and then



1  you will have an opportunity to come in and read it

2  and sign it within 30 days of her notifying you

3  that it's been typed up.

4       THE WITNESS:  Okay.

5       MS. BLACK:  But you have to say it on the

6  record whether you want to read or whether you

7  waive that right.

8       THE WITNESS:  Yes, I would like it read it.

9       THE VIDEOGRAPHER:  We are going off the video

10 record 11:26 a.m.

11      MR. VINE:  We would like a rush on this as

12 well.

13      MS. BLACK:  Yes, I would like a copy, only

14 electronic PDF, TXT.

15      (Thereupon, the videotaped deposition

16 was concluded.  Signature and formalities were

17 not waived.)

18                 - - - - - -

19

20

21

22

23

24

25



1                              - - - - - -

2                      CERTIFICATE OF OATH

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6

7              I, the undersigned authority, certify

8    that KELLON GOODSON personally appeared

9    before me and was duly sworn.

10             WITNESS my hand and official seal this

11   12th day of January 2020.

12

13

14   _____

15             Evan A. Ferguson
               Notary Public, State of Florida
16             My Commission Expires 12/29/21
               Commission No. GG 139467

17

18

19

20

21

22

23

24

25



1               CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA:

5    COUNTY OF BROWARD:

6

7

8            I, Evan A. Ferguson, Court Reporter,
     certify that pursuant to Notice of Taking Deposition
9    in the above-styled cause, that I was authorized to
     and did stenographically report the foregoing
10   deposition as hereinabove shown, and the testimony
     of said witness was reduced to computer
11   transcription under my personal supervision.
             I further certify that the said deposition
12   was taken at the time and place specified
     hereinabove, and that I am neither of counsel nor
13   solicitor to either of the parties in said suit nor
     interested in the event of the cause.
14           I further certify that I have delivered
     the original copy of said deposition to JONATHAN
15   VINE, ESQUIRE, to be retained by him pending further
     order of the Court.
16           Witness my hand and official seal in the
     City of Fort Lauderdale, County of Broward, State of
17   Florida, this 12th day of January 2020.

18

19                        _____

20                        Evan A. Ferguson, Notary
                          Public at Large
21                        My Commission Expires 12/29/21
                          Commission No. GG 139467

22

23

24

25



1              DEPOSITION ERRATA SHEET

2

   Job Assignment No: J4842062
3
   Case Caption:  SOLU-MED, INC.
4
   vs.
5
   YOUNGBLOOD SKIN CARE
6  PRODUCTS, LLC.

7

8       DECLARATION UNDER PENALTY OF PERJURY

9         I declare under penalty of perjury

10  that I have read the entire transcript of

11  my Deposition taken in the captioned matter

12  or the same has been read to me, and

13  the same is true and accurate, save and

14  except for changes and/or corrections, if

15  any, as indicated by me on the DEPOSITION

16  ERRATA SHEET hereof, with the understanding

17  that I offer these changes as if still under

18  oath.

19         Signed on the _____ day of

20  _____, 20____.

21

22  _____

23  KELLON GOODSON

24

25



```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24              KELLON GOODSON

25
```



```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25         KELLON GOODSON
```



Exhibits

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT1
  3:9 45:24
  46:2
  83:15,22,
  24 84:18

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT2
  3:10
  57:20,22
  61:2
  63:22
  150:1,4

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT3
  3:11
  62:15,19
  150:20

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT4
  3:12
  62:23,25
  63:22
  70:17,18
  77:21
  152:2,3

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT5
  3:14
  69:4,6
  70:13
  80:5
  150:19

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT6
  3:15
  82:17

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT7
  3:16
  89:7,9
  101:23

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT8
  3:17
  103:8,10,
  11 104:9,
  11,17,25
  153:16

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.EXHIBIT9
  3:18
  104:10,
  12,19
  105:2,11
  106:4

  107:11

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.
EXHIBIT10
  104:14,21
  107:8,10
  110:10

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.
EXHIBIT11
  110:16,
  18,19
  114:18

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.
EXHIBIT12
  115:12,14

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.
EXHIBIT13
  123:2,4
  155:3

4842062 Kel
lon.
Goodson CON
FIDENTIAL D
FT.
EXHIBIT14
  158:25
  159:1

0

0003
  105:1

1

1
  45:24
  46:2
  83:15,22,
  24 84:18

1/27/2018
  89:20

1/28
  89:23

10
  104:6,10,
  14,21
  107:8,10
  110:10
  148:11
  149:6

100
  49:2
  138:4,7

10:02
  88:25

10th
  150:23

11
  110:16,
  18,19
  114:18

11/13
  126:16,24

11/13/2018
  110:20

11/14
  136:5

11/14/2018
  115:17

11/15
  127:2
  136:5

11:02
  144:23

11:08
  145:1

11:26
  162:10

11th
  154:2

12
  115:12,14

12:10
  111:2

13
  123:2,4,6
  155:3

13th
  110:13
  111:2
  114:19,22
  123:21
  124:2
  126:21

14
  158:25
  159:1

14th
  115:18
  117:13,
  18,23
  118:15

16
  11:22
  21:23
  131:24
  155:3

16th



131:1

**18**
29:11
145:14

**198**
90:25

**199**
90:20,23
91:3
102:6

**1997**
138:3

**1st**
8:3

---

**2**

**2**
57:20,22
61:2,15
62:20
63:22
150:1,4

**20**
6:14

**2005**
8:12

**2006**
9:7,8

**2007**
9:6,18,19

**2008**
10:3,19
11:22

**2009**
10:18

**2015**
11:22,24
21:23
26:7,8,

14,17,21
33:4,12
34:5
42:10,14
55:5
58:2,4
61:8 63:5
65:18
66:7
69:10,11
82:21
150:13

**2016**
33:2

**2017**
15:12
32:25
33:16
144:17,18
159:19,
23,24

**2018**
26:8
27:10,12,
20 28:8,
12,13,14,
15 29:4
32:17,21,
22 33:14,
15,22,25
34:2
38:5,9,
10,17,19
40:15
42:7,9
55:2,7,11
61:11
63:7
69:12,13
80:20
82:22
91:5
95:2,7
98:13
101:6

111:2
144:15
145:3,11,
14 146:1
150:16
151:18
153:12
154:19
155:3
158:5,6

**2019**
22:7
30:9,16
90:11
95:2,8
96:3,4,
10,16
97:1
98:13
122:14
149:12
150:9,23

**222**
90:25

**25**
6:14

**26th**
117:24
118:5

**2nd**
150:9

---

**3**

**3**
62:15,19,
21 63:22
122:2
150:20

**3/05**
89:25

**30**
138:9

162:2

**33314**
5:19

---

**4**

**4**
62:23,25
63:22
70:17,18
77:21
152:2,3

**4/04**
90:2

**4/04/2018**
90:19

**40**
127:6

**4657**
5:19

---

**5**

**5**
69:4,6
70:13
80:5
150:19

**5/12**
90:4

**53**
123:5

---

**6**

**6**
82:17,19

---

**7**

**7**
89:7,9
101:23

---

**8**

**8**
103:8,10,
11 104:9,
11,16,17,
22,25
153:16

**8:55**
43:9

---

**9**

**9**
104:6,10,
12,19,22
105:2,11
106:4
107:11

**9:01**
43:12

**9:52**
88:22

---

**A**

**A-TO-Z**
81:2

**a.m.**
43:9,12
88:22,25
144:23
145:1
162:10



**abide**
    69:18
    80:6

**ability**
    13:25
    80:11
    151:3

**absolutely**
    112:6

**accept**
    44:10,14
    45:2,5,
    14,17
    46:11,16
    47:4,23
    48:1,6,
    14,16
    49:14,25
    50:3
    84:1,20

**acceptable**
    115:22

**acceptance**
    49:21

**accepted**
    45:15
    50:10
    85:24
    146:16
    147:1

**accepting**
    48:8
    83:13,14

**access**
    99:13
    160:4

**accomplishe
d**
    86:14

**account**
    14:10
    15:10,14,

20 23:6,
    24 29:10
    37:11
    81:7
    82:2,9
    84:20
    86:13,19
    87:9,10
    94:6 98:3
    99:12
    108:5,19,
    23 109:10
    110:20
    112:10,12
    114:19
    115:7
    124:4
    135:18

**accounting**
    18:20
    19:5,24
    21:17
    144:14

**accounts**
    12:25
    82:3

**accuracy**
    25:10

**accurate**
    47:2,3
    83:2,4
    84:6
    111:14,17
    112:2,5
    113:4,7
    123:24
    124:14
    127:21
    128:9
    134:23
    161:17

**accurately**
    83:8,12
    151:12

**achieve**
    143:24
    149:15

**acknowledgi
ng**
    35:23

**acquiring**
    32:16,19
    33:10
    34:14

**action**
    93:9
    95:6,7,9,
    10 96:3
    108:20
    109:15
    110:19
    115:2,4,
    16 124:4
    126:21,22
    155:4

**actions**
    81:5
    95:22
    111:19
    116:24
    136:12

**active**
    93:5

**actual**
    39:12
    106:11
    144:14

**Adam**
    28:10,11,
    24 29:17
    31:2,6
    36:1
    46:9,19
    55:14
    64:7
    110:24

**add**

123:14

**added**
    123:12,
    15,18

**adding**
    130:1

**additional**
    136:4,14,
    24

**address**
    5:18
    97:23,25
    98:6
    121:10
    123:9
    136:2,8

**addressed**
    121:11

**adhere**
    45:9

**Administrat
ion**
    8:10

**advanced**
    139:11

**advice**
    95:17
    99:8

**advise**
    43:24
    44:2

**advised**
    95:20
    112:14

**agree**
    32:9 70:2
    100:23
    140:5,8

**agreed**
    112:15

**AGRO**
    6:5,7
    7:21
    12:15

**Aguero**
    47:7
    82:11
    92:7 97:3
    106:16
    112:13

**ahead**
    62:7
    63:15
    66:4
    146:12
    151:6

**algorithm**
    143:15,20

**allowed**
    40:8
    133:17

**Amazon**
    13:21,23,
    25 14:4,
    14,24
    15:9,14,
    17,19,21,
    25 16:16
    22:11,13,
    24 23:3,
    20,22
    24:11,17,
    21 25:11
    26:17
    27:3,4,7,
    10 28:7,9
    30:25
    31:13,17,
    19 32:2,
    12,14,21
    34:12,15,
    18 35:1,
    19,22,24
    36:2



37:25
39:8,17,
20 41:4,
6,9,13,24
42:3,17,
21 43:2,
15,20
44:5
45:1,9,12
48:11,16,
19,21
49:2,21
50:2 54:8
55:11,19,
22 57:2,
23 58:21
59:9
61:4,25
62:19
63:18,23
64:1 65:2
67:8 68:1
69:6,22,
24 70:2,6
77:19
78:8
80:14
82:2,9
83:5
84:20
85:9,18,
21 89:11,
12 92:6
93:17,20
94:3
96:6,17
99:17
101:20
103:24
106:6,7
107:23
108:22,24
113:10
114:2,23
115:21
116:8
124:12,

17,25
125:12
126:11
127:7
128:20
129:3,12,
17 130:13
131:1,10,
13,24
132:1,7,9
133:4,12,
13,18,22
134:7,12,
13,21
135:1,6,
15 137:7,
20 138:1,
12 139:9,
10,16
140:1,9
146:17,25
148:25
149:11,22
151:1,11,
17 152:9,
12
153:21,23
154:7,17
155:9
156:22
157:5,9,
10,12,18,
20,21
158:3

Amazon's
39:15
41:5,11,
16 45:11
48:6
51:6,10
54:11
62:25
82:8 85:3
87:23
88:11
112:25

122:6
130:7
132:3
135:16
137:16
143:15
148:22
151:1,4,
12 155:10
157:8,10

amended
115:18

amount
47:13
119:19

AMZN
105:1

analyst
10:21,22
11:21
21:24

analytics
16:21,22

and/hair
61:3

and/or
82:4

answering
7:8

answers
17:24

Anti-
counterfeit
ing
69:7

anticipate
18:6

anymore
30:11
47:16
145:20

anyone's
35:23

apologies
138:1

appeal
93:10

application
52:18,19

applies
58:9

apply
51:16
52:9

April
91:5

area
11:19
75:1,18
76:3,6,8
77:11,14

areas
53:19
76:13

argue
65:25

articulate
18:10

ASIN
31:23,24
32:1,6,11
39:15,19
41:4,18
43:17
51:10
88:11,14
91:14
102:7
103:24,25
104:1,2
105:14,
15,21
106:6,9

107:11,12
113:20
125:25
130:13
131:14
132:10
133:11,
18,21
134:3

ASIN(S)
103:20

ASINS
53:23
94:14,18,
21 109:1,
4 131:15
134:19

asks
102:7

asserting
98:22

assist
151:11

assume
34:6
62:21

assuming
34:5
65:13

Atlas
9:21
10:16

attached
117:7

attempted
107:25

attend
16:6
34:17
36:2

attendance



35:23

**attended**
35:1

**attending**
35:19

**attorney-client**
95:17
99:2
100:20

**attracting**
140:6

**audits**
147:18

**authentic**
55:17
103:20
124:25
125:7,8

**authenticity**
26:12
27:8,19
34:13,18
39:7
54:21
56:22
63:1,18
64:23
65:3
66:11,17
67:12,18,
22,25
68:1
69:21
70:10
77:24
78:4
81:4,11
90:17
126:8,13
138:13
152:13

**author**
123:11

**authority**
116:19

**automatically**
93:8
146:25

**average**
90:7

**aware**
12:18
13:19
14:13
15:25
21:9,12
24:15
29:15
33:17
34:20,21
35:25
37:6
38:4,23
39:22
40:16
42:6,8,
12,13
44:6,8,13
50:9
52:20
57:15,18
61:12
63:9,10,
11 64:6,
7,9 69:13
70:8,23
71:19
73:25
74:1,7,18
76:5
79:8,14
80:16
82:6,11,
12,24
86:15

89:3
91:23
93:19
97:19
100:13,19
101:21,25
106:18,
20,21
109:4
113:22
116:7,9
126:5
128:10
138:3,6,
12,19
139:14
143:1,2,
15,19,24
145:3,13
146:5
147:22
148:14
149:1,11,
13 151:14
153:6,15
154:21
160:10,
12,15,21
161:3,8

———————

**B**

———————

**BA**
8:13

**Bachelor's**
8:8

**back**
8:4 24:4
25:8 42:5
43:11
46:24
47:6,15
75:4,7
80:5
88:24

103:5
108:6,7
119:9,25
144:25
157:17

**background**
6:19 8:7

**bad**
140:10,18
154:3

**bar**
41:11,14,
17 42:3

**based**
20:20
65:6,11
66:10,11
114:6
115:21
133:21
149:3

**basically**
12:11
20:16
31:11
43:1
46:22
88:12
99:13
115:6
133:18

**basis**
147:19

**Bates**
90:20

**beauty**
39:5
141:25
142:5,8,
12,14

**begin**
12:19,23

**believed**
132:24

**big**
74:17,18
100:24
147:13

**biggest**
139:18

**bins**
74:21

**bit**
15:22
120:14
128:13

**Black**
6:9 7:12,
20 17:19,
21 19:22
24:14
25:12
28:22
29:14
33:11
35:9
41:22
43:3,5,7
47:10
48:3 49:5
50:4,11,
15 52:22
53:7 56:6
57:11
58:23
59:2,10
60:14,22
62:3
65:4,7,9,
13,19,22,
25 71:17
72:3,12,
14,18,20
75:8
83:16
84:7,15



86:7,24
87:3,16,
24 88:9,
19 92:20
95:16,19,
24 97:10
98:17
100:18,20
105:25
117:25
118:2,6,
16 120:23
121:4,10,
16,21,24
122:23
126:4
129:4,13
135:19
137:2
138:15
139:19
140:17,24
141:5
143:18
146:2,13,
15,23
147:4,17,
21 148:7,
20
149:10,21
151:8,16
152:1
154:3,4
155:1,21
156:2,7,
12,15,18
157:2,22
158:23
159:2,19
161:10,25
162:5,13

blush
142:16

bold
46:10
49:10

boss
28:21,24

bottom
80:21
90:20
103:17

bought
11:17
139:1
158:19

brand
111:7
116:6,9,
12
117:10,15
118:24
119:13
120:4
121:4
141:14,
15,17,18,
21 142:1,
3 147:13
153:1

brand-new
58:8

branded
77:18
78:7
142:23

brandprotec
tion@ybskin
107:15

brandprotec
tion@
ybskin.com.
121:7

brands
141:15

break
18:15
39:11
40:22

43:3
88:19
144:21

bring
23:24
49:8

broke
40:21,24

brought
97:25

Broward
29:25

brush
142:16

builder
8:22 9:10

bulk
15:13
19:9
139:9
142:8

bullet
64:17
69:20
128:18

business
8:9 74:14
83:8
148:4

bust
10:10

butcher
31:23

buy
11:10,15
125:11
140:11

buys
11:7

———————
C
———————

call
16:19
108:3,4,
6,7
114:21
117:15
118:10,
12,20
119:9,15,
17 120:17

called
9:10,21
13:9
119:25

calling
119:20

calls
120:20
133:4

camera
147:24

care
39:5
44:15,16
46:13
61:3,14
62:18
142:13
150:19

Care/hair
62:18

case
6:18,21,
25 7:17,
21 8:1

catalog
125:1
126:11
130:7,14
131:1,25

categories
23:16
44:19
141:16

categorized
67:13,17,
22

categorizes
138:12

category
83:9
141:17
142:2
152:23

caused
132:4

Cental
102:17

center
41:16
48:21
91:10

centers
82:4
157:9

Centex
9:11 10:9

Central
32:21
63:23
81:8
96:21

certificate
35:22
149:15

cetera
151:2

chain
127:10,
14,17
137:5,11,



16 148:25
160:7,8

**chance**
80:11

**change**
22:3
96:16
97:8
115:25
155:25

**changed**
12:1
116:25
150:12,15

**channel**
149:12,16

**characteriz
ed**
67:19

**charge**
17:3
18:18,20,
23 77:4,5

**charged**
31:2

**check**
136:24

**checking**
73:22

**Checklist**
61:16

**checks**
136:14

**Cheri**
29:4
30:11
123:9
127:11,13
128:5,25
129:7,20
131:3

134:10
135:9
136:22
137:13
156:10

**Cheri's**
127:12
128:23

**chose**
14:9
24:11
93:13
94:5
107:1,18
109:6

**chosen**
60:8
102:12

**class**
35:5

**clear**
20:4
72:21

**clearer**
20:6

**client**
117:14

**code**
25:20,23
28:1
32:20
33:7,19
34:1
41:11,14,
17 42:3
83:1

**combination**
144:1

**comments**
58:10

**communicati
ons**

154:5,7

**companies**
12:16
122:17
147:12

**company**
5:25
9:21,23
10:6
12:17
77:7
122:12
149:7

**compare**
39:16

**compared**
39:19
148:21

**comparison**
51:9

**competitors**
139:24

**compiled**
108:21

**complained**
93:25

**complaining**
154:6

**complaint**
37:25
38:6,9,18
40:15
56:25
89:21
90:9
94:10
97:1,9,15
103:3,14,
18,23,24
104:15,25
105:4,5,
10,11

109:18,24
110:2,5,8
117:12
123:21
124:1,6,
13
126:16,
23,24
127:2,3
132:5
153:18

**complaints**
38:5,16
54:14
55:8 81:7
89:3,4,11
90:13
94:11,25
95:3
96:20
97:2,15,
18,24,25
98:7,10
101:23
102:2
103:11
104:9
122:15
124:8,16,
19,21
126:17

**complete**
18:3 19:7
34:12

**completely**
112:12

**compliance**
61:16
79:20
80:1
112:24
113:2
114:4
117:11,15
118:24

119:13
120:4
122:5,8,
22

**complied**
88:14

**comply**
137:6

**complying**
137:16
151:3

**composite**
89:9

**computer**
25:9
106:10

**computers**
25:4

**concepts**
72:12

**concerns**
79:16
81:4,11
108:25

**concisely**
6:17

**condition**
39:7
55:17
56:22
57:17,22
58:7
59:21
60:21
64:11
68:4,6
150:11
151:19,20
152:6,24,
25

**conditioner
s**



142:18

**conditions**
152:20

**Conduct**
25:20,23
28:1
32:20
33:7,20
34:1 83:1

**confident**
77:23
78:2,4

**CONFIDENTIAL**
105:1

**confirm**
25:9
127:10

**conflict**
91:19

**conflicting**
131:9,25

**confuse**
41:17
72:17

**confusing**
62:18
72:12
86:11

**confusion**
87:10

**consequence**
82:7

**consequences**
81:18,24,
25

**considered**
66:18
79:16

**consistently**
143:6

**constant**
142:25
143:3

**construction**
9:22,23,
24

**consumers**
14:3

**contact**
36:16
72:10
91:22
107:14,15
117:16
120:4
125:16,18
146:19,20
153:7,11,
14

**contacted**
116:12
117:13
127:19
158:10,
14,17

**contacting**
91:9
127:24

**contained**
76:17
153:18

**Container**
5:23,24

**content**
123:13,14
133:5,15

**continue**
143:11

146:8
148:3

**continued**
90:11

**contracts**
139:11
143:12

**control**
148:16,21

**controlled**
74:25
75:2
76:3,20,
23,25
77:11

**conversation**
99:9
108:13,
15,18
119:8
130:25
131:2,4,
24

**conversations**
6:5 36:19

**copies**
26:24

**copy**
25:6
31:13,15
46:3 91:1
103:10
109:24
110:1,19,
21
117:20,21
123:6
128:17
159:1
162:13

**corner**
63:21
80:21
90:24
150:3,21

**Corporation**
5:23,24
8:20
10:17

**correct**
11:5 12:9
13:21,23,
24 15:2,
3,5,6,15
18:21,22
19:1,2,
18,19,21
20:21,24,
25 21:2,
3,5,6,18,
20,21
22:11
23:21
24:7,13
25:11,19
26:10,22
28:24
30:12,13,
21,25
32:4,5,7,
14 33:4,
5,7 34:22
35:8,13,
16,17
36:9
38:7,13,
14,19,20
42:11,15
44:20,21,
23,24
45:3,4
46:17,18
47:2,12,
18,19,21,
22,24,25
48:15

49:4,12,
17,20,22,
23 50:7
51:19,21,
22,24
52:1,2
53:16,19,
20 54:3,
5,6,9,10
55:6
57:3,10
58:18,19
59:3,15,
16,18,19,
22,23
60:1,2,9
61:21,24
62:2,9,
10,12
63:6,10,
19,23
64:5,8,
14,20,21,
24 66:7,
8,18
67:20,25
68:7,8,
11,12,14,
15,17,18,
20,23,25
69:1,22,
25 71:14
72:25
73:2,3,18
75:19,21,
22,25
76:11,15
78:9,10,
20,21,23,
24 79:5
81:12,13,
15,16
82:10
83:6,9,
10,11,22
84:2,4,5
85:2,5,6,

9,13,15,
16,18,19,
22 86:23
87:12
88:5,8
89:4,21,
23,25
90:10,11,
12,16,18
91:14,15,
18,20,21
93:11,12,
14,22,23
94:1,2,6,
10,12,17,
18,19,21,
22 95:3,4
96:13,14,
23,24
97:15,16,
18,22,23
98:1,3,4,
7,8
100:9,11,
12,14,15
101:15,
17,18,24
102:4,5
103:4,15,
16 105:5,
6,8,9,13
106:21,
22,24,25
107:2,3,
6,7,8,9,
20,21,23,
24 109:3,
7,8,10,
11,14,17
110:11,
12,13,14
111:6,11,
12,13,16
112:19
114:12,
13,16
115:9,10,

19,20,23,
24
116:11,
13,16,17,
23 117:1,
2 119:23,
24 122:9,
10,15,16,
18,19
123:18,25
124:9,10,
14,19,22
125:14,
15,20,22,
23,25
126:1,3,
8,13,14,
17,18,25
127:7,8,
22,24,25
128:1,3,
4,6,7,9,
12,15
129:3,14,
16,18,19,
20,21,22,
23
132:22,24
133:9
135:7,8,
13,14,18,
24 136:8
137:1,17,
18,21,25
139:2,3,
25 142:9,
10,23,24
143:4,5,
8,14
144:7
147:1,2,
6,8,11,16
148:1,9,
10 149:9
150:13,
14,16,17,
24 152:20

153:2,24
154:8,9
155:12,
15,19
158:3,7,
8,15,16,
19,20
159:8,9,
10,11,13,
14,16,17,
23,24
160:1,2,
7,13,16

**correctly**
129:9
155:14

**correlate**
133:10

**cosmetic**
50:22
142:17

**cosmetics**
44:16
46:13,17
49:25
61:3,13,
18 62:18
74:25
75:17
76:2,22
79:7,11,
12,24
83:14
84:1
85:16
111:8,24
116:5
117:7
130:20,21
140:9
150:19

**cost**
19:20
20:2,8

139:18,
21,23
161:6

**costs**
10:23

**counsel**
97:23
98:6

**counterfeit**
26:2
27:8,23
54:18
80:15
81:7,15
90:14
91:11
102:11
123:21
124:1
132:5
148:3,13
153:12,
21,22
154:6

**County**
29:25

**couple**
28:5
107:4,22
120:19
124:1
157:25

**courses**
15:20
16:1,6
22:19,21,
23,25
23:19,20,
22 24:6,
9,11,12,
16,20

**court**
17:23,25
18:4,7,12

75:7
147:24
161:16

**cover**
41:20

**create**
125:1
130:5
131:18
132:14,
15,17,23
133:15,20

**created**
132:8
133:7
136:16

**creating**
131:12
134:18
144:9

**credentials**
149:12

**crisis**
10:6

**CROSS**
146:14

**current**
5:18
15:16
137:5

**custody**
127:10
148:25
160:7,9

**customer**
48:10,23,
25 49:13
52:4,6,7,
17 53:18
108:5
124:15,18
140:3,10,



19 144:2
146:20
157:11,
12,13,18

**customers**
81:6 83:5
84:12
86:15
140:6
147:19

**cut**
128:13,17

———————
D
———————

**damaged**
100:6

**Dart**
5:23,24

**dashboard**
96:19,21

**data**
44:4

**date**
74:15
136:25
150:6,21

**dates**
54:25
55:3

**Davie**
5:19

**day**
17:22
89:21
114:21

**days**
107:4,22
119:20
124:2
138:9

162:2

**deactivated**
93:1,24
109:13

**deal**
15:16
97:6
100:24

**dealt**
9:23

**debate**
17:22
100:22
121:22

**December**
10:19
28:14,15
29:11
150:9,13,
23

**decide**
37:9
96:12

**decided**
10:11
94:4

**decision**
36:8
112:13
145:6

**decisions**
97:12

**decline**
145:17,
18,25
146:6

**declines**
145:13

**Defendant's**
45:24
57:20

62:15,23
69:4
82:17
89:7
103:8
104:6
110:16
115:12
123:2
158:25

**definition**
51:6,13
58:13
68:7,10
87:14,22
151:18

**deleted**
111:22
117:5

**delisted**
106:23

**delivery**
140:3
157:14

**demand**
143:3

**demanded**
143:1

**demos**
16:4

**department**
12:3,5,
13,20,24
17:1
18:19
86:22

**depending**
92:13,23

**deposed**
17:11

**deposition**
6:6 7:2

46:2
89:2,10
161:11,16

**description**
8:6 152:8

**descriptions**
67:16

**destroy**
82:3

**detail**
129:25
130:1,5
131:10
132:1
134:13
152:9
155:11

**details**
58:10

**determination**
161:24

**determine**
73:8,19
78:25
125:18,21
126:12

**determined**
74:1
125:8

**difference**
57:5
86:18,23
87:5

**differentiate**
86:12
139:24

**differentiates**
87:8

**direct**
14:5
20:13
31:19
36:4
80:18
100:23

**directed**
46:19,21
97:3
118:25
123:16

**directing**
20:16

**direction**
20:21,23
92:10,16
112:19
122:25

**directions**
92:17

**directly**
11:11,15
14:1,4,11
48:9,23
49:13
84:21
86:19

**director**
6:3 7:9

**directs**
17:21

**discourage**
47:9,20

**discuss**
98:15
108:1
156:24
158:10

**discussed**
89:2
101:24



125:10
156:21

**discussing**
110:7

**discussion**
7:19 99:1
134:17
146:21

**discussions**
7:16

**displayed**
143:17

**disposable**
11:20

**disposables**
11:3

**distinguish**
49:24
50:6

**distributing**
24:12

**distribution**
11:17
13:4,10,
11 16:11
23:24
24:17
35:8,11
37:16

**distributor**
36:13
116:6,8
117:8
139:2

**distributors**
11:8,9,16
19:18
70:4

**document**
30:23
45:23
46:4,6
57:24
65:6,12,
13 66:10,
12 69:3,
8,11,22
70:12,13,
16 77:20
82:16
87:2
102:13
103:7,12
105:11
110:15,22
115:11
123:1,8,
10 131:10
132:1
136:25
151:23
158:24
159:5,21

**documentation**
70:25
71:8,11
72:1

**documents**
57:19
62:14,22
65:16
69:24,25
71:3
72:23,25
89:6,17
104:5

**draft**
46:6
110:22
123:8
144:13

**drafted**
46:8
144:19
159:5,7

**drive**
25:7

**Due**
46:11

**duplicate**
131:13
132:2

**duplicating**
126:10

**duties**
19:3

———————

**E**

**earlier**
35:12
48:14
58:17
80:19
85:21
89:2
126:17
127:19
129:9
143:13
151:19
156:3
158:22
159:21,22

**ebay**
14:17,18
15:7,9

**ecommerce**
6:3 7:9
11:25
12:2,3,5,
7,11,12,
20,24
16:25

17:5
18:19
20:17
21:24
86:22

**educational**
8:7 16:1

**electronic**
25:6
162:14

**email**
92:5
117:15,
16,20,23
118:14,25
120:21
121:10
136:7
153:17

**emailed**
120:11
121:8
136:7

**emailing**
120:21

**emails**
117:21
120:23,
24,25
133:4
134:4,7,
12 136:5
146:11

**employed**
5:20,22
8:17
10:16,17

**employee**
39:10

**employees**
26:24
27:2,7
40:17

77:10

**employment**
10:8
74:15

**encourage**
81:3

**encouraged**
80:14

**end**
9:19
10:3,19
98:13

**enforces**
67:8

**ensued**
72:9

**ensure**
78:8,11
111:23
112:24
114:3
117:6
122:5
136:14
137:5,16
151:2
155:10

**Enterprise**
13:12

**entire**
93:21
94:5
97:21
98:3

**entities**
143:16

**entitled**
34:13
72:19

**equipment**
147:12



**ERA**
161:3

**ERP**
13:4,11
161:5,6

**establish**
117:10

**establishing**
71:5

**evaluate**
128:14

**exact**
119:19
130:21

**EXAMINATION**
146:14
157:23

**examples**
152:22,24

**exchange**
138:10

**exchanges**
44:15
45:2
46:12,16
49:1

**Exhibit**
30:23
31:22
45:22,24
46:2
57:20,22
61:2
62:15,19,
23,25
63:22
69:4,6
70:13,17,
18  77:21
80:5
82:17

83:15,22,
24  84:18
89:7,9
101:23
103:8,10,
11  104:6,
9,10,11,
12,14,17,
19,21,25
105:2,11
106:4
107:8,10,
11
110:10,
16,18,19
114:18
115:12,14
123:2,4
150:1,4,
19,20,22
152:2,3
153:16
154:1
155:3
158:25
159:1

**Exhibits**
89:10
104:22
146:9,10

**existed**
13:6
53:25
74:9
133:8,16,
25  158:5,
6

**existing**
13:3,7
43:2
53:23
130:13
131:14,15
134:19

**exists**
133:11

**expand**
37:13,22

**expect**
6:16

**expectations**
23:14

**expected**
7:7

**expense**
82:4

**expenses**
21:13
159:8,10,
12,15

**experience**
149:4

**explain**
15:22
66:2
106:16
145:5
157:5

**explained**
133:3

**extent**
145:10

**extremely**
148:15

**eyes**
77:16

————————

**F**

————————

**fact**
15:4  64:7
68:10
85:14,20

107:18
116:9
135:15
149:25

**factor**
139:18,23
140:6,14,
16  141:3
144:3,4

**factors**
140:4

**facts**
6:18,24
7:17
110:4,7

**failure**
69:18
80:6

**fall**
44:19

**familiar**
21:17
22:10
33:6 63:2

**familiarity**
22:10

**fast**
17:25
98:23

**FBA**
41:6
45:11
48:5,16,
17  49:4,
7,10,16,
19,25
84:9,19
86:13,19
87:9
140:4

**Federal**
46:11

**feel**
17:17

**felt**
111:9

**Female**
119:3

**file**
160:18,22
161:1

**fill**
111:5

**financial**
10:6
144:6

**fine**
43:6
100:24
121:20
155:25
157:4

**flag**
136:17

**flip**
153:17
155:6

**Florida**
5:19
8:10,14,
17

**follow**
74:23
124:25
130:12,21
136:5

**follow-up**
114:21
121:18
157:25

**food**
5:25

**footage**



21:7

**force**
10:13

**forecast**
143:10

**forgot**
17:14

**form**
19:22
24:14
25:12
28:22
29:14
33:11
35:9
41:22
47:10
48:3 49:5
50:4,11,
12,14
52:22
53:7 56:6
57:11
58:23
59:2,10
60:14,22
62:3
65:4,7,8
71:17
72:3,19
75:8
83:16
84:7,15
86:7,24
87:3,16,
24 88:9
92:20
97:10
100:18
122:23
126:4
129:4,13
135:19
137:2
138:15

139:19
140:17,24
141:5
143:18
146:2

**forward**
97:7
112:22,23
122:3,4
137:10,23

**fourth**
137:19

**fragrance**
44:16
46:13

**free**
17:17

**Friday**
130:25
131:24

**fulfilled**
84:12
85:8,17,
21 87:9
146:25
157:20

**fulfillment**
41:16
48:9,19,
21,22
82:4
157:5,8,
11

**fully**
22:8

**functions**
13:7,11
19:3

**future**
136:13
137:5
139:12

143:12

_____

_____
G
_____

**gave**
78:19
98:20
99:10

**general**
56:19
58:6
59:21
100:4

**generally**
29:8
56:13,15,
16 57:13,
15 92:4,9
160:23

**generated**
136:17

**gentlemen**
48:17
67:1
80:25
87:6
94:24
141:4

**genuine**
124:25
136:16

**gesture**
98:20

**give**
5:17 6:24
8:6 17:14
31:13
62:11
92:15,17
104:15
110:21
123:6
153:16

**good**
126:7
144:2

**Goodman**
95:13
96:4,23,
25 98:9,
14,15
99:8
100:16
118:5

**goods**
77:24
78:5

**Goodson**
5:16,17

**gosh**
119:18

**graduate**
8:11

**graduating**
8:16

**great**
19:9
62:21
140:11
157:25

**greater**
115:6

**ground**
17:15

**group**
10:14,15

**growing**
37:11

**guarantee**
81:3
138:4,6

**guess**
10:18
12:16

22:2 53:8
87:10
94:4
105:24
109:21
111:3
115:18
128:16

**guessing**
54:23
56:5
71:16

**guide**
130:1

**guideline**
25:21,24
61:5

**guidelines**
24:24
25:1,4,
10,14,15,
17,18
26:1,11,
16,25
27:3,7,19
31:14,17,
20 32:14
34:4
41:19,21
45:16
55:4
57:23
58:4,7
59:21
60:12,18,
21 63:1,
2,18
67:25
82:8
87:23
99:16,20
114:4,15
117:12
130:12,21
137:17

150:11
151:19,21
158:3
160:1,4,
6,9

**guys**
6:15
29:22
74:12
117:23
131:16
156:21

——————

**H**

——————

**hair**
27:9 28:3
39:5
44:15
46:12
142:13,18

**half**
9:5

**halfway**
152:5

**hand**
63:21
80:21
90:23
98:20
150:3,21

**handle**
48:25
73:21
157:11

**handles**
49:2

**happen**
92:8

**happened**
10:6
11:24

94:8,9
126:21

**happening**
112:14

**hard**
25:6

**HAZMAT**
47:5

**head**
17:8
118:3

**health**
32:10
44:10,13,
25 46:3
50:3,25
52:16
81:7
83:24
84:19,23
85:4,11
86:9
102:17
141:25
142:5,6,
8,12,14
151:10
154:11

**hear**
17:19

**heard**
148:12

**helped**
12:3
144:11

**helplines**
151:2

**hiding**
118:8

**hired**
97:23
98:6

**history**
79:2,3
148:11
149:6

**hold**
95:1

**holder**
111:9

**holders**
81:6,10

**home**
8:22 9:10

**Homes**
9:11

**honest**
19:24
42:6
118:10

**honestly**
36:7 60:6
118:24

**hopes**
145:23

**host**
140:1

**housing**
10:10

**hundred**
42:2

**hygiene**
44:15
46:12

——————

**I**

——————

**ID**
105:4,5

**idea**
141:23
149:22

150:11

**identical**
65:20

**identifies**
83:8

**ignore**
109:6

**II**
137:4

**III**
136:13

**immediately**
82:1

**important**
18:3,9
123:13
140:7,8,
15 141:7,
8

**inaccurate**
86:5,10
88:6
129:22
151:6
156:7,9

**inauthentic**
64:25
80:15,22
81:1,18,
22,25
82:1,3

**include**
53:22
57:16
151:20,22

**included**
52:11
58:10
123:17
154:18

**including**

67:16
95:3

**incorrect**
134:22

**individual**
17:3 28:8

**info@
lifeandheal
thsource**
121:5

**inform**
50:19,23
51:1

**information**
13:12
16:2 19:5
39:23
40:5
42:16,20
43:2,15
46:22
53:15,21,
24,25
70:3,7
72:7,10
73:5
83:2,5,13
86:5,10
88:7,12
91:19
92:4
96:18,20
99:11,14
111:5
131:9,25
133:6,12,
16,17,25
144:11
152:9
153:18

**infrastruct
ure**
9:23
12:23



13:4

**infringe**
111:23
117:6

**infringed**
111:9

**infringement**
108:2

**ingredients**
52:11

**Innopex**
36:13,16
37:23
38:2,22
39:2,24
72:2,10,
24 73:9,
19,22
74:2,8,15
78:13
79:10
116:18
125:18
127:20
147:7
148:12
149:2
160:16,
17,19,22

**inquiry**
118:16

**inserted**
156:2,13

**inside**
40:23

**inspection**
136:15

**inspections**
136:18

**instance**
148:12

**instituting**
136:13

**instruct**
27:2 77:9
98:17

**instructed**
56:21
73:16

**instructing**
56:9

**instructions**
74:23
153:4

**insurance**
159:12

**intellectual**
54:7,11,
15 55:11
64:13
66:18,21
67:3,13,
19,22
90:14
102:16
108:1
111:9,10,
23 112:25
114:4
117:6
122:6
132:21
133:24
134:2
138:14,20
152:19

**intended**
59:1

**internal**
99:15,19,
23 100:1,
14,17

101:3,5,
10,17,19
128:19
129:2,11,
16 155:8
156:5,25
160:1

**interruption**
105:25

**invalid**
134:22

**inventory**
48:20
92:14

**investigate**
51:15
81:5

**investigation**
127:9,13,
16,23

**invited**
14:11

**invoice**
78:23

**invoices**
71:4
72:24
73:2
117:8

**invoicing**
72:4

**involved**
20:11
49:1
73:13
144:9

**issuance**
132:5

**issue**

38:6 54:9
67:15,24
88:3
111:4,20
112:22
116:4,25
134:5
135:2
136:12
153:20
154:11

**issued**
115:18
154:15

**issues**
29:10
46:23
66:17
67:18
81:11,14
90:17
108:1
122:3
134:21

**item**
28:7
37:20
39:18,19
42:23
47:5 51:9
58:8
92:14,15
93:2
102:12
106:18,23
111:19
113:22,23
115:25
116:24
118:4
125:11
126:9
133:8,11
135:2
137:19

157:19

**items**
26:2
27:24
33:10
44:15
45:9,15
46:12,23,
24 48:5,
24 49:12
57:5
58:11,12
66:16
76:19,21
84:11,19
91:11
101:20
113:14
124:24
127:5
128:14,20
129:3,11,
17 130:12
131:13
133:14
134:22
135:1,4,7
137:7
142:7
145:19,21
155:9

———————

**J**

———————

**January**
95:2

**job**
15:16
19:3
30:1,3

**Joel**
36:17

**June**
30:16



95:2
145:3,14

jury
48:18
67:2
80:25
87:6
94:25
141:4

———————————

K

Kellon
5:16

Kelsey
98:21,23
117:22
123:7

keywords
133:5,15,
20

kind
6:19 7:14
13:6
22:17
133:24

Kipson
147:13

knew
63:25
78:13,18
97:5
98:22
114:5,11

knowledge
20:7,10
31:17,18
33:25
34:7,9
54:24
71:15
74:4,5
77:13

KPI
144:9,13,
16,17
158:21
159:7,22

KPIS
144:14
159:24

———————————

L

label
41:2,4,7,
9,18 42:3
126:3

ladies
48:17
67:1
80:24
87:6
94:24
141:4

Lakeside
5:19

language
151:17

large
94:23
145:21

launched
127:9

lawsuit
6:22

lawyer
95:11

layoffs
10:14,15

layout
7:14

learn
102:15

learned
114:14

leave
10:5,9,
11,12
28:11,15
92:22,25
93:7
157:3

leaving
120:10

left
15:13
29:18
30:17,19
63:21
80:21
90:23
119:11
141:24
150:3,21

letter
118:4
123:17

life
32:10
44:10,13,
25 46:3
50:3,25
52:16
83:24
84:18,23
85:4,11
86:9
142:6,11,
14 151:10
154:10

light
9:24

likes
11:3

lines
37:12

linked
132:10
133:18,20
134:3,18

links
43:1

list
23:14
31:11
32:7
87:12,18
88:7
91:16
152:7
154:18

listed
32:11
39:20
41:5
43:16
44:6
51:10
52:12
57:9,15
58:15
59:18
60:4 64:3
68:16
87:22
88:11
91:11,13
101:23
108:25
134:22
135:7
146:17
153:9
157:10

listening
60:19

listing
27:17
32:2,12
33:18,21,

24 34:15
36:1
39:8,14,
15,18
43:1
53:21,25
55:21,22
57:2
58:10
59:22
60:12,19
68:5
88:15
91:10
92:3,4,22
93:1,3,4,
6 101:20
116:5
125:1,12
126:11
128:19
129:3,11,
17
131:13,18
132:9,14,
15,17
133:7
150:25
151:10,
12,21
152:10,25
155:9
156:5,22,
24 157:19

listings
32:3
93:25
98:6
111:8,21
112:6
117:4
122:20
125:2
127:6
132:3,12,
23 133:6



134:18
135:14
154:12

**lists**
83:9
87:18
102:7
152:22

**located**
63:25

**locked**
133:12

**long**
6:13 7:13
9:4,16
11:21

**looked**
10:7
37:12
40:23
107:11,12
151:19

**loss**
80:6

**lot**
119:18
140:4

**loud**
18:10
67:1
81:22

**lovely**
161:16

**luxury**
37:20

———————

**M**

———————

**made**
20:5
78:25

79:6 94:9
106:20
109:19
112:13
138:18

**mail**
108:4

**main**
120:17
123:11

**majority**
142:8

**make**
17:19
20:4,18
23:18
24:3
32:10
34:11
45:6,18
50:8
62:20
72:22
97:12
114:1
115:14
118:16
140:2
149:3,5
161:16,24

**makes**
139:15

**makeup**
27:9 28:3
37:13,22
44:19,22

**making**
47:1
153:11

**male**
119:3

**management**
9:22

145:6

**manager**
21:24
28:20,25
29:2 36:4

**managing**
29:4

**Manny**
17:9
82:11
92:6,11
97:3,4
106:16,19
112:13,
14,16
122:25

**manufacture**
11:4 15:1

**manufacture
d**
15:5
52:14
53:3,13
139:1

**manufacture
r**
40:5
41:20
51:16
68:21
114:7,9
125:16
154:18

**manufacture
r's**
58:9
74:23
151:22

**manufacture
rs**
11:10,16

**mark**
46:2 61:2

89:9
104:9
110:18

**marked**
45:24
57:20,22
62:15,23,
25 69:4,6
82:17
89:7,10
103:8
104:6
105:1
110:16
115:12
123:2
158:25

**marketplace**
14:16,23
15:7,17
16:1,16
22:11,13,
16 23:16

**marketplace
s**
13:1

**markup**
20:3

**Master's**
8:9,13

**match**
32:4,7
39:19
43:17
67:16
105:5
106:17
125:25
152:8

**matched**
32:11
39:18
42:24
53:23

78:23
106:17
113:20
114:2

**matches**
104:11

**material**
57:5

**materially**
57:2
64:10,14
66:16,21
67:17
68:3
150:12
152:3,6,
10,19,23

**materials**
9:2,3
10:25
16:9 73:6

**matter**
133:20

**meaning**
52:9
56:20
87:15
139:21

**means**
79:4 83:7

**measures**
148:16

**mechanics**
18:23

**Med**
6:5,7
7:21
10:17
11:1,4,6,
17 12:6,
9,10,12,
14 13:3,



7,14
16:21
19:10,14,
17,20
20:3,8,
13,20,24
21:1,11,
25 30:11,
21 73:16
74:3,14,
20 75:18,
23,24
76:1
77:7,8,10
79:2,3
143:8
147:5,7,
9,12,18
148:2,3,
8,11,15,
24 149:4
160:11

**Med's**
148:21
160:1

**medical**
11:2,18,
20 77:11
79:4
142:7
145:9
147:12,13

**meet**
68:6
87:14,22
115:6

**mention**
124:6

**mentioned**
118:19
127:5

**merchandise**
138:9

**merchant**
84:12
87:9

**message**
96:19
119:11
120:11

**met**
51:6

**Metrics**
144:10,
13,17
158:21
159:7,22

**mid**
9:18

**Milapinski**
36:18

**minor**
146:9

**minute**
62:6
103:6
144:21

**minutes**
6:14

**mischaracte
rizes**
153:25

**misleading**
155:23

**misundersto
od**
155:7

**mitigate**
47:13

**model**
22:18

**month**
90:7

**months**
146:1

**move**
151:5

**moved**
88:12

_____

N

_____

**names**
141:15

**needed**
6:23 19:7
52:4,7
73:4
76:19
77:10
97:5
108:20
115:2,3,6
119:10
123:16

**newly**
136:14

**night**
6:9,10
161:10

**non-
youngblood**
38:21

**normal**
75:1

**Nos**
104:6

**note**
156:8

**noted**
135:17

**notes**
108:12

**notice**
55:18,25
56:10,20
91:6,8
98:20
102:18
106:5
107:4,23
153:20

**notices**
92:2
93:18

**notificatio
n**
54:8
96:18
104:11,15
153:23

**notificatio
ns**
55:8
99:11
102:3

**notified**
38:15
103:23
157:19

**notify**
81:4
154:11

**notifying**
162:2

**November**
8:3 38:9,
18 110:13
111:2
114:19,22
115:18
117:13,
18,23,24
118:5,15
123:21
124:2
131:1,24

145:14
146:1
154:2
155:3

**number**
32:2
61:15
82:19
90:20
91:13
93:13
102:7
103:24
105:4,15
107:11
122:2,15
136:13
137:4
159:25

**numbers**
91:14
105:5
113:20
150:20

**numerous**
133:3
134:4,7,
9,12

_____

O

_____

**oath**
48:2
129:2,10
156:1

**object**
95:16
98:17
155:23
156:1

**objection**
20:5
98:24
99:6



146:18
147:3,15,
20 148:5,
18 149:8,
18 151:5,
13,24
153:25
154:20
156:23

**objections**
17:20

**observed**
77:16

**occasion**
135:5

**October**
150:16
151:17
154:19

**offer**
22:19
52:24

**offered**
15:21,25
24:11,20
37:15

**offering**
42:17,21
113:20

**offerings**
111:7,22
112:24
113:1,9,
25 117:5
122:5,7,
11 127:7

**office**
25:2

**online**
23:25
39:15

**open**
40:17,20

**opened**
15:19

**opening**
55:20

**operating**
100:14,17
101:3,6,
11,17,19
129:2,11,
17 156:5

**operation**
11:25
12:7,11
99:24

**operational**
100:1
128:19
155:8,16
156:21

**operations**
18:24
21:16
99:20

**opportunity**
37:13
62:12
63:12,17
134:1
161:15
162:1

**opposed**
11:16

**order**
39:11
61:23
73:7
90:24
117:11
155:9

**orders**

157:11

**organizatio
n**
12:8
73:23

**original**
53:22
58:9,11
151:22

**originally**
12:9

**override**
133:17

**owned**
13:14
157:7

**owner**
17:9
91:17,20,
22

**owners**
81:3

———————

——— **P** ———

**P-U-L-T-E**
8:23

**p.m.**
111:2

**pack**
94:24

**package**
35:11

**packaging**
5:25 16:9
24:12
40:17
41:16
58:11
61:15
136:15

**packing**
148:2

**pages**
130:1
131:17

**paid**
21:10,13,
18

**paragraph**
67:7
103:18

**parameters**
44:17

**part**
10:14
12:2,9,10
17:6
19:24
44:4
73:12
139:5
145:23

**partners**
137:5,11

**party**
14:2

**passes**
136:15

**passing**
148:12,17

**pay**
13:18

**paychecks**
21:24

**payments**
82:5

**payroll**
159:8

**pays**
161:7

**PDF**
162:14

**pending**
6:22

**people**
33:9
45:19
47:14
120:3
140:11

**people's**
15:5

**perceived**
86:15

**percent**
42:2 49:2
138:4,7

**percentage**
139:4

**Perfect**
157:22

**performance**
29:13

**permission**
116:15

**person**
17:7 77:5
113:23
119:12,
13,14
120:1,2

**personal**
44:15
46:12

**personally**
55:10
73:10
78:16
103:25
107:14

**personnel**



13:7

**petition**
134:21

**petitioned**
135:6,12

**petitioning**
134:25

**phone**
107:25
118:10,
12,20
119:14
120:17,19
133:4

**photo**
135:2

**photograph**
39:17

**photographe
d**
39:16

**photos**
133:5

**physical**
39:12

**pictures**
133:14,19
152:8

**PL**
90:20,23,
25 91:3

**PL000049**
115:17

**PL000051**
123:5

**PL00046**
104:19
105:2

**PL00047**
104:21

**PL00048**
110:20

**place**
44:18
65:14
99:2
114:21
136:24
149:24

**plan**
108:20
109:15
110:19
115:2,3,
16 124:3
126:22
137:7
155:3

**platform**
14:25

**platforms**
13:20
18:24,25

**PO**
78:23

**point**
19:9
24:22
29:1 54:7
60:7
69:20
93:6,9
106:19,20
107:17
112:12
122:12
128:18
135:5

**points**
64:17

**policies**
32:20
33:7,19

34:1
55:11
61:2 67:9
80:9
84:10
130:1
148:22
149:23
150:10
151:4,12

**policy**
45:9
48:11
54:12
62:18
65:19,20
69:7
72:15
80:6,17
83:1
84:16
100:8,11
102:3,16
106:5
135:23
136:1
152:9,12,
15

**Political**
8:8

**poor**
29:13

**popular**
141:11,
13,19
142:12,20

**POS**
71:4
72:24
73:2

**possibility**
108:22

**post**
28:8

**postal**
46:24

**posted**
32:21

**posting**
27:3,17

**potentially**
47:5,14

**practices**
33:19,22
34:13,17
70:10,21
77:25

**pre**
150:15
153:11

**presence**
12:12

**present**
23:15
58:11

**pretty**
94:23

**prevent**
112:22
122:3
136:12

**previously**
7:25
16:19
93:24
107:19
108:24,25
112:17
155:17

**price**
43:22
140:5,7,
13 141:2
144:1,3,4

**pricing**

140:12

**Prime**
41:6
45:11
157:21

**print**
106:14

**printed**
105:17,18

**printout**
25:1,3

**prior**
6:4 27:17
32:16,19
33:18,21,
24 34:14
38:5,15
39:8
40:15
54:14
65:14
70:21
82:6
93:16
97:14,15
98:5
103:3
112:17
115:22
116:14
124:6,8
133:8
136:24
137:15
146:1
149:16
158:6

**privilege**
99:2
100:21

**privileges**
80:7

**proactive**



135:15,24

**proactively**
127:5
134:20,25
135:6,11
136:2

**problem**
50:14,15
65:15
107:16

**problems**
152:22

**procedures**
99:23
100:2,14,
17 101:3,
6,7,11,
17,19
128:19
129:2,11,
17 155:9,
17,20
156:5,21
157:1

**process**
49:2 51:8
55:20
117:9
120:8

**produce**
133:5

**produced**
118:6

**product**
13:2 14:4
32:4,6,11
34:13,18
37:12,15
39:10,13,
14,15,16
40:1,9,
12,18,19
41:3,10

43:25
44:6
45:17
50:22
51:15
52:7,9,
12,18,19,
25 53:2,
13 54:2
55:17,21
56:3,10,
23 57:3,8
58:21
60:20
61:10
62:8,25
63:8,18
64:10,14,
23,25
65:3
66:11
67:12,15,
21 68:1,
3,5,16
70:10,11
71:22
73:17
74:22
75:3,15
78:9
81:4,11,
22 85:8
87:12,19,
21 92:3
94:20
111:22
112:24
113:9,24,
25 116:5,
7,13,16,
19,21,22
117:5
122:4
125:11,24
127:24
129:25
130:5,6

131:10
132:1
133:5
134:13
136:15
138:8,13
139:23
142:11
143:17
145:15
148:13,16
151:12
152:4,6,
7,9,20,23
153:22
154:6
155:11
157:7,14,
15 158:18

**production**
118:3
121:15,17

**products**
11:7
13:13
14:21,24
15:2,3,5,
13 18:25
19:9,12,
17 20:8,
12,14,15,
20,22
23:14,15,
17 27:4,
8,9,13,18
31:3,12
32:16,19
33:10,21,
24 34:3,
14 36:2,
9,12,20,
22,25
37:3,6,
10,23
38:1,6,
12,16,17,

21:22
39:2,4,5,
7,11,12
40:19,23
41:5,8
42:18,22
43:16,20
44:11,22
45:2,10,
19 47:14
48:22
49:6,18
50:9,20,
22 51:5
52:4
54:18
55:9,18
58:15
59:6,14,
18,25
60:4,9
61:14,20,
23 64:3
65:15
67:16
69:15,22
70:19,22
71:5,18,
19 73:13
74:20,24
77:10,14,
19 78:8,
12,19,22
79:16,21
80:2,11,
12,15,20,
22 81:1,
2,18,25
82:1,3,7,
23 83:9
84:9
85:20,24
89:11
94:8
98:16
99:16,17
100:6

103:20
107:5
112:7
117:8
124:25
128:15
130:20
131:14
136:17
137:20,24
138:4,22,
25 139:1,
13 141:11
142:11,23
143:1,4,
16 145:7,
22
146:16,
22,24
147:5
148:3
149:5,17
151:21
152:11,
13,25
153:5,9
154:15,19
156:22
157:9,12
158:7,11,
15,19
160:13

**program**
45:11
48:5,19
49:4,7,
11,16,19,
25 61:2
140:4
146:25
157:6

**prohibits**
152:10

**promptly**
81:5



pronounce
36:17

property
54:8,11,
15 55:11
64:13
66:18,21
67:3,13,
19,22
90:14
102:16
108:2
111:9,10,
24 113:1
114:4
117:7
122:7
125:13
132:21
133:25
134:2
138:14,20
152:19

proprietary
15:11

protect
81:6

protocol
125:1
155:11

protocols
156:20

provide
19:5 31:6
53:18
69:21
83:4
92:12
144:11

provided
53:23
117:16
121:3,4

providing
79:4
83:2,12
86:5,10
88:6 99:8

public
45:13
46:15
47:2
50:2,9,
14,19,23
51:1
83:25
84:4
85:5,7,
10,14
86:6,10
88:7

publications
40:4

pull
98:23
136:17

Pulte
8:20,21,
25 10:12

pun
58:25

purchase
19:12,17
20:13,16,
20 36:8
37:9
39:1,2
65:14
73:7,17
85:8

purchased
14:21
19:10
20:22,24
36:11,14
40:1

116:8
146:24

purchaser
138:8

purchases
70:25
72:5

purchasing
9:1,13
10:2,23,
25 13:13
16:20,23
19:8,14
20:12
73:14,15
143:8
149:17

put
28:6
41:2,5,6,
7,9,14
42:3
44:17
45:18
46:19,21
47:8,17
51:3 59:5
61:1 68:9
77:14
80:4
82:15
87:11
103:5
105:2
108:21
114:17
126:2
138:2
149:24
159:18

putting
31:3

—————

**Q**

quality
34:14,18
63:1,18
67:15
68:1
77:24
78:5
136:14,
15,24
148:15,21
152:13

quantity
43:23

question
11:13
17:7 18:4
20:6 22:2
24:4
27:11
43:18,19
51:18,21,
25 53:5,
12 62:7
66:5 71:9
72:16
75:5,6
77:25
95:22
98:18,21
99:5,7
106:1
111:3,19
112:21
130:20
132:8
140:22
146:11
149:25
150:25
151:7,9
154:3
157:16

161:9

questions
7:5,8,12
17:16,17,
24 52:17
53:17
70:24
79:15
92:14
98:24
144:5,7
155:2
157:22
158:1,2
159:25
161:11

quick
88:19

quote
127:12

—————

**R**

ran
86:22

ratings
140:3,10,
19

re-boxed
58:12

re-review
27:18

reach
40:7
107:25
118:23
119:20

reached
154:10

reaching
117:9
120:8,10



**Reactivate**
110:20

**reactivated**
114:19

**read**
25:23
26:9,16,
19 31:17,
19 34:5
58:6
66:13
67:1,11,
14 72:14
75:4,7
80:19,24
81:22
117:3
133:1
152:12
155:14
161:15,23
162:1,6,8

**reading**
24:23
26:21
46:22
66:15
87:2
152:15

**ready**
102:8

**reality**
48:1

**reason**
47:8
93:20
94:3
96:22,25

**reasons**
47:8,17

**recall**
16:13,14
19:13

21:25
22:1,6
24:16,20,
22 25:22
26:3,20,
21 27:1
28:19
29:7,21
30:8
32:17
34:8
35:7,15
36:11,19
37:5,18,
19 38:3
56:12
82:14
92:17
95:6
102:19,
20,21,22,
23,24,25
108:3,14,
15,17
110:3,6,9
117:24
118:23
119:5,6,
8,19,22,
25
120:12,20
122:13
123:15,18
127:18
129:9,12
130:3,11,
18,23
134:8,25
135:3,10,
12
136:20,22
137:12,14
145:8,12
146:3
160:5

**receipt**

136:18

**receive**
16:15
35:22
37:25
39:10,11
43:15
91:5,17
92:12
96:18
105:12
110:10

**received**
38:1,5
51:10
54:7
55:7,18
56:9 90:6
91:9 92:3
95:2
109:3
122:14
123:20
127:20
135:23
136:1
153:22
154:2,7
160:18

**receiving**
46:23
51:8
126:16

**recent**
108:1

**recess**
43:10
88:23
144:24

**recollectio**
**n**
55:10,13
56:2,8,
17,19

58:3
71:16

**record**
5:15 20:4
43:9,12
62:17
72:20
88:22,25
104:17
144:23
145:1
156:15
162:6,10

**records**
69:21
71:4

**REDIRECT**
157:23

**redo**
115:2,3

**reduction**
10:13
29:9

**redundant**
132:3,12,
14 134:18

**refer**
151:1

**referenced**
103:20
151:1

**referencing**
129:25
149:16

**referred**
45:23
57:19
62:14,22
69:3 75:6
82:16
89:6
103:7

104:5
110:15
115:11
123:1
158:24

**referring**
124:21
158:22

**reflect**
159:8,10,
12,15

**reflected**
83:15
135:6
154:2

**reflects**
83:24
159:22

**refund**
138:10

**regard**
149:22

**regular**
147:19

**regulations**
46:11

**reinvesting**
145:22

**relabel**
41:8

**relate**
105:7

**related**
16:9,10
21:16
23:17,23
54:18
64:23
65:3
66:11
67:12,21



74:21
82:3
94:7,15
99:12
108:1
112:25
122:6
157:14,16

**relates**
18:24
34:2 56:3
79:23
160:13

**relating**
38:16
49:17
66:10
126:10

**relationship**
14:5

**reliability**
73:22

**reliable**
71:5
73:9,20
74:2
78:9,12,
13,15,17,
18 79:1,
6,11
149:2

**relisted**
93:11

**remaining**
127:6

**remember**
24:23
32:24
33:1,3,4
34:16,23
35:14,18,
21 36:7

55:3
56:4,25
91:25
108:11
109:20,
22,23
110:1,4,7
115:5
117:22
118:11
119:4,18
121:15
158:11

**remembering**
22:8

**remove**
92:21
112:15
122:7,11,
20 127:4

**removed**
93:5
111:21
112:6
113:19
117:4
127:6

**removing**
113:1

**rent**
21:10
159:10

**reopen**
115:7

**reopened**
108:23
112:10

**repeat**
66:5

**repeatedly**
133:3

**report**

81:10
91:10
153:12

**reporter**
17:23,25
18:4,7,13
75:7
147:25
161:16

**reporting**
80:15,22
81:1

**representation**
46:15
47:1 86:4

**represented**
85:5

**representing**
6:8 84:3

**reputation**
144:2

**request**
72:1

**requested**
120:24
121:20,21
154:14

**requests**
69:22

**require**
23:3

**required**
17:20
23:1,8,
19,21
24:6 41:4
49:21
154:18

**requirement**

23:5
41:12
45:8

**requirements**
79:20
80:1 83:2
149:4

**requires**
41:6
70:2,6

**research**
79:19

**resell**
40:24
100:5

**reseller**
15:4

**resellers**
11:7

**reselling**
15:3
18:25
51:5

**reserve**
146:10

**resold**
14:22

**resolve**
111:20
116:25

**Resource**
13:12

**respond**
93:15,17
96:13
97:18
107:1
109:8
127:25

**responded**

93:20
101:24
102:1
112:17

**responding**
97:9
102:12
109:9

**response**
91:24
92:2,5,11
115:9
161:18

**responses**
18:9
161:18

**responsibilities**
12:1 17:5
29:5

**responsibility**
17:6 31:3
32:10

**responsible**
28:8
48:22
128:2
157:13

**restate**
53:8
83:19,21

**restaurants**
6:1

**result**
80:6

**resulted**
143:16

**retail**
11:10,12

**retract**



117:12

**retraction**
91:17

**return**
44:14
45:9,20
48:11
50:10
84:10
85:9,14
119:15
138:9
147:1

**returned**
45:12
46:23
49:13
50:20,23
85:25

**returns**
44:11,18
45:2,16
46:12,16
47:5,9,
20,24
48:1,7,
14,16,24
49:14
50:3
83:14
84:1,20,
21 146:16
157:13

**review**
26:4,6,
11,24
27:3,7,23
32:20
33:9
42:10
51:13
54:11,19
55:1 62:6
63:17

64:4
70:21
82:22
92:7
112:24
113:9,24,
25 114:9,
11 117:9
122:4
140:2
150:10
151:11
158:6,18
160:6,8

**reviewed**
54:15
55:4,14
65:18,19,
23 66:6
82:20
102:13
113:12
114:6
123:12
125:12,13
128:19
150:12
155:8
160:18

**reviewing**
32:17
42:13
55:10,21
58:3
60:18
64:7
100:10

**revised**
149:24

**rights**
81:3,6,10
91:10
111:10

**road**

9:24

**role**
9:14,15

**roles**
12:1

**room**
76:7,10,
11,15,18

**root**
111:3
116:3
123:20

**Roughly**
90:6

**row**
94:11

**rules**
17:15
129:25
131:10
132:1
134:14
155:11

**running**
17:3,10

**runs**
13:12

**rush**
162:11

─────────

─────────
**S**
─────────

**safety**
79:16,20,
25

**sale**
28:3
33:21
34:15
38:12,18
39:8

42:18,22
157:14

**sales**
6:3 10:23
19:6
20:17
29:10
111:22
117:5
139:4
145:13,
17,25
146:5

**samples**
153:8
154:14
158:18

**satisfactio
n**
138:7

**satisfied**
115:9
138:8

**save**
25:4,20
26:1
105:19
106:9

**saved**
25:10,17
26:3,24
27:1
105:23

**scanning**
41:17,18

**Science**
8:8,9

**seal**
40:21,22,
24

**search**
25:8

102:16
143:17

**secondary**
131:18
132:9,15,
23

**section**
46:10
66:13,15
67:8
70:11
78:3
80:25
81:17,23
116:25

**secure**
139:11

**seek**
93:10

**Seidle**
29:4
30:11
123:9

**sell**
13:1,25
14:2,10
16:15
19:20
32:7
37:23
39:4 40:8
43:22
45:8 60:8
61:23
74:11
77:18
78:7
79:21
80:2,11
81:21
82:1
84:21
116:16,19
137:7



140:12
145:20,23
149:5

seller
 25:20,23
 28:1
 32:20,21
 33:7,19
 34:1,12,
 18 35:1,
 24 36:2
 63:23
 81:8
 96:21
 102:17
 133:8
 149:11

Seller's
 35:20
 83:1

sellers
 67:8
 81:6,9
 103:19

selling
 12:25
 14:3,21
 16:3
 18:25
 27:3,8
 32:18,20
 33:6,19
 34:1
 38:6,16
 43:24
 48:9 54:2
 55:9
 60:12
 61:10,20
 62:8 63:8
 67:9
 69:15
 70:22
 80:7
 81:14,18,

25 82:2,
6,9,22,25
84:9,11
86:19
99:17
103:19
113:14
116:7,13
117:11
124:12,17
133:8
137:20,23
140:9
141:21
142:6,22
145:7,9,
19 158:7,
15,17

sells
 5:25

send
 92:6
 157:8

sending
 47:15

sentence
 66:25
 67:11,14
 69:17
 125:5
 130:19
 131:5
 133:2

separate
 75:3,18
 76:7,8,
 11,13,15,
 18 77:11
 94:21
 98:25

series
 17:16

service
 6:1 22:18

46:24
48:25
52:17
53:18
108:5
112:25
122:6
129:5
131:20
132:4,16
134:17
137:6
140:3,10,
19 144:2
155:10
157:13

services
 13:5,8
 52:7
 61:25

set
 12:23,25
 13:1
 30:25
 89:9
 156:25
 157:3

setting
 16:25

setup
 31:12

Shampoos
 142:18

shared
 13:5,8

shift
 145:4

ship
 48:23
 152:7

shipments
 16:10

shipping
 152:10

shoes
 58:12

Shopify
 15:10

shopping
 157:18

short
 43:10
 88:23
 144:24

show
 94:24
 103:10
 104:3,8

showed
 149:23

shown
 103:20

shut
 93:21
 96:6
 153:23

side-by-
side
 105:2

sign
 162:2

significant
 140:6,14,
 16 141:3,
 7,9

similar
 15:7

single
 113:12,
 19,23

Sir
 34:25

sister
 12:15,17

sit
 16:13
 26:23
 79:9
 135:12

site
 81:2
 125:25
 157:10

situation
 92:23

skin
 39:5
 44:16
 46:13
 61:3,13
 62:18
 142:13
 150:19

SKU
 32:2
 41:2,10,
 20 42:4

slew
 158:2

small
 139:5,6,7

software
 13:2,12,
 14

sold
 14:4
 15:13
 20:2,8
 23:16,17
 27:9,12
 28:7
 43:20
 45:10
 48:5
 49:6,12,



15,18
57:3,8
58:21
59:8,25
61:14,21
80:21
81:2
89:11
138:22
141:12

Solu-med
6:5,7
7:21,25
12:7,11,
13,19,23
13:16,18
14:5,9,12
15:1,4,20
17:4,6,8
19:10,12,
21 20:8,
12,16,21,
23 21:2,
7,10,23
22:3
25:5,9
27:2,6,
12,18
28:11,25
29:3,5
33:9
34:17
38:4,15
39:1,2
40:7,11,
14,17
41:2,7
42:20
43:15,19
44:10
48:20
49:13
50:8,13,
19,23,24
51:4
56:21

62:2,8
70:6 71:7
72:9 74:8
75:20
77:7,9
79:10,23
83:12
84:12
86:9
87:18
89:3,12
95:2
96:7,12
97:17
99:15,19,
20 101:5
113:15
117:25
138:21
139:11
141:12,19
142:22
144:10
145:4
146:16
147:5
148:9,11
153:8
155:17
156:21
157:8
158:10
160:3,14
161:7

Solu-med's
19:14
28:7 32:9
42:17,21
68:16
99:24
139:15
144:5

somebody's
100:10

SOP

148:24

SOPS
148:22

sought
43:23

sounds
58:8

source
32:10
44:10,13,
25 46:3
50:3,25
52:16
70:15
73:20
74:2
78:8,9
84:19,23
85:5,11
86:9
125:19
127:24
142:6
151:10

Source/
solu-med
83:25

sourced
71:5 73:6
116:6
124:24
136:14
147:5

sources
125:7

sourcing
9:1,13
10:2
16:20,22
19:8
20:12
39:23
69:25

70:3,6,
11,18
71:11
72:7,10
73:14
122:5
148:25

space
75:23

speak
52:3,6
98:9,12
108:8,10
118:22
119:10
120:5,18

speaking
18:7
57:12
124:3,15
161:10

specific
6:24
20:7,10,
15 22:25
23:5
25:13
31:16,18
33:25
34:7,9
35:3,6
39:9
42:16,20
43:14
45:6 48:4
53:4
54:23
55:3,9,13
56:2,8
58:3
71:15
74:4,5,25
75:11
77:13
80:11

84:11
91:25
92:14
93:2 94:7
98:6
102:7
103:18
105:15
106:18
109:4
124:15
126:20
135:4,14
139:17
141:15
142:3
153:4

specifically
24:17
27:6,20
32:12,17,
24 33:1,3
35:13,21
37:17,21
38:8 41:7
50:21
52:24
54:25
55:15
56:4,12,
25 57:12
77:5
79:12
94:4
99:10
102:17
103:2
105:15
106:6
108:16
109:22
118:11
121:20,21
124:3
131:12,17



135:3
139:10
145:20
160:17

**specificati
ons**
54:16

**specifics**
28:19
30:6
34:24
41:15
42:5
55:12
97:5
115:5
143:10,23
146:3

**spoke**
6:9,10
30:7,14,
15 119:1,
12,22

**spoken**
29:17,20

**square**
21:7

**Stan**
95:13
96:4,23,
25 97:12
98:9,14,
15 100:16
118:5

**stand**
81:1
107:18

**standards**
147:9

**standpoint**
21:17

**start**

11:13
12:3
22:25
23:5
37:12
96:12
97:8
104:18
141:18

**started**
10:7
11:25
12:2
15:19
36:1 72:2
158:15

**starts**
69:17

**state**
5:15 58:7
159:19

**stated**
35:12
45:1,21
83:13
85:2

**statement**
45:6,18
48:2
111:14,17
112:2,5
113:4,7
128:2,8,
23,24
129:20,22
134:23
136:19
149:3,14
156:10,20

**statements**
144:6

**states**
68:4,5
73:3

**steps**
39:6,9
51:4
55:16
56:11
92:16
96:5
108:20
112:21
117:10
122:2
126:15
127:18
133:24
151:15

**stickers**
76:22

**stop**
145:6,9

**stopped**
8:3
145:19

**store**
45:21
74:24
75:14,15
139:15
146:17
151:1,11
153:4,23
154:11
157:19

**stored**
74:20
158:11

**storefront**
13:23
14:20,24
27:10,15
28:7
30:25
39:8
44:14,25
46:3

49:15,24
50:25
84:18,24,
25 85:1,
24 93:22
97:21
139:15,16
140:9

**storefronts**
145:7

**stores**
143:16

**storing**
70:25

**strategic**
145:4

**strategy**
97:8

**stress**
84:8
126:20

**strict**
148:15

**stricter**
148:24

**strictly**
11:18

**strike**
28:6
32:18
33:20
44:9 65:1
149:25
151:5

**stringent**
147:9
149:4

**subcontract
ing**
9:3

**submission**

111:1

**submit**
42:16,20
43:19

**submittal**
44:4

**submitted**
114:18
115:22

**subsection**
130:1

**substantive**
7:16,19

**substantive
ly**
120:6

**sudden**
96:12

**suggesting**
118:8

**suit**
72:2,9

**summaries**
19:6

**summer**
145:10

**supplier**
51:19
73:9
74:8,17
78:9,12,
13,15,17,
19 79:1,
6,11
147:7
148:2,16
149:3

**suppliers**
71:6,13
139:12
147:10,13



149:5
160:23,24

**supplies**
11:2,20
74:11
79:4
139:12
145:10
147:12

**supply**
11:19
127:10,
14,17
137:5,11,
15 142:25
143:7,11
160:7,8

**support**
52:4,7,17
53:19
133:4

**supposed**
41:14,20
59:7,15
60:3

**suspend**
82:2

**suspended**
80:12
93:1,25
94:5
108:19
109:10
135:17

**suspension**
82:8 94:7
96:8,11
97:21
98:3
106:21
124:4

**suspensions**
98:5

**system**
13:4
32:21
41:6
42:24
96:17
114:2
133:13
136:16,24
161:3,6

**systems**
9:22,24
13:1,5
126:10

———————

**T**

———————

**taking**
17:23
56:11
95:6

**talk**
6:15 8:1
29:22
118:13,25
119:13

**talked**
34:10
64:4
131:6
143:13

**talking**
18:18
43:14
49:3
72:23
85:4
135:20
144:17
155:16
161:4

**talks**
63:23
102:11

**tapped**
13:6

**team**
19:6
131:1,25
144:14

**telephone**
108:3

**telling**
55:14
81:9
83:25
115:21
118:9
141:3

**temperature**
75:2
76:3,4,
19,23,24
77:2,8

**temporarily**
109:12

**terminate**
28:21
82:2

**terms**
48:6
61:25
84:10
112:25
122:6
129:5
131:19
132:4,16
134:17
137:6
153:16
154:5
155:10
157:3

**Terrace**
5:19

**testified**
47:7
58:17
59:13,17,
24 85:21
129:1,10
149:2
155:25
156:6
159:21,22

**testify**
6:23 79:9

**testimony**
7:3 25:10
60:19
154:1
156:1

**testing**
79:20,25

**thing**
10:10

**things**
6:1 7:22
9:24
10:10,24
11:3
13:2,13
16:3,10
19:6
21:14
25:15
31:12
35:4
45:17,20
46:24
47:4,5
49:1 97:6
100:6
123:16
135:21
140:2
142:19

**thought**
48:13

73:13
123:13
131:19
159:21

**thousand**
113:18

**Thousands**
113:17

**time**
7:8,22
11:13,15
12:14
15:12
17:19
18:8,15
26:9
29:20
30:7,14,
15 42:5
54:12
58:1 61:9
63:7 66:7
73:7
78:19
79:19
82:20
102:10
107:15
112:3
113:5,10
114:12
119:25
138:18
141:20,24
150:12
151:18

**times**
38:17
56:18
119:17
120:11

**tip**
13:9

**today**



6:4,16
26:23
79:9
108:1
112:5
113:7
114:6,14
135:12
161:12

**told**
41:24
42:2
47:23
55:4
56:13
97:17
101:2
109:15,16
115:8
116:12
132:2,7
145:9
153:21

**top**
63:21
68:1
118:2
150:3

**toys**
44:16
46:13

**trademark**
90:14

**Traffic**
9:21

**training**
16:15
22:15,18
23:7,9
31:6,10
34:13
35:6,20

**transaction s**
71:4 73:4

**transfer**
21:1

**transferred**
21:23

**treatments**
142:18

**trouble**
10:7

**true**
44:9
48:15
87:18,21
111:14,
17,18
112:2,5
113:4,7
116:10
136:19,23
149:14,20
156:20

**truthfully**
6:17

**turn**
70:9
89:15,19
136:10
157:17

**tutorials**
151:2

**TXT**
162:14

**type**
7:5 9:14,
15 10:25
48:25
52:9,11
75:3
92:15
126:2

142:11,16
161:25

**typed**
123:12
162:3

**types**
23:15
64:19
66:23
67:4
89:17
97:6
145:7
152:18

**typical**
17:14
92:11

**typically**
92:6
93:15

**typo**
125:4

———————

**U**

**uhm-hum**
14:15
16:24
18:2
20:19
64:18
80:23
83:23

**unable**
46:11

**unaware**
59:14

**understand**
17:17
20:18
23:18
34:11

53:6 57:1
65:2
117:17
120:19
122:14

**understandi ng**
65:11
66:9
143:9

**understood**
18:14
48:13
80:9,14
82:25

**unique**
139:15,16

**university**
8:10,14,
16 16:3
34:12,19
35:2,24
36:2
149:11

**University' s**
35:20

**UPC**
39:19
42:24
126:1,2
132:10
133:21

**UPCS**
114:1,2

**updates**
42:8

**upper**
150:21

**usage**
45:16

**utilities**
21:14

**utilizing**
96:17

———————

**V**

———————

**valid**
42:7
45:20
135:1
136:16

**variations**
94:19

**vary**
92:13

**vendor**
10:23
14:10
146:20

**verbal**
18:12
100:8
101:16
156:6

**verificatio n**
126:1
160:11

**verify**
39:6
40:8,11
51:5
55:16
56:22
73:8
78:14,16
79:10
126:7,9

**version**
115:19
125:12,13



**versus**
  51:10

**vet**
  137:4

**vet all**
  160:23

**vetted**
  160:15

**vetting**
  137:10,15
  160:21

**video**
  16:8,12
  23:6 35:7
  43:8,11
  88:21,24
  144:22,25
  162:9

**videos**
  16:4,5
  22:17
  41:15
  151:2

**view**
  23:1
  39:12
  81:7

**viewed**
  39:14

**viewing**
  51:9

**Vine**
  20:1
  24:19
  25:16
  28:23
  29:16
  33:13
  35:10
  41:25
  42:1
  43:4,6,13

46:1
47:11
48:12
49:9
50:5,12,
16,18
53:1,9
56:7
57:14,21
58:24
59:4,12
60:15,23
62:4,16,
24 65:5,
8,10,17,
21,23
66:3 69:5
71:20
72:6,13,
18 73:1
75:4,9
82:18
83:17
84:13,17
86:8
87:1,4,17
88:1,13,
20 89:1,8
92:24
95:18,21
96:1,2
97:13
98:19
100:22
101:1
103:9
104:7
106:3
110:17
115:13
117:22
118:1,4,
8,13,17,
18 121:6,
14,19,22
122:1
123:3

126:6
129:6,15
135:22
137:3
138:17
139:20
140:20
141:1,6
143:21
145:2
146:4,8,
18 147:3,
15,20
148:5,18
149:8,16,
18,20,23
151:5,13,
24 153:25
154:20,22
155:2,22
156:4,9,
14,16,23
157:17,24
159:1,3,
4,20
162:11

**violate**
  67:8
  133:24
  134:2

**violated**
  80:10

**violating**
  82:7

**violation**
  32:13
  56:10,20,
  21 57:1
  60:11,21
  64:11,13,
  14 67:3
  68:4,5
  106:5
  107:5
  131:19

132:16,20
138:14
152:4,7,
19,20

**violations**
  64:20,22
  65:3
  66:10,14,
  18,22,23
  67:5,12,
  13,17,19,
  21,23
  90:15
  94:5
  102:16
  103:1
  109:5
  135:17
  138:13
  152:18,24

**visible**
  133:7

**voice**
  108:4

---

**W**

**waiting**
  30:23

**waive**
  161:20,24
  162:7

**Wal-mart**
  14:19,20,
  23 15:9
  22:13,15,
  23 23:1,
  8,19 24:6
  139:9

**Wal-mart's**
  14:22,25
  23:24

**walk**
  12:22

**walls**
  76:13

**wanted**
  14:1
  47:9,13,
  20 49:7
  112:10
  120:17
  133:19

**warehouse**
  21:4
  49:14
  74:20
  75:1,18,
  20,23,24
  76:1,6,9,
  14 148:17

**Warning**
  106:5

**warnings**
  99:12
  109:6
  112:17
  135:16,23
  136:1

**warranties**
  114:10

**warranty**
  37:1,4,7
  40:4,5,12
  44:3,7
  51:16
  53:22
  54:3
  57:9,16
  58:9,10,
  18,22
  59:7,15,
  22 60:1,
  4,13,20
  61:24
  62:8



68:13,19,
21,22
88:4,16
114:7
125:22
132:18
138:7
151:22
154:18

**watch**
23:6,8

**watched**
16:4,5,8,
12 24:16,
18 34:24,
25

**watching**
35:7

**ways**
156:24

**web**
106:11

**webinar**
35:19

**webinars**
35:4

**website**
14:22
15:11
31:4
40:15
45:1 85:3
138:21
139:5

**Weinstein**
28:10,11,
24 29:17
36:1 46:9
55:14
110:24

**withhold**
82:5

**word**
151:20
156:2,13

**work**
9:4,16
19:7
30:11

**worked**
7:25
9:10,21
30:21
123:9
148:8

**working**
7:22 8:3
30:1,3,5

**works**
42:23

**write**
116:4
128:3
130:2,10,
17,22
133:15
134:20
137:13

**writing**
155:18

**written**
40:5
99:15,19,
23 100:1,
3,11,13,
17 101:2,
4,7,13
102:2
103:15
156:3,6,
13,20
160:4,6

**wrong**
41:21

**wrote**
62:20
111:7,12,
15 112:3,
23 117:3
125:3,5
127:11
129:7,8,
20 131:5,
7,21
134:9
135:9
136:21
156:11

———————

**Y**

———————

**year**
9:5,17,25
30:9
38:5,17
90:6
145:24
148:11
149:6

**years**
15:12
64:5
124:12,
13,18

**Youngblood**
27:9,12
32:16,19
33:10,21,
24 34:2,
14 36:8,
11,20
37:9,14,
17 38:8,
12 39:7
40:8,12,
15 41:10
43:16
44:11,22
49:6,18

50:9,20,
21 51:5
52:1,3,6
53:13
54:8
55:18
56:3,10,
20,23,24
58:15,20
59:6,14,
18,25
61:10,20,
23 63:8
64:3
65:15
68:23
69:15
70:22
71:22
74:19,24
75:11,14
77:10,14
78:11
80:20
82:7,23
85:20,24
87:19,21
92:1,3
93:16,17
94:8,9
95:1,3,5
97:1,14
98:10,15
99:10
103:3,11,
15 104:25
107:5
111:8,22,
24 112:7,
11,15
116:5
117:5,7,
25 120:6,
24 122:17
123:21
124:8,12,
18,22

126:24
127:3,5,6
130:20
131:14
134:5
135:17
137:24
138:3,6
145:15
149:17
153:4,7,
9,17,21
154:5,10
158:7,9,
10,14,17
160:13

**Youngblood's**
41:14
42:4,17,
21 45:10
116:22

**Youtube**
149:12,15



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SOLU-MED, INC., | Civil Action No.:  0:19-cv-60487-RKA |
| Plaintiff, | **DECLARATION OF NONPARTY AMAZON.COM, INC. CUSTODIAN OF RECORDS** |
| v. | AMAZON REF NO.: SUB1004122 |
| YOUNGBLOOD SKIN CARE PRODUCTS, LLC, | |
| Defendant. | |

Clarice Cohn declares as follows:

I am over the age of eighteen and I am a duly authorized Custodian of Records for

Amazon.com, Inc. ("Amazon").

1.    I am a Litigation Paralegal in the Litigation and Regulatory group at Amazon.  I

make this declaration based on my personal knowledge and my review of Amazon records kept,

maintained, and relied upon by Amazon in the ordinary course of business.

2.    My responsibilities include working with outside counsel to respond to subpoenas

served on Amazon.  This includes gathering, compiling, analyzing, cross-checking, and

preparing documents to be produced in response to subpoenas, among many other duties.

3.    On January 14, 2020, Amazon was served with a subpoena from Defendant

Youngblood Skin Care Products, LLC ("Defendant") in the above-referenced action.  On

January 21, 2020, Amazon served objections to the subpoena.

4.    Attached as <u>Exhibit 1</u> is a true and correct copy of Amazon's Selling Policies and

Seller Code of Conduct in effect as of November 1, 2018.

**EXHIBIT 6**

5.      Attached as Exhibit 2 is a true and correct copy of Amazon Anti-Counterfeiting Policy in effect as of November 1, 2018.

6.      Attached as Exhibit 3 is a true and correct copy of Amazon's Product Authenticity and Quality Policy in effect as of November 1, 2018.

7.      Attached as Exhibit 4 is a true and correct copy of Amazon's Cosmetics & Skin / Hair Care guidelines in effect as of November 1, 2018.

8.      Attached as Exhibit 5 is a true and correct copy of Amazon's Condition Guidelines in effect as of November 1, 2018.

9.      Attached as Exhibit 6 is a true and correct copy of a compilation of complaints from intellectual property rights owners to Amazon against Plaintiff Solu-Med, Inc.'s storefront "Life and Health Source," seller ID ABABPETWJQTSG ("Plaintiff").  The compilation contains the following information:  complaint ID; date; alleged infringement; rights owner ("RO") information; RO communication; and ASIN(s) at issue.

10.      Attached as Exhibit 7 is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated January 27, 2018, regarding Complaint ID 1382641761.

11.      Attached as Exhibit 8 is a true and correct copy of Amazon's notice of intellectual property rights infringement warning to Plaintiff, dated January 28, 2018, regarding Complaint ID 1387678261.

12.      Attached as Exhibit 9 is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated March 5, 2018, regarding Complaint IDs 1493861371, 1493861291, 1493861121, 1493860871, 1493861581, 1493860981, 1493861011, 1493860931, 1493861451, 1493861181, 1493861241, 1493861641, 1493860821, 1493861071, and 1493861531.

DECLARATION OF NONPARTY AMAZON.COM, INC. CUSTODIAN OF RECORDS

13.     Attached as <u>Exhibit 10</u> is a true and correct copy of Amazon's notice of intellectual property rights infringement warning to Plaintiff, dated April 4, 2018, regarding Complaint IDs 1584640131, 1584640051, 1584640081, 1584640321, and 1584640211.

14.     Attached as <u>Exhibit 11</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated May 12, 2018, regarding Complaint ID 5057530651.

15.     Attached as <u>Exhibit 12</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated July 23, 2018, regarding Complaint ID 5235198981.

16.     Attached as <u>Exhibit 13</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated July 25, 2018, regarding Complaint ID 5201230301.

17.     Attached as <u>Exhibit 14</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated January 27, 2019, regarding Complaint ID 5732843141.

18.     Attached as <u>Exhibit 15</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated January 30, 2019, regarding Complaint ID 5739450721.

19.     Attached as <u>Exhibit 16</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated February 13, 2019, regarding Complaint ID 5785594171.

20.     Attached as <u>Exhibit 17</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated March 14, 2019, regarding Complaint ID 5869338901.

21.     Attached as <u>Exhibit 18</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated April 17, 2019, regarding Complaint ID 5992065151.

22.     Attached as <u>Exhibit 19</u> is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated April 29, 2019, regarding Complaint ID 6028406021.

23.     I hereby certify and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 6 day of February, 2020, at Seattle, Washington.

_____
CLARICE COHN

EXHIBIT 1

# Selling Policies and Seller Code of Conduct

All sellers are expected to adhere to the following policies when listing products on Amazon. Seller offenses and prohibited content can result in suspension of your Amazon account.

## Seller code of conduct

Amazon enables you to reach hundreds of millions of customers. We strive to ensure a fair and trustworthy buyer and seller experience. At Amazon, we expect you to adhere to the code of conduct principles outlined below. Violation of the code of conduct principles may result in the loss of your selling privileges and removal from Amazon Marketplace.

Seller Code of Conduct Principles:

· Adhere to all applicable laws and abide by all Amazon policies.
· Maintain current account information.
· Never misrepresent yourself.
· Always act in a manner that ensures a trustworthy experience for Amazon customers.
· Never list products that may cause harm to Amazon customers.
· Never engage in any misleading, inappropriate or offensive behavior. This applies to all your activities, including but not limited to:
  o Information provided on your account
  o Information provided in listings, content or images
  o Communication between you and Amazon or you and our customers
· Act fairly at all times. Unfair behavior includes but is not limited to the following:
  o Behavior that could be deemed as manipulation or "gaming" of any part of the buying or selling experience
  o Actions that could be perceived as manipulating customer reviews, including by directly or indirectly contributing false, misleading or inauthentic content
  o Activities that could be perceived as attempting to manipulate Amazon's search results or sales rankings
  o Actions that intentionally damage another seller, their listings or their ratings

To learn more about Amazon policy violations and review a few examples, please watch this short video.

EXHIBIT 2

https://sellercentral.amazon.com/gp/help/G201165970

Published version on 2/19/2018

# Amazon Anti-Counterfeiting Policy

**Products offered for sale on Amazon must be authentic. The sale of counterfeit products is strictly prohibited. Failure to abide by this policy may result in loss of selling privileges, funds being withheld, and destruction of inventory in our possession.**

It is each seller's and supplier's responsibility to source, sell, and fulfill only authentic products. Prohibited products include bootlegs, fakes, or pirated copies of products or content; products that have been illegally replicated, reproduced, or manufactured; and products that infringe another party's intellectual property rights. If you sell or supply inauthentic products, we may immediately suspend or terminate your Amazon selling account (and any related accounts) and destroy any inauthentic products in our fulfillment centers at your expense. In addition, we do not pay sellers until we are confident our customers have received the authentic products they ordered. We may withhold payments if we determine that an Amazon account has been used to sell inauthentic goods, commit fraud, or engage in other illegal activity.

We work with manufacturers, rights holders, content owners, vendors, and sellers to improve the ways we detect and prevent inauthentic products from reaching our customers. As a result, we remove suspect listings based on our own review of products. We also work with rights holders and law enforcement worldwide to take and support legal action against sellers and suppliers that knowingly violate this policy and harm our customers. In addition to criminal fines and imprisonment, sellers and suppliers of inauthentic products may face civil penalties including the loss of any amounts received from the sale of inauthentic products, the damage or harm sustained by the rights holders, statutory and other damages, and attorney's fees.

We stand behind the products sold on our site with our A-to-z Guarantee, and we encourage rights owners who have product authenticity concerns to notify us. We will promptly investigate and take all appropriate actions to protect customers, sellers, and rights holders.

EXHIBIT 3

https://sellercentral.amazon.com/gp/help/G202010130

Published version on 10/12/2018

# Ensuring product authenticity and quality

Customers trust that they can always buy with confidence on Amazon. As a seller, it's important to understand Amazon's guidelines on product quality and authenticity.

Please take a moment to review our guidelines below. Reviewing and complying with these guidelines will help you keep your account in good health. For additional information, see Best Practices for Listing Quality Improvements, Product Listing Guidelines, and Condition Guidelines.

# Types of violations

Amazon enforces sellers who violate our selling policies. Violations related to product authenticity are categorized as intellectual property violations. Issues with the overall product quality, including products that do not match their descriptions, can be categorized as "materially different" violations.

- Intellectual property violation

  Amazon respects the intellectual property rights of others. As a seller, you are responsible for ensuring that the products you offer are legal, authorized for sale or re-sale, and that they do not violate intellectual property rights such as copyrights, patents, trademarks, and rights of publicity. To learn more about intellectual property violations, see Amazon's Intellectual Property Policy.

- Materially different product condition violation

  The product you list and ship must exactly match the description, pictures, and all other information on the product detail page. Amazon policy prohibits you from listing or shipping "materially different" products. For example:

  o Listing your product in New condition when it is not in brand-new or unused condition, or in un-opened original packaging.
  o Listing your product for sale on any related product detail page when your product does not exactly match the description on that page.
  o Shipping a product that is damaged, defective, misclassified, misrepresented, or missing any of its parts.

  Review and update your listings to confirm your products are accurately described.

  Learn more about Prohibited Seller Activities and Actions.

# Enforcement

Based on the severity of a policy violation, Amazon may take the following actions:

- Cancel your listings
- Limit, suspend, or block your ability to list products
- Suspend or block your ability to sell
- Remove or destroy your FBA inventory

· Withhold your payments

Additionally, we have implemented listing restrictions for certain brands, ASINs, and categories. Approval is required to list under brands, ASINs, or categories with listing restrictions.

# Best Practices in Product Authenticity and Quality

All Amazon sellers are responsible for complying with the law along with Amazon's policies. Customers trust that they can buy with confidence on Amazon and receive authentic products that arrive in the condition they expect. In order to ensure that both sellers and customers have the best experience, here are some tips that sellers might find helpful when listing products on Amazon.

# Sourcing Products

**Are you purchasing your products from a reliable source?**
Know your supplier. Reduce the risk of complaints by researching the manufacturers, resellers, and suppliers from whom you purchase goods.

**Are you confident in the authencity and quality of your goods?**
Verify the authenticity of the products you source. Take time to perform a quality check of the products you source. If you sell branded products on Amazon, ensure that you source the product(s) from a reliable supplier.

**Are you storing documentation for all of your purchases?**
Keep all documents and records of transactions, such as POs and invoices establishing that you sourced products from reliable suppliers.

**Have you considered possible safety concerns with your products?**
Verify that the products you sell are safe. Take time to research whether there are any safety testing or compliance requirements for the products you sell.

Learn more about Amazon's Product Authenticity and Quality program and Anti-counterfeiting Policy.

To learn more about Amazon's safety policies, please visit the Product safety and compliance page and review the Selling products with Safety and Compliance Requirements page on Seller University

# Listing Products

**Are you listing your products correctly?**
When you are offering a branded product that is already listed, make sure you list it under the corresponding ASIN. If your product is generic, do not list the product under a branded ASIN. Offering a product on an ASIN communicates to customers that you are offering that specific item with those specific characteristics. If you are selling a product that has additional listing qualifications, you will be required to apply to sell those products through Seller Central.

**Are you describing your products accurately?**
When selling generic products that are compatible with a branded product, make sure it is clear that your generic item is not a product of that brand.

Clearly state whether your products are new or used, and list your products under the most appropriate Amazon category. Provide detailed and accurate information about the product you are selling.

You can find guidance on how to add your products and manage your inventory under the "Add your products and manage your inventory" section in Seller University.

For more information about listing your products, please review our Best Practices for Listing Quality Improvements, Product Listing Guidelines, and Condition Guidelines

For more information about listing your products, please review our Condition Guidelines

# Storing & Shipping

**Have you considered the unique features of your products?**
Store your products according to their unique features. Thoughtfully storing your products will help you preserve the integrity of your products and their packaging. Some goods will need to be preserved in a particular manner to maintain their freshness. Remember to check the expiration date on your products. If you use the Fulfilled by Amazon services, we may deem your expired products unsellable.

Pack products carefully and include all parts of the product. Buyers expect to receive products in their original packaging. If you purchased your inventory in bulk and the items are unpackaged, be sure to inform customers of this. See more on Packaging best practices.

If you are sourcing from other parts of the world and/or shipping globally, make sure that your products will properly function and comply with all applicable laws in the country where you are selling them.

See more on Seller Fulfilled Shipping and Fulfilled by Amazon.

For additional information, please review Amazon's policies and agreements.

# FAQ

**How can I check to see if I have a product authenticity complaint?**
You can check the "Product Authenticity Customer Complaints" link under the "Product Policy Compliance" section in Account Health. We may also send you an email if Amazon has concerns about your listings.

**What should I do if my listing(s) has been removed or my account has been suspended due to product authenticity complaints?**
If your listings are removed, your account has been suspended or your ability to list new products has been removed, we will notify you via email. We may ask you to submit invoices from your supplier or provide your supplier's contact information. We may also ask for a plan of action that describes steps you took to resolve the issue and prevent similar complaints, or an authorization letter from the manufacturer. You can submit the documents through the account health dashboard or via email.

For additional information, see:

Appeal the restriction or removal of selling privileges

Amazon Anti-Counterfeiting Policy

Policies and Agreements

**Important:** Providing fabricated documents will result in the removal of your Amazon selling privileges.

EXHIBIT 4

**Important:** If you supply products for sale on Amazon, you must comply with all federal, state, and local laws and Amazon policies applicable to those products and product listings.
Cosmetics are products that are usually rubbed, poured, sprinkled, or sprayed onto the body for cleansing, beautifying, or changing the appearance of the body. Cosmetics are products like skin creams, perfumes, lipsticks, fingernail polishes, eye and facial makeup, shampoos, hair colors, toothpastes, and deodorants.

Cosmetics and skin or hair care products must be correctly described and labeled, and they must not be otherwise prohibited by Amazon policies. Please use the checklist below to be sure your product can be sold on Amazon.

# Compliance Checklist

Packaging

1. Cosmetics must be sealed in the original manufacturer's packaging
2. Cosmetics must be new and unused
3. Cosmetics must clearly display identifying codes placed on the packaging by the manufacturer or distributor, such as matrix codes, lot numbers, or serial numbers

Labeling

1. Cosmetics must be labeled in English with the following information:

    a. The name of the product
    b. The purpose or use of the product (e.g. cleansing the body, reducing the appearance of wrinkles, moisturizing the skin)
    c. The amount of content of the cosmetic, in terms of weight, measure, count or a combination (e.g. 30 oz, 5 mL, 10 pills, 5 lbs)
    d. The ingredient list
    e. The name and address of the manufacturer, packer, or distributor
    f. Any necessary label warnings
2. Cosmetic labels must not state that the products cure, mitigate, treat, or prevent a disease in humans, unless that statement is approved by the FDA
3. Cosmetic labels must not state that the cosmetics are "FDA approved" if they are not FDA approved
4. Cosmetic labels must not use the FDA logo
5. Cosmetic labels should not state "tester," "not for retail sale," or "not intended for resale" as such items may not be sold on Amazon

For more information, see the U.S. Food and Drug Administration's resources Summary of Labeling Requirements and Is It Really 'FDA Approved?'.

Detail page

1. Detail pages must include the following information:

    a. The name of the product
    b. The purpose or use of the product (e.g. cleansing the body, reducing the appearance of wrinkles, moisturizing the skin)

      c.  The ingredient list, including an image of the ingredient list from the product label

      d.  Any necessary label warnings

2.  Detail pages must not state that the products cure, mitigate, treat, or prevent a disease in humans, unless that statement is approved by the FDA

3.  Detail pages must not state that the cosmetics are "FDA approved" if they are not FDA approved

4.  Images associated with detail pages must not include the FDA logo

For more information, see the U.S. Food and Drug Administration's resources Summary of Labeling Requirements and Is It Really 'FDA Approved?'.

Products and ingredients

1.  Cosmetics must not be named in an FDA recall or safety alert (for more information, see: Recalls, Market Withdrawals, & Safety Alerts)

2.  Cosmetics must not contain prohibited ingredients (for more information, see: Prohibited & Restricted Ingredients)

3.  Cosmetics must be safe for use and must not be a product that the Food and Drug Administration (FDA) has determined presents an unreasonable risk of injury or illness, such as:

      a.  Products that contain methylene glycol, which, when heated, release formaldehyde into the air (for more information, see: Hair-Smoothing Products That Release Formaldehyde When Heated)

      b.  Eyelash and eyebrow permanent dye (for more information, see: Use Eye Cosmetics Safely)

      c.  Eye makeup containing Kohl, Kajal, Al-Kahal, or Surma (for more information, see Use Eye Cosmetics Safely)

      d.  Skin creams containing mercury (for more information, see: Mercury Poisoning Linked to Skin Products)

      e.  Henna products designed or marketed for body-decorating or any other variation of direct skin application (for more information, see: Cosmetics Safety Q&A: Tattoos and Permanent Makeup)

4.  Cosmetics must not require a prescription or a medical professional's supervision or direction for their use

5.  Cosmetics must not contain controlled substances, such as:

      a.  Anything listed in Schedules I, II, III, IV or V of the Controlled Substances Act (for more information, see: Schedules of Controlled Substances)

      b.  "List I" chemicals or their derivatives as designated by the Drug Enforcement Administration (DEA) (for more information, see: List I and List II Chemicals)

6.  Cosmetics must not contain plastic microbeads (for more information, see: The Microbead-Free Waters Act: FAQs)

7.  In order to be sold into California and New York, antiperspirants, deodorants, and hairsprays must not contain toxic air contaminants (for more information, see California Air Resources Board Consumer Products Enforcement and New York Department of Environmental Conservation)

8.  Cosmetics must comply with Amazon policies, including:

a. Cosmetics that contain ingredients derived from sharks, whales, dolphins, or porpoises are prohibited from sale
b. Cosmetics that contain more than 12% hydrogen peroxide are prohibited from sale
c. Cosmetics that contain acetone, such as nail polish remover, cannot be sold in volumes more than 16 oz in total
d. InStyler rotating irons are prohibited from sale
e. Claire's brand cosmetics are prohibited from sale

## Additional useful resources

· LegitScript has a searchable database that may help when determining if a cosmetic includes a prohibited ingredient: https://www.legitscript.com/

## Related Amazon help pages

· Restricted Products: Animals & Animal Products
· Restricted Products: Dietary Supplements
· Restricted Products: Food & Beverage
· Restricted Products: Drugs & Drug Paraphernalia
· Restricted Products: Medical Devices & Accessories

## Known prohibited products

Amazon specifically prohibits the following cosmetic products. These products are prohibited because they do not meet the checklist requirements. This list does not include all cosmetic products prohibited by Amazon.

· Corrective and cosmetic contact lenses
· Latisse
· Obagi Nu-Derm Sunfader
· Obagi Nu-Derm Clear
· Obagi Nu-Derm Blender
· Obagi Elastiderm Decolletage Skin Lightening Complex
· Obagi C-Therapy Nightcream
· Obagi RX System Clarifying Serum
· Products that contain minoxidil in excess of 5%
· Bithionol
· Brazilian Blowout Acai Professional Smoothing Solution
· Chloroform
· Halogenated salicylanilides
· Methylene chloride
· Vinyl chloride in aerosol products
· Zirconium-containing complexes in aerosol products
· Synthol, Synthrol, or Swethol posing oil

Last updated 10/18/2018

EXHIBIT 5

Last Updated 10/30/2018, 6:47:53 AM

# Condition guidelines

Assigning the correct condition to each product you list on Amazon is the first step toward providing a great customer experience. It's important to make a careful assessment of your product before specifying its condition.

For information about selecting a condition for your product, see Selecting Conditions.

## General condition guidelines

The following guidelines apply to all product categories unless otherwise indicated in the Category-Specific Condition Guidelines:

**Note: Certified Refurbished**, **Used – Good**, and **Used – Acceptable** can be used only where noted as acceptable in the category-specific condition guidelines.

*New:*
Just like it sounds. A brand-new, unused, unopened item in its original packaging, with all original packaging materials included. Original protective wrapping, if any, is intact. Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments.

*Certified Refurbished:*
Use only if noted in the Category-Specific Condition Guidelines.

A product that has been inspected and graded by a qualified manufacturer or a specialized third-party refurbisher to like-new working condition with no visible cosmetic imperfections when held 12 inches away.

The item is backed by a minimum 90-day limited warranty provided by the supplier.

The products may be packaged in a generic box and come with relevant accessories as expected for a new product, with exceptions, if any, mentioned on the product detail page. Certified Refurbished items are sometimes referred to as Pre-Owned or Open-Box products.

*Used - Like New:*
An apparently untouched item in perfect condition. Original protective wrapping may be missing, but the original packaging is intact and pristine. There are absolutely no signs of wear on the item or its packaging. Instructions are included. Item is suitable for presenting as a gift.

*Used - Very Good:*
A well-cared-for item that has seen limited use but remains in great condition. The item is complete, unmarked, and undamaged, but may show some limited signs of wear. Item works perfectly.

*Used - Good:*
Use only if noted in the Category-Specific Condition Guidelines. The item shows wear from consistent use, but it remains in good condition and works perfectly. It may be marked, have identifying markings on it, or show other signs of previous use.

*Used - Acceptable:*
Use only if noted in the Category-Specific Condition Guidelines. The item is fairly worn but continues to work perfectly. Signs of wear can include aesthetic issues such as scratches, dents, and worn corners. The item may have identifying markings on it or show other signs of previous use.

# Unacceptable and prohibited items

Items in any of the following conditions are unacceptable for listing on Amazon:

- Item does not work perfectly in every regard.
- Item is not clean, including signs of mold, heavy staining, or corrosion.
- Item is damaged in a way that renders it difficult to use.
- Item is missing essential accompanying material or parts. (This does not necessarily include instructions.)
- Item requires repair or service.
- Item was not created by the original manufacturer or copyright holder. This includes copies, counterfeits, replicas, and imitations.
- Item was originally distributed as a promotional copy, promotional bundle, product sample, or advance reading copy. This includes uncorrected proofs of in-print or not-yet-published books.
- Any aspect of the item is obscured and not able to be read or viewed because of markings, stickers, or other damage.
- Item has passed the expiration date (includes "best by" and "sell by" dates), has an unacceptable portion of its shelf life remaining, or has had the expiration date removed or tampered with.
- Item is prohibited for sale on Amazon.

For more information about prohibited products, see Restricted Products.

Only full retail versions of software may be sold on Amazon. See Software & Computer Games for a list of software products that are prohibited for sale on Amazon.

# Category-specific condition guidelines

The following category-specific condition guidelines should be used as indicated in addition to or in place of the General Condition Guidelines.

# Books – New and Used

In addition to the general condition guidelines, apply the following guidelines to new and used books:

- **New**: Just like it sounds. A brand-new, unused, unread copy in perfect condition. The dust cover and original protective wrapping, if any, are intact. All supplementary materials are included and all access codes for electronic material, if applicable, are valid and/or in working condition. Books with markings of any kind on the cover or pages, books marked as "Bargain" or "Remainder," or with any other labels attached, may not be listed as "New" condition.
- **Used - Like New**: Dust cover is intact, with no nicks or tears. Spine has no signs of creasing. Pages are clean and not marred by notes or folds of any kind. May contain remainder marks on outside edges, which should be noted in listing comments.
- **Used - Very Good**: Pages and dust cover are intact and not marred by notes or highlighting. The spine is undamaged.

- **Used - Good**: All pages and cover are intact (including the dust cover, if applicable). Spine may show signs of wear. Pages may include limited notes and highlighting. May include "From the library of" labels.
- **Used - Acceptable**: All pages and the cover are intact, but the dust cover may be missing. Pages may include limited notes and highlighting, but the text cannot be obscured or unreadable.
- **Unacceptable**: Has missing pages and obscured or unreadable text. We also do not permit the sale of advance reading copies, including uncorrected proofs, of in-print or not-yet-published books.

## Clothing & Accessories

All apparel must be listed in New condition only. You cannot sell used products in this category.

## Industrial & Scientific

Industrial & Scientific products may be listed as New, New – Open Box, Certified Refurbished, Used – Like New, Used – Very Good, Used – Good, or Used – Acceptable.

## Books – Collectible

To ensure that customers are able to buy with confidence from all sellers on Amazon, sellers listing in the Collectible Books category must be pre-approved. For more information, see Collectible Books.

To be considered collectible, a book should be unique in a way that could reasonably be assumed to increase the book's value to a collector:

- First editions and first printings
- Signed, inscribed, or scarce copies
- Advance reading copies and uncorrected proofs of out-of-print books

Collectible books do not include the following:

- Uncorrected proofs of in-print or not-yet-published books
- Former library books
- Remaindered books
- Book club editions

The **General Condition Guidelines** do not apply to collectible books. Use the following condition types for Collectible Books:

- **Collectible - Like New**: All pages and the cover are intact. The dust jacket is intact, if applicable, with no noticeable or very tiny nicks or flaws. Spine has no signs of creasing. Book may have very small but virtually unnoticeable flaws. List items in Fine condition as Like New. Include condition details in the listing comments.
- **Collectible - Very Good**: Pages are intact and not marred by notes or highlighting. Spine shows no sign of creasing. Dust jacket, if applicable, shows signs of some rubbing or chipping. List items in Near Fine condition as Very Good. Include condition details in the listing comments.

- **Collectible - Good**: All pages and the cover are intact, including the dust jacket, if applicable. Spine may show signs of wear. Generally, books in Good condition are not considered to be collectible grade.
- **Collectible - Acceptable**: A readable copy showing significant wear. Dust jacket may be missing. For all but the rarest items, books in Acceptable condition are not considered to be collectible grade.

# Music – New and Used

Music formats include vinyl, magnetic tape, and disc.

If you are listing a club edition against the detail page for the standard edition, use the listing comments to indicate that your item is a club edition. For more about listing club editions, see the exception under **Matching product offers inaccurately** in Prohibited Seller Activities and Actions.

CDs and cassettes must be sold with a protective jewel or cassette case. You may substitute newer packaging when a jewel or cassette case is damaged, but you may not substitute copied cover art or liner notes for the originals.

In addition to the general condition guidelines, the following guidelines apply to new and used music:

- **New**: A brand-new, unused, unopened CD or cassette in perfect condition.
- **Used - Like New:** The jewel case, cassette case, or album cover has no scratches or scuffing. Cover art, liner notes, and inclusions are in perfect condition. The product itself is unmarked with no sign of wear. Packaging may have a remainder cut-out, which should be noted in the listing comments section.
- **Used - Very Good:** The CD or cassette that has been listened to but remains in great condition and plays perfectly. The packaging, cover art, liner notes, or inclusions may show limited signs of wear.
- **Used - Good:** The CD or cassette plays perfectly but has clear signs of wear. The product or its packaging may have identifying markings from its owner.
- **Used - Acceptable:** The CD or cassette plays perfectly but is otherwise the worse for wear. Packaging and inclusions may be damaged, marked, or missing. Note any missing elements in the listing comments section.

A brand-new, unused, unopened CD, MC or record in perfect condition.

*What we will not accept for sale at Amazon.com.tr:*
Music that is in any way unplayable or recorded, recordings not manufactured by the copyright holder, including recopied media in any form. Promotional media is prohibited for sale through Amazon.com.tr Marketplace. Any missing components must be explicitly stated in the description.

Make sure you describe your CDs, MCs, and records accurately. An accurate product description increases buyer satisfaction. Should an item have an obvious cosmetic flaw, sellers are strongly encouraged to make a note in the comments field. The presence of remainder marks or cut-outs should always be noted in comments. Recopied media is not permitted. CDs with surface scratches may be listed as Good or Acceptable, subject to the above guidelines, as long as the quality of the playback is not affected.

# Camera & Photo Electronics & Photo, PC

You may be required to obtain approval to list certain products in the Electronics category. For more information, see Categories Requiring Approval.

In addition to the General Condition Guidelines, apply the following guidelines to Camera & Photo:

- **New:** The original manufacturer's warranty, if any, must apply. Unless otherwise specified, all new camera and photo items are assumed to be in full retail packaging. Bulk, plain white box, or other types of packaging are not allowed unless specifically called out in the product title.
- **Certified Refurbished:** You may use Refurbished in this category. See the General Condition Guidelines for details.
- **Certified Refurbished:** You may use Certified Refurbished in this category. See the General Condition Guidelines for details. A product that has been inspected and graded by a qualified manufacturer or a specialized third-party refurbisher to like-new working condition with no visible cosmetic imperfections when held 12 inches away. The item is backed by an additional 1-year limited warranty provided by the supplier, in addition to buyer's statutory rights. The products may be packaged in a generic box and come with relevant accessories as expected for a new product, with exceptions, if any, mentioned on the product detail page. Certified Refurbished items are sometimes referred to as Pre-Owned or Open-Box products.
- **Used - Like New:** An apparently untouched item in perfect condition. On the 1 to 10 point used-equipment scale, this item must be a 10.
- **Used - Very Good:** On the 1 to 10 point used-equipment scale, this item must be a 9 or better.
- **Used - Good:** On the 1 to 10 point used-equipment scale, this item must be an 8 or better.
- **Used - Acceptable:** On the 1 to 10 point used-equipment scale, this item must be a 7 or better.
- **Unacceptable:** On the 1 to 10 point used-equipment scale, a 6 or lower is **Unacceptable**.

See Selling International Camera & Photo Products for specific listing policies on international version products.

# Music – Collectible

To be considered collectible, the item should be unique in a way that increases value for a collector:

- Signed, inscribed, or scarce
- Unique characteristics such as special pressings, unusual aesthetics (colored vinyl), or limited edition packaging

Seller comments for collectible music should include the following:

- Further detail on condition or completeness of item and packaging
- Notes about the presence of signatures, inscriptions, or other personalization

# Software & Computer Games

You may be required to obtain approval to list certain products in the Software & Computer Games categories. To submit a request to sell restricted products in Software & Computer Games, please contact us.

Only full retail versions of software may be sold on Amazon. The following types of software are prohibited for sale:

- Copied or duplicated software, in any format
- OEM software
- Back-up copies
- Fulfillment software

- Promotional software
- Beta (pre-release) copies
- Unauthorized freeware or shareware
- Academic software requiring pre-purchase verification

In addition to the General Condition Guidelines, please apply the following guidelines to Software & Computer Games.

**Note:** All products in Software & Games with the condition type **Used** will be listed as **Open Box**.

- **New**: Includes the original Universal Product Code (UPC).
- **Open Box - Like New**: The box and jewel case are pristine, with no signs of wear. UPC should be visible.
- **Open Box - Good**: Original UPC should be visible.
- **Open Box - Acceptable**: Original UPC, the original jewel case, or both are missing.
- **Unacceptable**: See the list of prohibited software and computer games earlier in this section.

For more information about listing software for sale on Amazon, see Selling Software.

# Cell Phones & Accessories

For more information on listing products in this category, see Selling Cell Phones & Accessories.

Before shipping a used or certified refurbished cell phone to a buyer, you must do the following:

- Cancel the existing account associated with the phone.
- Remove the SIM card from the phone, if present.
- Clear the phone's memory and restore the default settings.

In addition to the General Condition Guidelines, apply the following guidelines to Cell Phones & Accessories:

- **New**: The original manufacturer's warranty, if any, should still apply, with details of the warranty included in the condition comments.
- **Certified Refurbished**: You may sell **Certified Refurbished** in this category. See the General Condition Guidelines for details.
- **Used - Like New**: The original packaging and all original accessories are intact. There are absolutely no signs of wear on the item or its packaging.
- **Used - Very Good**: Some signs of wear and tear are visible.
- **Used - Good**: The item shows wear from consistent use, but it remains in good condition and works perfectly.
- **Used - Acceptable**: Signs of wear can include aesthetic issues such as scratches, dents, and worn corners.

# Personal Computers

Before selling a computer on Amazon, you must restore the computer's hard drive and any software on it to its original state in one of the following ways:

- Use the Restore discs included with the computer.
- Reformat the computer's hard drive and reinstall the original software.

Include in your shipment any documentation provided with the computer itself and any software installed on the computer.

You must comply with the terms of any software licenses or other agreements governing any software on the computer. This includes any restrictions on transferring software or retaining copies of any software.

In addition to the General Condition Guidelines, apply the following guidelines to Computers:

- **Certified Refurbished**: You may sell **Certified Refurbished** in this category. See the General Condition Guidelines for details.
- **Used - Like New**: The original packaging and software are intact.
- **Used - Acceptable**: The box and nonessential instructions may be missing or damaged. Discs for installed software are included.

# Consumer Electronics

You may be required to obtain approval to list certain products in the Electronics category. For more information, see Categories Requiring Approval.

In addition to the General Condition Guidelines, apply the following guidelines to Electronics:

- **Certified Refurbished**: You may sell **Certified Refurbished** in this category. See the General Condition Guidelines for details.

# Toys & Games - Collectible

Collectible toys and games must be rare, exclusive, one-of-a-kind, or otherwise unique.

**Note:** The General Condition Guidelines do not apply to Collectible Toys & Games.

Use the following condition types for Collectible Toys & Games:

- **Collectible - Like New:** An apparently untouched item in perfect condition. The original protective wrapping, if any, may be missing, but the original packaging is intact. There are absolutely no signs of wear. Suitable for presenting as a gift.
- **Collectible - Very Good:** A well-cared-for item that has seen limited use but remains in great condition. Item and instructions are complete and undamaged but may show some signs of wear.
- **Collectible - Good:** Item shows wear from consistent use, but it remains in good condition. The original instructions are included and in acceptable condition. The item may be marked, identified, or show other signs of previous use. The item works perfectly and is in good shape overall.

# Home & Garden

Besides the general condition guidelines, the following guidelines apply:

*New:*
A brand-new, unused and unopened item in the original packaging with all of the original packaging materials included. The original manufacturer's warranty, if any, should still apply, with details of any such warranty included when you complete the condition note section of the product listing.

*Used items:*

Refurbished items must be refurbished and warranted by the manufacturer or re-manufacturer.

· **Certified Refurbished:** a product that has been professionally restored to working order. Typically, this means the product has been inspected, cleaned and repaired to meet manufacturer specifications. It may or may not be in its original packaging. The manufacturer warranty or warranty of the company performing the refurbishing services may apply to the product and should be included in the condition notes for the item.

· **Like New:** an apparently untouched item in perfect condition. The original plastic wrap may be missing, but the original packaging is intact. There are absolutely no signs of wear. Suitable for presenting as a gift.

· **Very Good:** a well-cared-for item that has seen limited use but remains in great condition. The item and its instructions are complete and undamaged, but may show some signs of wear. The item works perfectly.

· **Good:** the item shows wear from consistent use, but remains in good condition. The original instructions are included, and are in acceptable condition. The item may be marked or identified, and show other signs of previous use. The item works perfectly and is in good overall shape.

· **Acceptable:** the item is fairly worn, but it continues to work perfectly. The signs of wear can include scratches, dents and other aesthetic problems. The box and non-essential instructions may be missing or damaged. The item may be marked or identified, and show other signs of previous use.

*What we will not accept for sale on Amazon:*

· Items that do not work perfectly in every regard or are damaged in ways that render them difficult to use

· Items not manufactured or printed by the original manufacturer and for which essential accompanying material is missing (this does not necessarily include instructions)

· Consumable items where any part has been used

· Products that require repair or service

· Products whose commercialization is prohibited under the applicable law (e.g. some cutlery products)

· Unclean items are not acceptable

All Home, Kitchen, Garden and Large Appliances equipment, whether new or used, must be safe (that is, there is no risk that the equipment will cause death, personal injury or damage to property) and, where applicable, come with the standard plug for the country where they are sold. . The seller must have used and refurbished equipment tested by an expert prior to listing to verify that it is safe. You must not list any product that has been the subject of a product safety recall.

# Ink and Toner Cartridges

**Note:** Amazon prohibits sellers from listing ink and toner cartridges in **Certified Refurbished** or **Used** condition.

All ink and toner cartridges should be listed as **New**, with "Remanufactured," "Compatible," or "Refilled" in the **Title** field.

See also Office Products.

See also Selling Ink and Toner Cartridges.

# Video, DVD & Blu-ray Discs -- New and Used

We suggest that you list videos and DVDs at a price that is the same as or lower than the Amazon price.

**Collectible videos and DVDs**

Must be rare, out of print or otherwise unique--you will have an opportunity to say why your copy is collectible. We suggest that you list such items at a price that is higher than the Amazon.in price.

**New videos and DVDs**

A brand-new, unused, unopened video or DVD in perfect condition in its original packaging and with all original packaging materials included.

**What we will not accept for sale at Amazon:** Video or DVD recordings not created by the copyright holder, including recopied media in any form. In addition, promotional media is prohibited for sale through the Amazon marketplace, as are recordings in which any aspect of the film is missing or obscured.

**Please note:** 18-certificate videos or DVDs can only be listed if the seller is at least 18 years of age.

Rental DVD and Blu-ray discs are only permitted for sale on Amazon in **Used** condition. If you are listing a rental DVD or Blu-ray disc edition against the detail page for the standard edition, use the listing comments to indicate that your item is a rental edition. For more information about listing rental editions, see the exception under **Matching product offerings inaccurately** in Prohibited Seller Activities and Actions.

In addition to the General Condition Guidelines, apply the following guidelines to used video, DVD & Blu-ray discs:

- **Used - Like New:** Any codes for digital copies or downloadable content must be included and unused.
- **Used - Acceptable:** A product with extensive external signs of wear, but one that continues to play perfectly. The box or jewel case may be damaged. The cover art, liner notes, or other inclusions may be marked, or one or all of these items may be missing. The seller must note any missing inclusions in their listing comments. Combination sets may not be listed with missing discs. If a digital copy is missing, this should be noted in the condition notes. Products must be sold with a protective jewel case or box. Sellers may substitute newer packaging when a jewel case or box is damaged, but they may not substitute copied cover art or liner notes for the originals. The video, disc, or packaging may have identifying markings from its owner.

# Video, DVD & Blu-ray Discs -- Collectible

To be considered collectible, the item should be unique in a way that increases value for a collector:

- Signed or inscribed
- Scarce

Seller comments for collectible media may include the following:

- Further detail on condition or completeness of item and packaging
- Presence of signatures, inscriptions, or other personalization

# Video Games

You may be required to obtain approval to list certain products in the Video Games category. For more information, see Categories Requiring Approval.

**Note:** Unless otherwise specified, all video game items sold on Amazon.com are assumed to be U.S. market products.

In addition to the General Condition Guidelines, apply the following guidelines to Video Games:

- **New:** Unless specified in the product title, all new video game items are assumed to be in full retail packaging. Bulk, plain white box, or other types of packaging are not allowed unless specifically called out in the product title.
- **Used - Like New:** Activation codes for bonus online content may be missing or expired. Product may not include downloadable content.
- **Used - Very Good:** Activation codes for bonus online content may be missing or expired. Product may not include downloadable content.
- **Used - Good:** Activation codes for bonus online content may be missing or expired. Product may not include downloadable content.
- **Used - Acceptable:** You must note whether the box or instructions are missing in the condition notes field. Activation codes for bonus online content may be missing or expired. Product may not include downloadable content.
- **Unacceptable:** Video games without essential accompanying material are not permitted. This does not necessarily include the box or instructions.

# Musical Instruments

In addition to the General Condition Guidelines, apply the following guidelines to Musical Instruments:

- **Certified Refurbished**: You may sell **Certified Refurbished** in this category. See the General Condition Guidelines for details.

# Office Products

In addition to the General Condition Guidelines, apply the following guidelines to Office Products:

- **Certified Refurbished**: You may use **Certified Refurbished** in this category. See the General Condition Guidelines for details.

# Outdoors

In addition to the General Condition Guidelines, apply the following guidelines to Outdoor Living:

- **Certified Refurbished**: You may sell **Certified Refurbished** in this category. See the General Condition Guidelines for details.

# Tools & Hardware

To sell a product as **New** in the Tools & Hardware category, the product must be unopened in its original packaging. All original accessories must be intact in the package, and manuals included.

If the original packaging is missing or opened, you must list the product as **Used – Like New** even if the product appears unused. You can clarify the condition of the product and packaging in the condition comments.

*Before listing a product as refurbished, see Selling Tools and Home Improvement products.

## Toys & Baby

· Toys and game products may be listed in **New** or **Collectible** condition only.
· Baby products may be listed in **New** condition only.

## Watches

All watches must be listed in **New** condition only. You may not sell used products in this category.

All watches must come in their original packaging, including all original packaging materials and instruction manuals.

To ensure that customers are able to buy with confidence from all sellers on Amazon, sellers must be pre-approved to sell products in the Watches category. For more information see Categories Requiring Approval.

EXHIBIT 6

Notices related to the Seller: ABARPTWOGT6G - Life & Health Source

| Complaint ID | Date | Infringement | RO info | RIGHTS OWNER COMMUNICATION | ASIN |
|---|---|---|---|---|---|
| 1382641761 | 27-Jan-18 | TrademarkComplaintCounterfeit | compliance@giovannicosmetics.com | Hello, It has come to our attention that the Amazon sellers listed below are selling counterfeit products again the Giovanni Trademark 4293380 - branded Amazon listing(s), specifically, the ASIN(s) referenced below. These products provided by these sellers to Amazon customers are materially different from the authentic products. Specifically, please note the following material difference: These products do not have our manufacturer's 60 day guarantee. Consumers who mistakenly purchase items from these sellers via the ASIN(s) referenced below will encounter a materially different purchasing experience. Amazon has a robust and aggressive anti-counterfeit policy, we know that Amazon takes product authenticity very seriously, and we do as well. We are also aware that Amazon requires sellers to list only against detail pages that exactly match their items. It is simply not possible for these sellers to provide the authentic products as shown in the ASIN(s) referenced here. Therefore, we respectfully | B002LMH5B4 |
| 1387678261 | 28-Jan-18 | TrademarkComplaintCounterfeit | compliance@giovannicosmetics.com | Hello, It has come to our attention that the Amazon sellers listed below are selling counterfeit products again the Giovanni Trademark 4293380 - branded Amazon listing(s), specifically, the ASIN(s) referenced below. These products provided by these sellers to Amazon customers are materially different from the authentic products. Specifically, please note the following material difference: These products do not have our manufacturer's 60 day guarantee. Consumers who mistakenly purchase items from these sellers via the ASIN(s) referenced below will encounter a materially different purchasing experience. Amazon has a robust and aggressive anti-counterfeit policy, we know that Amazon takes product authenticity very seriously, and we do as well. We are also aware that Amazon requires sellers to list only against detail pages that exactly match their items. It is simply not possible for these sellers to provide the authentic products as shown in the ASIN(s) referenced here. Therefore, we respectfully | B00B0VM5SQ |
| 1493861371, 1493861291, 1493861121, 1493860871, 1493861581, 1493860931, 1493861001, 1493861291, 1493861121, 1493861181, 1493861241, 1493861641, 1493860921, 1493861071, and 1493861531 | 5-Mar-18 | TrademarkProductDetailPage | losproveedor@media.com | Hello, It has come to our attention that the Amazon sellers listed below are selling counterfeit products again the Giovanni Trademark 4293380 - branded Amazon listing(s), specifically, the ASIN(s) referenced below. These products provided by these sellers to Amazon customers are materially different from the authentic products. Specifically, please note the following material difference: These products do not have our manufacturer's 60 day guarantee. Consumers who mistakenly purchase items from these sellers via the ASIN(s) referenced below will encounter a materially different purchasing experience. Amazon has a robust and aggressive anti-counterfeit policy, we know that Amazon takes product authenticity very seriously, and we do as well. We are also aware that Amazon requires sellers to list only against detail pages that exactly match their items. It is simply not possible for these sellers to provide the authentic products as shown in the ASIN(s) referenced here. Therefore, we respectfully | B00007P9G0, B001V9EVOM, B006GH8S1M, B001IA6S42, B00BG7S3Y, B00G7PTZP, B000DA7E8, B00MWN9VD2, B00MWN9VD2, B06XT1025, B000MPYG5E, B00111GYPK6, B00V4RWX5S, B00B00KXNA, B0013D9N0B |
| 5014137671 | 4-Apr-18 | CopyrightPiracy | YoungBlood - young.blood-ibg@redpoints.com | The product and page for these ASINs lists the brand name as Brumisateur™ which is a registered trademark of the SARME. The trademark is not authorized to be used with ANY product as the official brand name. This has nothing to do with a selective distribution agreement. The trademark referenced above with registration numbers is Brumisateur™ and is not authorized as a brand name for any product being manufactured at this time. Thus, these products are either counterfeit or are using a registered name for a product that is not authorized to be used on Amazon.com for any product as the main brand. We have a letter from the manufacturer enforcing this point, please email me for a copy if you wish to review. : Trademark #: 3594001, 1163383, 1176764, 774531834 Have you bought the item and confirmed that the product or its packaging has your trademark on? No Brand Trust Score : 78.000000591573741 | B075ZZCTW1, B000OB8QM4, B0056HBM3M, B075ZZN6R5, B07524R8JM4, B07524R8JM4, B07525N0Z8 |
| 5057530651 | 30-Apr-18 | TrademarkComplaintCounterfeit | laurel@wellnesgroup.com | We have received product shipped from the seller Life and Health Source today, with the receipt # 811042116-9473053. This product appears to be counterfeit product. Please remove this listing from Amazon as it infringes on the rights of SAEME and Sarbec who hold the trademarks for Brumisateur™ and evian® | B079NUA5, B000OB8QM4, B0045MNRA, B07EH81PPW, B001L00TR8, B00NV97S6C, B07241TJ6G |
| 5208598981 | 12-May-18 | TrademarkComplaintCounterfeit | evian® Facial Spray - support@evianatnp.com VAN DER HAGEN® - suzi@bioslaw.com | | B001U8MNK |
| 5202128301 | 23-Jul-18 | TrademarkComplaintCounterfeit | TANGLE TEEZER - tangleteezer.legal@gmail.com Global Kerato: digital.so2@vantibolli.com | RE: Legal Notification of Counterfeit Goods and Take Down Demand (Counterfeiter: "Life & Health Source") (Counterfeited Brand: VAN DER HAGEN®) Counterfeiter: Life & Health Source Counterfeiter Seller ID: ABARPTWOGT6G ASIN(s): B077968GHT Rights Owner: Universal Beauty Products Incorporated (hereinafter referred to as "Universal Beauty Products" or "Client"), in intellectual property and other legal matters. Universal Beauty Products is the owner of the trademark VAN DER HAGEN® and US PTO Reg. No. 5513030 for the trademark VAN DER HAGEN. The company has used this trademark since October 2001, if not earlier. It has come to our Client's attention that the Amazon seller "Life & Health Source" (hereinafter "Life & Health Source") is selling counterfeit products against the VAN DER HAGEN® branded Amazon listings, specif | B077968GHT |
| 5732843141 | 28-Jan-19 | TrademarkComplaintCounterfeit | | This letter served as Notice of Infringement authorized in Section 102(b)(i & ib) Trade Marks Act. Trademark Law. These sellers are violating Trademarks law by using our registered Trademarks on these counterfeit/replica products. For your reference please verify the below Trademarks by using this link: http://www.wipo.int/romarin/search.xhtml: Global Kerato™ registration no: 1031195, Ushair™ registration no: 1050324, Juveen™ registration no: 1031917, Tbolli® registration no: 1046128, and Hair Luming System™ registration no: 1048228 are trademarks of Van Tibolli Beauty S.à r.l., are registered in the United States and abroad and are protected by copyright and trademark laws under U.S. and international law. As the registered trademark owner, we hereby declare that upon thorough verification from our chemist and after conducting several test purchase we concluded that product is materially different and not the one that is made by a manufacturer. Hence it is humbly requested to take down these counterfeit | B01N7P8R9D |
| 5738450721 | 30-Jan-19 | POTENTIALCOUNTERFEIT | ReginaSindler email: storefilled.compliance@gmail.com | The seller "HSFP1234" is selling counterfeit products, These seller is using our brand and logo, Their product label is different than original product. Their product are faulty and inferior, Their product may harm the consumers buyers/customers. Their counterfeit products may endanger the consumer buyers/customers. Purchase these counterfeit products from these sellers and then-down immediately before more customers purchase their counterfeit product. Thank you. | B008IH8UXK |

| ID | Date | Category | Contact | Notice | ASIN |
|---|---|---|---|---|---|
| 5785594171 | 13-Feb-19 | TrademarkProductDetailPage | BRIAN SATEUR - email: mail@walkeegroup.com | This seller is continue to relist a product as a evian® Facial Spray. However, they are not selling ANY evian® products. They are selling products under the detail page for evian® Facial Spray products; however they are not selling this product. Please resolve this issue as soon as possible. | B001RO3MNK |
| 5869338901 | 14-Mar-19 | | DermOrganic - email: ecommerce@dermorganic.com | We are receiving calls from consumers that are buying our product on Amazon from the noted third-party sellers and the buyer are receiving counterfeit items. The DermOrganic U.S. Trademark Registration # is 2,532,425. We respectfully request that Amazon removes the sellers from these DermOrganic listings. The person completing this notice is: Stephen Mastey, President of DermOrganic ecommerce@dermorganic.com. I, Stephen Mastey, am authorized to act on behalf of the rights owner and has a good-faith belief that the use of the content is not authorized by the rights owner, its agent, or the law. The information in the notice is accurate. Rights Owner: DermOrganic Laboratories Inc / DermOrganic 25413 Rye Canyon Rd Santa Clarita, CA 93355 661-257-6255 | B001E45RXO |
| 5992061151 | 17-Apr-19 | TrademarkComplaintCounterfeit | Mixed Chicks - ecommerce@mixedchicks.net | Hello Brand Registry - The sellers noted in this report are selling counterfeit Mixed Chicks items on Amazon. We have purchased various test buys and they were all not authentic. We respectfully request that Amazon removes these sellers from this Mixed Chicks listing. The Mixed Chicks U.S. Trademark Registration Numbers are 4327903, 4718709, 4549176 (Tools/Toji), 4081062, 3289069 (His Mix) and 3083281. The person completing this notice is.. Anna Roberts – Online Account Manager ecommerce@mixedchicks.net. I, Anna Roberts, am authorized to act on behalf of the rights owner and has a good faith belief that the use of the content is not authorized by the rights owner, its agent, or the law. The information in the notice is accurate.  Rights Owner : Mixed Chicks LLC / Mixed Chicks 21200 Vanowen Street Canoga Park, CA 91303  818-888-4008 | B001ROPSA |
| 6028406021 | 29-Apr-19 | TrademarkComplaintCounterfeit | Duracell - email: takedown_duracell@pointerbp.nl | The Duracell branded products advertised with these ASINs on Amazon are not sold with the benefits and characteristics established by Duracell, thus the products are materially different from those available to consumers at retail and are not considered genuine Duracell products. Therefore the reported products are counterfeit and we kindly ask you to remove them from your platform. | B019R87VSQ |

EXHIBIT 7

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

## policy warning

notice@amazon.com

Sat 1/27/2018 3 07 AM

To:John Laurila <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email.We may let you list this content again if we receive a retraction of the complaint from the rights owner. Their contact information can be found below.

--compliance@giovannicosmetics.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for 'Intellectual Property Violations' in Seller Central Help.

ASIN(s):
B009V0Z942

PL00208

1 of 3                                                                                                            6/13/19, 9:18 AM

B009V0Z7VW
B01CWYES1I
B009LEPED4
B009V0Z87A
B00CWE8SIA
B0016BM244
B009V0Z8MA
B0011UYV1M
B00N54P6WA
Complaint ID: 1382641761
Infringement type: Counterfeit

Sincerely,
Amazon.com

PL00209

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00210

6/13/19, 9:18 AM

EXHIBIT 8

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

## Warning: Notice of Intellectual Property Rights Infringement

**seller-evaluation@amazon.com**

Sun 1/28/2018 11:18 PM

To John Laurila <info@lifeandhealthsource.com>,

Hello,

We are contacting you because we received a report from a rights owner that you are listing counterfeit items. Examples of these items are listed below:

ASIN: B00BGVM9SQ, GIOVANNI COSMETICS - Ultra-Moist Shampoo With Avocado And Olive Oil (24 Ounce)

We may let you list this content again if we receive a retraction from the rights owner. Their contact information can be found below.

Giovanni, ,Compliance
compliance@giovannicosmetics.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.
If you believe that the reported content does not infringe the rights owner's intellectual property rights, you may email notice-dispute@amazon.com with supporting information.

We consider allegations of intellectual property infringement a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

Complaint ID: 1387678261

Sincerely,

**PL00211**

6/13/19, 9:20 AM

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00212

6/13/19, 9:20 AM

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00213

6/13/19, 9:20 AM

EXHIBIT 9

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

# Notice: Policy Warning

### notice@amazon.com
Mon 3/5/2018 11.45 AM

To:John Laurila <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner concerning the authenticity of the products listed at the end of this email. We removed this content, but we may let you list these product(s) again if we receive a retraction of the complaint from the rights owner:

-- Medela, TM Enforcement
-- lossprevention@medela.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is authentic, you may email notice-dispute@amazon.com with proof of authenticity. This includes, but is not limited to, an invoice or Order ID.

We consider allegations of intellectual property infringement a serious matter. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

ASIN: B06XGTJDZS B008JG792Y B004HWXCJS B001V9EVCM B001JA85K2 B0013O9RX8 B0011ECP9S B000YQMWLU B000WPVCQE B000WKNW2Q B000LPZTQY B00092A7E8 B0006HBS1M B00028XJNA B0000067PQ0
Infringement type: Counterfeit
Trademark asserted: 73708221
Complaint ID:  1493861371 1493861291 1493861121 1493860871 1493861581 1493860981 1493861011 1493860931 1493861451 1493861181 1493861241 1493861641 1493860821 1493861071 1493861531

**PL00216**

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

Sincerely,

Seller Performance Team
Amazon.com
http://www.amazon.com

PL00217
6/13/19, 9:22 AM

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00218

6/13/19, 9:22 AM

EXHIBIT 10

Mail - info@lifeandhealthsource.com                          https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

## Warning: Notice of Intellectual Property Rights Infringement

**seller-evaluation@amazon.com**

Wed 4/4/2018 3:41 PM

To John Laurila <info@lifeandhealthsource.com>;

Hello,

We are contacting you because we received a report from a rights owner that you are listing counterfeit items. Examples of these items are listed below:

ASIN: B075ZZC7W1, Brumisateur Facial Spray 10.1 oz (12 Pack)
ASIN: B075ZL2PQ4, Brumisateur Facial Spray 10.1 oz (8 Pack)
ASIN: B075ZZY6R5, Brumisateur Facial Spray 10.1 oz (6 Pack)
ASIN: B075ZYR4MH, Brumisateur Facial Spray 10.1 oz (4 Pack)
ASIN: B075ZZNG18, Brumisateur Facial Spray 10.1 oz (2 Pack)

We may let you list this content again if we receive a retraction from the rights owner. Their contact information can be found below.

Lauren
lauren@wilkesgroup.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.
If you believe that the reported content does not infringe the rights owner's intellectual property rights, you may email notice-dispute@amazon.com with supporting information.

We consider allegations of intellectual property infringement a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

**PL00199**


Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

Complaint ID: 1584640131,1584640051,1584640081,1584640321,1584640211

Sincerely,

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00201

6/13/19, 3:41 PM

EXHIBIT 11

Mail - info@lifeandhealthsource.com                                        https://outlook.office.com/owa/?realm=lifeandhealthsource.com&cxsvurl=1&ll-cc=103...

## Notice: Policy Warning

**Amazon** <notice@amazon.com>

Sat 5/12/2018 2:10 PM

Amazon

To:John Laurila <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner concerning the authenticity of the products listed at the end of this email. We removed this content, but we may let you list these product(s) again if we receive a retraction of the complaint from the rights owner:

-- support@evianspray.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is authentic, you may email notice-dispute@amazon.com with proof of authenticity. This includes, but is not limited to, an invoice or Order ID.

We consider allegations of intellectual property infringement a serious matter. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for &ldquo;Intellectual Property Violations&rdquo; in Seller Central Help (https://sellercentral.amazon.com /gp/help/external/201361070).

ASIN: B001RO8MNK
Infringement type: Counterfeit
Trademark asserted: 3594001
Complaint ID: 5057530651

**PL00202**

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

You can learn more about your account health in the Performance section of Seller Central (https://sellercentral.amazon.com/gp/seller-rating/pages/performance-summary.html).

Sincerely,
Seller Performance Team
Amazon.com

**PL00203**

6/13/19, 3:28 PM



Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00204

6/13/19, 3:28 PM

EXHIBIT 12

Mail - info@lifeandhealthsource.com                                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

# Notice: Policy Warning

Amazon <notice@amazon.com>

Mon 7/23/2018 1:27 PM

Amazon

To John Laurila <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner concerning the authenticity of the products
listed at the end of this email. We removed this content, but we may let you list these
product(s) again if we receive a retraction of the complaint from the rights owner:

-- suzi@hixonlaw.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at
notice-dispute@amazon.com.

If you believe that the reported content is authentic, you may email notice-
dispute@amazon.com with proof of authenticity. This includes, but is not limited to, an

1 of 3

PL00228

6/13/19, 3:29 PM

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

Invoice or Order ID.

We consider allegations of intellectual property infringement a serious matter. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help (https://sellercentral.amazon.com/gp/help/external/201361070).

ASIN: B0779KG6KT
Infringement type: Counterfeit
Trademark asserted: 5133030
Complaint ID: 5235198981

You can learn more about your account health in the Performance section of Seller Central (https://sellercentral.amazon.com/gp/seller-rating/pages/performance-summary.html).

Sincerely,
Seller Performance Team
Amazon.com

**PL00229**

6/13/19, 3:29 PM

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

http://www.amazon.com

**PL00230**

6/13/19, 3:29 PM

EXHIBIT 13

# Notice: Policy Warning

**notice@amazon.com**

Wed 7/25/2018 3:45 AM

To John Laurila <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner concerning the authenticity of the products listed at the end of this email. We removed this content, but we may let you list these product(s) again if we receive a retraction of the complaint from the rights owner:

-- tangleteezer.legal@gmail.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is authentic, you may email notice-dispute@amazon.com with proof of authenticity. This includes, but is not limited to, an invoice or Order ID.

We consider allegations of intellectual property infringement a serious matter. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help (https://sellercentral.amazon.com/gp/help/external/201361070).

ASIN: B008HJRLXK
Infringement type: Counterfeit
Trademark asserted: 79171418
Complaint ID: 5201230301

You can learn more about your account health in the Performance section of Seller Central (https://sellercentral.amazon.com/gp/seller-rating/pages

**PL00225**

6/13/19, 3:28 PM

Mail - info@lifeandhealthsource.com

/performance-summary.html).

Sincerely,
Amazon.com

PL00226

6/13/19, 3:28 PM

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00227
6/13/19, 3:28 PM

EXHIBIT 14

⇄   **Notice: Policy Warning**
    notice-dispute@amazon.com

Sunday, January 27, 2019 9:56 PM (PST)
SENT ☑
info@lifeandhealthsource.com

Hello,

We received a report from a rights owner that the products listed at the end of this email are inauthentic.

The rights owner is asserting that the products infringe the following trademark:

-- Trademark number 3831714

Why did this happen?
One or more of your listings may be infringing the intellectual property rights of others.

We're here to help.
If you need help understanding why your listings may infringe the intellectual property rights of others, please search for "Intellectual Property Policy" in Seller Central Help (https://sellercentral.amazon.com/gp/help/external/201361070).
How do I reactivate my listing?
Please provide one of the following to reactivate your listings:
1) A retraction of the report from the rights owner:

-- digital.se2@vantibolli.com

2) An invoice or letter of authorization from the manufacturer or Rights Owner verifying the product's authenticity to notice-dispute@amazon.com. External links are not accepted. For security reasons, we only accept attachments in the following file formats: .jpeg, .jpg, .pjpeg, .gif, .png, .tiff,

Have your listings been removed in error?
If you believe there has been an error, please tell us why. Your explanation should include the following information:
-- Proof that you have never sold the reported product. We will investigate to determine if an error occurred.

OR

-- Explanation of why you were warned in error. We will investigate to determine if an error occurred.

What happens if I do not provide the requested information?
If we do not receive the requested information, your listings will remain inactive.

ASIN: B01N7PBR9D
Infringement type: Counterfeit
Trademark asserted: 3831714
Complaint ID: 5732843141

You can view your account performance (https://sellercentral.amazon.com/performance/dashboard?reftag=email_warn) or select Account Health on the home screen of the Amazon Seller app on your iOS or Android device. The Account Health dashboard shows how well your account is performing against the performance metrics and policies required to sell on Amazon.

-- iOS: https://itunes.apple.com/us/app/amazon-Seller/id794141485
-- Android: https://play.google.com/store/apps/details?id=com.amazon.sellermobile.android&hl...

Sincerely,
Amazon.com

EXHIBIT 15

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

# Notice: Policy Warning

### notice-dispute@amazon.com

Wed 1/30/2019 9:25 AM

To:John Launla <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner that the products listed at the end of this email are inauthentic.

The rights owner is asserting that the products infringe the following trademark:
-- Trademark number: 4719175

Why did this happen?
One or more of your listings may be infringing the intellectual property rights of others.

We're here to help.
If you need help understanding why your listings may infringe the intellectual property rights of others, please search for "Intellectual Property Policy" in Seller Central Help (https://sellercentral.amazon.com/gp/help/external/201361070).
How do I reactivate my listing?
Please provide one of the following to reactivate your listings:
1) A retraction of the report from the rights owner:
-- store@beautyblender.com

2) An invoice or letter of authorization from the manufacturer or Rights Owner verifying the product's authenticity to notice-dispute@amazon.com.
External links are not accepted. For security reasons, we only accept attachments in the following file formats: .jpeg, .jpg, .pjpeg, .gif, .png, .tiff,

Have your listings been removed in error?

**PL00187**

Mail - info@lifeandhealthsource.com                     https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

If you believe there has been an error, please tell us why. Your explanation should include the following information:
-- Proof that you have never sold the reported product. We will investigate to determine if an error occurred.

OR

-- Explanation of why you were warned in error. We will investigate to determine if an error occurred.

What happens if I do not provide the requested information?
If we do not receive the requested information, your listings will remain inactive.

ASIN: B000HRVC5I
Infringement type: Counterfeit
Complaint ID: 5739450721

You can view your account performance (https://sellercentral.amazon.com/performance/dashboard?reftag=email_warn) or select Account Health on the home screen of the Amazon Seller app on your iOS or Android device. The Account Health dashboard shows how well your account is performing against the performance metrics and policies required to sell on Amazon.

-- iOS: https://itunes.apple.com/us/app/amazon-Seller/id794141485
-- Android: https://play.google.com/store/apps/details?id=com.amazon.sellermobile.android&hl...

Sincerely,
Amazon.com

PL00188

6/13/19, 3:19 PM

Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00189
6/13/19, 3:19 PM

EXHIBIT 16

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

## Notice: Policy Warning

### notice@amazon.com
Wed 2/13/2019 4:14 PM

Amazon

To:John Laurila <info@lifeandhealthsource.com>,

Hello,

We received a report from a rights owner that the products listed at the end of this email are inauthentic.

The rights owner is asserting that the products infringe the following trademark:
Trademark number 73246372

Why did this happen?
One or more of your listings may be infringing the intellectual property rights of others.

We're here to help.
If you need help understanding why your listings may infringe the intellectual property rights of others, please search for "Intellectual Property
Policy" in Seller Central Help (https://sellercentral.amazon.com/gp/help/external/201361070).
How do I reactivate my listing?
Please provide one of the following to reactivate your listings:
1) A retraction of the report from the rights owner:
Wilkes Group
BRUMISATEUR
mail@wilkesgroup.com

2) An invoice or letter of authorization from the manufacturer or Rights Owner verifying the product's authenticity to notice-dispute@amazon.com.
External links are not accepted. For security reasons, we only accept attachments in the following file formats: .jpeg, .jpg, .pjpeg, .gif, .png, .tiff,

1 of 3                                                                      **PL00205**
                                                                            6/13/19, 3:26 PM

Mail - info@lifeandhealthsource.com                                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

Have your listings been removed in error?
If you believe there has been an error, please tell us why. Your explanation should include the following information:
-- Proof that you have never sold the reported product. We will investigate to determine if an error occurred.

OR

-- Explanation of why you were warned in error. We will investigate to determine if an error occurred.

What happens if I do not provide the requested information?
If we do not receive the requested information, your listings will remain inactive.

ASIN: B001RO8MNK
Infringement type: Counterfeit
Trademark number 73246372
Complaint ID: 5785594171

You can view your account performance (https://sellercentral.amazon.com/performance/dashboard?reftag=email_warn) or select Account Health
on the home screen of the Amazon Seller app on your iOS or Android device. The Account Health dashboard shows how well your account is
performing against the performance metrics and policies required to sell on Amazon.

-- iOS: https://itunes.apple.com/us/app/amazon-Seller/id794141485
-- Android: https://play.google.com/store/apps/details?id=com.amazon.sellermobile.android&hl...

**PL00206**



Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00207

6/13/19, 3:26 PM

EXHIBIT 17

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

# Notice: Policy Warning

**notice-dispute@amazon.com**

Thu 3/14/2019 4:50 AM

To:John Laurila <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner that the products listed at the end of this email are inauthentic.

The rights owner is asserting that the products infringe the following trademark:
-- Trademark number: 2532425

Why did this happen?
One or more of your listings may be infringing the intellectual property rights of others.

We're here to help.
If you need help understanding why your listings may infringe the intellectual property rights of others, please search for "Intellectual Property Policy" in Seller Central Help (https://sellercentral.amazon.com/gp/help/external/201361070).
How do I reactivate my listing?
Please provide one of the following to reactivate your listings:
1) A retraction of the report from the rights owner:

-- EMAIL ADDRESS OF RIGHTS OWNER: ecommerce@dermorganic.com

2) An invoice or letter of authorization from the manufacturer or Rights Owner verifying the product's authenticity to notice-dispute@amazon.com. External links are not accepted. For security reasons, we only accept attachments in the following file formats: .jpeg, .jpg, .pjpeg, .gif, .png, .tiff,

Have your listings been removed in error?
If you believe there has been an error, please tell us why. Your explanation should include the following information:

1 of 3

**PL00193**
6/13/19, 3:27 PM

-- Proof that you have never sold the reported product. We will investigate to determine if an error occurred.

OR

-- Explanation of why you were warned in error. We will investigate to determine if an error occurred.

What happens if I do not provide the requested information?
If we do not receive the requested information, your listings will remain inactive.

ASIN: B00E4SRSXO
Infringement type: Counterfeit
Trademark asserted: 2532425
Complaint ID: 5869338901

You can view your account performance (https://sellercentral.amazon.com/performance/dashboard?reftag=email_warn) or select Account Health on the home screen of the Amazon Seller app on your iOS or Android device. The Account Health dashboard shows how well your account is performing against the performance metrics and policies required to sell on Amazon.

-- iOS: https://itunes.apple.com/us/app/amazon-Seller/id794141485
-- Android: https://play.google.com/store/apps/details?id=com.amazon.sellermobile.android&hl=en

**PL00194**



Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00195

6/13/19, 3:27 PM

EXHIBIT 18

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

## Notice: Policy Warning

**notice@amazon.com**

Wed 4/17/2019 5:24 AM

To John Laurla <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner that the products listed at the end of this email are inauthentic.

The rights owner is asserting that the products infringe the following trademark:
-- Trademark number 3083281

Why did this happen?
One or more of your listings may be infringing the intellectual property rights of others.

We're here to help.
If you need help understanding why your listings may infringe the intellectual property rights of others, please search for "Intellectual Property Policy" in Seller Central Help (https://sellercentral.amazon.com/gp/help/external/201361070).
How do I reactivate my listing?
Please provide one of the following to reactivate your listings:
1) A retraction of the report from the rights owner:
-- Anna Roberts
ecommerce@mixedchicks.net

2) An invoice or letter of authorization from the manufacturer or Rights Owner verifying the product's authenticity to notice-dispute@amazon.com.
External links are not accepted. For security reasons, we only accept attachments in the following file formats: .jpeg, .jpg, .pjpeg, .gif, .png, .tiff,

Have your listings been removed in error?
If you believe there has been an error, please tell us why. Your explanation should include the following information:

**PL00219**

1 of 3                                                                                          6/13/19, 3:25 PM

-- Proof that you have never sold or listed the reported product. We will investigate to determine if an error occurred.

OR

-- Explanation of why you were warned in error. We will investigate to determine if an error occurred.

What happens if I do not provide the requested information?
If we do not receive the requested information, your listings will remain inactive.

ASIN: B001BOOFSA
Infringement type: Counterfeit
Trademark asserted: 3083281
Complaint ID: 5992065151

You can view your account performance (https://sellercentral.amazon.com/performance/dashboard?reftag=email_warn) or select Account Health
on the home screen of the Amazon Seller app on your iOS or Android device. The Account Health dashboard shows how well your account is
performing against the performance metrics and policies required to sell on Amazon.

-- iOS: https://itunes.apple.com/us/app/amazon-Seller/id794141485
-- Android: https://play.google.com/store/apps/details?id=com.amazon.sellermobile.android&hl=en

PL00220



Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00221

6/13/19, 3:25 PM

EXHIBIT 19

Mail - info@lifeandhealthsource.com                    https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

## Notice: Policy Warning

**notice-dispute@amazon.com**

Mon 4/29/2019 3:52 PM

To John Laurila <info@lifeandhealthsource.com>;

Hello,

We received a report from a rights owner that the products listed at the end of this email are inauthentic.

The rights owner is asserting that the products infringe the following trademark:
-- Trademark number: 0793273

Why did this happen?
One or more of your listings may be infringing the intellectual property rights of others.

We're here to help.
If you need help understanding why your listings may infringe the intellectual property rights of others, please search for "Intellectual Property Policy" in Seller Central Help (https://sellercentral.amazon.com/gp/help/external/201361070).
How do I reactivate my listing?
Please provide one of the following to reactivate your listings:
1) A retraction of the report from the rights owner:

-- Jan-Maarten Laurijssen
-- takedown_duracell@pointerbp.nl

2) An invoice or letter of authorization from the manufacturer or Rights Owner verifying the product's authenticity to notice-dispute@amazon.com. External links are not accepted. For security reasons, we only accept attachments in the following file formats: .jpeg, .jpg, .pjpeg, .gif, .png, .tiff,

Have your listings been removed in error?

**PL00196**
6/13/19, 3:15 PM

Mail - info@lifeandhealthsource.com                                            https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

If you believe there has been an error, please tell us why. Your explanation should include the following information:
-- Proof that you have never sold the reported product. We will investigate to determine if an error occurred.

OR

-- Explanation of why you were warned in error. We will investigate to determine if an error occurred.

What happens if I do not provide the requested information?
If we do not receive the requested information, your listings will remain inactive.

ASIN: B019P87V5O
Infringement type: Counterfeit
Trademark asserted: 0793273
Complaint ID: 6028406021

You can view your account performance (https://sellercentral.amazon.com/performance/dashboard?reftag=email_warn) or select Account Health on the home screen of the Amazon Seller app on your iOS or Android device. The Account Health dashboard shows how well your account is performing against the performance metrics and policies required to sell on Amazon.

-- iOS: https://itunes.apple.com/us/app/amazon-Seller/id794141485
-- Android: https://play.google.com/store/apps/details?id=com.amazon.sellermobile.android&hl...

Sincerely,
Amazon.com

**PL00197**

2 of 3                                                                                              6/13/19, 3:15 PM



Mail - info@lifeandhealthsource.com

https://outlook.office.com/owa/?realm=lifeandhealthsource.com&exsvurl=1&ll-cc=103...

PL00198

6/13/19, 3:15 PM

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
 3
               CASE NO:  0:19-CV-60487-RKA/PMH
 4
 5   SOLU-MED, INC.,
 6
                    Plaintiff,
 7
            vs.
 8
 9   YOUNGBLOOD SKIN CARE PRODUCTS, LLC,
10
                    Defendant.
11   _____/
12
13                  DEPOSITION OF
14                 ADAM WEINSTEIN
15        TAKEN ON BEHALF OF THE DEFENDANT
16
17            Friday, February 21, 2020
18
19            1:11 p.m. - 2:04 p.m.
20
21            110 Southeast Sixth Street
                    Suite 2700
22            Fort Lauderdale, Florida
23
              Lynn Cantin, RMR, CRR
24
25
```

**Page 2**

```
 1   APPEARANCES OF COUNSEL
 2
     On behalf of the Plaintiff:
 3
              BLACK LAW, P.A.
 4        BY:  KELSEY K. BLACK, ESQUIRE
              1401 East Broward Boulevard
 5            Suite 204
              Fort Lauderdale, Florida 33301
 6            Tel:  954 320-6220
              Fax:  954 320-6005
 7            E-mail:  kelsey@kkbpa.com
 8
 9   On behalf of the Defendant:
10        COLE, SCOTT & KISSANE, P.A.
          BY:  JONATHAN VINE, ESQUIRE
11            222 Lakeview Avenue
              Suite 120
12            West Palm Beach, Florida  33401
              Tel:  561 383-9203
13            E-mail:  jonathan.vine@csklegal.com
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                INDEX OF EXAMINATION
 2
     DIRECT EXAMINATION
 3   BY MR. VINE                                    4
 4   CROSS-EXAMINATION
     BY MS. BLACK                                  28
 5
     REDIRECT EXAMINATION
 6   BY MR. VINE                                   38
 7   RECROSS EXAMINATION
     BY MS. BLACK                                  46
 8
     FURTHER REDIRECT EXAMINATION
 9   BY MR. VINE                                   52
10                INDEX OF EXHIBITS
11
     Defendant's I.D. Exhibit No. 1 - Declaration    12
12   Defendant's I.D. Exhibit No. 2 - Policy Warning  22
13
                      *****
14
         (Original Exhibits have been attached to the
15    original transcript.)
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1       DEPOSITION OF ADAM WEINSTEIN
 2         Friday, February 21, 2020
 3            ADAM WEINSTEIN
 4   having been first duly sworn, testifies as follows:
 5            DIRECT EXAMINATION
 6   BY MR. VINE:
 7       Q.   Can you please state your name for the
 8   record.
 9       A.   Adam Weinstein.
10       Q.   Can you give me your current location?
11       A.   Right now, in this chair, in your office.
12       Q.   No, your address.
13       A.   2605 Northwest 55th Street, and it's Tamarac,
14   Florida 33309.
15       Q.   Can you give me the name of your current
16   employer?
17       A.   I believe his name is Bellefit.
18       Q.   Where is Bellefit located?
19       A.   We're in Weston, Weston.
20       Q.   What do you do for Bellefit?
21       A.   eCommerce, basically building all their
22   listings and managing their different eBay stores,
23   Wal-Mart stores, Amazon.
24       Q.   And how long have you been there?
25       A.   Two weeks.
```



EXHIBIT 7

800.211.DEPO (3376)
EsquireSolutions.com

ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
5–8

Page 5

1      Q.   Before that, where were you employed?
2      A.   I wasn't.  I was working in between two
3   different jobs.  I was working for a company in Hialeah
4   called Safe Tech and another company around the corner
5   from them called Carib Sales.
6      Q.   And what were you doing for them?
7      A.   Same.
8      Q.   eCommerce?
9      A.   Yes.
10      Q.   And how long did you work at those two --
11      A.   Six months.
12      Q.   Each?
13      A.   I was working both of them at the same time.
14      Q.   And then before that, where were you?
15      A.   Before that, I was at QMed.
16      Q.   You worked for QMed?
17      A.   I worked for a portion of QMed called
18   Solu-Med.
19      Q.   Where did your paycheck come from?
20      A.   I want to say QMed.
21      Q.   Okay.  Do you know as you sit here today?
22      A.   I don't remember, honestly.
23      Q.   Okay.
24      A.   I'm almost positive it came from QMed.
25      Q.   Okay.  How long were you at QMed?

Page 6

1      A.   Just under two years.
2      Q.   Okay.  And where were you before that?
3      A.   Where was I before that?  That's a good
4   question, I don't remember.  I don't remember the name
5   of the company where I was at.
6      Q.   Okay.
7      A.   It might have been HSI Professional, they
8   were down in Hialeah.
9      Q.   HI --
10      A.   HSI Professional.
11      Q.   And what were they?
12      A.   They were a hair care company, I was doing
13   the same thing, eCommerce.
14      Q.   I got -- let me go back.  How long were you
15   with HSI?
16      A.   Four years.
17      Q.   Four years.  Okay.  Have you ever been
18   deposed before?
19      A.   No.
20      Q.   Okay.  So, let me give you some of the ground
21   rules.
22           I'm going to be asking you a series of
23   questions today.  If you don't understand any of my
24   questions, feel free to ask me to rephrase them;
25   otherwise, I'm going to assume you understood them; is

Page 7

1   that okay?
2      A.   Yes.
3      Q.   From time to time, you may hear objections
4   from counsel for QMed/Solu-Med; you're still required to
5   answer unless she directs you not to.
6           It's also important to let me complete my
7   question as the court reporter can't take the two of us
8   speaking at the same time, and it's also important that
9   all your responses be verbal; nonverbal gestures can't
10   be taken down by the court reporter.
11      A.   Makes sense.
12      Q.   Fair enough?
13      A.   Yes.
14      Q.   Thank you.  So, I represent a company called
15   Youngblood; are familiar with a --
16      A.   Yes.
17      Q.   -- company called Youngblood?
18      A.   Yes.
19      Q.   And how are you familiar with it?
20      A.   By selling the products at that point and
21   having to do research about the company while we were
22   trying to sell the products.
23      Q.   Okay.  What research did you do at
24   Youngblood?
25      A.   Basically just product-based research,

Page 8

1   learning the, you know, specific items that we had in
2   stock.
3      Q.   Go ahead.
4      A.   Just, you know, basically, like I said,
5   researching the product information, finding out, you
6   know, the color, tones and stuff like that, looking up
7   the pricing that they were available for, and really,
8   that's about it.
9      Q.   Where did you -- so the product, the pricing
10   and the -- the makeup?
11      A.   Yeah, yeah.
12      Q.   Nothing else, correct?
13      A.   No, no.
14      Q.   Am I correct?
15      A.   Yes.
16      Q.   Okay.  And would you agree with me -- strike
17   that.
18           Did you go to the Youngblood website?
19      A.   Yes.
20      Q.   Okay.  Did you review each page?
21      A.   Not every specific one, but product base, you
22   know, if we -- if there was a lipstick, I looked up that
23   specific lipstick to see what it looked like.
24      Q.   The purpose was to see what it looked like,
25   correct?



ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
9–12

Page 9

1    A.  See what it looked like, see the information
2  about it, some of the pages have the ingredients on it
3  and stuff like that.  So, trying to -- trying to build
4  out the information so I can build the item on the
5  marketplace.
6    Q.  Prior to coming here today, did you ever
7  speak with anyone about your deposition testimony?
8    A.  No.
9    Q.  You understand you were previously served
10  with a subpoena and you didn't appear?
11    A.  Yes, I missed.
12    Q.  Yes?
13    A.  I had the wrong day.
14    Q.  Okay.  Fair enough.  Okay.  When you did --
15  were you doing the research of the Youngblood product, like
16  other makeup products that you would do, did you look to
17  see about the warranties?
18    A.  No.
19    Q.  Were you ever instructed to do that?
20    A.  No.
21    Q.  Were you ever instructed to list the products
22  as new?
23    A.  We did list them as new, yes.
24    Q.  Were you instructed to do that?
25    A.  Yes.  It was -- it was clear we were

Page 10

1  receiving as new.
2    Q.  Have you ever verified from a genuine
3  Youngblood product versus the product that you saw that
4  they were the same?
5    A.  No.
6    Q.  Okay.  So, you can't personally verify -- let
7  me just say it.
8        You can't personally verify whether they were
9  genuine authentic products?
10    A.  No.
11    Q.  Am I correct?
12    A.  You are correct.
13    Q.  You're saying "no."
14    A.  You are correct.
15    Q.  Okay.  Were you aware that Amazon has
16  guidelines and policies?
17    A.  Yes.
18    Q.  You're more aware now than you were then?
19    A.  I was aware then, too.
20    Q.  Were you aware then that you could not sell a
21  product as new without a warranty?
22    A.  No.
23    Q.  Do you now know that?
24    A.  Yes.
25    Q.  Who told you that?

Page 11

1    A.  You just did.
2    Q.  Well, I'm going to show you the policy, and
3  Tom Goodson testified that he did not instruct you to
4  read these guidelines.
5    A.  Correct.
6    Q.  Were you ever instructed by anyone to read --
7    A.  No.
8    Q.  -- the guidelines?
9      MS. BLACK:  Objection.
10      THE COURT REPORTER:  Wait, wait, wait, wait,
11    wait.
12      MR. VINE:  You got to let me finish my
13    question.
14      THE COURT REPORTER:  Were you ever instructed
15    to read...
16  BY MR. VINE:
17    Q.  The Amazon guidelines by anyone at Solu-Med?
18    A.  No.
19    Q.  By anyone at QMed?
20    A.  No.
21    Q.  Prior to listing the Youngblood products
22  online, did you review the Amazon guidelines to make
23  sure that you were complying with their guidelines when
24  you listed it?
25    A.  No.

Page 12

1    Q.  Okay.  I'm going to show you --
2      MS. BLACK:  Did you get my objection?
3      THE COURT REPORTER:  Yes.
4      MR. VINE:  I didn't -- I have no intentions
5    to cut you off, if you thought I did.
6      MS. BLACK:  No, it just got confusing.  I
7    mean, there was a lot of talking, so I wanted to
8    make sure she got it.
9      MR. VINE:  Okay.  Perfect.  I don't want to
10    be called bully.
11      (Defendant's I.D. Exhibit No. 1 -
12  Declaration was marked for Identification.)
13  BY MR. VINE:
14    Q.  Marked as Exhibit 1 is a declaration from
15  Amazon with a number of exhibits attached to it, and I'm
16  going to draw your attention, sir -- I'll pull the page
17  for you --
18    A.  Okay.
19    Q.  -- 'cause it's easier 'cause it's so much.
20    A.  Yes.
21    Q.  First, I'm going to show you Exhibit 4 to
22  Exhibit 1, which is the compliance checklist for
23  cosmetics; and do you see that Number 2 says, "Cosmetics
24  must be new and unused"?
25    A.  Uh-huh.



ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
13–16

Page 13

1    Q.  Have you ever read this document before?
2    A.  No.
3    Q.  Okay.  As you testified earlier, you did not
4  review the guidelines before you listed them, correct?
5    A.  You are correct.
6    Q.  Okay.  Then I just want to show you the
7  general condition guidelines; and can you read out loud
8  what under "New" -- what "New" says?
9    A.  Just like it sounds.  A brand-new, unused,
10  unopened item in its original package, with all original
11  packaging materials included.  Original protective
12  wrapping, if any, is intact.  Original manufacturer's
13  warranty, if any, still applies, with warranty details
14  including in the listing comments.
15    Q.  Is that a surprise to you?
16    A.  No, it's not.  I do know about this from
17  other -- other items, not so much this one, but this is
18  Amazon's policy for pretty much everything you sell on
19  Amazon.
20    Q.  Okay.  So, did you -- was there a discussion
21  at QMed or Solu-Med about selling a product as new even
22  though it wasn't coming with a manufacturer's warranty?
23    A.  No, never.
24    Q.  Did you raise that issue?
25    A.  No.

Page 14

1    Q.  Okay.  Did Kellon ever raise that issue?
2    A.  Not that I recall.
3    Q.  Okay.  You understand that selling it as new
4  without a manufacturer's warranty is a violation of
5  Amazon's guidelines, correct?
6    A.  Yes.
7    Q.  Okay.  You can put that aside for a minute.
8  And we're going to talk about -- are you aware of
9  complaints from January 2018 moving forward that were
10  filed against Solu-Med?
11    A.  Complaints as far as customer complaints
12  or --
13    Q.  Well, we know there were customer complaints,
14  correct?
15    A.  Yes.
16    Q.  Then there were also -- in addition to
17  customer complaints, there were also complaints from
18  brands, correct?
19    A.  Yes.
20    Q.  So, first let's do the customer complaints.
21  You agree with me that there were customers who
22  complained --
23    A.  Yes.
24    Q.  You got to let me finish the question.
25      That there were customers who complained that

Page 15

1  they received product different than the product they
2  were supposed to get?
3    A.  Yes.
4    Q.  They received product that was tampered with?
5    A.  Wasn't aware of the "tampered" part.
6    Q.  Okay.  About packages opened that shouldn't
7  have been opened?
8    A.  Yes.
9    Q.  What other customer complaints are you aware
10  of that existed at Solu-Med?
11    A.  Really, the only thing, I think, was more on
12  shipping side, you know, they were -- they would ship
13  the wrong item to them by mistake or they received it
14  damaged, stuff like that.  It wasn't really like
15  item-specific, brand-specific stuff.
16    Q.  So, there were times when people would order
17  Product A and got Product C?
18    A.  Yeah, it did happen, yes.
19    Q.  There were times, also, you would agree with
20  me, where products didn't arrive on time?
21    A.  Absolutely, yes.
22    Q.  And that's a metrics that Amazon --
23    A.  Absolutely.
24    Q.  -- applies?
25    A.  Absolutely.

Page 16

1    Q.  All right.  And Amazon will shut you down if
2  you don't meet those metrics?
3    A.  Absolutely, yes.
4    Q.  And that happened at Solu-Med?
5    A.  Yes, it did.
6    Q.  Okay.  So, Solu-Med was well-aware of the
7  metrics that Amazon had, correct?
8    A.  Yes.
9    Q.  And was well-aware that they needed to comply
10  with the guidelines?
11    A.  Yes.
12    Q.  And from time to time, they didn't comply
13  with guidelines?
14    A.  Yes.
15    Q.  Okay.  Were you aware that customers have
16  complained that they weren't receiving authentic
17  products?
18    A.  Yes.
19    Q.  Okay.  Were you aware of -- that
20  Youngblood -- that, sorry, brands also complained?
21    A.  Yes.
22    Q.  Okay.  And as it relates to the customer
23  complaints about not receiving authentic products, what
24  did you do, if anything -- you may not have been in
25  charge of that, what did you do to address that?

ESQUIRE
DEPOSITION SOLUTIONS

ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
17–20

Page 17

1    A.  I wasn't in charge, but I was involved.
2    Q.  Okay.  Who was in charge of it?
3    A.  Kellon was in charge of the department
4  basically.
5    Q.  Okay.
6    A.  So, it was mostly Kellon, but we all sat in
7  on the meetings, and then towards the end, Sherry was
8  running that department and we were -- she was involved
9  with everything and we were like pushed to the side.
10  So, she really was handling everything, the last, I want
11  to say, four or five months that I was there when,
12  really, everything went downhill.
13    Q.  Okay.  When you say "went downhill," was it
14  because of the products not being shipped correctly or
15  authentic challenges?
16    A.  No, it was more that we -- we had already
17  gotten the information from Youngblood that they were --
18  they were after us and there were other companies doing
19  the same thing because of where we were purchasing from
20  and not purchasing direct and not having the paperwork,
21  basically, to follow the trail.
22    Q.  Okay.  So, it was because -- just let me
23  finish.
24       So, the reason why the company was, as you
25  said, "downhill," was because there were a number of

Page 18

1  companies complaining and brands complaining because of
2  the source information on the authenticity of the
3  products, it didn't exist?
4    A.  Correct.
5    Q.  Okay.  I'm going to take you Exhibit 7 --
6  sorry.  Exhibit 1 is a declaration, as I talked about
7  earlier.  Exhibit 7 to Exhibit 1, I know that sounds
8  confusing, is a compilation -- sorry, I mean, Exhibit 8,
9  sorry.  Exhibit 8 -- don't go to that yet, I want to
10  make sure I did it right.
11       If you start with Exhibit 6, actually,
12  there's a -- there's a spreadsheet from Amazon that
13  lists a number of the complaints that existed, and it's
14  very hard to see.
15    A.  Oh, boy.
16    Q.  Yeah, I'm not asking you, but you are aware
17  that there was a whole set of complaints from January to
18  November of 2018?
19    A.  Yes.
20    Q.  Okay.  And did you participate in responding
21  to any of those complaints?
22    A.  I believe I did send the --
23    Q.  Youngblood?
24    A.  -- some paperwork to Amazon that they
25  required --

Page 19

1    Q.  For the Amazon -- for the --
2    A.  Yeah.
3    Q.  -- for Youngblood complaint?
4    A.  I don't remember if it was for specifically
5  for the Youngblood complaint because there were so many
6  other ones at the time, we were all going through them.
7    Q.  Okay.
8    A.  I don't remember if I did anything with the
9  Youngblood one.
10    Q.  So, Kellon testified that up until the
11  Youngblood complaints, the policy at Solu-Med was not to
12  respond to Amazon's inquiries on counterfeit and
13  authenticity?
14    A.  The only time we had to respond is if they
15  got to the level where they were starting to want to
16  shut down the account; and I believe there was one
17  challenge, it wasn't specifically based on product, but
18  there was one challenge before with Amazon where we had
19  to respond to them so they would not shut our account
20  down.
21    Q.  So there was another shut -- so there was the
22  one that occurred in November/December 2018?
23    A.  Yeah.
24    Q.  And that, you had to provide source
25  information, correct?

Page 20

1    A.  I believe so, yes.
2    Q.  All right.  Prior to that, there was another
3  threat of a shutdown, but that wasn't related to a
4  product specifically, it was related to something else?
5    A.  Yeah.  I want to say it was more based on
6  metrics with shipping issues and things like that.  I
7  don't -- I don't believe it ever got to the level of
8  this with any of the other products, like we just pulled
9  them.
10    Q.  Well, aren't you aware that in Amazon's
11  correspondence, they indicated that they would delist
12  the product that was complained about being inauthentic
13  or counterfeit?
14    A.  Yes.
15    Q.  And then after you -- those inquiries were
16  sent, Solu-Med never responded to Amazon with the source
17  information for those specific products, correct?
18    A.  Correct.
19    Q.  You understand that Amazon requested that
20  information?
21    A.  Yes.
22    Q.  You understand that Amazon would say -- if
23  you look at Exhibit 7, just as an example:  We consider
24  these allegations of counterfeit a serious matter and
25  your account is under review.  If we receive more



ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
21–24

Page 21

1 complaints about your listings, we may not allow you to
2 sell on Amazon.com?
3    A. Yes.
4    Q. Do you see that?
5    A. Yeah.
6    Q. Were you aware of that?
7    A. Yeah, absolutely. Yes.
8    Q. Was Kellon aware of that?
9    A. Yes.
10      MR. VINE: Form.
11 BY MR. VINE:
12    Q. Are you aware if Solu-Med was aware of it?
13    A. Yes.
14    Q. They were aware of it?
15    A. Yes.
16    Q. And were there meetings about it?
17    A. There were meetings about it.
18    Q. And the decision was not to respond, correct?
19    A. I was -- I was -- I was in the meetings with
20 Kellon, and then Kellon would take it further up the
21 chain, and then he would come back and he would be, I
22 have no answers, you know, so they -- they were aware,
23 they were definitely aware and we spoke to them multiple
24 times about this issue and it just never got anywhere.
25    Q. Is it because Manny didn't want to address

Page 22

1 it?
2    A. I don't think so.
3    Q. You don't think so; what do you mean?
4    A. I wasn't involved with any of the
5 conversations with Manny. Those were always left out --
6 I was always left out of that, that was always him and
7 Kellon. But the answer is, every time it was brought
8 back was, this is the way it is.
9    Q. Okay. You can put that aside. I'm going to
10 mark as Exhibit 2 to this deposition -- there's one more
11 exhibit I'm going to want, Kelsey, at the next break,
12 I'll take it.
13      MS. BLACK: Okay.
14      MR. VINE: It's an E-mail with the plan of
15   action, I'm just telling you.
16      MS. BLACK: Okay.
17      (Defendant's I.D. Exhibit No. 2 - Policy
18 Warning was marked for Identification.)
19 BY MR. VINE:
20    Q. I'm marking as Exhibit 2, it's a compilation
21 of correspondence that were produced by Solu-Med,
22 Bate-stamped PL2408 through 2442. I'm going to take
23 you -- let -- okay. If you could look on PL02413.
24    A. 13, you said?
25    Q. Yeah, 2413.

Page 23

1    A. Yeah.
2    Q. Have you ever seen this document before?
3    A. This one specifically, no.
4    Q. Okay. Were you aware that Solu-Med had a
5 selling account?
6    A. Yes.
7    Q. And it was in Seller Central?
8    A. Correct.
9    Q. Did you ever go into that?
10    A. Every single day.
11    Q. Okay. Were you aware that Amazon sent
12 correspondence on November 13, 2018, indicating they
13 were trying to reach Solu-Med by phone?
14    A. Yes.
15    Q. Do you see that?
16    A. Yes.
17    Q. And you're aware that they were calling?
18    A. Yes.
19    Q. And they indicated that they weren't getting
20 anybody?
21    A. Yeah, 'cause I believe -- we did not have --
22 Solu-Med did not have a direct phone line, everything
23 went through QMed. So, I'm assuming the phone was --
24 the phone number was going to the front and it was never
25 getting any further than that.

Page 24

1    Q. I understand you're assuming. Do you know --
2 did you later learn from Solu-Med that there were phone
3 calls made by Amazon on November 13 that went
4 unanswered?
5    A. I know there were phone calls that were made
6 from Amazon to Solu-Med, I don't know the specific
7 dates, but I was told that there were phone calls that
8 had come in.
9    Q. And that went unanswered?
10    A. Yeah, yeah.
11    Q. Okay. Now, if you also look, Amazon lists a
12 couple of different items and talking about the
13 violations of counterfeit and authenticity issues; and
14 then it says: To reactivate your account, it says:
15 Please submit a plan of action --
16    A. Uh-huh.
17    Q. -- a valid plan of action. And it says,
18 "Proof of authenticity"; do you see that?
19    A. Yeah, I got it.
20    Q. Okay. And "the steps you have taken to
21 ensure that you are no longer infringing," and "Other
22 relevant information," Supporting details that you
23 believe the notice was submitted in error or the notices
24 are incorrect.
25      Okay. Now, you indicated earlier, there were



ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020

25–28

Page 25

1   certain source information you didn't have, correct?
2       A.  Uh-huh, correct.
3       Q.  The only invoice that you had at the time
4   was -- and what you submitted was a QMed invoice to
5   Solu-Med, correct?
6       A.  I didn't have any portion of that, but, yes,
7   I was aware.  Actually, I don't even remember -- I
8   don't -- when this Youngblood started, I remember, we
9   pulled the items, that was basically -- we -- that was
10  always our action plan when this came up --
11      Q.  For any --
12      A.  -- for every single one --
13      Q.  Okay.
14      A.  -- just to pull the items --
15      Q.  Okay.
16      A.  -- pull the items down and we'll figure it
17  out from there.  I don't actually remember -- I know
18  that they did submit a plan of action at one point once
19  the account was shut down, but I don't know -- at that
20  point, Sherry was running everything and I was out of
21  the loop.
22      Q.  So, you weren't involved in that plan of
23  action?
24      A.  No.
25      Q.  So you can put that aside.  Okay.

Page 26

1           Were you aware -- let me just go to one more
2   page, I apologize.  Were you aware that on November
3   29th, if you go back onto 2421, that in addition to the
4   Youngblood complaint, they were asking for information
5   about a variety of other people who -- all the prior
6   other complaints; do you see that?
7       A.  Yes.
8       Q.  Were you aware of that?
9       A.  No, because at this point, I was pretty much
10  out of the loop.  Again, once Sherry took over, we
11  all -- Kellon and I were pretty much pushed aside and
12  she was dealing with everything without us.
13      Q.  How would Sherry be involved if she didn't
14  have any experience with Amazon?
15      A.  That is a wonderful question that I cannot
16  answer.  She came in supposedly to run that department
17  and she kind of just took over; we never understood her
18  role.  Eventually, we figured out she was basically
19  there to just get rid of everybody, but I don't know.
20          But she was -- once she came in, she pretty
21  much pushed Kellon and I to the side, he was obviously
22  still there 'cause he had more insight 'cause he had
23  been there for, you know, a long time.
24      Q.  Right.
25      A.  But I was pushed completely out, I was very

Page 27

1   rarely involved in a meeting besides, you know, like a
2   weekly briefing of what was going on and what, you know,
3   what we were doing.
4       Q.  So when you say Sherry -- you learned that
5   Sherry came in to put -- to get rid of everybody, what
6   do you mean by that?
7       A.  I mean, she -- she was brought in, she took
8   over Kellon's position, she pushed --
9           MR. VINE:  Form.
10      A.  -- Kellon out.
11  BY MR. VINE:
12      Q.  Go ahead.
13      A.  And she was just -- I mean, they had goals
14  that were unachievable, and I think she was brought in
15  to try to revamp the department and kind of just make
16  the department disappear, which is kind of what
17  happened.
18      Q.  So, you believe that was always their
19  intention?
20      A.  Absolutely.  She was brought in to bring in
21  the -- to do the stuff for the new building and kill off
22  the eCommerce department.
23          MR. VINE:  Okay.  I have nothing further.
24
25

Page 28

1           CROSS-EXAMINATION
2   BY MS. BLACK:
3       Q.  Mr. Weinstein, your testimony you've just
4   given about what you believe Sherry's role was in the
5   company is just your opinion, correct?
6       A.  Yes.
7       Q.  No one ever told you that?
8       A.  Except for the building portion, no.
9       Q.  Except for that --
10      A.  Yeah.
11      Q.  -- her role in coming to the building.
12          When were you laid off from the company?
13      A.  December 22nd, '19.
14      Q.  2019?
15      A.  Yes.
16      Q.  And how long have you worked -- when did you
17  start at the company?
18      A.  November of '17, I think.
19      Q.  November of -- so, approximately two years?
20      A.  Yeah, just under two years I was there.
21      Q.  And, originally, your job was to list the
22  products on Amazon; is that correct?
23      A.  I -- I was -- I was Kellon's first hire,
24  basically, to start going to the next step of that
25  department, listing items all over Amazon, eBay,

Page 29

1  Wal-Mart website and --
2      Q.  When was Sherry hired from your best memory?
3      A.  Right before they -- right before they
4  decided to purchase the building.  It was '18, I want to
5  say maybe February, February of '18, somewhere --
6  somewhere in there.
7      Q.  And from January 2018 until October 2018, in
8  your opinion and in your role as analyst, how was the
9  eCommerce department, specifically, the Life and Health
10 Source store performing?
11         MR. VINE:  Objection.
12         THE WITNESS:  The store didn't come online
13     until later that year, I want to say it came --
14     it came on June -- no, no --
15 BY MS. BLACK:
16     Q.  Of 2018?
17     A.  Yeah, 'cause it was only up a couple of
18 months before we lost the -- the -- part of that
19 account.  I want to say maybe September might have been
20 the first month that that site went live.
21     Q.  Life and Health Source store --
22     A.  Yeah.
23     Q.  -- On Amazon?
24     A.  No, no.  Oh, you're talking on Amazon?
25     Q.  Yeah.

Page 30

1      A.  That store has been up -- it was up before I
2  started, so, Kellon had brought that up.  It was on its
3  way up, we had done -- you know, we didn't hit the goals
4  that they -- Manny had set out, but it was a little too
5  high for the first year.  It was doing well, we did have
6  challenges with, you know, the products getting listed
7  and delisted, but it was doing okay.
8      Q.  Do you remember what goals were given to the
9  store?
10     A.  Yeah.  Well, it was overall.  They wanted --
11 I believe the original was 10,000,000, and then it was
12 brought down to seven, and it wasn't attainable on your
13 first year, on your first full year of doing things.
14     Q.  Do you know what it was tracking to do prior
15 to the shutdown?  Were you given that information?
16     A.  No.
17     Q.  How did you know -- how did you become aware
18 it wasn't making the goals?
19     A.  We were aware -- we had a sign on the -- in
20 the office that said $10,000,000, and, obviously, you
21 could see the sales and the sales were not -- you know,
22 achieved $10,000,000.
23     Q.  When you say you could see the sales, what do
24 you mean by that?
25     A.  Through all the channels, you know, we had a

Page 31

1  piece of software called Sellbrite that basically had
2  all of the items inside of it and had all the orders
3  inside of it, and, you know, you could see that, you
4  know, we weren't tracking $10,000,000 worth of sales, we
5  didn't have enough inventory to do $10,000,000 in sales.
6      Q.  And when the goals were lowered to
7  $7,000,000, when did that occur?
8      A.  Relatively quickly after the 10,000,000,
9  because it was just, you know --
10     Q.  When was the 10,000,000 set?
11     A.  The 10,000,000 was set, I want to say,
12 January of '18.  Yeah, it was -- it was like, you know,
13 we did those -- we did, you know, the couple months that
14 I was there in '17, and then it was like, okay, now
15 we're in the new year, we want to do $10,000,000, and
16 very quickly, it was brought down because, again, it was
17 an unachievable goal with what we had available to us.
18     Q.  So, within a month or two --
19     A.  Yeah, I would say, you know, a couple, you
20 know, two, three months at the most.
21         MR. VINE:  You've got to let her complete her
22     question.
23 BY MS. BLACK:
24     Q.  So, within a month or two, it was lowered to
25 $7,000,000?

Page 32

1      A.  Yes.
2      Q.  Do you know as of halfway through the year
3  how close it was to that goal of $7,000,000?
4      A.  No, I don't, I don't remember.  Actually, I
5  take it back, it was 7.5 million, that was always the --
6  the joke was 7.5.
7      Q.  Were you ever involved in any meetings where
8  there were concerns about the store not performing?
9      A.  No.
10     Q.  Have you seen any -- were you privy to any of
11 the monthly financials on the store's performance?
12     A.  They were there, but I never paid attention
13 to them.
14     Q.  Okay.  So, you don't know one way or the
15 other if the company was going to achieve that $7.5
16 million goal prior to the shutdown in November?
17     A.  With the inventory we had in stock, with the
18 stuff we were able to list, there was no way we were
19 going to get to that type of money unless, you know --
20 there's no way.
21     Q.  And that number is a gross sales number,
22 correct?
23     A.  Yes.
24     Q.  Do you know how the -- the Life and Health
25 Source store performed in November 2017 in terms of



ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
33–36

Page 33

1  gross sales?

2      MR. VINE:  Objection, he wasn't present

3  until -- he wasn't present, but you can answer.

4      THE WITNESS:  I was there at the end, I don't

5  know, I'm assuming --

6      MR. VINE:  Don't assume, nobody wants you

7  assuming.

8      THE WITNESS:  Because of them bringing me on

9  board and when it was only Kellon running the

10  store, I kind of think it was doing okay enough

11  to want to go to the next level.

12  BY MS. BLACK:

13     Q.  But you don't know what the actually sales

14  history --

15     A.  No.

16     Q.  -- was for 2017?

17     A.  No.

18     Q.  Do you know what the sales history was for

19  2018?

20     A.  No.

21     Q.  Have you spoken to Sherry since your

22  departure?

23     A.  No.

24     Q.  Have you spoken to Kellon since your

25  departure?

Page 34

1      A.  Yes.

2      Q.  When was the last time you spoke to Kellon?

3      A.  About three weeks ago.

4      Q.  Did you talk about the fact that there's a

5  deposition?

6      A.  No.

7      Q.  It was unrelated to this lawsuit?

8      A.  Correct.

9      Q.  Who did Solu-Med purchase its products from?

10     A.  There were two companies -- there was a

11  person named Joel that I know that they were purchasing

12  from, I don't know the name of their company; and the

13  other one was Victory -- I want to say -- I want to

14  say -- it was Victory something, I think it was -- I

15  think their complete company name is Victory Grocer, I

16  know they were buying from them, as well.

17     Q.  You're talking about distributors to QMed

18  that eventually got sourced in the Life and Health

19  Source store, correct?

20     MR. VINE:  Objection, form, leading.

21     THE WITNESS:  I believe so, yes.  We were

22  never able to onboard any of our own people, I do

23  know that.

24  BY MS. BLACK:

25     Q.  What do you mean?  Sorry.

Page 35

1      A.  We looked at other brands to go to to

2  purchase from and we were never given the ability to do

3  that.

4      Q.  You looked -- you, as in an employee at

5  Solu-Med, looked to find direct sources you could

6  purchase from?

7      A.  Yes.

8      Q.  Beyond using -- well, let me strike that.

9      The records in this case show that all the

10  products came through QMed.

11     A.  Correct.

12     Q.  Would that be consistent with --

13     A.  Yes.

14     Q.  -- your understanding --

15     A.  Yes.

16     Q.  -- as well?

17     And QMed uses Victory and the Innopex --

18     A.  Yes.

19     Q.  -- that you were referencing?

20     Okay.  You just testified that you spoke with

21  someone about going to another brand; is that correct?

22     A.  We did.

23     Q.  Who did you speak with?

24     A.  It's a company called --

25     MR. VINE:  No, no.  Who did you speak with --

Page 36

1      THE WITNESS:  Oh.

2      MR. VINE:  -- QMed or Solu-Med, she said.

3      THE WITNESS:  Oh, we talked -- I spoke to

4  Kellon about it, and I know Kellon spoke to Manny

5  'cause he did give us the ability to start

6  reaching out, but it just died, it never went

7  anywhere.

8  BY MS. BLACK:

9      Q.  Who was the company you wanted to reach out

10  to?

11     A.  It's called Something Liquid, I cannot

12  remember the name of it, I don't remember.  But I

13  believe that we did open an account, we just never went

14  anywhere with it.

15     Q.  Why did you want to reach out to a new

16  account?

17     A.  Actually, I heard about the company on the

18  radio, and they were very small company that was on its

19  way up, and it just seemed like, hey, you know, if we

20  can get into the -- you know, if we can get in at the

21  low level, we can be in there -- we can be one of the

22  first people to start listing it and selling it and we

23  just never went anywhere with it.

24     Q.  Was it a company that is a reseller like

25  Innopex or it's a brand?



ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
37–40

Page 37

1  A. It's a brand. It's a brand.
2      THE COURT REPORTER: I'm sorry --
3      MR. VINE: Innopex, I-N-N-O-P-E-X.
4  BY MS. BLACK:
5      Q. Have you ever spoken directly with Joel from
6  Innopex?
7      A. No.
8      Q. Who was in charge of making the orders?
9      A. Kellon. Oh, the brand was called Sliquid.
10     Q. And you wanted to be a distributor --
11     A. Correct.
12     Q. -- for Sliquid?
13         When the store was shut down, what was the
14  reaction within Solu-Med?
15     MR. VINE: Objection.
16     THE WITNESS: First, it was kind of
17     surprising, you know, kind of came out of nowhere
18     for me, at least, and then once we really read
19     into it, we kind of knew what was going on and --
20  BY MS. BLACK:
21     Q. Did Solu-Med make efforts to get the store
22  reinstated?
23     A. Yes.
24     Q. Was that a major concern, let's get the
25  store --

Page 38

1      A. Yes.
2      Q. -- reinstated?
3      A. Yes.
4      Q. Did your job at all involve direct
5  interaction with Mr. Iguerro (phonetic)?
6      A. No.
7      Q. When you would report to someone, was it
8  Mr. Goodson?
9      A. Yes. And then, Sherry, obviously, when she
10  started taking over.
11     MS. BLACK: Okay. I have no further
12     questions for you.
13     MR. VINE: Okay.
14         REDIRECT EXAMINATION
15  BY MR. VINE:
16     Q. You indicated that it was -- when it was shut
17  down, you were surprised, correct?
18     A. Yes.
19     Q. And then after you looked into it, you said,
20  quote, we -- we knew what was -- what is going on?
21     A. Yeah.
22     Q. And what did you mean by that?
23     A. We knew, 'cause, I mean, we knew clearly from
24  the past interactions, and I've worked on Amazon before,
25  I know when they -- you know, when a brand goes after

Page 39

1  you, you get shut down, you know it's going on.
2      Q. And you -- was everybody made aware that
3  Solu-Med was violating Amazon's guidelines?
4      A. We all knew we weren't buying direct, we all
5  knew, you know, and that was -- that was just part of
6  how it was done.
7      Q. So, when you say "not buying direct," you
8  understood that you were buying through a, quote,
9  middleman?
10     A. Correct.
11     Q. Did anybody at Solu-Med vet Innopex?
12     A. Not that I'm aware of, but I don't -- I don't
13  know.
14     Q. And you understand that Amazon requires you
15  to get the appropriate sourcing information?
16     A. Correct, yes, I do.
17     Q. And you understand Amazon warns resellers to
18  make sure that they properly vet those resellers?
19     A. Yes.
20     Q. The companies like Innopex?
21     A. Yes.
22     Q. Did anybody do any research that you're aware
23  of Innopex?
24     A. Not that I'm aware of.
25     Q. Did you ever suggest to them --

Page 40

1      A. Because --
2      Q. Let me just finish. She's going to kill both
3  of us.
4         Did you ever suggest that you had concerns
5  about Innopex?
6      A. Being that they were already there when I
7  started, I really had no idea exactly what was going on
8  with that company. I know that they were buying from
9  them and not buying direct from the manufacturer, but,
10  no, I didn't -- I didn't really question it.
11     Q. Okay. I understand you didn't question it,
12  but to yourself, did you have concerns about what was
13  going on?
14     A. Yes.
15     Q. You felt uncomfortable?
16     A. Yes, 'cause I -- I dealt with this before.
17     Q. Okay. And did Kellon also feel
18  uncomfortable?
19     A. Yes.
20     Q. And did -- was that expressed to Manny?
21     A. Yes, multiple times.
22     Q. And what did Manny say?
23     A. Wasn't in the meeting directly, but I'm going
24  to assume, you know, since we did not have any
25  permission to purchase, you know, go direct or anything



ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
41—44

Page 41

1  like that, it was just the way it was.
2      Q.  That's another thing I want to ask.  You
3  agree with me that Youngblood never authorized the sale
4  of those products?
5      A.  Absolutely.
6      Q.  Okay.  And I know Kellon testified to this,
7  Manny testified to that, but agree with me that the
8  products were being sold as new?
9      A.  Yes.
10     Q.  And without a manufacturer's warranty?
11     A.  Yes.
12     Q.  Okay.  You indicated that it was in your
13 opinion that Sherry was hired to eliminate the eCommerce
14 department, correct?
15     A.  Yes.
16     Q.  Okay.  Even just assume that, you came up
17 with that opinion based upon facts?
18        MR. VINE:  Objection.
19        THE WITNESS:  Yes.
20 BY MR. VINE:
21     Q.  Did you come up with that opinion based upon
22 facts?
23     A.  My own facts, yes.
24     Q.  What facts are those?
25     A.  Just the fact that she had no -- she had no

Page 42

1  experience with eCommerce, she worked at Office Depot,
2  she was, you know, high up in the Office Depot chain, we
3  weren't Office Depot.  You know, we were a small -- a
4  small company in a company that had very limited things
5  that we were able to do, and when she came on, it wasn't
6  like she came on with new ideas on how to grow, it was,
7  okay, what are we doing.
8      Q.  You indicated in response to Ms. Black's
9  communications that in 2018, the sales goals were around
10 7.5, and you didn't believe you were going to meet those
11 goals, correct?
12     A.  No. No.
13     Q.  And you had access to the sales orders,
14 correct?
15     A.  Yes.
16     Q.  And based upon your review of that, you
17 didn't think you'd be able to meet those goals?
18     A.  It was between, it was that and the amount of
19 product that we already had to pull off of Amazon and
20 eBay and the rest of the stores that we just -- there
21 was no inventory to sell to make that kind of money.
22     Q.  One of the comments also you responded -- I
23 think you said, the sales were okay in 2018, correct?
24     A.  Uh-huh, yeah.  Yeah.
25     Q.  You weren't privy to whether the company was

Page 43

1  making a profit, though, correct?
2      A.  No.
3      Q.  All right.  Were you aware that all the
4  insurance was being paid by -- sorry, all the rent was
5  being paid by QMed?
6        MR. VINE:  Form.
7        THE WITNESS:  I knew QMed was the overall,
8     they took care of everything, we were just a
9     little box in there in the QMed world.
10 BY MR. VINE:
11     Q.  Right.  So when you say they were doing okay
12 or well, you meant the sales were okay or well, you
13 don't know whether they were making any profits,
14 correct?
15     A.  No, no.
16        MR. VINE:  Form.
17        THE WITNESS:  I have no idea.
18 BY MR. VINE:
19     Q.  And you've been in the eCommerce field for
20 many years, correct?
21     A.  Yes.
22     Q.  And obviously, you're astute, correct?
23     A.  Yes.
24     Q.  And you're very knowledgeable, correct?
25     A.  Yes.

Page 44

1      Q.  And sales go up and sales go down, correct?
2      A.  Correct, absolutely.
3      Q.  And, certainly, six to eight months is not a
4  big enough time period to determine the trajectory of a
5  company, correct?
6      A.  Yeah.
7      Q.  So certainly, for the -- based upon the sales
8  in the year of 2018, you would agree with me, you could
9  not say that the company was going on a trajectory going
10 up?
11     A.  No.
12        MS. BLACK:  Form.
13 BY MR. VINE:
14     Q.  Am I correct?
15     A.  Yes.
16     Q.  You weren't part -- you didn't participate in
17 the plan of action submitted by Sherry and Kellon,
18 correct?
19     A.  At the very beginning, I was, but, no.  The
20 plan of action, I was not completely involved, no.
21     Q.  The one that was submitted to Amazon --
22     A.  Correct.
23     Q.  -- trying to get reinstated, correct?
24     A.  No, I was not -- I was in, the very
25 beginning, meetings when it first happened the first

ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
45–48

Page 45

1  couple days, I was -- I do know that they -- there were
2  two other people brought in to reach out to Youngblood,
3  to fly out to Youngblood and do all of that, but I
4  was -- I was not aware of the actual -- what was
5  submitted to Amazon.
6      Q.  Okay.  And you also mentioned earlier that
7  Kellon would do the orders for QMed to buy?
8      A.  Yes.
9      Q.  Okay.  Explain that to me.  Kellon was an
10  employee of Solu-Med, correct?
11      A.  Uh-huh.
12      Q.  "Yes"?
13      A.  Yes.
14      Q.  Yet, he would walk over to QMed in the
15  building and make the orders?
16      A.  I believe he had access to whatever ordering
17  system that they were using, which I know didn't
18  completely function.  So, yeah, at times, he did have to
19  walk across to do things, but he was -- he would get --
20  you know, he would go through -- do whatever items he'd
21  want to order and then he'd have to go to QMed to submit
22  a PO to purchase.
23      Q.  And how would he figure out what order --
24  what he wanted to order?
25      A.  Honestly, I don't have a complete answer to

Page 46

1  that, I know it was just a lot of research going through
2  Amazon, you know, Victory would say, hey, we have, you
3  know, this brand, we would go into Amazon, see if it
4  was -- you know, he would go in, see if it was open or
5  if it was locked down; if it was open, he would take a
6  look at it, see if the -- you know, the pricing was
7  right and stuff like that.
8      Q.  Okay.  But you don't have specific personal
9  knowledge about what was done?
10      A.  No.
11      Q.  Am I correct?
12      A.  Yes, you are correct.
13          MR. VINE:  Okay.  I don't have anything
14      further.  You have the ability --
15          MS. BLACK:  I have a couple more questions.
16          MR. VINE:  Oh, sorry.
17              RECROSS-EXAMINATION
18  BY MS. BLACK:
19      Q.  You mentioned -- I don't have many.  But
20  mentioned that -- I think I mentioned that you worked
21  with Amazon seller accounts before you started your job
22  at QMed?
23      A.  Yes.
24      Q.  Who did you work for -- how many different
25  Amazon seller accounts did you work with?

Page 47

1      A.  I want to say three or four.
2      Q.  And those were with previous jobs you've
3  held?
4      A.  Correct, yes.
5      Q.  Were those seller accounts on behalf of
6  brands or on behalf of resellers, like Solu-Med?
7      A.  Both.  We did -- I did work for a brand and
8  then we did reselling, as well.
9      Q.  The brand did reselling or a different
10  company?
11      A.  Different company.
12      Q.  So, is it fair to say one of the previous
13  companies you worked for was a brand and three were
14  resellers?
15          MR. VINE:  Objection.
16  BY MS. BLACK:
17      Q.  I think you said four --
18      A.  Two were brands and then two were resellers.
19      Q.  Okay.  In the scenario where they were
20  resellers before, what companies did you work for?  What
21  were the names of your employer?
22      A.  The ones that were resellers were Carib
23  Sales.
24      Q.  And what was the other one?
25      A.  Wow, HSI was a brand.  He also -- we also had

Page 48

1  a seller account with that, which, I believe, he did
2  under Blue Novelties.
3      Q.  Did Blue Novelties only sell HSI products?
4      A.  Yes.
5      Q.  Did not sell other products?
6      A.  No.
7      Q.  And Carib Sales would sell -- well, tell me,
8  what type of business was Carib Sales?
9      A.  They're a beauty wholesaler.
10      Q.  Would they sell cosmetics similar to
11  Solu-Med, the Life and Health Source store?
12      A.  They did not do cosmetics; they did hair
13  care.
14      Q.  Hair care products.  Did they have an
15  authorized distribution agreement with particular hair
16  care product brands?
17      A.  Yes.
18      Q.  Did they sell any products that they did not
19  have distribution agreements with?
20      A.  Yes.
21      Q.  Would issues arise comparable to the ones
22  that you encountered here with -- with Carib Sales?
23      A.  Most of the stuff that they were selling that
24  was not -- they didn't -- basically, what they did, like
25  most other companies, they have their company, then they



ADAM WEINSTEIN
SOLU-MED vs YOUNGBLOOD SKIN CARE

February 21, 2020
49–52

Page 49

1  open up a smaller company inside of it and they sell to
2  themselves, basically.
3      So, it was buying -- they were buying from
4  the brand under Carib Sales, and then we were selling
5  under -- I can't remember the name of the selling
6  channel, but it wasn't Carib Sales.  So it was kind of,
7  yes, they're buying it directly from the manufacturer
8  and they're just moving it over to their internal
9  company.  There were some of the brands that were aware
10  of it and some that weren't.
11     Q.   The products were always authentic products,
12  correct?
13     A.   Yes.
14         MR. VINE:  At those other companies.
15         THE WITNESS:  Correct.
16  BY MS. BLACK:
17     Q.   Did they receive complaints that -- at this
18  other Carib company, did they ever receive any
19  complaints that those products weren't authentic?
20     A.   They received the one complaint from -- I
21  can't remember, it's a shave -- one of the people that
22  makes razors, but it was more, hey, we know that you're
23  buying from us, we know this company is yours, we're not
24  really -- you're not authorized or anyone is authorized
25  to sell on Amazon, so pull the product.  So, it wasn't

Page 50

1  completely the same.
2      Q.   And you worked for Carib sales for how long?
3      A.   Under six months.
4      Q.   So, you received one complaint in six
5  months --
6      A.   Yes.
7      Q.   -- about an inauthentic product?
8         MR. VINE:  No, that's not what he said.
9         THE WITNESS:  No, it wasn't -- you weren't --
10        no one was able to sell that brand on Amazon
11        except that specific company.
12  BY MS. BLACK:
13     Q.   So, the complaint was how -- how would you
14  phrase it?  I don't want to put words in your mouth.
15     A.   It was, you need to remove your items because
16  you're not -- no one is authorized to sell that brand
17  online.
18     Q.   You weren't an authorized reseller?
19     A.   They are, but they just don't allow it to be
20  sold online.
21     Q.   Okay.
22     A.   They have some sort of licensing with Amazon
23  where they're the only ones.
24     Q.   They have a brand --
25     A.   Yes.

Page 51

1      Q.   -- agreement?
2      A.   Yes.
3      Q.   Prior to -- and Carib Sales, you actually
4  worked for after you worked for Solu-Med, right?
5      A.   Correct.
6      Q.   Did you work for any companies that had an
7  Amazon store before you worked for Solu-Med?
8      A.   Yes.  HSI Professional was before, actually.
9      Q.   For four years --
10     A.   Yes.  Almost every company I've worked for
11  has had some sort of Amazon store from the beginning.
12     Q.   And you worked -- and HSI is a brand?  I'm
13  sorry.
14     A.   Yes.
15     Q.   That was the one that you said is the -- the
16  seller account was Blue Novelties?
17     A.   Yeah, we had --
18     Q.   And --
19     A.   -- we had both.  We had the brand one and
20  then we had the nonbrand one.
21     Q.   So, the nonbrand one would sell what?
22     A.   The same products, same products.
23     Q.   And --
24     A.   It was a weird setup.  It was a very weird
25  setup.

Page 52

1      Q.   Do you know why they did it that way?
2      A.   Yes.  He did it just to make more money, just
3  so you had -- he had two -- he had two channels into the
4  brand basically, and if there was, you know, a problem
5  on Blue Novelties, it wouldn't affect the brand.
6      Q.   You're not necessarily supposed to do that
7  with Amazon?
8      A.   Absolutely not.
9      Q.   Yeah, you can't have two --
10     A.   No.
11     Q.   -- Amazon accounts.
12     A.   No, it is not -- it is definitely against
13  their terms and conditions.
14         MS. BLACK:  I don't have any further
15        questions.
16         FURTHER REDIRECT EXAMINATION
17  BY MR. VINE:
18     Q.   Did QMed have an Amazon account?
19     A.   They did not have a Seller Central account;
20  they had a Vendor Central account, which was something
21  totally different.
22     Q.   Did QMed advise Amazon that it was
23  essentially the same -- that it owned Solu-Med?
24     A.   As far as I know, no.
25     Q.   That would have been also a violation?



Page 53

1    A.  Yes.

2       MS. BLACK:  Form.

3  BY MR. VINE:

4    Q.  I just want to make sure I'm clear on

5  something.  Those other companies that you worked for,

6  some had distributor licenses and agreements, correct?

7    A.  Yes.

8    Q.  Okay.  Solu-Med never had any, correct?  As

9  relates to Youngblood.

10   A.  As relates to Youngblood, no.

11   Q.  Okay.

12   A.  No.

13   Q.  As relates to any of the companies that

14  complained, correct?

15   A.  I did not notice if there was one company

16  that we -- that they did have licensing to sell, it's a

17  skin care brand, something with a "U," I cannot remember

18  the name of it.  They do have an agreement with them

19  directly, but as far as any of the other companies, no.

20   Q.  Okay.  Was it raised to Solu-Med by you or

21  someone that you heard that you should -- they should

22  try to get a license agreement?

23   A.  Yes, we did it multiple times, we asked.

24   Q.  And the response was, no?

25   A.  The response was, we are getting it from

Page 54

1  where we're getting it from and that's who we can work

2  with.

3    Q.  Okay.  Was it your impression that they

4  wanted to just take the risk?

5    A.  I don't know if they wanted to take the risk

6  or they just weren't -- they weren't convinced of the

7  eCommerce, you know.  It was always a secondary thing,

8  you know, it wasn't their -- their main business.  So, I

9  don't know if they were willing to go to the next step

10  with it 'cause there is, you know, legal involved and

11  money involved and -- so I don't know if they just

12  didn't want to take the risk, you know, they wanted to

13  take the risk or they just didn't want to go to the next

14  step 'cause they weren't ready.

15   Q.  But they were aware they were selling product

16  that they weren't authorized, correct?

17   A.  Yes.

18   Q.  And they also became aware that they were

19  selling a product in violation of Amazon's policies?

20   A.  Yes.

21      MR. VINE:  Okay.  Nothing further.  You have

22   the ability to read, you could read what this

23   nice court reporter has taken down, or you can

24   waive that.  The purpose of you reading is so she

25   can -- is so you can determine that she took down

Page 55

1  everything you said as accurate, or, you can

2  waive it; if you read it and you change anything,

3  then we get to come back if we wanted to ask you

4  further questions.  It's up to you.

5      THE WITNESS:  No, I'll waive it, I think she

6   knows what she's doing.

7      MR. VINE:  And we will order and I need it

8   within a week, by next Friday.  Can I get it the

9   27th?  And we need it in electronic only.

10      MS. BLACK:  We will take a copy, the deadline

11   is fine.

12        (Witness excused.)

13   (Thereupon, the deposition was concluded at

14   2:04 p.m.)

Page 56

1              CERTIFICATE OF OATH

2

3  STATE OF FLORIDA          )

4  COUNTY OF BROWARD          )

5

6

7      I, the undersigned authority, certify that the

8  aforementioned witness, Adam Weinstein, personally

9  appeared before me and was duly sworn.

10

11

12      WITNESS my hand and official seal this 25th

13  day of February, 2020.

14

15

16

17

18        _____

           Lynn Cantin, RMR, CRR

19         Notary Public-State of Florida

           My Commission No. GG 207789

20         Expires:  May 12, 2022

21

22

23

24

25



Page 57

```
 1                    C E R T I F I C A T E
 2
     STATE OF FLORIDA    )
 3   COUNTY OF BROWARD   )
 4
             I, Lynn Cantin, Registered Merit Reporter,
 5   Certified Realtime Reporter, do hereby certify that I
     was authorized to and did stenographically report the
 6   foregoing deposition in stenotype; and that the
     foregoing pages, numbered from 1 to 57, inclusive, are a
 7   true and correct transcription of my shorthand notes of
     said deposition.
 8
             I further certify that said deposition was
 9   taken at the time and place hereinabove set forth and
     that the taking of said deposition was commenced and
10   completed as hereinabove set out.
11           I further certify that I am not an attorney
     or counsel of any of the parties, nor am I a relative or
12   employee of attorney or counsel of party connected with
     the action, nor am I financially interested in the
13   action.
14           The foregoing certification of this
     transcript does not apply to any reproduction of the
15   same by any means unless under the direct control and/or
     direction of the certifying reporter.
16
17           IN WITNESS WHEREOF, I have hereunto set my
     hand this 25th day of February, 2020.
18
19
20   _____
21        Lynn Cantin, RMR, CRR
22
23
24
25
```



**Page 1**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 0:19-CV-60487

ARGO HOLDINGS, INC. AND SOLU-MED, INC.,

                    Plaintiff,

            vs.

YOUNGBLOOD SKIN CARE PRODUCTS, LLC,

                    Defendant.
_____/

                VIDEOTAPED DEPOSITION
                        OF
                  MANUEL E. AGUERO
        SOLU-MED, INC. CORPORATE REPRESENTATIVE
               NONCONFIDENTIAL PORTIONS

          TAKEN ON BEHALF OF THE DEFENDANT

             Wednesday, November 20, 2019
               10:02 a.m. - 2:03 p.m.

             110 Southeast 6th Street
                   Suite 2700
             Fort Lauderdale, Florida 33301
                  Job #J4467092

        Reported by:  Dona J. Wong, CSR, RPR

**Page 2**

                APPEARANCES OF COUNSEL

   On behalf of the Plaintiffs:

        BLACK LAW, P.A.
        1401 East Broward Boulevard
        Suite 204
        Fort Lauderdale, Florida 33301
        Telephone:  (954) 320-6220
        Fax:  (954) 320-6005
        E-mail:  kelsey@kkbpa.com
        By:  KELSEY K. BLACK, ATTORNEY AT LAW

   And

        GOODMAN & SAPERSTEIN
        666 Old Country Road
        Suite 200
        Garden City, New York  11530
        Telephone:  (516) 227-2100
        Fax:  (516) 227-2108
        E-mail:  Gsesq600@aol.com
        By:  STANLEY R. GOODMAN, ATTORNEY AT LAW

   On behalf of the Defendant:

        COLE, SCOTT & KISSANE, P.A.
        222 Lakeview Avenue
        Suite 120
        West Palm Beach, Florida  33401
        Telephone:  (561) 383-9201
        Fax:  (561) 683-8977
        E-mail:  ryan.ransom@cslegal.com
        By:  RYAN M. RANSOM, ATTORNEY AT LAW

   Also Present:

        George B. Ellis, Videographer

                - - -

**Page 3**

REPORTER'S KEY TO PUNCTUATION
-- at the end of the question, answer or colloquy
indicates interruption by another speaker

. . . indicates while reading, words left out

. . . . and the end of a line indicates a trailing off

"Uh-huh" indicates affirmative

"Huh-uh" or "huh-huh" indicates negative

                - - -
              I N D E X
                - - -

WITNESS:        DIRECT    CROSS    REDIRECT    RECROSS

MANUEL E. AGUERO

BY MR. RANSON        7

                - - -
            E X H I B I T S
                - - -

NUMBER              DESCRIPTION              PAGE

DEFENDANT'S EX. 1   TWO-PAGE SOLU-MED WEB SITE   13

DEFENDANT'S EX. 2   ONE PAGE PRINTOUT FROM       34
                    YOUNGBLOOD'S WEBSITE
                    REGARDING DIVERSION

DEFENDANT'S EX. 3   TWO-PAGE COMPOSITE OF        41
                    REVIEWS

**Page 4**

                - - -
            E X H I B I T S
                - - -

NUMBER              DESCRIPTION              PAGE

DEFENDANT'S EX. 4   ONE-PAGE LIFE & HEALTH       53
                    SOURCE REVIEW

DEFENDANT'S EX. 5   FOUR-PAGE CODE OF CONDUCT    73
                    DOCUMENT

DEFENDANT'S EX. 6   FOURTEEN-PAGE AMAZON         75
                    CONDITION GUIDELINES

DEFENDANT'S EX. 7   CONFIDENTIAL AMAZON          79
                    PRODUCT AUTHENTICITY AND
                    QUALITY DOCUMENT, BATES
                    LABEL CONFIDENTIAL
                    AMZN_0038-0042

DEFENDANT'S EX. 8   AMAZON ANTI-COUNTERFEITING   84
                    POLICY, BATES LABEL
                    CONFIDENTIAL AMZN_00046-47

DEFENDANT'S EX. 9   FOUR-PAGE BEST PRACTICES     89
                    IN PRODUCT AUTHENTICITY
                    AND QUALITY

DEFENDANT'S EX. 10  ONE-PAGE DOCUMENT WITH       91
                    TITLE OF CURRENT SELLING
                    STATUS OF ABABPETWJQTSG:
                    NORMAL

DEFENDANT'S EX. 11  COMPLAINT                    96
DEFENDANT'S EX. 12  LIST OF ITEMS BEING          98
                    COUNTERFEIT

DEFENDANT'S EX. 13  COMPLAINTS BATES LABELED     103
                    PL00187-PL00229 WITH A
                    LIST ENTITLED OTHER
                    COMPLAINTS



Page 5

```
 1              -  -  -
 2              E X H I B I T S
 3              -  -  -
 4
        NUMBER          DESCRIPTION              PAGE
 5
 6  DEFENDANT'S EX. 14   PLAINTIFFS' RESPONSES TO  121
                         DEFENDANT'S FIRST SET OF
 7                       INTERROGATORIES
 8  DEFENDANT'S EX. 15   PLAINTIFF'S RESPONSES TO  124
                         DEFENDANT'S SECOND SET OF
 9                       INTERROGATORIES
10  DEFENDANT'S EX. 16   ONE-PAGE DROP SHIPPING    150
                         POLICY
11
                         -  -  -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    VIDEOTAPED DEPOSITION OF MANUEL E. AGUERO,
2         Wednesday, November 20, 2019
3         - - -
4    Videotaped deposition taken before Dona J. Wong,
5  Certified Shorthand Reporter, Registered Professional
6  Reporter, and Notary Public in and for the State of
7  Florida at Large, in the above cause.
8         - - -
9         THE VIDEOGRAPHER:  We are now on the video
10  record.  Today is Wednesday, the 20th day of
11  November 2019.  The time is 10:02.
12       This is the videotaped deposition of Manuel
13  E. Aguero as corporate rep -- representative of
14  Solu-Med in the matter of Argo Holdings,
15  Incorporated and Solu-Med, Incorporated versus
16  Youngblood Skin Care Products, LLC.
17       The court reporter is Dona Wong, the
18  videographer is George B. Ellis.
19       Will counsel please announce their
20  appearances for the record.
21       MR. RANSON:  Ryan Ranson on behalf of
22  Youngblood Skin Care Products.
23       MR. GOODMAN:  Stanley R. Goodman, Goodman &
24  Saperstein on behalf of Solu-Med.
25       MS. BLACK:  And Kelsey Black, Black Law, P.A.

Page 7

1    on behalf of Solu-Med.
2         THE COURT REPORTER:  Sir, would you raise your
3    right hand to be sworn, please.
4         THE WITNESS:  I do.
5         THE COURT REPORTER:  Thank you.
6         (Oath administered.)
7    Thereupon,
8              (MANUEL E. AGUERO)
9    having been first duly sworn or affirmed, was examined
10   and testified as follows:
11            DIRECT EXAMINATION
12   BY MR. RANSON:
13       Q.  How are you doing today, sir?
14       A.  Good.
15       Q.  I know we went over this yesterday.  You've
16   had your deposition taken.
17       Do you understand the ground rules of kind of
18   how this works?
19       A.  Yes.
20       Q.  Okay.  I would like to reiterate -- reiterate
21   that if you do need to take a break at any time, please
22   let me know, but please answer the pending question or
23   the line of questioning.  Is that okay?  Is that fair?
24       A.  Yes.
25       Q.  Okay, great.

Page 8

1        For the record, could you please state your
2    complete name.
3        A.  Manuel E. Aguero.
4        Q.  And could you please spell that.
5        A.  M-a-n-u-e-l, middle initial E., last name
6    A-g-u-e-r-o.
7        Q.  And your home address, please.
8        A.  1801 Southeast Eighth Street, Fort Lauderdale,
9    Florida 33316.
10       Q.  And your phone number?
11       A.  (954) 254-1107.
12       Q.  And what is your age and date of birth?
13       A.  Age, 58; date of birth, June 30th, 1961.
14       Q.  Okay.  And you understand that you're
15   appearing today, pursuant to the notice that was served
16   upon your counsel, to answer questions regarding
17   Solu-Med.  Correct?
18       A.  Yes.
19       Q.  And you've reviewed those documents and you're
20   prepared to answer those questions?
21       A.  Yes.
22       Q.  Okay.  And we spoke yesterday, but did you
23   review any other documents after we spoke yesterday?
24       A.  No.
25       Q.  Have you spoken to anyone about the deposition



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
9–12

Page 9

1  today other than your attorneys?
2      A.  No.
3      Q.  Okay.  And you're -- you're familiar with
4  Youngblood products that Solu-Med sells?
5      A.  Yes.
6      Q.  And what's your position at Solu-Med?
7      A.  I'm the cofounder and director of the company.
8      Q.  How many other cofounders are there?
9      A.  One other cofounder.
10      Q.  And who is that?
11      A.  Carlos Rodriguez.
12      Q.  Do you guys have 50/50 or how does that work?
13      A.  We actually own 45 percent each, and we have
14  five executives that own about ten percent.
15      Q.  Are they located in Florida as well?
16      A.  Yes.
17      Q.  Okay.  Do you have any other occupation other
18  than owning these companies?
19      A.  No.
20      Q.  Okay.  And how long have you worked for
21  Solu-Med?
22      A.  Solu-Med started operations in -- 2014.
23      Q.  And you've worked for Solu-Med since 2014?
24      A.  Yes.
25      Q.  Okay.  And you've always been the founder

Page 10

1  and -- and I guess you've ran that company?
2      A.  Correct.
3      Q.  Okay.  And where did you work before or did
4  you work?
5      A.  Well, we -- yesterday we took the deposition
6  on Q-Med and Q-Med was founded in 1990 and I've been
7  working for Q-Med as a cofounder for 29 years.
8      Q.  Okay.  Where did you work before Q-Med?
9      A.  Johnson & Johnson Medical, Inc.
10      Q.  And how long were you at Johnson & Johnson?
11      A.  Six years.
12      Q.  And what did you do for them?
13      A.  I was a medical sales rep.
14      Q.  So you're very familiar with acquiring and
15  selling products from your experience at Johnson &
16  Johnson?
17      A.  Well, no.  I'd say Johnson & Johnson, I was a
18  medical sales rep.  When I founded Q-Med is when we got
19  into the business of -- of trading medical supplies.
20      Q.  But did your experience at Johnson & Johnson
21  lead you to founding Q-Med?
22      MR. GOODMAN:  I'll object to the form.
23      THE WITNESS:  I would say no.
24  BY MR. RANSON:
25      Q.  Okay.  And where did you attend school?

Page 11

1      A.  University of Florida.
2      Q.  Go Gators.
3      Did you get a master's degree?
4      A.  Bachelor's in business administration, major
5  in finance, graduated in 1983 with honors.
6      Q.  Okay.  You only worked at Johnson & Johnson?
7      A.  Prior to that, I worked at Dean Witter
8  Reynolds for one year.
9      Q.  Okay.  All right.  And what position did you
10  hold with Dean Witter Reynolds?
11      A.  I was a licensed stockbroker.
12      Q.  Okay.  And that was in Florida?
13      A.  Yes.
14      Q.  Okay.  Do you have any professional licenses?
15      A.  No.
16      Q.  I'm going to be referring to Youngblood Skin
17  Care Products as Youngblood today.  Is that okay with
18  you?
19      A.  Yes.
20      Q.  Okay.  I'll -- I'll be referring to Solu-Med,
21  Inc. as Solu-Med.  Is that okay?
22      A.  Yes.
23      Q.  Okay.  And I'll be discussing some Amazon
24  policies with you today.  I'm just going to refer to
25  those as the selling policies or the seller code of

Page 12

1  conduct.  Is that okay?
2      A.  Yes.
3      Q.  Okay.  All right.
4      And you said Solu-Med was founded in Florida.
5  Correct?
6      A.  I believe it's Delaware.
7      Q.  Delaware.  Where is it -- where is it
8  headquartered right now?
9      A.  At 2281 Griffin Road, Fort Lauderdale,
10  Florida.
11      Q.  Okay.  So it was headquartered in Delaware and
12  now it's in Florida?
13      A.  It was established in Delaware.  It's a
14  Delaware Corp.  It's always been housed in Florida.
15      Q.  Okay.  Do -- do you know if you have a
16  registered agent listed on Sunbiz?
17      A.  I'm -- I'm not certain.
18      Q.  I mean, is there any reason why you wouldn't,
19  being a corporation in Florida, why you wouldn't
20  register on Sunbiz?
21      A.  I think we initially initiated the corporation
22  in Delaware, and it's been registered there since the
23  beginning.
24      Q.  So I went on your Web site for Solu-Med --
25  I'll just enter this as Composite Exhibit 1.  She can



Page 13

1  mark it and she'll hand it to you.
2      MR. GOODMAN:  Thank you.
3      (Defendant's Exhibit Number 1 was marked for
4  identification.)
5  BY MR. RANSON:
6      Q.  This is your Web site.  Correct?
7      A.  Yes.
8      Q.  Okay.  I'm a little bit confused because on
9  the first page it says Company Overview.
10         Do you see that?
11     A.  I can barely read it because it's so light.
12         MR. GOODMAN:  Do you have a darker copy by any
13  chance?
14         MR. RANSON:  We can print it off if you need
15  it.
16         MR. GOODMAN:  Yeah.
17         MR. RANSON:  Okay.
18         MR. GOODMAN:  Because I'm finding it difficult
19  to read it as well.
20  BY MR. RANSON:
21     Q.  Okay.  I'll -- I'll just represent to you and
22  you can correct me if I'm wrong, but it says,
23         "We ship directly from our warehouse to
24     your home.  We're committed to providing only
25     new and authentic high quality named brands with

Page 14

1  fast and reliable shipping."
2  Is that true?  Can you see that?
3      A.  Actually, I can't read it because it's so
4  light.
5         MR. GOODMAN:  Well, we'll accept your reading
6  of it --
7         THE WITNESS:  Yes.
8         MR. GOODMAN:  -- so just follow Mr. Ranson.
9  BY MR. RANSON:
10     Q.  Are you -- are you aware of what's on your Web
11  site?  Maybe I should ask you that.
12     A.  Yes.
13     Q.  Okay.  And you've seen this before?
14     A.  Yes.
15     Q.  Okay.  My -- my real question is:  Why does
16  your Company Overview, on the first page, differ so much
17  from when I click on it?  So this is a link when I click
18  on Company Overview, the second page.  The first one
19  says --
20         MR. GOODMAN:  I do not have the second page
21  here.
22         MR. RANSON:  You should.
23         MS. BLACK:  Oh, this is the second page.
24         MR. GOODMAN:  Okay.  Sorry.
25

Page 15

1  BY MR. RANSON:
2      Q.  All right.  I'll start up.  I'll read the
3  first page in -- in the entirety of what it says in Our
4  Company Overview.  It says,
5         "We are a leading distributor for beauty
6     and cosmetics with 25 years of experience and
7     top seller rates on marketplaces like Amazon,
8     Walmart and eBay.  It's clear that our customers
9     are always our number one priority.  Shipping
10     directly from our warehouse to your home, we're
11     committed to providing only new and authentic,
12     high quality name brands with fast and reliable
13     shipping."
14  Does that sound right?
15     A.  Yes.
16     Q.  Can you -- can you see what I'm reading or no?
17     A.  I can't but I -- I'm hearing what you're
18  saying.
19     Q.  Okay.  All right.
20         Well, first of all, before we move on to the
21  second page, does Solu-Med have a warehouse?
22     A.  Yes.
23     Q.  It does?
24     A.  Correct.
25     Q.  Okay.  I thought you told me yesterday that

Page 16

1  Q-Med had a warehouse.
2      A.  Q-Med and Solu-Med are housed in the same
3  facility, at 2281 Griffin Road.
4      Q.  So they share warehouse space?
5      A.  Correct.
6      Q.  Okay.  And how is that -- how do you keep
7  track of that?  Does -- does one company get 50 percent
8  and the other company get 50 percent, or how is it split
9  up?
10     A.  No, no, no.  If you come to our warehouse,
11  it's a hundred eighty thousand square foot facility, and
12  a section of it is specific Solu-Med inventory and the
13  other section is Q-Med inventory.
14     Q.  Is that labeled in your warehouse?
15     A.  Yes.
16     Q.  So if I walk in your warehouse, I could see
17  this is Solu-Med section and this is Q-Med section?
18     A.  I don't know that you would know but we would
19  know.
20     Q.  How would you know?
21     A.  Because it's basically cordoned off and it's a
22  section within the warehouse.
23     Q.  But I mean, you couldn't -- if I -- if someone
24  came and visited your warehouse, it would not be clear
25  to them which section is Q-Med or which section is



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
17—20

Page 17

1  Solu-Med?
2      A.  Not necessarily.
3      Q.  Okay.  Okay.
4          And it also says you provide authentic, high
5  quality name brands.  What does that mean?
6      A.  Exactly what it says.
7      Q.  What does that mean to you?  What is an
8  authentic, high quality name brand?
9      A.  It means we go through great lengths to make
10  sure that we're only selling authentic, first quality
11  goods.  We don't sell seconds.  We don't sell damages.
12  We don't sell any counterfeit products.  We only sell
13  name brand quality goods.
14      Q.  What about authentic as defined by Amazon, do
15  you sell authentic Amazon goods?
16      A.  Authentic Amazon goods?
17          MR. GOODMAN:  I'll object to the form.  As
18  defined by Amazon, do you have a Amazon definition?
19          MR. RANSON:  Possibly.
20          MR. GOODMAN:  Well, how can you --
21          MR. RANSON:  Okay.  Well, I'm just asking
22  about his knowledge, but we'll -- we'll get there.
23  Okay.
24  BY MR. RANSON:
25      Q.  So when I -- when I click on Company Overview,

Page 18

1  it now takes me to a different definition of your
2  company, which says,
3          "Solu-Med is a highly experienced and
4      leading distributor of medical and surgical
5      supplies and equipment to the Southern Cone
6      region of South America.  We work with public
7      and private hospitals, nursing homes, clinics,
8      distributors and various government and military
9      agencies to service our brand -- broad portfolio
10      of primarily branded manufacturers."
11          So my question is:  Do you sell -- are you a
12  leading distributor of medical and surgical supplies or
13  are you a top-rated seller on Amazon, Walmart and eBay?
14      A.  Okay.  So in 2009, Solu-Med was formulated.
15      Q.  Uh-huh.
16      A.  After -- we -- during 2009, we basically sold
17  products in Southern Cone of South America.  In 2014, we
18  shifted the focus of the company to selling online
19  products.
20      Q.  So when was this added onto the Web site, the
21  new Company Overview?  So I think what you're telling
22  me, and you can correct me if I'm wrong, so you're
23  saying that the -- this Company Overview, when I click
24  it, right, which takes me to your Company Overview is
25  old?  This is the new.

Page 19

1      A.  Yes.
2      Q.  Correct?  Okay.
3          So when was this added on the home page of the
4  Web site, Company Overview?
5      A.  Probably 2014.
6      Q.  Probably 2014?
7      A.  I couldn't tell you exactly what year.
8      Q.  It didn't happen in the last year?
9      A.  No.
10      Q.  Okay.  And you're sure about that?
11      A.  I didn't make the change so I don't know
12  exactly what year, which is what I stated, but I'm
13  saying it was done sometime 2014 or '15.  It was
14  definitely not in the last year.
15      Q.  Okay.  All right.  Thank you.
16          And what kind of corporation is Solu-Med?
17      A.  Solu-Med is a QSUB of Argo Holdings.  Q-Med
18  and Solu-Med are QSUBs of Argo Holdings.
19      Q.  But you don't sell stock at Solu-Med.  Right?
20      A.  No.  Stock, when you say stock --
21      Q.  Do you sell stock privately?  Do you sell
22  stock publicly?
23      A.  No.
24      Q.  Do you sell stock of your corporation?
25      A.  No.

Page 20

1      Q.  Okay.  And where is the company located in
2  Florida?
3      A.  The company Solu-Med?
4      Q.  Uh-huh.
5      A.  It's located at 2281 Griffin Road.
6      Q.  Okay.  You probably already said that.
7          And do the employees that work at Solu-Med, do
8  they work strictly for Solu-Med or are they
9  interchangeable with Q-Med and your other companies?
10      A.  They work primarily for Solu-Med.
11      Q.  What does that mean?
12      A.  They work primarily for Solu-Med.  I mean,
13  they spend most of their days working for Solu-Med.
14      Q.  Do they spend other days working for Q-Med?
15      A.  No.
16      Q.  Well, you said "primarily."  I'm just trying
17  to understand what you meant by "primarily."
18      A.  The reason I'm answering it that way is
19  because we have warehouse workers and so from time to
20  time, based on load and demand, there could be warehouse
21  workers that are working for both Q-Med and Solu-Med on
22  a given day, so I don't want to misrepresent that, but
23  primarily their functions are they're Solu-Med
24  employees.
25      Q.  So anybody besides the warehouse workers that



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
21—24

Page 21

1  works for Solu-Med, do they also work for Q-Med?
2  A.  No.
3  Q.  Okay.  And when these warehouse workers are
4  working for Solu-Med or Q-Med, are they aware of who
5  they're working for that day?
6  A.  Absolutely.
7  Q.  So they know like Monday I'm working for
8  Solu-Med, Tuesday I might be working for Q-Med?
9  A.  Correct.
10  Q.  And they're paid separate paychecks for each
11  corporation?
12  A.  I'm going to say no, that they're only paid
13  from their working company.
14  Q.  So there's two corporations.  An employee that
15  works in your storage warehouse could work for either
16  corporation but they would still receive their salary or
17  their pay from the corporation they were hired for.
18  Correct?
19  A.  That's correct.
20  Q.  Okay.  And does Solu-Med have offices in other
21  states?
22  A.  No.
23  Q.  Okay.  So it's just the one office in Fort
24  Lauderdale.  Correct?
25  A.  Correct.

Page 22

1  Q.  Okay.  And what's the name of the store that
2  Solu-Med operates -- operates on Amazon?
3  A.  Life & Health Source.
4  Q.  Okay.  I'm going to refer to that as the
5  Amazon store today.  Is that okay?
6  A.  Yes.
7  Q.  Okay.  And that's the store that sold the
8  Youngblood products that are in question in this
9  lawsuit.  Correct?
10  A.  That's correct.
11  Q.  Okay.  I just want to go through some
12  information that you provided us.
13  Who is Cheri Siedle?
14  A.  Cheri Siedle was a Q-Med executive who helped
15  us transition to our new facility and was earmarked to
16  come over and be the chief operating officer of
17  Solu-Med.  Unfortunately, due to greatly diminished
18  sales and impact to the bottom line, we offered her a
19  severance package in June of this year.
20  Q.  So she was -- she was fired in June.  Right?
21  MR. GOODMAN:  Objection, form.
22  THE WITNESS:  She was -- we agreed on a
23  mutual -- there wasn't a role for her to take over
24  in Solu-Med, so we agreed on a mutual basis that we
25  give her a generous severance package and she moved

Page 23

1  on.
2  BY MR. RANSON:
3  Q.  And what role did she play in acquiring the
4  Youngblood products?
5  A.  None.
6  Q.  Well, in your disclosure, sir, it says that
7  Miss Siedle would have knowledge about the length of the
8  store being disabled due to Youngblood's actions and the
9  acquisition of Youngblood products.  So --
10  A.  She -- she was aware of the actions taken by
11  Youngblood, so she was very much aware that the store
12  was disabled for two months.
13  Q.  But she had no role in the acquisition of
14  Youngblood products?
15  A.  Kellon Goodson ran the store for -- for me, so
16  Kellon Goodson did all the acquisitions and all the
17  sales.  He was the operator of the Amazon store.
18  Q.  Let me stop you there.  I may ask you about
19  Mr. Goodson in a second, but did Miss Siedle, did she
20  have any role in the acquisition of the Youngblood
21  products?
22  A.  When you say "acquisition," I'm assuming that
23  you mean the purchasing of the products.
24  Q.  You -- you provided this to me so I'm -- I'm
25  asking you:  What role does Cheri Siedle have in the

Page 24

1  acquisition of the Youngblood products?  The
2  acquisition.
3  A.  She -- she played no role in the purchasing of
4  the product.
5  Q.  So it's fair to say that Cheri Siedle played
6  no role in the acquisition of Youngblood products?
7  A.  Cheri's role was, during the time that we were
8  disabled, in assisting Kellon Goodson in trying to find
9  ways that we could reopen the store based on
10  Youngblood's actions.  So her primary role was helping
11  us reestablish the store.
12  But when you say "was she involved with the
13  acquisition of the product," she neither played a role
14  in the purchasing nor the sale of the product.  Is that
15  clear?
16  Q.  Yes, sir.  Thank you.
17  And we just talked about Mr. Goodson.  And
18  what does he do?  Does he create this Web site for you?
19  A.  He creates the Web site.  He manages the
20  Amazon store.  He procures the products that he believes
21  we can sell successfully on the store.  He does the
22  purchasing and the selling.  He manages the entire
23  operation of the Amazon store.  That's his job.
24  Q.  And he reports directly to you?
25  A.  He does -- he reported directly to me,



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
25–28

Page 25

1  correct.
2      Q.  Okay.  So I reviewed your listings on Amazon.
3  I noticed you have about 470 different brands.
4      Does that sound about right?
5      A.  I think we have about 470 different S.K.U.s.
6  I don't think it's 470 brands.
7      MR. GOODMAN:  Excuse me, Mr. Ranson, are you
8  referring to the listings as of this day?
9      MR. RANSON:  Yes, sir.
10      MR. GOODMAN:  Okay.
11  BY MR. RANSON:
12      Q.  As of today.
13      A.  I just want to clarify --
14      Q.  What's an S.K.U.?  I'm not aware.  You might
15  have to tell me.
16      A.  Okay.  So when you say 470 items are listed on
17  our store, that's a -- a unique selling item with a
18  unique selling A.S.I.N. number in the Amazon system.
19  When you say 470 brands, I'm going to correct you and
20  say that it's probably less than 470 brands because we
21  might sell a dozen different S.K.U.s of a particular
22  brand.
23      Q.  When you say "S.K.U.," are you meaning
24  different products?
25      A.  Yes, a unique selling item.  So we might

Page 26

1  sell -- for example, one time we might have sold eight
2  or ten Youngblood products.  I would refer to that as
3  eight different S.K.U.s or stock keeping units but it's
4  only one brand.
5      Q.  So you're telling me -- this is
6  approximately -- that you might, approximately, only
7  have 470 items for sale on Amazon?
8      A.  You're talking specifically of our store?
9      Q.  Uh-huh.
10      A.  And that's what's listed on the Amazon store,
11  yes.
12      Q.  Okay.  How many brands do you think you have
13  for sale on Amazon?
14      A.  I wouldn't want to just guess.  I could count
15  them but it's -- it's not 470.
16      Q.  Are you familiar with the brands that you sell
17  on Amazon?
18      A.  Absolutely.
19      Q.  You could name all of them?
20      A.  No, I couldn't name them all, but it's
21  constantly changing.
22      Q.  Sure.  And why is it always changing?
23      A.  Sourcing opportunities.
24      MS. BLACK:  What topic are we on?
25      MR. RANSON:  We're on the structure of

Page 27

1  Solu-Med, Solu-Med's business.
2      MS. BLACK:  Okay.
3      THE WITNESS:  It's constantly in flux.
4  There's constantly items being added and items
5  being deleted.
6  BY MR. RANSON:
7      Q.  Okay.  Are you familiar with Amazon seller
8  policies?
9      A.  Generally, yes.
10      Q.  Okay.  Do you feel like you have a duty to
11  keep up with those policies?
12      A.  Absolutely.
13      Q.  Okay.  And who in your -- who in Solu-Med is
14  in -- would also, you know, be aware of those policies?
15      A.  Kellon.
16      Q.  Kellon.  That's it?
17      A.  That would be the primary -- it would have
18  been Kellon and Cheri but Cheri has been gone since --
19      Q.  Is Kellon the only person that lists these
20  products for sale on Amazon?
21      A.  That's correct.
22      Q.  Okay.  No one else is in charge of listing any
23  other products on Amazon?
24      A.  He handles its complete responsibility for the
25  store.

Page 28

1      Q.  Okay.  And do you and Kellon both try to stay
2  up to date with the seller's policies and changes that
3  are made?
4      A.  I would say yes.
5      Q.  And -- and what do you do to -- what -- what
6  policy do you have in place at Solu-Med that would prove
7  that you guys stay up to date with those policies?
8      A.  We have S.O.P.s within our distribution team
9  that basically monitors any changes Amazon would
10  communicate, any changes to us directly in their selling
11  policy.  So if they communicate something that there's
12  an issue, they would communicate it to us directly.
13      Q.  All right.  And what's S.O.P.  I'm sorry?
14      A.  Standard operating procedures.
15      Q.  Okay.  Have you ever had to change the way you
16  do business on Amazon since you've had Solu-Med, from
17  changes in their policies?
18      A.  The only change that's taken place is from
19  time to time manufacturers have gone to Amazon and
20  requested to become brand registered, and brand
21  registered means that they strike a deal with Amazon to
22  basically eliminate any third-party sellers from Amazon
23  sites, and so in that case Amazon will notify us and
24  basically send us a notification that says, Such and
25  Such brand, XYZ Brand -- let's use Youngblood as an



Page 29

1  example -- has become brand registered and you have 60
2  days to liquidate your inventory and whatever is
3  remaining will have to be shipped back to you.
4      Q.  Okay.  So since 2009, that's the only change
5  you're aware of in Amazon's policies?
6      A.  I wouldn't say it's the only change.
7  That's --
8      Q.  Strike that.
9          Since 2014, that's the only change that you're
10  aware of in Amazon's policies that has changed the way
11  you conduct business?
12     A.  I'm going to say that it's the only one that
13  I'm aware of.
14     Q.  Sure.  Okay, that's fair.
15         And, to the best of your knowledge, you've
16  never violated any of Amazon's policies.  Correct?
17     A.  Absolutely not.
18     Q.  Okay.  And I know we discussed this yesterday,
19  but can you please tell -- tell me how Solu-Med received
20  its Youngblood products.
21     A.  How we receive the Youngblood product.  Okay.
22  Let's -- you want me to walk through an example of the
23  purchasing of the Youngblood product?
24     Q.  Sure.
25     A.  So we -- you know, we'll tell a -- suppliers

Page 30

1  that we have that we're open to buy certain lines or
2  that we're interested, open to buy certain lines.  They
3  will tell us what lines they have available.  And so we
4  will look at the -- at the lines that we're interested
5  in buying, that we're open to buy, the lines that
6  they're offering it and then we'll drill down on those
7  lines and ask them to send us pricing and availability
8  of what codes and prices they have on those lines.
9      Q.  And when you say "we," are you referring to
10  Solu-Med or Q-Med?
11     A.  I'm referring to -- I'm referring to both
12  because Kellon is a Solu-Med employee but we would
13  purchase the product through Q-Med.
14     Q.  So Youngblood acquires their products from
15  Q-Med.  Correct?
16     A.  Youngblood acquires their products --
17     Q.  I'm sorry -- strike that.
18         Solu-Med acquires their products from Q-Med?
19     A.  That's correct.
20     Q.  Okay.  Do they -- does Solu-Med pay -- strike
21  that.
22         Does Q-Med sell their products to Solu-Med at
23  a profit?
24     A.  At cost.
25     Q.  At cost.  And how do you -- how do you track

Page 31

1  these purchases?
2          MR. GOODMAN:  Are you referring to Youngblood?
3          MR. RANSON:  Young -- Youngblood, sure.
4  BY MR. RANSON:
5      Q.  How would you track a Youngblood purchase from
6  the moment that you purchase the product?  How would you
7  track the item?
8      A.  When you say track --
9      Q.  Do you -- do you have any tracking systems in
10  place to track your items?
11     A.  Sure.  Let's walk through an example of
12  sourcing.
13     Q.  Okay.
14     A.  So let's say that we receive an offer for
15  Youngblood products.  The way that that would play out
16  is the folks at Solu-Med would purchase merchandise
17  directly from the manufacturer in an effort to basically
18  assure that we're selling the exact same brand of
19  product, so they would purchase a sample of four or five
20  items, basically get samples from the supplier to make
21  sure that they match up exactly, that we're not
22  receiving something that's different, that's somehow
23  different product.  Once they're satisfied and it's gone
24  through our Q.A. process and it's been approved, then we
25  would place a purchase order from Q-Med to the supplier.

Page 32

1          In this case, the product that you're
2  referring to came from Imperial Trading.  We would place
3  an order with Imperial Trading.  They would ship it from
4  their New Jersey warehouse freight prepaid to our
5  facility in Q-Med.  Q-Med would check it in off of a
6  packing slip, place it into inventory.  Once it's in
7  inventory, then Solu-Med would be free to place it on
8  the store.
9      Q.  So when Q-Med acquires the Youngblood product,
10  for example, is there a bar code?  Is there some sort of
11  scanning device that tracks that product from the moment
12  it's in your possession in Q-Med until -- then it is
13  sold in Amazon?
14     A.  I want to make sure I understand the question.
15  Could you repeat it one more time?
16     Q.  Sure.  My question really is:  How do you
17  track the goods that you acquire from the moment that
18  you purchase them until the moment that they're sold, or
19  do you track them at all?
20     A.  We absolutely track them.
21     Q.  Okay.
22     A.  We have a warehouse -- warehouse management
23  system in our facility.
24     Q.  And how does that system track it?
25     A.  It's checked in, it's given a bin location and



MANUEL E. AGUERO  Non-Confidential                                                 November 20, 2019
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                                                        33–36

Page 33

1  it's updated monthly in -- and we keep an inventory of
2  every month how much product we've sold, how much we
3  still have in stock.
4     Q.  So you know where all your products are at all
5  times, what bin they're in, when they're shipped to one
6  facility to the next, when they're shipped to Amazon?
7     A.  That's correct.
8     Q.  Okay.  And what steps do you take to verify
9  the condition and authenticity of the products prior to
10  listing them for sale?
11     A.  I think we just covered that.  We basically
12  purchase samples to make sure that they're exact matches
13  and that there's no deviation from the product that
14  we're sourcing.
15     Q.  So if the samples are good, then you'll place
16  the order?
17     A.  That's correct.
18     Q.  Okay.  And did you check to see if these
19  products had a manufacturer's warranty?
20     A.  All products have a manufacturer's warranty.
21     Q.  So the Youngblood products that you purchased
22  had a manufacturer's warranty?
23     A.  I'm assuming that they do.
24     Q.  Why are you assuming that they do?
25     A.  Most of the products that we source have --

Page 34

1  the manufacturer's will have some warranty on it.
2     Q.  Okay.  Let me just show you.
3        Mark this as 2.
4        MR. GOODMAN:  Two?
5        MR. RANSON:  Yes, sir.
6        (Defendant's Exhibit Number 2 was marked for
7  identification.)
8  BY MR. RANSON:
9     Q.  I took this from Youngblood's Web site.
10        MS. BLACK:  I'm sorry.  Would you raise that
11  up.
12        MR. RANSON:  Sure.  Yeah.
13  BY MR. RANSON:
14     Q.  I took this from Youngblood's Web site.  It
15  says,
16        "What is Youngblood doing to stop
17     diversion.  In order to ensure Youngblood
18     consumers only receive the highest quality
19     Youngblood products with a backed warranty and
20     to protect Youngblood's authorized salons, spas
21     and retailers, Youngblood continues in its
22     commitment to aggressively combat diversion."
23        Okay.  So I want to ask you:  Do you have a
24  Solu-Med spa?
25     A.  No.

Page 35

1        MS. BLACK:  I'm going to object to this
2  question.  When was this updated on the Web site;
3  do you have any idea?
4        MR. RANSON:  No.
5        MS. BLACK:  So you don't know if it was before
6  or after they purchased the product.  Right?
7        MR. RANSON:  Youngblood products have always
8  had a warranty.
9        MS. BLACK:  But how -- did they have this
10  statement on the Web site that you're reading to
11  him?  It has no relevance in the case unless it was
12  on Youngblood's Web site in October of 2018.
13        MR. RANSON:  Are you directing him not to
14  answer the question?
15        MS. BLACK:  I'm asking you if you know when
16  this was posted on the Web site.
17        MR. RANSON:  I can get that information to
18  you.
19        MS. BLACK:  He can go ahead and answer, but go
20  ahead.
21        MR. RANSON:  Okay.  Yeah.  We can -- we can
22  sort that out.
23  BY MR. RANSON:
24     Q.  So I was asking you:  Do you have -- does
25  Solu-Med have a spa?

Page 36

1     A.  Does Solu-Med have a spa?
2     Q.  Correct.  Do you -- do you have any spas under
3  Solu-Med?
4     A.  No.
5     Q.  Okay.  Do you have any salons?
6     A.  No.
7     Q.  Okay.  Are you an authorized seller from
8  Youngblood to sell their products?
9     A.  No.
10     Q.  Okay.  So I'm going to ask you again:  Does
11  your products come with a Youngblood warranty?
12     A.  No.
13     Q.  Okay.  Thank you.
14        And how did you become aware of Youngblood
15  products?
16     A.  They were offered to us by one of our
17  suppliers.
18     Q.  I know I asked you this yesterday but we have
19  to keep the record clean.  I'm sorry.
20        So would it be fair to say that the Youngblood
21  products were offered to you for a price you felt like
22  you could make some money on your e-commerce platforms?
23     A.  Correct.
24     Q.  Okay.  Do you guys look at customer trends on
25  Amazon to select your products?



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
37–40

Page 37

1    A.  I'm not sure what you mean by "customer
2  trends."
3    Q.  Sure.  Well, Amazon has customer trends; you
4  can see the products that are trending, the products
5  that are selling.  I didn't know if Solu-Med had a
6  policy to look at those products and then pick the ones
7  that were doing well and try to acquire those.
8    A.  I -- I believe that Kellon would evaluate
9  products based on their merit and based on making sure
10  that they met our quality standards and making sure that
11  they were -- would have the adequate volume and would
12  make purchasing decisions based on all those factors.
13    Q.  So Kellon would probably be a better person to
14  ask that question?
15    A.  Could be, yeah.
16    Q.  Okay.  Were you aware of Youngblood products
17  because of the high quality of those products?
18    A.  No.
19    Q.  Okay.  Did you order samples of the Youngblood
20  products?
21    A.  Yes.
22    Q.  And you can verify that?
23    A.  Can I verify.  In what way would you want --
24    Q.  Can you prove to me that you received
25  Youngblood samples from your --

Page 38

1         MR. GOODMAN:  Object to the form of the
2  question.
3         You can answer.
4         THE WITNESS:  I -- we purchased Youngblood
5  samples -- we purchase samples of all products that
6  we -- before we purchase --
7  BY MR. RANSON:
8    Q.  So you purchased the samples.  They didn't
9  send them to you for free.  Correct?
10    A.  Correct.
11    Q.  So you would have a receipt?
12    A.  Potentially.
13         MR. GOODMAN:  Objection.  Ask him whether he
14  has a receipt.
15  BY MR. RANSON:
16    Q.  Do you have a receipt for the Youngblood
17  products that you purchased the samples?
18    A.  I doubt that we have a receipt dating back to
19  2017.
20    Q.  Okay.  Now I want to ask you how you store
21  these products.  Kind of went over a few of these
22  questions so. . . .
23         What -- what employee monitors the Solu-Med
24  facility, the storage facility?
25    A.  We have multiple employees in the warehouse

Page 39

1  that work under Solu-Med.  When you say monitor the
2  warehouse, I'm not quite sure I understand your
3  question.
4    Q.  Sure.  Is there someone that's in charge of
5  the -- of Solu-Med's warehouse?
6    A.  No.  We have the -- the warehouse of Solu-Med
7  is all managed by Greg May, who oversees both Q-Med and
8  Solu-Med.
9    Q.  I'm sorry, who is that?
10    A.  Our warehouse manager.
11    Q.  What's his name?
12    A.  Greg May.
13    Q.  May or Bay?  I'm sorry.
14    A.  May.
15    Q.  May?
16    A.  Greg May, M-a-y.
17    Q.  Okay.  And he works for Q-Med but oversees
18  Solu-Med's warehouse as well?
19    A.  Correct.
20    Q.  So you have two separate corporations but you
21  have Q-Med's warehouse supervisor that monitors
22  Solu-Med's warehouse as well?
23    A.  The purpose of that is to maintain the same
24  integrity and quality that we do with our medical
25  supplies.

Page 40

1    Q.  I see.  Okay.
2    A.  We have one quality system and one -- you
3  know, one set of S.O.P.s for the entire warehouse.
4    Q.  Okay.  Do you have a manual or a handbook that
5  provides the protocol for monitoring the storage
6  facility?
7    A.  Absolutely.
8    Q.  Okay.  I think we requested that in -- I don't
9  think we received it, so do you mind sending me that?
10    A.  Not at all.
11         MS. BLACK:  We produced --
12         MR. RANSON:  Did you?
13         MS. BLACK:  -- those documents.
14         MR. RANSON:  Okay.  I'll check again but --
15         THE WITNESS:  Let me make sure I understand
16  what you want, so you want the --
17         MR. GOODMAN:  Well, I believe we've already --
18         MR. RANSON:  If you've produced them, that's
19  fine because I know that, you know --
20         MR. GOODMAN:  Yeah, I believe we did.
21         MR. RANSON:  Okay.  All right.
22  BY MR. RANSON:
23    Q.  Do you use Amazon's fulfillment centers?
24    A.  Yes.
25    Q.  Okay.  And -- and so you keep some products in



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
41—44

Page 41

1 the fulfillment centers and some products at Q-Med's
2 storage facility.  Correct?
3    A.  That's correct.
4    Q.  Do you have any idea what percentages of those
5 are?
6    A.  It varies constantly.
7    Q.  Okay.  I want to show you something.
8    You can make this a composite exhibit.
9    (Defendant's Exhibit Number 3 was marked for
10 identification.)
11    MR. GOODMAN:  Thank you.  Which one is page
12 one?
13    MR. RANSON:  We'll make page one the one with
14 the stars.  How about that?  This one.
15    MR. GOODMAN:  This one?
16    MR. RANSON:  Yeah.  They're two separate pages
17 but page one would be the with the stars.
18    MR. GOODMAN:  (Simultaneous cross talking.)
19    MR. RANSON:  Yes, page one with the stars.
20    MR. GOODMAN:  So this will be Exhibit 3?
21    MR. RANSON:  Yes, Composite Exhibit 3.  Okay.
22    Did you do that?
23    THE COURT REPORTER:  No, because you were
24 talking.
25    MR. RANSON:  That's right.  Sorry.

Page 42

1    THE COURT REPORTER:  You were moving pretty
2 fast so --
3    MR. RANSON:  Yeah.  You've got to slow me
4 down.  Sorry.
5    THE COURT REPORTER:  Yeah.
6    MR. RANSON:  Okay.
7    MR. GOODMAN:  Can you read it?  It's kind of
8    faint.
9 BY MR. RANSON:
10    Q.  I'm really more concerned with a different
11 question rather than what the actual reviews say.  So in
12 one, we have -- we have negative reviews on the first
13 page with the stars, you see, and they're not stricken
14 through.  Correct?  They're not striked out.  Whereas if
15 you look at the second page, it will say -- and these
16 are -- I'll represent to you, these are your Life &
17 Health Source reviews from your Web site on Amazon,
18 seller's Web site on Amazon.
19    The second page, you will see it says,
20    "Very rough material.  Not really cotton as
21    described.  Can't wear."
22 and then it's stricken out.  Do you see that?
23    A.  Can you point out what you're reading?
24    MR. GOODMAN:  Is this page two?
25

Page 43

1 BY MR. RANSON:
2    Q.  Yes, this one.  I'm sorry.  Page two.
3    A.  Okay.  Yes.
4    Q.  Do you see where it's stricken out?
5    A.  Yes.
6    Q.  Okay.  It's my understanding that it's
7 stricken out because this was fulfilled by Amazon's
8 fulfillment center and when they screw up, they will
9 strike out your review.  Is that correct?
10    A.  Yes.
11    Q.  Okay.  And on the other page, these are
12 reviews that were from your warehouse.  They were
13 fulfilled by Q-Med's warehouse.
14    A.  I don't know that you can say with certainty
15 that these would have been exclusively from our
16 warehouse.
17    Q.  Can you give me any reason why they wouldn't
18 be?
19    A.  We'd have to look at each one individually and
20 understand what was the product that was shipped, what
21 was the customer complaint, and then I can determine by
22 researching it and the shipment number whether it came
23 from Amazon's fulfillment center or if it came from our
24 warehouse.
25    Q.  Well, if you look at the second page, it says,

Page 44

1    "Message From Amazon.  This item was
2    fulfilled by Amazon and we take responsibility
3    for this fulfillment experience."
4    So when Amazon fulfills the item -- I'm sorry,
5 when Amazon fulfills the shipment, the customer is
6 unhappy, they'll take responsibility.
7    When you ship the item, obviously Amazon is
8 not going to take responsibility because it's not from
9 their fulfillment center.  Correct?
10    A.  If you're saying that all of these negative
11 customer reviews were exclusively shipped from our
12 facility, I wouldn't be able to confirm that.  That -- I
13 think I understand what you're saying, which is if
14 Amazon strikes it, that they're owning that
15 responsibility.  The ones here that have negative
16 reviews, what you're trying to imply is that all of
17 these came from our facility and what I'm trying to tell
18 you is that some of them could have and some of them
19 might have come from Amazon.  It does not mean
20 exclusively that they came from our facility.
21    Q.  So you're telling me that the negative reviews
22 on page one may have came from Amazon's fulfillment
23 center?
24    A.  What I'm saying is without looking at each
25 individual claim and where it shipped from, I wouldn't



Page 45

1  know whether it shipped from Amazon or whether it
2  shipped from our warehouse.  I don't have that
3  information.
4      Q.  Who -- who handles the reviews on your Web
5  site, on your -- I'm sorry, on your Amazon e-commerce
6  platform?
7      A.  I'm not sure I follow who handles
8  (Simultaneous cross talking) --
9      Q.  Let me ask you -- let me ask that question
10  again.
11        Do you have somebody that's in charge of
12  monitoring your reviews?
13      A.  Absolutely.
14      Q.  And who is that person?
15      A.  Kellon would monitor reviews and respond
16  accordingly.
17      Q.  So Kellon probably would be a better person to
18  ask this question?
19      A.  He monitors the reviews more closely than I
20  do.
21      Q.  And how often do you monitor the reviews?
22      A.  I go on -- we talk about it on a monthly
23  basis.  We have a board meeting every month.  We talk
24  about all business issues related to Solu-Med.
25      Q.  Okay.  Now, when you send a lot today --

Page 46

1  because you do use Amazon's fulfillment center.
2  Correct?
3      A.  We do.
4      Q.  Okay.  Now, when you send a shipment to the
5  Amazon fulfillment center, do you send that in a large
6  lot?  Do you send little tiny lots?  Do you -- how do
7  you do it?
8      A.  It would be -- Amazon will direct us.  They
9  will give us the labels that we have to place on the
10  product so they will -- all the product that goes to
11  Amazon fulfillment center has to be pre-labeled, and
12  Amazon would send us those labels so we can print them
13  and then we will label the product and then it will be
14  sent to the various distribution centers per Amazon's
15  direction.
16        So let's say we have 100 pieces of a certain
17  item.  They're going to tell us, Send 20 here, send 40
18  there.  And, typically, our Amazon shipments are pallets
19  of product, not just individual items or small boxes.
20      Q.  So, if I understand you correct -- correctly,
21  you send pallets which is -- I'm not in the Amazon
22  sales --
23      A.  No, I understand.
24      Q.  -- industry, but when you send a pallet,
25  that's a large, you know, shipment of items that all

Page 47

1  comes in bulk to the fulfillment center.  Correct?
2      A.  It might contain, you know, 20 different
3  S.K.U.s or 20 different items on that pallet that's
4  being shipped, and we prepare the items that we want to
5  ship to F.P.A. which is fulfillment by Amazon, and then
6  they direct us how they want it broken down.  So they
7  might want a certain amount to go to Jacksonville, a
8  certain amount to go to Kentucky, and they have, as you
9  well know, you know, hundreds of locations.
10      Q.  Does -- does Amazon tell you how many pallets
11  or shipments you're allowed to make at once -- strike
12  that.
13        Does Amazon tell you how many products you're
14  allowed to send to their fulfillment center at the time?
15      A.  They usually limit based on the seasonality of
16  the year, you know, how much -- you can't just ship to
17  them without their approval.
18      Q.  So they have to approve the shipment
19  beforehand but there's not necessarily a maximum number
20  of items you can send at once?
21      A.  I'm -- I'm not aware of that level of detail.
22  I don't believe that there's a --
23      Q.  Okay.  Who's in charge of sending the
24  shipments to Amazon?
25      A.  Generally, Kellon would be the one that would

Page 48

1  prepare because the Amazon's seller central store will
2  indicate where you're running low on inventory, where
3  you're running low on -- on product, where you're on
4  back order, you're out of stock, and so, generally, you
5  monitor the -- the metrics that they provide you, which
6  is like a tool to basically decide where you need to
7  fulfill product.
8      Q.  I see.  Okay.
9        Now, we -- we talked about expiration dates a
10  little bit yesterday, but what's your expiration policy
11  when purchasing products?
12      A.  Our purchasing product -- purchase order that
13  governs our agreements is 18 months, is what -- what we
14  request, the minimum of 18-month dating on the product.
15      Q.  So you will not purchase any product with an
16  expiration date that's less than 18 months?
17      A.  There are examples where some manufacturers
18  will sometimes produce product with less -- with a year
19  dating.  So if we're aware of that, there could be
20  exceptions to that.  But, generally speaking, I'm going
21  to say 98 percent, 99 percent of our purchases are going
22  to be with 18-month dating or better.
23      Q.  Okay.  So you're saying if a company -- if
24  they make a product, you know, today that expires in 12
25  months from today, then that would be acceptable to,



Page 49

1  obviously, purchase and --
2      A.  We would still have a minimum dating required.
3  It might be six months.  It might be nine months.  We
4  would take that as a one-off unique example.  There's
5  very few items that fall under that category.
6      Q.  So how do you evaluate what your expiration
7  date is going to be by each -- each purchase?
8      A.  Again, we -- if -- if the manufacturer does
9  not have an expiration date or if the manufacturer has,
10  typically, a five-year expiration date, we're going to
11  govern it and say it has to have a minimum of 18 months.
12      Q.  Okay.  Are you --
13      A.  Eighteen months is the standard.
14      Q.  Okay.  Do you know what a first-in, first-out
15  policy is?
16      A.  For inventory terms?
17      Q.  Yes.
18      A.  Yes.
19      Q.  And what is that?
20      A.  Basically, we rotate the inventory to make
21  sure that the oldest inventory goes out first.
22      Q.  Okay.  Are you aware that Amazon does not have
23  a first-in first-out policy?
24      A.  I -- I don't know that.
25      Q.  Do you think that's something you should know?

Page 50

1      MR. GOODMAN:  Objection to form.
2  BY MR. RANSON:
3      Q.  I'll represent to you that Amazon does not
4  have a first-in first-out policy.
5      So, for example, if you ship a product today
6  and you ship the same product six months from now and
7  someone makes a purchase seven months from now, it does
8  not necessarily mean that Amazon is going to fulfill
9  that order with the first shipment you sent.  They can
10  send products from the second shipment.  Are you aware
11  of that?
12      A.  Yes.
13      Q.  Okay.
14      MR. GOODMAN:  Mr. Ranson, are we finished with
15  this exhibit?
16      MR. RANSON:  Yes, sir.  Yes.
17      MR. GOODMAN:  All right.  I just wanted to
18  note for the record that there is no indication on
19  Exhibit 3 that any of these complaints or reviews
20  are with regard to Youngblood products.
21      MR. RANSON:  I -- I wasn't asking about
22  Youngblood products, sir.  I was asking about in
23  general about their fulfillment -- whether they
24  were at the fulfillment center or whether, you
25  know --

Page 51

1      MR. GOODMAN:  Okay.
2      MR. RANSON:  -- they were fulfilled by Q-Med.
3  That was more into the storage of the products.
4      THE WITNESS:  Are you -- one of the things
5  that should be mentioned is 98 percent positive
6  ratings.
7  BY MR. RANSON:
8      Q.  That's very impressive.
9      A.  Very rare.
10      Q.  That's a good job.
11      A.  Yeah.
12      Q.  Okay.  And I forgot to ask you this:  Solu-Med
13  doesn't have an online store directly so I couldn't
14  purchase these products from Solu-Med or -- directly.  I
15  would have to go through one of the e-commerce
16  platforms.  Correct?
17      A.  No, we do have our own proprietary Web site.
18      Q.  And -- and you're selling Solu-Med branded
19  items or are you selling items based on the other
20  platforms?
21      A.  Items that are sold on other platforms.
22      Q.  Okay.  So I could purchase these items from
23  you directly?
24      A.  Potentially.
25      Q.  Okay.

Page 52

1      A.  It's a more limited Web site.
2      Q.  What about Q-Med, can I purchase items from
3  them directly?
4      A.  No.
5      Q.  Okay.  Is there someone in your storage
6  facility that verifies that each shipment is accurate
7  and what it's supposed to be?  Would that be Kellon?
8      A.  No, that would be the warehouse team.
9      Q.  Okay.  Is that a large team?  How many people
10  work on the warehouse team?
11      A.  Probably -- we probably have a total of at
12  least 60 warehouse employees.
13      Q.  Sixty?
14      A.  Sixty.
15      Q.  And who do they report to?
16      A.  Greg May.
17      Q.  Greg May, okay.
18      And who processes the returns from the
19  customers on Amazon?
20      A.  We would process them through Solu-Med.
21      Q.  Okay.
22      A.  We don't get that many returns, but we get
23  periodic returns.  Typically, we will inspect the
24  product and, basically, it usually gets discarded.
25      Q.  So if I return an item to you, does that go to



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
53–56

Page 53

1  the Q-Med facility?
2      A.  It goes to the 2281 Griffin Road facility.
3      Q.  Okay.  And what's your return policy on Amazon
4  for cosmetics?  So, for example, I purchase Youngblood
5  lipstick from you and I don't like the lipstick, I want
6  to to send it back two days later.  What -- what would you
7  do?
8      A.  We have a 100 percent customer satisfaction
9  policy, we take back any product at any time.
10     Q.  No matter what?
11     A.  No matter what.
12     Q.  On all your cosmetics?
13     A.  On all the products that we sell, not just the
14  cosmetics.
15     Q.  Okay.  So this is a little bit bigger.
16  Hopefully, you can read it, but this is from Life &
17  Health Source, Exhibit 4.  Sorry.
18         (Defendant's Exhibit Number 4 was marked for
19  identification.)
20         MR. GOODMAN:  Just give me a second, please.
21         MR. RANSON:  Sure.
22  BY MR. RANSON:
23     Q.  Okay.  Now, you had a chance to review this
24  document?
25     A.  I'm reading it.

Page 54

1      Q.  Okay.  Take your time.  I'm really just
2  focused on the -- it looks like it's darkened, but the
3  third paragraph up from the middle.
4      A.  Uh-huh.
5      Q.  Do you see that?
6      A.  Yes.
7      Q.  Can you read that for me?
8      A.  "Due to Federal regulations we are
9  unable to accept returns or exchanges on
10      personal hygiene items, hair care, cosmetic,
11      fragrances, skin care or toys."
12     Q.  Okay.  Now, a moment ago you said that you
13  offer a hundred percent satisfaction guarantee, and here
14  it says you're unable to accept returns or exchanges on
15  cosmetics.  So which one is it?
16     A.  We still accept returns on cosmetics.  What
17  happens with Amazon customers, sometimes people will
18  open products, use them, say they're unhappy with them
19  and return them and so in order to --
20     Q.  In that circumstance, you would not accept it.
21  Correct?
22     A.  In the end, Amazon governs the return policy
23  for their customers and so the answer is yes, we accept
24  all returns.
25     Q.  Then why does it say under Life & Health

Page 55

1  Source,
2      "We are unable to accept returns or
3      exchanges on cosmetics"?
4      A.  This is to basically dis -- you know,
5  discourage people from using products and just returning
6  them.
7      Q.  So I'm a customer of Life & Health Source.  I
8  purchase Youngblood lipstick and I read this and -- and
9  I think I can still return the product to you?  Should
10  I -- should I think that I can still return this product
11  to you?
12     A.  I don't know what you would conclude.
13     Q.  How would a customer know that they can return
14  the product to you?
15     A.  Because the -- the Amazon policy is they
16  accept pretty much all returns.
17     Q.  So you're saying Amazon will process the
18  return for you?
19     A.  That's correct.
20     Q.  And how many days would that be?  How many
21  days would I have to -- before I had to -- for the
22  item --
23     A.  It's immediate.
24     Q.  -- would not be able to be returned?  I'm
25  sorry.

Page 56

1      A.  It's, essentially, immediate.  They debit our
2  account and -- and return the product.
3      Q.  Now, I purchase lipstick from you.  Okay?
4         How many days do I have to return the product?
5      A.  I don't think it gives you a specific number
6  of days or a limit.
7      Q.  How would a customer know that they can return
8  cosmetics to your store?
9      A.  Because if -- if you purchase on Amazon,
10  people have purchased things and returned them six
11  months later.
12     Q.  But you would agree, sir, that this says,
13      "We are unable to accept returns or
14      exchanges on cosmetics," among others?
15  Would you agree that that says that?
16     A.  I agree that it says that, yes.
17     Q.  Okay.  But you don't agree with that?
18     A.  I -- let's -- let's make sure I understand.
19     Q.  Sure.
20     A.  What is it that you're asking me I don't agree
21  to?
22     Q.  Well, I'm reading --
23     A.  I just told you that this --
24     Q.  -- I'm reading from your store that you do not
25  accept returns or exchanges on cosmetics, among other



Page 57

1  things.  Okay?  You're telling me that Amazon will --
2  will refund my money immediately.  I'm -- I'm -- I'm --
3  I'm confused as well.
4      Q.  There's no confusion.  If you return product
5  on Amazon, they will refund your money in full and they
6  will debit our account.
7      Q.  What if I open the product, use the lipstick,
8  I don't like the color, then I can send it back?
9      A.  Yes.
10     Q.  Okay.  What if I don't like it three months
11 later?
12     A.  This is the problem that you have with Amazon,
13 is they take back all returns.
14     Q.  All returns without any limits on time?
15     A.  I'm sure there is some limit on time.
16     Q.  You're -- you're just not really aware of the
17 return policy for cosmetics?
18     A.  I don't agree with that statement.  I'm
19 generally aware that, yes, you can return product on
20 Amazon.  And on average you're going to get two to
21 three percent returns of folks that are going to use the
22 product and then return it several months later.  That's
23 just a reality of doing business on Amazon.  It's the
24 cost of doing business.
25         In order to discourage that, we try to make

Page 58

1  sure that we don't get people just willy-nilly buying
2  product and then returning it.
3      Q.  What do you mean by "willy-nilly buying
4  product"?
5      A.  People using product and then returning it
6  several months later when they've consumed the product.
7  People will --
8          We've had situations where folks have bought a
9  box of bandages, used half the bandages, then three
10 months later returned the bandages.
11     Q.  And what do you do to combat that?
12     A.  Really, there's no combating it other than
13 trying to discourage people from doing that.
14     Q.  So you're saying that this note here,
15         "Due to Federal regulations, we're unable
16     to accept returns or exchanges on cosmetics,"
17 among other things, is a deterrent?
18     A.  Correct.
19     Q.  Okay.  All right.  Because you're not an
20 authorized retailer of Youngblood products, you would
21 agree I could not contact Youngblood, give them the
22 S.K.U. number, the -- is it S.K.U. number -- do items
23 have S.K.U. numbers on them or A.S.I.N.?  How -- how do
24 you identify each item?
25     A.  There's both.

Page 59

1      Q.  Both?
2      A.  A.S.I.N. is an Amazon number and then the
3  manufacturer has their own manufacturer code number.
4      Q.  The manufacturer code number, what do you call
5  that in your line of work?  Just the manufacturer code?
6      A.  Code number, S.K.U.
7      Q.  Okay.
8          MR. GOODMAN:  Mr. Ranson --
9          MR. RANSON:  Yeah.
10         MR. GOODMAN:  -- it would be most helpful if
11     you had any of the Youngblood products here.
12         MR. RANSON:  The what?
13         MR. GOODMAN:  The Youngblood products here.  I
14     mean, the samples to show him.
15         MR. RANSON:  Okay, thank you.
16 BY MR. RANSON:
17     Q.  So I'm asking you:  If I purchase a Youngblood
18 product from you, I'm unhappy with the product, you
19 would agree I couldn't return that to Youngblood in
20 California because you're not an authorized reseller of
21 Youngblood products.  Correct?
22         MR. GOODMAN:  Object to the form.
23         THE WITNESS:  I -- I don't know what
24     Youngblood's policy would be on that.
25

Page 60

1  BY MR. RANSON:
2      Q.  We just looked at it.  It's right here.
3          The products will be backed with a warranty.
4  I'll represent to you that Youngblood has a hundred
5  percent guarantee on all their products for the life of
6  the product.  So I could use the lipstick down to the
7  last drop, two years later say, I don't really want this
8  anymore and they would give me a brand new lipstick.
9  Correct?
10     A.  I don't know that.
11     Q.  Okay.  I'm representing that you to.
12     A.  Okay.
13     Q.  So if I -- if I purchase the Youngblood
14 products from you -- because you're not an authorized
15 dealer, are you?
16     A.  No.
17     Q.  Okay.  So if I purchase the product from you,
18 I would not be able to go to Youngblood and then say,
19 Hey, I don't like this lipstick, will you replace this
20 lipstick.  Correct?
21     A.  Why not?
22     Q.  Because they're not going to give a war --
23 they're not going to back their product by a warranty in
24 a -- from someone that sold their product that was not
25 an authorized reseller.



Page 61

1    MR. GOODMAN: You are assuming facts --
2    THE WITNESS: You just said that they -- you
3  just said that they --
4    MR. RANSON: It is in Exhibit --
5    THE WITNESS: -- you just said that they would
6  provide a hundred percent warranty on all products.
7 BY MR. RANSON:
8    Q.  Right, for the authorized resellers or salons
9 or spas.  So -- okay.
10     Is it your understanding, then, that I would
11 be able to get my product replaced by Youngblood that I
12 purchased from you?
13    A.  I don't know what it would be.
14    Q.  Okay.
15    A.  You have to do it to test it out.
16    Q.  Okay.  Do all the individuals responsible for
17 acquiring -- listing your Youngblood products, so they
18 review the selling policies and the seller code of
19 conduct posted on the Amazon seller central system prior
20 to acquiring the products?
21    A.  I would say yes.
22    Q.  Okay.
23    A.  When you say all -- all the folks, it would be
24 primarily one person.
25    Q.  And who would that be?

Page 62

1    A.  Kellon.
2    Q.  Because Kellon is the only person that
3 acquires the products.  Correct?
4    A.  Correct.
5    Q.  Okay.  And do you have any handbooks or
6 manuals that -- that I could look at that would show
7 that Kellon must be -- must review the selling policies
8 and seller code of conduct before he acquires products?
9    A.  Are we talking the warehouse S.O.P.s and --
10 and --
11    Q.  I'm talking when an individual acquires
12 Youngblood products from your company.  Correct?  You
13 told me that you would imagine they were -- they review
14 the selling policies and seller code of conduct before
15 they acquired the items.  Correct?
16    A.  Yes.
17    Q.  Okay.  Do you have any documentation that
18 would show Kellon must review the selling policies and
19 seller code of conduct before acquiring Youngblood
20 products?
21    A.  I'm going to say no.
22    Q.  Or any cosmetics.  The answer is no?
23    A.  No.
24    Q.  Okay.  Can you tell me anything that the
25 selling policies and seller code of conduct says?

Page 63

1    A.  Our primary focus is to make sure that we
2  comply with Amazon's vigorous non-counterfeiting policy,
3  so we go through great lengths to ensure that we're only
4  selling first quality, authentic goods.  That's our
5  primary goal.
6    Q.  Okay.  All right.  What's -- what's Amazon's
7  authenticity requirement then?
8    A.  Authenticity requirement, making sure it's not
9  counterfeit product.  You have to go to -- due diligence
10  to make sure you're not selling counterfeit product.
11    Q.  Do you know what a counterfeit product means
12  to Amazon?  Strike that.
13     Do you know what a counterfeit product is as
14  it relates to Amazon?
15    A.  I -- well, you're asking a question that what
16  do I -- do I understand what Amazon's definition of
17  counterfeit is?
18    Q.  Uh-huh.  Yes.  Do you?
19    A.  I -- I believe that the counterfeit product is
20  items that are not authentic product.
21    Q.  What's an authentic product?
22    A.  It's originally made by the manufacturer.
23    Q.  So that's what an authentic product is?
24    A.  Correct.
25    Q.  Okay.  Do you have any documentation that the

Page 64

1  selling policies and seller code of conduct, those
2  policies, were followed in the acquisition of selling
3  the Youngblood products?
4     Initially, I asked you if you -- if you had
5  any documentation when they acquired the Youngblood
6  products.  Now, I'm talking about when they sell the
7  Youngblood products, do you have any documentation that
8  would show that Kellon -- that's the only person that
9  sells the products.  Right?
10     Do you have any documentation that Kellon
11  followed the selling policies and seller code of conduct
12  when he -- when he sold the Youngblood products on
13  Amazon?
14    A.  I would say he would have followed the
15  policies that Amazon presents on -- on their Web site.
16    Q.  Why would you say that?
17    A.  Because that -- that's our policy, you must
18  comply with the Amazon's policies for sale.
19    Q.  Okay.  So you said that's your policy.
20     Do you have that written somewhere?  Do you
21  have a written policy?
22    A.  No.
23    Q.  No.  Okay.  So it's just like a -- a known
24  policy that you guys have amongst each other, it's just
25  not written down?



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019

65–68

Page 65

1    A.  Correct.
2    Q.  Okay.  Do you know if the selling policies and
3  seller code of conduct was followed in the customer
4  support of Youngblood's products?
5    A.  Customer support.  Could you rephrase the
6  question?
7    Q.  Sure.  Were the selling policies and the
8  seller code of conduct that you agreed to when you sold
9  your products on Amazon, were they followed in the
10  customer support of Youngblood's products?
11    A.  I'm not aware of any customer returns or -- or
12  any dissatisfaction with any of the Youngblood products
13  that we sold.
14    Q.  Do you have any policy concerning customer
15  returns for products on Amazon?  When I say "policy," I
16  mean, written.  Do you have any written policy that
17  would tell me how you handle a return on Amazon?
18    A.  We -- we follow the Amazon protocol for
19  returns.
20    Q.  I'm asking if Solu-Med has a written policy
21  for how to follow the selling policies and seller code
22  of conduct on Amazon when there's a customer return.
23    A.  I don't believe there is a written policy.
24    Q.  Okay.  What written policies do you have?
25    A.  We have quite a few.

Page 66

1    Q.  Okay.  What written policies do you have in
2  regard to Amazon?
3    A.  Can you be more specific?
4    Q.  Sure.  What written policies do you have in
5  the acquiring, listing, sale, and customer support of
6  your products on Amazon?
7    A.  Okay.  So we have our purchase order; terms
8  and conditions on our purchase order would govern the
9  terms and conditions of the purchase.
10    Q.  Let me stop you there.
11       What internal policies do you have in the
12  acquiring, listing, selling and customer support of your
13  products that you sell on Amazon?
14    A.  I -- I'd have to go and retrieve those.  I
15  don't have those.
16    Q.  But there is some that exist?
17    A.  I believe we have -- yes, we have --
18    Q.  How sure are you as you sit here today?
19    A.  I'm sure we have policies and procedures.
20    Q.  A hundred percent?
21    A.  Yes.
22    Q.  Okay.  Do you mind producing those to me?
23    A.  Not a problem.
24    Q.  Okay, thank you.  All right.
25       Did any of your employees complete the Amazon

Page 67

1  Seller University Training, and that training is called
2  Best Practices in Product Authenticity and Quality?  And
3  since Kellon is the only person that lists products on
4  Amazon, let me rephrase that.
5       Does Kellon complete the Amazon Seller
6  University Training, Best Practices in Product
7  Authenticity and Quality?
8    A.  You're asking me did Kellon complete that
9  course?
10    Q.  Uh-huh.
11    A.  I personally don't know if he --
12    Q.  Have you completed it?
13    A.  No.
14    Q.  Has anyone in your company, to your knowledge,
15  completed that?
16    A.  I wouldn't know if Kellon completed it or not.
17    Q.  Is today the first time you're aware that
18  there's a Seller University Training?
19    A.  I haven't heard of it referred to that.  I'm
20  sure that we basically have reviewed the policies
21  required to sell on Amazon.
22    Q.  No, sir, I'm not talking about the policies.
23       So Amazon offers a Seller University where
24  they will train your employees on the Best Practices in
25  Product Authenticity and Quality.  I'm asking if today

Page 68

1  is the first time you've heard of that.
2    A.  The first time I've heard it specifically in
3  that term.
4    Q.  Is today.  Correct?
5    A.  Yeah.
6    Q.  Okay.  Do you think it's a good idea to have
7  Kellon or other people that sell products on Amazon to
8  complete that training?
9       MR. GOODMAN:  Objection as to form.
10  BY MR. RANSON:
11    Q.  Would you like me to repeat the question?
12    A.  Sure.
13    Q.  Okay.  Do you have any intentions of -- for
14  your employees to complete the Amazon Seller University
15  Training, Best Practices in Product Authenticity and
16  Quality?
17    A.  I'm -- I'm going to look into it and decide,
18  you know, if it makes sense.
19    Q.  Do you think it's a good practice to have your
20  employees aware and trained on the authenticity and
21  quality policies that are on Amazon where you sell
22  products?
23    A.  I -- I believe that Kellon probably has
24  complied with that.  He would know about it.
25    Q.  Okay.  All right.  We'll ask Kellon.



Page 69

1          Okay.  Do you know if the Best Practices in
2  Product Authenticity and Quality guidelines were
3  followed in the listing, acquisition, sales, and
4  customer support on Amazon?
5      A.  I don't know.
6      Q.  Okay.  And Kellon would know that?
7      A.  I don't know if Kellon would know that.
8      Q.  Well, he's the person that sells on Amazon.
9  Correct?
10     A.  Yes.
11     Q.  Okay.  So what information did you give Amazon
12  when you listed the Youngblood products for sale?
13     A.  What information?
14     Q.  Sure.  Let me give you an example.  I'm sure
15  you had to give them a price.  Is that correct?
16     A.  I'm sure there's a process to upload items
17  onto the Amazon site.  I'm not specifically aware of all
18  the details as far as what the process is.
19     Q.  So, as you sit here today, you're not really
20  aware of how you list a product for sale on Amazon?
21     A.  I wouldn't be able to list a product for sale
22  on Amazon myself.
23     Q.  Okay, fair enough.
24         Would Kellon be in charge of that?
25     A.  Correct.

Page 70

1      Q.  Okay.  Do you know if Kellon listed the
2  product without a warranty?
3      A.  I -- I don't know.
4      Q.  Okay.  When you sell cosmetics like Youngblood
5  on Amazon, do you list them in new condition or used
6  condition?
7      A.  New condition.
8      Q.  New condition.  Okay.
9         But you wouldn't list your products on Amazon
10  with a manufacturer's warranty.  Correct?
11         MR. GOODMAN:  Objection as to form.
12  BY MR. RANSON:
13     Q.  Do -- are your -- were your Youngblood
14  products listed for sale on Amazon listed with a
15  manufacturer's warranty?
16     A.  I couldn't say.
17     Q.  Are you -- are you familiar with Amazon's
18  seller's code of conduct?
19     A.  In general, yes.
20     Q.  Well, what do you know in general about it?
21     A.  I've read it before.
22     Q.  Can -- can you tell me one thing that it says?
23         MS. BLACK:  Can I -- he can answer.  I'm
24  sorry, but can you -- I think it will help for
25  purposes of today's deposition if you just let us

Page 71

1  know what topic you're under when you're asking
2  questions.
3         MR. RANSON:  Sure.  I'm -- this is -- this all
4  relates to the entire complaint in this entire
5  lawsuit.
6         MS. BLACK:  Okay.  I mean, that's broad.  I
7  could formulate an objection based on that.  I'm
8  not saying you can't ask that question, but it
9  would be nice to stick to the topics.
10         MR. RANSON:  This has to do with Solu-Med's
11  relationship with Amazon, selling and listing
12  Youngblood's products on Amazon --
13         THE COURT REPORTER:  You're going to have to
14  slow down.
15         MR. RANSON:  Okay, I'm sorry.
16         THE WITNESS:  Speed.
17         MS. BLACK:  That's not a topic.
18         MR. RANSON:  It relates to the lawsuit --
19         MS. BLACK:  Okay.
20         MR. RANSON:  -- to the Complaint that you
21  filed.
22         Okay.  It relates to the authenticity of
23  the products.
24         MS. BLACK:  Also.  Right.
25         MR. RANSON:  Which is the subject of the

Page 72

1  lawsuit.  Okay.
2         MR. GOODMAN:  Mr. Ranson, do you have a copy
3  of the actual listing of the Youngblood products of
4  Life & Health Source that he can refer to?  You've
5  been asking him a lot of questions concerning the
6  content of the listing and more --
7         MR. RANSON:  Sure.  I mean, when you --
8  whenever you -- on direct -- you're happy to
9  provide him any exhibits you want and show him
10  anything that you want.
11         MR. GOODMAN:  Well, you're referring to the
12  warranty, presumably, the --
13         MR. RANSON:  Yeah, I'm asking him about his
14  knowledge of these things.
15         MR. GOODMAN:  Oh.
16         MR. RANSON:  Okay.
17         MR. GOODMAN:  But if we had the products, it
18  would be helpful.
19         MR. RANSON:  Sure.  Well, to my knowledge, the
20  products are no longer for sale on Life & Health
21  Source.  Is that correct?
22         MR. GOODMAN:  No.  I mean, do you have here in
23  your office samples of the Youngblood products that
24  were the subject of the notice?
25         MR. RANSON:  No, I don't have any Youngblood



Page 73

1  products here today.  We could probably order you
2  some.  Okay.
3      What did we say we're on, 5?
4      MR. GOODMAN:  Five.
5      MR. RANSON:  Okay.  Yeah, this is 5.
6  BY MR. RANSON:
7      Q.  So I went ahead and printed out the selling
8  policies --
9      THE COURT REPORTER:  Wait, wait, I'm sorry.
10      (Defendant's Exhibit Number 5 was marked for
11  identification.)
12      MR. RANSON:  Sorry.  Go ahead.
13  BY MR. RANSON:
14      Q.  So I went ahead and printed out the selling
15  policies and seller code of conduct that you agreed to
16  when you became a seller on Amazon, and you said you --
17  you're generally aware of this.  Correct?
18      A.  I'm sure at some point I reviewed this.  I
19  couldn't regurgitate it.  If that's what you're
20  asking --
21      Q.  Sure, I understand.  No, I mean, you just told
22  me a minute ago that you've read through it, though.
23  Correct?
24      A.  Correct.
25      Q.  Okay.  I'm really just focused on the first

Page 74

1  page, and you can look at the whole document if you
2  want, but I'm really just focused on the first page
3  where it says Accurate Information.  Do you see that?
4  You see at the bottom where it says Accurate
5  Information?
6      A.  "You must provide accurate information
7      to Amazon and our customers and update
8      information if it changes."
9      Q.  Then what?  Can you just read that for me,
10  please, the Accurate Information.
11      MR. GOODMAN:  It continues on the next page.
12      MR. RANSON:  Yeah.
13      THE WITNESS:  "You must provide accurate
14      information to Amazon and our customers and
15      update the information if it changes.  For
16      example, this means that you must --"
17  BY MR. RANSON:
18      Q.  I believe it says, "Have a business or use a
19  business name."
20      A.  "-- use a business name that accurately
21      identifies your business and lists your products
22      in the correct category."
23      Q.  Okay.  So you would agree you have to list
24  your products in the correct category and you have to
25  provide accurate information to Amazon.  Correct?

Page 75

1      A.  That's what it says.
2      Q.  Okay.  Thank you.
3      And do you believe that Solu-Med does that?
4      A.  Yes.
5      MR. RANSON:  Okay.  Mark this as Exhibit 6.
6      (Defendant's Exhibit Number 6 was marked for
7  identification.)
8  BY MR. RANSON:
9      Q.  So, sir, this is the Condition Guidelines.  Do
10  you see that?
11      A.  Yes.
12      Q.  Do you understand what the Condition
13  Guidelines means?  We discussed it earlier.  New, used,
14  so forth, the condition of the product.
15      A.  Okay.
16      Q.  And you sell your cosmetics, specifically the
17  Youngblood products, as new.  Correct?
18      A.  That's correct.
19      Q.  Okay.  Can you read where it says New, please?
20      A.  "New, just like it sounds.  A brand new
21      item.  Original manufacturer's warranty, if any,
22      still applies, with warranty details included in
23      the listing comments.  Original packaging is
24      present for most new items but certain items,
25      like shoes, may be reboxed."

Page 76

1      Q.  Okay.  And you would agree, as we've been over
2  many times, that your Youngblood products for sale on
3  Amazon did not contain the original manufacturer's
4  warranty?
5      MS. BLACK:  Objection, form.
6      THE WITNESS:  I -- I don't have an actual
7      listing from 2017, so I -- I don't have the answer
8      to that question.
9  BY MR. RANSON:
10      Q.  Okay.  Are you an authorized reseller of
11  Youngblood products?
12      A.  No.
13      Q.  Okay.  So I'll represent to you that you do
14  not get a manufacturer's warranty from Youngblood.
15      Have you purchased a -- a warranty from
16  someone else for the Youngblood products?
17      MS. BLACK:  Objection, form.
18      THE WITNESS:  No.
19  BY MR. RANSON:
20      Q.  Okay.  So why do you list your products as new
21  when they do not contain the original manufacturer's
22  warranty?
23      MS. BLACK:  Objection, form.
24      THE WITNESS:  The product is authentic
25      product.  It's new product.  It's unused product.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019

77–80

Page 77

1  BY MR. RANSON:
2      Q.  And you believe it's new as defined by Amazon?
3      A.  I believe it's new items.  It's -- it's not
4  used product.
5      Q.  I'm asking you:  Do you believe your
6  Youngblood products you list for sale on Amazon meet the
7  new Condition Guideline as provided by Amazon?
8      A.  When was this guideline implemented?  Is this
9  a recent change in the guidelines or is this the
10  guidelines that were in place --
11      Q.  Well, you would know that, sir, because you
12  monitor -- as you told me earlier, you monitor the
13  changes in the Amazon policies.  Correct?
14      A.  As in general our organization monitors any
15  changes within Amazon, but I'm asking you --
16      Q.  I will represent to you that this document
17  existed at the time you listed the Youngblood products,
18  okay, so if that's what you're asking me, even though
19  I'm asking the questions.
20          So I'm going to ask you again.  Do you believe
21  the products you listed for sale on Amazon, the
22  Youngblood products, meet the new Condition Guideline as
23  provided by the Condition Guidelines on Amazon?
24      A.  Clearly, the issue that you're bringing forth
25  is the warranty issue.

Page 78

1      Q.  So yes or no, sir?
2      A.  From my perspective, yes.  From your
3  perspective, no.
4      Q.  Why from your perspective yes?
5      A.  Because you're singling out the issue
6  regarding this warranty as being -- that we're not
7  complying with the warranty issue.  I -- I cannot tell
8  you -- I'd have to see our original listing from 2017 to
9  see how it was listed to be able to answer the question.
10      Q.  All right.  Let me ask you this:  How many --
11  how many products do you think you have for sale on
12  Amazon right now?  Roughly.
13      A.  You thing -- I think you said 470 earlier this
14  morning.
15      Q.  Okay, let's say 470.  Do you think any of the
16  470 products you have for -- for sale on Amazon right
17  now, do you think one of them says -- comes with an
18  original manufacturer's warranty on the listing?
19      A.  I don't know.  I'd have to check and see.
20      Q.  You can't tell me if one of them does?
21      MS. BLACK:  Objection to form.
22      MR. RANSON:  What's wrong with the question?
23      MS. BLACK:  Because you're arguing with the
24  witness, and in addition, have you shown the
25  witness what the manufacturer's warranty is in this

Page 79

1  case?
2      MR. RANSON:  No.
3  BY MR. RANSON:
4      Q.  I'm asking if the product came with the
5  manufacturer's warranty in the listing.
6      A.  I've already answered.  I said no.
7      Q.  Okay, thank you.  That was it.
8      MR. RANSON:  What are we on, 6 or 7?
9      MR. GOODMAN:  Seven.
10      MR. RANSON:  Seven.  Okay.
11      (The testimony on pages 79 through 87, line 7 was
12  marked confidential, excerpted and bound separately.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
81–84

Page 81
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 82
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 84
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 85

Page 87

1
2
3
4
5
6
7
8       THE VIDEOGRAPHER:  We are back on the record.
9    The time is 11:37.
10  BY MR. RANSON:
11      Q.  Okay, sir.  I wanted to follow up on something
12  you mentioned earlier, which was the 60 warehouse
13  employees that work in the Q-Med/Solu-Med warehouse
14  facility.  Okay?
15       How many of those employees work for Solu-Med
16  and how many work for Q-Med?
17      A.  Okay.  At one -- at its peak, prior to being
18  delisted, Solu-Med had probably ten folks working in the
19  warehouse, primarily working for Solu-Med, and we're
20  down to about three now and Q-Med would have the
21  balance.
22      Q.  Okay.  And are those employees paid hourly, or
23  are they paid a salary?  How are they paid?
24      A.  All warehouse employees are paid an hourly
25  wage and have bonuses based on accuracy and K.P.I.

Page 86

Page 88

1  metrics, key performance metrics, so they're capable of
2  earning a bonus based on shipping accuracy and other,
3  you know, key performance indicators that we measure.
4      Q.  And do those employees also receive overtime?
5      A.  Yes.
6      Q.  Okay.  I'm going to switch gears a little bit.
7  We were on the topic of authenticity before we took a
8  break.
9       We can go off the record for one second.
10      THE VIDEOGRAPHER:  We're off the record.
11      (Thereupon, a recess was taken.)
12      THE VIDEOGRAPHER:  Back on the record.
13  BY MR. RANSON:
14      Q.  Okay.  Before we took the -- last break,
15  we were discussing authenticity and quality.  We were
16  discussing some Condition Guidelines by Amazon.  And now
17  I want to show you what I think I mentioned to you
18  earlier, which is the Best Practices in Product
19  Authenticity and Quality, and this is also what -- if
20  someone would have completed the Seller University
21  Training what they would have been made aware of.
22      MR. GOODMAN:  Is this 9 or --
23      MR. RANSON:  I can't keep track.
24      MS. BLACK:  It is 9.
25      MR. RANSON:  Yeah, it's 9.  I won't say



Page 89

1    anything else.
2         (Defendant's Exhibit Number 9 was marked for
3    identification.)
4    BY MR. RANSON:
5         Q.   Okay.  So this manual, this Best Practices in
6    Product Authenticity and Quality basically lays out how
7    you can comply with all of Amazon's guidelines and not
8    be in violation of counterfeit, of intellectual property
9    violations, and authenticity violations.
10        If you look at the second page, do you see the
11   second bullet point?  Do you see that, sir?
12        A.   Yes.
13        Q.   Okay.  And you would agree with me that that
14   says that you must verify the authenticity of the
15   products you source.  Correct?
16        A.   Yes.
17        Q.   Okay.  And if you look at the third page, when
18   it says Listing the Products, do you see the third
19   bullet point now?
20        A.   Yes.
21        Q.   Can you read that for me?
22        A.   "Clearly state whether your products
23        are new or used, and list your products under
24        the most appropriate Amazon category.  Provide a
25        detail and accurate information about the

Page 90

1    product you are selling."
2         Q.   Okay.  And you would agree that new or -- and
3    also the word "used" is in bold.  Correct?
4         A.   Yes.
5         Q.   Okay.  All right.
6         So other than the alleged complaint by
7    Youngblood against your store, has your store ever been
8    reported or shut down on Amazon?
9         A.   I think you're asking two questions, reported
10   or shut down.  The answer to shut down --
11        Q.   Let me -- you're right -- let me -- let me --
12   strike that question, please.  Okay.
13        Has your store ever been shut down on Amazon
14   other than the Youngblood instance in this lawsuit?
15   Strike that.  That was a terrible question.
16        Other than the time your store was shut down
17   due to the alleged Youngblood complaint, has your store
18   ever been shut down on Amazon?
19        A.   No.
20        Q.   Never?
21        A.   Never.
22        Q.   Okay.
23        MR. RANSON:  Is this 10?
24        (Defendant's Exhibit Number 10 was marked for
25   identification.)

Page 91

1    BY MR. RANSON:
2         Q.   Okay.  This document was produced to me by
3    Amazon and it says, Current Selling Status of
4    ABABPETWJQTSG.
5         Is that -- is that something to do with your
6    store?  I'm confused what that means.
7         A.   I -- I couldn't say.
8         Q.   Is that maybe an abbreviation for your store?
9    You -- you might have been able to tell me.
10        Anyway, this was in response to the time
11   periods that your store was suspended or prohibited.
12   Okay?
13        Now, I understand on 11/13 the store was
14   suspended due to the alleged complaint from Youngblood.
15   Would you agree with me there?  On 11/13/2017.
16        A.   Yes.
17        Q.   Okay.  So on 7/1/2018, it says your store was
18   suspended and then you were reinstated a day later.
19        Do you -- do you remember that?
20        A.   I do not.
21        Q.   Okay.  Do you want to change your answer a
22   minute ago when I asked you if your store has ever been
23   suspended or shut down on Amazon other than on
24   11/13/2018?
25        A.   I'd want to make sure that you're representing

Page 92

1    that this is our store.
2         Q.   Well, I don't want -- I'm representing to you
3    that Amazon gave me this in response and also provided
4    to your attorney when Amazon produced these documents
5    that shows this -- this is for your store.
6         A.   So you're representing that this is --
7         Q.   Absolutely, representing that this is your
8    store.
9         A.   Okay.
10        Q.   So you're not aware of a 7/1 suspension for
11   Performance-LSR?
12        A.   I am not.
13        Q.   Okay.  Do you know what Performance-LSR means?
14        A.   I do not.
15        Q.   Okay.  It means late shipment rate.  So I
16   assume, and you can tell -- correct me if I'm wrong,
17   that your store was shut down for having a late shipment
18   rate.  Were you not aware of that?
19        A.   I was not.
20        Q.   Okay.  And then on 12/20/2018 your store was
21   blocked for infringement and you were reinstated
22   1/14/2019.  I would assume that's in regard to this --
23   to the Youngblood complaint.  Would you agree?
24        A.   We were -- I agree that on 11/13 we were shut
25   down for the Youngblood complaint and that we were



Page 93

1 reinstated on or about January 14th.

2    Q.  Yeah.  That's why I'm confused, because why
3 does it say on 12/20/2018 your store was blocked?

4       MS. BLACK:  Objection.  This is my problem,
5 you're asking him to interpret an Amazon document,
6 so whatever he says --

7       MR. RANSON:  Well, he runs the -- he -- I
8 don't want to get into an argument with you, but he
9 runs the store so I'm just -- I mean, if he's not
10 aware of when his store was shut down or suspended
11 or blocked, that's fine.

12       MS. BLACK:  But he can't testify to the
13 accuracy of this document or it's only attesting
14 this isn't -- as, you know --

15       MR. RANSON:  We can take that up with Amazon
16 or you can tell me that these dates aren't -- this
17 isn't true, that this didn't happen.

18       MS. BLACK:  I'm just saying he has no way of
19 knowing that.  So he can testify as to what he
20 thinks --

21       MR. RANSON:  To his knowledge.  Sure.

22       MS. BLACK:  -- but it's not -- it's hearsay
23 and it's not going to --

24       MR. RANSON:  Okay, thank you.

25       MR. GOODMAN:  I believe he did testify that

Page 94

1    11/13 through 12/20 is the same cause which is
2 infringement and then the restoration was
3 January 14th so it refers to the complaint.

4       MR. RANSON:  Thank you.  Okay.

5 BY MR. RANSON:

6    Q.  And then you see on 2/14/2019?

7    A.  Yes.

8    Q.  It says, Block MFN.  Are you aware of this?

9    A.  No.

10    Q.  Okay.  So I'll ask you again:  Are you aware
11 of any other time, other than the report by Youngblood,
12 where your store was shut down?

13    A.  I was not aware of any other shutdowns of the
14 store.

15    Q.  Okay.  Okay.  Also, I meant to ask you this
16 earlier:  When you said process the returns from the
17 Q-Med storage facility, are you a hundred percent sure
18 that the Solu-Med employees processed those returns or
19 could there be a chance that a Q-Med employee processed
20 that return?

21    A.  In our warehouse we have a segmented area for
22 Solu-Med.  All returns come to that area to be processed
23 and returned.

24    Q.  Sure.  I understand they come to that area,
25 but would a Q-Med employee possibly on that day be the

Page 95

1 one that processed that return?

2    A.  Very unlikely.

3    Q.  But it is possible?

4    A.  Anything is possible.

5    Q.  Well, I mean, if it's -- is it -- you told me
6 earlier that some of the Q-Med employees work for
7 Solu-Med some days of the week, some days they're
8 working for Q-Med.  Is that correct?

9    A.  What I said was that during peak shipping
10 seasons or peak shipping times, sometimes folks will
11 come over to support the Solu-Med team to make sure that
12 we get shipments out on time.

13    Q.  Okay.  So on a peak --

14    A.  That would be outbound shipments, not returns
15 or inbound shipments.

16    Q.  So you're a hundred percent sure that all the
17 returns are handled by Solu-Med only?

18    A.  As reasonably -- a hundred -- yes.

19    Q.  Okay.  I want to go through the Complaint with
20 you a little bit, which I have here.  I think.  Oh,
21 right here.  I would like to represent that this
22 Complaint is the original Complaint.

23       Is there anything different in this
24 Complaint -- I'm asking you guys.  Is there anything
25 different in the Complaint other than the title Argo

Page 96

1 Holdings?

2       MR. GOODMAN:  No.

3       MR. RANSON:  Okay.  All right.  Is this fine
4 if I use this as an exhibit, or do you want me to
5 print out one that says Solu-Med?

6       MR. GOODMAN:  No.

7       MR. RANSON:  Okay.

8       MR. GOODMAN:  Other than the change in the
9 caption and the --

10       MR. RANSON:  Right.

11       MR. GOODMAN:  -- the removal of Argo, it's the
12 same.

13       MR. RANSON:  Everything else is the same?

14       MR. GOODMAN:  Yeah.

15       MR. RANSON:  Okay, all right.

16       (Defendant's Exhibit Number 11 was marked for
17 identification.)

18 BY MR. RANSON:

19    Q.  So let's run through what happened.  Okay?
20 Okay.

21       So you acquired Youngblood products.  You
22 listed them for sale.  On or about November 13th, you
23 received a notification from Amazon that your store was
24 in violation of a counterfeit policy.  Is that correct?

25    A.  What I recall is that our store -- our store



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
97–100

Page 97

1  was shut down, assuming that we received some sort of
2  notification from Amazon.
3      Q.  But you're not aware when that notification --
4  you don't remember ever receiving that correspondence
5  or --
6      A.  Kellon notified me that the store had been
7  shut down due to a counterfeit allegation.
8      Q.  Okay.  Well, it says in the Complaint
9  November 11th and the 13th.  Right?  That's on page
10  four.  Do you see where it says that?
11      A.  Yes.
12      Q.  Okay.  Did -- were you notified that -- that
13  Youngblood reported you for any products other than
14  Youngblood products as being counterfeit?
15          MR. GOODMAN:  Would you rephrase that
16  question?
17          MR. RANSON:  Sure.
18  BY MR. RANSON:
19      Q.  Are you aware -- let me ask it this way:
20  What -- what brand of products were reported as being
21  counterfeit?
22      A.  I believe it was Youngblood products.
23      Q.  Okay.  Any other brands?
24      A.  Not that I'm aware of.
25          MR. RANSON:  Okay.  Just to verify, I just

Page 98

1  want to enter this as Composite Exhibit 14 -- 15 --
2  12.
3          (Defendant's Exhibit Number 12 was marked for
4  identification.)
5  BY MR. RANSON:
6      Q.  So on this page, this is a list of all the
7  items that were reported as being counterfeit to Amazon.
8  And I've actually -- I drafted this, which is a nice
9  chart.  It basically goes through each item as it is
10  shown on this fairly confusing rights infringement
11  e-mail to you or notification.  Okay?
12          MR. GOODMAN:  I believe that refers to
13  everything that was on the platform.
14          MS. BLACK:  Can we go off the record one
15  second?
16          MR. RANSON:  Sure.
17          MS. BLACK:  This document --
18          THE VIDEOGRAPHER:  Just a moment.  Off the
19  record.
20          (Discussion held off the record.)
21          THE VIDEOGRAPHER:  We are back on the record.
22          MS. BLACK:  Counsel just showed us Exhibit
23  marked as 15.  It's the --
24          THE WITNESS:  Twelve.
25          MR. RANSON:  Twelve.

Page 99

1          MS. BLACK:  Twelve?  Oh.  Exhibit marked as
2  12.  It's our contention that this exhibit was not
3  produced to us before in discovery and we're just
4  having an objection to any documents that we
5  haven't had the opportunity to see before today's
6  corporate rep deposition.
7          MR. RANSON:  Okay.  And I'll represent that
8  this was produced to plaintiff's counsel, and we'll
9  take that issue up at a later time.
10          MR. GOODMAN:  And the report date is
11  11/12/2018.  And we have produced for you a letter
12  from -- an e-mail communication of November 11
13  providing the delisting of the products, which you
14  have.  I think it's an exhibit on the Complaint.
15          MR. RANSON:  Okay.  Thank you.  All right.
16          MR. GOODMAN:  And this is the listing of all
17  the Youngblood products, the different S.K.U.s.
18          MR. RANSON:  This is what Amazon removed
19  from --
20          MR. GOODMAN:  Yeah, I know.  They removed
21  initially all the S.K.U.s.  You're correct.
22          MR. RANSON:  Sure.  Yes.  I just want to be
23  clear.
24          MR. GOODMAN:  From Youngblood.
25          MR. RANSON:  Yes, sir.  All right.  Thank you.

Page 100

1  BY MR. RANSON:
2      Q.  So I just want to be clear, and my question to
3  you is:  That no other products were removed other than
4  the Youngblood products on 11/12/2018 -- strike that.
5          No other products were reported as counterfeit
6  other than the Youngblood products?
7      A.  Okay.  So no other products other than
8  Youngblood were referred to as counterfeit?
9      Q.  Uh-huh.  Correct.  Is that correct?
10      A.  You -- you're the one telling me that.
11      Q.  I'm asking you.
12      A.  I don't know.
13      Q.  You don't know, so you don't know if
14  Youngblood maybe reported your L'Oreal products as
15  counterfeit or --
16      A.  I -- I have no knowledge of the Youngblood
17  complaint.  I don't have a copy of their complaint to
18  Amazon.
19      Q.  Your counsel didn't provide you with a copy of
20  the complaint?
21      A.  I haven't seen the Youngblood specific
22  complaint.
23      Q.  Oh.  Well, your counsel has it so I think
24  maybe he can show that to you.  Okay.
25          Well, would you agree with me that it says the



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
101–104

Page 101

1  only products that were removed, based on the
2  information that this brand protection e-mail address
3  provided, were the Youngblood products, which is on this
4  nice list here?
5       MR. GOODMAN:  Can we go off the record for a
6  minute?
7       MR. RANSON:  Sure.
8       THE VIDEOGRAPHER:  One moment, please.  Off
9  the record.
10      (Discussion held off the record.)
11      THE VIDEOGRAPHER:  We are back on the record.
12  BY MR. RANSON:
13   Q.  So, sir, are you aware of any other products
14  that were complained of by Youngblood besides Youngblood
15  products when your store was shut down?
16   A.  No.
17   Q.  Okay.  Thank you.  All right.
18      So on 11/13, you received notification from
19  Amazon that your store was shut down.
20      Are you aware of that?
21   A.  Yes.
22   Q.  Okay.  And you said your store has never been
23  shut down before.  Correct?
24   A.  I was not aware of any other shutdowns --
25   Q.  Okay.

Page 102

1   A.  -- for counterfeit claims.
2   Q.  What about complaints?
3   A.  Complaints, yes.
4   Q.  Okay.  So how many complaints do you think you
5  had before your store was shut down?
6   A.  You're asking me to speculate.
7   Q.  Do you know?
8   A.  I -- I don't know.
9   Q.  Okay.  I'll just give it in relation to this.
10   A.  Are you talking about customer complaints or
11  are you talking about brand complaints?
12   Q.  I'm talking about complaints, trademark
13  infringement complaints, counterfeit complaints,
14  authenticity complaints.
15   A.  Okay.
16      MR. RANSON:  All right.  So we don't have
17  three copies of this, but I'm just going to show --
18  I can get them printed, but these are what you guys
19  produced to us, which is the -- and I just made
20  this little list of the dates, which I think you
21  provided to me in the -- yeah.  So I can do it that
22  way, if that's easier.
23      MS. BLACK:  Do you need these?  Is that what
24  you're saying?
25      MR. RANSON:  I was just going to ask him

Page 103

1  about -- I'm sure he would like to review --
2       MS. BLACK:  No, he --
3       MR. GOODMAN:  No.
4       MS. BLACK:  -- needs to give them to the
5  witness because he doesn't have extra copies.
6       MR. RANSON:  Yeah, sorry.
7       MS. BLACK:  They were Bates stamped --
8       MR. RANSON:  Yes.
9       THE COURT REPORTER:  I'm sorry, could you
10  speak up a little bit when you're talking.  I'm
11  having a hard time hearing.
12      MS. BLACK:  Of course.
13      THE COURT REPORTER:  Thank you.
14      MR. GOODMAN:  Here, this is yours.
15      MR. RANSON:  Yes, sir.  Thank you.  Sorry I
16  didn't bring more copies.
17  BY MR. RANSON:
18   Q.  Okay, sir.  I'm going to -- I'm going to give
19  you what is Plaintiffs marked Bates stamp PL00187
20  through PL00229.  And I've done you a favor and made a
21  nice little chart here of each of these complaints.
22      (Defendant's Exhibit Number 13 was marked for
23  identification.)
24  BY MR. RANSON:
25   Q.  Take -- take a second to review those.

Page 104

1       You're aware of those complaints during that
2  time?
3   A.  Yes.
4   Q.  Okay.  Okay.
5       So you would agree that there was a complaint
6  on, let's see, 1/27/2018?  Let me read that one second.
7       Okay, sir, I'll -- I'll just do this.  It's a
8  lot easier.  I'll represent to you that from the
9  documents you produced, that are Bates stamp PL00187
10  through PL00229, that you had seven complaints on Amazon
11  before this Youngblood complaint.
12      MR. GOODMAN:  That's prior to November 11th of
13  2018?
14      MR. RANSON:  Yes, sir.
15      MR. GOODMAN:  Yep.
16      THE WITNESS:  Well, some of these dates are
17  2019.
18  BY MR. RANSON:
19   Q.  That's why I only said seven.
20   A.  Okay.
21      MR. GOODMAN:  He's only referring to seven of
22  them.
23      THE WITNESS:  Okay.
24  BY MR. RANSON:
25   Q.  So, as you told me -- and I'm not trying



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
105–108

Page 105

1  to argue with you about when -- when your store was shut
2  down or not shut down, but there were seven complaints
3  that was filed against you on Amazon where your store
4  was not shut down or suspended.  Correct?
5      A.  Yes.
6      Q.  Okay.  And then for this specific instance
7  your store was shut down.  Correct?
8      A.  Yes.
9      Q.  Do you know why?
10     A.  I believe because it was made as a counterfeit
11 claim.
12     Q.  And -- and why would that matter?
13         MR. GOODMAN:  Objection as to form.  You're
14     asking him what Amazon's thinking process was in
15     taking it down.
16         THE WITNESS:  Go ahead, restate your question.
17 BY MR. RANSON:
18     Q.  You said you thought your store was taken down
19 because of the counterfeit claim.  Right?  Correct?  But
20 you had other -- as you can see in front of you, some of
21 the seven complaints before this time that your store
22 was shut down included counterfeit complaints where your
23 store was not shut down.  Correct?
24     A.  Correct.
25     Q.  Okay.  So why do you think this time your

Page 106

1  store was shut down?
2      A.  I don't know.
3      Q.  Okay.  All right.
4          I just want to go through some of the exhibits
5  in the Complaint.  It's kind of a timeline.
6          MS. BLACK:  You're talking about the lawsuit?
7          MR. RANSON:  Yeah, the Complaint that was
8      filed.
9          THE WITNESS:  Yeah.
10 BY MR. RANSON:
11     Q.  Okay.  So on 11/13 -- and this is in the --
12 this is actually Plaintiff's -- I'm not entering this as
13 an exhibit.  I'm just reading this to you.  This is a
14 Plaintiff's Bates stamp PL0048 and it says on 11/13,
15         "Reactivate your account.  Next step,
16     please provide us -- I'm sorry, fulfill any open
17     orders to ensure customers receive their items
18     to -- to avoid future impact to your account.
19     The actions you have taken resolved the issues.
20     We have removed all listings for the Youngblood
21     product line.  Deleted are sales offerings to
22     ensure that we don't infringe --"
23 I'm sorry, strike everything that I just said.
24     A.  Yeah.
25     Q.  This is your Plan of Action on 11/13 that you

Page 107

1  provided to -- to Amazon.  Okay?  And this is what you
2  said you're -- you were going to do.  You are going to
3  take down all Youngblood products from your store.
4  Correct?
5      A.  Yes.
6      Q.  Okay.  You have deleted all your sales
7  offerings to ensure that they don't infringe on anyone's
8  intellectual property or Youngblood cosmetics.  Correct?
9          I'll show you.  If you want, I can make a --
10 we can go off the record -- I can make a quick copy.
11 This is your Plan of Action.
12         Can you just read the Plan of Action?  That
13 might be easier -- one, two, and three.
14     A.  "Your submission, the root cause of
15     the issues:  We have offerings of the brand
16     Youngblood cosmetics with listings which the
17     intellectual property holder felt infringed on
18     their intellectual property rights.  The actions
19     you have taken to resolve the issue:  We have
20     removed all listings for -- for Youngblood
21     product line and deleted our sales offerings to
22     ensure that we don't infringe on any
23     intellectual property of Youngblood cosmetics.
24     Three, the steps you have taken to prevent these
25     issues going forward:  We will review our

Page 108

1      product offerings to ensure compliance with
2      Amazon terms and conditions."
3      Q.  Thank you.  So you would agree that you took
4  down the Youngblood products so you would be in
5  compliance with Amazon's terms of service related to
6  intellectual property.  Correct?  And removed any
7  offerings that weren't in compliance.  Correct?
8      A.  Yes.
9      Q.  Okay.  And just -- just a quick question.
10 When you were reinstated, which was in January --
11 January 14th, correct, of 2019 -- did you sell
12 Youngblood products anymore?
13     A.  We never sold Youngblood products after 11/13.
14     Q.  Why not?
15     A.  Because, first off, Youngblood had already
16 filed to become brand registered --
17     Q.  Uh-huh.
18     A.  -- and had Youngblood contacted us, we would
19 have said, We have only about $10,000 worth of inventory
20 left and we're not going to continue to sell the
21 Youngblood products because they were -- had struck a
22 deal with Amazon.
23     Q.  Do you know when Youngblood became brand
24 registered?
25     A.  I don't know the exact date, no.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
109–112

Page 109

1    Q.  Okay.  So you submitted your Plan of Action
2  which was on 11/13, but then your attorney sends an
3  e-mail on November 26th -- and this is Bates stamp
4  PL00045 -- to my client stating,
5       "Amazon, consistent with their policies,
6    has delisted all of Solu-Med's products."
7       Do you know -- do you have any idea what that
8  means, "consistent with their policies," which policies
9  that's in reference to?
10    A.  I don't.
11    Q.  Me neither.
12       Then there's a demand,
13       "Demand is made that Youngblood immediately
14    communicate in writing to Amazon and copy us,
15    advising that the statement made as to the lack
16    of authenticity of the product is a complete
17    fabrication."
18  And this was on November 26th.
19       Are you aware of this -- this letter?
20    A.  Yes.
21    Q.  I believe you're copied.
22    A.  Yes.
23    Q.  Okay.  So that's November 26th.
24       So three days later we have an e-mail from
25  brandprotection@ybskin.com, and this is PL00044.  It

Page 110

1  says,
2       "Hello, we've agreed to file a retraction
3    with Amazon.  Please provide me with the
4    following information so we can submit it to
5    Amazon."
6       Then it asks for the Amazon store name, the
7  Amazon store e-mail, the merchant I.D. and the complaint
8  I.D.  Are you aware of that e-mail?
9    A.  Yes.
10    Q.  Okay.  Then on November 30th, which is the
11  very next day, Mr. Goodman said,
12       "Please send retraction upon receipt of
13    this e-mail and copy me at Goodman and
14    Sapersein -- Saperstein.
15       MR. GOODMAN:  Saperstein.
16       MR. RANSON:  Saperstein, sorry.
17  BY MR. RANSON:
18    Q.  Okay.  So that was the next day.  Right?  Are
19  you aware of that e-mail?
20    A.  Yes.
21    Q.  Okay.  Then that was on a Thursday.  On
22  Tuesday, which was three business days later -- you
23  agree with me there?  Do you agree with me that Tuesday
24  is three business days later from Thursday?
25    A.  Yes.

Page 111

1    Q.  Okay.  Young -- the e-mail
2  brandprotection@ybskin.com says,
3       "Hello, Amazon.  Please withdraw complaint
4    I.D. number," the I.D. number, "We resolved our
5    complaint with the seller Life & Health Source,"
6  gives the merchant I.D. which is, for the record,
7  ABABETWJQTSG, which I believe matches that Excel
8  spreadsheet that I gave you and says,
9       "Thank you to Youngblood."
10  So this is on December the 4th.  Are you aware of that?
11    A.  Yes.
12    Q.  Okay.  On the same day, on December 4th, their
13  e-mail sent to Mr. Saperstein --
14       MR. GOODMAN:  Saperstein.
15  BY MR. RANSON:
16    Q.  It says,
17       "A retraction has been filed with Amazon.
18    Please review the attached."
19  Are you aware of that e-mail?
20    A.  Yes.
21    Q.  Okay.  That was on December the 4th.  On
22  December the 6th, two days later, after the retraction,
23  Mr. Saperstein --
24       MR. GOODMAN:  This is a withdrawal.  You're
25  misstating.

Page 112

1       MR. RANSON:  What's that?
2       MR. GOODMAN:  It says we -- please withdraw
3    the complaint.  You said there was a retraction.  I
4    think you misspoke.
5       MR. RANSON:  Okay.  Well, just to be clear,
6    the document on December 4th, that was a -- that
7    was withdrawing the complaint on Amazon.  It said,
8       "Please withdraw complaint I.D. number
9    5518323151 as we have resolved our complaint
10    with the seller, Life & Health Source, merchant
11    I.D. ABABPETWJQTSG."
12       MR. GOODMAN:  Okay.
13       MR. RANSON:  Okay?  All right.
14       MR. GOODMAN:  Now we're right.
15  BY MR. RANSON:
16    Q.  All right.  So they sent that to Amazon.  You
17  said you were aware of that e-mail.  Correct?
18    A.  Yes.
19    Q.  All right.  Then they forwarded a copy to
20  Mr. Saperstein.  You're aware of that e-mail --
21    A.  Yes.
22    Q.  -- on the following -- on the same day.  Two
23  days later, so it must have been Thursday,
24  Mr. Saperstein sends another e-mail to
25  brandprotection@ybskin.com.  In that e-mail it says,



Page 113

1       "The communication of December 4th by
2   Youngblood to Amazon does not constitute a
3   retraction, nor was there any resolution of the
4   baseless statements Youngblood made to Amazon."
5       Do you know why that does not constitute a
6   retraction?
7    A.  Because, basically, it did not retract the
8   statement of product being counterfeit.
9    Q.  So when you were asking for a retraction, you
10  wanted them to say their products are not counterfeit?
11   A.  Correct.
12   Q.  Okay.  Then it says,
13      "Although Amazon has received your
14   December 4th e-mails, it has not yet restored
15   our client's status as a online retailer.  We
16   have no information that would indicate when our
17   client's status will be restored."
18  So the retrac -- what I'm calling the retraction, the --
19      MR. GOODMAN:  Withdrawal.
20  BY MR. RANSOM:
21   Q.  -- withdrawal of the complaint that was sent
22  to Amazon on December the 4th, okay, your -- you two
23  days later are now unsatisfied that your store has not
24  been reinstated.  Correct?
25   A.  Correct.

Page 114

1    Q.  How long do you think it takes to get
2   reinstated on Amazon?
3      MR. GOODMAN:  Objection as to form.
4      MR. RANSOM:  Sure.
5      THE WITNESS:  I -- I don't know.
6   BY MR. RANSOM:
7    Q.  Okay.  Do you think it takes two days?
8      MR. GOODMAN:  Objection.
9      THE WITNESS:  I -- I wouldn't know what it
10   takes.
11  BY MR. RANSOM:
12   Q.  Okay.  You would agree, though, that from --
13  that during December it's probably Amazon's busiest time
14  of the year because it's Christmas?
15      MS. BLACK:  Objection.
16      THE WITNESS:  Yes.
17  BY MR. RANSOM:
18   Q.  You would agree that the holidays occur in
19  December?
20   A.  Yes.
21   Q.  All right.
22      MR. GOODMAN:  That, we could agree upon.
23  BY MR. RANSOM:
24   Q.  Okay.
25   A.  I think what we don't agree on is that a

Page 115

1   retraction of the complaint is -- is -- is not the same
2   as a retraction of a counterfeit claim.
3    Q.  Sure.  So did Amazon ever send you any
4   correspondence whatsoever that says the retraction that
5   was filed by Youngblood was insufficient?
6    A.  Their lack of putting us back on as a
7   storefront I think was their response.  It was
8   unsatisfactory.
9    Q.  Okay.  Let me -- let me be more specific.
10      Did Amazon ever send you any documentation
11  that said the retraction filed by Youngblood was
12  insufficient?
13   A.  I'm not aware.
14   Q.  Did -- did Amazon ever send you any
15  correspondence or documentation that said that the
16  retraction was inadequate?
17      MR. GOODMAN:  That the withdrawal --
18      MR. RANSON:  What?
19      MR. GOODMAN:  You said retraction.  I thought
20  we were talking about the withdrawal of the
21  complaint was not satisfactory.
22      MR. RANSON:  We call it a retraction.
23      MR. GOODMAN:  You're calling --
24      MR. RANSON:  I'm calling it a retraction.
25      MR. GOODMAN:  Okay.

Page 116

1      MR. RANSON:  All right?
2      THE WITNESS:  Okay.  Restate the question.
3   BY MR. RANSON:
4    Q.  Sure.  Yeah, it's pretty simple.
5      Did Amazon ever notify you that the retraction
6   or the withdrawal by Youngblood was insufficient?
7    A.  Yes.
8    Q.  And what -- do you have a documentation?  Do
9   you have an e-mail?  What do you have that shows that?
10   A.  What we have is that our store was not -- our
11  store was not restored.
12   Q.  Okay.  When was your store restored?
13   A.  I believe we said it was on or about
14  January 14th.
15   Q.  Okay.  So that's, roughly, 40 days after the
16  withdrawal or the retraction was sent, correct, which
17  was on December 4th?
18   A.  Roughly, yes.
19   Q.  Okay.  So because your store was not
20  reinstated from December 4th until January 14th, because
21  it took 40 days, you're telling me you assumed that the
22  retraction was inadequate.  Is that correct?
23   A.  I didn't assume.
24   Q.  Okay.  Then what?
25   A.  I'm stating that it was inadequate.



Page 117

1  Q. But you don't have any -- you don't have any
2  documentation from Amazon that it was inadequate?
3  A. I'd have to check. I don't know if we do or
4  don't.
5  Q. As you sit here today, to your knowledge, do
6  you have any documentation that the withdrawal or
7  retraction that was sent to Amazon by Youngblood was
8  inadequate?
9  A. What I recall is Kellon sent multiple action
10  plans to get the store reinstated. None of them were
11  sufficient. What Amazon -- what he stated to me was
12  that Amazon wanted a full and comprehensive retraction
13  of the counterfeit claim.
14  Q. Do you have an e-mail where Amazon says that
15  they did not receive a full retraction of the complaint
16  after December 4th?
17  A. No.
18  Q. Would Kellon have that e-mail?
19  A. I don't know.
20  Q. Okay. Did you get any letters, documentation
21  whatsoever that ever said that the retraction was
22  inadequate?
23  A. I'm not aware of that.
24  Q. Okay, thank you.
25  I want to refer you to paragraph 17 of the

Page 118

1  Complaint. Okay. It says,
2  "Not only did plaintiffs lose income from
3  the shutdown of the store during the
4  historically busiest time of the year costing
5  them hundreds of thousands of dollars, but
6  plaintiffs also lost the goodwill and analytical
7  data stored by Amazon and, essentially, had to
8  rebuild from start."
9  That's what that says. Correct?
10  A. Yes.
11  Q. Okay. I have two questions. One, which I
12  just asked you a second ago.
13  Now, would you agree that this time period was
14  historically the busiest time of the year? We're
15  talking about a time period from 11/13 to January 14th.
16  Correct?
17  A. Yes.
18  Q. And as pled in your Complaint, do you agree
19  that that time period is historically the busiest time
20  of the year?
21  A. For who?
22  Q. For -- for stores, for sellers, Amazon, for
23  you as a seller.
24  A. It's busy for us, yes. That's the only person
25  I can attest --

Page 119

1  Q. Well, it doesn't say busy for you, sir. It
2  says, "historically, the busiest time of the year."
3  A. What that refers to is that -- come on, you
4  know as well as I do that being shut down during Black
5  Friday and Cyber Monday was harmful to our business.
6  That's what I can attest to.
7  Q. And Christmas?
8  A. Yeah.
9  Q. Correct. So I'm asking you a really simple
10  question.
11  Do you agree that this time period for
12  sellers, for e-commerce sellers in the marketplace, was
13  the busiest time of the year?
14  A. Yes.
15  Q. Okay. Did you ever think that the 40 days it
16  took to get reinstated back online had anything to do
17  with the historically busiest time of the year?
18  A. No.
19  MR. GOODMAN: Objection as to form.
20  BY MR. RANSON:
21  Q. Okay. And it says it costed you hundreds of
22  thousands of dollars.
23  When you say "hundreds of thousands of
24  dollars," are you talking about hundreds of thousands of
25  dollars in profit, in revenue? What are you referring

Page 120

1  to there?
2  A. Referring to sales.
3  Q. Sales. Okay. So not profit then. Just sales
4  in general?
5  A. Not sales in general. Are -- are -- you --
6  you can see through our sales that our average sales
7  were for the first ten months of the year and then as
8  you -- as you stated during busy time of the year, we
9  were probably anticipating a significant bump in sales
10  during this time of year.
11  Q. Sir, I'm just asking what you pled in this
12  Complaint, sir.
13  A. Uh-huh.
14  Q. Okay. So when it says,
15  "Shutdown of the store during the
16  historically busiest time of the year costing
17  them hundreds of thousands of dollars --"
18  and when I say "them," I'm referring to you Solu-Med.
19  Okay.
20  A. Yes.
21  Q. I'm asking you: Are you saying costing you
22  hundreds of thousands of dollars in revenue or profit or
23  do you not know?
24  A. Of course I know.
25  Q. Okay.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE
November 20, 2019
121–124

Page 121

1    A.  It cost us hundreds of thousands of dollars in
2   sales and probably well over a hundred thousand dollars
3   in profit.
4    Q.  Okay.  I appreciate that.
5      All right.  Do you care if we take a 15-,
6   20-minute break?  And we'll finish this up.
7      MR. GOODMAN:  Okay, sure.
8      MR. RANSON:  Unless you guys want to do lunch
9   or something?
10      MS. BLACK:  Well, what do you -- how long do
11   you think --
12      MR. RANSON:  Can we go off the record, please?
13      MIDDLE ATTORNEY:  We are going off the record.
14   The time is 12:21.
15      (Thereupon, the deposition adjourned for the
16   luncheon recess at 12:21 p.m.)
17   AFTERNOON SESSION - 1:15 P.M.
18      THE VIDEOGRAPHER:  We are back on the record.
19   The time is 1:16.
20   BY MR. RANSON:
21    Q.  I just want to go over your Answers to
22   Interrogatories real quick.  I'll give you --
23      (Defendant's Exhibit Number 14 was marked for
24   identification.)
25      MR. GOODMAN:  Thank you.  You're marking this?

Page 122

1      MR. RANSON:  Please.
2      MR. GOODMAN:  What number?
3      THE COURT REPORTER:  Fourteen.
4   BY MR. RANSON:
5    Q.  And we discussed this a little bit earlier,
6   sir, but I would just like you to turn to page four.
7      You say that, in your response to the
8   question,
9      "If you contend that Youngblood by any of
10      its officers, agents, managers or supervisors
11      made any statement that might constitute an
12      omission or might be construed to be against the
13      interest of Youngblood, identify the specific
14      person that made the statement, any witnesses to
15      the statement, the date of the statement and the
16      substance of the statement."
17      And in your response in the second paragraph
18   you say,
19      "Similarly, Youngblood informed plaintiffs
20      that it agreed to file a retraction with Amazon
21      but never filed one."
22   That's reference in paragraph 16 dealing with the
23   Complaint.  Is that correct?
24    A.  Yes.
25    Q.  And is it your position here today still

Page 123

1   that -- that Youngblood never filed a retraction to
2   Amazon?
3    A.  That's correct.
4    Q.  Okay.  And I'll ask you one more time:  Do you
5   have any documentation from Amazon stating that the
6   retraction sent by Youngblood was insufficient?
7    A.  It wasn't considered a retraction.
8    Q.  Okay.  Do you have any correspondence from
9   Amazon that said the withdrawal sent by Youngblood was
10   not a retraction?
11    A.  Merely the fact that we weren't reinstated for
12   two months.
13    Q.  Well, that would be 40 days after the
14   withdrawal.  Correct?
15    A.  Correct.
16    Q.  Okay.  But you don't have anything from Amazon
17   that says their withdrawal filed by Youngblood was not
18   in effect a retraction?
19    A.  Again, the lack of responsiveness from Amazon
20   and the lack of restoring our store -- as you see,
21   they -- they restored, you, know, our store before very
22   quickly, in one day -- so the fact that they didn't
23   restore it, we took it as insufficient retraction.
24    Q.  Okay.  You said they restored our store
25   quickly, in one day.  Right?

Page 124

1    A.  Yes.
2    Q.  That's what you just said?
3    A.  Uh-huh.
4    Q.  And what was that in response to?
5    A.  You showed me a document earlier today that
6   showed that our store was closed for one day for what
7   they consider an LSR --
8    Q.  Uh-huh.
9    A.  -- which I'm not familiar with, but we're
10   going to --
11      MR. GOODMAN:  That was Exhibit 10.
12      MR. RANSON:  Uh-huh.
13   BY MR. RANSON:
14    Q.  So let me ask you this:  Have -- has your
15   store ever been shut down previously for counterfeit
16   allegations?
17    A.  No.
18    Q.  Okay.  So the -- the reference you just made
19   to "my store was shut down for one day" had nothing to
20   do with the counterfeit complaint.  Correct?
21    A.  Correct.
22    Q.  Okay.  Thank you.  This is 15.
23      (Defendant's Exhibit Number 15 was marked for
24   identification.)
25



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
125–128

Page 125

BY MR. RANSON:

Q.   And you're looking at the second set of interrogatories.  Is that correct?

A.   This is Exhibit 15?

MR. GOODMAN:  Yes.

MR. RANSON:  Yes.

THE WITNESS:  Yes.

BY MR. RANSON:

Q.   Does it say Second Set of Interrogatories at the top of the page?

A.   Yes, it does.

Q.   Okay, great.  And it says that Solu-Med's financials are completed by Joaquin Lorie.  Is that correct?

A.   That is correct.

Q.   Okay.  And explain to me how that works.  How does -- how does Joaquin Lorie complete your financials each year?

MR. GOODMAN:  I'll object to the form.

BY MR. RANSON:

Q.   Okay.

A.   Joaquin Lorie is the C.F.O. of both Solu-Med as well as Q-Med and he files, in conjunction with our C.P.A.s, our taxes, and he's a -- chief financial officer for both companies, as they both are QSUBS of

Page 126

Argo Holdings.  He's been employed with us for 13 years.  He's a C.P.A.

Q.   Okay.  And he has done all of your financials since 2014, since Solu-Med was founded?

A.   That's correct.

Q.   Okay.  So does he provide the information from Solu-Med to the accounting firm that files the consolidated tax returns?

A.   He does.

Q.   Okay.  And if you look at question number three, it says,

"Please explain with detailed specificity how Solu-Med incurred approximately 60,000 in freight and warehouse charges with Amazon as, stated in your response to interrogatory number eight."

You say,

"The 60,000 loss relating to freight and warehouse is encompassed in the $1.1 million loss discussed in the previous response and should not be separate line item of loss.  Please accept this response as supplementing interrogatory response to number eight, defendant's set of interrogatories."

So let me ask you that question again.

Page 127

Do you know how Solu-Med incurred $60,000 in freight and warehouse charges?

A.   What I -- what we said in that statement was that all the losses related to the freight and warehouse impact of lost revenue and lost profits was incorporated in the financial statements that we've provided, so it was not to be in addition to.

Q.   Sure.  Now, I understand that, but did you incur $60,000 in freight and warehouse charges?

A.   Approximately.

Q.   Okay.  Can you tell me why?

A.   I think we talked about when we were shut down for a period of two months, basically Amazon's charge -- creates charges for you for storing of product, product that's not moving, shipping merchandise for you and, basically, all the -- this was an estimate that Kellon had put together for me of the financial impact of the store being closed down for two months only, as it pertained to freight and Amazon-related charges.

Q.   Okay.  I need you to explain this to me because I'm -- I'm not in your line work so I don't understand.

So what was the $60,000 charge for?  Did you have to receive products back from Amazon?

A.   It was debits to our account.  Amazon froze

Page 128

our account on November 13th and was not reinstated until January of 2019 and these were debits to our account.

Q.   Debits to your online seller's account on Amazon?

A.   Debits to the seller, yes.

Q.   So you had $60,000 in debits --

A.   Approximately.

Q.   Approximately, $60,000 in debits to your Amazon account while your store was shut down, in freight and warehouse charges?

A.   Correct.

Q.   Okay.  And I don't have them with me and if you don't know, that's fine, but the Amazon documents you produced to me say you got an F.B.A. inventory credit of $25,000, approximately, in December.

Do you know what that was for?

A.   F.B.A. inventory credit.

Q.   Uh-huh.  Well, now we know F.B.A. means fulfillment by Amazon.  Correct?

A.   You have to show me the document you're referring to because I don't know which --

Q.   Okay.  You're not aware?

A.   I don't know what you're looking -- what you're referring to.  See, you're asking about a



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
129–132

Page 129

1  specific document that I haven't seen.
2      Q.  Okay, I'll get it for you.  All right.
3          I don't think I want to enter this as an
4  exhibit but I'll just give it to you so you can look at
5  it.  A copy for everybody.
6          So these are some of the financial statements
7  that you produced to us.  You are aware that you
8  produced these.  Correct?
9      A.  Yes.
10     Q.  Okay.  And we were able to get the general
11  ledger for 2018 and some of 2017.
12         Did you not keep a general ledger in 2017, for
13  the entire year?
14     A.  Let me see what you're looking at here.
15     Q.  Well, it's not in here, sir, because you
16  didn't produce it.  What I'm saying, this is a general
17  ledger for 2018.
18     A.  Okay.
19     Q.  Right here on the front.
20     A.  Yep.
21     Q.  I'll separate it for you, I believe.
22         So you have your tax returns in the back --
23  I'm sorry, you have your K.P.I. metrics in the back and
24  then this is your general ledger for 2018.  You have two
25  documents.  Do you see that?

Page 130

1      A.  Okay.  Yeah.
2      Q.  Okay.  So you produced me -- to me a general
3  ledger for 2018?
4      A.  Yes.
5      Q.  But your counsel indicated that you do not
6  have one for 2017.  I'm asking you --
7      A.  That is correct.
8      Q.  Okay.  And your company has been around since
9  2014.  Correct?
10     A.  Correct.
11     Q.  Okay.  So why did you not keep a general
12  ledger until the end of 2017?
13     A.  In 2014 through 2017, Solu-Med operated as
14  strictly a department within Q-Med.  It was not
15  maintained as a separate entity.
16         In 2018, we had separated out.  We wanted to
17  actually see the specific performance of the company
18  because it was growing very rapidly and we decided as of
19  1/1 -- January 2018, to start producing complete sets of
20  financials starting January of 2018.
21     Q.  So was Solu-Med incorporated in 2014?
22     A.  No.
23     Q.  When was Solu-Med incorporated?
24     A.  I believe Solu-Med was incorporated in 2009.
25     Q.  Okay.  So Solu-Med was incorporated in 2009

Page 131

1  and they were a corporation within Q-Med so both -- they
2  were a department inside of Q-Med.  Is that -- is that
3  correct, since 2009 --
4      A.  It wasn't --
5      Q.  -- up until --
6      A.  We didn't produce -- all the financial
7  transactions within Solu-Med up through 2017 were
8  incorporated within Q-Med.  And then in 2018, because we
9  had the K.P.I. metrics that we were producing at a high
10  level, but it wasn't a detailed financial income
11  statement or balance sheet, so I told our C.F.O. that I
12  wanted to, as of 1/1/2018, break it out so I could
13  really monitor the growth and the progress of the
14  organization separately, so we broke it out in 2018.
15     Q.  So until it was broke out, as you say, in
16  2018, then everything was kind of commingled together?
17     A.  Prior to 2018.
18     Q.  Okay.  And you told me yesterday that Solu-Med
19  was, roughly, five percent of Q-Med's business.  Is that
20  still correct today?
21     A.  Correct.
22     Q.  Okay.  So Solu-Med is, approximately,
23  five percent of Q-Med's business up until they broke
24  off, and now Solu-Med is Solu-Med which is a hundred
25  percent, all -- everything, financials are all under

Page 132

1  Solu-Med?  Correct?
2      A.  That's correct.
3      Q.  Okay.  So when you found out your store was
4  shut down, what actions did you take to mitigate your
5  damages?
6      A.  Well, the first thing we did was we filed an
7  action plan with Amazon and -- to -- to get the store
8  reopened, and as the days went by we started to,
9  basically, cut back on expenses.
10     Q.  And how did you cut back on expenses?
11     A.  We -- as employees -- you know, our workload
12  went from -- you can imagine we were doing as of
13  October, roughly, some $300,000 in sales and so in
14  November and December, the sales that you see here
15  listed in November and December would either be -- would
16  be other platforms other than Amazon, and the sales
17  decreased dramatically and the profits quickly turned to
18  losses.  So as folks were basically, you know, let go
19  as -- until the store was, you know, returned to
20  normalcy.
21     Q.  Okay.  Well, let's discuss that.  So the first
22  thing you did to mitigate your damages was you had to
23  let some employees go.  Correct?
24     A.  Yes.
25     Q.  Okay.  Did you reduce your costs and expenses?



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
133–136

Page 133

1  A. Yes.
2  Q. Did you reduce the amount of money you spent
3  on advertising?
4  A. Actually, we increased the amount of
5  advertising on other sales platforms in an effort to try
6  to grow our sales.
7  At the time of the shutdown on -- on Amazon,
8  Amazon was, approximately, 80 percent of our revenue.
9  Ten percent of our revenue was in the Walmart Jet
10  platform and, approximately, ten percent on eBay. So
11  with 80 percent of our revenue shut down, we started
12  doing more advertising on other platforms in an effort
13  to try to increase sales.
14  Q. Okay. And what happened to the merchandise --
15  because your entire store was shut down, not just the
16  Youngblood products, correct, for those two months?
17  A. Correct.
18  Q. So what did you do with all the merchandise?
19  Was it all in a Amazon fulfillment center? Was it in
20  the Q-Med warehouse? What happened to it?
21  A. Well, it's a mixture. Some of it was in our
22  facility at Griffin Point, which is our -- our
23  warehouse, and some of our merchandise was at Amazon
24  fulfillment centers all over the country. And not
25  knowing the extent -- you know, we first had the store

Page 134

1  shut down, we thought it might be a one- or
2  two-day event.
3  Once we realized it was a two-week event, we
4  started to take action and, ultimately, it turned out to
5  be more than a two-month event.
6  Q. Okay. So I'm -- I'm sorry. So what happened
7  to all the merchandise during those two months? That's
8  what I'm asking. Did it sit in the warehouse? Did
9  you sell it on another platform? Did you throw it away?
10  A. You're asking about the merchandise that was
11  sitting at Amazon?
12  Q. Yes, because I imagine you had -- well, yeah,
13  tell me what happened. I don't know.
14  A. Okay. So the merchandise that's sitting at
15  Amazon, after a certain period of time of it not moving,
16  Amazon begins the process of shipping it back to you at
17  your expense. And so, remember, it's -- it's a very
18  lengthy supply chain. You have merchandise that's in
19  transit going from our facility to Amazon that's on the
20  road. Then you have merchandise that has arrived at an
21  Amazon warehouse that has not been checked in by Amazon.
22  And then you have merchandise that Amazon has it in your
23  inventory and is available for sale in the store.
24  So on the day of the shutdown, all that
25  merchandise that was in transit, both over the road and

Page 135

1  in their facilities, all of that merchandise got refused
2  and sent back at our expense.
3  And we also, in addition to eating the freight
4  expense, also eat any subsequent damages or anything
5  that happens to that product getting shipped back. And
6  the merchandise that was in the Amazon centers as
7  fulfillment by Amazon over a period of time, if your
8  product isn't moving, Amazon starts to hit you with
9  slow-turning charges and fees and then, subsequently, if
10  the product doesn't ship or sell, they, basically, ship
11  it back to you at their discretion, at their expense --
12  Q. So --
13  A. -- at -- at our expense. Sorry.
14  Q. I understand.
15  A. Our expense.
16  Q. So were you able to sell any of those other
17  products on any other platforms? Did you try to take
18  some of the products you received back and sell them on
19  Walmart or eBay or anywhere else?
20  A. Sure. We tried to advertise on Walmart. We
21  tried to advertise on eBay. We spent quite a bit on
22  advertising on -- with Google. And we did shuffle
23  product from other -- you know, that we received back
24  that was in good sellable condition to other platforms.
25  Q. Okay. And I'm not asking you about

Page 136

1  advertising.
2  When you received the products back -- you
3  said Amazon ships the products back to you. Correct?
4  A. Yes.
5  Q. Okay. Did you wait to be reinstated on Amazon
6  and put those products back on Amazon or did you try to
7  sell them during that two-month period on other
8  platforms or both?
9  A. I would both.
10  Q. Okay.
11  THE VIDEOGRAPHER: Excuse me. We need to go
12  off the record.
13  (Discussion held off the record.)
14  THE VIDEOGRAPHER: Okay. We are back on the
15  record.
16  BY MR. RANSON:
17  Q. Okay. So we were discussing mitigating
18  damages, what you did with the products, what you did
19  with Solu-Med store while the store was shut down.
20  You said that you had to lay some people off
21  during the shutdown. That's correct?
22  A. Yes, we reduced head count.
23  Q. Okay. Did payroll reflect that?
24  A. Not immediately because in some cases we gave
25  people severance pays.



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
137–140

Page 137

1    Q.  I see.  Okay.  All right.
2        I'm going to ask you some questions about the
3    documents I gave you.  It starts on PL000308.
4        Do you see that?
5    A.  Yes.
6    Q.  Yeah, so I'm going -- I'm actually going to
7    turn to 000328.
8        MR. GOODMAN:  328?
9        MR. RANSON:  Yes, sir.
10       MS. BLACK:  One thing we didn't do, any
11   documents that are marked confidential, we would
12   like to maintain that designation.
13       MR. RANSON:  I -- I didn't enter in this
14   exhibit.
15       MS. BLACK:  It's not an exhibit.  Okay?
16   Relevant to financial actual numbers and
17   discussions on the record about confidential
18   documents, we're probably going to designate that
19   portion --
20       MR. RANSON:  That's fine.
21       MS. BLACK:  -- of the testimony --
22       MR. RANSON:  Yeah.
23       MS. BLACK:  -- as confidential.
24       MR. RANSON:  That's what I was going to say,
25   agreed.  All right.  Yeah.  So the rest of this

Page 138

1    testimony probably will be confidential until I
2    tell you otherwise.
3        MR. GOODMAN:  Some will be changed.
4        MS. BLACK:  Thanks, Ryan.
5        MR. RANSON:  Yep.
6    (The testimony on pages 138 through 150, line 4 was
7    marked confidential, excerpted, and bound separately.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

Page 140



MANUEL E. AGUERO  Non-Confidential
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

November 20, 2019
141–144

Page 141

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 143

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 142

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 145
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 147
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 146
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 149

Page 150

1     Q.   Okay.  Are you aware of Amazon's drop shipping
2   policy?
3
4     A.   Drop shipping policy?
5     Q.   Yes.  Have you ever seen that before or heard
6   of that before?
7     A.   I'm not familiar with what it is.
8     Q.   Okay, I'll show you.
9         (Defendant's Exhibit Number 16 was marked for
10   identification.)
11   BY MR. RANSON:
12     Q.   So Amazon's Drop Shipping Policy, if you'll
13   look to the fourth one down, can you read that for me?
14     A.   "Be responsible for accepting and
15   processing customer returns of your products."
16     Q.   Right.  And if you read at the very top,
17   it's -- it's basically the Drop Shipping Policy in
18   reference to third parties.
19         You would agree, though, that Solu-Med is
20   responsible for accepting and processing customer
21   returns.  Correct?
22     A.   Yes.


Page 151

1     Q.   Okay.  Do you see examples of drop shipping
2   that is not permitted?  Do you see that?
3     A.   Where are you pointing to?
4     Q.   It says,
5         "Examples of drop shipping that is not
6   permitted."
7   Do you see that?
8     A.   "Examples of drop shipping that is
9     not permitted.  Purchasing products from another
10     online retailer and having the retailer ship
11     directly to customers."
12     Q.   Okay.  My question is:  Do you guys ever
13   purchase products from other retailers and have them
14   ship them to the customers or do you always possess your
15   products?
16     A.   We always possess our products.
17     Q.   So Q-Med, for example, wouldn't be sending
18   products from Q-Med that were purchased through
19   Solu-Med's Life & Health Source?
20     A.   No.
21     Q.   You're positive?
22     A.   State the question again.
23     Q.   Q-Med would not ship a product that was
24   purchased by Solu-Med -- strike that.
25         Q-Med would not ship a product that was

Page 152

1   purchased from Life & Health Source under Solu-Med.
2   Correct?
3     A.   Q-Med would not purchase a product that was --
4     Q.   Q-Med would not ship a product.  So I
5   purchase -- let me give you a example.
6         I purchase L'Oreal eye cream from Life &
7   Health Source under Solu-Med.  Correct?  Okay, follow
8   me?
9         Would Q-Med send that shipment or would
10   Solu-Med?  Would Q -- would there ever be an instance
11   where Q-Med would be the corporation sending that?
12     A.   No.
13     Q.   Okay.  All right.  Thank you.
14         All right.  Back to, sorry, PL000340.  And we
15   were discussing the rent expense, and you were
16   explaining that that was for a third party to,
17   basically, collect the returns and then bring them to
18   Solu-Med.  Is that correct?
19     A.   It was a courier service.  Yes.
20     Q.   A courier service.  Okay.
21         It was not rent for Solu-Med's section of
22   Q-Med's warehouse then?
23     A.   No.
24     Q.   Okay.  Does Solu-Med pay any rent to Q-Med for
25   the warehouse?



Page 153

1    A.  No.

2    Q.  So they use it, basically, free of charge?

3    A.  Correct.

4         MR. RANSON:  Okay.  Can we just take like a

5    five-minute break and I will just see if I have

6    anything else.

7         MR. GOODMAN:  Okay, sure.

8         MR. RANSON:  I don't think I do.

9         THE VIDEOGRAPHER:  Off the record.  The time

10   is 2:00 p.m.

11        (Thereupon, a recess was taken.)

12        THE VIDEOGRAPHER:  We are back on the record.

13   The time is 2:03.

14        THE WITNESS:  Oh.

15        MR. RANSON:  I have no further questions.

16        MR. GOODMAN:  One moment.  No further

17   questions.  Thank you.

18        MR. RANSON:  All right.  Thank you, guys.

19        THE VIDEOGRAPHER:  Going off the record.  The

20   time is 2:03.

21        (The following discussion was held off the

22   video record.)

23        THE COURT REPORTER:  Read or waive?

24        MR. RANSON:  We'll waive it.  It's video.

25        MS. BLACK:  We'll read but -- yeah.

Page 154

1         THE VIDEOGRAPHER:  Are you ordering?

2         MR. RANSON:  Please, yes.  Yes.  How long will

3    that take?

4         THE COURT REPORTER:  Ten business days.

5         MR. RANSON:  Can you expedite it?

6         THE COURT REPORTER:  How fast?

7         MR. RANSON:  By next Monday.

8         THE COURT REPORTER:  Monday, yeah.

9         MR. RANSON:  Actually, ten days will be fine.

10        THE COURT REPORTER:  Okay.  Okay.  All right.

11   Copy?

12        MS. BLACK:  Yeah, we'll take a copy.  I don't

13   want a hard copy.  I do want the exhibits and

14   addressed to me, not to Stanley.  And then a text

15   TXT format.

16        (Thereupon, at 2:03 p.m., the deposition was

17   concluded.)

18        (Witness excused.)

19             - - - - -

20

21

22

23

24

25

Page 155

1              C E R T I F I C A T E

2    THE STATE OF FLORIDA  )
                           )
3    COUNTY OF BROWARD.    )

4         I, Dona J. Wong, Registered Professional
     Reporter, do hereby certify that I was authorized to and
5    did stenographically report said deposition in
     stenotype, and that the foregoing deposition as
6    hereinabove shown is a true and correct computer
     transcription under my shorthand notes of said
7    deposition.

8         I further certify that I am not a relative,
     employee, attorney or counsel of any of the parties, nor
9    am I a relative or employee of any attorney or counsel
     or party connected with the action, nor am I financially
10   interested in the action.

11        The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
12   means unless under the direct control and/or direction
     of the certifying reporter.

13

          Dated this 27th day of November, 2019.

14

15

16        Dona J. Wong, RPR, CSR
          My Commission #GG91873
17        Expires May 16, 2021

18

19

20

21

22

23

24

25

Page 156

1              DEPOSITION ERRATA SHEET

2

3    Our Assignment No.  J4467092

4    Case Caption:

5    ARGO HOLDINGS, INC. AND SOLU-MED, INC.,

6              vs.

7    YOUNGBLOOD SKIN CARE PRODUCTS, LLC,

8

9

10        DECLARATION UNDER PENALTY OF PERJURY

11        I declare under penalty of perjury that I

12   have read the entire transcript of my Deposition taken

13   in the captioned matter or the same has been read to me,

14   and the same is true and accurate, save and except for

15   changes and/or corrections, if any, as indicated by me

16   on the DEPOSITION ERRATA SHEET(S) hereof, with the

17   understanding  that I offer these changes as if still

18   under oath.

19        Signed on the _____ day of  _____, 20___.

20

21        _____

          MANUEL E. AGUERO

22

23

24

25



MANUEL E. AGUERO  Non-Confidential                          November 20, 2019
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                              157—159

Page 157

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
                MANUEL E. AGUERO
25
```

Page 158

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
                MANUEL E. AGUERO
25
```

Page 159

```
 1              C E R T I F I C A T E
 2    THE STATE OF FLORIDA, )
                            )
 3    COUNTY OF BROWARD.   )
 4
 5         I, the undersigned authority, certify that
 6    MANUEL E. AGUERO personally appeared before me and was
 7    duly sworn on the 20th day of November 2019.
 8         WITNESS my hand and official seal this 27th
 9    day of November 2019.
10
11         _____
           Dona J. Wong, RPR, CSR
           Notary Public - State of Florida
12         My Commission #GG91873
           Expires May 16, 2021
13
14
15
16
17
18
19
20
21
22
23
24
25
```



# Life & Health Source

### Life & Health Source storefront

☆ ☆ ☆ ☆ ☆ | **97% positive** in the last 12 months (721 ratings)

Life & Health Source is your source for medical, surgical, lab, beauty, cosmetics, home health, and wellness products. We provide new, authentic, in-stock products that ship directly from our warehouse to you. Your order is processed and shipped within two business days of your order. We strive for five star customer service, so if you have questions about an item or your order, don't hesitate to contact us using the "contact seller" button in our Amazon Store.

**Please be Advised All items must be returned in like new condition:**

**If an item is opened or sent back used the item is subject to a 20% restocking fee**

**Due to Federal regulations, We are unable to except returns or exchanges on Personal Hygiene items, Hair Care, Cosmetics, Fragrance, Skin Care, or Toys.**

**All Alviero Martini bags are Wallets and belts are subject to a 20% restocking fee. (Must be returned with all tags and packaging in new condition)**

**Do to Amazon's policies, we are unable to accept returns for the Pluerx drainage kits, if a drainage kit is returned it is subject to a 20% restocking fee or returned to the customer at there expense.**

# EXHIBIT 9

**Current Selling Status of ABABPETWJQTSG**: Normal
**First Registered**: Thu Jan 17 16:48:46 UTC 2013
**Time Periods Suspended or Prohibited**

| Date of enforcement | Action | Reason | Reinstatement date |
|---|---|---|---|
| 7/1/2018 | Suspension | Performance-LSR | 7/2/2018 |
| 11/13/2018 | Suspension | Infringement | |
| 12/20/2018 | Block | Infringement | 1/14/2019 |
| 2/14/2019 | Block MFN | Performance-LSR | 2/15/2019 |

**EXHIBIT 10**