**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

ARGO HOLDINGS, INC., and          Case No. 0:19-cv-60487

SOLU-MED, INC.,

    Plaintiffs

v.

YOUNGBLOOD SKIN CARE

PRODUCTS LLC,

    Defendants

_____

DEPOSITION OF

MICHAEL PAZAK

February 19, 2020

9:46 a.m.

Esquire Deposition Solutions

3838 North Central Avenue, Suite 750

Phoenix, Arizona 85012

Prepared by:  Sandra Marruffo, R.P.R., AZ C.R. 50815

**Page 2**

1       The deposition of MICHAEL PAZAK, was taken
2 by Stanley R. Goodman, Esq., on February 19, 2020, from
3 9:46 a.m. to 12:51 p.m., at the Offices of Esquire
4 Deposition Solutions, 3838 North Central Avenue, Suite
5 750, Phoenix, Arizona 85012, before Sandra Marruffo,
6 Arizona certified reporter No. 50815.
7
8          APPEARANCES OF COUNSEL
9
10  Representing the Plaintiffs:
      GOODMAN & SAPERSTEIN
11      BY:  Stanley R. Goodman, Esq.
      666 Old Country Road
12      Suite 200
      Garden City, New York 11530
13      (516) 227-2100
      gsesq600@aol.com
14
15 Representing the Defendants:
16      COLE, SCOTT & KISSANE, P.A.,
      BY: Jonathan Vine, Esq.
17      222 Lakeview Avenue
      Suite 120
18      West Palm Beach, Florida 33401
      (561) 383-9203
19      Jonathan.Vine@csklegal.com
20
21
22
23
24
25

**Page 3**

1          INDEX OF EXAMINATION
2
3 WITNESS:  MICHAEL PAZAK
4
5 EXAMINATION                  PAGE
6 By Mr. Goodman            4, 115
7 By Mr. Vine           101, 122
8
9
10         INDEX TO EXHIBITS
11 NO.     DESCRIPTION             PAGE
12 EXHIBIT 1  Subpoena to testify at a deposition    4
          in a civil action to Michael Pazak
13
      EXHIBIT 2  SOLU-MED, INC., vs. YOUNGBLOOD SKIN   20
14          CARE PRODUCTS, LLC., Amazon Policies
          Perspective
15
      EXHIBIT 3  SOLU-MED, INC., vs. YOUNGBLOOD SKIN   78
16          CARE PRODUCTS, LLC., Rebuttal to Report
          of C.J. Rosenbaum
17
      EXHIBIT 4  11/11/2018 Notice: Policy Warning    86
18
      EXHIBIT 5  "Notices related to the seller"    90
19          Compilation of a complaint history
20
21
22
23
24
25

**Page 4**

1         TRANSCRIPT OF DEPOSITION
2          * * *
3         MICHAEL PAZAK,
4 having been first duly sworn to tell the truth, the
5 whole truth, and nothing but the truth, was examined
6 and testified as follows:
7
8          EXAMINATION
9    Q.  BY MR. GOODMAN:  Would you state your name for
10 the record, please.
11    A.  Sure.  Michael Pazak.
12    Q.  And do you have a local address?
13    A.  Yes, I do.
14    Q.  And what is that?
15    A.  36779 North Vasari, I'll spell it, V-A-S-A-R-I,
16 Drive in Scottsdale, Arizona.
17    Q.  Is that your personal address?
18    A.  Yes, it is.
19    Q.  Do you have a business address?
20    A.  No, not separate.
21    Q.  Mr. Pazak, I'm going to show you what has been
22 marked as Exhibit 1, which is the subpoena in this case.
23        (Exhibit No. 1 was marked for
24 identification.)
25    Q.  BY MR. GOODMAN: Mr. Pazak, I would like you to



MICHAEL PAZAK                                              February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                      5—8

Page 5

1 read through Exhibit 1 as well as the attachment which is
2 schedule A.
3          MR. VINE:  The attachment.
4          THE WITNESS:  Okay.  All right.
5     Q.  BY MR. GOODMAN:  Mr. Pazak, have you seen
6 Exhibit 1 prior to today?
7     A.  Yes, I did.
8     Q.  And when did you receive the document?
9     A.  It was approximately two weeks ago.  I don't
10 have the exact date.
11         MR. VINE:  That's fine.
12    Q.  BY MR. GOODMAN:  Was the Exhibit 1 mailed to
13 you?
14    A.  Emailed.
15    Q.  And who was the sender?
16    A.  Shena.
17         MR. VINE:  Shena Smith.
18         THE WITNESS:  Shena Smith.
19    Q.  BY MR. GOODMAN:  Do you know is she a law
20 associate of Mr. Vine?
21    A.  Yes, she is.
22    Q.  And after you received the email copy of the
23 exhibit, did you discuss it with anybody?
24    A.  The exhibit?
25         No.

Page 6

1     Q.  Did you --
2     A.  Outside -- Sorry.
3          MR. VINE:  Right.
4          THE WITNESS:  I discussed it with Shena.
5     Q.  BY MR. GOODMAN:  All right.  Can you tell me
6 what you discussed with Shena?
7     A.  Yes, I clarified sort of format.  So she said
8 easiest thing to do would be put it on a thumbdrive and
9 just make sure I -- I included all the documents that it
10 referred to.
11    Q.  You're referring to schedule A; is that
12 correct?
13    A.  Correct, schedule A.
14    Q.  And when did you send her the thumbdrive?
15    A.  I did not.  I just brought it with me here
16 today.
17    Q.  And Mr. Vine has given me a thumbdrive.
18        Is this the thumbdrive that you forwarded
19 to her?
20    A.  Yes, that is the thumbdrive.  I gave the
21 documents on there.
22    Q.  And does it contain all of the items that are
23 enumerated on schedule A?
24    A.  Yes, it does.
25         MR. VINE:  Just so the record is clear,

Page 7

1 there's an item about communications, but communications
2 that were -- that it says he relied upon to form his
3 opinion, my understanding is there are no such
4 communications.  There are email communications between
5 the expert and us scheduling or things of that nature,
6 but nothing that he's relied upon that he's agreed --
7 that he'll testify that he did not -- that he did rely
8 upon.  But everything else has been produced.
9     Q.  BY MR. GOODMAN:  Let's just go through this.
10 Schedule A documents to be produced at your deposition.
11 Your entire file for your work on this case, as you sit
12 here today, can you tell me what's contained in that
13 file?
14    A.  Yes.  So it would be copies of the complaint,
15 copies of the witness depositions, copies of Amazon's
16 Seller Central policies, copies of productions from the
17 different -- What's the right term? -- the production of
18 different material related to the case, so the plaintiff
19 and the defendant productions, so supporting
20 documentation, I guess, is how I think about that.  There
21 are prints of the time sheets that I submit to the
22 service that handles the billing for my time.  There is a
23 copy of the plaintiff's expert witness report.  I believe
24 that's -- I believe that's all.
25         MR. VINE:  Amazon production?

Page 8

1          THE WITNESS:  Yes.
2          MR. VINE:  Okay.
3     Q.  BY MR. GOODMAN:  With respect to the billing
4 records in this case, as you sit here today, can you tell
5 me how much you have billed to date, other than today's
6 time in this case, in the preparation of your reports in
7 preparation for your testimony?
8     A.  I would need to refer to the -- to the time
9 sheets that are on the -- the drive for that exact
10 information.
11    Q.  Well, do you have any memory as to the total
12 amount you've billed to date?
13         MR. VINE:  Or you could do number of hours
14 if that helps.
15         MR. GOODMAN:  And multiply it.
16         MR. VINE:  Yeah.  General.
17         THE WITNESS:  Yeah.
18         MR. VINE:  If you can't, you can't.
19         THE WITNESS:  I -- maybe a range.
20         MR. VINE:  Yeah, that's fine.
21         THE WITNESS:  Or I'd say roughly maybe 20
22 hours.  It's -- it's my estimate.
23         MR. VINE:  The documents will speak for
24 themselves.
25         THE WITNESS:  Yes.



MICHAEL PAZAK                                          February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                          9–12

Page 9

1    Q.  BY MR. GOODMAN:  But that would be contained in
2  the thumbdrive?
3    A.  Yes.  The way the reporting works is you submit
4  weekly and so this -- my work began last calendar year,
5  so it's been several weeks, but the weeks that I had
6  billable time would be on there.  I just can't recall
7  exactly what those totals are.
8    Q.  Who does the billing for your services?
9    A.  The billing is handled through Gerson -- GLG
10  it's Gerson Lehrman.
11   Q.  Tell me who Gerson -- Gerson Lehrman is,
12  please.
13   A.  They are the service that connects me to these
14  types of ad hoc opportunities.  So they are an expert
15  consulting broker, I suppose is the way you'd -- the way
16  I'd describe it, but I -- I have my clients that I work
17  with directly.  And I have a series of clients that I
18  work with that GLG connects me to.
19   Q.  And how did GLG make the connection for your
20  retention in this case?
21       MR. VINE:  If you know.
22   Q.  BY MR. GOODMAN:  Of course.
23   A.  I can describe in general -- I'm assuming --
24       MR. VINE:  I don't want to assume.
25  Only what you know.

Page 10

1        MR. GOODMAN:  No, no.
2        THE WITNESS:  Okay.
3        MR. VINE:  If you were told something, if
4  not --
5    Q.  BY MR. GOODMAN:  Let's get it straight right
6  away.
7    A.  Sure.
8    Q.  No assumptions.  Just what you know.
9        MR. VINE:  He's never been deposed before.
10       MR. GOODMAN:  Okay.  I understand.
11       THE WITNESS:  Sorry about that.  I
12  received an email from GLG stating, based on my profile,
13  that they're aware of -- and I worked with them for six
14  or seven years now, so they know the types of work I do.
15  They know the types of clients -- their clients that I
16  can help.  They reached out to me and said, "We think
17  this might be something you could help with.  Are you
18  available to discuss it?"  And from there I had an
19  initial discussion with the representative from GLG and
20  the follow-on discussion with an associate of Jonathan's
21  to explain my background and the work that I've done in
22  this area.
23   Q.  BY MR. GOODMAN:  When you had the initial
24  conversation with GLG, were you provided with any
25  documents to review at that time?

Page 11

1    A.  No.  The discussion with GLG contained no
2  specifics about the case and, in fact, even my initial
3  discussion with Jonathan's associate, nothing was
4  disclosed specifically about the case.  It was more about
5  my experience with Amazon, my time at Amazon and since,
6  related to the brands and the different clients that I
7  work with in this area.
8    Q.  Well, what did you discuss with GLG that led
9  them to have you retained in this case?
10       MR. VINE:  They didn't --
11       Objection.  GLG doesn't get to decide if
12  we retain him.  My client did it.
13   Q.  BY MR. GOODMAN:  But how did GLG determine that
14  you were the right witness for this case?
15       MR. VINE:  If you know.
16       THE WITNESS:  I maintain a professional
17  profile with GLG.  As I said, I've worked for their
18  clients for the last seven years, so I -- based on the
19  information they have about the work that I've done and
20  the information I've provided and my background, I think
21  those were the factors.
22   Q.  BY MR. GOODMAN:  Did you execute a retention
23  letter?
24   A.  There is an email system that GLG uses upon
25  selection for one of their projects.  They send you an

Page 12

1  email outlining the -- the terms of the agreement and you
2  accept it by -- via email.
3    Q.  Is that email contained in the thumbdrive?
4    A.  That is not.
5    Q.  Where is that email?
6    A.  It would be in my email account.
7    Q.  And what is the name of your email account?
8    A.  It's mpazak@hotmail.com.  I could -- I could
9  certainly --
10       MR. VINE:  We can provide it if necessary,
11  but, as I said earlier -- And I don't want to interrupt
12  anymore than this.  As I said earlier, we did not produce
13  documents for items that he did not rely upon, based upon
14  the specific request, meaning communications based upon
15  the request.  Nonetheless, if it's something that you
16  feel you need it, I can produce that.
17   Q.  BY MR. GOODMAN:  With regard to your retention,
18  do you recall what the scope of the retention was?  What
19  was your assignment?
20   A.  Prepare an expert report and I think that was
21  the initial assignment.
22   Q.  And when, for the first time, did you receive
23  documents related to this case upon which you could form
24  your opinion?
25   A.  I don't have the exact date.



MICHAEL PAZAK                                    February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE              13–16

Page 13

1    Q.  Approximately.
2    A.  Late November.
3    Q.  Of 2019?
4    A.  Of 2019.
5    Q.  All right.  And do you recall what you were
6  provided with?
7    A.  Yeah, I was provided with the complaint.  I
8  believe that was the first thing that I received.
9    Q.  And did you receive any other documents?
10    A.  Yes, from time to time thereafter, I received
11  deposition transcripts and a copy of Youngblood's
12  warranty and -- and some of the other articles I
13  mentioned, like the discovery, the -- the -- the product
14  of the discovery.
15        MR. VINE:  Production.
16        THE WITNESS:  Production.  I'm sorry.
17    Q.  BY MR. GOODMAN:  And who did you receive those
18  from?
19    A.  I generally -- Let's see.  So it would have
20  been initially Ryan --
21        THE WITNESS:  What's Ryan's last name?
22        MR. VINE:  You could just say, "I don't
23  know."  Just someone from Cole, Scott & Kissane.
24        THE WITNESS:  Yes, that's correct.
25        MR. VINE:  For all --

Page 14

1        THE WITNESS:  For everything.  Yes.  The
2  documents all came from Cole, Scott, Kissane.
3    Q.  BY MR. GOODMAN:  Did you request any additional
4  documents other than that which was provided to you by
5  Mr. Ranson?
6    A.  No, I did not.  I received documents as
7  deposition notes were -- or depositions were completed,
8  but I -- I didn't ask for anything beyond that.  I didn't
9  ask for those, so --
10    Q.  Well, after you reviewed the documents that
11  were provided to you, did you find the need to request
12  additional documents?
13    A.  No.
14    Q.  So all of those documents would be contained in
15  the thumbdrive; is that correct?
16    A.  That's correct, yes.
17        MR. VINE:  And just so it's clear, "and
18  more."  It's not just that.
19        THE WITNESS:  Correct, yeah.
20    Q.  BY MR. GOODMAN:  Well, what's more?
21    A.  Yeah, so there's -- I've included -- Sorry.
22  Let me start over.
23        When I started my research on the case,
24  one of the things I do when I work with an Amazon seller
25  is I spend time evaluating their -- the nature of their

Page 15

1  business on Amazon.  So I look at the seller's
2  storefront.  I look at comments made about the seller's
3  performance.  I look at the seller's return policy, all
4  their policies essentially as they are explained on the
5  seller's storefront.  So those notes are contained on the
6  thumbdrive as well.
7    Q.  Prior to submitting your initial report, can
8  you tell me how many hours you spent until you drafted
9  your initial report?
10    A.  It's an estimate.  I'd say 15.
11    Q.  And during the period of time before you
12  prepared your final report, did you have any
13  conversations with an attorney?
14    A.  Yes.
15    Q.  And who did you have those conversations with?
16    A.  Ryan and Shena.
17    Q.  And have you had any conversations with
18  Mr. Vine?
19    A.  Yes, yesterday.
20    Q.  When was the first time you met Mr. Vine?
21    A.  Yesterday.
22    Q.  And where did you meet him?
23    A.  At his hotel here in Phoenix.
24    Q.  All right.  What time did you meet with him?
25    A.  Two o'clock.

Page 16

1    Q.  Two p.m.?
2    A.  Yes, sorry, 2:00 p.m.
3    Q.  And how long --
4        MR. VINE:  And that's Mountain time.
5        THE WITNESS:  Yes.
6        MR. VINE:  Just kidding.  I'm just messing
7  around.
8        THE WITNESS:  Two p.m. Mountain time.
9        MR. VINE:  I was -- that was joking.
10        THE WITNESS:  Yeah.  No, no, that was
11  funny cause --
12        MR. VINE:  I was trying to be a wise guy.
13        MR. GOODMAN:  Thank you for clarification.
14        MR. VINE:  You know what, it doesn't
15  matter whether it's 2:00 p.m. --
16        THE WITNESS:  Okay.
17    Q.  BY MR. GOODMAN:  How long did the meeting last?
18    A.  About 45 minutes.
19    Q.  And were you provided with any documents by
20  Mr. Vine?
21    A.  Yeah, he shared -- we -- we reviewed some
22  documents that I had already seen, but he had them in
23  hard copy in his binder.
24    Q.  So there's nothing that you observed yesterday
25  that was any different than what you already had?



