# EXHIBIT "B"

**Page 1**

```
1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
3    --------------------------------------- x
4    SOLU-MED, INC.,
5              Plaintiff,    Civil Action No.
                              0:19-cv-60487-RKA
6        -against-
7    YOUNGBLOOD SKIN CARE PRODUCTS, LLC,
8                   Defendant.
9    --------------------------------------- x
10        DEPOSITION of an Expert Witness, CORY JAY
11   ROSENBAUM, taken by the Respective Parties, held at
12   the Crowne Plaza JFK Airport, 138-10 135th Avenue,
13   Jamaica, New York 11436, on February 17, 2020, at
14   12:00 p.m., before a Notary Public of the State of
15   New York.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2    C O R Y   J A Y   R O S E N B A U M, the witness
3    herein, having been first duly sworn before a Notary
4    Public of the State of New York, was examined and
5    testified as follows:
6    EXAMINATION BY
7    MR. VINE:
8       Q.  Please state your name for the record.
9       A.  Cory Jay Rosenbaum.
10      Q.  What is your address?
11      A.  138A East Park Avenue, Long Beach, new
12   York 11561.
13      Q.  Mr. Rosenbaum, have you been deposed
14   before?
15      A.  No.
16      Q.  You have taken depositions before?
17      A.  Yes.
18      Q.  You are currently a practicing lawyer?
19      A.  Yes.
20      Q.  What states are you licensed in?
21      A.  New York.
22      Q.  Any other states?
23      A.  Northern District of Illinois.
24      Q.  When were you licensed in the State of New
25   York?
```

**Page 2**

```
1
2    A P P E A R A N C E S:
3
4        BLACK LAW, P.A.
5            Attorneys for Plaintiff
             1401 E. Broward Boulevard, Suite 204
             Fort Lauderdale, FL 33301
6
             (NOT PRESENT)
7
8        GOODMAN & SAPERSTEIN
9            Pro hac vice admission pending
             666 Old Country Road, Suite 200
10           Garden City, NY 11530
11       BY:   STANLEY R. GOODMAN, ESQ.
12
13       COLE SCOTT & KISSANE
             Attorneys for Defendant
14           222 Lakeview Avenue, Suite 120
             West Palm Beach, FL 33401
15
         BY:   JONATHAN S. VINE, ESQ.
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              CJ ROSENBAUM
2       A.  1995 or something.
3       Q.  Did you attend law school?
4       A.  Yes.
5       Q.  Where?
6       A.  Golden Gate Law and Fordham Law.
7       Q.  Did you attend college?
8       A.  Yes.
9       Q.  Where did you graduate from college?
10      A.  SUNY Oneonta.
11      Q.  Today I will be asking you a series of
12   questions.  If you don't understand any of my
13   questions, feel free to let me know.  Obviously,
14   since you are an attorney, you probably know the
15   ground rules but I will just repeat them.  From time
16   to time you may hear counsel object.  You are still
17   required to respond to the question even if you
18   anticipate the answer or he indicates he has an
19   objection to form, unless he directs you not to
20   answer the question, which he and I or Kelsey and I
21   can address at a later date.  If at any time you
22   need a break, just let me know.  Keep all of your
23   responses verbal.
24      A.  Okay.
25          MR. GOODMAN:  Jonathan, I will be making
```



Page 5

CJ ROSENBAUM

1
2  objections along the way, but all the
3  objections will be as to form since there are
4  no speaking objections.
5      MR. VINE:  Okay.
6      Q.  Have you been retained in this case to
7  serve as an expert?
8      A.  Yes.
9      Q.  Have you ever served as an expert in
10  litigation?
11     A.  Yes.
12     Q.  What capacity?
13     A.  Same, with regards to issues on Amazon.
14     Q.  What about issues on Amazon?
15     A.  Counterfeiting, unauthorized sales,
16  control of what they call the listings on Amazon
17  which is the detail page.  Every product on Amazon
18  has one page that describes the product.  That's
19  about it.
20     Q.  Have you ever been retained by Mr. Goodman
21  before?
22     A.  No.
23     Q.  Is this the first time you ever worked
24  with him?
25     A.  Yes.

Page 6

CJ ROSENBAUM

1
2      Q.  In any capacity?
3      A.  Yes.
4          MR. VINE:  I am going to mark a copy of
5      the report.
6          (Document was marked as Exhibit 1
7      for identification, as of this date.)
8      Q.  I have marked as Exhibit 1 a copy of
9  Mr. Rosenbaum's report; is that correct?
10     A.  Yes.
11     Q.  Did you draft this document?
12     A.  Yes.
13     Q.  Are there any portions of this document
14  that you did not draft?
15     A.  No.
16     Q.  Did anybody assist you in drafting this
17  document?
18     A.  No.
19     Q.  You are here pursuant to a subpoena?
20     A.  No.
21     Q.  You are not here pursuant to a subpoena?
22     A.  Correct.
23     Q.  You were not aware that plaintiff's
24  counsel accepted the subpoena on your behalf?
25     A.  I am not sure if it was accepted or not.

Page 7

CJ ROSENBAUM

1
2  I was asked to come and I am here.
3      Q.  You understand as part of your requirement
4  to be here you had to produce certain documents?
5      A.  Yes.
6      Q.  You produced all the documents that were
7  requested of you?
8      A.  Yes.
9      Q.  You did not withhold any documents?
10     A.  Of course not.
11     Q.  Currently you are a lawyer and practicing
12  law in Long Beach, New York; is that correct?
13     A.  Yes.
14     Q.  What is your area of practice?
15     A.  We focus mostly on people and companies
16  that sell products on Amazon.
17     Q.  What about that area that you focus on?
18     A.  That's the area.
19     Q.  What about that area; is it litigation,
20  transactional?
21     A.  A lot of it is helping people and
22  companies that sell products on Amazon to write
23  documents to use to persuade Amazon to reinstate
24  their ability to sell products or listings.  It
25  involves representing sellers, people and companies

Page 8

CJ ROSENBAUM

1
2  taking Amazon to arbitration to resolve disputes
3  that we cannot resolve amicably.  It also involves
4  helping certain brands against counterfeiters and
5  other types of unauthorized sales on Amazon.  It
6  involves writing contracts for Amazon sellers.  It
7  involves writing terms of service for online
8  businesses.
9      Sometimes it involves employment issues.
10  Sometimes it involves internet type related issues,
11  trademark, copyright.  Here and there we will have
12  someone approach us with patent issues.  So mostly
13  intellectual property, business consultation.  But
14  practically everything, if not everything, involves
15  people and companies selling products from Amazon.
16  From time to time we will help people and companies
17  that sell products on eBay or Jet or Wal-Mart or
18  other online retail platforms.
19     Q.  And have you ever been involved in
20  litigation with Amazon?
21     A.  Not litigation per se.  Arbitrations.
22     Q.  How many arbitrations have you been with
23  Amazon?
24     A.  I don't know.
25     Q.  More than one?



Page 9

1                    CJ ROSENBAUM
2    A.  Yes.
3    Q.  More than --
4    A.  Well, representing clients.
5    Q.  Right.  More than one?
6    A.  Yes.
7    Q.  Less than ten?
8    A.  More than ten.
9    Q.  And you sue Amazon in arbitration relative
10   to your client's listings or ability to sell
11   product, correct?
12   A.  And other issues and arbitrations
13   specifically through the American Arbitration
14   Association.
15   Q.  Can you give me some examples of the
16   subject matters of these arbitrations?
17   A.  Amazon withholding money from sellers is a
18   common topic.
19   Q.  Why would they be withholding money in
20   these cases?
21   A.  Amazon will often claim that products were
22   not genuine.  Amazon will often claim that sellers
23   obtained fake reviews, and other issues.
24   Q.  As it relates to this case, you understand
25   that the plaintiff is Solu-Med, correct?

Page 10

1                    CJ ROSENBAUM
2    A.  Correct.
3    Q.  Have you ever spoken to anyone from
4    Solu-Med?
5    A.  No.
6    Q.  Have you ever spoken to any of the
7    attorneys for Solu-Med?
8    A.  Just Mr. Goodman and Ms. Black.
9    Q.  When was the last time you spoke to either
10   of them?
11   A.  I spoke to Stan a few moments ago this
12   morning.
13   Q.  In preparation for your deposition did you
14   speak with him?
15   A.  Yes.
16   Q.  When was that?
17   A.  Friday.
18   Q.  Over the phone?
19   A.  No.
20   Q.  In person?
21   A.  Correct.
22   Q.  With whom?
23   A.  With Stan.
24   Q.  And what did you go over?
25   A.  We talked about the contents of my report.

Page 11

1                    CJ ROSENBAUM
2    Q.  Anything else?
3    A.  No.
4    Q.  I see here that you brought a binder.
5    A.  Correct.
6    Q.  Can we mark that binder?
7    A.  Sure.
8        (Document was marked as Exhibit 2
9    for identification, as of this date.)
10   Q.  I am going to mark the binder as Exhibit
11   2.  What we will do is, because the court reporter
12   typically takes exhibits, I will let you take it
13   back, or Stan take it back, and then we will mark it
14   as an exhibit.
15   What did you do to prepare yourself for today's
16   deposition?
17   A.  I reviewed the contents in the binder.
18   Q.  Did you speak with anyone other than Stan
19   and Kelsey Black?
20   A.  No.
21   Q.  Have you ever spoken with Kellon Goodson?
22   A.  No.
23   Q.  Have you ever spoken with Manny Aguero?
24   A.  No.
25   Q.  Have you spoken to any of the specific

Page 12

1                    CJ ROSENBAUM
2    fact witnesses involved in this case?
3    A.  No.
4    Q.  Have you ever visited the warehouse at
5    Solu-Med?
6    A.  No.
7    Q.  The warehouse at Q-Med?
8    A.  No.
9    Q.  Do you know what Q-Med is?
10   A.  Just from reading the transcripts I saw
11   that it was mentioned.
12   Q.  Other than reading the transcripts, do you
13   have an independent knowledge?
14   A.  No.
15   Q.  You don't have any specific knowledge
16   about Q-Med?
17   A.  The only knowledge I have about Q-Med is
18   what was in the transcript.
19   Q.  What is your knowledge about what was in
20   the transcript?
21   A.  Q-Med, I don't recall specifically what
22   they did.  I know they were mentioned in the
23   transcript.
24   Q.  So the only knowledge that you have, as
25   you sit here today, is that they were mentioned in



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
13–16

Page 13

CJ ROSENBAUM

1 the transcript, correct?
2    A.   If you ask me more specific questions it
3 will probably trigger what I read about them.  But
4 as of right now they are in the transcript.
5    Q.   What role does Q-Med play in this case?
6    A.   I don't know specifically.
7    Q.   Are you aware if Q-Med sold all of the
8 Youngblood product to Solu-Med?
9    A.   No.
10   Q.   Are you aware of where Solu-Med got the
11 Youngblood product?
12   A.   No.
13   Q.   Have you ever inspected any of the
14 Youngblood product that Solu-Med maintains right
15 now?
16   A.   No.
17   Q.   Do you have the ability to inspect
18 Youngblood product and even determine whether it's a
19 genuine or counterfeit product?
20   A.   If I had the products in front of me I
21 might be able to, but without them in front of me I
22 don't know.
23   Q.   You don't have that expertise?
24   A.   I did not say that.
25

Page 14

CJ ROSENBAUM

1    Q.   Do you have that expertise?
2    A.   I said if I had both products in front of
3 me I would be able to answer your question whether I
4 could or could not tell whether they are both
5 genuine or one was counterfeit or not.  But the way
6 the question is posed to me, if I don't have the
7 products in front of me, I cannot tell you whether I
8 could or could not.
9    Q.   You can't tell me in this case whether the
10 products that Solu-Med currently maintains, if they
11 are counterfeit or not, correct?
12   A.   That Q-Med made?
13   Q.   No.  That Solu-Med maintains.  The
14 products that they were trying to sell on Amazon,
15 can you tell me if they were counterfeit Youngblood
16 products or not?
17   A.   From what I read, they were 100 percent
18 genuine products.
19   Q.   Have you inspected it personally?
20   A.   You asked me that.  The answer is no.
21   Q.   So you don't have any personal knowledge,
22 isn't that correct, about whether the product is
23 authentic, genuine or counterfeit; isn't that
24 correct, yes or no?
25

Page 15

CJ ROSENBAUM

1    A.   First of all, there is no need for you to
2 raise your voice.
3    Q.   I did not raise my voice.
4    A.   Yes, you did.
5    Q.   No, I did not.
6    A.   So my answer remains the same.  Everything
7 I read leads me to opine the products were
8 100 percent genuine.
9    Q.   Are you done?
10   A.   That was a little immature, but yes, my
11 answer is done.
12   Q.   So my question is again, as you sit here
13 today, you have no personal knowledge as to whether
14 the product is authentic, genuine or counterfeit
15 because you did not inspect it, correct?
16   A.   From everything I read, my opinion is the
17 products were 100 percent genuine.
18   Q.   What did you read?
19   A.   What is in the notebook; the transcript;
20 the description; how they were obtained; where they
21 came from and what is in the transcript.
22   Q.   Where did they come from?
23   A.   They were purchased through a distributor.
24 They came from the brand, went to distributor; from
25

Page 16

CJ ROSENBAUM

1 the distributor they went to the plaintiffs.
2    Q.   So your testimony under oath is it went
3 from the brand to the distributor to Solu-Med?
4    A.   My understanding is it went from the brand
5 to the distributor, distributor to the Amazon
6 sellers which was Solu-Med.
7    Q.   Are you aware of a company called Inopex?
8    A.   I remember they were mentioned in the
9 transcripts.
10   Q.   Are you aware that Inopex was not a
11 distributor for Youngblood?
12   A.   My understanding is that they were.  They
13 were getting volumes of the products and, as a
14 distributor, reselling them to retailers like the
15 plaintiffs.  So I consider them to be a distributor.
16 It sounds like you are talking whether they were an
17 authorized distributor or unauthorized one.  But
18 from everything I read, they were distributor; they
19 sold genuine products to the plaintiff.  Plaintiff
20 was offering 100 percent genuine products, from what
21 I read.
22   Q.   We already went over you never inspected
23 the products.  You are going based upon what
24 people's testimony is, correct?
25



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
17–20

Page 17

CJ ROSENBAUM

1
2     A.   I am going over the documents.  There were
3   also some of the exhibits in some of the
4   transcripts.  The documents in the notebook, which
5   you now have, leads me to opine the products were
6   100 percent genuine.
7     Q.   So you have the notebook here.  Please
8   show me a document that makes that reflection.
9     A.   Exhibit 2, which I believe was attached to
10   the complaint, is an email from 1@ybskin where they
11   were going to retract their complaint.
12        MR. GOODMAN:  Excuse me, is that a Bates
13     stamp number?
14     A.   If it is, I don't see a number on it.
15     Q.   Just describe it, I guess.
16     A.   It's an email -- oh, it's filed to federal
17   court.  It has the case number on it, entered into
18   the docket.  The top starts with Stanley R. Goodman,
19   sent from my iPad.  It includes an email from
20   1@ybskin.com who wrote "Hello, we have agreed to
21   file a retraction with Amazon.  Please provide me
22   with the following information so we can submit to
23   Amazon," and it has what they were looking for.
24   That indicates to me that YB Skin, Youngblood Skin,
25   was withdrawing their complaint, which indicates to

Page 18

CJ ROSENBAUM

1
2   me that the products were genuine.
3     Q.   Were you aware --
4     A.   Should I continue?  There is a lot of
5   pages.
6     Q.   We will get to it all.
7     A.   So you want me to stop and not continue to
8   point out in the notebook what leads me to believe
9   the products were genuine?
10     Q.   Absolutely.  We will go through it.  So
11   the first item that you addressed is the agreement
12   to retract, correct?
13     A.   Yes.
14     Q.   Were you aware that the retraction was
15   based upon the offer of Solu-Med agreeing not to
16   sell Youngblood product?
17     A.   My understanding there were other factors,
18   not just the one you mentioned.
19     Q.   Were you aware of that fact?
20     A.   As a factor?  I can't tell you why your
21   client decided to withdraw the complaint other than
22   the products were genuine.
23     Q.   Did anyone ever testify, ever, from my
24   client that the product was genuine?
25        MR. GOODMAN:  Objection.

Page 19

CJ ROSENBAUM

1
2     Q.   Yes or no?
3     A.   When you take your client's deposition as
4   a whole and its ludicrous definition of counterfeit
5   versus genuine, then yes, the testimony as a whole
6   also lead me to opine that the products were
7   100 percent genuine.
8     Q.   My client has never stated that the
9   product was genuine; isn't that correct?
10     A.   I don't know the answer to that.
11     Q.   My client never testified that the product
12   was genuine.
13     A.   In those specific words quote unquote?
14     Q.   Yes.
15     A.   I don't know.
16     Q.   Why don't we go through some other
17   examples that you have indicated that leads you to
18   believe that the products were authentic.
19     A.   The very next page,
20   brandprotection@ybskin.com on December 4, 2018,
21   4:49 p.m. states "A retraction has been filed with
22   Amazon.  Please review the attached."
23     Q.   What was attached?
24     A.   I am getting there.
25     Q.   Well, wouldn't you be aware of what was

Page 20

CJ ROSENBAUM

1
2   attached?
3     A.   Out of the hundreds or probably in excess
4   of thousands of pages I have to go through it.
5   Offhand I don't.  But if you allow me to continue I
6   am happy to.
7     Q.   I think it's important to address the
8   statement one by one.
9     A.   Should I stop answering your question?
10     Q.   Sure.
11        MR. VINE:  Let's mark Exhibit 3 and
12     Exhibit 3A.
13        (Documents were marked as Exhibits 3
14     and 3A, for identification, as of this
15     date.)
16        MR. GOODMAN:  What is this, Jonathan?
17        MR. VINE:  Exhibit 3 is the complaint
18   and 3A is the quote attachment.
19     Q.   Have you seen Exhibit 3 before and 3A?
20        MR. GOODMAN:  3A is the attachment?
21        MR. VINE:  Yes.  It says page ten of 20
22   on the top right-hand corner.
23     A.   I think I did, but I am not sure.
24     Q.   What does the first paragraph say?  Can
25   you read it out loud, please.



