UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 0:19-cv-60487**

SOLU-MED, INC.,

      Plaintiff,

vs.

YOUNGBLOOD SKIN CARE
PRODUCTS LLC,

      Defendant.
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE PAUL DESTEFANIS AND C.J. ROSENBAUM**

    Plaintiff Solu-Med, Inc. ("Plaintiff" or "Solu-Med"), pursuant to Local Rule 7.1(c) and Rules 104 and 702 of the Federal Rules of Evidence, submits this Response in Opposition to Defendant Youngblood Skin Care Products, LLC's ("Defendant" or "Youngblood") Motion to Exclude the testimony of Paul DeStefanis and C.J. Rosenbaum (ECF No. 110).

**Expert Cory Rosenbaum**

**I.**     **Summary of Opinion**

Plaintiff offers the report and testimony of Cory Rosenbaum ("Rosenbaum") to opine on causation. In essence, Rosenbaum testified that Youngblood's act of submitting the counterfeit complaint to Amazon caused Solu-Med's store to be shut down.

**II.**     **Rosenbaum's Background and Experience**

Rosenbaum has authored six books relating to the Amazon storefront, including a book titled "Amazon's Seller Guide: Suspensions and Reinstatements – 2019-2020." Rosenbaum teaches Amazon Brand Protection and other issues related to Amazon to approximately 10,000 to 20,000 people per year at Amazon Seller conferences. He has written and/or published over 700 videos, webinars and written articles on the sale of products on Amazon. He received his juris doctorate from Golden Gate University Law School in San Francisco and earned his bachelor's degree from the State University of New

1

York, College at Oneonta. His law practice focuses solely on the sale of products on Amazon and protecting brands from counterfeit and unauthorized sales on Amazon. He has cross-examined Amazon representatives' numerous times on the training of its employees as it relates to Amazon's handling of counterfeit complaints.

### III. Factual Underpinnings of Rosenbaum's Report

In order to form his causation opinion in this matter, Rosenbaum relied upon Amazon's counterfeit policies and product authenticity policies at issue at the time of Youngblood's complaint; review of Youngblood's complaint; Youngblood's "retraction" of its complaint, and various deposition transcripts, along with the declaration of Amazon. Rosenbaum also reviewed prior complaints against Plaintiff's Amazon Store.

### IV. Argument

In its *Daubert* motion, Youngblood seeks to exclude the expert testimony of Rosenbaum for three specific reasons: (1) that his testimony as to "causation and why Amazon deactivated" Solu-Med's store is unreliable (ECF No. 110 at 4-8); (2) that there is an inadequate factual basis for him to conclude that the "products were genuine" (ECF No. 110 at 8-10); and (3) that he is "unqualified to offer expert opinions as to lost sales and business valuations" (ECF No. 110 at 10-12). Each point is separately addressed.

#### A. Opinions on Causation/Basis for Store Deactivation

In his report and deposition testimony, Rosenbaum opined that Youngblood's act of submitting the counterfeit complaint to Amazon caused Solu-Med's store to be shut down. In seeking exclusion of that opinion, Youngblood first argues that it impermissibly constitutes a legal conclusion. To that end, Youngblood string-cites a number of cases on page 5 of its motion for the proposition that experts are not allowed to present ultimate *legal* conclusions. While that may be a sound legal principle in the abstract, it has no application here. This expert merely opined on the *factual* issue of causation. *See, e.g., Zaslow v. Louisville Ladder, Inc.*, No. 18-80091-CIV, 2019 WL 7376780, at *5 (S.D. Fla. Oct. 4, 2019) ("proximate causation is generally an issue of fact for the jury to decide"); *Dixon v. United States*, No. 15-23502-CIV, 2017 WL 5643318, at *3 (S.D. Fla. Feb. 13, 2017) ("proximate cause is generally a question of fact").

And as Youngblood's *own* cited authority acknowledges, an expert is *not* precluded from testifying on an "ultimate issue to be decided by the trier of fact." *See Cook v. Sheriff of*

2

*Monroe County*, 402 F. 3d 1092, 1112 n. 8 (11th Cir. 2005) (expressly declining to rule on the issue of whether expert's conclusion was legal or factual in nature). Since none of Youngblood's string-cited cases on page 5 holds that causation is a legal issue or is not a proper subject of expert testimony, its argument fails.

