## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 0:19-cv-60487-RKA/PMH

SOLU-MED, INC.,

       Plaintiffs,

vs.

YOUNGBLOOD SKIN CARE
PRODUCTS LLC,

       Defendant.

_____/

## PLAINTIFF SOLU-MED, INC.'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action seeks to recover the substantial damages caused by Defendant's wrongful actions. Four causes of action have been asserted: Count I for tortious interference; Count II for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); Count III for defamation; and Count IV for common law trade disparagement/trade libel. Defendant has moved for summary judgment dismissing all four counts. For the reasons set forth *infra*, its motion should be denied.

### I.    Argument

#### A. *Noerr -Pennington Doctrine*

Although *Noerr-Pennington* is the final ground upon which Defendant seeks summary judgment, Plaintiff elects to dispose of this first, since it pertains to all of Plaintiff's claims. Initially Defendant filed a Rule 12(b)(6) motion to dismiss the Complaint pursuant to *Noerr-Pennington* (ECF No. 18). On September 20, 2019, in an oral decision from the bench, this Court denied Defendant's motion.

On September 15, 2018 Defendant entered into an agreement with a company called Amazzia for Amazzia to provide "brand protection services", which consisted of filing complaints in Defendant's name with Amazon against unauthorized resellers, accusing them

of selling counterfeit Youngblood product.[1] The purpose was to get rid of them.[2] According to Fikhman, one of Amazzia's co-owners,[3] a product is counterfeit if it does not come with the manufacturer's warranty or have the same quality controls.[4] Defendant's representative, Dr. Jason Toth ("Toth") claimed that Amazon also defined counterfeit in that manner.[5]

In keeping with Youngblood's assignment, on November 11th and 13th, 2018, Amazzia filed under Defendant's name and email address, two complaints against Plaintiff, claiming Plaintiff was selling *counterfeit* Youngblood products.[6] The complaints stated in pertinent part:

> Hello, we have researched Youngblood's listing and found the following ASINs are in violation of our trademark, 3812755.  Counterfeit products are being sold on the following listings.  Please immediately take action and remove these sellers currently listing counterfeit product….[7]

Plaintiff received from Amazon a notice, dated November 13, 2018, that by reason of Defendant's counterfeit complaints, Amazon was temporarily deactivating Plaintiff's entire store.[8] Plaintiff was not able to restore its selling privileges until January 14, 2019.[9]

Defendant maintains that its counterfeit complaints constitute First Amendment petitioning activity protected by the *Noerr-Pennington* Doctrine, which do not come under the sham litigation exception. Regarding *Noerr-Pennington*, the Doctrine originates from two Supreme court cases: *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). "The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anti-competitive intent." *Video Int'l. Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988).

---

[1] Plaintiff's Counter Statement of Facts, ¶65, 67.
[2] *Id.* at ¶69.
[3] *Id.* at ¶65.
[4] *Id.* at ¶92, 96.
[5] *Id* at ¶92.
[6] Plaintiff's Counter Statement of Facts, ¶61.
[7] *Id.*
[8] *Id*. at ¶62.
[9] ECF No. 113 at ¶59.

Not all courts have extended *Noerr-Pennington* beyond anti-trust and petitioning governmental entities. This Court correctly perceived that at oral argument on Defendant's Rule 12(b)(6) motion to dismiss:

> THE COURT: In the context of a monopoly, an antitrust case that the government was permitting. In other words, the government was permitting a company to engage in antitrust or monopolistic activities. There's no antitrust claims here. Antitrust claims were at the heart of Pennington and Noerr, so it makes sense that the Eleventh Circuit would think that an antitrust claim would implicate the Noerr-Pennington doctrine, but this isn't an antitrust case. And I don't think you-- I haven't seen, and you haven't cited, a case from the Eleventh Circuit that suggests that in a private dispute involving no antitrust regulations that Noerr—Pennington applies.
>
> But even if Noerr-Pennington applied to a private case involving no antitrust violations, it still wouldn't apply in any case that I've seen or that you've cited, other than Hard2Find out of the Ninth Circuit, in the context of a situation where the defendant has not threatened the third party with an assertion of its own rights against that third party.
>
> MR. VINE : So, we did assert our own rights, but —
>
> THE COURT : Not against Amazon, you didn't. I read that is not correct. The allegations in the complaint are not that you threatened Amazon with litigation against Amazon. Are you suggesting that that's incorrect?
>
> MR. VINE: No, your Honor, I —[10]

---

[10] A copy of the Transcript from the September 20, 2019 hearing is attached as Exhibit 1, page 13).

In Slip-N-Slide Records, Inc. v. TVT Records, LLC, 2007 WL 473273 at *6 (SD Fla. (SD Fla.2007), this Court stated:

> Significantly, TVT has cited no case from this Circuit that holds that the federal antitrust doctrine works to bar state tort claims wholly unrelated to an antitrust claim, and this Court will not extend the *Noerr-Pennington* doctrine to bar the traditional state -law tort claims asserted here by SNS. Frankly, the doctrine has likely been extended far beyond what the exercise of judicial restraint would allow. Accordingly, this doctrine does not shield TVT from any liability it may have for interfering with SNS's relationship with ADA.

*Accord: Clearplay, Inc. v. Nissim Corp.*, 2011 WL 38783 at fn.11 (SD Fla. 2011) ("…judicial restraint also motivates the Court's decision [not] to apply… *Noerr-Pennington* immunity, to *Clearplay*'s state law claims, which are unrelated to anti-trust law"), *aff'd* 490 Fed. Appx. 963 (11th Cir. 2012). The Eleventh Circuit has only extended *Noerr-Pennington* to a state tort claim, *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992), where the state unfair trade practices claim was *identical* to the federal anti-trust claim.

As it did at oral argument, this Court should continue to refuse to follow *Hard2Find Accessories, Inc. v. Amazon.com, Inc.*, 2014 WL 6452173 (W.D. Wash. 2014) *aff'd.* 691 Fed. App. 406 (9th Cir. 2017). The two *Hard2Find* decisions, which have not been followed elsewhere, represent an overextension of *Noerr-Pennington*.

In the instant case, Defendant sent several complaints to Amazon, alleging that Plaintiff was selling specific *counterfeit* Youngblood products and requested that Amazon require Plaintiff to delist those products.[11] This was a request, not a threat to sue Amazon, or a cease and desist to Amazon. These complaints do not constitute prelitigation petitioning activity that would shield Defendant from liability under the *Noerr-Pennington* doctrine. As to Defendant's authority, they are inapposite. *Rolex Watch U.S.A., Inc. v. Rainbow Jewelry, Inc.*, 2012 WL 4138028 (SD Fla. 2012) was a trademark infringement case where the counterclaim was based on Plaintiff sending Defendant cease and desist letters, accusing it of trademark infringement and threatening legal action. Clearly, *Rolex* is distinguishable.

*Live Face On Web, LLC v. Tweople, Inc.*, 2014 WL 12611359 (MD Fla. 2014) was a copyright infringement case, where the counterclaim was based on Plaintiff sending

---

[11] ECF No. 113 at ¶¶33-37.

Defendant's customers cease and desist letters threatening to sue them for copyright infringement if they did not cancel their contracts with Defendant. *Live Face* too is distinguishable on the facts. Similarly, *Lynn v. Amoco Oil Company*, 459 F.Supp.2d 1175 (M.D. Ala. 2006) was a case where the defendants were engaged in legitimate petitioning activities with federal agencies which qualified for *Noerr-Pennington* protection.

Finally, *Atico International USA, Inc. v. Luv N' Care. Ltd.*, 2009 WL 2589148 (SD Fla. 2009) was a case where Defendant's attorney sent a warning to Plaintiff's customer, intimating that Defendant would take legal action if the customer engaged in intellectual property infringement *in futuro.* Thereafter Defendant commenced suit against the customer in another jurisdiction. Since the Defendant filed suit based on the subject matter of the letter, the Court found that the letter was clearly prelitigative activity. Thus, *Atico* is  also distinguishable on the facts.

i.    Sham Litigation Exception

Although the *Noerr-Pennington* doctrine is inapplicable, Plaintiff has also established that this case comes under the sham litigation exception to *Noerr-Pennington* immunity. As set forth in *SilverHorse Racing, LLC v. Ford Motor Company,* , the exception requires the litigant to establish (1) that the lawsuit is objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits and (2) the party bringing the baseless lawsuit did so with a subjective motivation to interfere directly with the business relationships of a competitor. 2016 WL 7137273 at *4 (M.D. Fla. 2016); *see Andrx Pharm., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1234 (11th Cir. 2005).