MICHAEL PAZAK                                          February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                        17–20

Page 17

1    A.  Correct.
2    Q.  With the exception being --
3        THE WITNESS:  I'm sorry.  The -- the
4    deposition that you had sent to me yesterday.
5        MR. VINE:  Cheri's?
6        THE WITNESS:  Yeah, Cheri what?
7        MR. VINE:  Seidel.
8        THE WITNESS:  Seidel.  So I had not seen
9    Cheri Seidel's deposition transcript prior to our meeting
10   yesterday.  At our meeting yesterday, Jonathan asked his
11   assistant to email me a copy of that deposition
12   transcript.
13   Q.  BY MR. GOODMAN:  Of Ms. Seidel's transcript?
14   A.  Yes.
15       MR. VINE:  And there were a couple
16   additional Amazon documents.
17       THE WITNESS:  And there were -- right,
18   from an additional Amazon production that I had not seen.
19   Q.  BY MR. GOODMAN:  What documents were those?
20   A.  Correspondence between Amazon and Solu-Med
21   regarding enforcement actions that they had taken and
22   directions basically from Amazon informing Solu- --
23   Solu-Med what to do in response to their actions.
24   Q.  Was that a compilation of complaints?
25       MR. VINE:  No.  So let me just -- I have

Page 18

1    it right here.  I'll put the Bates on.
2        MR. GOODMAN:  Is that Exhibit 1 from
3    yesterday?
4        MR. VINE:  No, it was not an exhibit.  It
5    was -- there were exhibits at the deposition, but it
6    wasn't the compilation.  What it was is Kelsey -- I'll
7    slow down cause I'm a New Yorker.  I'm sorry.
8        Kelsey had produced documents, I want to
9    say last week, of additional documents that she pulled
10   from Seller Central, Seller Central being the Amazon
11   website.  And I have the Bates.  And I showed the witness
12   yesterday, your client -- your expert.  He did not have
13   --
14       MR. GOODMAN:  Can I see them for a moment?
15       MR. VINE:  Yeah, yeah, yeah.  It has my
16   notes on it, but I don't mind.  I don't mind it.
17   Q.  BY MR. GOODMAN:  This -- suffice it to say
18   these documents that Mr. Vine showed you yesterday, you
19   hadn't seen before; is that correct?
20       MR. VINE:  Some.
21       THE WITNESS:  Some I had seen.  They were
22   included as exhibits to previous depositions such as
23   Mr. Aguero's deposition, so some I had seen, some I had
24   not seen.
25   Q.  BY MR. GOODMAN:  Based upon what you had seen

Page 19

1    yesterday, do you find that there is any need to revise
2    your initial report?
3    A.  No.
4    Q.  And rebuttal report?
5    A.  No.
6    Q.  Is there anything in the documents you were
7    shown that provided you with greater insight as to
8    whether the issue -- of the issues in this case?
9    A.  Yes.  One of the emails in particular from
10   Amazon reaffirmed my belief that Solu-Med's -- the cause
11   of Solu-Med's suspension was a history of repeated policy
12   violations without any response.  So I believe that
13   Solu-Med was suspended because they allowed Amazon to
14   form an opinion of them based on a series of complaints
15   made by others prior to the Youngblood complaint.  And
16   there is an email from Amazon included in that that
17   states basically that, because they asked Solu-Med about
18   a whole list of prev- -- their previous complaints.  So
19   it -- for me it reinforced the conclusion that I reached
20   based on the earlier documents I had seen.
21   Q.  In your initial report you did not, then, have
22   any of the history that you're just referring to?
23   A.  I had some of the history because some of the
24   correspondence between Amazon and Solu-Med were included
25   in as exhibits to previous deposition testimony.  There

Page 20

1    was one specific communication between Amazon and
2    Solu-Med where they referred specifically to prior
3    complaints.  And that was a document I had not seen;
4    however, without that document, based on my experience
5    and history working in this space, I already had reached
6    my conclusion that the -- the history of complaints was
7    the determining factor in --
8    Q.  It was what?  I'm sorry.
9    A.  The history of complaints was the determining
10   factor in Amazon's decision to suspend Solu-Med.
11       MR. GOODMAN:  I'd like to mark this as
12   Exhibit 2.  This is the initial report entitled SOLU-MED,
13   INC vs. YOUNGBLOOD SKIN CARE PRODUCTS, LLC, Amazon
14   Policies Perspective, and it's -- just looking for the
15   date -- January 24th, 2020.
16       (Exhibit No. 2 was marked for
17   identification.)
18       MR. GOODMAN:  Jonathan, do you need a copy
19   of it?
20       MR. VINE:  Yes -- No.  No, I don't.  I
21   have a copy.
22       MR. GOODMAN:  If you need a copy of it,
23   it's right here.
24       MR. VINE:  I have it.
25   Q.  BY MR. GOODMAN:  A little while ago I asked you



Page 21

1 about various documents you reviewed and you mentioned
2 you reviewed or observed Solu-Med's storefront?
3     A.  Yes, sir.
4     Q.  Tell me what that entailed.
5     A.  So I look at the products that -- or I looked
6 at the products that Solu-Med had listed for sale on
7 Amazon.
8     Q.  May I just interrupt you for a moment?
9     A.  Sure.
10    Q.  I neglected to ask you as of what date did you
11 view the storefront?
12    A.  It would have been in November, but I -- I
13 don't have the exact date without looking at my notes.
14    Q.  November 2019?
15    A.  Yes, sir.
16    Q.  Thank you.  Go ahead.  Continue.
17    A.  So I -- I looked at the products that Solu-Med
18 had listed for sale on their storefront.  Gives me an
19 understanding of the categories that they list in, which
20 is important because Amazon's policies are very specific
21 according to the category of product that you're selling.
22 So that was an initial review.  I looked at -- I -- I
23 identified approximately 418 different brands that they
24 were currently listing for sale on Amazon at that time,
25 so I -- I try to gauge sort of how broadly the product

Page 22

1 mix is that they are selling.
2         The storefront also gives information
3 about the seller's feedback rating.  So I looked at the
4 seller feedback, both rating in terms of the number of
5 stars that customers provide to Solu-Med as well as then
6 the verbatim customer comments for customers that have
7 purchased products from Solu-Med.  Amazon puts those --
8 puts those verbatim comments on the storefront page and
9 makes them available for all customers to read.
10    Q.  Were you able to view Solu-Med's storefront as
11 it existed in November of 2018?
12    A.  No.  Some of the content I looked at was dated,
13 meaning it actually carried the date, for example, the
14 customer comments are dated from when they are posted so
15 I have an understanding of the time line of those
16 comments, but I do not have a -- sort of a snapshot of a
17 hundred percent what that storefront looked like at that
18 time.
19    Q.  Would you have been able to view Solu-Med's
20 storefront as it existed in November of 2018?
21    A.  I would not have access to that.
22    Q.  Who would have access to it?
23    A.  Amazon would be able to have that version.
24    Q.  Would that be available to you if you had
25 requested it?

Page 23

1     A.  I assume so.  Sorry.  I -- I believe so.
2     Q.  All right.  But you didn't request it?
3     A.  I did not.
4     Q.  Okay.  Now, you related to me that at the time
5 you looked at the storefront in November of 2019; is that
6 correct?
7     A.  Yes, sir.
8     Q.  They had 320 brands?
9     A.  I believe the number was more than 400.  418, I
10 think.  It's in my notes on the thumbdrive.
11    Q.  But, as we sit here today, can you give me --
12        MR. VINE:  He -- he wasn't done.
13        MR. GOODMAN:  Huh?
14        MR. VINE:  He wasn't done with his answer.
15        MR. GOODMAN:  Well, I -- I'm not aware of
16 that.
17        THE WITNESS:  I was just saying the exact
18 number is in my notes on the thumbdrive where I counted
19 the exact number of brands at the time.
20    Q.  BY MR. GOODMAN:  And were you able to determine
21 the various products that were within those brands?
22    A.  Yes, I did look at the products and the brands.
23    Q.  Could you tell me what particular categories
24 they fell into?
25    A.  The majority of products that I looked at were

Page 24

1 of a consumer personal goods or CPG nature.  Amazon would
2 typically put them in the health and beauty subcategory,
3 so, in general, they would be mostly health and beauty.
4     Q.  Were there also commodity products?
5     A.  I believe there were.
6     Q.  Were there medical devices?
7     A.  I did not look for those, so I don't recall
8 seeing any.  If I was not -- I -- I'm not generally
9 familiar with medical device brands, so I didn't look for
10 that specifically.
11    Q.  Were you made aware at any time since your
12 retention in this case as to how long Solu-Med had a
13 storefront on Amazon prior to November of 2018?
14    A.  Yes.  According to deposition testimony, I got
15 the impression that the storefront was available on
16 Amazon sometime beginning in around 2014.  There is an
17 exhibit to the Aguero testimony that shows, from Amazon's
18 point of view, the seller storefront status and that
19 would have the exact date that they opened the account;
20 however, in my experience, sometimes they might have had
21 a previous account that I don't know of.  So I don't have
22 a precise knowledge, but it's my belief that that would
23 have been 2014.
24    Q.  And from 2014 to November of 2018, to your
25 knowledge, were there any complaints filed against the



MICHAEL PAZAK                                    February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                    25—28

Page 25

1  Solu-Med storefront?
2      A.  Yes.  In the documents that I received, there
3  was a record of complaints beginning in 2018, I believe
4  as early as January of 2018.
5      Q.  Okay.
6      A.  And continuing even into 2019 and I think in --
7  yeah, through 2019 so, yes.
8      Q.  But you were not shown any complaint history
9  prior to November of 2018?
10         MR. VINE:  Objection.
11     Q.  BY MR. GOODMAN:  Go ahead.  You can answer.
12         MR. VINE:  Go ahead and answer, and then
13  I'm going to put something on the record.
14         THE WITNESS:  Okay.  Yes, I did see
15  complaints from earlier in 2018, beginning like
16  January of 2018.  I want to make sure I'm answering the
17  question so --
18     Q.  BY MR. GOODMAN:  I'm satisfied with that
19  answer.
20     A.  Okay.
21         MR. VINE:  Just let me put on the record
22  Solu-Med did not become a standalone company until
23  January of 2018.  Plaintiff did not produce any documents
24  relating to when it was part of Q-Med, and we'll leave it
25  at that.

Page 26

1          MR. GOODMAN:  Okay.
2          MR. VINE:  And we can let the Court
3  address that.
4          MR. GOODMAN:  All right.
5          MR. VINE:  I can understand what your
6  import is.  The import of your statement is that
7  therefore they didn't receive any complaints prior to
8  January 2018.  And the record is not -- is definitely --
9  does not support that position.
10         MR. GOODMAN:  Okay.  All right.
11     Q.  BY MR. GOODMAN:  Do you understand or do you
12  know what the term SKUs are?
13     A.  Yes, sir.
14     Q.  What are they?
15     A.  SKUs are -- it's an acronym for stock keeping
16  units.  It is a method applied in the industry to
17  uniquely describe a product for which a manufacturer or
18  resaler -- reseller or retailer counts and -- and
19  validates their inventory positions.
20     Q.  Now, of the 320 brands that you previously
21  referred to, do you have any knowledge as to the number
22  of SKUs that that involved?
23     A.  I -- I think the count of brands was more than
24  400 if I'm remembering correctly.
25     Q.  Yeah.

Page 27

1      A.  But I do not have a recollection of the number
2  of products or SKUs that involves.
3      Q.  So --
4      A.  I -- I would only be able to say more than 420,
5  so more than the number of brands.
6      Q.  So when you reviewed the storefront, Solu-Med's
7  storefront in 2019, the account was fully active?
8      A.  Yes, sir.
9      Q.  And do you have any knowledge as to the source
10  of the products representing those 320 brands?
11     A.  From the documentation I received on this case,
12  I've -- I know of at least one distributor that was
13  referred to called Innopex, so based on that I'm assuming
14  they have more similar distributors that they source
15  through.
16     Q.  Do you know what diversion is?
17     A.  Yes, diversion, in my understanding, is when a
18  product is sold to a specific distributor for a specific
19  channel or a specific customer and that product is,
20  instead, resold to a different or -- or through a
21  different channel.
22     Q.  When you reviewed the storefront, did you make
23  any inquiry as to whether the -- whether life and --
24  Strike that -- whether Solu-Med was an authorized
25  distributor for all these brands.

Page 28

1      A.  I did not.
2      Q.  Was there a way you could have determined that?
3          MR. VINE:  Objection.
4      Q.  BY MR. GOODMAN:  Go ahead.  You can answer.
5          MR. VINE:  That you know of.
6          MR. GOODMAN:  He understands the question.
7          THE WITNESS:  So could -- just repeat the
8  question for me.
9          MR. GOODMAN:  Let the reporter do it.
10         (The requested question was read.)
11         THE WITNESS:  Did I make an inquiry?
12  I didn't, no.
13     Q.  BY MR. GOODMAN:  So you have no idea whether
14  life -- Solu-Med was, in fact, a authorized distributor
15  for some 400 brands?
16     A.  That's correct.  My analysis with respect to
17  the brands -- sorry, my analysis with respect to the
18  authorized nature of them as a reseller was limited to
19  Youngblood and prior complainants that complained to
20  Amazon.
21     Q.  If I represent to you that none of the brands
22  that you have referred to were sourced directly from the
23  manufacturer and they were all diverted goods.  Would you
24  accept that?
25         MR. VINE:  Objection.



Page 29

1    Q.  BY MR. GOODMAN:  Go ahead.
2    A.  I'm -- I'm not sure I understand the -- your --
3  your -- are you stating that that's -- you're stating
4  that's the fact?
5    Q.  Yeah.
6    A.  I have no basis to dispute that.
7    Q.  So if that fact is correct, then Solu-Med was
8  offering goods that were not authorized by the
9  manufacturer?
10    A.  I don't believe that's necessarily true.  There
11  are certainly manufacturers who maintain distributor
12  relationships and do allow products to be sold through a
13  distributor and then resold to another party who would
14  ultimately sell them, so it's -- it's not the case that
15  Amazon or a seller on Amazon must buy everything from the
16  manufacturer in order to do that.  I don't know if I'm
17  making sense.
18        MR. VINE:  It makes sense.  It makes
19  sense.
20    Q.  BY MR. GOODMAN:  Yeah.
21    A.  Okay.  I guess what I'm saying is it's not --
22  the choice isn't from the manufacturer or diverted and
23  therefore unauthorized.  There are certainly retailers
24  and sellers who buy through authorized distribution and
25  those are distribution channels that a manufacturer will

Page 30

1  maintain for the purposes of selling their product.
2    Q.  But my question was directed to unauthorized
3  distribution.
4    A.  So I'll make sure I understand.
5    Q.  Yeah.
6    A.  So your -- your question is --
7    Q.  Assume for the moment that none of those 320
8  brands were authorized by the manufacturer, nor did they
9  come directly from the manufacturer.
10    A.  Okay.
11        MR. VINE:  What's the question.  Don't
12  answer.  There's nothing to answer.
13    Q.  BY MR. GOODMAN:  Would, in fact -- based upon
14  those facts, would, in fact, those be counterfeit goods?
15        MR. VINE:  Objection.
16    Q.  BY MR. GOODMAN:  Go ahead.  You can answer.
17    A.  I'd have to understand how the products are
18  listed for sale at a greater level of detail to assess
19  within Amazon's policies if those goods would be
20  considered counterfeit or in violation of any of Amazon's
21  relevant policies like the authenticity policy or the
22  anti-counterfeiting policy.
23    Q.  I just want to go through some of your
24  background --
25    A.  Okay.

Page 31

1    Q.  -- if I may.
2        Prior to 2008 were you employed?
3    A.  Yes, sir.
4    Q.  And where were you employed?
5    A.  I was employed at a company called Avanade.
6  I'll spell.  A-V-A-N-A-D-E.
7    Q.  And what was the business of Avanade?
8    A.  Business -- Digital technology consulting
9  software and services.
10    Q.  Were your duties with Avanade in any way
11  related to Amazon?
12        MR. VINE:  Objection.
13    Q.  BY MR. GOODMAN:  Go ahead.
14    A.  Let me think.
15        MR. VINE:  Or what they do or --
16        THE WITNESS:  Yeah.  I'm just trying --
17  it's actually a broad question.  I just want to make
18  sure.  I would say not directly.
19    Q.  BY MR. GOODMAN:  Well, if it's indirect, what
20  was it?
21    A.  As a company and a leadership team at Avanade,
22  we were in discussion with Amazon's chief technology
23  office.  It was not directly an initiative I was part of,
24  but -- but indirectly the -- the companies were certainly
25  aware of each other and working on some level, but

Page 32

1  nothing specific to my responsibility.
2    Q.  And when you joined Amazon, what year was that?
3    A.  2008.
4    Q.  And were you employed at its facilities in
5  Seattle, Washington?
6    A.  Yes, sir.
7    Q.  And did you live there at the time?
8    A.  Yes, I did.
9    Q.  And what was the nature of your employment?
10    A.  I was a full-time employee.
11        Oh.  You mean, like, responsibilities?
12    Q.  Yes.
13    A.  Oh.  Okay.  I'm sorry.
14    Q.  You can save me a few questions.
15    A.  Yeah.  No.  I'm sorry.  I -- so I had several
16  different roles at Amazon.  My first responsibility was
17  overseeing the outsourced e-commerce operations.  So, at
18  the time, Amazon was running e-commerce sites and
19  businesses for third parties such as Target.com;
20  Sears.ca, so Sears in Canada; Marks & Spencer in the UK;
21  Timex; BB Lacoste; Benefit Cosmetics.  So we were running
22  various parts of their e-commerce operations behind the
23  scenes.  If you were a customer, you wouldn't know that
24  that was Amazon behind the scenes, but that was business
25  that we had at that time.



MICHAEL PAZAK                                    February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                    33—36

Page 33

1    Q.   What was your title?

2    A.   Director of enterprise business.

3    Q.   And did your responsibilities change at any
4  time thereafter?

5    A.   Yes.  So as part of my responsibilities, I also
6  then -- they added to my responsibilities the U.S.
7  marketplace for large brands and sellers, so I had that
8  responsibility as well.  And then from that -- following
9  that I also then acquired responsibility for all size
10  sellers, so the small and medium seller group as well for
11  the U.S. marketplace and then the expansion of the
12  Canadian marketplace so Amazon.ca, as well as new
13  category launches within the marketplace.  So we launched
14  sports collectibles, wine, a number of different
15  categories, and I was responsible for that as well as our
16  third-party payments group.

17        So Amazon also was -- does provide payment
18  processing services for other e-commerce providers.
19  Again, these would be other branded websites.  So you can
20  use your Amazon credentials to pay on other websites, and
21  I had responsibility there as well as responsibility for
22  Amazon's on-site advertising product called product ads
23  at the time.  So I had -- I was also involved in the
24  expansion of the Amazon Prime program to include non-core
25  benefits, meaning on-site deliveries.  So as Amazon began

Page 34

1  to look at other ways of driving more value to Prime
2  customers, I was involved in that, those efforts as well.

3    Q.   And you mentioned before something about the
4  smaller sellers?

5    A.   Correct.

6    Q.   Tell me about that.

7    A.   Sure.  So the way Amazon, at the time anyway,
8  was thinking about --

9    Q.   Let's stick to the date.

10    A.   So this would have been 2009 or '10.  I can't
11  be a hundred percent certain on the year.

12    Q.   All right.  I'm not concerned with that.  Just
13  tell me what you did.

14    A.   Sure.  So in addition to the -- working with
15  the larger sellers then, there was a team working with
16  small and medium sellers.  These would be companies
17  similar to Solu-Med.  They typically didn't have a brand
18  of their own.  They had -- they were typically just a
19  reseller of products and some of these could be, you
20  know, good size businesses, but that was what this tier
21  of business was focused on, so we called that the small
22  and medium seller.

23    Q.   And what were your responsibilities within that
24  area?

25    A.   For each of these I was responsible for growth

Page 35

1  of the business, so we would look at -- kind of looking
2  at seller profiles, what -- who are sellers that are
3  doing well?  You know, what can we do to help them?  What
4  kind of guidance can we give them?  Are there things that
5  we can learn about their successes to make the platform
6  overall more successful?  Are there other sellers in the
7  marketplace there that meet that profile we should be
8  approaching and asking to sell or inviting to sell on
9  Amazon, things of that nature.

10    Q.   You used the term "reseller"; what does that
11  mean?

12    A.   By which I mean these would be companies that
13  don't manufacture any of their own products or represent
14  their own products, they simply buy products, acquire
15  products, and then resell them on Amazon or other --
16  and/or other marketplaces.

17    Q.   And were you successful in aiding the
18  development of those -- that class, the resellers?

19    A.   Yes.

20    Q.   And did you bring to Amazon's platform a number
21  of those resellers?

22    A.   Yes, my team.

23    Q.   Do you have any recollection of the names of
24  certain of those resellers?

25        MR. VINE:  You know, let me start off

Page 36

1  objection.  I -- I don't know if you have any
2  confidentiality agreements that are contained within the
3  Amazon handbook that would require you to keep what you
4  did from a specific clientele confidential.

5        MR. GOODMAN:  I'm only asking what his
6  memory is.

7        MR. VINE:  No.  He can talk about what he
8  did.  I can't -- I don't think you should identify -- I
9  don't know if you should identify any people.

10        Can you recall?

11        MR. GOODMAN:  Well --

12        MR. VINE:  That one you can answer "yes."
13  And if you can't, you can't.

14        MR. GOODMAN:  Are you --

15        THE WITNESS:  I can recall certain sellers
16  that we worked with and partnered with, yes.

17    Q.   BY MR. GOODMAN:  It would help.  Just tell me.

18    A.   Okay.  So from this tier, probably not from --
19  probably not from this middle tier.  The ones that are
20  more prominent in my memory are more the big brands just
21  because they were -- these -- they tended to be sort of
22  these made up names like Solu-Med.  I don't recall those
23  as easily as some of the big brands.