Page 21

1            CJ ROSENBAUM
2      A.   "Since you have agreed that selling our
3   product does not comply with Amazon's general
4   conditions, guidelines of 'new', and you have
5   removed the product from the listings, we have filed
6   a retraction with Amazon.  This will be the only
7   filing of the retraction.  It will be your
8   responsibility to follow up with Amazon until the
9   retraction is complete."
10     Q.   Are you aware that Solu-Med had agreed,
11  prior to the filing of retraction, to not list the
12  Youngblood product?
13     A.   I am not sure.
14     Q.   Were you aware that on November 13th they
15  even advised Amazon that they were no longer going
16  to sell a Youngblood product?
17     A.   Not sure.
18     Q.   Let's go over some of those documents.
19     A.   Are you done with this first paragraph?
20     Q.   Yes, we are done.  We will come back to it
21  at some point.  I want to go over a couple of other
22  items.  Were you aware that Solu-Med had received at
23  least eight prior complaints prior to the
24  November 13th complaint?
25     A.   I saw an Amazon production with a

Page 22

1            CJ ROSENBAUM
2   spreadsheet of complaints which I think had, if not
3   all, some of the complaints you seem to be referring
4   to.
5      Q.   Are you aware of that?
6      A.   I am aware of that.
7      Q.   Were you ware that Solu-Med ignored all
8   prior complaints and never responded to Amazon?
9      A.   My understanding is there was no response
10  to Amazon.  Whether the company ignored them or not
11  ignored them, I don't know.
12     Q.   Were you aware that Solu-Med did not
13  respond to Amazon?
14     A.   I don't know what the company may have
15  done internally.  My understanding is they did not
16  write anything to Amazon.
17     Q.   Did you read the deposition testimony of
18  Kellon Goodson?
19     A.   I think I did, yes.
20     Q.   Did you read where he stated that he
21  raised the issue with Manny Aguero and then they
22  decided every time not to get a complaint, to delist
23  the product?
24     A.   I don't recall reading anything as you
25  have just phrased it.

Page 23

1            CJ ROSENBAUM
2      Q.   You don't recall where Kellon Goodson
3   alerted Manny Aguero of the issues when their
4   complaint came in; are you aware of that testimony?
5      A.   I think I did read that.
6      Q.   You are aware Manny Aguero directed him
7   not to respond to Amazon?
8      A.   I don't recall reading that testimony as
9   you are stating it, no.
10     Q.   What do you recall?
11     A.   I don't recall testimony about the
12  conversations back and forth specifically.  My
13  understanding was there was no response sent to
14  Amazon.  What the company did internally I am aware
15  of.
16     Q.   Have you read the deposition of Sherry
17  Seidell?
18     A.   No, I don't think I did.
19     Q.   Were you aware that she was one of the
20  individuals or executives involved that was in
21  charge of Ecommerce?
22     A.   I remember reading that she was involved
23  with Ecommerce.  The specifics of whether she did it
24  by herself or with others I don't recall.  I do
25  remember she was involved with the company.

Page 24

1            CJ ROSENBAUM
2      Q.   As it relates to Ecommerce, you represent
3   a number of companies dealing with Amazon, correct?
4      A.   Yes.
5      Q.   And it's important for your companies to
6   comply with Amazon's guidelines, correct?
7      A.   Sometimes yes, sometimes no.
8      Q.   You don't think it's important to comply
9   with Amazon's guidelines?
10     A.   Sometimes yes, sometimes no.
11     Q.   Why would it ever not be important?
12     A.   Because some of their policies internally
13  are inconsistent.  Others are just not enforced.
14  Others don't make any sense.  So sometimes yes and
15  sometimes no.
16     Q.   As it relates to intellectual property,
17  you think it's important for your clients to comply
18  with those guidelines?
19     A.   Sometimes yes, sometimes no.
20     Q.   What guideline with Amazon that your
21  clients should not comply with?
22     A.   Should not comply with?
23     Q.   Yes.  I asked you and you said sometimes
24  they should not comply with Amazon's guidelines as
25  it relates to intellectual properties.  Which ones?



CORY JAY ROSENBAUM

February 17, 2020

SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

25–28

Page 25

CJ ROSENBAUM

2    A.   In terms of copyright images, for example.
3  If the brand or another seller creates the listing,
4  I think it's fine for another seller to jump on that
5  listing and sell, which may or may not comply
6  exactly with Amazon's policies.
7    Q.   Do you know if it does?  You said may or
8  may not.
9    A.   The policies are inconsistent so there are
10  some portions of the policies that say you should
11  not list on products without having copyright
12  interest.  Other portions say that it's totally
13  fine.  Is it specifically spelled out which it is, I
14  don't recall.  You have the business solutions
15  agreement, then you have the policies.  Then you
16  have seller central Amazon issues, statements and
17  there is conflicts all the time.
18    Q.   Are you aware that Amazon provides
19  training for people on their guidelines?
20    A.   Yes.
21    Q.   Do you encourage your clients to get that
22  training.
23    A.   No.
24    Q.   Why not?
25    A.   Because I think it's better training

Page 26

CJ ROSENBAUM

2  elsewhere.
3    Q.   What better training?
4    A.   There are events and speakers around the
5  globe that are just more adept at teaching beginning
6  sellers, intermediate sellers and advanced sellers
7  how to do better.
8    Q.   So that's helpful.  You believe that there
9  are avenues out there or opportunities out there for
10  a company to get the appropriate training on how to
11  sell on a platform like eBay, Amazon, et cetera,
12  correct?
13    A.   Yes.
14    Q.   Have you ever taught at any of these?
15    A.   Yes.
16    Q.   What is the name of it, the one you taught
17  at?
18    A.   One of them?
19    Q.   Yes.
20    A.   Global Sources.
21    Q.   And you indicated that beginners should
22  attend these courses, correct?
23    A.   I said there is good opportunity.  It's
24  better than watching Amazon Seller University videos
25  or taking advice from Amazon staff itself.

Page 27

CJ ROSENBAUM

2    Q.   What about not doing any training?
3    A.   A lot of it is self-taught anyway, so I
4  would not advise people against starting and
5  learning on their own.  I also would advise people
6  to take courses if they can.  Some people can do
7  very, very well on their own, other people need
8  courses.
9    Q.   What about keeping informed of the Amazon
10  guidelines and reading the Amazon guidelines?
11    A.   What about it?
12    Q.   Do you think it's important for them to be
13  read before you start placing products on Amazon?
14    A.   No.
15    Q.   I want to make sure it's clear for the
16  record that your testimony under oath is it's not
17  important for a seller to read the seller's
18  guidelines prior to listing the seller's product?
19    A.   Correct.
20      MR. VINE:  Let's mark Exhibit 4.  This
21  is a composite set of exhibits of complaints
22    that was produced by plaintiff.
23      (Document was marked as Exhibit 4
24      for identification, as of this date.)
25    Q.   Have you ever seen this document before?

Page 28

CJ ROSENBAUM

2  Just so it's clear, I suspect you may have seen the
3  individual ones.  I am asking about how the
4  composite set of exhibits is set up.  Have you ever
5  seen it?
6    A.   I am looing at it right now.  I am on the
7  third page.
8    Q.   No.  I meant the first page.  Have you
9  ever seen something like this before?
10    A.   Have I ever seen the first page of Exhibit
11  4?
12    Q.   Yes.
13    A.   I am unsure.  Do you want me to go through
14  the rest of the pages?
15    Q.   Go ahead.  I wanted to know if you were
16  familiar with the actual composite set of exhibits.
17  Either you are or not.  If you need to go through
18  every page, by all means, go ahead.
19      MR. GOODMAN:  Is this the compilation
20    that Amazon produced?
21      MR. VINE:  No.  It's the compilation you
22    produced.
23    A.   No, I don't think I have seen this
24  compilation before.
25    Q.   Have you seen the correspondence contained



CORY JAY ROSENBAUM                                       February 17, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      29–32

Page 29

CJ ROSENBAUM

2   within Exhibit 4?
3        MR. VINE:  Note for the record that the
4   witness previously just looked through it for
5   the past couple of minutes and now having an
6   opportunity again.
7        A.   The first email dated Wednesday,
8   January 30, 2019, 9:25 a.m., I don't think I have
9   seen this email before.
10       Q.   How about you just look through it and
11  tell me only those items you have seen.
12       A.   Sure.  I believe I have seen portions of
13  several of the emails in Amazon's production in
14  their spreadsheet.  I have not seen any of the
15  entire emails as you presented them to me in Exhibit
16  4.
17       Q.   So you only read the spreadsheet that was
18  given to you from Amazon?  You did not read the
19  actual emails when they were produced?
20       A.   If that's what you are referring to in
21  Exhibit 4 I don't think I have read the entire
22  emails.  But in Amazon's production, some of it
23  seems to have significant portions of the email
24  without the to and the from.  Others are more
25  truncated.

Page 30

CJ ROSENBAUM

2        Q.   Have you ever spoken to Amazon about this
3   case?
4        A.   No.
5        Q.   Can you turn to PL208 in Exhibit 4.  It's
6   the Bates stamp number.
7        MR. VINE:  For the record the Bates
8   stamp number reflects the production from
9   plaintiff.
10       A.   208?
11       Q.   Yes.
12       A.   Okay.  I am on it.
13       Q.   Have you seen this specific email before?
14       A.   I believe I have seen a portion of this
15  email on Amazon's production.
16       Q.   What portion?
17       A.   I would have to look at the Amazon
18  production.
19       Q.   Can you pull that out?
20       A.   (Complying).
21       MR. VINE:  So we are going to mark this,
22  I guess, as Exhibit 2A because it was
23  contained in the binder.  It's a double-sided
24  document of a spreadsheet.
25       (Document was marked as Exhibit 2A

Page 31

CJ ROSENBAUM

2   for identification, as of this date.)
3        Q.   So I ask you to pull out 2A and show me
4   where on 2A it reflects the portion that you do
5   recall reviewing.
6        A.   The top line has the same email that is in
7   the body of PL208 of Exhibit 4.  The top line of 2A,
8   compliance@giovannicosmetics.com.  It also has the
9   same date.  The body that is in that entry seems
10  different than the context of the email in 4.  But
11  it has the same date, has the same email.  The
12  second one --
13       Q.   That's from January 28th, right?
14       A.   Yes.  Same email.
15       MR. GOODMAN:  What year?
16       MR. VINE:  2018.
17       A.   That seems to be the commonality, the date
18  and the email address.
19       Q.   That's it, not the text?
20       A.   Correct.  However, the top, if you look at
21  the column that we are in, there is text that is
22  rights owner communication.  It is clearly truncated
23  from Amazon's production.  You can see that the last
24  word is cut off.  So I don't know what else Amazon
25  may or may not have, but clearly it's truncated.

Page 32

CJ ROSENBAUM

2        Q.   Were you ever given the Excel version of
3   this document?
4        A.   I don't know what format I received it in.
5   I don't know if it was just -- I don't know what
6   format that was when I printed it.
7        Q.   Exhibit 4 is reflective of a number of
8   complaints received by Amazon about Solu-Med selling
9   products, correct?
10       A.   Seems to be, yes.
11       Q.   So the document --
12       MR. GOODMAN:  Excuse me.  I believe that
13  was a two-page document that was Amazon's
14  production.
15       MR. VINE:  I was talking about Exh bit
16  4.
17       MR. GOODMAN:  Yes, but Exh bit 4 was two
18  pages that Amazon produced.
19       MR. VINE:  No.  That's 2A.  I am talking
20  about Exhibit 4.  I moved back to Exhibit 4.
21       Q.   Exhibit 4 is a reflective compilation of
22  complaints received by Amazon about Solu-Med selling
23  products, correct?
24       A.   Not entirely correct.  For the most part
25  it is.



CORY JAY ROSENBAUM                                    February 17, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                      33–36

Page 33
1               CJ ROSENBAUM
2       Q.  So if you go to PL208, which we were on,
3   have you seen these policy warning violation
4   correspondence before?
5       A.  In 2A?
6       Q.  I said page 208 of Exhibit 4.
7       A.  Oh, 208.  Have I seen this type of
8   communication before?
9       Q.  Yes.
10      A.  Yes.
11      Q.  Your clients received them?
12      A.  Yes.
13      Q.  And have your clients responded to them?
14      A.  Some have and some have not.
15      Q.  Were you aware that Solu-Med on
16  January 27, 2018, did not respond to this warning of
17  PL208?
18      A.  Did not respond to Amazon?
19      Q.  Right.
20      A.  Yes.
21      Q.  Were you aware that Solu-Med agreed not to
22  tell any more of these products that are reflected
23  in PL208?
24      A.  I am unaware of that.
25      Q.  Were you aware --

Page 34
1               CJ ROSENBAUM
2       A.  I am unaware of what they did or did not.
3       Q.  Were you aware that Amazon advised if they
4   "received more complaints about your listings, we
5   may not allow you to sell to Amazon.com"?  Were you
6   aware of that?
7       A.  That's boilerplate.  That is in their
8   emails generally; or its emails generally.
9       Q.  Sitting here today though, were you aware
10  that Solu-Med was advised as early as January 27,
11  2018, from Amazon, that if they received more
12  complaints about their listings, they may not be
13  allowed to sell on Amazon.com?
14      A.  I just answered that question.  It's
15  boilerplate that is in the emails and it's in this
16  email.
17      Q.  That's not what I asked.  Were you aware
18  prior to today that Solu-Med received a warning in
19  January 2018 that if they continue receiving more
20  complaints about Solu-Med's listings, Amazon may not
21  allow them to sell on Amazon.com?  Prior to today
22  were you aware of that?
23      A.  Like I have told you now at least three
24  times, it's boilerplate language that is in the
25  emails from Amazon.  For example, in PL208 it's

Page 35
1   in -- if not every one of their emails, it's in this
2   one and some of the others that are here.
3       Q.  So I don't know how much litigation you do
4   but you are not answering the question so I am going
5   to give you the opportunity one more time.  But at
6   some point I am going to bring this to the judge's
7   attention, and I will seek a motion and we will come
8   back here if the judge agrees -- and they could
9   not -- that you are not answering my questions the
10  way I believe it would be the appropriate way how to
11  respond.  And you can answer "No, I don't agree" on
12  certain things.  But I asked you prior to coming
13  here today, were you aware that Solu-Med was advised
14  of this?  It's yes or no.  Were you aware prior to
15  today that Solu-Med -- not about the boilerplate.
16  If you are going to continue with the boilerplate,
17  that's fine and we will mark it and we will let the
18  Court make a ruling on it.
19      A.  I believe I have answered your question
20  several times.  It's in the email.  It is in the
21  compilation that you provided in the emails from
22  what you told me were received by Solu-Med.  And if
23  you want to go to a judge and have me come back, I
24  am happy to come back again.  I believe I answered

Page 36
1   your question numerous times.  It's in the email.
2   It was sent to Solu-Med.
3       Q.  But were you aware prior to today about
4   those emails?
5       A.  I have testified about this also several
6   times, that it's my understanding that Solu-Med did
7   not respond to Amazon's email.
8       Q.  That's not what my question was.  And I
9   will ask it one more time.  We already know you did
10  not review this compilation which is Exhibit 4,
11  correct?
12      A.  Correct.  I don't believe I have reviewed
13  it.
14      Q.  And it's not in your binder, correct?
15      A.  I did not see it in my binder.
16      Q.  And what you did review was the
17  compilation provided by Amazon in 2A, correct?
18      A.  Yes.  Well, it is truncated, but yes.
19      Q.  And you can't tell me if you have the
20  Excel version or not that Amazon produced?
21      A.  Correct.
22      Q.  Have you ever done any work for Solu-Med?
23      A.  No.
24      Q.  Let's turn to on Exhibit 4 PL211.



CORY JAY ROSENBAUM                                        February 17, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                          37—40

Page 37
CJ ROSENBAUM

1
2    A.   Okay.
3    Q.   This is a complaint about -- it, says
4  "Warning:  Notice of intellectual property rights
5  infringement"; is that correct?
6    A.   That's what it's titled.
7    Q.   This is a document that Amazon sends to
8  Solu-Med, correct?
9    A.   Appears to be, yes.
10   Q.   You are aware that lifeandhealthsource.com
11  is Solu-Med, correct?
12   A.   Yes.
13   Q.   And this is correspondence again regarding
14  Giovanni Cosmetics the next day, correct?
15   A.   That's what it says.
16   Q.   From the prior PL208, correct?
17   A.   Yes.  The other one was the 27th, this is
18  the 20th.
19   Q.   Again in this correspondence Amazon is
20  advising Solu-Med that "If we receive more
21  complaints about your listings, we may not allow you
22  to sell on Amazon.com."  Are you aware of that?
23   A.   Am I aware it's on the email?
24   Q.   Yes.
25   A.   Yes.  It's right here on the email.