Next, Youngblood argues that Rosenbaum's conclusion that the shutdown was caused by Youngblood's counterfeit complaint is based on nothing but his own "say so" and that he is impermissibly attempting to opine as to Amazon's "state of mind" or "motive" in shutting down the store. That is simply not true.

As his report and deposition testimony reflects, Rosenbaum has a wealth of knowledge and experience regarding Amazon's standard business practices, including how counterfeit complaints are treated by Amazon. To that end, Rosenbaum has extensive experience both defending and asserting "counterfeit complaints made through Amazon … via Amazon's 'take down' system." (ECF No. 110-1 at ¶ 7.) He also has "specific experience with Amazon's intellectual property infringement complaint system, how the system is abused by brands, how complaints are asserted *and the anticipated outcome of counterfeit complaints*." (ECF No. 110-1 at ¶ 8 (emphasis added); *see also* ECF No. 110-2 at 5 (reiterating his expertise in "counterfeiting, unauthorized sales" on Amazon).) Moreover, Rosenbaum's experience is multi-dimensional in that he gained this knowledge about Amazon's practices while acting in various capacities -- as a lawyer, as a consultant for Amazon sellers, and as an educator.[1] (ECF No. 110-2 at 7-8).

For example, Rosenbaum has authored six books that educate Amazon sellers on the business. (ECF No. 110-1 at ¶ 2; ECF No. 110-2 at 122.) He teaches between ten and twenty thousand people per year at Amazon seller events around the world. (ECF No. 110-1 at ¶ 3; ECF No. 110-2 at 123-124.) Rosenbaum has written and published over 700 videos, webinars and written articles focused on the sale of products on Amazon. (ECF No. 110-1 at ¶ 3.]) And he represents approximately 75% of Amazon sellers who bring claims against

---

[1] As Rosenbaum's report reflects, Rosenbaum based his opinion not only on his own experience with Amazon related businesses, but also on his own review of a host of documents in this case – which are all listed in paragraph 13 of his report. [D.E. 110-1 at ¶ 13.]

3

Amazon. (ECF No. 110-1 at ¶ 5.) As such, he is more than adequately qualified to address the matter at hand.

In addition, it is well-settled that an expert may rely on his own experiences in formulating an opinion and that such testimony should typically be challenged through cross-examination at trial rather than exclusion under *Daubert*. In *Wiggins v. Gov't Employees Ins. Co.*, No. 3:16-CV-1142-J-32MCR, 2019 WL 338945, at *3 (M.D. Fla. Jan. 28, 2019), for example, the court refused to exclude the testimony of an expert in a bad-faith action whose testimony was based merely on his own "years of experience" involving similar claims. Exclusion was sought because his experience-based opinions were in actuality mere "assumptions." Relying on Eleventh Circuit precedent, the court disagreed -- concluding that such an attack on experience-based testimony "goes to weight and not admissibility." *Id., citing, Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193-94 (11th Cir. 2011) ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). As the court explained, "[a]n expert can make reasonable assumptions in formulating his opinions, and those assumptions can be attacked through cross-examination and the presentation of contrary evidence." *Wiggins, supra* at *3, *citing Rosenfeld*, 654 F.3d at 1194 & *Maiz v. Virani*, 253 F.3d 641, 666–67 (11th Cir. 2001).

A similar approach was taken by the court in *Carideo v. Whet Travel, Inc.*, No. 16-23658-CIV, 2018 WL 1367444, at *13–14 (S.D. Fla. Mar. 16, 2018). In that case, the defendant sought to exclude the testimony of a purported cruise-ship expert who did not have any personal experience with the industry but instead had spent a lot of time reading and making presentations about it. The court expressed doubts about the reliability of such testimony but refused to exclude it under *Daubert*. After pointing out that an expert may indeed rely "on personal knowledge and experience" and that the expert's "opinions are certainly susceptible to significant challenge," the court denied exclusion under *Daubert* because such challenges are "more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Id.* at *13–14.