As to the first prong, Defendant made a Rule 12(b)(6) motion to dismiss the Complaint. On page 10 of its Memorandum of Law (ECF  No. 18), Defendant stated:

> In the instant matter, Youngblood's inquiry to Amazon in regards to the authenticity of Youngblood's products was justified…. anytime Youngblood identifies its products being sold by an unauthorized reseller, the first assumption Youngblood must make is that the products are counterfeit…. When Youngblood identifies said products on Amazon, Youngblood's first level of recourse is to submit a counterfeit petition to Amazon.

A statement made in a brief filed by a party may be considered an admission of fact. *Tucker v. Housing Authority Of The Birmingham District*, 229 Fed. Appx. 820 at **5 (11th Cir. 2007); *Young & Vann Supply Co. v. Gulf. Florida & Alabama Railway Co.,* 5 F.2d 421,

423 (5th Cir. 1925); *Hanson v. Waller,* 888F.2d 806, 814 (11th Cir. 1989) (statements made by an attorney in representational capacity admissible as exception to the hearsay rule). The foregoing constitutes an admission that Defendant's counterfeit complaints were based upon an unsupported assumption that the goods were counterfeit because Plaintiff was not an authorized reseller.

Actually, the counterfeit complaints here were made by Defendant's agent Amazzia. Amazzia's representative, Fikhman testified that Plaintiff's Youngblood goods were counterfeit because Plaintiff was an unauthorized seller, whose goods did not include the warranty, were not subject to Youngblood's quality controls and per Amazon's policy that means they are counterfeit.[12] Fikhman also testified that, "A counterfeit item by us is defined as having a material difference, and one that creates consumer confusion."[13] But Amazon, through its paralegal Clarice Cohn, submitted a Declaration in response to a Rule 45 Subpoena that Defendant served upon Amazon.[14] In ¶12 of her Declaration, Ms. Cohn states that Amazon considers a product is counterfeit if the product or packaging has an unlawful reproduction of a registered trademark.[15] Therefore, Fikhman misspoke or lied regarding Amazon's view of what constitutes counterfeit goods.

Fikhman admitted that Amazzia did not purchase any Youngblood products from Plaintiff before lodging the complaints, nor had it seen the products.[16] It did not matter if the goods were actually counterfeit to Youngblood's agent Amazzia.[17] As to Defendant, Toth testified that Youngblood was not aware of the two counterfeit complaints that Amazzia filed with Amazon until November 29, 2018.[18] Youngblood did not purchase any Youngblood products from Plaintiff or do a comparison.[19] Thus, at the time Amazzia made the two counterfeit complaints, neither it nor Defendant had any evidence that Plaintiff was selling Youngblood products bearing an unlawful reproduction of Defendant's trademarks. From this, a reasonable fact finder could find that since the complaints were false and objectively

---

[12] Plaintiff's Counter Statement of Facts, ¶92.
[13] *Id.*
[14] *Id.* at ¶86.
[15] *Id.*
[16] Plaintiff's Counter Statement of Facts, ¶70.
[17] *Id.* at ¶¶67, 69, and 97.
[18] *Id.* at ¶71.
[19] *Id.* at ¶70.

baseless, no reasonable litigant could realistically expect success on the merits of such an action. As to the second prong, at his deposition Toth testified that if the Youngblood product is not being offered by an authorized seller, then it is counterfeit and it was Defendant's strategy to protect the equity of the brand and their investment by eliminating grey market sellers such as Plaintiff, to file a counterfeit complaint with Amazon, which is exactly what its henchman, Amazzia did.[20]

Toth and Fikhman testified that they were familiar with Amazon's policies as expressed in its Seller Policy and Code of Conduct.[21] They also understood that Amazon had a strong anti-counterfeiting policy and banned resellers from selling when counterfeit goods were reported.[22] After Amazzia filed another counterfeit complaint, Amazon sent Plaintiff a second notice that it was deactivating Plaintiff's selling account due to intellectual property infringement, to wit: "-Infringement Type: COUNTERFEIT".[23]

Despite their protestations that it was not their intent to interfere with Plaintiff's business relationship with Amazon, given their express knowledge of Amazon's policies regarding selling counterfeit goods, a reasonable jury could conclude that Defendant weaponized Amazon's complaint process, and did so with the subjective intent of interfering with Plaintiff's business relationship with Amazon, as the means to eliminate Plaintiff from competing online with Defendant. In sum, summary judgment should be denied to Defendant with respect to the *Noerr-Pennington* Doctrine.

**B.** *Qualified Privilege As A Defense To Defamation And Trade Libel*

Defendant claims that it is entitled to summary judgment on the defamation and trade libel claims by reason of the qualified privilege defense. This is an affirmative defense that Defendant must prove by the preponderance of the evidence. Preponderance of the evidence requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence. *Concrete Pipe And Products Of California, Inc. v. Construction Laborers Pension Trust For Southern California*, 508 U.S. 602, 622 (1993); *U.S. v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012).

---

[20] Plaintiff's Counter Statement of Material Facts, at ¶67.
[21] *Id.* at ¶83; ECF No. 113-1, p. 14:1-11.
[22] *Id.* at ¶61, Exh. 1.
[23] *Id.* at ¶62, Exh. 2.

Two of the elements which a party asserting the defense must establish are that (1) the statement was made in good faith and (2) with an interest to be upheld. *Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*, 391 F. Supp. 2d 1148, 1166 (S.D. Fla. 2005); *Axelrod v. Califano* , 357 So.2d 1048, 1051 (Fla. Dist Ct. App. 1978). Further, a party's interference with a business relationship is not privileged where the party intentionally interferes or acts egregiously against another party. *Alphamed at 1166, citing Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1294 n. 9 (11th Cir. 2001). This Court has recognized that qualified privilege does not exist if the speaker acts for its own unilateral interest.  *See Falic v. Legg Mason Wood Walker, Inc.*, 347 F.Supp.1260, 1267 (.S.D. Fla. Oct. 26, 2004).  The issue of whether a privilege is qualified is typically an issue of fact that must be submitted to a jury.  *Int'l Yacht Bureau, Inc. v. Int'l Registries, Inc.*, 2015 WL 5118121 at *4 (S.D. Fla. September 1, 2015).

Defendant claims that it was justified in filing its counterfeit complaints with Amazon because it "believed" another secondary market company was selling counterfeit Youngblood goods. Through its henchman Amazzia, Defendant submitted counterfeit complaints against all unauthorized Amazon resellers.[24] There is no question that good faith is the key element for this defense. Defendant's Motion reeks of an anti-competitive plan to eliminate unwanted competitors. This Court, in *Ameritox, Ltd. v. Aegis Services Corp.*, 2008 WL 2705435 at *4 (SD Fla. 2008) stated that: "Bad faith can include reckless conduct as well as deliberately and knowingly engaging in wrongdoing, fraud or misconduct."  As the deposition abstracts previously cited established, Amazzia filed counterfeit complaints solely on the basis that Plaintiff was not an authorized reseller. A reasonable jury could find that this "shoot first, ask questions later" approach was both reckless and wrong, and therefore not made in good faith.

As to the second element -  an interest to be upheld -  as Toth had testified, this strategy of filing a counterfeit complaint was to eliminate gray market vendors because their sales negatively affect Defendant's brand equity and investment.[25] The short answer is that tortious, predatory conduct cannot be justified as the means to an anti-competitive end. The goal of elimination through anti-competitive and monopolistic practices is an attempt to control the

---

[24] Plaintiff's Counter Statement of Facts, ¶¶64-68.
[25] *Id.* at ¶75.

free flow of goods in the open marketplace. Youngblood's actions were only to further its own anti-competitive interest; Amazon certainly does not share that interest.

The foregoing presents competing factual scenarios with regard to the interest element. Defendant claims the counterfeit complaints are to ensure authenticity, while Plaintiff maintains, with an evidentiary basis, the interest is the wrongful elimination of gray market competitors. As this Court is well aware, gray market sales are not illegal. Nor is diversion. *See United States v. Weinstein,* 762 F.2d 1522, 1527 (11th Cir. 1985), *opinion modified on denial of reh'g,* 778 F.2d 673 (11th Cir. 1985). For summary judgment purposes, the Court must accept Plaintiff's version and deny Defendant summary judgment, since the maintained interest is antithetical to our free enterprise system.