24    Q.   From that point forward can you tell me, just
25  in numbers, how many resellers went on Amazon's platform?



MICHAEL PAZAK
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020
37—40

Page 37

1 Resellers.

2     A.  I would just say thousands.

3     Q.  And today do you have any knowledge how many of

4 those resellers -- how many resellers there are on

5 Amazon's platform?

6     A.  Not beyond the publically made available

7 statement from Amazon which I think they say more than a

8 million, but beyond that, no.

9     Q.  And these are resellers you're referring to?

10    A.  Oh.  Sorry.  They just say "sellers."  They

11 don't disclose whether it's an individual, whether it's a

12 small or medium business or a large seller.

13    Q.  Well, to your knowledge, are a good number --

14 you just tell me percentage-wise of the --

15         MR. VINE:  If you know.

16    BY MR. GOODMAN:  -- of -- of the resellers.

17    A.  That, I couldn't tell you.  I don't know.

18    Q.  But you were aware that resellers are on

19 Amazon's platform?

20    A.  I assume they are, yes.

21    Q.  Is that just an assumption or do you know?

22    A.  Solu-Med being one, so, yes.

23    Q.  All right.  So when you reviewed Solu-Med's

24 platform -- Amazon's -- Withdraw that.

25         When you reviewed Solu-Med's storefront in

Page 38

1 November of 2019, they were -- that was an active

2 listing, wasn't it?

3     A.  Yes, it was.  The store was active and the

4 products were buyable.

5     Q.  Right.  And I believe you said there may have

6 been about 320 to 400 brands.

7     A.  400 plus brands, yes.

8     Q.  And you are aware of the fact, by the materials

9 you have reviewed, that Solu-Med was deactivated in

10 November of 2018?

11    A.  Yes, based on the documentation I reviewed,

12 they were suspended in November of 2018.

13    Q.  And I believe you also testified earlier that

14 you believe that the reason that they were deactivated

15 was their history of complaints?

16    A.  Their -- their -- the history of their

17 performance, including their complaints.

18    Q.  When you say "the history of their

19 performance," is that separate and apart from complaints?

20    A.  Yes.

21    Q.  And what does that involve?

22    A.  Amazon monitors seller performance against a

23 number of criteria that they believe is important to make

24 sure their customers have a good experience and remain

25 loyal to Amazon, so they monitor a number of things like

Page 39

1 does the seller ship on time?

2         So on the -- on the detail page, when a

3 customer sees a product and decides to purchase, that

4 they make a promise to that customer that says, "If you

5 buy today, it will be available here."  They don't want

6 that to be missed because that's a trust buster in the

7 eyes of the customer.  It violates the trust between

8 Amazon and their customer.  So Amazon measures those

9 types of things based on the data that they see.

10        And I know Solu-Med was suspended in 2018

11 for what was called an LSR or a late ship rate.  So for

12 orders that Solu-Med was receiving, they were missing

13 their objectives on shipping on time to customers.

14 That's one of the factors that Amazon would use to look

15 at the overall seller performance.  Another factor I

16 mentioned a little bit earlier was the seller feedback,

17 so customer feedbacks -- feedback where they will rate

18 Solu-Med and then provide a comment about their

19 experience working with Solu-Med, so they will look at

20 that feedback for the verbatims, they'll look at the

21 rating that the customer gives.  So those are just two of

22 the things, in addition to the complaints, that Amazon

23 will look at to determine how well the seller is

24 performing, if the seller is hurting Amazon's business or

25 helping Amazon's business, and whether the seller should

Page 40

1 be allowed to continue.

2     Q.  Can you tell me what document you were

3 referring to that indicated that Solu-Med's storefront

4 was closed down in 2018 because of seller -- seller --

5     A.  Seller performance.

6     Q.  I didn't see that in your report.

7     A.  I'm sure I referenced it.  I have to look at

8 the document, but it was an exhibit to the Aguero

9 testimony -- or deposition that was sort of the

10 storefront history that Amazon provided.

11    Q.  The facts, the documents you reviewed, did

12 indicate that the Solu-Med storefront was deactivated

13 temporarily early in November of 2018 and then in

14 December of 2018 it was permanently deactivated.  Did you

15 refer to those documents?

16    A.  Yes, I saw that as well.  There was a

17 suspension followed by a block.  I think the suspension

18 was November 13th and the block was December 20th or

19 right around the 20th.

20    Q.  Well, any documents that you may have reviewed

21 in connection with that, did it indicate that they were

22 closed down because of seller performance?

23    A.  Yeah, I believe it was the same document that

24 showed the late ship rate.

25    Q.  Now, in your experience would a late ship rate



MICHAEL PAZAK
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020
41—44

Page 41

1 for a reseller necessarily result in a deactivation of
2 the storefront?
3     A.   The late ship rate is a metric that Amazon
4 shares and prods the sellers to comply with.  So it is
5 common that, if you let the ship rate fall below target
6 for a period of time, that Amazon will suspend you, even
7 a temporary suspension, just to make sure you understand
8 Amazon is monitoring your performance and is dissatisfied
9 with your performance and you need to improve your
10 performance.
11     Q.   Would it be more likely that Amazon would just
12 de-list or deactivate the particular product that
13 resulted in the seller performance?
14     A.   No, because the late ship rate is across a
15 seller's account in aggregate and it's not product
16 specific.  It speaks more to how well a seller's business
17 is organized and operating.  And regardless of product,
18 if the seller cannot meet their ship promise, they need
19 to -- they either need to fix their promise, if they need
20 more time, they need to change their promise date to
21 customers or they need to fix their process and ship on
22 time and make sure they have a foolproof process to ship
23 on time.  So a seller can do either one of those things
24 to improve.  But the suspension would be the usual thing
25 for the account because it doesn't really speak to a

Page 42

1 product, it speaks to a process.
2     Q.   In connection with preparing your report, I
3 assume that you did review the complaint that Youngblood
4 made to Amazon on November 11th of 2018 that the
5 Youngblood products it was offering was counterfeit?
6     A.   Yes, I believe the verbatim on the complaint
7 said they were inauthentic but the nature of the
8 complaint per the brand tool I think was -- said
9 "counterfeit."
10     Q.   What is the difference between "counterfeit"
11 and "inauthentic"?
12          MR. VINE:  Objection.
13          You mean under Amazon's guidelines?
14          MR. GOODMAN:  I mean his understanding.
15          MR. VINE:  Okay.
16          THE WITNESS:  Amazon uses those terms very
17 interchangeably, so I don't think Amazon sees a
18 difference.  The anti-counterfeiting policy, when you
19 look at it, it refers to inauthentic products.
20 Immediately you start shifting that terminology around.
21 In my view, Amazon doesn't draw a distinction between
22 "inauthentic" and "counterfeit."
23     Q.   BY MR. GOODMAN:  Well, do you know, based upon
24 what you reviewed here, is the reason for Amazon to
25 deactivate Solu-Med's storefront was as a result of a

Page 43

1 complaint that the products were counterfeit?
2          MR. VINE:  Objection.
3          Go ahead.
4          THE WITNESS:  I believe that Amazon
5 decided to suspend the storefront at that time, based on
6 a history of those -- history of complaints and
7 performance combined.  There was a virtually identical
8 complaint made in March of 2018 by a different party.
9 They said exactly the core of the Youngblood complaint,
10 which is that the seller is listing products as new
11 without a manufacturer's warranty included, and that
12 constitutes a material violation that violates Amazon's
13 authenticity policy and constitutes a violation of the
14 anti-counterfeiting policy.  And so, to me, if that was a
15 sole event, Amazon would have suspended them earlier in
16 March.  Amazon didn't suspend them in March.  Amazon gave
17 them many, many chances and many, many warnings.
18          And the fact that, unfortunately, Solu-Med
19 didn't respond per Amazon's instructions to each of these
20 warnings, that, to me, is why, ultimately, after many,
21 many complaints and many, many concerns that Amazon
22 shared with them, their lack of action, their lack of
23 response, Solu-Med's lack of response, is what led to
24 their suspension in November.  Because they weren't
25 suspended in March and they weren't suspended for these

Page 44

1 other identical complaints that were raised against them.
2     Q.   That's your opinion of what caused Amazon to
3 deactivate the account?
4     A.   Yes.
5     Q.   Do you -- have you reviewed any documents that
6 specifically express what you have just said?
7          MR. VINE:  Talk about the documents that
8 you relied upon to come up with your opinion.
9          MR. GOODMAN:  That's all I'm asking.
10          THE WITNESS:  Okay.  So I'm sorry.  Give
11 me the question again.
12          MR. GOODMAN:  Let the reporter read it
13 back.
14          MR. VINE:  He's asking you, while she's
15 looking for it -- Oh.
16          THE REPORTER:  If you're talking, I'm
17 writing.
18          MR. VINE:  Yeah.
19          THE REPORTER:  Unless you want to go off.
20          MR. VINE:  No, no.
21          MR. GOODMAN:  No, no, no.  Just read the
22 question.
23          MR. VINE:  Yeah, I just want to let him
24 know that he's asking for the documents you reviewed and
25 relied upon to come up with that opinion.

MICHAEL PAZAK
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020
45–48

Page 45

1    THE WITNESS:  Yes.  Okay.  So --
2    (The requested question was read.)
3    THE WITNESS:  Oh, yes.  Sorry.
4    Q.   BY MR. GOODMAN:  What documents were those?
5    A.   Okay.  So Amazon's condition guidelines -- I'm
6  sorry -- their listing guidelines.  In that document it
7  states clearly that Amazon -- that to be listed and sold
8  as new, an Amazon product must include a manufacturer's
9  warranty if one is, in fact, available.  The second would
10  be the cosmetics, their policy specifically around
11  cosmetics.  It's clear that everything listed in the
12  category must be listed and sold as new.  Therefore
13  Amazon's policy is that all cosmetics must be sold to
14  include a manufacturer's warranty if one exists.  If the
15  manufacturer's warranty does not -- is not included, then
16  according to Amazon policy, they -- the product fails to
17  meet the condition guidelines in a material way and that
18  product is therefore inauthentic.  That material
19  violation and inauthentic product violates Amazon's
20  anti-counterfeiting policy.
21    Q.   Does Amazon provide to customers its own
22  guarantee?
23    A.   Amazon has -- so -- so, yes, Amazon provides a
24  guarantee for the products that they sell as a retailer
25  and then they provide what I call sort of a safety

Page 46

1  backstop for products sold by third-party sellers on the
2  marketplace and that's their A to Z guarantee.
3    Q.   Have you ever heard of Amazon's A to Z
4  guarantee?
5    MR. VINE:  He just said --
6    THE WITNESS:  Yes.
7    Q.   BY MR. GOODMAN:  Is that what you're referring
8  to?
9    A.   That is what I'm referring to.
10    Q.   Now, if a consumer had a complaint about a
11  particular product and wrote to Amazon and said they were
12  dissatisfied with it, would Amazon refund their money?
13    A.   Depending on the circumstances.
14    Q.   Tell me what circumstances.
15    A.   And this is a case where the -- the third
16  party -- so -- so just to be clear on your question, this
17  is something where they purchased a product from a third
18  party on Amazon so, therefore, it's outside of the realm
19  of Amazon's own guarantee.  They don't follow the same
20  thing.  So, yes, if -- in most cases under the A to Z
21  guarantee, if the claim is made within a certain number
22  of days from when the product was supposed to be shipped,
23  it would fall under that and Amazon would investigate the
24  nature of the claim and, in most cases, they would refund
25  the customer's money if they found the complaint to be

Page 47

1  legitimate.  They -- they do monitor for fraudulent
2  complaints.  They do monitor for those types of things
3  that aren't legitimate complaints.
4    Q.   Based upon your knowledge and experience with
5  Amazon, is -- how responsive is Amazon to those requests
6  for a refund or, you know, something the consumer was not
7  satisfied with the product?
8    A.   Amazon is, I would say, very responsive.  They
9  take very prompt action when they have a complaint about
10  a seller or a product and, you know, reach their
11  conclusion generally very quickly.  Again, it is a
12  consideration.  They are looking for patterns of fraud.
13  When you have a broad guarantee, you can have a lot of
14  customers who are making a lot of fraudulent claims under
15  that guarantee.
16    And this is a balance because Amazon wants
17  customers to buy from third-party sellers with
18  confidence, but they also don't want to be the bank of
19  third-party sellers.  So they have to strike the balance
20  between meeting the customer's expectation and -- and --
21  and not paying every dollar out that they receive.  And
22  because they have such a small margin, the seller
23  products, you know, they don't have a hundred percent of
24  the net sales proceeds, so it's a very expensive
25  proposition for Amazon.

Page 48

1    Q.   Could you explain that, please.
2    A.   Sure.  So if you buy a product from the
3  third-party seller, you, as the customer, will give the
4  third-party seller $20.  If you give it to Amazon, Amazon
5  gives that third-party seller $20, less Amazon's sales
6  commission which might be $3.  Now, through -- under
7  Amazon's A to Z guarantee, Amazon is on the hook for the
8  full sales amount.  They might only have $3, so they have
9  to come up with the $17 somewhere else to refund you.
10    And that's the big reason why the A to Z
11  guarantee is really a backstop.  If you can't work it out
12  with the seller -- again, they don't want to be out --
13  they don't want to be the primary.  They want the -- and
14  it's the big reason they demand that the manufacturer's
15  warranty be in effect.  The consumer's first line of
16  satisfaction is the manufacturer's warranty because it
17  would simply be too expensive for Amazon to allow all the
18  products to -- to fall all the way through all the
19  remedies to their own A to Z guarantee, which is really
20  intended to be really a backstop on the marketplace.
21    And its origins are much more in the early
22  days of e-commerce when you would buy without even
23  knowing if you were ever going to get the product.  And
24  so that's really the core of it.  It's not intended to
25  replace any sort of your first line of defense or your



Page 49

1 first remedies you might have as a consumer.
2    Q.  To your knowledge, in those instances where
3 Amazon refunds the full price to the consumer, did they
4 charge back the reseller?
5    A.  If they can.  They may not be able to in every
6 case.  It's a risk that Amazon bears.  It's a risk they
7 try to manage, but they may not be able to recover that,
8 which is why they need to be careful and diligent and
9 make sure that there are other primary remedies available
10 to the consumer.
11    Q.  In the documents that are contained in the
12 thumbdrive, item 2 of your report on page 3 indicates
13 that you relied upon the website of Youngblood; is that
14 correct?
15    A.  That's correct.
16    Q.  And when did you view, to the best of your
17 knowledge as you sit here today, Youngblood's website?
18    A.  It would have been in the -- in the same time I
19 looked at the storefront, so November of 2019.
20        MR. VINE:  Just so the record is clear,
21 there was also printouts, and they are in there, for
22 stuff from 2000 --
23        MR. GOODMAN:  Excuse me?  Don't look
24 frustrated.
25        MR. VINE:  What?

Page 50

1        MR. GOODMAN:  You look frustrated.
2        MR. VINE:  Well, cause you didn't hear me.
3 So there were --
4        MR. GOODMAN:  Because I wear hearing aids.
5 Is that all right?
6        MR. VINE:  There were printouts that --
7 from the website and other portions that discuss
8 Youngblood's warranty that were in existence in 2018.
9 You have copies of them.  I believe one of them, for
10 example, is YBSC0054.
11    Q.  BY MR. GOODMAN:  So in reviewing Youngblood's
12 website, what information did you gather from that
13 review?
14    A.  I determined that, first off, the nature of
15 their products.  I was not familiar with the brand, so I
16 learned about the products and the brand they offer, the
17 natural organic way that they, you know, create and
18 manufacture their formulations.  So just understanding
19 sort of what the brand value was and what the brand stood
20 for.  And then I also looked at sort of their policy in
21 terms of how they manage their customer -- their customer
22 care and the type of warranty that they offer as a
23 manufacturer.
24    Q.  Did you view any of the Youngblood products on
25 their website?

Page 51

1    A.  Yes.
2    Q.  And what did you observe from viewing those
3 packages?
4    A.  I just got a better understanding of the nature
5 of the products specifically, like its blush or that sort
6 of thing.
7    Q.  Were you able to view, at their website, their
8 warranty?
9    A.  Yes, I did see that published on the website.
10    Q.  Where was it placed on the product?
11    A.  On the website?
12    Q.  No.
13    A.  Oh, on the product?  I did not -- I did not see
14 a product specifically.  I saw a warranty on the website.
15    Q.  Did you ever have the opportunity to view any
16 of the products that were complained of by Youngblood in
17 this case?
18    A.  Not physically, no.
19    Q.  Did you feel it necessary to view those
20 products?
21    A.  I did not for the -- for the purposes of the
22 report I was writing.
23    Q.  You also relied upon, among other things, the
24 transcript of the deposition of Dr. Goth; is that
25 correct?

Page 52

1    A.  Yes, sir.
2    Q.  Do you recall the portions of the testimony
3 wherein he was shown various packages of Youngblood
4 products?
5    A.  Not specifically.
6    Q.  Well, I'll get to that after the break.
7        Did you have any recollection of his
8 testimony that you read wherein he responded that they
9 looked the same?
10    A.  I don't specifically recall that.
11    Q.  Again, do you believe and is it your opinion
12 that the Youngblood products authored by Solu-Med were,
13 in fact, counterfeit because they were not being sold by
14 an authorized distributor?
15    A.  No.  They were -- I mean, I suppose indirectly
16 they were counterfeit because they lacked a
17 manufacturer's warranty.  And I think that was a
18 byproduct of the relationship or the lack of distributor
19 relationship, so I -- I think we're saying the same thing
20 I just think that it's tied to the -- the violation from
21 Amazon's standpoint is tied to the lack of the
22 manufacturer warranty.
23    Q.  What is your definition, your understanding of
24 the word "counterfeit"?
25        MR. VINE:  Objection.