Page 38
CJ ROSENBAUM

1
2    Q.   Were you aware of this email and that
3  warning, second warning, to Solu-Med before you came
4  here today?
5    A.   On every email that Amazon sends to people
6  and companies that sell on Amazon, when it receives
7  intellectual property right accusation, that
8  language is on the email.  So to answer your
9  question again, if they received emails from Amazon,
10  there was an IP complaint asserted against them,
11  baseless, or even possibly having merit, that same
12  boilerplate language would most likely be on the
13  email each and every time.
14   Q.   Most likely or do you believe it's every
15  time?
16   A.   I can't say every time.  All the ones I
17  have ever seen have that.
18   Q.   I have a couple I will show you that
19  doesn't have it, but that's fine.  So those two were
20  in January.  Now we are into March 5, 2018, PL216.
21  This is a complaint about authenticity of products
22  Solu-Med is selling, correct?
23   A.   Yes.
24   Q.   And Amazon considers authenticity issues
25  of products an intellectual property issue, correct?

Page 39
CJ ROSENBAUM

1
2    A.   Not necessarily, no.
3    Q.   If you look on the bottom of PL216 it
4  says, "We consider allegations of intellectual
5  property infringement a serious matter."  Do you see
6  that?
7    A.   Yes.
8    Q.   So you think it's a mistake for Amazon to
9  put that?
10       MR. GOODMAN:  Objection.
11   A.   I have no idea what Amazon's intention was
12  of writing it.  I can't testify what Amazon thinks.
13   Q.   Are you aware that the Amazon guidelines
14  reflect that authenticity violations is a -- they
15  consider an intellectual property violation?  That's
16  what Amazon says.  Are you aware of that guideline?
17   A.   That Amazon considers an inauthenticity to
18  be?
19   Q.   An intellectual property violation.
20   A.   I am not sure if that's the exact language
21  they use.
22   Q.   Are you aware of anything similar to that?
23   A.   Yes.
24   Q.   What are you aware of?
25   A.   When Amazon has inauthentic allegation

Page 40
CJ ROSENBAUM

1
2  against the seller Amazon generally wants to see the
3  sources of the products to see where they were
4  sourced from.
5    Q.   Have you seen any of the sourcing of the
6  products in this case?
7    A.   I read about them in the depositions.  I
8  am unsure if I saw invoices or not.
9    Q.   Well, I did not see in your report you
10  listing even any of the sourcing of the documents.
11  So would it have been something you received after
12  you wrote your report?
13   A.   No.
14   Q.   So whatever was in your report, you
15  identified in your report, would have been documents
16  that you reviewed?
17   A.   My report was based on the documents I
18  reviewed.
19   Q.   So if there was a document that you did
20  not list, you obviously did not review it, correct?
21   A.   Unless I made a mistake, yes.
22   Q.   You don't make mistakes, right?
23   A.   Of course I make mistakes.  Everyone makes
24  mistakes.
25   Q.   Are you familiar with Amazon Seller



CORY JAY ROSENBAUM                                          February 17, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                   41—44

Page 41

CJ ROSENBAUM

2  Central?
3      A.  I am aware of it.
4      Q.  What is it?
5      A.  Amazon Seller Central is where sellers go
6  to receive information that is part of like the
7  mechanism, the dashboard, when they are sellers.  A
8  lot of different aspects to it.
9      Q.  What is your familiarity with it, just the
10  existence of it or have you participated and worked
11  with it?
12      A.  I have read plenty of things that were
13  produced from seller central.  I have read posts on
14  seller central.  I have seen certain screens of
15  seller dashboards.  That's what I have seen.
16      Q.  Have you actually worked on it?
17      A.  Do I go onto seller central?
18      Q.  Yes.
19      A.  Rarely.
20      Q.  So let's go to PL216.  It's March 5, 2018.
21  Do you see that?
22      A.  Yes.
23      Q.  And in this one again, in March of 2018,
24  Solu-Med is being advised that if they receive more
25  complaints, they may not be allowed to sell on

Page 42

CJ ROSENBAUM

2  Amazon.com, correct?
3      A.  Correct.  Same boilerplate as the other
4  emails.
5      Q.  And you are aware that Solu-Med did not
6  respond to this complaint, correct?
7      A.  My understanding is they did not respond
8  to Amazon about this complaint.
9      Q.  Are you aware of Kellon Goodson's
10  testimony that he testified that they never
11  contacted the rights owner in any of these prior
12  complaints prior to Solu-Med?
13      A.  I am unsure if that's what her testimony
14  was to.
15      Q.  It's a he, but I understand.  Let's go to
16  PL0199.  It's after that.  It's April 4, 2018 email
17  from Amazon saying, "Warning:  Notice of
18  intellectual property rights violation."  Do you see
19  that?
20      A.  Yes.
21      Q.  This is about counterfeit, correct?
22      A.  Yes.
23      Q.  So Solu-Med in April of 2018 received
24  complaints regarding counterfeit items they were
25  selling, correct?

Page 43

CJ ROSENBAUM

2      A.  That's what this email seems to indicate.
3      Q.  That's not a Youngblood product, correct?
4      A.  This email it is not a Youngblood product.
5  As far as I am aware it's not a Youngblood product.
6      Q.  And again in this document Amazon advises
7  that in April of 2018, if they continue to receive
8  more complaints about the listings, they may not
9  allow Solu-Med to sell on Amazon.com, correct?
10      A.  Same boilerplate as other emails.
11      Q.  You are aware that Solu-Med did not
12  respond to Amazon about this complaint, correct?
13      A.  That's my understanding, yes.
14      Q.  You don't believe it's important for a
15  client to -- for one of these businesses or sellers
16  to respond to Amazon?
17      MR. GOODMAN:  Objection.
18      Q.  That's your testimony earlier?
19      A.  No, that was not my testimony earlier.
20  You are misstating it.
21      Q.  Do you believe it's important for a seller
22  to respond to Amazon's correspondence regarding
23  intellectual property violations and policy
24  warnings?
25      A.  Sometimes yes, sometimes no.

Page 44

CJ ROSENBAUM

2      Q.  So for these items was it important for
3  them to respond to?
4      A.  I don't know enough about their account at
5  the time, the volume of sales, the source of
6  documents they had.  Often these things are easily
7  resolved by just writing back to Amazon
8  notice-dispute@amazon.com team or their higher teams
9  and a lot of complaints if not the vast majority of
10  complaints are entirely baseless.  So sometimes yes
11  and sometimes no.
12      Q.  You don't know if these were baseless or
13  not, correct?
14      A.  Everything that I read indicates to me
15  that the products that the seller was selling were
16  100 percent genuine --
17      Q.  I am not talking about Youngblood
18  products.
19      A.  You are interrupting my answer.  I did not
20  mention Youngblood products either.  I was answering
21  your question.  Everything I read indicated to me
22  that this seller was only selling 100 percent
23  genuine products.  Therefore, to respond to
24  Brumisateur may not have been important with regard
25  to Amazon.



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
45–48

Page 45

CJ ROSENBAUM

1
2    Q.   Are you aware that after receiving this
3    complaint, Solu-Med took down selling Brumisateur's
4    products?
5    A.   Not sure if that was in the depositions or
6    not.
7    Q.   Are you aware that every time Solu-Med did
8    receive a complaint prior to Youngblood, that
9    instead of responding they chose not to sell the
10   product anymore?
11   A.   I am unaware.
12   Q.   Is that an important fact for you then?
13   A.   No.
14   Q.   If you could turn to PL202.  It is a May
15   12, 2018 correspondence from Amazon saying policy
16   warning regarding authenticity of products from
17   Evianspray.  Email correspondence came from Amazon.
18   Do you see that document?
19   A.   Yes.
20   Q.   Have you ever seen this document before?
21   A.   I may have seen a portion of it in the 2A,
22   Amazon's production.
23   Q.   And again now we are in May.  So we had
24   two in January, one in March that's been produced,
25   one in April and one in May.  And again in this May

Page 46

CJ ROSENBAUM

1
2    correspondence Amazon advises Solu-Med that if they
3    continue to receive complaints, they are going to no
4    longer let them sell on Amazon.com, correct?
5    A.   Same boilerplate we discussed a bunch of
6    times.
7    Q.   Are you aware that Solu-Med, after
8    receiving this, did not respond to Amazon's policy
9    violation?
10   A.   That's my understanding.
11   Q.   Are you aware that Solu-Med decided no
12   longer to sell the Evianspray after receiving this
13   policy warning?
14   A.   I am not sure if that was in the
15   transcripts or not.
16   Q.   You are aware that the product was removed
17   from Amazon, right?
18   A.   The specific Evianspray products?
19   Q.   Yes.
20   A.   I am not sure.
21   Q.   It actually says it in the correspondence
22   you have in front of you, in all of these
23   correspondence.  You are aware that Amazon removed
24   those products?
25   A.   No, I don't know that Amazon actually

Page 47

CJ ROSENBAUM

1
2    removed the products.
3    Q.   If you look on the first paragraph it
4    says, "We removed this content, but we may let you
5    list these products again if we receive your
6    retraction."  Do you see that statement?
7    A.   I do see that.
8    Q.   Are you aware that Amazon did remove the
9    products after receiving complaints?
10   A.   No.  I have no idea whether Amazon removed
11   the products or any other content from its
12   warehouses or its website or anyplace else simply
13   because it's in this email.  There is no way of
14   telling.
15   Q.   This is what Amazon said they were doing,
16   correct?
17   A.   It says, "We removed this content."  One,
18   what Amazon is referring to in terms of content,
19   whether it means products or something else, we
20   don't know.
21   Q.   If you read the sentence on --
22   A.   If you want me to answer your questions I
23   am happy to, but I can't do it if you speak over me.
24   I am just going to stop.  To remove this content I
25   do not know what Amazon is referring to.  I doubt

Page 48

CJ ROSENBAUM

1
2    Amazon stopped selling this product if it was making
3    even five cents on it.  So I believe that Amazon
4    continued to sell it despite how you are
5    interpreting the email.
6    Q.   I am not asking if Amazon continued to
7    sell it.  I am asking if -- it said, "We removed
8    this content, but we may let you" -- being Solu-Med
9    -- "list this product again."  Are you aware if,
10   after receiving this correspondence, Solu-Med was
11   allowed to list this product?
12   A.   They received the email.  Looks like they
13   were not allowed to list on the product, but it
14   doesn't mean that their products did not continue to
15   go out the door from Amazon's warehouse system or
16   that Amazon actually removed anything at all.  They
17   may have continued to sell their products, just not
18   pay them.  They may have continued to sell their
19   products and then mixed up the inventory with other
20   products.  There is a whole host of other things
21   that goes on in Amazon's warehouse system.  So this
22   statement "We removed this content," I have no idea
23   what Amazon's staff intention was or what Amazon
24   actually did.
25   Q.   Are you aware of what products Solu-Med



Page 49

CJ ROSENBAUM

1  manufactures?
2  A.  What they manufacture?
3  Q.  Right.
4  A.  No.
5  Q.  Do you manufacture any products?
6  A.  You just asked me if I know what they
7  manufacture and I said no.
8  Q.  Do you know if they manufacture any
9  products or not?
10  A.  I don't know if they manufacture products
11  or have any products manufactured for them.  I don't
12  know.
13  Q.  Are you aware if they are a distributor of
14  any products?
15  A.  They seem to be a retailer.  Whether they
16  are also a distributor, I don't know.
17  Q.  Let's go to the next one, PL228, which is
18  a July 23, 2018 policy warning notice of
19  intellectual property violation in July of 2018.  Do
20  you see this document?
21  A.  Yes.
22  Q.  Again in this correspondence, like the
23  other ones, it says they "removed this content, but
24  we may let you list this product again if we receive

Page 50

CJ ROSENBAUM

1  a retraction"; is that correct?
2  A.  Yes.  In the first paragraph "We removed
3  this content," looks like the same verbiage.
4  Q.  "We may let you list it again if we
5  receive a retraction," correct?
6  A.  Yes.
7  Q.  You are aware that Solu-Med did not
8  respond to this policy warning violation?
9  A.  That is my understanding.  Well, did not
10  respond to Amazon.
11  Q.  You don't have any facts as to whether
12  they addressed it at all?
13  A.  I don't know.  All I can tell you is I
14  don't believe they responded to Amazon.
15  Q.  Do you know if they contacted
16  suzi@hixonlaw.com?
17  A.  I don't know.
18  Q.  Again in this correspondence, like the
19  others, does Amazon advise that if they continue to
20  receive more complaints, that they may not allow
21  them to sell on Amazon.com?
22  A.  Like I said, it's boilerplate language.
23  It's in most if not all emails coming from Amazon.
24  That blurb is put in.

Page 51

CJ ROSENBAUM

1  Q.  If you look on the July 25th, PL0225, it's
2  another policy warning violation from a different
3  company.  It's the same verbiage.  This one is about
4  authenticity of products, but it is the same
5  verbiage of removal of the product, as well as may
6  not let them list if they continue to receive
7  complaints.  Do you see that?
8  A.  Are you asking me if the same language is
9  there?
10  Q.  Yes.
11  A.  "We removed this content, but we may let
12  you list these products again if we receive a
13  retraction of the complaint from the rights owner,"
14  that one?
15  Q.  Yes.
16  A.  Yes.
17  Q.  You are aware that after receiving this
18  complaint in July of 2018, that Solu-Med did not
19  respond to Amazon about this complaint?
20  A.  Yes.
21  Q.  Are you aware that Solu-Med did nothing to
22  address this complaint?
23  A.  I don't know.
24  Q.  You don't know what they did?

Page 52

CJ ROSENBAUM

1  A.  You asked me if I know that they did
2  nothing.  My answer is I don't know.
3  Q.  Are you aware that they don't have any --
4  they had no internal procedures regarding dealing
5  with counterfeit and authenticity items?
6  A.  I don't know if they did or did not have
7  any procedures to deal with this type of an email
8  coming in.
9  Q.  My question is a little different.  Are
10  you aware of any type of written internal procedures
11  that they had that governed how they list products
12  on Amazon?
13  A.  I am unaware whether or not Solu-Med had
14  any written procedures with regard to dealing with
15  emails coming from Amazon like the one indicated in
16  225.
17  Q.  I will ask the question again and I would
18  appreciate if you listen to my question.  Are you
19  aware if Solu-Med had any internal written
20  procedures regarding how they list products on
21  Amazon?
22  A.  I listen very carefully.
23  Q.  You talked about an email.  I am not
24  referring to an email.  Please go ahead.



Page 53

CJ ROSENBAUM

1
2    A.  I listened very carefully to your
3  question.  You changed it to a listing rather than a
4  complaint received.  I am unaware whether Solu-Med
5  had any written procedures.
6    Q.  Have you reviewed any written procedures
7  from Solu-Med?
8    A.  I don't think I reviewed any written
9  procedures from Solu-Med.
10   Q.  Did you ask for the written procedures?
11   A.  No.
12   Q.  Why not?
13   A.  I did not need written procedures to form
14 the opinions in my report that the products they
15 were selling were 100 percent genuine and that your
16 client's description or your client's interpretation
17 of Amazon's policies was ludicrous.  Especially in
18 light of their extensive experience on Amazon made
19 it even more ludicrous.
20   Q.  Are you aware that Youngblood filed
21 complaints November 2, 2018, with Amazon about
22 Solu-Med selling Youngblood products?
23   A.  The date sounds right, yes.  Your date
24 sounds correct.
25      MR. VINE:  I am going to mark a

Page 54

CJ ROSENBAUM

1
2  composite set right now of documents.  I
3  think we are on Exhibit 5.
4      (Document was marked as Exhibit 5
5      for identification, as of this date.)
6    Q.  Have you seen this document before?  This
7  is PL000298.
8    A.  Just the first page?
9    Q.  Yes.
10   A.  I think I did see this before.
11   Q.  Were you aware that Solu-Med chose not to
12 respond to this complaint that was sent to them on
13 November 2, 2018?  Just so you have a reference, 2A
14 relates to non-Youngblood complaints.
15   A.  I don't know if Solu-Med wrote directly to
16 Amazon regarding this particular email.
17   Q.  Do you recall Kellon Goodson testifying
18 that they did not respond to the first complaint
19 from Youngblood?
20   A.  Response meaning writing back to Amazon?
21   Q.  Correct.
22   A.  I believe that's accurate.
23   Q.  And this is the November 2nd one.  If you
24 turn to PL there is 298 and then the next page is
25 PL299, do you see they are both November 2nd but

Page 55

CJ ROSENBAUM

1
2  they are regarding different items and they were
3  sent at different times?  But they were both
4  regarding Youngblood products.  Do you see those two
5  correspondence?
6    A.  Yes.  Two minutes later?
7    Q.  Yes.  It's regarding different matters.
8  You are familiar with the ASIN, right?
9    A.  Yes.  Your client sending out one at 6:31
10 p.m. and then another at 6:33 p.m. were more or less
11 Amazon responding, right?
12   Q.  No.  This is correspondence from Amazon
13 that is sending one at 6:31 and 6:33.
14   A.  Right.  But in response to your client
15 sending out multiple complaints practically
16 simultaneously.
17   Q.  Correct.  Absolutely.  And you are aware
18 that Solu-Med did not respond to these complaints on
19 November 2, 2018?
20   A.  Correct.  Well, they did not respond --
21 are you asking whether they responded to Amazon or
22 whether they responded to Amazon on November 2,
23 2018?
24   Q.  No.  I will be very clear.  They did not
25 respond to Amazon about the complaint received on --