The same result should be reached here. As noted, Rosenbaum is well-experienced as to Amazon's business practices, and based on that expertise, he has essentially concluded that the counterfeit complaint at issue -- as Youngblood crafted it -- was virtually tailor-made

4

to ensure a complete shutdown by Amazon. (ECF No. 110-2 at 126.) In reaching that conclusion, Rosenbaum specifically pointed to his experience with counterfeit complaints and Amazon's "take down" system, his own interviews with current and former employees of Amazon, and testimony that he has personally witnessed while participating in other legal proceedings that relates to Amazon's reaction to counterfeit complaints. (ECF No. 110-2 at 125-126; ECF No. 110-1 at ¶¶ 7-8.) From his knowledge and vast experience, Rosenbaum was more than qualified to render the opinion that Youngblood's false counterfeit complaint was tailor made to ensure a complete shutdown. This is not a situation in which Rosenbaum is attempting to opine on the "state of mind" of someone else. If Youngblood wants to challenge Rosenbaum's causation testimony, it can do so through cross-examination at trial.[2] Exclusion, however, is not a sustainable option.

### B. Opinions as to the Authenticity of Products

Youngblood next seeks exclusion because Rosenbaum allegedly has no factual basis upon which to opine as to the authenticity of the products in Solu-Med's store. Although Rosenbaum did venture into this topic during his deposition testimony in response to questioning by opposing counsel, Rosenbaum is not being offered to opine on that topic. This point is apparent simply by looking at the specific enumerated topics of his opinion -- as set forth in his own expert report. (*See* ECF No. 110-1 at ¶ 11.) Authenticity is *not* listed as a topic therein, nor is any opinion about the authenticity of Solu-Med's merchandise contained in that report. That said, Plaintiff stipulates that it will not offer any expert testimony from him at trial as to whether the goods being sold by Solu-Med were indeed authentic.

### C. Opinions on Lost Sales/Business Valuation

In its final section, Youngblood claims that Rosenbaum is unqualified to offer expert testimony about Solu-Med's lost sales and business valuation because he is not an accountant, economist, or business-valuation expert. This completely misses the point. Rosenbaum has not testified to any specific numbers at all, much less anything that might

---

[2] Rosenbaum possesses the key ingredient that Youngblood's own expert Michael Pazak did not -- namely, personal experience with counterfeit complaints. Pazak's complete lack of experience on that topic is why Plaintiff has moved to exclude his testimony under *Daubert*.

require the need for such a pedigree. Indeed, Rosenbaum is not a damages expert – and he has never claimed otherwise. Moreover, Rosenbaum specifically acknowledged that he is "not a valuation expert" and thus could not give any "specifics" as to value. (ECF No. 110-2 at 116.)

Rosenbaum's testimony instead related specifically to Amazon's business practices with respect to a seller who has been tainted by a counterfeit complaint, and it is based on his own personal experience dealing with clients and sellers whose stores have been shut down. Based on that experience, he has opined: (a) that the closure of store obviously "stopped the sales" while the store was closed (ECF No. 110-2 at 114) and (b) that there is a lingering "degradation of the plaintiff's ability to sell and the value of the business" even after a store re-opens because that Amazon seller will no longer visually appear at the "top of the list of Sellers for a product on Amazon.com." (ECF No. 110-1 at ¶ 19 & n.4). In essence, the store becomes invisible by virtue of Amazon pushing it to a much-later page of a customer's search result. That is all Rosenbaum testified to on this topic, and none of it requires accounting, economics, or business-valuation expertise. It instead requires expertise as to Amazon's business practices, and that is exactly the expertise which he possesses.

## Expert Paul DeStafanis

### I. Summary of Opinion

Plaintiff offers the report and testimony of Paul DeStefanis as evidence of the damages incurred by Plaintiff as a result of the Youngblood's false statement made to Amazon reporting Plaintiff for selling "counterfeit" products. The damages report and opinion of DeStefanis can be summarized succinctly. DeStefanis opined that Youngblood's action destroyed Plaintiff's business and that a valuation of the company in October 2018 (two weeks before the shutdown) would have yielded $5.4 million and the cost to liquidate is an additional $1.3 million.