### C. *Tortious Interference With Business Relations*

Under Florida law, there are four elements required for tortious interference with business relationship. They are: (1) the existence of a business relationship between plaintiff and a third party; (2) defendant's knowledge of the relationship, which Defendant here cannot deny; (3) unjustified interference with that relationship; and (4) damage to the plaintiff as a result of that interference. *See Wellnext LLC v. OVM LLC,* 2018 WL 7048129 at *6 (SD Fla. 2018); *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812,814 (Fla. 1994).

1. Amazon is an Identifiable Business Relationship

Defendant argues on page 4 of its Motion, that the tortious interference claim set forth in its Complaint must fail because, "[Plaintiff] has failed to identify any customers who stopped shopping at the Amazon Storefront during the Deactivation Period…or since the Amazon Storefront was reinstated…" and, "[Plaintiff's] relationship with its past customers *cannot* serve as a basis for its tortious inference (sic) claim…."[26] At oral argument on Defendant's 12(b)(6) motion to dismiss, this Court correctly construed the tortious interference claim as: "They were on Amazon, that relationship was one they're are claiming was interfered with as well….As a result, they allege…of what you sent over to Amazon, that relationship was cut off, and that relationship was the *sine qua non* of their business."[27] This

---

[26] ECF No. 108, p. 4
[27] Copy of Transcript from September 20, 2019 proceeding, attached as Exhibit 1, at p. 22.

caused Defendant's counsel to concede that, "…if the relationship that they're talking about is Amazon, I think that would be sufficiently identified."[28]

Defendant knew that it was Plaintiff's five-year business relationship with Amazon that it interfered with.   Amazon's policies and protocols were a key topic of Defendant's and Amazzia's depositions. Indeed, Defendant served <u>two</u> Rule 45 subpoenas on Amazon to produce its written policies and seller's guidelines along with other documents, and requested multiple declarations authenticating the same.

The Court in *Affiliated Network, Inc. v. Wanamaker*, 2017 WL 8784851 at *5 (SD Fla. 2017) held that F.R.Civ. P. 15(b) permits a Court in its discretion to conform pleadings to evidence adduced at summary judgment or trial. Issues are tried by express or implied consent at the summary judgment stage where these issues are squarely addressed in the parties' briefs. *Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 663 (7th Cir. 1998). Here, Defendant raises numerous arguments that rely on Amazon's alleged policies and guidelines to avoid liability for tortious interference with Plaintiff's business relationship with Amazon.[29] Further Defendant recently filed an Amended Answer which interposed as its Thirteenth Affirmative Defense a justification claim based upon Amazon's policies with respect to tortious interference with Plaintiff's relationship with Amazon.[30]

Since the issue of whether Defendant tortiously interfered with Plaintiff's business relationship with Amazon has been the focal point of this litigation and Defendant's summary judgment motion, the Complaint may be constructively amended to include that claim. *Whitaker v. T.J. Snow Co.*, *supra*; *Esmont v. City of New York*, 371 F.Supp.2d 202, 217 (E.D.N.Y. 2005). The inquiry on summary judgment is whether no material issue of fact remains to be tried on Plaintiff's tortious interference with its business relation with Amazon claim.

*2.   Plaintiff Could Not Have Sold Through Amazon's FBA Program*

Also unavailing is Defendant's argument that once the store was deactivated, Plaintiff could have sold its wares through Amazon's Fulfillment By Amazon Program ("FBA").[31] For record support, Defendant relies on its SOF ¶58, i.e. the deposition testimony of Kellon

---

[28] *Id.* at 23.
[29] ECF No. 108, Section B.
[30] ECF No. 79-1.
[31] ECF No. 108, at p. 5-6.

Goodson at page 14, lines 3-15. An examination of that page and those lines reveal no reference to Amazon's FBA Program. On the other hand, Goodson described the FBA Program at pages 48, lines 17-25, 49, lines 1-2, which is utilizing Amazon as a shipper as well as to handle returns. Ironically, Plaintiff's Youngblood goods were actually sold through the FBA Program, so they would be able to be returned to Amazon.[32] The statement on page 6 of Defendant's Motion that, "[h]ere, Plaintiff did not even attempt to sell its goods through the FBA program" is refuted by the record.

3. *There Was No Justification for Youngblood's Actions*

    a. <u>Plaintiff Did Not Violate Amazon's Guidelines By Selling Counterfeit Product</u>

On pages 6-9 of its Motion, Defendant presents a self-serving sanitized version of the facts to justify its false counterfeiting complaints. It is undisputed that Defendant hired Amazzia in September, 2018 to provide brand protection services for Defendant. On page 6 of its Motion, citing its SOF ¶5 for record support, Defendant claims Amazzia was engaged to curb the sale of inauthentic and counterfeit Youngblood products on the secondary market "that were diluting the Youngblood brand and its products." However, Amazzia's representative William Fikhman testified that Defendant engaged Amazzia to provide "brand protection services," which consisted of filing complaints in Defendant's name with Amazon against unauthorized resellers, accusing them of selling counterfeit Youngblood product - the purpose was to get rid of them.[33] This is exactly what Amazzia did here. The complaints accused Plaintiff of offering counterfeit Youngblood products – not inauthentic, counterfeit. When asked about the choice of the word "counterfeit," Defendant's representative Dr. Jason Toth testified that if the Youngblood product is not being offered by an authorized seller, then it is counterfeit and it was Defendant's strategy to protect the equity of the brand and their investment by eliminating grey market sellers such as Plaintiff, to file a counterfeit complaint with Amazon.[34] Amazzia was hired to get rid of unauthorized competitors, and there is no record evidence to support this spurious dilution claim.

---

[32] ECF No. 113-5, p. 45:6-12, 49:18-23.
[33] Plaintiff's Counter Statement of Facts, at ¶67.
[34] *Id.*

Clarice Cohn, a Litigation Paralegal in the Litigation and Regulatory group at Amazon, submitted several Declarations in response to a Rule 45 Subpoena Duces Tecum that Defendant served upon Amazon.[35] In ¶12 of one of the Declarations, Ms. Cohn states that Amazon considers a product counterfeit if the product has an unlawful reproduction of a registered trademark.[36] In addition, included in Exhibit "B" to Ms. Cohn's Declaration was Amazon's Condition Guidelines.[37] On page 2 under the heading "Unacceptable and prohibited items:"

> • Item was not created by the original manufacturer or copyright holder. This includes copies, counterfeits, replicas, and imitations.[38]

The foregoing is conclusive that counterfeit to Amazon means either an item not created by the original manufacturer and/or an item bearing an unlawful reproduction of a registered trademark.  While Amazon may choose to classify a type of product as being "inauthentic" due to material differences (lack of warranty) or quality control shortcomings, what the aforesaid evidence from Amazon shows is "inauthentic" to Amazon is not synonymous with "counterfeit". What Defendant is trying to do is to hoodwink the Court by employing the conjunctive "inauthentic and counterfeit" in order to argue that to Amazon, inauthentic and counterfeit mean the same thing.  This is not true.

    *i.    Inauthentic*

Defendant has given the Court a laundry list of Plaintiff's alleged violations of Amazon's guidelines to justify its two counterfeit complaints to Amazon on page 7 of its motion, ending with "•  Plaintiff's purported Youngblood products were inauthentic and counterfeit (SOF ¶¶ 8-16)."[39] As demonstrated *supra*, use of the conjunctive (inauthentic *and* counterfeit) is a too cute tactical maneuver to mislead the Court into believing that to Amazon, the two terms are synonymous. They are not. Defendant's complaint was that specific Youngblood products Plaintiff was selling were *counterfeit,* and Plaintiff's store was deactivated for that reason.[40]

---

[35] ECF Nos. 113-6, 104-10.
[36] ECF No. 104-10.
[37] ECF No. 104-10 at Ex. B.
[38] *Id.*
[39] ECF No. 108, at p. 8.
[40] Plaintiff's Counter Statement of Facts, at ¶¶61-63.