Page 53

1      Q.  BY MR. GOODMAN:  Go ahead.
2            MR. VINE:  As it relates to Amazon?
3      Q.  BY MR. GOODMAN:  No, I'm asking about what is
4  his understanding of it.
5            MR. VINE:  Objection.
6            MR. GOODMAN:  Well, you can object, but he
7  can answer.
8            THE WITNESS:  Sure.
9            MR. VINE:  Unlike your expert.
10           MR. GOODMAN:  No need for that comment.
11  He's your expert.  He's fair game.
12           MR. VINE:  Okay.  You can answer.
13           THE WITNESS:  Okay.  From an
14  authenticity -- So -- so I would say "counterfeit" would
15  be something that's inauthentic.  Looking at a product's
16  whole value to a customer, it needs to -- it needs to
17  contain exactly what the customer's expectation is, based
18  on the promise of the brand, and that would be -- it
19  is -- it is, in fact, the actual ingredients prepared to
20  the exact specification of the formulation that the brand
21  would have.  It would be packaged in exactly the way that
22  the brand would specify.  It would be distributed and
23  maintained through the distribution chain exactly per the
24  specifications with respect to things like light and heat
25  and climate, the nature of the seal on the package, the

Page 54

1  amount of product in the package per their specification,
2  the -- the freshness.  So if it is a perishable product,
3  it must be -- for it to be authentic, it needs to be
4  fresh to the date on the package.  I'm trying to think.
5  I think that.  Plus the brand promise of how they will
6  stand behind it must be in effect.  And so the -- I think
7  any -- any of those things that aren't in place and
8  available to the purchasing consumer would constitute a
9  counterfeit product to that -- to that transaction and
10  that product.
11     Q.  Did you review any materials to gain an
12  understanding of how Youngblood regulates or maintains
13  the quality and control of its products?
14     A.  I didn't see that in any of the material that I
15  reviewed, no.
16     Q.  Did you see any material with regard to the way
17  the Youngblood products are stored by Youngblood?
18     A.  By Youngblood, no.  I don't have any detailed
19  knowledge of -- of their supply chain.
20     Q.  Now, when Youngblood ships a product to a
21  distributor and then a distributor then ships it to
22  Amazon or another retailer for resale, do you review any
23  materials to demonstrate how the product is protected
24  during that channel?
25     A.  No, I just reviewed a description of what their

Page 55

1  supported channels would be, but no specifics related to
2  how the product is handled in shipment.
3      Q.  Now, with respect to the complaint that was
4  sent to Amazon in November 11th, there were two
5  complaints, is that correct, November 11th and
6  November 13th?
7      A.  Those were dates where complaints were made.
8  I'm not sure how we would count them, but there may have
9  been multiples on one of those days but, yes.
10     Q.  Without going through the necessity of marking
11  an exhibit --
12     A.  No --
13     Q.  -- you have a recollection that the complaint
14  was that the products were counterfeit?
15     A.  I -- I believe they use the term "inauthentic"
16  in the complaint.
17     Q.  Well, then we'll have to get the complaint
18  unfortunately to let you review it again.
19           THE WITNESS:  Do you --
20           MR. VINE:  Yes.  Here is mine -- You could
21  see here the document.
22           MR. GOODMAN:  Is that the Amazon
23  production?
24           MR. VINE:  Yeah.
25           MR. GOODMAN:  0003?

Page 56

1            MR. VINE:  He's going to -- Yes.
2            THE WITNESS:  Let me just make sure of the
3  date here.  Where's it at?
4            MR. VINE:  It doesn't say the date on
5  there.
6            THE WITNESS:  Oh.
7            MR. VINE:  But here's the --
8            Right?  It doesn't say the date.
9            MR. GOODMAN:  No.
10           MR. VINE:  But it's Amazon 000 --
11           MR. GOODMAN:  We agree that it was on or
12  around that date?
13           MR. VINE:  One of them.
14           MR. GOODMAN:  Does he have any dispute --
15           MR. VINE:  Yeah.
16           MR. GOODMAN:  Yeah.
17           May I see that, please, for the moment.
18  You can take it out.
19           THE WITNESS:  Okay.
20           MR. GOODMAN:  Rather than mark this as an
21  exhibit, we'll just note that the document we're
22  referring to is marked Confidential AMZN00003.
23     Q.  BY MR. GOODMAN:  Would you take a look at that,
24  please.
25     A.  Sure.  Okay.



MICHAEL PAZAK                                          February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                   57–60

Page 57

1    Q.   May I have it for a second?
2         The first bullet point --
3    A.   Yes.
4    Q.   It says "counterfeit products are being sold at
5    this listing."  Does it contain any of the topics that
6    you testified earlier with regard to lack of
7    authenticity?
8    A.   The first bullet alone does -- no, it says
9    "Counterfeit products are being sold," and the -- the
10   verbatim gets in and says they refer to them -- "The
11   sellers are not selling the authentic products as shown
12   in the ASINs referenced."
13        (The reporter requested clarification.)
14        THE WITNESS:  As shown in the ASINS.
15        MR. VINE:  A-S-I-N.
16        THE WITNESS:  Oh, I'm sorry.  Yeah.
17   Q.   BY MR. GOODMAN:  What is ASIN so we don't have
18   to go through this?
19   A.   Yeah.  It's an Amazon standard identification
20   number.  It's Amazon's unique system for identifying each
21   unique product for sale.
22   Q.   In your experience have you viewed complaints
23   made to Amazon regarding the sellers' products that are
24   claimed to be counterfeit other than Solu-Med?
25   A.   Yes, I have.

Page 58

1    Q.   And what type of complaints have you reviewed?
2    A.   I've seen complaints where product has been
3    relabeled.  I've seen complaints where product has
4    been -- where they have changed expiration dates.  I've
5    seen complaints where products have been produced by
6    unauthorized manufacturers.  I've seen complaints where
7    the products had seals that were opened or not secured.
8    I've seen complaints where products are outright out of
9    date.  I've seen complaints where products are -- I'm
10   just trying to think of all the other -- dates -- I've
11   seen other complaints where -- where the seller is saying
12   the -- the product doesn't have a manufacturer's
13   warranty.
14   Q.   Is -- is -- are these complaints the ones you
15   reviewed when you were at Amazon or in your private
16   endeavors?
17   A.   Both.  It would span both.
18   Q.   And the documents and materials you relied upon
19   here, did they evidence any of the factors that you just
20   testified to:  Relabeling, expiring, broken seals?
21   A.   The only -- the only -- I'm sorry.
22        Of this complaint specifically?
23   Q.   Yeah, just relating to this way.  You gave me
24   a --
25   A.   Okay.

Page 59

1    Q.   -- panoply of --
2    A.   Sure.
3    Q.   -- everything --
4    A.   Yeah.  So I mean I -- I saw other complaints
5    made about Solu-Med that addressed some of these issues
6    like expired product, like a broken seal.  I saw other
7    complaints like that and so -- so, yes, I guess that's
8    right.
9    Q.   But in this document that we've shown you, none
10   of that is articulated in that document?
11        MR. VINE:  Objection.
12        Go ahead.
13        THE WITNESS:  So correct.  This is limited
14   specifically to inauthenticity based on the lack of the
15   manufacturer's warranty.
16   Q.   BY MR. GOODMAN:  But it does say "counterfeit"?
17   A.   Yes, it does.
18   Q.   All right.  Your understanding of Amazon's
19   policies is that it has a zero tolerance with regard to
20   counterfeiting?
21   A.   I would say they'll -- if they find -- if
22   they -- zero tolerance, I -- I -- I suppose it's -- it's
23   probably fair to say that.
24   Q.   Well, you phrase it in your terms.
25   A.   Sure.  Yeah.  So they are very concerned about

Page 60

1    customers getting authentic goods that are exactly what
2    they get in any other situation where they can buy them
3    through a retailer.  The big issue for Amazon is customer
4    trust.  They also don't want to be seen as a sort of a
5    second tier place where you get stuff that you can't
6    trust and stuff you can't rely on.  So their big focus --
7    and they're very focused on making sure the product you
8    buy from Amazon will perform, will meet your expectations
9    just like if you bought the product through any other
10   physical chain in particular, because they don't have a
11   big physical channel.
12   Q.   Going back to your employment with Amazon, when
13   did you terminate that relationship or when was the
14   relationship terminated?
15   A.   When?  When?
16   Q.   Yeah.
17   A.   I think that was fall of 2012 I believe.
18   Q.   2012?
19   A.   Yeah.
20   Q.   You resigned from the company?
21   A.   I did.
22   Q.   Any particular reason?
23   A.   Just a personal decision.
24   Q.   Uh-huh.  And then you started consulting; is
25   that it?



Page 61

1    A.  That's correct.

2    Q.  And you've been consulting since that time?

3    A.  Yes, I have.

4    Q.  Prior to leaving Amazon that time, did you
5 acquire -- we went through the early stages of your
6 employment with Amazon where you took on additional
7 responsibilities, was there any other responsibilities
8 you undertook prior to leaving?

9    A.  I -- I don't believe so.  I think that was -- I
10 believe what -- I believe my --

11        MR. VINE:  Objection to the question, by
12 the way, because he didn't only discuss his early stages.
13 He discussed how the stages then expanded more and more
14 into the Amazon marketplace and the management of the
15 Amazon marketplace.

16        THE WITNESS:  I believe that was a
17 complete summary.

18    Q.  BY MR. GOODMAN:  Okay.  And what did you do
19 from that point on when you left Amazon?

20    A.  So I began to consult with customers -- my --
21 my clients who were either trying to decide how they
22 should partner with Amazon -- so maybe they had no
23 relationship with Amazon.  And those would be brands that
24 had avoided working with Amazon directly, but Amazon was
25 getting to be a big force in the market across -- you

Page 62

1 know, outside of their traditional media categories.  So
2 my clients were big brands trying to determine, "Should
3 we be a vendor?  Should we be a seller?  How do we go
4 about it?  How do we set it up?"

5        I also helped sellers who got into similar
6 types of problems with Amazon.  Amazon, there are a lot
7 of resellers who expanded their business into Amazon
8 without fully understanding the nature of how to do it
9 and avoid Amazon's wrath, if you will, of how they
10 maintain and discipline their sellers and how they
11 maintain a well ordered marketplace.  So in a number of
12 cases, I helped sellers in that regard, helped them
13 understand -- and in a number of cases I helped vendors
14 in the same way.

15        Amazon can be a very unprofitable channel
16 if you don't follow the rules and that's regardless if
17 you're a vendor or a seller, and that was the main focus
18 of the work I began doing.

19    Q.  Among your clients were there also resellers?

20    A.  Yes.

21    Q.  How do you differentiate from a seller on
22 Amazon and a reseller?

23    A.  When I say "reseller," I mean their primary
24 business is buying and reselling product.  They
25 themselves don't have a brand, they themselves don't have

Page 63

1 a product, R & D or research and development function.
2 They are selling someone else's product primarily.  And
3 I'll contrast that with a brand who has built a brand,
4 sells through other channels, but also then decides to
5 sell on Amazon.

6    Q.  Like Youngblood today?

7    A.  Yes, like Youngblood today.

8    Q.  Okay.  Let me ask you this:  For the past
9 several years since you've been essentially in your own
10 business, have you acted as an expert in any litigated
11 matter?

12    A.  No, this is my first role.

13    Q.  Well, congratulations.

14        Have you testified in any arbitration
15 proceeding involving Amazon and sellers or resellers?

16    A.  No.

17    Q.  Have you written any -- have you authored any
18 publications on the subject matter of your expertise?

19    A.  I've written papers and procedural documents
20 for vendors and sellers for their private use.  I've not
21 submitted any to sort of a -- like a publisher or
22 anything.

23    Q.  And where are those maintained?

24    A.  Those are in the custody of the clients that I
25 would have created them for.  So I created them as work

Page 64

1 product for a vendor or seller and they have those
2 documents.

3    Q.  So they would not be available for you to
4 disclose?

5    A.  Correct.

6    Q.  What subjects did you write about?

7    A.  A very, very broad set.  So general categories
8 would be complying with Amazon's metrics, so the things
9 I've talked about, how to handle queries from Amazon, how
10 to manage queries from Amazon customers to avoid negative
11 feedback, negative response, how to list products
12 accurately, how to portray products so that there's no
13 misunderstanding about what the product is that's being
14 purchased.  Basically any of the major policy areas would
15 have been covered in one or more of the types of
16 documents I prepared.  It's a service to my clients to
17 help distill what is a very, very large amount of
18 information made available to vendors and sellers and
19 help them focus on the things that can help drive their
20 business most successfully and very importantly stay out
21 of trouble with Amazon.

22    Q.  Based upon your experience with Amazon and in
23 the field of e-commerce, could you tell me whether Amazon
24 has on its platform resellers who do not purchase the
25 products directly as an authorized distributor of the



MICHAEL PAZAK                                February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                      65–68

Page 65

1  brand?
2         MR. VINE:  Objection.
3     Q.  BY MR. GOODMAN:  Go ahead.
4         MR. VINE:  To the extent you can answer if
5  you have personal knowledge.
6         THE WITNESS:  I couldn't name an example.
7     Q.  BY MR. GOODMAN:  I don't want an example.  I
8  just want --
9     A.  But I believe that's the case.
10    Q.  All right.  Now, assuming then if those
11 resellers are offering the product on Amazon, not being
12 an authorized distributor, would you consider those
13 resellers as offering counterfeit products?
14        MR. VINE:  Objection.
15    Q.  BY MR. GOODMAN:  Go ahead.
16    A.  Only if they list the product in violation of
17 Amazon's authenticity and anti-counterfeiting policy.  If
18 they list the product -- so if the product has no
19 manufacturer warranty available.
20    Q.  Let's assume it has everything.
21    A.  Okay.  If we're assuming it has a manufacturer
22 warranty available in other channels, but not through
23 this reseller; is that the scenario?
24    Q.  Uh-huh.
25    A.  Okay.  If a product is being offered for sale

Page 66

1  on Amazon without a manufacturer's warranty, any reseller
2  is allowed to list that for sale without violating any
3  policy so long as they do so with a note in the listing
4  available to the consumer that discloses the lack of the
5  manufacturer's warranty.  So they clearly set the
6  expectation that the product is not new by Amazon's
7  guidelines -- it's one of the other conditions -- and
8  they have to state, "By the way, this does not include a
9  manufacturer's warranty, so it's buyer beware."  And if
10 an Amazon customer chooses that, that's fine, but they
11 have to be up front about it.
12        MR. VINE:  And it can't be cosmetics.
13        THE WITNESS:  As I said earlier, cosmetics
14 don't allow for that condition type to be listed.  That's
15 a category-specific requirement.  And that's why I said
16 one of the things that I do when I start with a customer
17 is get a broad understanding -- or any seller, or trying
18 to understand a seller's business, I try to look at
19 everything they are selling because there are
20 category-specific guidelines that must be considered to
21 stay within the rules and -- and not create a policy
22 violation.
23    Q.  BY MR. GOODMAN:  In any of the materials that
24 you reviewed, including the depositions and referring to
25 Youngblood's website, have you found any evidence that

Page 67

1  the products offered by Solu-Med, the Youngblood
2  products, were not new, did not carry the manufacturer's
3  guarantee, or any other violation of Amazon's policies?
4     A.  Yes.  So both in the Aguero deposition and the
5  Kellon Goodson.
6     Q.  Yes.
7     A.  In the Goodson -- in both of those depositions
8  they said the products they were selling from Youngblood
9  were not being sold with a manufacturer's warranty.
10    Q.  Did you consider any other materials other than
11 the testimony?
12    A.  To determine if it --
13    Q.  If it carried the manufacturer's warranty --
14 if -- Let me back up.
15        If you would have visualized the product,
16 would you be able to determine whether it carried a
17 manufacturer's warranty?
18        MR. VINE:  That the reseller sold it with
19 a manufacturer warranty?
20    Q.  BY MR. GOODMAN:  I just want to know where it
21 would be.
22    A.  If it had a manufacturer's warranty?
23    Q.  Yeah.
24    A.  If it had a manufacturer's warranty --
25    Q.  Would it be on the package?

Page 68

1         MR. VINE:  Objection.
2     Q.  BY MR. GOODMAN:  You can answer.
3     A.  It might be.  It may not be.  But it could be.
4  But it's not required to be.  Typically because of the
5  nature of warranty language -- and it can be sort of long
6  and a lot of legalese in there, they tend to refer to a
7  website, manufacturers tend to refer to a website today
8  for a full listing or full disclosure of a warranty.
9     Q.  So then the fallback position is Amazon's A to
10 Z?
11        MR. VINE:  No.
12        THE WITNESS:  Not if it -- the -- the --
13        MR. VINE:  Objection.
14    Q.  BY MR. GOODMAN:  Go ahead.
15    A.  I think maybe I'm not following the discussion.
16 If -- most customers that are buying the product will
17 look at the product and, if it says, you know, ybskin.com
18 or something, most customers will look at that product
19 and then look for remedies from a manufacturer or they'll
20 go to -- they may go to the reseller.  They may contact
21 Amazon through -- or they may contact the reseller
22 through Amazon's platform.  Amazon always wants you to go
23 that route first, and those claims will wind up -- first
24 and foremost -- It depends who fulfilled the item.  If
25 Amazon fulfilled the item, the customer service, those



Page 69

1 claims will go to Amazon first.  If Solu-Med fulfilled
2 the item, and they do, it's a mix, they do some of their
3 own fulfillment, those claims will go to Solu-Med.  And
4 so what happens then is -- you know, falls to the policy,
5 and that's where it gets -- in Solu-Med's case it gets
6 even a little bit unfriendly to the customer because they
7 say they don't accept cosmetics on their website.
8              And so you have customers that are,
9 therefore, very unclear how to get the remedy.  If they
10 go to Youngblood, Youngblood will say, "Sorry, I never
11 heard of it."  If you go to -- you look at Solu-Med,
12 you're, like, well, I -- it says that they don't accept
13 returns, so I don't do anything there.  Not every
14 customer of Amazon's -- and, in fact, very few customers
15 understand how to make an A to Z guarantee claim.  That's
16 a very different thing.  Most consumers aren't really
17 even familiar that that's there anymore.
18             It was important at one time when no one
19 knew who Amazon was or had any reason to trust Amazon.
20 It's still important today, but there's a separate
21 process to make an A to Z guarantee claim when you don't
22 get a good response from a seller.  And, unfortunately,
23 there are cases where, you know, because they didn't
24 think they had that remedy from Solu-Med, they didn't
25 even know that they could make an A to Z guarantee claim.