Page 56

CJ ROSENBAUM

1
2  the complaints received on November 2, 2018.
3    A.  Ever?
4    Q.  Until they received more complaints.  In
5  between November 2nd and November 13th did they
6  respond to Amazon?
7    A.  I think those dates are correct.  It was a
8  response but it certainly wasn't on November 2nd.
9  Whether it was on the 13th, I am not sure.  Your
10 question was a bit confusing.  Initially it sounded
11 like you asked whether they responded November 2,
12 2018.  I don't think they did.  The exact date that
13 Solu-Med responded to Amazon and responded, I don't
14 believe it was on the 2nd.
15   Q.  Isn't it a fact they only responded after
16 their storefront was shut down?
17   A.  To Amazon?
18   Q.  Yes.
19   A.  I believe that is correct.
20   Q.  Are you aware of Solu-Med responding to
21 anyone about the Youngblood complaints before the
22 store was shut down?
23   A.  No.
24   Q.  So now let's go within composite Exhibit 5
25 PL000290.  You see there is a November 13th from



Page 57

CJ ROSENBAUM

2  Amazon of a policy warning violation?  Do you see
3  that?
4      A.  Yes.
5      Q.  Are you aware if they responded to this
6  item, PL290?
7      A.  I don't know the exact date that Solu-Med
8  wrote back to Amazon.
9      Q.  You can put that aside for a second.
10         MR. VINE:  I am going to mark as Exhibit
11  6 an example of one of the complaints issued
12  to Amazon from Youngblood.
13         (Document was marked as Exhibit 6
14      for identification, as of this date.)
15      Q.  Do you see this document?
16      A.  Okay.  I read it.
17      Q.  Have you ever seen this document, Exhibit
18  6, before?
19      A.  I am unsure.
20      Q.  If you look at the paragraph where it
21  says, "According to Amazon's robust and aggressive
22  anti-counterfeit policy"; do you see that?
23      A.  Yes.
24      Q.  Youngblood or Amazia sent to Amazon "The
25  sellers must list items that match the detail pages

Page 58

CJ ROSENBAUM

2  exactly."  Do you agree with that position, that a
3  seller must list items that match the detailed pages
4  exactly?
5      A.  No.
6      Q.  So just to make sure, you don't believe
7  that Solu-Med needs to, when it lists its product,
8  match the ASIN page or the detail page as it's
9  called?
10      A.  You are supposed to, yes, if Amazon wants
11  you to.  But there is plenty of sellers that put
12  things on listings all the time that don't match
13  detailed pages exactly.
14      Q.  But you agree that Amazon requires you to
15  do that?
16      A.  Amazon does not require it.  It's in their
17  policies, but the reality is that they do not.
18      Q.  So their policy says they do but you are
19  saying in reality it doesn't happen?
20      A.  Correct.
21      Q.  Then it says, "The indicated sellers" --
22  being Solu-Med -- "are not selling the authentic
23  products as shown in the ASIN reference."  Do you
24  see that statement?
25      A.  I see that statement.

Page 59

CJ ROSENBAUM

2      Q.  Did you personally confirm whether the
3  products that were identified in these complaints
4  were matching the ASIN page as "products as shown in
5  the ASIN reference"?
6      A.  Everything I read --
7      Q.  I asked you if you personally did it.  Yes
8  or no?
9      A.  First of all I am trying to answer your
10  question and your interrupting me makes that very
11  difficult.  If you allow me to answer, I am happy
12  to.
13      Q.  I want you to answer my question.  You can
14  answer yes or no or I don't know, but those are the
15  three answers you are going to do and then you can
16  give an explanation.
17      A.  The way your question is phrased it's not
18  a yes or no question.  Rephrase it.
19      Q.  So I will rephrase it.  Have you
20  personally looked at the ASIN reference pages that
21  are at issue in this case?
22      A.  Your own clients indicated that the
23  products were genuine.
24      Q.  I asked you if you did it.
25      A.  As they exist today?

Page 60

CJ ROSENBAUM

2      Q.  No.  As they existed at the time these
3  complaints were made.
4      A.  No.  I wasn't involved then.  As far as I
5  am aware, it would be impossible to do that.  So my
6  answer would be no.
7      Q.  Have you looked at the ones that exist
8  today?
9      A.  Regarding issues that happened in 2018?
10      Q.  I am going to say this one more time, then
11  I want to take a break.  But have you reviewed the
12  ASIN pages for the Youngblood products that are at
13  issue in this case, yes or no?
14         MR. GOODMAN:  As of when?
15         MR. VINE:  As ever.
16      A.  Your question doesn't make sense in the
17  way that you are asking the question.
18      Q.  Okay.  Why is that?
19      A.  Because you are mixing up the verbiage
20  when it comes to Amazon in terms of the listing and
21  an ASIN and a detailed page.
22      Q.  Have you reviewed a listing, detailed page
23  or anything else on Amazon regarding Youngblood
24  products?
25      A.  Ever?



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
61–64

Page 61

CJ ROSENBAUM

1
2    Q.   Ever.
3    A.   Yes.
4    Q.   When?
5    A.   I don't know.
6    Q.   As it relates to this case.
7    A.   As then, no.
8    Q.   When did you do that?
9    A.   I just told you I don't know.
10   Q.   Past five years?
11   A.   Yes.
12   Q.   Are you still using the same computer that
13   you looked at it?
14   A.   No.
15   Q.   So in the past five years, you would have
16   looked at a Youngblood detailed or listing or ASIN
17   page?
18   A.   Chances are I have seen a Youngblood
19   detailed page.  Let me rephrase that.  A detailed
20   page having to do with a Youngblood product.
21   Q.   You are saying chances are.  Do you have a
22   specific recollection of doing it?
23   A.   No.
24         MR. VINE:  Let's take a quick break.
25         (Whereupon, a brief recess was

Page 62

CJ ROSENBAUM

1
2    taken.)
3         (Document was marked as Exhibit 7
4    for identification, as of this date.)
5    Q.   Marked as Exhibit 7 is another composite
6    set of exhibits that were produced by plaintiff very
7    recently.  I don't know if you reviewed these or
8    not.  You could tell me if you have or have not.
9    There are some duplicates of prior documents, but
10   these were taken off of Amazon Central.  I want to
11   start with the end.  They are in order.
12        So we can go to PL2408 which is on the last
13   page.  I am not going to go through every document.
14   Go to the very last page.
15   A.   Okay.
16   Q.   So if you recall earlier I showed you
17   complaints from November 2, 2018, to Amazon
18   regarding Solu-Med selling Youngblood products.  Do
19   you remember that?
20   A.   The last I saw was Amazon's emails to
21   Solu-Med about the complaints received.
22   Q.   Do you recall that they were sent on
23   November 2nd?
24   A.   Yes.  But I think you said -- you said
25   Youngblood to Amazon.  The last I looked at it I

Page 63

CJ ROSENBAUM

1
2    think both were Amazon to Solu-Med.
3    Q.   So you recall on November 2, 2018, there
4    were two policy warnings that were sent to Solu-Med
5    from Amazon regarding Youngblood complaints,
6    correct?
7    A.   Yes.  First two page of Exhibit 5.
8    Q.   Now PL02408 is another correspondence from
9    Amazon to Solu-Med.  Have you ever seen this
10   document before?  This one is dated November 11,
11   2018.
12   A.   Yes, I think I did see this before.
13   Q.   And if you see in this document like I
14   believe in Exhibit 4 in all the correspondence,
15   there is a section that says, "If you believe that
16   the reported content is not counterfeit, you may
17   email notice-dispute@amazon.com with supporting
18   information."  Do you see that?
19   A.   I am just uncomfortable with your question
20   working in Exhibit 4.
21   Q.   We will go to Exhibit 4.  Do you see it in
22   this document?
23   A.   Do I see?
24   Q.   That statement in this document, in
25   PL2408.  "If you believe that the reported content

Page 64

CJ ROSENBAUM

1
2    is not counterfeit, you may email
3    notice-dispute@amazon.com with supporting
4    information."  Do you see that?
5    A.   I do see that.
6    Q.   So Amazon is telling Solu-Med that they
7    can provide -- they being Solu-Med -- supporting
8    information to refute the counterfeit claims,
9    correct?
10        MR. GOODMAN:  Objection.
11   Q.   In that sentence.
12   A.   Yes.
13   Q.   If you go back to the November 2nd emails
14   from Amazon.  If you can pull them out.  It's PL298
15   and PL299.  I believe it's Exhibit 5.  Do you see
16   that?
17   A.   Yes.
18   Q.   That same language or verbiage is also
19   there, correct?
20   A.   The verbiage is different.
21   Q.   This one says, "With proof of
22   authenticity," correct; PL298?
23   A.   That's one of the differences.
24   Q.   But up until November 13th, Solu-Med did
25   not respond to Amazon with any proof of

Page 65

CJ ROSENBAUM

1
2  authenticity, correct?
3      A.  I don't know the date that Solu-Med
4  ultimately responded.  I think it was around the
5  13th.  I don't know the exact date.  Prior to
6  responding they did not respond, yes.
7      Q.  So how about for purposes of this question
8  I want you to assume that -- are you aware of the
9  plan of action that was submitted by Solu-Med to
10  Amazon?
11      A.  Yes.
12      Q.  Are you aware that they had multiple
13  different versions, correct?
14      A.  I think there was more than one version.
15      Q.  Can you pull me out the first response
16  that Solu-Med sent to Amazon regarding Youngblood
17  products?
18      A.  From my notebook?
19      Q.  Yes.
20      A.  I will take a look.
21      Q.  Not the complaint, the actual document.
22      A.  I am looking for it.  I believe there were
23  three, plus at least one email to the Bezos' team.
24      Q.  So I am asking you to pull out the first
25  one.

Page 66

CJ ROSENBAUM

1
2      A.  I am still looking for it.
3      Q.  If you are looking for it within the
4  exh bits of the complaint, I don't believe it's
5  there.
6      A.  The Bezos correspondence --
7      Q.  Again that's not what I was asking for.
8  What I asked was the first response that Solu-Med
9  did to Amazon regarding the Youngblood complaints.
10      A.  I believe you asked me about the plans of
11  action and correspondence to Amazon in response to
12  your clients baseless of intellectual property.
13  That is what I am looking for right now.  If you
14  would like me to stop --
15      Q.  No.  I want you to find what I asked,
16  which I said is please find the first one -- you
17  could be problematic or we could try to make this
18  streamlined as much as possible.  I don't know if
19  it's my fault or your fault, you are just not
20  understanding what I am saying.  I asked you to find
21  the first document that Solu-Med responded to Amazon
22  regarding the Youngblood complaints.
23      A.  First, it is you, and I ask you not to
24  raise your voice.
25      Q.  I have not.

Page 67

CJ ROSENBAUM

1
2      A.  I believe you have.  And I am looking for
3  the documents right now.  In my answer to you I
4  indicated that I believe there were three different
5  plans of action and a correspondence with Bezos,
6  which you then asked me a follow-up question.  So I
7  am looking for all of them.  So now you want me to
8  find the very first plan of action submitted; is
9  that correct?
10      Q.  Yes.
11      A.  I will look at it.  I would ask you to
12  stop raising your voice to me.  We are sitting
13  two feet apart.
14      Q.  Again I am not raising my voice.  In fact,
15  Mr. Goodman just asked me to raise my voice because
16  he could not hear me.
17      A.  That was before the bathroom break and
18  then you were speaking softly.  I don't seem to have
19  the first plan of action that was submitted.
20      Q.  But you do recall seeing it?
21      A.  I am not sure if I read just a description
22  of it or the actual plan of action.  In the first
23  document I read there was indication there were
24  three different plans of action, plus communications
25  with the Jeff Bezos team.  I am not sure that I read

Page 68

CJ ROSENBAUM

1
2  the plan of action or it was referred to in the
3  other documents I reviewed.
4          (Document was marked as Exhibit 8
5          for identification, as of this date.)
6      Q.  What marked as Exhibit 8 is the first plan
7  of action dated November 13, 2018.  Have you ever
8  seen this document before?
9      A.  When I went through my notebook I saw
10  something similar to these icons, but it was a poor
11  copy of it.  You are saying have I seen this
12  document before?
13      Q.  Yes.
14      A.  I think I did.  I think it was the page in
15  here that had the icons, but I am not sure.
16      Q.  Can you show me the document that you are
17  referring to that you think is similar?
18      A.  What I said is I saw something with
19  similar icons a few moments ago when I was going
20  through my notebook.
21      Q.  What about similar content?
22      A.  I am not sure.  Like I said, I saw similar
23  icons on one of these pages.  No.  They were
24  different icons.
25      Q.  So Exhibit 8 reflects the first plan of

Page 69

CJ ROSENBAUM

1
2  action submitted on November 13, 2018; do you see
3  that?
4      A.  Yes; I see Exhibit 8, and yes.
5      Q.  From November 13th are you aware of any
6  documents being submitted in terms of providing
7  supporting information or proof of authenticity to
8  Amazon regarding Youngblood products?
9      A.  No.
10     Q.  If you look on Exhibit 8, if you see the
11  second submission -- there is three submissions.
12  The second one says, "The actions you have taken to
13  resolve the issue.  We have removed all listings for
14  the Youngblood product line and deleted our sales
15  offerings to ensure that we don't infringe on any
16  intellectual property of Youngblood Cosmetics."  Do
17  you see that?
18     A.  I see that under paragraph two under your
19  submission.  I don't think it was three different
20  submissions.  It was all the same correspondence but
21  I see it in paragraph two.
22     Q.  This was on PL48, correct?
23     A.  Yes.
24     Q.  Were you aware that Solu-Med on
25  November 13, 2018, had removed all the listings of

Page 70

CJ ROSENBAUM

1
2  the Youngblood product line and deleted the sales
3  offerings to ensure they don't infringe on any
4  intellectual property of Youngblood Cosmetics?
5      A.  I believe that was discussed in one or
6  more of the depositions.
7      Q.  Are you aware of what review Solu-Med did
8  after they made this submission of November 13,
9  2018, as reflected in paragraph three?
10     A.  What period of time are you asking about?
11  *Q.  Any time after November 13, 2018, until
12  January 1, 2020, are you aware of any review of
13  Solu-Med's product offerings that were done to
14  ensure compliance with Amazon's terms of service
15  related to intellectual property and remove any
16  offerings that were in the plans?  Are you aware of
17  what they did?
18     A.  I know there was a deposition of your
19  client that confirmed the products were genuine and
20  I assume there other steps were taken.  I know that
21  your client confirmed in his deposition the products
22  were genuine and the counterfeit complaint was
23  baseless and false.
24     Q.  So do you think you answered my question?
25     A.  Yes.

Page 71

CJ ROSENBAUM

1
2      MR. VINE:  Can you read back the
3  question.
4          (Whereupon, the referred to question
5      was read back.)
6      Q.  She read back the question.  Can you
7  answer it, please.
8      A.  I answered it.  One of the things that was
9  done was the deposition of your client where he or
10  she confirmed the products were genuine.  That is
11  one of the things that was done to confirm they were
12  in full compliance with Amazon's policies, which
13  they were, so they were selling genuine products.
14     Q.  Anything else you think they had done?
15     A.  They sourced products from what appears to
16  be a reliable source.  And they had genuine
17  products, there was no counterfeit.  Your client's
18  complaint was 100 percent baseless.  And your
19  client's experience, they took the nuclear option to
20  try and stop their competition because they wanted
21  to make money on the sales rather than anybody else.
22     MR. VINE:  Mark that question.
23  REQUEST NOTED
24     A.  Also, I am available to stay as late as
25  you want.  If you want me to stay past 4:30, it is

Page 72

CJ ROSENBAUM

1
2  fine with me.
3      Q.  We are going to come back regardless.  If
4  I can't get an answer to my question, I am not going
5  to argue with you.  I will let the Court make the
6  decision.
7  Can you turn within this composite set of
8  exhibits, I believe it's the color code of conducts.
9  Can you look at Exhibit 7, PL02413.
10     A.  May I read the entire exhibit before I
11  answer your question about it?
12     Q.  It's a composite set so I am only asking
13  about that specific email page.  Please go to
14  PL2413.
15     MR. VINE:  Let the record reflect the
16     witness has got to PL2413 and he is now
17     reviewing it.
18     MR. GOODMAN:  Are we on Exhibit 7?
19     MR. VINE:  Yes.  PL2413.
20     A.  Okay.  I have read that.
21     Q.  Have you had an opportunity to review
22  PL2413?
23     A.  Yes.
24     Q.  Have you ever seen this document before?
25     A.  I don't think so.



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
73–76

Page 73

CJ ROSENBAUM

1
2    Q.   Were you aware that Amazon tried to
3    contact Solu-Med before they shut down their
4    account?
5    A.   I am not sure if I read this email, if
6    they were notified before, or just the suspension
7    email.  I am not aware.
8    Q.   Were you aware that Amazon tried to reach
9    them by phone before they shut them down?
10    A.   I am unaware if Amazon tried to reach them
11    by telephone.  Also Amazon will often send an email
12    that they tried to call and they really don't.
13    Q.   This email states that they tried to call,
14    correct?
15    A.   It states that.  It doesn't mean it
16    happened.  My understanding is it's very unusual for
17    Amazon to actually make the phone calls they
18    describe in their email notices.
19    Q.   This is an email correspondence where they
20    advised Solu-Med that Amazon has temporarily
21    deactivated their account, correct?
22    A.   Correct.
23    Q.   So Amazon deactivates their account, and
24    then we just looked at an exhibit, if you recall,
25    the plan of action is then submitted also on

Page 74

CJ ROSENBAUM

1
2    November 13, 2018.  Do you recall that document?
3    A.   I have to go back and check the date on
4    it.  Also there is no way of knowing what time
5    Exhibit 8 00048 was sent in comparison to 02413.
6    Q.   But they are both from the same day,
7    correct?
8    A.   They appear to be dated the same day.
9    Q.   And after --
10    A.   The timezones are not indicated.
11    Q.   After the plan of action was submitted, do
12    you know what Amazon's response was?
13    A.   I believe as a result of your client's
14    baseless complaints are counterfeit, the account was
15    closed, suspended.
16    Q.   My question was different and maybe it was
17    a poor question.  I will say it again.  After they
18    submitted that plan of action on November 18, 2018,
19    did Amazon accept it or reject it?
20    A.   It seems it was rejected.
21    Q.   If you turn to the remail correspondence
22    in this document production PL2415.  Have you ever
23    seen this document before?
24    A.   I am unsure if I have seen this document
25    before.