### II. DeStefanis's Background and Qualifications

DeStefanis is the owner of Paul D. DeStefanis, P.A. d/b/a Advanced Business Valuations and has held that position since 1990. Prior to that, he spent eight years as a Certified Public Accountant ("CPA") at Deloitte and Touche, LLP. DeStefanis holds a Bachelor's Degree in Accounting from the University of Florida. He has been a CPA since 1983, is an Accredited Senior Appraiser ("ASA") with the American Society of Appraisers

and is certified in both Business Valuations and Intangible Asset Valuations. He is also a Certified Valuation Analyst with the National Association of Certified Valuation Analyst. (See ECF No. 110-3, p. 36).

DeStefanis's significant expertise includes the preparation of valuations of a wide range of businesses, but has specific experience with wholesalers, distribution companies and e-commerce companies like Plaintiff. (ECF No. 110-4, p. 10, 76, 114). He has performed business damage valuations and provided litigation support countless times in the past twenty years. He has served as an expert witness in matters involving valuation, lost profit analysis, complex accounting and asset transfers. (*Id.*) In that capacity, he has prepared valuation reports and testified to the same in Court. Based on his education, training and professional expertise, DeStefanis is extremely well-qualified to testify as an expert with respect to damages.

### III.  Factual Underpinning of the Damages Report

In order to calculate damages in this matter, DeStefanis relied upon (1) the financial data provided by Plaintiff and (2) several studies performed by third parties. ECF No. 110-3, p. 7. The data provided by Plaintiff includes historical Amazon financials for Plaintiff's Amazon store dating back to January 2015; in addition, it includes profit and loss statements for 2018 and 2019, along with other financial data. DeStefanis also had conversations with Plaintiff's CEO Manuel Aguero and acting Chief Financial Officer Joaquin Lorie. (ECF No. 110-4, p. 20, 33, 46-47, 57-58). In relying on the data, DeStefanis did not adopt wholesale management's calculation of income and expenses. (ECF No. 110-4, 71-91).

### IV.  Application of the Facts in Preparing Damage Report

DeStefanis conducted a total destruction of business valuation for purposes of preparing his damages report. He conducted his damages projection based on Manuel Aguero's statement that the business was in liquidation and Joaquin Lorie's deposition testimony regarding the same. DeStefanis asserts that this model was supported by the staggering losses Solu-Med experienced since Youngblood caused the shutdown of its Amazon store. (Declaration of M. Aguero, attached as Exhibit "1;" ECF No. 107-4, p. 132). The Chief Financial Officer of Plaintiff testified as follows at his January 7, 2020 deposition:

```
 9     Q  Now, is Solu-Med in liquidation right now?
10     A  It is.
11     Q  It still has a storefront on Amazon, doesn't
12  it?
13     A  That is correct, we still have over a million
14  dollars of inventory that we are trying to liquidate as
15  much as possible.
```

No one – on either side – has disagreed that Solu-Med has been operating at a loss since the shutdown. When asked how is it reasonable to continue to operate a store at a loss before considering it destroyed, Defendant's expert testified as follows.

```
15  BY MS. BLACK:
16       Q.   I'm not saying you haven't.
17            I'm asking how long in your opinion is
18  it reasonable to continue to sustain losses before
19  you shutter the store?
20       A.   Again, that's dependent on the owners
21  and how deep their pockets are.
```

(ECF No. 106-2, p. 96).  On the other hand, it was Defendant's Expert's opinion that so long as the owners had "deep pockets," the store should never be completely destroyed. This meant that the owners would have to inject their personal financial assets to keep the business afloat, which could lead to personal financial ruin.

Defendant contends that because the store is still recording sales, it cannot be destroyed.  (ECF No. 106-2, p. 95).  Obviously, this is a very simplistic approach to the realities of operating a business.  Here, Solu-Med attempted to continue operations for almost eight months before the owners were forced to face the reality that the store was not recovering from the dramatic impact of the shutdown. (*See* Exhibit 1, ¶2-6.) Sales never reached pre-shutdown levels, and income continued to decrease. (*Id.*)

In hopes that the store could normalize, Plaintiff continued to pour resources into the store through July 2019, including purchasing inventory as Plaintiff referenced in its motion to exclude, always with the belief that this once-thriving business could be rebuilt. (ECF No.