Regarding Defendant's laundry list, the fact that Plaintiff was not an authorized seller nor asked for Defendant's permission is not an Amazon guideline requirement. Moreover, the fact that Defendant did not authorize their sale does not render these goods infringing or not "genuine", by reason of the first sale doctrine. *See Wellnext, supra at \*3,* citing *Allison v. Vintage Sport Plaques*, 136 F.3d 1443, 1447-48 (11th Cir. 1998).

Next is Defendant's purported 100% satisfaction guarantee. Defendant's founder, Pauline Toth ("Pauline") in her Affidavit avers that Youngblood products purchased directly from its website *or* from an authorized retailer come with a warranty. The warranty is that a consumer can return a purchase for a full refund within 30 days of purchase. However, Youngblood products purchased from unauthorized resellers do not come with that warranty.[41]

Youngblood's website www.ybskin.com states the alleged warranty. The first states in pertinent part:

> HOW CAN I PROCESS MY RETURN OR EXCHANGE?

> WHAT IS YOUNGBLOOD'S RETURN POLICY?

> All of our products are 100% guaranteed. If you are not completely satisfied with your purchase from ybskin.com, you may return it within 30 days of receipt!

…

> Please note that only Youngblood products purchased from ybskin.com can be accepted for return.

The second is:

> CAN I RETURN AN ITEM NOT BOUGHT ON YBSKIN.COM?

> We will not accept orders that were purchased in Youngblood Mineral Cosmetics approved specialty stores, secondhand shops, or other retailers.

According to these website disclaimers, only Youngblood products purchased *directly* from Defendant's website come with this satisfaction guaranteed warranty, meaning products

---

[41] ECF No. 108-1 at ¶¶ 4-7.

purchased even from authorized retailers, do not.[42] Yet Pauline in her Affidavit, avers that they do.[43] It appears that Pauline is playing fast and loose with the truth.

But there is another problem facing Defendant. Youngblood admitted that the labeling of the Youngblood products does not contain the word warranty or guarantee.[44] Ostensibly the products also do not carry a disclaimer of the undisclosed warranty or guarantee. The Uniform Commercial Code ("UCC") however contemplates that a seller may disclaim warranties as long as the buyer reasonably understands it is being done. *American Coach Lines Of Orlando, Inc. v. North American Bus Industries, Inc.*, 2011 WL 653524 at *10 (MD Fla. 2011); *Rose v. ADT Security Services, Inc.*, 989 So.2d 1244, 1248 (Dist. Ct. of Appeal of Florida 1st Dist. 2008); *Knipp v. Weinbaum*, 351 So.2d 1081, 1084-85 (Dist. Ct. of Appeal of Florida, 3rd Dist. 1977).  Anyone purchasing a Youngblood product from a retailer would have no reason to visit Defendant's website, scroll down to the bottom and click through the hyperlinks in order to learn that Defendant was not providing its 100% return satisfaction guarantee to a product not purchased from its website.

Since both the warranty and the warranty disclaimer do not appear on the product, but only through hyperlinks at the bottom of Defendant's website, the disclaimer is ineffective as a matter of law. Therefore, under the UCC (Fla. Stat. § 672.2-316), Defendant would still have to honor its warranty on *all* sales of its products, assuming consumers were even aware of the warranty. The foregoing raises a material question of fact with respect to whether Plaintiff's Youngblood products, would be considered "new" under Amazon's guidelines. But there is more.  Dr. Toth testified that Amazon also was selling counterfeit Youngblood because Amazon was not an authorized seller.[45] Further, could Amazon be violating its own anti-counterfeiting policy by selling Youngblood products that were not "new", because as an unauthorized seller, they did not carry Defendant's warranty? In this regard, Kellon Goodson, Plaintiff's former director of ecommerce,[46] made it quite clear that all items sold by Amazon or through Amazon's "Fulfillment By Amazon" ("FBA") Program, could be returned by the customer for a refund. Notably, Plaintiff's Youngblood products were sold exclusively

---

[42] www.ybskin.com/pages/returns
[43] ECF No. 108-1  at ¶ 5.
[44] Plaintiff's Counter Statement of Material Facts, at ¶93.
[45] Plaintiff's Counter Statement of Material Facts, at ¶97.
[46] ECF No. 113-5, p. 11-12

through Amazon's FBA Program wherein Amazon would handle the shipping and accept returns on *all* items.[47]  Defendant proffers no evidence which refutes the former Director of Ecommerce's testimony.

From Goodson's testimony and the fact that it would be illogical that Amazon would violate its own policy guidelines, it can be  fairly  inferred that Amazon would not consider the Youngblood products it sold counterfeit much less inauthentic.  The foregoing likewise controverts Defendant's SOF ¶16, which *inter alia* states that it is undisputed that Amazon considers, "A product is inauthentic and counterfeit if the product is being sold without a warranty." Interestingly, Defendant's record citation is to Exhibits 2, 3, and 5 to Ms. Cohn's Declaration. Those rather voluminous Exhibits contain (1) Amazon's Anticounterfeiting Policy, (2) Ensuring product authenticity and quality and (3) Condition guidelines.  However, no specific page references are provided in SOF ¶16 to support this purported undisputed fact.

Next, Defendant's claim on page 8 of its *Motion* that Plaintiff does not allow returns of any of its cosmetics sold on its Amazon storefront, including Youngblood products, citing its SOF ¶15, which is page 58, lines 15-18 of Manuel Aguero's Deposition, for record support. However, Goodson was asked that same question at his deposition and as previously indicated, Goodson made it quite clear that the "no return policy" did not apply to Plaintiff's Youngblood products because they were sold through Amazon's "Fulfillment By Amazon" ("FBA") Program.  Amazon would handle the shipping and accept returns on *all* items, including Plaintiff's sales of Youngblood products.  In sum, Defendant's submission is riddled with contradictions, inaccuracies, and blatant misrepresentations of the records to foster its inauthentic and counterfeit claim. By refuting or controverting Defendant's bullet points and SOF regarding Plaintiff's alleged violations of Amazon's Policy Guidelines through competent and admissible evidence, Plaintiff has shown that there are triable issues of material fact regarding Amazon's policies pertaining to authenticity, requiring the denial of summary judgment.

ii.      *Defendant's Supposed Concerns Regarding The Secondary Market*

Defendant claims it had a legitimate concern that sales "…on the secondary market were degrading and diminishing, on a daily basis, the Youngblood brand as customers were

---

[47] ECF No. 113-5, p. 45:6-12, 48:4-25, 49:1-2, 18-23, and 157:5-15.

purchasing purported Youngblood products that were unauthorized and *potentially* expired or fake" (emphasis ours).[48] These are conclusory statements, empty rhetoric, devoid of evidentiary support.  Just as important, "potentially" selling either fake or expired goods, cannot justify Defendant's wonton, reckless and false counterfeit complaints to Amazon regarding Plaintiff. The cases Defendant relies upon were Lanham Act cases involving trademark infringement, namely *Otto Products, LLC v. Wang,* 2019 WL 1403022 (D. Co. 2019) and *Swiss Watch Intern., Inc. v. Movado Group, Inc.*, 2001 WL 362709980 (SD Fla. 2001). They serve as the platform for Defendant's justification argument on pages 8-9 of its motion. However, remove that platform and the justification argument topples like a house of cards.

Trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner. *Davidoff & CIE, S.A. v. PLD Int'I Corp.*, 263 F.3d 1297, 1301-02 (11th Cir. 2001); *Polymer Technology Corporation v. Mimran, 975 F. 2d 58 (2d Cir. 1992)*; *Brain Pharma, LLC v. Scalini*, 858 F.Supp.2d 1349, 1353 (SD Fla. 2012). That is so because the Lanham Act, under the first sale doctrine does not give mark holders the right to control subsequent, non-authorized resales, so long as the product sold is genuine.  *Bel Canto Design, Ltd. v. MSS HiFi, Inc., 837 F. Supp. 2d 208 (SDNY 2011).*

However, there are two exceptions to the first sale doctrine, to wit, material differences and failure to meet quality control standards. *Brain Pharma, supra* at 1353. A material difference is a difference that a consumer would consider relevant to a decision about whether to buy a product. *Id.* Defendant relies on the lack of its alleged warranty with respect to Plaintiff's sale of Youngblood products on Amazon as the material difference. Defendant's warranty however is rather limited, namely products purchased from its website may be returned within 30 days for a refund.