Page 70

1     Q.   You don't know that to be a fact?
2     A.   Sure.  No.  There are -- you'll see on the
3 thumbdrive there are customer feedback comments where
4 Solu-Med's customers were complaining about authenticity
5 of product and they said, you know, "And -- and this
6 product is sold without any" -- you know, "I can't return
7 it because the policy says, 'I can't return it.'"  I'm
8 summarizing.  The exact quote is on there.
9     Q.   But I could find that on the thumbdrive?
10     A.   Yeah.  If you look on the storefront notes,
11 it's on there.
12     Q.   Let me ask you this:  Are you familiar with
13 Amazon's complaint policies and what they do to
14 investigate a complaint that's made, in this instance,
15 that the products being offered by Solu-Med were
16 counterfeit?  Do you know what the process is?
17         MR. VINE:  Objection.
18         THE WITNESS:  So I have a general
19 understanding of how they respond to seller performance
20 complaints, yes.
21     Q.   BY MR. GOODMAN:  Please tell me.
22     A.   So this falls under the general area of seller
23 performance.  So Amazon has a team of people that will
24 review the complaint, review the seller history with
25 respect to the complaint, and make a determination which

Page 71

1 track to follow, so they have a standard operating
2 procedure that says, based on certain factors, they might
3 just inform the seller and -- and so it's in the -- the
4 policies and the customer's best interest.  The fact that
5 you -- excuse me.
6     Q.   Take your time.
7     A.   The fact that you -- that you have the
8 complaint, Amazon is going to immediately take the
9 products off line.  Just those products, they will take
10 those products that there are concerns about, they will
11 make those unavailable.  Because if there is a problem,
12 they don't want other customers to be harmed by it.  So
13 as soon as there's any inkling that there could be a
14 problem, they take those customers off line.
15             Amazon has the same policy if a customer
16 calls in to the call center and says, "Hey, this product
17 isn't right."  Those call center front line employees are
18 empowered to take the product down and immediately begin
19 an investigation on that because, again, the risk is very
20 great to Amazon's reputation.
21     Q.   In this instance here where the complaints were
22 made on November 11th and 13th and then by November 15th
23 the account was delisted, does that account for any
24 investigation?
25     A.   Sure.  So I would -- I expect that just like on

Page 72

1 the previous complaints that Solu-Med received, the
2 performance team would have looked, seen, is there a
3 prior complaint history, and most importantly, the
4 complaint doesn't establish the violation.  They give the
5 seller every opportunity to respond and say, "No, no, no,
6 these products are authentic.  Here is my chain of
7 custody.  Here are the invoices from the distributor.
8 They are a hundred percent authentic."  And so -- In
9 fact, that's Amazon's expectation.  They give you time to
10 respond.
11             So the first Youngblood complaint, I
12 believe, was on the 11th.  There was -- you know,
13 that -- that -- that began -- they had the opportunity to
14 begin a discussion, but I don't think that they even
15 responded to the first complaint, which is consistent,
16 unfortunately, with the way Solu-Med responded to each of
17 these complaints throughout 2018.  They -- they didn't
18 answer Amazon, and that's the worst thing that you can do
19 when Amazon is reaching out and saying, "We're concerned.
20 We think this is a violation.  Hey, if we got it wrong,
21 here are the steps to take to tell us it's fine, you
22 know.  Tell us you're doing everything as you should.
23 We'll consider it."  But unfortunately they didn't do any
24 of those things.
25             So by the time they had the seventh or



MICHAEL PAZAK                                    February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                    73–76

Page 73

1 eighth complaint on the 13th when another round of
2 complaints showed up and they've heard nothing from
3 Solu-Med in that time, I'm sure that they've --
4 they breached --
5        MR. VINE:  There was a phone call to them.
6        THE WITNESS:  Well, and -- and, yeah,
7 they'll absolutely -- when they have the concern, there's
8 a phone number in your seller account that you designate
9 for critical concerns, so you don't even rely on email at
10 that point.  They actually call you to your designated
11 phone number for critical complaints, which is specific
12 to when they are going to take action.
13     Q.  BY MR. GOODMAN:  So in this case Amazon took
14 this very severe reaction to the complaint and within a
15 matter of four days they closed down the store?
16        MR. VINE:  Objection.
17     Q.  BY MR. GOODMAN:  Is that correct?
18        MR. VINE:  Objection.
19     Q.  BY MR. GOODMAN:  Go ahead.
20     A.  Amazon -- yeah, within four days of receiving
21 one of the complaints -- but they didn't respond to that
22 complaint.  And you could say, you know, whether -- I
23 don't know -- again, the severity of that action, I mean,
24 they also had, you know, 20, 30, 40, 50 days between
25 complaints where they didn't take any action, but I don't

Page 74

1 believe it -- it -- the action on the 13th was entirely
2 based on the 11th.  It's the history and the pattern of
3 no response from Solu-Med.
4     Q.  Is that anywhere contained in your report?
5        MR. VINE:  Objection.  Asked and answered.
6        MR. GOODMAN:  He can answer again.
7        THE WITNESS:  Yes.  So I refer to --
8     Q.  BY MR. GOODMAN:  I'm talking about the initial
9 report.
10     A.  Yeah.  Let me get to that.  On page 11.
11     Q.  I'm looking for it.
12     A.  Top of page 11 and actually a little bit on
13 page 10.  I say that, "When they receive a notice of
14 infringement, Amazon investigates the validity of the
15 claim" --
16     Q.  Well, let me go back to 11 --
17     A.  I'm sorry.
18     Q.  -- 10, bottom.
19     A.  Yeah.  Bottom of page 10.  Yeah.
20     Q.  "When Amazon receives a notice of potential
21 infringement, Amazon investigates the validity of the
22 claim, considers the seller's history of complaints,
23 responses, performance, any prior suspensions and takes
24 whatever action it determines appropriate, ranging from
25 notice/inquiry to suspension to cancellation.  In this

Page 75

1 case Amazon would have considered Solu-Med's suspension
2 and complaint history."  And then it cites the
3 references?
4     A.  Correct.
5     Q.  So is that your opinion now that that is the
6 reason why they shut down the store?
7     A.  Yes.  It was a history of complaints to which
8 Youngblood -- I'm sorry -- history of complaints to which
9 Solu-Med did not respond per Amazon's specific
10 instructions.
11     Q.  And then this -- these two complaints on
12 November 11th and 13th were the trigger point for closing
13 down the account?
14        MR. VINE:  Objection.
15     Q.  BY MR. GOODMAN:  Go ahead.
16        MR. VINE:  He never testified --
17 Mischaracterizes his testimony.  He never said it was the
18 trigger point.
19        MR. GOODMAN:  I'm asking based upon his
20 knowledge what is his opinion?
21        THE WITNESS:  It's my opinion that every
22 time they get a complaint, they'll look at the complaint
23 history.  They got a complaint on the 11th.  It followed
24 the same pattern as the seven previous complaints where
25 they got no response from Solu-Med.  And based on no

Page 76

1 response to eight complaints at that point, I think
2 Amazon said, "We need to wake them up," to use kind of a
3 casual term, "see if they are even paying attention.
4 They are not answering our emails.  We need to make sure
5 that we have a discussion with them."  And I think Amazon
6 took the action to have an in-depth discussion and
7 investigation with Solu-Med, and I think that's exactly
8 what it triggered, is they suspended it so that they
9 could have that discussion, and that's what transpired.
10     Q.  BY MR. GOODMAN:  At the time you rendered this
11 report, did you have the opportunity to review the
12 complaint history?
13     A.  Yes.
14     Q.  And that was an exhibit to the depositions?
15     A.  Yes.
16        MR. VINE:  And was also part of the
17 production that he mentioned earlier.
18        MR. GOODMAN:  Yeah, I understand.
19        MR. VINE:  I know.  But you keep leaving
20 things out and that's misleading.  He specifically
21 testified -- let me finish -- earlier that not only did
22 he review the exhibits to the depositions and the
23 depositions, he rereviewed the entire set of production.
24        MR. GOODMAN:  Thanks for your help.
25        MR. VINE:  I know.  But by you limiting it



MICHAEL PAZAK
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020
77—80

Page 77

1 to the exhibits, it's not --
2          MR. GOODMAN: Okay. All right. Going
3 back to the --
4          MR. VINE: And just so the record is
5 clear, there were also complaints on November 2nd, but --
6          MR. GOODMAN: There was a complaint on
7 November 2nd --
8          MR. VINE: That went unanswered.
9          MR. GOODMAN: -- I'll stipulate to that.
10         MR. VINE: Okay.
11         MR. GOODMAN: No problem.
12     Q.  BY MR. GOODMAN: But in reviewing those
13 complaints in that exhibit, if you recall, were there not
14 five complaints after -- during the year 2019 after
15 Solu-Med was reinstated?
16     A.  I don't recall exactly because I was limiting
17 my view -- review to events prior to -- to that period of
18 time.
19         MR. GOODMAN: All right. Can we take a
20 short break?
21         MR. VINE: Sure.
22         (A break was taken from 11:31 a.m. to
23 11:50 a.m.)
24         MR. GOODMAN: Let's have this marked as
25 Exhibit 3, which is your rebuttal report.

Page 78

1          (Exhibit No. 3 was marked for
2 identification.)
3          THE WITNESS: This one's got your notes.
4 Did you want your notes?
5          MR. GOODMAN: Yeah, I gave you the wrong
6 one. Thank you. You're a gentleman.
7     Q.  BY MR. GOODMAN: You have before you what has
8 been marked Exhibit 3. It's entitled SOLU-MED, INC vs.
9 YOUNGBLOOD SKIN CARE PRODUCTS, LLC, Rebuttal to Report of
10 C.J. Rosenbaum. When did you prepare this report?
11     A.  It would have been the -- the week
12 following the -- the submission on my report was
13 January --
14         MR. VINE: You could just say "After
15 C.J.'s."
16         THE WITNESS: Oh.
17     Q.  BY MR. GOODMAN: It was February 6th that this
18 report is dated.
19     A.  Okay. So, yeah, it would have been the first
20 of February.
21     Q.  At the time you prepared this report, were you
22 provided -- or shortly before that or contemporaneously
23 with it, were you provided with additional discovery and
24 materials?
25     A.  Only the report itself.

Page 79

1     Q.  Did you review any production that was made by
2 Amazon?
3     A.  Not prior to the rebuttal --
4         MR. VINE: Well --
5         THE WITNESS: Additional.
6         MR. VINE: Are you asking -- I need to
7 make sure it's clear.
8         MR. GOODMAN: Cause this is coincidental,
9 the time, with the document regarding Clarice Cohn --
10         MR. VINE: You mean the declaration?
11         MR. GOODMAN: The declaration.
12         MR. VINE: Okay. He had that. Okay.
13         MR. GOODMAN: Let's be clear.
14         THE WITNESS: Okay.
15         MR. VINE: Well, you also have to show --
16 that's fine. I'm going to show him a copy of --
17         MR. GOODMAN: I have the whole thing. I
18 don't want to clutter the record again.
19         MR. VINE: Right.
20         Here is the declaration with the
21 attachments with -- remember -- of the guidelines --
22         THE WITNESS: Yes, the guidelines that
23 Amazon produced.
24         MR. VINE: Right. So you remember there
25 was a declaration --

Page 80

1         THE WITNESS: Yes --
2         MR. VINE: -- Clarice --
3         THE WITNESS: Yes, yes, yes, yes.
4         MR. GOODMAN: And a complaint history?
5         THE WITNESS: Yes, that was in there as
6 well, yes. There's a spreadsheet or discussion of it,
7 yes.
8     Q.  BY MR. GOODMAN: And did you receive that on
9 February 6th?
10     A.  I don't know the exact date of when I got that.
11     Q.  It's dated February 6th.
12         MR. VINE: I will tell you the date. I
13 mean, it was literally sent -- it was forwarded -- but
14 you're fine.
15         THE WITNESS: Yeah, I'll trust if that's
16 the date. I don't know.
17     Q.  BY MR. GOODMAN: What I'm asking for is did --
18 immediately after you received the report by whatever
19 means it was transmitted, did you then prepare your
20 rebuttal report?
21     A.  I did.
22     Q.  All right. Prior to that you had no reason to
23 file a rebuttal report; is that correct?
24         MR. VINE: You're talking about C.J.'s.
25         THE WITNESS: Prior to receiving a report?



MICHAEL PAZAK
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020
81–84

Page 81

1      MR. VINE:  You mean C.J.'s?
2      (The reporter requested clarification.)
3      MR. VINE:  Okay.  The record --
4      MR. GOODMAN:  Yeah, to C.J.'s report.
5      MR. VINE:  Okay.  Let me make -- let's
6   make sure the record is clear because it's not cause I
7   think either I was misunderstanding what you were
8   saying or not cause --
9      MR. GOODMAN:  Probably you did, yeah.
10      MR. VINE:  I thought you were asking about
11   a rebuttal report to the declaration --
12      MR. GOODMAN:  No, no, no --
13      MR. VINE:  -- of --
14      THE REPORTER:  I'm sorry.  You're speaking
15   at the same time.
16      MR. GOODMAN:  We're trying not to, but
17   it's just our nature.
18      Q.  BY MR. GOODMAN:  Okay.  This is the rebuttal
19   report to the report of C.J. Rosenbaum?
20      A.  Yes.
21      Q.  All right.  Prior to that there was no reason
22   that you had to file any additional report?
23      A.  Correct.
24      Q.  And what influenced you to write this report?
25      A.  Reviewing C.J.'s report.

Page 82

1      Q.  Yes.
2      A.  The content of the report itself, I felt that
3   the report was missing some important information that is
4   relevant in the case.
5      Q.  May I ask you why you didn't prepare this
6   report earlier than February 6th?
7      A.  I -- I -- I probably worked on it for a few
8   days' time prior to that.  So it was really just my
9   availabil- -- the availability of my time to read the
10   report, digest -- C.J.'s report, digest the information,
11   and think through a response.
12      Q.  But prior to that time, you had not been able
13   to review the declaration of Clarice Cohn and the
14   attachments?
15      A.  Correct.
16      Q.  All right.  So it was upon receipt of that that
17   you determined to formulate this rebuttal report?
18      MR. VINE:  Objection.  That's
19   mischaracterizing his testimony.
20      THE WITNESS:  No.  What I meant to say
21   is -- so when I got C.J.'s report is -- when I was
22   reading through it, that's when I said it's -- I wanted
23   to call out the things I felt were missing in the report.
24   So I wanted to prepare the rebuttal based on this --
25   based on the C.J. Rosenbaum report.

Page 83

1      Q.  BY MR. GOODMAN:  And the declaration of Clarice
2   Cohn and the attachments?
3      MR. VINE:  Objection.
4      THE WITNESS:  That wasn't a factor in
5   whether or not I prepared the rebuttal report.
6      Q.  BY MR. GOODMAN:  So the complaint history that
7   was attached to Clarice Cohn's deposition -- I mean
8   declaration had nothing to do with formulating this
9   report?
10      A.  Correct.
11      Q.  So your opinions were based upon what you
12   already had?
13      A.  Correct, we had a complaint history that was
14   a -- a part of an exhibit to the Aguero deposition and so
15   that's -- that's what I had already seen prior to
16   preparing -- or prior to getting the Amazon information.
17      Q.  All right.  Let me just --
18      MR. VINE:  That's why I had to clean it
19   up, cause it was getting --
20      THE WITNESS:  Yeah, I think I
21   misunderstood maybe.
22      MR. VINE:  That's fine.  That's fine.
23      Q.  BY MR. GOODMAN:  On page 9 of your report.
24      A.  The rebuttal?
25      Q.  Yes.

Page 84

1      A.  Okay.  Okay.
2      Q.  Number 3.
3      A.  Yes.
4      Q.  "Solu-Med had a history of not responding to
5   prior Amazon warnings regarding intellectual property
6   infringement, authenticity infringement, and counterfeit
7   product.  This history was a significant factor."  When
8   you say "this significant factor," which factor are you
9   referring to?
10      A.  The complaint history that Solu-Med -- that
11   was -- that Solu-Med had and their lack of response.  So
12   when I say "the history," the history and the history of
13   not responding.
14      MR. VINE:  Do you know -- I just want to
15   make sure you understand that the complaint history
16   attached to the Cohn declaration was previously
17   produced --
18      MR. GOODMAN:  Yeah.
19      MR. VINE:  Yeah.  And it was obviously --
20   some of it was exhibits at depositions.  This was --
21      MR. GOODMAN:  I didn't attend those
22   depositions.
23      MR. VINE:  Right.
24      MR. GOODMAN:  But I did review those --
25      MR. VINE:  Right.  So this is just an

Page 85

1 authenticity --

2    MR. GOODMAN:  Of those complaints.

3    MR. VINE:  -- of those complaints.

4    MR. GOODMAN:  I got you.

5    MR. VINE:  Okay.  Not that they were -- I

6 think that's what you thought, like they were new.  This

7 was all documents that were previously produced.  In

8 fact, a lot of them say "PL," which means plaintiff

9 produced it.

10    THE WITNESS:  Yeah.  The -- the complaint

11 history I recall seeing was plaintiff produced and was an

12 exhibit to the Aguero deposition.

13    MR. VINE:  And Amazon also provided this

14 spreadsheet, I think, before as well.

15    Q.  BY MR. GOODMAN:  In your opinion, what

16 importance did the complaint by Youngblood to Amazon that

17 their products were counterfeit play a role in

18 deactivating the account?

19    A.  I would -- I'd say -- or I would say that the

20 importance was raising a specific seller to -- on

21 Amazon's radar for an investigation.  And when Amazon

22 looked at the facts, looked at the history, the lack of

23 response, then they took that action.  So it was -- I

24 think it was in a -- it -- it triggered the same response

25 that Amazon had many times before throughout the year.

Page 86

1 And it was a -- just sort of, yet, another example of the

2 same type of complaint that was lodged with the same type

3 of objection and the same type of policy violation that

4 Amazon took.

5    Q.  So this is an assumption on your part that that

6 is what Amazon considered --

7    A.  Yes.

8    Q.  -- all of these factors --

9    MR. VINE:  Wait.  Let him finish.

10    Q.  BY MR. GOODMAN:  -- in taking the action they

11 did in deactivating the account?

12    MR. VINE:  Objection.

13    Q.  BY MR. GOODMAN:  Go ahead.

14    A.  Yes, that's my belief.

15    MR. GOODMAN:  Let me mark this as an

16 exhibit.  It's a notice of policy warning dated

17 November 11th, 2018.

18    Jonathan, do you need this?  You may have

19 it.

20    (Exhibit No. 4 was marked for

21 identification.)

22    Q.  BY MR. GOODMAN:  Read it through, please.

23    A.  Okay.

24    Q.  All right.  Have you seen this document before?

25    A.  Yes, I have.

Page 87

1    Q.  And when did you see it to the best of your

2 recollection?

3    A.  I believe this was in the first -- I believe

4 this was an exhibit to the deposition, so I would have

5 seen that in December.

6    Q.  Uh-huh.  Prior to that time, in your experience

7 with Amazon and representing your own clients, had you

8 ever seen a notice of policy warning similar to this?

9    A.  Yes, I have.

10    Q.  Where did you see that?

11    A.  Working with other clients of mine.

12    Q.  Did these other clients receive a policy

13 warning similar or substantially the same as this?

14    A.  Yes.

15    Q.  And were they resellers of products on Amazon?

16    A.  Some were, yes.

17    Q.  All right.  And did you represent them with

18 respect to the situation that developed with Amazon

19 concerning the policy warning?

20    A.  Yes, I advised them on how to respond to

21 Amazon's policy warning.

22    Q.  All right.  Now, I'd like you to just direct

23 your attention to the one, two, three, fourth sentence of

24 this policy warning.  "If the rights owner agrees to

25 retract their complaint, they must send the retraction to

Page 88

1 us and notice this dispute [sic] at Amazon.com"?

2    A.  Okay.

3    Q.  Have you seen that before?

4    A.  Yes.

5    Q.  And in the context of your representation of

6 your clients, what do you take that -- what is your

7 understanding of that request?

8    A.  It is one of the ways you can respond, so it's

9 Amazon -- it basically lays out a couple of different

10 responses that they want you to follow.  You can get a

11 retraction from the rights owner or you can give Amazon

12 supporting documentation proving that the product is

13 authentic.

14    Q.  Right.  In the context of your representation

15 of your clients, had you ever submitted or obtained a

16 retraction of the complaint?

17    A.  Of the complaint?  No.

18    Q.  Have you attempted to obtain a retraction?

19    A.  No.

20    Q.  Why?

21    A.  Because the most straight forward path is to

22 provide Amazon the proof that they are asking for the

23 chain of custody of the product and it doesn't require

24 the action of any third party.  You can you simply work

25 directly with Amazon to resolve their concern.