Page 75

CJ ROSENBAUM

1
2    Q.   Are you aware if Solu-Med ever provided to
3    Amazon on November 15th, 14th or 13th proof of
4    product authenticity as described in PL02415?
5    A.   Unsure whether Solu-Med sent their
6    information regarding authenticity to your client
7    and then promised to do a retraction or if it was
8    sent to Amazon.
9    Q.   Do you have any documents that reflect, in
10    your documents that you have right there, that
11    Solu-Med sent to Amazon proof of product
12    authenticity as requested in PL02415?  Just so the
13    record is clear, we are looking for correspondence
14    from Solu-Med to Amazon with the proof of product
15    authenticity that is being submitted to Amazon.
16    A.   There is an exhibit number 11 to
17    Mr. Finkman's deposition from 12/10/19.  I can't
18    tell if that email was sent to Amazon or not.
19    Q.   What is it?
20    A.   It has to do with Youngblood retracting
21    its complaint.  But the copy is poor, I am not sure
22    if Amazon was Cc'd on that in terms of showing them
23    that the products were genuine.  No, I don't seem to
24    have a copy of documents from Solu-Med to Amazon
25    that you asked about.

Page 76

CJ ROSENBAUM

1
2    Q.   Have you ever seen any such?
3    A.   I am unsure.
4    Q.   Have you produced all the documents you
5    have seen?
6    A.   Yes.
7    Q.   So if it wasn't in those documents, then
8    you would not have seen it, correct?
9    A.   Correct.
10    Q.   You now could turn to PL2416.
11    A.   Okay.
12    Q.   And in the November 16th correspondence,
13    again they are indicating that they need to provide
14    proof of product authenticities and now they add
15    also greater detail on the root cause of the
16    infringement, greater detail on the actions you have
17    taken to resolve the policy met/metric violated
18    issues, and greater detail on the steps you have
19    taken to prevent infringement going forward.  Do you
20    see that?
21    A.   I do, but you are ignoring the language
22    and not reading the portion about a valid
23    retraction.  Not just a retraction, a valid
24    retraction, which appears on 216; it appears on 215;
25    it appears on 2412 and --



Page 77

CJ ROSENBAUM

2    Q.   That verbiage is on all of the complaints
3  that we went over today regardless if they are
4  Youngblood about a retraction?
5    A.   Regarding Youngblood retracting its
6  complaint?  I don't know about all of them.  I could
7  look at them all again, but it's on enough of them
8  that Amazon's email is inconsistent where it says
9  the retraction from Youngblood baseless complaint
10  and also the seller has the opportunity to send the
11  stuff to Amazon.
12    Q.   Amazon says on PL2416 "Please provide the
13  following."  The first thing is a valid retraction,
14  correct?
15    A.   Well, the valid retraction says right here
16  it has to come from the same email address
17  brandprotection@ybskin.com, which is neither
18  Youngblood nor it's your client.  So it has to come
19  from that email address.
20    Q.   So that has to be done in order for Amazon
21  to process their claim, correct?  That's one of the
22  items?
23    A.   No, that's not what it says.
24    Q.   Does Amazon also ask for the proof of
25  product authenticity?

Page 78

CJ ROSENBAUM

2    A.   I just said that's not what it says and
3  you said does it also say.  So the answer to your
4  question -- I can't answer your question because you
5  added in a question I just said was wrong into my
6  next question.
7    Q.   Does Amazon request proof of product
8  authenticity in order to process the appeal?
9    A.   In addition to Youngblood withdrawing its
10  complaint doing a valid retraction, yes.
11    Q.   It also asks for greater detail on the
12  root cause, correct?
13    A.   Yes.
14    Q.   And it also asks for greater detail on the
15  actions you have taken to resolve the matter, right?
16    A.   Look at that line.  You can see there is a
17  glitch on Amazon's side and what the Amazon staff
18  member chose from their blurb choosing mechanism.
19  It says to resolve dollar sign colon policy/metric
20  seller violated, whatever that symbol is called,
21  issue.
22    Q.   And then Amazon also asks for greater
23  detail on steps you have taken to prevent
24  infringement going forward?
25    A.   The first question you asked I said no

Page 79

CJ ROSENBAUM

2  because there is a glitch in that.
3    Q.   I moved on because I am not going to argue
4  with you.  That's why I am saying --
5    A.   You are arguing with yourself.  I am not
6  raising my voice and I am not interrupting you at
7  all.  You asked me a question and I answered it and
8  you added that question to your follow-up question
9  and made that question impossible to answer.
10    Q.   Did Amazon ask for greater detail on the
11  steps you have taken to prevent infringement going
12  forward?
13    A.   Yes.
14    Q.   Have you seen the plans of action that
15  Solu-Med did in response to these correspondence?
16    A.   I don't think I saw the actual plans of
17  action.  I read descriptions of the plans of action
18  and the extensive attempts to get a valid retraction
19  that was submitted on behalf of Youngblood.
20    Q.   Do you know that they provided greater
21  detail on the root cause?
22    A.   I don't know.
23    Q.   Do you know if they provided greater
24  detail on the steps taken to prevent infringement
25  going forward?

Page 80

CJ ROSENBAUM

2    A.   Since there was no infringement it would
3  not make much sense so I don't know.
4    Q.   Do you know if they provided proof of
5  product authenticity to Amazon?
6    A.   I am unsure.
7    Q.   Are you aware if Youngblood ever
8  authorized Solu-Med to sell Youngblood products?
9    A.   I don't think there was an authorization
10  agreement between Youngblood and Solu-Med.
11    Q.   If you could take a look at PL2418.
12    A.   Okay.  Want me to read it?
13    Q.   Have you ever seen this document before?
14    A.   I would have to read it first.
15    Q.   Go ahead.  Actually, this is not about --
16  we could skip it.  We don't need this document.  You
17  are more than welcome to look at it.  It's not
18  regarding Youngblood product so I am not going to
19  ask a question about it.  If you could turn to
20  PL2421?
21    A.   Would you want me to read it?
22    Q.   Let's go over to PL241.  This is another
23  correspondence from Amazon to Solu-Med and it's
24  regarding their appeal, correct?
25    A.   Yes.



Page 81

CJ ROSENBAUM

1
2    Q.   So still by November 29th their account
3  was not reinstated.  It was suspended on
4  November 13th and now we are on November 29th,
5  correct?
6    A.   Yes.  This document is dated
7  November 29th.
8    Q.   But you agree their account was suspended
9  by Amazon and was not reinstated as of
10  November 29th?
11    A.   Correct.  The account is still down based
12  upon your client's counterfeit complaint, yes.
13    Q.   So have you ever seen this document
14  before, PL2421?
15    A.   I don't know if I have seen this exact
16  document.  I definitely have seen portions of it in
17  the Amazon production.  I don't know if I have seen
18  this email or the truncated version that Amazon
19  provided or both.
20    Q.   Were you aware that Amazon was requesting
21  valid retractions from other rights owners, other
22  than Youngblood, before they would accept their
23  appeal?  Were you aware of that before today?
24    A.   From what I read from the production,
25  these complaints from suzi@hixonlaw were absolutely

Page 82

CJ ROSENBAUM

1
2  irrelevant.  When it came to the suspension, the
3  suspension was based on your client's counterfeit
4  complaints.
5    Q.   Where did you read that?
6    A.   I read the spreadsheet that Amazon
7  produced in the prior complaints from Suzi Hixon and
8  Evian.
9    Q.   No one from Amazon ever said that it was
10  only related to the Youngblood complaint, correct?
11  You never heard anybody from Amazon say that?
12    A.   No.  I think there was an email from
13  Amazon that said this account is being suspended
14  because of the Youngblood complaints.  And then, as
15  Amazon has done countless times, brings up other
16  complaints that were absolutely irrelevant when it
17  comes to this suspension, because these complaints
18  did not result in the suspension of the account at
19  all.  The suspension of the account was caused
20  solely by your clients going nuclear and making an
21  entirely baseless counterfeit complaint.  And this
22  is expressed in Amazon's spreadsheet from what you
23  did get from Amazon, even in their truncated
24  version.
25    Q.   Exhibit 2A?

Page 83

CJ ROSENBAUM

1
2    A.   Yes.  Did you take it?
3    Q.   No.
4        MR. VINE:  Let the record reflect the
5      witness had it.
6    Q.   I am asking about the November 29th email.
7    A.   Is there a portion of your question you
8  feel I did not answer?
9    Q.   Yes.  Where on the November 29, 2018 email
10  is it listed on Exhibit 2A?
11    A.   Is what listed on it, these complaints?
12    Q.   No.  That's not what I asked.  Is the
13  correspondence listed on it, the November 29th
14  correspondence?
15    A.   The Tangle Teezer, which appears to be the
16  third one from the bottom of the page, that is a
17  full one.
18    Q.   I am asking about the November 29, 2018
19  email correspondence.
20    A.   Correct.
21    Q.   Is the email from November 29, 2018
22  reflected on it, that date?
23    A.   Yes.  If you let me answer instead of
24  cutting me off and raising your voice at me, I am
25  happy to explain.

Page 84

CJ ROSENBAUM

1
2    Q.   Because I have seen that document and I
3  don't recall the November 29th email being reflected
4  on there.
5    A.   I will show you.  Third one from the
6  bottom Tangle Teezer is reflected on here.  The next
7  one up is Suzi Hixon's complaint.  Then we have
8  Youngblood is right above that, looks like they were
9  using Red Points.  You have -- I don't know if Beard
10  Guyz is on here.
11    Q.   When you are done let me know so I can
12  show you what I am referring to.
13    A.   So Tangle Teezer, suzi@hixonlaw, the
14  Youngblood one by Red Points.
15    Q.   You are referring to complaints, correct;
16  from those people, right?
17    A.   You asked me about the email dated
18  November 29, 2018 and whether it was reflected upon
19  Exhibit 2A and I am showing you where it is.
20    Q.   Can I see Exhibit 2A.
21    A.   (Handing).
22    Q.   So the Tangle Teezer, the correspondence
23  that the witness reflected, does it say July 25,
24  2018; yes or no, sir?
25    A.   That one is dated July 25, 2018 from



CORY JAY ROSENBAUM                                    February 17, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS              85–88

Page 85

CJ ROSENBAUM

1  Tangle Teezer.
2  Q.  I am asking, as I did the very first time,
3  is the November 29, 2018 actual correspondence
4  listed on 2A, yes or no?  Not the complaints, the
5  actual correspondence.  Is it listed, yes or no?
6  A.  I have answered your question the best I
7  can.
8  Q.  So Amazon through this November 29, 2018
9  correspondence PL2421 states that they want
10  retraction from other product rights owners,
11  correct; based upon prior complaints?
12  A.  Incorrect.
13  Q.  They don't say that?
14  A.  Correct; they do not say what you are
15  saying it says, correct.
16  Q.  Does it say that they require a valid
17  retraction, and then it lists individual entities
18  other than Youngblood?
19  A.  It lists other complainants, yes.
20  Q.  Does it require those valid retractions so
21  they can process Solu-Med's appeal?
22  A.  Amazon would not have required Tangle
23  Teezer or Suzi Hixon's complaint or the Evian
24  complaint to be retracted to reinstate Solu-Med
25

Page 86

CJ ROSENBAUM

1  account.
2  Q.  Even though they said that?
3  A.  Correct.  It doesn't say it's required to
4  reinstate.  It talks about a process.  But with 100
5  percent certainty they would not have required
6  Tangle Teezer, Suzi Hixon Law, Evian's complaints to
7  be retracted.
8  Q.  Did you speak to Amazon about this
9  correspondence.
10  A.  Amazon has hundreds of thousands of
11  people.  What does that mean; did I speak to a
12  company?
13  Q.  Did you speak to anyone?
14  A.  No; I did not speak to an entity about
15  these complaints, no.
16  Q.  Did you speak to Amazon or any employee
17  from Amazon about PL2421?
18  A.  No.
19  Q.  Did you speak to anyone from Amazon about
20  any portion of this case?
21  A.  You asked me that earlier and my answer is
22  the same.  No, I did not.
23  Q.  Were you aware that Amazon continued to
24  reject the submissions, the three submissions that
25

Page 87

CJ ROSENBAUM

1  Solu-Med had submitted?
2  A.  I understand the account remained down
3  while trying to get a valid retraction from
4  Youngblood.  The account was down and then
5  ultimately the account was reinstated.
6  Q.  They made submissions, correct?
7  A.  My understanding is that there were three
8  plans of action that were communicated to the Bezos
9  team.
10  Q.  After the three plans of action were
11  submitted, Amazon rejected those, correct?
12  A.  I don't think that there was an
13  outright -- I don't think they were rejected.  I
14  don't think they said this is no good.  I don't
15  agree the way you are describing it.
16  Q.  Do you believe that they have stated that
17  they can't accept their appeal because it did not
18  provide all the information that they had asked for?
19  A.  From everything that I have read and seen
20  what Amazon was looking for was a valid and complete
21  retraction from Youngblood until it got to the Bezos
22  level.
23  Q.  But the correspondence actually asked for
24  more than just the valid retraction, doesn't it?
25

Page 88

CJ ROSENBAUM

1  A.  Amazon boilerplate emails ask for more,
2  yes.  Doesn't mean that's the reality of it.
3  Q.  And you don't know if that was submitted
4  or not?
5  A.  You asked me this six times already.  I
6  read that there were description of three different
7  plans of action and communication to the Bezos'
8  escalation team.
9  Q.  Can you turn to PL2433.  Have you ever
10  seen this page?
11  A.  I don't know if I have seen this exact
12  page.
13  Q.  Have you seen anything similar to this
14  from December 20, 2018 email correspondence?
15  A.  I have seen similar correspondences
16  hundreds if not thousands of times.  I don't know if
17  December 20, 2018 or this particular one.
18  Q.  I am talking about the correspondence
19  regarding Youngblood.
20  A.  I don't know if I read this one.
21  Q.  If it's not in your documents you would
22  not have read it, correct?
23  A.  Correct.
24  Q.  I did not see it in your document
25



Page 89

CJ ROSENBAUM

1
2  production so, therefore, you did not read it,
3  correct?
4      A.  I would have to go back to the book.  I
5  don't recall seeing it in the book.
6      Q.  I reviewed what you produced and you told
7  me earlier you would not withhold anything, correct?
8      A.  Correct.
9      Q.  So if it wasn't in that production,
10 therefore you --
11     A.  I have not read it, correct.
12     Q.  Did you see here why it says, "Amazon
13 selling privileges have been removed to Solu-Med"?
14     A.  I see it in the second paragraph.
15     Q.  Can you read out loud why it says under
16 "why did this happen?"
17     A.  "We arrived at this decision because we
18 are unable to verify information related to your
19 seller account or did not receive any new
20 information regarding your listings or selling
21 history, which to me means a valid retraction."
22     Q.  Doesn't say that, does it?
23     A.  Correct.
24         (Document was marked as Exhibit 9
25     for identification, as of this date.)

Page 90

CJ ROSENBAUM

1
2      nine
3      Q.  Marked as Exhibit 9 is a Declaration of
4  Nonparty Amazon.com, Inc. Custodian of Records
5  Affidavit with attached records.  I believe this
6  document was contained in your notebook; is that
7  correct?
8      A.  I don't know if all the exhibits are or
9  not.  I believe I have Ms. Cohn's declaration.
10     Q.  Are you familiar with the seller's code of
11 conduct?
12     A.  It's a lot of stuff so I am familiar with
13 it.  I certainly could not recite the whole thing or
14 specific provisions, but as a general working
15 knowledge, yes.
16     Q.  You are aware that a seller -- Amazon
17 requires that their sellers, at least in writing,
18 must comply with the code of conduct?
19     A.  In writing, yes.  In reality, no, they do
20 not.
21     Q.  I understand you believe in reality it
22 doesn't, but their policies say selling policies and
23 seller code of conduct, correct?  It says it.  "All
24 sellers are expected to adhere to the following
25 policies," and it lists the products from Amazon.

Page 91

CJ ROSENBAUM

1
2      A.  I don't think that's the exact verbiage,
3  but something like that.
4      Q.  I actually just read it word for word so
5  that's fine.  Let's turn to Exhibit 1, Exhibit 1
6  within Exhibit 9.  Read the first sentence under the
7  first bold heading.
8      A.  You read it correctly.  Would you like me
9  to read it again?
10     Q.  No, because you said two seconds ago that
11 you don't believe it's what I said.
12     A.  I did not think your verbiage was exactly
13 right.  The address of the seller's code of conduct
14 changes quite often; the verbiage changes, their
15 policies change, their emails change.
16     Q.  This was the one that was in effect in
17 November 2018, correct?
18     A.  I have no idea.
19     Q.  As indicated earlier, you had read
20 Ms. Cohn's declaration?
21     A.  Yes.
22     Q.  If you look at paragraph four it says,
23 "Amazon's selling policies and seller code of
24 conduct in effect November 1, 2018."  Do you see
25 that?