110, p. 14-15). Indeed, it was on track to earn approximately $700,000 in net profit in 2018. (ECF No. 113-31, ¶19(g)). Plaintiff never imagined a scenario where errant and reckless complaints by a wrong-doer could destroy a once thriving, profitable business.

However, as the summer of 2019 passed and sales and income continued to decline, Aguero was forced to inform the company it would not purchase any new product for sale. (Exhibit 1 at ¶4). By December 2019, Aguero made the decision to liquidate the company. (*Id.* at ¶6). Lay-offs were made, including the departure of Kellon Goodson, a Solu-Med e-commerce manager who had worked for Mr. Aguero for over 10 years. Just because Solu-Med's e-commerce store still sells product on Amazon does not mean it is doing any more than liquidating the existing inventory during the wind-down process. DeStefanis did not merely make assumptions relating to "destruction of the store, "given the foregoing, he also spoke to the owner and reviewed the financials to support the conclusion that the store was completely destroyed as a result of the-shutdown.

As to valuation, when forming his valuation opinion, DeStefanis looked back to the five-year history of the store's performance on Amazon as part of his projections. (ECF No. 113-31 at p. 23.) Solu-Med used to operate the Amazon store as part of its parent company Q-Med (a company that grosses over $150 million in revenue annually). When the Life and Health Source store's revenue began exceeding $5 million, Q-Med decided to roll off the company into its own entity – Solu-Med, Inc. However, Q-Med carried some of the shared expenses – *i.e.*, it did not charge Solu-Med for rent, for C-level salaries, and basic utilities. (ECF No. 110-4, p. 26-27). Thus when forming DeStefanis's opinion as to the value of the company, instead of trying to partition those figures from Q-Med's financials because the companies were vastly difference in size and structure, he simply relied on his own experience, his own inspection of the warehouse, the market for e-commerce companies and Amazon companies of similar sizes and made a projection for rent, salaries, utilities. (ECF No. 110-4, p. 27-30, 55-56; ECF No. 113-31 at p. 26). Defendant believes that this is somehow improper and instead, DeStefanis should have–separated Solu-Med's expenses from Q-Med's; however, **Defendant's own expert did not even use this formula**. This is because as DeStefanis opined, it is completely improper.

DeStefanis explained based on Solu-med's size, gross revenue and projected income, if sold to another company as a stand-alone company, it would not carry C-level employees

9

or a full-time accountant (like Gray projected), it would not require 27,000 square feet in warehouse space, and it would be able to operate on a much lighter budget. (ECF No. 110-4, p. 55-73). DeStefanis specifically opines that average operating expenses for Solu-Med if acquired as a stand-alone company would be approximately $95,000/year. (ECF No. 110-3, p. 27). On the other hand, Gray opines that the average operating expenses for Solu-Med if acquired as a stand-alone company would be $522,000/year – including a whopping $216,000 for rent, $221,000 for C-level staffing, an addition $45,000 for a staff accountant, and other grossly inflated expenses. (See ECF No. 106-2, p. 112-126; ECF No. 124-4, p. 13). Therefore, which Expert's damage model should be accepted is a question for the jury and not grounds for DeStefanis's disqualification.

V. **Argument**

A. DeStefanis's "Complete Destruction of a Business" Methodology is Reliable

Defendant further assails DeStefanis's damage model, on the basis that Plaintiff's business is not completely destroyed because the "store is still operating." In doing so Defendant conveniently ignores and/or discounts the testimony of Plaintiff's Chief Financial Officer that Solu-Med is liquidating and selling off existing inventory through its Amazon store. Defendant concedes that Solu-Med's financials show that it has not purchased any new inventory since July 2019. (ECF No. 110, p. 15). Further, Plaintiff has been unable to reach its pre-store shutdown sales history and profits, and has been operating at a loss since November 2018. *(*Exhibit 1, at ¶4-8.). While Plaintiff expected it would take approximately 6-9 months to re-build its business to pre-shutdown levels, it was unable to do so. (*Id.*) When this became abundantly clear in Fall 2019, management made the decision to shutter the store. (*Id.*) Despite Solu-Med deposition testimony from company representatives relating the same and being aware of this from at least December 17, 2019, Defendant takes the absurd position that "a store that is recording sales" cannot be completely destroyed. (ECF No. 106-2, p. 95).