Plaintiff has established *supra* from the deposition testimony of Goodson that Plaintiff's Youngblood products are purchased exclusively through Amazon's FBA Program, which features an even more robust warranty/refund policy.[49]  In view of the foregoing, Plaintiff maintains that this is not a difference that either Amazon or an Amazon customer would find relevant and therefore material because either way, the consumer would get his/her money back, if not satisfied. And, ironically, a consumer might be better off buying

---

[48] ECF No. 108, p. 8.
[49] ECF No. 113-5, p. 45:10-12; 48:1-25: 49:1-23

from Plaintiff than from an authorized reseller, who might not have a return policy according to Defendant's website.

Regarding quality control, the Court in *Iberia Foods v. Romeo,* 150 F. 3d 298, 304 (3d Cir. 1998) cautioned that "Quality Control" is not a talisman the mere utterance of which entitles the trademark holder to judgment. Rather the burden is on Defendant to establish (i) the asserted quality control procedures are established, legitimate, substantial and non-pretextual; (ii) it abides by these procedures; (iii) sales of products that fail to conform to these procedures will diminish the value of the mark. *Brain Pharma* at 355, citing *Warner-Lambert Company. v. Northside Development Corporation,* 86 F. 3d 3,6 (2d Cir. 1996*). Defendant carries the additional burden of articulating what quality control standards, if any, apply to retail internet sales and how Plaintiff has failed to abide by them. *Wellnext, supra at *3.*

Defendant makes no attempt to satisfy these requirements and its quality control distributor guidelines have no application to retailers. Further, Goodson's previously cited testimony establishes that Amazon's FBA Program involves Amazon storing and shipping Defendant's products, not Plaintiff. Clearly, Plaintiff had a legal right to sell Youngblood products on Amazon, and Dr. Toth's conclusory claims at his deposition about how unauthorized resellers were diluting brand equity and his investment is pure "ecobabble". This anti-competitive economic justification argument should be rejected by the Court.

Finally citing *Ice Portal v. VFM Leonardo, Inc.*, 2010 WL 2351463 at *7 (SD Fla. 2010), Defendant on page 9 of its Motion argues that Plaintiff has proffered no evidence that Defendant's complaints to Amazon were made in bad faith or with malice. These are not elements however for tortious interference claim. The import of *Ice Portal* is the "Competition Privilege" defense to a tortious interference claim wherein the defendant has the burden of showing *inter alia* that (1) it did not employ improper means and (2) it did not intend to create an illegal restraint of competition. Other than being an unauthorized seller, Defendant has proffered no evidence that Plaintiff's Youngblood products bore unlawful reproductions of Defendant's registered trademarks, meaning they were counterfeit. However, a jury could rightly conclude that Defendant's admitted policy of submitting a scurrilous counterfeit complaint against *every* unauthorized Youngblood seller in order to get rid of them constituted improper means and was for the purpose of creating a restraint on free competition in the sale of Youngblood products. Being the rights holder did not give Defendant a license to lie in

order to lessen lawful competition.   In sum, Defendant's Competition Privilege defense should be rejected by the Court.

### D. *Causation*

#### 1. Generally and Prior Complaints

On page 10 of its Motion, Defendant argues that "…there is no record evidence that any complaint made by Youngblood caused Amazon to deactivate… [Plaintiff's] Amazon Storefront." And, "Plaintiff must come forth with evidence that Youngblood caused the deactivation of the Amazon Storefront."  As noted *supra*, after Youngblood complained to Amazon about Plaintiff selling counterfeit product, Amazon sent a notice stating that a counterfeit complaint had been made.[50] Indeed, between November 1 and 13, 2018, Amazzia filed 13 false  counterfeit complaints against Plaintiff with Amazon. They are summarized in the following email:



From:      Jamie Siegel
To:        Jason Toth; Rachel Kier; Geovanna Waters
Cc:        Daniel Le Blanc
Subject:   Meeting Follow-Up - Solu-Med/Argo Holdings
Date:      Friday, March 01, 2019 5:24:13 PM
Attachments: image001.png

Hi Team!

I just heard back from the team on your request for information regarding Life and Health Source (Solu-Med/Argo Holdings).  The report dates are listed below, and the retraction request was submitted twice on 12/4.

| ASIN | Date of Report | Removal Date |
|------|---------------|--------------|
| B00025G1JC | 11/1/2018 | 11/5/2018 |
| B00025G1K6 | 11/1/2018 | 11/5/2018 |
| B00025G1M4 | 11/11/2018 | 11/15/2018 |
|  | 11/13/2018 |  |
| B00025G1ME | 11/1/2018 | 11/5/2018 |
| B00025G1NI | 11/13/2018 | 11/15/2018 |
| B00025G1PG | 11/11/2018 | 11/13/2018 |
|  | 11/11/2018 | 11/15/2018 |
|  | 11/14/2018 |  |
| B00025G1TC | 11/1/2018 | 11/5/2018 |
| B00097DKUQ | 11/11/2018 | 11/15/2018 |
| B00329GR4O | 11/13/2018 | 11/15/2018 |
| B00513M2YI | 11/1/2018 | 11/5/2018 |

Thanks!

Regards,

**Jamie Siegel** | Account Manager

818.629.2008 | jamie@amazzia.com

This barrage of baseless complaints led to the deactivation of Plaintiff's store.[51]

---

[50] *Id.* at ¶¶61-63.

[51] *Id. at* ¶62.

This unquestionable documentary proof produced during the course of discovery establishes that Defendant's false counterfeit complaints were the cause of the deactivation of Plaintiff's Amazon Store. Defendant can allude to prior complaints, culled from Amazon's response to Defendant's subpoena (Defendant's Motion, page 11; Defendant's SOF ¶¶22-27) as the cause, but given the foregoing Notices from Amazon, at best the prior complaints create an issue of fact for the jury to decide with regard to causation.

2.  Plaintiff's Alleged Misrepresentations

Defendant on pages 11-13 of its Motion takes Plaintiff to task for its inability to get its selling privileges restored following Amazon's deactivation of Plaintiff's Amazon Store. Defendant claims that Plaintiff submitted three insufficient Plans Of Action, riddled with alleged misrepresentations, thereby violating Amazon's Code of Conduct, which led to its permanent deactivation on December 20, 2018. Thus Plaintiff, not Defendant, was the cause of its Store's demise.  This is  a transparent attempt by Defendant to shift the blame for the temporary and then permanent deactivation of Plaintiff's Amazon Store from itself to Plaintiff. Overlooked in this argument is that but for Defendant's thirteen false complaints to Amazon, Plaintiff would not have had to go through this almost impossible task of attempting to prove its innocence and the corrective measures it would employ in the future to ensure product authenticity.  Thus we are not going to take the bait and respond to the alleged numerous shortcomings and false statements Defendant claims Plaintiff made in the Three Plans of Action that were submitted in desperation due to Defendant's unjustified refusal to issue a retraction. If blame is assigned, that is where it lies.

In this regard, Plaintiff respectfully requests the Court to examine Defendant's Exhibits 21, 24, 25, 28, 29 and 30. These Exhibits are Notices which Amazon sent to Plaintiff after deactivating its store. Exhibit 21 dated November 15, 2018 advises that to process Plaintiff's appeal, it would be required to have Defendant send directly to Amazon a valid retraction. In the alternative, Plaintiff had to submit documentary proof of product authenticity, which as a secondary market retailer whose source was a secondary market wholesaler, Plaintiff could not do, although as Defendant's Exhibits show, Plaintiff made a prodigious effort to try to satisfy Amazon's requirements.  Clearly, getting Defendant to send a retraction was the most efficacious way to achieve restoration. This is borne out by Defendant's Exhibits 24, 25, and 28, Amazon's responses to each Plan of Action Plaintiff

submitted. The responses all state that the Plans were rejected because they did not establish product authenticity, and each referred to Defendant sending a valid retraction in connection with Plaintiff's appeal in order to obtain reactivation.