Page 89

1    Q.  Why is it not a straight forward path?
2    A.  Well, when you're communicating with a third
3  party, you can't control the outcome.  You can engage in
4  a discussion.  It might be lengthier.  You might not be
5  able to get ahold or get a response from the right person
6  at the right point in time, and time can be of the
7  essence on these things.  So if you have the
8  documentation readily at hand, you can respond the same
9  day in most cases.  If you have the documentation Amazon
10  is asking for, it's just a matter of scanning it, sending
11  it in, and explaining to Amazon what's going on.  So
12  you'll get a much more rapid response -- or, sorry, much
13  more rapid answer to Amazon that way instead of trying to
14  work through a third party.
15    Q.  In the order of the options that are stated in
16  this policy warning, the retraction is the first option,
17  is it not?
18    A.  It is.
19    Q.  And what is your understanding of what a
20  retraction would have to articulate?
21    A.  I believe that a retraction would basically
22  need to use that word, this is -- we retract our
23  complaint, so it has to be unambiguous, and like with
24  everything Amazon, it has to be retracted.
25    Q.  And to your understanding, based upon the

Page 90

1  materials you reviewed in this case, isn't it a fact that
2  Solu-Med requested a retraction from Youngblood?
3    A.  At some point I believe that they did, yes.
4    Q.  And to your knowledge was a retraction ever
5  provided by Youngblood?
6        MR. VINE:  Objection.
7    Q.  BY MR. GOODMAN:  Go ahead.
8    A.  I believe that it was.  I -- I don't recall
9  seeing the document.  But I recall seeing a conversation
10  thread via email where Youngblood or someone from the
11  organization agreed to submit a retraction.
12    Q.  And do you know -- did you have an opportunity
13  to review the retraction?
14    A.  I believe I -- I believe I saw it.  I can't --
15  I can't recall with certainty.
16        MR. VINE:  Just so it's clear, it was in
17  the production of --
18        THE WITNESS:  It was probably in one of
19  the emails I read, yes.
20        MR. GOODMAN:  I just have one more
21  exhibit, Jonathan.
22        MR. VINE:  That's fine.
23        (Exhibit No. 5 was marked for
24  identification.)
25        (An off-the-record discussion was held.)

Page 91

1        MR. VINE:  Exhibit 5 was produced in an
2  Excel format electronically, so it wasn't truncated.
3  It's your version that you printed up.  But the entire
4  content is contained in the Excel version that Amazon
5  produced.
6    Q.  BY MR. GOODMAN:  To the best that of your eyes
7  can do, I'd just like you to look at Exhibit 5.
8    A.  Okay.
9    Q.  It's a 1-page document double sided.
10    A.  Okay.
11    Q.  All right.  And I represent to you this was
12  attached to a declaration of Clarice Cohn, the custodian
13  at Amazon, as Exhibit 6, I believe.  And supposedly it's
14  a compilation of a complaint history.  Let's use her
15  exact words.
16        MR. VINE:  Of non-Youngblood complaints.
17        THE WITNESS:  Youngblood is on here.
18        MR. VINE:  Oh, really?  Because she --
19  they testified --
20        THE WITNESS:  There's one there.
21        MR. GOODMAN:  Yeah, it's Exhibit 6 related
22  in --
23        MR. VINE:  No, no, no --
24        MR. GOODMAN:  -- paragraph 9 of the
25  declaration --

Page 92

1        MR. VINE:  Okay.  So let me just --
2        MR. GOODMAN:  -- document.  Yeah.
3        MR. VINE:  -- explain it.
4        MR. GOODMAN:  It's a compilation of
5  complaints from intellectual property rights owners to
6  Amazon against Plaintiff Solu-Med storefront Life &
7  Health Source.  And then it gives the seller's
8  identification number.
9        MR. VINE:  Okay.  Can I -- It does not
10  include, and that's what they are amending -- adding for
11  authenticity purposes, the complaints of November 2018
12  from Youngblood.
13        MR. GOODMAN:  No, it doesn't.
14        MR. VINE:  Right.
15        MR. GOODMAN:  That's conspicuous by its
16  absence.
17        MR. VINE:  Well, no, cause they were only
18  doing --
19        MR. GOODMAN:  You don't know what they
20  were doing.
21        MR. VINE:  No, I spoke to Davis Wright.
22        MR. GOODMAN:  Yeah, I mean, I found it
23  very unusual that they wouldn't have that complaint here:
24  November 11th or 13th.
25        MR. VINE:  Or the 2nd.



Page 93

1         MR. GOODMAN:  Huh?
2    MR. VINE:  Or the 2nd.
3         MR. GOODMAN:  Or the 2nd.
4         MR. VINE:  There was --
5         MR. GOODMAN:  November 2nd.
6         MR. VINE:  -- November -- Yeah.
7         MR. GOODMAN:  All right.  So we'll agree
8    to that, that obviously it was not included.  We don't
9    know the reasons why.
10        Q.  BY MR. GOODMAN:  I'd just like you to look at
11   this, Mr. Pazak.  And as best as your eyes will permit,
12   look at the first date, January 27, 2018.  Have you seen
13   reports similar to this before when you were at Amazon?
14        A.  Yes.
15        Q.  Now, how are these -- to the best of your
16   knowledge, what is the practice of Amazon in preparing
17   these reports?  How were they stored?  How did they do
18   this?
19        A.  They -- the reports were stored in -- so
20   there's a solid performance team that acts as the
21   custodian of information related to complaints.  And the
22   seller performance team would store these in a database
23   and produce -- if there was a question as to the history,
24   you could -- there was internal tools that you could look
25   at to show an overall seller performance score as well as

Page 94

1    all sorts of factors related to complaints, customer
2    complaints, and the like.  So they maintained those in a
3    series of databases.
4         Q.  In looking at Exhibit 5, the first entry is
5    January 27th, 2018.  And can you read the communication?
6    Is it possible for you to do so or have you reviewed this
7    before?
8         A.  Yes, I can read it and I did review this one
9    other time as well.
10        Q.  And what is the substance of the complaint?
11        A.  On the 27th?
12        Q.  Yes, please.
13        MR. VINE:  Yeah.  Just so it's clear,
14   we're going to object to the use of this exhibit.  I
15   think the actual complaints that are sent to Solu-Med are
16   probably the best evidence, but, by all means, go ahead.
17        MR. GOODMAN:  You can make that objection
18   at the appropriate time before trial.
19        THE WITNESS:  Can you read the question
20   back.
21        (The requested question was read.)
22        THE WITNESS:  Okay.  The complaint on the
23   27th made to Amazon suggests that the products from
24   Giovanni Cosmetics are not sold with a manufacturer's
25   guarantee and therefore they are materially different

Page 95

1    from authentic products.
2         Q.  BY MR. GOODMAN:  I don't want you to strain
3    your eyes.
4         A.  Yeah.
5         Q.  Do the best you can.  Is there anything
6    contained therein as to any action being taken by Amazon
7    based upon this complaint?
8         MR. VINE:  Objection.  There's no column
9    that even talks about --
10        Q.  BY MR. GOODMAN:  No, I said anything that you
11   have reviewed.
12        A.  Oh.  I am not aware of any specific action that
13   Amazon took as a result of that complaint.
14        Q.  All right.  And this complaint dated
15   January 27th, 2018, preceded the complaint by Youngblood
16   on November 2nd, 2018; is that correct?
17        A.  Yes.
18        Q.  By how many months?
19        A.  Ten roughly.
20        Q.  All right.  The next complaint seems to be --
21   and it has a different complaint ID as January 28th,
22   2018?
23        A.  Yes.
24        Q.  Is that as well from Giovanni?
25        A.  Yes, it is.

Page 96

1         Q.  Is it essentially the same complaint?
2         And I agree with Mr. Vine this would be
3    better articulated in the full document.
4         A.  Yeah, it is the same essence of the complaint.
5    It's referring to a different product.
6         Q.  A different ASIN?
7         A.  Correct.
8         Q.  But it is the same company a day apart?
9         A.  Correct.
10        Q.  And go to the third one, March 5th, 2018.
11        A.  Yes.
12        Q.  Is that Giovanni?
13        A.  That is Medela, M-E-D-E-L-A.
14        Q.  And as best as you can discern with the small
15   print, what is the substance of the complaint?
16        A.  Essentially the complaint is the same in that
17   Solu-Med is selling products that do not include the
18   manufacturer's guarantee, therefore they are materially
19   different from authentic products and constitute a
20   violation of Amazon policy.
21        Q.  All right.  To the best of your knowledge,
22   based upon the materials you reviewed, did Amazon take
23   any action with regard to that?
24        A.  Not other than removing the products in
25   question, so Amazon would have --



Page 97

1    Q.  Meaning the specific ASINs?
2    A.  Yes, these ASINS would have been removed from
3  the site.  And I should have said in each of these, the
4  prior two --
5         MR. VINE:  They did take action.
6         THE WITNESS:  -- yeah, they took action of
7  removing those products and informing Solu-Med of what
8  steps they should take.
9    Q.  BY MR. GOODMAN:  All right.  Let's go to the
10  next one and get through this quickly.
11         MR. VINE:  Yeah.
12    Q.  BY MR. GOODMAN:  -- April 4th, 2018.  This is
13  by --
14    A.  Well, it's -- it looks like Brumisateur is the
15  brand and Wilkes Group is the brand owner or
16  representative of the brand that created the complaint.
17    Q.  Do you know whether Brumisateur is a cosmetic?
18    A.  I do not know.  I'm not familiar with that.
19    Q.  How about Giovanni, is it a cosmetics company?
20    A.  I believe it is, yes.
21    Q.  Any action, to your knowledge, that was taken
22  with regard to this?
23    A.  Other than removing the products from the
24  website, the ASINS on the complaint and warning Solu-Med,
25  that's -- I believe that's the only action that I see.

Page 98

1    Q.  Let's go quickly to April 30th, 2018.  The
2  complainant is Youngblood?
3    A.  Yes, that's correct.
4    Q.  All right.  What's the substance of the
5  complaint?
6    A.  It's intellectual property.  It's a
7  non-specific intellectual property complaint basically.
8    Q.  Okay.  You have no knowledge, based upon
9  materials you reviewed, whether any action was taken by
10  Amazon?
11         MR. VINE:  Objection.
12    Q.  BY MR. GOODMAN:  Go ahead.
13    A.  I believe that Amazon would have followed the
14  same process for each of these on the page: removing the
15  products and warning Solu-Med and giving them
16  instructions on what to do.
17    Q.  All right.  And the next one is July 23rd,
18  2018.  Van Der Hagen, do you know what kind of company
19  that is?
20    A.  It's a beauty and cosmetics so --
21    Q.  Okay.  And, briefly, what's the substance of
22  the complaint?
23    A.  So it looks like it was a trademark -- it says
24  "counterfeit" but it's cut off.  I can't really tell.
25  The core of that one is counterfeit.  There's a bit of a

Page 99

1  preamble, and then I don't know what it says after that.
2    Q.  Okay.  The very next one is a very short line
3  there.  I think it's July 25th, 2018?
4    A.  Uh-huh.
5    Q.  Tangle Teezer, do you know what those are?
6    A.  I'm not familiar with that.
7    Q.  And what's the substance of the complaint?
8    A.  He's saying "counterfeit," "not produced by
9  original manufacturer."
10    Q.  Anything that you've relied upon indicate that
11  Amazon took any action with regard to that complaint?
12    A.  No.  I suspect only that they gave them the
13  standard warning, took down the product, gave them the
14  standard warning and told them, if it wasn't counterfeit,
15  to let them know.
16    Q.  Okay.  I'm going to group the remaining ones.
17    A.  Okay.
18    Q.  January 30th, 2019.  Turn it over.
19    A.  Okay.
20    Q.  March 14th, 19 -- 2019; April 17, 2019;
21  April 29th, 2019.  I just want you to tell me what
22  companies made these complaints.
23    A.  Sure.  So looks like Vantibolli Beauty would be
24  the one on the 28th of January 2019.
25    Q.  Yeah.  Is that a cosmetics company to your

Page 100

1  knowledge?
2    A.  Typically, yes.
3         Beauty Blender would be the company, it
4  looks like on the 30th of January.  I'm not familiar with
5  that company.  It has "beauty" in the name, but I don't
6  know what they are doing.
7    Q.  All right.
8    A.  There is another one from Brumisateur, but that
9  is talking about Evian Facial Spray, so I'm familiar with
10  that as a brand, Evian.
11         And, let's see, the 14th of March,
12  Dermorganic, that would be a cosmetic company, yes.
13         Mixed Chicks I do not know.  That would be
14  the next one on April 17th.
15    Q.  Right.
16    A.  And then Duracell, April 29th, I'm familiar
17  with that brand as a battery company, not a
18  beauty/cosmetics.
19    Q.  All right.  So all of these 2019 complaints,
20  would you agree with me, were made after Solu-Med was
21  reactivated by Amazon?
22         MR. VINE:  Objection.
23    Q.  BY MR. GOODMAN:  Go ahead.
24         Do you know when Amazon reinstated the
25  account?  It was in the materials you were provided.



MICHAEL PAZAK
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020
101–104

Page 101

1    A.  Yeah, so it would have been in January.  I
2 expect that each of these was made after they were
3 reinstated.
4    Q.  And, to your knowledge, is Solu-Med still
5 active on Amazon's platform?
6    A.  As of November, the last time I looked, yes,
7 they were, as of November 2019.
8    Q.  All right.  Have you looked at it since?
9    A.  I have not.
10       MR. GOODMAN:  Mr. Vine, I have no further
11 questions.
12       MR. VINE:  Okay.  Great.  I have a couple
13 questions.
14          EXAMINATION
15    Q.  BY MR. VINE:  Let's start with Exhibit 4.
16    A.  Okay.
17    Q.  Exhibit 4 is a policy warning correspondence
18 from Amazon to Solu-Med, correct?
19    A.  Yes.
20    Q.  There were many of these such documents to
21 Solu-Med from January of 2018 --
22       MR. GOODMAN:  Why don't you ask him the
23 question instead of answering it?
24       MR. VINE:  You have an objection?
25       MR. GOODMAN:  You're leading him.

Page 102

1       MR. VINE:  Okay.  So then "Objection,
2 leading."
3       MR. GOODMAN:  Yeah.
4    Q.  BY MR. VINE:  Were there other complaints in
5 similar forms as the one in Exhibit 4?
6    A.  Yes.
7    Q.  Okay.
8    A.  I believe I counted at least seven in 2018
9 prior to this.
10    Q.  And that, of course, did not include the
11 November 2nd complaints by Youngblood or the
12 November 11th and 13th complaint, correct?
13    A.  That's correct.
14    Q.  Okay.  Now, one of the options that Amazon
15 gives is to request supporting information, correct?
16    A.  Yes, they do.
17    Q.  And then it says to provide that supporting
18 information?
19    A.  Yes, they do.
20    Q.  Is it important to Amazon, based upon your
21 experience, to get that supporting information?
22    A.  Yes.  Amazon is specifically asking for you to
23 take one or two actions in response to this notice.
24 You -- they are very clear on their ask.  You either --
25 you either work to -- with the rights owner or you

Page 103

1 provide the supporting documentation they ask for, either
2 one.
3    Q.  Okay.  And the supporting information is the
4 sourcing or chain of custody documents?
5    A.  Yes, that's correct.
6    Q.  Okay.  In Amazon's guidelines they talk about
7 keeping maintenance of the sourcing and chain of custody
8 documents, correct?
9    A.  Yes, they do.
10    Q.  And based upon your experience at Amazon, was
11 that important to Amazon to maintain those records?
12    A.  Yes, very important.  For reasons like this.
13 It's authoritative.  You can tell exactly where the
14 products came from.
15    Q.  Okay.  Does Amazon also warn Solu-Med in these
16 complaint histories that, if they continue to receive
17 complaints, they may not allow them to sell on
18 Amazon.com?
19    A.  Yes, they -- that's -- that specific warning is
20 included with each of the policy warning documents.
21    Q.  And each of the correspondence to Solu-Med
22 regarding complaints, correct?
23    A.  That's correct.
24    Q.  And why do they -- why do they provide that
25 warning that they may not allow them to sell on

Page 104

1 Amazon.com based upon your experience?
2    A.  I believe that it is the -- trying to
3 impress upon the seller the real risk that they will be
4 suspended.  And so they -- that's something that they
5 don't -- Amazon feels like you can't over warn on --
6       There was a time where sellers were very
7 vocal in their complaints that they were shut off without
8 warning, and Amazon took that to heart and made a point
9 of including that warning in correspondence that would
10 lead to that or could lead to that outcome.
11    Q.  Okay.  And does Amazon also, in all these
12 notice, policy warnings, and communications regarding
13 complaints from January 2018 through December of 2018
14 advise Solu-Med to look at their policies regarding
15 intellectual property and other violations?
16    A.  Yes, they want -- they want the seller to
17 understand exactly Amazon's concerns, the actions that
18 they are taking or could take, and what the seller needs
19 to abide by policy-wise.  So they are asking for a
20 response to each complaint specifically, but then they
21 also want to reinforce that they have a written policy to
22 guide the seller.  And they want to make sure that the
23 seller follows the written policy.
24    Q.  So you were asked a series of questions today
25 by Mr. Goodman, and as articulate as he was, I wanted to



MICHAEL PAZAK                                    February 19, 2020
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE                    105–108

Page 105

1  do some follow-up.
2         You were asked what action Amazon took
3  after each complaint that is listed on Exhibit 5; do you
4  recall that question?
5     A.  Yes.
6     Q.  Okay.  Was one of the actions they took
7  removing the ASINs and the product from Solu-Med's
8  ability to sell the product?
9     A.  Yes, they would have removed -- in each case
10  they would have removed those ASINS from Solu-Med's
11  listings.
12    Q.  Okay.  Was that significant?
13    A.  Yes.  The -- they want to immediately -- they
14  want to immediately stop any future complaints or any
15  future problems they might have with customers, so
16  they -- they immediately make those products unbuyable
17  from Solu-Med.  If another -- if another third party is
18  listing those products and they don't have a complaint
19  there, those products would still be available.  But
20  Solu-Med is no longer allowed to sell that product from
21  that moment forward unless they respond to the complaint
22  and in the way that Amazon asked them to do so.
23    Q.  And the testimony from every witness from
24  Solu-Med was that there was no response to be done?
25         MR. VINE:  Objection, leading.