Page 92

CJ ROSENBAUM

1
2      A.  Yes.  I still don't know whether that's --
3  whether she is right or not.  I have no idea if this
4  is the code of conduct that existed on that
5  particular day, whether she says it or not.
6      Q.  Do you have any documents that would prove
7  she was wrong about the date?
8      A.  No.  I don't know she is correct either.
9  I don't know if she is right or wrong.
10     Q.  You understand that plaintiff has
11 stipulated and accepted this?
12     A.  I don't know about that.  I don't know.
13     Q.  Let's turn to Exhibit 2 of Exhibit 9.
14     A.  To get back, the seller code of conduct is
15 not a one-page document, so this is certainly not
16 complete.  Back to Exhibit 2.
17     Q.  Have you ever seen this document before?
18     A.  Generally, yes.  But again the verbiage
19 changes from time to time as Amazon updates its
20 policies and its agreements.
21     Q.  One of the things that Amazon says in the
22 policy is that "Failure to abide by their policy may
23 result in the loss of selling privileges, funds
24 being withheld and destruction of inventory in our
25 possession," correct?



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
93–96

Page 93

CJ ROSENBAUM

2    A.   That's what it says on the page you just
3  read.
4    Q.   And Amazon issued these written policies
5  to the sellers, correct?
6    A.   I don't know if they issued it to the
7  sellers.  They don't send it to the seller or
8  anything like that.  It's just a policy they
9  exchange on the website.  There is often hyperlinks
10  to it, that sort of thing.
11    Q.   In fact, in each correspondence regarding
12  infringement violations, Amazon refers them to their
13  policies and procedures.
14    A.   There is a hyperlink to it, but I don't
15  know if this is what those particular hyperlinks
16  would have led them to at any particular point in
17  time.
18    Q.   Are you aware that it's the seller's
19  responsibility to keep the source materials and
20  chain of custody documents?
21    A.   No.
22    Q.   Are you aware that it is the seller's
23  responsibility to keep documents on where the
24  sourcing of the product was, if they are resellers?
25    A.   I don't know if Amazon requires sellers to

Page 94

CJ ROSENBAUM

2  maintain their sourcing documents.  I know Amazon
3  will often ask for them, but I am not sure if Amazon
4  actually requires them to maintain them.  Regarding
5  chain of custody, no matter -- once they are sent
6  into Amazon's FBA warehouse system, then there is no
7  way I am aware of that a seller can track it because
8  all the inventory is mixed up together.
9    So, you know, whoever sent it in, if you send
10  it to Louisiana or Florida or New York, Amazon has
11  this commingling system where people's inventory is
12  mixed up with each other.  They are all stored in
13  the same fashion.  They are all kept in the same
14  fashion, individual warehouses.  They take inventory
15  from one seller, send it to another buyer, even
16  though they credit one seller with the sale.  So
17  your chain of custody question, no offense intended,
18  just did not really make sense in the light of
19  Amazon's warehouse system with your client sending
20  in products to FBA and Solu-Med and other people
21  sending products to FBA.  Once it's there, as far as
22  I am aware, there is no accurate way of doing a
23  chain of custody because Amazon makes boatloads of
24  mix-ups once they are there.
25    Q.   So I was referring to the chain of custody

Page 95

CJ ROSENBAUM

2  documents regarding the Youngblood products that are
3  maintained in the warehouse of Solu-Med, not the one
4  that is reflective of what you are talking about,
5  all the fulfillment centers that Amazon is doing.
6  There is two different programs.  I am sure you are
7  very familiar with that.
8    So as it relates to Solu-Med's maintenance of
9  products in their warehouse, are you aware if Amazon
10  requires them to have a chain of custody document,
11  chain of custody or sourcing document?
12    A.   I don't know if Amazon required Solu-Med
13  to maintain sourcing document.
14    Q.   What about chain of custody documents?
15    A.   I don't know what you mean by chain of
16  custody.
17    Q.   So you understand that it goes from the
18  manufacturer to a distributor, from a distributor to
19  another company, and from another company to
20  Solu-Med.  That is the plaintiff's position, it went
21  to four different entities.
22    A.   So manufacturer to distributor,
23  distributor -- from Solu-Med to distributor,
24  distributor to another distributor, distributor to
25  Solu-Med.

Page 96

CJ ROSENBAUM

2    Q.   I don't agree that that has happened, but
3  that is what plaintiff is saying.  Do you believe in
4  order to prove the sourcing information, they need
5  to have those chain of custody documents going from
6  one place to each other?
7    A.   No.
8    Q.   If you turn to Exhibit 3 of Exhibit 9, it
9  says, "Ensuring product authenticity and quality."
10  Do you see that?
11    A.   Yes.
12    Q.   It says, "As a seller it's important to
13  understand Amazon's guidelines on product quality
14  and authenticity."  Do you see that?  Do you agree
15  with that statement?
16    A.   Not necessarily.
17    Q.   Do you agree with the next paragraph where
18  it says, "Reviewing and complying with these
19  guidelines will help to keep your account in good
20  health."  Do you agree with Amazon's statement
21  there, under that same heading of ensuring product
22  authenticity and quality?
23    A.   It certainly doesn't hurt but doesn't
24  necessarily help either.  If companies make baseless
25  counterfeit complaints, it doesn't mean anything



Page 97

CJ ROSENBAUM

1   that you read the policy on a daily basis.  A
2   company makes baseless counterfeit complaints, they
3   are doing so generally to knock another seller out
4   of aftermarket shares.  So in this case it would not
5   matter if I read it that morning or not.
6       Q.   Are you aware that violations of product
7   or authenticity are categorized as intellectual
8   property violations?
9       A.   There are certainly emails from Amazon
10  that say that.  There are also other emails from
11  Amazon that comes to authenticity where they are not
12  challenging whether a product is genuine or
13  counterfeit, they just want to see sourcing
14  documents.  So there is statements from Amazon that
15  say both.
16      Q.   So if you look under where it says, "Types
17  of violations."  In the next bold heading do you
18  agree with the statement by Amazon "Violations
19  related to product authenticity are categorized as
20  intellectual property violations"?
21      A.   I just answered that.  Sometimes yes,
22  sometimes no.  In the actual conduct of business
23  using Amazon as a selling platform, sometimes yes,
24  sometimes no.

Page 98

CJ ROSENBAUM

1       Q.   Their guidelines here say that it is an
2   intellectual property violation, correct?
3       A.   It also says that Amazon respects
4   intellectual property rights of others, which it
5   generally, from my opinion, does not.  So it says a
6   lot of things here that are really not the reality
7   of doing business on Amazon or Amazon doing business
8   through its own website.
9       Q.   And are you familiar with material
10  different violation?
11      A.   Yes.
12      Q.   Are you aware -- so you are familiar with
13  it.  What is it?
14      A.   It's when the consumer receives something
15  that is materially different than if they bought it
16  directly from a traditional brick and mortar store
17  or the brand directly.
18      Q.   So one of the examples given is if the
19  product is listed in new condition, correct?
20      A.   That is listed here, correct.
21      Q.   So Amazon suggests that if you are listing
22  it in new condition, it must be in brand new
23  condition, correct?
24      A.   Just like Solu-Med was doing here.

Page 99

CJ ROSENBAUM

1       Q.   If you go to the next page, it talks about
2   best practices and product authenticity of quality.
3   One of the items they are talking about is sourcing
4   products.  Do you see that?
5       A.   Talks about when listing products and the
6   next paragraph talks about sourcing.
7       Q.   One of the things that Amazon says is that
8   "All Amazon sellers are responsible for complying
9   with the law along with Amazon's policies"; isn't
10  that correct?
11      A.   Complying with the laws under best
12  practices is under authenticity of quality and the
13  other line you are referring to seems to be under
14  sourcing.  Yes.
15      Q.   I am reading the sentence word for word
16  saying, "All Amazon sellers are responsible for
17  complying with the law along with Amazon's
18  policies."  Do you see that?
19      A.   It says that, correct.
20      Q.   Do you agree with that statement?
21      A.   Not sure if I agree or not.
22      Q.   Do you agree that Amazon sellers are
23  responsible for complying with the law and Amazon's
24  policies?

Page 100

CJ ROSENBAUM

1       A.   Each instance is different.  We are all
2   responsible for complying with the law.  "Along with
3   Amazon's policies" is a bit unclear since Amazon has
4   conflicting policies and then the policies don't
5   jibe with the practices.  So do I agree with that?
6   I am not even sure what you are asking me.
7       Q.   So if you look under sourcing the product,
8   it says, "Are you storing documentation for all your
9   purchases?"  Do you see that?
10      A.   Yes.
11      Q.   It says, "Keep all documents and records
12  of transaction such as POs and invoices to establish
13  that you sourced a product from reliable suppliers."
14      A.   That's what it says.
15      Q.   And you believe it's important for a
16  seller to do that, correct?
17      A.   I think it's helpful if they maintain
18  their sourcing products, but it's certainly not
19  required.  As things are going along, you may be
20  selling millions of dollars of products and not
21  retain a single record and there is no issue at all.
22      Q.   But it's important if you need to
23  establish a sourcing issue, correct?
24      A.   Not always.  If there is an admission that



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
101–104

Page 101

CJ ROSENBAUM

1    a product is genuine, like there is in this case,
2    the documents would be irrelevant.  Your client
3    admitted in his deposition that the products were
4    genuine.  This is all nonsense.
5       Q.  You understand that all cosmetics must be
6    new and unused?
7       A.  Yes.
8       Q.  And that's something that Amazon requires,
9    correct?
10      A.  Yes.  I don't think you can sell used --
11   you can sell other products that are used.  I don't
12   think cosmetics are one of them.  Pretty certain you
13   can't sell like used lipstick and that sort of
14   thing.
15      Q.  So if you turn to Exhibit 4 in this
16   Exhibit 9 declaration it says, "Compliance
17   checklist."  First thing is it says, "Cosmetics must
18   be sealed in the original manufacturer's packaging."
19   Do you see that?
20      A.  I see that.
21      Q.  Have you seen the products?
22      A.  I saw the depositions.
23      Q.  Did you see the deposition where he
24   indicated that it wasn't the original product?

Page 102

CJ ROSENBAUM

1       A.  No.  Your clients testified that they
2    thought these products were counterfeit because they
3    did not have their permission to sell it even though
4    the customers were receiving the same exact product.
5    How your client was dancing around this was absurd.
6    Your client confirmed they were genuine --
7       Q.  No, he did not.
8       A.  The definition that -- because it did not
9    have their permission -- it must be counterfeit
10   makes no sense at all, and they knew it from their
11   experience as a seller.
12      Q.  "Cosmetics must be new and unused," do you
13   see that?
14      A.  Yes.  My understanding here was that all
15   the products were new and unused.
16      Q.  "Amazon requires products to be unused,"
17   correct?
18      A.  Cosmetics, yes.
19      Q.  Are you aware of what the definition of
20   new is?
21      A.  Yes.
22      Q.  What is the definition of new?
23      A.  Same packaging, same unsealed, not used,
24   with all the same material issues that come along

Page 103

CJ ROSENBAUM

1    with the product.  Not the exact verbiage, but
2    that's the gist of it.
3       Q.  What about a manufacturer's warranty?
4       A.  If the consumer is receiving all the same
5    benefits, then it's the same.  Manufacturer's
6    warranty says money back guarantee.  Amazon
7    consumers have that anyway from A to Z, the product
8    is genuine.
9       Q.  Well, you understand that
10   lifeandhealthsource@solu-med had told the public
11   that they would not accept returns of these
12   cosmetics?
13      A.  Every consumer that brought the product
14   via Amazon had the A to Z system anyway.  So they
15   all had a money back guarantee, which is what the
16   warranty was.
17      Q.  My question was were you aware that
18   Solu-Med indicated to the public that they could not
19   return the Youngblood product?
20      A.  Yes.  But you are taking that out of
21   context.
22      Q.  I am asking about that.  Are you aware of
23   that?
24      A.  That simple statement by itself?  Your

Page 104

CJ ROSENBAUM

1    question is -- the way you are asking the question I
2    can't answer it.  But the deposition also said other
3    things that you are picking and choosing what to ask
4    about.  Your rendition is incorrect.
5       Q.  Have you ever seen the Youngblood
6    guarantee?
7       A.  Yes.
8       Q.  Where have you seen it?
9       A.  Probably seen it online.  The exact place
10   I cannot tell you.
11      Q.  When did you do that?
12      A.  I don't know.
13      Q.  Within the past six months?
14      A.  I don't know.
15      Q.  During your retention in this case?
16      A.  I don't think so.
17      Q.  What computer did you use?
18      A.  It was an iMac-27 that has since been
19   either trashed or replaced with because the
20   motherboard has a defect on it.
21      Q.  If you turn to the Amazon guidelines on
22   Exhibit 5 of Exhibit 9 it says, "General condition
23   guidelines."  Under the section new, can you read
24   that out loud?



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
105—108

Page 105

CJ ROSENBAUM

1
2    A.   "Just like it sounds.  A brand new,
3    unused, unopened item in its original packaging,
4    with all original packaging materials included.
5    Original protective wrapping, if any, is intact.
6    Original manufacturer's warranty, if any, still
7    applies, with warranty details included in the
8    listing comments," which these products had.
9        Q.   Did you see the testimony from Kellon
10   Goodson where he testified that Youngblood products
11   were sold without the manufacturer's warranty?  Did
12   you see that testimony?
13       A.   I don't recall seeing that testimony.
14       Q.   Did you see the testimony from Manny
15   Aguero that the Youngblood manufacturer's warranty
16   was not sold with Youngblood product by Solu-Med?
17       A.   I don't recall seeing that, but products
18   had the same -- the consumers received the same
19   thing, the warranty with the money back guarantee,
20   which every single consumer received.
21       Q.   Are you aware if Solu-Med provided any
22   customer service about the product, the Youngblood
23   product?
24       A.   I don't think Solu-Med provided any
25   customer service.

Page 106

CJ ROSENBAUM

1
2        Q.   Like, for example, answering a phone call
3    about is this tested on animals; could they answer
4    that question?
5            MR. GOODMAN:  Objection.
6        Q.   Because, you know, some cosmetic companies
7    test on animals and some don't, right?  Are you
8    aware of that?
9            MR. GOODMAN:  Objection.
10       A.   Which question are you asking me?  You are
11   asking me --
12       Q.   Are you aware if Solu-Med could answer
13   questions regarding how the product was
14   manufactured?
15       A.   I don't know.
16       Q.   Are you aware if Solu-Med could answer
17   questions on how it was stored?
18           MR. GOODMAN:  To who?
19           MR. VINE:  To the customers.
20       A.   They are all stored in Amazon's FBA
21   warehouses the exact same, regardless of who sends
22   them in.  So can anyone describe how they were
23   stored; did Amazon shift them from warehouse to
24   warehouse to warehouse?
25       Q.   I am talking about Solu-Med.

Page 107

CJ ROSENBAUM

1
2        A.   I will do my best to answer your question.
3    I don't know if they could or could not, just I ke
4    your client could not say how it was stored in the
5    New Jersey warehouse, for example.
6        Q.   Is it your testimony under oath that
7    Solu-Med doesn't store any Youngblood products?
8        A.   I don't know whether they store any
9    products.  I don't know.
10       Q.   You have not examined any of their
11   products, correct?
12       A.   No.
13       Q.   Are you aware of the products that
14   Mr. Goodman handed to my client at the deposition
15   did not come from Solu-Med; were you aware of that?
16       A.   I wasn't there.  I have no -- how would I
17   know what was handed to you?
18       Q.   Because you testified earlier under oath
19   that my client said that the product Solu-Med had
20   were genuine because of the products he looked at.
21   Were you aware that the products that Mr. Goodman
22   gave him were not products that came from Solu-Med?
23       A.   I have no idea where the products that
24   your client looked at.  I read the deposition of
25   your client --

Page 108

CJ ROSENBAUM

1
2            MR. GOODMAN:  I think that's a
3    mischaracterization.
4            MR. VINE:  You had the envelope showing
5    where they came from.
6            MR. GOODMAN:  It was more than one
7    product.  I don't want to argue with you.
8    Let's leave that for the trial.
9        Q.   The documents that you reviewed, prior to
10   issuing your report, did not contain the Youngblood
11   guarantee?  None of the documents you have had that?
12       A.   I don't recall whether that was one of the
13   exhibits.  I don't know.
14       Q.   So if it wasn't within the document
15   production that was produced in response to the
16   subpoena, you would not have reviewed it, correct?
17       A.   Between receiving the documents and
18   writing my report?
19       Q.   Yes.
20       A.   Correct.  Whatever I reviewed to write my
21   report is in my binder.
22       Q.   Since then have you reviewed a document
23   given to you regarding the Youngblood warranty?
24       A.   No.
25       Q.   Are you aware if the ASIN pages on the



Page 109

CJ ROSENBAUM

2 Youngblood products that are at issue, that were
3 reported as counterfeit or inauthentic, were listed
4 as new products?
5    A.  I did not look at the detail pages, but if
6 they are selling cosmetics, it must be listed as
7 new.
8    Q.  All of your opinions regarding your
9 testimony are contained within your report, correct?
10    A.  After writing my report I had a chance to
11 look at Amazon's Exhibit 2A, so I have more opinions
12 from the result of 2A.  Do I have other opinions?  I
13 guess you have to ask me the questions.  But there
14 was certainly more information I obtained when I
15 received Amazon's production, 2A, that led to some
16 other opinions.
17    Q.  What information that you reviewed from 2A
18 led to additional opinions?
19    A.  If you look at the top one, January 27,
20 2018, asserted by compliance@giovannicosmetics.com,
21 even with Amazon truncating the balance of the
22 complaint, whatever else came after, the notation
23 that these products did not have our manufacturer's
24 60-day guarantee.  Since that was included, this
25 complaint, which I have become aware of in terms of

Page 110

CJ ROSENBAUM

2 Amazon, was practically meaningless since Amazon
3 required more of a lead time anyway.  So this
4 complaint meant, as far as I am aware of, nothing in
5 terms of the seller's account.
6    Q.  Okay.  So I am going to ask you --
7    A.  But I am still answering your question.
8    Q.  I want to ask about each item you are
9 referring to so I don't lose the question.
10    A.  But you are interrupting my answer to your
11 first question.
12    Q.  Right.  I don't do narratives well.
13    A.  It wasn't a narrative.  It was answering
14 your question.  If you want me to stop answering
15 your question, I am happy to.  It is your
16 deposition, but you are stopping me mid-answer.
17    Q.  As it relates to the first line item that
18 you mentioned, did Amazon provide you any more
19 information other than what you have reviewed in
20 Exhibit 2A?
21    A.  For the opinions I am talking about?
22    Q.  Did they give you more documents, other
23 than what is contained in 2A or Exhibit 9?
24    A.  Regarding my opinions that you asked me
25 about that I was expressing come straight from 2A.