Florida's damage model for lost profits of a business is simple: "If a business is completely destroyed, the proper measure of damages is the market value of the business on the date of loss. If the business is not completely destroyed, then it may recover lost profits." *Envir. Biotech, Inc. v. Sibbitt Enterp.*, 2008 WL 5070251, at *4 (S.D. Fla. Nov. 24, 2008), *citing*, *KMS Restaurant Corp. v. Wendy's Int'l*, 194 Fed. Appx. 591, 601-02 (11th Cir. 2006). As the

10

Florida Third District Court of Appeals noted, a "plaintiff chooses to affirmatively prove that its business was completely destroyed because market value of a successful business will often yield a higher recovery than lost profits over a shorter period of time. Recovering lost profits for a wounded business is typically seen as a secondary method of recovery." *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, 183 So.3d 374, 381 (3d DCA 2013). The *Katz* case makes a point to note that the primary goal in a business-loss case like this one is to restore the business to where it was before the offending act. *Id.* at 381. Here, after nine months attempting various strategies to rebuild the business[3], it became clear that the business was permanently injured and liquidation was the only viable option. (*See generally*, Exhibit 1). In this regard, the *Katz* court notes that there must be some ability by the courts to apply common sense to allow the Plaintiff an adequate recovery. *Id.* at 380-381.

In *Katz*, the landlord breached a lease for the restaurant and failed to correct persistent leaks; eventually the leaks caused the restaurant to move. *Id.* at 377. It attempted to re-open but failed, and did not dissolve. *Id.* at 378. It had inventory on hand and retained some goodwill. *Id.* at 380. With that said, it was completely destroyed. *Id.* at 380-81. However, the court held that awarding market value to business that had been slowly reduced to nothing was not just and would not allow the restaurant an adequate recovery at law-as this would be inequitable. *Id.* at 381.

Thus, the court allowed Katz to recover lost profits, even though the business was completely destroyed as the recovery to make it whole. *Id.* Here, Solu-Med's reasonable efforts at attempting to salvage the business cannot be held against it; it attempted to infuse money into marketing and rebuild sales for at least eight months after the initial shutdown. When it became clear that this business would be permanently injured, however, the owner decided to liquidate the inventory through the store and wind down the company.

DeStafanis is permitted to review the financials and form opinions. In addition, Destefanis is allowed to rely on Solu-Med's own testimony that the company is liquidating and then closing. Youngblood's opinion to the contrary is absurd – *i.e.*, if the owners have

---

[3] During Solu-Med, Inc.'s deposition, it explained that it had to lay off employees, increase spending on advertising, and figure out how to recover at the least cost possible existing inventory sitting at Amazon's fulfillment center without additional financial penalty. See ECF No. __, Aguero depo p. 132-135.

11

enough money, a store can never be completely destroyed. (ECF No. 106-2, p. 96). Courts have noted that the technical prongs of *Daubert* are difficult to apply for experts testifying on financial matters. *First Tenn. Bank Nat'l Ass. v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001); *In re Commercial Financ. Serv.*, Inc., 350 B.R. 520 (N.D. Okla. 2005); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 70 (Bankr. N.D. Ill. 2002) (addressing solvency and finding "accounting is not an exact science and therefore, accountants are allowed to make judgments on how to communicate financial information – a *Daubert* hearing is not the time to test the validity of those assumptions"). When confronted with a *Daubert* challenge of a financial expert, the Court is permitted to "focus on the reliability of the expert's principles and methodology" rather than the correctness of his conclusions. *Kipperman v. Onex Corp.*, 411 B.R. 805, 844 (N.D. Ga. 2009). Here, DeStefanis more than adequately explained step by step how and why he reached his conclusions. DeStefanis is more than qualified to state that the company was completely destroyed after the store shutdown, and this testimony is reliable based on the totality of facts examined by him.