While Plaintiff continued to make efforts to provide a sufficient Plan of Action necessitated by Defendant's baseless counterfeit claims to Amazon, Plaintiff was also concomitantly trying to get Defendant to issue a retraction. On November 26, 2018, Plaintiff's counsel sent a letter to Defendant advising that as a result of its two counterfeit complaints, Amazon delisted Plaintiff's entire store.[52] The letter maintained that the complaints were false as these were not counterfeit Youngblood products.[53] Plaintiff's counsel demanded that Defendant send a retraction of its counterfeit complaints to Amazon, so that Amazon would reinstate Plaintiff.[54] Only three days later, Defendant notified Plaintiff's counsel that it would send a retraction.[55] However the notification that Defendant sent to Amazon merely stated that it had resolved its dispute with Plaintiff.[56] Since that did not constitute a retraction, understandably Amazon did not reinstate Plaintiff.

Plaintiff's counsel made several more attempts to get Defendant to issue a retraction, but his entreaties were ignored. These are summarized in Plaintiff's counsel's letter to Pauline Toth dated December 19, 2019.[57]  As a result, on December 20, 2018, Alisa Garrett in Defendant's Brand Protection Unit sent an email to Dr. Jason Toth M.D., Defendant's Vice-President explaining:

> "We filed a retraction BUT (sic) they want us to say we were
> wrong and they are not selling counterfeit products. We didn't
> admit to that. We just said we resolved the complaint with the
> seller….Even though we submitted a retraction their store is
> still not opened."[58]

Despite the gratuitous use of the word "retraction" in this internal communication, Defendant's communication to Amazon was anything but. A retraction would require an

---

[52] ECF No. 1-8, p. 17.
[53] *Id.*
[54] *Id.*
[55] ECF No. 1-5.
[56] ECF No. 1-6.
[57] ECF No. 1-8, p. 3.
[58] ECF No. 95:25-96:9.

admission that Plaintiff was not selling counterfeit Youngblood goods. Since Defendant refused to admit to that, this "retraction" did not satisfy Amazon, as evidenced by the aforesaid defense Exhibits' repeated references to send a "valid retraction." Stuck with Ms. Garrett's non-retraction missive, Dr. Toth at his deposition attempted the impossible maneuver of trying to fit a square peg (the promise to retract) into a round hole (the non-retraction notice to Amazon). Here are a few exchanges:

> Q.   BY MR. GOODMAN: So there's no question that Youngblood did agree to file a retraction?
>
> …
>
> A.   Well, we agreed to file a *response* (emphasis ours) with Amazon that we had resolved our differences and that by filing that, that was in no way an admission by us that the products weren't somehow authentic. And part of the condition of the retraction was that Solu-Med would no longer sell Youngblood products.
>
> Q.   But that was not contained in the November 29, 2018, email, was it?
>
> A.   Well, show me the email, please, and I'll refresh my memory.
>
> Q.   I will. I will.[59]

Thus, to suppress Defendant's deliberate failure to comply with its November 29, 2018 email, Toth replaced "retraction" with "response", and adds the unstated and nonexistent condition that Plaintiff stop selling Youngblood products. Toth made a further attempt to blink reality:

> Q.   BY MR. GOODMAN:    Do you understand what the word "retraction" means?
>
> A. Yes.    Common sense. It means that we will—we will file a — some
> communication with Amazon that we've resolved the differences between us and that Solu-Med has agreed to no longer sell— that's how I understood it.
>
> Q.   That's how you understood it?

---

[59] *ECF No.* 113-1, at p. 51:20-52:4, p. 52:16-22.

A.   Right.[60]

A party's testimony can be discounted at the summary judgment stage if it is inherently incredible as a matter of law. *Perez v. Suszczynski*, 809 F.3d 1213, 1221 (11th Cir. 2016) *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013); *Boston v. Alonso*, 2013 WL 6564217 at *7 (SD Fla. 2013); *Martelus v. Hathaway*, 2019 WL 1245865 at *6 (ND Fla. 2019).

Defendant's changing "retraction" to "response" and its blatantly false claim that its email to Amazon qualified as a retraction is incredible as a matter of law and must be discounted. The fact is that in November 2018 , as Defense Exhibit 21 shows, Defendant was in a unique position to extricate Plaintiff from the disastrous consequences of its false counterfeit complaint by simply informing Amazon that it was retracting or withdrawing its multiple complaints. This Defendant failed to do.

Rather Defendant sent a vague response that it resolved its complaint with Plaintiff, which was not a statement that anyone would consider to be a "valid "retraction. By failing to act when it had a duty to act (having no concrete proof that Plaintiff's Youngblood products were counterfeit), Defendant, rather than Plaintiff, must bear the responsibility for the prolonged shutdown of Plaintiff's Amazon store. The store was not reinstated until Plaintiff bypassed the appeals process by having its counsel write directly to Jeff Bezos, the head of Amazon.[61] The record evidence shows that (1) Defendant's false counterfeit complaints caused the suspension of Plaintiff's selling privileges and (2) that Defendant's unjustified refusal to issue a retraction was the primary cause of the continued deactivation of Plaintiff's store. In sum, the fault lies with Defendant and its attempt to shift the blame should be rejected.

### 3.   Alleged Lack Of Source Documents

Defendant argues on page 13 that there is no evidence of the source documents that would establish that Plaintiff actually sold genuine Youngblood products. As Defendant points out, Plaintiff was able to establish a distribution chain from Innopex to Q-Med (a related company) to Plaintiff, which was allegedly deficient, since Innopex was not an authorized distributor.   Thus, Defendant claims that Plaintiff cannot show that its

---

[60] ECF No. 113-1, p. 52:16-22.
[61] ECF No. 1-9.

Youngblood products were genuine and hence, Defendant is entitled to summary judgment. However, source documents are not the only means of demonstrating authenticity.

Plaintiff's burden on this issue would be by the preponderance of the evidence. At Dr. Toth's deposition as Defendant's Rule 30(b)(6) witness, Plaintiff's counsel showed Dr. Toth, the Youngblood products which Amazon specifically referenced in its November deactivation notice, *supra*, as being counterfeit per Defendant's complaints, which were identified as Exhibits 7-9.[62] Dr. Toth was asked to examine these Exhibits and made the following admissions: "Yes, they appear as Youngblood products," and "Yes. This is our pressed mineral foundation, honey. It appears to be our pressed mineral foundation, honey."[63]

Then there was this exchange:

```
Q. BY MR. GOODMAN:  Is there anything different about those
products,  physically,  that  different  from  Youngblood
products?

Mr. Vine:  Objection.

THE DEPONENT:   No. Other than how they were acquired, no.
They appear to be our product.[64]
```

In this regard the accompanying Declarations of Attorney Goodman and Plaintiff's co-founder Manuel Aguero establish (1) a complete chain of custody from Plaintiff's possession to Attorney Goodman's continued possession, custody and control and (2) these Exhibits were part of Plaintiff's Youngblood inventory in November, 2018.[65] Indeed this is also verified by one of Defendant's Exhibits, one of the Plans of Action submitted to Amazon, wherein Plaintiff states that it will no longer sell Youngblood products.[66]

It is anticipated that Defendant will challenge the admissibility of this deposition testimony on the ground that Plaintiff was required to make a Rule 26 Supplemental Disclosure prior to the deposition regarding these Exhibits. Technically, Defendant is correct. Dr. Toth's deposition was taken December 9, 2019, well before the end of fact discovery and well before the May trial date. According to the Goodman Declaration, he obtained these

---

[62] Plaintiff's Counter Statement of Facts, at ¶78.
[63] ECF No. 113-1 at 85:15-25, 86:1.
[64] *Id.* at p. 87:17-18.
[65] Declaration of Stanley Goodman, attached as Exhibit 2; Declaration of Manuel Aguero, attached as Exhibit 3.
[66] ECF No. 113-22, p. 2.

samples on November 18, 2019, about three weeks prior to Dr. Toth's deposition.  Patently, Defendant could hardly claim prejudice by this disclosure at its deposition, as the authenticity of these Youngblood products was a key issue and Plaintiff maintained that its Youngblood products were genuine. If Plaintiff had disclosed these Exhibits to Defendant prior to Toth's deposition, what then? At best, Defendant could have requested their production for inspection, but that is what Toth did on the record.  Defendant was always aware the product still sat on Solu-Med's shelf and yet not once took up Plaintiff's invitation for inspection.

Furthermore, nothing prevented Defendant from obtaining these samples after Toth's deposition for the purpose of scientific testing to determine authenticity, which it did not. Plaintiff maintains that the trier of fact is entitled to hear Dr. Toth's admissions which establish authenticity. This is an untoward attempt to suppress the truth.