Page 106

1         THE WITNESS:  I can speak to --
2     Q.  BY MR. VINE:  Strike that.
3         Was the testimony of Kellon Goodson that
4  the policy at Solu-Med was not to respond to the
5  complaints from Amazon?
6     A.  Yes, that was his testimony, that they did not
7  respond to any of these warnings.
8     Q.  Okay.  Now, would you agree with me that in
9  effect what Amazon was doing was limiting, after each
10  complaint, Solu-Med's ability to sell a product?
11    A.  That's absolutely what they did.
12    Q.  So that -- you would agree with me that that is
13  a significant step for Amazon to take, to limit --
14    A.  Sure.
15    Q.  -- the ability of Solu-Med to sell a product,
16  correct?
17    A.  Yes.
18    Q.  Okay.
19    A.  Solu-Med may now -- may no longer list those
20  products for sale.
21    Q.  Okay.  And they were permanently no longer to
22  list those products because they never responded?
23    A.  Correct.
24    Q.  Okay.  So they were permanently barred and
25  limited from selling certain types of products since at

Page 107

1  least January of 2018, correct?
2         MR. GOODMAN:  Objection.
3     Q.  BY MR. VINE:  Strike that.
4         Was Solu-Med permanently barred from
5  selling certain products since January of 2018?
6     A.  Yes.
7     Q.  Okay.  Was it also significant that they --
8  that Amazon was warning Solu-Med that if they received
9  more complaints about their listings, they may not allow
10  you to sell on Amazon.com?
11    A.  Yes.  Amazon sets the expectation they do what
12  they say they're going to do.  That's an important part
13  of maintaining the trust they have with the seller
14  community.
15    Q.  Based upon your experience, was it important
16  for -- Strike that.
17         Based upon your experience, does Amazon
18  expect that sellers review and train their employees
19  before placing and listing products on the Amazon
20  platform?
21    A.  Yes.  Amazon lays out a process for new sellers
22  to -- and they point out things that are particularly
23  important to drive customer satisfaction, which is what
24  their primary importance is.  So that all starts with,
25  you know, listing products.  And they say specifically in

Page 108

1  the training materials "The customer satisfaction starts
2  when the product is listed correctly," and they start
3  from that point forward.  So the expectation is -- They
4  took the time to write these documents.  They have
5  webinars.  They make training available.  It's important
6  to follow the processes and procedures, and Amazon
7  expects you to do that and holds you accountable for
8  that.
9     Q.  Based upon your review of the deposition
10  testimony of Cheri, Kellon, and Manny Aguero, was
11  Solu-Med training their employees on how to sell products
12  on Amazon?
13    A.  No.
14    Q.  Based upon the testimony, were the Solu-Med
15  employees experienced on selling on Amazon?
16    A.  No.
17    Q.  Based upon your experience in the years 2016,
18  '17, and 2018, did the Solu-Med employees admit that they
19  never read the Amazon guidelines?
20    A.  Yes, they --
21    Q.  In those years?
22    A.  -- they testified that they hadn't.
23    Q.  Okay.  If you recall, there was a question by
24  Mr. Goodman that said -- asking about why Amazon took the
25  action it did and you provided an answer.  And you said



MICHAEL PAZAK
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020
109–112

Page 109

1 it was your belief. Was your belief based upon your
2 experience at Amazon and your subsequent work experience?
3   A.  Yes, it was.
4   Q.  Okay.
5       MR. GOODMAN:  You finished?
6       MR. VINE:  No.  Almost.  Just going over
7 my notes.  I think just two or three more areas.
8   BY MR. VINE:  You recall earlier there with
9 Mr. Goodman he had asked about remedies available to a
10 seller -- sorry, to a customer?
11   A.  A customer, yes.
12   Q.  Was one of the remedies available to a customer
13 who had a problem with a complaint to contact a company,
14 such as Solu-Med, that was selling a product?
15   A.  Yes, the actual seller of the product, yes.
16   Q.  Okay.  And that company -- that's the first --
17 the first line of where the customer should go to,
18 correct?
19   A.  Yes.
20   Q.  Okay.  Another one would be -- a remedy would
21 be going to the manufacturer, correct?
22   A.  Yes.
23       MR. GOODMAN:  Objection.
24   Q.  BY MR. VINE:  Would another remedy be to go to
25 the manufacturer?

Page 110

1   A.  Yes.
2   Q.  And why was it important to have that remedy
3 available for the customer?
4   A.  Sorry.  What?
5   Q.  Why was it important to have a remedy available
6 to go to the manufacturer?
7       MR. GOODMAN:  May I just ask you, what do
8 you mean by "remedy"?
9       MR. VINE:  Meaning regarding a complaint
10 of a specific product.
11       MR. GOODMAN:  Okay.
12       THE WITNESS:  Okay.  And so do you mean --
13       MR. VINE:  Well, I'll ask it a different
14 way.
15       MR. GOODMAN:  Yeah.
16       THE WITNESS:  Yeah.
17   Q.  BY MR. VINE:  A manufacturer warranty is given
18 by a manufacturer, correct?
19   A.  Yes.
20   Q.  A remedy a customer has, if purchasing a
21 product with a manufacturer warranty, is to be able to go
22 to that manufacturer, correct?
23   A.  Yes.
24   Q.  In this case, the customers of Solu-Med did not
25 have that available remedy, correct?

Page 111

1   A.  Correct.
2   Q.  In this case, they did not have the available
3 remedy to go to Solu-Med because their storefront said
4 that they were not accepting cosmetics, correct?
5   A.  As returns, correct.
6   Q.  Was one of the things that -- does one of the
7 things that Amazon do is to vet sellers or to ensure
8 compliance with the Amazon guidelines?
9   A.  Amazon closely monitors sellers' performance
10 against guidelines around all sorts of KPIs, or key
11 performance indicators, that tell them that the seller is
12 satisfying the customer, so they very closely monitor
13 seller performance.
14   Q.  Okay.  And you were talking earlier about
15 seller performance and your experience at Amazon.  I want
16 to make sure the record is clear.  Did you have
17 experience with addressing sellers who had customer
18 complaints?
19   A.  Yes.
20   Q.  Okay.  Did you have experience with the issues
21 that are addressed in this case?
22   A.  Yes, authenticity, yes.
23   Q.  And counterfeit?
24   A.  Counterfeit, yes.  Warranty, yes.
25   Q.  Oh, when making a complaint to Amazon regarding

Page 112

1 a company such as Solu-Med, a customer or a brand owner
2 can go to the website of Amazon, correct?
3   A.  Yes.  The -- there is a brand registry tool
4 available to rights owners.
5   Q.  So explain that to me.
6   A.  So first step is that a manufacturer that owns
7 a brand or just a brand owner will register the brand and
8 their authority over that brand with Amazon.  They can
9 produce a number of different documents.  First there
10 will be validation of who they are, who they say they
11 are, the organization they represent, and then the actual
12 brands they represent with patent trademark office
13 records, things of that nature, that clearly establish
14 the ownership of the brand in question.  Once they have
15 that brand in question, then Amazon will associate the
16 products within its catalog affiliated with that brand.
17       And then once that association is done,
18 the brand owner has a number of abilities.  They can
19 provide content to Amazon so that the products are
20 represented clearly.  They can provide additional content
21 to what Amazon may have already produced that says, "Hey,
22 let me tell you about the features of the product better,
23 give you more images," things of that nature to help
24 merchandise and sell the product better.  And then they
25 can also -- it provides an avenue for that brand holder



Page 113

1 to lodge the concerns that they might have about
2 authenticity and the like that we're talking about here.
3     Q.   Are there drop-down boxes for -- under
4 intellectual property violations?
5     A.   Yes.  So the tool isn't free-form.  Because
6 Amazon has a process that they follow, you -- the
7 complaint -- the party complaining chooses from a
8 preselected list so that the complaint is directed to the
9 right team that follows the right procedure to deal with
10 it, to deal with the complaint.  At that time, then,
11 there's additional information available.  So there is
12 some free-form that you can put in and clarify, but it's
13 a combination of the predefined category of complaint and
14 then the -- the additional commentary that goes with it.
15     Q.   So on Amazon production 00003 there's an
16 identification of counterfeit products.  Is that, where
17 it says "counterfeit products," where one would have done
18 the predefined areas in the pull-down?
19     A.   Yeah.  The pull-down would have said
20 "counterfeit."  If you look at sort of the complaint
21 histories, you see the categorization.  For example, on
22 Exhibit 5 they have the Infringement column and that
23 shows the -- the things that -- or the categorization of
24 the complaints.
25     Q.   Right.  So if you then look back at Exhibit 5,

Page 114

1 you can have trademark/counterfeit, but they were talking
2 about the same complaint that we have here today,
3 correct?
4     A.   That's right, yes.
5     Q.   Meaning the product did not come with a
6 manufacturer's warranty?
7     A.   Right.  They are basically -- they are
8 reporting a violation of the anti-counterfeiting policy
9 which is the policy that governs inauthentic products,
10 products that are listed as new but don't meet the
11 definition of Amazon's definition of new.
12     Q.   What we have here is a history of
13 trademark/counterfeit complaints?
14     A.   Yes.
15     Q.   Correct?
16     A.   Yes.
17     Q.   And then in this case we have the same
18 counterfeit trademark complaint with a description of
19 authenticity, correct?
20     A.   Correct.
21     Q.   And that's on Amazon 00003?
22     A.   Yes.
23         MR. VINE:  Okay.  I don't think I have
24 anything further.
25         MR. GOODMAN:  Just a couple, Jonathan.

Page 115

1         MR. VINE:  Sure.
2             FURTHER EXAMINATION
3     Q.   BY MR. GOODMAN:  In answer to Mr. Vine's
4 questions about remedies, do you have any memory, based
5 upon what you reviewed, that any customers of Solu-Med
6 communicated to Youngblood that the products they had
7 received were counterfeit?
8         MR. VINE:  Objection.  I don't understand
9 the question.
10     Q.   BY MR. GOODMAN:  I think he does.
11     A.   So did any of Solu-
12     Q.   You talked about remedies before as only being
13 able to go to Solu-Med.
14     A.   Right.
15     Q.   But do you have any memory of any documentation
16 that indicates any of the customers of Youngblood
17 actually went to Youngblood?
18     A.   I don't recall seeing any, and I'm not even
19 sure how Youngblood would know if they were from
20 Solu-Med.  Typically they -- they would -- a -- it would
21 be typical that a customer would say, "Hey, I bought this
22 on Amazon.  They wouldn't necessarily know from whom
23 but -- but -- but -- but --
24     Q.   But if it was fulfilled by Solu-Med, they
25 certainly could go to Solu-Med?

Page 116

1     A.   Yeah, if they -- if -- customers don't always
2 know where to go.  They might choose to go to Youngblood,
3 they might choose to go to Solu-Med.  I didn't see any
4 specific example.
5     Q.   In all of the responses to Mr. Vine's questions
6 as to the actions Amazon took and the basis for it are
7 based upon your opinions but not upon the thought
8 processes of Amazon in arriving at that decision to
9 deactivate the store?
10         MR. VINE:  Objection.
11         MR. GOODMAN:  He can answer.
12         MR. VINE:  I think he said it was based
13 upon his experience.
14     Q.   BY MR. GOODMAN:  They're your interpretations?
15     A.   My -- my -- my -- in my experience, what I
16 described, is consistent with the actions Amazon has
17 taken in the past.  Beyond that -- but beyond that, I
18 don't -- I didn't talk to anybody at Amazon about the
19 case or anything like that.
20     Q.   And you haven't seen any documentation from
21 Amazon as well?
22         MR. VINE:  Objection.  Mischaracterizes
23 his testimony.  He testified earlier that he specifically
24 saw email - sorry, communications regarding these
25 issues.



MICHAEL PAZAK

ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020

117—120

Page 117

1    Q.   BY MR. GOODMAN:  All right.  Let me just take

2  you, for a moment, to Amazon 0003.

3    A.   That was in here.

4    Q.   Yes.

5         MR. VINE:  The complaint.  I got it.  I

6  got it.  I got it.

7    Q.   BY MR. GOODMAN:  I think you -- and I may be

8  incorrect, but tell me if I am --

9         MR. VINE:  That's okay.  For now I'll do

10  it.

11    Q.   BY MR. GOODMAN:  -- you said that there -- in

12  filing a complaint, the complainant has the option of

13  qualifying any of these statements; is that correct?

14    A.   Yes.  They -- the basics for the complaint are

15  the category and the products and then they might -- they

16  may choose to provide additional information.

17    Q.   In your opinion, Youngblood -- did Youngblood

18  have the ability to include the further reasoning of why

19  they deemed the product to be counterfeit?

20         MR. VINE:  Objection.

21    Q.   BY MR. GOODMAN:  Could they have included that

22  in their complaint?

23         MR. VINE:  Objection.

24         MR. GOODMAN:  You can object.  He can

25  answer.

Page 118

1         MR. VINE:  And I'm allowed an objection.

2         THE WITNESS:  They have a free-form text

3  ability to provide the rationale for the claim.

4    Q.   BY MR. GOODMAN:  But they did not in this

5  instance?

6         MR. VINE:  Objection.  Mischaracterizes

7  his testimony and the document.

8         THE WITNESS:  Yeah, I think what they are

9  saying -- yeah, in the paragraph -- well, there's a

10  paragraph -- there's a first paragraph, two bullets.  And

11  the third paragraph it says, "The indicated sellers are

12  not selling the authentic products as shown in the ASINs

13  referenced."  I believe that is that -- that is their --

14  that is their qualifying statement that they provide.

15    Q.   BY MR. GOODMAN:  But they didn't provide the

16  detail of why they are not providing the detail that's

17  required?

18         MR. VINE:  Objection.  Mischaracterizes

19  the testimony.

20         Did not provide the detail required?

21         MR. GOODMAN:  Let him answer.

22         THE WITNESS:  I don't believe that the

23  complaint is deficient in the amount of detail provided.

24    Q.   BY MR. GOODMAN:  Again, going back to the

25  notice of policy warning in one of the exhibits over

Page 119

1  there.

2    A.   Yeah.  Exhibit 4?

3    Q.   Yeah.

4    A.   Okay.

5    Q.   There were several options afforded to the

6  reseller to respond to this notice of policy warning?

7    A.   Yes.

8    Q.   Isn't it not true that the first option is to

9  obtain a valid retraction from the rights owner?

10         MR. VINE:  Objection.

11    Q.   BY MR. GOODMAN:  It's not mutually exclusive,

12  is it?

13    A.   It is -- it is -- the one that you refer to is

14  listed first.  They are not mutually exclusive and, in

15  fact, the statement on the second one says, "If you

16  believe the reported content is not counterfeit," it

17  tells you how to email with supporting information.

18    Q.   That's another option?

19    A.   It's an option, but it's also a direct -- it's

20  a direct -- it's a direction from them.  I mean --

21    Q.   Well, actually, the reseller, does it not have

22  several options of how to respond?

23    A.   They do.  But I think what I would advise any

24  seller to do is, since they are saying, "If you believe

25  it's not counterfeit, take this action," if you're --

Page 120

1  failure to take that action is admitting it's counterfeit

2  to Amazon.  They need to defend and clear that claim and

3  charge.

4    Q.   Is that your belief as to what Amazon's thought

5  process is?

6    A.   It is.

7         MR. VINE:  Is that based upon experience?

8         THE WITNESS:  Based upon experience.

9    Q.   BY MR. GOODMAN:  Based on experience.

10         But, nevertheless, it still remains the

11  first option is to obtain a retraction?

12         MR. VINE:  Objection.

13         THE WITNESS:  Certainly.  It's the first

14  one listed in the complaint.

15    Q.   BY MR. GOODMAN:  And if a reseller could obtain

16  that retraction, then Amazon would take a different view,

17  I assume, of the complaint?

18         MR. VINE:  Objection.

19         THE WITNESS:  A different --

20    Q.   BY MR. GOODMAN:  Well, let's --

21    A.   A different -- I'm just trying --

22    Q.   It would not delist the account?

23         MR. VINE:  Objection.

24         MR. GOODMAN:  Why?  He could testify.

25  He's testified as to all his thoughts.



MICHAEL PAZAK
ARGO HOLDINGS vs YOUNGBLOOD SKIN CARE

February 19, 2020
121—124

Page 121

1       MR. VINE:  I'm allowed to make an

2   objection.  It was on your form.

3       Q.  BY MR. GOODMAN:  Go ahead.

4       A.  If Amazon receives a retraction of this

5   complaint, yeah, that would -- that would restore the

6   seller's credibility in the matter.  And I think that's

7   what you're saying.

8       Q.  I think so.

9       A.  Yeah.

10      Q.  And just lastly, with respect to those

11  complaints, I believe you testified in response to

12  Mr. Vine's questions that the ASINs for the products were

13  delisted?

14      A.  Yes.

15      Q.  Is it in that document that you reviewed?

16      A.  It doesn't say it explicitly, but because they

17  are -- they are --

18      MR. VINE:  Here.

19      THE WITNESS:  -- complaints is listed and

20  the ASINs are listed, that's the implication and that was

21  Amazon's actions.

22      Q.  BY MR. GOODMAN:  That's what you believe Amazon

23  did?

24      MR. VINE:  No --

25      THE WITNESS:  Correct.

Page 122

1       MR. GOODMAN:  Okay.

2       MR. VINE:  Go ahead.

3       MR. GOODMAN:  All right.

4       MR. VINE:  Are you done?

5       MR. GOODMAN:  That's it.

6       MR. VINE:  Well, now I'm going to have to

7   follow up.

8           FURTHER EXAMINATION

9       Q.  BY MR. VINE:  Do you recall specifically

10  reviewing all of the complaints that were lodged against

11  Solu-Med?

12      A.  Yes.  In each notice and policy warning they

13  received, they -- it included language explaining that

14  "We removed the content listed at the end of the email,"

15  and that is, in fact, the ASIN.

16      Q.  So when Mr. Goodman said this was based upon

17  your experience, that actually is not accurate; it was

18  based upon the actual evidence of documents produced by

19  plaintiff, correct?

20      A.  Yes.

21      Q.  For example, PL00208, January 27th, 2018,

22  regarding the Giovanni cosmetics; do you recall that

23  document?

24      A.  Yes.

25      Q.  Okay.  And in that document and in all other

Page 123

1   documents did Amazon advise Solu-Med that they were

2   delisting the ASINS referenced?

3       A.  Yes, they did.

4       MR. GOODMAN:  I would agree with that.

5       MR. VINE:  We're good.

6       And he will read.

7       Are you ordering a copy?

8       MR. GOODMAN:  Yes.

9       MR. VINE:  And we'll take a copy.

10      Can we get it by early next week?

11   (The deposition was concluded at 12:51 p.m.)

12      (Signature was not waived.)

Page 124

1    D E P O S I T I O N   S I G N A T U R E   P A G E

2

3   ARGO HOLDINGS, INC., and        Case No. 0:19-cv-60487
    SOLU-MED, INC.,
4       Plaintiffs

5   v.

6   YOUNGBLOOD SKIN CARE
    PRODUCTS LLC,
7       Defendants
    _____
8   Job No. J5190065

9

10      DECLARATION UNDER PENALTY OF PERJURY

11          I declare under penalty of perjury that I

12  have read the entire transcript of my deposition taken in

13  the above-captioned matter or the same has been read to

14  me, and the same is true and accurate, save and except

15  for changes and/or corrections, if any, as indicated by

16  me on the DEPOSITION ERRATA SHEET hereof, with the

17  understanding that I offer these changes as if still

18  under oath.

19

20          Signed on the _____ day of

21  _____, 20_____.

22

23      _____

        MICHAEL PAZAK

24  (*Arizona does NOT require your signature to be
    notarized.)