Page 111

CJ ROSENBAUM

2    Q.  But I am asking the sole information that
3 these additional opinions comes solely from 2A, not
4 from another document, correct?
5    A.  I believe so, yes.  Yes.  Everything I am
6 about to tell you to answer your question is coming
7 straight from 2A.
8    Q.  So what are these new opinions you have?
9    A.  The complaint January 27, 2018, was
10 meaningless to this account because the complainant
11 included this sentence, "These products do not have
12 our manufacturer's 60-day guarantee."  Amazon
13 requires a longer lead time with expiration dates
14 and that sort of thing.  So this would be
15 meaningless, which means the staff in India who look
16 at this, this complaint would be basically ignored.
17 Meaningless for this account.
18    Q.  It wasn't ignored though, in this case.
19    A.  I disagree with you.  I believe it was
20 ignored through this account until the account was
21 suspended by your client's counterfeit complaint.
22 And then someone went back what Amazon calls a deep
23 dive investigation and asked about these others.
24 But the operation of this account continued without
25 anything at all after this complaint and that's the

Page 112

CJ ROSENBAUM

2 reason why.
3    Same thing with the complaint right below that.
4 The next day, January 28, 2018, also by
5 compliance@giovannicosmetics.  And even the last
6 line of that where it says, "It is simply not
7 possible for these sellers to provide authentic
8 products as shown on the ASINs referenced here.
9 Amazon staff is well aware that Amazon sellers are
10 able to obtain genuine products and offered their
11 consumers at lower prices with or without the
12 brand's permission."  So that complaint also would
13 have just been ignored right out of hand.
14    Q.  Do you have any --
15    A.  Meaningless to the suspension.
16    Q.  Do you have any documents that reflect
17 that Amazon did reject that complaint?
18    A.  No.
19    Q.  I have another follow-up question.
20    A.  I am still answering your question.  Do
21 you want me to stop?
22    Q.  Yes.  I am going to move on.
23    A.  Okay.  I have not answered.  You are
24 stopping me midstream from answering your question,
25 but it's your deposition.



Page 113

CJ ROSENBAUM

1
2    MR. GOODMAN: May I make one comment,
3    please. Exhibit 2A is not a complete
4    document, Mr. Vine. The submission Exhibit 6
5    was two pages.
6        MR. VINE: Exhibit 2A is two pages. It
7    is, if you look at it. He has it. It's two
8    pages.
9        MR. GOODMAN: Oh, it's on the back.
10       MR. VINE: And the document was marked
11   from what he produced, not from mine.
12    Q.   If you could turn to your report.
13    A.   Same thing with the next complaint, the
14   same exact verbiage. It was made by the same
15   person.
16    Q.   In your report you said that "Amazon's
17   anticounterfeiting policy is strict," correct?
18    A.   I don't see the line. Show me where.
19    Q.   Page four paragraph 17. "Amazon's
20   anticounterfeiting policy is strict." Do you see
21   that?
22    A.   Yes; first line of 17, yes.
23    Q.   So you put in here that you believe that
24   Amazon has a strict policy on anticounterfeiting,
25   correct?

Page 114

CJ ROSENBAUM

1
2    A.   Correct.
3    Q.   Turn to page five.
4    A.   Yes.
5    Q.   Is it your understanding that plaintiff
6    had loss of sales during this suspension?
7    A.   Yes.
8    Q.   How did you learn that?
9    A.   Because they were selling before and they
10   were suspended after; it stopped the sales.
11    Q.   Have you reviewed any documents regarding
12   their sales?
13    A.   No.
14    Q.   Have you reviewed any documents that
15   reflected that their sales went up after they were
16   reactivated?
17    A.   No.
18    Q.   You just have not reviewed one way or the
19   other on their sales?
20    A.   In terms of the number of sales they were
21   closing, dollars and cents, absolutely not. But
22   they were selling before, then they were suspended
23   and the sales stopped. That is my understanding.
24    Q.   Have you ever been qualified as an expert
25   to testify on the evaluation of companies such as

Page 115

CJ ROSENBAUM

1
2    Solu-Med?
3    A.   By who?
4    Q.   By any court.
5    A.   By a court, no.
6    Q.   Do you have an accounting degree?
7    A.   No.
8    Q.   In college did you take accounting
9    classes?
10    A.   Yes.
11    Q.   Did you graduate with an accounting
12   degree?
13    A.   No.
14    Q.   Do you have any expertise as an economist?
15    A.   No.
16    Q.   Have you ever been qualified as an expert
17   to testify on damages regarding the valuation of a
18   company like Solu-Med?
19    A.   No. When you said qualified, do you mean
20   by a judge?
21    Q.   Yes. Have you ever been trained or
22   educated by any organization and received a
23   certificate of such accreditation to testify on the
24   valuation of a company like Solu-Med?
25    A.   I have never received an accreditation or

Page 116

CJ ROSENBAUM

1
2    certificate.
3    Q.   Have you received any training?
4    A.   I have. I have listened to people deliver
5    presentations on business valuations typically with
6    regard to Amazon-based businesses. But nothing that
7    was accredited by the university system or anything
8    like that.
9    Q.   So your training is you have listened to
10   other people's presentation?
11    A.   And also my own experience dealing with
12   seller accounts, correct. I am not a valuation
13   expert. Generally, I can give you some ideas about
14   valuation, but I would not call myself a valuation
15   expert.
16    Q.   And you are not coming in here and
17   testifying as a valuation expert, correct?
18    A.   I could tell you the value of this
19   business certainly tanked after these baseless
20   complaints and the account was suspended on the
21   marketplace, where you would see this type of
22   business. It certainly tanked. The specifics and
23   more than that I could not tell you, but it was
24   certainly diminished.
25    Q.   You don't know, because you have not



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
117–120

Page 117

CJ ROSENBAUM

1
2  received and reviewed any of the sales documents,
3  about once it was reactivated whether the sales went
4  up or down?
5     A.  Correct.  The valuation would still go
6  down.  When these businesses are bought and sold a
7  suspension is a significant decrement in the value.
8     Q.  You state in paragraph 20 that "Youngblood
9  failed to provide its distributors with guidelines
10  on the safe handling of its goods."  Do you see
11  that?
12     A.  Yes.
13     Q.  That's based upon your review of the
14  distribution agreement, correct?
15     A.  I don't know if that sentence is
16  specifically on the distribution agreement.  It's
17  definitely on the documents as a whole, but I could
18  not nail down that particular sentence to a
19  particular document as I sit here today.
20     Q.  How do you know that then?  How do you
21  know Youngblood does not provide that document?
22     A.  From what I read there was nothing here
23  that had the safe handling of its goods and
24  certainly nothing that would go to Amazon once they
25  were in Amazon's wacky warehouse system.

Page 118

CJ ROSENBAUM

1
2     Q.  Can you show me a document where that
3  question was asked and answered about the safe
4  handling of Youngblood's products?
5     A.  You are asking me to solely look at the
6  depositions, not the exhibits or anything else?
7     Q.  You can look at everything you have.  Show
8  me where the question was "do you give this" and it
9  wasn't, whether it's an exhibit, anything.  Do you
10  recall?  Let me start with that.  Do you recall?
11     A.  Do I recall where it came from?
12     Q.  Yes.
13     A.  Offhand?  Out of the thousands of pages of
14  documents in my folder, no.
15     Q.  You think that is thousands of pages of
16  documents?
17     A.  The depositions are four to a page double
18  sided, so yes.  Is it over 1,000?  I suspect that it
19  is.  Every page is double sided, and when it comes
20  to the depositions, there is four pages to each one,
21  both sides, which is eight.  So yes, I think there
22  is in excess of thousands of pages.  Could I be
23  wrong?  I might be.
24     Q.  Can you tell me where you came up with the
25  statement, where it was derived from, when you wrote

Page 119

CJ ROSENBAUM

1
2  that "Youngblood does not provide its distributors
3  with any guidelines on the safe handling of its
4  goods"?
5     A.  You just asked me that three times.  The
6  answer is I cannot tell you that as I sit here.  You
7  asked me to look solely at the depositions.  If you
8  want me to, I can do that.  I suggest that I go
9  through the whole book to find that, if you want the
10  answer.  As I sit here right now, I can't tell you
11  exactly which page, out of the thousand plus pages I
12  read, for that sentence.
13     Q.  But it would be in your document
14  production, right; that's where you would have
15  gotten it from?
16     A.  My report was based on the document
17  production.
18     Q.  So if it's not in there, then where would
19  you have gotten that information from?
20     A.  I don't know what you are asking me.
21     Q.  If there is no document deposition or
22  exhibit that reflects that Youngblood doesn't
23  provide its distributors with guidelines of the safe
24  handling of its goods, where did you get that
25  information from?

Page 120

CJ ROSENBAUM

1
2     A.  We are going in circles.  You asked me
3  what I reviewed when I wrote the report.  It's what
4  is in the notebook here.
5     Q.  Paragraph 23.
6     A.  So I am not looking for the support for
7  that sentence, now?  You are not asking me to go
8  through it?
9     Q.  If you can go to paragraph 23.
10     A.  You asked me to find it and we are going
11  back.  Do you want me to look for the support for
12  that sentence or not?
13     Q.  Can you go to paragraph 23.
14     A.  I am going to assume you do not since you
15  are not responding to me.  Paragraph 23, got it.
16     Q.  It states, "It is my opinion under
17  Amazon's policies that the Youngblood products
18  listed in the Life and Health Source store were
19  properly listed and/or distributed," okay?  That's
20  what you wrote.
21     A.  Yes.
22     Q.  Did you see how Life and Health Source
23  listed the Youngblood products?
24     A.  From what I read they were selling
25  Youngblood products that were genuine.  They were



CORY JAY ROSENBAUM                                      February 17, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                        121–124

Page 121
CJ ROSENBAUM

1
2  listed on a Youngblood listing.  That makes it a
3  correct listing.
4      Q.   What document can you point me to that
5  reflects how the Youngblood product was listed at
6  the Life and Health Source store?
7      A.   If you would like, I will go through all
8  thousand plus pages and show you the grounds for
9  that sentence.  Overall the picture is they were
10  selling genuine products and listing it on that
11  products detailed page.
12      Q.   I am not asking for a deposition
13  testimony.  I am asking have you seen the listing
14  page that you refer to in paragraph 23, yes or no?
15      A.   I don't think I saw the listing page.
16  There was no listing page issue.  Your client says
17  they were counterfeit when they were genuine.  No
18  one said they were selling the wrong 24 ounces on a
19  12-ounce listing or anything like that; or a
20  conditioner on a shampoo listing; or a Revlon on a
21  Youngblood.  Your client claimed that these were
22  counterfeit, which they surely were not.
23      Q.   Do you know why Solu-Med chose not to sell
24  Youngblood products?
25      A.   No.

Page 122
CJ ROSENBAUM

1
2      Q.   What does great market goods means?
3      A.   Great market goods are products that
4  arrive to the consumer outside the brand's intended
5  distribution chain.
6      Q.   You currently work in that area, of great
7  market goods, representing sellers of goods outside
8  of sellers distribution chain?
9      A.   Yes.
10      Q.   You indicated that you have written six
11  books related to Amazon, correct?
12      A.   Authored or coauthored, yes.  Not by
13  myself.
14      Q.   Who are the other authors?
15      A.   Each book had different people on them.
16  My partner was involved in some.  There were other
17  people involved in each book.
18      Q.   So the Amazon Sellers Guide to Suspensions
19  and Reinstatements, that one, what year was that?
20      A.   First version was 2016 or so, maybe 2017.
21      Q.   Then the second one was?
22      A.   '17 or '18, I think.
23      Q.   Do you have a copy of those?
24      A.   I would be happy to send you some.
25      Q.   I don't mean one here.  But do you have

Page 123
CJ ROSENBAUM

1
2  one back at your office?
3      A.   I probably have hard copies, yes.  I don't
4  have hard copies of the updated version of the
5  Amazon Sellers Guide to Suspensions and
6  Reinstatements.  The other ones I probably do.
7      Q.   The updated one would be online?
8      A.   Yes.
9      Q.   You say you teach Amazon focused brand
10  protection.
11      A.   Yes.
12      Q.   What is brand protection?
13      A.   Brand protection is making sure that if
14  you develop a brand, that consumers receive a
15  product that is not materially different than what
16  they would get when they are buying from the brand
17  owner.
18      Q.   Where do you teach it?
19      A.   At Amazon seller events all over the
20  world.
21      Q.   Do you have documents that you hand out,
22  like outlines?
23      A.   No.
24      Q.   Do you provide PowerPoints for any of
25  them?

Page 124
CJ ROSENBAUM

1
2      A.   Generally, I don't provide them, but
3  sometimes I do.
4      Q.   For those that you have done, do you have
5  those documents in your computer system at home?
6      A.   No.
7      Q.   Where would they be?
8      A.   I have to take a look.  Certainly not in
9  my home.
10      Q.   In your office?  Would you have them in
11  your office?
12      A.   Some probably are.
13      Q.   When was the last time you taught at an
14  Amazon focus brand protection issue?
15      A.   It was right before the Coronavirus
16  outbreak, about two weeks before that.  February --
17  about a month ago, give or take, or a little bit
18  less.  Either Monday the 13th of January or Tuesday
19  the 14th of January.  I am not sure which day.
20      Q.   Where was that?
21      A.   Harbin, China.
22      Q.   You say in paragraph five "According to
23  Amazon's counsel, you represent 75 percent of Amazon
24  sellers different brands against Amazon?
25      A.   Yes.



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
125–128

Page 125

CJ ROSENBAUM

2   Q.   Which counsel?
3   A.   John Goldmark at Davis Wright Tremaine.
4   Q.   In Seattle?
5   A.   Yes.
6   Q.   You say you are familiar with Amazon's
7   training and its employees as it relates to its
8   reaction to intellectual property complaints made
9   against Amazon storefronts?
10  A.   Yes.
11  Q.   Is that based upon you taking depositions
12  of Amazon employees?
13  A.   Actual testimony, not a deposition.
14  Q.   Testimony at arbitration?
15  A.   Correct; and other sources.
16  Q.   What other sources?
17  A.   Speaking with Amazon's current employees,
18  speaking with Amazon's former employees.
19  Q.   Do you have copies of their transcripts
20  from those arbitrations?
21  A.   No.
22  Q.   What is a takedown system?
23  A.   Takedown system is described in the
24  Digital Millennium Copyright Act where platforms
25  like Amazon are able to avoid liability by allowing

Page 126

CJ ROSENBAUM

2   people and companies to make intellectual property
3   right complaints against sellers, whether they are
4   valid or not, and when the platform just simply
5   takes them down, they avoid liability.  Amazon in
6   particular has a ridiculously silly ability for
7   anybody to assert any baseless complaint, and a
8   counterfeit takes a seller down as long as they
9   don't do certain things in their complaint.
10  So your clients, for example, knew to assert
11  counterfeit with nothing or a little extraneous
12  information unlike the complaints we talked about
13  earlier on the spreadsheet.  Your clients knew 100
14  percent, they just assert counterfeit.  That seller
15  was at a significant risk of being shut down.  And
16  not just for the Youngblood products, but for the
17  entire account going down.  They had to have known
18  it based upon their experience with Amazon, both the
19  sellers, their brand protection and their brand
20  protection with this conflict, where every sale they
21  stopped someone else getting, they were making money
22  on it because they had the product as well.
23  Q.   You say in paragraph 12 that the Life and
24  Health Source listed thousands of products on Amazon
25  primarily health and beauty related.  Where did you

Page 127

CJ ROSENBAUM

2   get that information?
3   A.   From the documents in the book.
4   Q.   So that's based on the documents you have
5   in there, correct?
6   A.   You have asked me this like 20 times
7   today.  The report is based upon the documents in
8   the book, the depositions.  There are some exhibits,
9   there are some other documents in there.
10  Q.   You say, "A retraction" -- in footnote
11  three -- "must include a statement that the original
12  complaint was made in error" -- correct?
13  A.   That's not the complete sentence.
14  Q.   I am stopping there on purpose.  I am
15  going to break it down.  I want to ask questions
16  about that portion, that every retraction must state
17  that the complaint was made in error.
18  A.   No.  Your question is absolutely
19  misleading because you are leaving out the "or"
20  other verbiage.  So the way your question is
21  phrased, you are wrong.  And you are purposely
22  leaving out the "or."
23  Q.   I am trying to break it down for you.
24  What other verbiage would be required?
25  A.   That states the seller was selling genuine

Page 128

CJ ROSENBAUM

2   products.  There is no exact verbiage that is
3   required, but you have to say either the complaint
4   was made in error or the seller is selling genuine
5   products, or else it is not a retraction.  You can
6   call it whatever you want.
7   Q.   Do you have a document that you can point
8   to that says that?
9   A.   No.  But if you look at Amazon's
10  spreadsheet, you know, the -- I don't have a
11  document that says that.
12  Q.   What is Amazon's third-party seller
13  program?
14  A.   It's the program where Amazon allows
15  millions of people and companies to sell products
16  through its Website.
17  Q.   Like Solu-Med is doing?
18  A.   Yes.
19  Q.   They are selling other people's products,
20  right?
21  A.   Just like any retailer.
22  Q.   Solu-Med is selling other people's
23  products without an authorization agreement,
24  correct?
25  A.   Authorization is not required in the



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
129–132

Page 129

CJ ROSENBAUM

1  United States at all.  Every retailer can buy and
2  United States at all.  Every retailer can buy and
3  sell anything they want as long as the consumer is
4  not receiving something that is materially
5  different.  Just like millions of retailers online
6  and tens of millions of retailers in brick and
7  mortar stores, hundreds of millions.
8      Q.   So earlier today I asked you what you did
9  to prepare and you provided in your testimony, one
10  of the things you indicated, that you met on Friday
11  with Mr. Goodman, correct?
12     A.   Yes.
13     Q.   Was anybody else present?
14     A.   No.
15     Q.   Was Kelsey Black available by phone?
16     A.   Yes.
17     Q.   What did you guys talk about?
18     A.   Talked about the contents in my report.
19     Q.   Anything else?
20     A.   And I received an Amazon spreadsheet about
21  the other complaints that, when you look at it, are
22  absolutely meaningless to the suspensions of this
23  account.  And also logistics, where to go.  Instead
24  of doing it in my office or someplace else we were
25  doing the deposition here.  That kind of thing.