B. <u>DeStefanis's Valuation Analysis is Not Based on Unsubstantiated Assumptions</u>

Defendant claims that relying on Plaintiff's Chief Financial Officer's sworn testimony that Plaintiff is liquidating its inventory is "unsubstantiated" and creates an improper assumption. Similarly, Defendant claims that DeStefanis's conversation with the owner Manuel Aguero that the company is no longer buying products is an improper basis to form his opinion. That is simply not true. "Experts may rely on hearsay if it's the type of evidence reasonably relied on by experts in the particular field." *U.S. v. Allen*, 190 Fed. Appx. 785, 787 (11th Cir. 2006). Defendant also claims that that Solu-Med did not testify to its liquidation during its November 2019 deposition. But Defendant never asked about the current state of the business; in fact, Defendant chose, for whatever reason, not to ask any questions relating to damages at all, other than asking what Plaintiff did to mitigate its damages and asking a few questions relating to Plaintiff's financials pre-store shutdown. (ECF No. 104-8, p. 132 and Confidential Portion of M. Aguero deposition (confidential designation removed), p. 139-148), attached as Exhibit "2").

Defendant's statement that "a store that is recording sales is indicative of a store that is operating" in perhaps the most perplexing criticism of Plaintiff's mitigation efforts. Instead of seeking damages for the approximately $1.8 million in inventory currently sitting on

Plaintiff's books, Plaintiff is taking affirmative steps to sell it off. Plaintiff should be commended for that effort to reduce its losses, but Defendant instead just doubles-down on its attack by arguing that this effort constitutes proof that the store is not "destroyed." (See ECF No. 110, p. 14-15). Defendant also points out that Plaintiff purchased inventory in July 2019 and therefore, was still operating. (*Id.* at p. 15).

But that was because Plaintiff did not stop trying to rebuild the store until Fall of 2019 and thus, was purchasing inventory through July 2019. It was not until October/November 2019 that Plaintiff realized its business was permanently crippled and completely destroyed. *Id.* Therefore, DeStefanis was entitled to rely upon this testimony and he relied upon along with the financials and private conversation with the owner of Solu-Med to conclude that the business was "completely destroyed."

C. DeStefanis's Report was Based on Actual Data and Reliable

As its final argument Defendant claims that even if valuation was the proper method for calculating damages, DeStefanis's report is based on faulty assumptions because he failed to consider actual data and relied on his own experience with Amazon businesses. Defendant fails to mention that its own expert also failed to use Solu-Med's operating expenses to project his opinion. This is because both experts agree that due to Solu-Med's relationship with Q-Med, it did not carry all of its own expenses. Therefore, expenses had to "normalized" by adding expenses into the company. Thus, DeStefanis added expenses into Solu-Med's operations to "normalize" it for purposes of conducting a valuation. To be clear, Defendant does not take issue with this. Instead, Defendant complains about the values used for these "normalizations." DeStefanis simply looked at the actual net income for Solu-Med for 2018, then took into account several expenses that a normal company would have to cover to reach a more appropriate gross income. (ECF No. 110-4, p. 77-87).

Put another way, DeStefanis reduced the value of the company for purposes of this report. Defendant however balks that DeStefanis did not reduce that value enough and should have used Q-Med's financials in order to do so, despite Defendant's own expert not using Q-Med's financials. That is a matter for cross-examination at trial, not exclusion under *Daubert*. *See, e.g., Nutrimatix Inc. v. Xymogen, Inc.*, No. 6:15-CV-790ORL37-GJK, 2017 WL 385753, at *10 (M.D. Fla. Jan. 27, 2017) (attack on the *values* used in a methodology rather than the methodology itself go to the issue of an expert's credibility which is reserved for

13

cross-examination at trial). Perhaps the most bizarre part of this argument is that Defendant's own expert did not use Q-Med's financials for purposes of inputting expenses. Instead, Gray simply used what he considered to be market standards by reviewing several industry-recognized publications – RCReports, Ignitespot Accounting---but not by reviewing Q-Med's operations. (ECF No. 106-2, p. 122-126). It can be assumed both experts concede that Q-Med's business is vastly different from Solu-Med. Thus, it would not be prudent to use a company's financials that distribute medical supplies and grosses $150 million in revenue per year to estimate the worth of an Amazon reseller of cosmetics with a gross income of approximately $5 million/year (pre-store shutdown).[4]