But this is more.  Defendant has interposed justification as an affirmative defense to the tortious interference claim and truth to the trade libel/defamation claims. Undoubtedly Defendant bears the burden of proof that would require that it prove that Plaintiff was offering counterfeit Youngblood products. *See Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550-51 (11th Cir. 1990) (holding defendant bears the burden of proof any affirmative defense at trial); *Miami Herald Publishing Co. v. Brautigam*, 127 So.2d 718, 723 (Fla. 3d DCA 1961) (holding defense of truth, plus good motive, are affirmative defenses that Defendant holds the burden of proof). Defendant made no attempt to conduct any definitive scientific tests or analysis of Plaintiff's Youngblood products. Rather Defendant appeared content to rely on its misrepresentation of what Amazon deems counterfeit and its and Amazzia's erroneous view of this term to establish these defenses.  However, Defendant's unexplained failure to make any attempt to determine whether the goods in question were counterfeit would permit the jury to draw a negative inference that had Defendant done so, it would have determined that the goods were genuine, not counterfeit, and that is why Defendant did not conduct any scientific tests.

Therefore despite the absence of a documentary chain regarding the origin of the goods, Defendant's aforesaid admissions that the Exhibits were genuine Youngblood products and the aforesaid negative inference satisfy Plaintiff's evidentiary burden as to authenticity or at worst, create a triable issue of fact, sufficient to warrant the denial of summary judgment.

**E.  *Youngblood's FDUPTA Argument Fails***

In its motion, Youngblood makes a threefold argument why the FDUTPA claim fails. First, it argues that there is no "deceptive act" or "unfair practice" because there is no evidence that the products which Solu-Med was selling "were actually authentic and not counterfeit"; (2) there is "no evidence that Amazon relied on Youngblood's complaints" and (3) there is no evidence that Youngblood caused the complete shutdown of Solu-Med's store.[67] Youngblood is wrong in all respects as Defendant shall now demonstrate.

*1.   "Deceptive Act" & "Unfair Practice" Are Questions for Fact.*

Youngblood's first argument is that this Court must resolve *as a matter of law* the issue of whether it committed a "deceptive act" or "unfair practice."  That argument, however, is contrary to well-settled authority in this district holding that in FDUTPA litigation, the issue of "[w]hether particular conduct constitutes such an unfair or deceptive trade practice is a ***question of fact.***"  *See SMS Audio, LLC v. Belson*, No. 16-81308-CIV, 2017 WL 1533941, at *4 (S.D. Fla. Mar. 9, 2017) (denying summary judgment on FDUTPA claim) (emphasis added); *accord Cox v. Porsche Fin. Svcs., Inc.*, No. 16-23409-CIV, 2020 WL 837167, at *5 (S.D. Fla. Feb. 19, 2020) (denying summary judgment on FDUTPA claim); *Nature's Products, Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1322 (S.D. Fla. 2013) (issue of whether "conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine"); *Copans Motors, Inc. v. Porsche Cars N. Am., Inc.*, No. 14-60413-CIV, 2014 WL 2612308, at *6 (S.D. Fla. June 11, 2014) ("whether a particular act or conduct … is unfair or deceptive is a question for the fact finder").  Remarkably, most of Defendant's *own* cited cases on pages 14-15 in its

---

[67]     In a footnote on page 4 of its motion, Youngblood states – without any attendant argument -- that "there is no evidence that Amazon was a consumer."  That point is misleading and irrelevant.  Although FDUTPA does require consumer harm, there is certainly evidence of that in the record.  Specifically, members of the public who shop at Solu-Med's online store are themselves consumers, and they were indeed harmed by Youngblood's act of shutting down its competitor Solu-Med.  After all, Solu-Med was selling merchandise *at a lower price* than Youngblood was on Youngblood's website.  As such, the shutdown of Solu-Med necessarily resulted in the consuming public having to pay a higher price for the exact same merchandise.  By driving up prices through the unfair elimination of its competitor, Youngblood engaged in precisely the type of conduct that FDUTPA is intended to prevent.  *See* § 501.202(2), Fla. Stat. (stating a legislative intent for FDUTPA to protect the consuming public against "unfair methods of competition").

motion either denied a motion for summary judgment or granted a *plaintiff's* motion for summary judgment -- rulings that certainly do not help Defendant here.

Youngblood's argument is further flawed by its attempt to treat "deception" as a narrow concept under the statute – an approach that flagrantly disregards overwhelming authority that requires "deception" to be "construed liberally." *See, e.g., Cabrera v. Haims Motors, Inc.*, 288 F. Supp. 3d 1315, 1322, 1325 (S.D. Fla. 2017) (ruling that defendant was liable under FDUTPA "[i]n light of the liberal construction afforded to FDUTPA's provisions"), *relief from judgment granted on other grounds*, 2018 WL 5000016 (S.D. Fla. Jan. 24, 2018); *Cone Shipping, Ltd. v. Marine Diesel Specialists, Inc.*, No. 12-60341-CIV, 2012 WL 12887007, at *3 (S.D. Fla. July 27, 2012) ("[c]ourts interpreting the FDUTPA, however, have regarded the concept of unfair or deceptive trade practices as "extremely broad"). In fact, that principle of liberal construction appears in the statute itself. Specifically, § 501.202(2) provides:

> The provisions of this part shall be ***construed liberally***… [t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. (Emphasis added.)

Adhering to that statutory mandate, courts have further concluded that the concept of "deception" under FDUTPA is so broad that it even includes conduct in the nature of "innuendo" and "omissions" rather than just "outright false statements." *See, e.g., State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1327 (S.D. Fla. Sep. 25, 2017).

Against this backdrop, there is no sustainable basis for this Court to take this issue from the jury. While Defendant's motion contains its own self-serving evidence to purportedly justify its "counterfeiting" accusations against Solu-Med (ECF No. 108 at 15), the record also contains evidence showing that those accusations were totally false as demonstrated *supra* in this Response, which for summary judgment purposes, the Court must accept as true. On this evidence, it is clearly up to the jury to decide if that conduct was "deceptive" or "unfair." Accordingly, summary judgment is not appropriate. *See also Gov't Employees Ins. Co. v. DG Esthetic & Therapy Ctr., Inc.*, No. 18-20921-CIV, 2019 WL 1992930, at *8-9 (S.D. Fla. Apr. 19, 2019) (denying summary judgment on FDUTPA claim because there

were questions of fact as to "whether [the defendant] … was engaged in unfair and deceptive acts and practices").

### 2. *Reliance Is Not an Element of FDUTPA*.

Next, Youngblood argues that the FDUTPA claim fails as a matter of law because there is no evidence "that Amazon relied on Youngblood's complaints." Such an argument is misguided because reliance is not even an element of a FDUTPA claim. Indeed, the Eleventh Circuit has been quite clear on this point in recent cases. As the Eleventh Circuit explained in *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016), there are only three elements to establish a FDUTPA claim: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." After reciting those elements, the Court dispatched any notion that reliance is an element for FDUPTA:

> Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably. That is, a party asserting a deceptive trade practice claim **need not show actual reliance** on the representation or omission at issue.

*Id.* at 984 (emphasis added; citations omitted). That same point was also made in a prior Eleventh Circuit case. *See Fitzpatrick v. Gen'l Mills, Inc.*, 635 F. 3d 1279, 1283 (11th Cir. 2011) (affirming district court's ruling that "a plaintiff need not prove reliance on the allegedly false statement to recover damages under FDUTPA").

Not surprisingly, courts in this district have uniformly followed suit. *See, e.g., Cox, supra,* at *5 (in FDUTPA claim "a plaintiff need not prove reliance"); *Cabrera, supra,* at 1322–23 ("reliance is not required for causation under FDUTPA"); *Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1301 (S.D. Fla. 2011) (observing that Eleventh Circuit has been clear that reliance is not required for FDUTPA and refusing defendant's "invitation" to disregard that precedent). That approach makes logical sense because as these cases illustrate, a FDUPTA claim focuses on the *defendant's* practice -- not on the plaintiff's conduct. *See, e.g., Cabrera*, 288 F. Supp. 3d at 1323. The one case Youngblood has cited in its motion that dismissed a FDUTPA claim for lack of reliance -- namely, *Dolphin, LLC v. WCI Communities, Inc.*, No. 07–80241–CIV, 2008 WL 6894512 (S.D. Fla. Feb. 20, 2008) -- was issued in 2008 and therefore pre-dated all of current authorities holding that "reliance" is no longer required for FDUTPA. Youngblood's argument therefore fails. Moreover, from the aforesaid

documentary evidence, a jury could find that Amazon relied on Defendant's multiple complaints in shutting down Solu-Med's store.