25



Page 125

```
 1        DEPOSITION ERRATA SHEET OF MICHAEL PAZAK

        Job No. J5190065   Taken: February 19, 2020

 2
 3   Page No._____ Line No._____
 4   Change to: _____
 5   Reason for change: _____
 6   Page No._____ Line No._____
 7   Change to: _____
 8   Reason for change: _____
 9   Page No._____ Line No._____
10   Change to: _____
11   Reason for change: _____
12   Page No._____ Line No._____
13   Change to: _____
14   Reason for change: _____
15   Page No._____ Line No._____
16   Change to: _____
17   Reason for change: _____
18   Page No._____ Line No._____
19   Change to: _____
20   Reason for change: _____
21   Page No._____ Line No._____
22   Change to: _____
23   Reason for change: _____
24
     SIGNATURE:_____DATE_____
25        MICHAEL PAZAK
```

Page 126

```
 1        DEPOSITION ERRATA SHEET OF MICHAEL PAZAK

        Job No. J5190065   Taken: February 19, 2020

 2
 3   Page No._____ Line No._____
 4   Change to: _____
 5   Reason for change: _____
 6   Page No._____ Line No._____
 7   Change to: _____
 8   Reason for change: _____
 9   Page No._____ Line No._____
10   Change to: _____
11   Reason for change: _____
12   Page No._____ Line No._____
13   Change to: _____
14   Reason for change: _____
15   Page No._____ Line No._____
16   Change to: _____
17   Reason for change: _____
18   Page No._____ Line No._____
19   Change to: _____
20   Reason for change: _____
21   Page No._____ Line No._____
22   Change to: _____
23   Reason for change: _____
24
     SIGNATURE:_____DATE_____
25        MICHAEL PAZAK
```

Page 127

```
 1              CERTIFICATE OF REPORTER
 2
 3   STATE OF ARIZONA   )
                        ) ss:
 4   COUNTY OF MARICOPA )
 5
        I, Sandra Marruffo, a Certified Reporter in the State
 6   of Arizona, do hereby certify that the foregoing
     deposition was taken before me on February 19, 2020, in
 7   the County of Maricopa, State of Arizona; that an oath
     was duly administered to MICHAEL PAZAK pursuant to A.R.S.
 8   41-324(B); that the questions propounded to the witness
     and the answers of the witness thereto were taken down by
 9   me in shorthand and thereafter reduced to typewriting;
     that the transcript is a full, true, and accurate record
10   of the proceedings, all done to the best of my skill and
     ability; and that the preparation, production, and
11   distribution of the transcript and copies of the
     transcript comply with the Arizona Revised Statutes and
12   ACJA 7-206(J)(1)(g)(1) and (2).
        The witness herein, MICHAEL PAZAK, has requested
13   transcript review and signature.
        I FURTHER CERTIFY that I am in no way related to any
14   of the parties nor am I in any way interested in the
     outcome hereof.
15      IN WITNESS WHEREOF, I have set my hand in my office
     in the County of Maricopa, State of Arizona, this 24th
16   day of February 2020.
17
18                          Sandra L. Marruffo
                          Sandra Marruffo, RPR
19                        AZ C.R. 50815
20
21           /S/
22   For Esquire Deposition Solutions
     Registered Reporting Firm No. R1048
23
24   Job No.  J5190065
25
```



English ‡   Search   🔍   Messages | Help | Settings

**Life & Health Source** 🇺🇸   www.amazon.com ‡

Catalog    Inventory    Pricing    Orders    Advertising    Stores    Programs    Reports    Performance    Apps & Services    B2B

‹ Performance notifications

November 11, 2018
## Notice: Policy Warning

Sent from: **notice@amazon.com**

Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we receive a retraction from the rights owner. Their contact information can be found below.

Compliance Youngblood Skin
brandprotection@ybskin.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com. with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

 ASIN: B00097DKUQ
Title: Youngblood Pressed Mineral Blush, Blossom, 3 Gram

Infringement type: Counterfeit
Complaint ID: 5514232061

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

Was this email helpful?

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2018 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210

**EXHIBIT 12**

**PL02409**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SOLU-MED, INC.,<br><br>                Plaintiff,<br><br>    v.<br><br>YOUNGBLOOD SKIN CARE PRODUCTS,<br>LLC,<br><br>                Defendant. | Civil Action No.:  0:19-cv-60487-RKA<br><br>**DECLARATION OF NONPARTY**<br>**AMAZON.COM, INC.**<br>**CUSTODIAN OF RECORDS**<br><br>AMAZON REF NO.: SUB1004122 |

Clarice Cohn declares as follows:

I am over the age of eighteen and I am a duly authorized Custodian of Records for

Amazon.com, Inc. ("Amazon").

1.     I am a Litigation Paralegal in the Litigation and Regulatory group at Amazon.  I

make this declaration based on my personal knowledge and my review of Amazon records kept,

maintained, and relied upon by Amazon in the ordinary course of business.

2.     My responsibilities include working with outside counsel to respond to subpoenas

served on Amazon.  This includes gathering, compiling, analyzing, cross-checking, and

preparing documents to be produced in response to subpoenas, among many other duties.

3.     On January 14, 2020, Amazon was served with a subpoena from Defendant

Youngblood Skin Care Products, LLC ("Defendant") in the above-referenced action.  On

January 21, 2020, Amazon served objections to the subpoena.

4.     Attached as <u>Exhibit 1</u> is a true and correct copy of a compilation of complaints

from Defendant to Amazon against Plaintiff Solu-Med, Inc.'s storefront "Life and Health

Source," seller ID ABABPETWJQTSG ("Plaintiff") in November 2018.  The compilation

**EXHIBIT 13**

contains the following information:  date; rights owner ("RO") email; infringement type; ASIN; seller ID; and description.

5.      Attached as Exhibit 2 is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated November 10, 2018, regarding ASIN B00097DKUQ, Complaint ID 5514232061.

6.      Attached as Exhibit 3 is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated November 12, 2018, regarding ASIN B00025G1M4, Complaint ID 5518323151.

7.      Attached as Exhibit 4 is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated November 12, 2018, regarding ASIN B00329GR4O, Complaint ID 5518323151.

8.      Attached as Exhibit 5 is a true and correct copy of Amazon's notice of policy warning to Plaintiff, dated November 12, 2018, regarding ASIN B00025G1PG, Complaint ID 5518323151.

9.      I hereby certify and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 14 day of February, 2020, at Seattle, Washington.


_____
CLARICE COHN

EXHIBIT 1

| date | ro_email | infringement_type | asin | seller_id | description |
|------|----------|-------------------|------|-----------|-------------|
| 11/11/18 5:22 AM | BRANDPROTECTION@YBSKIN.COM | TrademarkComplaintCounterfeit | B00097DKUQ | ABABPETWJQTSG | Hello,We have researched Youngblood's listings and found the following ASINs are in violation of our trademark, 3812755. • Counterfeit products are being sold on the following listings• Please immediate action and remove these sellers currently listing counterfeit product.According to Amazon's robust and aggressive anti-counterfeit policy, sellers must list items that match the detail pages exactly. The indicated sellers are not selling the authentic products as shown in the ASIN(s) referenced.We know that Amazon takes product authenticity very seriously and Amazon requires sellers to list items that exactly match the detail pages. Therefore, we respectfully request that Amazon immediately and proactively remove these sellers from the mentioned ASIN(s) and prohibit these sellers from listing against these ASIN(s) in the future. Thank You, |
| 11/13/18 5:38 AM | BRANDPROTECTION@YBSKIN.COM | TrademarkComplaintCounterfeit | B00329GR4O | ABABPETWJQTSG | Hello,We have researched Youngblood's listings and found the following ASINs are in violation of our trademark, 3812755. • Counterfeit products are being sold on the following listings• Please immediate action and remove these sellers currently listing counterfeit product.According to Amazon's robust and aggressive anti-counterfeit policy, sellers must list items that match the detail pages exactly. The indicated sellers are not selling the authentic products as shown in the ASIN(s) referenced.We know that Amazon takes product authenticity very seriously and Amazon requires sellers to list items that exactly match the detail pages. Therefore, we respectfully request that Amazon immediately and proactively remove these sellers from the mentioned ASIN(s) and prohibit these sellers from listing against these ASIN(s) in the future. Thank You,Youngblood |
| 11/13/18 5:38 AM | BRANDPROTECTION@YBSKIN.COM | TrademarkComplaintCounterfeit | B00025G1M4 | ABABPETWJQTSG | Hello,We have researched Youngblood's listings and found the following ASINs are in violation of our trademark, 3812755. • Counterfeit products are being sold on the following listings• Please immediate action and remove these sellers currently listing counterfeit product.According to Amazon's robust and aggressive anti-counterfeit policy, sellers must list items that match the detail pages exactly. The indicated sellers are not selling the authentic products as shown in the ASIN(s) referenced.We know that Amazon takes product authenticity very seriously and Amazon requires sellers to list items that exactly match the detail pages. Therefore, we respectfully request that Amazon immediately and proactively remove these sellers from the mentioned ASIN(s) and prohibit these sellers from listing against these ASIN(s) in the future. Thank You,Youngblood |
| 11/13/18 5:38 AM | BRANDPROTECTION@YBSKIN.COM | TrademarkComplaintCounterfeit | B00025G1PG | ABABPETWJQTSG | Hello,We have researched Youngblood's listings and found the following ASINs are in violation of our trademark, 3812755. • Counterfeit products are being sold on the following listings• Please immediate action and remove these sellers currently listing counterfeit product.According to Amazon's robust and aggressive anti-counterfeit policy, sellers must list items that match the detail pages exactly. The indicated sellers are not selling the authentic products as shown in the ASIN(s) referenced.We know that Amazon takes product authenticity very seriously and Amazon requires sellers to list items that exactly match the detail pages. Therefore, we respectfully request that Amazon immediately and proactively remove these sellers from the mentioned ASIN(s) and prohibit these sellers from listing against these ASIN(s) in the future. Thank You,Youngblood |

EXHIBIT 2

< Performance notifications

November 10, 2018
**Notice: Policy Warning**

Sent from: **notice@amazon.com**



Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we receive a retraction from the rights owner. Their contact information can be found below.

Compliance Youngblood Skin
brandprotection@ybskin.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com. with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

ASIN: B00097DKUQ
Title: Youngblood Pressed Mineral Blush, Blossom, 3 Gram

Infringement type: Counterfeit
Complaint ID: 5514232061

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

Was this email helpful?
If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2018 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210

Get support   Program Policies   English   © 1999-2020, Amazon.com, Inc. or its affiliates

EXHIBIT 3

**Notice: Policy Warning**

Sent from: **notice@amazon.com**

**amazon**

Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we receive a retraction from the rights owner. Their contact information can be found below.

Compliance Youngblood Skin
brandprotection@ybskin.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com. with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

 ASIN: B00025G1M4
Title: Youngblood Pressed Mineral Foundation, Soft Beige, 8 Gram

Infringement type: Counterfeit
Complaint ID: 5518323151

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

**Was this email helpful?**

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2018 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210

EXHIBIT 4

November 12, 2018

**Notice: Policy Warning**

Sent from: **notice@amazon.com**

amazon

Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we receive a retraction from the rights owner. Their contact information can be found below.

Compliance Youngblood Skin
brandprotection@ybskin.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com. with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

ASIN: B00329GR4O
Title: Youngblood Pressed Mineral Blush, Bashful, 3 Gram

Infringement type: Counterfeit
Complaint ID: 5518323151

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

EXHIBIT 5

amazon seller central

| Catalog | Inventory | Pricing | Orders | Advertising | Stores | Programs | Reports | Performance | Apps & Services |

‹ Performance notifications

November 12, 2018

## Notice: Policy Warning

Sent from: **notice@amazon.com**



amazon

Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we receive a retraction from the rights owner. Their contact information can be found below.

Compliance Youngblood Skin
brandprotection@ybskin.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com. with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

ASIN: B00025G1PG
Title: Youngblood Ultimate Concealer, Tan, 2.8 Gram

Infringement type: Counterfeit
Complaint ID: 5518323151

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

**Was this email helpful?**

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2018 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210

English ↕    Search 🔍   Messages | Help | Settings

Life & Health Source 🇺🇸   www.amazon.com ↕

Catalog   Inventory   Pricing   Orders   Advertising   Stores   Programs   Reports   Performance   Apps & Services   B2B

‹ Performance notifications

November 13, 2018
**Notice: Policy Warning**

Sent from: **notice@amazon.com**



Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we receive a retraction from the rights owner. Their contact information can be found below.

Compliance Youngblood Skin
brandprotection@ybskin.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com. with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

 ASIN: B00025G1M4
Title: Youngblood Pressed Mineral Foundation, Soft Beige, 8 Gram


Infringement type: Counterfeit
Complaint ID: 5518323151

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

Was this email helpful?

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2018 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210

EXHIBIT 14

Get support   Program Policies   English ↕                    © 1999-2020, Amazon.com, Inc. or its affiliates

FEEDBACK

**PL02410**

1/1

English ▾              Messages | Help | Settings

**Life & Health Source** 🇺🇸 www.amazon.com ▾

Catalog     Inventory     Pricing     Orders     Advertising     Stores     Programs     Reports     Performance     Apps & Services     B2B

‹ Performance notifications

November 13, 2018
## Notice: Policy Warning

Sent from: **notice@amazon.com**

Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we receive a retraction from the rights owner. Their contact information can be found below.

Compliance Youngblood Skin
brandprotection@ybskin.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com. with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

 ASIN: B00025G1M4
Title: Youngblood Pressed Mineral Foundation, Soft Beige, 8 Gram


Infringement type: Counterfeit
Complaint ID: 5518323151

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

Was this email helpful?

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2018 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210

**EXIHIBIT 15**

Get support     Program Policies     English ▾          © 1999-2020, Amazon.com, Inc. or its affiliates

FEEDBACK

**PL02411**

Life & Health Source  www.amazon.com

Catalog  Inventory  Pricing  Orders  Advertising  Stores  Programs  Reports  Performance  Apps & Services  B2B

‹ Performance notifications

November 13, 2018
**Notice: Policy Warning**

Sent from: **notice@amazon.com**



Hello,

We received a report from a rights owner that you are listing counterfeit products. Sellers on Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we receive a retraction from the rights owner. Their contact information can be found below.

Compliance Youngblood Skin
brandprotection@ybskin.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.com. with supporting information.

If the rights owner does not retract their complaint, or you do not provide supporting information, we may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

 ASIN: B00025G1PG
Title: Youngblood Ultimate Concealer, Tan, 2.8 Gram

Infringement type: Counterfeit
Complaint ID: 5518323151

Sincerely,

Seller Performance Team
https://www.amazon.com
Amazon.com

Was this email helpful?

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2018 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210

**EXHIBIT 16**

Get support  Program Policies  English

© 1999-2020, Amazon.com, Inc. or its affiliates

FEEDBACK

**PL02412**

1/1



Life & Health Source    www.amazon.com

Catalog    Inventory    Pricing    Orders    Advertising    Stores    Programs    Reports    Performance    Apps & Services    B2B

‹ Performance notifications

November 13, 2018

## Your Amazon.com Selling Account

Sent from: **notice-dispute@amazon.com**

Hello,

We attempted to reach you by phone today to discuss recent issues related to intellectual property infringement. As a result of these issues, your Amazon selling account has been temporarily deactivated. At this time, funds will not be transferred to you but will stay in your account while we work with you to address this issue.

Amazon previously alerted you of these issues by emailing the warnings listed below:

-- ASIN:

Title:Youngblood Natural Mineral Loose Foundation, Sunglow
ASIN:B00025G1K6

Title:Youngblood Pressed Mineral Foundation, Honey, 8 Gram
ASIN:B00025G1ME

Title:Youngblood Pressed Mineral Blush, Sugar Plum, 3 Gram
ASIN:B00025G1TC

-- Infringement Type: COUNTERFEIT

Amazon does not allow listings that violate the intellectual property rights of brands or rights owners. To learn more, please review Amazon's Intellectual Property Policy (https://sellercentral.amazon.com/gp/help/external/201361070).

To reactivate your selling account, please submit a plan of action. A valid plan of action should include:
-- Proof of authenticity (e.g., invoice or Order ID) for infringing listings
-- The steps you have taken to ensure that you are no longer infringing and will not infringe in the future
-- Other relevant information
-- Supporting details should you believe the notice was submitted in error or the notices are incorrect

When you are ready, please submit your plan and supporting product documentation at this link (https://sellercentral.amazon.com/cu/contact-us).

We're here to help. Use this link (https://sellercentral.amazon.com/cu/contact-us/cmn/QUALITY) to speak with an Account Health Specialist if you need help drafting your plan of action or have questions.

We look forward to hearing from you.

Sincerely,
Seller Performance Team
Amazon.com
http://www.amazon.com

**EXHIBIT 17**

View appeal

Get support    Program Policies

© 1999-2020, Amazon.com, Inc. or its affiliates

FEEDBACK

**PL02413**

1/1

## FIRST PLAN OF ACTION-11/13/18

# Reactivate your account



**We've received your submission.**
We will review your submission and you should expect a reply within the next 24 hours.



### Next Steps

- Fulfill any open orders to ensure customers receive their items on time and to avoid future impact to your account.
- Learn more about Amazon Selling Policies.
- Monitor the performance of your account on the Account Health Dashboard.

### Your submission:

November 13, 2018 12:10 PM EST

1. The root cause of the issue We have offerings for the brand Youngblood Cosmetics with listings which the intellectual property holder felt infringed on their intellectual property rights.

2. The actions you have taken to resolve the issue We have removed all listings for the Youngblood product line, and deleted our sales offerings to ensure that we don't infringe on any intellectual property of Youngblood Cosmetics.

3. The steps you have taken to prevent the issue going forward Going forward, we will review our product offerings, to ensure compliance with Amazon's terms of service related to intellectual property, and remove any offerings that aren't in compliance.

**EXHIBIT 18**

PL00048

‹ Performance notifications

Catalog    Inventory    Pricing    Orders    Advertising    Stores    Programs    Reports    Performance    Apps & Services    B2B

November 15, 2018

**Your Amazon.com Inquiry**

Sent from: **notice-request-dispute@amazon.com**



Hello,

We reviewed your account and the information you provided, and we have decided that you may not sell on Amazon.com. Please provide the following information so that we can process your appeal:

-- A valid retraction sent to Amazon directly from the original rights owner who reported the infringing content listed at the end of this email. We do not accept forwarded or attached retractions. Please contact the rights owner listed below to request that a retraction be sent to notice-dispute@amazon.com:

-- brandprotection@ybskin.com

-- Proof of product authenticity (e.g., invoice, Order ID or letter of authorization). It must clearly prove that your products do not infringe on the intellectual property of the rights owner. Please send this information, any other documentation, and a list of impacted ASINS to notice-dispute@amazon.com.

You can see your balance and settlement information in the Payments section of Seller Central. If you have questions about those, please write to payments-funds@amazon.com.

You can view your account performance (https://sellercentral.amazon.com/performance/dashboard?reftag=email_appeal) or select Account Health on the home screen of the Amazon Seller app on your iOS or Android device. The Account Health dashboard shows how well your account is performing against the performance metrics and policies required to sell on Amazon.

-- iOS: https://itunes.apple.com/us/app/amazon-Seller/id794141485
-- Android: https://play.google.com/store/apps/details?id=com.amazon.sellermobile.android.am...;hl=en

Sincerely,
Seller Performance Team
Amazon.com
http://www.amazon.com

**EXHIBIT 19**

Get support    Program Policies    English

© 1999-2020, Amazon.com, Inc. or its affiliates

FEEDBACK

**PL02415**

# PLAN OF ACTION-11/14/18

**1. The root cause of the issue:**
We were listing Youngblood Cosmetics product that we sourced from a distributor, and the brand may not have been aware that we were selling their product on Amazon that was purchased through that distributor.

**2. The actions you have taken to resolve the issue:**
We have removed all listings for the Youngblood product line and deleted our sales offerings to ensure that we don't infringe on any intellectual property of Youngblood Cosmetics. We have attached the invoices from our distributor for these products for your review. We are in the process of reaching out to the brand to establish what steps we should take next in order to come into compliance with their selling guidelines and ask them to retract the complaint.

**3. The steps you have taken to prevent the issue going forward:**
Going forward, we will review our product offerings and sourcing, to ensure compliance with Amazon's terms of service related to intellectual property and remove any offerings that aren't in compliance.

**EXHIBIT 20**

PL00049