Page 130

CJ ROSENBAUM

2      Q.   Did you go over the correspondence that I
3  showed you, that states that Amazon required, in
4  order to process the appeal, retractions from other
5  entities other than Youngblood?  Did you go over
6  that document?
7      A.   No.
8          (Document was marked as Exhibit 10
9          for identification, as of this date.)
10     Q.   This is marked as Exhibit 10.  Did you
11  review this document as part of your production?
12     A.   Think it's in my book.  I am not certain.
13  Want me to check my book?
14     Q.   Yes, please.
15     A.   Exhibit 2 to the Finkman deposition of
16  December 10, 2019.  I read a portion of it in my
17  book.  I may have read the rest of it on my
18  computer.  I certainly have seen it before.
19     Q.   So the items that are in your book are
20  just not all portions of it that you have seen; is
21  that what you are saying?
22     A.   My copy stops at A1, which is an exhibit
23  attachment to it.  I don't seem to have the
24  signature page.
25     Q.   Other than that everything else is the

Page 131

CJ ROSENBAUM

1  same?
2      A.   Yes.  Looks like I am just missing the
3  signature page.  And Exhibit B to it, other than
4  that, I seem to have the whole thing.
5      Q.   You do or do not have Exhibit B?
6      A.   I do not.  At the end of what you marked
7  as today's Exhibit 10, the last page is Exhibit B to
8  the distributor agreement.  I don't think I have
9  that page.
10     Q.   So on Exhibit B to the distributor
11  agreement that I showed you, it says, "Distribution
12  channels," and there is a limitation on who could
13  sell online, correct; and where it could be sold
14  online?
15     A.   Yes.
16     Q.   Are you aware of what distributor Solu-Med
17  claims to have received it from?
18     A.   I think what you mentioned before, Inopex,
19  or something like that, was where they obtained it
20  from.  I am not certain.
21     Q.   Are you aware if they are an authorized
22  distributor of Youngblood?
23     A.   Doesn't matter.  They were selling genuine
24  products, so I have no idea whether or not Inopex

Page 132

CJ ROSENBAUM

2  signed a contract with Youngblood or not.
3      Q.   Have you ever inspected the products of
4  Youngblood that are maintained by Inopex?
5      A.   You asked me this hours ago.  I never
6  actually compared product versus product.
7      Q.   Have you ever held a Youngblood product?
8      A.   I don't know.  Not really big into
9  shampoo.
10     Q.   Do you believe that a Youngblood product
11  is --
12     A.   I don't know.  It was a bad joke.  I don't
13  know if I had Youngblood products in my hands or
14  not.  I may have.
15     Q.   It's a cosmetic.  You understand that;
16  right?
17     A.   I am not a big user of cosmetics either.
18  It was a bald joke.
19         MR. GOODMAN:  Can we take a five-minute
20  break?
21         MR. VINE:  Sure.
22         (Whereupon, a brief recess was
23         taken.)
24     Q.   Let's take a look at Exhibit 10, please.
25     A.   Got it.  Distribution agreement.

CORY JAY ROSENBAUM                                February 17, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                 133–136

Page 133

CJ ROSENBAUM

2  Q.  I see that you have highlights, right?
3  A.  Yes.
4  Q.  So first page, what did you highlight?
5  A.  And Amazzia located at 7040 Darby Avenue,
6  Reseda, California 91335 ("distributor").
7  Q.  What is the next highlight you have?  You
8  don't have to read it out loud.  Just tell me the
9  page.
10  A.  Page five paragraph L.  Just a portion of
11  it.
12  Q.  What portion, the first line?
13  A.  A portion of the first line.
14  Q.  Saying, "Shall not let others to sell any
15  product to any person or entity"?
16  A.  Yes.  Stops after person, though.
17  Q.  Why was that highlight important to you?
18  A.  I don't know specifically.  I read it and
19  I highlighted it.
20  Q.  But the agreement prohibits distributors
21  from reselling a product to any other entity,
22  correct?
23  A.  Yes.
24  Q.  The agreement says, "You are not allowed
25  to sell the product to any person or entity,

Page 134

CJ ROSENBAUM

2  including any approved subcontractor," and then it
3  goes on.
4  A.  If this contract is irrelevant to
5  Solu-Med's.  They did not sign it.  They are not a
6  signatory to this contract.
7  Q.  So what about the contract distributor
8  agreement between the entity you believe Solu-Med
9  got it from?
10  A.  Say that again.
11  Q.  Your position is that Solu-Med purchased
12  genuine Youngblood products from an authorized
13  distributor.
14  A.  I did not say they were authorized or not.
15  MR. GOODMAN:  Objection.
16  A.  I said I had no idea whether Inopex was
17  authorized or not.  I said they were part of buying
18  and reselling genuine products.  My understanding is
19  that is not even an issue in the case, whether the
20  products were genuine or not.
21  Q.  We absolutely dispute that.
22  A.  Your client seems to think otherwise at
23  his deposition, but whatever.
24  Q.  I disagree.
25  A.  Your question was why did I highlight that

Page 135

CJ ROSENBAUM

2  line.  I don't know why I highlighted that line.
3  Q.  Let's go to the next one.  You say there
4  is a tab there saying missing a page?
5  A.  Yes, I am missing page eight because I did
6  not print it out or whatever it was.  It goes from
7  seven to nine.
8  MR. GOODMAN:  So you have them here.
9  THE WITNESS:  I do, right.
10  Q.  But they would not be highlighted.  I am
11  only looking for --
12  A.  You just asked about the Post-it note.
13  Q.  I know.
14  A.  Do you want Post-it notes and highlights
15  or just highlights?
16  Q.  Go ahead.  Both.  Anything else as part of
17  that agreement?
18  A.  That's it.
19  Q.  And then the next thing you are referring
20  to as a Post-it regarding Amazzia's agreement with
21  Youngblood, correct?
22  A.  Yes.
23  Q.  Have you ever spoken with --
24  A.  Which guarantees that report unauthorized
25  seller until Amazon removes them, which means they

Page 136

CJ ROSENBAUM

2  are purposely asserting baseless counterfeit claims.
3  Q.  Have you ever spoken to anyone from
4  Amazzia?
5  A.  I don't think so, but I don't know who the
6  principals are offhand.
7  Q.  Have you ever spoken to anybody at Amazzia
8  about this case?
9  A.  No.
10  Q.  Have you ever dealt with litigation with
11  Amazzia?
12  A.  No.
13  Q.  Have any of your clients that had problems
14  with these brand protection companies, have you ever
15  dealt with Amazzia for them?
16  A.  I don't know.
17  Q.  You often deal with representing your
18  clients against brand protection companies, correct?
19  A.  Yes.
20  Q.  That's the bulk of your business?
21  A.  That's a significant portion of my
22  business.  I would not say the bulk.
23  Q.  Representing resellers against branded
24  companies.
25  A.  Against -- we represent people in



CORY JAY ROSENBAUM                                    February 17, 2020
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS                    137–140

Page 137

CJ ROSENBAUM

1
2  companies against baseless counterfeit complaints.
3      Q.   And part of that area is representing
4  resellers against companies that hire brand
5  protection to protect their branded products,
6  correct?
7      A.   In house and also outside brand
8  protection; hacks.
9      Q.   Do you believe that the distributor
10  agreement is important to the genuine sourcing of a
11  product?
12         MR. GOODMAN:  Objection.
13      Q.   You can answer.
14      A.   No.
15      Q.   Do you think if Solu-Med knows that they
16  purchasing product from an unauthorized seller, they
17  should be purchasing that product?
18         MR. GOODMAN:  Objection.
19      A.   Yes.  As along as the products are
20  genuine.  In this case they were genuine, so yes.
21  If they are buying from a distributor who has
22  genuine products, whether the brand has given the
23  blessing or not, I don't think it is relevant.
24  That's how consumers get better prices.
25      Q.   Even if that distributor has a written

Page 138

CJ ROSENBAUM

1
2  agreement that said that they can't resell it to
3  Solu-Med?
4         MR. GOODMAN:  Objection.
5      A.   What are you asking me?  Are you asking if
6  I think it's morally right or wrong?
7      Q.   You think Solu-Med can encourage and
8  participate in the purchases and sale of product and
9  the violations of the agreement?
10         MR. GOODMAN:  Objection.
11      A.   Are you asking me for a legal conclusion?
12      Q.   No.  Do you have an opinion on that?
13      A.   Do I have an opinion on whether or not it
14  was okay for Solu-Med to purchase genuine products
15  from another distributor?  Yes, I think that's
16  100 percent fine, absolutely.  There is nothing
17  legally wrong with it, nothing morally wrong with
18  it, if a consumer is getting a genuine product at a
19  lower price.  Distribution agreements tend to raise
20  prices for consumers and hurt people.
21      Q.   And your basis that it was genuine product
22  is not based upon any personal inspection of the
23  product, correct?
24      A.   For like the 15th time, I did not look at
25  your client's products.  I read the transcripts of

Page 139

CJ ROSENBAUM

1
2  the depositions and some other documents.  From
3  everything I am reading there is no longer a
4  question whether products were counterfeit or
5  genuine.  The products were genuine.  It's your
6  client making a baseless counterfeit allegation
7  because it knew that is what would take the seller
8  down and, therefore, they would get all the sales.
9      Q.   I don't know what you are reading, but I
10  can tell you our client is disputing that these were
11  not only not genuine products, that they were
12  actually counterfeit.  They have to prove otherwise,
13  and they have not.
14         MR. GOODMAN:  Objection.
15      Q.   You have not seen any, correct?  You have
16  not met anybody from Solu-Med or spoken to anybody
17  from Solu-Med about them being genuine products,
18  correct?
19      A.   For now the 21st time, my information is
20  based upon the transcripts which includes your
21  client's testimony.  Maybe you have not read the
22  right transcripts, I don't know.  But the issue is
23  your client testified that they thought these were
24  counterfeit because they were not authorized.  That
25  is their grounds for it, that is nonsense.

Page 140

CJ ROSENBAUM

1
2         MR. VINE:  You have the opportunity to
3  read or waive.  Reading, I assume you know
4  what that means.  It means --
5         THE WITNESS:  I would like to read the
6  transcript.
7         MR. GOODMAN:  I have just two questions.
8  EXAMINATION BY
9  MR. GOODMAN:
10      Q.   Have you been provided with any documents
11  other than Exhibit 2A, which was I think Exhibit 6
12  to Clarice Cohn's declaration of history of
13  complaints to Amazon regarding Solu-Med, before
14  2018?
15      A.   I don't think so.  I think all those other
16  complaints that meant nothing to this account were
17  on that 2A.
18      Q.   Were you aware of the fact or did you
19  become aware of the fact that Solu-Med in its
20  storefront Life and Health Source has been on the
21  Amazon platform since 2015?
22      A.   I don't know if that was in the complaint
23  or not so I am not sure if I knew the exact date
24  when they started selling online.  I know they got a
25  significant track history of selling online.



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
141–144

Page 141

CJ ROSENBAUM

1
2    Q.   Are you aware or have you been made aware
3  of how many skews -- do you know what a skew is?
4    A.   Yes.
5    Q.   What is it?
6    A.   Product identification number.
7    Q.   Well, let's leave it at that.  Do you know
8  how many skew were on Solu-Med's listing in 2017?
9    A.   No.
10   Q.   Do you know how many skews were listed in
11 2019?
12   A.   No.
13   Q.   '19?
14   A.   No.
15   Q.   And in looking over Exhibit 2A -- could
16 you please refer to the exhibit.
17   A.   (Complying).
18   Q.   How many of those complaints were in
19 Exhibit 2A after 2018?
20   A.   There are five dated within 2019.
21   Q.   Are you aware --
22   A.   Sorry, six.
23   Q.   Are you aware of the date that Life and
24 Health Source, Solu-Med, was relisted with Amazon?
25   A.   Looks about January 14, 2019.

Page 142

CJ ROSENBAUM

1
2    Q.   Do you have any knowledge as to whether
3  Solu-Med is still listed on Amazon?
4    A.   That I don't know.
5    MR. GOODMAN:  Thank you.
6    MR. VINE:  I have one follow-up
7    question.  Can you pull out composite Exhibit
8    4.
9      THE WITNESS:  May I take the time to
10   read it?
11     MR. VINE:  How many complaints on the
12   first page are listed for the year 2019, from
13   just January to June of 2019, against
14   Solu-Med?
15     THE WITNESS:  Want me to just count the
16   number?
17   MR. VINE:  Yes.
18   THE WITNESS:  Nine.
19   MR. VINE:  Nothing further.
20     (Time noted: 3:45 p.m.)
21

_____

22 CORY JAY ROSENBAUM
23 Subscribed and sworn to
   before me on this _____ day
24 of _____, _____.
25

_____

   Notary Public

Page 143

CJ ROSENBAUM

1
2              I N D E X
3  WITNESS       EXAMINATION BY           PAGE
4  Cory Jay Rosenbaum  Mr. Vine            3
5       Mr. Goodman       140
6
7          E X H I B I T S
8  DEFENDANT'S
9  FOR IDENTIFICATION   DESCRIPTION        PAGE
10 1          Report               6
11 2          Binder              11
12 3          Complaint           20
13 3A         Quote attachment      20
14 4          Composite set of complaints  27
15 2A         Double-sided document of a   31
   spreadsheet
16
   5          Composite set of documents   54
17             of policy warning
18 6          One of complaints issued to  57
               Amazon from Youngblood
19
   7          Composite set of exhibits    62
20             produced by plaintiff
21 8          First plan of action       68
22 9          Declaration of Amazon.com    89
   Custodian of Records
23
   10         Youngblood distr butor      130
24             agreement
25

Page 144

CJ ROSENBAUM

1
2          C E R T I F I C A T E
3      I, CHRISTINA FERRARO, a shorthand
4  reporter and Notary Public within and for the State
5  of New York, do hereby certify:
6      That the witness whose testimony is
7  hereinbefore set forth was duly sworn by me, and the
8  foregoing transcript is a true record of the
9  testimony given by such witness.
10     I further certify that I am not related to
11  any of the parties to this action by blood or
12  marriage, and that I am in no way interested in the
13  outcome of this matter.
14
15
16
17
18         Christina Ferraro
19
   _____
         CHRISTINA FERRARO
20
21
22
23
24
25



CORY JAY ROSENBAUM
SOLU-MED vs YOUNGBLOOD SKIN CARE PRODUCTS

February 17, 2020
145—147

Page 145

```
1              CJ ROSENBAUM

2            ESQUIRE ERRATA SHEET

3

4    Esquire Job ID: 5215858

5    Case Caption: SOLU-MED, INC. vs. YOUNGBLOOD

6

7          DECLARATION UNDER PENALTY OF PERJURY

8

9        I declare under penalty of perjury that I have

10    read the entire transcript of my Deposition taken

11    in the above-captioned matter or the same

12    has been read to me and the same is true and

13    accurate, save and except for changes and/or

14    corrections, if any, as indicated by me on the

15    DEPOSITION ESQUIRE ERRATA SHEET hereof, with the

16    understanding that I offer these changes as if still

17    under oath.  Signed on the _____ day of

18    _____, 20___.

19    _____

20               CORY JAY ROSENBAUM

21

22

23

24

25
```

Page 146

```
1              CJ ROSENBAUM

2          DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25               CORY JAY ROSENBAUM
```

Page 147

```
1              CJ ROSENBAUM

2          DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25               CORY JAY ROSENBAUM
```