      As to the second prong of Defendant's argument, DeStefanis indeed used his own experience in valuation and his own operation of an Amazon business to conclude that an approximately 10-person company that works primarily as a e-commerce store on Amazon would not carry C-level personnel if it was a stand-alone company (and the $200K+ salary that Defendant projects to go alone with it). Similarly, DeStefanis concludes that a 10-person company would not employ a full-time accountant or require $220,000/annually in rent. He makes this opinion based on his experience with valuations of similar e-commerce companies and his own experience of running an Amazon store of similar size. This type of experience is certainly more reliable that trying to input abstract principles from various publications into an e-commerce store – *i.e.,* shoving a square peg into a round hole. DeStefanis explains on page 76 of his deposition his vast experience in valuing companies like Solu-Med and why he is uniquely qualified to offer an opinion on valuation in this case. (ECF No. 110-4, p. 76). He believes the operating expenses projected in his valuation indicate all necessary expenses based on "valuating internet companies over the years and owning them . . . I have valued companies since 1985 … including brand new [companies]. Here, you have five years of … revenues and costs of goods sold. I know the shipping, the

---

[4] Plaintiff, throughout the discovery process, objected to the production of Q-Med's financials and Agro's tax returns, but ultimately voluntarily produced tax returns and lost a motion for protective order on Q-Med's financials. Plaintiff's objections were based on the fact that nothing useful could be gleaned from the operation of Q-Med for purposes of calculating lost profits and/or a valuation of Solu-Med. Defendant vehemently disagreed. Yet, at his deposition, Defendant's own expert conceded that he did not use any information from the Q-Med financials in reaching his opinions in this case.

14

fees, and actual costs of the product. So you have a long track record." (ECF No. 110-4, at p. 77). He further says that the expenses he projected (*i.e.*, what Defendant is taking issue with) were based on a "combination of reviewing all the data so I look at everything in [Solu-Med's] general ledger on how they reported it. I talked to them about it, you know, what's your telephone (cost) so we don't break it. You know? What's your dues and subscriptions [costs]? … Based on the companies I've reviewed and the company that I own, I looked at it . . . we have 3,000 square foot of warehouse…." (ECF No. 110-4, p. 80). This is certainly permissible given DeStefanis's vast experience in valuing distribution companies and internet companies, and running his own Amazon entity. If Defendant wants to challenge that, then it must do so through cross-examination at trial, not by a *Daubert* motion. . *See, e.g., Wiggins, supra,* at *3 (determining that attack on expert's experience-based testimony "goes to weight and not admissibility"). As a final note here, Defendant's accusation on page 18 that "DeStefanis cannot simply ignore Plaintiff's actual business and supplement its own expenses for what he thinks its expenses should be" really takes nerve when that is *exactly* what Defendant's *own* expert did in reaching his conclusions. (ECF No. 106-2, p. 112-113, 122-126)/

As a result, DeStefanis should be permitted to testify in full as to his opinion at trial. He has vast experience in e-commerce valuations and is well-equipped to provide an opinion to the jury in this matter.

### III. Conclusion

For the reasons stated above, Plaintiff's experts are well-qualified to offer expert testimony in this matter and Defendant's motion should be denied in all respects.

BLACK LAW P.A.

1401 E Broward Blvd. Suite 204
Fort Lauderdale FL 33301
ph-954.320.6220 fx-954.320.6005

By:       *s/ Kelsey K. Black*
        Kelsey K. Black
        Florida Bar No. 078925
        kelsey@kkbpa.com

and

Stanley R. Goodman, Esq. (admitted *pro hac vice*)
Goodman & Saperstein
666 Old Country Road, Suite 200
Garden City, NY  11530
Telephone:  (516) 227-2100
Facsimile:   (516) 227-2108
*gsesq600@aol.com*

Case 0:19-cv-60487-RKA   Document 126   Entered on FLSD Docket 03/26/2020   Page 16 of 16