      3.  *Causation is Question of Fact*.

In its final argument on this claim, Youngblood contends that there is no evidence that Youngblood caused the shutdown of Solu-Med's store on Amazon and that causation must be resolved as a matter of law in its favor.  This is a bogus argument.

First, causation is a quintessential fact question since it necessarily requires an examination as to the totality of the circumstances.  Indeed, courts in this district routinely hold that causation is an issue to be decided by the jury, not the court.  *See, e.g., Martorella v. Deutsche Bank Nat'l Tr. Co.*, No 12-80372-CIV, 2015 WL 10857441, at *1 (S.D. Fla. Nov. 9, 2015) (finding "genuine issues of material fact as to a causal link under FDUTPA"), *clarifying*, 161 F. Supp. 3d 1209, 1221 (S.D. Fla. 2015); *Hetrick v. Ideal Image Dev. Corp.*, 758 F. Supp. 2d 1220, 1230 (M.D. Fla. 2010) (whether "injury was caused" by defendant's actions is fact question precluding summary judgment on FDUTPA claim); *see generally Zaslow v. Louisville Ladder, Inc.*, No. 18-80091-CIV, 2019 WL 7376780, at *5 (S.D. Fla. Oct. 4, 2019) (denying summary judgment because "proximate causation is generally an issue of fact for the jury to decide"); *Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1317 (S.D. Fla. 2016) ("causation-in-fact is ordinarily a factual question reserved for the jury"), *citing*, *Dowdy v. Suzuki Motor Corp.*, 567 Fed. Appx. 890, 892 (11th Cir.2014).  That is likely why Defendant has not cited any cases to support its position on causation (except perhaps *Dolphin, supra*, which as noted turned on an absence of "reliance" and is thus outdated under the current state of the law).

Second, Youngblood's argument completely ignores record evidence supporting causation.  In this regard, the written warning that Amazon sent to Solu-Med shortly before it deactivated Solu-Med's store explicitly stated that it had received a "report from a rights owner that you are listing counterfeit products" and it explicitly identified the rights owner as "Youngblood Skin."[68]  This was followed by an Amazon notice that it was deactivating Plaintiff's store because it was selling counterfeit items.[69]  Amazon listed three Youngblood

---

[68] Plaintiff's Counter Statement of Material Facts, ¶61.
[69] *Id*. at ¶62.

products, which emanated from Youngblood's false complaints.[70]  From the documentary evidence alone, it is obvious that Youngblood caused the shutdown.  On top of that, Solu-Med has presented the testimony of its Amazon expert (Cory Rosenbaum) to further support causation.  He opined based on his extensive experience with Amazon and knowledge of Amazon's standard business practices that Youngblood's actions did indeed cause the complete shutdown of Solu-Med's store.[71]  Again, he opined that Youngblood crafted the wording of the counterfeit complaint in such a way as to virtually guarantee a complete shutdown of the store.[72]  Causation is therefore an issue for the jury to decide, and Youngblood's argument to the contrary must be rejected.

**F.** *Plaintiff's Defamation Argument Fails As Defendant Made a False Statement of Fact*

For brevity purposes, Plaintiff will rely on previous arguments in this Response to oppose Defendant's false statement argument.  In sum, Defendant made a patchwork and self-serving definition of counterfeit out of various Amazon's policies to justify its false statement as explained *supra* on pages 6, 8, 11-12.  Amazon submitted a declaration defining counterfeit, and this definition does not mirror Defendant's arduous journey through various Amazon policies to compile its justification that the statement was not false.[73]  For defamation-related claims, truth is indeed a defense **as long as its coupled with good motive** (*see Williamson v. Digital Risk, LLC*, 2020 WL 434954 at *6 (M.D. Fla. Jan. 28, 2020); however, when the record is laden with a dispute over whether the statement was true, a genuine issue of material facts exists and the issue must go to the jury.  *Lagassey v. Roy*, 2017 WL 1397410, at *7 (S.D. Fla. Jan. 31 2017), citing *Herman v. Kafka*, 2016 WL 5349211, at *1 (11th Cir. Sept. 26 2016).  "Truth and good motive are jury issues in defamation cases." *Williamson*, 2020 WL 434954 at *6, citing *Lipsig v. Ramlawi*, 760 So.2d 170, 183 (Fla. 3d DCA 2000) (holding under Florida law, truth is only a defense to defamation when its coupled with good motive).  As we have demonstrated *supra*, there is a reasonable view of the record (Toth and Fikhman's testimony, Defendants' 13 complaints against Plaintiff in a less than two week period)[74] that the real motive Defendant had when making the statements to Amazon was to get Plaintiff's

---

[70] *Id.*

[71] *See generally*, ECF No. 110-2.

[72] ECF No. 110-2 at 126.

[73] Plaintiff's Counter Statement of Material Facts, at ¶86.

[74] Plaintiff's Counter Statement of Material Facts, ¶¶67, 69-70, 75, 81-82, 84, and 89.

products off Amazon, so Youngblood could control the market and the pricing. Finally, in response to Defendant's argument that the there is no invoice to prove authenticity, as noted in *supra* in §D(3), Defendant's representative admitted the products were genuine and at the very least, creates a fact dispute that must be given to the jury. For summary judgment purposes, the court must take disputed facts in the light most favorable to non-moving party. There is certainly a fact dispute as to whether Defendant's counterfeit complaints were true and made with good motive.

### G. *The Single Publication Rule Does Not Apply to Bar Defamation and/or Trade Libel*:

On page 16, FN3 of its *Motion*, Defendant raises the single publication rule as a bar/defense to defamation and trade libel.   As the record is clear, Defendant made numerous publications to Amazon throughout this matter; in fact the email embedded in page 18 of this response lists at least thirteen different publications Defendant made to Amazon. In addition, Defendant's acts after making these publications – broken promises, unanswered demands and reckless inaction also caused injury to Plaintiff.   As such, the single publication rule does not apply. *Geller v. Von Hagens*, 2011 WL 2434217, at *4 (M.D. Fla. June 13, 2011) (denying motion to dismiss based on single publication rule because tortious interference claim is not simply a restatement of the defamation claim but is based on separate conduct engaged in by the defendants).   Furthermore, the single publication rule does not apply if the defamation claim succeeds. *See Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So.2d 204, 209 (Fla. 4th DCA 2002); *Baker v. Joseph*, 2013 WL 12094322 at *5 (M.D. Fla. Oct. 31, 2017).

### H. *Measure of Damages*

Because Plaintiff has exceeded its page limitations, it refers to the Court to its Response to Defendant's *Daubert* Motion to refute Defendant's Summary Judgment argument made in *Section V*.   In sum, just because a business records sales, this does not mean that it remains financially viable.   Plaintiff's efforts to mitigate loss by selling off its remaining inventory is actually more proof that the business was destroyed.   Even assuming Defendant is correct (it is not), Plaintiff can still submit a lost profit claim to the jury through the corporate representative of Solu-Med.   *See Fed. R. Evid. 701 (advisory committee notes); Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, Ltd., 320 F.3d 1213, 1223 (11th Cir. 2003).   The numbers are not complicated, despite Defendant's attempt to confuse and dilute them.

## III. Conclusion

For the reasons stated above, Defendant's motion for summary judgment fails in all respects.  The issues developed by the record in this matter create a fact dispute that must be submitted to the jury.  For these reasons, Plaintiff Solu-Med, Inc. respectfully requests that the Court deny Defendant's motion for summary judgment in all respects.

Respectfully submitted,

BLACK LAW P.A.
1401 E Broward Blvd.  Suite 204
Fort Lauderdale FL 33301
ph-954.320.6220  fx-954.320.6005

By:          s/ Kelsey K. Black
             Kelsey K. Black
             Florida Bar No. 078925
             kelsey@kkbpa.com


and

Stanley R. Goodman, Esq. (admitted *pro hac vice*)
Goodman & Saperstein
666 Old Country Road, Suite 200
Garden City, NY  11530
Telephone:  (516) 227-2100
Facsimile:   (516) 227-2108